UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
-----------------------------------------------------------------X
                              :

MIKHAIL FRIDMAN, PETR AVEN, AND        :
GERMAN KHAN,                            :      Case No. _____/2017
c/o CARTER LEDYARD & MILBURN LLP      :
2 Wall Street                              :
New York, NY 10005,                   :       **COMPLAINT**
                              :
                Plaintiffs,     :
                              :
           -v-                     :
                              :
BEAN LLC (A/K/A FUSION GPS) AND      :
GLENN SIMPSON,                      :
1700 Connecticut Avenue, Suite 400       :
Washington, D.C. 20009,               :
                              :
                Defendants.   :
-----------------------------------------------------------------X

## COMPLAINT

Plaintiffs Mikhail Fridman, Petr Aven, and German Khan, by their attorneys

Carter Ledyard & Milburn LLP, allege as follows:

## INTRODUCTION

1.      This is a defamation case brought by three international businessmen who

were defamed in widely disseminated political opposition research reports commissioned

by political opponents of candidate Donald Trump.  The reports (which came to be

known as the "Trump Dossier" and the "Dossier") were published in advance of the 2016

presidential election by the Defendants:  the Washington, D.C. based firm Fusion GPS

("Fusion") and its principal Glenn Simpson, a former journalist specializing in political

opposition research.  In that role, the Defendants traffic in procuring damaging

information about political candidates.  The reports are gravely damaging in that they

falsely accuse the Plaintiffs—and Alfa ("Alfa"), a consortium in which the Plaintiffs are

investors—of criminal conduct and alleged cooperation with the "Kremlin" to influence

the 2016 presidential election.  But neither the Plaintiffs nor Alfa committed any of the

acts irresponsibly attributed to them by the Defendants.  To the contrary, the Plaintiffs

and Alfa are collateral damage in a U.S. political operation—conducted by the

Defendants—that has nothing to do with the Plaintiffs.

       2.      The specific "report" that includes defamatory statements about the

Plaintiffs is one of  seventeen written Company Intelligence Reports 2016 ("CIRs") that

comprise the Trump Dossier.  The Defendants included Company Intelligence Report

112 (the "Report" or "CIR 112") in the Trump Dossier, even though the Trump Dossier's

themes have nothing to do with the Plaintiffs.  Broadly, those reports purport to describe

details of an alleged scheme between the Russian government and the Trump presidential

campaign to unlawfully manipulate the result of the presidential election in favor of

candidate Trump.  The Defendants gathered these reports in the process of conducting

"opposition research" (known as "oppo research" by its practitioners and the media)

against Trump.  Opposition research, in essence, is the gathering of information for the

purpose of eventually discrediting or otherwise harming a candidate for a public office.

Opposition research is neither objective nor neutral.  Instead, it is skewed from the outset

in favor of appearing to find negative information about individuals—the essence of the

product that political opposition research practitioners are hired to produce.

3.       As described below, the Defendants were initially hired to conduct this opposition research by Republican Party political opponents of candidate Trump.  Those political opponents sought to gather discrediting information about candidate Trump to thwart his presidential run, including any connections he might have to Russian businesses or Russia's government.  To perform that research, the Defendants hired a private investigator—a former British intelligence officer named Christopher Steele, who operated through an entity known as Orbis Business Intelligence Limited ("Orbis"). Steele used his own Russian sources to compile the reports, which were then delivered to the Defendants over the course of several months.  Eventually, the reports, including the false and defamatory Report at the heart of this case, were assembled in the document that has come to be known to the public as the Trump Dossier.  Even though the Dossier contained unverified allegations, Defendants recklessly placed it beyond their control and allowed it to fall into the hands of media devoted to breaking news on the hottest subject of the day:  the Trump candidacy.

4.       One of the seventeen reports in the Dossier—CIR 112—accused the Plaintiffs of criminal conduct and participation in an alleged Trump-Russia scheme to influence the 2016 presidential election.  Defendants knew that this Report was not verified, and that it defamed Plaintiffs on its face.  Defendants could easily have removed that Report from the Dossier before they started peddling the Dossier to media and journalists in September and October 2016.  They chose not to do so.  Nor did they attempt to determine the veracity of that Report with the Plaintiffs themselves.

5.     At all times during the Defendants' engagement of Orbis and Steele, it

was either intended or clearly foreseeable that the Dossier's contents would be

republished (in whole or in part) to third parties, either by the Defendants themselves or

their clients.  Indeed, that is the entire purpose of "oppo research" in politics.  Those third

parties included government officials, as well as news media and journalists who could

make its content public.

