# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MIKHAIL FRIDMAN, PETR AVEN, and GERMAN KHAN, <br><br> Plaintiffs, <br><br> v. <br><br> BEAN LLC a/k/a FUSION GPS, and GLENN SIMPSON, <br><br> Defendants. | Civil Case No. 1:17-cv-2041-RJL |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

PUBLIC CONTROVERSY CONCERNING THE RUSSIAN OLIGARCHY,
INCLUDING THE THREE OLIGARCH PLAINTIFFS IN THIS CASE ................................... 3

A.      The Russian Oligarchy ........................................................................................... 3

B.      Oligarchs Fridman, Aven, and Khan ...................................................................... 5

        i.    Plaintiffs' Careers and Fortunes .................................................................. 6

        ii.   Public Attention on Plaintiffs' Relationship with the Russian State ........... 9

        iii.  Persistent Allegations of Wrongdoing in the Media .................................. 11

CIR 112 AND THE DOSSIER ........................................................................................... 13

ARGUMENT .................................................................................................................... 14

I.    Standard of Law ........................................................................................................ 14

II.   Statements in CIR 112 about the oligarch Plaintiffs, such as having a good
      relationship with President Putin, are not defamatory ........................................... 16

         A.  The title of CIR 112 is not defamatory .................................................... 16

         B.  The first paragraph of CIR 112 is not defamatory .................................... 17

         C.  With the possible exception of one statement, the second paragraph of CIR 112 is not
             defamatory ............................................................................................... 20

         D.  The third paragraph of CIR 112 is not defamatory .................................. 21

III.  Plaintiffs are public figures for the purposes of the public controversies addressed
      by CIR 112: Russian oligarchs' political-business relationships with the Russian state
      and President Putin and the conduct of those parties with respect to those relationships ..... 23

         A.  Legal Standard ......................................................................................... 23

         B.  Public Controversy ................................................................................... 24

         C.  Plaintiffs' Prominence in the Controversy ............................................... 25

         D.  Germaneness ............................................................................................ 27

E. The public controversy at issue in CIR 112 is not the U.S. presidential election, but even if CIR 112 touches on that controversy, Plaintiffs are still public figures ........................................................................................ 28

IV. Plaintiffs have made no factual allegations that would support a plausible inference of actual malice ........................................................................................................................ 29

V. Plaintiffs have inadequately pleaded publication by Defendants to a third party ................. 31

    A. "Briefing" of journalists ............................................................................................ 31

    B. Delivery of the dossier to Senator McCain ............................................................... 32

    C. BuzzFeed's publication of CIR 112 .......................................................................... 35

    D. Conclusory allegation ............................................................................................... 36

VI. Any publication of CIR 112 is privileged under the doctrine of neutral reportage ............... 37

CONCLUSION ........................................................................................................................ 38

# TABLE OF AUTHORITIES

## CASES

*Adelson v. Harris,*
   973 F. Supp. 2d 467 (S.D.N.Y. 2013) .................................................................... 19

*Am. Petroleum Inst. v. Technomedia Int'l Inc.,*
   699 F. Supp. 2d 258 (D.D.C. 2010) ....................................................................... 36

*\*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ................................................................... 14, 29, 32, 36

*Barry v. Time, Inc.,*
   584 F. Supp. 1110 (N.D. Cal. 1984) ..................................................................... 37

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................................. 14

*\*Boley v. Atl. Monthly Grp.,*
   950 F. Supp. 2d 249 (D.D.C. 2013) ........................................................... 19, 24, 27

*Buckley v. Littell,*
   539 F.2d 882 (2d Cir. 1976) ................................................................................. 19

*Clyburn v. News World Commc'ns, Inc.,*
   903 F.2d 29 (D.C. Cir. 2003) ............................................................................... 30

*Coles v. Wash. Free Weekly, Inc.,*
   881 F. Supp. 26 (D.D.C. 1995) ....................................................................... 15, 17

*\*Deripaska v. AP,*
   Civ. Action No. 17-00913 (ESH), 2017 WL 4685297 (D.D.C. Oct. 17, 2017) ............... *passim*

*Effie Film, LLC v. Pomerance,*
   909 F. Supp. 2d 273 (S.D.N.Y. 2012) ................................................................... 15

*\*Farah v. Esquire Mag.,*
   736 F.3d 528 (D.C. Cir. 2013) ..................................................................... 15, 16, 22

*Golden N. Airways, Inc. v. Tanana Publ'g Co.,*
   218 F.2d 612, 625 (9th Cir. 1954) ....................................................................... 18

*Harte-Hanks Commc'ns v. Connaughton,*
   491 U.S. 657 (1989) ............................................................................................. 30

*Hogan v. Winder*,
   762 F.3d 1096 (10th Cir. 2014) .......................................................... 17

*Hourani v. Psybersolutions LLC*,
   165 F. Supp. 3d 128 (D.D.C. 2016)
   *aff'd*, 690 F. App'x 1 (D.C. Cir. 2017) .............................................. 24

*In re United Press Int'l*,
   106 B.R. 323 (D.D.C. 1989) ............................................................... 37

*Jankovic v. Int'l Crisis Grp.*,
   494 F.3d 1080 (D.C. Cir. 2007) ............................................. 15, 20, 31

*Jankovic v. Int'l Crisis Grp.*,
   822 F.3d 576 (D.C. Cir. 2016) ................................................... *passim*

*Kowal v. MCI Commc'ns Corp.*,
   16 F.3d 1271 (D.C. Cir. 1994) ........................................................... 14

*Lohrenz v. Donnelly*,
   350 F.3d 1272 (D.C. Cir. 2003) ......................................................... 30

*McCabe v. Rattiner*,
   814 F.2d 839 (1st Cir. 1987) .............................................................. 19

*McFarlane v. Sheridan Square Press, Inc.*,
   91 F.3d 1501 (D.C. Cir. 1996) ..................................................... 29, 31

*Milkovich v. Lorain Journal Co.*,
   497 U.S. 1 (1990).......................................................................... 16, 21

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1995)............................................................................ 29

*Novecon v. Bulgarian-Am. Enter. Fund*,
   977 F. Supp. 45 (D.D.C. 1997) .......................................................... 26

*Nurriddin v. Bolden*,
   818 F.3d 751 (D.C. Cir. 2016) ........................................................... 14

*OAO Alfa Bank v. Center for Public Integrity*,
   387 F. Supp. 2d 20 (D.D.C. 2005) .............................................. *passim*

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*,
   418 U.S. 264 (1974)....................................................................... 18-19

*Ollman v. Evans*,
   750 F.2d 970 (D.C. Cir. 1984) ..................................................... 18, 21

*Parisi v. Sinclair*,
845 F. Supp. 2d 215 (D.D.C. 2012) ................................................................. 31

*Phantom Touring, Inc. v. Affiliated Publ'ns*,
953 F.2d 724 (1st Cir. 1992) ......................................................................... 19

*Premier Growth Fund v. Alliance Capital Mgmt.*,
435 F.3d 396 (3d Cir. 2006) ......................................................................... 15

*Provisional Gov't of New Afrika v. ABC, Inc.*,
609 F. Supp. 104 (D.D.C. 1985) ................................................................... 20

*Q Int'l Courier, Inc. v. Seagraves*,
No. 95-1554 (RMU), 1999 WL 1027034 (D.D.C. Feb. 26, 1999) ..................... 16-17

*Rubenstein v. Manhattan & Bronx Surface Operating Auth.*,
No. CV-96-902, 1997 WL 833456 (E.D.N.Y. Oct. 8, 1997)............................... 36

*Smith v. District of Columbia*,
399 A.2d 213 (D.C. 1979) ............................................................................. 34

*Sunshine Sportswear & Elecs., Inc. v. WSOC Television, Inc.*,
738 F. Supp. 1499 (D.S.C. 1989) ................................................................... 37

*Tavoulareas v. Piro*,
817 F.2d 762 (D.C. Cir. 1987) ........................................................... 23, 26, 27

*Vreven v. Am. Ass'n of Retired Persons*,
604 F. Supp. 2d 9 (D.D.C. 2009) ................................................................... 36

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
592 F.3d 954 (9th Cir. 2010) ......................................................................... 15

*Wait v. Beck's N. Am., Inc.*,
241 F. Supp. 2d 172, 183 (N.D.N.Y. 2003) ..................................................... 19

*Waldbaum v. Fairchild Publ'ns*,
627 F.2d 1287 (D.C. Cir. 1980) ............................................................... 23, 27

*Wash. Post Co. v. Keogh*,
365 F.2d 965 (D.C. Cir. 1966) ....................................................................... 15

*Webster v. Sun Co.*,
731 F.2d 1 (D.C. Cir. 1984) ........................................................................... 33

*Weyrich v. New Republic, Inc.*,
235 F.3d 617 (D.C. Cir. 2001) ................................................................. 15, 19

*Zimmerman v. Al Jazeera Am., LLC*,
   246 F. Supp. 3d 257 (D.D.C. 2017) ........................................................................................ 31

**RULES**

Fed. R. Civ. P. 12(b)(6) ............................................................................................................ 14

**OTHER AUTHORITIES**

2 Robert D. Sack, *Sack on Defamation* § 16:2.1 (5th ed. 2017) .................................................. 16

## INTRODUCTION

Plaintiffs Mikhail Fridman, Petr Aven, and German Khan are three of Russia's wealthiest and most internationally prominent oligarchs.  Their business and political conduct has attracted substantial international press and public scrutiny for decades.  Defendant Glenn Simpson is a former Wall Street Journal reporter.  He is a principal in Defendant Fusion GPS, which is a research and strategic intelligence firm that investigates matters of substantial public interest.

Plaintiffs are suing Defendants for money damages based on an investigative report titled Company Intelligence Report 2016/112 ("CIR 112") (Ex. 1) that Defendants commissioned from a well-regarded former British intelligence officer, Christopher Steele.  With one possible exception regarding corruption, no statement in CIR 112 is defamatory.  Consequently, Plaintiff's Complaint identifies the other supposedly defamatory language in CIR 112, rephrases and distorts it using words *not in CIR 112*, and then unsurprisingly finds defamatory meaning in the rephrased content.  For example, Plaintiffs take the statement in CIR 112 that they "are on very good terms" with President Putin and that "[s]ignificant favors continued to be done in both directions" – and reinvent the statement as one alleging that Plaintiffs "maintain a highly inappropriate, and even criminal, relationship with Putin," and then complain that the reinvented version is defamatory.  Plaintiffs' need to revise the text of CIR 112 is telling and fatal.  As we show below in Section II, Plaintiff's claims can be dismissed on the simple ground that CIR 112's actual text is not defamatory.

Even if CIR 112's text could be defamatory, Plaintiffs are public figures many times over for all purposes relevant here.  The text of CIR 112 concerns the Russian government and President Putin's intertwined relationships with Russian oligarchs and misconduct by both sides in business and politics.  Those relationships are the subject of a public controversy that has

generated immense public interest and scrutiny over more than two decades, as explained in Section III.  The Russian government's relations with its oligarchs, and with Plaintiffs in particular, have achieved such daily currency that the Wikipedia entry for the general term "Russian Oligarchs" contains the following language about Plaintiffs:

> The *most famous oligarchs* of the Putin era include . . . German Khan . . . Mikhail Fridman . . . Pyotr Aven. . .  Between 2000 and 2004, Putin apparently engaged in a power-struggle with some oligarchs, reaching a "grand bargain" with them. This bargain allowed the oligarchs to maintain their powers, in exchange for their explicit support of – and alignment with – Putin's government.

https://en.wikipedia.org/wiki/Russian_oligarch (last visited Nov. 20, 2017) (emphasis added).

To plead a defamation claim, public figures like Plaintiffs must plausibly allege facts establishing "actual malice," a state of mind required by the First Amendment.  Beyond a conclusory mention of recklessness in the Complaint, however, there is no factual allegation that plausibly establishes actual malice, as we explain below in Section IV.

