**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MIKHAIL FRIDMAN, PETR AVEN, and
GERMAN KHAN,

        Plaintiffs,

    v.

BEAN LLC a/k/a FUSION GPS, and GLENN
SIMPSON,

        Defendants.

Civil Case No. 1:17-cv-2041-RJL

**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT
FOR FAILURE TO STATE A CLAIM**

Defendants Fusion GPS and Glenn Simpson, by and through undersigned counsel, hereby move this Court for an order dismissing Plaintiffs' Amended Complaint with prejudice.  A Memorandum of Points and Authorities in Support of this Motion and a Proposed Order are filed herewith.

As detailed in the attached Memorandum of Points and Authorities, the Amended Complaint should be dismissed.  With one possible exception, the statements about Plaintiffs in CIR 112 are not defamatory.  Further, Plaintiffs are among the most prominent Russian oligarchs in Russian history and thus public figures who are required to plead "actual malice" in order to state a defamation claim.  They have not done so.  Finally, Plaintiffs have failed to adequately allege any actionable publication of CIR 112 by Defendants.

WHEREFORE, Defendants respectfully request that the Court dismiss Plaintiffs' Amended Complaint with prejudice.

Dated:  January 29, 2018

Respectfully submitted,

*/s/ William W. Taylor, III*
William W. Taylor, III (DC Bar No. 84194)
Steven M. Salky (DC Bar No. 360175)
Rachel F. Cotton (DC Bar No. 997132)
**ZUCKERMAN SPAEDER LLP**
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
wtaylor@zuckerman.com
ssalky@zuckerman.com
rcotton@zuckerman.com

*Attorneys for Defendants*

### CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of January 2018, I electronically filed and served the

foregoing using the CM/ECF system.

*/s/ Rachel F. Cotton*
Rachel F. Cotton

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MIKHAIL FRIDMAN, PETR AVEN, and GERMAN KHAN,<br><br>        Plaintiffs,<br><br>    v.<br><br>BEAN LLC a/k/a FUSION GPS, and GLENN SIMPSON,<br><br>        Defendants. | Civil Case No. 1:17-cv-2041-RJL |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**
**<u>FOR FAILURE TO STATE A CLAIM</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ................................................................................................................. 1

PUBLIC CONTROVERSY CONCERNING THE RUSSIAN OLIGARCHY,
INCLUDING THE THREE OLIGARCH PLAINTIFFS IN THIS CASE ................................... 3

A.      The Russian Oligarchy ......................................................................................... 3

B.      Oligarchs Fridman, Aven, and Khan .................................................................... 5

      i.      Plaintiffs' Careers and Fortunes ..................................................................... 6

      ii.     Public Attention on Plaintiffs' Relationship with the Russian Government ............... 9

      iii.    Persistent Allegations of Wrongdoing in the Media ................................................ 12

CIR 112 AND THE DOSSIER ............................................................................................ 14

ARGUMENT ........................................................................................................................ 15

I.      STANDARD OF LAW ................................................................................................ 15

II.     STATEMENTS IN CIR 112 ABOUT THE OLIGARCH PLAINTIFFS, SUCH AS
      HAVING A GOOD RELATIONSHIP WITH PRESIDENT PUTIN, ARE NOT
      DEFAMATORY ............................................................................................................ 17

      A.      The Title of CIR 112 Is Not Defamatory .................................................... 17

      B.      The First Paragraph of CIR 112 Is Not Defamatory .................................... 18

      C.      With the Possible Exception of One Sentence, the Second Paragraph of
            CIR 112 is Not Defamatory ......................................................................... 21

      D.      The Third Paragraph of CIR 112 Is Not Defamatory .................................. 23

III.    PLAINTIFFS ARE PUBLIC FIGURES FOR THE PURPOSES OF THE PUBLIC
      CONTROVERSIES ADDRESSED BY CIR 112: RUSSIAN OLIGARCHS'
      POLITICAL-BUSINESS RELATIONSHIPS WITH THE RUSSIAN STATE
      AND PRESIDENT PUTIN AND THE CONDUCT OF THOSE PARTIES WITH
      RESPECT TO THOSE RELATIONSHIPS. ......................................................................... 25

      A.      Legal Standard ............................................................................................ 25

      B.      Public Controversy ..................................................................................... 26

C.  Plaintiffs' Prominence in the Controversy .................................................................. 27

D.  Germaneness .............................................................................................................. 29

E.  The Public Controversy at Issue in CIR 112 Is Not the U.S. Presidential
    Election, But Even if CIR 112 Touches on That Controversy, Plaintiffs Are
    Still Public Figures ..................................................................................................... 29

IV.  PLAINTIFFS HAVE MADE NO FACTUAL ALLEGATIONS THAT SUPPORT A
     PLAUSIBLE INFERENCE OF ACTUAL MALICE ........................................................... 30

V.   PLAINTIFFS HAVE NOT PLEADED ANY ACTIONABLE PUBLICATION BY
     DEFENDANTS TO A THIRD PARTY ............................................................................... 33

A.  "Briefing" of Journalists ............................................................................................ 33

B.  Delivery of the Dossier to Senator McCain ............................................................... 34

C.  Publication of CIR 112 to Fusion's Client ................................................................. 37

D.  BuzzFeed's Publication of CIR 112 ........................................................................... 36

VI.  ANY PUBLICATION OF CIR 112 IS PRIVILEGED UNDER THE DOCTRINE OF
     NEUTRAL REPORTAGE ................................................................................................ 38

CONCLUSION ............................................................................................................................ 40

# TABLE OF AUTHORITIES

## CASES

*Adelson v. Harris*,
   973 F. Supp. 2d 467 (S.D.N.Y. 2013) ................................................................ 20

*\*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .............................................................................. 15, 33

*Barry v. Time, Inc.*,
   584 F. Supp. 1110 (N.D. Cal. 1984) .................................................................. 39

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................... 15

*\*Boley v. Atl. Monthly Grp.*,
   950 F. Supp. 2d 249 (D.D.C. 2013) ........................................................ 20, 25, 29

*Buckley v. Littell*,
   539 F.2d 882 (2d Cir. 1976) .......................................................................... 20

*Clyburn v. News World Commc'ns, Inc.*,
   903 F.2d 29 (D.C. Cir. 2003) ......................................................................... 32

*Coles v. Wash. Free Weekly, Inc.*,
   881 F. Supp. 26 (D.D.C. 1995) ................................................................... 16, 18

*\*Deripaska v. AP*,
   Civ. Action No. 17-00913 (ESH), 2017 WL 4685297 (D.D.C. Oct. 17, 2017) ............... *passim*

*Edwards v. Nat'l Audubon Soc'y*,
   556 F.2d 113 (2d Cir. 1977) .......................................................................... 39

*Effie Film, LLC v. Pomerance*,
   909 F. Supp. 2d 273 (S.D.N.Y. 2012) ................................................................ 16

*\*Farah v. Esquire Mag.*,
   736 F.3d 528 (D.C. Cir. 2013) ............................................................... 16, 17, 24

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
   314 F.3d 48 (2d Cir. 2002) ........................................................................... 37

*Harte-Hanks Commc'ns v. Connaughton*,
   491 U.S. 657 (1989) ................................................................................... 32

*Hogan v. Winder*,
762 F.3d 1096 (10th Cir. 2014) ............................................................ 18

*Hourani v. Psybersolutions LLC*,
164 F. Supp. 3d 128 (D.D.C. 2016) ....................................................... 25

*In re United Press Int'l*,
106 B.R. 323 (D.D.C. 1989) ................................................................. 39

*\*Jankovic v. Int'l Crisis Grp.*,
494 F.3d 1080 (D.C. Cir. 2007) .............................................. 16, 21, 33

*\*Jankovic v. Int'l Crisis Grp.*,
822 F.3d 576 (D.C. Cir. 2016) ................................... 25, 29, 31, 32

*Kowal v. MCI Commc'ns Corp.*,
16 F.3d 1271 (D.C. Cir. 1994) .............................................................. 15

*Lohrenz v. Donnelly*,
350 F.3d 1272 (D.C. Cir. 2003) ............................................................ 31

*McCabe v. Rattiner*,
814 F.2d 839 (1st Cir. 1987) ................................................................ 20

*McFarlane v. Sheridan Square Press, Inc.*,
91 F.3d 1501 (D.C. Cir. 1996) .............................................................. 32

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1 (1990) ......................................................................... 17, 23

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1995) ............................................................................. 31

*Norex Petroleum Ltd. v. Access Indus.*,
No. 02-cv-1499 (S.D.N.Y. Feb. 26, 2002) ............................................ 14

*Novecon v. Bulgarian-Am. Enter. Fund*,
977 F. Supp. 45 (D.D.C. 1997) ............................................................. 28

*Nurriddin v. Bolden*,
818 F.3d 751 (D.C. Cir. 2016) .............................................................. 15

*\*OAO Alfa Bank v. Center for Public Integrity*,
387 F. Supp. 2d 20 (D.D.C. 2005) ................................................ *passim*

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*,
  418 U.S. 264 (1974) ........................................................................................... 20

*\*Ollman v. Evans*,
  750 F.2d 970 (D.C. Cir. 1984) ...................................................................... 20, 23

*Parisi v. Sinclair*,
  845 F. Supp. 2d 215 (D.D.C. 2012) .................................................................. 32

*Payne v. Clark*,
  25 A.3d 918 (D.C. 2011) ................................................................................... 36

*Phantom Touring, Inc. v. Affiliated Publ'ns*,
  953 F.2d 724 (1st Cir. 1992) ............................................................................. 20

*Premier Growth Fund v. Alliance Capital Mgmt.*,
  435 F.3d 396 (3d Cir. 2006) ............................................................................. 16

*Provisional Gov't of New Afrika v. ABC, Inc.*,
  609 F. Supp. 104 (D.D.C. 1985) ....................................................................... 21

*Q Int'l Courier, Inc. v. Seagraves*, No. 95-1554 (RMU),
  1999 WL 1027034 (D.D.C. Feb. 26, 1999) ...................................................... 18

*Rubenstein v. Manhattan & Bronx Surface Operating Auth.*,
  1997 WL 833456 (E.D.N.Y. Oct. 8, 1997) ....................................................... 37

*Smith v. District of Columbia*,
  399 A.2d 213 (D.C. 1979) ........................................................................... 35, 36

*Sunshine Sportswear & Elecs., Inc. v. WSOC Television, Inc.*,
  738 F. Supp. 1499 (D.S.C. 1989) ...................................................................... 39

*Tavoulareas v. Piro*,
  817 F.2d 762 (D.C. Cir. 1987) ............................................................... 25, 28, 29

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
  592 F.3d 954 (9th Cir. 2010) ............................................................................ 16

*Wait v. Beck's N. Am., Inc.*,
  241 F. Supp. 2d 172 (N.D.N.Y. 2003) .............................................................. 20

*\*Waldbaum v. Fairchild Publ'ns*,
  627 F.2d 1287 (D.C. Cir. 1980) .................................................................. 25, 29

*Wash. Post Co. v. Keogh*,
  365 F.2d 965 (D.C. Cir. 1966) .......................................................................... 16

*Webster v. Sun Co.*,
   731 F.2d 1 (D.C. Cir. 1984) ................................................................................... 34

*\*Weyrich v. New Republic, Inc.*,
   235 F.3d 617 (D.C. Cir. 2001) ....................................................................... 16, 20

*Zimmerman v. Al Jazeera Am., LLC*,
   246 F. Supp. 3d 257 (D.D.C. 2017) ...................................................................... 32

## RULES

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 15

## OTHER AUTHORITIES

2 Robert D. Sack, *Sack on Defamation* (5th ed. 2017) ..................................... 17, 36

Restatement (Second) of Torts § 596 (1977) .......................................................... 36

Restatement (Second) of Torts § 598 (1977) .......................................................... 35

## INTRODUCTION

Plaintiffs Mikhail Fridman, Petr Aven, and German Khan are three of Russia's wealthiest and most internationally prominent oligarchs. Their business and political conduct has attracted substantial international press and public scrutiny for decades. Defendant Glenn Simpson is a former Wall Street Journal reporter. He is a principal in Defendant Fusion GPS, which is a research and strategic intelligence firm that often investigates matters of public interest.

Plaintiffs are suing Defendants for money damages based on an investigative report titled Company Intelligence Report 2016/112 ("CIR 112") (Ex. 1) that Defendants commissioned from a well-regarded former British intelligence officer, Christopher Steele. With one possible exception regarding corruption, no statement in CIR 112 is defamatory. Consequently, Plaintiff's Amended Complaint rephrases and distorts the language of CIR 112 using words *not in CIR 112*, and then unsurprisingly finds defamatory meaning in the rephrased content. For example, Plaintiffs take the statement in CIR 112 that they "are on very good terms" with Russian President Vladimir Putin and that "[s]ignificant favors continued to be done in both directions" – and reinvent the statement as one alleging that Plaintiffs "maintain a highly inappropriate, and even criminal, relationship with Putin," and then complain that the reinvented version is defamatory. Plaintiffs' need to revise the text of CIR 112 is telling and fatal. As we show below in Section II, with one possible exception, Plaintiff's claims can be dismissed on the simple ground that CIR 112's actual text is not defamatory.

Even if CIR 112's text could be defamatory, Plaintiffs are public figures many times over for all purposes relevant here. The text of CIR 112 concerns the Russian government and President Putin's intertwined relationships with Russian oligarchs and misconduct by both sides in business and politics. Those relationships are the subject of a public controversy that has

generated immense public interest and scrutiny over more than two decades, as explained in Section III. The Russian government's relations with its oligarchs, and with Plaintiffs in particular, have achieved such daily currency that the Wikipedia entry for the general term "Russian Oligarchs" contains the following language about Plaintiffs:

> The *most famous oligarchs* of the Putin era include . . . German Khan . . . Mikhail Fridman . . . Pyotr Aven. . . Between 2000 and 2004, Putin apparently engaged in a power-struggle with some oligarchs, reaching a "grand bargain" with them. This bargain allowed the oligarchs to maintain their powers, in exchange for their explicit support of – and alignment with – Putin's government.

https://en.wikipedia.org/wiki/Russian_oligarch (last visited January 29, 2018) (emphasis added).

To plead a defamation claim, public figures like Plaintiffs must plausibly allege facts establishing "actual malice," a state of mind required by the First Amendment. Plaintiffs fail to do so. Thus, as we explain below in Section IV, their claims must be dismissed.

Plaintiffs have tried bringing a defamation claim without alleging malice before and failed. Two of the Plaintiffs here, Fridman and Aven (along with Alfa, the business of all three Plaintiffs here) sued the Center for Public Integrity and others in this district for an article describing Fridman and Aven's criminal connections to corruption, organized crime and drug trafficking in Russia. Judge Bates dismissed the case, holding that Plaintiffs were public figures who had not established actual malice. He found that Fridman and Aven were oligarchs who had achieved "an unforeseen level of prominence and influence in the economic and political affairs of their nation" and had long been "dogged by allegations of corruption and illegal conduct." *OAO Alfa Bank v. Center for Public Integrity*, 387 F. Supp. 2d 20, 27-28 (D.D.C. 2005). Judge Huvelle recently dismissed a comparable defamation case brought by a different Russian oligarch on similar grounds. *Deripaska v. AP*, Civ. Action No. 17-00913 (ESH), 2017 WL

4685297, at *4 (D.D.C. Oct. 17, 2017) (Huvelle, J.) (dismissing defamation claim because "a public controversy exists relating to Russian oligarchs acting on behalf of the Russian government" and plaintiff had failed to allege malice).  This Court should dismiss Plaintiffs' claims here for similar reasons even if CIR 112 could be said to contain defamatory text, as well as for others explained below.

**PUBLIC CONTROVERSY CONCERNING THE RUSSIAN OLIGARCHY, INCLUDING THE THREE OLIGARCH PLAINTIFFS IN THIS CASE***

### A. The Russian Oligarchy

During the 1990s, in the aftermath of the dissolution of the Soviet Union, a small group of well-connected entrepreneurs became staggeringly rich by taking advantage of the corruption and collusion that plagued the Russian economy.  *See OAO Alfa Bank*, 387 F. Supp. 2d at 23. Using their close connections to the Russian government, these Russian oligarchs amassed power and wealth by exploiting the privatization of state assets and entering into shady deals with government officials.  *See id.*  Since the rise of the oligarchy in Russia, the relationship between the oligarchs and the Russian government has been the subject of "intense" public discourse, scholarship, and scrutiny in the U.S. and abroad.  *Id.* at 24 (highlighting acute focus on the Russian oligarch-state relationship "in the White House, the halls of Congress, think tanks, and in the press" (footnotes omitted)).  Although that relationship has evolved over the past two decades, with periodic power struggles between the oligarchs and the Kremlin and certain oligarchs falling in and out of favor, the domestic and international attention trained on the oligarchs and their political and economic entanglements with the Russian government has

remained persistent and robust.[1]  "[T]hese relationships are fixed in the public mind and widely

reported by the Russian news media,"[2] as well as the U.S. news media.

---

[*]  This Motion cites to publicly available news articles regarding the public controversy concerning Russian oligarchs and Plaintiffs.  The nature of the public record – the fact that it exists – is properly considered in determining whether a plaintiff is a public figure required to allege malice in order to avoid a Rule 12(b)(6) dismissal of his or her complaint.  *See, e.g.*, *Deripaska v. AP*, 2017 WL 4685297, at *3.  For the Court's convenience, certain articles which may require a subscription to access on the Internet are appended to this Motion.

[1]   For only a small sampling of more recent press coverage on the subject, see Anders Aslund, *Russia's oligarchs-in-waiting*, JAPAN TIMES (July 4, 2017), https://www.japantimes.co.jp/opinion/2017/07/04/commentary/world-commentary/russias-oligarchs-waiting/#.WhCvCe3ytPY; Leonid Bershidsky, *Not All Russian Billionaires Are Putin Cronies*, BLOOMBERG (Mar. 5, 2015), https://www.bloomberg.com/view/articles/2015-03-05/not-all-russian-billionaires-are-putin-cronies (discussing Fridman's attempts to make investments beyond the reach of the Russian government); Megan Davies & Melissa Akin, *Russian risks bear down on oligarch Fridman*, REUTERS, June 6, 2012, https://www.reuters.com/article/us-russia-tnkbp-fridman/russian-risks-bear-down-on-oligarch-fridman-idUSBRE8550S420120606; Pamela Engel, *How Vladimir Putin became one of the most feared leaders in the world*, BUSINESS INSIDER (Feb. 14, 2017), http://www.businessinsider.com/how-vladimir-putin-rose-to-power-2017-2 (describing Putin's collaboration with oligarchs during his rise to power); Masha Gessen, *The Myth of the Russian Oligarchs*, N.Y. TIMES (Dec. 11, 2014), https://www.nytimes.com/2014/12/11/opinion/masha-gessen-the-myth-of-the-russian-oligarchs.html?_r=0; Jonathan Kandell, *Alfa's Mikhail Fridman Skirts Russian Sanctions to Invest Abroad*, INSTITUTIONAL INVESTOR, May 4, 2015, https://www.institutionalinvestor.com/article/b14z9vxcqbvzjy/alfas-mikhail-fridman-skirts-russian-sanctions-to-invest-abroad (discussing Fridman's interest in staying in Putin's good graces); Andrew E. Kramer & David M. Herszenhorn, *Midas Touch in St. Petersburg: Friends of Putin Grow Brightly*, N.Y. TIMES, Mar. 1, 2012, http://www.nytimes.com/2012/03/02/world/europe/ties-to-vladimir-putin-generate-fabulous-wealth-for-a-select-few-in-russia.html; Andrew E. Kramer, *The Last Days of the Oligarchs?*, N.Y. TIMES, Mar. 7, 2009, http://www.nytimes.com/2009/03/08/business/08shift.html (discussing the oligarchs' debt crisis  and reporting that Fridman secured a "$2 billion Kremlin bailout to repay Deutche Bank"); Andrei Kolesnikov, *Navalny Has Alleged the Russian Prime Minister is Corrupt.  Now What?*, MOSCOW TIMES, Nov. 6, 2017, https://themoscowtimes.com/articles/navalny-has-exposed-the-russian-prime-ministers-corruption-now-what-57336 ("At the core of the Russian state system is an unspoken agreement: the oligarchy supplies the needs and wants of the ruling authorities who, in turn, protect the oligarchy from interference."); Steve Levine, *The Last Free Oligarch*, FOREIGN POLICY (July 25, 2012), http://foreignpolicy.com/2012/07/25/the-last-free-oligarch-2/ (discussing Putin's efforts to push oligarchs out of the oil business); Stanislav Markus, *The Atlas That has Not Shrugged: Why Russia's Oligarchs are an Unlikely Force for Change*, DAEDALUS, J. AM. ACAD.  ARTS & SCI., Spring 2017, http://www.mitpressjournals.org/doi/pdf/10.1162/DAED_a_00438; Charles P. Pierce, *This is How the Russian Kleptocracy Operates*, ESQUIRE (July 27, 2017), http://www.esquire.com/news-politics/politics/news/a56666/russia-putin-oligarchs/ (describing Senate testimony regarding Putin's attempts to benefit personally from oligarchs' business dealings in exchange for not prosecuting them); Andrew S. Weiss, *Russia's Oligarchy, Alive and Well*, N.Y. TIMES, Dec. 30, 2013, http://www.nytimes.com/2013/12/31/opinion/russias-oligarchy-alive-and-well.html (reporting that "the supposedly all-powerful Mr. Putin actually devotes much of his time to refereeing bitter disputes" among oligarchs); Joshua Yaffa, *Putin's Shadow Cabinet and the Bridge to Crimea*, THE NEW YORKER, May 29, 2017, https://www.newyorker.com/magazine/2017/05/29/putins-shadow-cabinet-and-the-bridge-to-crimea ("The oligarchs of the Putin era . . . are themselves assets of the state, administering business fiefdoms that also happen to pay handsomely.  Many have a long-standing relationship with the President, and a particular sphere of responsibility."); Shamil Yenikeyeff, *BP, Russian Billionaires, and the Kremlin: a Power Triangle that never was*, THE OXFORD INSTITUTE FOR ENERGY STUDIES, Nov. 2011, https://www.oxfordenergy.org/wpcms/wp-content/uploads/2011/11/BP-Russian-billionaires-and-the-Kremlin.pdf ("A super-presidential system of government has been [a] key characteristic of th[e] [Russian] political system, in which the survival and success of political and economic elites is based on privileged personal contacts with the chief executive."); *see also* Jonas E. Alexis, *Vladimir Putin: Killing oligarchic schemes economically saved Russia*, VETERANS TODAY, July 1, 2017, https://www.veteranstoday.com/2017/07/01/vladimir-putin-killing-oligarchic-schemes-economically-saved-russia/;

Corruption and other business and political misconduct in both the business and political spheres are constant themes in the immense public record on the Russian oligarch-state relationship.  From the inception of the oligarchy to the present, the press has examined and reported on the mostly symbiotic relationship through which the oligarchs and the Russian state serve each other's interests.  For instance, oligarchs acquire and maintain gargantuan business assets through legally dubious means with scant government interference, and in return, government officials receive off-the-books contributions to serve both political and personal/business ends.[3]  The pervasive public perception that many oligarchs have benefitted from ill-gotten gains is reflected in "an expression that is popular among Russian businessmen: 'Never ask about the first million.'"[4]

## B.  Oligarchs Fridman, Aven, and Khan

Mikhail Fridman, Petr Aven, and German Khan are three of the most prominent oligarchs in Russian history.  As a summary of their prominence, *Wikipedia*'s entry for "Russian oligarch"

---

Greg Fish, *How Russia Became Ruled by Corruption and Vladimir Putin*, Rantt.com, May 30, 2017, https://rantt.com/how-russia-became-ruled-by-corruption-and-vladimir-putin-927bdf7af6af; Ben Mezrich, *It isn't the oligarchs who rule Russia anymore*, BOSTON GLOBE, June 10, 2015, https://www.bostonglobe.com/opinion/2015/06/10/isn-oligarchs-who-rule-russia-anymore/hA9sGsk0TzlniQ0bmhECDN/story.html; Stanislav Markus, *Oligarchs and Corruption in Putin's Russia: Of Sand Castles and Geopolitical Volunteering*, *Volunteering*, GEO. J. INT'L AFF. (Summer/Fall 2017); Stuart Reid, *The Russian Triad has infiltrated American Society*, THE SALT LAKE TRIBUNE, Aug. 27, 2017, http://www.sltrib.com/opinion/commentary/2017/08/27/stuart-reid-the-russian-triad-has-infiltrated-american-society/; Irina Reznik, *A Fallen Russian Oligarch Sends Warning to Rest of Putin Insiders*, BLOOMBERG, Jan. 12, 2016, https://www.bloomberg.com/news/articles/2016-01-13/a-fallen-russia-oligarch-sends-warning-to-rest-of-putin-insiders.

