UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
------------------------------------------
MIKHAIL FRIDMAN, PETR AVEN, and          )
GERMAN KHAN,                             )
                                         )
                   Plaintiffs,           )
                                         )      Case No. 1:17-cv-02041 (RJL)
           v.                            )
                                         )
BEAN LLC (a/k/a FUSION GPS) and GLENN    )
SIMPSON,                                 )
                   Defendants.           )
------------------------------------------
```

# MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM

CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005
Tel.:   212-238-8647
Fax:    212-732-3232
Email:  lewis@clm.com

*Attorneys for Plaintiffs
Mikhail Fridman, et al.*

*Of Counsel:*

Alan S. Lewis (#NY0252)
John J. Walsh
Judith Wallace
Karen Meara

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ..................................................................................................iv

INTRODUCTION ................................................................................................................1

STANDARD OF REVIEW ..................................................................................................5

ARGUMENT ........................................................................................................................6

POINT I
THE AMENDED COMPLAINT PLAUSIBLY ALLEGES  DEFAMATORY
STATEMENTS ....................................................................................................................6

    A.   *Defendants Fail to Demonstrate, as a Matter of Law, That CIR 112 Is Not Potentially Susceptible to a Defamatory Reading by a Reasonable Reader* .........7

    B.   *Plaintiffs Plausibly Allege That a Number of Statements in CIR 112 Are Plainly Defamatory* ..................................................................................................8

    C.   *Defendants Concede That at Least One of Their Statements Is Defamatory*........................................................................................................9

    D.   *Plaintiffs Have Plausibly Alleged That the Headline of CIR 112 Is Defamatory*......................................................................................................10

POINT II
THE AMENDED COMPLAINT MAY NOT BE DISMISSED BASED ON
DEFENDANTS' ARGUMENT THAT IT FAILS TO PLEAD DEFENDANTS'
ACTUAL MALICE.  WHILE PLAINTIFFS ARE NOT REQUIRED TO PLEAD
DEFENDANTS' ACTUAL MALICE, THE AMENDED COMPLAINT
NEVERTHELESS DOES SO ............................................................................................13

    A.   *Defamation Plaintiffs Are Not Required to Allege in Their Pleadings That They Are Not Public Figures or to Allege Actual Malice by the Defendants*.................................................................................................14

    B.   *Defendants Fail to Establish That Plaintiffs Are Public Figures for the Controversy at Issue in This Case*.......................................................................16

        1.   *Waldbaum* Sets Forth a Controversy-Specific Three-Part Test............................17

        2.   The Controversy in This Case Is Distinct From the Controversy at Issue in *OAO* ..................................................................................................18

3. The Central Controversy in This Case is About Alleged Russian Interference in the U.S. Election—a Controversy into Which Plaintiffs Have Never Thrust Themselves..................................................................22

4. Defendants' String Cites of Media Reports Fail to Demonstrate a Second Public Controversy With Respect to Plaintiffs' Business-Political Relationship With the Russian Government Generally.........................................23

5. Defendants' Defamatory Statements About Plaintiffs Are Not Adequately Linked to Any Voluntary Public Role Played by Plaintiffs in the Public Controversies in This Case.............................................................................24

6. Defendants' Extreme Position Would Effectively Deem Plaintiffs General-Purpose Public Figures ...........................................................................25

C. *Defamation Plaintiffs Are Not Required to Allege or Produce Evidence of Actual Malice at the Pleading Stage* .....................................................................26

D. *The Allegations in the Amended Complaint Are Consistent With Actual Malice* ...................................................................................................................26

POINT III
PLAINTIFFS ADEQUATELY ALLEGE PUBLICATION .........................................28

A. *The Amended Complaint Plausibly Alleges Publication to Journalists* ..............28

B. *Plaintiffs Plausibly Allege Publication to David Kramer and John McCain* ...............................................................................................................30

1. The Amended Complaint Adequately Alleges That the Defamatory Statements Were Published by Transmittal to David Kramer (and Through Him to John McCain). That Publication Is Not, as Defendants Argue, Privileged, Given That Kramer Worked for McCain's Private Institute, Not for McCain in His Capacity as a Senator.................................................30

2. Defendants, as Sophisticated Political Operatives, May Not Shield Their Defamatory Statements Behind Privileges and Immunities Designed to Encourage Individual Citizens' Participation in Government................................33

C. *Even if Defendants Were at One Point Entitled to a Common Interest Privilege Shielding Publication to Its Client, Perkins Coie, Defendants' Subsequent Acts Have Forfeited the Privilege* .....................................................35

D. *Plaintiffs Have Sufficiently Alleged Republication to Journalists, Including BuzzFeed* .................................................................................................37

E.    *Defendants' Anti-SLAPP Special Motion and Assertion of Privileges and Immunities Applicable to Media Companies Constitute Admissions of Publication* ...................................................................................................38

POINT IV
DEFENDANTS FAIL TO DEMONSTRATE THAT  DEFENDANTS'
STATEMENTS CONSTITUTE NEUTRAL REPORTAGE AS A MATTER OF
LAW ...............................................................................................................39

A.    *The "Neutral Reportage" Privilege Has Not Been Adopted by the D.C. Circuit Court of Appeals or the District of Columbia Courts*............................39

B.    *Defendants' Statements Were Not Neutral* .........................................................41

CONCLUSION...................................................................................................42

# TABLE OF AUTHORITIES

Page(s)

CASES

*Afro American Publishing v. Jaffe*,
    366 F.2d 649 (D.C. Cir. 1966) ................................................................................................ 11

*Armenian Assembly of Am., Inc. v. Cafesjian*,
    597 F. Supp. 2d 128 (D.D.C. 2009) .................................................................................. 28, 30

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................................ 5, 30

*\*Banneker Ventures, LLC v. Graham*,
    798 F.3d 1119 (D.C. Cir. 2015) ................................................................................. 5, 12, 29

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................ 5, 14

*Caudle v. Thomason*,
    942 F. Supp. 635 (D.D.C. 1996) ........................................................................................... 37

*Celle v. Filipino Reporter Enters., Inc.*,
    209 F.3d 163 (2d Cir. 2000) ................................................................................................. 11

*Clyburn v. News World Communications*,
    903 F.2d 29 (D.C. Cir. 1990) ................................................................................................ 18

*Curtis Publ'g Co. v. Vaughan*,
    278 F.2d 23 (D.C. Cir. 1960) ................................................................................................ 13

*Davis v. Indiana State Police*,
    541 F.3d 760 (7th Cir. 2008) ................................................................................................ 15

*\*De Csepel v. Republic of Hungary*,
    714 F.3d 591 (D.C. Cir. 2013) .......................................................................... 5, 15, 22, 34

*Deripaska v. The Associated Press*,
    No. 17-00913, 2017 U.S. Dist. LEXIS 171512 (D.D. C. Oct. 17, 2017) ......................... 21, 22

*Edwards v. National Audubon Society*,
    556 F.2d 113 (2d Cir. 1977) *cert. denied*, 434 U.S. 1002 (1977) ....................................... 40

*EEOC v. St. Francis Xavier Parochial Sch.*,
    117 F.3d 621 (D.C. Cir. 1997) ............................................................................................... 6

*Flying Food Group, Inc. v. NLRB,*
    471 F.3d 178 (D.C. Cir. 2006) ............................................................................... 14

*Foretich v. Chung,*
    No. 91-0123, 1995 U.S. Dist. LEXIS 22813 (D.D.C. 1995) ................................. 39

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1974) ....................................................................................... 20, 25

*Goodman v. Praxair, Inc.,*
    494 F.3d 458 (4th Cir. 2007) ................................................................................ 15

*Gordon v. Nat'l Youth Work Alliance,*
    675 F.2d 356 (D.C. Cir. 1982) ......................................................................... 6, 29

*Herbert v. Lando, et al.,*
    441 U.S. 153 (1979) ................................................................................. 4, 26, 27

*Hogan v. Herald,*
    58 N.Y.2d 630 (1982) ........................................................................................... 40

*In re United Press Int'l,*
    106 B.R. 323 (D.D.C. 1989) .......................................................................... 39, 41

*Jankovic v. Int'l Crisis Group,*
    494 F.3d 1080 (D.C. Cir. 2007) .............................................................................. 9

*Jankovic v. Int'l Crisis Group,*
    822 F.3d 576 (D.C. Cir. 2016) ......................................................................... 15, 25

*Kim v. US.,*
    632 F.3d 713 (D.C. Cir. 2011) .......................................................................... 6, 14

*Kindergartners Count v. Demoulin,*
    No. 00-4173, 2003 U.S. Dist. LEXIS 2129 (D. Kan. 2003) ................................. 14

*McBride v. Merrell Dow,*
    717 F.2d 1460 (D.C. Cir. 1983) .............................................................................. 7

*McFarlane v. Esquire Magazine,*
    No. 92-0711, 1994 U.S. Dist. LEXIS 9497 (D.D.C. 1994) ............................. 41, 42

*Moss v. Stockard,*
    580 A.2d 1011 (D.C. Ct. of App. 1990) ........................................................... 35, 36

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964) ....................................................................................... 26, 40

*Norton v. Glenn,*
    580 Pa. 212 (2004) ..........................................................................................40, 41

*OAO Alfa Bank v. Center for Public Integrity,*
    387 F. Supp. 2d 20 (D.D.C. 2005) ....................................................................*passim*

*Parisi v. Sinclair,*
    845 F. Supp. 2d 215 (D.D.C. 2012) .....................................................................16, 26

*Q Int'l Courier, Inc. v. Seagraves,*
    No. 95-1554, 1999 U.S. Dist. LEXIS 23355 (D.D.C. Feb. 26, 1999) ................12, 13

*Reuber v. United States,*
    No. 82-1033, 1982 U.S. Dist. LEXIS 18382 (D.D.C. Aug. 25, 1982), *rev'd in part,*
    750 F.2d 1039 (D.C. Cir. 1984) ...............................................................................15

*Schultz v. Reader's Digest Assn., Inc.,*
    No. 770310, 1977 U.S. Dist. LEXIS 12563 (E.D. Mich. 1977) ...............................14

*Smith-Haynie v. D.C.,*
    155 F.3d 575 (D.C. Cir. 1998) ......................................................................5, 15, 16

*Southern Air Transport, Inc. v. ABC, Inc.,*
    877 F.2d 1010 (D.C. Cir 1989) .................................................................................9

*St. Amant v. Thompson,*
    390 U.S. 727 (1968) .................................................................................................27

*Tavoulareas v. Piro,*
    817 F.2d 762 (D.C. Cir. 1987) (en banc) .................................................................17

*\*Waldbaum v. Fairchild Publications, Inc.,*
    627 F.2d 1287 (D.C. Cir. 1980) .......................................................................*passim*

*Washburn v. Lavoie,*
    357 F. Supp. 2d 210 (D.D.C. 2004) ...........................................................................7

*\*Webster v. Sun Co.,*
    731 F.2d 1 (D.C. Cir. 1984) .........................................................................33, 34, 35

*White v. Fraternal Order of Police,*
    909 F.2d 512, 514 (D.C. Cir. 1989) .........................................................................39

*Ye v. Holder,*
    644 F. Supp. 2d 112 (D.D.C. 2009) ...........................................................................7

**RULES**

Fed. R. Civ. P. 7 ................................................................................................26

Fed. R. Civ. P. 8 ................................................................................................26

Fed. R. Civ. P. 12(b)(6) ...............................................................................*passim*

Fed. R. Civ. P. 12(d) ..........................................................................................6

Fed. R. Civ. P. 56 .............................................................................................26

Fed. R. Evid. 201(b) ...........................................................................................6

**OTHER AUTHORITIES**

Blue Book of Grammar, Rule 4 ..........................................................................12

New York Public Library Desk Reference (1st ed. 1989) ...............................12

Restatement (Second) of Torts, § 563 ...............................................................10

Robert D. Sack, 1 *Sack on Defamation* (5th Ed. 2017) .............................*passim*

Plaintiffs Mikhail Fridman, Petr Aven and German Khan submit this memorandum of points and authorities in opposition to Defendants' motion, made pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the complaint [Dkt. 20].

