**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MIKHAIL FRIDMAN, PETR AVEN, and
GERMAN KHAN,

        Plaintiffs,

   v.

BEAN LLC a/k/a FUSION GPS, and GLENN
SIMPSON,

        Defendants.

Civil Case No. 1:17-cv-2041-RJL

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS THE
AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................1

I. WITH ONE POSSIBLE EXCEPTION, CIR 112 DOES NOT CONTAIN
ACTIONABLE DEFAMATORY STATEMENTS. ................................................1

    A. Allegations of "Significant Favors" or Doing Putin's "Political Bidding"
    Are Not Precise and Verifiable Facts.................................................................2

    B. Allegation about Fridman and Aven related to Corruption in the 1990s............3

    C. The Title of CIR 112 Is Not Defamatory..........................................................4

II. DEFAMATION PLAINTIFFS MUST PLAUSIBLY PLEAD ACTUAL
MALICE IN THEIR COMPLAINT. ......................................................................5

III. PLAINTIFFS ARE PLAINLY LIMITED PURPOSE PUBLIC FIGURES. ...........7

    A. The Relevant Public Controversy at Issue Is the Relationship between
    Russian Oligarchs and the Kremlin. ................................................................8

    B. Plaintiffs are Public Figures in the Public Controversy Related to the
    Russian Oligarchs' Relationship to the Kremlin ..............................................9

IV. THE ALLEGATIONS IN THE COMPLAINT FAIL TO PLAUSIBLY
PLEAD ACTUAL MALICE. ...............................................................................12

V. PLAINTIFFS HAVE NOT PLED AN ACTIONABLE PUBLICATION. .............14

    A. "Briefing" of Journalists ...............................................................................14

    B. Delivery of the Dossier to Senator McCain ...................................................15

    C. Publication of CIR 112 to Fusion's Client.....................................................17

    D. BuzzFeed's Publication of CIR 112 ..............................................................18

VI. ANY PUBLICATION BY DEFENDANTS WAS A PRIVILEGED
NEUTRAL REPORT...........................................................................................18

CONCLUSION...........................................................................................................20

i

# TABLE OF AUTHORITIES

**CASES**

*Am. Petroleum Inst. v. TechnoMedia Int'l, Inc.*,
  699 F. Supp. 2d 258 (D.D.C. 2010) ...................................................................... 15

*\*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................ 5, 6, 7, 12

*Barry v. Time, Inc.*,
  584 F. Supp. 1110 (N.D. Cal. 1984) ...............................................................18-19

*\*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................... 1, 5, 6, 7, 12, 13

*\*Biro v. Condé Nast*,
  807 F.3d 541 (2d Cir. 2015) ............................................................................. 6, 13

*Boley v. Atl. Monthly Grp.*,
  950 F. Supp. 2d 249 (D.D.C. 2013)........................................................................ 7

*Contemporary Mission, Inc. v. New York Times Co.*,
  842 F.2d 612 (2d Cir. 1988) ................................................................................... 4

*Curtis Publ'g Co. v. Vaughan*,
  278 F.2d 23 (D.C. Cir. 1960).................................................................................. 5

*\*Deripaska v. Assoc'd Press*,
  282 F. Supp. 3d 133 (D.D.C. 2017), *appeal dismissed* 2017 WL 6553388 ......... 3, 6, 7, 8, 9, 10

*Edwards v. Nat'l Audubon Soc'y, Inc.*,
  556 F.2d 113 (2d Cir. 1977) ................................................................................. 19

*\*Farah v. Esquire Mag.*,
  736 F.3d 528 (D.C. Cir. 2013)......................................................................... 2, 10

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
  314 F.3d 48 (2d Cir. 2002) ................................................................................... 18

*Herbert v. Lando*,
  441 U.S. 153 (1979)............................................................................................. 13

*In re United Press Int'l*,
  106 B.R. 323 (D.D.C. 1989) ................................................................................ 19

*Jankovic v. Int'l Crisis Grp.*,
  494 F.3d 1080 (D.C. Cir. 2007)................................................................... 3, 5, 14

*Jankovic v. Int'l Crisis Grp.,
  822 F.3d 576 (D.C. Cir. 2016) *cert. denied*, 137 S. Ct. 1434 (2017) ........................................ 9

Joftes v. Kaufman,
  324 F. Supp. 660 (D.D.C. 1971) ................................................................................................ 17

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.,
  674 F.3d 369 (4th Cir. 2012) ..................................................................................................... 6

McDonald v. Wise,
  769 F.3d 1202 (10th Cir. 2014) .................................................................................................. 6

McFarlane v. Esquire Mag.,
  No. 92-0711, 1994 U.S. Dist. LEXIS 9497 (D.D.C. 1994) ...................................................... 20

*Michel v. NYP Holdings, Inc.,
  816 F.3d 686 (11th Cir. 2016) ................................................................................................. 5, 6

Moss v. Stockard,
  580 A.2d 1011 (D.C. 1990) ....................................................................................................... 17

*OAO Alfa Bank v. Ctr. for Pub. Integrity,
  387 F. Supp. 2d 20 (D.D.C. 2005) ................................................................................ 4, 8, 9, 10, 12

Parisi v. Sinclair,
  845 F. Supp. 2d 215 (D.D.C. 2012) .......................................................................................... 6, 7

Payne v. Clark,
  25 A.3d 918 (D.C. 2011) ........................................................................................................... 17

*Pippen v. NBCUniversal Media, LLC,
  734 F.3d 610 (7th Cir. 2013) ...................................................................................................... 6

S. Air Transp., Inc. v. ABC, Inc.,
  877 F.2d 1010 (D.C. Cir. 1989) .................................................................................................. 3

*Schatz v. Republican St. Leadership Comm.,
  669 F.3d 50 (1st Cir. 2012) ........................................................................................................ 6

Tavoulareas v. Piro,
  817 F.2d 762 (D.C. Cir. 1987) .................................................................................................... 9

Vreven v. Am. Ass'n of Retired Pers.,
  604 F. Supp. 2d 9 (D.D.C. 2009) .............................................................................................. 15

Waldbaum v. Fairchild Publ'ns, Inc.,
  627 F.2d 1287 (D.C. Cir. 1980) ................................................................................................ 10

*Webster v. Sun Co.*,
  731 F.2d 1 (D.C. Cir. 1984) ...................................................................................... 16

*Zimmerman v. Al Jazeera Am., LLC*,
  246 F. Supp. 3d 257 (D.D.C. 2017) ....................................................................... 6-7

