**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MIKHAIL FRIDMAN, PETR AVEN, and GERMAN KAHN<br><br>           Plaintiffs,<br><br>   v.<br><br>BEAN LLC a/k/a FUSION GPS, and GLENN SIMPSON,<br><br>           Defendants. | Civil Case No. 17-2041 (RJL) |

<u>**NOTICE OF SUPPLEMENTAL AUTHORITY**</u>

As this Court is aware, Plaintiffs Fridman, Aven and Khan brought a companion defamation case against Christopher Steele and Orbis Business Intelligence Limited in the D.C. Superior Court, captioned as *Fridman et al. v. Orbis Business Intelligence Ltd. and Christopher Steele*, Case No. 2018 CA 18-0002667B. This companion case was based on virtually identical facts as those alleged in this case and the legal issues significantly overlap. Defendants Fusion GPS and Glenn Simpson previously filed a Notice attaching the briefing of the motions to dismiss filed in that case. *See* ECF No. 33.

Yesterday, Judge Anthony C. Epstein granted Mr. Steele and Orbis's special motion to dismiss the companion complaint under the District of Columbia's Anti-SLAPP Act, D.C. Code § 16-5502(a). Judge Epstein's Order dismissing the case is attached as Exhibit A.

Among other rulings made by Judge Epstein that are relevant to this Court's determination of Defendants' pending motions, the Order concludes that:

(a)     Defendants Steele and Orbis "made a prima facie showing that Plaintiffs' claims arise from 'an act in furtherance of the right of advocacy on issues of public interest' within the meaning of § 16-5501(1) [the D.C. Anti-SLAPP Act]," Ex. A at 12;

(b)     Plaintiffs Fridman, Aven and Khan "are limited-purpose public figures for the broad controversy related to Russian oligarchs' involvement with the Russian government and its activities and relations around the world, including the United States," *id.* at 18;

(c)     Plaintiffs do not have a likelihood of success on the merits of their defamation claim because they have no evidence of actual malice. *Id.* at 18-19.  For example, they did not offer evidence that "Mr. Steele in fact had subjective doubts or recklessly disregarding information about [CIR 112's] falsity, or that Defendants had obvious reason to doubt the source described in CIR 112 as a 'trusted compatriot' of a 'top level Russian government official.' . . . Moreover, the information in the Steele Dossier about corrupt payments to Russian public officials was consistent with other information in the public domain" about Plaintiffs Aven and Fridman, *id.* at 20-21;

(d)     No discovery was warranted into Defendants' state of mind.  *Herbert v. Lando*, 441 U.S. 453 (1979) "holds only that in a case where discovery is warranted, the First Amendment does not allow a media entity to claim absolute privilege over its editorial processes. *Herbert* does not hold that the Constitution gives an absolute right to discovery by any plaintiff who has the burden to show actual malice by clear and convincing evidence and who can only speculate that discovery will enable him to prove his case."  Ex. A at 23.

Given the similarity of the factual and legal issues in that case, Fusion submits the attached Order as particularly relevant supplemental authority.

Dated:  August 21, 2018

Respectfully submitted,

*/s/ Rachel F. Cotton*
William W. Taylor, III (DC Bar No. 84194)
Steven M. Salky (DC Bar No. 360175)
Rachel F. Cotton (DC Bar No. 997132)
**ZUCKERMAN SPAEDER LLP**
1800 M Street, N.W., Suite 1000
Washington, DC 20036
Tel:  (202) 778-1800
Fax:  (202) 822-8106
wtaylor@zuckerman.com
ssalky@zuckerman.com
rcotton@zuckerman.com

*Attorneys for Defendants Fusion GPS and Glenn Simpson*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of August 2018, I caused the foregoing to be electronically filed and served using the CM/ECF system.


Respectfully submitted,

*/s/ Rachel F. Cotton*
Rachel F. Cotton

# EXHIBIT A

Filed
D.C. Superior Court
08/20/2018 15:56PM
Clerk of the Court

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

GERMAN KHAN, *et al.*              :
                                   :
v.                                 :          Case No. 2018 CA 002667 B
                                   :
ORBIS BUSINESS INTELLIGENCE        :
LIMITED, *et al.*                  :

**ORDER**

The Court grants the special motion to dismiss filed by defendants Orbis Business

Intelligence Limited ("Orbis") and Christopher Steele under the D.C. Anti-SLAPP Act, D.C.

Code §§ 16-5501 to -5505. The Court therefore denies as moot Defendants' motion to dismiss

under Rule 12(b)(6)for failure to state a claim upon which relief can be granted.

This case involves what has become known as the "Steele Dossier." The relatively small

portion of the Steele Dossier at issue in this case discusses the relationship between plaintiffs

German Khan, Mikhal Fridman, and Petr Aven and the Russian government, but it does not

discuss specific information linking them to any Russian interference in the 2016 U.S.

presidential election or to any specific American candidate. Defendants' special motion to

dismiss does not require the Court to determine whether any information in the Steele Dossier is

accurate or inaccurate. The purpose of such a motion is not to determine whether the defendant

actually committed the tort of defamation. *See Competitive Enterprise Institute v. Mann*, 150

A.3d 1213, 1230 (D.C. 2016). The Court concludes only that the Anti-SLAPP Act requires

dismissal of this case because Defendants have made a prima facie case that the Act applies to

their provision of this portion of the Steele Dossier to the media, and Plaintiffs have not

submitted evidence that Defendants knew any of this information was false or acted with

reckless disregard of its falsity.

