UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MIKHAIL FRIDMAN, PETR AVEN, and<br>GERMAN KHAN, | ) <br>) <br>) | Case No. 1:17-cv-02041 (RJL) |
| *Plaintiffs,* | ) <br>) <br>) | |
| v. | ) <br>) | |
| BEAN LLC (a/k/a FUSION GPS) and<br>GLENN SIMPSON, | ) <br>) <br>) | |
| *Defendants.* | ) <br>) | |

## NOTICE OF SUPPLEMENTAL AUTHORITY
## RELEVANT TO DEFENDANTS' ANTI-SLAPP MOTION

Plaintiffs Mikhail Fridman, Petr Aven, and German Khan respectfully make this

submission to apprise the Court of two recent decisions from this District holding that the D.C.

Anti-SLAPP Act (the "Act") may not be applied in federal court.

In opposition to Defendants' pending motion to dismiss based on the Act, Plaintiffs

argued, relying on *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328, 1332 (D.C. Cir. 2015),

that the Act may not be invoked in federal court because its procedures are inconsistent with the

Federal Rules of Civil Procedure. *See* Dkt. # 24 at 2, 5-11. Defendants argued in response that

the foundation of *Abbas* was purportedly undermined by a District of Columbia Court of Appeals

decision, *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213 (D.C. Cir. 2016). *See* Dkt. # 28 at 2-4.

We now apprise the Court of two recent decisions addressing that issue, *Fairbanks v.*

*Roller*, Case No. 17-cv-01052(TNM) (D.D.C. June 6, 2018), and *Cockrum v. Donald J. Trump*

*for President, Inc.*, Civil Action No. 17-1370 (ESH) (D.D.C. July 3, 2018).[1]  In *Fairbanks*,

Judge McFadden engaged in a lengthy analysis of whether *Abbas* is still controlling precedent in

---

[1] A copy of the *Fairbanks* decision is attached hereto as Exhibit 1.  A copy of the *Cockrum* decision is attached
hereto as Exhibit 2.

light of *Mann*, concluding that it was. *See* Case No. 17-cv-01052 at 11-13. That is, Judge

McFadden concluded that *Mann* did *not* undermine *Abbas*, but rather reinforced its conclusion

that the D.C. Anti-SLAPP Act differs from the Federal Rules of Civil Procedure, also holding

that the Court was "bound by the law of the Circuit" to deny the anti-SLAPP motion. *Id.* at 13.

Similarly, in *Cockrum*, the court denied the defendants' motion to dismiss under the Act, holding

that "controlling precedent precludes the application of D.C.'s Anti-SLAPP Act in federal

court." Civil Action No. 17-1370, at 2, n.2.

Given that the issue recently decided in *Fairbanks* and *Cockrum* - whether the Act's

invocation in federal court is precluded because it conflicts with the Federal Rules of Civil

Procedure – is also at issue in this case, Plaintiffs submit that the attached Memorandum

Opinions are relevant authority.

Dated: New York, New York
        August 23, 2018

By:        */s/ Alan S. Lewis*
           Alan S. Lewis (#NY0252)
           John J. Walsh
           CARTER LEDYARD & MILBURN LLP
           2 Wall Street
           New York, NY 10005
           Telephone:  212-238-8647
           *New York Counsel for Plaintiffs*
             *Mikhail Fridman, et al.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23rd day of August 2018, I electronically filed and served the

foregoing Notice of Supplemental Authority using the CM/ECF system.

<u>      /s/ Alan S. Lewis                </u>
Alan S. Lewis

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CASSANDRA FAIRBANKS,

Plaintiff,

v.

EMMA ROLLER,

Defendant.

Case No. 1:17-cv-01052 (TNM)

## MEMORANDUM OPINION

Plaintiff Cassandra Fairbanks trolled the web through Twitter, releasing a photo of herself and a fellow journalist in the White House press room making a gesture widely recognized as the "okay" hand symbol but also speculated at the time to be a "white power" symbol. Defendant Emma Roller, also a journalist, retweeted the photo with the caption, "just two people doing a white power hand gesture in the White House." Ms. Fairbanks sued Ms. Roller for defamation. The First Amendment requires that Ms. Fairbanks' claim be considered "against the background of a profound national commitment" to the freedom of speech and especially of political speech, which is "essential to the security of the Republic." *See New York Times v. Sullivan*, 376 U.S. 254, 269-70 (1964). This "fundamental principle of our constitutional system" obligates Ms. Fairbanks, as a public figure, to support her defamation claim by alleging facts that support a finding of actual malice on the part of Ms. Roller. *See id.* at 269, 279-80. Because Ms. Fairbanks has failed to allege such facts, Ms. Roller's Motion to Dismiss under the Federal Rules of Civil Procedure will be granted. The District of Columbia's anti-SLAPP statute does not apply in federal court, so Ms. Roller's Motion to Dismiss and request for attorney's fees under the anti-SLAPP statute will be denied.

### I.

Ms. Fairbanks describes herself as a political activist and a grassroots journalist who uses social media to reach the public. Am. Compl. 2, ¶ 4. She describes Ms. Roller as a gatekeeper journalist with an esteemed professional reputation, though she also alleges that Ms. Roller works for a click-bait news site that intentionally publishes fake news. *Id.* at 2-3. According to Ms. Fairbanks, gatekeeper journalists like Ms. Roller consider themselves superior to grassroots journalists. *Id.* at 2. At the same time, they fear that grassroots journalists threaten their role as "[t]he primary gatekeepers of news." *Id.* Because of their fear, Ms. Fairbanks alleges, some gatekeeper journalists "wage a personal, political war on their ideological adversaries and grassroots competitors." *Id.* According to Ms. Fairbanks, this conflict intensified when grassroots journalists received White House press passes. *Id.*

When Ms. Fairbanks received a White House press pass, she and a fellow "new media" journalist posted a picture of themselves making the "okay" hand symbol in the White House press room. *Id.* At the time, there was ongoing public debate about whether the alt-right movement had turned the gesture into a hate symbol. Memo. ISO Mot. Dismiss 2-3 (citing news articles about the "okay" hand symbol).[1] Ms. Roller retweeted Ms. Fairbanks' photo, adding the caption, "just two people doing a white power hand gesture in the White House." Am. Compl. ¶ 6. She followed up with a second tweet, which stated "for reference," provided a link to an article on the Anti-Defamation League website, and contained a graphic of the "okay" symbol

---

[1] On a motion to dismiss for failure to state a claim, a court may take judicial notice of statements made on the internet when a party relies on them "not for their truth, but merely to show that those statements were made." *Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d 29, 35 (D.D.C. 2012).

with the letters $W$ and $P$ traced over the fingers and the words "white power."[2]  Ms. Roller then

published a third tweet, noting, "people in the alt-right vigorously deny it has anything to do with

white power, but keep using it to annoy the libtards."[3]

Roller's tweets were read, retweeted, and referenced by a variety of "major news outlets,"

though not by any "serious publication in America." Am. Compl. ¶¶ 8-9.  Ms. Fairbanks

tweeted, "They've become so easy to troll that you don't even have to make an effort anymore,"[4]

and, "The outrage is cracking me up."[5]  Similarly, Ms. Fairbanks responded to a tweet that read,

"Please tell me you guys made the OK sign to troll off this fantastic lefty hysteria," with an

emoji of a smiley face sticking out its tongue and winking.[6]  But then Ms. Fairbanks sued Ms.

Roller, arguing that Ms. Roller's first tweet defamed her.[7]  Ms. Roller filed Motions to Dismiss

under the Federal Rules of Civil Procedure and the District of Columbia anti-SLAPP statute.

---

[2]  Emma Roller, Twitter (Apr. 28, 2017 8:07 PM), available at https://web.archive.org/web/
20170501041302/https://twitter.com/emmaroller/status/858155641684320256.  The Anti-
Defamation League article discusses a two-handed gesture rather than the "okay" symbol. *See*
Am. Compl. ¶ 7.  The Anti-Defamation League later published an article stating that the one-
handed "okay" symbol is not a hate symbol and calling the rumor a hoax.  Am. Compl. 1-2, ¶ 10.

[3]  Emma Roller, Twitter (Apr. 28, 2017 8:17 PM), available at https://web.archive.org/web/
20170501041302/https://twitter.com/emmaroller/status/858155641684320256.

[4]  Cassandra Fairbanks, Twitter (Apr. 29, 2017, 8:34 AM), https://twitter.com/CassandraRules/
status/858343836761956352.

[5]  Cassandra Fairbanks, Twitter (Apr. 29, 2017 9:26 AM), available at http://archive.is/HDzMD.

[6]  Cassandra Fairbanks, Twitter (Apr. 29, 2017, 8:47 AM), https://twitter.com/CassandraRules/
status/858346964513107968.

[7]  Ms. Fairbanks' Amended Complaint does not argue that the other tweets defamed her, so my
analysis is focused on Ms. Roller's first tweet.

3

## II.

"[T]he Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017). Early resolution of defamation cases under Federal Rule of Civil Procedure 12(b)(6) "not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Palin v. New York Times Co.*, 264 F. Supp. 3d 527, 533 (S.D.N.Y. 2017).

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must contain sufficient factual allegations that, if true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility requires that a complaint raise "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Pleading facts that are "merely consistent with" a defendant's liability "stops short of the line between possibility and plausibility." *Twombly*, 550 U.S. at 545–46. Thus, a court evaluating a motion to dismiss for failure to state a claim does not accept the truth of legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. That said, it construes the complaint in the light most favorable to the plaintiff and accepts as true all reasonable inferences drawn from well-pled factual allegations. *See In re United Mine Workers of Am. Emp. Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994). Consideration is limited to "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *Hurd v. D.C. Gov't*, 864 F.3d 671, 678 (D.C. Cir. 2017).

### III.

Under District of Columbia law, a defamation claim requires: (1) a false and defamatory statement; (2) published without privilege to a third party; (3) made with the requisite fault; and (4) damages. *See Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001). Ms. Roller's motions argue that Ms. Fairbanks has not pled facts to support findings of falsity and fault. Ms. Fairbanks concedes that she is a public figure. *See* Pl.'s Opp. to Mot. Dismiss 4 (reciting standard for public figures), 10-12 (applying standard for public figures). Under First Amendment law, this means that she bears a heightened burden on both these elements. *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988).

### A.

The First Amendment requires public figures suing in defamation to "demonstrate by at least a fair preponderance of the evidence that the [allegedly] defamatory statement is false," with close cases decided against them. *Liberty Lobby*, 838 F.2d at 1292. Although the First Amendment permits liability for false factual statements under some circumstances, "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990). Pure statements of opinion can never support liability because "[u]nder the First Amendment there is no such thing as a false idea." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974).

Courts in this jurisdiction consider four factors to determine whether a defendant has stated a fact or an opinion. *Ollman v. Evans*, 750 F.3d 970, 979 (D.C. Cir. 1984). First, courts evaluate whether a defendant's statement "has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous" and

5

thus less likely to carry specific factual connotations. *Id.* Second, courts evaluate whether the statement can be "objectively characterized as true or false" or instead "lacks a plausible method of verification." *Id.* Third, courts evaluate any unchallenged language that provides context for the challenged statement—for example, the uncontested portions of an article or column—to determine whether the context would influence an average reader's perception that the challenged statement has factual content. *Id.* Fourth, courts evaluate the broader context, including social conventions surrounding different types of writing, to determine whether this context signals that a statement concerns fact or opinion. *Id.*

Ms. Roller argues that all four *Ollman* factors show she stated an opinion, not a purported fact, when she tweeted that Ms. Fairbanks made "a white power hand gesture in the White House." Memo. ISO Mot. Dismiss 8-18. First, she argues that her interpretation of the "okay" hand symbol is "indefinite and ambiguous" because the gesture itself means different things in different contexts—sometimes showing agreement, sometimes showing safety, and sometimes showing disagreement, if used sarcastically. *Id.* at 9-12. Second, she argues that her statement is not falsifiable because "white power" is a loosely defined political charge with no concrete and objectively verifiable meaning, much like charges of racism or fascism, which courts have found inactionable. *Id.* at 12-14. Third, she argues that readers would not infer any false facts from her statement because it appears in the context of other tweets that state the true factual bases for her interpretation of the gesture. *Id.* at 14-16. Fourth, she argues that the social conventions surrounding political disagreements and off-the-cuff statements on Twitter made readers unlikely to interpret her statement as factual. *Id.* at 16-18.

But the *Ollman* factors do not point in Ms. Roller's favor as strongly as she suggests. Ms. Roller's argument about the first *Ollman* factor depends on the mistaken assumption that it

6

is impossible to make a clear statement about an ambiguous gesture.[8]  A simple illustration

shows the flaw in this logic: People wave in greeting and in parting, but the ambiguity of the

gesture does not make the sentence "she waved goodbye" ambiguous or indefinite.  Ms. Roller's

argument about the second *Ollman* factor relies almost entirely on analogies to statements in

other cases about plaintiffs' views or attitudes but does not address the fact that views and

attitudes are subjective realities while physical gestures are objective realities.[9]  Her argument

about the third *Ollman* factor suggests that readers would not infer false facts from her tweet but

does not address whether her tweet makes a false factual statement directly.  And her argument

about the fourth *Ollman* factor notes that society generally has low expectations of political

debates on Twitter but does not address society's expectations of journalistic conduct on Twitter.

One can imagine situations in which a defendant's characterization of a plaintiff's gesture

would be arguably defamatory.  For example, a defendant might claim that the plaintiff "flipped

me off" when the evidence showed the plaintiff actually gave a thumbs-up, or a defendant might

claim that the plaintiff performed the Nazi salute when the plaintiff merely waved hello.  These

demonstrably false factual statements would differ from related, but protected, statements of

---

[8]  Ms. Roller cites *McCaskill v. Gallaudet University* for the proposition that where "different
constituencies can hold different—and completely plausible—views of Plaintiff's actions,
statements characterizing those actions constitute protected opinion." 36 F. Supp. 3d 145, 159
(D.D.C. 2014). But Ms. Roller herself notes that this rule pertains to a statement's verifiability,
not to its clarity. Memo. ISO Mot. Dismiss 10. And *McCaskill* addressed the verifiability of
plausible characterizations. Here, Ms. Roller's argument about the gesture's ambiguity declines
to address plausibility, expressly "setting aside whether it has a political meaning." *Id.* at 10.

