IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

MIKHAIL FRIDMAN, ET AL.,            )
                                    )   CV No. 17-2041
        Plaintiffs,                 )
                                    )   Washington, D.C.
        vs.                         )   September 26, 2018
                                    )   3:00 p.m.
BEAN LLC, ET AL.,                   )
                                    )
        Defendants.                 )
_____)


TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:          Alan S. Lewis
                             Karen E. Meara
                             John J. Walsh
                             CARTER, LEDYARD
                             & MILBURN LLP
                             2 Wall Street
                             New York, NY 10005
                             (212) 238-8647
                             lewis@clm.com


For the Defendants:          Rachel F. Cotton
                             Steven M. Salky
                             William W. Taylor, III
                             ZUCKERMAN SPAEDER, LLP
                             1800 M Street, NW
                             Suite 1000
                             Washington, D.C. 20036
                             (202) 778-1876
                             rcotton@zuckerman.com
                             ssalky@zuckerman.com
                             wtaylor@zuckerman.com

APPEARANCES CONTINUED

Court Reporter:                    William P. Zaremba
                                   Registered Merit Reporter
                                   Certified Realtime Reporter
                                   Official Court Reporter
                                   U.S. Courthouse
                                   333 Constitution Avenue, NW
                                   Room 6511
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
 1                    P R O C E E D I N G S
 2           DEPUTY CLERK:  All rise.  The United States
 3   District Court for the District of Columbia is now in
 4   session, the Honorable Richard J. Leon presiding.  God save
 5   the United States and this Honorable Court.  Please be
 6   seated and come to order.
 7           Good afternoon, Your Honor.
 8           This afternoon, we have Civil Action No. 17-2041,
 9   Mikhail Fridman, et al., versus Bean LLC, et al.
10           Will counsel for the parties please approach the
11   lectern and identify yourself for the record and the party
12   or parties you represent, please.
13           MR. LEWIS:  Good afternoon, Your Honor.  I'm
14   Alan Lewis of Carter, Ledyard and Milburn.  We represent the
15   plaintiffs.
16           At the table with me are my colleagues,
17   John J. Walsh and Karen Meara.
18           THE COURT:  Welcome.
19           MS. COTTON:  Good afternoon, sir.  I'm
20   Rachel Cotton of Zuckerman Spaeder.  We represent the
21   defendants.
22           And with me at counsel table are Steve Salky and
23   Bill Taylor.
24           THE COURT:  Welcome.
25           All right.  Well, we're here for the motion to
```

