UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MIKHAIL FRIDMAN, PETR AVEN, and GERMAN KHAN, | ) ) ) | Case No. 1:17-cv-02041 (RJL) |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) | |
| BEAN LLC (a/k/a FUSION GPS) and GLENN SIMPSON, | ) ) ) | |
| *Defendants.* | ) ) | |

## NOTICE OF RELEVANT PLEADINGS AND SUPPLEMENTAL AUTHORITY

### *Relevant Pleadings*

The Defendants previously provided this Court with papers from a case brought in the

D.C. Superior Court entitled *Fridman et al. v. Orbis Business Intelligence Ltd. and Christopher*

*Steele*, Case No. 2018 CA 18-0002667B, (the "Steele case") including memoranda of law and an

order of the Superior Court dated August 20, 2018 (the "Superior Court Order"). *See* Dkt. ## 33,

34. At the September 26 oral hearing and in their post-hearing submission dated November 7,

Defendants relied on the Superior Court Order. Now that Plaintiffs have perfected their appeal

from the Superior Court Order, Plaintiffs make this submission to provide the Court with a copy

of their D.C. Court of Appeals brief in which Plaintiffs explain in detail their reasons for

challenging the correctness of the Superior Court Order (attached as Exhibit 1).

Plaintiffs are also submitting a courtesy copy of a British High Court filing by Orbis

Business Intelligence Ltd ("Orbis") (cited in Plaintiffs' D.C. Court of Appeals brief)  in a case

pending in England entitled *Aven v. Orbis Business Intelligence Ltd.*, Claim No. HQ18M01646

(attached as Exhibit 2).  As Plaintiffs argue in their D.C. Court of Appeals brief, the British High

Court Filing undermines the notion that the challenged defamatory statements constitute an "act

in furtherance of the right of advocacy" – a requirement to invoke the D.C. Anti-SLAPP Act – in light of the admission by Orbis that it did not publicly publish or circulate the defamatory statements.

## Supplemental Authority

Plaintiffs respectfully apprise the Court of a recent decision relevant to Defendants' pending Rule 12(b)(6) motion.  In that motion, Defendants argue that the Complaint should be dismissed because it purportedly fails to adequately plead Defendants' actual malice in publishing the challenged statements.   In the attached decision, Judge Bates held that *unless* a plaintiff alleges facts in his defamation complaint that "establish" that it "is a public or limited purpose public figure" that there is otherwise "no basis" for imposing on a defamation plaintiff a burden "to plead facts to defend against defendants' assertion that it is a public figure." *See MiMedx Grp., Inc. v. DBW Partners, LLC*, 2018 U.S. Dist. LEXIS 166970, at *19 (D.D.C. Sept. 28, 2018).  A copy of *MiMedx Grp., Inc. v. DBW Partners, LLC* is attached as Exhibit 3.

Dated: New York, New York
     December 11, 2018

By:       _____/s/ Alan S. Lewis_____
            Alan S. Lewis (#NY0252)
            John J. Walsh
            CARTER LEDYARD & MILBURN LLP
            2 Wall Street
            New York, NY 10005
            Telephone:  212-238-8647
            *New York Counsel for Plaintiffs*
             *Mikhail Fridman, et al.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of December 2018, I electronically filed and served the foregoing Notice of Relevant Pleading using the CM/ECF system.

_____/s/ Alan S. Lewis_____
Alan S. Lewis

# EXHIBIT 1

RECORD NO. 18-CV-0919



ORAL ARGUMENT REQUESTED

𝔍𝔫 𝔗𝔥𝔢

# 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 𝔆𝔬𝔩𝔲𝔪𝔟𝔦𝔞
## 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

Clerk of the Court
Received 12/10/2018 03:55 PM
Filed 12/10/2018 03:55 PM

# MIKHAIL FRIDMAN, PETR AVEN, AND GERMAN KHAN,

*Appellants,*

v.

# ORBIS BUSINESS INTELLIGENCE LIMITED AND CHRISTOPHER STEELE,

*Appellees.*

## ON APPEAL FROM CASE NO. 2018 CA 002667 B IN THE DISTRICT OF COLUMBIA SUPERIOR COURT, CIVIL DIVISION, THE HONORABLE ANTHONY C. EPSTEIN, JUDGE PRESIDING

---

## BRIEF OF APPELLANTS

---

*Alan S. Lewis, *pro hac vice*
John J. Walsh, *pro hac vice*
Madelyn K. White, *pro hac vice*
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, New York  10005
(212) 238-8614

*Counsel for Appellants*

Kim Hoyt Sperduto
SPERDUTO THOMPSON & GASSLER PLC
1747 Pennsylvania Avenue, NW, Suite 1250
Washington, D.C.  20006
(202) 408-8900

*Counsel for Appellants*

## LIST OF PARTIES AND COUNSEL

Plaintiffs-Appellants:

Mikhail Fridman
Petr Aven
German Khan

Plaintiffs-Appellants' Counsel:

Alan S. Lewis
John J. Walsh
Madelyn K. White
CARTER LEDYARD & MILBURN LLP

Kim Hoyt Sperduto
SPERDUTO THOMPSON & GASSLER PLC

Defendants-Appellees:

Orbis Business Intelligence Limited
Christopher Steele

Defendants-Appellees' Counsel:

Christina Hull Eikhoff
Kristin Ramsay
Kelley C. Barnaby
ALSTON & BIRD LLP

Rule 26.1 Disclosure Statement:

Pursuant to Defendant Orbis Business
Intelligence Limited's Rule 7.1
Disclosure Statement filed in the
Superior Court, its parent company is
Orbis Business International Limited
and no publicly held corporation owns
10% or more of the stock of either
company.

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES.................................................................... iii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES ...........................................................1

*Issues Pertaining to the Scope and Availability of the Act* ....................................1

*Issues Pertaining to the Superior Court's Conclusion that the  Plaintiffs Should Be Adjudged as Limited Public Figures* ....................................2

*Issues Pertaining to the Meaning of "Reckless Disregard"  [Part of the Definition of Actual Malice]*....................................3

*Issue Pertaining to the Availability of Discovery Under the Act*........................3

STATEMENT OF THE CASE .............................................................3

STATEMENT OF FACTS ...................................................................4

A.   *The Controversy Giving Rise to the Defamatory Publication*......................4

B.   *The Defamatory Statements*.................................................................4

C.   *The Defamatory Statements Are Unverified and Their Source Is Unknown* ....................................5

D.   *Defendants' Publication of the Defamatory Statements* ................5

E.   *The Complaint* .................................................................................6

F.   *The Special Motion to Dismiss* ..........................................................6

SUMMARY OF THE ARGUMENT.....................................................7

*The Anti-SLAPP Act Is Not Applicable to Defendants' Conduct* ........8

*The Superior Court Erred in Holding that Plaintiffs Failed to Demonstrate a Likelihood of Success* ....................................10

i

*The Superior Court Erred by Depriving Plaintiffs of Targeted Discovery*.......13

STANDARD OF REVIEW................................................................................. 14

ARGUMENT.................................................................................................... 14

I.   THE SUPERIOR COURT'S THRESHOLD DETERMINATION—
     ITS FINDING THAT THE ANTI-SLAPP ACT APPLIES TO
     DEFENDANTS' LIMITED CIRCULATION OF CIR 112 TO
     SELECTED JOURNALISTS AND OTHERS—IS ERRONEOUS ....... 14

II.  THE SUPERIOR COURT ERRED IN CONCLUDING THAT
     PLAINTIFFS' DEMONSTRATION OF A LIKELIHOOD OF
     SUCCESS ON THEIR DEFAMATION CAUSE OF ACTION
     REQUIRES A SHOWING THAT DEFENDANTS PUBLISHED
     THE DEFAMATORY STATEMENTS WITH ACTUAL MALICE..... 23

     A.   *The Superior Court Erred by Treating Proof of Defendants' Actual
          Malice as Part of Plaintiffs' Cause of Action*........................................24

     B.   *Even if Plaintiffs' Status as Private or Limited Public Figures
          Were to Be Determined Pre-Answer, the Conclusion Must Be  the
          Plaintiffs Are Not Limited Purpose Public Figures*...............................30

III. PLAINTIFFS PROFFERED SUFFICIENT EVIDENCE OF
     DEFENDANTS' ACTUAL MALICE.................................................... 37

IV.  THE SUPERIOR COURT ERRED BY DENYING PLAINTIFFS
     TARGETED DISCOVERY TO OPPOSE THE MOTION..................... 46

CONCLUSION ............................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bell Atl. Corp v. Twombly*,
  550 U.S. 544 (2007)..........................................................................................27

*Biro v. Condé Nast*,
  963 F. Supp. 2d 255 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541
  (2d Cir. 2015).............................................................................................27, 40

*Charles Parker Co.* v. *Silver City Crystal Co.*,
  116 A.2d 440 (Conn. 1955) ...............................................................................42

*\*Clyburn v. News World Commc'ns*,
  705 F. Supp. 635 (D.D.C. 1989), *aff'd*, 903 F.2d 29 (D.C. Cir. 1990) ..............26

*\*Competitive Enter. Inst. v. Mann*,
  150 A.3d 1213 (D.C. 2016) ............................... 15, 28, 37, 38, 39, 43, 44, 45, 46

*Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*,
  473 U.S. 788 (1985)...........................................................................................19

*\*Davis v. Indiana State Police*,
  541 F.3d 760 (7th Cir. 2008) .............................................................................27

*\*District of Columbia v. Gallagher*,
  734 A.2d 1087 (D.C. 1999) ...............................................................................17

*Doe No. 1 v. Burke*,
  91 A.3d 1031 (D.C. 2014) ...........................................................................14, 28

*Fletcher v. Evening Star Newspaper Co.*,
  133 F.2d 395 (D.C. Cir. 1942)...........................................................................18

*\*Gertz v. Welch*,
  418 U.S. 323 (1974)......................................................................................12, 30

*\*Harte-Hanks Commc's, Inc. v. Connaughton*,
  491 U.S. 657 (1989)...........................................................................................39

.

*Herbert v. Lando,
   441 U.S. 169 (1979)...................................................................................49, 50

*Hutchinson v. Proxmire,
   443 U.S. 111 (1979)..........................................................................................48

In re JMC,
   741 A.2d 418 (D.C. 1999) ...............................................................................18

Kelly-Brown v. Winfrey,
   717 F.3d 295 (2d. Cir. 2013) ...........................................................................27

Kindergartners Count v. Demoulin,
   No. 00-4173, 2003 U.S. Dist. LEXIS 2129 (D. Kan. Feb. 11, 2003) ...............25

Lloyd Corp. v. Tanner,
   407 U.S. 551 (1972)..........................................................................................19

*Lohrenz v. Donnelly,
   223 F. Supp. 2d 25 (D.D.C. 2002), aff'd, 350 F.3d 1272 (D.C. Cir. 2003) .......26

*New Hampshire v. Maine,
   532 U.S. 742 (2001)..........................................................................................36

New York Times v. Sullivan,
   376 U.S. 254 (1964)....................................................................................41, 42

*OAO Alfa Bank v. Center for Public Integrity,
   387 F. Supp. 2d 20 (D.D.C. 2005) ..............................................................11, 12

Oparaugo v. Watts,
   884 A.2d 63 (D.C. 2005) .................................................................................24

Outlaw v. United States,
   854 A.2d 169 (D.C. 2004) ...............................................................................18

Park v. Brahmbhatt,
   No. 2015 CA 005686 B, 2016 D.C. Super. LEXIS 16 (D.C. Super. Ct.
   Jan. 19, 2016)...................................................................................................16

Schultz v. Reader's Digest Assn., Inc.,
   No. 770310, 1977 U.S. Dist. LEXIS 12563 (E.D. Mich. 1977).........................26

*Smith-Haynie v. District of Columbia,*
    155 F.3d 575 (D.C. Cir. 1998)......................................................27, 28

*Solers, Inc. v. Doe,*
    977 A.2d 941 (D.C. 2009) ...................................................................24

*St. Amant v. Thompson,*
    390 U.S. 727 (1968)...............................................................13, 39, 40

*Tavoulareas v. Piro,*
    817 F.2d 762 (D.C. Cir. 1987)............................................................39

*Thompson v. Armstrong,*
    134 A.3d 305 (D.C. 2016) ...........................................................44, 45

*Waldbaum v. Fairchild Publ'ns,*
    627 F.2d 1287 (D.C. Cir. 1980)....................................................30, 32

## STATUTES

D.C. Code § 16-5501 ..............................................................9, 15, 22, 24

D.C. Code § 16-5502 ....................................6-7, 8, 13, 16, 21, 22, 23, 46, 50

D.C. Code § 16-5504 ..............................................................................23

Plaintiffs sued Defendants for defamation based on Defendants' act of providing selected recipients with a document that Defendants created that contains allegations that Plaintiffs bribed Vladimir Putin (among other alleged misdeeds).  Applying the D.C. Anti-SLAPP Act (the "Act"), the Superior Court dismissed the lawsuit with prejudice.  It ruled that: (1) Defendants had demonstrated their entitlement to the protection of the Act; (2) each Plaintiff is a limited purpose public figure ("LPPF") and thus subject to a burden to prove Defendants' actual malice in order to defeat the Anti-SLAPP motion; and (3) Plaintiffs had failed to proffer evidence supporting an inference that Defendants published the defamatory statements with actual malice.  For the reasons described below, the Superior Court's decision was erroneous in each respect and Plaintiffs' lawsuit should be reinstated.

## JURISDICTIONAL STATEMENT

This appeal is from a final order or judgment that disposes of all parties' claims.

## STATEMENT OF THE ISSUES

### Issues Pertaining to the Scope and Availability of the Act

1. Whether the Superior Court erred in suggesting that the Act's definition of protected speech as, *inter alia*, "statement[s] made . . . *in* a place open to the public or a public forum" includes statements that Defendants "*intended* the media to communicate . . . to the public," but which were not actually made "in a public place or forum."

1

2. Whether the Superior Court erred in concluding that the Act's definition of protected speech as, *inter alia*, "expressive conduct that involves . . . communicating *views*" includes passing along factual allegations in the form of "raw intelligence."

2(a).  Whether the Superior Court's proffered reason for that conclusion—that the Act is "at least as broad" as the First Amendment regarding the speech it protects—was an erroneous interpretation of the scope of the speech protected by the Act.

### *Issues Pertaining to the Superior Court's Conclusion that the Plaintiffs Should Be Adjudged as Limited Public Figures*

3. Insofar as the Act obligates a plaintiff opposing an Anti-SLAPP motion to demonstrate that his *cause of action* is likely to succeed, whether the Superior Court erred in concluding that this requirement encompassed an obligation to demonstrate a likelihood of overcoming an *affirmative defense* not yet pleaded in this case, *viz.*, that Plaintiffs are purported public figures.

4. Even if it were appropriate to determine, pre-Answer and pre-discovery, Plaintiffs' status as public or private figures, whether in its application of the second prong of the Supreme Court's decision in *Gertz v. Welch*, the Superior Court erred by defining the controversy giving rise to the defamatory statements as "the broad controversy relating to Russian oligarchs' involvement with the Russian government and its relations around the world, including the United States" rather than as a controversy relating to Donald Trump and the 2016 presidential election.

5. Even if it were appropriate to determine, pre-Answer and pre-discovery, Plaintiffs' status as public or private figures, whether the Superior Court erred in its conclusion that the controversy giving rise to the publication of a set of reports largely related to Donald Trump and the 2016 U.S. presidential campaign was the same as that giving rise to an article mentioning Plaintiffs which was the subject of a 2005 federal court decision.

6. With respect to the controversy described by the Superior Court as "Russia's relations with the United States," did the Superior Court err by defining the controversy in that boundless fashion and by finding that "Plaintiffs have assumed special prominence" in that controversy.

2

### *Issues Pertaining to the Meaning of "Reckless Disregard"*
### *[Part of the Definition of Actual Malice]*

7. Given the Supreme Court's holding in *St. Amant v. Thompson* that the "unverified [and] anonymous" character of an accusation is sufficient proof that its publication was reckless, whether the Superior Court erred in concluding that Plaintiffs "have not offered evidence" supporting recklessness where Plaintiffs' proof included (among other things) the defamatory report that describes its source as merely an unidentified "trusted compatriot" of an *unidentified* foreign government official—*not* himself described in the defamatory report as a witness to the relevant underlying facts.

8. Whether the Superior Court erred by interpreting a purported limited purpose public figure's obligation to prove, *inter alia*, that a defamation defendant "acted with reckless disregard for whether or not the statement was false," as requiring proof of a defendant's awareness (or disregard of information) that "no conceivable possibility existed" that the defamatory statement was true.

### *Issue Pertaining to the Availability of Discovery Under the Act*

9. In light of the Supreme Court's holding in *Herbert v. Lando*, as well as the Act's allowance of targeted discovery when it "appears likely" that such discovery will "enable the plaintiff to defeat the motion," whether the Superior Court erred in holding that Plaintiffs were *not* entitled to targeted discovery focused on identifying the controversy giving rise to the publication of CIR 112 and Defendants' state of mind in connection with its publication.

## STATEMENT OF THE CASE

Plaintiffs filed their complaint on April 16, 2018, alleging that Defendants defamed them by publishing statements that accused Plaintiffs of maintaining a corrupt relationship with Vladimir Putin. App. at 1. On May 30, 2018, Defendants made a special motion under the D.C. Anti-SLAPP Act to dismiss the complaint (the "Special Motion"), and on August 20, 2018, the Superior Court granted that motion, App. at 2, 3.

3

## STATEMENT OF FACTS

### A.   *The Controversy Giving Rise to the Defamatory Publication*

In June of 2016, Defendants were engaged by Fusion GPS—a D.C. based

entity that provides political opposition research services—to assist Fusion in

gathering information about then presidential candidate Donald Trump.  Order,

App. at 646 (citing Compl. ¶ 5).  The information that Defendants were tasked to

obtain was intended for use by Fusion and its clients (the Democratic National

Committee and the Clinton campaign) in connection with the 2016 presidential

election.  Compl. ¶¶ 1, 22, App. at 5, 16.  As part of their engagement, Defendants

prepared seventeen reports.  Compl. at ¶ 24, App. at 17.  Although separately dated

and titled, the reports have collectively become known as the "Dossier," the

"Trump Dossier," and/or the "Steele Dossier."

### B.   *The Defamatory Statements*

One of those individual reports, "Company Intelligence Report 112" (or

"CIR 112"), defames Plaintiffs—partial owners of the Alfa Group ("Alfa"), a

Russian business conglomerate.  That report, titled "RUSSIA/US

PRESIDENTIAL ELECTION:  KREMLIN-ALPHA GROUP CO-OPERATION,"

has "summary" and "detail" sections that include allegations—of unrevealed

origin—that Plaintiffs (and Alfa) have a bribery-based relationship with Vladimir

Putin.  Compl. ¶¶ 31, 32, App. at 19, 21.  Even though the body of CIR 112, unlike

the other sixteen reports in the "Dossier," does not mention Donald Trump or his

presidential campaign, CIR 112 was prepared by Defendants as part of their

political opposition research about Trump and his 2016 presidential campaign.

Compl. at ¶ 4, App. at 7.

### C. The Defamatory Statements Are Unverified and Their Source Is Unknown

The furthest back that CIR 112 traces its allegations about Plaintiffs is to an

unnamed "top level Russian government official." App. at 58-59. CIR 112 does

not say where or how that unidentified government official learned of the

defamatory allegations that wound up in CIR 112. Nor does CIR 112 indicate that

its author, Defendant Steele, communicated with that unidentified official. Instead,

CIR 112 implies that someone, presumably Steele or a person working with him,

spoke to someone else—described only as a "trusted compatriot" of the

unidentified Russian government official. In other words, according to CIR 112, in

2016 an unidentified foreign official passed along defamatory allegations he or she

heard elsewhere about Plaintiffs [relating to events dating back to the 1990s] to

another, unidentified Russian person (the "compatriot"), who in turn repeated those

defamatory statements to Steele (or someone acting for him and Defendant Orbis).

