UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MIKHAIL FRIDMAN, PETR AVEN, and GERMAN KHAN, <br><br> Plaintiffs, <br><br> v. <br><br> BEAN LLC (a/k/a FUSION GPS) and GLENN SIMPSON, <br><br> Defendants. | Civil Case No. 17-2041 (RJL) |

FILED
JAN 15 2019
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## MEMORANDUM OPINION
(January 14, 2019) [Dkt. ## 19, 20]

This is a defamation action for monetary damages brought by three Russian businessmen—Mikhail Fridman, Petr Aven, and German Khan ("plaintiffs")—against political opposition research firm Fusion GPS and its principal Glenn Simpson ("defendants"). Pending before me are defendants' motions to dismiss under the D.C. Anti-Strategic Lawsuits Against Public Participation ("Anti-SLAPP") Act of 2010, D.C. Code §§ 16–5501–5505, and Federal Rule of Civil Procedure 12(b)(6). [Dkt. ## 19, 20]. On September 26, 2018, the parties presented oral argument on these motions, and on November 7, 2018, the parties submitted supplemental briefing. [Dkt. ## 43, 44]. Upon consideration of the pleadings and the relevant law, and for the reasons set forth below, defendants' motions to dismiss are **DENIED**.

1

## BACKGROUND

Plaintiffs claim that defendants falsely accused them and their business consortium, Alfa, of engaging in criminal and other misconduct in conjunction with the Russian government and its president, Vladimir Putin. *See generally* Am. Compl. [Dkt. # 17]. Plaintiffs allege that defendants are liable for defamatory statements contained in one of the seventeen written Company Intelligence Reports 2016 ("CIRs") that collectively comprise what is now known publicly as the "Trump Dossier" or simply the "Dossier." *Id.* at ¶¶ 1–2. According to the Amended Complaint, defendants were hired first by the Washington Free Beacon and later by a law firm representing the Democratic National Committee and the Hillary Clinton presidential campaign to conduct political opposition research against then-candidate Donald Trump. *Id.* at ¶ 15. To perform this research, defendants engaged former British intelligence officer turned private investigator Christopher Steele and his company Orbis Business Intelligence Limited. *Id.* at ¶ 3. Steele allegedly used his sources in Russia to create the CIRs and compile the Dossier. *Id.*

At issue in this case is CIR 112. CIR 112 is titled "RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION," which, according to plaintiffs, implies that they, through Alfa, "cooperated in the alleged Kremlin-orchestrated campaign to interfere in the 2016 U.S. presidential election." *Id.* at ¶ 19 (alleging that nearly all of the CIRs bear headings related to alleged Russian interference in the 2016 United States presidential election and/or ties between the Russian government and the 2016 campaign of now-President Donald Trump). CIR 112, which defendants attached to their motion to dismiss, describes plaintiffs' and Alfa's purported relationship with Putin,

2

including (1) "[s]ignificant" political favors done by plaintiffs for Putin in exchange for business and legal favors done by Putin for Alfa; (2) an "illicit cash" delivery by an "Alpha executive" to Putin while Putin was the Deputy Mayor of St. Petersburg; (3) "informal advice" given by two of plaintiffs to Putin regarding Russian foreign policy toward the United States; and (4) compromising information held by Alfa about Putin as a source of leverage. *See* [Dkt. # 20-2]. Plaintiffs claim that the foregoing statements are false and defamatory because they accuse plaintiffs and their business of "maintain[ing] a highly inappropriate, and even criminal, relationship with Putin" and, by implication, involvement in the Russian government's campaign to interfere with the 2016 United States presidential election. Am. Compl. ¶ 23.

The Amended Complaint asserts that defendants knew that the CIRs contained "unverified" and potentially inaccurate information gathered from sources and "subsources" unknown to them. *Id.* at ¶¶ 3–4, 13, 16, 18. In 2016, defendants allegedly arranged for Steele to brief select members of the media about the contents of the then-incomplete Dossier, including CIR 112, to "generate interest in the Dossier and secure eventual public dissemination of its content." *Id.* at ¶¶ 6, 18. These briefings were followed soon after by media articles describing the Dossier's contents. *Id.* In addition, defendants allegedly published the Dossier and CIR 112 to multiple other third parties. *Id.* at ¶ 18. Ultimately, on January 10, 2017, media organization BuzzFeed, Inc. published the entire Dossier online, including CIR 112. *Id.* at ¶ 8.

