**EXHIBIT 41**

Claimants<br>
G Khan<br>
First<br>
No Exhibits<br><br>
Dated:   02.2020<br><br>
Claim No: QB-2018-006349

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
MEDIA AND COMMUNICATIONS LIST

**B E T W E E N**

(1) PETR AVEN<br>
(2) MIKHAIL FRIDMAN<br>
(3) GERMAN KHAN

**Claimants**

-and-

**ORBIS INTELLIGENCE LIMITED**

**Defendant**

---

### WITNESS STATEMENT OF GERMAN KHAN

---

I, **GERMAN KHAN** of 2nd floor, Devonshire House, One Mayfair Place, London, W1J 8AJ, **WILL SAY** as follows: -

1. I am the Third Claimant in this matter and I make this statement in support of my claim for breaches of the Data Protection Act 1998.

2. Unless otherwise stated, the facts and matters set out below are within my own knowledge or are derived from other sources or documents that I have seen and which in all cases I believe to be true.

PERSONAL AND PROFESSIONAL BACKGROUND

3. I was born and grew up in Kiev, Ukraine. I hold Russian and Israeli citizenship and I live in London and Moscow. As an international businessman, investor and philanthropist, I travel to various countries worldwide. I speak Russian and

Ukrainian fluently and basic English. I have given this statement in English, with the benefit of a Russian translation. I intend to rely on a Russian interpreter at trial.

4. In 1988 I graduated with a degree in engineering, specifically steel production, from the Moscow Institute of Steel and Alloys. This is the same university that Mr Fridman attended and where we met for the first time, although our friendship began later on.

5. While I have subsequently focused on a variety of businesses in different sectors, my major area of business and expertise has been Russian oil and gas.

6. I am an active supporter of Jewish initiatives in Russia and Europe and I donate to the European Jewish Fund, a non-profit organisation that promotes tolerance and reconciliation across the continent. I am also a founding member of the Russian Jewish Congress.

7. I currently hold various positions within the Alfa Group of companies ("**Alfa**"), including as a member of the Supervisory Board.

8. After a chance meeting with Mr Fridman in 1990, he invited me to head up Alfa Eco, a wholesale trade business which formed part of Alfa. I became President of Alfa Eco in 1996 and helped lead the development of the export business, focusing on oil.

9. In 1990, Alfa Bank was established, Alfa's flagship company, which is now Russia's largest private and non-state-owned bank.

10. Alfa is now one of the largest privately owned investment consortiums with operations in Russia. We have ownership interests in a variety of sectors. Our core area of success has been oil and gas investments in Russia, initially through the oil trading activities of Alfa Eco, which later became part of the Alfa-Access-Renova ("**AAR**") Consortium.

*TNK / TNK-BP*

11. Since 1998, I have been involved at the Board level of Siberian-based oil company OJSC Tyumenskaya Neftenaya Kompaniya, also known as Tyumen Oil Company ("**TNK**"). Following its purchase through a state-organised tender in 1997 by entities controlled by Alfa, together with Access Industries (owned by Mr Len Blavatnik) and Renova Group (owned by Mr Viktor Vekselberg), it became the AAR Consortium.

12. Alfa had to rebuild TNK following its purchase, because it was in such a bad state, and relied on its existing reputation in the oil sector to raise international financing for various projects. I played an active role managing operations in the company, with direct responsibility for building the business through identifying and implementing mergers and acquisitions of companies in the oil and gas sector. The TNK operation developed a reputation for transparency and good corporate governance, helping it become the first Russian company to receive significant financing from Western banks and the first Russian company to produce audited financial statements that met US accounting standards.

13. I was deputy chairman of TNK from 1998 until 2003. Subsequently and until 2013, I served as the Executive Director and a member of the Management Board of TNK-BP International Limited. TNK-BP was formed in 2003 as a result of the joint venture between UK oil company British Petroleum PLC ("**BP**") and AAR's oil and gas assets (TNK). BP and AAR each owned 50% of TNK-BP. The deal generated the largest ever foreign investment in Russia to date.

14. TNK-BP was sold to the Russian state-owned company Rosneft in March 2013. It required Russian cabinet approval, as the Russian government owns the majority shareholding of Rosneft.

15. Various comments were made in the press regarding President Putin's publicly reported views on where and how the proceeds of the sale of TNK-BP would be invested. I understand why President Putin would want the proceeds of sale of a Russian company to be re-invested in Russia. However, the shareholders who benefited from the proceeds of sale of TNK-BP in 2013 each made their own choices on where exactly to invest.

