**EXHIBIT 66**



Petr Aven, Mikhail Fridman and German Khan v Orbis Business Intelligence Limited

Day 1

March 16, 2020

Opus 2 International - Official Court Reporters

Phone: +44 (0)20 3008 5900
Email: transcripts@opus2.com
Website: https://www.opus2.com

**Page 1**

Monday, 16 March 2020

(10.30 am)

Housekeeping

MR TOMLINSON: My Lord, in this matter I appear for the claimant along with Ms Sjøvoll. Mr Millar and Mr Hopkins appear for the defendant.

MR JUSTICE WARBY: Yes.

MR TOMLINSON: My Lord, this is the trial, as your Lordship knows, of the claim under the Data Protection Act in respect of the processing of inaccurate personal data of the claimants in a memorandum in which the defendant is the data controller.

My Lord, a matter has arisen in relation to one of the witnesses and it may be that before we proceed any further, Mr Millar should explain the position to your Lordship because it may be that some decision or direction is required.

MR JUSTICE WARBY: Yes.

MR MILLAR: My Lord, we hope not, but this is very much a fact of the day, I'm afraid.

One of Mr Steele's co-directors in Orbis is displaying all the symptoms of Covid-19 and has done since Friday. He has been self-isolating, has not been tested. He's tried to get a test through a private clinic but it's not an easy thing to achieve at the

**Page 2**

moment.

The two of them -- the two directors had a meeting with a third person on Wednesday of last week and the third person is also as of yesterday displaying classic symptoms of Covid-19 and self-isolating.

That is the bad news.

The good news is that Mr Steele feels fine and doesn't understand that he has to self-isolate because his contact with the co-director preceded that person becoming symptomatic by two days.

As a precaution, he's not here this morning, just so that I could raise this with the other side and with your Lordship and with the court, and he is trying to check out the medical advice as to whether he needs to self-isolate. At the moment he doesn't understand that he does. He's keen to come and be here as soon as possible and participate in the trial. But the government's website is not terribly helpful on the point of close contact shortly before the person becomes symptomatic and what your obligations are in that situation.

MR JUSTICE WARBY: No. My own understanding is that you don't have to self-isolate unless you have symptoms. That's the latest advice. That obviously may change, but he's voluntarily absent at the moment so there's not

**Page 3**

a problem at the moment.

MR MILLAR: No.

MR JUSTICE WARBY: Wednesday, four days ago, was his last contact with a person who is now showing symptoms?

MR MILLAR: Yes.

MR JUSTICE WARBY: Yes.

MR JUSTICE WARBY: Well, at the moment it seems to me that we can go ahead and obviously we'll have to get updates on what advice he receives.

MR MILLAR: Yes. I just wanted anybody who wanted to express any concern about it to have the opportunity to do so.

MR JUSTICE WARBY: Yes. Mr Tomlinson?

MR TOMLINSON: My Lord, there's two issues that may arise. The first is, if it turns out that Mr Steele does start manifesting symptoms tomorrow, for example, then we're in a situation where we will have started on the evidence and we may be in the unsatisfactory situation of not having the defendant's only witness available and having to decide how to proceed.

One assumes that unless his symptoms were very serious, he would still be in a position to give evidence by videolink.

MR JUSTICE WARBY: Well, that's what I was thinking.

MR TOMLINSON: Yes. I was wondering whether it may, just as

**Page 4**

a precaution, be sensible to make enquiries as to whether that could be put in place. I see we have a screen in this court. Whether this court is -- one would have thought this court, of all places, would be set up for it, but perhaps not, but it would be most unfortunate if we went part-heard, as it were, with the defendant's key witness not able to give evidence and my witnesses having started their evidence and perhaps not finished.

MR JUSTICE WARBY: Yes. Well, I'll make enquiries about the availability of videolink. Obviously there will be a place where we can do that. It may be a case of moving some things around. I don't know whether this is set up, but all the Court of Appeal courts along -- the Criminal Court of Appeal are set up for that.

MR TOMLINSON: Yes, they are now set up.

MR JUSTICE WARBY: And it probably would be possible to work around the other work in those courts.

MR TOMLINSON: My Lord, we have made the enquiries like Mr Millar and it is our understanding that the guidance is: doesn't require self-isolation due to the mere fact of exposure. So that's the position that we are apparently in at the moment, but obviously that may change.