6.     On information and belief, Defendants arranged for Steele to brief selected

members of the print and online media about the information he was compiling on

candidate Trump.  Consistent with the intended purpose of "oppo research" to publicly

discredit its target, Steele's briefings were designed to generate interest in the Dossier and

secure its eventual public dissemination.  Briefings were held for journalists from the

New York Times, the Washington Post, CNN, Yahoo News, and others in September

2016.  Shortly thereafter, Yahoo News published an article by Michael Isikoff that

described some of the content of the Dossier (referred to there as "intelligence reports"

and "reports"), which was still being compiled at that time.[1]  Many other media articles

reported speculative accounts of the Dossier's existence and contents.  In October 2016,

Steele was interviewed by David Corn, a writer for Mother Jones, which on October 31,

2016 published an article headlined "A Veteran Spy Has Given The FBI Information

Alleging a Russian Operation to Cultivate Donald Trump."[2]  The Corn article stated that

it had "reviewed" the early reports in the Dossier, and then quoted from those reports as

---

[1]  https://www.yahoo.com/news/u-s-intel-officials-probe-ties-between-trump-adviser-and-kremlin-175046002.html

[2]  https://www.motherjones.com/politics/2016/10/veteran-spy-gave-fbi-info-alleging-russian-operation-cultivate-donald-trump/

well as statements made by Steele in the interview.  The public dissemination of the

Dossier's content had begun in earnest.

7.      In addition to cultivating media interest, the Defendants also organized or

approved a meeting in Great Britain between Steele and David Kramer, a director of a

private foundation led by U.S. Senator John McCain.  The purpose of that meeting was to

brief Kramer on behalf of Senator McCain, who at the time was an outspoken critic of

Trump's candidacy.  Subsequently, in November 2016, Defendants provided a copy of

the Dossier's first sixteen reports, including the Report that falsely accused and defamed

Plaintiffs, to Kramer for redelivery to Senator McCain.

8.      As the 2016 presidential election neared, both print and online media in

the United States and abroad began to expand their coverage of the Dossier and its

alleged content.  That coverage only intensified after Trump won the election.  On

January 10, 2017, one of those media entities, BuzzFeed, Inc., published the entire

Dossier on the Internet, describing it as "explosive."  The copy of the Dossier that

BuzzFeed published included the false and defamatory allegations about the Plaintiffs

and Alfa, along with an article entitled "These Reports Allege Trump Has Deep Ties to

Russia."[3]  The Dossier misspells Alfa's name throughout, incorrectly spelling it as

"Alpha."  In a recent court filing, Fusion admitted that it had "pre-publication"

communications with BuzzFeed about its publication.[4]

---

[3]  https://www.buzzfeed.com/kenbensinger/these-reports-allege-trump-has-deep-ties-to-russia?utm_term=.srp6v32Bxl

[4]  Non-Party Fusion GPS's Motion to Quash Third-Party Subpoena or, in the Alternative, for a Protective Order at 1-2, *In re Third Party Subpoena to Fusion GPS*, (No.1:17-mc-02171-TSC), (D.D.C., August 31, 2017).

9.      The Defendants intended, anticipated, or foresaw a high likelihood that allowing their clients and/or the media access to the Dossier's defamatory content would result in its republication by news media outlets, including online news media such as BuzzFeed.

10.     Plaintiffs seek an award of compensatory and punitive damages for the harm to their personal and professional reputations, current business interests, and the impairment of business opportunities that resulted from the blatantly false and defamatory statements and implications about them published by the Defendants and republished by BuzzFeed and countless other media around the world.

## THE PARTIES

11.     Plaintiffs Fridman, Aven, and Khan are ultimate beneficial owners of Alfa.  Fridman and Khan are each citizens of both Russia and Israel, and Aven is a citizen of Russia.

12.     On information and belief, defendant Bean LLC is a Delaware corporation that conducts business under the name Fusion GPS.  Fusion is registered to transact business in Washington, D.C., where it is headquartered and conducts its operations.

13.     Defendant Glenn Simpson, on information and belief, is a principal of Fusion.  He was the principal actor involved in securing the Dossier from Orbis and Steele, arranging for press briefings about it in the late summer and early fall of 2016, and publishing the Dossier to Fusion's clients, government officials, and the news media. Simpson conducts his business for Fusion from an office in Washington, D.C., where his business included his activities with respect to the Dossier.  Both Simpson and his sub-

contractor Steele used their prior experience as, respectively, an investigative journalist

for the Wall Street Journal and an operative in British intelligence covering Russian

matters, to give their "oppo research" output a gloss of credibility and reliability which,

in this case, was unwarranted.  Neither of them has ever stated that the Dossier and CIR

112 were compiled in a fashion that accords with standards observed in their professions

for establishing the credibility of sources and for verifying information provided by the

sources.  To the contrary, Steele has stated publicly that he did not abide by such

standards in compiling the Dossier.[5]

## JURISDICTION AND VENUE

14.     This case is within this Court's jurisdiction pursuant to 28 U.S.C. §

1332(a)(2).  Venue is proper in this District pursuant to 28 U.S.C. § 1391.  The matter in

controversy in the cause of action asserted herein exceeds $75,000.