Plaintiffs tried this before and failed.  Two of the Plaintiffs here, Fridman and Aven (along with Alfa, the business of all three Plaintiffs here) sued the Center for Public Integrity and others for an article strongly alleging criminal connections to corruption, organized crime and drug trafficking in Russia.  Judge Bates dismissed the case, holding that Plaintiffs were public figures who had not established actual malice.  He found that the oligarchs had achieved "an unforeseen level of prominence and influence in the economic and political affairs of their nation" and had been "dogged by allegations of corruption and illegal conduct."  *OAO Alfa Bank v. Center for Public Integrity*, 387 F. Supp. 2d 20, 27-28 (D.D.C. 2005).  Judge Huvelle recently followed suit in a similar defamation case brought by a different Russian oligarch.  *Deripaska v. AP*, Civ. Action No. 17-00913 (ESH), 2017 WL 4685297 (D.D.C. Oct. 17, 2017) (Huvelle, J.)

2

(dismissing defamation claim because "a public controversy exists relating to Russian oligarchs acting on behalf of the Russian government").  This Court should dismiss Plaintiffs' claims here for similar reasons even if CIR 112 could be said to contain defamatory text, as well as for others explained below.

## PUBLIC CONTROVERSY CONCERNING THE RUSSIAN OLIGARCHY, INCLUDING THE THREE OLIGARCH PLAINTIFFS IN THIS CASE*

### A.   The Russian Oligarchy

During the 1990s, in the aftermath of the dissolution of the Soviet Union, a small group of well-connected entrepreneurs became staggeringly rich by taking advantage of the corruption and collusion that plagued the Russian economy.  *See OAO Alfa Bank*, 387 F. Supp. 2d at 23. Using their close connections to the Russian government, these Russian oligarchs amassed power and wealth by exploiting the privatization of state assets and entering into shady deals with government officials.  *See id.*   Since the rise of the oligarchy in Russia, the relationship between the oligarchs and the Russian state has been the subject of "intense" public discourse, scholarship, and scrutiny.  *Id.* at 24 (highlighting acute focus on the oligarch-state relationship "in the White House, the halls of Congress, think tanks, and in the press" (footnotes omitted)). Although that relationship has evolved over the past two decades, with periodic power struggles between the oligarchs and the Kremlin and certain oligarchs falling in and out of favor, the domestic and international attention trained on the oligarchs and their political and economic entanglements with the Russian government has remained persistent and robust.[1]   "[T]hese relationships are fixed in the public mind and widely reported by the Russian news media."[2]

---

* This Motion cites to publicly available news articles regarding the public controversy concerning Russian oligarchs and Plaintiffs.  The nature of the public record – the fact that it exists –is properly considered in determining whether a plaintiff is a public figure required to allege malice in order to avoid a Rule 12(b)(6) dismissal of his or her complaint.  *See Deripaska v. AP*, 2017 WL 4685297, at *3.  For the Court's convenience, certain articles which may require a subscription to access on the Internet are appended to this Motion.

---

[1]    For only a small sampling of press coverage on the subject, see Anders Aslund, *Russia's oligarchs-in-waiting*, JAPAN TIMES (July 4, 2017), https://www.japantimes.co.jp/opinion/2017/07/04/commentary/world-commentary/russias-oligarchs-waiting/#.WhCvCe3ytPY (reporting that Putin has been cultivating an inter-generational cohort of business elites); Leonid Bershidsky, *Not All Russian Billionaires Are Putin Cronies*, BLOOMBERG (Mar. 5, 2015), https://www.bloomberg.com/view/articles/2015-03-05/not-all-russian-billionaires-are-putin-cronies (discussing Fridman's attempts to make investments beyond the reach of the Russian government); Megan Davies & Melissa Akin, *Russia risks bear down on oligarch Fridman*, REUTERS, June 6, 2012, https://www.reuters.com/article/us-russia-tnkbp-fridman/russian-risks-bear-down-on-oligarch-fridman-idUSBRE8550S420120606; Pamela Engel, *How Vladimir Putin became one of the most feared leaders in the world*, BUSINESS INSIDER (Feb. 14, 2017), http://www.businessinsider.com/how-vladimir-putin-rose-to-power-2017-2 (describing Putin's collaboration with oligarchs during his rise to power); Masha Gessen, *The Myth of the Russian Oligarchs*, N.Y. TIMES (Dec. 11, 2014), https://www.nytimes.com/2014/12/11/opinion/masha-gessen-the-myth-of-the-russian-oligarchs.html?_r=0 (discussing speculation that a weakening Russian economy might lead to coup led by Russian oligarchs); Jonathan Kandell, *Alfa's Mikhail Fridman Skirts Russian Sanctions to Invest Abroad*, INSTITUTIONAL INVESTOR, May 4, 2015, https://www.institutionalinvestor.com/article/b14z9vxcqbvzjy/alfas-mikhail-fridman-skirts-russian-sanctions-to-invest-abroad (discussing Fridman's interest in staying in Putin's good graces); Andrew E. Kramer & David M. Herszenhorn, *Midas Touch in St. Petersburg: Friends of Putin Grow Brightly*, N.Y. TIMES, Mar. 1, 2012, http://www.nytimes.com/2012/03/02/world/europe/ties-to-vladimir-putin-generate-fabulous-wealth-for-a-select-few-in-russia.html; Andrei Kolesnikov, *Navalny Has Alleged the Russian Prime Minister is Corrupt. Now What?*, MOSCOW TIMES, Nov. 6, 2017, https://themoscowtimes.com/articles/navalny-has-exposed-the-russian-prime-ministers-corruption-now-what-57336 ("At the core of the Russian state system is an unspoken agreement: the oligarchy supplies the needs and wants of the ruling authorities who, in turn, protect the oligarchy from interference."); Steve Levine, *The Last Free Oligarch*, FOREIGN POLICY (July 25, 2012), http://foreignpolicy.com/2012/07/25/the-last-free-oligarch-2/ (discussing Putin's efforts to push oligarchs out of oil business); Stanislav Markus, *The Atlas That has Not Shrugged: Why Russia's Oligarchs are an Unlikely Force for Change*, DAEDALUS, J. AM. ACAD. ARTS & SCI., Spring 2017, http://www.mitpressjournals.org/doi/pdf/10.1162/DAED_a_00438; Charles P. Pierce, *This is How the Russian Kleptocracy Operates*, ESQUIRE (July 27, 2017), http://www.esquire.com/news-politics/politics/news/a56666/russia-putin-oligarchs/ (describing Senate testimony regarding Putin's attempts to benefit personally from oligarchs' business dealings in exchange for not prosecuting them); Andrew S. Weiss, *Russia's Oligarchy, Alive and Well*, N.Y. TIMES, Dec. 30, 2013, http://www.nytimes.com/2013/12/31/opinion/russias-oligarchy-alive-and-well.html (reporting that "the supposedly all-powerful Mr. Putin actually devotes much of his time to refereeing bitter disputes" among oligarchs); Joshua Yaffa, *Putin's Shadow Cabinet and the Bridge to Crimea*, THE NEW YORKER, May 29, 2017, https://www.newyorker.com/magazine/2017/05/29/putins-shadow-cabinet-and-the-bridge-to-crimea ("The oligarchs of the Putin era . . . are themselves assets of the state, administering business fiefdoms that also happen to pay handsomely. Many have a long-standing relationship with the President, and a particular sphere of responsibility."); Shamil Yenikeyeff, *BP, Russian Billionaires, and the Kremlin: a Power Triangle that never was*, THE OXFORD INSTITUTE FOR ENERGY STUDIES, Nov. 2011, https://www.oxfordenergy.org/wpcms/wp-content/uploads/2011/11/BP-Russian-billionaires-and-the-Kremlin.pdf ("A super-presidential system of government has been [a] key characteristic of th[e] [Russian] political system, in which the survival and success of political and economic elites is based on privileged personal contacts with the chief executive."); *see also* Jonas E. Alexis, *Vladimir Putin: Killing oligarchic schemes economically saved Russia*, VETERANS TODAY, July 1, 2017, https://www.veteranstoday.com/2017/07/01/vladimir-putin-killing-oligarchic-schemes-economically-saved-russia/; Greg Fish, *How Russia Became Ruled by Corruption and Vladimir Putin*, Rantt.com, May 30, 2017, https://rantt.com/how-russia-became-ruled-by-corruption-and-vladimir-putin-927bdf7af6af; Ben Mezrich, *It isn't the oligarchs who rule Russia anymore*, BOSTON GLOBE, June 10, 2015, https://www.bostonglobe.com/opinion/2015/06/10/isn-oligarchs-who-rule-russia-anymore/hA9sGsk0TzlniQ0bmhECDN/story.html; Stanislav Markus, *Oligarchs and Corruption in Putin's Russia: Of Sand Castles and Geopolitical Volunteering*, Volunteering, GEO. J. INT'L AFF. (Summer/Fall 2017); Stuart Reid, *The Russian Triad has infiltrated American Society*, THE SALT LAKE TRIBUNE, Aug. 27, 2017, http://www.sltrib.com/opinion/commentary/2017/08/27/stuart-reid-the-russian-triad-has-infiltrated-american-society/; Irina Reznik, *A Fallen Russian Oligarch Sends Warning to Rest of Putin Insiders*, BLOOMBERG, Jan. 12, 2016, https://www.bloomberg.com/news/articles/2016-01-13/a-fallen-russia-oligarch-sends-warning-to-rest-of-putin-insiders.

Corruption and other business and political misconduct in both the business and political spheres are constant themes in the immense public record on the Russian oligarch-state relationship.  From the inception of the oligarchy to the present, the press has examined and reported on the mostly symbiotic relationship through which the oligarchs and the Russian state serve each other's interests.  For instance, oligarchs acquire and maintain gargantuan business assets through legally dubious means with scant government interference, and in return, government officials receive off-the-books contributions to serve both political and personal/business ends.[3]  The pervasive public perception that many oligarchs have benefitted from ill-gotten gains is reflected in "an expression that is popular among Russian businessmen: 'Never ask about the first million.'"[4]

### B.     Oligarchs Fridman, Aven, and Khan

Mikhail Fridman, Petr Aven, and German Khan are three of the most prominent oligarchs in Russian history.  As a summary of their prominence, Wikipedia's entry for "Russian oligarch" names "the most famous oligarchs of the Putin era" as including all three Plaintiffs.[5]  With their incredible wealth and political power, each has had a pronounced influence on the economic and political affairs of Russia.  For more than two decades, each has been the subject of searching domestic and international attention.

---

[2]     Kramer & Herszenhorn, *supra* note 1.

[3]     *See, e.g.*, Kolesnikov, *supra* note 1 ("At the core of the Russian state system is an unspoken agreement: the oligarchy supplies the needs and wants of the ruling authorities who, in turn, protect the oligarchy from interference."); Yaffa, *supra* note 1 ("[M]any oligarchs finance the 'black ledger,' which . . . is 'money that does not go through the budget but is needed by the state. . . . Funds leave the state budget as procurement orders [to companies owned by the oligarchs], and come back as off-the-books cash, to be spent however the Kremlin sees fit."); Kramer & Herszenhorn, *supra* note 1 ("Critics say these relationships are evidence of deeply entrenched corruption, which they view as essentially government-sanctioned theft invariably connected to Russia's abundant natural resources: gas, oil, minerals.").

[4]     Connie Bruck, *The Billionaire's Playlist: How an oligarch got into the American music business*, THE NEW YORKER, Jan. 20, 2014, https://www.newyorker.com/magazine/2014/01/20/the-billionaires-playlist.

[5]     https://en.wikipedia.org/wiki/Russian_oligarch

Searching Plaintiffs' names on any Internet search engine shows that for decades they have been squarely in the public eye and the eye of public controversy, shying away from neither. [6]   Any search returns an avalanche of articles about their business endeavors, their wealth, their political and economic power, their close relationship with the Kremlin, and their misconduct.  As of October 2003, a "search of an online news database for English language articles revealed more than 1,100 English language articles since 1990 that mention the name Mikhail Fridman, and more than 1,400 articles that include the name Petr Aven."  *OAO Alfa Bank*, 387 F. Supp. 2d at 28.  A similar search today shows that number has climbed higher as Plaintiffs have increased their wealth and their visibility over the years.