2    Kramer & Herszenhorn, *supra* note 1.

3    *See, e.g.*, Kolesnikov, *supra* note 1 ("At the core of the Russian state system is an unspoken agreement: the oligarchy supplies the needs and wants of the ruling authorities who, in turn, protect the oligarchy from interference."); Yaffa, *supra* note 1 ("[M]any oligarchs finance the 'black ledger,' which . . . is 'money that does not go through the budget but is needed by the state. . . . Funds leave the state budget as procurement orders [to companies owned by the oligarchs], and come back as off-the-books cash, to be spent however the Kremlin sees fit."); Kramer & Herszenhorn, *supra* note 1 ("Critics say these relationships are evidence of deeply entrenched corruption, which they view as essentially government-sanctioned theft invariably connected to Russia's abundant natural resources: gas, oil, minerals.").

4    Connie Bruck, *The Billionaire's Playlist: How an oligarch got into the American music business*, THE NEW YORKER, Jan. 20, 2014, https://www.newyorker.com/magazine/2014/01/20/the-billionaires-playlist.

names "the most famous oligarchs of the Putin era" as including all three Plaintiffs.[5]  With their incredible wealth and political power, each has had a pronounced influence on the economic and political affairs of Russia.  For more than two decades, each has been the subject of searching domestic and international attention.

Searching Plaintiffs' names on any Internet search engine shows that for decades they have been squarely in the public eye and the eye of public controversy, shying away from neither. [6]  Any search returns an avalanche of articles about their business endeavors, their wealth, their political and economic power, their close relationship with the Kremlin, and their misconduct.  As of October 2003, a "search of an online news database for English language articles revealed more than 1,100 English language articles since 1990 that mention the name Mikhail Fridman, and more than 1,400 articles that include the name Petr Aven." *OAO Alfa Bank*, 387 F. Supp. 2d at 28.  A similar search on Lexis today shows that number has climbed higher—now, more than 10,000 English language articles mention Fridman, more than 1,700 articles include Aven's name, and more than 5,000 articles mention Khan.

### i.  Plaintiffs' Careers and Fortunes

Fridman, Aven, and Khan's public prominence owes to their meteoric business success and their entanglements with the Russian state.  Their business success and political relationships

---

[5]    Wikipedia, *Russian Oligarch*, https://en.wikipedia.org/wiki/Russian_oligarch (as of Jan. 28, 2018).

[6]    Searches will also reveal a number of lawsuits involving Alfa entities.  The New Yorker quoted a Russian analyst who knows Fridman as saying that Fridman "has the reputation that he loves suing companies.  For him, it's a pleasure, not a cost."  Bruck, *supra* note 4.

have made them among the richest men in Russia, each worth billions of dollars.[7,8,9]  Just last month, *Forbes* named Fridman Russia's top businessman in 2017.[10]

Plaintiffs' fortunes were made in large part as shareholders in the prominent Alfa Group, one of the biggest privately owned financial-industrial consortiums in Russia, with more than 240,000 employees and a number of financial services companies (including one of Russia's largest private banks), an investment business, and interests in retail, water utilities and mineral water production. [11]  In its infancy, the Alfa Group "won the first auction for a state-owned company" during Russia's period of rapid privatization.  *OAO Alfa Bank*, 387 F. Supp. 2d at 25. Fridman and Khan founded and remain the "main beneficial owners" of the Alfa Group. [12]  Petr Aven was not an original founder of the Alfa Group, instead beginning his career as "one of the handful of elite academics who [Boris] Yeltsin chose to steer the country on a course to privatization.  Yeltsin appointed Aven to be his first Minister for Foreign Economic Relations." *OAO Alfa Bank*, 387 F. Supp. 2d at 25.  In that role, Aven "helped shape a radical and painful policy shake-up in the turbulent Russia of the early 1990s."[13]  He then left and joined Fridman and Khan in building the Alfa Group.  Plaintiffs have each held a number of leadership roles with the Alfa Group and its companies.  Fridman has been the long-time Chairman of Alfa Group, Aven served as the President of Alfa Bank between 1994 to 2011, and Khan was the

---

[7]     *Profile/Mikhail Fridman*, FORBES.COM, https://www.forbes.com/profile/mikhail-fridman/.

[8]     *Profile/Petr Aven*, FORBES.COM, https://www.forbes.com/profile/pyotr-aven/.

[9]     *Profile/German Khan*, FORBES.COM, https://www.forbes.com/profile/german-khan/.

[10]    *Forbes named Mikhail Fridman Russia's top businessman in 2017*, Prime Business News Agency, Dec. 21, 2017, http://www.1prime.biz/news/0/%7B2577C6C7-481D-467D-B4E7-6AA370B1050F%7D.uif?layout=print.

[11]    ALFA GROUP CONSORTIUM, http://www.alfagroup.org/.

[12]    *About Us*, ALFA GROUP CONSORTIUM, http://www.alfagroup.org/about-us/.

[13]    Andrew Jack, *Petr Aven: the Russian oligarch with an eye for art, not yachts*, FINANCIAL TIMES, July 12, 2017, https://www.ft.com/content/f328a740-6233-11e7-8814-0ac7eb84e5f1.

Executive Director of TNK-BP between 2003 and 2013.  All three remain on the Alfa Group Supervisory Board.[14]

Plaintiffs' ventures in the oil and gas industry illustrate the entanglement of their wide-ranging business interests with those of the Russian state.  For example, in 1997, Alfa purchased Tyumen Oil (TNK), a struggling state-owned oil producer at the time, "at a fraction of the company's value, allegedly relying on [Alfa Group]'s allies at the highest levels of the Russian government."  *OAO Alfa Bank*, 387 F. Supp. 2d at 25.[15]  In 2003, in a high-profile and controversial deal that proceeded only with President Putin's blessing, the Alfa Group sold half of TNK to British Petroleum (BP) in what was then the biggest foreign investment in Russia.[16]  TNK-BP became Russia's third largest oil company, and Khan was named its Executive Director.  Ten years later, in 2013, Alfa Group sold its 50% stake in TNK-BP to a Russian state-owned company, Rosneft, for $28 billion, which was described by Reuters as "one of the biggest energy takeovers in history"[17] and which *Forbes* deemed "another move by Vladimir Putin to centralize power."[18]  The deal was finalized in an "all-night round-table" with Putin at his official residence.[19]  The Putin-orchestrated deal made billions for Plaintiffs: Fridman made $5.1 billion,[20] Khan earned approximately $3.3 billion,[21] and Aven made almost $2 billion.[22]

---

[14]  About Us*, Supervisory Board*, Alfa Group Consortium,  http://www.alfagroup.org/about-us/supervisory-board/.

[15]  About Us*, History*, Alfa Group Consortium, http://www.alfagroup.org/about-us/history/?print=Y.

[16]  *German Khan the oligarch behind TNK*, Luxatic, https://luxatic.com/german-khan-the-oligarch-behind-tnk/.

[17]  Andrew Callus, *Insight: UK court reveals fear and mistrust at TNK-BP*, Reuters, Dec. 4, 2012, https://ca.reuters.com/article/businessNews/idCABRE8B30XS20121204.

[18]  Nathan Vardi, *The Four Horsemen of Russia's Economic Apocalypse*, Forbes, Feb. 9, 2015, https://www.forbes.com/sites/nathanvardi/2015/01/21/the-four-horsemen-of-russias-economic-apocalypse/#47b9ea301542.

[19]  Vladimir Soldatkin & Andrew Callus, *Rosneft pays out in historic TNK-BP deal completion*, Reuters, Mar. 21, 2013,  https://www.reuters.com/article/us-rosneft-tnkbp-deal/rosneft-pays-out-in-historic-tnk-bp-deal-completion-idUSBRE92K0IZ20130321.

[20]  *Profile/Mikhail Fridman*, Forbes.com, https://www.forbes.com/profile/mikhail-fridman/.

Although there reportedly was an understanding that the oligarchs would reinvest the proceeds in

Russia, they have not done so—a fact that has generated media controversy[23] and was touched

on in CIR 112.  *See* Ex. 1 ¶ 3 (noting Alfa's "failure to reinvest the proceeds of its TNK oil

company sale into the Russian economy").

### ii.  Public Attention on Plaintiffs' Relationship with the Russian Government

Plaintiffs' relationship with the Kremlin is the subject of judicial recognition and

significant media scrutiny.[24]  As Judge Bates recognized, Fridman and Aven "have maintained a

---

[21]  Praveen Duddu, *The richest oil and gas billionaires*, OFFSHORE TECHNOLOGY, Aug. 25, 2014, http://www.offshore-technology.com/features/featurethe-richest-oil-and-gas-billionaires-4353593/.

[22]  *Profile/Pyotr Aven*, FORBES.COM, https://www.forbes.com/profile/pyotr-aven/.

[23]  *See, e.g.*, *How Russia's 20 biggest billionaires hide their fortunes from the government*, BLOOMBERG NEWS (May 1, 2013, 10:26 AM), http://business.financialpost.com/personal-finance/managing-wealth/how-russias-20-biggest-billionaires-hide-their-fortunes-from-the-government; Ben Aris, *PROFILE: Mikhail Fridman, chairman of Alfa Group*, BNE INTELLINEWS, May 10, 2017, http://www.intellinews.com/profile-mikhail-fridman-chairman-of-alfa-group-121087/; Bershidsky, *supra* note 1 (quoting from Putin press conference stating his wish that Fridman and his partners invest proceeds from the TNK-BP deal in the Russian economy).

[24]  For a sampling of more recent press about Plaintiffs and their relationship with the Russian government, see John Aglionby, *Profile: Mikhail Fridman – from rugs to riches*, FINANCIAL TIMES, Mar. 2, 2015, https://www.ft.com/content/c5aafbe6-c0bf-11e4-876d-00144feab7de#axzz3hqmiAWh6; Howard Amos, *Russian Tycoon Fridman Should Make U.K. Feel Nervous*, MOSCOW TIMES, Mar. 10, 2015, https://themoscowtimes.com/articles/russian-tycoon-fridman-should-make-uk-feel-nervous-44604 ("Fridman's access to top Russian officials is undisputed . . . Fridman's ties extend to the heart of the Kremlin."); Bershidsky, *supra* note 1 (arguing that Fridman is not a Putin crony); Guy Chazan, *Lunch with the FT: Mikhail Fridman*, FINANCIAL TIMES, Apr. 1, 2016, https://www.ft.com/content/9527e2be-f5b5-11e5-96db-fc683b5e52db (Fridman stating that he hired Aven as a "channel for communication with the government"); Guy Chazan & John Thornhill, *Mikhail Fridman: The Alpha oligarch*, FINANCIAL TIMES, Mar. 5, 2015, https://www.ft.com/content/b47de3d4-c325-11e4-ac3d-00144feab7de; Jason Corcoran, *PROFILE: Mikhail Fridman – the Teflon oligarch new to Londongrad*, BNE INTELLINEWS, Apr. 11, 2016, http://www.intellinews.com/profile-mikhail-fridman-the-teflon-oligarch-new-to-londongrad-94873/; Megan Davies & Melissa Akin, *Russian risks bear down on oligarch Fridman*, REUTERS, June 6, 2012, https://uk.reuters.com/article/us-russia-tnkbp-fridman/russian-risks-bear-down-on-oligarch-fridman-idUSBRE8550S420120606; Mikhail Fridman, *Fridman: How I became an oligarch* (Nov. 14, 2010), available at https://www.opendemocracy.net/od-russia/mikhail-fridman/fridman-how-i-became-oligarch (reproducing Fridman's 2010 lecture entitled "How I Became an Oligarch"); Jack, *supra* note 13; Kandell, *supra* note 1; Sergei Karpukhin, *Few Oligarchs Can Beat Russia's Weakening Economy*, NEWSWEEK, Dec. 11, 2014, http://www.newsweek.com/few-oligarchs-can-beat-russias-weakening-economy-290984; Kramer, *supra* note 1; Levine, *supra* note 1 (discussing relationship between Fridman and Putin in light of Fridman's business moves in oil industry); Henry Meyer, et al., *Putin Critics Are Advising the U.S. on its New Oligarchs List*, BLOOMBERG, Jan. 26, 2018, https://www.bloomberg.com/news/articles/2018-01-26/kremlin-foes-advise-u-s-on-sanctions-as-oligarch-list-looms (noting that Fridman and Aven may be included on U.S. Treasury Department list of "the most senior foreign political figures and oligarchs in the Russian Federation, as determined by their closeness to the Russian regime and their net worth"); Karina Orlova, *Russia's Great Bank Takeover*, THE AMERICAN INTEREST, Jan. 12, 2018, https://www.the-american-interest.com/2018/01/12/russias-great-bank-takeover/ (discussing the Kremlin's attack on

close relationship to the highest reaches of the Russian government, and forged a series of friendships and alliances with Russian luminaries and politicians." *OAO Alfa Bank*, 387 F. Supp. 2d at 26.  Aven has a long-standing relationship with Putin because Putin "worked for [Aven] when [Aven] was a minister." *Id.* at n.15.[25]  Fridman is "one of the most powerful and efficient lobbyists in the Kremlin with its new master [Putin]." *Id.*  Alfa was "one of a handful of private financial companies with a special, direct line to the Kremlin." *Id.* at n.23.

Recent press reinforces that Judge Bates' summary of Plaintiffs' relationship with the Kremlin as of 2005 is still accurate.  One recent publication referred to Fridman as "President Vladimir Putin's favorite oligarch."[26]  An international affairs publication observed in 2012 that TNK-BP "benefits from . . . Russian shareholders with close ties to Putin, including German Khan."[27]  And the press has observed, in terms echoing CIR 112, that "it is acknowledged that Alfa Group's consortium of billionaires enjoys excellent communication channels with the Kremlin. A recent paper from Oxford University's Institute for Energy concluded that the group can command direct access to Vladimir Putin and Dmitry Medvedev while bypassing any government gatekeepers."[28]

---

private banks and noting that "of the top 10 largest Russian banks today, the only privately owned one that has not been targeted by the authorities is Alfa Bank, owned by Putin's long-time crony Mikhail Fridman"); *see also* Mikhail Zygar, *All of the Kremlin's Men: Inside the Court of Vladimir Putin* 57 (2016), available at https://books.google.com/books?id=ETrXCwAAQBAJ&q=aven#v=snippet&q=aven&f=false (noting Putin as being "indebted" to Aven and Putin's blessing of the merger between Alfa Group subsidiary TNK and Britain's BP); Andrew Jack & Arkady Ostrovsky, *Power broker in Russia's shifting scene: Alfa boss Mikhail Fridman*, FIN. TIMES, Aug. 29, 2003 ("Mr. Fridman has bridged the transition to the new regime of President Vladimir Putin more smoothly than most, and has gone further in restructuring and selling interests in his businesses.").

[25]   Aven even keeps a photo of himself and Putin in his home office.  *See* Jack, *supra* note 13.

[26]   Kandell, *supra* note 1.

[27]   Russia: *Is the Kremlin Ending TNK-BP's Infighting?*,  STRATFOR WORLDVIEW,  (May 30, 2012, 10:01 GMT), https://worldview.stratfor.com/analysis/russia-kremlin-ending-tnk-bps-infighting.

[28]   Michael O'Farrell, *Anglo's Partnership with Ruthless Russian Oligarchs*, IRISH MAIL, Nov. 4, 2012, https://www.pressreader.com/ireland/the-irish-mail-on-sunday/20121104/281676842172543.

In addition, the press has scrutinized to Fridman's willingness to push boundaries with Putin insiders in his business ventures, while noting that "Alfa has managed to avoid trouble with the Kremlin itself," including through Aven, "an old friend of Mr. Putin who meets the president regularly."[29]  Fridman himself "says he's careful to avoid anything that the Kremlin would see as a challenge to its control of national politics."[30]  Putin's recent directive to the Alfa shareholders to reinvest the proceeds of the sale of TNK-BP in Russia and Plaintiffs' apparent willingness to ignore that instruction without consequence has also garnered public attention.[31]

Plaintiffs have not been passive subjects of the media attention on their relationship with the Kremlin, but have actively engaged in it and courted it.  Plaintiffs have given frequent interviews to journalists and have spoken publicly on their relationship with the Russian state.[32]  *See also OAO Alfa Bank*, 387 F. Supp. 2d at 45 (noting that Fridman and Aven "have written articles in Russian newspapers, given interviews to newspapers and other media outlets

---

[29]   Gregory L. White, *As Russia Squeezes Big Business, A Tycoon Decides to Pick a Fight*, WALL ST. J., Oct. 6, 2005, https://www.wsj.com/articles/SB112856247619561303.

[30]   *Id.*

[31]   Aris, *supra* note 23 ("But it seems all Alfa's new investments are going on outside of Russia. . . . Ironically, he has been allowed to do this despite Putin's warning to keep the money in the motherland. The fact that he could is a testament to the work that Aven has done behind the scenes to shore up Alfa political krysha, or protection in government circles."); *How Russia's 20 biggest billionaires hide their fortunes from the government*, *supra* note 23 (Putin said in "televised news conference . . . that he 'hoped' the billionaires who sold their 50% stake in TNK-BP -... would reinvest the proceeds in their home country. . . . So far, there's been little money flowing back to Russia.").

[32]   *See, e.g.*, Mike Cummings, *Aven offers inside account of the makings of modern Russia*, YALE NEWS (Nov. 13, 2017), https://news.yale.edu/2017/11/13/aven-offers-inside-account-making-modern-russia; Kristina Subbotina, *Exclusive "No Tie" Interview With Head of the Alfa Banking Holding, Petr Aven on Business, Childhood and Friends*, JEWISH BUSINESS NEWS, Nov. 19, 2015, http://jewishbusinessnews.com/2015/11/19/exclusive-no-tie-interview-with-alfa-banks-president-peter-aven-on-business-childhood-and-friends/ (Aven suggesting that Fridman partnered with him because of his "useful contacts at the government"); Gregory L. White, *TNK-BP Russian Partner Relishes Conflict*, WALL ST. J., Nov. 14, 2011, https://www.wsj.com/articles/SB10001424052970203503204577036000854767804 (interviewing German Khan); Jack, *supra* note 13 (interviewing Aven); Chazan, *supra* note 24 (interviewing Fridman and quoting Fridman as saying he "never wanted to challenge authority . . . We always followed this philosophy — always to be loyal and friendly [to the government] but never to be too close."); Mikhail Fridman, *Fridman: How I became an oligarch*, *supra* note 24; Jack & Ostrovsky, *supra* note 24 (Fridman stating "The rules of business are quite different to western standards.  I don't want to lie and play this game.  To say one can be completely clean and transparent is not realistic.").

11

throughout the world (including ABC's Nightline and CNN), spoken on economic reform issues to international audiences, and developed a well-coordinated and sophisticated public relations strategy through in-house press departments, external public relations firms, and corporate websites."). Just three months ago, in a public forum moderated by Russian *Forbes*, Fridman "spoke about Alfa Group's strange relationship to the Russian authorities," in response to a question about "why the Kremlin has not attacked such a huge conglomerate."[33] Fridman used an analogy of humans and hippopotami, saying that the "main thing" in avoiding an attack is not getting between the hippopotamus (*i.e.*, the Russian state) and "the water."[34]

### iii. Persistent Allegations of Wrongdoing in the Media

The media attention focused on Plaintiffs also reports and comments on widespread, ongoing allegations of wrongdoing by the oligarch Plaintiffs going back decades. Indeed, the article that was the subject of Aven and Fridman's failed defamation claim in *OAO Alfa Bank* reported that Russian intelligence reports claimed that "Alfa Bank, one of Russia's largest and most profitable, as well as Alfa Eko, a trading company, had been deeply involved in the early 1990s in laundering of Russian and Colombian drug money and in trafficking drugs from the Far East to Europe," and that "Alfa Groups top executives, oligarchs Mikhail Fridman and Pyotr Aven, 'allegedly participated in the transit of drugs from Southeast Asia through Russia and into Europe.'"[35] The article detailed, among other things, the intelligence reports' statements on Alfa Bank laundering drug funds from Russian and Colombian cartels; an incident in which the

---

[33] *Russian media roundup, October 7-13, 2017*, INSTITUTE OF MODERN RUSSIA, *Republic gets political advice from Alfa Group co-founder Mikhail Fridman*, at ¶ 4, Oct. 13, 2017, https://imrussia.org/en/the-rundown/media-must-reads/2862-russian-economy-suffers,-saudi-king-in-moscow,-lessons-for-intelligentsia.

[34] *Id.*

[35] Knut Royce & Nathaniel Heller, Cheney led Halliburton to feast at federal trough, CTR. FOR PUB. INTEGRITY (Aug. 2, 2000, 10:03 pm), https://www.publicintegrity.org/2000/08/02/3279/cheney-led-halliburton-feast-federal-trough.

residents of a Siberian town were poisoned by heroin-laced sugar that had been shipped in an

Alfa Eko rail car; and Alfa officials' cooperation with Russian crime organizations.[36]

In reviewing these statements, Judge Bates noted that "Russian newspapers have

published repeated claims that Aven and Fridman have rigged the auction of state assets through

government connections, threatened the lives of government officials, ordered the assassination

of a mobster, and engaged in narcotics trafficking and money laundering." *OAO Alfa Bank*, 387

F. Supp. 2d at 28.[37]  Allegations of fraud, corruption, and general misconduct have persisted in

the press coverage of Aven and Fridman and their Alfa entities, including coverage related to a

recent bribery scandal involving a Fridman-owned telecommunications company that resulted in

a nine-figure settlement with the U.S. Department of Justice.[38]  Khan has similarly been dogged

by frequent allegations of unethical and criminal activity.[39]

---

[36]   *Id.*

[37] Judge Bates also noted that "[a]s early as during Aven's tenure in the Yeltsin government, a corruption task force informed Yeltsin that Aven was engaged in various misdeeds, including drug trafficking." *OAO Alfa Bank*, 387 F. Supp. 2d at 28 n.26; *see also* KAREN DAWISHA, PUTIN'S KLEPTOCRACY: WHO OWNS RUSSIA 18-20 (2014) (special commission report in 1993 "recounted widespread instances of 'bribery of officials, blackmail, and the illegal transfer of currency resources to foreign banks,' with specific ministers sanctioned by name, including Minister of Foreign Economic Relations Pyotr Aven"). And "[e]ven Fridman has acknowledged . . . that the 'rules of business' in Russia 'are quite different to western standards …. To say one can be completely clean and transparent is not realistic." *OAO Alfa Bank*, 387 F. Supp. 2d at 29 & n.9.