## INTRODUCTION

Plaintiffs, all of whom are citizens of Russia and two of whom are also citizens of Israel, are owners of various businesses that operate globally. They have sued Defendants for defamation based on Defendants' publication of statements that accuse Plaintiffs of various kinds of misconduct.[1] For example, one of the statements challenged as defamatory accuses two of the Plaintiffs of bribery, an accusation that Defendants grudgingly admit "could be potentially defamatory."[2] The defamatory statements are contained in a report known as Company Intelligence Report 112 ("CIR 112") that, in combination with several other reports, has become known as the "Trump Dossier" and/or the "Steele Dossier." Those reports were published both before and after the 2016 election by the Defendants: the Washington, D.C. based firm Fusion GPS ("Fusion") and its principal, Glenn Simpson, a former journalist specializing in political opposition research. Defendants were aware, when they published CIR 112, that it was not verified and that its content was provided by unidentified sources whose credibility could therefore not be assessed by its readers. Defendants could have removed that report from the Dossier before they started peddling it to media and others in September and October 2016.

---

[1] *See* Amended Complaint, filed December 12, 2017 [Dkt. 17] (hereafter "Am. Compl.") ¶ 1.

[2] Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss the Amended Complaint for Failure to State a Claim, filed January 29, 2018 [Dkt. 20] (hereafter "Def's Motion to Dismiss.") at 22.

They chose not to do so.  Nor did they attempt to determine the veracity of CIR 112 with the Plaintiffs themselves.[3]

Plaintiffs' complaint alleges that Defendants published the reports, including the one containing defamatory statements about Plaintiffs, as part of Defendants' work as political opposition researchers for a U.S. political campaign.  Am. Compl. at ¶¶ 2-5.  Defendants, rather than answering the complaint, have made two motions to dismiss.  The first [to which Plaintiffs respond in this memorandum] argues that Plaintiffs have failed to state a claim (the "Motion to Dismiss").  The second motion [which Plaintiffs address in a separate memorandum] contends that Defendants' alleged defamatory statements are protected under a local statute that immunizes from suit certain acts of "public participation."[4]

Defendants' Motion to Dismiss makes four separate arguments.  First, Defendants contend that the statements identified by the Amended Complaint as defamatory are not, albeit "[w]ith one possible exception."  Def's Motion to Dismiss at 17.  Second, in a two-part argument, Defendants argue that Plaintiffs: (a) should be treated as public figures as a matter of law; and (b) purportedly failed to plead facts sufficient to support the element of "actual malice" that applies to defamation claims made by public figures.  *Id.* at 25, 38.  Third, Defendants argue that the Amended Complaint fails to adequately plead Defendants' publication of the defamatory statements.  *Id.* at 30.  And fourth, Defendants contend that their defamatory statements about Plaintiffs are "privileged" under the doctrine of "neutral reportage."  *Id.* at 38.

As explained in greater detail below, none of Defendants' arguments support dismissal. Defendants' first argument, that "no statement in CIR 112 is defamatory," is without merit, and

---

[3]  Am. Compl. ¶ 4.

[4]  Defendants' Special Motion to Dismiss the Amended Complaint Pursuant to the D.C. Anti-SLAPP Act, filed January 29, 2018 [Dkt. 19] (hereafter "Defendants's anti-SLAPP Motion").

in any event is a contention that Defendants themselves contradict, almost in the same breath: immediately after describing CIR 112 as "not defamatory" Defendants admit that their description in CIR 112 of the purported relationship between Plaintiffs and the Russian government is of "*misconduct* by both sides." Def's Motion to Dismiss at 1 (emphasis added). In any event, as demonstrated below, many of the statements made about Plaintiffs in CIR 112 are plainly defamatory.

Defendants' arguments that Plaintiffs are public figures as a matter of law and that the Amended Complaint purportedly fails to plead the "actual malice" element triggered by public figure status is wrong in both respects. Plaintiffs are not required to plead, much less prove, at the inception of this case that they are not public figures, and therefore they are not required to plead Defendants' actual malice, which in any event the Amended Complaint does plead. Defendants' argument that Plaintiffs are public figures relies primarily on a decision rendered by Judge Bates, thirteen years ago, in a different case, *OAO Alfa Bank v. Center for Public Integrity*, 387 F. Supp. 2d 20 (D.D.C. 2005). Two of the Plaintiffs in this case were plaintiffs in *OAO*. In that case, the particular pre-existing public controversy against which the plaintiffs' limited public figure status was assessed was the transition, in Russia, to a post-Soviet economy. *Id*. at 43. Judge Bates' conclusion in that case, that the plaintiffs were limited public figures for purposes of that particular controversy, does not apply to the different question of whether, more than a decade later, Plaintiffs are public figures for the purpose of the controversy that is the backdrop of this case—alleged interference by the Kremlin in the 2016 U.S. Presidential election. Moreover, while the Amended Complaint cannot be dismissed based on Plaintiffs' purported failure to plead facts supporting Defendants' actual malice, the Amended Complaint does, as demonstrated below, nevertheless plead facts sufficient to allege actual malice.

Even *if* Defendants could make a strong argument that Plaintiffs are limited public figures and therefore subject to the burden to prove the Defendants' actual malice (i.e., their knowing or reckless publication of a false statement), Plaintiffs would be entitled to discovery.   Because information about the Defendants' state of mind is uniquely within the control of Defendants, Plaintiffs are entitled, under the Supreme Court's holding in *Herbert v. Lando, et al.*, to take discovery of the state of mind of Defendants when they published the defamatory statements.   That is, the First Amendment cannot be used as a shield to foreclose inquiry into a defendant's internal mental  processes where there is a "specific claim of injury arising from a publication that is alleged to have been knowingly or recklessly false." 441 U.S. 153, 174 (1979).

Defendants' argument that Plaintiffs have failed to plead "actionable publication" is also incorrect.  As demonstrated below, the Amended Complaint adequately pleads Defendants' non-privileged publication of the defamatory statements contained in CIR 112 to various journalists and others.

Defendants' final argument—their contention that the doctrine of "neutral reportage" shields them from liability—should also be rejected.  The doctrine of neutral reportage has never been adopted by the D.C. Circuit and has been rejected by many jurisdictions.  Even if that doctrine were to be applied here, it would not aid Defendants because there was nothing neutral about their conduct.  Moreover, Defendants were not engaged in "reportage" but rather, were engaged in playing a role that was part of an effort to advance the political interests of Defendants' clients.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim crosses from conceivable to plausible when it contains factual allegations that, if proved, would 'allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged'." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (*quoting Ashcraft*, 556 U.S. at 678). Courts must "accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Id.*

There is no requirement that a pleading anticipate and plausibly allege responses to all affirmative defenses that could be asserted by the defendants—which would effectively require defamation plaintiffs to allege status as private figures for the purpose of the statements at issue and the actual malice of defamation defendants. An "affirmative defense may be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint." *Smith-Haynie v. D.C.*, 155 F.3d 575, 578 (D.C. Cir. 1998). However, dismissal of a complaint based on an affirmative defense is improper, "as long as a plaintiff's potential rejoinder to the affirmative defense (is not) foreclosed by the allegations in the complaint." *De Csepel v. Republic of Hungary*, 714 F.3d 591, 608 (D.C. Cir. 2013) (collecting authorities) (quotations omitted). That is, plaintiffs are "not required to negate an affirmative defense in [their] complaint" and dismissal is inappropriate where "nothing in the complaint contradicts" its allegations. *Id.*

"In determining whether a complaint fails to state a claim, [the court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the

complaint and matters of which [the court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). If the court considers other facts, it must convert the motion to dismiss into a motion for summary judgment and "provide the parties with notice and an opportunity to present evidence in support of their respective positions." *Kim v. US.*, 632 F.3d 713, 719 (D.C. Cir. 2011); *see* Fed. R. Civ. P. 12(d); *Gordon v. Nat'l Youth Work Alliance*, 675 F.2d 356, 360 (D.C. Cir. 1982). News articles not cited in the complaint do not meet this standard, and may not be considered by the court on a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6). *See* Fed. R. Evid. 201(b).

## ARGUMENT

### POINT I

### THE AMENDED COMPLAINT PLAUSIBLY ALLEGES DEFAMATORY STATEMENTS

As detailed in the Amended Complaint, CIR 112 makes a number of different statements that defame Plaintiffs. Many are plainly defamatory on their face, while others are defamatory by implication and/or in the context of the entirety of the Dossier. For example, CIR 112 accuses Plaintiffs of having an essentially corrupt relationship with Russian President Vladimir Putin marked by "favours" done in each direction. Am. Compl. at ¶¶ 20-22. Specifically, CIR 112 contends that Plaintiffs do "political" favors for Putin in exchange for "business" and "legal" favors from Putin. Am. Compl. at ¶ 22. From that plainly defamatory accusation of corruption, CIR 112 then goes further, accusing Plaintiffs of bribery: CIR 112 alleges that in the 1990s, Plaintiffs Fridman and Aven "deliver[ed] large amounts of illicit cash to the Russian president" when he was the Deputy Mayor of St. Petersburg through a "bag carrier." Am. Compl. at ¶¶ 21, 24, 26. In the same vein, CIR 112 accuses Plaintiffs Fridman and Aven of doing Putin's "political bidding." Am. Compl. at ¶ 27. Even the heading of CIR 112 is defamatory—at the

very least by implication.  It alleges "cooperation" between the company of which Plaintiffs are majority owners (Alfa—misspelled in CIR 112 as "Alpha") and the Kremlin relating to the recent U.S. Presidential Election.  Am. Compl. at ¶ 19.