**OTHER AUTHORITIES**

Dep't of the Treas.,
  Rep. to Cong. Pursuant to Sec. 241 of the Countering Am.'s Adversaries
  Through Sanctions Act of 2017 Regarding Senior Foreign Political Figures
  & Oligarchs in the Russian Fed'n & Russian Parastatal Entities (Jan. 29, 2018) ...................... 3

Robert D. Sack,
  1 *Sack on Defamation* § 9:3.5[A] (5th ed. 2017) ................................................ 17, 19

Robert D. Sack,
  2 *Sack on Defamation* § 16:2.2 (4th ed. 2010) ......................................................... 6

## INTRODUCTION

Plaintiffs, among the most famous, rich, and powerful Russian oligarchs of the Putin era, seek to impose burdensome and intrusive discovery on Defendants by struggling against, and in some instances outright ignoring, the requirements for pleading a defamation claim.  First, finally forced to identify (without embellishment) particular statements in Company Intelligence Report ("CIR") 112 that they assert are defamatory, with one possible exception, Plaintiffs point to statements that are not verifiable facts, are not defamatory, or do not actually say or imply what Plaintiffs assert.  The lone potentially defamatory statement relates to corruption in post-Soviet Russia—a controversy for which a judge in this district has already found Plaintiffs to be public figures.  Second, Plaintiffs repeatedly contend that they need not plausibly plead that Defendants acted with actual malice, an argument that flies in the face of unanimous case law that the pleading standards of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), apply to all defamation plaintiffs.  Finally, Plaintiffs attempt to rewrite their complaint in a futile effort to claim that it adequately alleges a non-privileged publication of CIR 112 to a third party.

The bottom line is the doors to discovery should not be unlocked for plaintiffs who have not plausibly alleged a viable claim for defamation, which as we demonstrate below, Plaintiffs have emphatically failed to do.

## I.   WITH ONE POSSIBLE EXCEPTION, CIR 112 DOES NOT CONTAIN ACTIONABLE DEFAMATORY STATEMENTS.

In Defendants' Motion to Dismiss, Defendants argued that—with one possible exception—the statements about Plaintiffs in CIR 112 were not defamatory because they were not verifiable facts and because Plaintiffs' Amended Complaint repeatedly sought to revise the statements in CIR 112 and then find defamatory meaning in their revised version.  *See* ECF No.

20-1, Mem. of Pts. & Auths. in Supp. of Defs.' Mot. to Dismiss ("Mot."), at 16-23.  In response,

Plaintiffs now specify the following statements in CIR 112, which they claim are defamatory:

- "Significant favors continue to be done in both directions, primarily political ones for PUTIN and business/legal ones for Alpha";[1]

- Fridman and Aven do Putin's "political bidding;"

- Fridman and Aven, through an intermediary, "deliver[ed] large amounts of illicit cash to the Russian President" when he was the Deputy Mayor of St. Petersburg; and

- The title of CIR 112: "RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION."

Opp'n at 8; *see also* Mot., Ex. 1.  None of these statements supports Plaintiffs' defamation claim.

### A. Allegations of "Significant Favors" Or Doing Putin's "Political Bidding" Are Not Precise and Verifiable Facts

Plaintiffs charge that CIR 112's statements that "[s]ignificant favors continue to be done

in both directions" between Alfa and Putin and that Fridman and Aven do Putin's "political

bidding" are defamatory.[2]  But as Defendants pointed out in their Motion to Dismiss and as

Plaintiffs completely ignore in their Opposition, those statements do not contain the kind of

precise and verifiable facts that can support a defamation claim.  *See, e.g.*, *Farah v. Esquire

Mag.*, 736 F.3d 528, 534-35 (D.C. Cir. 2013) (holding that, to be defamatory, statements must

state "actual facts" about Plaintiffs" that are "verifiable" and not "so imprecise or subjective that

[they are] not capable of being proved true or false").  Indeed, in the Motion to Dismiss,

---

[1] Plaintiffs break this sentence into two purportedly defamatory statements: that "'[s]ignificant favors continue to be done in both directions' between Vladimir Putin and Plaintiffs" and "that Plaintiffs do 'political' favors for Putin in exchange for 'business' and 'legal' favors from Putin."  ECF No. 25, Mem. of Pts. & Auths. in Opp'n to Defs.' Mot. to Dismiss ("Opp'n), at 8; *see also* Mot., Ex. 1 (reproducing CIR 112).

[2] Notably, the statement about "favors" is about Alfa, not Plaintiffs, and neither of these statements concerns Khan.

Defendants cited a number of cases where similarly imprecise and unverifiable statements were held to be not actionable.  *See* Mot. at 20.  Plaintiffs have no answer to this argument.[3]

## B.  Allegation about Fridman and Aven related to Corruption in the 1990s

As Defendants acknowledged in their Motion to Dismiss, the statement about Fridman and Aven using an intermediary to deliver cash to Putin during his tenure as Deputy Mayor of St. Petersburg is the lone statement in CIR 112 that may be defamatory.  As an initial matter, that statement cannot support Khan's claim because it does not concern him.  As to Aven and Fridman, that statement unequivocally falls within "the public controversy involving corruption in post-Soviet Russia" defined by Judge Bates in *OAO Alfa Bank* (as well as the public controversy defined by Defendants, *see* Mot. at 26-27), and for which Judge Bates already found