1

## I.    BACKGROUND

On April 16, 2018, Plaintiffs filed a complaint against Defendants for defamation. Plaintiffs make the following allegations in their complaint.  Plaintiffs are international businessmen who are the beneficial owners of Alfa-Bank (a.k.a. Alfa Group), which is based in Russia; Mr. Fridman and Mr. Khan are each citizens of both Russia and Israel, and Mr. Aven is a citizen of Russia.[1]  Complaint ¶¶ 1, 15.  Mr. Steele is a U.K. citizen and a principal of Orbis, a U.K.-based company.  *See id.* ¶¶ 16-17.  Defendants were hired in June 2016 by Fusion GPS ("Fusion"), a Washington, D.C.-based firm that conducts political opposition research, to compile information about then-candidate Donald J. Trump's ties to Russia and Vladimir Putin. *Id.* ¶ 5.  Fusion was originally hired during the primary phase of the 2016 election cycle by Republicans.  *Id.*  After the Republican convention, Fusion was hired by the Democratic National Committee and the campaign of Hillary Clinton.  *Id.*

Mr. Steele compiled the Steele Dossier between June 2016 and October 2016.  *See* Complaint ¶¶ 5-8.  The Steele Dossier consists of seventeen Company Intelligence Reports ("CIR").  *Id.*  This case focuses on CIR 112, a one-and-a-half page document entitled "RUSSIA/US PRESIDENTIAL ELECTION:  KREMLIN-ALPHA GROUP CO-OPERATION." CIR 112 (Special Motion to Dismiss Ex. B).  CIR 112 identifies Mr. Fridman, Mr. Aven, and Mr. Khan as "oligarchs" who lead the Alfa Group.  The summary makes three points:

- Alfa Group has a close relationship with President Vladimir Putin of Russia:  "Significant favours continue to be done in both directions and FRIDMAN and AVEN still giving informal advice to PUTIN, especially on the US."

---

[1]  Alfa-Bank is spelled as "Alpha" throughout the Steele Dossier.  The Court uses Plaintiffs' spelling.

- The "[k]ey intermediary" in the relationship is Oleg Govorun, who "delivered illicit cash directly to PUTIN" throughout the 1990s when President Putin was the deputy mayor of St. Petersburg.

- President Putin is not personally bothered about Alfa's current lack of investment in Russia, but he is "able to exploit it as lever over Alpha interlocutors."

The body of CIR 112 does not refer the 2016 U.S. presidential election. CIR 112 also does not contain a specific allegation that any Plaintiff gave advice to President Putin relating to the election or attempted to influence the election in any way, or that Alfa Group's "cooperation" with the Russian government extended to the election. CIR 112 states that "FRIDMAN and AVEN continued to give informal advice to PUTIN on foreign policy, and especially about the US where he distrusted advice being given to him by officials." CIR 112 states that Mr. Fridman and Mr. Aven used Mr. Govorun in the 1990s to "deliver large amounts of illicit cash to the Russian president, at the time deputy Mayor of St. Petersburg."

In the summer of 2016, Mr. Steele briefed members of the print and online media about the contents of the Steele Dossier. Complaint ¶ 9. On January 10, 2017, BuzzFeed, Inc. published the full Steele Dossier, including CIR 112. *See id.* ¶ 12.

On May 30, 2018, Defendants filed a special motion to dismiss ("Motion") and a motion to dismiss under Rule 12(b)(6). On July 6, Plaintiffs filed an opposition to both the special motion to dismiss ("Opp.") and the Rule 12(b)(6) motion. On July 24, Defendants filed a reply in support of their special motion to dismiss ("Reply") and a reply in support of their Rule 12(b)(6) motion.

## II.      LEGAL STANDARD

### A.      The Anti-SLAPP Act

"A 'SLAPP' (strategic lawsuit against public participation) is an action 'filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view.'" *Mann*, 150 A.3d at 1226 (quoting legislative history).  The Anti-SLAPP Act tries "to deter SLAPPs by 'extend[ing] substantive rights to defendants in a SLAPP, providing them with the ability to file a special motion to dismiss that must be heard expeditiously by the court.'" *Id.* at 1235 (quoting legislative history).  "Consistent with the Anti-SLAPP Act's purpose to deter meritless claims filed to harass the defendant for exercising First Amendment rights, true SLAPPs can be screened out quickly by requiring the plaintiff to present her evidence for judicial evaluation of its legal sufficiency early in the litigation." *Id.* at 1239.

"Under the District's Anti-SLAPP Act, the party filing a special motion to dismiss must first show entitlement to the protections of the Act by 'mak[ing] a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest.'" *Mann*, 150 A.3d at 1227 (quoting D.C. Code § 16-5502(b)).

"Once that prima facie showing is made, the burden shifts to the nonmoving party, usually the plaintiff, who must 'demonstrate[] that the claim is likely to succeed on the merits.'" *Mann*, 150 A.3d at 1227 (quoting § 16-5502(b)).  "[O]nce the burden has shifted to the claimant, the statute requires more than mere reliance on allegations in the complaint, and mandates the production or proffer of evidence that supports the claim." *Id.* at 1233.  "[I]n considering a special motion to dismiss, the court evaluates the likely success of the claim by asking whether a jury properly instructed on the applicable legal and constitutional standards could reasonably find that the claim is supported in light of the evidence that has been produced or proffered in connection with the motion." *Id.* at 1232.  "This standard achieves the Anti-SLAPP Act's goal

of weeding out meritless litigation by ensuring early judicial review of the legal sufficiency of the evidence, consistent with First Amendment principles, while preserving the claimant's constitutional right to a jury trial." *Id.* at 1232-33.