[9]  Ms. Roller draws this distinction herself, asking me not to treat her statement about
Ms. Fairbanks' gesture as a statement about her personal beliefs. *Id.* at 13. But neither party has
briefed the issue well, and Ms. Roller's interpretation of the gesture's meaning involves at least
somewhat more subjectivity than a simple description of the physical gesture. The only case that
the parties cite for its treatment of a statement characterizing a Plaintiff's conduct is *McCaskill*, a
district court decision holding that a plausible characterization of ambiguous conduct was not
falsifiable. *See McCaskill*, 36 F. Supp. 3d at 159.

opinion such as, "She is a vulgar person," or "He is a Nazi-lover." *Cf. Buckley v. Littell*, 539

F.2d 882, 893-94 (2d Cir. 1976) (distinguishing the factual allegation that a plaintiff was a

member of the Communist Party from the statement of opinion that plaintiff is "a fellow traveler

of fascism"); *Smith v. Sch. Dist. of Phila.*, 112 F. Supp. 2d 417, 429 (E.D. Pa. 2000) (holding that

general accusations of being "racist and anti-Semitic" state opinion and not fact). While the

allegation that Ms. Fairbanks displayed a "white power gesture" is arguably more ambiguous

than an allegation that the plaintiff flipped someone off or performed the Nazi salute, this

ambiguity is not clearly fatal to her suit against Ms. Roller.

"While courts [of different jurisdictions] are divided in their methods of distinguishing

between assertions of fact and expressions of opinion, they are universally agreed that the task is

a difficult one." *Ollman*, 750 F.2d at 978. "Where the question of truth or falsity is a close one,

a court should err on the side of nonactionability." *Liberty Lobby*, 838 F.2d at 1292. But since

actual malice presents a clearer question and requires dismissal of the case, I need not decide

whether Ms. Roller's tweet constitutes a protected statement of opinion.

**B.**

The First Amendment requires public figures suing in defamation to establish by clear

and convincing evidence that the defendant's fault rises to the level of "actual malice." *Liberty

Lobby*, 838 F.2d at 1292. That is, public figures must establish that the defendant made the

allegedly defamatory statement "with knowledge that it was false or with reckless disregard of

whether it was false or not." *Sullivan*, 376 U.S. at 280. Because free debate inevitably leads to

some mistaken statements and punishment of these statements would chill the freedom of

speech, reckless disregard requires a "high degree of awareness of . . . probable falsity."

*Garrison v. La.*, 379 U.S. 64, 74 (1964). "The actual malice inquiry focuses on the defendant's

state of mind at the time of publication." *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 118 (D.C. Cir. 2017).

Ms. Fairbanks seeks to prove actual malice in four ways. First, she alleges that Ms. Roller knew the "okay" symbol is not a white power gesture. Pl.'s Opp. to Mot. Dismiss 11. Second, she alleges that Ms. Roller failed to perform due diligence consistent with professional standards of journalism. *Id.* Third, she alleges that Ms. Roller, as a gatekeeper journalist, has a motive to smear Ms. Fairbanks' reputation as a competing grassroots journalist and "continues a campaign of smears." *Id.* at 11-12; *see also* Am. Compl. 2. Fourth, she argues that Ms. Roller's "failure to issue a single correction or retraction" suggests her recklessness about truth. Pl.'s Opp. to Mot. Dismiss 11; *but see* Am. Compl. ¶ 17 (implying that Ms. Roller deleted her tweet); Compl. 2 (alleging that Ms. Roller deleted her tweet before learning of this lawsuit).

None of these arguments comes close to satisfying the First Amendment's demanding standard for public figures bringing defamation actions. Ms. Fairbanks' first argument fails because she has not pled facts sufficient to support her conclusory allegation that Ms. Roller knew the falsity of her statement.[10] Her second and third arguments fail because, even "an extreme departure from professional standards" coupled with an illicit motive does not satisfy the actual malice standard. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665 (1989); *see also Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 81 (D.D.C. 2012) ("Subjective ill-will

---

[10] Ms. Fairbanks alleges, "Roller knew at the time of her publishing that Fairbanks was a long-time civil rights writer, journalist, and advocate, who backed Donald Trump's candidacy for the Presidency only also after protesting civil rights violations against a wide range of citizens, including women and African-Americans, and after Fairbanks had previously backed Bernie Sanders's presidential bid. Roller knew Fairbanks was not using 'white power' signals before she published her false stories on April 28, 2017." Am. Compl. ¶ 11. But the second sentence is conclusory and the first fails to provide a "clear and convincing" basis for finding that Ms. Roller knew the "okay" gesture does not symbolize white power. *See Liberty Lobby*, 838 F.2d at 1292.

does not establish actual malice, nor does a malevolent motive for publication. Even highly

unreasonable conduct constituting an extreme departure from the standards of investigation and

reporting ordinarily adhered to by responsible publishers does not establish actual malice.")

(internal citation omitted). And her fourth argument fails because Ms. Roller's failure to correct

her statement does not show that she had actual malice when she published it. *See Kahl*, 856

F.3d at 118 (requiring evidence of actual malice at the time of publication); *see also Lohrenz v.*

*Donnelly*, 223 F. Supp. 2d 25, 56 (D.D.C. 2002) ("[T]here is no duty to retract or correct a

publication . . . ."). Especially given the public debate about the "okay" hand gesture at the time

of Ms. Roller's tweet, Ms. Fairbanks' allegations do not provide clear and convincing evidence

of actual malice. Indeed, the inescapable conclusion one reaches upon viewing the photo and

tweets at issue (including Ms. Fairbanks' tweets) is that Ms. Fairbanks intended her photo and

hand gesture to provoke, or troll, people like Ms. Roller—whether because the gesture was

actually offensive or because they would think that it was offensive—not that Ms. Fairbanks was

the victim of a malicious attack based on innocent actions. So Ms. Fairbanks has failed to state a

claim and her case should be dismissed.

### C.

Dismissing the Amended Complaint for failure to state a claim does not moot

Ms. Roller's anti-SLAPP motion since the motion seeks attorneys' fees in addition to dismissal.

The District of Columbia's anti-SLAPP statute seeks to protect people from "Strategic Lawsuits

Against Public Participation" or SLAPPs—that is, from illegitimate lawsuits designed to

discourage free speech on issues of public interest. *See Abbas v. Foreign Policy Grp.*, 783 F.3d

1328, 1332 (D.C. Cir. 2015). Among other things, the statute establishes a mechanism for early

dismissal of SLAPPs and enables defendants who win dismissal under the statute to recover their

attorneys' fees. D.C. Code §§ 16-5502(a)-(b), 16-5504(a). But Ms. Fairbanks argues that the

anti-SLAPP statute does not properly apply in federal courts exercising diversity jurisdiction over local law claims.

A federal court sitting in diversity generally applies local substantive law and federal procedural rules. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). If local substantive law and the Federal Rules of Civil Procedure answer the same question in different ways, the Federal Rules of Civil Procedure control unless they exceed the authorization of the Rules Enabling Act. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398-99 (2010). The United States Court of Appeals for the District of Columbia Circuit has already determined under this framework that "[a] federal court exercising diversity jurisdiction . . . must apply Federal Rules 12 and 56 instead of the D.C. Anti-SLAPP Act's special motion to dismiss provision." *Abbas*, 783 F.3d at 1337. And it has determined that this holding prevents an award of attorneys' fees under the anti-SLAPP statute since the relevant provision requires a defendant to invoke the special motion to dismiss provision successfully. *See id.* at 1337 n.5 (citing D.C. Code § 16-5504(a)).

Ms. Roller argues that the District of Columbia Court of Appeals' subsequent decision in *Competitive Enterprise Institute v. Mann*, 150 A.3d 1213 (D.C. 2016), supersedes *Abbas*. She notes that *Mann* clarified two facts about the District's anti-SLAPP statute that differ from the understanding in *Abbas*. Memo. ISO Anti-SLAPP Mot. 5. First, *Mann* held that the anti-SLAPP statute creates substantive rights. *Mann*, 150 A.3d at 1226. Second, it held that the statute's "likely to succeed" standard of proof for special motions to dismiss mirrors the summary judgment standard of proof under Federal Rule of Civil Procedure 56. *Id.* at 1238 n.32.

*Mann*'s articulation of District law—and not *Abbas*'s interpretation of it—controls. *See Payne v. D.C. Gov.*, 722 F.3d 345, 353 (D.C. Cir. 2013) (noting that District of Columbia Court

of Appeals decisions provide binding interpretations of District law). But I am also bound to follow *Abbas* as the law of the Circuit unless *Mann* "clearly and unmistakably" resolves the question at issue. *See Easaw v. Newport*, 253 F. Supp. 3d 22, 34 (D.D.C. 2017). Two of my colleagues have already determined that *Abbas* remains binding after *Mann*. *See Libre by Nexus v. Buzzfeed, Inc.*, 2018 WL 2248420 at *9 (D.D.C. May 16, 2018); *Deripaska v. Associated Press*, 2017 WL 8896059 at *3 (D.D.C. Oct. 17, 2017). Indeed, I am not aware that any judge in this District has awarded attorneys' fees under the anti-SLAPP statute since *Mann*.

Because *Abbas*'s application of the *Shady Grove* framework does not depend on either of the points that *Mann* later clarified, I join my colleagues in concluding that *Abbas* controls. The reasoning in *Abbas* begins with the observation that the anti-SLAPP statute and Federal Rules of Civil Procedure 12 and 56 "answer the same question about the circumstances under which a court must dismiss a case before trial." *Abbas*, 783 F.3d at 1333-34. *Mann* does nothing to disturb this understanding of District law.

*Abbas* goes on to observe that the anti-SLAPP statute and the Federal Rules of Civil Procedure answer the same question in different ways: "[U]nlike the D.C. Anti–SLAPP Act, the Federal Rules do not require a plaintiff to show a likelihood of success on the merits in order to avoid pre-trial dismissal." *Id.* at 1334. And *Mann* confirms this conclusion. As Ms. Roller notes, *Mann* clarifies that the anti-SLAPP statute's "likelihood of success on the merits" standard mirrors the Rule 56 summary judgment standard, requiring that "the evidence suffices to permit a jury to find for the plaintiff."[11] *Mann*, 150 A.3d at 1238 n.32. But like a mirror, the anti-SLAPP statute reverses the image that it reflects: *Mann* agrees with *Abbas* that the statute differs

---

[11] Ms. Roller's other observation—that *Mann* clarified the substantive nature of the anti-SLAPP statute—confirms that the *Shady Grove* framework applies and does not alter how. *See* Memo. ISO Anti-SLAPP Mot. 5.

from Rule 56 by requiring the plaintiff to show a likelihood of success on the merits instead of placing the burden on the defendant. *Id.* And *Mann* adds that the statute's dismissal standard differs from Rule 12 by requiring the plaintiff to produce evidence rather than allowing the plaintiff to rely on the allegations in her complaint. *Id.* at 1233; *see also Libre by Nexus*, 2018 WL 2248420 at *9. In short, *Mann* does not align the District's anti-SLAPP statute with the Federal Rules. Instead, it expressly states that the statute "is not redundant relative to the rules of civil procedure." *Mann*, 150 A.3d at 1238.

The final question that *Abbas* addressed under the *Shady Grove* framework is whether Federal Rules of Civil Procedure 12 and 56 exceed the authorization of the Rules Enabling Act. *See Shady Grove*, 559 U.S. at 398. *Abbas* held that Rules 12 and 56 do not. *Abbas*, 783 F.3d 1336-37. As a local court, *Mann* had no occasion to explore the validity of the Federal Rules. Thus, *Mann* does not undermine *Abbas* in this respect either.

According to Ms. Roller, "*Mann* could not have spoken more 'clearly and unmistakably' to . . . whether the standards imposed by [the anti-SLAPP statute] are the same or different than those imposed by the Federal Rules of Civil Procedure." Memo. ISO Anti-SLAPP Mot. 5. I believe it "clearly and unmistakably" confirms *Abbas*'s determination that they differ. In any event, it does not show that the anti-SLAPP statute should apply in federal court. So I am bound by the law of the Circuit and must dismiss Ms. Roller's anti-SLAPP motion.

## IV.

Some countries criminalize gestures that others may take as racist or hateful. *See, e.g.*, Strafgesetzbuch (StGB) (Penal Code), § 130, http://www.gesetze-im-internet.de/englisch_stgb/englisch_stgb.html#p0080 (German law criminalizing incitement to hatred against certain groups, which has been used to prosecute individuals who perform the Nazi salute); Code

Pénal [C.Pén] art. 144 (Belgian law criminalizing the use of actions, words, gestures, or threats

to insult religious objects). But in America, the First Amendment's commitment to a public

debate that is "uninhibited, robust, and wide-open," *Sullivan*, 376 U.S. at 270, offers broad

protections to those who make these gestures and those who accuse public figures of making

them.

     For the reasons explained above, the Defendant's Motion to Dismiss under the Federal

Rules of Civil Procedure will be granted and the Defendant's Motion to Dismiss under the

District of Columbia anti-SLAPP statute will be denied. A separate order will issue.


Dated: June 6, 2018

                          TREVOR N. MCFADDEN

                          United States District Judge

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

ROY COCKRUM; SCOTT COMER; and
ERIC SCHOENBERG,

           **Plaintiffs,**

    v.

DONALD J. TRUMP FOR PRESIDENT,
INC.; and ROGER STONE,

           **Defendants.**

Civil Action No. 17-1370 (ESH)

---

## MEMORANDUM OPINION

Before the Court are defendants' motions to dismiss and plaintiffs' motion for

jurisdictional discovery.  Plaintiffs are two Democratic National Committee ("DNC") donors

(Cockrum and Schoenberg) and a former DNC employee (Comer).  Defendants are Donald J.

Trump for President, Inc. ("the Trump Campaign"), and Roger Stone, who was employed by the

Trump Campaign until November 9, 2015, and allegedly continued thereafter to advise the

Trump Campaign informally.  Plaintiffs assert that defendants engaged in a conspiracy with

unidentified Russian agents and WikiLeaks to publish hacked emails.  They bring two tort claims

under D.C. law, one alleging a conspiracy to violate plaintiffs' privacy rights by publicly

disclosing private facts and the other alleging a conspiracy to subject plaintiffs to intentional

infliction of emotional distress.  They also bring a federal claim under 42 U.S.C. § 1985(3),

alleging a conspiracy to violate plaintiffs' right to give support or advocacy to their chosen

political candidate. (Pls.' Am. Compl., ECF No. 17, ("Compl.") ¶¶ 25–26.)[1]

For the reasons stated below, the Court concludes that it lacks personal jurisdiction over

defendants and, alternatively, that Washington D.C. is not the proper venue for plaintiffs' suit.