```
 1   dismiss.  So the moving party goes first.  You can have 20
 2   minutes.  And opposing party can have 20 minutes.  And then
 3   you can have three minutes for rebuttal, all right?
 4              MS. COTTON:  All right.
 5              Your Honor, as I said, my name is Rachel Cotton.
 6   I'm here on behalf of Defendants Fusion GPS.
 7              THE COURT:  Hold on.
 8              MS. COTTON:  Yes, sir.
 9              THE COURT:  Now, listen.  You have to slow down --
10              MS. COTTON:  Okay.
11              THE COURT:  -- for two reasons.  He's really good,
12   he's fabulous, but he can only go so fast.
13              MS. COTTON:  Fair enough.
14              THE COURT:  And at my age, I can only follow you
15   so fast.
16              MS. COTTON:  I grew up in New York; I talk fast
17   naturally.
18              THE COURT:  I know.  I can tell.  I can tell.
19              Okay.  So just --
20              MS. COTTON:  But I'll do my best to go as slowly
21   as possible.
22              THE COURT:  If I go like this, that's what I'm
23   telling you to do, slow down, okay?
24              MS. COTTON:  Not sit down?
25              THE COURT:  All right.  Slow down.
```

1           No, not sit down.

2           All right.  So now we'll start the clock.  Okay,

3    go ahead.

4           MS. COTTON:  As I said, I'm here on behalf of

5    Fusion GPS and Glenn Simpson, the defendants in this case.

6           I want to focus my argument, Your Honor, on

7    plaintiffs' public figure status and their failure to allege

8    actual malice, because I think that is a clear path to

9    dismissal of the complaint today.

10          The First Amendment jurisprudence sets an

11   intentionally high and demanding bar on recovery for

12   public-figure plaintiffs in a defamation suit.  They simply

13   have to allege actual malice.

14          Here, plaintiffs are public figures many times

15   over for the purposes of the document at issue, Company

16   Intelligence Report 112, or CIR 112 as we refer to it in our

17   papers.

18          As this Court knows, CIR 112 was one of the

19   17 memos that was authored by Christopher Steele, a former

20   British Intelligence officer.  They were published by

21   BuzzFeed in January of 2017 and have become known as the

22   dossier, although they were stand-alone memos.

23          Now, determining public-figure status can be hard.

24   Courts use the metaphor of nailing jellyfish to walls.  But

25   here, it's straightforward, or made more straightforward to

1   you -- for you, by the vast and indisputable public record

2   about these three plaintiffs, as well as the fact that two

3   judges have already adjudicated this question; first,

4   Judge Bates and then, just a couple of weeks ago,

5   Judge Epstein.  Judge Epstein had the companion case that

6   these plaintiffs brought against Christopher Steele over in

7   D.C. Superior Court.

8           But first I want to start with Judge Bates.

9   Judge Bates had a case ten years ago, where plaintiffs,

10  Fridman and Aven, sued for defamation, a local nonprofit.

11          Judge Bates went through the record and made a

12  number of observations and findings, including -- and

13  I'm going to quote some of them -- that, "Plaintiffs have

14  chosen paths of endeavor that invite attention and comment.

15  They are among the richest and most influential business

16  people in Russia, if not the world.  They have risen to

17  positions of unprecedented influence in the political and

18  economic affairs of their nation."

19          He quoted newspapers as saying that Aven and

20  Fridman, along with several other oligarchs, "run modern

21  Russia."

22          He noted their widespread access to the media,

23  numerous interviews to Russian and international press; that

24  their media presence extends to the United States, their

25  access to channels of effective communication, that they're

1    two of the most powerful Russian oligarchs, and more.

2            He also recognized that, despite Alfa Bank's

3    respected reputation, that Fridman and Aven have been dogged

4    by allegations of corruption and illegal conduct across a

5    number of specters.

6            Based on that record, Judge Bates easily concluded

7    that Fridman and Aven were limited public figures for

8    controversies which he described as corruption in

9    post-Soviet Russia and then the rise of the oligarchs and

10   the decline of the Russian economy.

11           Now, just a few weeks ago, as I said,

12   Judge Epstein, faced with the same plaintiffs and the same

13   facts and the same law as are before Your Honor, reviewed

14   Judge Bates's findings and found that they are still valid

15   today, and that these plaintiffs are public figures in a

16   public controversy, which he defined broadly as relating to

17   a Russian oligarch's involvement with a Russian government

18   and its activities and relations around the world, including

19   the United States.

20           Now, plaintiffs are going to come and argue that

21   Judge Epstein got it wrong.  They're going to argue that he

22   got it wrong, because the only public controversy applicable

23   to CIR 112 is a narrow public controversy, the narrow

24   controversy that they articulate as related to Russian

25   government's purported interference with the U.S. election.

1          Now, that argument is misplaced for at least three

2     reasons.

3          First, it entirely ignores the content of CIR 112.

4     The content of CIR 112, which was attached to Exhibit 1 of

5     our motion, is exclusively devoted to a discussion of

6     plaintiffs' relationship with President Putin, the Russian

7     state.  It discussed that that relationship had ups and

8     downs, that they're currently close, that there's a carrot

9     and a stick in the relationship, and that their favor is

10    going in both directions.

11          It is all about their relationship.  There is

12    nothing in plaintiffs' articulation of the public

13    controversy that would account for the content of CIR 112.

14    So that's reason number one.

15          Reason number two is that they have assumed that

16    the public controversy they articulate, as opposed to the

17    public controversy we articulate, are mutually exclusive,

18    and that's just not the case.

19          Controversies can be narrow.  Controversies can

20    broad.  They urge a narrow one; we urge a broad one.  And

21    they can overlap, they frequently do overlap, and here they

22    overlap.

23          I would point you to the *Deripaska* case that

24    Judge Huvelle adjudicated last year, where Oleg Deripaska,

25    another Russian oligarch, came to this Court and made a

1   nearly identical argument, which was -- what was happening

2   in that case -- there's an *Associated Press* article that

3   supposedly defamed Mr. Deripaska because it associated him

4   with some activities of Paul Manafort and President Putin.

5          And the *Associated Press* said, "there's a broad

6   public controversy here about the Russian oligarch's

7   relationship with the Russian government."  And Deripaska

8   said, "No, no, no, the public controversy at issue is much

9   narrower".  It's what he called the Trump campaign