### D. Defendants' Publication of the Defamatory Statements

Despite the fact that they did not know or have a basis for believing the

accusations in CIR 112 about Plaintiffs to be true (the accusations are unverified

and anonymous), *see* Compl. ¶ 6, App. at 8, Defendants published CIR 112 (as

well as the other reports in the Dossier) to various recipients including members of

the media.  Compl. ¶¶ 9-10, App. at 9.  One media entity, BuzzFeed, Inc.,

subsequently published the entire Dossier on the Internet, including the false and

defamatory allegations of CIR 112 about Plaintiffs.

### E.    The Complaint

On April 16, 2018, Plaintiffs filed this lawsuit, alleging that Defendants

defamed Plaintiffs by publishing CIR 112.  Plaintiffs are ultimate beneficial

owners of Alfa—the company whose name is repeatedly misspelled as "Alpha" in

CIR 112.  Compl. ¶¶ 12, 15, App. at 11-12.  Plaintiffs are not widely known in the

United States, had no role or involvement in any aspect of the 2016 U.S.

presidential election, and made no public comments about it.  Fridman and Khan

are each citizens of both Russia and Israel, and Aven is a citizen of Russia.

Compl. ¶ 15, App. at 12.

### F.    The Special Motion to Dismiss

On May 30, 2018, Defendants moved to dismiss under the D.C. Anti-

SLAPP Act.[1]  The Act provides:

> If a party filing a special motion to dismiss under this section makes
> a *prima facie* showing that the claim at issue arises from an act in
> furtherance of the right of advocacy on issues of public interest, then
> the motion shall be granted unless the responding party demonstrates
> that the claim is likely to succeed on the merits, in which case the
> motion shall be denied.

---

[1] Defendants' also moved to dismiss under Rule 12(b)(6).  That motion was denied as moot.
App. at 645.

6

[D.C. Code § 16-5502(b).]

On August 20, 2018, the Superior Court granted Defendants' Anti-SLAPP Special Motion, concluding that "the Act applies to [Defendants'] provision of this portion of the Steele Dossier [CIR 112] to the media, and [that] Plaintiffs have not submitted evidence that Defendants knew that any of this information was false or acted with reckless disregard of falsity." App. at 645. In discussing the headline of CIR 112—its defamatory implication that Plaintiffs cooperated with the Kremlin to interfere in the 2016 election—the Superior Court interpreted Plaintiffs' obligation to show Defendants' reckless disregard of whether the statements were true or false as requiring Plaintiffs to show that Defendants knew or were aware "that no conceivable possibility existed" that the defamatory headline was false. App. at 664.

## SUMMARY OF THE ARGUMENT

For several independent reasons, as demonstrated by this appeal, the Superior Court's decision dismissing the complaint was erroneous. As a threshold matter, the Act's protection is restricted by its terms to those who make a *prima facie* showing that they were sued for engaging in "an act in furtherance of the right of advocacy," but here, Defendants merely passed along "raw intelligence" in non-public settings—conduct which does not fall within the Act's definition of advocacy.

7

Even *if* Defendants made a *prima facie* showing that their conduct was covered by the Act, Plaintiffs *showed a likelihood* of success on their claim.  The Superior Court made three errors in reaching a contrary conclusion.  First, by requiring Plaintiffs to show that Defendants acted with actual malice, the Superior Court erroneously required Plaintiffs to prove that they could overcome an *unpled affirmative defense*.  Second, even putting that aside, the existing record did not support the Superior Court's definition of the controversy that gave rise to the publication of the defamatory report, undermining the Superior Court's determination that Plaintiffs should be saddled with limited public figure status.  Third, even *if* Plaintiffs could properly be required to produce evidence of actual malice to defeat the special motion, they did so.

Finally, the Superior Court erroneously denied Plaintiffs the opportunity to seek targeted discovery that could have helped them to defeat the motion.

### The Anti-SLAPP Act Is Not Applicable to Defendants' Conduct

The Superior Court erred in holding that the Act is available to Defendants.  It is not.  As the court recognized, the Act's remedies are restricted to parties "*act[ing] in furtherance of the right of advocacy* on issues of public interest."  D.C. Code § 16-5502(b) (emphasis added).  The Act defines that phrase, in the disjunctive, as, *inter alia*, a "statement made . . . *in* a place open to the public or a public forum in connection with an issue of public interest" or

8

as "expressive conduct that involves . . . *communicating views* to members of
the public in connection with an issue of public interest." D.C. Code § 16-
5501(1) (emphasis added).  Without relying on any authority, the Superior Court
suggested that Defendants' conduct fits one or both of those definitions of
advocacy, App. at 657-58, but it fits neither.

But in doing so, the Superior Court failed to apply the plain meaning of
the Act.  The court suggested that "[e]ven if Mr. Steele did not meet with the
media in a public place or forum," his "expect[ation]" that the media would
"communicate the information [conveyed in a private setting] to the public"
transforms Mr. Steele's private conveyance of information into a statement
made "in a place open to the public or a public forum."  App. at 657-58.
However, "[i]n a public place or forum" means just that, and does not
encompass statements that were made *not in* a public place or forum, regardless
of the level of interest that the public might have in the statements or the
subjective expectation of the speaker that his privately uttered statement would
later be repeated in the media.

Similarly, the Superior Court's implication that the conveyance of "raw
intelligence" constitutes "communicating *views*"—on the theory that the speech
protected by the Act "is at least as broad as protect[ed] under the First
Amendment"—ignores the Act's plain words.  *See* App. at 658.  The Act does

9

*not* say that it applies to *all* speech protected by the First Amendment, but instead explicitly defines protected speech more narrowly. The provision of "raw intelligence" does not constitute "communicating views" or satisfy any other definition of advocacy set forth in the Act.

In short, Defendants' private publication of third-hand "raw intelligence" was neither an act "in public or a public forum" nor a communication by Defendants of their "views" about a matter of public interest, and thus was not "an act in furtherance of the right of advocacy," rendering the Act unavailable to Defendants.

### The Superior Court Erred in Holding that Plaintiffs Failed to Demonstrate a Likelihood of Success

Even *if* the Act were applicable to Defendants' private conveyance of raw intelligence—thus triggering an obligation by Plaintiffs to demonstrate a likelihood of success—Plaintiffs have done so.

In reaching a contrary conclusion, the Superior Court relied on its determination that each Plaintiff should be found to be a limited purpose public figure—a type of defamation plaintiff subject to a higher "fault" burden, *viz.*, that the defamation was published with "actual malice." According to the Superior Court, Plaintiffs did not "offer[] evidence supporting a clear and convincing inference that Defendants made any defamatory statement in CIR 112 [with actual malice]." App. at 666.

10

Because only *public* figures [including LPPFs] are required to prove

actual malice, the Superior Court's conclusion that the Complaint is subject to

dismissal at this juncture based on a purported failure to prove actual malice

depends, in part, on the correctness of the Superior Court's treatment of

Plaintiffs as LPPFs.

However, saddling Plaintiffs with LPPF status was erroneous,

particularly at this early stage of the case.  Fundamentally, a libel plaintiff's

potential status as a public figure is an *affirmative defense*.  *Except* where a

plaintiff pleads facts in his complaint that establish an affirmative defense, or,

arguably, when the facts pertinent to public figure status are known and not in

dispute (neither of which is the case here), a plaintiff may not be burdened with

the consequences of a successfully established affirmative defense *before* that

defense has been pled and established *by the defendant*.  By nevertheless

saddling Plaintiffs with a burden to prove Defendants' actual malice in

publishing the defamatory statements, the Superior Court violated that principle.

In support of its contrary finding, the Superior Court relied almost

entirely on the idea that it could, *without* applying the doctrine of issue

preclusion, import findings made more than a decade ago in a different

defamation case that two of the plaintiffs brought in 2000—*OAO Alfa Bank v.

Center for Public Integrity*, 387 F. Supp. 2d 20 (D.D.C. 2005) ("*OAO*").  *See*

11

App. at 661.  In *OAO*, Judge Bates found that Plaintiffs Fridman and Aven were LPPFs for the particular controversy which gave rise to the publication at issue in that case.

But the Superior Court, in importing the public figure finding made in connection with allegedly defamatory statements of eighteen years ago, failed to consider whether the controversy that gave rise to the making of those defamatory statements in 2000 is the same controversy "giving rise" to the publication by Defendants of CIR 112 in 2016.  *See Gertz v. Welch*, 418 U.S. 323, 352 (1974).  When that crucial question is considered, the conclusion should be that the *OAO* controversy and the controversy giving rise to the publication of CIR 112 are *not* the same.  As demonstrated below, the controversy that gave rise to the publication of the Dossier, including CIR 112, was Donald Trump's presidential campaign and possible collusion between it and Kremlin operatives.  Plaintiffs have not attempted to shape the outcome of that controversy.

By contrast, Judge Bates found that Plaintiffs Fridman and Aven had voluntarily injected themselves into a different and older controversy—"the public controversy involving corruption in post-Soviet Russia and the future of Western aid and investment in that country."  *OAO*, 387 F. Supp. 2d at 43.  Thus, regardless of whether the *OAO* findings are "valid today," Order, App. at 661, the

12

2005 *OAO* decision about statements made in 2000 did not determine what controversy gave rise to the publication of CIR 112 in 2016, much less provide a basis for concluding that Plaintiffs attempted to influence the outcome of any public controversy that gave rise to the publication of CIR 112.

Even if Plaintiffs could be required to demonstrate Defendants' actual malice, the Superior Court was wrong to conclude that Plaintiffs failed to do so. Under the standard set forth by the Supreme Court in *St. Amant v. Thompson*, 390 U.S. 727 (1968), the content of CIR 112 is sufficient evidence of Defendants' recklessness:  Defendants published it even though the source of its allegations is anonymous and not described, and even though CIR 112's headline implication of electoral interference is inconsistent with the body of CIR 112; it includes no such allegations.  Moreover, Defendants decided to publish it even though they were aware that a very substantial percentage of the Dossier of which CIR 112 is a part is false, *see* Compl. ¶ 19, App. at 14, a decision motivated in part by Defendants' bias that derived from their undisputed private commercial interest.

### The Superior Court Erred by Depriving Plaintiffs of Targeted Discovery

Finally, the Superior Court also erred by declining to permit the "targeted discovery" that the Act authorizes when it appears likely such discovery "will enable the plaintiff to defeat the motion." D.C. Code § 16-5502(2).  Targeted discovery would likely have demonstrated that CIR 112 was produced in

13

connection with Defendants' engagement by D.C. based Fusion GPS to produce

political opposition research for use in relation to the 2016 presidential election—

thereby supporting the Plaintiffs' argument that the controversy giving rise to the

defamatory statements was not one in which Plaintiffs had made themselves into

limited public figures by trying to influence its outcome.  Targeted discovery

would also likely have demonstrated that Defendants have *no* identifiable non-

anonymous source for the third-level hearsay accusations of criminality that they

published—evidence that would support the conclusion that Defendants acted with

actual malice in publishing CIR 112.

## STANDARD OF REVIEW

Because the issues raised by this appeal involve questions of statutory

interpretation, this Court's review is *de novo*.  *See Doe No. 1 v. Burke*, 91 A.3d

1031, 1040 (D.C. 2014) (holding, on appeal of trial court's order denying motion

to quash under Anti-SLAPP Act, that review of the underlying issue, "a question of

statutory interpretation, is *de novo*").

## ARGUMENT

I.     **THE SUPERIOR COURT'S THRESHOLD DETERMINATION—ITS
       FINDING THAT THE ANTI-SLAPP ACT APPLIES TO
       DEFENDANTS' LIMITED CIRCULATION OF CIR 112 TO
       SELECTED JOURNALISTS AND OTHERS—IS ERRONEOUS**

The Act is available as a mechanism to dismiss a lawsuit only insofar as the

lawsuit seeks to penalize a statement (or other expressive conduct) made "in

furtherance of the right of advocacy on issues of public interest." As explained

below, Defendants' conduct—the authorship and private circulation of CIR 112—

simply does not fall within the Act, which is limited to:

> (A)   Any written or oral statement made:
>
>> (i)   In connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; or
>>
>> (ii)  In a place open to the public or a public forum in connection with an issue of public interest; or
>
> (B)   Any other expression or expressive conduct that involves *petitioning the government or communicating views* to members of the public in connection with an issue of public interest.

[D.C. Code § 16-5501(1) (emphasis added).]

Thus, the Act requires a movant to make a *prima facie* showing that he was

sued to "punish" him for or "prevent" him, *Competitive Enter. Inst. v. Mann*, 150

A.3d 1213, 1226 (D.C. 2016), from doing at least one of the following:  (1) making

a statement about an issue under consideration *in an "official proceeding*;" (2)

making a statement about an issue of public interest "*in a place open to the public*

*or a public forum*;" or (3) engaging in *expressive conduct involving* "petitioning

the government" or otherwise "*communicating views*" about an issue of public

interest to the public, D.C. Code § 16-5501 (1) (emphases added).  But in the

single paragraph of their Superior Court motion papers addressing whether

Defendants had made such a "showing," Defendants did not offer *any* evidence

that they did so.  *See* Defendants Christopher Steele and Orbis Business

Intelligence Limited's Memorandum and Points of Authority in Support of

Contested Special Motion to Dismiss Under the District of Columbia Anti-SLAPP

Act, D.C. Code § 16-5502, dated May 30, 2018 ("Special Motion") at 4.

Instead—after pointing to the Act's second and third alternative definitions

*of acts of advocacy* ("in a public place or forum" and "communicating views")—

and relying exclusively on the allegations of the Complaint, Defendants contended

that its allegations bring them "within the meaning and application of the Anti-

SLAPP Act." Special Motion at 4.[2]

Although the Complaint alleges that Defendants *privately* supplied the

Dossier including CIR 112 to "a select group of journalists [and others]" (Compl.

¶ 26, App. at 17-18) during "*background briefings . . . without attribution*"

(Compl. ¶ 29, App. at 18), the Superior Court nevertheless held that by also

pleading that Defendants "intended, anticipated, or foresaw" (Compl. ¶ 13, App. at

12) the possibility of "republication of the Dossier and CIR 112 by someone in

that group . . . to a worldwide public" (Compl. ¶ 43, App. at 24), such intent and

expectation rendered Defendants' private "provision of [the Steele] Dossier to the

---

[2] It is dubious, at best, whether Defendants' citations to the Complaint are an adequate basis for invoking the Act. Those who seek to invoke the Act are required to make a *prima facie* showing of entitlement to its protection. *See Park v. Brahmbhatt*, No. 2015 CA 005686 B, 2016 D.C. Super. LEXIS 16, *7 (D.C. Super. Ct. Jan. 19, 2016) (denying motion where moving party did not allege she had engaged in public advocacy). Thus, distinct from whether Plaintiffs are later bound by their Complaint's allegations, Defendants independently must make the evidentiary "showing" that the Act requires, which they have not.

media" an "act in furtherance of the right of advocacy." App. at 657-58.[3]  In

support of that conclusion, the Superior Court referenced the "in a public place or

forum" definition of advocacy and wrote that "[e]ven if Mr. Steele did not meet

with the media in a public place or forum, he engaged in expression involving

communicating information to members of the U.S. public through the media."

App. at 657-58.  But it is not clear which of the three alternative definitions of "act

of advocacy" the Superior Court meant to invoke by making this finding.

In any event, it is beyond reasonable dispute that the Complaint does *not*

plead that Steele made any statements "in a public place or forum."  Thus, his

conduct does not fall within that definition of advocacy.  The statutory requirement

that hinges this definition of advocacy on *where* the statement was made—"in a

public place or forum"—cannot be disregarded on the ground that the defendant

hoped or anticipated that his private audience would publicly share the privately

made statement.  "In," as used in the phrase "in public," means in.  "Place" refers

to a geographic location.  And when, as here, "the plain meaning of the statutory

language is unambiguous . . . [the] judicial inquiry need go no further."  *District*

*of Columbia v. Gallagher*, 734 A.2d 1087, 1091 (D.C. 1999).

---

[3] Expressive conduct falls within the ambit of the Act only if it is both "an act in furtherance of
the right of advocacy" and "on an issue of public interest."  *See* D.C. Code § 16-5502(a).  In this
appeal, Plaintiffs' challenge to the invocation of the Act is limited to the notion that Defendants'
conduct satisfies any of the Act's definitions of an act in furtherance of the right to advocacy.
While Plaintiffs disagree with *some* of the Superior Court's *reasons* for concluding that CIR
112's content  is "on an issue of public interest" (e.g., that court's use of the *OAO* decision),
Plaintiffs do not disagree that the content of CIR 112 includes an "issue of public interest."

In related legal proceedings pending in the United Kingdom (in which

Plaintiffs are suing Orbis for violating the United Kingdom Data Protection Act),

Defendant Orbis has pled that it did *not* publicly publish or circulate CIR 112.  As

part of its defense in the UK Action, Orbis averred that it: (a) "took all steps

reasonably required" to honor its client's instruction regarding "the limited

circulation intended for Memorandum 112," *see* Defendant's Response to Part 18

Request ("Response") at 12; [4] (b) created the "intelligence memoranda" including

CIR 112 "for the purposes of prospective legal proceedings and/or obtaining legal

advice and/or for establishing, exercising or defending legal rights," Defence ¶ 1,

App. at 633; and (c) did so as a part of its "commercial interest in providing the

services" consistent with the instructions of its client, Response at 10.  These

public admissions by Orbis are inconsistent with any notion that its dissemination

of CIR 112 falls within the Act's definition of advocacy as a statement made "in a

place open to the public or a public forum."

The conclusion that Defendants cannot meet the "public forum" definition

of advocacy is further reinforced by decisions of the United States Supreme Court

---

[4] A courtesy copy of the Response which was filed by Orbis in the High Court of Justice, Queen's Bench Division, Media and Communications List on August 2, 2018 has been filed with this Court.  Plaintiffs ask the Court to take judicial notice of that document, as well as Orbis's Defence which was provided to the Superior Court, *see* App. at 633-38.  *See In re JMC*, 741 A.2d 418, 424 (D.C. 1999) ("In general, a judge may take judicial notice of the contents of court records."); *accord Fletcher v. Evening Star Newspaper Co.*, 133 F.2d 395, 395 (D.C. Cir. 1942); *Outlaw v. United States*, 854 A.2d 169, 172 (D.C. 2004) ("This court can . . . take notice of its own records and of other cases including the same subject matter or questions of a related nature between the same parties." (citation and internal quotation marks omitted)).

that define the concept of a public forum.  With one exception not applicable here,

a *public* forum refers to *property owned by the government*, either "[t]raditional

public fora . . . which by long tradition or by government fiat have been devoted to

assembly and debate [and] . . . [i]n addition . . . a public forum may be created by

*government designation* of a place or channel of communication for use by the

public at large for assembly and speech, for use by certain speakers, or for the

discussion of certain subjects." *Cornelius v. NAACP Legal Defense & Educ. Fund,*

*Inc.*, 473 U.S. 788, 802 (1985) (emphasis added) (citations omitted).  The only

exception in which the public forum concept may be extended to communications

expressed on *private* property is where "even though property is privately owned,"

because the owner permits broad public access "it [the private property] may be

treated as though it were publicly held." *Lloyd Corp. v. Tanner*, 407 U.S. 551, 573

(1972).  Here, Defendants have never alleged that their communications with

journalists about CIR 112 occurred on government property at all, much less in a

public place traditionally or by government designation devoted to assembly and

debate—or on private property that should be treated as if it were "publicly held."