## ANALYSIS

### I. D.C. Anti-SLAPP Act

The D.C. Anti-SLAPP Act imposes a heightened pleading standard where a defendant makes "a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest." D.C. Code § 16-5502(b). Upon such a showing, a plaintiff can survive dismissal only by "demonstrat[ing] that the claim is likely to succeed on the merits." *Id.* Defendants contend that they have made the required threshold showing, that plaintiffs cannot show a likelihood of success, and that, therefore, D.C.'s Anti-SLAPP law forecloses plaintiffs' defamation action. *See* Mem. in Supp. of Defs.' Special Mot. to Dismiss Under the D.C. Anti-SLAPP Act [Dkt. # 19-1]. I disagree. How so?

As a general matter, federal courts sitting in diversity, as I am here, are called on to apply local substantive law and federal procedural rules. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Where local substantive law and a validly promulgated federal rule address the same question but differ as to the answer, the federal rule controls. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398–99 (2010). Applying this framework, then-Judge Kavanaugh wrote for our Circuit in *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328 (D.C. Cir. 2015) that a federal court sitting in diversity must apply Federal Rules of Civil Procedure 12 and 56 rather than D.C.'s Anti-SLAPP law, as the former are valid and "answer the same question" differently than the latter. *Id.* at 1334–37.

Defendants respond that the D.C. Court of Appeals later rejected *Abbas* in *Competitive Enterprise Institute v. Mann*, 150 A.3d 1213 (D.C. 2016). *See Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 907 (D.C. Cir. 2006) (federal court's "duty" in resolving question of D.C. substantive law "is to achieve the same outcome" that the D.C. Court of Appeals would reach). Were that true, *Mann* would control here so long as it "clearly and unmistakably" resolves the disputed question. *See Easaw v. Newport*, 253 F.Supp.3d 22, 35 (D.D.C. 2017). Unfortunately for defendants, however, three of my colleagues on this Court recently have held that *Mann* does *not* sufficiently resolve this issue and that, therefore, *Abbas* remains the controlling law in our Circuit. *See Cockrum v. Donald J. Trump for President, Inc.*, 319 F.Supp.3d 158, 165 n.2 (D.D.C. 2018) (Huvelle, J.) ("The Court continues to adhere to its view that controlling precedent precludes the application of D.C.'s Anti–SLAPP Act in federal court."); *Fairbanks v. Roller*, 314 F.Supp.3d 85, 94–95 (D.D.C. 2018) (McFadden, J.); *Libre By Nexus v. Buzzfeed, Inc.*, 311 F.Supp.3d 149, 160–61 (D.D.C. 2018) (Mehta, J.). Indeed, for this very reason defense counsel candidly admitted at oral argument that defendants are "swimming uphill on the application of the Anti-SLAPP Act" in this case. Mot. to Dismiss Hr'g Tr. 22 (Sept. 26, 2018) [Dkt. # 41]. Given the sound reasoning employed in the foregoing decisions, the hill is steep, and the current is strong. I decline to ease either.

Accordingly, defendants' motion to dismiss under D.C.'s Anti-SLAPP Act is **DENIED**.

## II. Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A facially plausible claim requires "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The Court assumes the truth of all well-pleaded factual allegations in the complaint and construes reasonable inferences from those allegations in the plaintiff's favor[.]" *Sissel v. U.S. Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014). In addition to the complaint's factual allegations, the Court may consider "documents attached to or incorporated in the complaint, matters of which courts may take judicial notice, and documents appended to a motion to dismiss whose authenticity is not disputed, if they are referred to in the complaint and integral to a claim." *Harris v. Amalgamated Transit Union Local 689*, 825 F.Supp.2d 82, 85 (D.D.C. 2011).

To state a defamation claim under D.C. tort law, a plaintiff must adequately plead: "(1) that he was the subject of a false and defamatory statement; (2) that the statement was published to a third party; (3) that publishing the statement was at least negligent; and (4) that the plaintiff suffered either actual or legal harm." *Farah v. Esquire Mag.*, 736 F.3d 528, 533–34 (D.C. Cir. 2013). Here, defendants contend that the Amended Complaint fails to adequately plead the first two of these elements and that, as to the third element, a heightened standard of fault applies and has not been sufficiently pleaded. I disagree, and will address these contentions in turn.