3

16. The Alfa shareholders have maintained investments in Russia as it is our core geographic area of expertise, but we have also worked hard to direct investments to new territories outside Russia. We have always acted independently in what we believe are in the best interests of the business, not the Russian state.

17. Following the sale of Alfa's stake in TNK-BP to Rosneft in 2013, I joined Mr Fridman, Mr Aven and others to establish the LetterOne group of companies, with the goal of increasing international investments outside of Russia. This necessitated building relationships in the West and for key individuals of LetterOne to spend time outside of Russia, myself included.

### RELATIONSHIP WITH PRESIDENT PUTIN

18. Both I and the businesses that I am involved in operate independently from political or government matters, other than what can be described as routine business activity. The oil and gas industry is heavily regulated and obviously requires contact with the government bodies that are local to where the assets are based. This is not something specific to Russia. No favours have been exchanged between me and the Russian government.

19. I have never met Mr Putin personally. I have only seen him at formal and coordinated events attended by many people, for example events organised by the Presidential Commission on the Strategic Development of the Fuel and Energy Complex and Environmental Safety, which President Putin formed in 2012. The Commission holds meetings typically about twice a year, where top managers from Russia's energy industry would get together to discuss industry and business strategy, and I attended on behalf of the TNK-BP joint venture. There would also be guests of scientists and governors and these were generally quite big meetings of about 60 or more people. The press would cover the events on a variety of different press channels.

20. I also see President Putin on the few occasions that I attend the meetings between him and Russia's most prominent businessmen, but I don't contribute to the discussions. The highly formal setting is similar to the Presidential Commission meetings.

21. I have never been close to President Putin and the inner circles of government. My involvement in business and the oil and gas industry has always been technical and did not require public appearances, which I do not enjoy at all. I did not attend the signing ceremony of the TNK-BP deal which took place on 26 June 2003 in London with Prime Minister Tony Blair and President Putin in attendance (as it coincided with President Putin's state visit). As usual, I was in the office in Russia dealing with business on the ground.

### MEMORANDUM CR112 ("MEMORANDUM")

22. I learned of the Memorandum when my friends and partners told me about it. It is of course very damaging to my reputation and the reputation of the companies which I represent and own a part of as a significant shareholder. I am named in the Memorandum, which refers to the "*Alpha* [sic] *Group of businesses led by oligarchs Mikhail FRIDMAN, Peter AVEN and German KHAN.*"

23. The title of the Memorandum, "*Russia/US Presidential Election: Kremlin-Alpha* [sic] *Group Co-operation*" suggests that Alfa was cooperating with the Russian government to interfere with the US Presidential election. This is false and absurd but it is obviously of great concern to me.

24. The Memorandum says that "*Top level Russian official confirms current closeness of Alpha Group – PUTIN relationship. Significant favours continue to be done in both directions and FRIDMAN and AVEN still giving informal advice to PUTIN especially on the US*". I understand this to be a suggestion that amongst other things, President Putin and I, as one of the leaders of Alfa, do "significant favours" for each other. This is completely untrue. I do not do favours for President Putin. As I have said, I have no personal relationship with him at all. He does not do favours for me, significant or otherwise.

25. The suggestion that I have some kind of close links with President Putin, as a result of which we do favours for each other, is extremely damaging. It suggests that I am directly and inappropriately involved with Russian government officials. This is completely untrue.

**IMPACT**

5

26. The publication of my personal data and the inaccurate allegations in the Memorandum have adversely affected me both personally and professionally. It is distressing to experience the effect that such a document can have on my work and professional reputation, on which I have spent so much time and effort.

27. An example is a deal that I spent a lot of time and energy negotiating in 2016 on behalf of LetterOne, relating to its acquisition of certain oil assets based in Texas, United States. We had got as far as agreeing on terms and paying a large deposit. However, the acquisition required the approval of the Committee on Foreign Investment in United States ("**CFIUS**"). Despite CFIUS having approved previous investments by LetterOne in the United States, in late March 2017, after the publication of the Memorandum, we learned that CFIUS had concerns about the acquisition. LetterOne ultimately had to withdraw its filing and in doing so forfeited a deposit of $45 million. I was personally extremely disappointed with this outcome.

28. The Memorandum has affected my ability to do business and form partnerships with people and companies particularly in the West, including Europe and the US. It is also damaging for my relationships with banks, who have very sensitive and substantial compliance processes to examine the ultimate beneficial owners of companies like me.

29. The aim of these proceedings is to set the record straight and reduce ongoing reputational damage being caused to me by the Memorandum.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true.

Signed.................................  Date: 11/02/2020