MR JUSTICE WARBY: Yes. Have you discussed and agreed,

Page 5

1   subject to all of this, a trial timetable and other
2   things that may develop? One realises that there could
3   be other problems of the same nature with other people,
4   but --
5   MR TOMLINSON: My Lord, there is an agreed trial timetable
6       of a rather rudimentary nature in the bundle. It's in
7       {A/4/1}.
8   MR JUSTICE WARBY: Ah.
9   MR TOMLINSON: I will wait for it to come up. (Pause)
10  MR JUSTICE WARBY: I have it now.
11  MR TOMLINSON: I have it, but it doesn't come up on the big
12      screen at the moment.
13  MR JUSTICE WARBY: Yes.
14  MR TOMLINSON: My Lord, as I say, that's a rather
15      rudimentary trial timetable.
16  MR JUSTICE WARBY: Yes. So if that's adhered to, then we
17      have Mr Steele on Wednesday.
18  MR TOMLINSON: Yes. My Lord, what I was going to say was
19      your Lordship may remember we discussed at the PTR and
20      your Lordship expressed the view, and I'm sure that's
21      entirely right, that we didn't need a full day for
22      opening. I discussed this with Mr Millar and the
23      intention is that Mr Fridman will begin his evidence
24      this afternoon, so the openings will be relatively
25      short.

Page 6

1   MR JUSTICE WARBY: Yes.
2   MR TOMLINSON: Confined to this morning. There's another
3       issue which your Lordship may wish to deal with at the
4       end of the openings, which I'll come to in due course,
5       but the intention is that we get to Mr Fridman at
6       lunchtime today and then there's effectively a day and
7       a half for my witnesses and then Mr Steele to begin and
8       occupy the whole of Wednesday.
9   MR JUSTICE WARBY: Good. Right.
10  MR TOMLINSON: My Lord, there's another matter which perhaps
11      my friend would like to deal with now, concerning --
12      just so your Lordship has the picture -- a supplemental
13      witness statement.
14  MR MILLAR: My Lord, in preparing to give his evidence over
15      the weekend, Mr Steele realised that the chronology that
16      one derives from his current witness statement, relating
17      to the instructions he received to do the research for
18      Memo 112 was incorrect. We served a short supplemental
19      witness statement yesterday, correcting the error. It's
20      not in the bundle, obviously it is late and we would
21      need permission to put it in the bundle, but it is very
22      short. It corrects some dates --
23  MR JUSTICE WARBY: Right. Well --
24  MR MILLAR: -- in relation to the two --
25  MR JUSTICE WARBY: Unless there's opposition, I will always

Page 7

1   allow that kind of witness statement because it is
2   exactly the sort of thing that if you put him in the
3   witness box and ask him to confirm his witness
4   statement, he's going to have to say, "No, I can't,
5   because there are some inaccuracies", and it's much
6   better to have notice of that in advance.
7   MR TOMLINSON: My Lord, absolutely, and we don't oppose it.
8   MR JUSTICE WARBY: Right. Well, I am going to get a bit of
9       paper. It will be uploaded at some stage, I imagine?
10  MR TOMLINSON: My Lord, I'm told it is in the bundle but not
11      as a witness statement. It's at {E/177/1}; in other
12      words, it's attached to a letter.
13  MR MILLAR: So Mr Steele's witness statement is at {C/5/1}
14      so if one was inserting what I've just handed up in the
15      hard copy bundles, I suppose it would go at the back of
16      C/5.
17  MR JUSTICE WARBY: Yes. It would be convenient if it can be
18      put there, even at the cost of duplication.
19  MR MILLAR: Yes.
20  MR JUSTICE WARBY: Because --
21  MR TOMLINSON: My Lord, I'm sure it will be sensible to have
22      it in the right and proper place.
23  MR JUSTICE WARBY: Right. Well, I won't read that just now,
24      but, thank you.
25  MR TOMLINSON: My Lord, I'm going to mention the reason