## FACTUAL ALLEGATIONS

15.     On information and belief, the Defendants were engaged by Republican

Party political opponents of Donald Trump prior to his nomination as the Republican

presidential candidate.  The Defendants were tasked with conducting "oppo research"

against Trump, including the gathering of compromising and salacious information about

Trump's personal behavior and business dealings in Russia.  The Defendants in turn

engaged Orbis and Steele for assistance in completing this task.

---

[5]  Defendants' Response to Claimants' Request For Information, *Gubarev, et al. v. Orbis Business Intelligence Limited and Christopher Steele*, Claim No. HQ17D00413, In The High Court of Justice, Queens Bench Division, May 18, 2017.

16.     Orbis proceeded to research Trump's personal behavior in Russia and business dealings with Russian government officials, business leaders, and business entities.  Steele compiled the "investigative" results into at least seventeen written CIR for delivery to the Defendants in Washington, D.C.  The CIRs included raw, unverified information.

17.     After Trump received the Republican nomination for President in July 2016, the Defendants' Republican clients terminated their relationship with Fusion. Media reports subsequently surfaced asserting that Fusion had entered into a new engagement with Democratic Party operatives interested in using the oppo research to support Hillary Clinton's candidacy.

18.     As they continued their work for their new clients, the Defendants knew, anticipated or reasonably should have foreseen that once in the hands of third parties— such as their new clients, other political operatives, or the media—the CIRs would be further disseminated publicly, thereby fostering widespread discussion about them in the United States and worldwide.  That is exactly what happened.  Much of that media attention and public discussion focused on Defendants' and Steele's roles in the creation and dissemination of the Dossier, and included interviews with them.  During this campaign to promote the public dissemination of their "oppo research," which, upon information and belief, included the provision of background briefing to the media by Defendants without attribution, Defendants never vouched for the credibility of their sources or the accuracy and reliability of the content of the Dossier and CIR 112.

Defendants published the Dossier and CIR 112 despite the fact that they did not know whether the defamatory accusations in CIR 112 about Plaintiffs were true.

19.     CIR 112 specifically discusses the Plaintiffs.  Its title, by itself, is defamatory:  "RUSSIA/US PRESIDENTIAL ELECTION:  KREMLIN-ALPHA GROUP CO-OPERATION."  CIR 112 suggests that Alfa and its executives, including the Plaintiffs, "cooperated" in an alleged Kremlin-orchestrated campaign to interfere in the 2016 U.S. presidential election.

20.     CIR 112 then makes, in sections labeled "Summary" and "Detail," a series of factual allegations about the "current closeness" of an "Alpha Group/PUTIN relationship," including that "[s]ignificant favors continue to be done in both directions" and that "FRIDMAN and AVEN [are] still giving informal advice to PUTIN, especially on the US."

21.     The Summary section of CIR 112 identifies a former employee of Alfa, Oleg Govorun, who is now the head of a government department in Putin's administration, as a "key intermediary" in the "PUTIN-Alfa relationship."  CIR 112 alleges that Govorun "delivered illicit cash directly to PUTIN" "throughout the 1990s," when Govorun was an "Alpha executive" and Putin was the Deputy Mayor of St. Petersburg.

22.     The first paragraph of the Detail section of CIR 112 then states the full names of Plaintiffs Fridman, Aven, and Khan.  It then includes a report from a "Russian government official:"

> although they have had their ups and downs, the leading
> figures in Alpha currently are on very good terms with

> PUTIN.  Significant favors continued to be done in both directions, primarily political ones for PUTIN and business/legal ones for Alpha.  Also, FRIDMAN and AVEN continued to give informal advice to PUTIN on foreign policy, and especially about the US where he distrusted advice being given him by officials.

23.     Under any reasonable reading, Plaintiffs Fridman, Aven, and Khan, along with Alfa, are alleged to maintain a highly inappropriate, and even criminal, relationship with Putin.  By clear and defamatory implication, Plaintiffs are also alleged to be involved in a Kremlin-orchestrated campaign to interfere in the 2016 U.S. election.

24.     The second paragraph of the Detail section alleges that Mr. Fridman "recently met directly with PUTIN" and that "much of the dialogue and business between them was mediated" by Govorun, the former Alfa employee.  The paragraph describes Govorun as a "senior Presidential Administration official" who is "trusted by PUTIN:"

> during the 1990s GOVORUN had been Head of Government Relations at Alpha Group and in reality the 'driver' and 'bag carrier' used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St. Petersburg.  Given that and the continuing sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN.