### i.      Plaintiffs' Careers and Fortunes

Fridman, Aven, and Khan's public prominence owes to their meteoric business success and their entanglements with the Russian state.  Their business success and political relationships have made them among the richest men in Russia, each worth billions of dollars.[7,8,9]

Plaintiffs' fortunes were made in large part as shareholders in the prominent Alfa Group, one of the biggest privately owned financial-industrial consortiums in Russia, with more than 240,000 employees and a number of financial services companies (including one of Russia's largest private banks), an investment business, and interests in retail, water utilities and mineral water production. [10]   In its infancy, Alfa Group "won the first auction for a state-owned company" during Russia's period of rapid privatization.  *OAO Alfa Bank*, 387 F. Supp. 2d at 25.

---

[6]    Searches will also reveal a number of lawsuits involving Alfa entities.  The New Yorker quoted a Russian analyst who knows Fridman as saying that Fridman "has the reputation that he loves suing companies.  For him, it's a pleasure, not a cost."  Bruck, *supra* note 4.

[7]    *Profile/*Mikhail *Fridman*, FORBES.COM, https://www.forbes.com/profile/mikhail-fridman/ (last visited Nov. 20, 2017).

[8]    *Profile/Petr Aven*, Forbes.COM, https://www.forbes.com/profile/pyotr-aven/ (last visited Nov. 20, 2017).

[9]    *Profile/German* Khan, FORBES.COM, https://www.forbes.com/profile/german-khan/ (last visited Nov. 20, 2017).

[10]   ALPHA GROUP *Consortium*, http://www.alfagroup.org/ (last visited Nov. 20, 2017).

Fridman and Khan founded and remain the "main beneficial owners" of the Alfa Group. [11]  Petr Aven was not an original founder of the Alfa Group, instead beginning his career as "one of the handful of elite academics who [Boris] Yeltsin chose to steer the country on a course to privatization.  Yeltsin appointed Aven to be his first Minister for Foreign Economic Relations." *OAO Alfa Bank*, 387 F. Supp. 2d at 25.  In that role, Aven "helped shape a radical and painful policy shake-up in the turbulent Russia of the early 1990s."[12]  He then left and joined Fridman and Khan in building the Alfa Group.  Plaintiffs have each held a number of leadership roles with the Alfa Group and its companies.  Fridman has been the long-time Chairman of Alfa Group, Aven served as the President of Alfa Bank between 1994 to 2011, and Khan was the Executive Director of TNK-BP between 2003 and 2013.  All three remain on the Alfa Group Supervisory Board.[13]

Plaintiffs' ventures in the oil and gas industry illustrate the entanglement of their wide-ranging business interests with those of the Russian state.  For example, in 1997, Alfa purchased Tyumen Oil (TNK), a struggling state-owned oil producer at the time, "at a fraction of the company's value, allegedly relying on [Alfa Group]'s allies at the highest levels of the Russian government."  *OAO Alfa Bank*, 387 F. Supp. 2d at 25.[14]  In 2003, in a high-profile and controversial deal that proceeded only with President Putin's blessing, the Alfa Group sold half of TNK to British Petroleum (BP) in what was then the biggest foreign investment in Russia.[15]

---

[11]   *About Us*, ALPHA Group CONSORTIUM http://www.alfagroup.org/about-us/ (last visited Nov. 20, 2017).

[12]   Andrew Jack, *Petr Aven: the Russian oligarch with an eye for art, not yachts*, FINANCIAL TIMES, July 12, 2017, https://www.ft.com/content/f328a740-6233-11e7-8814-0ac7eb84e5f1.

[13]   About Us, Supervisory *Board*, ALPHA GROUP CONSORTIUM, http://www.alfagroup.org/about-us/supervisory-board/ (last visited Nov. 20, 2017).

[14]   About Us, *History*, Alpha GROUP CONSORTIUM, http://www.alfagroup.org/about-us/history/?print=Y (last visited Nov. 20, 2017).

[15]   *German Khan the oligarch behind TNK*, LUXATIC, https://luxatic.com/german-khan-the-oligarch-behind-tnk/ (last visited Nov. 20, 2017).

TNK-BP became Russia's third largest oil company, and Khan was named its Executive Director.  Ten years later, in 2013, Alfa Group sold its 50% stake in TNK-BP to a Russian state-owned company, Rosneft, for $28 billion, which was described by Reuters as "one of the biggest energy takeovers in history"[16] and which *Forbes* deemed "another move by Vladimir Putin to centralize power."[17]   The deal was finalized in an "all-night round-table" with Putin at his official residence.[18]  The Putin-orchestrated deal made billions for Plaintiffs: Fridman made $5.1 billion,[19] Khan earned approximately $3.3 billion,[20] and Aven made almost $2 billion.[21] Although there reportedly was an understanding that the oligarchs would reinvest the proceeds in Russia, they have not done so—a fact that has generated media controversy and was touched on in CIR 112.[22]

---

[16]   Andrew Callus, *Insight: UK court reveals fear and mistrust at TNK-BP*, REUTERS, Dec. 4, 2012, https://ca.reuters.com/article/businessNews/idCABRE8B30XS20121204.

[17]   Nathan Vardi, *The Four Horsemen of Russia's Economic Apocalypse*, FORBES, Feb. 9, 2015, https://www.forbes.com/sites/nathanvardi/2015/01/21/the-four-horsemen-of-russias-economic-apocalypse/#47b9ea301542.

[18]   Vladimir Soldatkin & Andrew Callus, *Rosneft pays out in historic TNK-BP deal completion*, REUTERS, Mar. 21, 2013, https://www.reuters.com/article/us-rosneft-tnkbp-deal/rosneft-pays-out-in-historic-tnk-bp-deal-completion-idUSBRE92K0IZ20130321.

[19]   *Profile/*Mikhail *Fridman*, FORBES.COM, https://www.forbes.com/profile/mikhail-fridman/ (last visited Nov. 20, 2017).

[20]   Praveen Duddu, *The richest oil and gas billionaires*, OFFSHORE TECHNOLOGY, Aug. 25, 2014, http://www.offshore-technology.com/features/featurethe-richest-oil-and-gas-billionaires-4353593/.

[21]   *Profile/Pyotr Aven*, FORBES.COM, https://www.forbes.com/profile/pyotr-aven/ (last visited Nov. 20, 2017).

[22]   *How Russia's 20 biggest billionaires hide their fortunes from the government*, BLOOMBERG NEWS (May 1, 2013, 10:26 AM), http://business.financialpost.com/personal-finance/managing-wealth/how-russias-20-biggest-billionaires-hide-their-fortunes-from-the-government; Ben Aris, *PROFILE: Mikhail Fridman, chairman of Alpha Group*, BNE INTELLINEWS, May 10, 2017, http://www.intellinews.com/profile-mikhail-fridman-chairman-of-alfa-group-121087/; Bershidsky, *supra* note 1 (quoting from Putin press conference stating his wish that Fridman and his partners invest proceeds from the TNK-BP deal in the Russian economy).

### ii. Public Attention on Plaintiffs' Relationship with the Russian State

Plaintiffs' relationship with the Kremlin is the subject of judicial recognition and significant media scrutiny.[23]   As Judge Bates recognized, Fridman and Aven "have maintained a close relationship to the highest reaches of the Russian government, and forged a series of friendships and alliances with Russian luminaries and politicians."   *OAO Alfa Bank*, 387 F. Supp. 2d at 26.   Aven has a long-standing relationship with Putin because Putin "worked for [Aven] when [Aven] was a minister."   *Id.* at n.15.[24]   Fridman is "one of the most powerful and efficient lobbyists in the Kremlin with its new master [Putin]."   *Id.*   Alfa was "one of a handful of private financial companies with a special, direct line to the Kremlin."   *Id.* at n.23.

Recent press reinforces that Judge Bates' summary of Plaintiffs' relationship with the Kremlin as of 2005 is still accurate.   One recent publication referred to Fridman as "President

---

[23]   For a sampling of more recent press about Plaintiffs and their relationship with the Russian government, see John Aglionby, *Profile: Mikhail Fridman – from rugs to riches*, FINANCIAL TIMES, Mar. 2, 2015, https://www.ft.com/content/c5aafbe6-c0bf-11e4-876d-00144feab7de#axzz3hqmiAWh6; Howard Amos, *Russian Tycoon Fridman Should Make U.K. Feel Nervous*, MOSCOW TIMES, Mar. 10, 2015, https://themoscowtimes.com/articles/russian-tycoon-fridman-should-make-uk-feel-nervous-44604 ("Fridman's access to top Russian officials is undisputed . . . Fridman's ties extend to the heart of the Kremlin."); Bershidsky, *supra* note 1 (arguing that Fridman is not a Putin crony); Guy Chazan, *Lunch with the FT: Mikhail Fridman*, FINANCIAL TIMES, Apr. 1, 2016, https://www.ft.com/content/9527e2be-f5b5-11e5-96db-fc683b5e52db (Fridman stating that he hired Aven as a "channel for communication with the government"); Guy Chazan & John Thornhill, *Mikhail Fridman: The Alpha oligarch*, FINANCIAL TIMES, Mar. 5, 2015, https://www.ft.com/content/b47de3d4-c325-11e4-ac3d-00144feab7de; Jason Corcoran, *PROFILE: Mikhail Fridman – the Teflon oligarch new to Londongrad*, BNE INTELLINEWS, Apr. 11, 2016, http://www.intellinews.com/profile-mikhail-fridman-the-teflon-oligarch-new-to-londongrad-94873/; Megan Davies & Melissa Akin, *Russian risks bear down on oligarch Fridman*, REUTERS, June 6, 2012, https://uk.reuters.com/article/us-russia-tnkbp-fridman/russian-risks-bear-down-on-oligarch-fridman-idUSBRE8550S420120606; Mikhail Fridman, Fridman: How I became an oligarch (Nov. 14, 2010), available at https://www.opendemocracy.net/od-russia/mikhail-fridman/fridman-how-i-became-oligarch (reproducing Fridman's 2010 lecture entitled "How I Became an Oligarch"); Jack, *supra* note 12; Kandell, *supra* note 1; Sergei Karpukhin, *Few Oligarchs Can Beat Russia's Weakening Economy*, NEWSWEEK, Dec. 11, 2014, http://www.newsweek.com/few-oligarchs-can-beat-russias-weakening-economy-290984; Levine, *supra* note 1 (discussing relationship between Fridman and Putin in light of Fridman's business moves in oil industry); *see also* MIKHAIL ZYGAR, ALL OF THE KREMLIN'S MEN: INSIDE THE COURT OF VLADIMIR PUTIN 57 (2016), available at https://books.google.com/books?id=ETrXCwAAQBAJ&q=aven#v=snippet&q=aven&f=false (noting Putin as being "indebted" to Aven and Putin's blessing of the merger between Alfa Group subsidiary TNK and Britain's BP); Andrew Jack & Arkady Ostrovsky, *Power broker in Russia's shifting scene: Alfa boss Mikhail Fridman*, Financial Times, Aug. 29, 2003 ("Mr. Fridman has bridged the transition to the new regime of President Vladimir Putin more smoothly than most, and has gone further in restructuring and selling interests in his businesses.").

[24]   Aven even keeps a photo of himself and Putin in his home office.   *See* Jack, *supra* note 12.