[38]   *See* Agustín Marco, *The FBI and the SEC investigate a Spanish company for bribes to Russian politicians*, EL CONFIDENCIAL, Dec. 30, 2016, https://www.elconfidencial.com/empresas/2016-12-30/fbi-sec-investigan-grupo-zed-sobornos-politicos-rusos_1308929/ (reporting that U.S. and Spanish authorities investigated whether company owned by Fridman paid bribes to "relatives of one of the most important ministers of the Kremlin"); Agence France-Presse, *VimpelCom pays $835m to US and Dutch over Uzbekistan telecom bribes*, GUARDIAN, Feb. 18, 2016, https://www.theguardian.com/world/2016/feb/19/vimpelcom-pays-835m-to-us-and-dutch-over-uzbekistan-telecoms-bribes (reporting that a mobile phone company largely owned by Fridman paid $835 million to settle charges that it paid bribes to enter the Uzbekistan telecommunications market); The Economist Intelligence Unit, *VimpelCom admits to bribery*, THE ECONOMIST (Mar. 2, 2016), http://www.eiu.com/industry/article/1263994310/vimpelcom-admits-to-bribery/2016-03-02 (same); *Dutch subsidiary of Russia's Alfa Bank raided in money laundering investigation*, REUTERS (Dec. 12, 2017), https://www.reuters.com/article/netherlands-russia-bank/corrected-dutch-subsidiary-of-russias-alfa-bank-raided-in-money-laundering-investigation-idUSL8N1OC4SM (noting that Amsterdam Trade Bank, the "Dutch subsidiary of Russia's Alfa Bank, owned by billionaire Mikhail Fridman, was searched last week as part of an investigation into possible money laundering"); *Spanish company Zed searched, son of Interior Minister and Russian oligarch involved*, Crime Russia (June 30, 2017), https://en.crimerussia.com/corruption/associated-with-fridman-and-kolokoltsov-spanish-company-zed-searched/ (reporting on Spanish investigation into Zed Worldwide group related to bribery of Russian officials, stating that Spanish investigators "point to Russian-Israeli oligarch, the founder and shareholder of Alfa Group Mikhail

## CIR 112 AND THE DOSSIER

As Plaintiffs acknowledge, Defendants did not author CIR 112.  Plaintiffs' Amended Complaint alleges that, in 2016, Defendants were engaged to "gather discrediting information about candidate Trump to thwart his presidential run, including any connections he might have to Russian businesses or Russia's government." Am. Compl. ¶ 3.  "Steele claims to have used his own Russian sources . . . to compile the reports, which were then delivered to the Defendants over the course of several months in 2016." *Id.*  ¶ 4.  CIR 112 is one of seventeen reports that

---

Fridman" as "the person involved in bribes in Russia"); *Mikhail Fridman's right hand arrested over corruption in Spain*, Crime Russia (Jan. 17, 2017),  https://en.crimerussia.com/gromkie-dela/mikhail-friedman-s-right-hand-arrested-over-corruption-in-spain/; *see also, e.g.*, Bruck, *supra* note 4 (noting that when Russian government privatized TNK by auctioning it off, government released "precise eligibility requirements" for auction and "those requirements matched AAR's qualifications exactly"); Eamon Javers, *Spies, Lies & KPMG*, BLOOMBERG BUSINESSWEEK (Feb. 26, 2007, 12:00 AM), https://www.bloomberg.com/news/articles/2007-02-25/spies-lies-and-kpmg (Alfa used former spies to infiltrate KPMG to obtain secrets from audits on Alfa's rival); Jeff Patch, *Did Lobbyists Break the Law?*, POLITICO (Mar. 14, 2007, 1:25 PM),  https://www.politico.com/story/2007/03/did-lobbyists-break-the-law-003137 (Congressional hearings into whether Alfa lobbyists who allegedly impersonated spies to obtain audit documents broke U.S. law); White, *supra* note 29 (Alfa accused of paying witnesses and fraud).

[39]   *See, e.g.*, Andrew E. Kramer, *In Bid for BP's State of Venture, a Former Spy Becomes the Focus*, N.Y. TIMES, July 24, 2012,  http://www.nytimes.com/2012/07/25/business/global/rosneft-opens-talks-on-buying-bps-stake-in-oil-joint-venture.html (reporting that former TNK-BP employee accused Khan "of funneling hundreds of millions of dollars in bribes to Russian officials in the guise of subcontracts"); Complaint ¶ 353, *Norex Petroleum Ltd. v. Access Indus.*, No. 02-cv-1499 (S.D.N.Y. Feb. 26, 2002) (detailing allegations of threats made by Khan to officials at a targeted oil company and alleging that "TNK obtained control over [the target company] through extortion as reflected by the threat of the armed thugs"); Callus, *supra* note 17 (alleging Khan threatened to harm former TNK-BP employee to force him to confess to accepting bribes); *id.* (detailing that Khan responded to the employee's description of him as "extremely ruthless" by stating "as is well known . . . doing business in Russia is not for the faint hearted"); Rowena Mason, *TNK-BP internal fraud probe leads to 37 criminal cases*, THE TELEGRAPH (Sep. 8, 2011),  http://www.telegraph.co.uk/finance/newsbysector/energy/oilandgas/8751128/TNK-BP-internal-fraud-probe-leads-to-37-criminal-cases.html (disclosing that probe at TNK-BP had detailed hundreds of allegations of unscrupulous behavior and 37 criminal cases involving employees and contractors); Holly Watt & Tim Ross, *WikiLeaks: BP's new Russian partner sees Godfather films as 'manual for life'*, THE TELEGRAPH (Feb. 1, 2011, 6:30 AM),   http://www.telegraph.co.uk/news/worldnews/wikileaks/8294428/WikiLeaks-BPs-new-Russian-partner-sees-Godfather-films-as-manual-for-life.html (according to U.S. diplomatic cables published by WikiLeaks, Khan considered The Godfather movie to be his "manual for life" and he attended dinners "armed with a chrome-plated pistol"); Kseniya Zaslavskiy, *Russia's 2008 "spying scandal" guise for FSB-oligarch takeover of TNK-BP*, EUROMAIDEN PRESS (Sept. 9, 2016), http://euromaidanpress.com/2016/09/09/russias-2008-spying-scandal-guise-for-fsb-oligarch-takeover-of-tnk-bp/; TOM BOWER, OIL: MONEY, POLITICS, AND POWER IN THE 21ST CENTURY (2010) (describing Khan as "an enforcer" who was "willing to throw a grenade into a room just to see what opportunities would arise out of the chaos"); Courtney Weaver, *Cash-laden oligarchs hunt pastures new*, FIN. TIMES, April 5, 2013,  https://www.ft.com/content/25bf411a-9e01-11e2-bea1-00144feabdc0 (quoting former TNK-BP associate as saying "Say what you want about the ethical things but [Khan is] good at squeezing efficiency out of [Russian oil and gas companies]").

Steele authored.  *Id.* ¶ 2.  Together, those reports have become known in the popular media as "the Dossier."  CIR 112 consists of less than one-and-a-half pages.  Ex. 1.

The Amended Complaint alleges that Defendants "arranged for Steele to brief selected members of the print and online media about the information he was compiling on candidate Trump."  Am. Compl. ¶ 6.  Plaintiffs do not allege that BuzzFeed, Inc., received such a briefing.  Plaintiffs also do not allege that Defendants gave copies of either CIR 112 or the Dossier to BuzzFeed or any other journalist or media organization.  On January 10, 2017, BuzzFeed published all of the reports comprising the Dossier on the Internet.  *Id.* ¶ 8.

## ARGUMENT

### I.  STANDARD OF LAW

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The court need not "accept inferences drawn by [a] plaintiff[] if such inferences are unsupported *by the facts* set out in the complaint."  *Id.* (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)) (emphasis added).  Nor must the court accept as true legal conclusions or "mere conclusory statements."  *Iqbal*, 556 U.S. at 678.  Instead, "determining whether a complaint states a plausible claim [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  "[U]nless a plaintiff is able to nudge his or her claim 'across the line from conceivable to plausible,' the complaint must be dismissed."  *Deripaska*, 2017 WL 4685297, at *2 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 571 (2007)).

To state a claim for defamation under District of Columbia law, the complaint must plausibly allege that the statements at issue are: (1) defamatory; (2) "of and concerning" the plaintiff(s); (3) capable of being proven true or false; (4) false; and (5) made with requisite degree of fault. *Coles v. Wash. Free Weekly, Inc.*, 881 F. Supp. 26, 30 (D.D.C. 1995); *see also Weyrich v. New Republic, Inc.*, 235 F.3d 617, 623 (D.C. Cir. 2001). And, of course, the defendant must have "published the statement without privilege to a third party." *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1088 (D.C. Cir. 2007). In assessing "whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013). Judicial notice is properly taken of publicly available publications, including books, magazines, and newspapers. *See id.*; *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954 (9th Cir. 2010); *Premier Growth Fund v. Alliance Capital Mgmt.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006); *Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 299 (S.D.N.Y. 2012).

"Given the threat to the first amendment posed by nonmeritorious defamation actions, it is particularly appropriate for courts to scrutinize such actions at an early stage of the proceedings to determine whether dismissal is warranted." *Coles*, 881 F. Supp. at 30. The D.C. Circuit has long recognized that, in defamation cases, "summary procedures are . . . essential" because "the stake here, if harassment succeeds, is free debate." *Wash. Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966). This frequently means dismissal on a motion to dismiss because, "unlike in most litigation, in a libel suit the central event—the communication about which suit has been brought—is ordinarily before the judge at the pleading stage" and he "may

assess it upon a motion to dismiss, firsthand and in context." 2 Robert D. Sack, *Sack on Defamation* § 16:2.1 (5th ed. 2017).

## II.   STATEMENTS IN CIR 112 ABOUT THE OLIGARCH PLAINTIFFS, SUCH AS HAVING A GOOD RELATIONSHIP WITH PRESIDENT PUTIN, ARE NOT DEFAMATORY.

"Under the First Amendment, liability for defamation arises only if, at a minimum, a defendant's statement 'reasonably implies false and defamatory *facts*.'" *Farah*, 736 F.3d at 534 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)) (emphasis added). Because of this First Amendment protection, the Court must make three threshold inquiries as a matter of law into the allegedly defamatory statements: (1) whether they can be reasonably interpreted as stating "actual facts" about Plaintiffs; (2) whether they are "verifiable," and not "so imprecise or subjective that [they are] not capable of being proved true or false;" and (3) whether they are "reasonably capable of defamatory meaning." *Id.* at 534-35. With one possible exception, none of the allegedly defamatory statements in CIR 112 satisfy these requirements.

### A.   The Title of CIR 112 Is Not Defamatory.

Plaintiffs assert that the title of CIR 112—RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION— is defamatory because it "suggests that Alfa and its executives, including the Plaintiffs, 'cooperated' in an alleged Kremlin-orchestrated campaign to interfere in the 2016 U.S. presidential election." Am. Compl. ¶ 19. To make this argument, Plaintiffs ignore the content of CIR 112 and ask the Court to consider the title on its own.

CIR 112's text contains no references to the 2016 U.S. presidential election, Hillary Clinton or Donald Trump. The body of the report makes clear that its author did not assert any involvement or cooperation by the Alfa Group in the U.S. presidential election. In fact, the body of the report makes clear that the "co-operation" referenced in the title refers to the "closeness"

of the Alfa Group and the Kremlin and the "favours . . . done in both directions." Ex. 1.   As a

result, Plaintiffs' claim that the "co-operation" referenced in the title refers to the U.S.

presidential election requires the reader to ignore the body of CIR 112.   The case law does not

allow for titles to be read in this manner.   *See, e.g.*, *Q Int'l Courier, Inc. v. Seagraves*, No. 95-

1554 (RMU), 1999 WL 1027034, at *4 (D.D.C. Feb. 26, 1999) ("adopt[ing] the majority rule

that headlines are to be construed in conjunction with their accompanying articles" and holding

the headline "Two Firms Nailed for Postage Fraud" was not actionable because the article made

clear that the term "nailed" meant "caught" rather than "arrested"); *see also Hogan v. Winder*,

762 F.3d 1096, 1108 (10th Cir. 2014) ("majority of jurisdictions hold that a headline cannot be

severed from the body of the article when undertaking defamation analysis").

And, even if the Court could consider the title of CIR 112 separate and apart from the

body of CIR 112, the title—like much of the rest of CIR 112—is not capable of defamatory

meaning because it is not a statement of fact.   *See Farah*, 736 F.3d at 534.

**B.     The First Paragraph of CIR 112 Is Not Defamatory.**

The first paragraph of CIR 112 reads as follows:

> Speaking to a trusted compatriot in mid-September 2016, a top
> level Russian government official commented on the history and
> current state of relations between President PUTIN and the Alpha
> Group of businesses led by oligarchs Mikhail FRIDMAN, Petr
> AVEN and German KHAN.   The Russian government figure
> reported that although they had had their ups and downs, the
> leading figures in Alpha currently were on very good terms with
> PUTIN. Significant favours continued to be done in both
> directions, primarily political ones for PUTIN and business/legal
> ones for Alpha.   Also, FRIDMAN and AVEN continued to give
> informal advice to PUTIN on foreign policy, and especially about
> the US where he distrusted advice being given to him by officials.

Ex. 1.   Plaintiffs do not allege that these statements are false, absent Plaintiffs'

reinterpretation of them.   *Coles*, 881 F. Supp. at 31 ("That the truth carries a negative implication

does not give the Plaintiff a meritorious defamation cause of action.").  Instead, Plaintiffs claim that the "reasonable reading" of this paragraph is that

> Plaintiffs Fridman, Aven, and Khan, along with Alfa, are alleged to maintain a highly inappropriate, and even criminal, relationship with Putin based on criminal interaction dating back to the 1990s. By clear and defamatory implication, CIR 112 purports to tie the Plaintiffs to a Kremlin-orchestrated campaign to interfere in the 2016 U.S. election.

Am. Compl. ¶ 23.  Those words, however, are not in the text of CIR 112 and are not a fair interpretation of that text.

First, Plaintiffs invent the paragraph's "clear . . . implication" that Plaintiffs are tied to "a Kremlin-orchestrated campaign to interfere in the 2016 U.S. election."  *Id.*  CIR 112 says nothing of the sort and is not fairly read to so imply.  Second, Plaintiffs read defamatory implications from the description of Plaintiffs' and Alfa's relationship with Putin where there are none.  There is nothing illegal about being on "very good terms" with the Russian president or "giv[ing] informal advice" to him on foreign policy.  *Id.* ¶ 22.  These statements are not capable of defamatory meaning.

Plaintiffs struggle to read something nefarious into the statement that "[s]ignificant favors continue to be done in both directions."  Favors are not illegal without more, and the text challenged here does not mention or imply illegality.  For example, Merriam Webster provides as definitions of favor, among others, "friendly regard shown toward another especially by a superior," "approving consideration or attention," "gracious kindness," "a token of love (usually a ribbon) usually worn conspicuously," and "a special privilege or right granted or conceded."[40]

---

[40]       *Favor*,      Merriam-Webster      Dictionaries,      https://www.merriam-webster.com/dictionary/favor?utm_campaign=sd&utm_medium=serp&utm_source=jsonld.

These dictionary definitions also show that CIR 112's reference to "[s]ignificant favors" is exactly the kind of vague, "loosely definable" and "variously interpretable" statement that does not constitute a verifiable fact and cannot support a defamation claim. *Ollman v. Evans*, 750 F.2d 970, 980-81 (D.C. Cir. 1984). Courts have repeatedly held that such statements are not actionable because they cannot reasonably be interpreted to convey actual facts, let alone verifiable ones. *See, e.g.*, *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 283-87 (1974) ("use of words like 'traitor' cannot be construed as representation of fact"); *Weyrich*, 235 F.3d at 624-25 (statement that politician "suffer[ed] bouts of pessimism and paranoia" not actionable because description was "not a verifiably false attribution in fact of a 'debilitating mental condition'"); *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 260 (D.D.C. 2013) (characterization of individual as "evil" was "not a verifiable statement of fact"); *see also Adelson v. Harris*, 973 F. Supp. 2d 467, 493 (S.D.N.Y. 2013) (holding that terms "dirty money" and "tainted money" are "not be susceptible of being proven true or false"); *McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir. 1987) ("The lack of precision [in the meaning of the word 'scam'] makes the assertion 'X is a scam' incapable of being proven true or false."); *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 728 (1st Cir. 1992) ("Whether appellant's 'Phantom' is 'fake' or 'phony' is [] unprovable, since those adjectives admit of numerous interpretations."); *Buckley v. Littell*, 539 F.2d 882, 893 (2d Cir. 1976) ("[T]he use of 'fascist,' 'fellow traveler' and 'radical right' as political labels . . . cannot be regarded as having been proved to be statements of fact, among other reasons, because of the tremendous imprecision of the meaning and usage of these terms"); *Wait v. Beck's N. Am., Inc.*, 241 F. Supp. 2d 172, 183 (N.D.N.Y. 2003) ("Statements that someone has acted . . . unethically generally are constitutionally protected statements of opinion.").

Furthermore, Plaintiffs, particularly Fridman and Aven, have publicly embraced their relationship with Putin and the Russian government. *See, e.g.*, *OAO Alfa Bank*, 387 F. Supp. 2d at 26 & n.23; *supra* note 32. They obviously do not find it damaging to have a good relationship with their president. Judge Bates recognized that, "as two of the most powerful Russian oligarchs," Fridman and Aven "have maintained a close relationship to the highest reaches of the Russian government, and forged a series of friendships and alliances with Russian luminaries and politicians." *OAO Alfa Bank*, 387 F. Supp. 2d at 26. Under these circumstances, it cannot be defamatory for Steele to memorialize in CIR 112 the current state of their relations. *See Deripaska*, 2017 WL 4685297, at *7 ("Moreover, it is readily available, judicially noticeable information that [Russian oligarch] Deripaska openly associates himself with the Russian government. For the AP to do the same cannot be defamatory, even if it were not true.").

As a final point, the first sentence of this paragraph is the only place in CIR 112 in which Plaintiff German Khan's name appears. This single reference to Khan as an oligarch who leads the "Alpha Group" is not defamatory.[41]

### C. With the Possible Exception of One Sentence, the Second Paragraph of CIR 112 Is Not Defamatory.

The second paragraph of CIR 112 states:

> Although FRIDMAN recently had met directly with PUTIN in Russia, much of the dialogue and business between them was mediated through a senior Presidential Administration official, Oleg GOVORUN, who currently headed the department therein responsible for Social Co-operation With the CIS. GOVORUN was trusted by PUTIN and recently had accompanied him to Uzbekistan to pay respects at the tomb of former president

---

[41]   Statements about Alfa are not "of and concerning" Khan. "'[D]efamation is personal; . . . allegations of defamation by an organization and its members are not interchangeable. . . . [S]tatements which refer to an organization do not implicate its members." *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1089 (D.C. Cir. 2007) (quoting *Provisional Gov't of New Afrika v. ABC, Inc.*, 609 F. Supp. 104, 108 (D.D.C. 1985)). Thus, even if the Court were not to dismiss the Amended Complaint in its entirety (which it should), the Court should dismiss Khan as a plaintiff.

KARIMOV. However according to the top level Russian government official, during the 1990s GOVORUN had been Head of Government Relations at Alpha Group and in reality, the "driver" and "bag carrier" used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St Petersburg. Given that and the continuing sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN.

Ex. 1. Plaintiffs do not deny or claim as defamatory the first sentence of this second paragraph stating that Fridman and Putin recently met in Russia in a meeting mediated through Oleg Govorun. The second sentence about Govorun does not concern Plaintiffs. The third sentence is the lone statement in CIR 112 that could be potentially defamatory, suggesting that Fridman and Aven (not Khan) used an intermediary to deliver "illicit cash" to Putin in the 1990s. This sentence is potentially defamatory because it suggests that Fridman and Aven engaged in criminal activity many years ago. It is not defamatory for the reasons that Plaintiffs argue: that the "statements, when considered in the Trump/Russia context of the Dossier as a whole, imply that the alleged improper relationship between Alfa, the Plaintiffs, and Putin . . . is currently ongoing, and that Govorun, the alleged 'bag carrier' of the 1990s, . . . serves as the trusted intermediary between the Plaintiffs and Putin the alleged cooperation of Plaintiffs in the Trump/Russia conspiracy." Am. Compl. ¶ 26. There is nothing in CIR 112 that remotely suggests that Plaintiffs are cooperating "in the Trump/Russia conspiracy," let alone that Govorun is their intermediary related to that conspiracy. Plaintiffs have invented the suggestion that this sentence concerns events occurring in 2016 when the sentence specifically says "in the 1990s."

But, as explained below, Plaintiffs cannot state a defamation claim based on that corruption-related allegation without alleging actual malice, as the public controversy concerning them as Russian oligarchs has already been determined to include "corruption in post-Soviet

Russia." *OAO Alfa Bank*, 387 F. Supp. 2d at 43 (dismissing defamation claim by Aven, Fridman and Alfa). And, as discussed in Section IV, they have failed to adequately allege actual malice.

### D.     The Third Paragraph of CIR 112 Is Not Defamatory.

The third paragraph states:

> The top level Russian government official described the PUTIN-Alpha relationship as both carrot and stick. Alpha held 'kompromat' on PUTIN and his corrupt business activities from the 1990s whilst although not personally overly bothered by Alpha's failure to reinvest the proceeds of its TNK oil company sale into the Russian economy since, the Russian president was able to use pressure on this count from senior Kremlin colleagues as a lever on FRIDMAN and AVEN to make them do his political bidding.

Ex. 1. This paragraph is similar to the first paragraph in that it does not contain any allegations of illegal conduct by Plaintiffs. Instead, it contains only "loose, figurative, or hyperbolic language" that cannot be reasonably interpreted as stating actual, provable facts about Plaintiffs. *Milkovich*, 497 U.S. at 21-23.

The first sentence recounts a government official's description of the Putin-Alfa relationship using a metaphor that the relationship is "both carrot and stick." Such a figure of speech is plainly not "objectively capable of proof or disproof." *Ollman*, 750 F.2d at 981 (noting that "a reader cannot rationally view an unverifiable statement as conveying actual facts").

The second sentence contains missing words and/or grammatical errors that make it hard to understand, much less have defamatory meaning. The word "kompromat" refers to "compromising material used to discredit rivals in politics or business or just settle personal scores."[42] Even if "Alpha held 'kompromat' on Putin" could be understood as a statement of a

---

[42]   Greg Myre, *A Russian Word Americans Need to Know: 'Kompromat,'* NAT. PUB. RADIO (Jan. 11, 2017, 3:11 PM),        http://www.npr.org/sections/parallels/2017/01/11/509305088/a-russian-word-americans-need-to-know-kompromat.

verifiable fact, the assertion that Alfa possessed unspecified material that could be embarrassing to Putin does not have any defamatory meaning as to Plaintiffs, or even as to Putin.

The other allegation embedded in this second sentence is that Putin, despite not being personally bothered by Alfa's failure to reinvest in the Russian economy proceeds of its TNK oil company sale, is able to use pressure from that failure to make Fridman and Aven "do [Putin's] political bidding."  That allegation—that Putin "was able to use pressure . . . from senior Kremlin colleagues as a lever on FRIDMAN and AVEN to make them do his political bidding"—is also not defamatory.  It suggests no illegal conduct whatsoever on the part of Fridman or Aven.  And, additionally, it is "so imprecise [and] subjective that it is not capable of being proved true or false," and therefore "is not actionable in defamation."  *Farah*, 736 F.3d at 534-35.

Plaintiffs' own assertions about why this paragraph is defamatory are divorced from the actual text, once again substituting new words and thoughts for those in the text.  Plaintiffs claim that the paragraph "suggests that Plaintiffs Fridman and Aven use their knowledge of past bribery of Putin—'kompromat'—as a means of criminally extorting continuing favorable treatment for their business interests from his government."  Am. Compl. ¶ 28.  Any suggestion that Plaintiffs are "criminally extorting continuing favorable treatment for their business interests" is not related to the text of this paragraph.  Plaintiffs then invent the *non sequitur* that the paragraph "implies that Alfa and two of its largest beneficial owners willingly maintain a close relationship with Putin and cooperated in some unspecified way in the Kremlin's alleged campaign to interfere in the U.S. election in an effort to avoid retribution from Putin for not reinvesting business proceeds in Russia."  *Id*.  No such implication exists.  This paragraph—like the entirety of CIR 112—has nothing whatsoever to do with interference in the U.S. election and

Plaintiffs' suggestion to the contrary is imagined.  (Nor does the paragraph assert the willing maintenance of a close relationship, although that characterization would not be defamatory.)