In spite of the presence in CIR 112 of these numerous, harmful allegations, all of which are emphasized in the Amended Complaint, Defendants seek dismissal on the ground that the Amended Complaint "ignore[s] the content of CIR 112."  Def's Motion to Dismiss at 17.  That is the pot calling the kettle black:  Defendants, not Plaintiffs, have mounted an argument that is inconsistent with CIR 112's content.  Moreover, as demonstrated below, Defendants' argument also interprets CIR 112 in a manner that violates the legal principles under which the defamatory meaning of an alleged defamatory statement is to be assessed.

A.    *Defendants Fail to Demonstrate, as a Matter of Law, That CIR 112 Is Not Potentially Susceptible to a Defamatory Reading by a Reasonable Reader*

The inquiry in a defamation case on a 12(b)(6) motion is not whether a defamation defendant can propose an alternative reading and a defense, but whether the plaintiff has plausibly alleged "as a threshold matter whether a statement is capable of being construed as defamatory." *Ye v. Holder*, 644 F. Supp. 2d 112, 118 (D.D.C. 2009) (*quoting Benic v. Reuters America, Inc.*, 357 F. Supp. 2d 216, 221 (D.D.C. 2004)); *see also Washburn v. Lavoie*, 357 F. Supp. 2d 210, 215 (D.D.C. 2004) (Leon, J.) (granting summary judgment where "no reasonable person" would construe statements as defamatory); *see McBride v. Merrell Dow*, 717 F.2d 1460, 1465 (D.C. Cir. 1983) (because the District of Columbia has not adopted an "innocent construction" standard, a statement susceptible to both defamatory and non-defamatory interpretations presents a question for jury).  At *minimum*, the Amended Complaint identifies a number of statements that are susceptible to a meaning that is defamatory and for that reason, Defendants' contrary argument must be rejected.

**B.**      ***Plaintiffs Plausibly Allege That a Number of Statements in CIR 112 Are Plainly Defamatory***

The Amended Complaint identifies as defamatory various statements of CIR 112, such as that "[s]ignificant favors continue to be done in both directions" between Vladimir Putin and Plaintiffs, that Plaintiffs do "political" favors for Putin in exchange for "business" and "legal" favors from Putin, that Plaintiffs do Putin's "political bidding," and that two of the plaintiffs "deliver[ed] large amounts of illicit cash to the Russian President" when he was the Deputy Mayor of St. Petersburg.  Am. Compl. at ¶¶ 20, 22, 24, 27.

Defendants, after initially acknowledging that these contentions do indeed constitute allegations of  "misconduct," *see* Def's Motion to Dismiss at 1, then pivot and argue the opposite.  But in doing so, Defendants ignore the plain meaning of the defamatory statements and of the context in which those statements are made.  In this vein, Defendants cite the dictionary definition (Merriam Webster) of "favors" as being generally understood  as "friendly regard" or "gracious kindness."  *Id.* at 19.  Relying on these definitions, Defendants argue that their statements about Plaintiffs are innocuous and describe ordinary and unremarkable relationships. *Id.* But the notion that CIR 112 is not even susceptible of a different, more sinister, meaning is profoundly mistaken.  For starters, the person with whom Plaintiffs are alleged to have an ongoing "exchange of favors" relationship—Vladimir Putin—is portrayed throughout the Dossier [and elsewhere] as an abuser of his powers (e.g., attempting to interfere in the presidential election of a foreign country—the United States) and as corrupt (e.g., receiving bribes in the form of bags of cash).  Am. Compl. at 19, 24.  In this context, the notion that the particular exchange of "favors" that CIR 112 describes is of purely innocuous "friendly" relations and "gracious kindness" is no better than silly.  In any event, it is well established that accusations of associating with a particular foreign government can be defamatory, even if the

statement alleges conduct that can be also described as political, where the alleged association potentially exposes the Plaintiff to antipathy. *See Jankovic v. Int'l Crisis Group*, 494 F.3d 1080, 1091 (D.C. Cir. 2007) and *Southern Air Transport, Inc. v. ABC, Inc.*, 877 F.2d 1010, 1015 (D.C. Cir 1989) (accusations of being a political crony of Slobodan Milosevic and of being engaged in dealings with the apartheid government of South Africa in a scheme to provide aid to Nicaraguan rebels held to be facially defamatory).

## C.   *Defendants Concede That at Least One of Their Statements Is Defamatory*

Moreover, one wonders why Defendants have even mounted this argument, given their explicit acknowledgment that at least one of the statements they published may be defamatory. At page 21 of their memorandum, Defendants readily concede that there is a "possible exception of one sentence" to Defendants' contention that CIR 112 is not otherwise defamatory. Def's Motion to Dismiss at 21.  Having made that concession, Defendants attempt to come up with a reason for why the presence of the conceded defamatory words should not result in the denial of their motion. *Id*. at 22.  But Defendants' only effort to do so is to contend that, because the concededly defamatory statement falsely accuses two of the Plaintiffs of arranging deliveries of cash to Vladimir Putin, it is not actionable absent a showing of actual malice.[5]  But, as demonstrated in Section II below, whether or not Plaintiffs are public figures, and therefore subject to the burden to prove actual malice, cannot be determined against Plaintiffs at the pleading stage.  Moreover, the notion that Defendants are limited public figures, in the United States, today, for the purposes of a supposed controversy regarding allegations centered on bribery of Vladimir Putin, in the 1990s, when he was the Deputy Mayor of St. Petersburg, is dubious, or at least debatable.

---

[5] *See* Def's Motion to Dismiss at 22-23.

**D.** *Plaintiffs Have Plausibly Alleged That the Headline of CIR 112 Is Defamatory*

While the plain defamatory meaning of much of the text of CIR 112 may make it unnecessary, at this stage of the case, to determine whether CIR 112's headline is also defamatory, should the Court reach that question, it should conclude that Plaintiffs have adequately alleged the headline's defamatory meaning. That headline reads: **"RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP COOPERATION."**

Under well-established principles of defamation law, the meaning of any alleged defamatory statement must be considered by reference to the context in which the alleged defamatory statement is made. *See* Robert D. Sack, 1 *Sack on Defamation*, § 2.4.2 (5th Ed. 2017) (principles of construction; context); Restatement (Second) of Torts, § 563 (meaning of the communication; context) (cmt. d) ("[i]n determining the meaning of a communication, words, whether written or spoken, are to be construed together with their context . . . words which alone are innocent may in their context clearly be capable of a defamatory meaning and may be so understood"). In this case, that context includes the fact that the Dossier's overriding theme is alleged efforts by the Kremlin to interfere in the U.S. presidential election, and the reference to "Alpha", in context, would be understood by a reader as referring to Plaintiffs, who are the only persons affiliated with Alfa that are mentioned in CIR 112.

The highly technical parsing of the headline of CIR 112 proposed by Defendants violates principles of law that govern how an allegedly defamatory publication is to be understood. As held by the D.C. Circuit:

> *Appellant's publication must be taken as a whole*, and in the sense in which it would be understood by the readers to whom it was addressed. The article, . . . stated that plaintiff, by canceling his subscription, "would appear to be a bigot," and that he told a story about a customer's ignorance which he said illustrated the low level of intelligence of the people in the neighborhood near his drugstore. These false statements were critical *in the total impact* of the article. The article contained other

> items that were true, but in the setting already described these only reinforced the defamatory impression. Partial truths are not necessarily even mitigating in this branch of the law, for the defamer may be the more successful when he baits the hook with truth. *What counts is not the painstaking parsing of a scholar in his study, but how the newspaper article is viewed through the eyes of a reader of average interest.*

*Afro American Publishing v. Jaffe*, 366 F.2d 649, 655 (D.C. Cir. 1966) (emphasis supplied)

(citations omitted).   *See also Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 187 (2d Cir.

2000) (holding that it was appropriate to consider articles in the same issue because "in the

context of the publication as a whole as an average reader would read and consider them"

especially where it was clear that "the defendants intended for the two articles to be read

together" as "confirmed by the transitional opening of the third article."); Sack, *supra*, § 2.4.2

("if two or more broadcasts, articles, or other communications would likely be received and

perused by their audience together, the meaning of each communication may be understood in

light of other communication or communications").

 When these principles are applied, the conclusion, respectfully, should be that Plaintiffs

have adequately alleged a defamatory meaning of the headline of CIR 112.  The headline refers

to "Russia/US Presidential Election"—a phrase that would be interpreted by a reasonable reader

in context of the entire Dossier as part of its overriding theme of Russian interference in the 2016

U.S. presidential election.  Next, after a colon, the headline refers to "Kremlin-Alpha Group

Cooperation."  At least by implication, the cooperation alleged between the Kremlin and Alfa,

after the colon, refers to the subject that immediately precedes the colon—Russia and the U.S.

election.

 Defendants propose to interpret the headline differently—as *not* alleging cooperation by

the Plaintiffs or their company, Alfa, with the Kremlin's alleged efforts to influence the outcome

of the U.S. election.  Def's Motion to Dismiss at 17-18.  Defendants urge that interpretation

based on the fact that the text of CIR 112 does not detail Plaintiffs' alleged cooperation with the Kremlin in connection with the U.S. election. *Id.* at 17.  But that reading of the headline ignores the grammatical construction of CIR 112's heading: by using a colon between two phrases, the headline ties those two phrases together.  Indeed, the purposes of a colon are to separate an enumerated list from the rest of the text, to precede an illustrative or explanatory phrase, or to separate book titles from their subtitles.  *See* New York Public Library Desk Reference (1st ed. 1989); *see also* Blue Book of Grammar, Rule 4 (Colons), at https://www.grammarbook.com/ punctuation/colons.asp (last visited 3/12/18) ("A colon means 'that is to say' or 'here's what I mean.'  Colons and semicolons should never be used interchangeably.").  A plausible implication of that colon is to tie Alfa and its individual owners mentioned in CIR 112 (the Plaintiffs) to the allegation of attempted election interference made elsewhere in the Dossier, especially since the allegations of CIR 112 were disseminated together with the rest of the Dossier (whose theme is election interference).[6]  In sum, Plaintiffs have plausibly alleged in the Amended Complaint that the headline of CIR 112, in the context of the entirety of the Dossier, is defamatory.  In any event, at this stage of the case, Plaintiffs, not Defendants, are entitled to the benefit of competing reasonable inferences.  *Banneker Ventures*, 798 F.3d at 1129.