---

[3] Plaintiffs also fall back on the notion that "accusations of associating with a particular foreign government can be defamatory."  Opp'n at 8-9 (citing *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1091 (D.C. Cir. 2007) and *S. Air Transp., Inc. v. ABC, Inc.*, 877 F.2d 1010, 1015 (D.C. Cir. 1989)).  But Judge Huvelle rejected exactly this argument when Russian oligarch Oleg Deripaska tried to assert that a news article defamed him by associating him with furthering Russian interests.  Judge Huvelle noted that "it is readily available, judicially noticeable information that Deripaska openly associates himself with the Russian government.  For the [Associated Press] to do the same cannot be defamatory, even if it were not true."  *Deripaska v. Assoc'd Press*, 282 F. Supp. 3d 133, 146 (D.D.C. 2017), *appeal dismissed*, 2017 WL 6553388; *see also id.* at 144 ("Moreover, to the extent that Deripaska argues that associating him with the Russian government is defamatory, the AP correctly suggests there is 'no legal support for allowing a Russian citizen with a diplomatic visa to maintain a libel claim based on a statement associating him with his home country.'" (citation omitted)).  So too here: Plaintiffs' association with the Russian government is beyond reasonable dispute and judicially noticeable.  Plaintiffs are among "[t]he most famous oligarchs of the Putin era," *Russian Oligarch*, WIKIPEDIA, https://en.wikipedia.org/wiki/Russian_oligarch (last edited Apr. 7, 2018), and the U.S. Treasury Department recently placed all three on its published list of the companies and individuals associated with the Putin regime.  *See* Dep't of the Treas., Rep. to Cong. Pursuant to Sec. 241 of the Countering Am.'s Adversaries Through Sanctions Act of 2017 Regarding Senior Foreign Political Figures & Oligarchs in the Russian Fed'n & Russian Parastatal Entities (Jan. 29, 2018), https://www.scribd.com/document/370313106/2018-01-29-Treasury-Caatsa-241-Final; *see also* Sabra Ayres, *Who made "Putin's List'? A broad scope of Russia's political and business elite*, L.A. TIMES (Jan. 30, 2018), http://www.latimes.com/world/europe/la-fg-russia-whos-who-20180130-story.html (noting the list includes oligarchs "believed to have close ties to the Kremlin and to Russian President Vladimir Putin himself" and  "believed to be worth at least $1 billion, a sum generally thought to be impossible to amass and keep in Russia without some kind of close connection to the Kremlin"); Mot. at 9-12 & nn.24-28; *OAO Alfa Bank*, 387 F. Supp. 2d at 26-27 nn.15 & 23 (quoting from Aven's deposition that "I know Mr. Putin for many years because he worked for me when I was a minister" and his estimate that "he spoke to Putin over 10 times in the course of two-and-a-half years, and [Alfa was] one of a handful of private financial companies with a special, direct line to the Kremlin").

Plaintiffs Aven and Fridman to be public figures.  387 F. Supp. 2d 20, 43 (D.D.C. 2005).[4]
Accordingly, this statement is the lone statement as to which the Court must determine whether
Plaintiffs have plausibly alleged malice, which they most certainly have not.  *See* Mot. at 30-33;
*infra* Part § IV.

### C.      The Title of CIR 112 Is Not Defamatory

The title of CIR 112 reads "RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-
ALPHA GROUP CO-OPERATION."  In their Opposition, Plaintiffs strenuously argue that this
title should be understood to allege that the Kremlin and the Alfa Group cooperated to interfere
in the U.S. presidential election.  Plaintiffs rely on the placement of the colon to urge that the
title's reference to "cooperation" must refer to the "Russia/US Presidential Election."  Opp'n at
11-12. But Plaintiffs' grammatical contortions ignore that, first, the title is not a verifiable factual
statement and therefore cannot be defamatory, *see supra* at p. 2; and, second, the body of CIR
112 makes clear that the cooperation referenced in the title refers to the political/business
cooperation between the Kremlin and the Alfa Group in Russia.  Indeed, the body of CIR 112
never once mentions the U.S. presidential election or Russian interference in it.  Read in the
context of the subject matter of the body of CIR 112, the only reasonable reading of the title is
that the "cooperation" referenced in the title refers to the cooperative political/business
relationship actually discussed in the report.[5]

---

[4] "[T]he passage of time will not necessarily change an individual's status as a public figure" and "courts have concluded that an individual who becomes a limited purpose public figure with respect to a particular controversy retains that status for the purpose of later commentary on that controversy."  *Contemporary Mission, Inc. v. New York Times Co*., 842 F.2d 612, 619 (2d Cir. 1988) (emphasis omitted).

[5] And despite Plaintiffs' parsing of colon usage, the structure of the CIRs' titles appears to be simply a formula used by Steele and not a careful grammatical decision.  *See* Am. Compl. ¶ 19 (reproducing the titles of fourteen other reports, each of which employs a colon).

Plaintiffs also attempt to argue that, despite the fact that the body of the report makes clear that the alleged cooperation was not related to the election, because "large segments of the public [] read the headlines only," the title is defamatory standing alone.  Opp'n at 13 (quoting *Curtis Publ'g Co. v. Vaughan*, 278 F.2d 23, 29 (D.C. Cir. 1960)).  But, of course, the title on its own does not defame Plaintiffs—they are not mentioned in the title, only the Alfa Group is.  *See Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1089 (D.C. Cir. 2007) ("Stated generally, 'defamation is personal; . . . allegations of defamation by an organization and its members are not interchangeable. . . . [S]tatements which refer to an organization do not implicate its members." (internal quotations and alterations omitted)).

Put differently, Plaintiffs' argument fails either way—if the title of CIR 112 should be read in isolation, then the title cannot defame Plaintiffs because it does not mention them; but if the title should be read in the context of the report, then the report makes clear that the cooperation referenced in the title does not relate to the U.S. presidential election but rather to the political/business cooperation actually discussed in the body of the report.

## II. DEFAMATION PLAINTIFFS MUST PLAUSIBLY PLEAD ACTUAL MALICE IN THEIR COMPLAINT.

Arguing against overwhelming and unanimous case law, Plaintiffs repeatedly contend that defamation plaintiffs should not have to face motions to dismiss on the grounds that they are public figures and therefore required to allege actual malice.  *See* Opp'n at 3, 9, 13-16, 18, 22, 26.  Tellingly, Plaintiffs cite no case that actually stands for that proposition.  That is because none exists.  In fact, "after [*Ashcroft v.*] *Iqbal* [556 U.S. 662 (2009)] and [*Bell Atlantic Corp. v.*] *Twombly*, [550 U.S. 554 (2007),] every circuit that has considered the matter has applied the *Iqbal*/*Twombly* standard and held that a defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of

actual malice." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016); *see also Biro v. Condé Nast*, 807 F.3d 541, 544-45 (2d Cir. 2015); *McDonald v. Wise*, 769 F.3d 1202, 1220 (10th Cir. 2014); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013); *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012); *Schatz v. Republican St. Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012). Simply put, defamation plaintiffs, like other litigants, are not entitled to proceed to discovery to determine whether they have a claim; they must first allege facts that plausibly support the existence of a claim, which, in the case of public figures, includes actual malice. *Michel*, 816 F.3d at 702.