"If the plaintiff cannot meet that burden [to establish a likelihood of success], the motion to dismiss must be granted, and the litigation is brought to a speedy end." *Mann*, 150 A.3d at 1227. Section 16-5502(d) provides, "If the special motion to dismiss is granted, dismissal shall be with prejudice." Section 16-5502(d) also requires the Court to hold an "expedited hearing" on the motion and to issue a ruling "as soon as practicable after the hearing."

Under D.C. Code § 16-5502(c)(1), the filing of a motion to dismiss generally results in an automatic stay of discovery "until the motion has been disposed of." Section 16-5502(c)(2) provides for an exception: "When it appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the discovery will not be unduly burdensome, the court may order that specified discovery be conducted."

## B.    Defamation

"To succeed on a claim for defamation, a plaintiff must prove (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement met the requisite standard; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Mann*, 150 A.3d at 1240 (quotation and brackets omitted).

"A statement is defamatory if it tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Mann*, 150 A.3d at 1241 (quotation and brackets omitted). "To evaluate whether a statement is capable of

defamatory meaning, courts employ a two-part framework that asks:  (a) whether a communication is capable of bearing a particular meaning, and (b) whether that meaning is defamatory." *Zimmerman v. Al Jazeera America, LLC*, 246 F. Supp. 3d 257, 273 (D.D.C. 2017) (quotations and citation omitted).

In defamation cases that rely on statements made about public figures concerning matters of public concern, plaintiffs must prove – by clear and convincing evidence – that defendants acted with actual malice. *Mann*, 150 A.3d at 1251-52.  "A plaintiff may prove actual malice by showing that the defendant either (1) had subjective knowledge of the statement's falsity, or (2) acted with reckless disregard for whether or not the statement was false." *Id.* at 1252 (quotation omitted); *see New York Times v. Sullivan*, 376 U.S. 254, 280-81 (1964).  "The 'reckless disregard' measure requires a showing higher than mere negligence; the plaintiff must prove that 'the defendant in fact entertained serious doubts as to the truth of [the] publication.'" *Mann*, 150 A.3d at 1252 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

The "actual malice" standard applies to statements about public figures.  A public figure can be either a limited-purpose public figure or a general-purpose public figure:

> General purpose public figures because of their position of such pervasive power and influence are deemed public figures for all purposes.  Limited-purpose public figures, that is, individuals who assume roles in the forefront of particular public controversies in order to influence the resolution of the issues involved, are deemed public figures only for purposes of the controversy in which they are influential.

*Doe No. 1 v. Burke*, 91 A.3d 1031, 1041 (D.C. 2014) (citations and quotations omitted).  The Court of Appeals has adopted a three-part test as a roadmap to determine whether an individual is a limited-purpose public figure.  *Moss v. Stockard*, 580 A.2d 1011, 1030 (D.C. 1990) (following *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980)).  The Court "should first decide whether there is a public controversy, and determine its scope." *Moss*,

580 A.2d at 1030.  "[T]his inquiry has two components:  (1) whether the controversy to which

the defamation relates was the subject of public discussion prior to the defamation, … and (2)

whether a reasonable person would have expected persons beyond the immediate participants in

the dispute to feel the impact of its resolution."  *Id.* (quotation omitted).  Second, the Court must

determine the plaintiff's role in the controversy:  "The plaintiff must have achieved a special

prominence in the debate, and either must have been purposely trying to influence the outcome

or could realistically have been expected, because of his position in the controversy, to have an

impact on its resolution."  *Id.* (quotation from *Waldbaum* omitted).  "In undertaking this analysis,

a court can look to the plaintiff's past conduct, the extent of press coverage, and the public

reaction to his conduct and statements."  *Waldbaum*, 627 F.2d at 1297.  The third and last

"question is whether the alleged defamation was germane to the plaintiff's participation in the

controversy."  *Moss*, 580 A.2d at 1031.

## III.   DISCUSSION

Plaintiffs make four arguments:  (a) Defendants cannot seek protection under the Anti-

SLAPP Act because they are not entitled to any protections under the First Amendment; (b)

Defendants do not make a prima facie case under the Anti-SLAPP Act that Plaintiffs' claims

arise from an act in furtherance of the right of advocacy on issues of public interest; (c) Plaintiffs

have shown they are likely to succeed on the merits; and (d) Plaintiffs are at least entitled to

targeted discovery to enable them to defeat the motion.  The Court addresses each argument in

turn.

### A.   Applicability of First Amendment protections

Plaintiffs contend that the Anti-SLAPP Act does not apply unless the First Amendment

applies and that Defendants do not have First Amendment rights because Mr. Steele is a non-

resident alien with British citizenship and Orbis is a U.K.-based company.  *See* Opp. at 1.  The

Court does not agree.

The Court assumes without deciding that the Anti-SLAPP Act applies only to conduct

that is protected by the First Amendment.  "To establish the grounds for either of the two

procedural protections the Anti-SLAPP statute affords – dismissal of the suit or quashing of a

subpoena – the moving party must show that his speech is of the sort that the *statute* is designed

to protect."  *See Doe No. 1*, 91 A.3d at 1036 (emphasis added).  The Act does not explicitly limit

its protection to activity that is also protected by the First Amendment, and indeed the Act's

legislative history indicates that the Council intended the Act to apply more broadly.[2]  In

addition, by its terms, the Anti-SLAPP Act does not limit its protections to U.S. citizens or

entities.  Although Plaintiffs argue otherwise (Opp. at 1), the plain language of D.C. Code § 16-

5502(a) indicates that any party can file a special motion to dismiss.  Reading an implied

limitation to District residents into the Act would be contrary to the purposes of the Act and the