The Court will grant defendants' motions to dismiss, deny plaintiffs' motion, and dismiss

plaintiffs' suit without prejudice.[2]  Given this ruling, the Court does not address defendants'

arguments that the complaint fails to allege sufficient facts to sustain a claim for tortious civil

conspiracies or a conspiracy under 42 U.S.C. § 1985(3).[3]  Although the Court will explain the

distinction between personal jurisdiction and the merits in detail below, it bears emphasizing that

this Court's ruling is *not* based on a finding that there was no collusion between defendants and

Russia during the 2016 presidential election.


## BACKGROUND

### I.      FACTUAL BACKGROUND

#### A.      Plaintiffs

Plaintiffs are two donors to the DNC and one former DNC employee.  (Compl. ¶¶ 2–5,

---

[1] The three conspiracies alleged in the complaint involved the same set of facts, although the legal theories differ.  For convenience, the Court refers to them herein as "the conspiracies."

[2] The Court denies defendants' motions to dismiss under the D.C. Anti-SLAPP Act. The Court continues to adhere to its view that controlling precedent precludes the application of D.C.'s Anti-SLAPP Act in federal court. *Democracy Partners v. Project Veritas Action Fund*, 285 F. Supp. 3d 109, 127–28 (D.D.C. 2018) (citing *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328 (D.C. Cir. 2015)); *see also Deripaska v. Associated Press*, No. 17-cv-913, 2017 WL 8896059, at *1 (D.D.C. Oct. 17, 2017), *appeal dismissed*, No. 17-7164, 2017 WL 6553388 (D.C. Cir. Dec. 8, 2017).

[3] Nor does the Court address defendants' arguments regarding subject matter jurisdiction and standing.  "While courts normally address subject-matter jurisdiction before turning to personal jurisdiction, this is not an absolute requirement." *Capel v. Capel*, 272 F. Supp. 3d 33, 38 (D.D.C. 2017) (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577–78 (1999)); *see also Forras v. Rauf*, 812 F.3d 1102, 1105–06 & n.4 (D.C. Cir. 2016).

32–34.)  Plaintiff Roy Cockrum is a domiciliary of Tennessee who donated to the DNC and

multiple candidates for public office in 2016.  (*Id.* ¶¶ 3, 32.)  Plaintiff Eric Schoenberg is a

domiciliary of New Jersey who also contributed to the DNC in the 2016 election cycle.  (*Id.* ¶¶ 4,

33.)  Plaintiff Scott Comer is a domiciliary of Maryland and worked as the DNC Finance

Office's Chief of Staff from April 2015 to October 2016, and as the DNC's LGBT Finance Chair

from June 2016 to October 2016.  (*Id.* ¶¶ 5, 34.)

### B.    Hack of the DNC's Email Systems

Plaintiffs allege that

> [o]n one or more occasions before the summer of 2016, computer hackers
> working on behalf of the Russian government hacked into the email systems of
> the DNC in the District of Columbia and obtained voluminous amounts of data,
> including emails and other documents sent to and from thousands of individuals.
> Some of those individuals were staff members of the DNC; some were donors;
> and some were other supporters, members of the media, or other private citizens.

(Compl. ¶ 7.)  The Russian hackers allegedly had access to DNC accounts "from July 2015 until

at least mid-June 2016."  (*Id.* ¶ 86.)  The voluminous material that the hackers obtained included

thousands of Comer's emails; the social security numbers, dates of birth, home address, phone

number, and banking relationships of Schoenberg and his wife; and the social security number,

date of birth, address, and phone number of Cockrum.  (*Id.* ¶ 8.)

### C.    Conspiracies with Russian Agents

Plaintiffs allege that Russian agents gained access to "DNC networks, Democratic

Congressional Campaign Committee ('DCCC') networks, and the personal email accounts of

Democratic party officials and political figures" (Compl. ¶ 86), and did so "as part of a deliberate

campaign to interfere in the U.S. election and tilt its outcome in favor of Donald Trump."  (*Id.*

¶ 9; *see also id.* ¶¶ 83–85.)  Plaintiffs attribute the hack to Russian agents and do not allege that

defendants were involved in the hack.  (*Id.* ¶¶ 86–87.)  Importantly, plaintiffs' claims concern

only the dissemination of emails hacked from the DNC and published by WikiLeaks on July 22,

2016. (*Id.* ¶¶ 16, 42.)  Plaintiffs do not seek to impose liability on defendants for the publication

of emails from the DCCC or John Podesta, Chairman of Hillary Clinton's 2016 presidential

campaign.[4]

Plaintiffs allege, on information and belief, that Russia "typically consults domestic

political actors who act as Russia's partners to decide which extracted information to publish,

how to time the release of the stolen information, and how to disseminate it in a way that would

maximize the political impact." (*Id.* ¶ 10.)  As relevant to defendants, plaintiffs allege that

> [a]gents of the Trump Campaign, acting on behalf of the Campaign, met with—
> and were otherwise in contact with—Russian officials or their agents on
> numerous occasions during the spring and summer of 2016. On at least one
> occasion, senior Trump Campaign officials met with a Kremlin-connected lawyer
> after being informed in an email that the meeting concerned information gathered
> as part of a Russian government effort to aid the Trump Campaign.

(*Id.* ¶ 12; *see also id.* ¶ 79.)  This meeting took place on June 9, 2016, at Trump Tower in New

York. (*Id.* ¶ 98.)  At this meeting,

> Mr. Trump Jr., Mr. Kushner, and Mr. Manafort met with a Kremlin-connected
> Russian lawyer who was described in emails as a "Russian government attorney
> who is flying over from Moscow." According to reports, Mr. Trump Jr. agreed to
> attend this meeting after being promised damaging material about his father's
> opponent. The Trump Campaign participants in the meeting expected that the
> lawyer, Natalia Veselnitskaya, would produce such material. Mr. Trump Jr.
> attended the meeting after receiving an email indicating that the material was part
> of a Russian government effort to aid the Trump Campaign. That email (released
> on July 11, 2017 on Mr. Trump Jr.'s Twitter account) stated, "This is obviously
> very high level and sensitive information but is part of Russia and its
> government's support for Mr. Trump." Rather than refuse to be part of an effort
> by Russia to interfere in the election through the release of Russian-obtained
> information, Mr. Trump Jr. expressed enthusiasm for the idea in a responsive
> email, in which he stated: "If it's what you say I love it especially later in the

---

[4] According to the complaint, the Russian General Staff Main Intelligence obtained access to the
DCCC and Podesta emails by March 2016. (Compl. ¶ 86.)  Hacker Guccifer 2.0 began releasing
documents from the DCCC on August 12, 2016. (*Id.* ¶ 172.)  WikiLeaks began publishing the
Podesta emails on October 7, 2016. (*Id.* ¶ 179.)

summer." According to reports, the formatting of the email chain suggests that it was forwarded to Mr. Manafort and Mr. Kushner before the meeting, meaning that they went to the meeting fully aware that it was part of Russian efforts to interfere with the election. Mr. Trump Jr. acknowledged in a tweet issued on July 10, 2017 that he took the "meeting to hear info about" Mr. Trump's opponent. Rinat Akhmetshin, a Russian-American lobbyist with suspected ties to Russian intelligence and the Kremlin who has previously been accused of involvement with computer hacking schemes, also attended the June 9 meeting. According to his account of the meeting, Ms. Veselnitskaya produced documents that she claimed would show illegal payments to the DNC.

(*Id.* ¶ 129.) By June 9, 2016, Russian agents already had access to the emails that concerned plaintiffs. (*See id.* ¶ 130.) Although plaintiffs provide a detailed account about what happened at the June 9th meeting, there is no allegation that DNC emails were discussed. Besides the June 9th meeting at Trump Tower in New York, plaintiffs largely rely on conclusory allegations, based on information and belief, that defendants entered into an agreement with agents of Russia and WikiLeaks "to have information stolen from the DNC publicly disseminated in a strategic way that would benefit the campaign to elect Mr. Trump as President" (*id.* ¶ 13), and in return, defendants promised Russia that Mr. Trump would institute a more favorable policy toward Russia after assuming the presidency. (*Id.* ¶¶ 14–15; *see also id.* ¶ 138–59.) Plaintiffs also cite evidence of long-standing financial and personal relationships between agents of the Trump Campaign and Russia as background evidence to support an inference that there was a foundation on which both parties could build a conspiratorial relationship. (*Id.* ¶¶ 102–118.)

### 1.    Meetings with Russian Agents in Spring and Summer 2016

Plaintiffs allege, on information and belief, that Russian agents met with the Trump Campaign and its agents in Cleveland, D.C., New York, London, and Moscow to collaborate on publication of the hacked emails. (*See* Compl. ¶¶ 88, 161.) Plaintiffs also allege, on information and belief, that the Trump Campaign exchanged at least 18 undisclosed phone calls and emails with Russian agents between April and November 2016. (*Id.* ¶ 92; *see also id.* ¶¶ 93–101, 129,

135–37.)[5]

Plaintiffs ask the Court to infer that certain interactions could have been related to the

alleged conspiracies when agents of the Trump Campaign met to discuss foreign policy towards

Russia or communicated with a representative or agent of the Russian government, including the

Russian Ambassador. (*See id.* ¶ 139.)  Most of the meetings that plaintiffs attempt to attribute to

the conspiracies did not occur in the District, but allegedly took place in New York, at the

Republican National Convention in Cleveland, or abroad.  As for D.C., plaintiffs allege, on

information and belief, that "agents and associates of the Campaign frequently conducted

Campaign-related business in D.C., including at the Trump International Hotel in the District

(even before it opened for business in September 2016) and on Capitol Hill." (*Id.* ¶ 37.)  On

March 24, 2016, George Papadopoulos—then a member of President Trump's national security

advisory committee—sent an email to "several high-ranking Campaign officials" about setting

up a meeting between Russian leadership and President Trump. (*Id.* ¶ 94.)  A week later

President Trump held a meeting with his national security advisory committee at the Trump

International Hotel in Washington D.C. (*Id.* ¶ 95.)  Papadopoulos, Jeff Sessions, and J.D.

Gordon, as well as other committee staff, attended. (*Id.*)  The complaint does not allege what

subjects were discussed at the meeting, but notes that "Mr. Gordon later stated that, because of

the views that Mr. Trump expressed at this meeting, during the Republican National Convention,

he pushed for the adoption of language more favorable to Russia in the Republican Party

platform." (*Id.*)

---

[5] Plaintiffs allege that at least six of these contacts included Sergey Kislyak, the Russian
Ambassador to the United States (Compl. ¶ 92), but plaintiffs' complaint does not explain what
role—if any—he played in the conspiracies, does not identify the dates when these contacts took
place, or otherwise link these contacts to D.C. other than stating that the Ambassador has an
office and residence in the District. (*Id.*)

Almost a month later, on April 27, 2016, at the Mayflower Hotel in D.C., President Trump gave a foreign-policy speech that was favorable to Russia. (*Id.* ¶ 96.) Russian Ambassador Kislyak attended the speech, and "[o]n information and belief, Mr. Trump, Mr. Kushner, Mr. Sessions, and Mr. Kislyak held a private conversation during that event." (*Id.*) Even if such a conversation occurred, there is, however, no indication as to how it related to the conspiracies alleged in the complaint.

Plaintiffs also allege that on July 7, 2016, Paul Manafort, while in Washington D.C., "sent an email through an intermediary to Oleg Deripaska, a Russian billionaire with close ties to Mr. Putin, offering to brief him about the campaign. The email stated: 'If he needs private briefings we can accommodate.'" (*Id.* ¶ 99.) The complaint does not explain how, if at all, this email fits into the alleged conspiracies. But besides the two meetings discussed above, it is the only act alleged to have occurred in the District involving an agent of the Campaign that relates to the alleged conspiracies prior to the publication by WikiLeaks of the hacked DNC emails.

## 2.     Publication of Hacked DNC Emails

On July 22, 2016, WikiLeaks published over 44,000 hacked emails, most of which came from personnel on the DNC's finance team, including Comer. (Compl. ¶¶ 16, 42.) WikiLeaks did not redact information from the emails, which meant that a myriad of personal information about DNC employees and donors was published with the email dump. (*Id.* ¶¶ 43, 45, 47–48.) As of the filing of the complaint, the emails were still publicly available on the Internet. (*Id.* ¶ 44.) Plaintiffs allege, again on information and belief, that defendants "and those they conspired with arranged for the hacked information to be provided to WikiLeaks" and targeted the DNC finance team's emails for publication. (*Id.* ¶ 16.)

7

### 3.      Events After the Email Publication

Plaintiffs do not specifically allege that Stone met with Russian agents or had

communications with any co-conspirators until after the DNC emails were published on July 22,

2016, except to note that Stone admitted in an interview shortly after the email publication that

"he had communicated with WikiLeaks founder Julian Assange but that he was 'not at liberty' to

discuss aspects of those communications." (Compl. ¶ 162.) As evidence that Stone was

involved in the conspiracies, plaintiffs also cite Stone's public and private Twitter conversations,

occurring shortly after the email publication, with "hacker Guccifer 2.0"— a person believed to

be involved in the hack. (*Id.* ¶¶ 163–64, 170–72.)

Plaintiffs also cite, as evidence to support an inference of conspiracy, instances after the

July 22, 2016 publication when the Trump Campaign or Stone drew attention to the emails.

(*Id.* ¶¶ 167–81.) In addition, plaintiffs note that after July 22, 2016, agents of the Trump

Campaign met with Russian agents to discuss foreign policy. For example, Michael Flynn had a

phone conversation with Ambassador Kislyak on December 29, 2016, which allegedly "took

place while Mr. Flynn, Mr. Kislyak, or both were in Washington D.C." (*Id.* ¶ 154.) Plaintiffs

also claim that after the July 22, 2016 email dissemination, defendants have lied about or

concealed their contacts with agents of the Russian government. (*Id.* ¶¶ 24, 182–219.)[6]

### D.      Injury Resulting from Publication

According to the plaintiffs, the publication of the hacked DNC emails caused the

following injuries:

---

[6] For example, plaintiffs point to conversations in D.C. that Michael Flynn had with the Russian Ambassador in December 2016 when Flynn urged Russia not to respond to recent U.S.-imposed sanctions. (Compl. ¶¶ 152–55.) Flynn later lied to the FBI about the existence and substance of these conversations. (*Id.* ¶ 153.)

> First, it intimidated and deterred existing donors from further supporting the
> DNC's financial efforts. Second, it intimidated and deterred existing or potential
> donors from communicating with Mr. Comer or others at the DNC to support the
> Democratic Party's candidate for President. Third, it intimidated and deterred
> individuals, including Mr. Comer, from using email to advocate the election of
> their preferred candidate for the Presidency, for fear that their communications
> would be publicly disclosed.