10  controversy.

11         And Judge Huvelle said what I said before, there

12  are broad controversies and there are narrow ones.  This

13  document touches on the broad public controversy, and

14  Oleg Deripaska is clearly a public figure for the broad

15  controversy, and so that's where the analysis ends.

16         The third point I want to make is that plaintiffs'

17  argument misapplies the *Waldbaum* test.  So I want to walk

18  through the *Waldbaum*.  *Waldbaum*, as this Court knows, is the

19  D.C. Circuit precedent that governs public-figure analysis.

20         It's a three-step test.

21         The first step, you identify the public

22  controversy.

23         There's no doubt that a public controversy exists

24  related to the relationship between Russian oligarchs and

25  the Russian Government.  Three judges have so found.

1          First, you have Judge Bates, who identified the

2    rise of the oligarchs and the decline of the Russian

3    economy.

4          Then you have Judge Huvelle, in the *Deripaska*

5    case, who identified a public controversy existing relating

6    to Russian oligarchs acting on behalf of the Russian

7    government.

8          And then last month, Judge Epstein, who defined a

9    broad public controversy relating to Russian oligarchs'

10   involvement with the Russian Government and its activities

11   and relations around the world, including the United States,

12   all various versions of essentially the same public

13   controversy.

14         I don't think plaintiffs are actually disputing

15   that that public controversy exists.

16         So move to step two, plaintiffs' role in that

17   controversy.

18         You also have two judges who have said that these

19   plaintiffs are public figures in that controversy, first

20   Judge Bates and then Judge Epstein.

21         I'm also not sure that plaintiffs are disputing

22   that they are public figures in that controversy.

23         THE COURT:  The controversy is a controversy in

24   Russia, right?

25         MS. COTTON:  No.

1          THE COURT:  It's an American controversy?

2          What do we care what the relationship is between

3     these oligarchs and Putin?  That's their business, not ours,

4     isn't it?

5          MS. COTTON:  So starting with Judge Bates, who

6     focused on the attention in the United States on the Russian

7     oligarch's relationship with the Russian state and

8     implications that had around the world --

9          THE COURT:  "Around the world," what do you mean

10    by that?

11         MS. COTTON:  I mean, the Russian economy and the

12    Russian state have impact everywhere.

13         And Judge Epstein specifically defined his public

14    controversy as including the activities of the Russian

15    oligarchs and the Russian Government around the world.

16         So the way he articulated the controversy was

17    relating to Russian oligarchs' involvement with Russian

18    government and its activities and relations around the

19    world, including the United States.  So when their

20    relationship reaches the United States, that's part of that

21    public controversy.

22         It's, admittedly, a very broad public controversy,

23    and that's intentional.

24         These are --

25         THE COURT:  So I have to find that there's a

1    controversy in the United States about the relationship

2    between the oligarchs and the Putin administration in order

3    for this to be characterizable as a public controversy?

4              MS. COTTON:  I think you have to find that the

5    public controversy -- or you have to agree that the public

6    controversy that Bates, Huvelle, and Epstein articulated

7    exists.

8              THE COURT:  How long ago did Bates find that it

9    existed?

10             MS. COTTON:  2005.

11             THE COURT:  How recently did Huvelle find it

12   existed?

13             MS. COTTON:  2017.

14             THE COURT:  Well, that's much more recent.

15             MS. COTTON:  Yes.

16             And then, again, Judge Epstein maybe three or four

17   weeks ago, even more recently.

18             THE COURT:  Did any of them deal with the

19   Anti-SLAPP Act?

20             MS. COTTON:  They did.

21             Although I should tell you that my colleague,

22   Steve Salky, is here to answer your questions about the

23   Anti-SLAPP Act.

24             I'm aware that in the *Deripaska* case --

25             THE COURT:  Why?  What's wrong with you?

1           Is he a specialist in the Anti-SLAPP Act?

2           MS. COTTON:  He'd like to be.  He has become one

3 anyway.

4           THE COURT:  He's kind of become one.

5           MS. COTTON:  Yeah.  Exactly.

6           THE COURT:  But what if I'm only going to give one

7 advocate a chance to talk for each side?

8           MS. COTTON:  We might be in trouble.

9           I can --

10          THE COURT:  You don't know anything about the

11 Anti-SLAPP Act?

12          MS. COTTON:  I know a little bit about it.

13          I can tell you that in the *Deripaska* case, it was

14 an issue.

15          I can tell you that we agreed with Judge Huvelle's

16 opinion on the 12(b)(6) and not on her Anti-SLAPP.

17          THE COURT:  Okay.  So how many of the 20 minutes

18 do you want me to give to Mr. Salky?

19          MS. COTTON:  Five?  Two.

20          THE COURT:  Two?  Okay.

21          MS. COTTON:  He says two, Bill says five.  We'll

22 go with four.

23          THE COURT:  I'll give him five.

24          Salky likes to go on and on, so I'll give him

25 five.

1              MS. COTTON:  Fair enough.

2              So I'm going to get back to -- do you want to talk

3     more about the *Deripaska* opinion?

4              THE COURT:  Yeah, you can go back to that, if you

5     want.

6              MS. COTTON:  Okay.

7              Well, where I actually want to go back to is, so I

8     think we're in Step 2 of the *Waldbaum* test.

9              THE COURT:  All right.  Go ahead.  Finish that up

10    then.

11             MS. COTTON:  Fair enough.

12             Which is deciding whether the plaintiffs have a

13    special prominence in the controversy.

14             And, again, the controversy that we've urged that

15    those three judges identified is, admittedly, a broad one.

16             But these are not ordinary businessmen.  They're

17    not even ordinary oligarchs.

18             It is plain from the public record -- and we only

19    footnoted to a small sliver of it.

20             THE COURT:  What is it that makes it

21    controversial, from your point of view?

22             MS. COTTON:  What makes what controversial?

23             THE COURT:  Their relationship with Putin.

24             MS. COTTON:  So the way you define a public

25    controversy is are people talking about it, does it have

1    effects outside of that relationship.

2              THE COURT:  I mean, you don't mean literally on

3    the street?

4              I can honestly say I've never heard anyone talking

5    about it on the street.

6              MS. COTTON:  Depends on what streets you're on.

7              THE COURT:  I'll say Washington, D.C. let's start

8    with that.

9              I mean, is there -- do you go to, like, Google