The conclusion that Steele's private meetings with journalists did not satisfy the

"in a public forum" test is further reinforced by an example: if a person were to

invite several U.S. Senators to his home or place of business to participate in a

discussion about an issue of public policy, the home or place of business does not

19

thereby become a place open to the public or a public forum.  In short, Defendants

simply cannot satisfy the "in a place open to the public or a public forum"

definition of an act of advocacy.

The Act also includes "*communicating views* to members of the public in

connection with an issue of public interest" within its definition of advocacy, but

here, Defendants did not make a *prima facie* case that they were sued in retaliation

for expressing any views about Plaintiffs.  Simply put, Defendants have *never* said

that the content of CIR 112 communicated their views about the Plaintiffs and

Plaintiffs have *pled* the opposite.  That is, the Complaint, which Defendants have

not controverted (and upon which Defendants *rely*), pleads that Defendants have

"acknowledged that [their] reports are unverified 'raw intelligence,'" Compl. ¶ 6,

App. at 8, that they were "gathered . . . through 'paid collectors' and 'subsources,'"

that Defendant Steele acknowledges that "as much as 30% of the Dossier's content

may not be 'accurate,'" Compl. ¶ 19, App. at 14, and that Defendants "did not

know the unverified, anonymous, inherently harmful accusations in CIR 112 about

Plaintiffs to be true."  Compl. ¶ 30, App. at 19.  Unsurprisingly, Glenn Simpson

and Fusion GPS—the individual and entity who hired Steele and Orbis to create

and disseminate CIR 112—have represented (while also purporting to speak *for*

*Steele*) that CIR 112 expresses no views.  *See* Defendants' Motion to Dismiss the

Amended Complaint for Failure to State a Claim, Case No. 17-cv-2041 (D.D.C.)

(ECF # 20) at 38-39  (representing that *"[n]either Steele* nor [the Simpson]

Defendants endorse or provide editorial gloss on the reports [comprising the

Dossier]" and asserting that CIR 112 merely "reports statements by Russian

government officials [but] . . . does not endorse those statements and it does not

editorialize about them").

 Nevertheless, the Superior Court appeared to be relying on the

"communicating views" definition of advocacy when it concluded that "the Act

applies" to Defendants' conduct of giving selected journalists a copy of a

document containing "statements of fact" [in the form of "raw intelligence"].  App.

at 658.  The court reached that conclusion by starting with a non-controversial

principle—"[t]he First Amendment protects . . . statements of fact"—and then

combined it with the erroneous legal conclusion that the scope of speech

"[p]rotect[ed] under the Anti-SLAPP Act is *at least as broad* as protect[ed] under

the First Amendment."  App. at 658 (emphasis added).  The Superior Court cited

*no* authority for that notion, and we are aware of none.  By its plain terms, the Act

provides enhanced protections only for expressive conduct defined as an "act in

furtherance of the right of advocacy"—not for all speech that falls within the ambit

of the First Amendment.  *See* D.C. Code § 16-5502(a).

 If, as they did below, Defendants should argue that the *legislative purpose* of

the Act would be furthered by defining the expression of "views" to encompass the

21

making of "factual statements," that argument must be rejected.  Specifically,

Defendants argued that there would have been "no reason for the legislature to

draft and pass" an Anti-SLAPP Act that did not define the publication of purely

factual statements as a communication of views, on the theory that the publication

of views or opinion was already not actionable as defamation.  *See* Defendants'

Reply in Support of Contested Motion to Dismiss Under the District of Columbia

Anti-SLAPP Act, D.C. Code § 16-5502, filed July 24, 2018 at 8.

But as shown below, Defendants' arguments about legislative purpose are

mistaken and simply do not permit the judicial broadening of statutory words in a

way that is contrary to their well understood meaning.  That is, views means

views—not facts.  In any event, contrary to Defendants' argument, the Act would

*not* be without purpose if its words, including "views," were interpreted

consistently with their commonly understood meaning.  As an initial matter, the

first two definitions of advocacy encompass expressions of fact, as well as views,

as they apply to "[a]ny written or oral statement," so long as those statements are

made in the requisite environment.  *See* D.C. Code § 16-5501(1)(A).  Even the

third definition, where the more restrictive word "views" is used, retains purpose in

the defamation context (although the Act's application is not limited to claims of

defamation), as one of the Act's purposes is to afford a successful movant with a

right to recover his attorney's fees—an important legislative goal with real value to

22

a defamation defendant sued for communicating his views who would otherwise

not be able to recover his fees after prevailing on a motion to dismiss. *See* D.C.

Code § 16-5504.

In sum, in this case, Defendants were not sued for making a statement about

an issue "under consideration or review" by the government, for making a

statement "in a public place or forum," or for communicating their "views" about

Plaintiffs. For that reason, Defendants' conduct falls outside of the Act's

definition of "an act in furtherance of the right of advocacy" and on that ground

alone the Superior Court's decision should be reversed.

## II.   THE SUPERIOR COURT ERRED IN CONCLUDING THAT PLAINTIFFS' DEMONSTRATION OF A LIKELIHOOD OF SUCCESS ON THEIR DEFAMATION CAUSE OF ACTION REQUIRES A SHOWING THAT DEFENDANTS PUBLISHED THE DEFAMATORY STATEMENTS WITH ACTUAL MALICE

After a defendant seeking dismissal under the Act establishes a *prima facie*

entitlement to its protection, the plaintiff opposing the motion must identify

evidence supporting a likelihood of success on his cause[s] of action. D.C. Code §

16-5502(b). The Superior Court, after making its *prima facie* finding, *see supra*,

went on to define the elements of Plaintiffs' cause of action as including

Defendants' "actual malice" in publishing the defamatory statements. That was

erroneous for two reasons. First, "actual malice" becomes an element of a

defamation claim *only* if and when the defendant pleads in his answer that the

23

plaintiff is a public figure and the defendant then sustains *his* resulting burden of proof to show that the plaintiff is a public figure.  Because that has not yet happened, it was premature at best for the Superior Court to require Plaintiffs to proffer proof of actual malice.  Second, *even if* the time were ripe to determine Plaintiffs' status as possible LPPFs, the conclusion must be that Plaintiffs are not LPPFs—and therefore have no burden to prove Defendants' actual malice.

### A.  *The Superior Court Erred by Treating Proof of Defendants' Actual Malice as Part of Plaintiffs' Cause of Action*

Where an Anti-SLAPP-Act movant sustains his *prima facie* burden, the plaintiff's resulting burden is to show that his "claim [cause of action] is likely to succeed on the merits."  *See* D.C. Code § 16-5501(2) (defining "claim" as, *inter alia*, "cause of action").  The Act does not say that that obligation to show the likely success of the cause of action includes an obligation to overcome an unpled affirmative defense.  Instead, the requirement to show a likelihood of success should be understood to require a Plaintiff to demonstrate only his ability to establish the elements of his cause action.

While a defendant's "fault" in publishing a statement challenged as defamatory is always an element of a defamation claim, the defendant's "actual malice" is not.  *See, e.g., Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005) (listing elements of defamation to include "that the defendant's fault in publishing the statement amounted to at least negligence").  *See also Solers, Inc. v. Doe*, 977 A.2d

24

941, 948 (D.C. 2009) (reaffirming, post-*Twombly*, that "plaintiff must allege and prove . . . that the defendant's fault in publishing the statement amounted to at least negligence" and noting that "[u]nlike some jurisdictions" the District of Columbia does not apply a "heightened pleading rule to claims of defamation" (internal quotation marks omitted)).  Those principles are important here because, even in connection with an Anti-SLAPP motion, a plaintiff cannot be required to *prove* something that he is *not* required to plead.  That is, if something is an element of a cause of action, the plaintiff is required to plead it in his complaint and then adduce evidence for that element to survive an Anti-SLAPP motion.  By contrast, if a plaintiff is not required to plead a concept in his complaint (e.g., a level of fault greater than negligence), that is because it is not treated as an element of his cause of action—which likewise means he cannot be required to prove it to survive an Anti-SLAPP motion.  Here, the Superior Court correctly found that Plaintiffs *did* proffer evidence of Defendants' negligence in publishing CIR 112. *See* App. at 663-64

But the Superior Court required Plaintiffs to go further, believing it could determine Plaintiffs to be public figures on the existing record.  But that was wrong, as it is well established that whether a plaintiff is a public figure is an affirmative defense, which defendants must raise by pleading and on which *defendants* also bear the burden of proof.  *See, e.g.*, *Kindergartners Count v.*

25

*Demoulin*, No. 00-4173, 2003 U.S. Dist. LEXIS 2129, *2 (D. Kan. Feb. 11, 2003)

(". . . Wheeler's 'public figure' affirmative defense to DeMoulin's defamation

counterclaim."); *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 40, 58 (D.D.C. 2002)

(granting defendant summary judgment on defamation claim where defendant

established plaintiff's public figure status, one of three "defenses" asserted), *aff'd*,

350 F.3d 1272 (D.C. Cir. 2003); *Clyburn v. News World Commc'ns*, 705 F. Supp.

635, 639 (D.D.C. 1989) (explaining that, on summary judgment, "[t]o show that

plaintiff is a limited purpose public figure, *defendants must* satisfy three criteria"

(emphasis added)), *aff'd*, 903 F.2d 29 (D.C. Cir. 1990); *Schultz v. Reader's Digest*

*Assn., Inc.*, No. 770310, 1977 U.S. Dist. LEXIS 12563, *6 (E.D. Mich. 1977)

("The defense that a plaintiff is a 'public figure' is an affirmative defense" in a

defamation case and "the burden is on the defendant to plead and prove [its]

elements.").

 While the Act, when triggered, requires a plaintiff to proffer evidence in

support of the *elements* of his cause of action at the pleading stage—sometimes

even before any discovery—it contains no language supporting the notion that it

authorizes early dismissal based on a failure to rebut *an affirmative defense* that is

unpled and as to which Plaintiffs have not been afforded discovery.  But that is

exactly what the Superior Court did when it erroneously imposed on Plaintiffs the

additional burden to show a likelihood of overcoming Defendants' yet-to-be-pled public figure affirmative defense.

There is a narrow exception to the principle that affirmative defenses cannot be raised as a basis for dismissal pre-answer, but it is triggered only when the complaint itself pleads facts establishing the affirmative defense or when the plaintiff concedes that he is a public figure.  Thus, in the context of a federal Rule 12(b)(6) motion, an "affirmative defense may be raised by pre-answer motion under Rule 12(b)," only *"when the facts that give rise to the defense are clear from the face of the complaint."  Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998) (emphasis added); *see also Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d. Cir. 2013) ("[When] affirmative defense[s] . . . require[] consideration of facts outside of the complaint [they are] inappropriate to resolve on a motion to dismiss.  Affirmative defenses may be adjudicated at this stage in the litigation, however, where the facts necessary to establish the defense are *evident on the face of the complaint.*" (emphasis added)); *Davis v. Indiana State Police*, 541 F.3d 760, 763 (7th Cir. 2008) ("[c]omplaints need not anticipate, and attempt to plead around, potential affirmative defenses") (citing *Bell Atl. Corp v. Twombly*, 550 U.S. 544 (2007)); *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 270 (S.D.N.Y. 2013) (affirmative defense of public figure status could be determined

27

pre-Answer where it could "be determined based upon the pleadings *alone*")
(emphasis added)), *aff'd*, 807 F.3d 541, 544-45 (2d Cir. 2015).

That exception does not aid Defendants because "the facts that give rise to
the defense" are *not* "clear from the face of the complaint," *Smith-Haynie*, 155
F.3d at 578, nor do Plaintiffs concede public figure status, *cf. Mann*, 150 A.3d at
1251 n.51 (noting, in holding plaintiff to burden imposed on public figures, that
"[t]*he parties agree*, as do we, *that* [the plaintiff] *is a limited public figure . . .*"
(emphasis added)). Here, the Complaint's only allegations addressing whether
Plaintiffs injected themselves into any controversy to try to shape its outcome
clearly aver that Plaintiffs did *not* do so. *See* Complaint ¶ 15, App. at 12
("Plaintiffs are *not* widely known in the United States, had *no* role or involvement
in *any* aspect of the 2016 U.S. presidential election, and made *no* public comments
about it." (emphasis added)).

*Doe No. 1 v. Burke*, 91 A.3d at 1034, a case "addressing the [D.C.] Anti-
SLAPP statute for the first time," does not support a different result. In *Doe*,
although this Court determined the Plaintiff-Appellee to be an LPPF, it noted that
"the relevant facts" pertaining to her public/private status were "not in dispute."
*Id.* at 1034, n. 1. Here, by contrast, there are several factual disputes pertaining to
Plaintiffs' public or private figure status, including the nature of the controversy
that gave rise to Defendants' publication of the defamatory statements and whether

Plaintiffs attempted to shape the outcome of the controversy. Because the determination of whether a plaintiff is a limited public figure is "difficult" and "require[s] a highly fact-intensive inquiry," *id.* at 1041, even if a pre-discovery determination may be made about that issue when, as in *Doe*, the pertinent facts "are not in dispute"—such a highly fact intensive inquiry is not appropriately concluded, pre-discovery, when, as here, the pertinent facts are very much in dispute.

Moreover, in *Doe*, the plaintiff [Burke] did *not* make the argument advanced by Plaintiffs in this case—that public or private figure status was an unpled affirmative defense, not yet ripe for adjudication. As a result, this Court in *Doe* was not presented with the issue of whether the Act permits courts to grant Anti-SLAPP motions based on affirmative defenses about which factual disputes exist, such as a defamation plaintiff's public-figure status.

The Act, when applicable, only requires that a plaintiff prove his ability to establish the same elements of his cause of action that he was required to plead. Here, Plaintiffs were required to plead only that Defendants published the defamatory statements with negligence, and under the Act, Plaintiffs can only therefore be required to proffer evidence supporting the conclusion that Defendants acted with negligence. Plaintiffs have done so—as the Superior Court found—which must result in the denial of Defendants' special motion.

29

**B.**   *Even if Plaintiffs' Status as Private or Limited Public Figures Were to Be Determined Pre-Answer, the Conclusion Must Be the Plaintiffs Are Not Limited Purpose Public Figures*

The first step in the process of determining whether a plaintiff is a limited

public figure is *identifying the pertinent controversy*. *Waldbaum v. Fairchild*

*Publ'ns,* 627 F.2d 1287, 1296 (D.C. Cir. 1980).  That is the necessary first step

because the next is to ask whether the plaintiff tried to influence its outcome (and

then, whether the defamatory statement is germane to it).  *See id.* at 1297, 1298

n.32.  The Supreme Court has clearly articulated the standard courts must use in

*identifying the controversy*—which is to identify the controversy "*giving rise to* the

defamation." *Gertz,* 418 U.S. at 352.

As illustrated by the Supreme Court in *Gertz*, the controversy "giving rise"

to the defamation is distinct from *the content* of the defamatory statement.  Thus,

in *Gertz*, the content of the defamation was a series of statements that accused Mr.

Gertz of membership in communist affiliated organizations. *See id.* at 326.  But in

defining the controversy (and whether Mr. Gertz tried to shape its outcome) the

Supreme Court did *not* discuss whether Mr. Gertz ever talked about any of the

alleged communist affiliated organizations or his own participation in

them.  Instead, the Court talked about *why* the defamatory statements accusing Mr.

Gertz of being a communist came to be published—Mr. Gertz's representation of

the estate of an individual who was shot and killed by a police officer. *See, e.g., id.*

30

at 352 ("In this context it is plain that petitioner was not a public figure. He played a *minimal role at the coroner's inquest*, and his participation related solely to his representation of a private client. He took *no part in the criminal prosecution* of Officer Nuccio. Moreover, he *never discussed either the criminal or civil litigation with the press* and was never quoted as having done so. He plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome." (emphases added)).

The lesson of *Gertz* is plain. Courts should not base their decision on how to define the controversy on *the content* of the defamatory statement (e.g., in *Gertz*, that Mr. Gertz was a communist), but rather, on the issue or dispute that triggered the making of the defamatory statements (in *Gertz*, a shooting by a police officer and ensuing criminal and civil litigation).

Applying that lesson to this case, it is plain that the controversy "giving rise" to Defendants' publication of statements that defame Plaintiff is the controversy surrounding Donald Trump's presidential campaign. That is, as the Superior Court correctly described, Defendants produced and published the entire "Steele dossier," including the defamatory report at issue (CIR 112) in connection with being "hired by . . . a Washington D.C.-based firm that conducts political opposition research, to compile information about then-candidate Donald J. Trump's ties to Russia and Vladimir Putin." App. at 646. Thus, regardless of the

31

*content* of CIR 112, under *Gertz* the controversy "giving rise" to the defamation is

about "Donald J. Trump's ties to Russia and Vladimir Putin." Once the

controversy is so defined, as required by *Gertz*, the conclusion is easily reached

that Plaintiffs are not limited purpose public figures in the pertinent controversy.

Indeed, Plaintiffs have never expressed a public view regarding whether or

not Trump had or has ties to the Kremlin or Putin, much less tried to "shape the

outcome" of that public controversy. The contrary arguments that Defendants

made below (which the Superior Court did not adopt) reveal the absurdity of the

notion that Plaintiffs ever tried to shape the outcome of the 2016 election

controversy. Attempting to argue that Plaintiffs "qualify as public figures in the

debate over *Russian influence in the U.S. Presidential Election*," Defendants made

such arguments as that Richard Burt, a former American diplomat who sits on the

Board of one of Plaintiffs' companies, was "advising the Trump campaign on

foreign policy," that Plaintiffs spoke about their "foray into the U.S. healthcare

market," and that Plaintiff Aven denied "rumors that Alfa Bank paid for Carter

Page's trip to Moscow." *See* Special Motion at 15-16. But as should be obvious,

none of these examples remotely support the conclusion that Plaintiffs were "trying

to shape the outcome," *Waldbaum*, 627 F.2d at 1298, n.32, of the controversy over

the question of whether the Trump campaign was colluding with Russia. That is,

none of the examples provided by Defendants below were of statements by

32

Plaintiffs expressing any view about Donald Trump's campaign or the question of whether the campaign had improper communications with the Kremlin.

The Superior Court reached the conclusion that Plaintiffs *are* LPPFs—but only after defining the controversy for which they are limited public figures as "Russian oligarchs' involvement with the Russian government and its activities and relations around the world, including the United States." App. at 662. To be sure, the Superior Court and other sources it cited have plausibly contended that there is *public interest* "in the political and commercial relationships between Russian oligarchs and the Russian government." App. at 662. But the question of whether that controversy "exists" does not resolve the pertinent legal question, which is whether that controversy—or a different one—"gave rise" to the publication of CIR 112.

The Superior Court's description of its methodology for identifying the pertinent controversy does not mention *Gertz*. Instead, the court quoted language originally used by the D.C. Circuit in *Waldbaum*, later quoted by this Court in *Doe*, referring to "the controversy *to which the defamation relates*." Decision at 7. But the D.C. Circuit and this Court, by using that phrase, could not have been imposing a new methodology for identifying a controversy meaningfully different than the methodology required by the Supreme Court in *Gertz*—the "giving rise to" test. Thus, to be consistent with *Gertz*, under *Waldbaum* and this Court's decisions in

33

*Doe* and other cases, a controversy should be understood to "relate" to a

defamatory statement only when the controversy gives rise to the making of that

defamatory statement.

While the Superior Court denied targeted discovery to Plaintiffs, the strong

likelihood is that such discovery would only have reinforced the conclusion that

the controversy identified by the Superior Court as "oligarch's involvement with

the Russian government" did *not* actually trigger or give rise to Defendants'

publication of CIR 112.  In the unlikely event that discovery revealed that Fusion

GPS asked Christopher Steele to produce a report about Plaintiffs because of

Fusion's general interest in the relationship between "oligarchs and the Russian

government," that might provide some support for Defendants' and the Superior

Court's proffered definition of the controversy.  But, more likely, if discovery

revealed that Fusion's request to Defendants for the report about Plaintiffs arose

from Fusion's engagement by the Clinton campaign and the DNC to create

political opposition material related to the 2016 presidential election, that factual

record would provide *evidence* for Plaintiffs' proposed definition of the

controversy as 2016 election interference—not "oligarchs' involvement with the

Russian government."