6

D.C. law defines a defamatory statement as "one 'that tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community.'" *Kendrick v. Fox Television*, 659 A.2d 814, 819 (D.C. 1995) (alterations omitted) (quoting *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1993)). To be actionable, the statement "must be more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous, or ridiculous." *Klayman v. Segal*, 783 A.2d 607, 613 (D.C. 2001) (internal quotation marks omitted). At this stage, however, my task is only to "determine as a threshold matter whether" the statements identified by plaintiffs are "capable of being construed as defamatory." *Ning Ye v. Holder*, 644 F.Supp.2d 112, 118 (D.D.C. 2009) (internal quotation marks omitted)). My inquiry, therefore, is limited; I may only find as a matter of law that the statements are not actionable if "the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense." *Weyrich v. The New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001) (quoting *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990)). I am also mindful of my obligations to evaluate the allegedly defamatory statements "within the context of the entire" publication and to consider the publication "as a whole, in the sense in which it would be understood by the readers to whom it was addressed." *Klayman*, 783 A.2d at 613–14 (internal quotation marks omitted); *Carpenter v. King*, 792 F.Supp.2d 29, 34 (D.D.C. 2011) (statement should not be "considered in isolation but rather must be examined in the context in which it appeared" (citing *Moldea v. New York Times Co.*, 22 F.3d 310, 313–15 (D.C. Cir. 1994)).

Taking CIR 112 as a whole, I find that a reasonable reader could interpret its contents as defamatory to plaintiffs such that this element of the tort is adequately pleaded. Defendants concede that at least the "illicit cash" statement "could be potentially defamatory." Mem. in Supp. of Defs.' 12(b)(6) Mot. to Dismiss ("12(b)(6) Mot. to Dismiss") 22 [Dkt. # 20-1]. That admission is warranted—plainly, an allegation that one has bribed a public official can be understood to make one appear "odious" or "infamous" in the community. *See Klayman*, 783 A.2d at 613. Moreover, this specific charge of corruption might also be reasonably understood as supplying context to the purported political and business "favors" back and forth between plaintiffs and Putin, suggesting a series of improper *quid pro quo* arrangements. *See Jankovic v. Int'l Crisis Group*, 494 F.3d 1080, 1091 (D.C. Cir. 2007) (while "[m]erely associating somebody with a foreign government would not ordinarily be defamatory," statements suggesting plaintiff "was actively in alliance" with and providing "mutual support" to Serbia's Milosevic regime were prima facie defamatory due to "intense antipathy" in America toward that government (quoting *Southern Air Transport, Inc. v. ABC, Inc.*, 877 F.2d 1010, 1015 (D.C. Cir. 1989))). And, given that CIR 112 is titled "Russia/US Presidential Election: Kremlin-Alpha Group Co-Operation," a reasonable reader could further construe the allegations of a corrupt relationship between plaintiffs and Putin's government against the backdrop of the latter's attempt to interfere in the 2016 presidential election, conduct that I infer from the Amended Complaint has generated substantial antipathy in this country. Thus, I find that plaintiffs have sufficiently pleaded that the allegedly false statements in CIR 112 are defamatory.

Plaintiffs also plausibly allege non-privileged publication to a third party. *See Farah*, 736 F.3d at 533–34. The Amended Complaint claims that defendants published CIR 112 to "clients, news media, journalists and others," the identities of whom are specifically alleged. Am. Compl. ¶¶ 6, 18, 31. To survive a motion to dismiss, a plaintiff "need only allege enough information to apprise [defendants] of the persons or category of persons to whom" CIR 112 was published. *Armenian Assembly of Am., Inc. v. Cafesjian*, 597 F.Supp.2d 128, 137 (D.D.C. 2009) (internal quotation marks omitted). Plaintiffs have done so here. Moreover, taking all reasonable inferences in plaintiffs' favor, I cannot conclude at this stage that the alleged publications were, indeed, privileged. *See* 12(b)(6) Mot. to Dismiss 34–39.

Finally, the Amended Complaint plausibly alleges that defendants acted with "at least negligence." *See Farah*, 736 F.3d at 533–34. According to plaintiffs, defendants published the CIRs despite knowing that Steele had obtained the information contained therein from sources unknown to defendants and that the information had *not* been verified. Am. Compl. ¶¶ 3–4, 13, 16, 18. Defendants apparently concede that these allegations amount to at least negligence. Nevertheless, defendants seek dismissal on the ground that plaintiffs are limited purpose public figures under the First Amendment and thus were required to plead the heightened actual malice standard of culpability. *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1995). To support application of this heightened standard here, defendants cite dozens of news articles concerning the relationship between so-called Russian "oligarchs," including plaintiffs, and the Russian state.