Page 8

1   I thought it was appropriate, so I'll say something
2   about it in opening.
3   MR JUSTICE WARBY: Yes.
4       Just in terms of numbers, this is the third?
5   MR TOMLINSON: My Lord, he --
6   MR JUSTICE WARBY: Because there was the one that followed
7       the pre-trial review.
8   MR TOMLINSON: Yes.
9   MR JUSTICE WARBY: Then the revised one, which is still the
10      first, I think.
11  MR TOMLINSON: Yes, exactly. It is sort of one and a half.
12  MR JUSTICE WARBY: Yes.
13  MR TOMLINSON: So this is, perhaps, two.
14  MR JUSTICE WARBY: Yes.
15              Opening submissions by MR TOMLINSON
16  MR TOMLINSON: So, my Lord, as I indicated, the case
17      concerns the processing of personal data relating to the
18      claimants in a memorandum prepared by the defendant.
19      This memorandum, as the court knows, forms part of what
20      came to be called in the media the Steele dossier, or
21      the Trump dossier, a document which I think can properly
22      be described as notorious and received worldwide
23      publicity because -- or a set of documents that received
24      worldwide publicity because it made sensational
25      allegations against the individual who, by that time,

9

was the President of the United States. It was probably the most high profile political story in the United States since Watergate and, because of this memorandum, these claimants were implicated in allegations concerning Russian-related misconduct in the 2016 presidential election.

The true position is that the claimants had nothing whatever to do with any of this, nothing whatever to do with any form of interference in the US presidential election, but because of this memorandum, they have been drawn into the whole story with what the court will appreciate are serious negative consequences.

The purpose of this action is to clear their names and correct the public record, so as to establish that this personal data is inaccurate and that the defendants should not have been processing it.

My Lord, I know your Lordship has had a very lengthy skeleton from me and a briefer one from Mr Millar. I am not going to go into the full detail of the background, but it is perhaps important, for the sake of public understanding of the case and so your Lordship knows how I stand on some of the issues that have been outlined, for me to give some brief description of the position. There's also, as I mentioned a few moments ago, a case management issue which has arisen over the weekend which

10

I'll address at the end, if that's convenient.

My Lord, the defendant describes itself as a corporate intelligence agency and its selling point is that the people who run it, the two founders, were, more than ten years ago, British intelligence officers; but when it comes down to it, it is simply a private business. They are private investigators. They are consultants whose business is to provide advice to other businesses, agencies, perhaps sometimes to governments. They certainly have no official role of any kind. They simply, like many other courts, are very familiar with this kind of private investigation agency. They carry out due diligence. They carry out investigations. They provide advice. They earn their money in that way.

My Lord, it is obviously a perfectly lawful occupation, but it's not one -- sometimes there's something of an attempt by Mr Steele to dress himself up as some kind of -- he describes himself in his witness statement, surprisingly, as a national security professional. My Lord, he's nothing of the kind. What he is is a businessman and a private investigator.

The claimants are very well-known international businessmen from Russia. Their company, Alfa Group, is closely associated with them personally. They're always named in connection with it.

11

My Lord, it is the largest private business in Russia. Like any businessman in any country, they have to have a good relationship with the government of their country and indeed of other countries, but they're not creatures of the Kremlin. They maintain their independence from the government in much the same way as a large business in this country or the United States would do.

One of the claimants, Mr Aven, is an internationally renowned economist who for a time was a government minister under President Yeltsin in the 1990s and indeed was very closely involved in the liberalisation of the Russian economy, of the change from communism to capitalism, as it turned out. And President Putin values his views on economics because of his standing as an economist, and he meets with President Putin from time to time and they discuss banking and economics, but he's not a close confidante of the president.

The two other claimants have no personal relationship with President Putin at all. Their relationship really extents to this: that they attend meetings of the Russian equivalent of the CBI with -- formal meetings where the president and leading industrialists and bankers and so on are present, but they're not confidantes or advisors of the government in

12

any way.

My Lord, that's important because what this memorandum is about is somehow suggesting that they have a much closer and very corrupt relationship with President Putin.

So, my Lord, the history of the memorandum is that in May 2016 the defendant -- that's Orbis -- was subcontracted to do some research by another company which describes itself as being in the business of strategic intelligence, called Fusion GPS. This is a company run by two former journalists. They in turn had been instructed by a Washington DC law firm, called Perkins Coie -- I think that's how you pronounce it -- on behalf of Hillary Clinton's presidential campaign. That campaign wanted information about Russian efforts to influence the 2016 presidential campaign and any links that might exist between Russia and the then Republican candidate Donald Trump.

My Lord, we don't say for a moment that that's an improper unlawful purpose. Permissible campaigns obviously want to find information about their opponents. But that's not a purpose -- as the defendant now surprisingly claims, it doesn't have anything to do with national security or the giving of legal advice.

There's actually no evidence at all before the court