25.     These allegations are false.  And their defamatory nature is clear:  CIR 112 alleges that, in the 1990s, Alfa (a member of "Alpha Group") and three of its largest beneficial owners purportedly engaged in acts of criminal bribery of Vladimir Putin, a public official, to secure favorable business treatment.

26.     That statement, particularly when considered in the context of the Dossier as a whole, implies that the alleged improper relationship between Alfa, the Plaintiffs,

and Putin is currently ongoing, and that Govorun, who is now an official in Putin's

administration, serves as an intermediary.

27.     The third paragraph of the Detail section characterizes "the PUTIN-Alpha

relationship as both a carrot and stick:"

> Alpha held 'kompromat' on PUTIN and his corrupt
> business activities from the 1990s whilst although not
> personally overly bothered by Alpha's failure to reinvest
> the proceeds of its TNK oil company sales into the Russian
> economy since, the Russian president was able to use
> pressure on this count from senior Kremlin colleagues as a
> lever on FRIDMAN and AVEN to make them do his
> political bidding.

28.     This passage is defamatory many times over.  It suggests that Plaintiffs

Fridman and Aven use their knowledge of past bribery of Putin—"kompromat"—as a

means of criminally extorting continuing favorable treatment for their business interests

from his government.  It also implies that Alfa and two of its largest beneficial owners

willingly maintain a close relationship with Putin and cooperated in some unspecified

way in the Kremlin's alleged campaign to interfere in the U.S. election in an effort to

avoid retribution from Putin for not reinvesting business proceeds in Russia.

29.     The statements about the Plaintiffs in the Dossier are false, defamatory,

and gravely damaging.

## CAUSE OF ACTION

30.     Plaintiffs repeat and reallege paragraphs 1-29 above.

31.     By their direct and intentional publication to third parties such as clients,

news media, journalists, and others, and by the foreseeable republication of the Dossier

and CIR 112 by someone in that group, the Defendants published to a worldwide public false and defamatory statements concerning Plaintiffs and Alfa, including that:

       (a)     they are implicated in the scandalous allegations involving Russia and President Trump referred to in CIR 112 and the other CIRs in the Dossier;

       (b)     they and other officials and employees of Alfa "cooperated" with an alleged Kremlin campaign to interfere in the U.S. presidential election;

       (c)     they are parties to a highly inappropriate, and even criminal, relationship with Vladimir Putin;

       (d)     they engaged in acts of criminal bribery of Putin, then the Deputy Mayor of St. Petersburg, in the 1990s to secure favorable business treatment; and

       (e)     they continue to use their knowledge of past bribery of Putin as a means of criminally extorting continuing favorable treatment for their business interests from the Putin government.

32.     Readers of the CIRs and Dossier were also led to understand, incorrectly, that as a result of their alleged past—and possibly current—close relationships and corrupt dealings, the Plaintiffs and Alfa were and are required to do Putin's bidding, including by cooperating in the Kremlin's recent alleged efforts to influence the outcome of the recent U.S. presidential election.

33.     The false statements by the Defendants referred to above defamed the Plaintiffs and Alfa, and have caused and will continue to cause serious injury to their personal, professional, and institutional reputations.

34.     The false and defamatory statements published and republished by the

Defendants concerning the Plaintiffs and Alfa, as well as the obvious implications of

those statements, were made negligently or with reckless disregard of whether they were

true or false.

35.     Defendants are liable for the defamation of Plaintiffs and Alfa, and the

resulting harm caused by the news media coverage of the Dossier, including the

republication by BuzzFeed and countless other media.

WHEREFORE, Plaintiffs Mikhail Fridman, Petr Aven, and German Khan

demand judgment against Defendants Bean LLC, Fusion GPS, and Glenn Simpson for:

a.     compensatory damages in an amount to be proved at trial, together with

interest and the costs and disbursements of this action, plus reasonable attorneys fees;

b.     punitive damages in an amount to be determined at trial; and

c.     such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       October 3, 2017

By:     _____*/s/ Alan S. Lewis*_____
        Alan S. Lewis, Esq.
        John J. Walsh, Esq.
        CARTER LEDYARD & MILBURN LLP
        2 Wall Street
        New York, NY 10005
        Telephone:   212-238-8647
        *New York Counsel for Plaintiffs*
        *Mikhail Fridman, et al.*

By:     _____*/s/ Kim H. Sperduto*_____
        Kim H. Sperduto, Esq. (# 416127)
        Sperduto Thompson PLC
        1133 Twentieth Street, NW Second Floor

-13-

Washington, DC 20036
Telephone:     202-408-8900

*Local Counsel for Plaintiffs*
 *Mikhail Fridman et al.*