Vladimir Putin's favorite oligarch."[25]   An international affairs publication observed in 2012 that TNK-BP "benefits from . . . Russian shareholders with close ties to Putin, including German Khan."[26]   And the press has observed, in terms echoing CIR 112, that "it is acknowledged that Alfa Group's consortium of billionaires enjoys excellent communication channels with the Kremlin. A recent paper from Oxford University's Institute for Energy concluded that the group can command direct access to Vladimir Putin and Dmitry Medvedev while bypassing any government gatekeepers."[27]

In addition, the press pays attention to Fridman's willingness to push boundaries with Putin insiders in his business ventures, while noting that "Alfa has managed to avoid trouble with the Kremlin itself," including through Aven, "an old friend of Mr. Putin who meets the president regularly."[28]   Fridman himself "says he's careful to avoid anything that the Kremlin would see as a challenge to its control of national politics."[29]   Putin's recent directive to the Alfa shareholders to reinvest the proceeds of the sale of TNK-BP in Russia and Plaintiffs' apparent willingness to ignore that instruction without consequence has also garnered significant attention.[30]

Plaintiffs have not been passive subjects of the media attention on their relationship with the Kremlin, but have actively engaged in it and courted it.   Plaintiffs have given frequent

---

[25]   Kandell, *supra* note 1.

[26]   Russia: *Is the* Kremlin *Ending TNK-BP's Infighting?,* STRATFOR WORLDVIEW,  (May 30, 2012, 10:01 GMT), https://worldview.stratfor.com/analysis/russia-kremlin-ending-tnk-bps-infighting.

[27]   Michael O'Farrell, *Anglo's Partnership with Ruthless Russian Oligarchs,* IRISH MAIL, Nov. 4, 2012, https://www.pressreader.com/ireland/the-irish-mail-on-sunday/20121104/281676842172543.

[28]   Gregory L. White, *As Russia Squeezes Big Business, A Tycoon Decides to Pick a Fight,* WALL ST. J., Oct. 6, 2005, https://www.wsj.com/articles/SB112856247619561303.

[29]   *Id.*

[30]   Aris, *supra* note 22 ("But it seems all Alfa's new investments are going on outside of Russia. . . . Ironically, he has been allowed to do this despite Putin's warning to keep the money in the motherland. The fact that he could is a testament to the work that Aven has done behind the scenes to shore up Alfa political *krysha*, or protection in government circles."); *How Russia's 20 biggest billionaires hide their fortunes from the government, supra* note 22 (Putin said in "televised news conference . . . that he 'hoped' the billionaires who sold their 50% stake in TNK-BP . . . would reinvest the proceeds in their home country. . . . So far, there's been little money flowing back to Russia.").

interviews to journalists and have spoken publicly on their relationship with the Russian state. *OAO Alfa Bank*, 387 F. Supp. 2d at 45.[31]  Just last month, in a public forum moderated by Russian *Forbes*, Fridman "spoke about Alfa Group's strange relationship to the Russian authorities," in response to a question about "why the Kremlin has not attacked such a huge conglomerate."[32]  Fridman used an analogy of humans and hippopotami, saying that the "main thing" in avoiding an attack is not getting between the hippopotamus (*i.e.*, the Russian state) and "the water."[33]

### iii.  Persistent Allegations of Wrongdoing in the Media

The media attention focused on Plaintiffs also reports and comments on widespread, ongoing allegations of wrongdoing by the oligarch Plaintiffs going back decades. Indeed, the article that was the subject of Aven and Fridman's failed defamation claim in *OAO Alfa Bank* reported that Russian intelligence reports claimed that "Alfa Bank, one of Russia's largest and most profitable, as well as Alfa Eko, a trading company, had been deeply involved in the early 1990s in laundering of Russian and Colombian drug money and in trafficking drugs from the Far East to Europe," and that "Alfa Groups top executives, oligarchs Mikhail Fridman and Pyotr

---

[31]  *See also, e.g.*, Mike Cummings, *Aven offers inside account of the makings of modern Russia*, YALE NEWS (Nov. 13, 2017),  https://news.yale.edu/2017/11/13/aven-offers-inside-account-making-modern-russia; Kristina Subbotina, *Exclusive "No Tie" Interview With Head of the Alfa Banking Holding, Petr Aven on Business, Childhood and Friends*, JEWISH BUSINESS NEWS, Nov. 19, 2015,  http://jewishbusinessnews.com/2015/11/19/exclusive-no-tie-interview-with-alfa-banks-president-peter-aven-on-business-childhood-and-friends/ (Aven suggesting that Fridman partnered with him because of his "useful contacts at the government"); Gregory L. White, *TNK-BP Russian Partner Relishes Conflict*, WALL ST. J., Nov. 14, 2011,  https://www.wsj.com/articles/SB10001424052970203503204577036000854767804 (interviewing German Khan); Jack, *supra* note 12 (interviewing Aven); Chazan, *supra* note 23 (interviewing Fridman and Fridman stating that he "never wanted to challenge authority . . . We always followed this philosophy — always to be loyal and friendly [to the government] but never to be too close."); Mikhail Fridman, *Fridman: How I became an oligarch,* Nov. 14, 2010, OPENDEMOCRACY,  https://www.opendemocracy.net/od-russia/mikhail-fridman/fridman-how-i-became-oligarch; Jack & Ostrovsky, *supra* note 23 (Fridman stating "The rules of business are quite different to western standards.  I don't want to lie and play this game.  To say one can be completely clean and transparent is not realistic.").

[32]  Evgeniy Karasyuk, *Republic gets political advice from Alpha Group co-founder Mikhail Fridman*, REPUBLIC, Oct. 7, 2017,  https://imrussia.org/en/the-rundown/media-must-reads/2862-russian-economy-suffers,-saudi-king-in-moscow,-lessons-for-intelligentsia.

[33]  *Id.*

11

Aven, 'allegedly participated in the transit of drugs from Southeast Asia through Russia and into Europe.'"[34]  The article detailed, among other things, the intelligence reports' statements on Alfa Bank laundering drug funds from Russian and Colombian cartels; an incident in which the residents of a Siberian town were poisoned by heroin-laced sugar that had been shipped in an Alfa Eko rail car; and Alfa officials' cooperation with Russian crime organizations.[35]

In reviewing these statements, Judge Bates noted that "Russian newspapers have published repeated claims that Aven and Fridman have rigged the auction of state assets through government connections, threatened the lives of government officials, ordered the assassination of a mobster, and engaged in narcotics trafficking and money laundering."  *OAO Alfa Bank*, 387 F. Supp. 2d at 28.[36]  Allegations of fraud, corruption, and general misconduct have persisted in the press coverage of Aven and Fridman and their Alfa entities, including coverage related to a recent bribery scandal involving a Fridman-owned telecommunications company that resulted in a nine-figure settlement with the U.S. Department of Justice.[37]  Khan has similarly been dogged by frequent allegations of unethical and criminal activity.[38]

---

[34]   Knut Royce & Nathaniel Heller, Cheney led Halliburton to feast at federal trough, CTR. FOR PUB. INTEGRITY (Aug. 2, 2000, 10:03 pm), https://www.publicintegrity.org/2000/08/02/3279/cheney-led-halliburton-feast-federal-trough.

[35]   *Id.*

[36] Judge Bates also noted that "[a]s early as during Aven's tenure in the Yeltsin government, a corruption task force informed Yeltsin that Aven was engaged in various misdeeds, including drug trafficking."  *OAO Alfa Bank*, 387 F. Supp. 2d at 28 n.26; *see also* KAREN DAWISHA, PUTIN'S KLEPTOCRACY: WHO OWNS RUSSIA 18-20 (2014) (special commission report in 1993 "recounted widespread instances of 'bribery of officials, blackmail, and the illegal transfer of currency resources to foreign banks,' with specific ministers sanctioned by name, including Minister of Foreign Economic Relations Pyotr Aven").  And "[e]ven Fridman has acknowledged . . . that the 'rules of business' in Russia 'are quite different to western standards …. To say one can be completely clean and transparent is not realistic."  *OAO Alfa Bank*, 387 F. Supp. 2d at 29 & n.9.

[37]   *See* Agustín Marco, *The FBI and the SEC investigate a Spanish company for bribes to Russian politicians*, EL CONFIDENCIAL, Dec. 30, 2016, https://www.elconfidencial.com/empresas/2016-12-30/fbi-sec-investigan-grupo-zed-sobornos-politicos-rusos_1308929/ (reporting that U.S. and Spanish authorities investigated whether company owned by Fridman paid bribes to "relatives of one of the most important ministers of the Kremlin"); Agence France-Presse, *VimpelCom pays $835m to US and Dutch over Uzbekistan telecom bribes*, GUARDIAN, Feb. 18, 2016, https://www.theguardian.com/world/2016/feb/19/vimpelcom-pays-835m-to-us-and-dutch-over-uzbekistan-telecoms-bribes (reporting that a mobile phone company largely owned by Fridman paid $835 million to settle charges that it

## CIR 112 AND THE DOSSIER

As Plaintiffs acknowledge, Defendants did not author CIR 112.  Plaintiffs' Complaint alleges that, in 2016, Defendants hired Christopher Steele to "gather discrediting information about candidate Trump to thwart his presidential run, including any connections he might have to Russian businesses or Russia's government."  Compl. ¶ 3.  "Steele used his own Russian sources to compile the reports, which were then delivered to the Defendants over the course of several months."  *Id.*  ¶ 4.  CIR 112 is one of seventeen reports that Steele authored.  *Id.* ¶ 2.  Together,

---

paid bribes to enter the Uzbekistan telecommunications market); The Economist Intelligence Unit, *VimpleCom admits to bribery*, THE ECONOMIST (Mar. 2, 2016), http://www.eiu.com/industry/article/1263994310/vimpelcom-admits-to-bribery/2016-03-02 (same); *see also, e.g.*, Bruck, *supra* note 4 (noting that when Russian government privatized TNK by auctioning it off, government released "precise eligibility requirements" for auction and "those requirements matched AAR's qualifications exactly"); Eamon Javers, *Spies, Lies & KPMG*, BLOOMBERG BUSINESSWEEK (Feb. 26, 2007, 12:00 AM), https://www.bloomberg.com/news/articles/2007-02-25/spies-lies-and-kpmg (Alfa used former spies to infiltrate KPMG to obtain secrets on Alfa's rival); Jeff Patch, *Did Lobbyists Break the Law?*, POLITICO (Mar. 14, 2007, 1:25 PM), https://www.politico.com/story/2007/03/did-lobbyists-break-the-law-003137 (Congressional hearings into whether Alfa lobbyists who allegedly impersonated spies to obtain audit documents broke U.S. law); White, *supra* note 28 (Alfa accused of paying witnesses and fraud).

[38]  *See, e.g.*, Andrew E. Kramer, *In Bid for BP's State of Venture, a Former Spy Becomes the Focus*, N.Y. TIMES, July 24, 2012, http://www.nytimes.com/2012/07/25/business/global/rosneft-opens-talks-on-buying-bps-stake-in-oil-joint-venture.html (reporting that former TNK-BP employee accused Khan "of funneling hundreds of millions of dollars in bribes to Russian officials in the guise of subcontracts"); Complaint ¶ 353, *Norex Petroleum Ltd. v. Access Indus.*, No. 02-cv-1499 (S.D.N.Y. Feb. 26, 2002) (detailing allegations of threats made by Khan to officials at a targeted oil company and alleging that "TNK obtained control over [the target company] through extortion as reflected by the threat of the armed thugs"); Callus, *supra* note 16 (alleging Khan threatened to harm former TNK-BP employee to force him to confess to accepting bribes); *id.* (detailing that Khan responded to the employee's description of him as "extremely ruthless" by stating "as is well known . . . doing business in Russia is not for the faint hearted"); Rowena Mason, *TNK-BP internal fraud probe leads to 37 criminal cases*, THE TELEGRAPH (Sep. 8, 2011, 11:00 PM), http://www.telegraph.co.uk/finance/newsbysector/energy/oilandgas/8751128/TNK-BP-internal-fraud-probe-leads-to-37-criminal-cases.html (disclosing that probe at TNK-BP had detailed hundreds of allegations of unscrupulous behavior and 37 criminal cases involving employees and contractors); Holly Watt & Tim Ross, *WikiLeaks: BP's new Russian partner sees Godfather films as 'manual for life'*, THE TELEGRAPH (Feb. 1, 2011, 6:30 AM), http://www.telegraph.co.uk/news/worldnews/wikileaks/8294428/WikiLeaks-BPs-new-Russian-partner-sees-Godfather-films-as-manual-for-life.html (according to U.S. diplomatic cables published by WikiLeaks, Khan considered The Godfather movie to be his "manual for life" and he attended dinners "armed with a chrome-plated pistol"); Kseniya Zaslavskiy, *Russia's 2008 "spying scandal" guise for FSB-oligarch takeover of TNK-BP*, EUROMAIDEN PRESS (Sept. 9, 2016, 5:12 PM), http://euromaidanpress.com/2016/09/09/russias-2008-spying-scandal-guise-for-fsb-oligarch-takeover-of-tnk-bp/; TOM BOWER, OIL: MONEY, POLITICS, AND POWER IN THE 21ST CENTURY (2010) (describing Khan as "an enforcer" who was "willing to throw a grenade into a room just to see what opportunities would arise out of the chaos"); Courtney Weaver, *Cash-laden oligarchs hunt pastures new*, FIN. TIMES, April 5, 2013, https://www.ft.com/content/25bf411a-9e01-11e2-bea1-00144feabdc0 (quoting former TNK-BP associate as saying "Say what you want about the ethical things but [Khan is] good at squeezing efficiency out of [Russian oil and gas companies]").

those reports have become known in the popular media as "the Dossier."  CIR 112 consists of less than one-and-a-half pages.  Ex. 1.