III.   **PLAINTIFFS ARE PUBLIC FIGURES FOR THE PURPOSES OF THE PUBLIC CONTROVERSIES ADDRESSED BY CIR 112: RUSSIAN OLIGARCHS' POLITICAL-BUSINESS RELATIONSHIPS WITH THE RUSSIAN GOVERNMENT AND PRESIDENT PUTIN AND THE CONDUCT OF THOSE PARTIES WITH RESPECT TO THOSE RELATIONSHIPS.**

Even if the Court concludes that CIR 112 contains statements capable of being defamatory, the Court should dismiss the Amended Complaint because Plaintiffs are public figures whose complaint wholly fails to plead the requisite actual malice.  This Section III addresses the public figure issue, and Section IV addresses the malice issue.

A.   **Legal Standard**

Whether Plaintiffs are public figures is a "matter of law for the court to decide." *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987) (citations omitted).  The test to determine whether a plaintiff is a limited purpose public figure in the D.C. Circuit examines whether: (1) there is a pre-existing public controversy; (2) the plaintiff played a significant role in that controversy; and (3) the allegedly defamatory statements are germane to the plaintiff's participation in the controversy.  *Waldbaum v. Fairchild Publ'ns*, 627 F.2d 1287, 1296-98 (D.C. Cir. 1980). The "touchstone" to this limited public figure analysis is "determining whether an individual has assumed a role of especial prominence in the affairs of society that invites attention and comment."  *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 585 (D.C. Cir. 2016) (alterations & internal quotation marks omitted).

Courts regularly resolve the issue of a defamation plaintiff's status on motions on the basis of pleadings and documents subject to judicial notice.  *See, e.g.*, *Deripaska*, 2017 WL 4685297, at *6; *Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 143 (D.D.C. 2016), *aff'd*, 690 F. App'x 1 (D.C. Cir. 2017); *Boley*, 950 F. Supp. 2d at 262.

B.      **Public Controversy**

A public controversy exists concerning the entanglement of the Russian oligarchs' political and business interests and those of the Russian state, including the questionable, unethical and illegal conduct by actors on both sides.  All of CIR 112's challenged text concerns that controversy.  Statements concerning immoral, criminal or other wrongdoing by Russian oligarchs on behalf of the Russian state or the Kremlin, or vice versa, relate to that controversy.

In *OAO Alfa Bank*, which involved the defamation claims of Plaintiffs Fridman, Aven and Alfa Bank arising out of reports of corruption, drugs, money laundering and other misdeeds, Judge Bates identified "the rise of the oligarchs and the decline of the Russian economy" into a "criminal-syndicalist state" as a "public controversy."  387 F. Supp. 2d at 43, 44.  Judge Bates described how, as the Russian economy privatized, a "group of individuals with close political connections to the Yeltsin government amassed enormous wealth and power through the wholesale transfer of prized state assets and shady deals with government officials."  *Id.* at 23.  "These tycoons, known as 'oligarchs,' rose to power based in large measure on their ability to navigate and manipulate the rules of a corrupt and lawless post-Soviet Russian economy."  *Id.*  Judge Bates found that the "situation did not change when Vladimir Putin took power [in 2000].  'Putin, said one analyst close to the Kremlin, has had dealings with several 'oligarch' groups.  The closest, at the moment, is Alfa Group, led by Pyotr Aven, who as Russia's foreign trade minister in 1992 approved Putin's export contracts in St. Petersburg.'"  *OAO Alfa Bank*, 387 F. Supp. 2d at n.23.

Just last month, Judge Huvelle also found that a public controversy existed concerning conduct by the Russian oligarchs on behalf of the Russian state, and vice versa.  *Deripaska*, 2017 WL 4685297, at *4.  In that case, another Russian oligarch, Oleg Deripaska, challenged as

defamatory an article reporting that he hired Paul Manafort to promote Putin's government's interests internationally.  *Id.* at *1.  Judge Huvelle looked at the news coverage related to Deripaska's "role as a Russian oligarch and one of Putin's closest confidantes" and held that "there can be no doubt that a public controversy exists relating to Russian oligarchs acting on behalf of the Russian government," which resulted in dismissal of the case.  *Id.* at *4.

The conclusions of Judge Bates and Judge Huvelle about the public controversy concerning the conduct of the Russian oligarchs and their relationship to the Kremlin are supported by a huge public record.[43]  The media, including in the United States, has paid close attention to the degree of the oligarchs' influence on the Kremlin and the Kremlin's control over the oligarchs and their acts in service of the Kremlin.[44]  The relationship is sometimes reported as symbiotic and sometimes reported as adversarial—but it is always the subject of public scrutiny.

### C.       Plaintiffs' Prominence in the Controversy

As three of the most prominent Russian oligarchs, Plaintiffs frequently feature in the controversy about the conduct of Russian oligarchs, including on behalf of or in cooperation with the Kremlin.[45]  Judge Bates exhaustively documented Plaintiffs Fridman and Aven's "special prominence" in the controversy of the rise of the Russian oligarchy, finding them to be "two of the richest and most powerful individuals" in Russia who "fully engaged in the worldwide debate

---

[43]     *See supra* note 1; *see also supra* note 24.

[44]     *See, e.g.*, Kolesnikov, *supra* note 1 ("At the core of the Russian state system is an unspoken agreement: the oligarchy supplies the needs *and* wants of the ruling authorities who, in turn, protect the oligarchy from interference."); Yaffa, *supra* note 1 ("[M]any oligarchs finance the 'black ledger,' which . . . is 'money that does not go through the budget but is needed by the state. . . . Funds leave the state budget as procurement orders [to companies owned by the oligarchs], and come back as off-the-books cash, to be spent however the Kremlin sees fit."); Kramer & Herszenhorn, *supra* note 1 ("Critics say these relationships are evidence of deeply entrenched corruption, which they view as essentially government-sanctioned theft invariably connected to Russia's abundant natural resources: gas, oil, minerals.").

[45]     See *supra* note 24.

regarding the causes and the cure for the corruption that has overcome the Russian economy, and have themselves been the repeated target of allegations of collusions and illegality." *OAO Alfa Bank*, 387 F. Supp. 2d at 44.  Judge Bates noted they had "risen to positions of unprecedented influence in the political and economic affairs of their nation" and found them to be "the very centerpiece of the public controversy." *Id.*  German Khan has played a nearly identical role in the controversy as Fridman and Aven.[46]

Other guideposts that bear on the public figure inquiry are also present here.  All of the Plaintiffs' careers have plainly "invite[d] attention and comment." *OAO Alfa Bank*, 387 F. Supp. 2d at 44 (Aven and Fridman "are among the richest and most influential businesspeople in Russia, if not the world"); *see also Tavoulareas*, 817 F.2d at 773 (fact that plaintiff was president and COO of large multinational corporations relevant to "whether that person has invited attention and comment"); *Novecon v. Bulgarian-Am. Enter. Fund*, 977 F. Supp. 45, 49 (D.D.C. 1997) (plaintiff's "impressive resume is a factor in his public figure status").  They have also been the subject of wide-spread news coverage, creating a "media footprint [that] is far greater than those found sufficient to support public figure status in the past." *OAO Alfa Bank*, 387 F. Supp. 2d at 45.  And Plaintiffs enjoy "access to the channels of effective communication that enable them to respond to any defamatory statements." *Id.* (internal quotation marks omitted) (discussing Aven and Fridman's frequent public appearances and interviews).[47]

---

[46]   *See, e.g., German Khan the Oligarch Behind TNK,* supra note 16; *The billionaire oligarchs behind Alfa-Access-Renova (AAR)*, THE GUARDIAN (May 17, 2011), https://www.theguardian.com/business/2011/may/17/aar-billionaire-oligarch; Jen Alic, *Alfa Billionaires Launch L1 Energy Fund*, OILPRICE (June 22, 2013, 7:00 PM), https://oilprice.com/Energy/Energy-General/Alfa-Billionaires-Launch-L1-Energy-Fund.html (describing Fridman's and Khan's venture to reinvest the proceeds from the TNK-BP sale internationally).

[47]   *See also, e.g., supra* note 32; Mikhail Fridman, *Fridman: How I became an oligarch*, *supra* note 24; Weaver, *supra* note 39 (noting that following the deal to sell their stake in TNK-BP, Fridman and Khan took "a dozen other tycoons, two camels and *a film crew from a Russian television channel*" on a trek in the Israeli desert to celebrate (emphasis added)).

### D.    Germaneness

CIR 112 directly concerns Plaintiffs' relationship with the Kremlin and the nature of that relationship and is therefore "germane" to the controversy.  *Boley*, 950 F. Supp. 2d at 261.  The germaneness inquiry is whether the challenged statements are "wholly unrelated" to the public controversy.  *Waldbaum*, 627 F.2d at 1298; *see also Tavoulareas*, 817 F.2d at 773-74 (article discussing alleged nepotism at an oil company was germane to public controversy on the direction of national energy policy because the alleged nepotism was not "'wholly unrelated' to a public controversy where the credibility and integrity of representatives of the oil industry had become an issue").  It prevents publishers from "us[ing] an individual's prominence in one area of public life to justify publishing negligent falsehoods about an unrelated aspect of the plaintiff's life."  *Jankovic*, 822 F.3d at 589.  CIR 112 is plainly germane to the public controversy related the role of Russian oligarchs in Russian politics and the economy, including Russian corruption.  It reported on the current state of relations between the Kremlin and the Russian oligarch Plaintiffs.  Further, even what Plaintiff alleges to be the defamatory implications of the statements in CIR 112—that Plaintiffs had a corrupt and improper relationship with President Putin—go directly to the heart of that controversy.

### E.    The Public Controversy at Issue in CIR 112 Is Not the U.S. Presidential Election, But Even if CIR 112 Touches on That Controversy, Plaintiffs Are Still Public Figures.

Plaintiffs have said that they will argue that the "controversy that is the subject of this case [is] alleged interference in the 2016 U.S. Presidential election."  *See* Reply in Supp. of Pls.' Mot. in Response to the Oct. 30, 2017 Order to Show Cause, ECF Dkt. No. 12 at 3-4.  This attempt to narrow the relevant public controversy finds no support in the text of CIR 112.  The text of CIR 112 does not mention the 2016 presidential election, Donald Trump or Hillary

Clinton.  The fact that the report has the caption "Russia/US Presidential Election" before the headline of "Kremlin-Alpha Group Co-operation" does not and cannot change the subject matter of CIR 112 or the statements within it.  CIR 112 does address the cooperation of the Kremlin and Alfa, but not related to the U.S. presidential election.

Furthermore, even if any discussion of the election could be read into the text of CIR 112 (it mentions none explicitly), that would not change the fact that CIR 112 unquestionably addresses the broader public controversy relating to misconduct in the relationship between the Russian oligarchs and the Russian state in which Plaintiffs are public figures.  In the *Deripaska* case, another Russian oligarch, Oleg Deripaska sued the Associated Press over an article that described how former Trump campaign manager Paul Manafort worked for Deripaska and that, in Deripaska's view, contained falsehoods involving criminal activity.  Unable to dispute the abundant news coverage of his "role as a Russian oligarch and one of Putin's closest confidantes," Deripaska argued that the "essential subject matter" of the challenged article was the narrower "Trump Campaign Controversy," and that he was not a limited-purpose public figure with regard to that controversy.  2017 WL 4685297, at *3.  Judge Huvelle did not dwell on Deripaska's attempt to narrow the public controversy.  She held that "there can be no doubt that a public controversy exists relating to Russian oligarchs acting on behalf of the Russian government.  For the purposes of the article in question—*which touches on this broader question as well as narrower concerns relating to the Trump campaign's contacts with Russia*—Deripaska is a limited-purpose public figure."  *Id*. at *4 (emphasis added).  So too here.

## IV.   PLAINTIFFS HAVE MADE NO FACTUAL ALLEGATIONS THAT SUPPORT A PLAUSIBLE INFERENCE OF ACTUAL MALICE.

As limited-purpose public figures, Plaintiffs' defamation claim can survive only if they have adequately pleaded that the defamatory statement "was made with 'actual malice'—that is,

with knowledge that it was false or with reckless disregard of whether it was false or not."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1995).  In a futile effort to meet this standard, the Amended Complaint alleges that the "statements of CIR 112, published in an unverified report attributed to an anonymous 'top level Russian official' of unknown credibility or existence, raise a clear and plausible inference of reckless disregard of truth or falsity by Defendants."  Am. Compl. ¶ 29; *see also id.* ¶ 4 (alleging "Defendants were aware that CIR 112 was not verified"); *id.* ¶ 18 (alleging Defendants published the Dossier not knowing "whether the unverified, anonymous, inherently harmful accusations in CIR 112 were true or false").

Such allegations do not come anywhere close to alleging actual malice.  The D.C. Circuit has held repeatedly that a defendant "has acted recklessly if the defendant in fact entertained *serious doubts* as to the truth of his publication or acted with a high degree of awareness of probable falsity."  *Jankovic*, 822 F.3d at 589 (internal quotation marks and alterations omitted).  Plaintiffs must allege "that the defendant in fact harbored subjective doubt . . . . The plaintiff[s] can make this showing, for example, by offering evidence that 'it was highly probable that the story was (1) fabricated; (2) so inherently improbable that only a reckless person would have put [it] in circulation; or (3) based on an unverified anonymous telephone call or some other source that [defendant] had obvious reason to doubt.'"  *Id.* at 589-90 (quoting *Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003)).  In other words, allegations that the Dossier was "unverified" or that the source was "anonymous" or that Defendants did not know whether the Dossier's contents "were true or false" are insufficient.  Am. Compl. ¶¶ 4, 8, 29.  There are no allegations that Defendants actually harbored subjective doubt here, and that is not surprising.  CIR 112 was authored by a highly regarded former British intelligence officer, described as a "sober, cautious

and meticulous professional with a formidable record,"[48] and there is an extensive public record concerning the topic that CIR 112 address, *i.e.*, Plaintiffs' relationship with President Putin.

Last, the Amended Complaint alleges that "Simpson and Fusion did not live up to their own professed [professional] standards when they published the Dossier."  Am. Compl. ¶ 13. Actual malice, however, cannot be established even where "the plaintiff [] offer[s] evidence of 'highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.'"  *Jankovic*, 822 F.3d at 590 (quoting *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 664-65 (1989); *Clyburn v. News World Commc'ns, Inc*., 903 F.2d 29, 33 (D.C. Cir. 2003)); *see also Harte-Hanks Commc'ns*, 491 U.S. at 665)  (motive in publishing story, including if motive was "to promote an opponent's candidacy," cannot provide basis for finding of actual malice).  "Rather, it is only when a plaintiff offers evidence that 'a defendant has reason to doubt the veracity of its source' does 'its utter failure to examine evidence within easy reach or to make obvious contacts in an effort to confirm a story' demonstrate reckless disregard."  *Jankovic*, 822 F.3d at 590 (quoting *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1509 (D.C. Cir. 1996)). The Amended Complaint contains no such allegations.

Courts in this district have not hesitated to dismiss a complaint for failure to allege actual malice.  *See, e.g.*, *Deripaska*, 2017 WL 4685297, at *6; *Parisi v. Sinclair*, 845 F. Supp. 2d 215, 218 (D.D.C. 2012) (dismissing complaint where it contained no factual allegations suggesting actual malice); *see also Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 280 (D.D.C. 2017) (defamation action can "only survive Defendants' motions to dismiss if it adequately

---

[48]   Nick Hopkins & Luke Harding, *Donald Trump dossier: intelligence sources vouch for author's credibility*, THE GUARDIAN (Jan. 12, 2017), https://www.theguardian.com/us-news/2017/jan/12/intelligence-sources-vouch-credibility-donald-trump-russia-dossier-author.

alleges facts that support an inference that Defendants published the defamatory statements . . . with actual malice"). This Court should similarly dispatch with the instant Complaint.

## V.     PLAINTIFFS HAVE NOT PLEADED ANY ACTIONABLE PUBLICATION BY DEFENDANTS TO A THIRD PARTY.

To plead a defamation claim, a plaintiff must allege that the "defendant published the statement without privilege to a third party." *Jankovic*, 494 F.3d at 1088. Plaintiffs have not adequately alleged such a publication by Defendants. The Amended Complaint's allegations of publication are limited to: (1) purported briefings of journalists about the Dossier, Am. Compl. ¶ 6; (2) the provision of the Dossier "to [David] Kramer for redelivery to Senator [John] McCain," *id.* ¶ 7; (3) Defendants' provision of the Dossier to their client, Perkins Coie; and (4) BuzzFeed's publication of the Dossier on the Internet, *id.* ¶ 8. These allegations do not allege a non-privileged publication for which Defendants could be liable.

### A.     "Briefing" of Journalists

Plaintiffs allege that "Defendants arranged for Steele to brief selected members" of the media "about the information he was compiling on candidate Trump and his campaign." Am. Compl. ¶ 6. But there is no allegation that Steele, let alone Defendants, made any statements in any purported briefing about Plaintiffs or CIR 112 or otherwise shared CIR 112 with any journalists. The Dossier contained seventeen written reports. *Id.* ¶ 2. Given the number of reports in the Dossier and the fact that reports other than CIR 112 addressed conduct about Donald Trump and his campaign, the plausible inference is that any "briefing" on the Dossier would have been on such conduct related to Trump and would not have included any mention of Plaintiffs or the contents of CIR 112. *See Iqbal*, 556 U.S. at 678. Plaintiffs do not allege anything to the contrary; indeed, they themselves allege that they have "nothing to do with" the Dossier's "purpose and intended subject matter." Am. Compl. ¶ 2. Plaintiffs also do not allege

that any of the journalists who attended a "briefing" published any statements about Plaintiffs. They take pains to draft around this inconvenient point. Plaintiffs allege that "[m]any [] media articles reported speculative accounts of the Dossier's existence and contents." Am. Compl. ¶ 6. They allude to articles by Yahoo News and Mother Jones which "described some of the content" or "quoted from [the] reports." *Id.* But there is no allegation that any of these news stories mentioned Plaintiffs or CIR 112.

All told, Plaintiffs have not alleged facts that make it "plausible" that Defendants published *any* statements (let alone any potentially defamatory ones) about Plaintiffs to *any* journalist. Put another way, Plaintiffs allege statements were made to journalists about the Dossier; but they do not allege that any of those statements were about Plaintiffs.

**B.      Delivery of the Dossier to Senator McCain**

As to the provision of a copy of the Dossier to Mr. Kramer for redelivery to Senator McCain, that communication is privileged as First Amendment petitioning activity and under the common law privilege for communications made to a legislator. *See Webster v. Sun Co.*, 731 F.2d 1, 5 (D.C. Cir. 1984) ("An individual must feel unrestrained by potential defamation liability when addressing the legislature. Only then can the lawmaking process be fully informed and operate with maximum effectiveness."). To fall within the privilege, the communicator must have: (1) made the statement with the purpose of "inform[ing] the legislative body on a subject properly within its jurisdiction"; and (2) the statement had "some relation" to "legitimate legislative business." *Id.* This privilege protects unsolicited communications to a legislator, even those made outside of an ongoing legislative proceeding. *Id.* at 3, 6.

The Dossier contained reports that were relevant to U.S. national security. *See, e.g.*, Am. Compl. ¶ 2. It is public knowledge, of which the Court can take judicial notice, that Senator

McCain was, at all relevant times, the Chairman of the Armed Services Committee and a member of the Senate Committee on Homeland Security and Governmental Affairs. *See* John McCain, Committee Assignments, https://www.mccain.senate.gov/public/index.cfm/committee-assignments. The Amended Complaint alleges that the purpose of the meeting between Steele and Kramer was to "show Kramer the content of the sixteen pre-election reports in the Dossier so he could brief Senator McCain," and that Defendants provided the reports in the Dossier to Kramer "for redelivery" to Senator McCain in November 2016.  Am. Compl. ¶ 7.  The plausible inference to be drawn from these alleged facts is that Defendants gave Senator McCain the Dossier—through his agent, Kramer—because of Senator McCain's legislative position and because the content of the Dossier was relevant to Senator McCain's legislative role. Accordingly, the disclosure of the Dossier to Senator McCain, or to Kramer for redelivery to Senator McCain, was absolutely privileged.

Additionally, the District of Columbia recognizes a qualified privilege where "there is reasonable ground for making the alleged defamatory statement, either in the legitimate interest of the person uttering it, or of the person to whom it is communicated."  *Smith v. District of Columbia*, 399 A.2d 213, 220 (D.C. 1979) (Appendix A, adopting the superior court decision); *see also* Restatement (Second) of Torts § 598 (1977) (stating that a publication is conditionally privileged if the information involves an important public interest and that interest requires communication to a public officer or private citizen who can take action).  For the same reasons discussed above, Senator McCain, as Chairman of the Armed Services Committee and a member of the Committee on Homeland Security and Governmental Affairs, had a legitimate interest in receiving the reports in the Dossier—which included information of legislative interest about Russia's alleged attempt to influence the 2016 presidential election as well as other information

about the Kremlin's activities and relationships.  Statements protected by this qualified privilege are "not actionable without a showing of excessive publication or express malice," neither of which is alleged here.  *Smith*, 399 A.2d at 221 (citation omitted).

### C.     Publication of CIR 112 to Fusion's Client

The Amended Complaint also alleges that Defendants published the Dossier, including CIR 112, to their client, Perkins Coie and that Perkins Coie provided it to their clients, the Democratic National Committee and HFACC, Inc. (Hillary Clinton's campaign organization). Am. Compl. ¶ 16.  These alleged "publications" are protected by the common interest privilege. The common interest privilege protects statements "(1) made in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has or honestly believes he has a duty (3) to a person who has such a corresponding interest or duty."  *Payne v. Clark*, 25 A.3d 918, 925 (D.C. 2011); *see also* Restatement (Second) of Torts § 596 cmt. Reporter's Note (1977) (publication is conditionally privileged if "persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know"); Sack, *Sack on Defamation* § 9:2.3.  Whether a statement is subject to the common interest privilege is a matter of law. *Payne*, 25 A.3d at 925.

Fusion's provision of the Dossier to their client manifestly falls within that privilege, as does Perkins Coie's alleged provision of the Dossier to its clients.  Each of those parties has an interest in the contents of the Dossier—Perkins Coie commissioned Fusion to do the research that led to the Dossier to assist in Perkins Coie's representation of its clients.  Am. Compl. ¶¶ 15-16.  In the absence of express malice or malice in fact—neither of which are alleged, the common interest privilege applies.  *Payne*, 25 A.3d at 925.

### D.      BuzzFeed's Publication of CIR 112

Lastly, Plaintiffs try to assign liability to Defendants for BuzzFeed's decision to publish CIR 112, along with the other reports in the Dossier, alleging in a conclusory fashion that Defendants "intended, anticipated, or foresaw a high likelihood that allowing their clients . . . , third parties (like David Kramer and Senator McCain) and the media access to the Dossier's defamatory content would result in its republication by news media outlets, including . . . BuzzFeed."  Am. Compl. ¶ 9.  Plaintiffs' effort to hold Defendants responsible for BuzzFeed's publication of CIR 112 fails for a number of reasons.

First, Plaintiffs do not allege—because they cannot—that Defendants authorized, permitted or acquiesced in the publication of the Dossier by BuzzFeed.  *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002) ("a plaintiff may not recover damages from the original author for . . . slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication"); *Rubenstein v. Manhattan & Bronx Surface Operating Auth.*, No. CV-96-902, 1997 WL 833456, at *6 (E.D.N.Y. Oct. 8, 1997) ("However, if the original publisher 'had nothing to do with the decision' to republish and 'had no control over it,' the 'original publisher cannot be held liable.").  To the contrary, as Plaintiffs well know, Defendants did not give the Dossier to BuzzFeed and that, in fact, "Buzzfeed went to [Fusion GPS] and tried to get the dossier from them and they refused to give it to Buzzfeed."  Ex. 2 (Disc. Hr'g Tr. 8-9, *Gubarev v. Buzzfeed*, No. 0:17-cv-60426-UU (S.D. Fla. Sept. 28, 2017)); *see also* Corrected Reply in Supp. of Non-Party Fusion GPS's Mot. to Quash Third-Party Subpoena at 5, *In re Third Party Subpoena to Fusion GPS*, No. 1:17-mc-02171-TSC (D.D.C. Oct. 27, 2017) (noting that Fusion did not give the Dossier to BuzzFeed).