Defendants also rely upon *Q Int'l Courier, Inc. v. Seagraves*, No. 95-1554, 1999 U.S. Dist. LEXIS 23355 (D.D.C. Feb. 26, 1999) for the proposition (derived from case law on the "fair reporting" privilege) that a headline must be read and understood in conjunction with the article that follows.  In *Q International*, the D.C. Circuit held that the article clarified which of two potential interpretations of the word "nailed" in the headline was applicable.  *Id.* at *12-13.

---

[6] *See* Am. Compl. ¶ 7, 16.

However, the *Q International* court also noted that this privilege[7] is only applicable if the newspaper headlines "fairly and accurately reflect the gist of the text." *See Q International* at *12 (*quoting Curtis Publ'g Co. v. Vaughan*, 278 F.2d 23, 29 (D.C. Cir. 1960)).  Thus, if a headline does *not* fairly and accurately reflect the text, it is not privileged and may be defamatory, even if the story is not misleading.  As the D.C. Circuit acknowledged in *Curtis*, "[t]his rule takes into account the very general practice of large segments of the public who read the headlines only and thus fail to get the full import of the article as an entity." *Curtis*, 278 F.2d at 29.  In this case, the likelihood that an ordinary reader would understand the headline of CIR 112 to allege Plaintiffs' cooperation with the Kremlin's alleged efforts to influence the result of the U.S. presidential election is particularly high because, as already emphasized, the allegation of such electoral interference is the overriding theme of the Dossier.  In sum,  Defendants are responsible for the defamatory meaning of the headline of CIR 112, accusing Plaintiffs of cooperating in Russian interference in the U.S. election even (or perhaps especially) if they are correct that the rest of CIR 112 does not.

## POINT II

### THE AMENDED COMPLAINT MAY NOT BE DISMISSED BASED ON DEFENDANTS' ARGUMENT THAT IT FAILS TO PLEAD DEFENDANTS' ACTUAL MALICE.  WHILE PLAINTIFFS ARE NOT REQUIRED TO PLEAD DEFENDANTS' ACTUAL MALICE, THE AMENDED COMPLAINT NEVERTHELESS DOES SO

Libel plaintiffs are not required, in their pleading, to allege that they are not public figures and therefore are not subject to a burden at that juncture to prove a defendant's "actual malice." The "public figure" issue arises if and when a defendant alleges that a plaintiff *is* a public figure, and at that point the resolution of that legal issue depends on factual determinations, as to which *the defendant* bears the burden of proof.  Specifically, a defendant

---

[7] Defendants have not invoked the fair reporting privilege as a basis for their motion to dismiss.

who alleges that a plaintiff is a public figure must establish: (1) the nature of the particular public controversy at issue in the case; (2) the plaintiff's central role in that controversy; and (3) the germaneness of the defamatory statement[s] to the plaintiff's role in that specific controversy. *See Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296-98 (D.C. Cir. 1980).  In this case, Defendants have failed to demonstrate, in their motion to dismiss, as a matter of law, that plaintiffs played a central role in a public controversy pertinent to the defamation claims or that the defamatory statements are linked to such a public controversy.

### A.    *Defamation Plaintiffs Are Not Required to Allege in Their Pleadings That They Are Not Public Figures or to Allege Actual Malice by the Defendants*

When a libel defendant wants to raise a public figure/actual malice defense, he must ordinarily do that in his answer—by asserting the plaintiff's "public figure" status as an affirmative defenses and alleging facts in support of that affirmative defenses.  By contrast, plaintiffs "are not required to negate an affirmative defense in [their] complaint," *Flying Food Group, Inc. v. NLRB*, 471 F.3d 178, 183 (D.C. Cir. 2006) (internal quotation marks omitted); *see also Kim v. United States*, 632 F.3d 713, 718-19 (D.C. Cir. 2011) (concluding that a plaintiff need not plead exhaustion of statutory remedies under the Taxpayer Bill of Rights because failure to exhaust is an affirmative defense).

The alleged public figure status of a defamation plaintiff is an affirmative defense.  *See, e.g., Kindergartners Count v. Demoulin*, No. 00-4173, 2003 U.S. Dist. LEXIS 2129, *2 (D. Kan. 2003) ("...Wheeler's 'public figure' affirmative defense to DeMoulin's defamation counterclaim."); *Schultz v. Reader's Digest Assn.*, Inc., No. 770310, 1977 U.S. Dist. LEXIS 12563, *6 (E.D. Mich. 1977) ("The defense that a plaintiff is a 'public figure' is an affirmative defense in a case of this sort.").  The Supreme Court's decision in *Bell Atlantic Corp.*, 550 U.S. at 544, did not alter the principle that "[c]omplaints need not anticipate, and attempt to plead

-14-

around, potential affirmative defenses." *Davis v. Indiana State Police*, 541 F.3d 760, 763 (7th Cir. 2008). Instead, as long as a plaintiff's potential "rejoinder to the affirmative defense [is not] foreclosed by the allegations in the complaint," dismissal at the Rule 12(b)(6) stage is improper. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 466 (4th Cir. 2007) (*en banc*); see also *Smith-Haynie*, 155 F.3d at 578 (affirmative defense may only "be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint"); *De Csepel*, 714 F.3d at 607-08 (where nothing in the complaint contradicts its claims, dismissal is inappropriate). *See also Reuber v. United States*, No. 82-1033, 1982 U.S. Dist. LEXIS 18382, at *8 n.1 (D.D.C. Aug. 25, 1982), *rev'd in part on other grounds*, 750 F.2d 1039 (D.C. Cir. 1984) (holding that although the question of public figure status is ultimately a legal issue, where, as in that case, the determination of that legal issue depends on "issues of material fact as to whether plaintiff thrust himself to the forefront of an identifiable public controversy," "ordinary summary judgment standards apply").

Defendants' motion relies substantially on *Jankovic v. Int'l Crisis Group*, 822 F.3d 576 (D.C. Cir. 2016). *See* Def's Motion to Dismiss at 25, 29, 31 and 32. But *Jankovic* does not aid Defendants because, in that case, the court evaluated the public controversy at issue and the limited public figure status for the purpose of that controversy *at the summary judgment stage*. Indeed, the *Jankovic* court relied for its determination regarding the scope of the public controversy at issue upon "evidence" introduced by the parties. *Jankovic*, 822 F.3d at 587. Here, Defendants have not requested summary judgment, although more than ten pages of Defendants' brief is devoted to footnotes citing news articles, which cannot be judicially noticed in connection with a 12(b)(6) motion. The legal issue, at this juncture, is whether the facts alleged in the Amended Complaint effectively constitute admissions sufficient to prove this

potential affirmative defense.  Because they do not, dismissal on a 12(b)(6) basis is inappropriate.  *See Smith-Haynie*, 155 F.3d at 578.

Defendants also rely on cases in which the status of plaintiffs as public figures for the specific controversy in the case was not disputed, making it appropriate in those cases for the court to analyze whether actual malice was adequately alleged.  *See, e.g., Parisi v. Sinclair*, 845 F. Supp. 2d 215, 218 n.2 (D.D.C. 2012) ("plaintiffs concede for the purpose of this motion that plaintiffs are limited public figures and subject to the actual malice standard").  By contrast, in this case, Plaintiffs emphatically dispute that they are public figures for purposes of this lawsuit.

Faced with these legal principles that require the rejection of Defendants' argument, Defendants attempt an end-run around those principles by asking the Court to hold that *OAO*, a decision granting *summary judgment* to a defendant in a different defamation lawsuit that two of the Plaintiffs brought more than fifteen years ago, permits that end-run.  But contrary to Defendants' argument, the ruling in *OAO*, finding that Mr. Fridman and Mr. Aven were limited public figures for the purposes of the controversy about Russia in the immediate years following the collapse of the Soviet Union, does not mean that Plaintiffs are limited public figures for the purpose of the different controversy at the heart of this case involving the 2016 U.S. presidential election.  Instead, application of well settled rules requires the conclusion that Plaintiffs should not be deemed public figures for the purpose of the controversy at the heart of this lawsuit.

**B.**   ***Defendants Fail to Establish That Plaintiffs Are Public Figures for the Controversy at Issue in This Case***

Defendants fail to demonstrate as a matter of law that Plaintiffs are public figures for the purpose of the controversy that is the context of the defamatory statements published by Defendants in CIR 112.  That is, Defendants have failed to properly define the relevant

controversy that is the context of CIR 112, failed to demonstrate as a matter of law that Plaintiffs played a significant role in the relevant controversy, and failed to demonstrate that the defamatory statements made about Plaintiffs in CIR 112 are germane to the pertinent controversy.

### 1. *Waldbaum* Sets Forth a Controversy-Specific Three-Part Test

In *Waldbaum*, 627 F.2d at 1296-98, the D.C. Circuit formulated a three-part test, each part of which must be satisfied, before a libel plaintiff may be defined as a limited-purpose public figure: (1) the existence of a genuinely *public* controversy; (2) adequate proof that the plaintiff played a sufficiently central role in that controversy; and (3) proof that the alleged defamatory statements were germane to the plaintiff's participation in the public controversy at issue. *See also Tavoulareas v. Piro*, 817 F.2d 762, 771-75 (D.C. Cir. 1987) (en banc) (applying *Waldbaum* test).

The first question in that three-part test— identifying the relevant public controversy— must be answered with precision and care. That is, even if a person is a public figure for purposes of a "subcontroversy," he is not necessarily a public figure for the purposes of the overall controversy of which the subcontroversy is just a part. *See Waldbaum*, 627 F.2d at 1297 n.27. *Waldbaum* holds that:

> A narrow controversy may be a phase of another, broader one, and a person playing a major role in the "subcontroversy" may have little influence on the larger questions or on other subcontroversies. In such an instance, the plaintiff would be a public figure if the defamation pertains to the subcontroversy in which he is involved but would remain a private person for the overall controversy and its other phases.

*Id.* Here, as discussed below, the determination of the relevant controversy or subcontrovers(ies) implicates disputed issues of fact.

Second, the mere identification of a public controversy does not mean that the libel plaintiff is a public figure with respect to that controversy. A libel plaintiff is a limited public figure for purposes of a controversy only if he is trying to *shape its outcome*. *See Waldbaum*, 627 F.2d at 1298 n.32 ([i]f in fact he is shaping or is trying to shape the outcome of a specific public controversy, he is a public figure for that controversy; *if not, he remains a private individual*").

And under the third part of the test, each defamatory statement must be assessed to determine whether it is genuinely linked to the public controversy at issue:

> The third component [of the *Waldbaum* test] plainly goes not to identifying the plaintiff as a public figure, but to whether the defamatory statement is *adequately linked* to the issues for which he is a public figure.

*Clyburn v. News World Communications*, 903 F.2d 29, 31-32 (D.C. Cir. 1990) (emphasis supplied).