Although the requirement of pleading actual malice may be challenging, *Iqbal* and *Twombly* (not to mention the First Amendment) require no less. *See Biro*, 807 F.3d at 545 ("The hurdles to plausibly pleading actual malice, though significant given the First Amendment interests at stake, are by no means insurmountable." (citing 2 Robert D. Sack, *Sack on Defamation* § 16:2.2 at 16.7-8 (4th ed. 2010)). In fact, because of the First Amendment interests at stake, the Eleventh Circuit held that "application of the plausibility pleading standard *makes particular sense* when examining public figure defamation suits" because "[f]orcing publishers to defend inappropriate suits through expensive discovery proceedings in all cases would constrict that breathing space in exactly the manner the actual malice standard was intended to prevent." *Michel*, 816 F.3d at 702 (emphasis added). "The costs and efforts required to defend a lawsuit through [discovery] could chill free speech nearly as effectively as the absence of the actual malice standard altogether." *Id.*

Furthermore, cases in this district have routinely dismissed defamation complaints for failure to plausibly allege actual malice. *See* Mot. at 32-33 (citing *Deripaska*, 282 F. Supp. 3d at 144; *Parisi v. Sinclair*, 845 F. Supp. 2d 215, 219 (D.D.C. 2012); *Zimmerman v. Al Jazeera Am.*,

*LLC*, 246 F. Supp. 3d 257, 280 (D.D.C. 2017)); *see also Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 263 (D.D.C. 2013) (finding actual malice allegations insufficient where plaintiff "adduced no *facts* indicating the [allegedly defamatory] statements were false or made with actual malice"). Plaintiffs try to distinguish *Parisi* on the ground that "the status of plaintiffs as public figures . . . was not disputed," Opp'n at 16, but public figure status is simply an antecedent to the requirement of properly alleging actual malice. There is no reason why the concession of public figure status would alter the analysis as to whether plaintiffs must plead actual malice and, indeed, that concession did not factor into the *Parisi* court's assessment of the pleading requirement: *Parisi* held that plaintiffs had alleged actual malice only in "conclusory fashion" and, therefore, did not satisfy *Twombly*'s requirement that plaintiffs "make factual allegations sufficient to 'raise a right to relief above the speculative level.'" 845 F. Supp. 2d at 218-19 (quoting *Twombly*, 550 U.S. at 555); *see also Deripaska*, 282 F. Supp. 3d at 143-44 (rejecting argument that alleging actual malice is not necessary at the pleading stage). In other words, the courts of this district have repeatedly come to the same conclusion that has been reached by every court of appeals to look at the question—*Iqbal* and *Twombly* apply to defamation cases and, therefore, public figure plaintiffs must plead sufficient facts to plausibly allege actual malice.

## III.    PLAINTIFFS ARE PLAINLY LIMITED PURPOSE PUBLIC FIGURES.

After struggling mightily to avoid the plain requirement that actual malice must be plausibly plead in the complaint, Plaintiffs then attempt to argue that they are not public figures. The attempt fails—Plaintiffs' public figure status is readily apparent based on the face of the complaint, judicially noticeable public material, and prior court decisions.

A.      **The Relevant Public Controversy at Issue Is the Relationship between Russian Oligarchs and the Kremlin.**

In their Motion to Dismiss, Defendants identified a public controversy concerning the Russian oligarchs' relationship to the Kremlin.  Mot. at 26-27; *see also OAO Alfa Bank*, 387 F. Supp. 2d at 43-44 (identifying as a public controversy "[t]he rise of the oligarchs and the decline of the Russian economy" into a "criminal-syndicalist state"); *Deripaska*, 282 F. Supp. 3d at 142 ("there can be no doubt a public controversy exists relating to Russian oligarchs acting on behalf of the Russian government").  This public controversy is addressed in CIR 112 and remains pertinent.  In fact, just days ago, as the U.S. government imposed sanctions on a few Putin associates, U.S. Treasury Secretary Steven Mnuchin stated, "The Russian government operates for the disproportionate benefit of oligarchs and government elites . . . Russian oligarchs and elites who profit from this corrupt system will no longer be insulated from the consequences of their government's destabilizing activities."[6]

Without disputing the existence of the controversy identified by Defendants, Plaintiffs argue that the controversy at issue in this lawsuit is "alleged Kremlin interference in the [U.S. presidential] election."  Opp'n at 23.  Not so.  CIR 112 makes no mention whatsoever of the presidential election, except in the title, and none of the text has anything to do with that election or the alleged interference in it.  Accordingly, that is not a relevant public controversy in this case.  But even if the election-related controversy identified by Plaintiffs was relevant, because CIR 112 also addresses a broader public controversy related to the Russian oligarchs' relationship to the Kremlin, the public controversy identified by Defendants would still apply.

---

[6] Gardiner Harris, *Trump Administration Imposes New Sanctions on Putin Cronies*, N.Y. TIMES (Apr. 6, 2018), https://www.nytimes.com/2018/04/06/us/politics/trump-sanctions-russia-putin-oligarchs.html.

Indeed, publications can touch on multiple public controversies, some of which may be sub-controversies of a larger controversy.

Although Plaintiffs contend that the public controversy identified by Defendants is so broad that it would "effectively deem Plaintiffs general-purpose public figures," Opp'n at 25, Plaintiffs ignore that the D.C. Circuit has previously defined controversies even more expansively than Defendants propose in this case and has consistently rejected efforts by plaintiffs to narrow the controversy. *See, e.g.*, *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 585 (D.C. Cir. 2016) (defining the public controversy as "the progress of political and economic reform in Serbia and the integration of Serbia into international institutions in the post-Milosevic Serbian government, including the Prime Minister Djindjic regime" and rejecting plaintiff's attempt to narrow it), *cert. denied*, 137 S. Ct. 1434 (2017); *Tavoulareas v. Piro*, 817 F.2d 762, 774 (D.C. Cir. 1987) (identifying public controversy as "public policy toward the oil industry"); *see also Deripaska*, 282 F. Supp. 3d at 142 (rejecting Deripaska's argument that the controversy at issue was the "Trump Campaign Controversy" and holding "there can be no doubt a public controversy exists relating to Russian oligarchs acting on behalf of the Russian government.  For the purposes of the article in question—which touches on this broader issue as well as narrower concerns relating to the Trump campaign's contacts with Russia—Deripaska is a limited-purpose public figure.").