First Amendment to provide broad protection for speech on issues of public interest (as the Court

discusses in the next paragraph).  In addition, Plaintiffs have not cited, and the Court is not aware

---

[2]  Section 2(1)(B) of the initial  version of the Anti-SLAPP Act introduced in June 2010
defined protected activity to include "any other conduct in furtherance of the exercise of the
constitutional right to petition the government or the constitutional right of free expression in
connection with an issue of public interest."  *See* Bill 18-893: "Anti-SLAPP Act of 2010"
(Motion Ex. A).  In September 2010, the American Civil Liberties Union of the Nation's Capital
("ACLU") proposed changing this definition because the "purpose of an anti-SLAPP law is to
provide broader protection than existing law already provides," and courts should not have to
determine whether conduct is covered by the Constitution before they can determine whether it is
protected by the Act.  *See* Testimony of the American Civil Liberties Union of the Nation's
Capital at 5 (Motion Ex. A).  Section 16-5501(1)(B) codifies the ACLU's proposed alternative
by making the Act applicable to "Any other expression or expressive conduct that involves
petitioning the government or communicating views to members of the public in connection with
an issues of public interest."  *See id.* at 5.

of, any case holding that the defenses that a defendant in a defamation case may assert under

D.C. law or the First Amendment depend on whether the defendant is a U.S. citizen or entity.[3]

       Plaintiffs contend that even if Defendants' speech involves issues of public interest in the

United States, it is unprotected by the First Amendment because Mr. Steele is not a U.S. citizen

or resident and Orbis is not a U.S. company.  However, advocacy on issues of public interest has

the capacity to inform public debate, and thereby furthers the purposes of the First Amendment,

regardless of the citizenship or residency of the speaker.  The First Amendment protects our

"profound national commitment to the principle that debate on public issues should be

uninhibited, robust, and wide-open." *New York Times v. Sullivan*, 376 U.S. at 270.

Constitutional standards for defamation cases have been developed to safeguard the "important

societal interest in vigorous debate over matters of public concern protected by the First

Amendment." *See Mann*, 150 A.3d at 1241.  Moreover, the First Amendment "guarantees are

not for the benefit of the press so much as for the benefit of all of us." *Time, Inc. v. Hill*, 385

U.S. 374. 389 (1967).  "It is now well established that the Constitution protects the right to

receive information and ideas." *Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972) (citations

and quotations omitted).  As a result, the interest of U.S. citizens in receiving information that

---

[3]  It is ironic that Plaintiffs, who are non-resident aliens with Russian and/or Israeli citizenship (Complaint ¶ 15), argue that non-resident aliens do not have rights that the First Amendment requires a U.S. court to respect – while petitioning a U.S. court for a redress of their grievances and invoking a constitutional right to conduct discovery (Opp. at 25). *See Stuart v. Walker*, 143 A.3d 761, 767 (D.C. 2016) ("[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government.") (quoting *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011)); *Douglas v. Kriegsfeld Corp.*, 849 A.2d 951, 994 (D.C. 2004) ("The right of access to the courts is but one aspect of the broader right, protected by the First Amendment, to petition the government for redress of grievances," and "[m]eaningful access to the courts is a fundamental right of citizenship in this country.") (quotations omitted).  Plaintiffs do not explain why non-resident aliens have the same rights as U.S. citizens to bring defamation actions, but non-resident aliens do not have the same rights as U.S. citizens to defend themselves.

the First Amendment protects does not depend on whether the speaker is a U.S. citizen or resident.

It is in this context that the Court evaluates Plaintiffs' argument that the First Amendment does not apply to Defendants' speech.  It is well established that non-citizens "enjoy certain constitutional rights."  *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (citing *Plyler* v. *Doe*, 457 U.S. 202, 211-212 (1982) (illegal aliens are protected by Equal Protection Clause); *Kwong Hai Chew* v. *Colding*, 344 U.S. 590, 596 (1953) (resident alien is a "person" within the meaning of the Fifth Amendment); *Bridges* v. *Wixon*, 326 U.S. 135, 148 (1945) (resident aliens have First Amendment rights); *Russian Volunteer Fleet* v. *United States*, 282 U.S. 481 (1931) (Just Compensation Clause of Fifth Amendment); *Wong Wing* v. *United States*, 163 U.S. 228, 238 (1896) (resident aliens entitled to Fifth and Sixth Amendment rights); *Yick Wo* v. *Hopkins*, 118 U.S. 356, 369 (1886) (Fourteenth Amendment protects resident aliens)). *Verdugo-Urquidez*, 494 U.S. at 259, indicates that a non-citizen must have "substantial connections with the country" before he can "receive constitutional protections."  *See Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950) ("The alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society.").

To paraphrase *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192, 202 (D.C. Cir. 2001), the Court need not undertake to determine, as a general matter, how "substantial" a non-resident alien's connections with this country must be to merit the protections of the First Amendment for speech in the United States.  The Court need not define the precise line because Mr. Steele and Orbis and their speech have ample connections with the United States that are clearly substantial enough to merit First Amendment protection.

According to Plaintiffs' own complaint, U.S. clients hired Mr. Steele and Orbis, and a U.S. presidential candidate was the subject of the investigation that they were hired to conduct. *See* Complaint ¶ 5. Furthermore, Mr. Steele was in the United States when he briefed U.S.-based media organizations about the results of his investigation, and Plaintiffs do not dispute that Mr. Steele was lawfully present in the United States when he provided his briefings.[4] These U.S.-based media organizations reported on allegations in the Steele Dossier in the United States. *See id.* ¶¶ 9, 11. Plaintiffs themselves allege that the Court has jurisdiction because "Orbis and Steele transacted business in the District of Columbia." Complaint ¶ 20. Plaintiffs' summary of their jurisdictional allegations is apt: "In sum, Steele, acting for himself and Orbis, has engaged in a persistent course of conduct, often with Fusion and Simpson, intended to have and which did have effects in the District, by meeting with District based media and government employees to bring his reports on 'Russia matters' to their attention." Complaint ¶ 20; *see id.* ¶ 1 (Fusion is based in Washington, and Glenn Simpson is Fusion's principal).