(Compl. ¶ 16.)  In addition, plaintiffs suffered other harm from the publication of personal

information.  (*See also id.* ¶ 61.)  Specific to their § 1985(3) claim, plaintiffs allege that "[t]he

injuries suffered by all three Plaintiffs were the result of their having taken steps to advocate for

and support candidates running for federal office."  (*Id.* ¶ 78.)

### 1.    Comer

WikiLeaks published "thousands" of Comer's emails.  (Compl. ¶ 19.)  Comer complains

about the dissemination of emails relating to his sexuality, a medical condition, and gossip.

(*Id.* ¶ 19–20.)

Comer's hometown newspaper covered publication of the DNC emails, which led family

members—including his grandparents—to search for and read emails about him.  (*Id.* ¶ 51.)

Comer admits that he had disclosed his sexuality to friends, colleagues, and other family

members, but he had not shared it with his grandparents before the email publication.  (*Id.* ¶¶ 69–

70.)[7]  The emails indicated that Comer served as the LGBT Finance Director for the DNC, and

---

[7] According to the complaint:

> In 2011, Mr. Comer came out as gay to his mother and close friends. He came out
> to his father a couple years later. But he did not tell most of his family, including
> his siblings and his grandparents. He knew that his grandparents viewed
> homosexuality as inconsistent with their deeply held religious beliefs. For the next
> five years, Mr. Comer kept his sexual orientation from his grandparents (as well
> as certain other close friends and relatives) so as not to upset them or disrupt his
> relationship with them, which he cherished.

(Compl. ¶ 5.)

9

some emails contained interoffice gossip. At a hearing before this Court, plaintiffs argued that

this interoffice gossip contained innuendo and suggestive language that could allow Comer's

grandparents to deduce that he was gay. (Hr'g Tr., May, 17, 2018, ECF No. 70, ("Tr.") at 18–

19.) As described generally in the complaint, Comer's

> emails . . . included frank and private discussions about other individuals. Those
> emails sometimes reflected frustration or conflict—unsurprising in a tight-knit
> office under a great deal of stress—or the kind of offhand remarks or gossip that
> many of us make in private but are never intended for sharing with the entire
> world.

(Compl. ¶ 53.)

> These revelations strained relationships with coworkers, family, and friends, and
> ended some of Mr. Comer's relationships altogether. Publication of private
> statements about other individuals caused damage to his personal and professional
> reputation. Because his emails were disclosed, Mr. Comer received phone calls
> threatening violence, some calling him "faggot." These circumstances led to
> severe emotional distress, anxiety, and depression. He found himself unable to
> sleep, haunted by nightmares, and unable to focus. He recognized the severity of
> the injury to his mental health and sought treatment, generating significant costs
> for medication and frequent visits with physicians and therapists.
>
> In addition, Mr. Comer has felt intimidated regarding how he communicates with
> others in his advocacy for candidates for federal office out of a fear that his
> communications will be publicly disclosed.

(*Id.* ¶¶ 19–20.) One of the emails that were disclosed also contained information about Comer's

health. "A May 17, 2016 email from Mr. Comer to his boss, with whom he was close, describes

his bodily functions during a virus, a topic that Mr. Comer, like most people, would never raise

in public communications." (*Id.* ¶ 52.)

Comer left the DNC in October 2016. (Tr. at 40.) Plaintiff attributes his decision to

leave the DNC, the ending of a long-term romantic relationship, and damage to his professional

reputation in the political finance industry to the publication of the emails. (Compl. ¶¶ 71–77.)

### 2.   Cockrum

WikiLeaks published Cockrum's social security number, address, and phone number.

(Compl. ¶¶ 17, 49.) He was required to provide most of this information to the DNC to be a

donor and attend certain DNC events. (*Id.* ¶ 49); 11 C.F.R. § 104.8.[8]

> As a result [of the email publication], Mr. Cockrum has seen multiple strangers
> attempt to obtain credit in his name, and at least one of these attempts was
> successful. Each new attempt requires a new round of extensive communications
> with creditors and credit agencies in an effort to prevent substantial financial loss.
> These circumstances have led to significant distress and anxiety and will require
> lifelong vigilance and expense. In addition, Mr. Cockrum has been chilled in the
> extent to which he supports and contributes to the DNC and political campaigns.

(Compl. ¶ 17; *see also id.* ¶¶ 61–64.)

### 3.   Schoenberg

Similarly, WikiLeaks published the social security numbers, address, phone number, and

banking relationships of Schoenberg and his wife. *See supra* n. 8; (Compl. ¶¶ 18, 50.)

> As a result, Mr. Schoenberg's identity was stolen and his information used in
> fraudulent attempts to get credit cards. In one instance, two new credit cards
> arrived together at his home—one in his wife's name, and the other in the name of
> an unknown woman. To this day, Mr. Schoenberg remains concerned that his and
> his family's credit and financial information are permanently in jeopardy. These
> circumstances led to significant distress and anxiety and will require lifelong
> vigilance and expense.

(Compl. ¶ 18; *see also id.* ¶¶ 65–68.)

---

[8] Federal regulation requires that the DNC report donor contributions in excess of $200.
11 C.F.R. § 104.8. The Federal Election Commission's website publicly lists a contributor's
name, employer, state, recipient of donation, and amount. FEC, *Individual Contributions*, FEC
(last visited July 3, 2018), https://www.fec.gov/data/receipts/individual-
contributions/?two_year_transaction_period=2018&min_date=01%2F01%2F2017&max_date=0
6%2F26%2F2018.

## II.    PROCEDURAL HISTORY

Plaintiffs filed their first complaint on July 12, 2017.  On September 26, 2017, after

defendants filed their first motions to dismiss, plaintiffs amended their complaint.

Plaintiffs' current complaint contains three claims.  The premise of these claims is that

defendants conspired with Russian agents and WikiLeaks to publish the hacked emails, or aided

and abetted Russian agents and WikiLeaks in publishing the hacked emails.  Plaintiffs allege that

defendants have committed two torts under D.C. law: (1) public disclosure of private facts, and

(2) intentional infliction of emotional distress.  (Compl. ¶¶ 223–39.)  As for their federal claim,

plaintiffs allege that defendants violated 42 U.S.C. § 1985(3) by conspiring to intimidate lawful

voters from supporting or advocating for candidates for president and to injure citizens in person

or property on account of such support or advocacy.  (*Id.* ¶¶ 240–50.)  Plaintiff seek

compensatory damages and punitive damages "in an amount over $75,000" to compensate them

for their injuries.  (*Id.* "Prayer for Relief" at 57.)

On October 25, 2017, the Trump Campaign filed a motion to dismiss, citing (1) lack of

subject matter jurisdiction, Fed. R. Civ. P. 12(b)(1), (2) lack of personal jurisdiction, Fed. R. Civ.

P. 12(b)(2), (3) improper venue, Fed. R. Civ. P. 12(b)(3), and (4) failure to state a claim upon

which relief can be granted, Fed. R. Civ. P. 12(b)(6).  Stone also filed a parallel motion to

dismiss citing the same grounds and additionally arguing that plaintiffs lacked standing to bring

their claims.[9]  Plaintiffs filed their opposition on December 1, 2017, and defendants filed their

replies on December 29, 2017.  The Court granted plaintiffs leave to file a surreply, which

plaintiffs filed on February 7, 2018.

At a hearing on defendants' motions to dismiss on May 17, 2018, which focused on the

---

[9] Both defendants also filed a motion to dismiss under the D.C. Anti-SLAPP Act. *See supra* n.2.

issue of personal jurisdiction, plaintiffs never raised jurisdictional discovery.  However, on May

24, 2018, plaintiffs filed a motion for such discovery.  Prior to this motion the only notice

plaintiffs had given the Court that they might seek jurisdictional discovery came in a footnote in

their opposition, which stated: "Plaintiffs believe that the allegations in the Complaint are

sufficient to establish that this Court may exercise personal jurisdiction over Defendants. If the

Court disagrees, Plaintiffs should be allowed to take jurisdictional discovery." (Pls.' Opp. to

Defs.' Mots. to Dismiss, ECF No. 25, ("Pls.' Opp.") at 18 n. 7.)

    Having received extensive briefing from all parties and three briefs from amicus curiae,[10]

the Court is now in a position to rule on the motions.


## ANALYSIS

## I.     LEGAL STANDARD

### A.     Personal Jurisdiction

    To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), the

plaintiff bears the burden of establishing a basis for exercising personal jurisdiction over the

defendant. *Crane v. New York Zoological Soc.*, 894 F.2d 454, 456 (D.C. Cir. 1990). "In

determining whether such a basis exists, factual discrepancies appearing in the record must be

resolved in favor of the plaintiff." *Id.*; *see also Jacobsen v. Oliver*, 201 F. Supp. 2d 93, 104

(D.D.C. 2002).  However, the Court "need not accept inferences drawn by plaintiffs if such

---

[10] Former National Security Officials filed an amicus curiae to offer a perspective on "whether and how Russia uses local actors inside a country to facilitate disinformation campaigns." (ECF No. 37, at 4.)  Campaign Legal Center and Professor Theodore M. Shaw filed an amicus curiae in opposition to defendants' motion to dismiss addressing the merits of plaintiffs' § 1985(3) claims. (ECF No. 38.)  Bipartisan Campaign Officials filed an amicus curiae in opposition to defendants' motion to address the harms posed to electoral democracy from conspiracies to hinder political participation by members of the electorate. (ECF No. 40.)

inferences are unsupported by the facts." *Livnat v. Palestinian Auth.*, 851 F.3d 45, 57 (D.C. Cir. 2017) (citation omitted); *see also Houlahan v. Brown*, 979 F. Supp. 2d 86, 88 (D.D.C. 2013). "Mere conclusions or 'bare allegation[s]' do not constitute the *prima facie* case for jurisdiction that this standard requires." *Fawzi v. Al Jazeera Media Network*, 273 F. Supp. 3d 182, 186 (D.D.C. 2017) (alteration in original) (citation omitted). "Under District of Columbia law, personal jurisdiction is determined as of the commencement of an action." *Roz Trading Ltd v. Zeromax Grp., Inc.*, 517 F. Supp. 2d 377, 384 (D.D.C. 2007).

## B.   Venue

Under 28 U.S.C. § 1406, "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *Id.* § 1406(a); *see also Corbett v. Jennifer*, 888 F. Supp. 2d 42, 44 (D.D.C. 2012) ("The Federal Rules provide that a court will dismiss or transfer a case if venue is improper or inconvenient in the plaintiff's chosen forum.") (citing Fed. R. Civ. P. 12(b)(3)).

The "question—whether venue is 'wrong' or 'improper'—is generally governed by 28 U.S.C. § 1391." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 577 (2013) (citation omitted). "In assessing a motion for improper venue, the court accepts the plaintiff's well-pled factual allegations regarding venue as true, draws all reasonable inferences from those allegations in the plaintiff's favor and resolves any factual conflicts in the plaintiff's favor." *Fam v. Bank of Am. NA (USA)*, 236 F. Supp. 3d 397, 405 (D.D.C. 2017). However, a plaintiff has the burden of demonstrating that venue is proper once challenged and "[t]he Court . . . need not accept the plaintiff's legal conclusions as true." *Id.* at 406; *Delta Sigma Theta Sorority Inc. v. Bivins*, 20 F. Supp. 3d 207, 212 (D.D.C. 2014).

## II.    PERSONAL JURISDICTION

The Court's exercise of personal jurisdiction over nonresidents must satisfy both the Due

Process Clause[11] and D.C.'s long-arm statute.  *See GTE New Media Servs. Inc. v. BellSouth*

*Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000); *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949

F.2d 415, 424 (D.C. Cir. 1991); *see also Lemon v. Kramer*, 270 F. Supp. 3d 125, 135–37 (D.D.C.

2017); *Swecker v. Midland Power Coop.*, 253 F. Supp. 3d 274, 278 & n.1 (D.D.C. 2017).  A

plaintiff still must carry its burden of demonstrating that a court can exercise personal

jurisdiction over a defendant "[e]ven if the defendant would suffer . . . no inconvenience."

*Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773,

1780 (2017) (alteration in original) (citation omitted).

"To show that the exercise of jurisdiction would comply with the constitutional

requirements of due process, a plaintiff must demonstrate that there are 'minimum contacts

between the defendant and the forum establishing that the maintenance of the suit does not

offend traditional notions of fair play and substantial justice.'" *Swecker*, 253 F. Supp. 3d at 278

(citation omitted); *see also Bristol-Myers Squibb Co.*, 137 S. Ct. at 1779–80; *Livnat*, 851 F.3d at

54–55; *Molock v. Whole Foods Mkt., Inc.*, No. 16-cv-2483, 2018 WL 1342470, at *5 (D.D.C.

Mar. 15, 2018).  As the Supreme Court has explained, "restrictions on personal jurisdiction are

more than a guarantee of immunity from inconvenient or distant litigation." *Bristol-Myers*

*Squibb Co.*, 137 S. Ct. at 1780 (citation omitted).

Consistent with due process, this Court may "exercise either general or specific personal

jurisdiction." *Bigelow v. Garrett*, 299 F. Supp. 3d 34, 41 (D.D.C. 2018).  But as explained

---

[11] The D.C. Circuit does not draw a legally operative distinction between Fourteenth Amendment
due-process precedent and Fifth Amendment due-process precedent for purposes of deciding this
case. *See Livnat*, 851 F.3d at 54–55.

15

herein, the Court has neither.[12]  The Court will first address general jurisdiction, then specific

jurisdiction, and conclude by explaining its denial of plaintiffs' request for jurisdictional

discovery.

### A.    General Jurisdiction and the Trump Campaign

"A court with general jurisdiction may hear *any* claim against that defendant." *Bristol-*

*Myers Squibb Co.*, 137 S. Ct. at 1780.  "But 'only a limited set of affiliations with a forum will

render a defendant amenable to' general jurisdiction in that State." *Id.* (citation omitted).  "For

an individual, the paradigm forum for the exercise of general jurisdiction is the individual's

domicile." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011).[13]  For

corporations, it is "an equivalent place, one in which the corporation is fairly regarded as at

home," *id.*, almost always "the place of incorporation and principal place of business." *Daimler*

*AG v. Bauman*, 571 U.S. 117, 137 (2014).  A corporation with a state of incorporation and

principal place of business outside of the District cannot be regarded as "at home" in the District

simply because its headquarters are nearby in Virginia and it conducts business activity in the

District. *See Duarte v. Nolan*, 190 F. Supp. 3d 8, 15 (D.D.C. 2016).