10   hits?  How many Google hits there are on this issue?

11             So how do you demonstrate that there's -- you just

12   pull it out of the air?  It's like an ether or something?

13             MS. COTTON:  So what *Waldbaum* says is that a

14   public controversy is a dispute that has received public

15   attention because its ramifications will be felt by persons

16   who are not direct participants.

17             So there's a slew of public controversies that

18   have been identified by jurists in this Court and elsewhere.

19             I also don't think that there's actually a dispute

20   that the public controversy articulated by Bates, Huvelle,

21   and Epstein actually exists.  I don't think they all just

22   made it up out of thin air.

23             THE COURT:  Was it conceded --

24             MS. COTTON:  No.

25             THE COURT:  -- by the opposing party?

1          I wouldn't think it would be.

2          MS. COTTON:  No.

3          In fact, in Judge Bates's case, these same

4   plaintiffs argued strenuously that he was identifying too

5   generalized a public controversy, which was an argument that

6   he dispatched with.

7          THE COURT:  I mean, I can understand how, within

8   Russia, there might be a controversy about oligarchs who are

9   not elected, wealthy folks, have too much power over the

10  economy, too much influence over trade issues or whatever.

11         I mean, I can understand how, in the Soviet

12  Union -- well, the old Soviet Union, now Russia, that there

13  might be some controversy about the amount of power that

14  they wield and the favored status that they might get from

15  the President of the country.

16         I can understand that, but what do the people in

17  Shanghai care about that?  What do the people here in --

18         I mean, our foreign-policy people might care about

19  it, but what do the people in St. Louis or Chicago care

20  about that?  What do they care?  What's the big deal?

21         MS. COTTON:  So I'm going to go back to what

22  Judge Bates said.

23         So what he noted was that it was a topic of

24  intense discussion in the media, classrooms, think tanks,

25  and the government of the United States, as well as through

1   the rest of the world.

2            THE COURT:  Did he cite that?  Did he, like, have

3   cites to media hits or classrooms --

4            I don't even know how you know about classrooms.

5            Think tanks?  I mean, I don't know.  Articles

6   written, I guess?

7            MS. COTTON:  Exactly.

8            THE COURT:  What did he have as a basis to

9   conclude that it was a matter of intense discussion and

10  thought?

11           I mean, maybe he had a law clerk who worked at AEI

12  in the past or something.

13           I mean, I don't know, but how does he know that?

14           MS. COTTON:  You look at the public record.

15           Not to be glib, but, yes, you can look at Google.

16           Again, the results are -- whatever Google hits you

17  get, it's not for the fact of whatever the articles say, but

18  it's to show that they exist.

19           If you enter any of these plaintiffs' names into

20  Google, you get thousands of results.

21           I mean, 5,000.  It was 5,000-plus for Aven, and

22  5,000 plus for Khan.  And I think double that for Fridman.

23           And, again, I say that not because it even matters

24  what the articles say as to their veracity or not, but as a

25  marker of the controversy and their prominence.

1          So, yes, Google, yes, think tank articles,

2    anything in the public record, all of which is judicially

3    noticeable, explains why there is a public controversy and

4    these plaintiffs' prominence in it.

5          THE COURT:  Okay.  You've got about a minute left

6    before you turn it over to Mr. Salky.

7          MS. COTTON:  Oh, goodness.

8          So then the last prong is germaneness, and that's

9    the place where you particularly need to assess the

10   allegedly defamatory statements.

11          And germaneness is not a stringent test.  It's

12   whether the statements are wholly unrelated to the public

13   controversy.

14          Here, I don't think there's any question that the

15   statements in CIR 112 are wholly unrelated to the public

16   controversy we've identified.  In fact, they're squarely

17   within it.  This is a document that discusses the

18   relationship between the oligarchs and the Russian

19   Government.  So I don't think there's a question that

20   they're wholly unrelated.

21          I also think that this is where it's important

22   that we argue that there is no defamatory implication in CIR

23   112 about plaintiffs being involved in Russian interference.

24          But even if the Court were to disagree with us and

25   think that there was that implication and even if the Court

1   were to find somehow -- again, we would disagree with

2   this -- that it's an actionable, verifiable statement.  But

3   even if that statement existed, that statement would also be

4   not wholly unrelated to the controversy that we've

5   identified.

6           Judge Bates looked at that controversy and said

7   the allegations back then, which were of corruption and drug

8   trafficking, that's a facet of this public controversy.

9           Just last month, Judge Epstein looked at and said,

10  this is also a facet of that controversy.

11          And if it is true, there's an allegation that

12  Russian oligarchs are colluding with the Russian government

13  about U.S. election, that would also fall within this

14  controversy.

15          THE COURT:  Remind me:  What's the case that

16  Epstein has in front of him?

17          MS. COTTON:  So he has the -- had, because he

18  dismissed the complaint, no longer has, but he had the

19  companion case, where these same plaintiffs sued

20  Christopher Steele, the author of the memos in the dossier

21  for defamation.

22          So the same plaintiffs, the same facts, also D.C.

23  law, and Judge Epstein dismissed the complaint.

24          THE COURT:  Okay.  Thanks.

25          MS. COTTON:  I'll cede it to Mr. Salky.

1          THE COURT:  Please.

2          Mr. Salky.

3          MR. SALKY:  Good afternoon, Your Honor.

4          THE COURT:  Good afternoon.

5          MR. SALKY:  I think the building superintendent,

6    is he sending you a message by the temperature that he's

7    keeping the courtroom?

8          THE MAGISTRATE:  Feels a little warm in here

9    today.

10          MR. SALKY:  That feels a little warm to you.

11          THE COURT:  It's a little humid in here.

12          MR. SALKY:  Okay.

13          Your Honor, I'm going to start where Ms. Cotton

14    left off, which is Judge Epstein's opinion in the Superior

15    Court, which is based on the exact same facts and

16    circumstances in this case, so I recommend that you study

17    that --

18          THE COURT:  Oh, believe me --

19          MR. SALKY:  -- carefully.

20          THE COURT:  -- I'm going to take a close look at

21    that.  He's a highly regarded judge.

22          MR. SALKY:  -- because --

23          He did a very thorough and, I think, a very

24    compelling analysis of the issues that are critical to your

25    consideration of our 12(b)(6) motion.