Indeed, in the earlier referenced British court filing, Defendant Orbis has

admitted that the controversy giving rise to CIR 112's creation *was* the election

34

controversy—as opposed to a general interest in the Kremlin's relationship with the so-called oligarchs. *See* Defendant's Response to Part 18 Request at 2 (explaining that Orbis provided intelligence memoranda, including CIR 112, because it was "instructed . . . to investigate and report, by way of preparing confidential intelligence memoranda, on Russian efforts to influence the US Presidential election process in 2016 and on links between Russia and the then Republican candidate and now President Donald Trump"); *see also id.* at 4 (averring that CIR 112 reported information that was "material to the allegations outlined above"—described as "allegations of Russian interference in the 2016 US Presidential election").[5]

In any event, the Superior Court not only ignored the *Gertz* "giving rise to" methodology for identifying the pertinent controversy, its shortcut for identifying the controversy was incorrect in other ways. Specifically, the Superior Court adopted the 2005 finding of Judge Bates—rendered in a different defamation case in which two of the Plaintiffs (Fridman and Aven) were also plaintiffs—that the plaintiffs were limited purpose public figures. The Superior Court reasoned that "the findings in *OAO Alfa Bank* are valid today," the case is "not a relic" and that Plaintiffs have not "become recluses in the last decade." App. at 661.

---

[5] This Court may take judicial notice of the averments by Defendant Orbis in the UK court proceeding. *See supra* at 18, n. 4.

But those observations, even if accurate, were not a sufficient basis for
importing the *OAO* limited public figure finding into this case.  In deciding to
apply the limited public figure determination rendered after discovery—at the
summary judgment stage—by Judge Bates in 2005 to the defamatory statements
published in 2016, the Superior Court failed to ask what controversy gave rise to
the defamatory statements at issue in *OAO*, what controversy gave rise to the
defamatory statements at issue in this case—and whether those controversies are
the same.  Had the court undertaken that inquiry, it could only have concluded that
*the controversies* giving rise to the year 2000 statements at issue in *OAO* and the
2016 statements in this case are not the same—making *OAO* an invalid shortcut
upon which to determine that Plaintiffs are LPPFs in this case.

Notably, neither Defendants nor the Superior Court invoked the doctrine of
"issue preclusion" when taking the position that Judge Bates' limited public figure
finding in *OAO* should be applied to Plaintiffs in this case.  That is significant
because whether an adjudication by a previous court should be adopted in a later
case is a function of that doctrine.  Issue preclusion "foreclose[s] successive
litigation of an issue of fact or law actually litigated and resolved" in a previous
case.  *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001).  But here, *OAO* did
not and could not *resolve* the issue presented in *this case*—whether, *in connection
with the controversy that gave rise to Defendants' publication of CIR 112 in 2016,*

36

Plaintiffs are private or limited public figures. *OAO* involved defamation claims asserted by Plaintiffs Fridman and Aven [but not Khan] based on an article dated *August 2, 2000* titled *"Cheney led Halliburton to feast at federal trough/State department questions deal with firm linked to Russian mob."*[6] The *OAO* court's ruling (after extensive discovery, on summary judgment) that Plaintiffs Fridman and Aven were public figures in connection with the controversy that gave rise to the defamatory statements published in 2000 simply does not resolve the distinct question of whether Plaintiffs are limited public figures in connection with the 2016 controversy about Donald Trump that gave rise to the defamatory report at issue titled "RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP COOPERATION."

## III.   PLAINTIFFS PROFFERED SUFFICIENT EVIDENCE OF DEFENDANTS' ACTUAL MALICE

Even if the Act's definition of advocacy encompassed Defendants' conduct and Plaintiffs were properly required to proffer evidence supporting Defendants' actual malice, the Superior Court erroneously concluded that Plaintiffs failed to do so.

As this Court explained in *Mann*, "it is not the court's role, at the preliminary stage of ruling on a special motion to dismiss, to decide the merits of the case." 150 A.3d at 1240. Therefore, under the Anti-SLAPP "likelihood of

---

[6] The full text of that article is available at: https://publicintegrity.org/federal-politics/cheney-led-halliburton-to-feast-at-federal-trough/.

success" standard, a special motion may be granted "only if the court can conclude

that the claimant could not prevail *as a matter of law*, that is, after allowing for the

weighing of evidence and permissible inferences." *Id.* at 1236. In making that

assessment, the court must consider "evidence that has been produced *or*

*proffered*." *See id.* at 1232.

The evidence proffered by Plaintiffs in the Superior Court included: (a) the

full text of CIR 112 (the unverified defamatory report that is both internally

inconsistent and based on unknown sources), Order, App. at 663; (b) a statement

by Defendant Steele acknowledging that up to 30 percent of the dossier of which

CIR 112 is a part may be factually erroneous, Order, App. at 665; (c) undisputed

background facts such as that Defendants created and published CIR 112 in

connection with their being hired to produce "political opposition research" about

"then candidate Donald J. Trump's ties to Russia and Vladimir Putin" for Fusion

GPS and its clients (the DNC and Hilary Clinton campaign), Order, App. at 646;

and (d) signed affidavits from Plaintiffs, *see* App. at 639-44.

A defamation plaintiff who has properly been adjudicated a public figure

and therefore subjected to a burden to adduce evidence of "actual malice" satisfies

that burden with evidence of "reckless disregard for whether or not the statement

was false." *Mann*, 150 A.3d at 1252. Such "recklessness may be found where

there are obvious reasons to doubt the veracity of the informant or the accuracy of

his reports." *St. Amant*, 390 U.S. at 732. Such "reasons to doubt" include the

"unverified [and] anonymous" character of a published accusation. *Id.* at 733.

While the motive of the maker of a defamatory statement does not by itself

ordinarily suffice to prove actual malice, "it cannot be said that evidence

concerning motive or care never bears any relation to the actual malice inquiry."

*Harte-Hanks Commc's, Inc.,v. Connaughton*, 491 U.S. 657, 664-65, 667-68, 689

n.36 (1989); *accord Tavoulareas v. Piro*, 817 F.2d 762, 796 (D.C. Cir. 1987)

(noting that evidence of ill will or bad motive, if probative of "willingness to

publish *unsupported* allegations," may be suggestive of actual malice). Instead,

"bias . . . may be a relevant consideration in evaluating other evidence to

determine whether a statement was made with reckless disregard for its truth."

*Mann*, 150 A.3d at 1259.

Applying these standards, including the "the weighing of [proffered]

evidence" and granting permissible inferences in Plaintiffs' favor, the conclusion

should be that, even if Plaintiffs were properly subjected at the pleading stage to a

burden to proffer evidence supporting an inference of Defendants' actual malice,

Plaintiffs satisfied that burden.

In reaching a contrary conclusion, the Superior Court acknowledged that

under settled law, "the plaintiff can make this showing" in ways that include

"offering evidence that it was highly probable" that the defamatory report rests on

39

sources that are "unverified [and] anonymous." App. at 664 (quoting *Jankovic*,

822 F.3d at 589-90).  *See also St. Amant*, 390 U.S. at 732; *Biro*, 807 F.3d at 545

(holding that inference of actual malice is permissible where "defendant provides

no source for the allegedly defamatory statements").   But the Superior Court

simply failed to apply that standard to what CIR 112 says about it sources.  A

careful reading of CIR 112 demonstrates that it is at least "highly probable" that

Steele did not know the identity of the ultimate source of the harmful "raw

intelligence" in CIR 112 because it "provides no source for the allegedly

defamatory statements." *Biro*, 807 F.3d at 545.  That is, CIR 112 does not attribute

its allegations of Plaintiffs' purported acts of corruption (such as having an Alfa

employee deliver "bags of cash" bribes to Deputy Mayor Putin in the 1990s) to *any*

ultimate source—even a confidential one.  Instead, CIR 112 suggests only that

Defendant Steele spoke to a Russian individual described as a "trusted compatriot"

of an anonymous Russian government official—who is not even described as a

first hand source of the allegations.  In other words, CIR 112 reports that Steele or

someone working with him received these allegations from a "trusted compatriot"

of an unknown foreign government official who in turn learned of them from

elsewhere.  In short, CIR 112 is a textbook example of reliance on "unverified

[and] anonymous" sources and therefore, under *St. Amant, Jankovic*, and *Biro*, is

legally sufficient evidence by itself to sustain the conclusion that Defendants acted with reckless disregard when they circulated it to the media.

Plaintiffs' proffer in support of Defendants' recklessness also included the evidentiary point that CIR 112 has *no* content that supports its defamatory headline. That is, as the Superior Court described, CIR 112's headline "is capable of bearing the meaning that . . . [Plaintiffs] were involved . . . in any Russian interference with the U.S. election" but its body evinces a "failure to include [any] supporting facts" for that allegation. App. at 663-64. The Superior Court nevertheless dispatched the significance of that point—describing it as a mere "lack of evidence" for the headline, and then cited *New York Times v. Sullivan* as authority for the notion that "lack of evidence . . . 'is constitutionally insufficient to show []recklessness." App. at 664 (quoting *New York Times v. Sullivan*, 376 U.S. 254, 288 (1964)).

But contrary to the Superior Court's characterization, Plaintiffs' argument is not *merely* that Defendants lacked evidence for the published accusation of election interference in CIR 112's headline—but is also that Defendants had no verifiable, non-hearsay source for it. *See supra* at 21, 39, 41. The lack of a verifiable non-anonymous source for the headline *combined with* Defendants' complete inability to support it with even hearsay-based corroboration add up to at least a permissible conclusion that Defendants had "obvious reasons to doubt"

41

the accuracy of the headline. Moreover, the Supreme Court's discussion of

recklessness in *New York Times* does not aid Defendants, as demonstrated by the

cases it cited. *See New York Times*, 376 U.S. at 288 (citing *Charles Parker Co.* v.

*Silver City Crystal Co.*, 116 A.2d 440, 446 (Conn. 1955) (holding that among that

which "is required" to conclude that speaker believed what he said "in good faith"

(the inverse of actual malice) is that speaker had actual "grounds for [his] belief")).

Here, when *all* of the pertinent facts about CIR 112 and its headline are

considered—Steele's lack of a non-anonymous source for the headline combined

with his lack of any disclosed information—even obtained indirectly—to support

it—the factual conclusion that Steele had no "grounds for" a belief in the accuracy

of the headline is legally permissible, *Charles Parker Co.*, 116 A.2d at 446,

warranting the inference that Steele acted recklessly in publishing CIR 112.

Not only is CIR 112's content itself evidence that permits an inference of

Defendants' actual malice, but Plaintiffs proffered additional evidence for that

conclusion. Specifically, Defendants were biased, at least potentially, because they

published the defamatory report as paid operatives for a political campaign. *See*

Order, App. at 646. The Superior Court, while acknowledging the facts that give

rise to Defendants' potential motive to publish the unsupported allegations,

appeared to ignore Defendants' bias in its analysis. However, as discussed, *supra*

at 40, bias, although insufficient by itself, is a relevant consideration in

42

determining whether a statement was made with reckless disregard for its truth.
Thus, this Court explained its conclusion in *Mann* that the plaintiffs had
sufficiently demonstrated actual malice so as to require the defeat of the Anti-
SLAPP motion by stating that "another factor that a jury could take into account in
evaluating appellants' state of mind . . . [is that the publishers of the defamatory
statements] are deeply invested in one side of the global warming debate" that gave
rise to the publication of the defamatory statements. 150 A.3d at 1258-59. Much
the same is true here. Defendants, as paid political operatives, were "deeply
invested" in the 2016 election issues that gave rise to the publication of the entire
dossier, including CIR 112, and therefore, as in *Mann*, that is a "factor that a jury
could take into account in evaluating appellants' state of mind." *See id.*

 Finally, as the Superior Court noted, Plaintiffs proffered evidence that
Defendant Steele has described up to thirty percent of the larger dossier of which
CIR 112 is a part as inaccurate. The Superior Court disregarded this fact because
Steele did not specifically say that his assessment of the dossier's inaccuracy
applied to CIR 112. *See* App. at 665. But that ignores the context of Steele's
statement, which combined with other facts about CIR 112 make it reasonable to
treat Steele's assessment of the overall inaccuracy of the dossier as applicable to
CIR 112. As described above, CIR 112's sourcing is *particularly* suspect and its
content is internally inconsistent. Moreover, it purports to be a report about

43

Plaintiffs' company "Alfa"—while consistently failing to spell the company's name correctly. *See* Order, App. at 646, n.1.   In light of these facts, the conclusion is strong, or at least reasonable, that Steele's confession of the Dossier's inaccuracy is applicable to CIR 112, providing further evidence that Defendants published it "with reckless disregard to whether it was false or not." *See Thompson v. Armstrong*, 134 A.3d 305, 311 (D.C. 2016); Order, App. at 663.

Given Plaintiffs' substantial proffer of evidence of Defendants' actual malice, the Superior Court erred in concluding that Plaintiffs "could not prevail *as a matter of law*." *Mann*, 150 A.3d at 1236.   Indeed, the Superior Court never asked the "precise question" this Court required in *Mann*, that is, whether a properly instructed jury "could reasonably find for the claimant on the evidence presented." *Id*.   Respectfully, the Superior Court should have held that a properly instructed jury could reasonably found for Plaintiffs.

Further underscoring its erroneous application of the legal standard required by *Mann*, the Superior Court held that Plaintiffs' obligation to show Defendants' reckless disregard required Plaintiffs to show that Defendants knew or were aware "that no conceivable possibility existed," App. at 664, that the allegation implied in CIR 112's headline of electoral interference was false.   The Superior Court cited no authority for saddling Plaintiffs with this "no conceivable possibility" standard, and there is none.   Instead, a plaintiff satisfies the actual malice

44

standard with proof that a statement was made "with reckless disregard of whether it was false or not" *Thompson*, 134 A.3d at 311, and a plaintiff is not required to show a defendant's awareness of "no conceivable possibility" that the defamatory statement is true. In other words, even where the publisher of a defamatory statement thinks it is "conceivable" that the statement is true, when, as here, the publisher has no original non-anonymous source for the allegation and publishes is with reckless disregard of whether it is *true or not*, the law permits the conclusion that he acted with actual malice.

By failing to afford Plaintiffs the benefit of a reasonable inference, based on the above-described evidence, that they could demonstrate Defendants' actual malice to a jury, the Superior Court not only misapplied the Act, but also deprived Plaintiffs of constitutional Due Process and their Seventh Amendment jury trial right. *See Mann*, 150 A.3d at 1236 ("[T]o remove doubt that the Anti-SLAPP statute respects the right to a jury trial, the standard to be employed by the court in evaluating whether a claim is likely to succeed may result in dismissal only if the court can conclude that the claimant could not prevail *as a matter of law*."). Here, given the internal contradiction in the report in question, Defendants' lack of an original non-anonymous source for the report's allegations, Defendants' bias as paid political operatives and Steele's doubt about the accuracy of the overall dossier, it cannot fairly be concluded that that Plaintiffs cannot prove Defendants'

actual malice "as a matter of law." By nevertheless granting the Special Motion, the Superior Court deprived Defendants of their constitutional rights to due process and a jury trial.

## IV.   THE SUPERIOR COURT ERRED BY DENYING PLAINTIFFS TARGETED DISCOVERY TO OPPOSE THE MOTION

The Act permits a party opposing a special motion to have targeted discovery where it "appears likely" that such discovery "will enable the plaintiff to defeat the motion." D.C. Code § 16-5502(c)(2).   The phrase "likely" when used in the Act to describe a plaintiff's likelihood of defeating the motion *does not mean more likely than not*, but rather, is satisfied by a considerably lower level of probability. *See Mann*, 150 A.3d  at 1234-35 .  In that light, it was erroneous for the Superior Court to conclude that targeted discovery was not "likely" to enable Plaintiffs to defeat the motion.

Indeed, there are various ways in which targeted discovery would have been reasonably likely to afford Plaintiffs with evidence that would have enabled them to defeat the motion.  First, targeted discovery would have likely enabled Plaintiffs to persuade the Superior Court that, under *Gertz*, the controversy "giving rise to" the publication of CIR was *not* the controversy identified by the Superior Court and instead, was the controversy about the 2016 Trump presidential campaign's alleged collusion with the Kremlin and its agents.  Discovery would have likely provided Plaintiffs with evidence to support that definition of the controversy

46

because, if Defendants and Fusion GPS were deposed, it is plausible that they

would acknowledge that an interest in the "Trump-Russia" question gave rise to

the creation and publication of CIR 112—not an interest in relationships between

Russian oligarchs and the Russian government.

Discovery could have enabled Plaintiffs to defeat the special motion, even if

they were adjudicated as LPPFs, by enabling Plaintiffs to demonstrate that

Defendants published the defamatory statements with reckless disregard of their

truth. As discussed above, the "anonymous" and "unverified" nature of an

accusation supports the conclusion that it was made recklessly. Here, on its face,

the content of CIR 112 strongly supports the conclusion that the ultimate source for

the accusations circulated by Defendants are unknown to Defendants. Indeed, if

Defendant Steele had communicated directly or even indirectly with the source of

the corruption allegations that pervade CIR 112, CIR 112 would presumably say

so—even if Defendants chose not to reveal their source. But here, instead, CIR

112 places the ultimate source at least two levels of communication away from the

"trusted compatriot" with whom Defendant Steele apparently communicated,

making it unlikely that Steele knows with whom or how the allegations that he

published originated. In that light, at a minimum, Plaintiffs should have been able

to *ask* Steele whether he has any such source. His reasonably probable answer—

that he does not—would enable Plaintiffs to defeat the motion by demonstrating

47

that the source of the allegations is indeed unverified and unknown.  Furthermore,

the fact that the defamatory report in question misspells the name of Alfa,

Plaintiffs' company, as "Alpha"—adds further doubt about the quality of

Defendants' source—and creates the likelihood that Defendants harbored such

doubts of their own—in which light it was error to deny targeted discovery to

Plaintiffs.

Other evidence provided by Plaintiffs further reinforces the conclusion that

discovery would have enabled Plaintiffs to show an ability to prevail on their

defamation claim.  For example, all three Plaintiffs submitted declarations averring

that the alleged conduit for the bribes in the 1990s, an Alfa employee at the time

named Oleg Govorun, did not actually work for Alfa then.  *See* App. at 639-44.

Defendants could have easily learned this fact—making the accusation

demonstrably false—but they did not, further leading to a potential legitimate line

of inquiry as to why Defendants did not take steps to corroborate or refute their

allegations against Plaintiffs before publishing them.

Finally, the fact that the Superior Court perceived the key issue in dispute to

be a matter of Defendants' state of mind (their actual malice), reinforces the

conclusion that this was a particularly appropriate case for allowing targeted

discovery.  *See, e.g., Hutchinson v. Proxmire*, 443 U.S. 111, 120,  n.9 (1979).

(noting that because proof of actual malice "calls a defendant's state of mind into

48

question . . . [it] does not readily lend itself to summary disposition" (citing 10 C. Wright & A. Miller, Federal Practice and Procedure § 2730, pp. 590-592 (1973))). Indeed the Supreme Court has recognized that a defamation plaintiff's ability to prove actual malice should not be impeded by restrictions into inquiry regarding the defendant's state of mind, *even when* such discovery would otherwise infringe on a media defendant's editorial privilege. *See Herbert v. Lando*, 441 U.S. 169, 175 (1979). In *Herbert*, the Supreme Court forbade the "erect[ion] [of] an impenetrable barrier to the plaintiff's use of such evidence . . . particularly when defendants themselves are prone to assert their good-faith belief in the truth of their publications, and libel plaintiffs are required to prove knowing or reckless falsehood with 'convincing clarity.'" *Id.* at 170.