9

Resolution of this issue turns on the application of our Circuit's three-part test in *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980), which requires me to (1) "isolate" the alleged public controversy, determine whether it genuinely exists, and "define its contours"; (2) analyze plaintiffs' role in the controversy to determine whether they achieved a "special prominence"; and (3) decide whether the alleged defamation was "germane to [plaintiffs'] participation in the controversy." *Id.* at 1296–98. This is a case-specific inquiry, and I "must exercise care" in determining whether each of the *Waldbaum* factors is met on these facts. *Id.* at 1296.

With the foregoing framework in mind, I unfortunately cannot resolve the public figure issue at this stage on the limited record before me. Plaintiffs vigorously dispute the facts and circumstances relevant to *Waldbaum*'s application in this case. *See* Mem. in Opp'n to Defs.' Mot. to Dismiss for Failure to State a Claim 16–25 [Dkt. # 25]. Moreover, defendants have put plaintiffs' public figure status—and the attendant actual malice standard—in issue as an affirmative defense to defeat plaintiffs' defamation claim. A plaintiff, however, is "not required to negate an affirmative defense in [the] complaint," and resolution of an affirmative defense is proper on a motion to dismiss only if the facts required to establish the defense are apparent on the face of the complaint (or if the plaintiff concedes public figure status or the facts that establish it). *See, e.g., de Csepel v. Republic of Hungary*, 714 F.3d 591, 607–08 (D.C. Cir. 2013) (internal quotation marks omitted) ("as long as a plaintiff's potential rejoinder to the affirmative defense [is not] foreclosed by the allegations in the complaint, dismissal at the Rule 12(b)(6) stage is improper"); *see also Parisi v. Sinclair*, 845 F.Supp.2d 215, 218 n.2 (D.D.C. 2012) ("Plaintiffs concede for the

purpose of this motion [to dismiss] that plaintiffs are limited public figures and subject to the actual malice standard."). Thus, where a plaintiff has not alleged facts establishing public figure status and "may be able to produce a factual basis for a finding that [the plaintiff] should be considered a private figure with regard to the" allegedly defamatory statements, "there is no basis for imposing on [the plaintiff] an obligation to anticipate in [the] complaint the need to plead facts to defend against defendants' assertion that [the plaintiff] is a public figure." *MiMedx Grp., Inc. v. DBWPartners, LLC*, No. 17-1925, 2018 WL 4681005, at *6 (D.D.C. Sept. 28, 2018).

Here, defendants' public figure defense is predicated not on the Amended Complaint allegations but on news articles and other documents that defendants have cited in their motion to dismiss. As such, defendants' affirmative defense "requires consideration of facts outside of the complaint" and is "inappropriate to resolve on a motion to dismiss." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013). "These issues are properly addressed at summary judgment or trial." *de Csepel*, 714 F.3d at 608.[1]

---

[1] This conclusion is further bolstered by the fact that applying *Waldbaum* now would require me to take judicial notice of the substantive content of defendants' news articles. While some courts have taken judicial notice of news articles, in most such cases the courts have been careful to take notice only of the existence or nature of the articles. *See, e.g.*, *Sandza v. Barclays Bank PLC*, 151 F.Supp.3d 94, 113 (D.D.C. 2015) (court may take judicial notice of newspaper articles for the fact that they contain certain information but may not accept the articles for the truth of their assertions); *Hourani v. Psybersolutions, LLC*, 164 F.Supp.3d 128, 136 (D.D.C. 2016) ("the Court takes judicial notice of the fact that the news articles cited above concerned Plaintiff"); *In re Domestic Airline Travel Antitrust Litigation*, 221 F.Supp.3d 46, 71–72 (D.D.C. 2016) (refusing to take judicial notice of news articles prior to summary judgment because defendants provided them to present new factual allegations to counter the complaint allegations). I see no reason to stretch the limits of judicial notice here before the parties have had a chance to develop a record.

Defendants' motion to dismiss for failure to state a claim under Rule 12(b)(6) is therefore **DENIED**.

## CONCLUSION

For the reasons stated above, defendants' motions to dismiss under the D.C. Anti-SLAPP Act and Rule 12(b)(6) are **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued herewith.

*[signature]*
RICHARD J. LEON
United States District Judge