The Complaint alleges that Defendants "arranged for Steele to brief selected members of the print and online media about the information he was compiling on candidate Trump."  Compl. ¶ 6.  Plaintiffs do not allege that BuzzFeed, Inc., received such a briefing.  Plaintiffs also do not allege that Defendants gave copies of CIR 112 or the Dossier to BuzzFeed or any other journalist or media organization.  On January 10, 2017, BuzzFeed published all of the reports comprising the Dossier on the Internet.  *Id.* ¶ 8.

## ARGUMENT

## I.    Standard of Law

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).   The court need not "accept inferences drawn by [a] plaintiff[] if such inferences are unsupported *by the facts* set out in the complaint."   *Id.* (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)) (emphasis added).  Nor must the court accept as true legal conclusions or "mere conclusory statements."   *Iqbal*, 556 U.S. at 678. Instead, "determining whether a complaint states a plausible claim [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."   *Id.* at 679.  "[U]nless a plaintiff is able to nudge his or her claim 'across the line from conceivable to plausible,' the complaint must be dismissed."   *Deripaska*, 2017 WL 4685297, at *2 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 571 (2007)).

To state a claim for defamation under District of Columbia law, the complaint must plausibly allege that the statements at issue are: (1) defamatory; (2) "of and concerning" the plaintiff(s); (3) capable of being proven true or false; (4) false; and (5) made with requisite degree of fault. *Coles v. Wash. Free Weekly, Inc.*, 881 F. Supp. 26, 30 (D.D.C. 1995); *see also Weyrich v. New Republic, Inc.*, 235 F.3d 617, 623 (D.C. Cir. 2001).   And, of course, the defendant must have "published the statement without privilege to a third party." *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1088 (D.C. Cir. 2007).   In assessing "whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013).   Judicial notice is properly taken of publicly available publications, including books, magazines, and newspapers. *See id.*; *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954 (9th Cir. 2010); *Premier Growth Fund v. Alliance Capital Mgmt.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006); *Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 299 (S.D.N.Y. 2012).

"Given the threat to the first amendment posed by nonmeritorious defamation actions, it is particularly appropriate for courts to scrutinize such actions at an early stage of the proceedings to determine whether dismissal is warranted." *Coles*, 881 F. Supp. at 30.   The D.C. Circuit has long recognized that, in defamation cases, "summary procedures are . . . essential" because "the stake here, if harassment succeeds, is free debate." *Wash. Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966).   This frequently means dismissal on a motion to dismiss because, "unlike in most litigation, in a libel suit the central event—the communication about which suit has been brought—is ordinarily before the judge at the pleading stage" and he "may

assess it upon a motion to dismiss, firsthand and in context." 2 Robert D. Sack, *Sack on Defamation* § 16:2.1 (5th ed. 2017).

## II.     Statements in CIR 112 about the oligarch Plaintiffs, such as having a good relationship with President Putin, are not defamatory.

"Under the First Amendment, liability for defamation arises only if, at a minimum, a defendant's statement 'reasonably implies false and defamatory *facts*.'"  *Farah*, 736 F.3d at 534 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)) (emphasis added).  Because of this First Amendment protection, the Court must make three threshold inquiries as a matter of law into the allegedly defamatory statements: (1) whether they can be reasonably interpreted as stating "actual facts" about Plaintiffs; (2) whether they are "verifiable," and not "so imprecise or subjective that [they are] not capable of being proved true or false;" and (3) whether they are "reasonably capable of defamatory meaning."  *Id.* at 534-35.

### A.     The title of CIR 112 is not defamatory.

Plaintiffs assert that the title of CIR 112—RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION— is "by itself" defamatory because it "suggests that Alfa and its executives, including the Plaintiffs, 'cooperated' in an alleged Kremlin-orchestrated campaign to interfere in the 2016 U.S. presidential election."  Compl. ¶ 19. Plaintiffs ignore the actual content of CIR 112 and improperly sever the title from that content.

There is nothing in the content of CIR 112 suggesting that the alleged cooperation between the Kremlin and the Alfa Group had anything to do with the 2016 U.S. presidential election.  CIR 112's text contains no references to Hillary Clinton, Donald Trump, the 2016 U.S. presidential election, or even the United States.  The body of the report makes clear that its author did not assert any involvement by the Alfa Group in the U.S. presidential election. *Accord Q Int'l Courier, Inc. v. Seagraves*, No. 95-1554 (RMU), 1999 WL 1027034, at *4

(D.D.C. Feb. 26, 1999) ("adopt[ing] the majority rule that headlines are to be construed in conjunction with their accompanying articles" and holding the headline "Two Firms Nailed for Postage Fraud" was not actionable because the article made clear that the term "nailed" meant "caught" rather than "arrested"); *see also Hogan v. Winder*, 762 F.3d 1096, 1108 (10th Cir. 2014) ("majority of jurisdictions hold that a headline cannot be severed from the body of the article when undertaking defamation analysis").

### B. The first paragraph of CIR 112 is not defamatory.

The first paragraph of CIR 112 reads as follows:

> Speaking to a trusted compatriot in mid-September 2016, a top level Russian government official commented on the history and current state of relations between President PUTIN and the Alpha Group of businesses led by oligarchs Mikhail FRIDMAN, Petr AVEN and German KHAN. The Russian government figure reported that although they had had their ups and downs, the leading figures in Alpha currently were on very good terms with PUTIN. Significant favours continued to be done in both directions, primarily political ones for PUTIN and business/legal ones for Alpha. Also, FRIDMAN and AVEN continued to give informal advice to PUTIN on foreign policy, and especially about the US where he distrusted advice being given to him by officials.

Ex. 1. Plaintiffs do not allege that these statements are false, absent Plaintiffs' restatement of them. *Coles*, 881 F. Supp. at 31 ("That the truth carries a negative implication does not give the Plaintiff a meritorious defamation cause of action."). Instead, Plaintiffs claim that the "reasonable reading" of this paragraph is that "Plaintiffs Fridman, Aven, and Khan, along with Alfa, are alleged to maintain a highly inappropriate, and even criminal, relationship with Putin. By clear and defamatory implication, Plaintiffs are also alleged to be involved in a Kremlin-orchestrated campaign to interfere in the 2016 U.S. election." Compl. ¶ 23. Those words, however, are not in the text of CIR 112 and are not a fair interpretation of that text.

First, Plaintiffs invent the paragraph's "clear . . . implication" that Plaintiffs are "involved in a Kremlin-orchestrated campaign to interfere in the 2016 U.S. election." *Id.* CIR 112 says nothing of the sort and is not fairly read to so imply. Second, Plaintiffs read defamatory implications from the description of Plaintiffs' and Alfa's relationship with Putin where there are none. There is nothing illegal or even untoward about being on "very good terms" with the Russian president or "giv[ing] informal advice" to him on foreign policy. *Id.* ¶ 22. These statements are not capable of defamatory meaning. *Accord Golden N. Airways, Inc. v. Tanana Publ'g Co.*, 218 F.2d 612, 625 (9th Cir. 1954) ("It is an established principle in the law of libel that it is never libelous to accuse one of doing a legal act although strong epithets are used in describing the act.").

Plaintiffs struggle to read something nefarious into the statement that "significant favors continue to be done in both directions." Favors usually are not illegal, and the text challenged here does not mention or imply illegality. For example, Merriam Webster provides as definitions of favor, among others, "friendly regard shown toward another especially by a superior," "approving consideration or attention," "gracious kindness," "a token of love (usually a ribbon) usually worn conspicuously," and "a special privilege or right granted or conceded."[39]

These dictionary definitions also show that CIR 112's reference to "significant favors" is exactly the kind of vague, "loosely definable" and "variously interpretable" statement that does not constitute a verifiable fact and cannot support a defamation claim. *Ollman v. Evans*, 750 F.2d 970, 980-81 (D.C. Cir. 1984). Courts have repeatedly held that such statements are not actionable because they cannot reasonably be interpreted to convey actual facts, let alone verifiable ones. *See, e.g.*, *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v.*

---

[39] Favor, Merriam-Webster Dictionaries, https://www.merriam-webster.com/dictionary/favor?utm_campaign=sd&utm_medium=serp&utm_source=jsonld.

*Austin*, 418 U.S. 264, 283-87 (1974) ("use of words like 'traitor' cannot be construed as representation of fact"); *Weyrich*, 235 F.3d at 624-25 (statement that politician "suffer[ed] bouts of pessimism and paranoia" not actionable because description was "not a verifiably false attribution in fact of a 'debilitating mental condition'"); *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 260 (D.D.C. 2013) (characterization of individual as "evil" was "not a verifiable statement of fact"); *Adelson v. Harris*, 973 F. Supp. 2d 467, 493 (S.D.N.Y. 2013) (holding that terms "dirty money" and "tainted money" are "not be susceptible of being proven true or false"); *McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir. 1987) ("The lack of precision [in the meaning of the word 'scam'] makes the assertion 'X is a scam' incapable of being proven true or false."); *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 728 (1st Cir. 1992) ("Whether appellant's 'Phantom' is 'fake' or 'phony' is [] unprovable, since those adjectives admit of numerous interpretations."); *Buckley v. Littell*, 539 F.2d 882, 893 (2d Cir. 1976) ("[T]he use of 'fascist,' 'fellow traveler' and 'radical right' as political labels . . . cannot be regarded as having been proved to be statements of fact, among other reasons, because of the tremendous imprecision of the meaning and usage of these terms"); *Wait v. Beck's N. Am., Inc.*, 241 F. Supp. 2d 172, 183 (N.D.N.Y. 2003) ("Statements that someone has acted . . . unethically generally are constitutionally protected statements of opinion.").

Plaintiffs, particularly Fridman and Aven, have publicly embraced their relationship with Putin and the Russian government. *See, e.g.*, *OAO Alfa Bank*, 387 F. Supp. 2d at 26 & n.23; *supra* note 31.  They obviously do not find it damaging to have a good relationship with their president.  Judge Bates recognized that, "as two of the most powerful Russian oligarchs," Fridman and Aven "have maintained a close relationship to the highest reaches of the Russian government, and forged a series of friendships and alliances with Russian luminaries and

politicians." *OAO Alfa Bank*, 387 F. Supp. 2d at 26.   Under these circumstances, it cannot be

defamatory for Steele to memorialize in CIR 112 the current state of their relations.   *See*

*Deripaska*, 2017 WL 4685297, at *7 ("Moreover, it is readily available, judicially noticeable

information that [Russian oligarch] Deripaska openly associates himself with the Russian

government.  For the AP to do the same cannot be defamatory, even if it were not true.").