Second, despite their conclusory allegation that Defendants "foresaw" that BuzzFeed would republish the Dossier, Plaintiffs do not allege facts that support this allegation or make it plausible. Plaintiffs do not allege any contact whatsoever between Defendants and BuzzFeed. (To the contrary, Plaintiffs know that BuzzFeed requested the Dossier from Defendants and Defendants *refused to give it to them. See* Ex. 2.) Plaintiffs do not allege that Defendants gave copies of the reports in the Dossier, including CIR 112, to any journalist or other news media, let alone one affiliated with BuzzFeed. Telling select journalists about the contents of other reports in the Dossier in a background briefing does not make it foreseeable that an entirely different publication would somehow obtain and publish CIR 112. And giving the Dossier to Senator McCain for national security reasons does not make it foreseeable that a news organization would somehow obtain the Dossier, much less publish it.

Plaintiffs' argument amounts to an assertion that republication of allegedly defamatory material by a media organization is attributable to the original author if that author ever allows the material to be viewed by or possessed by any third party—no matter how confidentially or under what circumstances the material was shown or given to the third party. Plaintiffs' argument would eviscerate the whole concept of privileged publications (including the legislative and common interest privileges), making the original author strictly liable for any subsequent republication, despite the fact that his original publication was privileged. Such a result would be nonsensical and also is not the law.

## VI. ANY PUBLICATION OF CIR 112 IS PRIVILEGED UNDER THE DOCTRINE OF NEUTRAL REPORTAGE.

CIR 112 reports statements by Russian government officials. It does no more than that. It does not endorse those statements and it does not editorialize about them. As a result, Defendants are protected by the neutral reportage doctrine. The neutral reportage doctrine

protects instances where an organization "makes serious charges against a public figure," as long as those charges are reported accurately and disinterestedly.  *In re United Press Int'l*, 106 B.R. 323, 328-29 (D.D.C. 1989) (holding that the doctrine should apply in the District of Columbia)); *see also Barry v. Time, Inc.*, 584 F. Supp. 1110, 1123 (N.D. Cal. 1984) (neutral reportage doctrine shields a "republisher who accurately and disinterestedly reports certain defamatory statements made against public figures").  Plaintiffs are public figures, *see supra* Section III, and CIR 112 simply reports statements of Russian government officials.  The statements contained in CIR 112 are what a "top level Russian government official commented" and what the "Russian government figure reported." Plaintiffs admit as much. Am. Compl. ¶ 3 ("Steele claims to have used his own Russian sources . . . to compile the reports").  Neither Steele nor Defendants endorse or provide editorial gloss on the reports.  *See Sunshine Sportswear & Elecs., Inc. v. WSOC Television, Inc.*, 738 F. Supp. 1499, 1510 (D.S.C. 1989) (finding the neutral reportage doctrine barred plaintiffs' claim where news report did not "embellish or distort" the original defamers' statements).  Accordingly, the neutral reportage doctrine should bar Plaintiffs' claims. *See UPI*, 106 B.R. at 323-24 (holding that neutral reportage doctrine applied where UPI reported that an individual had been quoted in another newspaper saying that the plaintiff was the "'Godfather' of Hawaii's underworld crime").

## **CONCLUSION**

The Amended Complaint should be dismissed for failure to state a claim.


Dated: January 29, 2018                              Respectfully submitted,


                                                     /s/ *William W. Taylor, III*
                                                     William W. Taylor, III (D.C. Bar No. 84194)
                                                     Steven M. Salky (D.C. Bar No. 360175)
                                                     Rachel F. Cotton (D.C. Bar No. 997132)
                                                     **ZUCKERMAN SPAEDER LLP**
                                                     1800 M Street, NW, Suite 1000
                                                     Washington, D.C. 20036
                                                     Tel: (202) 778-1800
                                                     wtaylor@zuckerman.com
                                                     ssalky@zuckerman.com
                                                     rcotton@zuckerman.com

                                                     *Counsel for Defendants BEAN LLC, a/k/a*
                                                     *Fusion GPS and Glenn Simpson*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 29, 2018, the foregoing was filed with the Court's

CM/ECF Service, and thereby provided to the following counsel of record:


Kim Hoyt Sperduto, Esquire
SPERDUTO THOMPSON PLC
1133 Twentieth Street, NW
Second Floor
Washington, D.C. 20036
Tel: (202) 408-8900
ksperduto@sperdutothompson.com

Alan S. Lewis, Esquire
John J. Walsh, Esquire
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005
Tel: (212) 238-8647
Lewis@clm.com
walsh@clm.com


*/s/ Rachel F. Cotton*
Rachel F. Cotton

EXHIBIT 1

COMPANY INTELLIGENCE REPORT 2016/112

## RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION

### Summary

- Top level Russian official confirms current closeness of Alpha Group-PUTIN relationship. Significant favours continue to be done in both directions and FRIDMAN and AVEN still giving informal advice to PUTIN, especially on the US

- Key intermediary in PUTIN-Alpha relationship identified as Oleg GOVORUN, currently Head of a Presidential Administration department but throughout the 1990s, the Alpha executive who delivered illicit cash directly to PUTIN

- PUTIN personally unbothered about Alpha's current lack of investment in Russia but under pressure from colleagues over this and able to exploit it as lever over Alpha interlocutors

### Detail

1. Speaking to a trusted compatriot in mid-September 2016, a top level Russian government official commented on the history and current state of relations between President PUTIN and the Alpha Group of businesses led by oligarchs Mikhail FRIDMAN, Petr AVEN and German KHAN. The Russian government figure reported that although they had had their ups and downs, the leading figures in Alpha currently were on very good terms with PUTIN. Significant favours continued to be done in both directions, primarily political ones for PUTIN and business/legal ones for Alpha. Also, FRIDMAN and AVEN continued to give informal advice to PUTIN on foreign policy, and especially about the US where he distrusted advice being given to him by officials.

2. Although FRIDMAN recently had met directly with PUTIN in Russia, much of the dialogue and business between them was mediated through a senior Presidential Administration official, Oleg GOVORUN, who currently headed the department therein responsible for Social Co-operation With the CIS. GOVORUN was trusted by PUTIN and recently had accompanied him to Uzbekistan to pay respects at the tomb of former president KARIMOV. However according to the top level Russian government official, during the 1990s GOVORUN had been Head of Government Relations at Alpha Group and in reality, the "driver" and "bag carrier"

25

used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St Petersburg. Given that and the continuing sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN.

3. The top level Russian government official described the PUTIN-Alpha relationship as both carrot and stick. Alpha held 'kompromat' on PUTIN and his corrupt business activities from the 1990s whilst although not personally overly bothered by Alpha's failure to reinvest the proceeds of its TNK oil company sale into the Russian economy since, the Russian president was able to use pressure on this count from senior Kremlin colleagues as a lever on FRIDMAN and AVEN to make them do his political bidding.

**14 September 2016**

26

EXHIBIT 2

```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                   CASE NO. 17-60426-CIVIL-UNGARO
 3

 4    ALEKSEY GUBAREV,                    Miami, Florida
      XBT HOLDINGS, S.A., and
 5    WEBZILLA, INC.,

 6                 Plaintiffs,            September 28, 2017

 7            vs.                        10:00 a.m.

 8    BUZZFEED, INC., and
      BEN SMITH,
 9
                   Defendants.           Pages 1 to 103
10    _____

11
                          DISCOVERY HEARING
12           BEFORE THE HONORABLE JOHN J. O'SULLIVAN,
                   UNITED STATES MAGISTRATE JUDGE
13           (TRANSCRIBED FROM THE DIGITAL AUDIO RECORDING)

14    APPEARANCES:

15
      FOR THE PLAINTIFFS:      EVAN FRAY-WITZER, ESQ.
16                             CIAMPA, FRAY-WITZER, LLP
                               20 Park Plaza
17                             Suite 505
                               Boston, Massachusetts 02116
18

19                             VALENTIN GURVITZ, ESQ.
                               BOSTON LAW GROUP, PC
20                             825 Beacon Street
                               Suite 20
21                             Newton Centre, Massachusetts 02459

22
                               BRADY COBB, ESQ.
23                             TRIPP SCOTT
                               110 Southeast Sixth Street
24                             Fifteenth Floor
                               Fort Lauderdale, Florida 33302
25
```

```
 1   APPEARANCES, CONT'D:

 2   FOR THE DEFENDANTS:        KATHERINE M. BOLGER, ESQ.
                                DAVIS WRIGHT TREMAINE, LLC
 3                              1251 Avenue of the Americas
                                21st Floor
 4                              New York, New York 10020

 5
                                NATHAN SIEGEL, ESQ.
 6                              DAVIS WRIGHT TREMAINE, LLC
                                1919 Pennsylvania Avenue, NW
 7                              Suite 800
                                Washington, DC 20006
 8
                                JARED M. LOPEZ, ESQ.
 9                              BLACK, SREBNICK, KORNSPAN & STUMPF
10                              201 South Biscayne Boulevard
                                Suite 1300
11                              Miami, Florida 33131

12
     TRANSCRIBED BY:           LISA EDWARDS, RDR, CRR
13                             Reporterlisaedwards@gmail.com
                               (305) 439-7168
14

15

16

17

18

19

20

21

22

23

24

25
```

1    want to do it, more power to you?

2           All of these things are going to go to the questions of

3    negligence and actual malice.

4           Were they given the dossier from a competitor of

5    Webzilla who saw an opportunity to hurt the company?  Again,

6    the questions as to who gave them the dossier, what they were

7    told when they were given the dossier, are clearly going to be

8    relevant, even if it's just to those questions.  But it's not

9    just to those questions.  The Defendants have asserted a fair

10   report privilege defense.  Well, the fair report privilege

11   defense applies only to reports of information received from

12   government officials or contained in official government

13   documents.

14          Did they receive the report from a government official?

15   There's no way we can know that unless we know who they

16   received the report from.

17          We do know --

18          THE COURT:  It's not an official document.  Right?

19          MR. FRAY-WITZER:  It's not an official government --

20          THE COURT:  Is [inaudible] admitting that?

21          MR. FRAY-WITZER:  Yeah.

22          We do know from Fusion GPS that the report didn't --

23          THE COURT:  What is that?  Fusion?

24          MR. FRAY-WITZER:  Fusion GPS -- and I'm sorry.  I

25   should have started with a little bit of the background.

1        But Fusion GPS is the opposition research firm in

2   Washington, DC, that was originally hired by someone to create

3   the Trump dossier.  They in turn turned to Orbis Business and

4   Christopher Steele of London, the former MI6 agent, who

5   gathered the information.

6        We have not yet been able to depose Fusion.  We're

7   making that attempt.  Fusion's fighting it.  But the one thing

8   that they have told us is Buzzfeed didn't get the dossier from

9   them.  Buzzfeed went to them and tried to get the dossier from

10  them and they refused to give it to Buzzfeed.

11       THE COURT:  The folks at Fusion GPS told you that?

12       MR. FRAY-WITZER:  That's what they -- that's what they

13  claim, yes, your Honor.

14       THE COURT:  Okay.  They just told you that informally

15  or you deposed them or they said that in some kind of filing

16  somewhere?

17       MR. FRAY-WITZER:  In response to our subpoenas and in

18  discussions about narrowing the categories, they've told it to

19  us.  It's not -- it's not in anything official yet and we

20  haven't been able to depose them because they have moved to

21  quash.

22       THE COURT:  And just to go back a little bit so I

23  understand, what do you contend that they did wrong as to your

24  client?

25       MR. FRAY-WITZER:  Okay.  Your Honor, on January 10th,

# ADDENDUM

FOCUS - 1 of 1 DOCUMENT

Copyright 2003 The Financial Times Limited
Financial Times (London,England)

August 29, 2003, Friday London Edition 1

**SECTION:** FEATURES; Pg. 10

**LENGTH:** 738 words

**HEADLINE:** Power broker in Russia's shifting scene: Ending a series, Arkady Ostrovsky and Andrew Jack profile Alfa boss Mikhail Fridman:

**BYLINE:** By MIKHAIL FRIDMAN, ANDREW JACK and ARKADY OSTROVSKY

**BODY:**

Mikhail Fridman, head of the powerful Russian group Alfa, has done more than most of his rivals to establish corporate partnerships with the west. But he makes clear that operating in his country remains a highly distinctive business.

Sitting in his Moscow office, Mr Fridman - Russia's third-richest man, with an estimated wealth of Dollars 4.3bn (Pounds 2.7bn) according to Forbes Magazine - defends the privacy of his group and his reluctance to adopt full public disclosure of ownership.

"The rules of business are quite different to western standards," he says. "I don't want to lie and play this game. To say one can be completely clean and transparent is not realistic."

Mr Fridman is a veteran Russian oligarch, one of the original seven who bankrolled former president Boris Yeltsin's election in 1996 in return for participation in cut-price "loans for shares" privatisations. Since then some of his peers have lost their businesses and gone into self-imposed exile. Mr Fridman has bridged the transition to the new regime of President Vladimir Putin more smoothly than most, and has gone further in restructuring and selling interests in his businesses.

Mr Fridman makes no bones about the way he and his counterparts made their money. "Of course we benefited from events in the country over the past 10 years. Of course we understand that the distribution of state property was not very objective. But we used our chance, and people are angry about it," he says.

The centrepiece of his empire is the oil group TNK, which recently combined its assets with BP to create a Dollars 14bn joint venture, a flagship deal blessed and praised by Mr Putin as a sign of Russia's openness to foreign investment. Sceptics say the deal is a form of insurance policy for Mr Fridman in Russia's still politically un-stable environment.

"Fridman has created a transnational company which is now outside the Kremlin's jurisdiction," says Igor Bunin, a Russian political analyst. Mr Fridman rejects this argument, insisting that business - not politics - was his only consideration.

The deal, approved this week by the Russian anti-monopoly ministry, poses significant challenges for both sides. Russia's poor environmental standards constitute one of them. Mixing Anglo-Saxon corporate culture, epitomised by BP, with Russian practices is another. Behind the affable public face of Mr Fridman, observers talk of associates, including German Khan, another important Alfa shareholder described by many as one of the country's most ruthless businessmen.

Financial Times (London,England) August 29, 2003, Friday

Alfa itself has been criticised for its aggressive approach, illustrated last December when it joined with Sibneft to bid for the state oil group Slavneft, depriving the government of the extra revenue that a more competitive auction might have generated.

Buying TNK at privatisation, for more than Dollars 800m, forced Alfa to raise substantial debt, helping to pioneer links between Russian companies and foreign banks. Its need to join forces at TNK with Access/Renova, another powerful Russian business group, also gave it an early taste of co-operating with those outside its own tight circle, rare in a country where a strong majority shareholder is the norm.

Its business strategy is different from those of other groups. While his peers focused on one core asset - usually oil or metals - Mr Fridman diversified, moving into growing sectors of the economy and playing the role of a venture capital fund. His talent, observers and competitors say, lies in spotting trends.

Alfa also stands out for riding the recent turbulence in Russia's own political landscape. With the transition from Mr Yeltsin to Mr Putin, many observers still see it as among the most influential lobbyists in parliament and the Kremlin, where a number of its former employees work.

In the years since Mr Putin ordered the oligarchs to keep out of politics, Mr Fridman has been cautious and discreet, observing the new rules of the game.

"Of course we lobby our interests in parliament; but we don't get involved in politics," he says. When a chairman of a commercial TV channel 25 per cent owned by Alfa asked Mr Fridman's permission to hire an outspoken Russian journalist, Mr Fridman replied: "Only if you can guarantee that there will be no telephone calls from the Kremlin." Read our coverage of Russia five years after the financial crisis at www.ft.com/russia

**LOAD-DATE:** August 28, 2003

**Mikhail Fridman**

## Profile: Mikhail Fridman — from rugs to riches

Alfa chairman walks a tightrope as the oligarch who has escaped western sanctions

MARCH 2, 2015 John Aglionby                                                                                    **5 comments**

Mikhail Fridman, one of Russia's richest oligarchs and chairman of Alfa Group, has so far walked largely successfully along a tightrope.

On the one hand, he has preserved his wealth by not falling out with Russian president Vladimir Putin. On the other, he has not been a target of sanctions imposed on Moscow over Russia's intervention in Ukraine.

Born in 1964 in Lviv, western Ukraine, Mr Fridman began his career by reselling rugs and theatre tickets before founding Alfa-Eco in 1989.

This developed into the Alfa Group, which has interests ranging from banking to energy and telecoms. It became one of Russia's largest privately owned investment groups after securing $14bn in 2013 when Rosneft, the Russian state-controlled energy group, bought TNK-BP, an oil explorer in which Alfa had a big stake.

The telecoms side of Mr Fridman's empire, Altimo, was launched in 2005, and is the largest shareholder in VimpelCom, one of Russia's largest mobile phone operators. It is also a shareholder in Turkcell, the leading Turkish mobile operator.

Altimo's history has been marked by repeated and often acrimonious legal disputes with its partners. In a ruling on a 2008 motion filed by Telenor, the Norwegian telecoms group that is a shareholder in VimpelCom, an American judge described Altimo as having an "extensive and brazen history of collusive and vexatious litigation".

Indeed, battles with partners have been a feature of Mr Fridman's business dealings. In 2011, Alfa scuppered BP's attempt to develop the Arctic and repeatedly had a row with the UK oil major when the two were fighting for control of TNK-BP.

Unlike many other oligarchs, Mr Fridman has largely stayed out of Russian politics and sensitive sectors such as the media — and this may have helped him to avoid the US and EU sanctions that have targeted Mr Putin's inner circle since the Ukraine crisis erupted.

When the sanctions were imposed last year, government officials in Moscow mocked the west for being afraid to hurt its own financial interests because Mr Fridman was among several Kremlin-friendly tycoons left off the list of targeted individuals.

But Mr Fridman has not escaped scot-free — as demonstrated by UK energy secretary Ed Davey's move to stop the oligarch's LetterOne group buying the British assets of Germany's RWE Dea.

**Fridman attacks North Sea deal threat**

Mikhail Fridman, the Russian billionaire, has told Britain's energy secretary that the UK government's threat to block a €5bn deal by his investment vehicle to buy North Sea gasfields is "not rational".

Continue reading

The creation of L1 Energy, LetterOne's energy-focused investment vehicle, is the latest indication that Mr Fridman is increasingly looking overseas for new business ventures.

Outside business, Mr Fridman has taken a leading role in efforts to revive Russia's Jewish community, co-founding the Russian Jewish Congress In 1996. He subsequently helped establish the Genesis Philanthropy Group, which seeks to develop Jewish identity among Russian-speaking Jews around the world.

Copyright The Financial Times Limited 2017. All rights reserved. You may share using our article tools. Please don't copy articles from FT.com and redistribute by email or post to the web.

Print this page     Send this article

# Not all Russian billionaires are Putin's pals

# By Leonid Bershidsky

Thursday March 5, 2015
7:48 PM GMT+8

Global views from
columnists from
international financial
wire service Bloomberg.

MARCH 5 — Perhaps it should come as no surprise that a Russian billionaire seeking to invest capital beyond President Vladimir Putin's reach and against his public advice has run into trouble. Less understandable is that the problems are being created by the British government, not Putin.

The UK is trying to block Mikhail Fridman's acquisition of Dea, the oil and gas subsidiary of German utility RWE, through his Luxembourg vehicle LetterOne. Although Germany has approved the acquisition, Dea extracts oil and gas from fields in British-controlled areas of the North Sea. UK energy minister Ed Davey has "raised concerns with the respective companies about the effect that possible future sanctions imposed on LetterOne may have on the continued operation of these twelve fields and the serious health and safety and environmental risks that may result."

In other words, Davey doesn't like the deal because of possible future sanctions against Fridman.

It's hard to imagine what kind of argument Davey could make about this in a court of law (Fridman is litigious). The bigger problem is that the UK government is being patently unfair and shooting itself in the foot to do so.

The ideology behind the current Ukraine-related sanctions imposed on Russian individuals and entities by the US and the European Union is that they impose a cost on Putin's regime for continuing to prey on a country that resists his meddling. Within this logic, it makes sense to impose restrictions on companies that belong to Putin's close friends and the Russian state. Sanctioning LetterOne would not impose any cost on the Kremlin.

Fridman, who was born in Ukraine and lavishly funds Jewish causes there, has a remarkable talent for survival. He started out in business in the late 1980s, when Soviet liberalisation allowed him to open a window-washing firm. Under President Boris Yeltsin, Fridman built Russia's biggest private bank, Alfa Bank. Unlike any of the competing financial institutions set up by his fellow oligarchs, Alfa is still around, with a big, sophisticated retail operation and US$40 billion (RM146 billion) in assets.

Fridman watched Putin's cronies get rich on government contracts and giant state corporations rise to dominate previously fragmented markets, and he kept a respectful distance. His business empire, however, was too big for him to avoid a clash with the new order.

Fridman was a partner in TNK BP, a 50-50 joint venture between a consortium of Russian investors and BP, the UK-based oil company. The union was blessed by former UK Prime Minister Tony Blair and Putin in 2003. In his book, "Beyond Business," then-chief executive of BP Lord John Browne wrote:

I tried to push for 51 per cent of TNK but Putin and Fridman both told me we could not have it. I knew if we had 49 per cent we would have no power whatsoever. So in the end the only option was to go for a 50:50 deal. Putin said: "It's up to you. An equal split never works." Over the years he reminded me of this statement again and again.

He had reason to do so: The joint venture was constantly at risk of falling apart because of squabbling between the British and Russian shareholders, even as TNK BP expanded and made billions in profit.

Then Igor Sechin, Putin's close friend, took an interest in the unstable situation and arranged to buy out BP's share for the state company Rosneft, which Sechin runs. "We never wanted to stay one-on-one with Sechin in TNK BP," a Russian consortium member told the Russian edition of Forbes at the time. Fridman and partners agreed to sell their share to Rosneft, too.

This wasn't something Fridman wanted to do, but he ended up with US$14 billion in proceeds from the mammoth US$55 billion deal — and ultimately emerged better from it than BP. The UK company ended up with 20 per cent of Rosneft, a shrinking asset now that the Russian stock market is toxic to most serious investors. Fridman, however, ignored government calls to take some of his payout in Rosneft shares. That made it necessary for the state behemoth to borrow heavily to pay him.

He and his partners received the money offshore, which worried Putin. The Russian president told a press conference in December 2012:

I would very much like them to invest these funds or a large part of them in the Russian economy. But we must create good conditions for that. On the whole, I know my colleagues from the government and some of our companies are in touch with the participants in that deal — I hope they decide in favour of investing in the Russian economy.

This polite expression of Putin's "hope" wasn't easily ignored. Still, Fridman was stubborn. He set up LetterOne and started looking for non-Russian assets to set up a new energy company. RWE, overburdened with debt and eager to get out of traditional power generation, which has been making less and less money, couldn't resist Fridman's offer: He outbid the nearest competitor by almost 50 per cent, agreeing to assume a 600 million euro chunk of RWE's debt. Germany approved the Dea deal last year, just a month after Russian-backed separatists shot down a passenger airliner over eastern Ukraine. German officials were mature enough to

understand that Fridman was the opposite of a Putin proxy and that RWE could not have done better than to sell Dea to him.

Knowing this backstory, it's hard to understand what Davey's problem could be. Even Lord Browne, who has had a stormy relationship with Fridman, is backing him now: He has accepted an appointment as LetterOne's executive chairman. Browne, of all people, knows Fridman is a gifted entrepreneur and that his company is not a Kremlin tentacle.

It's also hard to see what the UK could gain by discriminating against Fridman solely on the basis of his Russian passport. Other companies, including BP, are divesting their North Sea assets. Would the UK prefer Fridman to pick up some of that slack or to invest his cash in Russia, as Putin has asked, thereby aiding a regime the West wants to bleed economically through sanctions? Blocking Fridman's investment can only undermine the sanctions strategy, which makes no sense.