### 2.     The Controversy in This Case Is Distinct From the Controversy at Issue in *OAO*

As noted above, whether a Plaintiff who brings a defamation lawsuit is a limited public figure, for purposes of the controversy in question, is not typically ripe for judicial determination until the defendant answers the complaint and factual discovery is taken with respect to the controversy in question and with respect to the extent to which the plaintiff has either shaped or tried to shape the outcome of *that* specific public controversy. *See Waldbaum*, 627 F.2d at 1298 n.32. Such discovery is essential because, if the plaintiff is not trying to shape the outcome of that specific public controversy, *he remains a private individual. See id.*

Without heeding these principles, Defendants attempt to suggest that the finding of Judge Bates, in *OAO*, that Mr. Fridman and Mr. Aven were limited public figures for the purpose of the

-18-

controversy in that case, should define them as limited purpose public figures for the purpose of this case.   But when the above-described principles are applied (e.g., a limited purpose public figure in connection with one controversy [or an aspect of it] is not necessarily a limited purpose public figure for purposes of the broader controversy of which it is a part) to Judge Bates' explanation for his finding in *OAO*, it is clear that the holding of *OAO* does not make Mr. Fridman and Mr. Aven limited public purpose figures in this case.

In *OAO*, the plaintiffs sued a public interest organization and its reporters for defamation based on their publication of an article "alleging that plaintiffs have connections to organized crime and have engaged in narcotics trafficking." *OAO*, 387 F. Supp. 2d at 23.  Thus, the statements alleged to be defamatory in that case were qualitatively different than those alleged to be defamatory in this case.   In any event, *after* extensive discovery, Judge Bates found that Messrs. Fridman and Aven were limited purpose public figures in connection with the controversy underlying that case, which he defined as "the transformation of the Russian economy" and the "economic changes attending the fall of the Soviet Union." *Id.* at 43. Similarly, Judge Bates characterized "the public controversy [as] involving corruption in post-Soviet Russia and the future of Western aid and investment in that country," principally in the 1990s. *Id.*  In finding Messrs. Fridman and Aven to be limited public purpose figures for the purpose of *that* controversy, Judge Bates emphasized that they had "fully engaged in the worldwide debate regarding the causes and the cure for the corruption that has overcome the Russian economy" and that they were not "trivial" or "tangential" persons in connection with "the upheaval of the Russian economy" attending its transformation from a Soviet, socialist economy. *Id.* at 44.

However the controversy at issue in this case might be defined (the parties postulate different answers), Defendants cannot rely on *OAO* to establish that Plaintiffs are limited public figures in this case because the controversy at the heart of this case is not identical to the controversy Judge Bates identified in *OAO*: "the transformation of the Russian economy" and the "economic changes attending the fall of the Soviet Union." Neither the Dossier as a whole, nor CIR 112, is focused on those issues. Moreover, Plaintiff Khan was not a party in *OAO*.

In any event, in order to fall within the definition of a limited purpose public figure, a person "either must have been purposely trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution." *Waldbaum*, 627 F.2d at 1297. Defendants have not identified any issue whose outcome the Plaintiffs were purportedly "trying to influence" or which they should have expected to impact simply because of their preexisting "position in the controversy." Defendants have not demonstrated that any of the three Plaintiffs have "thrust [themselves] into the vortex" of a "public issue" surrounding the defamation case, nor have Defendants demonstrated that Plaintiffs previously "engage[d] the public's attention in an attempt to influence" the outcome of the pertinent underlying public issue. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 352 (1974).

In any event, as elaborated in Point II(B)(3) below, the pertinent controversy here is best understood as an alleged Russian effort to influence a U.S. election. That is the overriding theme of the Dossier, including the heading of CIR 112. Even the statements in CIR 112 that, when considered in isolation, appear to be about subjects other than 2016 electoral interference, are not statements about, or made in the context of, the controversy that Judge Bates identified regarding Russia's economic development after the breakup of the USSR.

-20-

Defendants would nevertheless saddle Plaintiffs with the designation of limited purpose public figures, based on the notion that both the *OAO* case and this one involve statements [made well more than a decade apart] broadly relating to the Plaintiffs' relationship with the Russian state. In other words, based only on the holding of *OAO*, Defendants would define Plaintiffs as public figures with respect to *all* aspects of their purported relationship with the Russian state and alleged actions of the Russian government worldwide. But that would eradicate the distinction between limited-purpose and general-purpose public figures.

Defendants also cite the recent holding of Judge Huvelle that another defamation plaintiff, Oleg Deripaska, was a limited public figure in the context of that case. However, the facts that Judge Huvelle relied on in finding Deripaska to be a public figure do not exist in this case. *Deripaska v. The Associated Press*, No. 17-00913, 2017 U.S. Dist. LEXIS 171512 (D.D. C. Oct. 17, 2017). The publication at issue in *Deripaska* focused on Trump campaign manager Paul Manafort's prior business dealings with, and on behalf of, Oleg Deripaska, who, the article alleged, had paid Manafort ten million dollars a year for several years to undermine democracy in various countries to benefit Vladimir Putin's government. *Id.* at *2-4. Deripaska did not deny that these payments had been made, but instead only took issue with the article's implications that he had engaged in criminal activity by "pay[ing] Mr. Manafort to act as an unregistered foreign agent" and that the conduct "merit[ed] a congressional investigation." *Id.* at *3-4. He also took issue with statements in the article that he claims "convey[ed] that Mr. Deripaska stole Ukrainian assets in 2014." *Id.* at *5.

Judge Huvelle found that the primary controversy addressed by the AP article was "Russian oligarchs acting on behalf of the Russian government." *Id.* at *11-12. In finding that Deripaska was a limited public figure for the purpose of that controversy, Judge Huvelle

-21-

emphasized that Deripaska did "not dispute any material facts presented in the AP's discussion of the factual background as it relates to Deripaska's biography and his role in advancing Russian interests internationally." *Id.* at *11. She also emphasized Deripaska's documented boast (which he also did not dispute) of "I don't separate myself from the state." *Id.* at *12. By contrast to *Deripaska*, in this case the Plaintiffs dispute *all* of the factual allegations made about them in CIR 112, including the notion that Plaintiffs ever bribed Vladimir Putin, engaged in an "exchange of favors" relationship with Putin or aided the Kremlin's alleged efforts to influence the outcome of the U.S. election.

In sum, an affirmative defense may support dismissal at the pleading stage only if there is no plausible rebuttal to the defense based on the content of the pleading, *De Csepel*, 714 F.3d at 608. There is nothing about the unique facts of *Deripaska*—or more importantly, the pleadings in this case – that make the Plaintiffs unable to rebut Defendants' argument that Plaintiffs are limited purpose public figures.

### 3. The Central Controversy in This Case is About Alleged Russian Interference in the U.S. Election—a Controversy into Which Plaintiffs Have Never Thrust Themselves

The overriding theme of the Dossier, of which CIR 112 is part, is alleged Russian efforts to influence the U.S. election—including efforts jointly undertaken with persons associated with the Trump campaign. While CIR 112 contains some defamatory statements about Plaintiffs which are not on their face overtly related to that theme, the heading of CIR 112 echoes that same theme with its allegation of "cooperation" between Plaintiffs' company and the Kremlin in regards to the U.S. election. Indeed, the heading makes clear that Plaintiffs became a subject of the political opposition research effort undertaken by Defendants precisely because of the notion,

expressed in the heading of CIR 112, that Plaintiffs' company and the Kremlin cooperated with respect to matters bearing on the recent U.S. presidential election.

Unsurprisingly, Defendants resist the notion that alleged Kremlin interference in the election is the relevant controversy for the purposes of determining Plaintiffs' limited public figure status, given that Plaintiffs never did anything to involve themselves in that controversy. Yet, while disputing that characterization of the relevant controversy, elsewhere Defendants admit that the controversy in which they injected themselves by creating the Dossier was indeed alleged Kremlin electoral interference. Thus, for example, Defendants insist that it is implausible that Defendants discussed with journalists the defamatory statements in CIR 112 about Plaintiffs' purported historic relationship with Putin *because* the theme of the Dossier and their briefings about it was recent Kremlin electoral interference—not internal Russian matters relating to Plaintiffs and others. *See* Def's Motion to Dismiss at 33-34 ("insisting that any 'briefing' on the Dossier would have been on … conduct related to Trump and would *not have included any mention of Plaintiffs or the contents of CIR 112*" (emphasis added)); *see also* Point III.B, *infra*. Defendants did not, according to them, emphasize Plaintiffs when speaking to journalists because they recognized that Plaintiffs were *not* part of the public controversy in which Defendants were attempting to engage the media's interest. Indeed, the conclusion that Plaintiffs did not "play a … central role in the controversy," as is required by *Waldbaum*, is compelling.

### 4. Defendants' String Cites of Media Reports Fail to Demonstrate a Second Public Controversy With Respect to Plaintiffs' Business-Political Relationship With the Russian Government Generally

To the extent that CIR 112 addresses subjects other than efforts to influence the U.S. election, those subjects are not public controversies—and certainly they are not controversies

into which Plaintiffs have thrust themselves.  For example, the libelous statement that Plaintiffs

bribed Vladimir Putin in the 1990s when he was the Deputy Mayor of St. Petersburg is not a

public controversy nor is it one in which Plaintiffs thrust themselves.  Indeed, it is an accusation

that Plaintiffs have never addressed or been asked to address prior to Defendants' publication of

that false allegation.  In the same vein, Plaintiffs have not publicly thrust themselves into a public

debate over whether they receive "favors" from Vladimir Putin—a subject that in any event is far

from the overriding theme of the Dossier.  The various news articles cited by Defendants do not

overcome these points for two independent reasons: (1) the truth of the articles may not be

assessed on a motion to dismiss; and (2) the articles' themes are different from the themes of the

specific defamatory statements made about Plaintiffs in CIR 112.

### 5.   Defendants' Defamatory Statements About Plaintiffs Are Not Adequately Linked to Any Voluntary Public Role Played by Plaintiffs in the Public Controversies in This Case

Defendants' argument also fails because Defendants have not demonstrated a significant

link between the defamatory statements and the Trump/Russia/U.S. election controversy that is

the context for the defamatory statements made in this case.  Indeed, Defendants essentially

admit that there is no such link—pointing to the absence of such a link as their reason for *not*

briefing members of the media about Plaintiffs or the defamatory statements in CIR 112 when

Defendants briefed members of the media about the Dosser.  Def's Motion to Dismiss at 33-34.

Given that absence of any direct and overt link between the statements CIR 112 makes in

its text about Plaintiffs and the Dossier's theme of a Kremlin-Trump campaign conspiracy to

influence the U.S. election, Defendants argue that the public controversy is purportedly Russian

government relationships with "oligarchs."  Def's Motion to Dismiss at 26.  But as noted above,

that is not the theme of the Dossier and not the subject on which Defendants claim to have briefed members of the media and government officials.