### B. Plaintiffs are Public Figures in the Public Controversy Related to the Russian Oligarchs' Relationship to the Kremlin

Plaintiffs' primary argument as to why they are not public figures in the controversy identified by Defendants is to dispute Defendants' reliance on Judge Bates's findings in *OAO Alfa Bank* on the grounds that the controversy identified by Judge Bates in that case is "not identical" to the one at issue here.  Opp'n at 20.  This argument has no force—regardless of the

relationship between the overlapping controversies at issue here and in *OAO Alfa Bank*, Judge Bates's observations about Plaintiffs are judicially noticeable and relevant to the controversy at hand. Furthermore, Defendants have not argued that Plaintiffs are public figures "based only on the holding of *OAO*." Opp'n at 21. To the contrary, Defendants' Motion to Dismiss cites abundant material that is publicly available and judicially noticeable also demonstrating Plaintiffs' public figure statuses.[7]

Plaintiffs next try to argue that they are not limited purpose public figures in the controversy identified by Defendants because they were not either "trying to influence the outcome or could realistically have been expected, because of [their] position in the controversy, to have an impact on its resolution." Opp'n at 20 (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980)). This argument ignores their role and prominence in Russian political affairs, as noted by Judge Bates and as reported in judicially noticeable material. *See* Mot. at 5-12.[8] As three of the thirteen "most famous oligarchs of the Putin era"

---

[7] Plaintiffs also make an odd statement for which they provide no authority: that the media articles cited by Defendants "cannot be judicially noticed in connection with a 12(b)(6) motion." Opp'n at 15. This is simply wrong; the Court may take judicial notice of publicly available articles, including articles attached to a defendant's motion to dismiss for the purposes of determining whether a plaintiff is a public figure. *See, e.g.*, *Farah*, 736 F.3d at 534; *Deripaska*, 282 F. Supp. 3d at 140, 142. These materials are not used to prove the truth of the matters asserted but to show the existence of the public controversy and Plaintiffs' prominence in it.

[8] *See, e.g.*, Andrew Jack & Arkady Ostrovsky, *Power broker in Russia's shifting scene: Alfa boss Mikhail Fridman*, FIN. TIMES (Aug. 29, 2003) (reproduced in Addendum to Motion to Dismiss) ("Mr. Fridman is a veteran Russian oligarch, one of the original seven who bankrolled former president Boris Yeltsin's election in 1996 in return for participation in cut-price 'loans for shares' privatisations. . . . Mr. Fridman has bridged the transition to the new regime of President Vladimir Putin more smoothly than most . . . In the years since Mr. Putin ordered the oligarchs to keep out of politics, Mr. Fridman has been cautious and discreet, observing the new rules of the game."); Howard Amos, *Russian Tycoon Fridman Should Make U.K. Feel Nervous*, MOSCOW TIMES (Mar. 10, 2015), https://themoscowtimes.com/articles/russian-tycoon-fridman-should-make-uk-feel-nervous-44604 ("While Fridman's access to top Russian officials is undisputed . . . he publicly distances himself from politics."); John Aglionby, *Profile: Mikhail Fridman – from rugs to riches*, FIN. TIMES (Mar. 2, 2015), https://www.ft.com/content/c5aafbe6-c0bf-11e4-876d-00144feab7de#axzz3hqmiAWh6 ("Mikhail Fridman, one of Russia's riches oligarchs and chairman of Alfa Group, has so far walked largely successfully along a tightrope . . . he has preserved his wealth by not falling out with Russian president Vladimir Putin."); *id.* ("Unlike many other oligarchs, Mr. Fridman has largely stayed out of Russian politics and sensitive sectors such as the media . . ."); Guy Chazan & John Thornhill, *Mikhail Fridman: The Alpha oligarch*, FIN. TIMES (Mar. 5, 2015), https://www.ft.com/content/b47de3d4-c325-11e4-ac3d-00144feab7de (noting Fridman "was one of the seven

(per Wikipedia) and the billionaire owners of one of the biggest privately owned financial

consortiums in Russia, Plaintiffs' relationship with the Kremlin is at the center of this

controversy (as well as at the center of CIR 112).  Indeed, given Plaintiffs' prominence and the

portrayal of their push and pull with the Kremlin (or, in the words of CIR 112, their "ups and

downs"),[9] Plaintiffs' relationship with the Kremlin realistically impacted the public controversy

---

oligarchs who helped bankroll Boris Yeltsin's re-election campaign in 1996 and exercised a huge influence over the Kremlin in the late 1990s.  Yet only three of them are still in business, testament to his street smarts and lack of overt political ambition," and quoting Fridman as saying that "[w]e have an ideology not to be involved in politics"); Jason Corcoran, *PROFILE: Mikhail Fridman – the Teflon oligarch new to Londongrad*, BNE INTELLINEWS (Apr. 11, 2016), http://www.intellinews.com/profile-mikhail-fridman-the-teflon-oligarch-new-to-londongrad-94873/ ("His oligarch peers from the 1990s have been incarcerated, exiled or had their assets seized, but Mikhail Fridman lives a charmed life, retaining much of his wealth without falling foul of the Kremlin. Now the Alfa Group founder has moved to London and is seemingly defying an edict to repatriate Russian wealth by splurging billions on foreign assets."); *id.* (quoting Fridman as saying, "Here [in Moscow], the most important factor of your success is the ability to build relationships with the government. . . . The power structure in Russia is huge—you're confronted with it everywhere."); *id.* ("Aven regularly meets with Putin at the President's Novo-Ogarevo residence and was even conferred with a state award for corporate citizenship personally by Putin in May last year."); Megan Davies & Melissa Akin, *Russian risks bear down on oligarch Fridman*, REUTERS (June 6, 2012), https://uk.reuters.com/article/us-russia-tnkbp-fridman/russian-risks-bear-down-on-oligarch-fridman-idUSBRE8550S420120606 ("More than a decade after Vladimir Putin succeeded Yeltsin and started reining in the oligarchs, Fridman is on the defensive as a new generation of businessmen snatch up assets and the Kremlin reasserts control over the economy.  His call for a divorce from BP, his partner in Russia's No.3 oil firm TNK-BP, and the $5 billion sale of his stake in mobile firm MegaFon are widely seen as evidence that he is following other oligarchs by cutting his exposure in Russia."); Mikhail Zygar, *All the Kremlin's Men: Inside the Court of Vladimir Putin* 57 (2016), available at https://books.google.com/books?id=ETrXCwAAQBAJ&q=aven#v=snippet&q=aven&f=false ("But Vladimir Putin did not sanction an assault on [Alfa], since he had known Alfa's head, Pyotr Aven, since the early 1990s and was even indebted to Aven for having brought him into the Kremlin elite . . . ."); Gregory L. White, *As Russia Squeezes Big Business, A Tycoon Decides to Pick a Fight*, WALL ST. J. (Oct. 6, 2005), https://www.wsj.com/articles/SB112856247619561303 ("So far, Alfa has managed to avoid trouble with the Kremlin itself.  Mr. Fridman has tried to insulate himself by hiring former top government officials as advisers, including Pyotr Aven, a former trade minister and an old friend of Mr. Putin who meets the president regularly. Mr. Fridman says he's careful to avoid anything that the Kremlin would see as a challenge to its control of national politics.").