Moreover, Plaintiffs recognize that Mr. Steele had substantial ongoing connections with the United States even before U.S. clients hired him to gather information relating to the 2016 presidential election:

> Steele, on behalf of himself and Orbis, has engaged in other ongoing business relationships with entities located in the District. Steele and Orbis have been retained repeatedly by the District-based F.B.I. to assist in various investigations between 2009 and 2016, and, as alleged above, Steele and Orbis have had an ongoing professional relationship with Fusion for years. And as also noted above, according to Winer, during his 2013-2016 employment at the State Department in the District, Steele/Orbis provided over 100 intelligence reports, many of which Winer shared with other State Department officials.

Complaint ¶ 21.

---

[4] The Court does not suggest that aliens who are not legally present in the United States automatically lack First Amendment rights. This case does not present that issue.

Plaintiffs argue that "Defendants must show that they have, in some form, assumed the obligations of the people," Opp. at 5 (quotation and citation omitted), and Defendants assumed at least one important "obligation" of "the people" – by accepting the Court's jurisdiction, Defendants assumed the obligation to pay any judgment that might ultimately be entered against them in a U.S. court.  By assuming this obligation, Defendants also assumed the concomitant right to raise the same defenses available to U.S. citizens and resident aliens who are sued for defamation.

Plaintiffs rely on *Hoffman v. Bailey*, 996 F. Supp. 2d 477 (E.D. La. 2014), which held that a British national could not invoke the Louisiana Anti-SLAPP Act because he did not have First Amendment protection.  *See* Opp. at 4-5.  However, in *Hoffman*, the defendant's only contact with the United States was that he sent the email that formed the basis of the defamation claim to a Louisiana resident.  *See Hoffman*, 996 F. Supp. at 488-89.  Here, Defendants and their speech have far more substantial contacts with the United States.

Because Defendants have substantial and ongoing connections with the United States and their speech in the United States concerns matters of public concern in the United States, Defendants' speech is protected by the First Amendment.  Therefore, even if the Anti-SLAPP Act protects only speech also protected by the First Amendment their speech is covered by the Act.

**B.      Prima facie showing**

Defendants have made a prima facie showing that Plaintiffs' claims arise from "an act in furtherance of the right of advocacy on issues of public interest" within the meaning of § 16-5501(1).  Section 16-5501(1) defines an "act in furtherance of the right of advocacy on issues of public interest" to include "[a]ny written or oral statement made … [i]n a place open to the

public or a public forum in connection with an issue of public interest; … or [a]ny other

expression or expressive conduct that involves … communicating views to members of the

public in connection with an issue of public interest."  Section 16-5501(3) defines an "issue of

public interest" to include an issue related to "community well-being" or "a public figure."

### 1.    The right of advocacy

Plaintiffs themselves allege that Defendants "intended, anticipated or foresaw" that

providing a copy of the Steele Dossier, including CIR 112, to third parties would likely result in

the Steele Dossier being published by the media, and that "[b]y their direct and intentional

publication to third parties … the Defendants published to a worldwide public false and

defamatory statements concerning Plaintiffs and Alfa."  *See* Comp. ¶¶ 13, 43.  The Court

disagrees with both of Plaintiffs' two arguments that Defendants' provision of the Steele Dossier

to the media with this intent and expectation was not "an act in furtherance of the right of

advocacy."

First, Plaintiffs contend that Defendants' statements to the media were outside the scope

of the Anti-SLAPP Act because "the Complaint [does not] allege or suggest that Defendants'

defamatory statements were made 'in a place open to the public or a public forum.'"  Opp. at 7

(quoting § 16-5501(1)(A)(ii));  *id* at 8 ("it is dubious that Defendants' private discussions with

members of the media and others constitute 'public' statements or expressions").  However,

§ 16-5501(1) applies in the disjunctive either to statements "[i]n a place open to the public or a

public forum in connection with an issue of public interest; … *or* [a]ny other expression or

expressive conduct that involves … communicating views to members of the public in

connection with an issue of public interest."  (Emphasis added.)  Even if Mr. Steele did not meet

with the media in a public place or forum, he engaged in expression involving communicating

information to members of the U.S. public through the media.  As the Court explains above,

Plaintiffs challenge Mr. Steele's provision of his dossier to the media precisely because he

expected and intended the media to communicate the information to the public in the United

States and around the world.

Second, Plaintiffs argue that "the Complaint's allegations in no way suggest that Steele

was hired to express '*views*,' or that he did so," and they suggest that the Anti-SLAPP Act does

not protect the provision of "raw intelligence" to the media.  *See* Opp. at 7-8 (emphasis in

original).  However, the public is interested in facts as well as opinions, and whether Defendants

were originally hired to express views or collect facts, they provided factual information to the

U.S. public through U.S. media relating to issues of public interest in the United States.  The

First Amendment protects not only statements of pure opinion but also statements of fact and of

opinions that imply or rely on provably false facts, unless the plaintiff proves that the statements

are false and that the defendant's fault in publishing the statements met the requisite standard.

*See Mann*, 150 A.3d at 1240-41; Opp. at 12.  Protection under the Anti-SLAPP Act is at least as

broad as protection under the First Amendment, so the Act applies to statements that consist of

"raw intelligence."