The Court lacks general jurisdiction over the Trump Campaign, which is incorporated in

Virginia and has its principal place of business in New York.  Plaintiffs argue that the Court has

general jurisdiction over the Trump Campaign because it has a temporary home in D.C.—at least

---

[12] The inability of this Court to exercise personal jurisdiction over defendants consistent with due
process renders discussion of D.C.'s long-arm statute unnecessary.  Suffice it to say that
plaintiffs argue their strongest personal jurisdiction argument involves specific personal
jurisdiction under (a)(1) of the D.C. long-arm statute, which is coextensive with the Due Process
Clause. *See Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 329 (D.C. 2000); *Bigelow*,
299 F. Supp. 3d at 45; *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995).

[13] Plaintiffs do not argue that the Court has general jurisdiction over Stone, who is not a
domiciliary of D.C.

since President Trump was inaugurated—and the Trump Campaign's contacts with D.C. for

purposes of electing President Trump are so continuous and systematic as to render the

Campaign at home in D.C. First, "personal jurisdiction is determined as of the commencement

of an action," not as of President Trump's inauguration. *Roz Trading Ltd*, 517 F. Supp. 2d at

384. Second, plaintiffs cannot analogize (*see* Pls.' Opp. at 23) the domestically-incorporated

Trump Campaign to a foreign corporation temporarily located in Ohio due to the Japanese

occupation of the Philippines in World War II. *See Perkins v. Benguet Consolidated Mining Co.*,

342 U.S. 437, 447–49 (1952).[14]

Finding general jurisdiction over the Trump Campaign—with a place of incorporation

and principal place of business outside D.C.—based on its election-related contacts within the

forum would eviscerate the distinction between general and specific jurisdiction. *See Bigelow*,

299 F. Supp. 3d at 42; *see also Daimler AG*, 571 U.S. at 139.

**B.     Specific Jurisdiction**

Plaintiffs argue that specific jurisdiction exists due to defendants' contacts with the

District or, alternatively, based on the theory of conspiratorial personal jurisdiction. After

considering the parties' pleadings, the arguments of counsel at the hearing, and the relevant law,

the Court disagrees and concludes that it lacks specific jurisdiction over defendants.

But before the Court can address the two bases for specific jurisdiction, it is necessary to

clearly delineate what is not at issue here. The Court's ruling *does not* represent a ruling on the

---

[14] Plaintiffs also rely on *Daimler AG v. Bauman*, for the proposition that jurisdiction is proper "over a foreign corporation *temporarily* headquartered in the forum state." (Pls.' Opp. at 23.) This case is inapposite. *Daimler* concerned a foreign corporation with continuous and systematic affiliations inside a forum state "comparable to a domestic enterprise in that State," *Daimler AG*, 571 U.S. at 133 n.11, but was incorporated or based outside the United States. *Id.* at 131–33. The Supreme Court has never suggested that there is any basis to extend *Daimler* to a corporation that has both a principal place of business and state of incorporation inside another forum state within the United States.

merits of plaintiffs' claims.  Plaintiffs seek to establish jurisdiction by citing events that

happened outside the District, events that happened well before defendants allegedly joined the

conspiracies, and events after the conspiracies achieved their objective on July 22, 2016.  These

events may have relevance to determining whether plaintiffs' claims are meritorious for purposes

of a Rule 12(b)(6) inquiry.  But that is not the issue before the Court in ruling on personal

jurisdiction, for the focus of a Rule 12(b)(2) inquiry is far different.  Specific personal

jurisdiction must focus on *defendants*' contacts with the forum *related* to the specific claims

raised in plaintiffs' complaint.

### 1.   Suit-Related Contacts with the Forum

#### i.   Legal Principles

In order to meet the test for specific jurisdiction, "the plaintiff must allege some specific

facts evidencing purposeful activity by the defendants in the District of Columbia by which they

invoked the benefits and protections of the laws of the District of Columbia."  *Bigelow*, 299 F.

Supp. 3d at 44.  Specific jurisdiction requires that a plaintiff's suit arise out of or relate "to the

defendant's contacts with the forum."  *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1780.  Therefore,

"specific jurisdiction is confined to adjudication of 'issues deriving from, or connected with, the

very controversy that establishes jurisdiction.'"  *Goodyear Dunlop Tires Operations, S.A.*, 564

U.S. at 919 (citation omitted).  Specific jurisdiction is tied to each defendant and to each claim.

*See Vasquez v. Whole Foods Mkt., Inc.*, 302 F. Supp. 3d 36, 45–46 (D.D.C. 2018); *Seiferth v.*

*Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274 (5th Cir. 2006).

For this Court to exercise specific personal jurisdiction over defendants their "suit-related

conduct must create a substantial connection with" the District.  *Walden v. Fiore*, 134 S. Ct.

1115, 1121 (2014).  The contours of plaintiffs' claims dictate what constitutes suit-related

conduct. *See id.* at 1123; *Vasquez*, 302 F. Supp. 3d at 45–46. Therefore, for purposes of

asserting jurisdiction over defendants, the Court must determine from the allegations in the

complaint what suit-related conduct by defendants, in furtherance of the conspiracies, took place

in D.C. *See Walden*, 134 S. Ct. at 1121.

Plaintiffs' claims are based on a conspiracy theory of liability. Importantly though,

plaintiffs' claims define the parameters of what constitutes suit-related contacts, and the scope of

the civil conspiracies is tethered to the injuries for which they may recover. *See Graves v.*

*United States*, 961 F. Supp. 314, 321 (D.D.C. 1997) ("The plaintiff's § 1985 claim also must be

dismissed because at the pleading stage a plaintiff is required to allege a connection between the

overt acts, the furtherance of the conspiracy and the plaintiff's injury."); *see also Wiggins v.*

*Philip Morris, Inc.*, 853 F. Supp. 470, 483 (D.D.C. 1994) ("It is well established that there is no

recognized independent tort action for civil conspiracy in the District of Columbia.") (citation

omitted).

"Civil conspiracy" is not a boundless concept that empowers this Court to exercise

personal jurisdiction over alleged wrongdoers from the beginning of any wrongdoing by an

alleged co-conspirator to the time when the co-conspirators cease covering up their wrongdoing.

Rather, conspiracy under 42 U.S.C. § 1985(3), conspiracy to commit public disclosure of private

facts, and conspiracy to intentionally inflict emotional distress all focus on specific wrongful

conduct, and defendants' contacts for specific jurisdiction must relate to those wrongs. *See, e.g.,*

*Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 44 (D.D.C. 2003) ("[P]laintiff's

jurisdictional allegations must arise from the same conduct of which it complains.").

Plaintiffs' federal claim rests on a conspiracy (1) to prevent a "citizen who is lawfully

entitled to vote" from giving support and advocacy or (2) to "injure any citizen in person or

property on account of such support or advocacy." 42 U.S.C. § 1985(3); *see also Graves*, 961 F.

Supp. at 321. The objective or goal of the § 1985(3) conspiracy was to intimidate or injure

plaintiffs by disclosing DNC emails concerning plaintiffs on July 22, 2016.

Similarly, the scope of the conspiracies relevant to plaintiffs' tort law claims depends on

the underlying tortious acts, *see Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 241 (D.D.C.

2007), for there is no independent tort of "civil conspiracy." *Exec. Sandwich Shoppe, Inc. v.

Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000). The public disclosure of private facts

involved the July 22, 2016 public disclosure of DNC emails concerning plaintiffs, and the

intentional infliction of emotional distress occurred when WikiLeaks published the emails

concerning plaintiffs on July 22, 2016.

Plaintiffs urge this Court to adopt a theory of specific jurisdiction that requires no causal

link between defendants' contacts and plaintiffs' claims. Relying on the D.C. Court of Appeals'

precedent in *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320 (D.C. 2000), plaintiffs argue

that to satisfy the requirements of due process they need only demonstrate that defendants'

contacts have a "discernible relationship" to plaintiffs' claims. *Id.* at 336. Neither the Supreme

Court nor the D.C. Circuit has decided the contours—for purposes of satisfying the due process

limits on specific jurisdiction—of the causal connection between a defendant's in-forum contacts

and plaintiffs' claims. *See Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 26 (D.D.C.

2017); *see also Bristol-Myers Squibb Co.*, 137 S. Ct. at 1788 & n.3 (Sotomayor, J., dissenting)

(noting that the Supreme Court in *Bristol-Myers* did not address the exact causal connection

between suit-related contacts and a plaintiff's injury). But, as explained by Judge Moss of this

Court in *Triple Up Limited v. Youku Tudou Inc.*,

> At the most restrictive end of the spectrum, courts require the defendant's
> contacts to have been the "proximate cause"—or at least something similar to the

proximate cause—of the plaintiff's alleged injury. Other courts are satisfied if the contacts are merely a "but-for cause" of the injury. And a third category of courts, including, notably, the D.C. Court of Appeals, require only a "discernable relationship" between the contacts and the plaintiff's cause of action. Unlike the other tests, the "discernable relationship" test does "not ... require a causal connection between the defendant's [activities] and the plaintiffs' lawsuit." Instead, "courts that follow this approach consider the totality of the circumstances," and from that attempt to infer whether the exercise of jurisdiction in the forum was "reasonably foreseeable."

235 F. Supp. 3d at 26–27 (footnotes omitted); *see also Myers v. Holiday Inns, Inc.*, 915 F. Supp. 2d 136, 142 (D.D.C. 2013).

For present purposes, it is sufficient to hold, as did Judge Moss in *Triple Up Limited*, 235 F. Supp. 3d at 27, that the discernible relationship test is not the applicable standard for complying with the due process limitations on this Court's exercise of specific jurisdiction. *See id.* A plaintiff must show a more exacting nexus between a defendant's contacts and the plaintiff's claims to support a finding of specific jurisdiction. *See id.*; *see also Estate of Klieman v. Palestinian Auth.*, 82 F. Supp. 3d 237, 247 (D.D.C. 2015) ("Plaintiffs' theory is tenuous at best, and this broad reading of the phrase 'relates to' has no support in the relevant case law. Courts typically require that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit.").

Holding otherwise would eviscerate the due process limitations on specific jurisdiction. First, plaintiffs' theory ignores the distinction between conduct that relates to a finding of liability for civil conspiracy and contacts that relate to specific jurisdiction. Only the latter represent the "suit-related conduct" that the Court can consider in determining specific personal jurisdiction. *See Kopff v. Battaglia*, 425 F. Supp. 2d 76, 85 (D.D.C. 2006) ("The central failure of plaintiffs' assertions relating to Sadiq is that they focus on his potential *liability* without alleging facts sufficient to support a judgment of liability *in this forum*. As noted above, the two

21

inquiries are to be kept analytically distinct; personal jurisdiction does not automatically flow

from the statement of a cognizable claim—at least not in the District of Columbia on these

facts."). Second, plaintiffs fail to distinguish defendants' contacts with D.C.—such as

Campaign-related activity—from suit-related contacts, and thereby they impermissibly "blur[]

the distinction between specific and general jurisdiction." *Triple Up Ltd.*, 235 F. Supp. 3d at 27.

Plaintiffs' approach also contravenes the Supreme Court's holding that specific

jurisdiction depends on contacts that the "defendant *himself*" created with the forum. *Walden*,

134 S. Ct. at 1122; *see also id.* at 1122–23.[15] Likewise, "[s]pecific jurisdiction is case specific."

*Vasquez*, 302 F. Supp. 3d at 45. Thus, this Court is confronting three civil conspiracies

predicated on two tort claims and one federal claim, and only the defendants' contacts in D.C.

relating to those claims have relevance to the Court's specific jurisdiction analysis.

### ii.      The Trump Campaign

In their opposition, plaintiffs focus on five categories of contacts to support a claim of

specific jurisdiction over the Trump Campaign: (1) campaign activity in D.C., (2) meetings in

D.C., (3) email communications from the Trump Campaign, (4) acts by the Trump Campaign in

D.C. after the email dissemination occurred on July 22, 2016, and (5) harms allegedly suffered in

D.C. by plaintiffs. None of these contacts establishes suit-related contacts that give rise to

specific jurisdiction.

### a.      Campaign Activity in D.C.

In their opposition, plaintiffs argue that, in conducting a specific jurisdiction analysis,

the Court should consider the (1) Trump Campaign's electioneering in D.C. and (2) the fact that

---

[15] To the extent D.C. Court of Appeals jurisprudence represents an interpretation of due process
principles—as opposed to an interpretation of the D.C. long-arm statute—it is federal precedent,
not D.C. Court of Appeals case law, which controls the Court's due process inquiry. *See Triple
Up Ltd.*, 235 F. Supp. 3d at 27.

its foreign policy team was based in D.C.  (Pls.' Opp. at 19 & n.8.)  These contacts, however, have no relevance to a specific jurisdiction analysis absent a causal link between the activities and plaintiffs' substantive claims.  *See Bigelow*, 299 F. Supp. 3d at 44 ("[T]he plaintiff's jurisdictional allegations must arise from the same conduct of which he complains.").

The Trump Campaign's efforts to elect President Trump in D.C. are not suit-related contacts for those efforts did not involve acts taken in furtherance of the conspiracies to disseminate emails that harmed plaintiffs.  Campaign meetings, canvassing voters, and other regular business activities of a political campaign do not constitute activities related to the conspiracies alleged in the complaint.  *See id.*; *Second Amendment Foundation v. United States Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001); *see also Richards*, 480 F. Supp. 2d at 236 ("The tortious activity that plaintiff alleges in this count, the fraudulent grading schemes at Duke and Georgetown and the misrepresentations by Dean Sockwell, are distinct actions or events, both from one another and from the other counts in her complaint, and these discrete incidents cannot be joined together as a continuing violation simply because plaintiff alleges that it was all part of an ongoing and widespread conspiracy.").  Plaintiffs have not brought, nor could they bring, a viable claim to hold defendants liable for conspiring to elect Donald Trump.  *See Graves*, 961 F. Supp. at 321 ("[T]he plaintiff has failed to allege how these acts either evidenced or furthered a conspiracy between any of these defendants.").  The same is true of the fact that the Trump Campaign's foreign policy team was based in the District.  Its mere presence here, without it undertaking overt acts in furtherance of the conspiracies, does not represent a suit-related contact.