```
 1              THE COURT:  Right.

 2              MR. SALKY:  Now, the plaintiffs here shopped,

 3     forum shopped to bring this claim against us in this Court

 4     instead of Superior Court, because they knew that the

 5     Circuit had ruled that the Anti-SLAPP Act did not apply in

 6     this Court.

 7              THE COURT:  And if I were to conclude,

 8     hypothetically --

 9              MR. SALKY:  Hypothetically.

10              THE COURT:  -- that the Anti-SLAPP doesn't apply

11     here, I don't have to get into any of this other stuff, do

12     I?

13              MR. SALKY:  No.  You do, sir.

14              THE COURT:  I still do?

15              MR. SALKY:  Yes, sir.

16              Because they're two separate bases, two separate

17     independent grounds to dismiss.

18              Ms. Cotton has argued --

19              THE COURT:  Wait a minute.  Hold on.  I only need

20     one ground to dismiss, don't I?

21              MR. SALKY:  Correct.

22              THE MAGISTRATE:  I don't need two grounds.

23              MR. SALKY:  Correct, you don't need the Anti-SLAPP

24     ground.  You only need the 12(b)(6) motion, which we filed,

25     which Ms. Cotton has argued to dismiss this case, and it
```

1     clearly should be dismissed on that basis.

2              THE COURT:  What if I --

3              MR. SALKY:  Independently, we wanted to preserve

4     the issue of the application of the Anti-SLAPP Act in

5     Federal Court.

6              THE COURT:  What if I want to dismiss it on the

7     Anti-SLAPP grounds, hypothetically?

8              MR. SALKY:  Hypothetically, I think there is a way

9     you can get there, even though a number of your brethren,

10    just as the plaintiffs, I would argue to you, are swimming

11    uphill on the question of whether they're public figures and

12    whether they have alleged malice, which they have not

13    effectively tried to do.

14             I note that I'm swimming uphill on the application

15    of the Anti-SLAPP Act in Federal Court, given the decision

16    in *Abbas*, and given Judge Huvelle, Judge Mehta, and

17    Judge McFadden's decisions that, despite a contrary opinion

18    by the D.C. Circuit, *Abbas* still ties their hands, and they

19    can't apply it.

20             But let me try to give you food for thought about

21    why your brethren have -- they've done a very good job,

22    don't get me wrong, but why they've got it just slightly

23    wrong, and that is, Your Honor, under --

24             THE COURT:  That's a pretty diverse group of

25    judges you're talking about around here.

1          MR. SALKY:  I couldn't agree more.

2          THE COURT:  Pretty diverse.

3          MR. SALKY:  And they all really tend to follow

4    Judge Huvelle, who was the first one to say that even though

5    the highest court of the District of Columbia, in the *Mann*

6    case has disagreed with the application of state law by the

7    Circuit in the *Abbas* case, Judge Huvelle said, "I don't

8    think that I, as a District Judge, can do anything about

9    that."

10         And that's where Judge Huvelle gave, in my

11   judgment -- and Judge Mehta and Judge McFadden to follow --

12   gave too much weight to the Circuit opinion in *Abbas*, and

13   not enough weight to the highest -- to the decision of the

14   highest court of the state, where state law governs.

15         This is an eerie issue, because we're interpreting

16   a state statute.  A state statute, which I know Your Honor

17   is familiar with, the D.C. Anti-SLAPP Act, 16-5502.

18         And the critical part that I want Your Honor to

19   focus on, because the part of *Abbas* -- because *Abbas* made

20   two critical predictions effectively about what D.C. law

21   would be in the absence of any decision by a higher court --

22   by the highest court of the District of Columbia, which

23   subsequently, the *Mann* court disagreed with.

24         But the key fact that, I think, undercuts *Abbas*

25   the most, is *Abbas* said -- and, Your Honor, I'm going to

1   read from page 1335, I believe, of the opinion, it says,

2   second, "Defendants suggest that the special motion to

3   dismiss provision embodies a substantive D.C. right not

4   found in the Federal Rules, a form of qualified immunity,

5   shielding participants in public debate from tort

6   liability."

7           And then the Court went on to say, we don't think

8   that's right.  It disagreed with that based upon an older --

9   a prior D.C. Court of Appeals' case concerning the subpoena

10  provision of the Anti-SLAPP Act, a totally different

11  provision of the Anti-SLAPP act, which called the Anti-SLAPP

12  Act a procedural mechanism.

13          But then the *Mann* court came along -- it was the

14  first court -- and it says that in the opinion, for the

15  first time, we've interpreted our Anti-SLAPP Act.

16          And its first decision was whether the issue was

17  appealable under *Cohen versus Beneficial* as a collateral

18  order.

19          And it said, in that section -- and now I'm going

20  to read, Your Honor, from the *Mann* -- excuse me, the *Mann*

21  case at page 1231 -- "after reviewing all of the factors

22  under *Cohen versus Beneficial*, it comes down to the

23  conclusion that the requirements are met and that the order

24  is appealable, the order denying an Anti-SLAPP motion is

25  appealable, and it says, "We come to this conclusion in

1  light of the District of Columbia Anti-SLAPP Act's purpose

2  to create a substantive right, substantive right not to

3  stand trial and to avoid the burdens and costs of pretrial

4  procedures, a right that would be lost if a special motion

5  to dismiss is denied and the case proceeds to discovery and

6  trial."

7         And later in the opinion at 1239, Your Honor, they

8  refer to the -- they say, "the immunity created by the

9  Anti-SLAPP Act shields only those defendants who face

10  unsupported claims that do not meet established legal

11  standards."

12         And so --

13         THE COURT:  You've got one minute.

14         MR. SALKY:  -- the *Abbas* case is just -- I will

15  finish up quickly.

16         The *Abbas* case's ruling on whether this was a

17  former qualified immunity has been completely -- they can't

18  overturn a D.C. Circuit opinion, and, indeed, they note the

19  fact that they can't overturn it.

20         And I direct your attention to footnote 32 of

21  their opinion, which they say, "Our decision here can't

22  decide what is right in the D.C. Circuit," but they barely

23  were trying to say, we disagree with the D.C. Circuit's

24  opinion in *Abbas*.

25         So when a District Judge is faced with the issue

1  of which case controls, I think Judge Huvelle, Judge Mehta,

2  and Judge McFadden underweighted -- the *Mann* decision

3  overweighted *Abbas*.

4        But if Your Honor goes along with your colleagues,

5  I want to introduce another food for thought to you, which

6  was, you may want to think about a 1292(b) certified

7  question, because if you deny our Anti-SLAPP motion, you --

8  and say, look, I can't decide this, this has got to be

9  decided by upstairs -- then you could certify that question

10  of what is the meaning of *Abbas* after *Mann*, so that you and

11  your brethren on the District Court are not having to guess

12  about this but get direction from upstairs.

13        Now, we may have a collateral-order appeal

14  ourselves, if you were to deny it, but I would suggest to

15  you that you would consider --

16        And I have a question that I think is the

17  certified question that I'm happy to send to you, that might

18  be best if you were to deny it, which I understand I'm --

19  believe me -- but I think ultimately -- I know Ms. Cotton is

20  going to have a little bit of rebuttal time and answer your

21  questions, on the motion that I think is a successful

22  motion.

23        THE COURT:  Well, you're kind of using it up.

24        MR. SALKY:  I don't want to use it up.

25        THE COURT:  All right.

1           Well, let's give Mr. Lewis a chance to respond to

2   all this.

3           MR. LEWIS:  Thank you, Your Honor.

4           I will also --

5           THE COURT:  We'll give you an extra five minutes.

6           MR. LEWIS:  Much appreciated.

7           I will also focus most of my time on the question

8   of whether you may adjudicate the plaintiffs as

9   limited-purpose public figures now in the context of a

10  12(b)(6) motion.

11          But very briefly, before I get to that question,

12  I just wanted to briefly speak to the contention made by

13  defendants that CIR 112, the article or report that contains