Even though the Supreme Court decided *Hutchinson* and *Herbert v. Lando* long before the first enactment of any Anti-SLAPP statute, the High Court's recognition that discovery into a defendant's mental process is particularly appropriate when a plaintiff is subjected to a burden to demonstrate actual malice is nevertheless relevant to how courts should interpret the scope of anti-SLAPP discovery provisions where, as here, plaintiffs have been saddled with the burden to prove actual malice. Given that Plaintiffs have been subjected to such a burden, the Superior Court's denial of discovery—even in light of the very real potential for discovery to produce helpful evidence for Plaintiffs—was in substance the

49

erection of the "impenetrable barrier" foreclosing inquiry into Defendants' state of mind of the kind that *Herbert v. Lando* disapproves.

In sum, Plaintiffs do not seek discovery "merely to satisfy curiosity." *Herbert*, 441 U.S. at 174.  Rather, they seek limited discovery on topics solely within Defendants' control to the extent necessary to show a likelihood of success on the merits.  Accordingly, targeted discovery to enable Plaintiffs to meet their burden under the Anti-SLAPP Act was warranted under D.C. Code § 16-5502(c)(2), and the Superior Court's contrary conclusion was an erroneous application of the Act and a violation of Plaintiffs' right to due process.

## CONCLUSION

Respectfully, this Court should reverse the Superior Court's decision and reinstate Plaintiffs' lawsuit.

Dated:  December 10, 2018

/s/ Alan S. Lewis

Alan S. Lewis* (#NY0252)
John J. Walsh
Madelyn K. White
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005
Tel.:    212-238-8647
Fax:    212-732-3232
Email:  lewis@clm.com

_/s/ Kim Hoyt Sperduto_
Kim Hoyt Sperduto  (D.C.# 416127)
SPERDUTO THOMPSON & GASSLER PLC
1747 Pennsylvania Avenue, NW, Suite 1250
Washington, DC 20006
Tel.:    202-408-8900
Fax:    202-408-8910
Email:  ksperduto@stglawdc.com

_Attorneys for Plaintiffs-Appellants_
_Mikhail Fridman, et al._

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of December, 2018, the foregoing was

served electronically upon:

Christina Hull Eikhoff, _pro hac vice_
Kristin Ramsay, _pro hac vice_
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
(404) 881-7000

Kelley C. Barnaby
ALSTON & BIRD LLP
950 F Street, NW
Washington, D.C. 20004
(202) 239-3300

_Counsel for Appellees_

_/s/ Alan S. Lewis_
Alan S. Lewis

# **<u>ADDENDUM</u>**

# ADDENDUM TABLE OF CONTENTS

**Page**

D.C. Code § 16-5501 ....................................................................Add. 1

D.C. Code § 16-5502 ....................................................................Add. 4

D.C. Code § 16-5504 ....................................................................Add. 9

## *D.C. Code § 16-5501*

The Official Code is current through December 7, 2018 [D.C. Law 22-179].

*District of Columbia Official Code  >  Division II. Judiciary and Judicial Procedure. (Titles 11 — 17)  >  Title 16. Particular Actions, Proceedings and Matters. (Chs. 1 — 55)  >  Chapter 55. Strategic Lawsuits Against Public Participation. (§§ 16-5501 — 16-5505)*

# § 16-5501. Definitions.

For the purposes of this chapter, the term:

(1)"Act in furtherance of the right of advocacy on issues of public interest" means:

(A)Any written or oral statement made:

(i)In connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; or

(ii)In a place open to the public or a public forum in connection with an issue of public interest; or

(B)Any other expression or expressive conduct that involves petitioning the government or communicating views to members of the public in connection with an issue of public interest.

(2)"Claim" includes any civil lawsuit, claim, complaint, cause of action, cross-claim, counterclaim, or other civil judicial pleading or filing requesting relief.

(3)"Issue of public interest" means an issue related to health or safety; environmental, economic, or community well-being; the District government; a public figure; or a good, product, or service in the market place. The term "issue of public interest" shall not be construed to include private interests, such as statements directed primarily toward protecting the speaker's commercial interests rather than toward commenting on or sharing information about a matter of public significance.

(4)"Personal identifying information" shall have the same meaning as provided in § *22-3227.01(3)*.

## History

(Mar. 31, 2011, D.C. Law 18-351, § 2, *58 DCR 741*; Sept. 26, 2012, D.C. Law 19-171, § 401, *59 DCR 6190*.)

Annotations

## Notes

**Legislative history of Law 18-351. —**

Legislative history of Law 18-351. Law 18-351, the "Anti-SLAPP Act of 2010", was introduced in Council and assigned Bill No. 18-893, which was referred to the Committee on Public Safety and the Judiciary. The Bill was adopted on first and second readings on November 23, 2010, and December 7, 2010, respectively. Signed by the Mayor on January 19, 2011, it was assigned Act No. 18-701 and transmitted to both Houses of Congress for its review. D.C. Law 18-351 became effective on March 31, 2011.

D.C. Code § 16-5501

**Legislative history of Law 19-171. —**

Law 19-171, the "Technical Amendments Act of 2012," was introduced in Council and assigned Bill No. 19-397. The Bill was adopted on first and second readings on Mar. 20, 2012, and Apr. 17, 2012, respectively. Signed by the Mayor on May 23, 2012, it was assigned Act No. 19-376 and transmitted to Congress for its review. D.C. Law 19-171 became effective on September 26, 2012.

**Editor's notes. —**

Section 401 of D.C. Law 19-171 enacted this chapter into law.

## CASE NOTES

 Applicability.

 Motion to dismiss denied.

**Applicability.**

In plaintiffs' suit for defamation, false light, assault, and intentional infliction of emotional distress against defendants seeking to construct an Islamic community center near the site of the tragic destruction of the World Trade Center in the September 11, 2001 attacks, defendants' statements in their motion to dismiss the state court action were protected by the judicial proceedings privilege. Defendants were entitled to dismissal under the District of Columbia Anti-Strategic Lawsuits Against Public Participation Act of 2010, as plaintiffs' claims arose from an act in furtherance of the right of advocacy on issues of public interest; and they failed to demonstrate a likelihood of success on the merits of their claims. *Forras v. Rauf, 39 F. Supp. 3d 45, 2014 U.S. Dist. LEXIS 53960 (D.D.C. 2014),* aff'd on other grounds, *812 F.3d 1102, 421 U.S. App. D.C. 158, 2016 U.S. App. LEXIS 2435 (D.C. Cir. 2016).*

Anonymous speaker's Internet website edit concerned a public figure because the attorney who was the subject of the edit, by the attorney thrusting the attorney to the forefront of a public controversy, could have been considered a limited-purpose public figure. *Doe No. 1 v. Burke, 91 A.3d 1031, 2014 D.C. App. LEXIS 163 (D.C. 2014).*

Where a writer made comments about a public official from the Republic of Liberia, dismissal of the official's defamation suit was warranted because, inter alia, the District of Columbia Anti-Strategic Lawsuits Against Public Participation Act of 2010's special motion to dismiss provisions applied in federal proceedings where jurisdiction was based on diversity, certain privileges applied, the official qualified as a limited purpose public figure, and there was no indication that a statement characterizing the official as a "warlord" was false or made with actual malice. *Boley v. Atl. Monthly Group, 950 F. Supp. 2d 249, 2013 U.S. Dist. LEXIS 88494 (D.D.C. 2013).*

Application of the District of Columbia's Anti-SLAPP Act, *D.C. Code 16-5501* et seq., to a university professor's action for libel against the publisher of a magazine and a website and affiliated parties was appropriate because the case involved published commentary on the professor's research into issues of climate change, which was a topic of public interest. *Mann v. Nat'l Review, Inc., 2013 D.C. Super. LEXIS 7 (D.C. Super. Ct. July 19, 2013).*

Where a Palestinian business owner brought a defamation action against the author of an article and the owner of a magazine covering topics on global politics and economics, defendants prevailed on their motion to dismiss under the Anti-Strategic Lawsuits Against Public Participation Act. The question of whether sons of the Palestinian president had enriched themselves at the expense of Palestinians and U.S. taxpayers as discussed in the article was fundamentally a matter of the public interest. *Abbas v. Foreign Policy Group, LLC, 975 F. Supp. 2d 1, 2013 U.S. Dist. LEXIS 139177 (D.D.C. 2013),* aff'd on other grounds, *783 F.3d 1328, 414 U.S. App. D.C. 465, 2015 U.S. App. LEXIS 6782 (D.C. Cir. 2015).*

D.C. Code § 16-5501

In a defamation action against the author of an article and the owner of a magazine covering topics on global politics and economics, the United States Court of Appeals for the District of Columbia held that the District of Columbia Anti-Strategic Lawsuits Against Public Participation Act of 2010 could be applied in federal court. *Abbas v. Foreign Policy Group, LLC, 975 F. Supp. 2d 1, 2013 U.S. Dist. LEXIS 139177 (D.D.C. 2013)*, aff'd on other grounds, *783 F.3d 1328, 414 U.S. App. D.C. 465, 2015 U.S. App. LEXIS 6782 (D.C. Cir. 2015)*.


**Motion to dismiss denied.**

Where plaintiff sued defendant for assault and other torts, the court denied her motion to dismiss defendant's counterclaims under the D.C. Strategic Lawsuits Against Public Participation Act because plaintiff did not allege that she had undertaken any advocacy on issues of public interest, and her claims, which alleged improper sexual conduct by defendant, her supervisor, involved a private interest and did not arise out of the type of advocacy protected by the Act. *Park v. Brahmbhatt, 2016 D.C. Super. LEXIS 16 (D.C. Super. Ct. Jan. 19, 2016)*.


District of Columbia Official Code
Copyright © 2018 All rights reserved.

End of Document

## D.C. Code § 16-5502

The Official Code is current through December 7, 2018 [D.C. Law 22-179].

*District of Columbia Official Code > Division II. Judiciary and Judicial Procedure. (Titles 11 — 17) > Title 16. Particular Actions, Proceedings and Matters. (Chs. 1 — 55) > Chapter 55. Strategic Lawsuits Against Public Participation. (§§ 16-5501 — 16-5505)*

## § 16-5502. Special motion to dismiss.

**(a)**A party may file a special motion to dismiss any claim arising from an act in furtherance of the right of advocacy on issues of public interest within 45 days after service of the claim.

**(b)**If a party filing a special motion to dismiss under this section makes a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest, then the motion shall be granted unless the responding party demonstrates that the claim is likely to succeed on the merits, in which case the motion shall be denied.

**(c)**

**(1)**Except as provided in paragraph (2) of this subsection, upon the filing of a special motion to dismiss, discovery proceedings on the claim shall be stayed until the motion has been disposed of.

**(2)**When it appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the discovery will not be unduly burdensome, the court may order that specified discovery be conducted. Such an order may be conditioned upon the plaintiff paying any expenses incurred by the defendant in responding to such discovery.

**(d)**The court shall hold an expedited hearing on the special motion to dismiss, and issue a ruling as soon as practicable after the hearing. If the special motion to dismiss is granted, dismissal shall be with prejudice.

## History

(Mar. 31, 2011, D.C. Law 18-351, § 3, *58 DCR 741*; Apr. 20, 2012, D.C. Law 19-120, § 201, *58 DCR 11235*; Sept. 26, 2012, D.C. Law 19-171, § 401, *59 DCR 6190*.)

Annotations

## Notes

**Effect of amendments. —**

D.C. Law 19-120, in subsec. (c)(2), substituted "specified discovery" for "specialized discovery".

**Emergency legislation. —**

For temporary (90 day) amendment of section, see § 201 of Receiving Stolen Property and Public Safety Amendments Emergency Amendment Act of 2011 (D.C. Act 19-261, December 21, 2011, 58 DCR 11232).

For temporary (90 day) amendment of section, see § 201 of Receiving Stolen Property and Public Safety Amendments Congressional Review Emergency Amendment Act of 2012 (D.C. Act 19-326, March 19, 2012, 59 DCR 2384).

D.C. Code § 16-5502

**Legislative history of Law 18-351. —**

For history of Law 18-351, see notes under § *16-5501.*

**Legislative history of Law 19-120. —**

Law 19-120, the "Receiving Stolen Property and Public Safety Amendment Act of 2011", was introduced in Council and assigned Bill No. 19-215, which was referred to the Committee on the Judiciary. The Bill was adopted on first and second readings on November 1, 2011, and December 6, 2011, respectively. Signed by the Mayor on December 21, 2011, it was assigned Act No. 19-262 and transmitted to both Houses of Congress for its review. D.C. Law 19-120 became effective on April 20, 2012.

**Legislative history of Law 19-171. —**

See note to § *16-5501.*

**Editor's notes. —**

Section 401 of D.C. Law 19-171 enacted this chapter into law.

# CASE NOTES

  **Construction with federal law.**

  **Defamation.**

  **Motion to dismiss denied.**

  **Practice and procedure.**

  **Time limitations.**

**Construction with federal law.**

In plaintiffs' suit for defamation, false light, assault, and intentional infliction of emotional distress against defendants seeking to construct an Islamic community center near the site of the tragic destruction of the World Trade Center in the September 11, 2001 attacks, defendants were entitled to dismissal under the District of Columbia Anti-Strategic Lawsuits Against Public Participation Act of 2010. Plaintiffs' claims arose from an act in furtherance of the right of advocacy on issues of public interest, and they failed to demonstrate a likelihood of success on the merits of their claims. *Forras v. Rauf, 39 F. Supp. 3d 45, 2014 U.S. Dist. LEXIS 53960 (D.D.C. 2014)*, aff'd on other grounds, *812 F.3d 1102, 421 U.S. App. D.C. 158, 2016 U.S. App. LEXIS 2435 (D.C. Cir. 2016)*.

Where a Palestinian business owner brought a defamation action against the author of an article and the owner of a magazine covering topics on global politics and economics, defendants prevailed on their motion to dismiss under the Anti-Strategic Lawsuits Against Public Participation Act. The question of whether sons of the Palestinian president had enriched themselves at the expense of Palestinians and U.S. taxpayers as discussed in the article was fundamentally a matter of the public interest. *Abbas v. Foreign Policy Group, LLC, 975 F. Supp. 2d 1, 2013 U.S. Dist. LEXIS 139177 (D.D.C. 2013)*, aff'd on other grounds, *783 F.3d 1328, 414 U.S. App. D.C. 465, 2015 U.S. App. LEXIS 6782 (D.C. Cir. 2015)*.

In a defamation action against the author of an article and the owner of a magazine covering topics on global politics and economics, the United States Court of Appeals for the District of Columbia held that the District of Columbia Anti-Strategic Lawsuits Against Public Participation Act of 2010 could be applied in federal court. *Abbas v. Foreign Policy Group, LLC, 975*

D.C. Code § 16-5502

*F. Supp. 2d 1, 2013 U.S. Dist. LEXIS 139177 (D.D.C. 2013)*, aff'd on other grounds, *783 F.3d 1328, 414 U.S. App. D.C. 465, 2015 U.S. App. LEXIS 6782 (D.C. Cir. 2015)*.

District of Columbia's anti-SLAPP (Strategic Lawsuit Against Public Participation) statute's special motion to dismiss procedure attempted to answer same question covered by federal rules governing motions to dismiss and for summary judgment, whether court could dismiss company's tort claims with prejudice on preliminary basis based on pleadings or on matters outside pleadings merely because company had not demonstrated that claim was likely to succeed on merits, so that District of Columbia law would be preempted to extent that it would not apply in federal court sitting in diversity, if federal rules were valid under Rules Enabling Act; although special motion to dismiss might raise arguments that were identical to motion to dismiss, District statute ultimately mandated dismissal with prejudice if plaintiff failed to demonstrate likelihood of success on merits, even where plaintiff raised genuine issue of material fact and even where dismissal without prejudice was appropriate. *3M Co. v. Boulter, 842 F. Supp. 2d 85, 2012 U.S. Dist. LEXIS 12860 (D.D.C. 2012)*, amended, *2012 U.S. Dist. LEXIS 151231 (D.D.C. Oct. 22, 2012)*.

**Defamation.**

Where a writer made comments about a public official from the Republic of Liberia, dismissal of the official's defamation suit was warranted because, inter alia, the District of Columbia Anti-Strategic Lawsuits Against Public Participation Act of 2010's special motion to dismiss provisions applied in federal proceedings where jurisdiction was based on diversity, certain privileges applied, the official qualified as a limited purpose public figure, and there was no indication that a statement characterizing the official as a "warlord" was false or made with actual malice. *Boley v. Atl. Monthly Group, 950 F. Supp. 2d 249, 2013 U.S. Dist. LEXIS 88494 (D.D.C. 2013)*.

**Motion to dismiss denied.**

Where plaintiff sued defendant for assault and other torts, the court denied her motion to dismiss defendant's counterclaims under the D.C. Strategic Lawsuits Against Public Participation Act because plaintiff did not allege that she had undertaken any advocacy on issues of public interest, and her claims, which alleged improper sexual conduct by defendant, her supervisor, involved a private interest and did not arise out of the type of advocacy protected by the Act. *Park v. Brahmbhatt, 2016 D.C. Super. LEXIS 16 (D.C. Super. Ct. Jan. 19, 2016)*.

**Practice and procedure.**

Order denying a special motion to dismiss under the District of Columbia's Anti-Strategic Lawsuits Against Public Participation (Anti-SLAPP) Act meets the requirements of conclusivity, separability, and effective unreviewability and is immediately appealable to the District of Columbia Court of Appeals, in light of the Act's purpose to create a substantive right not to stand trial and to avoid the burdens and costs of pre-trial procedures, a right that would be lost if a special motion to dismiss is denied and the case proceeds to discovery and trial. *Competitive Enter. Inst. v. Mann, 150 A.3d 1213, 2016 D.C. App. LEXIS 435 (D.C. 2016)*.

In considering a special motion to dismiss, the court evaluates the likely success of the claim by asking whether a jury properly instructed on the applicable legal and constitutional standards could reasonably find that the claim is supported in light of the evidence that has been produced or proffered in connection with the motion. This standard achieves the statutory goal of weeding out meritless litigation by ensuring early judicial review of the legal sufficiency of the evidence, consistent with First Amendment principles, while preserving the claimant's constitutional right to a jury trial. *Competitive Enter. Inst. v. Mann, 150 A.3d 1213, 2016 D.C. App. LEXIS 435 (D.C. 2016)*.

Although the court can be confident that "on the merits" refers to success on the substance of the claim, the meaning of the requirement that the opponent "demonstrate that the claim is likely to succeed" is more elusive. Use of the word "demonstrate" indicates that once the burden has shifted to the claimant, the statute requires more than mere reliance on allegations in the

D.C. Code § 16-5502

complaint, and mandates the production or proffer of evidence that supports the claim. *Competitive Enter. Inst. v. Mann, 150 A.3d 1213, 2016 D.C. App. LEXIS 435 (D.C. 2016)*.

Because it is a variable standard that is used for a different purpose, "a likelihood of success," the term used in deciding requests for preliminary injunctions and stays, does not determine the proper interpretation of the "likely to succeed" standard for deciding special motions to dismiss under the Anti-SLAPP Act. *Competitive Enter. Inst. v. Mann, 150 A.3d 1213, 2016 D.C. App. LEXIS 435 (D.C. 2016)*.

Phrase "likely to succeed on the merits," must be interpreted in a manner that does not supplant the role of the fact-finder, lest the statute be rendered unconstitutional. To remove doubt that the Anti-SLAPP statute respects the right to a jury trial, the standard to be employed by the court in evaluating whether a claim is likely to succeed may result in dismissal only if the court can conclude that the claimant could not prevail as a matter of law, that is, after allowing for the weighing of evidence and permissible inferences by the jury. *Competitive Enter. Inst. v. Mann, 150 A.3d 1213, 2016 D.C. App. LEXIS 435 (D.C. 2016)*.