As a final point, the first sentence of this paragraph is the only place in CIR 112 in which

Plaintiff German Khan's name appears.  The single reference to Khan as an oligarch who leads

the "Alpha Group" is not defamatory.  Accordingly, this Court should dismiss Khan as a plaintiff

because there are no allegedly defamatory statements that are "of and concerning" him.[40]

### C.   With the possible exception of one sentence, the second paragraph of CIR 112 is not defamatory.

The second paragraph of CIR 112 states:

> Although FRIDMAN recently had met directly with PUTIN in Russia, much of
> the dialogue and business between them was mediated through a senior
> Presidential Administration official, Oleg GOVORUN, who currently headed the
> department therein responsible for Social Co-operation   With the CIS.
> GOVORUN was trusted by PUTIN and recently had accompanied him to
> Uzbekistan to pay respects at the tomb of former president KARIMOV.  However
> according to the top level Russian government official, during the 1990s
> GOVORUN had been Head of Government Relations at Alpha Group and in
> reality, the "driver" and "bag carrier" used by FRIDMAN and AVEN to deliver
> large amounts of illicit cash to the Russian president, at that time deputy Mayor of
> St Petersburg.  Given that and the continuing sensitivity of the PUTIN-Alpha
> relationship, and need for plausible deniability, much of the contact between them
> was now indirect and entrusted to the relatively low profile GOVORUN.

Ex. 1.  Plaintiffs do not deny or claim as defamatory the first sentence of this second

paragraph stating that Fridman and Putin recently met in Russia in a meeting mediated through

Oleg Govorun.  The second sentence about Govorun does not concern Plaintiffs.  The third

---

[40]   Statements about Alfa are not "of and concerning" Khan.  "'[D]efamation is personal; . . . allegations of
defamation by an organization and its members are not interchangeable. . . . [S]tatements which refer to an
organization do not implicate its members." *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1089 (D.C. Cir. 2007)
(quoting *Provisional Gov't of New Afrika v. ABC, Inc.*, 609 F. Supp. 104, 108 (D.D.C. 1985)).

sentence is the lone statement in CIR 112 that could be potentially defamatory, suggesting that Fridman and Aven (not Khan) used an intermediary to deliver "illicit cash" to Putin in the 1990s. But, as explained below, Plaintiffs cannot state a defamation claim based on that corruption-related allegation because the public controversy concerning them as Russian oligarchs has already been determined to include "corruption in post-Soviet Russia," *OAO Alfa Bank*, 387 F. Supp. 2d at 43 (dismissing defamation claim by Aven, Fridman and Alfa), and they have failed to adequately allege actual malice. *See* Section IV.

**D.    The third paragraph of CIR 112 is not defamatory.**

The third paragraph states:

> The top level Russian government official described the PUTIN-Alpha relationship as both carrot and stick. Alpha held 'kompromat' on PUTIN and his corrupt business activities from the 1990s whilst although not personally overly bothered by Alpha's failure to reinvest the proceeds of its TNK oil company sale into the Russian economy since, the Russian president was able to use pressure on this count from senior Kremlin colleagues as a lever on FRIDMAN and AVEN to make them do his political bidding.

Ex. 1.  This paragraph is similar to the first paragraph in that it does not contain any allegations of illegal conduct by Plaintiffs.  Further, it contains only "loose, figurative, or hyperbolic language" that cannot be reasonably interpreted as stating actual, provable facts about Plaintiffs. *Milkovich*, 497 U.S. at 21-23.

The first sentence recounts a government official's description of the Putin-Alfa relationship using a metaphor that the relationship is "both carrot and stick."  Such a figure of speech is plainly not "objectively capable of proof or disproof."  *Ollman*, 750 F.2d at 981 (noting that "a reader cannot rationally view an unverifiable statement as conveying actual facts").

The second sentence contains missing words and/or grammatical errors that make it hard to understand, much less have defamatory meaning.  The word "kompromat" refers to

"compromising material used to discredit rivals in politics or business or just settle personal scores."[41]  Even if "Alpha held 'kompromat' on Putin" could be understood as a statement of a verifiable fact, the assertion that Alfa possessed unspecified material that could be embarrassing to Putin does not have any defamatory meaning as to Plaintiffs, or even as to Putin.

The other allegation embedded in this second sentence is that Putin, despite not being personally bothered by Alfa's failure to reinvest in the Russian economy proceeds of its TNK oil company sale, is able to use pressure from that failure to make Fridman and Aven "do [Putin's] political bidding."  That allegation—that Putin "was able to use pressure . . . from senior Kremlin colleagues as a lever on FRIDMAN and AVEN to make them do his political bidding"—is also not defamatory.  It suggests no illegal conduct whatsoever on the part of Fridman or Aven.  And, additionally, it is "so imprecise [and] subjective that it is not capable of being proved true or false," and therefore "is not actionable in defamation."  *Farah*, 736 F.3d at 534-35.

Plaintiffs' own assertions about why this paragraph is defamatory are divorced from the actual text, substituting new words and thoughts for those in the text.  Plaintiffs claim that the paragraph "suggests that Plaintiffs Fridman and Aven use their knowledge of past bribery of Putin—'kompromat'—as a means of criminally extorting continuing favorable treatment for their business interests from his government."  Compl. ¶ 28.  Any suggestion that Plaintiffs are "criminally extorting continuing favorable treatment for their business interests" is not related to the text of this paragraph.  Plaintiffs then invent the nonsequitor that the paragraph "implies that Alfa and two of its largest beneficial owners willingly maintain a close relationship with Putin and cooperated in some unspecified way in the Kremlin's alleged campaign to interfere in the U.S. election in an effort to avoid retribution from Putin for not reinvesting business proceeds in

---

[41]   Greg Myre, *A Russian Word Americans Need to Know: 'Kompromat,'* Nat. Pub. Radio (Jan. 11, 2017, 3:11 PM),   http://www.npr.org/sections/parallels/2017/01/11/509305088/a-russian-word-americans-need-to-know-kompromat.

Russia." Compl. ¶ 28. That paragraph—like the entirety of CIR 112—has nothing to do with interference in the U.S. election. (Nor does the paragraph assert the willing maintenance of a close relationship, although that characterization would not be defamatory.)

**III. Plaintiffs are public figures for the purposes of the public controversies addressed by CIR 112: Russian oligarchs' political-business relationships with the Russian state and President Putin and the conduct of those parties with respect to those relationships.**

Even if the Court concludes that CIR 112 contains statements capable of being defamatory, the Court should dismiss the Complaint because Plaintiffs are public figures whose Complaint wholly fails to plead the requisite actual malice. This Section III addresses the public figure issue, and Section IV addresses the malice issue.

**A.  Legal Standard**

Whether Plaintiffs are public figures is a "matter of law for the court to decide." *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987) (citations omitted). The test to determine whether a plaintiff is a limited purpose public figure in the D.C. Circuit examines whether: (1) there is a pre-existing public controversy; (2) the plaintiff played a significant role in that controversy; and (3) the allegedly defamatory statements are germane to the plaintiff's participation in the controversy. *Waldbaum v. Fairchild Publ'ns*, 627 F.2d 1287, 1296-98 (D.C. Cir. 1980). The "touchstone" to this limited public figure analysis is "determining whether an individual has assumed a role of especial prominence in the affairs of society that invites attention and comment." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 585 (D.C. Cir. 2016) (alterations & internal quotation marks omitted).

Courts regularly resolve the issue of a defamation plaintiff's status on motions on the basis of pleadings and documents subject to judicial notice. *See, e.g.*, *Deripaska*, 2017 WL

4685297, at *6; *Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 143 (D.D.C. 2016), *aff'd*, 690 F. App'x 1 (D.C. Cir. 2017); *Boley*, 950 F. Supp. 2d at 262.

## B.  Public Controversy

A public controversy exists concerning the entanglement of the Russian oligarchs' political and business interests and those of the Russian state, including the questionable, unethical and illegal conduct by actors on both sides.  All of CIR 112's challenged text concerns that controversy.  Statements concerning immoral, criminal or other wrongdoing by Russian oligarchs on behalf of the Russian state or the Kremlin, or vice versa, relate to that controversy.

In *OAO Alfa Bank*, which involved the defamation claims of Plaintiffs Fridman, Aven and Alfa Bank arising out of reports of corruption, drugs, money laundering and other misdeeds, Judge Bates identified "the rise of the oligarchs and the decline of the Russian economy" into a "criminal-syndicalist state" as a "public controversy."  387 F. Supp. 2d at 43, 44.  Judge Bates described how, as the Russian economy privatized, a "group of individuals with close political connections to the Yeltsin government amassed enormous wealth and power through the wholesale transfer of prized state assets and shady deals with government officials."  *Id.* at 23.  "These tycoons, known as 'oligarchs,' rose to power based in large measure on their ability to navigate and manipulate the rules of a corrupt and lawless post-Soviet Russian economy."  *Id.* Judge Bates found that the "situation did not change when Vladimir Putin took power [in 2000]. 'Putin, said one analyst close to the Kremlin, has had dealings with several 'oligarch' groups. The closest, at the moment, is Alfa Group, led by Pyotr Aven, who as Russia's foreign trade minister in 1992 approved Putin's export contracts in St. Petersburg."  *OAO Alfa Bank*, 387 F. Supp. 2d at n.23.

Just last month, Judge Huvelle also found that a public controversy existed concerning conduct by the Russian oligarchs on behalf of the Russian state, and vice versa. *Deripaska*, 2017 WL 4685297, at *4.   In that case, another Russian oligarch, Oleg Deripaska challenged as defamatory an article reporting that he hired Paul Manafort to promote Putin's government's interests internationally. *Id.* at *1.   Judge Huvelle looked at the news coverage related to Oleg Deripaska's "role as a Russian oligarch and one of Putin's closest confidantes" and held that "there can be no doubt that a public controversy exists relating to Russian oligarchs acting on behalf of the Russian government," which resulted in dismissal of the case. *Id.* at *4.

The conclusions of Judge Bates and Judge Huvelle about the public controversy concerning the conduct of the Russian oligarchs and their relationship to the Kremlin are supported by a huge public record.[42]   The media has paid close attention to the degree of the oligarchs' influence on the Kremlin and the Kremlin's control over the oligarchs and their acts in service of the Kremlin.[43]   The relationship is sometimes reported as symbiotic and sometimes reported as adversarial—but always the subject of public scrutiny.

### C.     Plaintiffs' Prominence in the Controversy

As three of the most prominent Russian oligarchs, Plaintiffs frequently feature in the controversy about the conduct of Russian oligarchs, including on behalf of or in cooperation with the Kremlin, and, consequently, these articles.[44] Judge Bates exhaustively documented Plaintiffs

---

[42]    *See supra* note 23.

[43]    *See, e.g.*, Kolesnikov, *supra* note 1 ("At the core of the Russian state system is an unspoken agreement: the oligarchy supplies the needs *and* wants of the ruling authorities who, in turn, protect the oligarchy from interference."); Yaffa, *supra* note 1 ("[M]any oligarchs finance the 'black ledger,' which . . . is 'money that does not go through the budget but is needed by the state. . . . Funds leave the state budget as procurement orders [to companies owned by the oligarchs], and come back as off-the-books cash, to be spent however the Kremlin sees fit."); Kramer & Herszenhorn, *supra* note 1 ("Critics say these relationships are evidence of deeply entrenched corruption, which they view as essentially government-sanctioned theft invariably connected to Russia's abundant natural resources: gas, oil, minerals.").

[44]    See *supra* note 23.