The UK government has enough experience with wealthy Russians, many of whom live and do business in London, to understand they are not all pillars of the Putin regime. It should leave Fridman alone: He's investing in Western Europe because he sees the same Russian risks that Western nations have seen since last year. — Bloomberg View

**\* This is the personal opinion of the columnist.**

https://www.bloomberg.com/view/articles/2015-03-05/not-all-russian-billionaires-are-putin-cronies

**The Big Read** Mikhail Fridman

## Mikhail Fridman: The Alpha oligarch

The Russian billionaire, who has earned a reputation as a fierce corporate fighter, is taking on the UK government



Lord Browne, left, and Mikhail Fridman. The former BP executive has joined the tycoon's L1 Energy venture

MARCH 5, 2015 Guy Chazan and John Thornhill

When the definitive history of Russia's oil industry is written, the Chief Rabbi of Moscow will warrant a special mention. Rabbi Pinchas Goldschmidt helped to reconcile two men who had been locked in one of the most epic corporate tussles of the 1990s — Lord John Browne, then chief executive of BP, and the Russian tycoon Mikhail Fridman.

The BP chief had stood by helplessly as Mr Fridman seized control of some of the UK major's most valuable Siberian oilfields. He retaliated by launching a noisy international campaign against Mr Fridman's oil company, TNK.

As recounted by Lord Browne in his memoirs, peace only broke out after he was contacted by a friend, Labour peer Greville Janner, who had just come back from a trip to Moscow. While there, Lord Janner spoke to the Chief Rabbi, who told him he knew Mr Fridman. "[He] is better than the other people you were dealing with," Lord Janner said. The BP chief relented and started taking the oligarch's phone calls. They met, and within months agreed a truce.

Four years later, the two men's companies teamed up to create TNK-BP — a joint venture that would become the world's seventh-largest oil producer and one of BP's most lucrative investments.

Now they have joined forces a second time. This week, Lord Browne was named executive chairman of L1 Energy, Mr Fridman's new oil and gas venture. His mission: to spend some of the proceeds from the sale of TNK-BP on energy assets around the world.

Yet the venture has had a bumpy start. This week, the oligarch's Luxembourg vehicle LetterOne announced it had acquired RWE Dea, the oil and gas arm of Germany's RWE, for €5bn. But the UK government is unhappy about the deal, fearing Mr Fridman might be hit by future sanctions imposed over Russia's actions in Ukraine: such an eventuality could affect the operations of Dea's 12 North Sea gasfields. Mr Fridman promptly threatened legal action.

The government wrote to LetterOne on Wednesday saying it had seven days to explain why it should be allowed to retain ownership of the fields and why ministers should not force their sale to a third party. The argument has puzzled many who know Mr Fridman. Always careful to steer clear of politics, he has never been seen as a Kremlin crony. His business empire, centred on Alfa-Bank, Russia's largest private lender, is a world away from state-owned corporations such as Rosneft, which have flourished under President Vladimir Putin and are now being squeezed by sanctions.

**Legal minefield**

That point was echoed on Wednesday by Victoria Nuland, US assistant secretary of state. Asked in a Congressional hearing whether Mr Fridman might be a potential target for US sanctions, she said the measures are aimed at "Russian public government assets and entities. Mr Fridman runs one of the few remaining private companies in Russia, and, as such, has had his own strong views as a private citizen about appropriate Russian-European relations".

> **Read more: Telecoms case shows Fridman's taste for combat**
>
> VimpelCom saga shows Alfa's recourse to legal action

The dispute over the Dea fields could be the first of many. With the political chill between Moscow and the west intensifying, more Russian businessmen could find themselves caught in the crossfire. That is a big concern for the City of London, which long ago opened its doors to Russian money. The web of financial ties may be hard to unpick.

One thing is clear: if the UK government wants a fight with Mr Fridman, a man renowned for his hardball tactics, he will relish it. The oligarch's career has been punctuated by fierce corporate battles, both with domestic rivals and western groups like BP and Norwegian telecoms group Telenor. His aggression, combined with a brilliant strategic vision, has helped make him one of Russia's richest men, with interests spanning banking, oil, retail and telecoms. Forbes estimates his fortune at $17.6bn.

For BP executives, the partnership with Mr Fridman, which ended when Rosneft bought TNK-BP in 2012 for $55bn, was a bruising experience. But they say he was unfailingly courteous, regularly assuring his antagonists that "it's nothing personal, just business".

"With him it was like a rugby game," says one person close to TNK-BP. "You kick the shit out of each other on the pitch but then you go and have a beer afterwards."

Born into a Jewish family in Lviv, western Ukraine, in 1964, Mr Fridman developed a taste for enterprise as a student at Moscow's Steel and Alloys Institute. He was one of a number of traders, nicknamed *fartsovshchiki* (the word may come from the English phrase "for sale"), who bought and sold consumer goods and scalped theatre tickets. He set up a window cleaning business and even bred white laboratory mice.



**This argument [by the UK government on the LetterOne deal] about possible future sanctions — it's uncharted territory**

**Western executive**

When the Soviet Union collapsed in 1991 it was this generation of small-time entrepreneurs that came to the fore, picking over the carcass of the Soviet economy for scraps of value.

Along with some friends, including German Khan who is still his partner, Mr Fridman founded Alfa Group in 1989 and Alfa-Bank two years later. The financial-industrial group was backed by a group of powerful shareholders, who still remain anonymous. But it is a fair bet they were linked to the Communist party nomenklatura, among the only people with access to capital at the time. Jovial, rumpled and unpretentious, Mr Fridman stood out among the Yeltsin-era oligarchs. He was more likely to be found at a jazz concert than in the dissolute nightclubs that were in vogue.



Chief Rabbi Pinchas Goldschmidt helped reconcile Lord Browne and Mikhail Fridman

He had, however, more staying power than many of his peers. He was one of the seven oligarchs who helped bankroll Boris Yeltsin's re-election campaign in 1996 and exercised a huge influence

over the Kremlin in the late 1990s. Yet only three of them are still in business, testament to his street smarts and lack of overt political ambition.

"We have an ideology not to be involved in politics," Mr Fridman said recently. "I never tried to become an important or influential person, like many other Russian businessmen. It's too risky in Russia." Trying to get a job in government was also out of the question, he says. "I couldn't be a minister with my Jewish roots. My mother told me it's not for you — forget about it."

Russia's 1998 financial crash swept away many of the first post-Soviet moguls. But Mr Fridman survived. Alfa-Bank distinguished itself by securing depositors' funds, paying staff and trying — wherever possible — to honour its debt obligations. Other oligarchs simply ripped off customers and creditors, knowing they would have no recourse in Russia's lawless business environment.

He could be brutal — nowhere more so than in his bare-knuckle fight with BP. One banker said at the time that he appeared to have a devil on one shoulder and an angel on the other, and would listen to whichever promised him the most money. "You cannot expect to play by western rules in western capital markets and by Russian rules in the Russian oil market and expect to retain your credibility," the banker says.



**We have an ideology not to be involved in politics. I never tried to become an influential person**

Mikhail Fridman

In 1997, Mr Fridman's Alfa teamed up with Len Blavatnik's Access Industries and Viktor Vekselberg's Renova to buy TNK, a state-owned oil company. BP had also entered Russia the same year, paying around $500m for a 10 per cent stake in Sidanco, a Siberian oil producer.

### Siberian manoeuvre

Soon, Mr Fridman and his partners were making a play for Sidanco's best fields. They bought up the debt of some of its production units, had them declared bankrupt and snapped them up on the cheap. By late 1999, the company was an empty shell. BP hit back by sending lobbyists to Washington to block a $500m US Eximbank loan to TNK. Ultimately, however, Lord Browne and his one-time nemesis were reconciled, and agreed to become partners.

In his book, Lord Browne describes Mr Fridman as a "superb negotiator", writing: "He would give you the feeling that he would rather forfeit everything than give up on a single crucial point."

In 2003, one-time enemies BP and Alfa-Access-Renova created TNK-BP, a 50:50 joint venture. For the first few years it seemed to be an unqualified success. But from the start there was friction. A secret US diplomatic cable from the time, later published by WikiLeaks, explained the antagonism: "As one BP official told us when the company was forming: 'We have a love-hate relationship. They love us (our money), and we hate them (their corporate governance and management styles).'"

The tensions surfaced in 2008. BP found itself under massive pressure as the shareholders argued over strategy. AAR pushed to remove Bob Dudley, TNK-BP's chief executive, accusing him of running the company as a BP subsidiary. TNK-BP found itself paralysed by labour inspections and audits. Peter Sutherland, BP's then-chairman, spoke darkly of "a return to the corporate raiding activities" of 1990s Russia. AAR denied any link to the wave of bureaucratic interference.

Then in July that year, Mr Dudley abruptly left Russia, blaming a campaign of "sustained harassment". Soon afterwards, BP effectively ceded control of TNK-BP to Mr Fridman and AAR.

But it was not the end of BP's run-ins with the oligarch. In January 2011, Mr Dudley, now head of BP, announced a $16bn share swap and Arctic exploration deal with Rosneft. AAR sued to stop the deal, arguing that under its agreement with BP the UK major was obliged to pursue all Russian oil and gas opportunities exclusively through TNK-BP.

The High Court in London agreed, granting AAR an injunction. In March 2011 an arbitration tribunal blocked the BP-Rosneft tie-up. A few months later, Rosneft did a deal on the same Arctic acreage with ExxonMobil instead.

Westerners were amazed at AAR's audacity in stymying a transaction that had been negotiated by Igor Sechin, Rosneft's powerful chairman, and blessed by Mr Putin himself. "It was like in *Spinal Tap*, the amp that goes to 11," says the person close to TNK-BP.

**Rosneft's embrace**

But Mr Fridman's intervention did not appear to harm his standing with the Kremlin. Within months, TNK-BP had been acquired by Rosneft, and Alfa came away with $14bn in cash. The group had spent about $1bn in the 1990s for its share of what became TNK-BP.

BP, too, did very well out of the venture. It had earned $19bn in dividends over TNK-BP's 10-year life and came away with $12.5bn in cash and a 20 per cent stake in Rosneft — all on an initial outlay of $7.5bn. It was one of the most successful investments in BP's history.

Mr Fridman's allies say if LetterOne's dispute with the UK government ever gets to court, he might be just as successful as he was against BP.

"Normally, a government would only ask a company to sell an asset if it was worried about its financial strength, or if it had concerns about market concentration," says one western executive who knows Mr Fridman well. "This argument about possible future sanctions — it's uncharted territory."

Anyway, he will overcome this hurdle, just as he has all others, the person believes. "I've no doubt he'll succeed. He's a brilliant opportunist and a great entrepreneur."

**Key Moments** How Fridman built a business empire

 

| 1997 | 2003 | 2008 | 2011 | 2013 | 2015 |
|---|---|---|---|---|---|
| Fridman's Alfa Group joins Len Blavatnik's Access Industries and Viktor Vekselberg's Renova to buy state-owned TNK | The Alfa-Access-Renova group of investors forms a 50:50 joint venture with BP, called TNK-BP | TNK-BP is rocked by a shareholder dispute, which ends with AAR effectively gaining control of the company | Fridman is successful in a move to block BP's Arctic tie-up with Rosneft, which does a deal with ExxonMobil instead | Rosneft buys TNK-BP, earning Alfa $14bn in cash. The group had spent about $1bn on its original share in TNK | L1 Energy, Fridman's oil and gas venture that is targeting assets worldwide, names Lord Browne executive chairman |

Copyright The Financial Times Limited 2017. All rights reserved.

**Lunch with the FT** Mikhail Fridman

## Lunch with the FT: Mikhail Fridman

The combative oligarch talks about battles with BP and the 'moral duty' of rich Russians

APRIL 1, 2016 Guy Chazan



© James Ferguson

As I sit with Mikhail Fridman in Frescobaldi, an Italian restaurant in Mayfair, my eyes drift to a quote from Dante's *Divine Comedy* painted on the white ceramic tiles behind us: "The devil is not as black as he is painted."

For years, Fridman was demonised in the western press as a symbol of everything that was wrong with Russian business. He was portrayed as a ruthless tycoon who exploited Russia's corrupt politics and courts, a billionaire bully who stopped at nothing to defeat competitors and partners alike.

As a reporter in Moscow in the 1990s, I'd witnessed his rise to mogul-dom, as he began to amass a fortune currently estimated by Forbes at $14.6bn. On returning to London, I covered the ins and outs of his war with BP over their jointly-held Russian oil producer TNK-BP — one of the most spectacular corporate battles of the past decade. The company had been subjected to an onslaught of tax, labour and police inspections — all engineered, BP claimed, by Fridman and his partners as part of a furtive power-grab. TNK-BP's American boss Bob Dudley fled Russia in July 2008, after a campaign of what he called "sustained harassment".

I was prepared for a touch of menace: this is a man whose appetite for litigation is legendary and who in a 2010 lecture entitled "How I Became an Oligarch" said that, of all types of human activity, "entrepreneurship is in some sense the closest to war". But today he is soft-spoken and jovial. Having moved his base from Moscow to London to reinvent himself as a global investor, Fridman is, he says, on a mission to improve the image of his country's business elite. "It's our moral duty to become a global player, to prove a Russian can transform into an international businessman."

To that end, he has hired a clutch of oil industry bigwigs as advisers — one of them is John Browne, the erstwhile boss of BP and a former adversary. In the 1990s, Browne had watched in impotent fury as a series of legal proceedings in remote Siberian courthouses left Fridman in control of some of BP's oilfields; for years, he wouldn't take the Russian's phone calls. Now, all is forgiven. A

western oilman who knows Fridman once likened doing business with him to a rugby game: "You kick the shit out of each other on the pitch but then you go and have a beer afterwards."

Frescobaldi, the venue for our lunch, is a short walk from the offices of LetterOne, Fridman's new investment vehicle. Owned by the eponymous Italian wine dynasty, it is stylish but discreet, with oak panelling, a marble floor and vines draped across the ceiling. Regulars include Tidjane Thiam, boss of Credit Suisse, and Pierre Lagrange of GLG Partners, as well as art-world types from Mayfair — there's a Hauser & Wirth gallery across the road.

Fridman says he chose it on a whim: the name evokes his beloved Tuscany, where he holidays every summer. Tieless in an elegant dark suit and blue shirt, the 51-year-old fits in among the bankers and hedge fund managers sauntering in for lunch, drawn by a wine list that includes a rare Ornellaia white for £290 a bottle. But he seems different, too: maybe it's his stocky frame and round, babyish face, or perhaps the vivid tales of 1990s Moscow — a cut-throat world that seems light years away from this polished corner of Mayfair.

Does he now regret the corporate wars with BP and other partners that earned him such opprobrium in the west? "When you're working with big companies they have their own agendas," he says. "At a certain stage, your interests are aligned, and sometimes they collide." The legal disputes did "damage our reputation", he adds, "but at the end of the day we benefited a lot as shareholders of the company."

In 2013 Fridman and his partners sold their 50 per cent stake in TNK-BP to Rosneft, Russia's state-owned energy group, for $28bn. It turned out to be a remarkably well-timed deal: crude prices have crashed and, with them, oil company valuations. But Fridman claims he doesn't really understand oil markets. "To be successful in business, you don't have to be smart, but you do have to be lucky," he says. He celebrated with a three-day pilgrimage through the Israeli desert accompanied by a group of fellow Russian Jewish billionaires and a caravan of camels.

A waiter sweeps over with menus and we go for the set lunch. Fridman chooses octopus salad, and I take the mixed salad with avocado: we both opt for the pan-fried sea bream with spinach and lemon, eschewing Frescobaldi's Tuscan wines for mineral water. I ask whether he thought of slowing down after selling out of TNK-BP — maybe buying a yacht and a football club, like Chelsea owner Roman Abramovich. He laughs. Keeping control of his weight is a "constant problem," he says, patting his belly, "so the idea of spending my time on a yacht is not good". Lying on a beach, meanwhile, is a "form of torture". "It's a kind of talent to spend money beautifully," he adds. "I don't have it."

———

Fridman was born into a Jewish family in Lviv, Ukraine, in 1964. It was a city that always felt different to the rest of the Soviet Union, he explains: for centuries it was ruled by the Habsburgs, and from 1918 to 1939 by Poland. "The body language of the people was anti-Soviet," he says.

Coming to Moscow in the 1980s, Fridman felt like an outsider. Unofficial anti-Semitic quotas meant he was barred from the best Soviet universities, so he went to the drab Moscow Institute of Steel and Alloys instead. It was there that his entrepreneurial streak first revealed itself. He led a group of students who would queue for tickets to some of Moscow's most popular plays and then use them as hard currency, bartering them for goods in short supply and favours from officials.

In 1988, as Mikhail Gorbachev began to open up the Soviet economy, Fridman set up a window-washing business, which quickly became a success. But that made his parents anxious. When his mother discovered he was earning Rbs1,000 a month — nearly seven times his official salary as an engineer — she turned "as white as this", he says, holding up his side plate. "She said, 'You must stop this immediately, or you'll end up in prison,'" he recalls. "In her mind it was impossible to make Rbs1,000 legally."

**Ristorante Frescobaldi**

Eating salad, he explains how in 1989, together with fellow students German Khan and Alexei Kuzmichev, he formed Alfa Group, which mushroomed into one

**15 New Burlington Place, London, W1S 2HX**

Still water £5

Set menu x 2 £58

Avocado salad

Octopus salad

Sea bream x 2

Sorbet x 2

Double espresso £5

Single espresso £4

**Total (inc service) £81**

of Russia's biggest conglomerates, spanning interests in telecoms, banking, retail and oil. The friends started off selling computers, perfumes, cigarettes and carpets. They soon branched into oil trading, amassing a vast fortune by buying up cheap Russian crude and selling it abroad at a mark-up. In 1991 they set up a bank, Alfa, now Russia's largest private lender.

In 1997, Fridman teamed up with tycoons Len Blavatnik and Viktor Vekselberg to buy TNK, a struggling Siberian oil producer, for $800m. The company was bankrupt, hit by a falling oil price. "We thought it was a mistake," he says. "We overpaid." But the new owners restructured its debt and then watched as the price of crude began to rise. TNK turned into a cash machine.

As piped jazz drifts round the restaurant, I ask Fridman whether he ever looks back at the Russia of the 1990s — when many lost their fortunes and some their lives — and wonders how he survived. Pausing over his fish, he puts it down to a refusal to do deals with criminals. Others turned to mafia gangs to provide "*krysha*" — "roof" — or protection. Alfa instead enlisted the local police. "They had no money, so we would buy [them] furniture," he says.

He also avoided politics. "We never wanted to challenge authority," he says. "We always followed this philosophy — always to be loyal and friendly [to the government] but never to be too close."

The spectre of Mikhail Khodorkovsky, a fellow oilman and oligarch, inevitably lurks in the background. After dabbling in opposition politics, Khodorkovsky fell foul of Putin, lost his oil company and ended up in jail. Fridman, in contrast, says he was never tempted by power: indeed, as a Jew, he consciously avoided it. "My mother always said, 'With your name you shouldn't be in government,'" he says.

That said, one of the keys to his success was his partnership with Pyotr Aven, a former minister who retained close ties to the Kremlin and from 1994 was president of Alfa-Bank. "We needed a channel for communication with the government," he says. "We didn't know anyone, and he was this very smart guy, young, energetic and liberal." Aven was also one of Putin's old acquaintances, a link that was to prove critical to Alfa Group later on.

In 2003, when TNK merged with BP's Russian operations to form TNK-BP, Fridman and Browne signed the deal at a ceremony in London presided over by Putin and Tony Blair. At first, relations between the two partners were cordial, but it wasn't long before the clash of cultures became apparent. BP executives found Khan particularly hard to deal with. In a US cable published by WikiLeaks, a TNK-BP executive said he had been invited by Khan on a hunting trip and the Russian had shown up with a girlfriend, as well as six other glamorous women. At dinner, which he attended armed with a chrome-plated pistol, Khan had described *The Godfather* as a "manual for life".

The tensions steadily grew and came to a head in 2008, after it emerged that BP had been holding secret talks with the state gas company Gazprom to buy out Fridman and his partners. TNK-BP soon found itself facing a wave of intrusive inspections, while its foreign staff were stripped of their Russian visas and work permits. BP accused Fridman and his associates of orchestrating the administrative nightmare. Fridman denied having anything to do with the official harassment, which eased off after Bob Dudley left Moscow, and control of the company effectively passed to the Russians.

Later Alfa was embroiled in an equally bitter struggle with the Norwegian company Telenor over a Russian mobile company they jointly owned. A drumbeat of lawsuits in Russia, Europe and the US climaxed in 2009 when a Siberian court ordered Telenor to pay $1.7bn or face the loss of its

Russian investment. Soon after, the two companies settled their differences and the court case was quietly withdrawn.

We both order a dessert of pear and mango sorbet. I ask Fridman whether it was true that Alfa exploited Russia's ramshackle legal system to win favourable judgments against its partners. "I don't agree," he replies. His partners, he says, were just as powerful: "BP as a major player has at least an equal ability to influence Russian officials, through diplomatic channels, and government-to-government."

Perhaps his boldest legal gambit came in 2011, when BP struck a megadeal with Rosneft for rights to drill for oil in the Arctic. TNK-BP's Russian investors cried foul, saying it violated the exclusivity provisions of their shareholder agreement with BP, and won an injunction in the London High Court to block the partnership.

How did Fridman feel taking on Rosneft boss Igor Sechin, one of Putin's closest allies, who had staked so much political capital on the tie-up with BP? "Of course we were worried about it," he says. "But why shouldn't we protect our rights? If you can't do that, you'll never succeed."

Thwarted, BP ultimately decided to sell out of TNK-BP. Fridman followed suit and Rosneft ended up buying the whole company for $55bn. About $14bn of that went to Alfa Group and Fridman has been putting the proceeds to use. Last year LetterOne bought Dea, a small German oil and gas company, and his latest bet is a $200m investment in US ride-hailing company Uber.

Putin said he hoped Alfa and its partners would invest the proceeds from the Rosneft deal in Russia. Fridman says he is still committed to his home market, but "the Russian economy is not in the best shape. And generally it would be inappropriate to put all our eggs in one basket."



**When his mother discovered he was earning Rbs1,000 a month, she turned 'as white as this' he says, holding up his side plate**

That's an understatement. Russia is in recession, labouring under a stubbornly low oil price and western sanctions over Ukraine. As our coffees arrive — a double espresso for him, a single for me — I ask him about the mood in Moscow, where he spends 40 per cent of his time.

"It's a pretty tough situation for everybody," he says. He avoids outright criticism of Putin but insists that Russia "must restructure its economy, to make it more open for investment, for competition. There should be privatisation, less domination of state businesses," he says. He omits to mention that it was the sale of TNK-BP that cemented the dominance of one of those state businesses — Rosneft — over Russian oil.

The conversation turns to Ukraine — a subject I know will be sensitive for him. Fridman feels a strong connection with the land of his birth. The annexation of Crimea, the war in Donbass — all of this is, he says, a "huge tragedy . . . for both nations, Russia and Ukraine". But, for the first time in our two-hour conversation, he clams up. "As head of a big company, I don't have the right to comment on the situation," he says.

We move on. I ask about his children. His eldest daughter recently graduated in economics at Yale, while his second is in her first year there. He has a teenage son at boarding school in Kent and his youngest daughter lives with his former partner in Moscow. Fridman says he has no intention of giving any of his children a job in Alfa Group or LetterOne. "I don't want to create a dynasty," he says.

I ask for the bill and pose one last question. Fridman's westward expansion hit a hurdle last year when the British government insisted he sell a dozen gasfields in the North Sea as part of the Dea deal. Ministers worried that he might be hit by future sanctions against Russia, and the fields would have to be shut down.