### 6.   Defendants' Extreme Position Would Effectively Deem Plaintiffs General-Purpose Public Figures

Defendants essentially ask this Court to deem each of the Plaintiffs a limited public figure with respect to any action in which the Kremlin is alleged to have a role, such that Plaintiffs can be accused of acting as the Russian government's agents in any and all such actions, for all time, and in all such circumstances would bear the elevated burden of proof assigned to public figures. That would eradicate the distinction set forth in *Gertz* between limited-purpose and general-purpose public figures:

> We would not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes. Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the *particular controversy giving rise to the defamation.*

*Gertz*, 418 U.S. at 352 (emphasis supplied).   A determination that all three Plaintiffs are deemed as a matter of law to be public figures for any and all controversies as long as a corrupt connection to the Russian government is mentioned is a substantial broadening of the analysis and definition of a public controversy set forth in *Jankovic*, 822 F.3d at 585, and is inconsistent with *Gertz.*

As the D.C. Circuit noted in *Waldbaum*, "the general public figure is a rare creature." *Waldbaum*, 627 F.2d at 1292.  Plaintiffs are not such rare figures, and cannot be deemed at this stage of the litigation to be public figures for the purpose of the defamatory statements at issue in this case.

-25-

**C.**   ***Defamation Plaintiffs Are Not Required to Allege or Produce Evidence of Actual Malice at the Pleading Stage***

By moving under Rule 12(b)(6) to dismiss the Amended Complaint on the theory that Plaintiffs are limited public figures, Defendants seek to deprive Plaintiffs of their right to rebut Defendants' potential affirmative defense and to obtain discovery relating to that defense.  Under *Herbert*, 441 U.S. at 153, and Federal Rules of Civil Procedure 7, 8 and 56, Plaintiffs should have the opportunity to subject the public figure/actual malice defense to scrutiny, such as by seeking discovery from the publisher of the defamatory statement regarding the publisher's subjective state of mind when it published the statements.  The cases relied upon by Defendants for the proposition that actual malice may be determined on a motion to dismiss are inapposite. *See, e.g., Parisi*, 845 F. Supp. 2d at 215, 218-19 (complaint contained affirmative admissions sufficient to demonstrate the defendant's lack of actual malice as a matter of law, *i.e.*, it pled extensive efforts of the defendant to verify the statements at issue and the identity of his anonymous tipster).

Accordingly, *Herbert's* rationale, *i.e.,* that libel plaintiffs seldom if ever know any facts about the subjective state of mind of the publisher required by *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), suggests strongly that the libel plaintiff faced with a 12(b)(6) motion to dismiss must be afforded discovery followed by a right to amend its complaint to include discovered facts relevant to that fault standard. *Herbert*, 441 U.S. at 169, 170.

**D.**   ***The Allegations in the Amended Complaint Are Consistent With Actual Malice***

In any event, the Amended Complaint's allegations are consistent with Defendants' actual malice under the standard established in *St. Amant v. Thompson*, 390 U.S. 727 (1968). Thus, even if Plaintiffs were to be identified as limited public figures in this case, they are entitled to the opportunity to obtain, through discovery, for use at trial, evidence of Defendants'

actual malice: that is, that the harmful statements in CIR 112 about Plaintiffs are either fabricated, so inherently improbable that only a reckless person would have put them in circulation, or are based on an unverified source that the publisher of the statement would have had obvious reason to doubt. *Id.* at 732.

Moreover, the defamatory headline of CIR 112 alone supports a finding of actual malice. Indeed, Defendants' argument that CIR 112, upon careful examination, does not in fact have any support for the suggestion, in CIR 112's headline, of interference by Plaintiffs in the presidential election only strengthens the conclusion that a material dispute of fact exists about whether the inclusion of CIR 112's headline was reckless and in total disregard of whether it was true or false. This material factual dispute cannot be resolved against Plaintiffs without providing Plaintiffs with the opportunity to conduct discovery. As the Supreme Court held, when rejecting an argument similar to that made by Defendants:

> We are thus being asked to modify firmly established constitutional doctrine by placing beyond the plaintiffs reach a range of direct evidence relevant to proving knowing or reckless falsehood by the publisher of an alleged libel, elements that are critical to plaintiffs such as Herbert. The case for making this modification is by no means clear and convincing, and we decline to accept it. . . . To erect an impenetrable barrier to the plaintiff's use of such evidence on his side of the case is a matter of some substance, particularly when defendants themselves are prone to assert their good faith belief in the truth of their publications, and libel plaintiffs are required to prove knowing or reckless falsehood with 'convincing clarity' (internal citations omitted).

*Herbert*, 441 U.S. at 170.

In sum, the Amended Complaint does not contain any averments inconsistent with Plaintiffs' status as private figures, is not inconsistent with actual malice by Defendants, and accordingly the Amended Complaint may not be dismissed at this juncture without affording Plaintiffs discovery from Defendants, consistent with the requirements of *Herbert*.

POINT III

PLAINTIFFS ADEQUATELY ALLEGE PUBLICATION

The Amended Complaint pleads Defendants' "intentional publication [of CIR 112] to third parties such as clients, news media, journalists, and others" and it specifically identifies a number of such clients, news media, journalists and others to whom CIR 112 was published. *See, e.g.*, Am. Compl. at ¶¶ 7, 10, 18, 31.  In spite of these allegations, which must be accepted as true in connection with this motion, Defendants contend that the Amended Complaint somehow fails to plead "actionable publication," that is, a "non-privileged" publication.  Def's Motion to Dismiss at 33, 38.  Defendants are simply wrong.  As demonstrated below, the Amended Complaint more than adequately pleads Defendants' actionable publication of the defamatory statements at issue.

A.      *The Amended Complaint Plausibly Alleges Publication to Journalists*

The Amended Complaint alleges that Defendants made extensive efforts to generate media interest in the Dossier by arranging briefings on its contents for specific print and online media outlets during September and October of 2016.  *See* Am. Compl. at ¶ 6.   A communication of defamatory material to a media outlet clearly establishes the element of publication.  *Armenian Assembly of Am., Inc. v. Cafesjian*, 597 F. Supp. 2d 128, 137 (D.D.C. 2009) (quotations omitted) (defining publication as publishing "the statement without privilege to a third-party").  Plaintiffs further allege that these briefings resulted in republication of *direct quotes* from the Dossier and an article describing a "Russian Operation to Cultivate Donald Trump."  *See* Am. Compl. at ¶ 6.  The plausible inference from the allegation of paragraph 6 of the Amended Complaint that a journalist (David Corn) wrote an article in which he *quoted from* the Dossier, in late October 2016, shortly after meeting with Defendants' agent, Christopher Steele—who had been instructed by Defendants to interact with the media about the content of

-28-

the Dossier—is that Defendants, operating through Steele, published the entire Dossier that

existed in October 2016, including CIR 112, to David Corn. *See id.* At minimum, these

allegations support an inference that Defendants shared the contents of the Dossier (verbally

and/or in writing) with media outlets, including CIR 112. *See* Am. Compl. at ¶¶ 6-9, 31.

Nevertheless, Defendants argue that the only plausible inference is that the briefings were

restricted to "Donald Trump and his campaign" and "would not have included any mention of

Plaintiffs or the contents of CIR 112." Def's Motion to Dismiss at 33. Defendants offer no basis

whatsoever to assume that its peddling of copies of the Dossier to journalists in late September

and October of 2016 would have excluded CIR 112 (dated September 14, 2016) whose title

echoes the theme of the other Reports in the Dossier—Russian interference in the U.S. election.

*See* Am. Compl. at ¶ 4. In fact, the far more plausible inference to be drawn from the

allegations, including the allegation that the briefings led to an article about a "Russian

Operation" to interfere in the U.S. election, is that Defendants shared copies of the entire Dossier

then-in-existence during these briefings, including CIR 112. Nor do Defendants attempt to

explain why their provision of a copy of the Dossier, including CIR 112, through Christopher

Steele, to David Corn, would not be actionable publication, in and of itself. *See* Am. Compl. at ¶

6. Pursuant to the established standard of review on a motion to dismiss, the Court must draw

"all reasonable inferences from [the] allegations in the plaintiff's favor," not simply the strained

inferences Defendants urge. *Banneker Ventures, LLC*, 798 F.3d at 1129. "The debate over

possible factual inferences in both parties' papers should have put the court on notice that it

needed a great deal more information before deciding that there was no material issue of fact in

dispute." *Gordon*, 675 F.2d at 361 (reversing grant of motion to dismiss).

Despite Plaintiffs' pleading of facts that support a clear inference that Defendants published defamatory statements about Plaintiffs to journalists, Defendants appear to argue that the Amended Complaint must be dismissed on the theory that it does not allege *republication* by the journalists who were provided with the Dossier of any of its statements that are about Plaintiffs. *See* Def's Motion to Dismiss at 34. But Plaintiffs are not required to plead such republication—only facts that permit a plausible inference that Defendants impermissibly published defamatory material to third parties without privilege. *Ashcroft*, 556 U.S. at 662, 678; *see also Armenian Assembly of Am., Inc.*, 597 F. Supp. 2d at 137 (holding that party "need not allege . . . the identity of one or more persons who read the defamatory statements"); Sack, *supra,* § 2:5.1 ("Publication need not be proved with respect to specific recipients of the allegedly defamatory message. It is enough to establish, by direct or circumstantial evidence, that third parties did indeed receive it."). In any event, as demonstrated above, the Amended Complaint does also allege republication.

In sum, the relevant legal question is not whether journalists *re*published the defamatory statements, but whether Plaintiffs have sufficiently alleged publication of defamatory statements to others, such as journalists. *Armenian Assembly of Am., Inc.*, 597 F. Supp. 2d at 137. As shown above, the answer to that question is an unequivocal yes.

**B.**   ***Plaintiffs Plausibly Allege Publication to David Kramer and John McCain***

**1.**   **The Amended Complaint Adequately Alleges That the Defamatory Statements Were Published by Transmittal to David Kramer (and Through Him to John McCain). That Publication Is Not, as Defendants Argue, Privileged, Given That Kramer Worked for McCain's Private Institute, Not for McCain in His Capacity as a Senator**

Plaintiffs also sufficiently allege publication to David Kramer and republication to U.S. Senator John McCain. Paragraph 7 alleges that "Defendants also organized or approved a

meeting in Great Britain between Steele and David Kramer . . . to show Kramer the content of

the sixteen pre-election reports in the Dossier . . ." and later in November 2016 provided Kramer

with copies of the reports.[8]  Plaintiffs further alleged that "the purpose of the meeting was to

show Kramer the content of the sixteen pre-election reports in the Dossier so he could brief

Senator McCain, who at the time was a well-known and outspoken critic of Trump's candidacy."