[9] *See, e.g.*, Mot. at 11 & n.31 (discussing Plaintiffs' apparent willingness to disobey Putin's recent directive to them to reinvest the proceeds of the sale of TNK-BP in Russia); Chazan & Thornhill, *supra* note 8 (reporting that "Westerners were amazed at AAR's [a consortium including Fridman and Khan] audacity in stymying a transaction that had been negotiated by Igor Sechin, Rosneft's powerful chairman, and blessed by Mr. Putin himself. . . But Mr. Fridman's intervention did not appear to harm his standing with the Kremlin."); Jonathan Kandell, *Alfa's Mikhail Fridman Skirts Russian Sanctions to Invest Abroad*, INSTITUTIONAL INVESTOR (May 4, 2015), https://www.institutionalinvestor.com/article/b14z9vxcqbvzjy/alfas-mikhail-fridman-skirts-russian-sanctions-to-invest-abroad ("Is it possible for an oligarch to invest outside Russia without running afoul of Western sanctions or incurring Vladimir Putin's wrath? . . . Mikhail Fridman is betting that the answer to those questions is yes. More than any other Russian business executive, he has moved billions of dollars into foreign ventures while skirting Putin's dictate to invest at home."); Steve Levine, *The Last Free Oligarch*, FOREIGN POL'Y (July 25, 2012), http://foreignpolicy.com/2012/07/25/the-last-free-oligarch-2/ ("Russian oil tycoon Mikhail Fridman thought he

and the public perception of the relationship between the oligarchs and the Kremlin. *See OAO Alfa Bank*, 387 F. Supp. 2d at 25-29, 43-44, 46; Mot. at 5-12, 27-28.

## IV.   THE ALLEGATIONS IN THE COMPLAINT FAIL TO PLAUSIBLY PLEAD ACTUAL MALICE.

To state a claim, public figure plaintiffs like Fridman, Aven, and Khan must allege facts—not conclusions—that plausibly establish that Defendants published any allegedly defamatory statements in CIR 112 with "actual malice." *See supra* Part § II.  They have not done so.  Indeed, in their opposition, Plaintiffs try to argue that "the Amended Complaint's allegations *are consistent with* actual malice." Opp'n at 26 (emphasis added).  Leaving aside that this is emphatically *not* the applicable pleading standard under *Iqbal/Twombly*, this argument is most remarkable because Plaintiffs attempt it *without ever once citing to the Amended Complaint*.  In other words, in the section of their Opposition devoted to showing why their Amended Complaint adequately alleges actual malice, Plaintiffs do not—because they cannot—point to a single sentence in their Amended Complaint that even attempts to allege actual malice in a nonconclusory fashion.  Instead, Plaintiffs make a disjointed argument that the headline of CIR 112—which Plaintiffs insist on misconstruing—somehow indicates that there is "a material dispute of fact" about whether "the inclusion of [that] headline was reckless." Opp'n at 27.  But again, they do not point a single factual allegation in the Amended Complaint, let

could get away with crossing Vladimir Putin. He miscalculated -- badly. . . . The Kremlin did not approve of his latest scheme.  Why?  Putin seems to want Fridman out of the oil patch."); Gregory L. White, *TNK-BP Russian Partner Relishes Conflict*, WALL ST. J., Nov. 14, 2011, https://www.wsj.com/articles/SB10001424052970203503204577036000854767804 ("Mr. Khan says there has been no indication that Russian authorities have given the company the cold shoulder after the Rosneft mess, as some observers had predicted."); Gregory L. White, *As Russia Squeezes Big Business, A Tycoon Decides to Pick a Fight*, WALL ST. J., Oct. 6, 2005, https://www.wsj.com/articles/SB112856247619561303 ("Russian President Vladimir Putin has largely succeeded in his campaign pledge to make oligarchs . . . disappear 'as a class.' Now, most of the country's super-rich are either packing up or hunkering down and trying to stay on the government's good side. Except Mikhail Fridman. . . . Now, he's picking a fight with Leonid Reiman, Russia's telecommunications minister and a longtime Putin friend.").

alone one that could plausibly support recklessness or explain how the headline somehow creates a plausible inference of recklessness.

Plaintiffs also fall back on their repetitive call for discovery into Defendants' state of mind, relying on *Herbert v. Lando* and claiming the Supreme Court "reject[ed] an argument similar to that made by Defendants." Opp'n at 27 (citing 441 U.S. 153, 170 (1979)). But in *Herbert*, the Court did no more than hold that the privilege for a media defendant not to answer inquiries into the editorial process is not absolute. 441 U.S. at 169-70. In so holding, the Court did not make any broadly applicable pronouncements about the pleading standard for actual malice or a defamation plaintiff's entitlement to discovery about malice, as Plaintiffs contend. *Contra* Opp'n at 4, 27. The *Herbert* Court most certainly did not hold that if an "Amended Complaint does not contain any averments inconsistent with Plaintiffs' status as private figures [and] is not inconsistent with actual malice by Defendants," then the complaint "may not be dismissed . . . without affording Plaintiffs discovery from Defendants." *Id.* at 27. Plaintiffs cite no authority that has interpreted *Herbert* in this manner and for good reason—their argument flips *Twombly*'s pleading standard on its head and has been repeatedly rejected by courts of appeals that have looked at the question. *See, e.g.*, *Biro*, 807 F.3d at 546 ("To the extent that [the plaintiff] reads [a pre-*Twombly* case] . . . as permitting an implausible claim to proceed to discovery, we think *Twombly* rejected this approach."). In short, despite Plaintiffs' repeated protestations, they cannot obtain discovery without first pleading sufficient facts to make it plausible that Defendants published CIR 112 with actual malice. They have not come close.

## V.     PLAINTIFFS HAVE NOT PLED AN ACTIONABLE PUBLICATION.

Plaintiffs have also failed to state a claim for defamation because they have not pled that "defendant[s] published [CIR 112] without privilege to a third party."  *Jankovic*, 494 F.3d at 1088.