## 2.    Issues of public interest

Defendants have made, at a minimum, a prima facie case that the information in the

Steele Dossier generally, and the information in CIR 112 in particular, involves "issues of public

interest."

It is appropriate to interpret the term "issues of public interest" in § 16-5501(3) in light of

defamation cases defining whether the controversy in which the plaintiff is involved is public.  In

these defamation cases, "courts often define the public controversy in expansive terms," and "a

court may find that there are multiple potential controversies, and it is often true that 'a narrow controversy may be a phase of another, broader one.'" *Jankovic v. International Crisis Group*, 822 F.3d 576, 586 (D.C. Cir. 2016) (quoting *Waldbaum*, 627 F.2d at 1297 n.27).   Defendants argue that CIR 112 involves two issues of public interest:  (1) relationships between Russian oligarchs and the Russian government and (2) Russian interference in the 2016 U.S. presidential election.  Reply at 10.  The Court adds that relations between the United States and Russia more generally (and not just related to alleged Russian interference with the 2016 U.S. presidential election) is an issue of public interest in the United States.  Plaintiffs contend that they are not public figures with respect to these issues of public interest.

The Steele Dossier *as a whole* plainly concerns an "issue of public interest" within the meaning of § 16-5501(3) because it relates to possible Russian interference with the 2016 presidential election.  The Steele Dossier generated so much attention and interest in the United States precisely because its contents relate to active public debates here.  *See Waldbaum*, 627 F.2d at 1296-97 (courts "may not question the legitimacy of the public's concern" to avoid becoming "censors of what information is relevant to self-government") (quoting Supreme Court cases).  Plaintiffs themselves "readily agree that the 2016 U.S. Presidential election was of public interest."  Opp. at 9.  A key part of Plaintiffs' case is that CIR 112 implicitly alleged that Plaintiffs aided "the Kremlin's interference in the 2016 U.S. Presidential election," Opp. at 1, and Plaintiffs cannot contend both that Defendants in CIR 112 accused them of cooperation with Russian interference in the election and that these statements did not involve an issue of public interest in the United States.  Plaintiffs own contentions therefore establish at least a prima facie case that Defendants' allegedly defamatory statements involve a matter of public interest.

Moreover, CIR 112 expressly discusses Russian foreign policy toward the United States and President Putin's advisors on Russia-U.S. policy, and these too are issues of public interest within the meaning of § 16-5501(3).  Contrary to their argument that Defendants defamed them by accusing them of complicity in Russian interference with the 2016 U.S. presidential election, Plaintiffs argue that CIR 112 does not relate to an issue of public interest because it does not mention any presidential candidate by name or explicitly address the 2016 presidential election.  *See* Opp. at 8-9, 20-21.  However, involvement of Russian international businessmen in Russian foreign policy, specifically including Russian foreign policy toward  the United States, involves an issue of public interest in the United States, regardless of whether it relates to a particular election.

For these reasons, Defendants have made a prima facie case that the expressive conduct that forms the basis of Plaintiffs' defamation claim involves an "issue of public interest," even if they do not also make a prima facie case that Plaintiffs are public figures.  Speech may involve an issue of public interest within the meaning of the Act even if the speech does not involve a public figure, so Defendants are entitled to the protection of the Anti-SLAPP Act on this basis alone.

In fact, Defendants have made a prima facie case that the Steele Dossier in general, and CIR 112 in particular, involve public figures.  It would appear to be beyond dispute that President Putin, who is discussed in CIR 112, is a general-purpose public figure.  *See Doe No. 1*, 91 A.3d at 1041 ("General purpose public figures because of their position of such pervasive power and influence are deemed public figures for all purposes.").

Furthermore, Plaintiffs are public figures for at least a limited purpose related to the information in CIR 112.  In some cases "[t]he task of determining whether a defamation plaintiff

is a limited-purpose public figure is a difficult one, requiring a highly fact-intensive inquiry that some have described as trying to nail a jellyfish to the wall." *Id.* at 1041-42.  The task is easier in this case. *OAO Alfa Bank v. Center for Public Integrity*, 387 F. Supp. 2d 20 (D.D.C. 2005), was a defamation case brought by Mr. Fridman, Mr. Aven, and their companies, and the court held as a matter of law that the evidence in that case eliminated any genuine dispute that they "are limited public figures":  the plaintiffs made choices that placed them "squarely in the public light;" they "have been the subject of widespread news coverage;" they "enjoy access to the channels of effective communication that enable them to respond to any defamatory statements and influence the course of public debate;" and "Aven and Fridman have used their positions to influence the events of their country and the world, and have assumed a prominent role in the civic life of Russia, associating closely and openly with the Russian business elite and politicians at the highest positions of government." *See id.* at 44-46 (quotation omitted); *see id.* at 25-28. "Simply put, Aven and Fridman are players on the world stage; hence, they are limited public figures not only in Russia, but in the United States as well." *See id.* at 47.  The same is true of Mr. Khan:  like Mr. Fridman and Mr. Aven, Mr. Khan is a beneficial owner of Alfa, Complaint ¶ 15; and he has had similar prominence and media coverage.  *See* Motion at 8 (an Internet search yielded 5,311 articles mentioning Mr. Khan, slightly more than those mentioning Mr. Aven).

These findings in *OAO Alfa Bank* are valid today.  *See* Motion at 8, 11-13 (including recent articles in examples of extensive media coverage of all three Plaintiffs going back to the 1990s).  Plaintiffs dismiss them as "findings of another court in another decade in connection with unrelated defamatory statements." *See* Opp. at 21 n.26.  *OAO Alfa Bank* is not a relic from a bygone era, and Plaintiffs do not contend that they have become recluses in the last decade.