### b.      Meetings in D.C.

Plaintiffs also argue that the Trump Campaign planned and negotiated at least part of the

conspiracies through meetings that took place in D.C. (Pls.' Opp. at 19.) There are two meetings in the District that occurred prior to the July 22, 2016 email publication: (1) the Trump Campaign's March 31, 2016 meeting at the Trump International Hotel in Washington D.C., and (2) the April 27, 2016 foreign-policy speech President Trump gave at the Mayflower Hotel in D.C.—where agents of the Trump Campaign may have had a conversation with Russian Ambassador Kislyak. Plaintiffs attempt to suggest that these activities should be treated as overt acts in furtherance of the conspiracies. Yet, plaintiffs do not allege anything more than that there was a March meeting at a D.C. hotel where the Trump Campaign adopted a favorable approach to Russia and an April meeting at another D.C. hotel where high-level Trump Campaign officials talked to the Russian Ambassador.

These contacts, as alleged, do not establish specific jurisdiction over the Trump Campaign. At some point, agents of the Trump Campaign, such as George Papadopoulos may have learned—at a meeting in London on April 26, 2016—that Russians had emails concerning Hillary Clinton.[16] But in any event, there is no indication that the two meeting that occurred in the District related in any way to the emails or to discussions about working with Russian agents to publish those emails.[17]

Without more specific allegations, the Court cannot assume that meetings in the District in March and April involving the Trump Campaign's national security team or the Russian

---

[16] As of the March meeting at the Trump Hotel, there is no suggestion that any Trump Campaign official knew of the existence of the hacked emails. The April 26th Papadopoulos meeting in London is not mentioned in the complaint, but plaintiffs reference it in their motion for jurisdictional discovery. (Pls.' Mot. for Jurisdictional Disc., ECF No. 62, at 11.)

[17] Admittedly, if the Trump Campaign took a favorable approach to Russia in exchange for help from the Russian government in defeating Hillary Clinton's candidacy, this may have violated federal election law, but such conduct alone could not be the subject of a lawsuit brought by these plaintiffs. Rather, plaintiffs can only vindicate harms that are done to them by the defendants or their co-conspirators.

Ambassador related to plaintiffs' claims. Take, for instance, *Second Amendment Foundation v. United States Conference of Mayors*, 274 F.3d 521 (D.C. Cir. 2001), a case plaintiffs rely on in their own briefing. (Pls.' Opp. at 20.) In *Second Amendment Foundation*, plaintiffs ("SAF") brought suit against the Conference of Mayors under 42 U.S.C. § 1983, alleging that the mayors conspired together to sue gun manufacturers and dealers in order to bankrupt the manufacturers and dealers. 274 F.3d at 522.

> The mayors, pointing out that none of them lives in the District of Columbia, moved to dismiss for lack of personal jurisdiction. In response, SAF asserted that the district court had jurisdiction under the District of Columbia long-arm statute, which accords jurisdiction over persons who "transact[ ] business" in the District "directly or by an agent[.]" D.C. Code Ann. § 13–423(a)(1) (West 2001). As evidence that the mayors transacted business here, SAF pointed to the United States Conference of Mayors' web site, which reports that at the Conference's 67th Winter Meeting, held in the District of Columbia, the mayors discussed their litigation against gun manufacturers. According to the web site, "[i]n a session closed to the public, Philadelphia Mayor Edward Rendell led mayors in a discussion of gun-related legislative and litigation strategies." In another session, the mayors "focused on lawsuits previously brought against the gun industry by the cities of New Orleans and Chicago, and two new suits filed by Miami–Dade County and Bridgeport." *Id.* The web site identifies four of the twenty-two mayors sued in this case as having participated in this session.

*Id.* at 522–23. "Concluding that SAF's allegations fell 'far short' of 'the prima facie showing necessary to carry the burden of establishing personal jurisdiction,' the district court dismissed the complaint pursuant to Federal Rule of Civil Procedure 12(b)(2)." *Id.* at 523.

The D.C. Circuit affirmed, explaining that the plaintiffs' allegations—that the mayors had met in D.C. and possibly discussed gun-related litigation strategies in closed sessions—were not sufficient to support a theory that those closed sessions were in furtherance of the conspiracy as alleged by the plaintiffs. *Id.* at 523–25. "Were [they] to conclude otherwise, people would be unable to meet in the nation's capital to discuss issues of concern without subjecting themselves to the jurisdiction of D.C. courts." *Id.* at 524. The D.C. Circuit further explained that, even

25

assuming that the alleged conspiracy would be unlawful, the plaintiffs had "alleged no 'specific

acts' showing" an agreement or acts in furtherance of the conspiracy. *Id.* "The allegation that

the mayors 'conspired together' represents nothing more than a legal conclusion, which we have

held 'does not constitute the prima facie showing necessary to carry the burden of establishing

personal jurisdiction.'" *Id.*

Unlike plaintiffs here, the plaintiffs in *Second Amendment Foundation* alleged that the

Conference of Mayors actually discussed plans relevant to the alleged conspiracy at the meeting,

but the D.C. Circuit ultimately found that allegation insufficient to confer personal jurisdiction.

As in *Second Amendment Foundation*, the Court needs more than "[m]ere conclusions or 'bare

allegation[s]' [since they] do not constitute the *prima facie* case for jurisdiction that [the due

process] standard requires." *Fawzi*, 273 F. Supp. 3d at 186; *Does 1-144 v. Chiquita Brands Int'l,

Inc.*, 285 F. Supp. 3d 228, 234 (D.D.C. 2018) ("This single assertion about one meeting at the

Department of Justice does not create a basis for personal jurisdiction in this District under the

District of Columbia long-arm statute. Plaintiffs have failed to plead with particularity the

existence of a conspiracy between the alleged co-conspirators or to explain how the single

meeting in this District furthered the alleged conspiracy."); *see also Bigelow*, 299 F. Supp. 3d at

45.[18]

---

[18] Plaintiffs cite *Dooley v. United Technologies Corporation*, for the proposition that a court in
the District has specific jurisdiction where a "conspiracy allegedly came to its inception" in D.C.
786 F. Supp. 65, 72 (D.D.C. 1992), *abrogated on other grounds by FC Inv. Grp. LC v. IFX
Markets, Ltd.*, 529 F.3d 1087 (D.C. Cir. 2008). *Dooley* is distinguishable on multiple grounds.
First, plaintiffs here have not specifically alleged that the conspiracies came to their inception in
D.C. Second, in *Dooley* the plaintiffs pleaded the conspiracy with much more particularity:

> [P]laintiff Dooley has set forth, in extraordinary detail, his allegations of
> conspiracy and each defendant's alleged involvement. He has cataloged numerous
> meetings allegedly held by the co-conspirators, and in many instances, described
> discussions which took place. Additionally, he has set forth a number of overt acts

c.      **Emails from the Trump Campaign**

Plaintiffs also point to "communications during which at least one party was in D.C."

(Pls.' Opp. at 19.)  But the Court is unable to identify from plaintiffs' complaint any

communications based in the District or sent to the District that establish suit-related contacts.

Plaintiffs' complaint is far from a model of clarity, but they allege, on information and

belief, that the "Trump Campaign associates exchanged at least 18 undisclosed calls and emails

with Russian officials and agents between April and November 2016, including at least six with

Russian Ambassador the United States Sergey Kislyak, whose U.S. office and residence is in

Washington D.C." (Compl. ¶ 92.)  Calls and emails occurring after July 22, 2016, do not have a

suit-related connection to the conspiracies that plaintiffs allege. *See infra* Part II.B.1.ii.d.  As to

plaintiffs' reference to the Russian Ambassador, plaintiffs fail to specify the time frame that he

was contacted, and they have provided no basis to infer that the Russian Ambassador's

conversations were in furtherance of the conspiracies alleged in the complaint or that he was a

participant in those conspiracies.

Plaintiffs also allege that on July 7, 2016, Paul Manafort, while in Washington D.C.,

"sent an email through an intermediary to Oleg Deripaska, a Russian billionaire with close ties to

Mr. Putin, offering to brief him about the campaign. The email stated: 'If he needs private

briefings we can accommodate.'" (Compl. ¶ 99.)  The complaint fails to tie this email to the

alleged conspiracies, but more importantly, the complaint cites allegations about Paul Manafort's

personal and business ties to Russian interests, including the claim that "Mr. Manafort was in

debt to Russian interests by as much as $ 17 million just months before he joined the Trump

---

within the District of Columbia allegedly committed by co-conspirators.

*Id.* at 78.

Campaign." (*Id.* ¶ 127; *see also id.* ¶ 97 ("While he was Campaign Chairman, Mr. Manafort also

sent emails from his Campaign account to Mr. Kilimnik in which Mr. Manafort emphasized his

influence in the Trump Campaign, sought repayment of debts, and discussed potential new

business opportunities in Ukraine.").)  Thus, Manafort had compelling business and financial

reasons to contact Deripaska and other Russian agents, which had nothing to do with plaintiffs'

claimed conspiracies. *See also Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 138–40

(D.D.C. 2017), *appeal dismissed*, No. 17-7164, 2017 WL 6553388 (D.C. Cir. Dec. 8, 2017).

Without an allegation linking Manafort's communications to plaintiffs' alleged conspiracies, this

Court cannot infer that Manafort's email to Deripaska plausibly represents a suit-related

contact.[19]

### d.    Post-Conspiracy Acts in D.C.

Moreover, plaintiffs cannot establish personal jurisdiction over the Trump Campaign by

alleging that agents of the Trump Campaign may have had foreign-policy conversations or

conversations about further email disclosures with Russian agents after the DNC email

-----

[19] Plaintiffs' complaint does refer to meetings that Manafort had with a Russian-Ukrainian
operative— Konstantin Kilimnik.  (Compl. ¶ 97.)  But these meetings occurred outside the
district, one in New York in May 2016 and one in Cleveland in August 2016.  (*Id.*)  It appears
from the complaint that any conversation about emails between Manafort and Kilimnik occurred
in Cleveland in August, after the publication of the emails, since the conversation about emails
also references the Republican Convention which had already occurred in July:

> On information and belief, around the time Mr. Manafort took over as Campaign
> Chairman in May of 2016, he met in New York with Konstantin Kilimnik, a
> Russian-Ukrainian operative with suspected ties to Russian intelligence who
> traveled from the Ukraine to the U.S. for that meeting. Mr. Manafort met with Mr.
> Kilimnik *again in Cleveland in August of 2016. Mr. Manafort discussed the
> hacking of DNC emails with Mr. Kilimnik, and Mr. Kilimnik has claimed that he
> played a role in preventing adoption of a version of an amendment to the
> Republican Party platform regarding military aid to Ukraine.*

(*Id.* (emphasis added).)

28

publication relevant to plaintiffs' claims was complete, even if discussions between agents of the Trump Campaign and Russian agents are arguably probative of a conspiracy. (*See, e.g.*, Compl. ¶¶ 152–54 (describing a December 2016 phone conversation between Michael Flynn and Russian Ambassador Kislyak).)  Similarly, plaintiffs cannot establish personal jurisdiction over the Trump Campaign by alleging that agents of the Trump Campaign sought to lie or conceal evidence of their contacts with Russian agents.

   While civil conspiracies share some similarities with criminal conspiracies, they are principally distinct in that, for a Court to impose liability, the underlying unlawful act must cause some injury.  *See* 42 U.S.C. § 1985(3) (requiring injury to sustain an action: "in any case of conspiracy set forth in this section . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators"); *Second Amendment Found.*, 274 F.3d at 524 ("In the District of Columbia, civil conspiracy has four elements: '(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme.'") (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)); *see also Richards*, 480 F. Supp. 2d at 241.  Therefore, courts should determine specific jurisdiction pertaining to civil conspiracies by examining the agreement and the overt acts that led to the plaintiff's injury.  *See Graves*, 961 F. Supp. at 321 (To sustain a § 1985 claim a plaintiff must "allege a connection between the overt acts, the furtherance of the conspiracy, and the plaintiff's injury").  Activities that occur after the injury occurred could be circumstantial evidence that conspiracies had existed, but these acts do not constitute in-forum contacts for purposes of establishing specific jurisdiction. *See, e.g.*, *Kopff*, 425 F. Supp. 2d at 85.

The same conclusion follows for acts of concealment that postdate the conclusion of the conspiracies. Even in the context of criminal conspiracies, acts of concealment that follow completion of the conspiracies' main objective are generally not considered to be part of the conspiracy, *see Grunewald v. United States*, 353 U.S. 391, 402 (1957), and courts have applied *Grunewald* and its progeny to civil conspiracies. *See, e.g., Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1118 (D.C. Cir. 1991). When considering acts of concealment in the context of a civil conspiracy, courts require plaintiffs to plead with particularity facts that show defendants agreed, as part of their initial conspiratorial agreement, to include acts of concealment as a necessary component of the underlying wrongdoing. *See EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*, 246 F. Supp. 3d 52, 90–91 (D.D.C. 2017). It is therefore not sufficient to allege that after the conspiracy ended, an individual co-conspirator sought to deny the conspiracy's existence or his role in it.

In short, federal courts can only redress injuries that arise from cognizable cases and controversies. U.S. Const. Art. III. A plaintiff essentially defines the parameters of his case or controversy by virtue of his complaint. Plaintiffs' tort claims cannot arise from events that occurred after the torts were committed, and plaintiffs' § 1985(3) claim cannot arise out of events that occurred after plaintiffs were intimidated or injured on account of their support and advocacy.

### e.    Plaintiffs' Harm in D.C.

Lastly, plaintiffs attempt to connect the Trump Campaign to the District by reference to alleged harms suffered by plaintiffs in the District:

> This Court may also exercise specific personal jurisdiction over Defendants because their actions foreseeably caused harm in D.C., and that harm is the basis of Plaintiffs' claims. First, Defendants harmed Mr. Comer's professional reputation in D.C. Second, Defendants harmed Plaintiffs' ability to support their

> preferred candidates for elected office, and D.C. was the locus of Plaintiffs'
> political advocacy.

(Pls.' Opp. at 21.)  This argument fails for two related reasons.

First, the harm to plaintiffs was not suffered in the forum.  No plaintiff is domiciled in the

District.  Cockrum and Schoenberg suffered emotional injury related to disclosure of their social

security numbers at home, outside of the District.  *See Masterson-Cook v. Criss Bros. Iron*

*Works*, 722 F. Supp. 810, 813 (D.D.C. 1989).  Second, assuming personal jurisdiction over out-

of-state defendants because plaintiffs' support and advocacy focused on national campaigns run

by entities operating in the District would ignore *Walden*'s requirement of defendant-centered

contacts.[20]

Comer presents a stronger argument for finding at least some harm in the forum.  Like

Cockrum and Schoenberg, Comer's emotional injuries are considered to have been suffered at

home in Maryland.  However, Comer worked for the DNC in the District.  Comer thus claims

that both his § 1985 injury and his tort-law injuries are connected to the reputational injury and

emotional harm he suffered at his job.  Even this is not enough.  *See Exponential Biotherapies,*

*Inc. v. Houthoff Buruma N.V.*, 638 F. Supp. 2d 1, 10 (D.D.C. 2009).