14  the statements at issue, is not defamatory.

15          I was surprised when I read that, because the

16  content of CI -- the notion that CIR 112 is not defamatory

17  runs up against five particular statements in the report.

18          Indeed, it's hard to imagine a report or memo that

19  is more defamatory on its face.

20          In the headline, it suggests that the plaintiffs

21  were cooperating with the Kremlin in connection with its

22  efforts to interfere with the American election in 2016.

23          It accuses the plaintiffs of bribery twice.  Once,

24  bags of cash allegedly delivered through a former employee;

25  and, secondly, in exchange of favors having value to Putin,

1   in exchange for official action by Putin in his role as

2   Russia's president, to benefit the plaintiffs.

3         Even post-*McDonnell*, Your Honor, that would

4   satisfy the Circuit for the Supreme Court for proof of a

5   bribery allegation.

6         So you've got electoral interference, bribery,

7   bribery, and then you have corruption, with the plaintiffs

8   doing Putin's political bidding.

9         Putin is not portrayed positively in CIR 112, in

10  the entire dossier, and in the media in general.

11        It's one thing to be doing President Putin's

12  political bidding, especially in the context of the

13  allegation that his government obstructed or interfered with

14  our election than it is to be doing something nice for a

15  friendly, innocuous figure.

16        Finally --

17        THE COURT:  How do you define controversy, as it

18  relates to this case?

19        MR. LEWIS:  So that question goes, of course, to

20  the question of whether the plaintiffs are -- can be

21  adjudged as limited-purpose public figures.

22        We define the controversy here as electoral

23  interference.  And the reason that we do that, Your Honor,

24  is that we're guided by what *Gertz* tells about what -- how

25  to define the controversy.  It says that the -- it directs

1    courts to focus on "the particular controversy giving rise

2    to the defamation."

3            The controversy that gave rise to the defamation

4    is the controversy about electoral interference, about

5    alleged connections between people in the Trump campaign,

6    orbit, and Russians.  That's why Glenn Simpson was hired by

7    the Democratic National Committee and the Clinton campaign.

8    That's why Glenn Simpson hired Christopher Steele in -- a

9    former intelligence agent, with contacts in Russia to

10   produce the dossier.

11           16 of the 17 reports of their content is

12   essentially about election interference.

13           The headline of the report that defames the

14   plaintiffs is about election interference.

15           And while I disagree with Judge Epstein in many

16   respects -- and we're appealing his decision -- he got that

17   right as well.

18           He described CIR 112 as "suggesting that the

19   plaintiffs cooperated in Russian interference with the U.S.

20   presidential election."

21           And he went on to say that "CIR 112 is capable of

22   being understood;" that there was a "relationship between

23   plaintiffs and the Russian government," creating a

24   "reasonable possibility that they were involved as advisers

25   or participants in any Russian interference in the U.S.

1 election ."

2          So the whole reason for this 17 report dossier,

3 and even for the CIR 112, is that defendants were hired by

4 the Clinton campaign and the DNC to come up with political

5 opposition research about then-candidate Trump, focused on

6 Trump-Russia connection.

7          That is the controversy that gave rise to the

8 defamation, even if some of the statements in CIR 112 are

9 about matters of -- are about the alleged relationship

10 between three individuals and Vladimir Putin.  That isn't

11 the issue that gave rise to the making of these defamatory

12 statements.

13          I'd like to continue elaborating on why you should

14 conclude that's the controversy and the plaintiffs are not

15 limited-purpose public figures for that controversy, or even

16 why they are not limited-purpose public figures, even if you

17 accept Ms. Cotton's methodology of analyzing the

18 controversy.

19          But before I do that, Your Honor --

20          THE COURT:  Well, don't move to that yet.  Hold on

21 a second.

22          So from your understanding of the law, it has to

23 be a controversy in the United States?

24          MR. LEWIS:  It does.  There's a geographic

25 requirement.

1          And the only subject --

2          THE COURT:  So it may not be a controversy in

3    Russia, but it has to be a controversy in the United States?

4          MR. LEWIS:  It does have to be a controversy here.

5          THE COURT:  Okay.

6          MR. LEWIS:  And, frankly, Your Honor, while, of

7    course, there's a lot of interest in Russia generally and

8    President Putin generally and there was a lot written about

9    the corrupt process or the dissolution of the Soviet Union

10   and how the Soviet Union emerged into a more -- well, a less

11   socialist or more market economy almost 30 years ago.

12         But that was what -- that was the context of the

13   defamatory statements.  At least we're much closer to that

14   in OIO, an article that was written in 2000.  Its headline

15   was about Dick Cheney.

16         But in any event, in 2016, Your Honor, there was

17   not a live controversy about Michael Fridman, Peter Aven and

18   German Khan, the allegation that they were bribing President

19   Putin.

20         You can read all of the articles that they've

21   supplied for you, and you won't see a large volume being

22   written about the -- that's comparable to the content of

23   CIR 112 or about its precise subject matter.

24         Beyond that, Your Honor, on the second prong of

25   *Waldbaum*, they didn't thrust themselves into a discussion of

1   whether or not they bribed Putin.

2           Yes, they are prominent people.  They have, they

3   think, ideas that they often share in articles, on panels

4   and seminars.

5           Yes, they're wealthy.  Yes, they are listed on

6   lists and written about.  That's all true.

7           But they have never thrust themselves recently, at

8   least, into a public discussion that they tried to influence

9   its outcome about whether or not they have been bribing

10  President Putin.

11          So I think that if you reach the question here in

12  connection with the motion to dismiss of whether there is --

13  whether the plaintiffs are public figures in the controversy

14  that gave rise to the publication of CIR 112, you'll

15  conclude that they're not, or at the very least, that you

16  can't conclude that now in the context of a motion to

17  dismiss.

18          But the analysis that has to even precede that,

19  before you get there, Your Honor, is to ask yourself whether

20  the plaintiffs are required, in their complaint, to plead

21  facts that overcome or satisfy the actual malice burden,

22  which is a burden that only public figures have to bear.

23          The important point, I think, is that a defamation

24  plaintiff's public-figure status is an affirmative defense.

25  The courts have held it's an affirmative defense.  It is a

1 fact on which the defendants, in the defamation case, bear

2 the burden of proof.  They have to persuade you that -- a

3 defendant, in a defamation case, has to persuade the Court

4 that the plaintiff is a public figure.

5         A defamation plaintiff doesn't come to court with

6 the automatic burden to prove to the Court that he is not a

7 public figure.  It's an affirmative defense.  And the

8 general rule for affirmative defenses, is that a plaintiff

9 doesn't have to anticipate them and plead around them.

10        There have been some cases, the *Parisi* case, your

11 own case, Your Honor, is one of them, in which courts have

12 reached the question of public-figure status in a 12(b)(6)

13 motion.

14        But those are cases, Your Honor, in which the

15 plaintiff conceded their public-figure status, or at least

16 conceded the facts that, as a matter of law, made them

17 public figures.

18        Neither is true here.

19        In *Parisi*, for example -- I think it's footnote 2

20 of your decision -- you note the plaintiffs' concession that

21 they considered themselves to be public figures.

22        Your Honor, in discovery, discovery provides an

23 opportunity to adduce evidence that is relevant to the

24 question of whether or not the plaintiffs did the things

25 that, under *Waldbaum*, they have to have done to be a

 1   limited-purpose public figure, for the purpose of these --