Anti-SLAPP Act gives the defendant the option to up the ante early in the litigation, by filing a special motion to dismiss that will require the plaintiff to put his evidentiary cards on the table and makes the plaintiff liable for the defendant's costs and fees if the motion succeeds. Even if the Anti-SLAPP special motion to dismiss is unsuccessful, the defendant preserves the ability to move for summary judgment under D.C. Super. Ct. Civ. R. 56 later in the litigation, after discovery has been completed, or for a directed verdict under D.C. Super. Ct. Civ. R. 50 after the presentation of evidence at trial. *Competitive Enter. Inst. v. Mann, 150 A.3d 1213, 2016 D.C. App. LEXIS 435 (D.C. 2016)*.

Where the trial court characterized the evidence of actual malice as "slight" and as not amounting to a showing by clear and convincing evidence, the Anti-SLAPP Act authorized the court to permit targeted discovery for the purpose of responding to a special motion to dismiss. Granting a request for such discovery was the proper way to proceed, if it appeared likely that targeted discovery would enable the plaintiff to shoulder his evidentiary burden to overcome the special motion to dismiss and would not be "unduly burdensome" to the defendants. *Competitive Enter. Inst. v. Mann, 150 A.3d 1213, 2016 D.C. App. LEXIS 435 (D.C. 2016)*.

As federal procedural rules regarding summary judgment and dismissal answered the same question as the D.C. Anti-Strategic Lawsuits Against Public Participation Act, and the Rules were valid under the Rules Enabling Act, a federal court exercising diversity jurisdiction was required to apply the Rules instead of the Act's special motion to dismiss provision. *Abbas v. Foreign Policy Group, LLC, 783 F.3d 1328, 414 U.S. App. D.C. 465, 2015 U.S. App. LEXIS 6782 (D.C. Cir. 2015)*, revoked and replaced, *In re Gawker Media LLC, 571 B.R. 612, 2017 Bankr. LEXIS 2364 (Bankr. S.D.N.Y. 2017)*.

University professor was entitled to proceed with a lawsuit against the publisher of a magazine and a website and affiliated parties because the District of Columbia's Anti-SLAPP Act, D.C. Code § *16-5501* et seq., did not bar the lawsuit as the professor presented a sufficient legal basis for the professor's defamation claims and the fair comment privilege was not available to the publisher and its affiliates. *Mann v. Nat'l Review, Inc., 2013 D.C. Super. LEXIS 7 (D.C. Super. Ct. July 19, 2013)*.


**Time limitations.**

It was unnecessary to decide whether the collateral order doctrine provided jurisdiction to review the denial of a motion to dismiss under the District of Columbia Anti-SLAPP Act of 2010, D.C. Code § *16-5501* et seq., because the merits of the appeal were a foregone conclusion. The motion was untimely, and the statutory time period could not be extended under *Fed. R. Civ. P. 6(b)*. *Sherrod v. Breitbart, 720 F.3d 932, 405 U.S. App. D.C. 395, 2013 U.S. App. LEXIS 12959 (D.C. Cir. 2013)*.

**Applied in**

*Doe No. 1 v. Burke, 2014 D.C. App. LEXIS 163 (May 29, 2014)*.

# Research References & Practice Aids

D.C. Code § 16-5502

**Section references. —**

This section is referenced in § 16-5504.

District of Columbia Official Code
Copyright © 2018 All rights reserved.

End of Document

### *D.C. Code § 16-5504*

The Official Code is current through December 7, 2018 [D.C. Law 22-179].

*District of Columbia Official Code > Division II. Judiciary and Judicial Procedure. (Titles 11 — 17) > Title 16. Particular Actions, Proceedings and Matters. (Chs. 1 — 55) > Chapter 55. Strategic Lawsuits Against Public Participation. (§§ 16-5501 — 16-5505)*

## § 16-5504. Fees and costs.

**(a)**The court may award a moving party who prevails, in whole or in part, on a motion brought under § *16-5502* or § *16-5503* the costs of litigation, including reasonable attorney fees.

**(b)**The court may award reasonable attorney fees and costs to the responding party only if the court finds that a motion brought under § *16-5502* or § *16-5503* is frivolous or is solely intended to cause unnecessary delay.

## History

(Mar. 31, 2011, D.C. Law 18-351, § 5, *58 DCR 741*; Sept. 26, 2012, D.C. Law 19-171, § 401, *59 DCR 6190.*)

Annotations

## Notes

**Legislative history of Law 18-351. —**

For history of Law 18-351, see notes under § *16-5501.*

**Legislative history of Law 19-171. —**

See note to § *16-5501.*

**Editor's notes. —**

Section 401 of D.C. Law 19-171 enacted this chapter into law.

## CASE NOTES

**Fees.**

As a defamation action was dismissed under the federal rules for failure to state a claim rather than under the special dismissal provision of the D.C. Anti-Strategic Lawsuits Against Public Participation Act, an award of attorneys fees was not warranted.

Add. 9

D.C. Code § 16-5504

*Abbas v. Foreign Policy Group, LLC, 783 F.3d 1328, 414 U.S. App. D.C. 465, 2015 U.S. App. LEXIS 6782 (D.C. Cir. 2015),* revoked and replaced, *In re Gawker Media LLC, 571 B.R. 612, 2017 Bankr. LEXIS 2364 (Bankr. S.D.N.Y. 2017).*

This section entitles a party who prevails on a special motion to quash a subpoena to a presumptive award of reasonable attorney's fees on request, unless special circumstances would render such an award unjust; the movant is not also required to show that the underlying suit was frivolous or improperly motivated. *Doe v. Burke, 133 A.3d 569, 2016 D.C. App. LEXIS 49 (D.C. 2016).*

In a strategic litigation against public participation (SLAPP) suit, the trial court erred in denying attorney's fees to an anonymous defendant who prevailed on a special motion to quash a subpoena for identifying information under *D.C. Code § 16-5503* of the Anti-SLAPP Act, as the fact that defendant rejected a settlement offer plaintiff made after filing the suit and seeking to learn defendant's identity was not a "special circumstance" that would render such an award unjust. *Doe v. Burke, 133 A.3d 569, 2016 D.C. App. LEXIS 49 (D.C. 2016).*

Anti-SLAPP Act gives the defendant the option to up the ante early in the litigation, by filing a special motion to dismiss that will require the plaintiff to put his evidentiary cards on the table and makes the plaintiff liable for the defendant's costs and fees if the motion succeeds. *Competitive Enter. Inst. v. Mann, 150 A.3d 1213, 2016 D.C. App. LEXIS 435 (D.C. 2016).*

District of Columbia Official Code
Copyright © 2018 All rights reserved.

End of Document

# EXHIBIT 2

RECORD NO. 18-CV-0919

In The

# District of Columbia
## Court of Appeals



Clerk of the Court
Received 12/10/2018 03:55 PM
Filed 12/10/2018 03:55 PM

## MIKHAIL FRIDMAN, PETR AVEN, AND GERMAN KHAN,

*Appellants,*

v.

## ORBIS BUSINESS INTELLIGENCE LIMITED AND CHRISTOPHER STEELE,

*Appellees.*

**ON APPEAL FROM CASE NO. 2018 CA 002667 B IN THE DISTRICT OF COLUMBIA SUPERIOR COURT, CIVIL DIVISION, THE HONORABLE ANTHONY C. EPSTEIN, JUDGE PRESIDING**

---

**COURTESY COPY OF BRITISH HIGH COURT FILING**

---

*Alan S. Lewis, *pro hac vice*
John J. Walsh, *pro hac vice*
Madelyn K. White, *pro hac vice*
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, New York  10005
(212) 238-8614

Kim Hoyt Sperduto
SPERDUTO THOMPSON & GASSLER PLC
1747 Pennsylvania Avenue, NW, Suite 1250
Washington, D.C.  20006
(202) 408-8900

*Counsel for Appellants*

*Counsel for Appellants*

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**MEDIA AND COMMUNICATIONS LIST**

**Claim No. HQ18M01646**

BETWEEN:

(1) PETER AVEN
(2) MIKHAIL FRIDMAN
(3) GERMAN KHAN



*Claimants*

-and-

**ORBIS BUSINESS INTELLIGENCE LIMITED**

**Defendant**

---

**DEFENDANT'S RESPONSE TO PART 18 REQUEST**

---

**UNDER PARAGRAPH 1**

Of "Fusion engaged Orbis to provide the intelligence memoranda because Fusion's client needed the information contained in those memoranda for the purposes of prospective legal proceedings and/or obtaining legal advice and/or for establishing, exercising or defending legal rights."

**Your requests and our responses**

1.      Did Fusion engage Orbis to provide the intelligence memoranda pursuant to an agreement made orally or an agreement in writing?

        <u>Response</u>: orally.

1

2.      If made orally, state when, where and between whom it was made, setting out the full substance of the words which constituted the agreement.

Response: Fusion engaged the Defendant pursuant to an agreement made orally between Mr Glenn Simpson of Fusion and Mr Christopher Steele of the Defendant in June 2016. Fusion instructed the Defendant to investigate and report, by way of preparing confidential intelligence memoranda, on Russian efforts to influence the US Presidential election process in 2016 and on links between Russia and the then Republican candidate and now President Donald Trump.

3.      If made in writing, supply a copy of the agreement.

Response: not applicable.

4.      Is it Orbis' case that Fusion's client needed the information contained in Memorandum 112:
        (a) For the purposes of prospective legal proceedings?
        (b) For the purposes of obtaining legal advice?
        (c) For the purpose of establishing, exercising or defending legal rights.

Response:  (b) and (c). Fusion's immediate client was law firm Perkins Coie LLP. It engaged Fusion to obtain information necessary for Perkins Coie LLP to provide legal advice on the potential impact of Russian involvement on the legal validity of the outcome of the 2016 US Presidential election. Based on that advice, parties such as the Democratic National Committee and HFACC Inc. (also known as "Hillary for America") could consider steps they would be legally entitled to take to challenge the validity of the outcome of that election. In turn, that may have resulted in legal proceedings within the meaning of limb (a) above, but the immediate needs of Fusion's clients fell within limbs (b) and (c).

5.      If the answer to request 4 is in terms of (a), give full details of the
        "prospective legal proceedings" for which the information contained in
        Memorandum 112 was needed, identifying the prospective parties and the
        nature of the prospective claim.

        Response: not applicable.

6.      If the answer to request 4 is in terms of (b), give full details of the legal advice
        for which the information contained in Memorandum 112 was needed,
        stating who was to receive the advice, who was to provide it and the legal
        issues which were to be the subject of the advice.

        Response: see the response to question 4 above.

7.      If the answer to request 4 is in terms of (c), give full details of the "legal
        rights" which were to be "established, exercised or defended" by the use of
        the information contained in Memorandum 112 stating whose rights they
        were and the circumstances in which they were to be established, exercised
        or defended.

        Response: see the response to question 4 above.

**UNDER PARAGRAPH 2**

Of: "(c) The disclosures referred to in subparagraph (b) above were required for the
purpose of safeguarding the national security of the US and the UK".

**Your request and our response**

8.      State, so that the Claimants may understand the nature of the Defendant's
        case, the factual basis on which it is alleged that the disclosure of
        Memorandum 112 was required for the purposes of safeguarding the

national security of the US and UK, identifying the manner in which it is alleged, that the disclosure of the Claimants' personal data would or might safeguard the national security of the US and the UK by means of such disclosure.

Response: prior to the preparation of Memorandum 112, allegations of Russian interference in the 2016 US Presidential election were under investigation by the Federal Bureau of Investigation ("FBI"). Those allegations included links between individuals associated with the Trump campaign and Russian operatives with links to the Kremlin. Any such interference would be likely to constitute a serious threat to democracy and national security in the US in the first instance, with further consequences for the national security of the US' partners, including the UK.

Memorandum 112 was concerned with such links. Its contents were reasonably necessary for the investigation and consideration of the allegations outlined above.

Memorandum 112 reported on links between the Claimants, who are Russian citizens with business interests in the United Kingdom and the United States and elsewhere, and their links to the Russian President, Vladimir Putin. Those links were material to the allegations outlined above. In summary, this was for the following reasons.

Internet traffic data suggested that a computer server of an entity in which the Claimants have an interest, Alfa Bank, had been communicating with a computer server linked to the Trump Organization. Alfa Bank instructed an individual, Mr Brian Benczkowski, to investigate the allegations of illicit communications between Alfa Bank and the Trump Organization. Mr Benczkowski had previously been part of Mr Trump's campaign and Presidential transition team.

4

Mr Benczkowski has recently been appointed as Assistant Attorney General for the Criminal Division of the US Department of Justice, having been nominated by President Trump.

Memoranda including Memorandum 112 were requested from the Defendant by individuals with official responsibilities for and/or a relevant interest in the safeguarding of the national security of the US and UK. The Defendant disclosed Memorandum 112 to those individuals for those purposes, reasonably understanding them to be making legitimate and proportionate requests in their official capacities.

**UNDER PARAGRAPH 4**

Of: "The Defendant relies on the exemptions under section 28(1) and 35(2) of the DPA".

**Your requests and our responses**

9.    If and insfoar as it differs from the case set out in response to Request 8, set out the full factual case which the Defendant will seek to establish at trial to support the contention that it is entitled to rely on the exemption under section 28(1) in relation to the disclosure of the Claimants' personal information in Memorandum 112.

Response: see the response to question 8 above.

10.    Set out the full factual case which the Defendant will seek to establish at trial to support the contention that it is entitled to rely on the exemption under section 35(2) in relation to the disclosure of the Claimants' personal information in Memorandum 112.

Response: see the response to question 4 above.

5

**UNDER PARAGRAPH 6**

Of:  "(c) ... the Defendant will rely inter alia on other information about the Claimants in the public domain".

**Your requests and our responses**

11.     Set out all the "information about the Claimants in the public domain" on which the Defendant relies.

   Response: the Defendant relies on the following:

- 'Lunch with the FT: Mikhail Fridman', *Financial Times*, 1 April 2016
- 'How to Take On Kremlin and Win', *Sunday Times*, 14 October 2012;
- 'The autumn of the oligarchs', *New York Times*, 8 October 2000;
- 'Profile: Mikhail Fridman – the Teflon oligarch new to Londongrad'; *Russia Today*, 11 April 2016;
- 'Petr Aven: the Russian oligarch with an eye for art, not yachts', *Financial Times*, 12 July 2017;
- 'Deutsche Bank: A Global Bank for Oligarchs – American & Russian, Part 2', www.whowhatwhy.org, 15 January 2018;
- 00-2208 OAO Alfa Bank, et al v Center/Public Integrity et al, Memorandum Opinion dated 27 September 2005 of Judge Bates of the United States District Court for the District of Columbia;
- Each of the Claimants was included on the US State Department's 'Report to Congress Pursuant to Section 241 of the Countering America's Adversaries Through Sanctions Act of 2017 Regarding Senior Political Figures and Oligarchs in the Russian Federation and Russian Parastatal Entities', *"as determined by their closeness to the Russian regime and their net worth"*;
- Each of the Claimants was included in the 'The Top-50 of Powerful Businessmen and Investors' in terms of political influence in Russia, *Nezavisimaya Gazeta*, 27 July 2007;

6

- 'Fate of foreign venture lies in Russian tussle: Shift at the Kremlin befuddles investors', *The International Herald Tribune*, 8 July 2008;
- Vladimir Putin was present at the signing of the TNK-BP joint venture deal in 2003;
- 'Profile – Mikhail Fridman: Alfa Group Chairman Builds Russian 'Benchmark'', *IPR Strategic Business Information Database*, 30 January 2002;
- 'Profile – Petr Aven: Prominent Politician & Successful Businessman in One', *IPR Strategic Business Information Database*, 14 February 2002;
- President Vladimir Putin participated in a meeting with the First Claimant, which was broadcast on television, in which he agreed with the First Claimant that reports of Alfa Bank's liquidity problems during 2004 were artificial;
- 'Alfa Male', *The Daily Deal*, 15 August 2005;
- 'Banks Were Remembered in August', *Izvestia*, 14 August 2006;
- 'Reiman Strikes Back at Allegations', *Moscow Times*, 6 December 2005;
- 'Cameron under pressure to punish Putin oligarchs', *The Times*, 24 July 2014;
- Article in the *Rusjji Kurier*, 26 March 2007;
- A report on the Second Claimant prepared by the business intelligence company Stratfor (Strategic Forecasting Inc), 2007, Wikileaks;
- The First Claimant gave evidence to The United States District Court for the District of Columbia to the effect that he estimated that he spoke to President Putin over 10 times in the course of two and a half years, and that they were one of a handful of private financial companies who had a special, direct line to the Kremlin (00-2208 OAO Alfa Bank, et al v Center/Public Integrity et al, Memorandum Opinion dated 27 September 2005 of Judge Bates of the United States District Court for the District of Columbia);
- 'The autumn of the oligarchs', *New York Times*, 08 October 2000;
- The Claimants are widely reported to have not only met with, but lobbied and advised Russian political leaders, in particular President Putin on

7

policy. For example, the First and Second Claimants were Board members of the Russian Union of Industrialists and Entrepreneurs, a lobbying group, which regularly held meetings attended by President Vladimir Putin who has stated that many government decisions are only taken after consulting with the group, Kommersant, 19 December 2016;

- 'Power Broker in Russia's Shifting Scene', *Financial Times*, 29 August 2003;

- 'Oligarchs' Power Unfettered Under Putin Once Ruthless Entrepreneurs Cede Politics to Kremlin for Free Economic Rein', *The Washington Post*, 14 December 2002;

- 'Quinns now face a triumvirate of Russian oligarchs with links to President Putin', *The Irish Times*, 05 November 2012;

- The Duma Deputy Nikolai Pavlov held a press conference alleging that he had been targeted in a corrupt attempt to bribe him to give favourable testimony in arbitration proceedings by entities associated with the Claimants, IPOC press release, 26 September 2005 and undated Lenta profile of Second Claimant;

- A full page ad including photographs of the First and Second Claimants was published stating 'The royal court of Great Britain does not trust these people' in connection with the High Court's judgment following the trial of Boris Berezovsky's successful libel claim against the Second Claimant Kommersant, 6 June 2006;

- 'Putin's Kleptocracy: Who Owns Russia?', Karen Dawisha, 2014;

- The Second Claimant was reported by *The Moskovskaya Pravda* to have been involved in the killing of the American journalist Paul Klebnikov, who worked for the Russian edition of Forbes, allegations in respect of which the Second Claimant brought a successful claim, which was subsequently the subject of an application to the European Court of Human Rights (Laskin v Russia, 593/06), 'Bullet and pen', Moskovskaya Pravda, 21 July 2004;

- The Russian Duma has been reported to have issued reports stating that the "foreign economic activities" of business entities associated with the Claimants "are accumulating a critical mass of problems which are

8

dangerous to the reputation of Russian business and whole economy of the country" Stratfor (Strategic Forecasting Inc), 2007, Wikileaks.

12.    Set out all other information on which the Defendant relies so that the Claimants know the case which they have to meet.  The Claimants will object to the Defendant relying at trial on any information which is not now particularised.

Response: the key examples are provided in answer to question 11. Those examples suffice for the Claimants to understand the case they have to meet. The Defendant does not accept that the Claimants would be entitled to preclude it from adducing any supplementary examples that further illustrate and make good its case.

Of: "(d) … In any event, conditions 5(b) and (d) and Condition 6 from Schedule 2 to the DPA were met".

**Your requests and our responses**

13.    Set out, in relation to each disclosure, the Defendant's full factual case that condition 5(b) in Schedule 2 to the DPA was met, identifying the enactment relied on.

Response: as regards the US, the FBI has authority to investigate threats to national security pursuant to Presidential Executive Orders, Attorney General Authorities, as well as under statute. The Defendant relies in particular on Title II of the Intelligence Reform and Terrorism Prevention Act of 2004 and Executive Order 12333; 50 U.S.C. 401 and 50 U.S.C. 1801.