Fridman and Aven's "special prominence" in the controversy of the rise of the Russian oligarchy, finding them to be "two of the richest and most powerful individuals" in Russia who "fully engaged in the worldwide debate regarding the causes and the cure for the corruption that has overcome the Russian economy, and have themselves been the repeated target of allegations of collusions and illegality." *OAO Alfa Bank*, 387 F. Supp. 2d at 44. Judge Bates noted they had "risen to positions of unprecedented influence in the political and economic affairs of their nation" and found them to be "the very centerpiece of the public controversy." *Id.* German Khan has played a nearly identical role in the controversy as Fridman and Aven.[45]

Other guideposts that bear on the public figure inquiry are also present here. All of the Plaintiffs' careers have plainly "invite[d] attention and comment." *OAO Alfa Bank*, 387 F. Supp. 2d at 44 (Aven and Fridman "are among the richest and most influential businesspeople in Russia, if not the world"); *see also Tavoulareas*, 817 F.2d at 773 (fact that plaintiff was president and COO of large multinational corporations relevant to "whether that person has invited attention and comment"); *Novecon v. Bulgarian-Am. Enter. Fund*, 977 F. Supp. 45, 49 (D.D.C. 1997) (plaintiff's "impressive resume is a factor in his public figure status"). They have also been the subject of wide-spread news coverage, creating a "media footprint [that] is far greater than those found sufficient to support public figure status in the past." *OAO Alfa Bank*, 387 F. Supp. 2d at 45. And Plaintiffs enjoy "access to the channels of effective communication that

---

[45]   *German Khan the Oligarch Behind TNK,* supra note 15; *The billionaire oligarchs behind Alfa-Access-Renova (AAR)*, THE GUARDIAN (May17, 2011, 1:06 PM), https://www.theguardian.com/business/2011/may/17/aar-billionaire-oligarch; Jen Alic, *Alfa Billionaires Launch L1 Energy Fund*, OILPRICE (June 22, 2013, 7:00 PM), https://oilprice.com/Energy/Energy-General/Alfa-Billionaires-Launch-L1-Energy-Fund.html (describing Fridman's and Khan's venture to reinvest the proceeds from the TNK-BP sale).

enable them to respond to any defamatory statements."  *Id.* (internal quotation marks omitted) (discussing Aven and Fridman's frequent public appearances and interviews).[46]

### D.     Germaneness

CIR 112 directly concerns Plaintiffs' relationship with the Kremlin and the nature of that relationship and is therefore "germane" to the controversy.  *Boley*, 950 F. Supp. 2d at 261.  The germaneness inquiry is whether the challenged statements are "wholly unrelated" to the public controversy.  *Waldbaum*, 627 F.2d at 1298; *see also Tavoulareas*, 817 F.2d at 773-74 (article discussing alleged nepotism at an oil company was germane to public controversy on the direction of national energy policy because the alleged nepotism was not "'wholly unrelated' to a public controversy where the credibility and integrity of representatives of the oil industry had become an issue").  It prevents publishers from "us[ing] an individual's prominence in one area of public life to justify publishing negligent falsehoods about an unrelated aspect of the plaintiff's life."  *Jankovic*, 822 F.3d at 589.  CIR 112 is plainly germane to the public controversy related the role of Russian oligarchs in Russian politics and the economy, including Russian corruption.  It reported on the current state of relations between the Kremlin and the Russian oligarch Plaintiffs.  Further, even what Plaintiff alleges to be the defamatory implications of the statements in CIR 112—that Plaintiffs had a corrupt and improper relationship with President Putin—go directly to the heart of that controversy.

---

[46]  *See also, e.g., supra* note 31; Mikhail Fridman, *Fridman: How I became an oligarch*; Courtney Weaver, *Cash-laden oligarchs hunt pastures new*, FIN. TIMES, April 5, 2013, https://www.ft.com/content/25bf411a-9e01-11e2-bea1-00144feabdc0  (noting that following the deal to sell their stake in TNK-BP, Fridman and Khan took "a dozen other tycoons, two camels and *a film crew from a Russian television channel*" on a trek in the Israeli desert to celebrate" (emphasis added)).

**E.     The public controversy at issue in CIR 112 is not the U.S. presidential election, but even if CIR 112 touches on that controversy, Plaintiffs are still public figures.**

Plaintiffs have said that they will argue that the "controversy that is the subject of this case [is] alleged interference in the 2016 U.S. Presidential election."  *See* Reply in Supp. of Pls.' Mot. in Response to the Oct. 30, 2017 Order to Show Cause, ECF Dkt. No. 12 at 3-4.  This attempt to narrow the relevant public controversy finds no support in the text of CIR 112.  The text of CIR 112 does not mention the United States, the 2016 presidential election, Donald Trump, or Hillary Clinton.  The fact that the report has the caption "Russia/US Presidential Election" before the headline of "Kremlin-Alpha Group Co-operation" does not and cannot change the subject matter of CIR 112 or the statements within it.  CIR 112 does address the cooperation of the Kremlin and Alfa, but not related to the U.S. presidential election.

Furthermore, if any discussion of the election could be read into the text of CIR 112 (it mentions none explicitly), that would not change the fact that CIR 112 unquestionably addresses the broader public controversy relating to misconduct in the relationship between the Russian oligarchs and the Russian state in which Plaintiffs are public figures.  In the *Deripaska* case, another Russian oligarch, Oleg Deripaska sued the Associated Press over an article that described how former Trump campaign manager Paul Manafort worked for Deripaska and that, in Deripaska's view, contained falsehoods involving criminal activity.  Unable to dispute the abundant news coverage of his "role as a Russian oligarch and one of Putin's closest confidantes," Deripaska argued that the "essential subject matter" of the challenged article was the narrower "Trump Campaign Controversy," and that he was not a limited-purpose public figure with regard to that controversy.  2017 WL 4685297, at *3.  Judge Huvelle did not dwell on Deripaska's attempt to narrow the public controversy.  She held that "there can be no doubt

that a public controversy exists relating to Russian oligarchs acting on behalf of the Russian government.  For the purposes of the article in question—*which touches on this broader question* as well as narrower concerns relating to the Trump campaign's contacts with Russia—Deripaska is a limited-purpose public figure." *Id*. at *4 (emphasis added).  So too here.

## IV.   Plaintiffs have made no factual allegations that would support a plausible inference of actual malice.

As limited-purpose public figures, Plaintiffs' defamation claim can survive only if they have adequately pleaded that the defamatory statement "was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1995).  The Complaint does not allege "malice," let alone "actual malice."  Instead, the Complaint contains only a single conclusory allegation to recklessness, alleging that "[t]he false and defamatory statements . . . were made negligently or with reckless disregard of whether they were true or false." Compl. ¶ 34.  That conclusory allegation can be summarily disregarded under *Iqbal*, 356 U.S. at 680-81; it is not supported by any factual allegations making plausible that Defendants acted with actual malice.

The Complaint also alleges that "Defendants knew that this Report [CIR 112] was not verified," Compl. ¶ 4, and that "Defendants published the Dossier and CIR 112 despite the fact that they did not know whether the defamatory accusations in CIR 112 about Plaintiffs were true." *Id.* ¶ 18.  Such allegations do not come anywhere close to alleging actual malice.  The D.C. Circuit has held repeatedly that it is "not enough" to allege that Defendants "should have known better." *Jankovic*, 882 F.3d at 589 (citing *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1996)).  Instead Plaintiffs must allege "that the defendant in fact harbored subjective doubt . . . . The plaintiff[s] can make this showing, for example, by offering evidence that 'it was highly probable that the story was (1) fabricated; (2) so inherently

improbable that only a reckless person would have put [it] in circulation; or (3) based on an unverified anonymous telephone call or some other source that [defendant] had obvious reason to doubt.'" *Id.* at 589-90 (quoting *Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003)). There are no such allegations here, and that is not surprising. CIR 112 was authored by a highly regarded former British intelligence officer, described as a "sober, cautious and meticulous professional with a formidable record,"[47] and there is an extensive public record concerning Plaintiffs' relationship with President Putin and allegations of wrongdoing.

Last, the Complaint alleges that neither Defendants nor Steele "has ever stated that the Dossier and CIR 112 were compiled in a fashion that accords with standards observed in their professions for establishing the credibility of sources and for verifying information provided by the sources. To the contrary, Steele has stated publicly that he did not abide by such standards in compiling the Dossier." Compl. ¶ 13.[48] Actual malice, however, cannot be established by "the plaintiff [] offer[ing] evidence of 'highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.'" *Jankovic*, 882 F.3d at 590 (quoting *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 664-65 (1989); *Clyburn v. News World Commc'ns, Inc.,* 903 F.2d 29, 33 (D.C. Cir. 2003)); *see also Harte-Hanks Commc'ns*, 491 U.S. at 665 (motive in publishing story, including if motive was "to promote an opponent's candidacy," cannot provide basis for finding of actual malice). "Rather, it is only when a plaintiff offers evidence that 'a defendant has reason to doubt the veracity of its source' does 'its utter failure to examine evidence within easy reach or to make

---

[47]   Nick Hopkins & Luke Harding, Donald Trump dossier: intelligence sources vouch for author's credibility, THE GUARDIAN (Jan. 12, 2017, 6:48 PM), https://www.theguardian.com/us-news/2017/jan/12/intelligence-sources-vouch-credibility-donald-trump-russia-dossier-author.

[48]   Notably, the document that Plaintiffs cite for this proposition does not contain any statements by Steele to that effect.

obvious contacts in an effort to confirm a story' demonstrate reckless disregard." *Jankovic*, 882

F.3d at 590 (quoting *McFarlane*, 91 F.3d at 1509). The Complaint contains no such allegations.

Courts in this district have not hesitated to dismiss a complaint for failure to allege actual

malice. *See, e.g.*, *Deripaska*, 2017 WL 4685297, at *6; *Parisi v. Sinclair*, 845 F. Supp. 2d 215,

218 (D.D.C. 2012) (dismissing complaint where it contained no factual allegations suggesting

actual malice); *see also Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 280 (D.D.C.

2017) (defamation action can "only survive Defendants' motions to dismiss if it adequately

alleges facts that support an inference that Defendants published the defamatory statements . . .

with actual malice").  This Court should similarly dispatch with the instant Complaint.

## V.      Plaintiffs have inadequately pleaded publication by Defendants to a third party.

One of the elements of defamation under District of Columbia law is that the "defendant

published the statement without privilege to a third party."  *Jankovic*, 494 F.3d at 1088.

Plaintiffs have not adequately alleged publication by Defendants.  The Complaint's allegations

of publication are limited to these four: (1) "Defendants arranged for Steele to brief selected

members of the print and online media about the information that he was compiling on candidate

Trump . . . designed to generate interest in the Dossier and secure its eventual public

dissemination," Compl. ¶ 6; (2) "Defendants provided a copy of the Dossier's first sixteen

reports . . . to [David] Kramer for redelivery to Senator [John] McCain," *id.* ¶ 7; (3) BuzzFeed

published the Dossier on the Internet, *id.* ¶ 8; and (4) a conclusory summary allegation in the

Causes of Action section.  These allegations are not sufficient to allege publication.

### A.      "Briefing" of journalists

Plaintiffs allege that Steele briefed "selected members" of the media "about the

information he was compiling on candidate Trump."  Compl. ¶ 6.  But there is no allegation that

Steele, let alone Defendants, made any statements in any purported briefing about Plaintiffs or

CIR 112, or otherwise shared CIR 112 with any journalists.  The Dossier contained seventeen written reports.  *Id*. ¶ 2.  Plaintiffs allege that they have "nothing to do with" the "Trump Dossier's theme[]," which they describe as "an alleged scheme between the Russian government and the Trump presidential campaign to unlawfully manipulate . . . the presidential election." *Id.* Given the number of reports in the Dossier and the fact that other of the reports addressed conduct attributable to Donald Trump, the plausible inference is that any "briefing" on the Dossier would not have included any mention of Plaintiffs or the contents of CIR 112.  *See Iqbal*, 556 U.S. at 678 (a claim only has "facial plausibility" where it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" (citation omitted)).  Plaintiffs certainly do not allege anything to the contrary.