Fridman called the demand irrational and threatened legal action, yet he sold the fields anyway. I asked him why he didn't take the government to court — after all, that's what he does, all the time. "The situation is not completely finished yet," he says. "We fulfilled the demand of the British

## Petr Aven: the Russian oligarch with an eye for art, not yachts

He grew up in a communal flat in Moscow. Today he is the billionaire head of Alfa-Bank with a mansion in Surrey



Petr Aven in the garden of his Surrey home with Henry Moore's 'Reclining Figure' © Rick Pushinsky

JULY 12, 2017 Andrew Jack                                                                    **9 comments**

Petr Aven looks a little uncomfortable framed by the gargantuan scale of his Surrey mansion. He is standing on the front steps of the three-storey pillared façade, approached up a long winding path from the gatehouse through the surrounding gardens.

"I would not have bought a house this big," he blurts out quickly, as if apologising. "I was raised in a communal apartment in Moscow with eight families. Each had just one room, with a shared kitchen and bathroom."

Having trained as an economist in the 1970s, Aven was picked to join the inner circle of politicians around Yegor Gaidar in 1991 to run Boris Yeltsin's first post-Soviet cabinet of pro-market reformers. He helped shape a radical and painful policy shake-up in the turbulent Russia of the early 1990s.

In alliance with his business partner Mikhail Fridman in the following years, he went on to build Alfa Group, the conglomerate that embraced banking, oil and retail. He emerged as one of the country's influential business "oligarchs" and his wealth today is estimated by Forbes to be $4.5bn.

Yet for a forthright power broker and commercial magnate who thrived in the feral capitalism of Russia and survived multiple financial and political crises, he seems accepting of the practices and tastes of his adopted part-time home in the UK. When he and his then wife bought Ingliston House near Virginia Water in 2004 their aim was to find somewhere comfortable so that their children could attend English schools nearby. They acquired a then empty plot, which came with plans already drawn up.



Sitting room © Rick Pushinsky

The neo-Palladian, pillared and limestone-faced design resembles other mansions in the gated community adjacent to Wentworth golf club. He left the design almost unchanged — albeit adding extensive security — since it had already been approved by the local authority. "You don't easily challenge English planning laws," says Aven with a grin.

Inside, he took the same hands-off approach to the proposed "Strawberry Hill gothic" decor by Nicky Haslam, complete with brightly coloured wallpaper and plumped-up sofas. "We didn't want to stop him. The paintings are so strong that they still work," he says, gesturing to the walls adorned with his passion: art.



'Bavarian Mountains with Village' by Wassily Kandinsky © Rick Pushinsky

Works by Larionov, Goncharova and Kandinsky are among the canvasses on display, part of his extraordinary collection of late 19th- and early 20th-century Russian art built up in parallel with his business career over the past quarter of a century.

"It comes from childhood. My father [a computer science professor] didn't buy art, but I wanted paintings around, like his friends that we used to visit," he says. "I didn't just want to buy art but to create a collection from scratch. My main satisfaction is to put things in order. I like arranging books on shelves. It gives me enormous pleasure."



Dining room © Rick Pushinsky

His choice was shaped by opportunity. "All the major work of Soviet art is in museums, but you could find pre-revolutionary art," he says. His first purchase was in 1993: a still life by Pavel Kuznetsov from the 1920s, which cost just $5,000.

Ever since, he has been tracking down works, mostly from the pre-Soviet era, in auctions, from private collections and sometimes directly from artists' descendants or others who have inherited work. "I never bought a plane or a yacht. All my money goes into art."



Porcelain cup and saucer © Rick Pushinsky

It is only late morning, but he offers champagne and wine, which a waiter brings into the circular entrance hall on a tray along with small snacks including smoked salmon served on blinis.

Down one of the two staircases, which wraps around the inner wall to bring visitors into a basement level, Aven has a collection of lacquered boxes. Yet he is most proud of the cupboards that line the walls: Soviet porcelain from 1917-41, made in St Petersburg in the former Imperial factory renamed Lomonosov. "It was very cheap to collect when I started," he says, stating that the collection fascinates him because he sees it as a one-off and less derivative than paintings of the period. "Russian painting was inspired by Cézanne and Matisse, but Russian porcelain was original."



Detail of ceramic plate © Rick Pushinsky

Upstairs in his bathroom, he shows off a series of more intimate sketches of female nudes by Vladimir Lebedev from the 1930s, which he sees as indicative of an unexpected tolerance by the Soviet authorities towards private life and its portrayal in art at the time.

His office, up a further flight of stairs beneath the roof rafters, is brighter, more relaxed and modern, with catalogues but fewer works of art. Photographs on one table show him with human rights activist Natan Sharansky, hunting bears in remote Kamchatka with his business partner German Khan, and with Vladimir Putin.

He is discreet about his own relations with the Russian president and veers the conversation away from politics. All he will say is that "Alfa had absolutely no connection with Trump". There were allegations in a purported intelligence document published by BuzzFeed suggesting such a connection, an inference that is now the subject of legal action.



Entrance hall © Rick Pushinsky

He is also circumspect about Boris Berezovsky, the maverick businessman and politician who was a longstanding acquaintance. Berezovsky fled Russia in 2000 after falling out with Putin and settled nearby in Virginia Water until his mysterious death in 2013. Aven says he long ago broke off contact from this "complex figure", but is finishing a book on "the time of Berezovsky" in the 1990s.

In reality Aven's office is his phone, from which he is inseparable. It rings repeatedly and buzzes still more often with texts as he moves between his house in Surrey and two others in Russia — in central Moscow and in the nearby town of Barvikha — as well as in Ukraine, where he manages Alfa-Bank's growing operations.

Outside his Surrey house, the 8.5 acres of green lawns, tended by several gardeners and framed by mauve rhododendrons, provide plenty of space for large open-air sculptures. Opposite the entrance is Lynn Chadwick's "Sitting Couple", a nod to Aven and his late wife, who spent most of her time in the UK and oversaw the garden and the couple's art collections.



'Sitting Couple' by Lynn Chadwick © Rick Pushinsky

At the end of a short path to the right of the entrance courtyard is a giant Soviet border guard sculpted by Aven's friend Grisha Bruskin. To the left is Louise Bourgeois's mother and daughter spiders, which he says he used to tease his children with at night.

Overlooking the gatehouse is a giant bear reared up on its hind legs. "Everyone thinks it's Russian, but it's French, by [François-Xavier] Lalanne," he says.

On one flank of the house, Henry Moore's "Reclining Figure", bought for £19m, rests on a plinth. "I like his passion and the very unusual perception of space, like the Expressionists," he says.



Spider sculpture by Louise Bourgeois © Rick Pushinsky

To the rear is a specially commissioned work by Antony Gormley, a hunched up abstract human figure made from angular pieces of metal that could symbolise DNA. Aven got to know the artist through his work as a trustee of the Royal Academy's development trust. Thanks to this role and others he now hosts patrons and collectors to show off his art.

For a number of years, he was reluctant to loan out any of his own works at a time of insecurity over property rights and difficulties in obtaining insurance and security guarantees.

Now he has greater confidence and enthusiasm for sharing: his works have been lent to the Jewish Museum in Moscow, the Tate in London, the Museum of Modern Art in New York and recently the Royal Academy for its Russian art exhibition this year. Others will soon go to New York and Tel Aviv.



Border guard sculpture by Grisha Bruskin © Rick Pushinsky

"I am lending more and more," he says. "Russian art deserves it." He hopes to be able to persuade the Victoria and Albert Museum to put on a show based around his porcelain collection. In the future, he dreams of a private museum to house his works.

Yet he believes they would be overshadowed by other state collections if it were in Moscow, and in London he questions whether there would be sufficient interest. Instead, he is considering Riga, for which he retains an affinity because of his Latvian grandfather.

Russia has changed radically in recent years, and Aven's own personal life has shifted following his wife's death in 2015 and his subsequent remarriage, causing fresh reflection on his cultural interests.

"If I was starting again, I would have done something different," he says. "This was an all-Russian collection. Step by step it's becoming international. I'm tempted by the connections between 20th-century Italian, German and Russian art, melded by the forces of totalitarianism."

## Favourite thing



© Rick Pushinsky

Aven chooses "Les maisonnettes rouges" (1922) by Marc Chagall. "I bought this in an auction at Sotheby's in London in 2015 [the recorded price is £3.3m]," he says. "It turned out I was bidding unknowingly against my business partner German Khan who had also started to collect works by Russian painters of Jewish origin. The painting is simultaneously about Russia, the Jewish attitude towards life — that of eternal movement — and of course it is also of the highest artistic quality."

*Andrew Jack is the FT's head of curated content*

*Photographs: Rick Pushinsky*

Copyright The Financial Times Limited 2017. All rights reserved. You may share using our article tools. Please don't copy articles from FT.com and redistribute by email or post to the web.

Print this page
Send this article

Cash-laden oligarchs hunt pastures new

**AAR Consortium**

Cash-laden oligarchs hunt pastures new



APRIL 5, 2013 Courtney Weaver in Moscow                                **3 comments**

Hours after Rosneft finalised a deal to buy out the oligarch founders of rival oil producer TNK-BP last month, Mikhail Fridman and German Khan donned white robes, safari hats and sunglasses and began a three-day trek in the Israeli desert.

Flanked by a dozen other tycoons, two camels and a film crew from a Russian television channel, the pugnacious Mr Fridman was shown taking naps in the shade, learning to make flatbread from scratch, and belting out Ukrainian folk songs for his travel mates across the camp fire.

Why Mr Fridman decided to have the film crew accompany him on this particular pilgrimage, his third such trip, will remain a mystery. Ten minutes of footage was later aired on Russia's opposition-leaning station, TV Rain. But one thing from the tape is clear: Mr Fridman was in high spirits.

"Some people after they do the deal of their lifetime, they go to the banya and call some girls, some guys go into the desert and sing Ukrainian folk songs," says Steven Dashevsky, founder of Dashevsky & Partners, a Moscow investment company.

"The guy is in a good mood and it's very easy to understand why he's in a good mood."

After selling their half of TNK-BP to Rosneft last month, Mr Fridman, Mr Khan and their two partners Viktor Vekselberg and Len Blavatnik, are $28bn richer.

Now they are embarking on new phases of their careers, nearly a decade after they joined forces with BP to create one of Russia's largest private oil majors.

While some market participants have questioned whether AAR – the four oligarchs' consortium – was able to keep the entire $28bn, people close to the consortium insist that the oligarchs are able to.

For two of the tycoons the deal marks the end of an era. Mr Vekselberg and Mr Blavatnik had been anxious to end their involvement in TNK-BP months before the deal with Rosneft was sealed, people close to the billionaires say.

Mr Blavatnik, who lives in London, has moved on from oil and gas to the music business, a likely investment target for some of the $7bn he has received from the sale.

**Some people after they do the deal of their lifetime, they go to the banya and call**

Mr Vekselberg, meanwhile, has switched his main focus to the power sector. He declared on Russian television on Thursday that up to $1.5bn of the $7bn he has received from the deal will go to his Integrated Energy Systems, Russia's largest power supply and

**some girls, some guys go into the desert and sing Ukrainian folk songs**

Steven Dashevsky, founder of Moscow investment company Dashevsky & Partners

gas distribution company, which has both high debts and a significant investment programme.

More uncertainty surrounds the next steps of Mr Fridman and Mr Khan, who now have a vast choice of countries and sectors in which they could deploy their cash.

Alfa Group, their holding company, has already announced that it is setting up a "major, new international investment business" to focus on oil and gas, and a separate business that would expand its telecoms interests.

"On Alfa's side there is an openness to staying in the oil and gas sector," said one senior western banker close to the tycoons. Future deals, he added, are "more likely to be international than domestic".

Mr Khan and Stan Polovets, chief executive of AAR, have held exploratory meetings with 25 major investment banks, private equity groups, and oil and gas consultancies, as they explore which investments to pursue.

They have also met former BP chief executives Lord Browne and Tony Hayward, with whom they worked during the early days of TNK-BP. Lord Browne is now a partner at Riverstone, the energy-focused private equity group, while Mr Hayward is at London-listed Genel Energy, the Kurdistan oil producer.

Mr Polovets said it was likely to be six to 12 months before the investors chose which options to pursue.

"We're not in any hurry to make investments," he told the Financial Times, declining to comment on whether Alfa saw specific opportunities with Mr Hayward or Lord Browne.

He added that Alfa was likely to pursue a number of deals alongside other private equity groups. "We don't expect to create another TNK-BP," he said. "That was a unique opportunity at a particular point in time."

A former TNK-BP associate said that the planned new oil and gas venture fitted with Mr Khan's previous work at TNK-BP, where he was the one largely running the company.

"Even when Fridman was there [as chief executive] Khan was the guy making all the decisions. He was good at it," the person said.

"Say what you want about the ethical things but he's good at squeezing efficiency out of [Russian oil and gas companies]," many of which remain highly ineffective, he added.

Outside oil and gas, Alfa is active in the telecoms sector where it owns nearly 50 per cent of operator VimpelCom and about 13 per cent of Turkcell where it is locked in conflict with Turkey's Cukurova.

At the end of March, Alfa's telecoms arm offered to buy out investors in Algerian telecoms group Orascom, a VimpelCom subsidiary, at an 8 per cent premium.

More recently, Alfa has sought to outbid Russian state-owned lender VTB for the Russian unit of Sweden's Tele2 with counterbids through two of its subsidiaries. Both Tele2 and VTB insist their deal is closed.

A person close to Alfa said that the company had weighed bids for other targets such as EE, the UK mobile phone operator, and MTN, the South African telecoms group.

How committed Alfa will remain to Russia remains to be seen. In a statement in December, AAR promised to reinvest most of the proceeds from the TNK-BP sale back into the Russian economy, following up on a public request by Vladimir Putin who said that he "hoped" the cash would stay in Russia.

While some analysts wondered whether Mr Fridman would want to reinvest in Russia after being pushed out of TNK-BP by state-owned Rosneft, others called the deal and the new opportunities it offers a win for AAR.

"They have all the cash," says the senior western banker.

"They should be psyched."



**Mikhail Fridman**

One of Russia's seven most powerful oligarchs in the 1990s, Mikhail Fridman is one of only two, along with Norilsk Nickel's Vladimir Potanin, who managed to stay at the top. Ukraine-born Mr Fridman, Russia's second-richest man with a fortune of $16.5bn, according to Forbes, started out reselling rugs and theatre tickets before co-founding the consortium then-known as Alfa-Eco in 1989. Over the years it has shifted from a small business selling computers and rugs to become Alfa Group, with assets spanning banking, oil and gas, retail and telecoms, including a stake in Turkish mobile operator Turkcell. The litigious 48-year-old has battled with partners ranging from the UK's BP to Sweden's Telenor. In 2011 he scuppered BP's attempt to develop the Arctic with state-owned Rosneft. While the feud ultimately ended with Rosneft buying both BP and AAR out of TNK-BP,
Mr Fridman is no worse for the wear. AAR was bought out for $28bn, with Alfa pocketing $14bn.



**German Khan**

A classmate of Mr Fridman at the Moscow Institute of Steel and Alloys, German Khan is the quieter of the two, preferring to let his steely reputation speak for itself. Mr Khan, 50, is equally known for his role at TNK-BP as he is for a mention in US diplomatic cables made public by WikiLeaks. In these, American diplomats described his Russian hunting lodge as being like "a Four Seasons in the middle of nowhere" and alleged that Mr Khan watched the film The Godfather every few months, considering it "a manual for life". An avid hunter, the Kiev-born businessman is worth $10.5bn, according to Forbes. A co-founding partner with Mr Fridman of Alfa Group, with interests in sectors from telecoms to Alfa-Bank, one of the largest privately owned lenders in Russia, Mr Khan these days is a philanthropist. His pet projects include the Genesis Philanthropy Group, which awards $1m every year to a scientist that exemplifies Jewish values.



**Viktor Vekselberg**

Possibly the closest of the four AAR tycoons to the Kremlin, Viktor Vekselberg has segued from natural resources to utilities, technology and art. The 55-year-

old tycoon, worth

an estimated $15.1bn, was born in a small city in western Ukraine, and first earned his fortune selling scrap metal. Together with his schoolmate Len Blavatnik, he formed the Siberian Ural's Aluminium Group (Sual) in the mid 1990s, which they eventually merged with Oleg Deripaska's own aluminium group to form Rusal. Once chairman of Rusal, Mr Vekselberg quit last year after a row with Mr Deripaska. And while he still owns a small minority stake in the group, he has showed greater interest in the utilities sector, weighing potential deals through his Integrated Energy Systems, Russia's largest power supply and gas distribution company. He is president of Skolkovo, prime minister Dmitry Medvedev's techo-park project modelled on Silicon Valley. An avid art collector, he has repurchased a rare collection of Fabergé eggs and donated them back to the Russian state.



**Len Blavatnik**

Born outside Moscow, Len Blavatnik emigrated with his university professor parents to the US in the late 1970s and went on to attend graduate school at Columbia University and Harvard Business School. An American citizen since 1984, Mr Blavatnik returned to Russia around the fall of the Soviet Union, as the country's natural resource assets suddenly became available for privatisation. After co-founding Sual with Mr Vekselberg, then TNK with his three partners, Mr Blavatnik began to focus on investments in the US, becoming one of the titans of the American music industry. Mr Blavatnik, 55, a Leonard Cohen lover, paid $3.3bn for Warner Music in 2011, and has won an auction for Parlophone, the former EMI label. In March, he invested in an up-and-coming music subscription service being developed by Jimmy Iovine and Dr Dre's Beats Electronics. His net worth is valued at $16bn by Forbes

Copyright  The Financial Times Limited 2017. All rights reserved. You may share using our article tools. Please don't copy articles from FT.com and redistribute by email or post to the web.

**Print this page**          **Send this article**

DOW JONES, A NEWS CORP COMPANY ▾

▲      ▲      ▲      ▲      ▼

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit
http://www.djreprints.com.

http://www.wsj.com/articles/SB112856247619561303

LEADER (U.S.) | TOUGH TACTICS

# As Russia Squeezes Big Business, A Tycoon Decides to Pick a Fight

Mikhail Fridman Takes On Putin's Telecom Minister; Avoiding Another Yukos

*By Gregory L. White Staff Reporter of THE WALL STREET JOURNAL*
Updated Oct. 6, 2005 12:01 a.m. ET

MOSCOW -- Two have fled the country. Another is in jail, his oil empire in ruins. Russian President Vladimir Putin has largely succeeded in his campaign pledge to make oligarchs -- the powerful tycoons who emerged in the chaos of post-Soviet Russia -- disappear "as a class."

Now, most of the country's super-rich are either packing up or hunkering down and trying to stay on the government's good side.

Except Mikhail Fridman. Using bare-knuckles business tactics, the 41-year-old built an $8 billion empire spanning oil, telecoms, banking and retail. Now, he's picking a fight with Leonid Reiman, Russia's telecommunications minister and a longtime Putin friend.

Last fall, lawyers for units of Mr. Fridman's Alfa Group lined up Anthony Georgiou, a former Reiman partner, to provide testimony to a British Virgin Islands court that he'd paid over $1 million in bribes to Mr. Reiman. He testified that the payments happened when the future minister was a top executive at a Russian state phone company in St. Petersburg in the early 1990s. Based in part on allegations raised in the case, German prosecutors have opened an investigation into whether Western banks facilitated any criminal activity.

Mr. Reiman has strenuously denied any wrongdoing, and late last year accused Alfa of smearing him to prevail in a business dispute. "Alfa, because it's an old oligarchic structure, is trying to use the traditional means by which they've resolved conflicts many times over many years -- by putting pressure on officials," Mr. Reiman told reporters.

In fact, Mr. Fridman makes little pretense that this is just about clean government. He's in a vicious battle over a stake in Russia's No. 3 mobile-phone company. His lawyers are using the corruption charges to fight off a legal challenge from a Bermuda-registered investment fund that claims it owns the stake. Mr. Fridman has offered to drop the lawsuits if the other side agrees to settle.

In Russian business, where hostile takeovers often involve burly men with masks and submachine guns, toughness has long been a key to success. But Mr. Fridman, whose hardball tactics are legendary, is charting a lonely course of resistance at a time when the state is increasingly squeezing private business.

"It's our style, our strategy and we're not changing it. We do a lot of things that might seem aggressive to some people," the baby-faced Mr. Fridman says with a smile, sitting in his spartan white office in downtown Moscow.

So far, Alfa has managed to avoid trouble with the Kremlin itself. Mr. Fridman has tried to insulate himself by hiring former top government officials as advisers, including Pyotr Aven, a former trade minister and an old friend of Mr. Putin who meets the president regularly.

Mr. Fridman says he's careful to avoid anything that the Kremlin would see as a challenge to its control of national politics. That's widely believed to be what got billionaire Mikhail Khodorkovsky in trouble: He was contributing tens of millions of dollars to a broad range of political parties. He's now serving an eight-year prison sentence on fraud and tax-evasion charges. His OAO Yukos oil company was slapped with $28 billion in back-tax claims and largely nationalized last year.

Where Mr. Khodorkovsky was often openly critical of the Kremlin during his frequent trips to the U.S., Mr. Fridman is much more careful. In January, he flew to New York to open a lecture series his bank endowed at the Council on Foreign Relations. The speaker was Russian Defense Minister Sergei Ivanov, a Putin confidante and a man frequently tipped as a potential presidential successor. Mr. Fridman introduced him as "an outstanding politician."

Alfa also has lined up some high-profile insurance. The oil company it controlled is now half-owned by BP PLC, in a deal for which Mr. Fridman made sure to get public backing from Mr. Putin and United Kingdom Prime Minister Tony Blair. In the wake of the Yukos case, which has battered business confidence and badly tarnished Mr. Putin's international reputation, Mr. Fridman says he doesn't think the Kremlin will risk another open clash with big business.

Still, these days every new back-tax claim against a company linked to Alfa spurs a wave of speculation in the local press that Mr. Fridman is about to face the same fate as Mr. Khodorkovsky.

A devoted movie and theater buff, Mr. Fridman is also known to take a turn at the piano at Color of the Night, the Moscow jazz bar he owns. He still looks a bit like the nerdy kid from school, his brown hair untouched by grey. The self-described adrenaline junkie has a taste for adventure that extends beyond the office to annual off-road rallies through the jungles and deserts of Africa, Asia and Latin America.

## Limited Information

Public information about the Alfa Group is limited, since it's a private company owned by Mr. Fridman and two university friends. Run roughly like a giant private-equity fund, the group holds assets valued at about $20 billion, says Mr. Fridman, who adds that his stake is "more than 40%." The assets are owned by a complex web of holding companies located in discreet offshore jurisdictions like Gibraltar. Managers of the various businesses -- banking, oil, trading, retail and telecoms -- own minority stakes in the individual units, sometimes alongside outside partners.

"We're financial investors," says Mr. Fridman, who keeps an apartment in downtown Moscow and commutes regularly to Paris, where his wife and two daughters have lived since the early 1990s. "We don't consider ourselves experts in the industries we're in."

Colleagues say Mr. Fridman led the group's push in the late 1990s into the oil business, which now delivers most of the profits. Telecom has been the focus for expansion since then -- Russia has been among the world's fastest-growing wireless markets for the past several years. Mr. Fridman says he aims to cobble his stakes in the region together into a regional network and then negotiate an equity alliance with a global player like Vodafone Group PLC.

For Mr. Fridman, a Jewish kid from Lvov in what's now Ukraine, persistence has long been a business signature. As a student in Moscow in the 1980s, he says he was blocked from continuing his studies because of anti-Semitism in the Soviet education system. So he started a window-washing cooperative, becoming one of the first to take advantage of the chance to open a private business.

After the collapse of the Soviet Union in 1991, he built his fortune trading everything from Oriental rugs to Cuban sugar to Russian crude. As the government began privatizing thousands of state companies, Mr. Fridman pushed the group into the oil business. He lined up two Russian &eacute;migr&eacute; partners who helped cobble together a patchwork of formerly state-owned companies into a group they called Tyumen Oil Co., known by its Russian abbreviation TNK.