*Id.* These statements clearly allege Defendants' publication of the sixteen pre-election reports in

the Dossier to Kramer (and also to McCain), both before and after the election.

Defendants argue that "[t]he plausible inference . . . is that Defendants gave Senator

McCain the Dossier—through his agent, Kramer—because of Senator McCain's legislative

position and because the content of the Dossier was relevant to Senator McCain's legislative

role."  Def's Motion to Dismiss at 35.   But the legal question is not whether Defendants can

make a "plausible" argument that some publications of the defamatory statements were

privileged, but rather, whether Plaintiffs have pled publication by Defendants that, plausibly, was

not privileged.   Here, the Amended Complaint alleges (in Paragraph 7) that Defendants

organized a meeting between Steele and Kramer, in his capacity as director of a *private*

foundation affiliated with McCain, during which Kramer was given a copy of the Dossier,

including CIR 112.  In that fashion, Plaintiffs have plausibly alleged Defendants' non-privileged

publication of CIR 112.

Defendants' contrary argument—the idea that their meetings with and provision of the

Dossier to a private citizen (Kramer) is constitutionally protected as "petitioning of government,"

or as "communications made to a legislator" under the "common law privilege," Def's Motion to

---

[8] *See* Am. Compl. at 7.

Dismiss at 34-35, is easily rejected.  Defendants' argument is inconsistent with facts that Plaintiffs have adequately pleaded and/or can readily establish from publications:

(1)   Kramer was a private citizen who "held no public office" and whose association with McCain stemmed from his role as a director at McCain's private foundation.  Am. Compl. at ¶ 7 (identifying Kramer as "the director of a private foundation affiliated with U.S. Senator John McCain");

(2)   Kramer and his employer, the McCain Institute for International Leadership at Arizona State University, had no governmental role or authority; [9]

(3)   Senator McCain, a former U.S. presidential candidate, is a veteran of U.S. and Republican politics and well known for his outspoken views on U.S. political issues;

(4)   In 2015-2016 Senator McCain was an outspoken opponent of Trump's candidacy for the presidency, and his opposition was prominently featured in news coverage throughout the U.S. and internationally, including stories in early October 2016 announcing McCain's decision to revoke his endorsement of then-candidate Trump. [10]

Notably, Plaintiffs do not allege that Defendants communicated the contents of the reports to *legislative* staff for Senator McCain, staff to the Senate Committee on Homeland Security and Governmental Affairs, or anyone else affiliated with the U.S. Government.  Had

---

[9] *See* MCCAIN INSTITUTE FOR INTERNATIONAL LEADERSHIP, at https://www.mccaininstitute. org/staff/david-j-kramer (David J. Kramer is listed as Affiliated Senior Fellow); *and* https://www.mccaininstitute.org/about/ (McCain Institute at Arizona State University is "a non-partisan do-tank").

[10] Don Nowicki, *Here's a blow-by-blow account of the Donald Trump vs. John McCain Feud*, AZ Central, (Oct. 15, 2016), *available* at https://www.azcentral.com/story/news/politics/azdc/ 2016/10/15/donald-trump-vs-john-mccain-feud/91960246.

Plaintiffs done so, those particular acts of publication might, arguably, be privileged.  But instead, Plaintiffs have pled only that Defendants provided the Dossier to, and briefed, Mr. Kramer, a non-state actor, and for that reason Defendants cannot rely on the privileges they would invoke.

**2.      Defendants, as Sophisticated Political Operatives, May Not Shield Their Defamatory Statements Behind Privileges and Immunities Designed to Encourage Individual Citizens' Participation in Government**

By Defendants' logic, any defamatory statement could be shielded by passing it through a legislator, regardless of whether the legislator sought or received the information as a party operative, a private citizen, or a legislator.  The authority cited by Defendants does not support that position.  As the D.C. Circuit explained in *Webster v. Sun Co.*, "grants of absolute immunity ought to be interpreted narrowly to serve only the purposes justifying the immunity" and "we must prevent overbroad application . . . that would create shelter from defamation liability."  731 F.2d 1, 4-5 (D.C. Cir. 1984) (finding district court erred in defining too broadly the scope of legislative privilege in connection with "unsolicited statements made to the legislature or its investigative arm").  The D.C. Circuit clarified that the purpose of the privilege was to ensure "individuals" would not be "discouraged from addressing their government." *Id.* (*quoting Sherrard v. Hull*, 456 A.2d 59, 62 (Md. Ct. Spec. App. 1983), *overruled on other grounds, Miner v. Novotny*, 498 A.2d 269 (Md. 1985)).  It is hard to imagine the D.C. Circuit had political operatives like Defendants in minds as "individuals" who would, but for the privilege, be discouraged from approaching "the legislature or its investigative arm."  Here, Defendants did neither; they approached David Kramer, a private individual. *Webster*, 731 F.2d at 5.

In fact, under the holding of *Webster*, Defendants' decision to reach Senator McCain via David Kramer is fatal to their claim of privilege:  "The privilege insulates statements made only

to the legislature or its investigative arm. *Publication to individuals not associated with the legislature and republication by the legislator are not covered by the privilege.*" *Webster*, 731 F.2d at 5 n.9.

Furthermore, *Webster* does not support the granting of a motion to dismiss on the basis of an asserted privilege or immunity; *Webster* involved a motion for summary judgment, not a motion to dismiss. *Id.* at 2. The D.C. Circuit, in part, remanded to make "sufficient findings of fact" pertinent to whether the defendants in that case were entitled to the asserted privilege. *Id.* at 4. Here, Plaintiffs have had no opportunity to conduct the discovery that would inform such a factual assessment on this disputed issue. And as discussed, *supra* at 5, 22, an affirmative defense may only support dismissal at the pleading stage if, based on the content of the complaint, there is no plausible rebuttal to the defense. *De Csepel*, 714 F.3d at 608. Here, as discussed above, Plaintiffs' allegations are completely consistent with a finding that Defendants' briefing of Mr. Kramer, and indirectly Senator McCain, was not undertaken with the intent to provide "candid legislative input" but rather, to provide political ammunition against Trump.

Notably, Defendants emphasize the portions of CIR 112 that do not, on their face, appear to relate directly to alleged Russian interference in the recent U.S. election. *See* Def's Motion to Dismiss at Point II, 17-25. But those portions of CIR 112 do not advance Defendants' assertion of privilege. Defendants do not even attempt to explain how allegations of bribery in a foreign country, allegedly occurring decades ago, relate in any way to "an issue of national security" on which they might theoretically petition Congress. *See* Def's Motion to Dismiss at 21-22, 34-35. Thus, there is a fatal tension between Defendants' contention that CIR 112 contains no "'clear … implication' that Plaintiffs are tied to 'a Kremlin-orchestrated campaign to interfere in the 2016 U.S. election,'" and Defendants' assertion of a privilege that is grounded in the notion that they

brought CIR 112 to the attention of government personnel because of its purported description of election interference. Def's Motion to Dismiss at 19. Extending the asserted privilege to Defendants' publication of CIR 112 would represent exactly the type of "overbroad applications of the privilege [creating] shelter from defamation liability" that the D.C. Circuit urged be avoided. *Webster*, 731 F.2d at 5.

### C.     Even if Defendants Were at One Point Entitled to a Common Interest Privilege For Their Publication to Their Client, Perkins Coie, Defendants' Subsequent Acts Have Forfeited the Privilege

Defendants do not dispute that they published the Dossier, including CIR 112, to their client Perkins Coie, which, in turn, republished it to its clients, the Democratic National Committee and HFACC, Inc. (the campaign organization supporting Hillary Rodham Clinton's candidacy for President). Instead they argue that, for those particular acts of publication, they are purportedly entitled to immunity under the qualified "common interest" privilege. *See* Def's Motion to Dismiss at 36. According to Defendants, publications to clients are entitled to protection if "made in good faith" to one to whom a party "has a duty." *Id.*

However, privilege may be destroyed through excessive publication. Excessive publication is "publication to those with no common interest in the information communicated, or publication not reasonably calculated to further the interest . . ." *Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C. Ct. of App. 1990). As Plaintiffs have alleged, Defendants did not limit their publication to their clients. Instead, as described above, they arranged meetings with numerous journalists at which they discussed the Dossier and provided a physical copy of it—including CIR 112.[11] They have also discussed, shown, and shared the contents of early reports, including

---

[11] *See* Am. Compl. ¶ 6.

CIR 112, with David Kramer, and, in turn, to John McCain.[12]  In the absence of any applicable

privileges, *see* Point III. B *supra*, or any common interest between Defendants and the other

recipients of the publication (e.g., journalists and David Kramer), Defendants' publication to

those recipients "render[ed] the statements [previous published to Perkins Coie] non-privileged."

*See Moss*, 580 A.2d at 1024.  Defendants do not and cannot attempt to argue that these

disclosures were "reasonably calculated to further" the common interest between Defendants and

their clients.  Accordingly, Defendants' disclosures are not protected by a common interest

privilege with Perkins Coie.

　　　Moreover, Defendants' invocation of the common interest privilege here would

contravene the principle that the privilege not be indiscriminately applied:

> Conditional privileges are available because the law has recognized that,
> on certain occasions, the need for free communication outweighs the
> interest in protecting reputation. But if such an occasion exists, it does
> not justify all communications; *it is not a license to defame.*

Sack, *supra,*, § 9:2.3 (emphasis added).  Here, far from coming to court wearing the mantle of

the free and independent press, Defendants are paid consultants collecting negative information

to influence the reputation of candidates for public office.  Defendants' dissemination of their

non-neutral and admittedly unverified opposition research recklessly disregards impacts on the

reputations of third parties.  Under these circumstances, Defendants have forfeited any privilege

they might have had.  *See Sack, supra,*, § 9:3 ( "A plaintiff may demonstrate abuse of privilege

by proving that the defendant acted . . . with knowledge that the statement was false *or with a*

*reckless disregard as to its truth.*") (emphasis added, quotation omitted).

　　　Defendant Simpson, and thus Fusion, knew that the allegations against Plaintiffs in CIR

112 were from anonymous sources and were unverified.  As a veteran journalist, Simpson also

---

[12] *Id.* at ¶ 7.

knew that the Putin bribery allegations were defamatory on their face. Yet he published CIR 112

along with the rest of the reports to known recipients at the law firm, and an unknown number of

others there and at their clients' political operations, instead of removing it from the bundle.

Although Simpson thus published CIR 112, he did so without any basis for believing that its

contents were true. Indeed, he had good reason to doubt its truth. By publishing statements that

Defendants knew to be damaging but did not know to be true, Defendants easily acted in a

manner that satisfies the definition of reckless disregard (which falls within the definition of

actual malice).