### A.     "Briefing" of Journalists

As Defendants argued in their Motion, there is no allegation or plausible inference that Defendants' alleged "briefing" of journalists in fall 2016 included any statements *about Plaintiffs*.  Mot. at 33-34.  Rather, Plaintiffs have alleged that Defendants briefed journalists as part of "a U.S. political operation conducted by the Defendants, whose focus [wa]s an alleged relationship (between the Kremlin and the Trump campaign) *which ha[d] nothing whatsoever to do with the Plaintiffs*."  Am. Compl. ¶ 1 (emphasis added).  Given that alleged focus and the allegation that the journalists being briefed were "devoted to breaking news on the hottest subjects of the day: the Trump candidacy and his election as President," *id.* ¶ 3, the plausible inference is that the briefings addressed the Trump campaign and its relations with the Kremlin, which CIR 112 does not address.

In their Opposition, Plaintiffs argue that paragraph 6 of the Amended Complaint supports a plausible inference that Defendants published statements about Plaintiffs to David Corn, a reporter for *Mother Jones*.  Opp'n at 28-29.  But paragraph 6 alleges no such thing.  Paragraph 6 alleges that Christopher Steele held "briefings" for various media outlets other than *Mother Jones* in September 2016, and gave an interview to *Mother Jones*'s David Corn in late October 2016.  Am. Compl. ¶ 6.  Whereas Plaintiffs allege that the September 2016 briefings were "arranged" by Defendants, *id.*, they do not allege that Defendants played any role whatsoever in the October 2016 interview with *Mother Jones*, *see id.*  Plaintiffs now try to argue that

14

Defendants were "operating through Steele" in that interview, Opp'n at 29, but the Amended Complaint contains no such allegation.  And even if Defendants were plausibly responsible for the *Mother Jones* interview, the allegation that the ensuing article "quoted from" the Dossier's "early reports," Am. Compl. ¶ 6, does not support a plausible inference that statements *about Plaintiffs* were published to *Mother Jones*, as Plaintiffs argue, *see* Opp'n at 28-29.  Indeed, the portions of the Dossier quoted in the *Mother Jones* article did not include any excerpts from CIR 112.[10]

Nor is it sufficient for Plaintiffs to allege as a general matter that Defendants "peddl[ed]" the Dossier to "media and journalists" without identifying a particular reporter who received CIR 112.  Am. Compl. ¶ 4.  *See, e.g.*, *Vreven v. Am. Ass'n of Retired Pers.*, 604 F. Supp. 2d 9, 15-16 (D.D.C.2009) (holding that "claims must be pleaded with particularity and specify the person or persons to whom the statements were made or published" and allegation that defendant "told [unnamed] others at AARP" was insufficient); *Am. Petroleum Inst. v. TechnoMedia Int'l, Inc.*, 699 F. Supp. 2d 258, 268 (D.D.C. 2010) (allegation that allegedly defamatory statements were published "throughout the [American Petroleum Institute] organization" held insufficient).

In short, the Amended Complaint contains no allegations that would create the plausible inference that Defendants published CIR 112 to any journalist.

### B.    Delivery of the Dossier to Senator McCain

In their Motion, Defendants demonstrated that the allegation that they provided the Dossier to David Kramer "for redelivery . . . to Senator McCain," Am. Compl. ¶ 7, could not satisfy the publication element of Plaintiffs' defamation claim because its alleged purpose was to

---

[10] *See* David Corn, *A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump*, MOTHER JONES (Oct. 31, 2016), https://www.motherjones.com/politics/2016/10/veteran-spy-gave-fbi-info-alleging-russian-operation-cultivate-donald-trump/  (cited in Am. Compl. ¶ 6 n.1).

inform a legislature on a matter within its jurisdiction, and as such, was absolutely privileged. *See* Mot. at 34-35 (citing *Webster v. Sun Co.*, 731 F.2d 1, 5 (D.C. Cir. 1984)).  Plaintiffs' primary response is to highlight the fact that Mr. Kramer was "a director at McCain's private foundation" rather than a member of "*legislative* staff for Senator McCain."  Opp'n at 32 (emphasis in original); *see also id.* at 32-33 ("Had [Defendants] [communicated the contents of the reports to legislative staff for Senator McCain], those particular acts of publication might, arguably, be privileged.").  That distinction is of no legal moment; the legislative privilege focuses on whether the *purpose* of a communication was to inform a legislative body, not whether the immediate recipient was the legislator himself, a member of his staff, or some other intermediary.  *See Webster*, 731 F.2d at 5 (evaluating purpose of a communication to the Congressional Research Service).  Here, the Amended Complaint plainly alleges that "[t]he *purpose* of th[e] meeting" that Defendants allegedly arranged between Steele and Kramer "was to show Kramer the [Dossier] *so he could brief Senator McCain*." Am. Compl. ¶ 7 (emphasis added).

Nor can Plaintiffs negate the legislative privilege by asserting that Defendants are "political operatives," as opposed to ordinary "individuals."  Opp'n at 33.  Plaintiffs cite no authority in support of such a distinction, and there is no principled reason why Defendants should receive less protection than any other individual or entity that seeks to inform a legislature on a manner within its purview.  Indeed, the very activity that the legislative privilege is designed to protect—communication intended "to initiate or discourage legislative action on a given issue"—is inherently political.  *Webster*, 731 F.2d at 5 n.10.  Defendants' alleged delivery of the Dossier, including CIR 112, to Senator McCain via Mr. Kramer was therefore privileged.

## C.  Publication of CIR 112 to Fusion's Client

Defendants established in their Motion that their alleged publication of CIR 112 to their client, Perkins Coie, and Perkins Coie's alleged republication of CIR 112 to its clients, the Clinton campaign and the DNC, were privileged.  *See* Mot. at 36 (citing *Payne v. Clark*, 25 A.3d 918, 925 (D.C. 2011)).  Plaintiffs' only response is to argue that this privilege, even if it existed "at one point," subsequently dissipated because of Defendants supposed *other* publications of CIR 112, which, in Plaintiffs' view, amounted to "excessive publication."  Opp'n at 35 (citing *Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C. 1990)).