Nothing suggests in the intervening decade a significant decrease in the fortunes of Alfa Group or the role of Russian oligarchs.

Plaintiffs therefore are limited-purpose public figures for the broad controversy relating to Russian oligarchs' involvement with the Russian government and its activities and relations around the world, including the United States.  The U.S. public today continues to have a strong interest in Russia's relations with the United States and in the political and commercial relationships between Russian oligarchs and the Russian government.  *Deripaska v. AP*, 282 F. Supp. 3d 133, 142 (D.D.C. 2017) ("there can be no doubt a public controversy exists relating to Russian oligarchs acting on behalf of the Russian government.").  Plaintiffs have assumed special prominence in these controversies, and the statements in CIR 112 are germane to these controversies.  *See OAO Alfa Bank*, 387 F. Supp. 2d at 43-44.

For all of these reasons, Defendants have made a prima facie case that their speech involved issues of public interest and that Plaintiffs are limited-purpose public figures.

C.      **Likelihood of success on the merits**

Because Defendants have made this prima facie case, the burden shifts to Plaintiffs to offer evidence that would permit a jury properly instructed on the applicable legal and constitutional standards to reasonably find that Defendants are liable for defamation.  *See Mann*, 150 A.3d at 1232.  "The precise question the court must ask, therefore, is whether a jury properly instructed on the law, including any applicable heightened fault and proof requirements, could reasonably find for the claimant on the evidence presented."  *Id.* at 1236.  Because Defendants' speech concerned a matter of public concern and Plaintiffs are limited-purpose public figures, Plaintiffs would have the burden at trial to prove by clear and convincing evidence that Defendants acted with actual malice – that is, "'that the statement was made … with knowledge

18

that it was false or with reckless disregard of whether it was false or not.'" *Thompson v. Armstrong*, 134 A.3d 305, 311 (D.C. 2016) (quoting *New York Times Co.*, 376 U.S. at 279-80). Plaintiffs have not carried their burden because they do not offer evidence that a reasonable jury could find to be clear and convincing proof that Defendants knew that facts stated in, or reasonably implied by, CIR 112 were false or that they published CIR 112 with reckless disregard of the falsity of these stated or implied facts.

Plaintiffs contend that they have shown actual malice because "a careful reading of the text of CIR 112 reveals that it contains no support for the implication in CIR 112's headline that Plaintiffs 'cooperated' in Russian interference in the U.S. Presidential election of 2016. In doing so, Defendants essentially admit that they have no facts to support that defamatory statement." *See* Opp. at 22. If it is plain from a reading of CIR 112 that Defendants do not have any evidence that Plaintiffs cooperated in Russian interference with this election beyond information that Plaintiffs have had a long and close relationship with the Russian government and gave advice to President Putin about Russia's relations with the United States, it would be plain that Defendants were engaging in speculation to the extent CIR 112 suggests that the Plaintiffs cooperated in Russian interference with the U.S. presidential election. However, under the First Amendment, a statement is not actionable "if it is plain that a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise." *See Mann*, 150 A.3d at 1241 (quotation omitted); *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997) ("When the defendant's statements, read in context, are readily understood as conjecture, hypothesis, or speculation, this signals the reader that what is said is opinion, and not fact.").

A reader could reasonably infer that inclusion of CIR 112 in a collection of reports relating to Russian interference in the 2016 U.S. presidential election was not gratuitous, and

CIR 112 is capable of bearing the meaning that that the nature of the overall relationship between

Plaintiffs and the Russian government creates a reasonable possibility that they were involved, as

advisors or participants, in any Russian interference with the U.S. election.  *See Zimmerman,* 246

F. Supp. 3d at 273.[5]  However, Plaintiffs do not offer any evidence that Defendants knew, or

recklessly disregarded substantial information, that no conceivable possibility existed that

Plaintiffs were involved in any such Russian interference.  The failure to include supporting facts

does not support a reasonable inference by clear and convincing evidence that Defendants knew

the statements were false or acted in reckless disregard to their falsity:  lacking supporting

information is different from having opposing information; and although lack of evidence may

establish negligence, negligence "is constitutionally insufficient to show the recklessness that is

required for a finding of actual malice."  *See New York Times Co.*, 376 U.S. at 288.

Plaintiffs argue that only a reckless person would publish CIR 112 to third parties.  *See*

Opp. at 22.  "But it is not enough to show that defendant should have known better; instead, the

plaintiff must offer evidence that the defendant in fact harbored subjective doubt."  *Jankovic*, 822

F.3d at 589-90.  "The plaintiff can make this showing, for example, by offering evidence that it

was highly probable that the story was (1) fabricated; (2) so inherently improbable that only a

reckless person would have put it in circulation; or (3) based wholly on an unverified anonymous

telephone call or some other source that defendant had obvious reason to doubt."  *Id.*  Plaintiffs

do not offer evidence that Mr. Steele in fact had subjective doubts or recklessly disregarded

information about its falsity, or that Defendants had obvious reason to doubt the source described

in CIR 112 as a "trusted compatriot" of a "top level Russian government official."  *See OAO Alfa

Bank*, 387 F. Supp. 2d at 1253-54 (a publisher does not have a duty to corroborate even when a

---

[5]  The Court need not and does not decide whether this meaning is defamatory.

single source of potentially libelous material is a person of questionable credibility); *St. Amant*, 390 U.S. at 733 ("Failure to investigate does not in itself establish bad faith."); *see Gertz v. Robert Welch*, 418 U.S. 323, 332 (1974) ("mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth."). Moreover, the information in the Steele Dossier about corrupt payments to Russian public officials was consistent with other information in the public domain: "Although Alfa Bank has developed a reputation in the international community as one of the most respected Russian financial institutions, Aven and Fridman have been dogged by allegations of corruption and illegal conduct." *OAO Alfa Bank*, 387 F. Supp. 2d at 28 (footnote omitted). Mr. Fridman himself acknowledged that the "rules of business" in Russia "are quite different to western standards" and to "be completely clean and transparent is not realistic." *Id.* at 29.