Moreover, assuming *arguendo* that some of plaintiffs' injuries were suffered in the

District, these injuries cannot serve as an independent basis for exercising personal jurisdiction

over an out-of-state defendant that does not have sufficient in-forum contacts, as the Supreme

---

[20] Taken to its logical conclusion, this argument would give the District personal jurisdiction
over all claims brought under § 1985(3).  For example, under plaintiffs' theory, this Court would
have personal jurisdiction in a suit brought by an Alaskan citizen based on an alleged conspiracy
that threatened the Alaskan citizen's right to send money to the DNC to support national election
efforts.  When confronted with similar "national connection" theories of personal jurisdiction in
other contexts, courts in this Circuit have refused to allow personal jurisdiction over non-
residents whose only contacts with the District arise from its role as the epicenter of national
politics.  *See, e.g.*, *Bigelow*, 299 F. Supp. 3d at 42–45; *see also Atlantigas Corp.*, 290 F. Supp. 2d
at 44.

Court has held, "the plaintiff cannot be the only link between the defendant and the forum.

Rather, it is the defendant's conduct that must form the necessary connection with the forum

State that is the basis for its jurisdiction over him." *Walden*, 134 S. Ct. at 1122.[21]

### iii.   Roger Stone

According to plaintiffs' statements at the hearing, they "are primarily relying on"

conspiratorial personal jurisdiction to establish specific jurisdiction over Stone.  (Tr. at 22.)  But

to the extent that plaintiffs have raised the possibility of relying on suit-related contacts by Stone

in D.C., the Court can quickly dispense with such a suggestion.  In the complaint it is alleged that

Stone has suit-related contacts with D.C. because of his employment with the Trump Campaign.

(Compl. ¶ 41.)[22]  But plaintiffs have not alleged that Stone's work for the Trump Campaign was

related to the alleged conspiracies. *See, e.g., Graves*, 961 F. Supp. at 321.  In fact, plaintiffs have

not alleged that Stone joined the conspiracies before either the hack of the DNC servers or the

dissemination of the emails on July 22, 2016.[23]

---

[21] Although plaintiffs do not cite *Calder v. Jones*, 465 U.S. 783 (1984), they rely on personal-jurisdiction precedent that purports to follow *Calder* by allowing personal jurisdiction over a defendant whose out-of-state conduct causes tortious injury in the forum where the plaintiff brought suit.  But in *Walden*, the Supreme Court explained that *Calder* did not rest on the proposition that tortfeasors would always be subject to personal jurisdiction simply because their alleged wrong caused harm in the forum where the plaintiff brought suit.  Rather, "[a] forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum," *Walden*, 134 S. Ct. at 1123, and according to the Supreme Court, both *Calder* and *Walden* are properly understood as focusing on "the relationship among the defendant, the forum, and the litigation." *Id.*

[22] Stone ended his official employment with the Trump Campaign in August 2015, but plaintiffs allege that he "continued to play an important role in the Trump Campaign as an advisor even after his departure, and he remained in regular contact with Mr. Trump throughout the campaign." (Compl. ¶ 41.)

[23] Recent news reports published since the Court's hearing suggest that Stone may have met with a Russian who may have had damaging information about Hillary Clinton in May 2016. *See, e.g.*, Manuel Roig-Franzia & Rosalind S. Helderman, "Trump Associate Roger Stone Reveals

Plaintiffs also allege that Stone had contact with D.C. as a result of "at least two trips to

D.C. during the campaign—on or about November 9, 2015, and on or about October 30, 2016—

during which, on information and belief, he interacted with other agents and associates of the

Campaign." (Compl. ¶ 41.)  One of these trips occurred long before any conspiracy could have

begun and the other occurred after the emails were disseminated.

The flaws in plaintiffs' definition of the scope of the conspiracies also apply to plaintiffs'

arguments about other actions by Stone. *See supra* Part II.B.1.ii; (*see also* Compl.  ¶¶ 163–64,

170–72 (discussing twitter public and private conversations Stone had with an alleged Russian

hacker *after* July 22, 2016); *id.* ¶ 216 (citing Stone's *July 11, 2017* denial of Russian interference

in the 2016 election)); *Atlantigas Corp.*, 290 F. Supp. 2d at 42 (noting that normally a "plaintiff

cannot aggregate factual allegations concerning multiple defendants in order to demonstrate

personal jurisdiction over any individual defendant.").

## 2.    Conspiratorial Theory of Personal Jurisdiction

Plaintiffs' remaining argument is based on a theory of conspiratorial jurisdiction, which

uses the overt acts of co-conspirators in the forum as a basis for exercising specific jurisdiction

over a defendant who otherwise has insufficient in-forum contacts.[24]  Plaintiffs point to the fact

---

New Contact with Russian National During 2016 Campaign", Washington Post (June 17, 2018),
https://www.washingtonpost.com/politics/trump-associate-roger-stone-reveals-new-contact-with-
russian-national-during-2016-campaign/2018/06/17/4a8123c8-6fd0-11e8-bd50-
b80389a4e569_story.html?utm_term=.76a839ea96f1.  However, this meeting occurred in
Florida. *Id.*

[24] Plaintiffs appeared to concede at the hearing that they were relying on a theory of
conspiratorial jurisdiction to establish jurisdiction over Stone, but not the Trump Campaign:

> So let me be clear about this. We are alleging that the campaign engaged in acts in
> furtherance of the conspiracy in the forum. We are not relying on the acts of the
> campaign's coconspirators. We're saying the campaign itself engaged in acts in
> furtherance of the conspiracy in the forum.

that the emails disclosed by WikiLeaks on July 22, 2016, came from the hacking of DNC servers

located in the District. (Pls.' Opp. at 20–21.) While plaintiffs acknowledge that they are not

seeking to hold defendants directly liable for a conspiracy to hack into the DNC servers (*Id.* at

21; Tr. at 7), they nevertheless argue that the hack should be considered because "[c]o-

conspirators can be liable for acts that took place before they joined the conspiracy" for purposes

of specific jurisdiction. (Pls. Opp. at 21.) Plaintiffs also suggest that defendants' co-conspirators

may have taken other actions in the District that could subject defendants to conspiratorial

personal jurisdiction. (*See id.* at 20 (noting that "this Court may exercise jurisdiction over

Defendants because their co-conspirators acted [in D.C.], and those actions gave rise to

Plaintiffs' claims.").) In making this argument, plaintiffs again ignore both the scope of the

conspiracies alleged in their complaint, and the focus of specific jurisdiction as clarified by the

Supreme Court in *Walden*.

### i.   Legal Principles

Some cases in this Circuit, predating the Supreme Court's 2014 decision in *Walden v.*

*Fiore*, discussed a conspiracy theory of personal jurisdiction, and those cases required "a prima

facie showing of (1) a conspiracy (2) in which the defendant participated and (3) a co-

conspirator's overt act within the forum, subject to the long-arm statute and in furtherance of the

conspiracy." *Youming Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72, 78 (D.D.C. 2004)

(footnote omitted); *FC Inv. Grp. LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1096 (D.C. Cir. 2008);

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1168 (D.C. Cir. 2002).

---

(Tr. at 14.)  Despite this unambiguous statement, plaintiffs addressed this theory in their
opposition to the motion to dismiss (Pls.' Opp. at 20), and in their motion for jurisdictional
discovery. (Pls.' Mot. for Jurisdictional Disc., ECF No. 62, at 1.)  The Court, out of an
abundance of caution, will therefore address the theory of conspiratorial jurisdiction as it relates
to the Trump Campaign and Stone.

In *Youming Jin v. Ministry of State Security*, Judge Urbina presciently noted:

> without [imposing additional requirements besides the three listed above], one might wonder what happened to the due process requirement regarding "the foreseeability that is critical to due process analysis . . . that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." In fact, it is not entirely clear whether the doctrine of conspiracy jurisdiction seeks to sidestep an explicit due process analysis altogether or whether due process is the second step in an analysis that begins with the three elements listed above

335 F. Supp. 2d at 79 (citation omitted).  In *Youming Jin*, Judge Urbina held that "jurisdiction based on the three traditional elements of conspiracy jurisdiction alone violates due process. Personal jurisdiction, even if based on conspiracy, requires purposeful availment." *Id.* at 80. However, he noted that one way to reconcile conspiratorial jurisdiction with due process would be to "require another element for conspiracy jurisdiction: the defendant's awareness or knowledge of the co-conspirator's acts in the forum." *Id.* at 79.

The Supreme cast further doubt on a broad-reaching theory of conspiratorial jurisdiction in its 2014 decision in *Walden*.  As already explained, in *Walden*, the Supreme Court made clear that, for purposes of determining specific jurisdiction, "it is the defendant, not the plaintiff or third parties, who must create contacts with the forum State." *Walden*, 134 S. Ct. at 1126.

After *Walden*, very few cases have discussed a theory of specific jurisdiction based on acts of co-conspirators.  A notable exception is Judge Mehta's decision in *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*, where he noted that "[c]ourts in this Circuit . . . have applied the test for co-conspirator jurisdiction 'warily' in order 'to prevent a broad extension of long-arm jurisdiction.'" 246 F. Supp. 3d at 90 (citation omitted).  "As a result, the D.C. Circuit requires that the plaintiff 'plead *with particularity* the conspiracy as well as the *overt acts within the forum* taken in furtherance of the conspiracy' in order to establish conspiracy jurisdiction over a

35

defendant." *Id.* (citation omitted). "This particularity requirement is 'strictly enforced.'" *Id.*

(citation omitted); *see also Does 1-144*, 285 F. Supp. 3d at 234; *Globe Metallurgical, Inc. v.

Rima Indus. S.A.*, 177 F. Supp. 3d 317, 330 (D.D.C. 2016), *appeal dismissed sub nom. Globe

Metallurgical, Inc. v. Rima Indus., S/A*, No. 16-7058, 2016 WL 3543509 (D.C. Cir. June 18,

2016); *Mensah-Yawson v. Raden*, 170 F. Supp. 3d 222, 230 (D.D.C. 2016). Judge Mehta's

opinion addressed the implications of *Walden*, and concluded that "following *Walden*, a plaintiff

who seeks to establish jurisdiction over a defendant based on a co-conspirator's contacts must

plead, at a minimum, that the defendant *knew* his co-conspirator was carrying out acts in

furtherance of the conspiracy *in the forum*." *EIG Energy Fund XIV, L.P.*, 246 F. Supp. 3d at 91.

Adopting the approach taken by Judge Mehta, this Court concludes that if any

conspiratorial jurisdiction survives *Walden*, a plaintiff pursuing such a theory must allege that the

defendant knew of the co-conspirator's acts in the forum. Furthermore, at the very least, a

plaintiff needs to meet the Circuit's strict particularity requirement to comport with due

process.[25]

### ii.   The Trump Campaign and Stone

Thus, for purposes of specific jurisdiction, the Court must focus on when defendants

began taking steps to join the conspiracies or themselves committed acts that were in furtherance

of the conspiracies. Plaintiffs' theory of the case is that the Trump Campaign became aware,

sometime in spring of 2016, at the earliest, that Russian agents had hacked into DNC servers and

---

[25] This Court's survey of out-of-Circuit precedent revealed that most courts addressing the issue of conspiratorial jurisdiction post-*Walden* have refused to apply the theory or have limited it. *See, e.g., Wescott v. Reisner*, No. 17-cv-06271, 2018 WL 2463614, at *4 (N.D. Cal. June 1, 2018) (noting that "district courts in this circuit [the Ninth Circuit] have refused to exercise personal jurisdiction over defendants based solely on the actions of their co-conspirators. In any event, California courts applying both California and federal due process have held that personal jurisdiction does not lie over an out-of-state defendant merely because of the residence or acts of a co-conspirator.") (citation omitted).

obtained information that would be damaging to Hillary Clinton and the Democratic Party. As for Stone, plaintiffs have no allegations suggesting he even became privy to this information pre-July 22, 2016, much less that he joined conspiracies whose objective it was to disseminate the DNC emails.

Plaintiffs do not allege that defendants directed the Russian hackers to target servers or locations in the District, nor do they allege that defendants joined a conspiracy the purpose of which was to hack the DNC servers. *See Kopff*, 425 F. Supp. 2d at 88. The Court cannot exercise jurisdiction over defendants by reference to activities performed by Russians participating in a separate conspiracy of hacking (as opposed to the publication of emails) that occurred during a different time frame from that of plaintiffs' alleged conspiracies. *See Walden*, 134 S. Ct. at 1126; *Halberstam*, 705 F.2d at 477; *see also Mattel, Inc. v. MGA Entm't, Inc.*, No. 04-cv-9049, 2010 WL 11463911, at *3 (C.D. Cal. Sept. 3, 2010) ("[O]ne logically cannot contemplate acts committed in furtherance of a conspiracy into which he has not yet entered."). Therefore, plaintiffs cannot invoke the hack to support claims of personal jurisdiction.

As for other in-forum acts by co-conspirators, plaintiffs have not met the exacting particularity requirement for pleading conspiratorial personal jurisdiction. *See Mensah-Yawson*, 170 F. Supp. 3d at 230 & n.4; *North v. Smarsh, Inc.*, 265 F. Supp. 3d 71, 77 (D.D.C. 2017), *aff'd*, No. 17-7120, 2017 WL 6553385 (D.C. Cir. Dec. 6, 2017) ("Both the existence of the conspiracy and the overt action taken within the forum must be plead with particularity.").

On the contrary, plaintiffs broadly rely on allegations that defendants conspired with WikiLeaks and Russian agents. But these amorphous allegations are not sufficient.

First, WikiLeaks did not subject itself to personal jurisdiction in the District simply by posting material on the Internet that could be read by District residents. *See, e.g., Hourani v.*

*Psybersolutions LLC*, 164 F. Supp. 3d 128, 139 (D.D.C. 2016), *aff'd*, 690 F. App'x 1 (D.C. Cir.

2017); *Bigelow*, 299 F. Supp. 3d at 45.  And plaintiffs do not allege any other acts by WikiLeaks

connected to the District.

As for Russian agents, plaintiffs' complaint fails to identify who these Russian agents

are.  At the hearing, when asked to identify the Russian co-conspirators, plaintiffs' counsel

stated: "We don't name anyone [of the Russian agents] –we don't name any other

coconspirators, nor are we required to name all coconspirators.  We have the campaign, Mr.