 2   whichever controversy we select as the guiding one.

 3          Again, in doing that, the Courts have been clear

 4   that newsworthiness is not enough.

 5          Public controversy is not simply a matter of

 6   interest to the public.  That's the Court in *Waldbaum*.

 7          THE COURT:  You can be a public figure in Russia

 8   and not be a public figure in the U.S.A., right?

 9          MR. LEWIS:  Absolutely.

10          And you can be a limited-purpose public figure for

11   one question and not for another.

12          Indeed, *Waldbaum* teaches us that there are

13   subcontroversies within controversies.

14          And someone who is a limited-purpose public figure

15   for one subcontroversy is not for another; therefore, it

16   asks us to look very precisely and carefully at the facts,

17   both the -- again, where it starts is reminding us that

18   *Gertz* holds that we have to focus on the controversy that

19   gave rise to the defamation, not just the defamatory

20   statement itself.  And when you do that, you conclude it's

21   the election interference controversy.

22          But, again, even if -- when we get to this at the

23   appropriate time, after discovery, after plaintiffs have had

24   a chance to express in a way that has evidentiary value at

25   their depositions, that they did not thrust themselves into

1    or try to influence a debate about the content of CIR 112,

2    they haven't sought to have a trial in the public sphere as

3    to whether or not they're guilty of bribing Vladimir Putin,

4    either in the 1990s or more recent.

5            But, again, the discovery process will give the

6    Court a much fuller record upon which to analyze that

7    question.

8            So in sum, the statements are plainly defamatory.

9    The plaintiffs cannot be made, at this point in time, to

10   overcome the affirmative defense.  And you may not do that

11   based on Judge Epstein's opinion or based on the OAO

12   decision.

13           The OAO decision doesn't bind the Court, and it's

14   not -- the controversy, as described in OAO, is different

15   than the controversy in this case.  It's different

16   because -- for so many reasons.

17           The OAO article was written in 2000 and doesn't

18   mention Vladimir Putin.

19           The 2016 defamation is all about plaintiffs'

20   alleged relationship with Vladimir Putin.

21           In OAO, Judge Bates described the controversy as

22   involving corruption in the Russian economy, not just in its

23   political sphere but in its economy in the post-Soviet era,

24   and related questions of American investment in Russia.

25           THE COURT:  Did Judge Bates address why he thought

1    this was a controversy in the United States?

2              MR. LEWIS:  So Judge Bates, I think --

3              THE COURT:  We have a country where most people on

4    the street don't even know who's on the U.S. Supreme Court.

5    They have no idea who their senators are.

6              MR. LEWIS:  Right.

7              I've, perhaps, told 100 people briefly about this

8    case.

9              And although Michael Fridman, Peter Aven and

10   German Khan are prominent in their spheres, nearly everyone

11   to whom I mention their names had never heard them before.

12   And I think that geographic -- the geographic point is

13   relevant here.

14             But as I recall, Judge Bates concluded that the

15   statements about corruption in the early years of Russia's

16   transition to a market economy were of interest on a fairly

17   wide level, not just in Russia.

18             But in any event, Your Honor, so you should

19   conclude -- you don't need to reach the public-figure

20   question now because it's an affirmative defense.

21             You should conclude that there's nothing about --

22   by the way, in defendants' reply papers, they said that

23   there is some content in the complaint in which plaintiffs

24   pled the facts that make them limited-purpose public

25   figures.  Remarkably, they didn't identify the place in the

1   complaint that they were referring to.  They haven't done it

2   here today.  They won't be able to do it on rebuttal because

3   it doesn't exist.

4           They said that because the cases that hold that a

5   plaintiff is not required to rebut an affirmative defense in

6   his complaint make an exception for situations where

7   plaintiffs plead the fact that otherwise establish the

8   affirmative defense, which this complaint does not.

9           THE COURT:  Talk about the Anti-SLAPP Act.

10          MR. LEWIS:  Yes.

11          The Anti-SLAPP motion has to be dismissed for

12  three distinct reasons.  The first and easiest is that it

13  was filed out of time.  It was filed 48 days after

14  plaintiffs filed the amended complaint.  It's subject to a

15  strict 45-day statute.  That's the law.  That's the law of

16  D.C.; and, for that reason, it has to be dismissed.

17          The defendants' contrary arguments are two,

18  Your Honor.  The first is that they filed a timely

19  Anti-SLAPP motion with respect to the original complaint,

20  and, therefore, they had no deadline to move to dismiss the

21  amended complaint on Anti-SLAPP grounds.  That argument,

22  respectfully, Your Honor, is as silly as it sounds.

23          The original complaint became a nullity when it

24  was superseded by the amended complaint; and, therefore, if

25  they wanted to move to dismiss it, they had to do so, and

1    they had to do so in a way that followed the rules for

2    making such motions.

3         While Rule 6 allows Federal Courts to extend

4    deadlines, it doesn't allow courts to extend -- it only

5    allows courts to extend deadlines that are imposed by court

6    rule or by the Federal Rules.  It does not allow courts to

7    extend deadlines that are imposed by statutes.

8         That's the holding of -- and I don't remember the

9    name of the case but it's in our papers.  And so they didn't

10   file their motion in time for it to be considered.

11        Even if you do consider it, you should conclude,

12   as all of the courts who have considered this question, that

13   you have to deny the motion, because Anti-SLAPP motions are

14   not cognizable in Federal Court, at least in this circuit.

15        While the defendants point to the *Mann* -- the

16   *Competitive Enterprises versus Mann* case, several judges, as

17   Mr. Salky identified for you, have considered this question

18   post-*Mann*, and they've all reached the same conclusion.

19   *Mann* doesn't change anything.  Courts on this district are

20   still bound by *Abbas*.

21        But, Your Honor, all you have to do is look at the

22   *Mann* decision itself to understand why those three judges

23   were correct.

24        The Court, in *Mann*, held that -- and this is on

25   page 8 of our brief in opposition to the Anti-SLAPP

1   motion -- we quote extensively from *Mann* there.

2            "The showing required to defeat the Anti-SLAPP

3   special motion to dismiss is more demanding than is required

4   to overcome a Rule 12(b)(6) motion to dismiss."

5            Going on, the motion to dismiss -- "The 12(b)

6   Anti-SLAPP motion to dismiss is different from summary

7   judgment, in that it imposes the burden on plaintiffs, and

8   rears the Court to consider the legal sufficiency of the

9   evidence."

10            Not something that happens under the Federal

11  Rules.

12            It goes on to say that "The Anti-SLAPP Act

13  reverses the allocation of burdens for dismissal of a

14  complaint under Local Rule 12(b)(6)."

15            In all of these ways, as the *Mann* court itself

16  recognized, the procedures that are set forth in the

17  Anti-SLAPP Act are different from and inconsistent with the

18  Federal Rules of Civil Procedure.

19            And it does not matter that Washington, D.C., has

20  tried to label these procedures as matters of substance.

21            They're procedures.  They're rules about the same

22  sorts of things that are procedures in the Federal Rules of

23  Civil Procedure.

24            So there is no Anti-SLAPP motion in Federal Court

25  in this district because of the conflict with the Federal

1   Rules of Civil Procedure.

2           Finally, Your Honor, even if you were to get to

3   the merits of the Anti-SLAPP Act, you would have to deny it.

4           Respectfully, Judge Epstein was wrong in his

5   analysis.  And while we'd be happy to explain that at

6   greater length in an additional submission, if you wanted

7   it, I can briefly explain here today why I think that ought

8   to be your conclusion.