As regards the UK, the Defendant relies in particular on the Intelligence Services Act 1994.

9

14. Set out, in relation to each disclosure, the Defendant's full factual case that condition 5(d) in Schedule 2 to the DPA was met identifying the function of a public nature relied on and the person who is alleged to have been exercising this function in the public interest.

Response: as regards the US, the Defendant relies on the functions of the FBI. As regards disclosure to David Kramer and Senator John McCain, it relies on the functions of the Senate Armed Services Committee (including its Cybersecurity and Emerging Threats and Capabilities sub-committees), the Senate Select Committee on Intelligence and the Senate Committee on Homeland Security and Government Affairs. As regards disclosure to Strobe Talbott (if relevant to this claim), the Defendant relies on US Department of State Foreign Affairs Policy Board.

As regards the UK, the Defendant relies on the functions of the Central Intelligence Machinery.

15. Set out, in relation to each disclosure, the Defendant's full factual case that condition 6 in Schedule 2 to the DPA was met.

Response: the processing complained of was necessary in the legitimate interests of Fusion and its clients, as well as the interests of the officials who received Memorandum 112 for the purposes of safeguarding national security. Those interests are outlined in responses given above. In addition, the Defendant relies on the public interest in the assessment of (a) the legal validity of the 2016 Presidential election, and (b) potential threats to the national security of the US and UK. The Defendant also relies on its own legitimate commercial interest in providing the services described above. The processing complained of was not unwarranted by reason of prejudice to the rights and freedoms or legitimate interests of the Claimants.

Of: "(d) … In any event, conditions 5, 6 and 7(b) and 7(c) from Schedule 3 to the DPA were met".

**Your requests and our responses**

16.  Set out, in relation to each disclosure, the Defendant's full factual case that condition 5 in Schedule 3 to the DPA was met stating when it is alleged that the personal data in question was made public as a result of steps deliberately taken by the First and Second Claimants.

Response: the examples given in answer to question 11 above, which include reporting in the public domain on or arising from steps deliberately taken by the First and Second Claimants.

17.  Set out, in relation to each disclosure, the Defendant's full factual case that condition 6 in Schedule 3 to the DPA was met, identifying the legal proceedings, legal advice or legal rights relied on.

Response: see the response to question 4 above.

18.  Set out, in relation to each disclosure, the Defendant's full factual case that condition 7(b) in Schedule 3 to the DPA was met, identifying the enactment relied on.

Response: see the response to question 13 above.

19.  Set out, in relation to each disclosure, the Defendant's full factual case that condition 7(c) in Schedule 3 to the DPA was met, identifying the "function of the Crown" or government department alleged to have been performed by the Defendant.

Response: see the response to questions 13 and 14 above in respect of the UK.

**UNDER PARAGRAPH 8**

Of: "At trial, the Defendant will rely inter alia on other information about the Claimants in the public domain".

**Your request and our response**

20.   Set out all the "information about the Claimants in the public domain" on which the Defendant will rely.

Response: see the response to question 11 above.

**UNDER PARAGRAPH 10**

Of: "The Defendant took such care as was reasonably required in the circumstances, including to establish the accuracy of the personal data complained of".

**Your requests and our responses**

21.   Set out full details of the care it is alleged was reasonably required to comply with the requirements of the DPA in the circumstances and the steps which were, in fact, taken by the Defendant which are alleged to constitute the taking of such care.

Response: the Defendant had regard to the nature of the allegations on which it was instructed to report, their importance to the public interest and national security of the US and UK, as well as the limited circulation intended for Memorandum 112 and the roles and status of the intended recipients. The Defendant took all steps reasonably required in that context, including

considering public domain material (see above) and the input of intelligence sources, the reliability of which the Defendant assessed using its knowledge and experience. The Defendant is restricted by law in terms of further information it can provide at this stage, including by virtue of section 10 of the Contempt of Court Act 1998.

22.   Without prejudice to the generality of the foregoing, set out the steps taken by the Defendant to establish the accuracy of the following personal data:

(a) That significant favours are done by President Putin for the Claimants and for President Putin by the Claimants.

(b) That the First and Second Claimants give informal advice to President Putin on foreign policy.

(c) That shortly before 14 September 2016, the Second Claimant met directly with President Putin in Russia.

(d) That the First and Second Claimants used Mr Oleg Govorun as a "driver" and "bag carrier" to deliver large amounts of illicit cash to President Putin when he was Deputy Mayor of St Petersburg.

(e) That the First and Second Claimants do President Putin's political bidding.

Stating, in each case, when, where and by whom the steps were taken and what, precisely, was done to establish the accuracy of the personal data.

Response: see the response to question 21 above.

The Defendants believe that the facts set out in this Response are true.

Signed:

Nicola Cain

Position:      Partner, Reynolds Porter Chamberlain LLP

Date:          01 August 2018

13

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of December, 2018, the foregoing was

served electronically upon:

Christina Hull Eikhoff, *pro hac vice*
Kristin Ramsay, *pro hac vice*
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
(404) 881-7000

Kelley C. Barnaby
ALSTON & BIRD LLP
950 F Street, NW
Washington, D.C. 20004
(202) 239-3300

*Counsel for Appellees*

/s/ Alan S. Lewis
Alan S. Lewis

# EXHIBIT 3

No *Shepard's* Signal™
As of: December 10, 2018 7:13 PM Z

## *MiMedx Grp., Inc. v. DBW Partners LLC*

United States District Court for the District of Columbia

September 28, 2018, Decided; September 28, 2018, Filed

Civil Action No. 17-1925 (JDB)

**Reporter**

2018 U.S. Dist. LEXIS 166970 *; 2018 WL 4681005

MIMEDX GROUP, INC., Plaintiff, v. DBW PARTNERS LLC, D/B/A THE CAPITOL FORUM, et al., Defendants.

## Core Terms

allegations, defamation, email, motion to dismiss, defamatory, business relationship, customers, public figure, slander, defendants', privacy, libel, tortious interference, false light invasion, false light, cause of action, misleading, stuffing, channel, parties, stock price, profession, reputation, damages, injure, defamatory statement, special damage, matter of law, constitutes

**Counsel:** [*1] For MIMEDX GROUP, INC., Plaintiff: Paul Anthony Werner, III, LEAD ATTORNEY, Abraham Jared Shanedling, SHEPPARD MULLIN RICHTER & HAMPTON LLP, Washington, DC; Jeffrey N. Williams, PRO HAC VICE, WARGO & FRENCH LLP, Los Angeles, CA; Joseph D. Wargo, PRO HAC VICE, WARGO & FRENCH LLP, Atlanta, GA.

For DBW PARTNERS LLC, doing business as CAPITOL FORUM, TREVOR BAINE, TEDDY DOWNEY, JAKE WILLIAMS, MILES PULSFORD, MATT TREACY, Defendants: Kevin Taylor Baine, Stephen J. Fuzesi, LEAD ATTORNEYS, WILLIAMS & CONNOLLY LLP, Washington, DC.

**Judges:** JOHN D. BATES, United States District Judge.

**Opinion by:** JOHN D. BATES

## Opinion

## MEMORANDUM OPINION

Before the Court is [18] defendants' motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, Plaintiff MiMedx Group, Inc. ("MiMedx") brought claims for libel, slander, defamation, false light invasion of privacy,

tortious interference with business relations, and false advertising under the *Lanham Act* after defendants published articles that questioned MiMedx's sales practices. Defendants move the Court to dismiss each claim for failure to state a claim upon which relief can be granted. For the reasons that follow, defendants' motion will be granted in part and denied in part.

## BACKGROUND[1]

MiMedx is a publicly traded medical-products [*2] corporation organized under Florida law and headquartered in Georgia. Compl. for Damages & Injunctive Relief ("Compl.") [ECF No. 1] ¶ 6. Id. Defendant DBW Partners LLC d/b/a The Capitol Forum ("The Capitol Forum") is a firm based in the District of Columbia that offers business and regulatory analysis to paid subscribers. Id. ¶ 7. This lawsuit arises from articles that The Capitol Forum published about MiMedx and communications related to those articles.

On August 21, 2017, The Capitol Forum "published an article entitled 'MiMedx: Channel Stuffing Accusations Resurface in Recent Counterclaim; Former Employees Corroborate Allegations; A Close Look at Potential Risk'" [hereinafter "the August 21 article"]. Id. ¶ 23. The August 21 article outlined allegations MiMedx's former employees made in court filings against MiMedx claiming that the company had engaged in "channel stuffing"—a practice by which a company artificially inflates its sales and revenue figures by distributing more products to retailers than the retailers can sell. Id. ¶¶ 19-25.

The same day, The Capitol Forum distributed this article to at least some MiMedx shareholders via email [hereinafter "the August 21 email"]. Id. [*3] ¶ 24. The email included a description of the August 21 article, which stated: "In the article, we detail channel stuffing allegations and recent

---

[1] The following facts are derived from the allegations in defendants' complaint and are assumed to be true for the purposes of deciding this motion to dismiss.

counterclaims which may pose as a regulatory risk for the company. The article examines the allegations made by customers & former employees, the company's response to these claims, and the potential legal risks for MiMedx." Id. ¶ 25 (emphasis added). The August 21 email concluded with an invitation to "schedule a call" with The Capitol Forum for more information. Id. The Capitol Forum now acknowledges that the "reference to 'customers' in the August 21 email was a mistake: as the underlying report . . . indicated, the allegations of channel stuffing were contained in claims and counterclaims filed by former MiMedx employees," not by customers. Mem. P. & A. Supp. Defs.' Mot. to Dismiss ("Defs.' Mot.") [ECF No. 18-1] at 3.

As part of its "ongoing examination of allegations of channel stuffing made by former MiMedx employees," The Capitol Forum also submitted a *Freedom of Information Act ("FOIA")* request to the Department of Veterans Affairs, Office of the Inspector General ("OIG"). Compl. ¶ 28. The Capitol Forum determined from the OIG's denial [*4] of its FOIA request that an OIG investigation "involve[d] documents related to MiMedx." Id. Meanwhile, MiMedx informed The Capitol Forum "off-the-record that MiMedx had initiated contact with the OIG, that MiMedx was voluntarily working with the OIG, and that MiMedx was specifically not a target of the investigation." Id. ¶ 30. On September 7, 2017, The Capitol Forum published another article titled "VA Office of Inspector General Confirms Investigation Involving MiMedx Documents" [hereinafter "the September 7 article"]. Id. ¶ 27. The article "omitted positive information" that MiMedx had provided The Capitol Forum and instead relayed only "that the OIG's inquiry involved 'documents related to MiMedx.'" Id. ¶¶ 29-30. As it had done with the August 21 article, the Capitol Forum promoted the September 7 article in an email, invited readers to schedule a call for more information, and directed the email to at least some MiMedx shareholders. Id. ¶¶ 27-28.

MiMedx alleges that The Capitol Forum's publications served as part of a "conspir[acy] to adversely manipulate the stock price of MiMedx via false and/or misleading statements to MiMedx's shareholders, which were intended to cause those [*5] shareholders to sell their stock." Id. ¶ 33. The Capitol Forum allegedly served "as a 'shill' for bearish traders in MiMedx stock" based upon "a nefarious motive to benefit the interests of bearish traders in MiMedx stock at the expense of the company, because those bearish traders included . . . friends, family, affiliates, and/or even . . . themselves." Id. ¶¶ 33-34. MiMedx states that its "stock price dropped" on both September 7 and September 8, 2017, and that its stock price declined by more than 20% overall between August 21 and September 21, 2017. Id. ¶ 32.

On September 21, 2017, MiMedx filed this action against The Capitol Forum and individuals who are principals or employees of The Capitol Forum: Trevor Baine, Teddy Downey, Jake Williams, Miles Pulsford, Matt Treacy, and fictitiously named defendants Does 1-100. Id. ¶¶ 7-10. MiMedx alleges that The Capitol Forum's description in its August 21 email of allegations by "customers" constitutes libel (Count 1) and defamation (Count 3). Id. ¶¶ 36-41, 47-51. MiMedx further alleges that The Capitol Forum's invitation to shareholders to "schedule a call" for more information about these customer allegations is evidence that The Capitol [*6] Forum "repeated the false and malicious statement(s)," constituting slander (Count 2). Id. ¶¶ 42-46. MiMedx also asserts that the false and misleading content in The Capitol Forum's articles and emails violated MiMedx's right to privacy by placing it in a false light in the public eye (Count 4), id. ¶¶ 52-56; tortiously interfered with its business relations (Count 5), id. ¶¶ 57-61; and violated the Lanham Act's false advertising provision (Count 6), id. ¶¶ 62-68.

Defendants now move to dismiss each claim for failure to state a claim upon which relief may be granted pursuant to *Federal Rule of Civil Procedure 12(b)(6)*.

## LEGAL STANDARD

*Rule 12(b)(6)* provides for dismissal of a claim where the proponent has failed to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6)*. A complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (citation omitted). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Twombly, 550 U.S. at 570*). "While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] [*7] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly, 550 U.S. at 555* (citation omitted). In short, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id.

## DISCUSSION

### I. CHOICE OF LAW

2018 U.S. Dist. LEXIS 166970, *7

In a diversity case, this Court generally employs the choice-of-law analysis of the District of Columbia. See *Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 857, 371 U.S. App. D.C. 68 (D.C. Cir. 2006)*; *Mar-Jac Poultry, Inc. v. Katz, 773 F. Supp. 2d 103, 111 (D.D.C. 2011)*. "Under District of Columbia law, the court must first determine if there is a conflict between the laws of the relevant jurisdictions" and "[o]nly if such a conflict exists must the court then determine, pursuant to District of Columbia choice of law rules, which jurisdiction has the 'more substantial interest' in the resolution of the issues." *Young Women's Christian Ass'n of the Nat'l Capital Area, Inc. v. Allstate Ins. Co. of Canada, 275 F.3d 1145, 1150, 348 U.S. App. D.C. 401 (D.C. Cir. 2002)*. Factors relevant to this substantial-interest determination include: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship is centered." *District of Columbia v. Coleman, 667 A.2d 811, 816 (D.C. 1995)*.

MiMedx asserts that Georgia law applies to all claims except for its federal Lanham Act claim because "MiMedx is headquartered [*8] in Georgia and stands to suffer injury there." Compl. ¶ 35; Pl.'s Mem. P. & A. Opp'n Defs.' Mot. to Dismiss ("Pl.'s Opp'n") [ECF No. 20] at 9 n.3. Defendants note that District of Columbia law could also apply because it is where "[T]he Capitol Forum is incorporated and domiciled, where it publishes its newsletter, where most of the individual defendants live and work, and where the bulk of the reporting concerning MiMedx was performed." Defs.' Mot. at 6 n.3. However, defendants maintain that "there is no need to resolve any choice of law issue" because the laws of Georgia and the District of Columbia are virtually identical. See id.[2] Because the Court concludes that the laws of Georgia and the District of Columbia as applied to MiMedx's claims do not conflict, the Court will apply the prevailing law of both jurisdictions.

## II. MIMEDX'S DEFAMATION CLAIMS (COUNTS 1-3)

MiMedx makes three related claims for libel, slander, and defamation.[3] Compl. ¶¶ 36-51. First, MiMedx alleges The

Capitol Forum committed libel (Count 1) and defamation (Count 3) by its use of the word "customers" in the August 21 email. Id. ¶ 37, 48. MiMedx bases its slander claim (Count 2) on the allegation that "Defendants [*9] repeated the false and malicious statement(s)" in the August 21 email, i.e., that customers had alleged channel stuffing, "to MiMedx's investors and/or others by telephone or in-person." Id. ¶ 43.[4]

A claim for defamation under Georgia law requires "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." *Infinite Energy, Inc. v. Pardue, 310 Ga. App. 355, 713 S.E.2d 456, 460 (Ga. Ct. App. 2011)* (citing *Mathis v. Cannon, 276 Ga. 16, 573 S.E.2d 376, 380 (Ga. 2002)*); see also *Ga. Code Ann. §§ 51-5-1, 51-5-4*. The elements are substantively identical under District of Columbia law. See *Oparaugo v. Watts, 884 A.2d 63, 76 (D.C. 2005)* (citing *Crowley v. N. Am. Telecomms. Ass'n, 691 A.2d 1169, 1173 n.2 (D.C. 1997)*).

The fourth element—"special harm or the actionability of the statement irrespective of special harm"—requires that a plaintiff either prove special damages, which "are limited to actual pecuniary loss . . . specifically pleaded or proved," *Fed. Aviation Admin. v. Cooper, 566 U.S. 284, 295, 132 S. Ct. 1441, 182 L. Ed. 2d 497 (2012)* (citing Restatement (First) of Torts *§ 575 cmts. a & b* (Am. Law Inst. 1938)), or show that the statements are "defamatory per se" because they are of a type "so likely to cause degrading injury to the subject's reputation that proof of that harm is not required to recover compensation," *Franklin v. Pepco Holdings, Inc., 875 F. Supp. 2d 66, 75 (D.D.C. 2012)*. Defamatory statements related to a [*10] plaintiff's "fitness for the proper conduct of his lawful business, trade or profession" generally constitute defamation per se. *Restatement (Second) of Torts § 573* (Am. Law Inst. 1977) (slander per se); see also *Cottrell v. Smith,*

---

[2] Although MiMedx is organized under Florida law, Compl. ¶ 6, and at least one individual defendant is domiciled in New York, Compl. ¶¶ 11-12, both parties propose—and the Court agrees—that only Georgia or District of Columbia law would reasonably apply to the claims at issue here.

[3] Written or printed defamation constitutes libel; oral defamation constitutes slander. *Restatement (Second) of Torts § 568* (1977); see

---

*Ning Ye v. Holder, 644 F. Supp. 2d 112, 117 (D.D.C. 2009)* (applying DC law); *Ga. Code Ann. §§ 51-5-1, 51-5-4*.

[4] In its opposition to defendants' motion to dismiss, MiMedx attempts to expand its defamation claim to apply to the September 7 article. Pl.'s Opp'n at 18-20. However, its complaint alleges defamation, libel, and slander only as to the August 21 email. See Compl. ¶¶ 37, 43, 48. Because a Court ruling on a *Rule 12(b)(6)* motion to dismiss may only consider allegations included in the operative complaint, documents incorporated by reference in the complaint, and matters of which a court may take judicial notice, see *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)*, the Court will not consider MiMedx's assertion in its brief that the September 7 article was defamatory.

*299 Ga. 517, 788 S.E.2d 772, 780-81 (Ga. 2016)* (stating that "charges against another in reference to his trade, office, or profession, calculated to injure him therein" constitutes defamation per se and renders the claim actionable without further proof of special damages) (quoting *Ga. Code Ann. § 51-5-4*); *Franklin, 875 F. Supp. 2d at 75* (applying District of Columbia law and noting that defamation per se includes "false statements that impute to the subject . . . a matter adversely affecting the person's ability to work in a profession" (citing Restatement (Second) of Torts)).

No heightened pleading standard applies to defamation actions, and a court reviewing a motion to dismiss need only determine "whether the factual allegations are sufficient to permit [defendants] to respond to [plaintiff's] claim of defamation and whether, construing the complaint in the light most favorable to [plaintiff], it appears beyond doubt that he can prove no set of facts that would entitle him to recover." *Oparaugo, 884 A.2d at 77*; see *Eason v. Marine Terminals Corp., 309 Ga. App. 669, 710 S.E.2d 867, 872 (Ga. Ct. App. 2011)* (reversing grant of motion to dismiss where defamation complaint "included all that was required, namely 'a short [*11] and plain statement of the claim that [gave] the defendant[s] fair notice of what the claim [was] and a general indication of the type of litigation involved . . .'" (citation omitted)).