Plaintiffs also do not allege that any of the journalists who attended a "briefing" published any statements about Plaintiffs.  They take pains to draft around this inconvenient point.  Plaintiffs allege that "[m]any [] media articles reported speculative accounts of the Dossier's existence and contents."  Compl. ¶ 6.  They allude to articles by Yahoo News and Mother Jones which "described some of the content" or "quoted from [the] reports." *Id.*  But there is no allegation that any of these news stories mentioned Plaintiffs or CIR 112.

All told, Plaintiffs have not alleged facts that make it "plausible" that Defendants published *any* statements (let alone any defamatory ones) about Plaintiffs to *any* journalist.  Put another way, Plaintiffs allege statements were made to journalists about the Dossier; but they do not allege that any of those statements were about Plaintiffs.

## B.   Delivery of the dossier to Senator McCain

As to the provision of a copy of the Dossier to Mr. Kramer for redelivery to Senator McCain, that communication is privileged as First Amendment petitioning activity and under the

common law privilege for communications made to a legislator.  *See Webster v. Sun Co.*, 731 F.2d 1, 5 (D.C. Cir. 1984) ("An individual must feel unrestrained by potential defamation liability when addressing the legislature.  Only then can the lawmaking process be fully informed and operate with maximum effectiveness.").  To fall within the privilege, the communicator must show that: (1) it would not have made the statement but for its intention to inform the legislative body on a "subject properly within its jurisdiction"; and (2) the statement had "some relation" to "legitimate legislative business."  *Id.*  This privilege protects communications made to an individual outside of a legislative proceeding.  *Id.* at 3, 6.  In *Webster*, the defendants sent an unsolicited memorandum containing allegedly libelous statements to an employee of the Congressional Research Service.  *Id.* at 2-3.  The D.C. Circuit held that the communication was privileged as long as the requirements of the test, as described above, were met.  *Id.* at 6-7 (remanding the case to the district court to determine whether the test had been met).  The court also noted that an investigation or legislative proceeding need not to be in progress to satisfy the test.  *Id.* at 6 n.13; *see also id.* at 5 n.10 ("The communication may be meant, of course, either to initiate or discourage legislative action on a given issue.").

The Dossier contained reports that were relevant to U.S. national security.  *See, e.g.*, Compl. ¶ 2.  It is public knowledge, of which the Court can take judicial notice, that Senator McCain was the Chairman of the Armed Services committee, a committee with jurisdiction over matters involving national defense.  *See History/Jurisdiction*, U.S. Senate Committee on Armed Services,   https://www.armed-services.senate.gov/about/history.    And   while   Plaintiffs gratuitously note that Senator McCain was an "outspoken critic" of then-candidate Trump, the Complaint also alleges that the purpose of the meeting between Steele and Kramer was to "brief Kramer on behalf of Senator McCain."  Compl. ¶ 7.  Senator McCain then received a copy of the

Dossier around November 2016.  *Id.*  The reasonable inference to draw from these alleged facts is that Senator McCain was briefed on the Dossier and provided its contents to inform him about possible Russian interference in the election, a subject within the Senate Armed Services committee's jurisdiction.  *See, e.g.*, Olivia Beavers, *McCain: Armed Services Panel Continues to Address Russian Cyber Threats*, The Hill (Oct. 5, 2017) http://thehill.com/homenews/senate/354102-mccain-senate-armed-services-panel-to-investigate-russias-disinformation (quoting Senator McCain: "We know that Putin's Russia has not slowed its efforts to interfere in our elections and domestic affairs.  The Senate Armed Services Committee will continue working to address this challenge, which is a threat to our national security.").  Accordingly, any disclosure to Senator McCain, or to Kramer on behalf of Senator McCain, was absolutely privileged.

Additionally, the District of Columbia recognizes a qualified privilege where "there is reasonable ground for making the alleged defamatory statement, either in the legitimate interest of the person uttering it, or of the person to whom it is communicated."  *Smith v. District of Columbia*, 399 A.2d 213, 220 (D.C. 1979) (Appendix A, adopting the superior court decision); *see also* Restatement (Second) of Torts § 598 (1977) (stating that a publication is conditionally privileged if the information involves an important public interest and that interest requires communication to a public officer or private citizen who can take action).  For the same reasons discussed above, Senator McCain, as Chairman of the Armed Services committee, had a legitimate interest in hearing about persons allegedly involved in Russia's alleged attempt to influence the 2016 presidential election.  Statements cloaked with this qualified privilege are "not actionable without a showing of excessive publication or express malice," neither of which is alleged here.  *Smith*, 399 A.2d at 221 (citation omitted).

### C.   BuzzFeed's publication of CIR 112

Lastly, Plaintiffs try to assign liability to Defendants for BuzzFeed's decision to publish CIR 112, along with the other reports in the Dossier.  But Plaintiffs do not allege—because they cannot—that Defendants authorized, permitted or acquiesced in the publication of the Dossier by BuzzFeed.  To the contrary, the Court can take judicial notice of the fact that Defendants did not give the Dossier to BuzzFeed and that, in fact, "Buzzfeed went to [Fusion GPS] and tried to get the dossier from them and they refused to give it to Buzzfeed."  Ex. 2 (Disc. Hr'g Tr. 8-9, *Gubarev v. Buzzfeed*, No. 0:17-cv-60426-UU (S.D. Fla. Sept. 28, 2017)); *see also* Corrected Reply in Supp. of Non-Party Fusion GPS's Mot. to Quash Third-Party Subpoena at 5, *In re Third Party Subpoena to Fusion GPS*, (No. 1:17-mc-02171-TSC), (D.D.C. Oct. 27, 2017)) (noting that Fusion did not give the Dossier to BuzzFeed).[49]

Thus, although Plaintiffs allege in a conclusory fashion that Defendants "intended, anticipated, or foresaw a high likelihood that allowing their clients and/or the media access to the Dossier's defamatory content would result in its republication by news media outlets, including . . . BuzzFeed," Compl. ¶ 9, they allege no facts that Defendants made it at all likely that BuzzFeed would publish CIR 112 and/or the Dossier.  Plaintiffs do not allege that Defendants gave copies of any of the reports in the Dossier to a journalist or any other third party, let alone one affiliated with BuzzFeed.  To the contrary, BuzzFeed requested the Dossier from Defendants and Defendants *refused to give it to them.  See* Ex. 2.  As a result, Plaintiffs ask this Court to infer from the allegation that Defendants gave briefings on the contents of the Dossier to journalists unaffiliated with BuzzFeed, without turning over the Dossier reports to any journalist,

---

[49]   Plaintiffs inaccurately state that "[i]n a recent court filing, Fusion admitted that it had 'pre-publication' communications with BuzzFeed about [the Dossier's] publication."  Compl. ¶ 8.  To the contrary, "Fusion searched for, but did not find, any such communications."  Corrected Reply in Supp. of Non-Party Fusion GPS's Mot. to Quash Third-Party Subpoena at 5, 13, *In re Third Party Subpoena to Fusion GPS* at 5 n.6 (No. 1:17-mc-02171-TSC), D.D.C. Oct. 27, 2017); *id.* Ex. 14.

that Defendants made it highly likely that BuzzFeed would publish CIR 112.  This is woefully insufficient.  Telling a select few journalists about the contents of other reports in the Dossier (without even giving them copies) does not make it highly likely or even reasonably foreseeable that an entirely different publication would somehow obtain and publish CIR 112.  *Cf. Rubenstein v. Manhattan & Bronx Surface Operating Auth*., No. CV-96-902, 1997 WL 833456, at *6 (E.D.N.Y. Oct. 8, 1997) ("However, if the original publisher 'had nothing to do with the decision' to republish and 'had no control over it,' the 'original publisher cannot be held liable.").

### D.   Conclusory allegation

Lastly, the Complaint contains a conclusory allegation in the section entitled "Cause of Action," which alleges: "By their direct and intentional publication to third parties such as clients, news media, journalists, and others, and by the foreseeable republication of the Dossier and CIR by someone in that group, the Defendants published to a worldwide public false and defamatory statements concerning Plaintiffs and Alfa . . . ."  Compl. ¶ 31.  This conclusory allegation is not entitled to any weight under *Iqbal*, and also is too vague to state a claim. Defamation "must be pleaded with particularity and specify the person or persons to whom the statements were made or published."  *See, e.g.*, *Vreven v. Am. Ass'n of Retired Persons*, 604 F. Supp. 2d 9, 15 (D.D.C. 2009) (plaintiff's allegation that defamatory statements were made to "others at AARP" was insufficient to state a claim); *Am. Petroleum Inst. v. Technomedia Int'l Inc.,* 699 F. Supp. 2d 258, 268 (D.D.C. 2010) (allegation that the challenged statements were republished "throughout the [company] organization" was inadequate).  This allegation fails to identify with any specificity to whom Plaintiffs contend CIR 112 was published, and should be disregarded as a conclusory allegation lacking in any factual specificity.

**VI.    Any publication of CIR 112 is privileged under the doctrine of neutral reportage.**

CIR 112 reports statements by Russian government officials.  It does no more than that.
It does not endorse those statements and it does not editorialize about them.   As a result,
Defendants are protected by the neutral reportage doctrine.   The neutral reportage doctrine
protects instances where an organization "makes serious charges against a public figure," as long
as those charges are reported accurately and disinterestedly.  *In re United Press Int'l*, 106 B.R.
323, 328-29 (D.D.C. 1989) (holding that the doctrine should apply in the District of Columbia);
*see also Barry v. Time, Inc.*, 584 F. Supp. 1110, 1123 (N.D. Cal. 1984) (neutral reportage
doctrine shields a "republisher who accurately and disinterestedly reports certain defamatory
statements made against public figures").  Plaintiffs are public figures, *see supra* Section III, and
CIR 112 simply reports what Steele was told by Russian government officials.  The statements
contained in CIR 112 are what a "top level Russian government official commented" and what
the "Russian government figure reported" to Steele.  Plaintiffs admit as much.  Compl. ¶ 3
("Steele used his own Russian sources to compile the reports . . . .").  Neither Steele nor
Defendants endorse or provide editorial gloss on the reports.  *See Sunshine Sportswear & Elecs.,
Inc. v. WSOC Television, Inc.*, 738 F. Supp. 1499, 1510 (D.S.C. 1989) (finding the neutral
reportage doctrine barred plaintiffs' claim where news report did not "embellish or distort" the
original defamers' statements).  Accordingly, the neutral reportage doctrine should bar Plaintiffs'
claims.  *See UPI*, 106 B.R. at 323-24 (holding that neutral reportage doctrine applied where UPI
reported that an individual had been quoted in another newspaper saying that the plaintiff was
the "'Godfather' of Hawaii's underworld crime").

## CONCLUSION

The Complaint should be dismissed for failure to state a claim.

Dated: November 21, 2017

Respectfully submitted,

/s/ *William W. Taylor, III*
William W. Taylor, III (D.C. Bar No. 84194)
Steven M. Salky (D.C. Bar No. 360175)
Rachel F. Cotton (D.C. Bar No. 997132)
**ZUCKERMAN SPAEDER LLP**
1800 M Street, NW, Suite 1000
Washington, D.C. 20036
Tel: (202) 778-1800
wtaylor@zuckerman.com
ssalky@zuckerman.com
rcotton@zuckerman.com

*Counsel for Defendants BEAN LLC, a/k/a
Fusion GPS and Glenn Simpson*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 21, 2017, the foregoing was filed with the

Court's CM/ECF Service, and thereby provided to the following counsel of record:


Kim Hoyt Sperduto, Esquire
SPERDUTO THOMPSON PLC
1133 Twentieth Street, NW
Second Floor
Washington, D.C. 20036
Tel: (202) 408-8900
ksperduto@sperdutothompson.com

Alan S. Lewis, Esquire
John J. Walsh, Esquire
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005
Tel: (212) 238-8647
Lewis@clm.com
walsh@clm.com


*/s/ Rachel F. Cotton*
Rachel F. Cotton