It was a heady time for Mr. Fridman and his fellow oligarchs. They'd made millions as capitalism was just taking root in the early 1990s and used their fortunes to build vast political clout. In 1996, Mr. Fridman and a handful of tycoons teamed up to finance President Boris Yeltsin's 1996 re-election campaign. Using their close connections with the Kremlin, they snapped up the country's richest assets in often-rigged privatizations and, in some cases, were awarded with top government jobs. Boris Berezovsky, for example, whose interests ran from oil to television, was named deputy secretary of Russia's powerful Security Council.

Along the way, Alfa cemented its reputation for aggressive tactics. Alfa often took advantage of gaps in the bankruptcy law that allowed small creditors to take control of debtor companies.

Officials at Norex Petroleum Ltd., a small Canadian oilfield-services company, contend Alfa went a step further in 2000, when it moved to take control of a Siberian joint-venture Norex had with a TNK unit. In a lawsuit filed in U.S. District Court in New York, Norex alleges that TNK took over with 20 machine-gun-toting guards. One executive was quoted in the lawsuit as saying that a top Alfa official vowed to "run over [the company] like a steamroller" if they resisted. Alfa says it's confident that its takeover of the company was legal but won't comment on details of the case, which hasn't yet gone to trial. Norex is seeking to recover $1.5 billion.

But even as Alfa was still throwing its weight around, twilight was setting in on the era of the oligarchs. Mr. Putin came to power in 2000 vowing to reassert Kremlin authority. Within a year, two of the most politically influential oligarchs, Vladimir Gusinsky and Mr. Berezovsky, had left the country under threat of prosecution, leaving the bulk of their empires behind. Oil tycoon Roman Abramovich quietly began selling off his holdings and spent more and more time in London, where he bought Britain's Chelsea soccer team. Last month, state gas company OAO Gazprom announced a deal to buy the oil company he controls, OAO Sibneft, for $13.1 billion.

Sensing the winds shift, Mr. Fridman realized he needed to move fast to get a foreign partner for TNK, a move that would provide both political insurance and cash. "We knew at some point that opportunity would be gone," he says.

Tempted by Siberia's vast reserves, BP was already on the prowl for a Russian deal. But Alfa had to rebuild relations with the British giant that had soured in the late 1990s when Alfa, in a battle with another oligarch, stripped key assets out of BP's previous investment in Russia. Mr. Fridman patched things up with BP CEO John Browne. BP wound up paying $7 billion in 2003 for half of the oil company Alfa owned with two partners. "There is a toughness built into the culture of Russia," Mr. Browne said at the time. "You have to cooperate."

Mr. Fridman's timing was impeccable. Although analysts touted the BP deal as the first of many foreign investments in the oil patch, the Kremlin soon closed the door on such big deals with foreigners and geared up to attack Yukos.

But it wasn't long before Mr. Fridman got into a government-relations mess of his own. In a complex series of transactions in the summer of 2003, Alfa had bought a 25% stake in Megafon, Russia's No. 3 cellphone company. The stake had previously been owned by LV Finance, an investment firm controlled by Leonid Mayevsky, a former legislator.

Within days, a little-known Bermuda investment fund called IPOC International Growth Fund Ltd. contested the sale, claiming it was entitled to the shares under a pair of option agreements dating to 2001. IPOC went to court in Bermuda and the British Virgin Islands, where some of the Alfa companies holding the Megafon shares were registered. IPOC also launched arbitration proceedings against LV Finance in Switzerland, where the 2001 option agreements had been executed.

Lawyers for LV Finance, cooperating with Alfa's legal team, argued IPOC hadn't properly paid for the options. They also sought to convince the courts that IPOC was in effect a criminal enterprise, thereby rendering any of its contracts illegal and voiding its claim to the Megafon shares.

In written arguments in the BVI case, Alfa lawyers asserted that an affidavit from former IPOC President Vidya Sharma showed IPOC was "simply a front for laundering the proceeds of criminal conduct in Russia for...Leonid Reiman."

Alfa lawyers argued in court papers that IPOC was part of a complex network of companies that served to conceal Mr. Reiman's ownership of large stakes in Russian telecom companies, including Megafon. They alleged the fund got its money from corrupt dealings in Russia involving the minister.

IPOC denied the allegations and accused Alfa of paying witnesses. In fact, Alfa did pay $7 million to Mr. Georgiou, the former partner of Mr. Reiman. Alfa said the payment was to buy out most of Mr. Georgiou's Russian businesses, which he feared would suffer after his testimony.

Mr. Reiman denies any wrongdoing. Jeffrey Galmond, a Danish lawyer who has known Mr. Reiman since the late 1980s, has testified that he's the owner of IPOC and its related companies -- holdings that could be worth more than $1 billion. He says the corruption allegations are just an effort to distract from what he says is Alfa's fraudulent acquisition of the shares.

"It looks to me as an attempt simply to crush a competitor by Alfa," he told a civil proceeding in Geneva last year. "They are all over the place and there is, in my personal opinion, no limit to what they are capable of doing."

The conflict has been tense. At the Geneva hearing, the presiding arbiter complained his house was being watched and his garbage searched. He said police told him the surveillance was linked to the case, although the culprits were never caught. Acting on an IPOC complaint, Russian police are investigating possible fraud charges against Mr. Mayevsky for his role in the Megafon share sale. He briefly fled Russia to avoid arrest.

Mr. Galmond says he got the money for IPOC from a series of lucrative deals in Russian telecoms and real estate in the 1990s. In court testimony, he admits that Mr. Reiman's work "played an important part in the creation of my own success and wealth," but says that took place before Mr. Reiman became minister. Mr. Galmond acknowledges he bought a summer house on the Danish coast in 1993 that he says he and Mr. Reiman shared, but denies any wrongdoing.

Court rulings are still pending in most of the cases. Prosecutors in Frankfurt, tipped off in part by the allegations from Alfa and LV Finance, are already investigating whether Germany's Commerzbank AG , which worked with Mr. Galmond, was involved in money laundering as a result, according to a spokesman for the prosecutor. Commerzbank denies it broke any laws, but a senior executive involved in the case resigned this summer and the bank has vowed to tighten internal oversight.

## No Signs of Concern

So far, the Kremlin is showing no sign that it's concerned about the allegations. Last year, Mr. Putin even took the unusual step of intervening to restore Mr. Reiman's ministerial job when he was about to lose it in a government reshuffle. He'd left nearly all the other appointments to his prime minister to decide.

As the grudge match dragged on, some of Alfa's other investments in Russia ran into trouble. In December, telecoms company OAO Vimpelcom , in which Alfa owns a big stake, was told it owed $160 million in unpaid taxes and fines. Vimpelcom's American depositary receipts, which trade on the New York Stock Exchange, plummeted 30% in two days. The company later got the tax claim sharply reduced and the stock has recovered. And in April, authorities slapped Alfa's main oil investment with $790 million in back-tax claims for 2001.

But unlike Yukos, which was crippled by tax assessments and saw executives jailed, tax and regulatory problems so far haven't fazed Alfa or its companies. The regulatory issues have cleared up and in August, TNK-BP said it settled the tax claims for $250 million. Auditors are still looking at company taxes for 2002 and 2003.

Mr. Fridman says the Megafon fight is worth it: He estimates Alfa's stake is now valued at about four times the $300 million he paid for it in 2003.

"We understood that there would be unhappiness on the part of certain bosses in the telecommunications ministry, but we were ready for that," Mr. Fridman says, adding that Alfa's legal position is "ironclad."

*—David Crawford in Berlin contributed to this article.*

**Write to** Gregory L. White at greg.white@wsj.com

Copyright &copy;2017 Dow Jones &amp; Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

DOW JONES, A NEWS CORP COMPANY ∨

'Pis posy is foryotrp3rsoost non-conrnarcisi oso my. To order preientation-mely copies for distrbufen to your coloogues tienb or customers yet
Irtlpi/insis.OJnoplinie.corn.

ntlekkewisysteem/ortlelea9010001424052879202,503204-577036000854767664

BUSINESS

# TNK-BP Russian Partner Relishes Conflict

Taking Lessons from 'The Godfather,' Russian Billionaire Expresses Pride in 'Tough Relations
With Our Partners'

*By Gregory L. White*
November 14, 2011

MOSCOW—For much of its eight-year history, Russian oil company TNK-BP Ltd. has
seen its two shareholders at odds. BP PLC and a group of Soviet-born billionaires known
as AAR have done battle in courtrooms and boardrooms from Siberia to the Caribbean.



AAR's German Kheui says he end his prince 'believe In the airuchire of TNK-EIP, despite periodic dbsputes. DENIS
ABRA1.40VNEDOMOS71

That's a good thing, says German Khan, an AAR principal who insiders say essentially
has run '1'NR-BP since the joint venture's BP-backed chief executive fled Russia during a
rowbetween the shareholders three years ago.

"I'm of the view that shareholder conflicts are good for companies," Mr. Khan says in a
rare interview at TNK-BP's Moscow headquarters_ "I've seen many conflict situations
where managers started working better than in ordinary conditions."

Mr. Khan, 50 years old, has seen plenty of tension in his business career. He is one of the
three founding shareholders of the Alfa Group, which grew from a window-washing
cooperative in the waning days of the Soviet Union into a conglomerate withholdings in
an array of sectors, including from oil, banking, retail and telecommunications.

Legendary for its often-aggressive tactics with partners, competitors and debtors, Alfa
has been criticized for exemplifying Russia's bare-knuckle business environment.

But Mr. Khan—a slight, soft-spoken man who
took up boxing as a child in Kiev, Ukraine, and
as an adult has been said to carry a chrome-plated pistol `under his sport coat—makes no
apologies for Alfa's style. The group's holdings are nowvalued at more than $25 billion.

1/3

"We try to set rather clear and tough relations with our partners and defend our rights in the legal situations that arise," he says.

TNK-BP often has been the battlefield for such relations. Alfa is the first 'A' and the dominant partner in AAR, which also includes Len Blavatnik's Access Industries and Viktor Vekselberg's Renova Group.

Early this year, AAR asked a London court to block a $16 billion alliance that BP had negotiated with 0A0 Rosneft, a Russian state-controlled oil company. AAR said the deal would have violated exclusivity provisions in joint-venture agreement with BP. The court agreed, and BP was forced to scuttle the Rosneft deal. BP rival Exxon Mobil Corp. **XOM 0.60%** ♦ ultimately made the deal with Rosneft instead.

Arbitration proceedings are under way with AAR. They could lead to TNK-BP suing the British giant for what AAR says are billions of dollars in damages from the failed deal. BP rejects that claim as groundless. Mr. Khan declines to comment on that dispute.

In BP's previous run-in with AAR, Bob Dudley, who then was chief executive of TNK-BP and now runs BP, had to leave Russia in 2008 amid a rising wave of pressure on foreign executives from regulators and courts in Russia. People close to BP blamed the problems on AAR, in particular, Mr. Khan. Mr. Dudley at the time said he held meetings on the balcony of his downtown Moscow office to avoid eavesdropping.

"It was a nice balcony," Mr. Khan recalls, saying he wasn't aware of eavesdropping. AAR has denied a role in pressuring BP. After Mr. Dudley left Russia, BP and AAR reached a truce in which the British giant gave up much of its direct influence inside the company.

"There's nothing personal here, it's just business," Mr. Khan says.

A BP representative says "occasional shareholder disagreements have not stopped [TNK-BP's] growth, and as shareholders we are very happy with the company's performance." Mr. Dudley wasn't available for comment.

At the height of the 2008 conflict, Mr. Khan was featured in a secret U.S. diplomatic cable, in which a British colleague painted an unflattering picture of him, even noting Mr. Khan's affection for the movie "The Godfather."

"I should have it framed and hung on my office wall," Mr. Khan jokes about the cable. "By the way, it's a very instructive film."

Visibly annoyed when asked about the pistol, which also figured in the cable, Mr. Khan says, "Everyone has their childhood dreams."

Mr. Khan says he and his partners "believe in" the 50-50 structure of TNK-BP, despite the periodic disputes. He says AAR doesn't regret not selling earlier this year, when BP and Rosneft discussed a deal to salvage their proposed alliance by buying out AAR's stake in TNK-BP for about $32 billion in cash and stock.

Mr. Khan denies that he dominates company management, which is formally headed by CEO and Chairman Mikhail Fridman, Alfa's largest shareholder. Mr. Fridman has said he is a hands-off CEO.

Mr. Khan says there has been no indication that Russian authorities have given the company the cold shoulder after the Rosneft mess, as some observers had predicted. With its hybrid of foreign and local ownership, TNK-BP is a rarity in the Russian oil sector, where local companies, particularly state-owned ones, have been dominant in recent years.

But Mr. Khan says he sees the government easing the tax burden and opening more opportunities—including access to the huge reserves on the Arctic shelf—to private players to boost flagging oil production. The tightly regulated gas market also is likely to open up over time, he says. That would allow TNK-BP to become one of Russia's biggest gas producers, he says. "We're not planning to retire."

Alfa has avoided the internal tensions of other Russian companies in recent years, in which oligarchs have taken each other to court.

One of the most dramatic of such battles is under way in London, where one-time Kremlin insider Boris Berezovsky has sued his former partner, oil tycoon Roman Abramovich. The case has provided a rare window into the murky business dealings of 1990s Russia. Last week, Mr. Abramovich testified that everyone in big business needed high-level political and other protection, known as a *krysha,* the Russian word for "roof."

Mr. Khan takes issue with that. 'We never had a krysha. We were always our own krysha."

**Write to** Gregory L. White at greg.white@wsj.com

Copyright Sicopy.2017 Dow Jones &amp; Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

# PUTIN'S KLEPTOCRACY

## Who Owns Russia?

### KAREN DAWISHA

**Simon & Schuster Paperbacks**

*New York   London   Toronto   Sydney   New Delhi*



Simon & Schuster Paperbacks
An Imprint of Simon & Schuster, Inc.
1230 Avenue of the Americas
New York, NY 10020

Copyright ©2014 by Karen Dawisha

All rights reserved, including the right to reproduce this book or portions thereof
in any form whatsoever. For information address Simon & Schuster Paperbacks
Subsidiary Rights Department, 1230 Avenue of the Americas, New York, NY 10020

First Simon & Schuster paperback edition September 2015

SIMON & SCHUSTER PAPERBACKS and colophon are
registered trademarks of Simon & Schuster, Inc.

For information about special discounts for bulk purchases,
please contact Simon & Schuster Special Sales at
1-866-506-1949 or business@simonandschuster com

The Simon & Schuster Speakers Bureau can bring authors to your live event.
For more information or to book an event contact the Simon & Schuster Speakers
Bureau at 1-866-248-3049 or visit our website at www.simonspeakers.com.

Cover design by Flag Tonuzi

Manufactured in the United States of America

1  3  5  7  9  10  8  6  4  2

Library of Congress Control Number: 2014948969

ISBN 978-1-4767-9519-5
ISBN 978-1-4767-9520-1 (pbk)
ISBN 978-1-4767-9521-8 (ebook)

chief of base and chief of station in countries of the former Soviet Union. When Palmer gave his testimony in September 1999, Putin was not yet president, but he was prime minister, he had been head of the successor organization to the KGB, the Federal Security Service, and he had been investigated on a number of occasions for high-level corruption and criminal activity.

Of course, there were those in the Russian government who were aware of the problem and had tried to correct it. On February 18, 1992, for example, the Yel'tsin-Gaidar government signed an agreement with an American corporate private investigation firm, Kroll Associates, to track down and help repatriate money illegally held or taken abroad by former Communist Party and Soviet government agencies, including the KGB. The money had allegedly left the country prior to the August 1991 attempted coup against the reformist-oriented Gorbachev by conservatives in the highest echelons of the ruling Communist Party and the KGB.[13] A group of Central Committee officials, including the head of the Party department dealing with the defense industry, the head of state television and radio, and the deputy head of the committee in charge of privatizing state property, were all dismissed after revelations about their involvement in embezzlement and capital flight. Several of them had also been involved in efforts during the Gorbachev period by a so-called patriotic wing of the special services to organize various provocations to undermine Gorbachev and prove that his reforms needed to be halted. Yegor Gaidar, who at that time was the minister of finance, stated that this kind of activity was not only illegal but constituted continued political resistance to the government's economic reform efforts: "Last year saw large-scale privatization by the nomenklatura [the high-ranking elite], privatization by officials for their own personal benefit."[14] The *New York Times* reported that the office of the Russian procurator general had been "unable to penetrate the maze of hidden bank accounts and secret investments, left behind by party officials acting in some cases . . . with the cooperation of the K.G.B. . . . One estimate for the party's hidden assets is $50 billion."[15] Kroll, which had also led the hunt for stolen funds from the Marcos regime in the Philippines and Saddam Hussein's invasion of Kuwait, was reported to have "found that thousands of mostly offshore bank accounts, real estate holdings and offshore compa-

nies had been set up to launder and shelter these funds and what had been the Soviet Union's gold reserves." [16]*

In response to this report and their own investigations, the Yel'tsin government passed a law giving it the right to confiscate funds taken abroad illegally. Yel'tsin was receiving monthly updates from Kroll; the lower house of the Russian Supreme Soviet, the Council of Nationalities (as it was called until December 1993), demanded that the Foreign Intelligence Service† provide a report on Kroll's progress, which *Izvestiya* reported was provided in a closed session by First Deputy Director Vyacheslav Trubnikov. [18] The Supreme Soviet Presidium had decreed that a special commission be established by the procurator general to investigate corruption, abuse of power, and economic offenses. Its report was presented to the Supreme Soviet in September 1993. In it Kroll's efforts were noted; the document recounted widespread instances of "bribery of officials, blackmail, and the illegal transfer of currency resources to foreign banks," with specific ministers sanctioned by name, including Minister of Foreign Economic Relations Pyotr Aven (whose activities in approving Putin's early contracts as

---

*Joseph Serio, an American seconded to the Organized Crime Control Department of the Soviet Interior Ministry in 1990–91 who went on to head Kroll's operations in Moscow, reached similar conclusions. On this subject and the global spread of Russian organized crime that occurred in parallel at this time, see Handelman (1995), Klebnikov (2000), Friedman (2002), Varese (2001), Gerber (2000), Williams (1997), and Shelly (2004). [17]

† When the KGB was broken up after its involvement in the 1991 coup attempt against Gorbachev, several separate security institutions emerged with different functions. The Foreign Intelligence Service (Sluzhba Vneshney Razvedki, SVR) was formed out of the First Directorate of the KGB and was responsible for external intelligence. The Federal Agency of Government Communications and Information (Federal'noye Agentstvo Pravitel'stvennoy Svyazi i Informatsii, FAPSI) was made responsible for electronic surveillance. FAPSI was the rough equivalent to the National Security Agency in the United States. It existed until 2003, when Putin reunited it with the FSB. The Main Administration for the Protection of the Russian Federation (Glavnoye Upravleniye Okhrany, GUO) came out of the Ninth Directorate of the KGB. It was renamed the Federal Protective Service (Federal'naya Sluzhba Okhrany, FSO) in 1996. It is roughly equivalent to the U.S. Secret Service and is responsible for the protection of high-ranking officials, including the president. The Ministry of Security was formed out of the internal security functions of the KGB and was responsible for domestic and border security. It was reorganized in December 1993 into the Federal Counter-Intelligence Service (Federal'naya Sluzhba Kontrrazvedki, FSK). The FSK was then reorganized into the current-day Federal Security Service (FSB) in April 1995, and it was the FSB that Putin took over as director in 1998.

head of the St. Petersburg Committee for Foreign Liaison* are dealt with below). The report also criticized the Ministry of Security (the precursor of the FSB) for the fact that while it had opened three hundred investigations in the first six months of 1993 alone, only "two criminal cases had been instituted in practice."[19] In theory, in both Yel'tsin's camp and in the Communist-dominated legislature, everyone was seeking to stanch the flow. But nothing happened in practice. As one of Kroll's investigators stated, the report raised "suspicions about certain players and institutions [in the former Soviet Union]. Our problem is that when we sent it to Moscow, it was never followed up."[20]

This image of high-level culpability was reinforced when U.S. law enforcement intercepted telephone calls in the United States from the highest officials in President Yel'tsin's office, Prime Minister Viktor Chernomyrdin's staff, and other ministers to and from the head of the Russian firm Golden ADA, established in San Francisco, linking the firm to various scams that collectively added up to almost $1 billion.[21] The size of the scams is suggested by the fact that in 1994 Golden ADA had a *declared* taxable income in the United States of $111,485,984, according to U.S. court documents.[22] FBI records show that the FBI turned over to Russia information linking Golden ADA with Yevgeniy Bychkov, the chairman of the Russian Committee for Precious Gems and Metals, and Igor Moskovskiy, a deputy minister of finance. Eventually, in 2001, with documents provided by FBI wiretaps, as the FBI website wryly states, both "were convicted of abusing their state positions and immediately granted State Duma amnesties."[23] At an Aspen Conference in St. Petersburg in the early 1990s, I asked a high-ranking U.S. government official, "How many Russian government ministers have bank accounts abroad in excess of $1 million?" The reply came back immediately and without hesitation: "All of them. Every last one." This was the general view of what was going on throughout the entire country at the time, a view reaffirmed by subsequent Russian journalistic investigations.[24]

---

*Komitet vneshnikh svyazey—KVS, also sometimes referred to as the Committee on Foreign Economic Relations, or External Relations.

Primakov had already called for "freeing places in the prisons and camps for those we will be sending there."[157] In a subsequent interview, Putin's PR chief, Gleb Pavlovskiy, developed this theme: "Putin always said, we know ourselves . . . we know that as soon as we move aside, you will destroy us. He said that directly, you'll put us to the wall and execute us. And we don't want to go to the wall. . . . That was a very deep belief and was based on [the] very tough confrontations of 1993 when Yel'tsin fired on the Supreme Soviet [Parliament] and killed a lot more people—Putin knows—than was officially announced."[158]

That summer Kremlin insiders started to court the country's human rights community and liberal elites, seeking support for Putin. Pyotr Aven, who had a strong relationship with Putin from the very beginning, hosted one such dinner at his palatial estate with Putin and Igor Malashenko, one of the founders of NTV, who had been Yel'tsin's campaign manager in 1996. In a subsequent interview, Malashenko stated that he thought the evening was going to end without his getting a real feeling for who Putin was. But then Malashenko's wife received a call from her daughter in London complaining that the private school she was attending had failed to send a car to pick her up from the airport. "Our daughter is a strange girl," she sighed. "I would certainly take a taxi instead of waiting at the airport so long." Putin immediately responded, "Listen, your daughter is correct and you are not." Malashenko's wife was slightly irritated. "Why do you say that?" "You could never be confident it's really a cab." Not long afterward Yumashev asked Malashenko to support Putin as Yel'tsin's successor, saying, "He didn't give up Sobchak. He won't give us up." But Malashenko declined Yumashev's request, insisting, "He's KGB and KGB can't be trusted."[159] Andrey Kolesnikov similarly described the veteran human rights campaigner Sergey Kovalev's hesitation as liberal and human rights circles debated the issue "Who is Mr. Putin?"[160]*

---

*In July Putin's situation was made a little more delicate by the return to Petersburg of his erstwhile mentor, Anatoliy Sobchak, whose plane touched down at Pulkovo Airport to great fanfare. Sobchak announced to the hundreds of waiting journalists that he was going to stand in the December 1999 Duma elections, which Putin presumably would have supported. In response to questions about the status of corruption charges against him, he defiantly declared,

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------------------

Mikal Fridman, Petr Aven, and German Khan,

    *Plaintiffs,*

v.

Bean LLC (a/k/a Fusion GPS) and Glenn Simpson,

    *Defendants.*

-------------------------------------------------------------------

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:17-cv-02041

## <u>PROPOSED ORDER</u>

Upon consideration of Defendants' Motion to Dismiss the Amended Complaint for Failure to State a Claim, along with the Memorandum of Points and Authorities in support thereof, the Court **ORDERS** that:

Defendants' Motion to Dismiss the Amended Complaint is **GRANTED**; and

Plaintiffs' Amended Complaint is **DISMISSED WITH PREJUDICE**.


_____

Richard J. Leon
United States District Judge