**D.**    ***Plaintiffs Have Sufficiently Alleged Republication to Journalists, Including BuzzFeed***

Defendants also argue that the Amended Complaint lacks sufficient facts to hold

Defendants liable for BuzzFeed's eventual republication of the entire Dossier, including CIR

112. Def's Motion to Dismiss at 37-38. In that vein, Defendants deny any direct involvement in

the republication of the Dossier by BuzzFeed, and cite to their own self-serving denials of direct

distribution to BuzzFeed in other litigation. *Id.* But Defendants' self-serving factual contentions

are irrelevant in connection with a motion to dismiss. And at the pleading stage, Plaintiffs need

not allege precisely how BuzzFeed came to possess and then republish the defamatory

statements, *see* Sack, *supra,*, § 2:5.1 ("Publication need not be proved [let alone alleged] with

respect to specific recipients of the allegedly defamatory message; it is enough to establish, by

direct or circumstantial evidence, that third parties did indeed receive it."). *See also Caudle v.*

*Thomason*, 942 F. Supp. 635, 639 (D.D.C. 1996) (holding that a party disseminating defamatory

material may be held accountable for republication by a third party when it is "reasonably to be

expected" that the material would be republished).

Plaintiffs' complaint easily satisfies this standard. Am. Compl. at ¶¶ 18, 31 (pleading

that Defendants published the statements to third-parties with reckless disregard as to their truth,

knowing, indeed, counting on, the fact that they were likely to be republished.); *see also* Def's

Motion to Dismiss at 37 (Defendants admitting that Plaintiffs alleged that it was reasonably

foreseeable that communicating the Dossier's defamatory statements to third parties like Kramer,

McCain and journalists would result in their republication).  Here, there was a media frenzy

going on in the U.S. in 2016 about the election, *see* Am. Compl. at ¶ 3 (noting that the "media"

was "devoted to breaking news on the hottest subjects of the day: the Trump candidacy and his

election . . . "), and Defendants were fomenting it by their briefings, leading publications such as

Mother Jones and Yahoo News to publish articles about the Dossier before the election.[13]  The

ultimate goal of Defendants' opposition research was to get negative coverage *in the media* that

would hurt Trump's candidacy.  To argue that the briefings had nothing to do with that end goal

is to ask the Court to ignore the very existence and purpose of Defendants' engagement.

**E.**      ***Defendants' Anti-SLAPP Special Motion and Assertion of Privileges and Immunities Applicable to Media Companies Constitute Admissions of Publication***

Finally, Defendants' argument that they did not publish CIR 112 is contradicted by

Defendants' allegations in support of their motion to dismiss pursuant to the D.C. anti-SLAPP

Act, where Defendants seek to invoke the Act on the basis that they *publicly* engaged in political

debate about Plaintiffs by disseminating CIR 112.  Plaintiffs also effectively admit publication to

a broad audience by asserting the neutral reportage privilege, the rationale of which is ostensibly

to facilitate dissemination of information *to the public* by media companies.[14]

---

[13] *Id.* at ¶ 6.

[14] As discussed in Point IV, the neutral reportage privilege has not been adopted by the D.C. Circuit or the District of Columbia courts.

**POINT IV**

**DEFENDANTS FAIL TO DEMONSTRATE THAT
DEFENDANTS' STATEMENTS CONSTITUTE NEUTRAL REPORTAGE
AS A MATTER OF LAW**

*A.*      *The "Neutral Reportage" Privilege Has Not Been Adopted by the D.C. Circuit Court of
Appeals or the District of Columbia Courts*

Defendants do not cite a single case from the District of Columbia courts for the

proposition that a "neutral reportage" privilege, protecting media defendants from liability when

they repeat defamatory statements while lacking knowledge that the harmful statements are true

or accurate, is recognized under District of Columbia law.  Nor do Defendants cite any decision

of the D.C. Circuit recognizing the privilege.  Plaintiffs are not aware of any (although the D.C.

Circuit has declined to rule on this point on more than one occasion), nor of any D.C. district

court case that has extended the doctrine to paid political consultants engaged to do political

opposition research.  The doctrine has been cited in cursory fashion a handful of times in this

district and is by no means well-established.  *See, e.g., Foretich v. Chung*, No. 91-0123, 1995

U.S. Dist. LEXIS 22813 (D.D.C. 1995) (granting summary judgment without specifying

grounds).

Defendants rely principally on *In re United Press Int'l*, 106 B.R. 323, 329 (D.D.C. 1989),

which noted that the D.C. Circuit had yet to speak to the issue, and that the contours of the

doctrine remained ill-defined.  *See id.* at 329 (even "those circuits that have considered the

doctrine have left its contours rather ill-defined");  *White v. Fraternal Order of Police*,

909 F.2d 512, 514 (D.C. Cir. 1989) (D.C. Circuit had declined to say whether neutral reportage

doctrine applied).

Since that time, the neutral reportage doctrine has been increasingly criticized and

rejected, even in districts that had previously accepted it.  The leading case on neutral reportage

doctrine finds its genesis in *Edwards v. National Audubon Society*, 556 F.2d 113 (2d Cir. 1977), *cert. denied*, 434 U.S. 1002 (1977), yet the doctrine has been criticized by the New York Court of Appeals in *Hogan v. Herald*, 58 N.Y.2d 630 (1982), which rejected it as a defense in New York.

Respectfully, a neutral report privilege should be rejected based on principles of defamation law elaborated by the Supreme Court: the existence of such a privilege would fly in the face of the holding of *New York Times Co.*, 376 U.S. at 279-280, *permitting* recovery of damages for defamatory statements relating to a public official's conduct when the official can prove that the statements were made with "'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." The "public" libel plaintiff—including a limited purpose public figure—who can do that would be denied vindication and damages by the absolute immunity of neutral reportage, despite the Supreme Court's recognition that the First Amendment *is not violated* by such a result.

In 2004, in *Norton v. Glenn*, 580 Pa. 212 (2004), the Pennsylvania Supreme Court described the trend away from the neutral reportage doctrine, the reasons many states have come to reject it and rejected its application in Pennsylvania, finding that the state and federal constitutional concerns for media organizations must be balanced with protections for those who have been defamed. Specifically, the *Norton* court noted that the Supreme Court, in the decades since *Edwards*, has rejected the notion that the media must be immunized from defamation liability. *Id.* at 221. Rather, the *Norton* court noted that the Supreme Court "has not declared that a media defendant is owed even a scintilla more protection than a private citizen-defendant[:]"

> Rather, the Court has declared that "the need to avoid self-censorship by the news media is . . . not the only societal value at issue. If it were, this

-40-

> Court would have embraced long ago the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation." *Gertz*, 418 U.S. at 340. The Court has repeatedly stated that the claim that the Federal Constitution requires such a blanket immunity for the media constitutes "an untenable construction of the First Amendment." *Herbert v. Lando*, 441 U.S. 153, 176, 60 L. Ed. 2d 115, 99 S. Ct. 1635 (1979).

*Norton*, 580 Pa. at 225.  Accordingly, this Court should decline to apply or extend the privilege to Defendants.

**B.     *Defendants' Statements Were Not Neutral***

Moreover, under any understanding of the doctrine of neutral reportage, that doctrine is inapplicable here. *United Press* limits the immunity granted by the neutral reportage privilege to reports that are factual, neutral, and accurate. *United Press*, 106 B.R. at 330. *United Press* involved a respected news service that simply republished a report from another news organization.  Here, the statements in CIR 112 are attributed to unidentified sources and were obtained from an intermediary and published by a private consultant that is alleged to have provided them to a client that commissioned the reports for political opposition purposes, not for objectively or even arguably neutral purposes.

In *McFarlane v. Esquire Magazine*, No. 92-0711, 1994 U.S. Dist. LEXIS 9497, *38-39 (D.D.C. 1994), the district court rejected reliance on this defense, because the report was not neutral, noting that:

> Turning to the substance of the motion, defendants argue that the neutral reportage privilege bears on the actual malice determination here and favors dismissal. The Court, in denying plaintiff's partial summary judgment motion on the issue of truth, found that it was unnecessary to decide whether the neutral reportage doctrine applied in this case because even if it did, "October Surprise" would not be protected by it . . . The Court determined that the article was not neutral with regards to Ben-Menashe and in fact advocated his credibility, even while quoting some detractors. Although the Court did permit the parties to brief the issue again, defendants have not presented any reason why the Court should change this determination.

-41-

*See id.*  The article at issue was published by a national magazine, involved a matter of national security, and used a source who had spoken to Congressional investigators.  Nevertheless, the court concluded that because Esquire's article sought to bolster the credibility of its questionable source the neutral reportage privilege was not applicable.  Here, Defendants' report relies upon anonymous foreign sources, and the reporting was undertaken on a paid basis for a particular political purpose; it cannot be presumed that the reporting is neutral with respect to these unknown conversations and sources on a motion to dismiss.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion to Dismiss for Failure to State a Claim should be denied.

Dated:  March 26, 2018

Respectfully submitted,

_____*Alan S. Lewis*_____
Alan S. Lewis (#NY0252)
John J. Walsh
Judith Wallace
Karen Meara
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005
Tel.:   212-238-8647
Fax:    212-732-3232
Email: lewis@clm.com

*Attorneys for Plaintiffs*
*Mikhail Fridman, et al.*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------------------------------------------

MIKHAIL FRIDMAN, PETR AVEN, and )
GERMAN KHAN, )
            )      Case No. 1:17-cv-02041 (RJL)
           *Plaintiffs,* )
            )
         v. )
            )
BEAN LLC (a/k/a FUSION GPS) and )
GLENN SIMPSON, )
            )
           *Defendants.* )

---------------------------------------------------------------

## PROPOSED ORDER

      Upon consideration of the Motion to Dismiss the Amended Complaint for Failure to State

a Claim (the "Motion to Dismiss") by Defendants Bean LLC a/k/a Fusion GPS and Glenn

Simpson, the opposition thereto by Plaintiffs Mikhail Fridman, Petr Aven and German Khan, and

Defendants' reply in further support of the Motion to Dismiss, it is hereby ORDERED that the

Motion to Dismiss is denied, and it is further ORDERED that Defendants shall answer the

Amended Complaint within fourteen days of notice of this ORDER.

      **SO ORDERED** this _____ day of _____, 2018.


                              _____
                              RICHARD J. LEON
                              United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of March 2018, I electronically filed and served the foregoing using the CM/ECF system.

*/s/ Alan S. Lewis*
Alan S. Lewis