The "excessive publication" doctrine does not provide that an otherwise privileged publication loses its privileged status by virtue of a separate and distinct publication.  The term "excessive publication" simply describes publications for which the "grounds for privilege do not exist."  *Moss*, 580 A.2d at 1024 (citing *Joftes v. Kaufman*, 324 F. Supp. 660, 664 (D.D.C. 1971)); *see also* 1 Robert D. Sack, *Sack on Defamation* § 9:3.5[A] (5th ed. 2017) (explaining that "excessive publication," though sometimes cited as grounds for "loss of the privilege," "perhaps more accurately" refers to circumstances in which "the statement . . . is not privileged in the first place").  Defendants raise the common-interest privilege only as to their alleged publication of CIR 112 to Perkins Coie, and Plaintiffs have no argument for why *that alleged publication* was "excessive" relative to the common interest between Defendants and Perkins Coie (and between Perkins Coie and its clients).  For the reasons described previiously, Plaintiffs have failed to adequately allege that Defendants' other conduct amounted to non-privileged publication of CIR 112, but in any event, that other conduct has no bearing on whether the alleged publication of CIR 112 to Perkins Coie was privileged.

17

### D.    BuzzFeed's Publication of CIR 112

Plaintiffs have failed to plausibly allege facts that would support holding Defendants responsible for BuzzFeed's publication of CIR 112.   There is no allegation that Defendants "w[ere] responsible for or ratified" BuzzFeed's publication.   *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002).   Nor are there any allegations that could plausibly support the conclusion that BuzzFeed's publication of CIR 112 was reasonably foreseeable to Defendants, even if such allegations could support holding Defendants responsible.   *See* Mot. at 38.   At most, the Amended Complaint alleges that Defendants arranged for Steele to brief *other journalists* on certain of the Dossier's contents related to Russian interference in the 2016 election.   *See* Am. Compl. ¶ 6.   But try as they might, Plaintiffs simply cannot identify any allegation in their Amended Complaint that Defendants shared the Dossier *with BuzzFeed* or took any action that would have made it foreseeable that *BuzzFeed* would obtain and publish CIR 112.[11]

## VI.    ANY PUBLICATION BY DEFENDANTS WAS A PRIVILEGED NEUTRAL REPORT

Finally, any publication of CIR 112 by Defendants was privileged under the doctrine of neutral reportage.   CIR 112 recited newsworthy matters on which a "top level Russian government official commented."   Mot., Ex. 1.   CIR 112 reported those statements in a manner that was "accurate[] and disinterested," and without embellishment.   *Barry v. Time, Inc.*, 584 F.

---

[11] The Court should give no credence to Plaintiffs' cursory argument that, by filing an Anti-SLAPP motion and by invoking the neutral reportage privilege, Defendants have somehow admitted that they published CIR 112.   *See* Opp'n at 38.   These grounds for dismissal are obviously available in the alternative, and in invoking them, Defendants have made abundantly clear that they do not concede that Plaintiffs have adequately pled publication.   *See* Mot. at 38 ("*Any publication* of CIR 112 is privileged under the doctrine of neutral reportage." (emphasis added)); Defs.' Mem. in Supp. of Defs.' Special Mot. to Dismiss under the D.C. Anti-SLAPP Act 4, ECF No. 19-1 ("To be clear, Defendants do not accept the Amended Complaint's allegations as true.   And, as explained in Defendants' Motion to Dismiss for Failure to State a Claim, Plaintiffs' allegations fail for several reasons, including . . . failure to allege actionable publication, among other defects.").

Supp. 1110, 1123 (N.D. Cal. 1984).  Accordingly, even if Defendants published CIR 112, that publication was privileged under the doctrine of neutral reportage.

Plaintiffs seek to dodge the neutral reportage privilege by pointing out that it has not yet been adopted by the D.C. Circuit or the District of Columbia courts, ignoring that a local judge persuasively held that "the logic of the doctrine, coupled with the weight of federal precedent, favor adoption of a neutral reportage doctrine in this circuit." *In re United Press Int'l*, 106 B.R. 323, 329 (D.D.C. 1989); *see also* 1 *Sack on Defamation* § 7:3.5[D][3] ("Most jurisdictions probably would apply it in the right case." (quoting David A. Anderson, *Is Libel Law Worth Reforming?*, 140 U. Pa. L. Rev. 487, 504 (1994)).  Plaintiffs contend that the neutral reportage doctrine "fl[ies] in the face of" the actual-malice standard. Opp'n at 40. But the doctrine appropriately deals with scenarios where a statement "is published because its utterance is of public interest, not because it is believed to be true." 1 *Sack on Defamation* § 7:3.5[D][1]; *accord Edwards v. Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113, 120 (2d Cir. 1977).  The statements in CIR 112 were newsworthy merely by virtue of having been made, and were thus protected under the doctrine of neutral reportage.

Plaintiffs' last resort is to argue that Steele's reporting in CIR 112 was "not neutral" because it was "undertaken on a paid basis for a particular political purpose."  Opp'n at 41-42. But the neutral reportage doctrine turns on how a publisher, here alleged to be Defendants, presents a statement—not the publisher's motives.  *See United Press Int'l*, 106 B.R. at 330 (explaining that what matters is "that a reporter not espouse or concur in the matter reported"). The Amended Complaint contains no allegations that Defendants endorsed the statements in CIR 112.  The case on which Plaintiffs rely involved an article that was not neutral because it "advocated [the] credibility" of the source whose statement it repeated.  Opp'n at 41 (quoting

19

*McFarlane v. Esquire Mag.*, No. 92-0711, 1994 U.S. Dist. LEXIS 9497, *38-39 (D.D.C. 1994)). That scenario bears no resemblance to CIR 112, which simply recited the comments of a "top level Russian government official," Mot., Ex. 1, without any effort to bolster that official or endorse his or her comments—a classic neutral report.

## CONCLUSION

For the foregoing reasons and those set forth in the Motion to Dismiss, Defendants respectfully request that the Court dismiss Plaintiffs' Amended Complaint.


Dated:  April 16, 2018                                Respectfully submitted,

                                                      /s/ Steven M. Salky
                                                      William W. Taylor, III (DC Bar No. 84194)
                                                      Steven M. Salky (DC Bar No. 360175)
                                                      Rachel F. Cotton (DC Bar No. 997132)
                                                      **ZUCKERMAN SPAEDER LLP**
                                                      1800 M Street, N.W., Suite 1000
                                                      Washington, D.C. 20036
                                                      Tel: (202) 778-1800
                                                      Fax: (202) 822-8106
                                                      wtaylor@zuckerman.com
                                                      ssalky@zuckerman.com
                                                      rcotton@zuckerman.com

                                                      *Attorneys for Defendants Bean LLC a/k/a*
                                                      *Fusion GPS and Glenn Simpson*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of April 2018, I electronically filed and served the foregoing using the CM/ECF system.

*/s/ Rachel F. Cotton*
Rachel F. Cotton