Plaintiffs argue that Mr. Steele doubted the truthfulness of some of the Steele Dossier based on a publication stating that Mr. Steele "estimated that between 10 and 30 percent of his 'raw intelligence' would ultimately prove inaccurate." Opp. at 23. However, even putting aside whether this publication falls within any exception to the hearsay rule, a belief that most, if not almost all, of the information would ultimately prove to be accurate is hard to square with actual malice. In any event, "defamation plaintiffs cannot show actual malice in the abstract; they must demonstrate actual malice *in conjunction* with a false defamatory statement." *Tavoulareas v. Piro*, 817 F.2d 762, 794 (D.C. Cir. 1987) (en banc) (emphasis in original). Plaintiffs do not allege that Mr. Steele subjectively believed that the 10-30% of the Steele Dossier that would ultimately turn out to be inaccurate included CIR 112 or that Mr. Steele knew any fact stated or implied in CIR 112 was false or acted with reckless disregard to its falsity.

Plaintiffs argue that Defendants have not demonstrated that the statements are true. *See* Opp. at 22. However, the burden is on Plaintiffs to show that the statements were false, not on Defendants to demonstrate their truth. *See New York Times Co.*, 376 U.S. at 271; *Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001) (the plaintiff in a defamation action must show "that the defendant made a false and defamatory statement concerning the plaintiff") (quotations and citations omitted).

Because Plaintiffs have not offered evidence supporting a clear and convincing inference that Defendants made any defamatory statement in CIR 112 with knowledge that it was false or with reckless disregard of its falsity, they have not offered evidence that their claims are likely to succeed on the merits.

### D.       Targeted discovery

Section 16-5502(c)(2) provides, "When it appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the discovery will not be unduly burdensome, the court may order that specified discovery be conducted." Plaintiffs have not shown that it is likely that any discovery that is targeted and not unduly burdensome will enable them to defeat the special motion to dismiss. More specifically, Plaintiffs do not show that any such discovery is likely to uncover clear and convincing evidence that, for example, Mr. Steele fabricated any information provided in CIR 112 or had solid intelligence that his source(s) fabricated it.

Plaintiffs suggest that they should be allowed to conduct discovery because Defendants have exclusive control over evidence about their subjective state of mind. *See* Opp. at 24. However, Plaintiffs have not shown a likelihood that Defendants have information that will establish actual malice by clear and convincing evidence. If targeted discovery were justified solely by the fact that a defendant in a defamation case is the best, if not only, source of

information about his subjective knowledge of the truth or falsity of the challenged statement, discovery would be justified in every Anti-SLAPP Act case.

Citing *Herbert v. Lando*, 441 U.S. 453 (1979), Plaintiffs contend that "defamation plaintiffs burdened with proof of actual malice *are entitled to discovery of a media defendant's editorial process as a constitutional matter*." *See* Opp. at 24-25 (emphasis in original). However, the Constitution does not entitle plaintiffs in defamation cases to conduct fishing expeditions. The provision of the Anti-SLAPP Act permitting targeted discovery only if the plaintiff shows a likelihood that discovery will produce clear and convincing evidence of actual malice is consistent with plaintiffs' constitutional rights, including their right to trial by jury. *Cf. Mann*, 150 A.3d at 1232-33. It is also consistent with more general direction from the Supreme Court "to expeditiously weed out unmeritorious defamation suits" in order to "preserve First Amendment freedoms." *See Kahl v. Bureau of National Affairs, Inc.*, 856 F.3d 106, 108 (D.C. Cir. 2017). *Herbert* holds only that in a case where discovery is warranted, the First Amendment does not allow a media entity to claim absolute privilege over its editorial processes. *See Herbert*, 441 U.S. at 158, 175. *Herbert* does not hold that the Constitution gives an absolute right to discovery by any plaintiff who has the burden to show actual malice by clear and convincing evidence and who can only speculate that discovery will enable him to prove his case.

## IV. CONCLUSION

Plaintiffs are correct that the Anti-SLAPP Act was "not enacted to immunize surreptitious for-hire intelligence operatives who defame private persons." Opp. at 9. However, the Anti-SLAPP Act was enacted to protect the right of advocacy on issues of public interest, and it does not exempt advocates if they can be described as "surreptitious for-hire intelligence

operatives." Nor does the Anti-SLAPP Act immunize any defamatory statement – whether the information was obtained surreptitiously or openly, or for hire or for other reasons. The Act allows defamation suits involving statements about issues of public interest to proceed, provided that the subjects of the alleged defamatory statement offers evidence that they are likely to succeed. Plaintiffs have failed to provide such evidence. Accordingly, the Court orders that:

1.      Defendants' special motion to dismiss is granted.

2.      Defendants' Rule 12(b)(6) motion to dismiss is denied as moot.

3.      This case is dismissed with prejudice.

_____
                Anthony C. Epstein
                Judge

Date: August 20, 2018

Copies to:

Kim Hoyt Sperduto
*Counsel for Plaintiffs*

Kelley C. Barnaby
*Counsel for Defendants*