Stone, of course, and WikiLeaks." (Tr. at 10.)  Apparently, plaintiffs are content to rely on Stone

and WikiLeaks, neither of whom committed any in-forum overt acts in furtherance of the

conspiracies.  Alternatively, as plaintiffs seem to implicitly recognize, subjecting defendants to

personal jurisdiction based on unspecified acts by unidentified third parties would offend

traditional notions of fair play and substantial justice.  *See North*, 265 F. Supp. 3d at 77–78.

Finally, the Court cannot subject Stone to personal jurisdiction by reference to a

conspiracy with the Trump Campaign when the Trump Campaign's suit-related contacts

themselves failed to subject the Trump Campaign to specific jurisdiction.  *See supra* Part

II.B.1.ii.

## C.    **Jurisdictional Discovery**

The D.C. Circuit has consistently held that district courts exercise broad discretion in

resolving jurisdictional discovery disputes.  *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 788

(D.C. Cir. 1983).  To obtain jurisdictional discovery a plaintiff must request discovery in a

detailed manner "at an appropriate stage in the course of litigation."  *City of Moundridge v.*

*Exxon Mobil Corp.*, 244 F.R.D. 10, 14 (D.D.C. 2007); *see also Second Amendment Found.*, 274

F.3d at 525; *NBC-USA Hous., Inc. Twenty-Six v. Donovan*, 741 F. Supp. 2d 55, 60 (D.D.C.

2010).  The Court denies plaintiffs' motion because it is both untimely and ill-defined.

### 1.      Untimely

Plaintiffs' motion for jurisdictional discovery is untimely.  When a defendant has moved to dismiss a complaint on jurisdictional grounds, the appropriate time to request jurisdictional discovery is in opposition to the defendant's motion—whether a plaintiff files a separate motion for jurisdictional discovery or puts the Court on notice by requesting jurisdictional discovery in a detailed manner in the opposition to the motion to dismiss.  *See City of Moundridge*, 244 F.R.D. at 14–16; *see also Second Amendment Found.*, 274 F.3d at 525; *Eliahu v. Israel*, No. 14-cv-01636, 2015 WL 981517, at *9 (N.D. Cal. Mar. 3, 2015), *aff'd sub nom.*, 659 F. App'x 451 (9th Cir. 2016).

Plaintiffs knew that defendants were opposing plaintiffs' complaint on jurisdictional grounds when defendants first moved to dismiss in September 2017.  After plaintiffs amended their complaint, defendants again moved to dismiss on jurisdictional grounds in October 2017.

Yet, despite notice that they were defending their complaint against a motion to dismiss on jurisdictional grounds, plaintiffs only briefly mentioned discovery in a couple of sentences tucked away in a footnote of an 84-page opposition: "Plaintiffs believe that the allegations in the Complaint are sufficient to establish that this Court may exercise personal jurisdiction over Defendants. If the Court disagrees, Plaintiffs should be allowed to take jurisdictional discovery." (Pls.' Opp. at 18 n. 7.)

"[E]ven if that footnote had constituted a request for jurisdictional discovery — which it most certainly did not — that request would have been woefully deficient."  *GSS Grp. Ltd. v. Nat'l Port Auth.*, No. 09-cv-1322, 2011 WL 13121428, at *6 (D.D.C. Aug. 10, 2011).  A plaintiff seeking jurisdictional discovery must explain in detail what discovery she wishes to

39

conduct and what results she anticipates it would produce. *See NBC-USA Housing, Inc.*, 741 F.

Supp. 2d at 60–61; *see also Second Amendment Found.*, 274 F.3d at 525. Plaintiffs' footnote is

conclusory, ambiguous, and explains nothing. *See Atlantigas Corp.*, 290 F. Supp. 2d at 53

("Plaintiff's request to supplement its jurisdictional allegations through discovery is not merely

ambiguous, it is conclusory and vague, and therefore insufficient.").

Plaintiffs had ample opportunity to address jurisdictional discovery not only in their

opposition, but also in their surreply.  In its reply filed on December 29, 2017, the Trump

Campaign put forth a sound argument for why plaintiffs were not entitled to jurisdictional

discovery (Trump Campaign Reply, ECF No. 42, at 6), but plaintiffs made no mention of

jurisdictional discovery in their surreply filed on February 7, 2018.  Likewise, plaintiffs remained

mute on the subject of jurisdictional discovery during the Court's May 17, 2018 hearing, despite

the fact that the over 3-hour hearing focused on personal jurisdiction and the flaws in plaintiffs'

jurisdictional allegations.

### 2.     Ill-defined

Plaintiffs waited until after the Court's hearing to file a 24-page motion for

jurisdictional discovery, presumably because the Court's extensive questioning on personal

jurisdictional alerted plaintiffs to the risk of relying on their complaint.  This motion came too

late, but even this late-filed motion is ill-defined and overly broad. *See Atlantigas Corp.*, 290 F.

Supp. 2d at 53.  Plaintiffs have failed to specifically tailor their discovery requests to

jurisdictional matters. *See Coal. for Mercury-Free Drugs v. Sebelius*, 725 F. Supp. 2d 1, 5

(D.D.C. 2010), *aff'd*, 671 F.3d 1275 (D.C. Cir. 2012) ("The Court also concludes that the

plaintiffs' request for jurisdictional discovery was not narrowly tailored to produce information

relevant to the issue of standing and thus ordering jurisdiction discovery is not warranted.").

Instead, they are seeking merits discovery.  Plaintiffs want to serve defendants with discovery requests for material related to "Relevant Forum Contact" defined as

> any in-person meeting, telephone conversation, or other communication, including electronic communications, conducted in the District of Columbia involving any Defendant, or between any Defendant and any Russian or Russian agent or any agent of WikiLeaks, in which any form of assistance by Russia or Russian agents to the Trump Campaign was discussed or facilitated, including but not limited to any discussions of the DNC emails, publication of the DNC emails by WikiLeaks, or the resulting impact on the Clinton campaign.

(Pls.' Mot. for Jurisdictional Disc., ECF No. 62, at 16.)  Plaintiffs request: (1) all initial disclosures required under Federal Rule of Civil Procedure 26(a); (2) interrogatories to identify all persons with knowledge of, or possession of, materials pertaining to Relevant Forum Contacts; (3) materials relating to the date, time, location, participants, and subject matter of any Relevant Forum Contacts (including the D.C. meetings of the Trump Campaign on March 31, 2016 and April 27, 2016, but not limited to these meetings); and (4) depositions of all persons with knowledge relating to any Relevant Forum Contacts or the location and condition of evidence relating to Relevant Forum Contacts.  (*Id.* at 16–18.)  In addition to this wide-ranging discovery, plaintiffs seek additional discovery related to their conspiracy theory of jurisdiction by expanding the term "Relevant Forum Contacts" to include:

> all contacts in the District of Columbia (1) between the Defendants, (2) between the Defendants and Russians or Russian agents or agents of WikiLeaks, or (3) attended by Russians, Russian agents, agents of WikiLeaks, or others acting in concert with them, in which any form of assistance by Russians or Russian agents to the Trump Campaign was discussed or facilitated including but not limited to any discussions of the DNC emails, publication of the DNC emails by WikiLeaks, or the resulting impact on the Clinton campaign.

(*Id.* at 18.)

These requests "do[] not constitute the required 'detailed showing of what discovery [plaintiffs] wish to conduct or what result [plaintiffs] think such discovery would produce.'"

41

*App Dynamic EHF v. Vignisson*, 87 F. Supp. 3d 322, 330 (D.D.C. 2015) (citation omitted).

Instead, they are trying to sidestep any procedural barriers to their bringing suit, in a thinly-

veiled effort to obtain discovery on the merits of their case. *See Shaheen v. Smith*, 994 F. Supp.

2d 77, 89 (D.D.C. 2013) ("The plaintiff only asserts that discovery should be 'freely given,' but

does not assert any other facts that establish that his request for discovery is more than a

speculative fishing expedition."); *see also Bible Way Church of Our Lord Jesus Christ World

Wide, Inc. v. Showell*, 578 F. Supp. 2d 164, 171 (D.D.C. 2008); *Lehigh Val. Indus., Inc. v.

Birenbaum*, 527 F.2d 87, 93–94 (2d Cir. 1975).

Granting plaintiffs' overreaching and ill-defined jurisdictional-discovery motion would

also draw this Court into endless discovery disputes.  For example, plaintiffs' request for

depositions would include Trump Campaign officials who are now high-level officials in the

Executive Branch, possibly even the President.  *See Cheney v. U.S. Dist. Court for D.C.*, 542

U.S. 367, 384–89 (2004); *see also id.* at 385 ("A party's need for information is only one facet of

the problem. An important factor weighing in the opposite direction is the burden imposed by the

discovery orders. This is not a routine discovery dispute. The discovery requests are directed to

the Vice President and other senior Government officials who served on the NEPDG to give

advice and make recommendations to the President.").  Similarly, plaintiffs admit that their

allegations of conspiracy dovetail with Special Prosecutor Robert Muller's ongoing

investigations, so they will be faced with witnesses who will invoke their Fifth Amendment

rights.

The Court will not lightly set "coequal branches of the government" onto "a collision

course," *id.* at 389, especially when plaintiffs' jurisdictional-discovery requests "ask for

everything under the sky."  *Id.* at 387; *see also NBC-USA Hous., Inc.*, 741 F. Supp. 2d at 60–61

(examining the burden and expense of discovery in considering the propriety of jurisdictional

discovery).  For all these reasons, the Court denies plaintiffs' motion for jurisdictional discovery.

## III.    VENUE

In addition, the District of Columbia is an improper venue for plaintiffs' lawsuit.  The

parties have not sufficiently briefed or argued the issue of transfer, but at a minimum, the Court

finds that dismissal for improper venue is both warranted and within this Court's discretion.

The Court's venue analysis is governed by 28 U.S.C. § 1391. *Atl. Marine Const. Co.*,

571 U.S. at 55–56.  Under § 1391(b)(1), "[a] civil action may be brought in . . . a judicial district

in which any defendant resides, if all defendants are residents of the State in which the district is

located."  Subsection (b)(1) does not apply because no defendant resides in the District of

Columbia. *Lemon*, 270 F. Supp. 3d at 139.  Subsection (b)(3) is also inapplicable because the

Court has found that defendants are not subject to the personal jurisdiction of this Court.

That leaves the Court with § 1391(b)(2), which provides that "[a] civil action may be

brought in . . . a judicial district in which a *substantial* part of the events or omissions giving rise

to the claim occurred, or a substantial part of property that is the subject of the action is situated."

28 U.S.C. § 1391(b)(2) (emphasis added).   "[W]here 'the claim arose' should . . . be ascertained

by advertence to events having operative significance in the case, and a commonsense appraisal

of the implications of those events for accessibility to witnesses and records." *Lamont v. Haig*,

590 F.2d 1124, 1134 (D.C. Cir. 1978).  Peripheral and tangential events occurring in the district

will not establish venue. *See Ciralsky v. CIA*, 689 F. Supp. 2d 141, 161 (D.D.C. 2010).

"[P]laintiffs must show that a considerable portion of the events took place in their chosen

forum." *Perlmutter v. Varone*, 59 F. Supp. 3d 107, 110 (D.D.C. 2014).

Venue is improper in the District because plaintiffs have not sufficiently alleged that a

substantial part of the events giving rise to plaintiffs' claim occurred here. As plaintiffs

acknowledge, "the venue inquiry overlaps pretty closely with the personal jurisdiction inquiry [in

this case] because venue is based on conduct in furtherance of the conspiracy." (Tr. at 63.)

Here, plaintiffs' claims arose from alleged conspiracies to harm plaintiffs by publishing the

emails on July 22, 2016, and plaintiffs have alleged at most two meetings and some emails

involving a sender or recipient in the District that could possibly be linked to their alleged

conspiracies. Otherwise, plaintiffs rely on vague allegations of conspiratorial activity possibly

occurring in the District. (*See, e.g.*, Compl. ¶ 37 ("Many of the Campaign's agents and

associates were based in or near D.C. and spent a substantial amount of time in D.C. working on

behalf of the Campaign. Meetings and other conduct relevant to the conspiracy

occurred in D.C.").)  Plaintiffs' own allegations suggest that defendants largely orchestrated the

alleged conspiracies from New York—where the Trump Campaign was headquartered and

where Trump Campaign officials met with Russian agents in May and June. (*See id.* ¶¶ 97–98;

*see also id.* ¶ 41 (noting that Stone rents an apartment located in New York).)[26]  In fact, the

Democratic National Committee—the custodian of Cockrum's and Schoenberg's personal

information and of Comer's work emails—recently brought suit in the Southern District of New

York against, *inter alia*, the Russian Federation, WikiLeaks, the Trump Campaign, Roger Stone,

and other Trump Campaign employees and agents for violating a host of federal and state laws

covering both the hacking and the dissemination of the DNC emails.  Compl., *Democratic Nat'l*

*Comm. v. The Russian Federation et al.*, 18-cv-3501 (S.D.N.Y. Apr. 20, 2018).

 Plaintiffs' reticence to file in New York is understandable given their concession that

New York does not recognize their tort claims. (Tr. at 64.) But this Court must consider only

---

[26] The Trump Campaign remarked at the Court's hearing that "[a]t this juncture, I can't think of a
reason [venue would not lie in New York] in all candor." (Tr. at 60.)

the statutory limitations of 28 U.S.C. § 1391 when determining if venue is proper. *See Atl. Marine Const. Co.*, 571 U.S. at 56 (noting that "§ 1391 makes clear that venue in 'all civil actions' must be determined in accordance with the criteria outlined in that section. That language cannot reasonably be read to allow judicial consideration of other, extrastatutory limitations on the forum in which a case may be brought."). "The structure of the federal venue provisions confirms that they alone define whether venue exists in a given forum," *id.*, and here, it is clear that venue does not lie in the District.

## CONCLUSION

In summation, this is the wrong forum for plaintiffs' lawsuit. The Court takes no position on the merits of plaintiffs' claims. It holds only that plaintiffs have failed to carry their burden to demonstrate that this Court has jurisdiction and is the appropriate venue. Nor are plaintiffs entitled to jurisdictional discovery. Therefore, the Court denies plaintiffs' motion for jurisdictional discovery and dismisses their suit without prejudice.


/s/ *Ellen Segal Huvelle*

ELLEN SEGAL HUVELLE
United States District Judge

Date:   July 3, 2018

45