9           Now, statements, first of all --

10          THE COURT:  You have a minute.

11          MR. LEWIS:  Okay.

12          In their neutral reportage argument, defendants

13  said that they were entitled to the protection of that

14  privilege.  They're not for many reasons.  But they said

15  that they were not communicating any views.  They describe

16  their statements as disinterested, involving no effort to

17  bolster or endorse the statements that they made.

18          The Anti-SLAPP Act, as relevant here, protects

19  communicating views to members of the public.  The

20  defendants themselves told you that they intended to

21  communicate no views.  And so by their own words, they don't

22  satisfy that provision of the Anti-SLAPP Act.

23          Judge Epstein wrote it out of the statute by

24  concluding that the Anti-SLAPP Act is as broad -- protects

25  all speech that's protected by the First Amendment.

1        It was wrong on many levels.  If he were right

2   about that, the Anti-SLAPP Act would protect commercial

3   speech, for example, which it clearly does not.

4        In any event, for all of those reasons

5   respectfully, Your Honor, you must deny the Anti-SLAPP

6   motion as well.

7        THE COURT:  Thank you.

8        MR. LEWIS:  Thank you.

9        THE COURT:  You can have three minutes,

10  Ms. Cotton.

11       MS. COTTON:  First, I want to respond to the

12  Judge's question about geography.

13       I think I'm going to start by reading what

14  Judge Bates wrote because, again, they actually made a

15  similar geographic argument to Judge Bates, and he concluded

16  that -- he did a search of news publications and lists a

17  bunch of domestic press which he said yielded more than 8500

18  pages of newspaper articles about the plaintiffs.

19       "Simply put" -- and now I'm quoting -- "Aven and

20  Fridman are players on the world stage, hence they are

21  limited public figures not only in Russia but in the United

22  States as well."

23       And that follows a several-paragraph analysis,

24  which, I think, if this Court reads carefully, will allow

25  you to conclude there's nothing about this that's confined

1    to Russia.

2              It's also worth noting that all three plaintiffs,

3    in January of this year, were put on the Treasury's list of

4    oligarchs close to Putin for potential sanctions.  So,

5    again, this is an ongoing public controversy with effects

6    here and there.

7              We have cited to a slew of domestic-only press,

8    all U.S. press in our motion.

9              The plaintiffs poked fun at us a little bit of

10   devoting ten pages, but that was just a small slice of the

11   public record that exists on these plaintiffs in the

12   United States.  So I just wanted to respond to that

13   geographic point.

14             Plaintiffs insist on rewriting CIR 112 repeatedly

15   in their papers and they did it again to you, and that's why

16   we had to attach it as an exhibit.  It doesn't say what they

17   say it says.  It has nothing to do with interference in the

18   Russian [sic] elections.  They get that from the caption

19   that happens to be in the upper left of ICR.

20             THE COURT:  You mean the U.S. elections?

21             MS. COTTON:  Yes.  What did I say?

22             THE COURT:  Russian elections.

23             MS. COTTON:  Oh, gosh.  Yes, U.S. Elections.

24             What they then -- I heard Mr. Lewis then point to

25   what Judge Epstein said about whether there's any defamatory

1    implication related to Russian interference and these

2    plaintiffs, and I think they're misreading Judge Epstein's

3    opinion actually.

4            He does say that it would -- reading CIR 112 with

5    that caption would be reasonably susceptible to the

6    reasonable possibility that these plaintiffs were involved.

7            But if you read that in the context of his

8    opinion, it's very clear that he's not finding -- and he's

9    uncertain that there's actually a verifiable, actionable

10   statement of fact to that effect.

11           He footnotes the very sentence that they quoted,

12   saying, "the Court does not decide that this is defamatory."

13           And what he means by that is that in order to be

14   defamatory in this Circuit and in D.C., a statement has to

15   be verifiable and a statement of fact, in addition to being

16   false.

17           And to the extent you read any defamatory

18   implication from a caption that doesn't contain a verb that

19   isn't a sentence that doesn't say anything verifiable, you

20   can't conclude that it's defamatory.

21           The last point that I want to make is the

22   affirmative-defense piece is just dead wrong.  It is an

23   element of defamation.  Requisite fault is the third element

24   of a defamation claim.

25           Every Circuit that has looked at the question of

1  whether you have to plead actual malice has said, you do,

2  and you have to do so in line with *Iqbal* and *Twombly*.  You

3  have to plead it plausibly when you're a public-figure

4  plaintiff.

5          They cite *Herbert v. Lando*, a Supreme Court case

6  from the 1970s, which they somehow claim changes that

7  pleading standard.  That's simply not true.

8          So when you back up and look at -- stand back and

9  look at the *Waldbaum* analysis here, we have a public

10 controversy that's been identified by three judges, two of

11 those judges have held these folks, these plaintiffs are

12 public figures in that controversy, and the statements in

13 CIR 112 are germane to that controversy.

14         At the end of that analysis, you have to conclude

15 that those guys are public figures.  And when you look at

16 the face of their complaint, they simply haven't plausibly

17 pled actual malice.

18         And on that basis, we think you should dismiss the

19 complaint.

20         THE COURT:  Thank you, Ms. Cotton.

21         MR. LEWIS:  Might I have three seconds?

22         THE COURT:  I don't do surrebuttals.

23         But what I do is this:  In certain cases, and this

24 falls in that category, I think, that raise novel and

25 interesting questions and difficult issues, I give the

1  parties a chance to supplement their briefing when the

2  transcript is done.

3          Now, it's not required, it's optional, but it's

4  limited, 15 pages or less, and it's limited to responding to

5  issues that arose in the course of oral argument.

6          It's not for the purpose of raising new issues.

7  It's responding to issues that arose or questions asked by

8  the Court or by opposing counsel, whatever, during the

9  course of oral argument.

10         I mean, we've all had the experience, certainly

11 I did when I was a lawyer practicing law, that you go back

12 to the office or maybe you go to the pub and have a beer

13 afterwards, and you say, gee, I wish I said this, I wish I'd

14 responded to this, I wish I responded to that.  Well, that's

15 a normal reaction, frankly, for any advocate to have.  So I

16 give the advocates a chance, after they get the transcript.

17         Now, my court reporter is very busy, so

18 I don't know when you'll get the transcript.  But you can

19 have ten days, from whenever he finishes the transcript and

20 gives it to you, to respond, if you want to -- to

21 supplement, not respond, to supplement your pleading.

22         But 15-page maximum.  It has to be limited to the

23 discussions here that took place in court and questions that

24 were raised or arguments that were raised that may be novel

25 or whatever.  So it's not an opportunity to raise whole new

1    issues.

2              Does everyone understand?  Okay.

3              Thank you for your arguments, Counsel.  They were

4    very good.  The pleadings are very good.

5              And I don't know when you'll get an opinion in

6    this case, because I'm starting an eight-week trial, a

7    criminal trial, not next week, the week after.

8              So I'll do my best to get you an opinion in the

9    next few months.  I can't promise you an opinion in the next

10   few months, but I'll try.

11             You're on the radar, but there are a lot of other

12   cases on the radar screen too, unfortunately.  So I'll try

13   to get it to you as fast as possible.

14             Have a good day.

15             DEPUTY CLERK:  All rise.

16             This Honorable Court will stand in recess until

17   the return of court.

18             (Proceedings concluded at 4:09 p.m.)

19

20

21

22

23

24

25

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

Date: September 26, 2018_____  /S/__William P. Zaremba_____

William P. Zaremba, RMR, CRR