Defendants first argue that MiMedx fails properly to allege the existence of a false and defamatory statement because "the single word MiMedx challenges is not defamatory in the context of the overall email" in that it neither rendered the email "substantially false" nor caused "any incremental harm above and beyond the harm that would have been caused by the remainder of the publication, which is not challenged." Defs.' Mot. at 8-13 (quotations at 8, 12). MiMedx responds that "the use of the word 'customers' . . . substantially changed the meaning of the entire communication" because "there is a significant difference between allegations by a company's customers and its disgruntled former employees" and further because it "made it appear that the article contained new or additional allegations that might corroborate the former employees' allegations." Pl.'s Opp'n at 16-18. MiMedx asserts also that this reference to channel-stuffing allegations by customers was defamatory because it "injured MiMedx's [*12] reputation," "tended to expose MiMedx to negative views by . . . shareholders," and "diminished" "the value of the company . . . in the eyes of the trading public." Compl. ¶¶ 26, 38-39.

Under District of Columbia law, "[w]hen confronted with a motion to dismiss, a court must evaluate" as a matter of law "[w]hether a statement is capable of defamatory meaning." *Jankovic v. Int'l Crisis Grp., 494 F.3d 1080, 1091, 377 U.S.*

*App. D.C. 434 (D.C. Cir. 2007)* (citation omitted). "A statement is 'defamatory' if it tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Moss v. Stockard, 580 A.2d 1011, 1023 (D.C. 1990)*; see also *Restatement (Second) of Torts § 559* (defining a defamatory communication as one that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him").

In contrast, Georgia law provides that "the question of whether a published statement is defamatory is a question for the jury," and "[o]nly when 'the statement is not ambiguous and can reasonably have but one interpretation, the question is one of law for the judge.'" *Mar-Jac Poultry, 773 F. Supp. 2d at 114* (citation omitted). A statement that "mak[es] charges against another in reference to his trade, office, or profession, calculated to injure him therein" constitutes [*13] defamation per se. *Ga. Code Ann. § 51-5-4(a)(3)* (slander per se); *Lucas v. Cranshaw, 289 Ga. App. 510, 659 S.E.2d 612, 616 (Ga. Ct. App. 2008)* (explaining that Georgia case law has incorporated the definition of slander into the definition of libel, rendering "that which is slander per se also . . . libel per se"). "An allegedly defamatory statement[] must be construed in the context of the entire publication, as a whole, to determine whether it was potentially defamatory." *Mar-Jac Poultry, 773 F. Supp. 2d at 114-15*. "[I]n considering whether a writing is defamatory as a matter of law, [a court] look[s] not at the evidence of what the extrinsic circumstances were at the time indicated in the writing, but at what construction would be placed upon it by the average reader." *Macon Tel. Publ'g Co. v. Elliott, 165 Ga. App. 719, 302 S.E.2d 692, 694 (Ga. Ct. App. 1983)*.

Here, the Court concludes that the contested statement is at least "capable of defamatory meaning" under District of Columbia law, see *Franklin, 875 F. Supp. 2d at 75* (emphasis added) (citation omitted), in that it was concededly false that customers had made allegations of channel stuffing against MiMedx and the statement alleged that MiMedx engaged in a wrongful commercial practice, which would "tend[] to injure" MiMedx's "trade, profession or community standing," see *Moss, 580 A.2d at 1023*. Applying Georgia law, the Court concludes that whether the statement is defamatory is ambiguous. The statement references [*14] MiMedx's "trade . . . or profession" and MiMedx alleges that The Capitol Forum acted purposely in a way "calculated to injure" MiMedx by conspiring to devalue its stock price, which would support a finding that the statement was defamatory per se. However, the statement is less clearly defamatory when "construed in the context of the entire publication"— that is, the August 21 email, which also attributed the accusations of channel stuffing to former employees. The

2018 U.S. Dist. LEXIS 166970, *14

Court concludes that, based on the allegations in the complaint, it is ambiguous under Georgia law "what construction . . . the average reader" would place upon the inclusion of the word "customers" in the August 21 email. See *Macon Tel., 302 S.E.2d at 694*. That means that the Court cannot conclude as a matter of law that, under Georgia law, the statement is not defamatory. Under the laws of either jurisdiction, then, MiMedx has sufficiently pleaded the existence of a defamatory statement to survive a motion to dismiss.

As to the remaining elements of a cause of action for defamation, MiMedx alleges—and The Capitol Forum concedes—that the August 21 email's reference to "'consumers'—as opposed to 'former employees'"—was false. See Compl. ¶ 26; Defs.' Mot. [*15] at 3. Moreover, as explained above, the statement is at least arguably defamatory. The parties do not dispute that the statement concerned MiMedx. Accordingly, MiMedx has pleaded the first element of a defamation claim. The Capitol Forum allegedly published this statement to third parties in written form via email and oral form either by "telephone or in-person" communications, thus satisfying the second element. See id. ¶¶ 23-25, 38, 43, 48. MiMedx further asserts that The Capitol Forum acted purposefully in publishing the contested statements in order to erode the value of the company's stock and thereby to profit, thus satisfying the requirement that the defendant have acted with at least negligence. Id. ¶¶ 3-5, 23-25, 33-34. MiMedx's complaint also satisfies the fourth element, as it can be construed either to allege defamation per se in the form of statements designed to injure a plaintiff's business reputation, see id. ¶¶ 3-5, 38; or to allege special damages in the form of a diminution of company value,[5] see id. ¶¶ 5, 32-34. Thus, MiMedx's complaint alleges each element of a claim for defamation (and/or libel and slander),

---

[5] Defendants also argue that MiMedx has failed to plead compensable damages and that this further justifies dismissal. Defs.' Mot. at 27-28. The parties disagree as to whether a corporation claiming defamation may claim damages in the form of diminution of the company's stock price as opposed to solely lost profits. See Defs.' Mot. at 27-28; Pl.'s Opp'n at 26-28. However, special damages are not limited to lost profits as a matter of law. *Webster v. Wilkins, 217 Ga. App. 194, 456 S.E.2d 699, 701 (Ga. Ct. App. 1995)* ("The special damages necessary to support an action for defamation, where the words are not actionable in themselves[,] must be the loss of money, or of some other material temporal advantage capable of being assessed in monetary value. The loss of income, of profits, and even of gratuitous entertainment and hospitality will be special damage if the plaintiff can show that it was caused by the defendant's words." (citation omitted)). MiMedx alleges damages that may be quantified in monetary form, see Compl. ¶¶ 32, 39, and thus its complaint does not fail as a matter of law on this account.

and defendants' motion to dismiss MiMedx's claims for [*16] defamation, libel, and slander will be denied.

Defendants seek to impose an additional pleading requirement, arguing that MiMedx was required to allege that defendants acted with actual malice and that its failure to do so justifies dismissal of MiMedx's claims. Defs.' Mot. at 13-27. MiMedx responds simply that its complaint "alleges numerous facts from which to conclude that Defendants acted against MiMedx with intentional or reckless disregard for the truth," including allegations of "the existence of several types of circumstantial evidence sufficient to demonstrate actual malice." Pl.'s Opp'n at 9, 21. More specifically, MiMedx proposes that The Capitol Forum purposely fabricated a fictitious channel-stuffing allegation by "customers" in order to manipulate MiMedx's stock price. Id. at 20. However, MiMedx does not address the threshold question of whether the actual malice standard applies to the allegedly defamatory statement at issue in this case.

"The constitutional guarantees" of freedom of speech and of the press require that a public figure may not recover damages related to a defamatory statement made in relation to a matter of public concern "unless he proves that the statement [*17] was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times v. Sullivan, 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)*. However, "[w]hether a person is a public figure is a question of law that requires the court to review the nature and extent of the individual's participation in the specific controversy that gave rise to the [alleged] defamation." *Cottrell, 788 S.E.2d at 782* (citation omitted). Only then must a public-figure plaintiff further "persuade the fact-finder that the defendant acted with actual malice in publishing the defamatory statements by clear and convincing evidence." See *Competitive Enter. Inst. v. Mann, 150 A.3d 1213, 1251-52 (D.C. 2016)*; see also *Mathis, 573 S.E.2d at 383*.

A plaintiff may be a public figure for all purposes or a limited-purpose public figure. Georgia courts apply a three-part test to determine if an individual is a limited-purpose public figure, under which the court "must isolate the public controversy, examine the plaintiff's involvement in the controversy, and determine whether the alleged defamation was germane to the plaintiff's participation in the controversy." *Mathis, 573 S.E.2d at 381* (quoting *Atlanta Journal-Constitution v. Jewell, 251 Ga. App. 808, 555 S.E.2d 175, 183 (Ga. Ct. App. 2001)*); see also *Jankovic, 822 F.3d at 586* (stating that "to be a limited-purpose public figure, [one] must have 'thrust' himself to the 'forefront' of the public controversy at issue" (citation omitted)). [*18]

2018 U.S. Dist. LEXIS 166970, *18

Defendants argue that MiMedx is a public figure because it is a public corporation. Defs.' Mot. at 14-18. Past decisions have indeed found public corporations to be public figures in a variety of contexts. *See OAO Alfa Bank v. Ctr. for Pub. Integrity, 387 F. Supp. 2d 20, 47-48 (D.D.C. 2005); Metastorm, Inc. v. Gartner Grp., Inc., 28 F. Supp. 2d 665, 670 (D.D.C. 1998)*. However, neither this Court nor the Supreme Court has ever announced a per se rule that all public corporations are public figures for all matters in all defamation actions against all defendants. Defendants point to the principle in OAO Alfa Bank that "[c]orporate plaintiffs are treated as public figures as a matter of law in defamation actions brought against mass media defendants involving matters of legitimate public interest," *387 F. Supp. 2d at 47*, as support for the proposition that MiMedx must be found to be a public figure here. *See* Defs.' Mot. at 14. However, MiMedx does not concede that The Capitol Forum is a "mass media defendant[]" for the purpose of the rule, *see OAO Alfa Bank, 387 F. Supp. 2d at 47*; Compl. ¶ 3 (calling The Capitol Forum a "supposed subscription-based media outlet" (emphasis added)), 7 ("The Capitol Forum purports to be a subscription-based media outlet" (emphasis added)), and the Court does not find The Capitol Forum's status as a member of the mass media so clear as to take judicial notice of such [*19] a fact. Upon review of MiMedx's complaint (and construing the facts alleged in MiMedx's favor, as the Court must do at the motion-to-dismiss phase), the Court finds that MiMedx has not alleged facts that establish that it is a public figure or limited-purpose public figure. MiMedx may be able to produce a factual basis for a finding that it should be considered a private figure with regard to the statements alleged in this case. Under these conditions, there is no basis for imposing on MiMedx an obligation to anticipate in its complaint the need to plead facts to defend against defendants' assertion that it is a public figure. *Cf. Gomez v. Toledo, 446 U.S. 635, 640, 100 S. Ct. 1920, 64 L. Ed. 2d 572 (1980)* (finding "no basis for imposing on the plaintiff an obligation to anticipate [a qualified-immunity] defense by stating in his complaint that the [police superintendent] defendant acted in bad faith"). MiMedx may later be deemed a public figure or limited-purpose public figure, but at this stage its failure to allege actual malice in its complaint does not support dismissal of its claims for defamation, libel, or slander. Accordingly, defendants' motion to dismiss these claims will be denied.

### III. MIMEDX'S FALSE LIGHT CLAIM (COUNT 4)

MiMedx's fourth claim for [*20] relief alleges that defendants' conduct "wrongfully placed MiMedx in a false light in the public eye." Compl. ¶ 53. Specifically, MiMedx alleges that defendants "made literally false statements as well

as misleading statements (e.g., those which purposely omitted facts or context tending to be favorable to MiMedx, or made suggestions concerning MiMedx that ran counter to the actual facts known by [d]efendants) in their articles, e-mails, and other discussions with shareholders." *Id.*

Both Georgia and the District of Columbia have adopted the Second Restatement of Torts' articulation of a cause of action for false light invasion of privacy. *Doe v. Bernabei & Wachtel, PLLC, 116 A.3d 1262, 1266 (D.C. 2015)* (noting that the District of Columbia has adopted the Restatement articulation of invasion of privacy torts, including false light); *Smith v. Stewart, 291 Ga. App. 86, 660 S.E.2d 822, 834 (Ga. Ct. App. 2008)* (citing Restatement articulation of false light invasion of privacy); *Thomason v. Times-Journal, 190 Ga. App. 601, 379 S.E.2d 551, 554 (Ga. Ct. App. 1989)* (same). "In order to sustain a false light invasion of privacy claim, a plaintiff must show that the defendant knowingly or recklessly published falsehoods about him or her and, as a result, placed him or her in a false light which would be highly offensive to a reasonable person." *Smith, 660 S.E.2d at 834* (citing *Thomason, 379 S.E.2d at 554; Restatement (Second) of Torts § 652E*); *see also Doe 116 A.3d. at 1267* (applying same standard).

The Restatement [*21] unequivocally states that "[a] corporation, partnership or unincorporated association has no personal right of privacy" and "therefore no cause of action" for false light invasion of privacy. *Restatement (Second) of Torts § 652I, cmt. c*. MiMedx argues that no Georgia case has explicitly adopted the Restatement's prohibition of corporations pursuing false light claims, and therefore its claim is not barred under Georgia law. Pl.'s Opp'n at 29-30. But MiMedx also fails to identify any instance in which a Georgia court—or any other court—has recognized such a claim as one upon which relief may be granted. *See id.*

This Court has previously reasoned that because the District of Columbia had adopted the Restatement's articulation of the false light tort, it also adopted the Restatement's prohibition against corporate entities bringing false light claims. *S. Air Transp., Inc. v. Am. Broad. Cos., 670 F. Supp. 38, 42 (D.D.C. 1987)*. The same reasoning applies to Georgia law. Because Georgia, like the District of Columbia, has adopted the Restatement's articulation of a cause of action for false light invasion of privacy, this Court concludes that Georgia also recognizes the Restatement's prohibition on corporate plaintiffs bringing false light claims.

Accordingly, since MiMedx is a corporation, it may [*22] not make a claim for false light invasion of privacy under Georgia or District of Columbia law. Because no amendment to its complaint could remedy this deficiency, its claim for false

light invasion of privacy will be dismissed.

## IV. TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS (COUNT 5)

MiMedx's fifth claim for relief asserts that defendants' conduct tortiously interfered with its business relations. Compl. ¶¶ 57-67. MiMedx alleges that "Defendants' conduct . . . was tortious, malicious, and independently wrongful" and that "Defendants' publications caused third parties, including customers, investors, and creditors, to fail to enter into anticipated business relationships with MiMedx, which proximately damaged MiMedx." Id. ¶¶ 58-59.

Under Georgia law, a claim for tortious interference with business relations requires proof that defendant "(1) acted improperly and without privilege, (2) acted purposely and maliciously with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) caused plaintiff financial injury." *Camp v. Eichelkraut, 246 Ga. App. 275, 539 S.E.2d 588, 593 (Ga. Ct. App. 2000)*. Under District of Columbia law, "[a] prima facie case of tortious interference with business [*23] relations requires: '(1) existence of a valid contractual or other business relationship; (2) [the defendant's] knowledge of the relationship; (3) intentional interference with that relationship by [the defendant]; and (4) resulting damages.'" *Whitt v. Am. Prop. Constr., 157 A.3d 196, 202 (D.C. 2017)* (citation omitted).

Although the elements of a tortious interference with business relations claim differ under District of Columbia and Georgia law, the Court identifies no conflict that would require application of choice-of-law analysis because MiMedx's allegations of tortious interference fail to allege a sufficient factual basis to satisfy the pleading standard of *Twombly* and *Iqbal* under either jurisdiction's standard. MiMedx uses the labels of "customers, investors, and creditors" to describe hypothetical categories of business relationships with which The Capitol Forum could have interfered but indicates no specific business relationship affected by the alleged interference. MiMedx alleges only that defendants sought to manipulate the market for MiMedx stock generally. MiMedx has thus failed "to raise a right to relief above the speculative level," *Twombly 550 U.S. at 555*, and its claim for tortious interference with business relations will be dismissed.[6]

─────────

[6] The parties disagree about whether and how a tortious interference with business relations claim might apply to the relationship between a company and its shareholders. See Defs.' Mot. at 35; Pl.'s Opp'n at 32-33. Because MiMedx does not allege any specific business relationship—with shareholders or otherwise—the Court does not

## V. [*24] LANHAM ACT FALSE-ADVERTISING CLAIM (COUNT 6)

In its sixth claim for relief, MiMedx alleges that defendants' conduct "constituted a violation of the federal Lanham Act by virtue of the false and misleading statements made to MiMedx's shareholders," which "resulted in a significant diminution in reputation and value for the company." Compl. ¶¶ 63, 66. More specifically, MiMedx alleges that "[d]efendants' statements to MiMedx's shareholders were a cause, if not the primary cause, of [MiMedx's] stock price depreciation." Id. ¶ 5.

*Section 43(a)* of the Lanham Act, as amended and codified at *15 U.S.C. § 1125*, provides a cause of action for false advertising when a person uses a false or misleading statement or description of fact "in commercial advertising or promotion . . . [that] misrepresents the nature, characteristics, qualities, or geographic origin of . . . another person's goods, services, or commercial activities." *15 U.S.C. § 1125(a)(1)(B)*. "To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead . . . [1] an injury to a commercial interest in sales or business reputation [2] proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 131-32, 140, 134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014)*. Under the proximate causation prong, the plaintiff "must show economic [*25] or reputational injury flowing directly from the deception wrought by the defendant's advertising," which "occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id. at 134*. "[L]ike any other element of a cause of action," proximate causation "must be adequately alleged at the pleading stage in order for the case to proceed." *Id. at 134 n.6*. "If a plaintiff's allegations, taken as true, are insufficient to establish proximate causation, then the complaint must be dismissed." Id.

MiMedx has failed to allege adequately a violation of the Lanham Act. MiMedx alleges that The Capitol Forum made false or misleading statements, but it does not connect these statements to a competitive injury related to MiMedx's commercial interests. For example, MiMedx does not allege that customers withheld trade because of the allegedly false and misleading communications or that MiMedx suffered any loss of revenue. In fact, MiMedx does not even allege that these allegedly false and misleading statements reached its customers. Thus, MiMedx has failed to state a claim for false advertising under the Lanham Act. MiMedx's claim for

─────────

decide whether such a claim would be cognizable under Georgia or District of Columbia law.

violation of the Lanham Act accordingly will be dismissed.

## CONCLUSION

[*26] For the reasons explained above, defendants' motion to dismiss will be denied as to Mimedx's libel, slander, and defamation claims. Mimedx's remaining claims for false light invasion of privacy, tortious interference with business relations, and for violation of the Lanham Act will be dismissed for failure to state a claim upon which relief may be granted. A separate Order consistent with this Memorandum Opinion has been issued on this date.

/s/ JOHN D. BATES

United States District Judge

Dated: September 28, 2018

## ORDER

Upon consideration of [18] defendants' motion to dismiss and the entire record herein, and for the reasons explained in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the motion to dismiss is **GRANTED IN PART AND DENIED IN PART**; it is further

**ORDERED** that the motion to dismiss will be **DENIED** as to plaintiff's claims for libel (Count 1), slander (Count 2), and defamation (Count 3); it is further

**ORDERED** that the motion to dismiss will be **GRANTED** as to plaintiff's claims for false light invasion of privacy (Count 4), tortious interference with business relations (Count 5), and violation of the Lanham Act (Count 6); and it is further

**ORDERED** that, pursuant to *Federal Rule of Civil Procedure 12(b)*, plaintiff's [*27] claims for false light invasion of privacy (Count 4), tortious interference with business relations (Count 5), and violation of the Lanham Act (Count 6) are **DISMISSED** for failure to state a claim upon which relief can be granted.

**SO ORDERED.**

/s/ JOHN D. BATES

United States District Judge

Dated: September 28, 2018

MADELYN WHITE