**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MIKHAIL FRIDMAN, PETR AVEN, and GERMAN KHAN,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 17-2041-RJL** |
| **BEAN LLC a/k/a FUSION GPS, and GLENN SIMPSON,** | |
| **Defendants.** | |

**MOTION BY AO ALFA-BANK, ABH HOLDINGS S.A., LETTERONE HOLDINGS S.A., AND LETTERONE INVESTMENT HOLDINGS S.A. FOR LEAVE TO INTERVENE FOR THE LIMITED PURPOSE OF LITIGATING  DEFENDANTS' MOTION TO COMPEL PLAINTIFFS'  PRODUCTION OF THEIR DOCUMENTS**

AO Alfa-Bank ("Alfa Bank"), ABH Holdings S.A. ("ABHH"), LetterOne Holdings S.A., and LetterOne Investment Holdings S.A., (together with LetterOne Holdings S.A. "LetterOne," and collectively the "Companies"), by and through undersigned counsel, move for leave to intervene under Rules 24(a)(2) and 24(b) of the Federal Rules of Civil Procedure for the limited purpose of litigating Defendants Bean LLC's and Glenn Simpson's Motion to Compel Plaintiffs' Production of Their Documents ("Defendants' Motion").  The Companies seek only limited intervention to litigate the specific matter of Defendants' Motion.  As discussed in detail below, the D.C. Circuit has made clear that in such limited circumstances, applicants seeking limited intervention do not subject themselves to the general jurisdiction of the court.  Accordingly, by filing this motion, the Companies are not subject to the Court's jurisdiction, and expressly object to the Court's exercise of jurisdiction over them.  Respectfully, the Companies file this motion on the condition that the Companies shall be deemed and treated as a non-party to this action, and the

Companies shall be immune from all forms of party discovery, service of process, claims of liability, and all other obligations of a party.

Defendants seek to compel Plaintiffs Mikhail Fridman, Petr Aven, and German Khan (collectively, "Plaintiffs") to produce documents that are in the possession, custody, or control of the Companies. The materials that Defendants seek contain privileged, confidential, and sensitive commercial information of the Companies that the Companies have a substantial interest in protecting. The Companies' interests would be impaired by a judgment in Defendants' favor, and the Companies are not adequately represented by the positions that Plaintiffs may advance in this action. For these reasons, and for the reasons set forth in the attached memorandum of points and authorities, the Companies respectfully request that this Court grant their motion to intervene.

Pursuant to Local Rule 7(m), counsel for the Companies has conferred with counsel for Plaintiffs and Defendants. Plaintiffs' counsel does not oppose the motion at this time. Defendants' counsel stated its intention to oppose this motion. In accordance with Local Rule 7(c), a proposed order is attached to this motion. Also attached to this motion are declarations from foreign counsel in Luxembourg and Russia as well as the Companies' brief in opposition to Defendants' Motion.

Dated: July 2, 2020

Respectfully submitted,

/s/ Margaret E. Krawiec
Margaret E. Krawiec (DC Bar No. 490066)
Michael A. McIntosh (DC Bar No. 1012439)
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
T: (202) 371-7303
F: (202) 661-9123
margaret.krawiec@skadden.com
michael.mcintosh@skadden,com

*Attorneys for LetterOne, Alfa Bank, and ABHH*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Motion for Leave to Intervene for the Limited Purpose of Litigating Defendants' Motion to Compel Plaintiffs' Production of Documents was filed electronically by the Clerk of Court on July 2, 2020, using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Margaret E. Krawiec  
Margaret E. Krawiec

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **MIKHAIL FRIDMAN, PETR AVEN, AND GERMAN KHAN,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 17-2041-RJL** |
| **BEAN LLC a/k/a FUSION GPS, and GLENN SIMPSON,** | |
| **Defendants.** | |

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION BY AO ALFA-BANK, ABH HOLDINGS S.A., LETTERONE HOLDINGS S.A., AND LETTERONE INVESTMENT HOLDINGS S.A. FOR LEAVE TO INTERVENE FOR THE LIMITED PURPOSE OF RESPONDING TO DEFENDANTS' MOTION TO COMPEL PLAINTIFFS' PRODUCTION OF DOCUMENTS**</u>

## **INTRODUCTION**

Plaintiffs Mikhail Fridman, Petr Aven, and German Khan (collectively, the "Plaintiffs") filed a lawsuit in their individual capacities seeking damages for defamation against Defendants Bean Bean LLC and Glenn Simpson ("Defendants") on October 3, 2017.  The defamatory statements were found in an "intelligence" report titled Company Intelligence Report 2016/112 ("CIR 112") that Defendants commissioned as part of an opposition research engagement.  Defendants subsequently distributed CIR 112 and similar reports, which BuzzFeed published as the so-called Trump Dossier.

During the discovery process, Defendants have repeatedly requested that Plaintiffs produce documents from AO Alfa-Bank ("Alfa Bank"), ABH Holdings S.A. ("ABHH"), LetterOne Holdings S.A., and LetterOne Investment Holdings S.A. (together with LetterOne Holdings S.A. "LetterOne," and collectively the "Companies").  Plaintiffs sought permission from the Companies to produce the requested documents, but the Companies denied their requests on the ground that the documents are within the exclusive possession, custody, or control of the Companies.  At the same time, however, the Companies reached out to Defendants, offering to negotiate in good faith, to produce documents in the absence of a subpoena, and to produce documents without forcing Defendants to proceed under the Hague Evidence Convention or the letters rogatory process.  The Companies also offered to produce documents central to the truth or falsity of the defamatory statements at issue.  Specifically, the Companies' counsel communicated the following to Defendants' counsel:  "As a further sign of good faith, we note that we are prepared to search for and produce documents from the plaintiffs' Alfa and LetterOne email accounts that relate to the truth or falsity of the allegedly defamatory allegations in CIR 112 and are dated within a reasonable time period."  Dkt. 78-33, at 2 (May 8, 2020 email).  Instead of engaging with the Companies'

counsel and seeking to resolve these issues without burdening the Court with motions practice, Defendants refused to engage with the Companies and filed a motion to compel Plaintiffs to produce the Companies' documents ("Defendants' Motion").

Despite best efforts to avoid burdening the Court with this issue and offering to provide Defendants with Company documents relevant to this litigation in the absence of a subpoena and not requiring adherence to the Hague Evidence Convention or the letters rogatory process, the Companies now seek to intervene in this matter for the limited purpose of participating in the briefing and argument concerning Defendants' Motion.  Respectfully, the Court should grant the Companies' motion for limited intervention given the significant Company interests implicated by Defendants' motion to compel.

*First*, the Companies' motion is timely.  The timeliness of the motion is measured from the point where the Companies' interest may have diverged from Plaintiffs' interest.  This occurred when Defendants filed their motion to compel Plaintiffs to produce documents in the possession, custody, or control of the Companies.  Prior to this point, the Companies had intended to, and attempted to, negotiate in good faith with Defendants to produce documents without the need to involve the Court.  Indeed, the Companies proactively attempted to resolve this issue but such good faith efforts were repeatedly rebuffed by the Defendants.  After Defendants flatly refused to resolve this dispute outside of court, the Companies moved quickly to protect their interests by filing this motion.

*Second*, the Companies have a clear interest related to the subject of this action. Defendants are seeking to compel Plaintiffs to produce documents that are the property of the Companies.  These documents contain privileged, confidential, and sensitive commercial information that the Companies have a right to protect.

3

**Third**, Defendants' Motion threatens to impair the Companies' interest in protecting their documents.  If Defendants' Motion were granted, Plaintiffs would be ordered by this Court to produce the Companies' documents  This disclosure would cause irreparable harm to the Companies.  The documents, which contain privileged, confidential, or sensitive commercial information, would be delivered to Defendants without the assurances that the Companies' privileges and any objections would be preserved.  Such documents also would be susceptible to further public dissemination either in this litigation or through other means.[1]

**Fourth**, the Companies' interests are not adequately represented by the existing parties. While each Plaintiff owns an indirect minority interest in the Companies, the Companies are large, complicated business entities located abroad, with a multitude of interests—including, most notably, the protection of Company privileges—that may diverge from those of any individual plaintiff.  Further, Defendants' Motion raises the possibility that Plaintiffs may be ordered by this Court to produce the Companies' documents, which would be a clear divergence of interests, and obviously adverse to the interests of the Companies.

---

[1]   Defendants have extensive ties to various media platforms and distributing materials to the media for the purpose of having embarrassing stories published about certain targets is part of Defendants' normal business practices.  *See* Glenn Simpson and Peter Fritsch, *Crime in Progress*, 31 (2019) (describing the objectives of their research as "to expose an opponent's vulnerabilities, provide source material for the media, and feed attack ads").  Defendants' targeted dissemination of information also occurs in the shadows, as their firm makes "many of its findings available to interested reporters as background material that could be confirmed with their own reporting."  *Id.*  Indeed, even Defendants' motion to dismiss cites to media articles for, what appears to be, the sole purpose of engaging in unprovoked mudslinging aimed at Plaintiffs, the Companies, and even Company counsel on issues wholly irrelevant to the merits of their motion.  If produced, privileged, confidential, or sensitive commercial information from the Companies' documents could therefore be disseminated to Defendants' many media contacts and reported on without any indication that the source material was initially provided by Defendants.

***Finally***, the grant of the Companies' motion will not delay this matter.  The Companies are submitting this motion at this point in the process so that all relevant parties can be heard as the Court considers Defendants' Motion.  The Companies are also best suited to address certain questions of law surrounding how the Companies are constructed and the implications under the corresponding foreign law as to control as well as to provide factual responses to clarify the interactions between the Companies' counsel and Defendants' counsel.  Resolving this issue with all interested parties involved will expedite this matter upon the Court's decision, rather than require possible further litigation on this issue at a later date.

For all these reasons, and as further explained below, the Court should grant the Companies' motion to intervene for the limited purpose of litigating Defendants' Motion.[2]

## BACKGROUND

### A.      The Companies

AO Alfa-Bank ("Alfa Bank") is a joint stock company formed under Russian law with its headquarters in Russia.  Alfa Bank is part of a larger group of entities informally referred to as the Alfa Group ("Alfa").  ABH Holdings S.A. ("ABHH"), a Luxembourg company formed under Luxembourg law, serves as Alfa Bank's indirect parent company.

LetterOne is comprised of LetterOne Investment Holdings S.A. and LetterOne Holdings S.A.  The LetterOne entities are formed under Luxembourg law, with headquarters in Luxembourg and offices in England and Gibraltar.

---

[2]    To ensure that the Companies' intervention does not delay resolution of this matter, the Companies have attached their substantive brief in opposition to Defendants' Motion at Exhibit 1.

### B.      Plaintiffs' Suit for Defamation

In 2016, Defendants published a series of reports that it compiled as opposition research on then-candidate Donald Trump.  The reports were commissioned by Trump's political opponents.  Among the reports was CIR 112, which contained a number of statements about Plaintiffs.  These reports were compiled by Orbis Intelligence Ltd. ("Orbis"), a British opposition research firm that Defendant Fusion commissioned.  The reports were distributed by Defendants and were published both before and after the 2016 Presidential election.  The reports came to be known as the "Trump Dossier" or "Dossier" and were widely reported on in the U.S. media.

Plaintiffs filed a lawsuit in their individual capacities in this Court against Defendants on October 3, 2017, seeking damages for the defamatory statements found in CIR 112.  Plaintiffs then filed an amended complaint on December 12, 2017.  The Companies are not a party to the lawsuit.

### C.      Current Dispute

During the discovery process, Defendants repeatedly have requested that Plaintiffs produce Company documents (the "Documents").  Plaintiffs expressly requested the Documents from the Companies for use in this litigation, but the Companies expressly refused.  The Companies' clear position is that the Documents are within their exclusive possession, custody, or control.  After being advised of the same by the Companies, Plaintiffs have maintained that the Documents are within the possession, custody, or control of the Companies and that Plaintiffs therefore have no legal right to produce them. [3]  *See* Dkt. 78-9 (Apr. 2, 2020 email).  The Companies have a strong interest in maintaining their control over the Documents, including any possible production of privileged, confidential, or sensitive commercial information.  The Documents contain attorney-

---

[3]     For a more detailed analysis for why the documents are in the possession, custody, or control of the Companies and not Plaintiffs, see the Companies' brief in opposition to Defendants' Motion at Exhibit 1.

client communications and other documents protected by the work product doctrine related to this litigation as well as other matters over which the Companies have a right to assert applicable privilege. The Documents also contain confidential business information, such as communications regarding potential and actual transactions. The Documents also contain data protected under foreign data protection laws, such as the personal identifying information of employees or others, that the Companies have a legal obligation to protect and that the Companies would face liability for if improperly disclosed. In addition, the Documents also contain other sensitive commercial information that the Companies have an interest in protecting. In order to protect their interests while not prejudicing Defendants in this litigation, the Companies have attempted to work with Defendants to produce the Documents in an efficient process that would still protect the Companies' interests.

The Companies reached out to Defendants on multiple occasions, offering to work with them in good faith to collect and produce responsive documents. As a show of good faith and in recognition of Defendants' concerns about obtaining documents from foreign entities, the Companies offered to produce documents without a subpoena and without requiring Defendants to proceed under the Hague Evidence Convention or letters rogatory process. The Companies further advised that they were prepared to search for and produce documents from the Plaintiffs' Alfa Bank and LetterOne email accounts that relate to the truth or falsity of the allegedly defamatory allegations in CIR 112 and are dated within a reasonable time period. Defendants, however, refused to engage in conversation with counsel for the Companies on this issue. *See* Dkt. 78-33 (May 8, 2020 email). Instead, Defendants chose to prematurely burden this Court and file Defendants' Motion. Recognizing that their legally protected interests would be impaired if Defendants' Motion were successful, the Companies filed this motion for limited intervention to

participate in the briefing and argument regarding the question of whether Plaintiffs have possession, custody, or control of the Documents.

## ARGUMENT

I.    **The Companies are Entitled to Intervene as a Matter of Right**

A.    **The Companies' Motion Satisfies the Requirements of Fed. R. Civ. P. 24(a)(2)**

Federal Rule of Civil Procedure 24(a)(2) ("Rule 24(a)(2)") allows for intervention as a matter of right when the applicant "claims an interest relating to the property or transaction which is the subject of the action, and is so situated that the disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless the existing parties adequately represent that interest."  The D.C. Circuit has set forth four factors which a court must consider when determining if an applicant may intervene as a matter of right under Rule 24(a)(2): "(1) the application to intervene must be timely; (2) the applicant must demonstrate a legally protected interest in the action; (3) the action must threaten to impair that interest; and (4) no party to the action can be an adequate representative of the applicant's interests."  *Karsner v. Lothian*, 532 F.3d 876, 885 (D.C. Cir. 2008) (quoting *SEC v. Prudential Sec. Inc.*, 136 F.3d 153, 156 (D.C. Cir. 1998)).  Each factor is met here.[4]

---

[4]    Intervenors must also demonstrate Article III standing by establishing injury in fact, causation, and redressability.  *Waterkeeper Alliance, Inc. v. Wheeler*, 330 F.R.D. 1, 6 (D.D.C. 2018). However, "[i]n most instances . . . the standing inquiry will fold into the underlying inquiry under Rule 24(a); generally speaking, when a putative intervenor has a 'legally protected' interest under Rule 24(a), it will also meet the constitutional standing requirements."  *Id.* (quoting *Wildearth Guardians v. Salazar*, 272 F.R.D. 4, 13 n.5 (D.D.C. 2010)); *see also Roedar v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003) ("With respect to intervention as of right in the district court, the matter of standing may be purely academic . . . . [A]ny person who satisfies Rule 24(a) will also meet Article III's standing requirement.").  As explained below, the Companies have a "protected interest" under the requirements of Rule 24(a) and therefore also have standing.

### 1.    *The Companies' Motion is Timely*

The Companies' motion to intervene is timely.  In the D.C. Circuit, timeliness is "to be judged in consideration of all the circumstances."  *Roane v. Leonhart*, 741 F.3d 147, 151 (D.C. Cir. 2014) (quoting *Smoke v. Norton*, 252 F.3d 468, 471 (D.C. Cir. 2001)).    Timeliness is not determined by the length of time that has elapsed since the suit was filed but rather "the requirement of timeliness is aimed primarily at preventing potential intervenors from unduly disrupting litigation."  *Id.*  (stating "we do not require timeliness for its own sake").  The Companies' limited intervention in this matter will not unduly disrupt litigation—to the contrary, it will facilitate resolution of the current dispute—and it was brought when it became clear that the Companies' interests may diverge from Plaintiffs.

The Companies' limited intervention will not disrupt—let alone "unduly disrupt"—this litigation or "disadvantage the original parties."  *Id.* (quoting *NRDC v. Costle*, 561 F.2d 904, 908 (D.C. Cir. 1977)).  Courts in this Circuit have recognized that a motion to intervene is not unduly disruptive and parties are not disadvantaged when the motion will not disrupt the court's schedule in resolving a case on the merits and resolving the underlying substantive issue will be more efficient over the course of the litigation.  *See Amador Cty, Cal. v. U.S. Dep't of the Interior*, 772 F.3d 901, 905-06 (D.C. Cir. 2014) (motions for intervention are untimely when they would "delay resolution of the merits") (collecting cases); *Gov't Accountability Project v. FDA*, 181 F. Supp. 3d 94, 95 n.1 (D.D.C. 2015) (finding motion timely when intervenor's entry would not alter the summary judgment briefing schedule); *United States. v. Phillip Morris USA Inc.*, No. Civ. A. 99-2496 (GK), 2003 WL 25572283, at *2 (D.D.C. Dec. 5, 2003) (finding that intervention was appropriate when resolving the underlying substantive issue "may well, in the long run, prove more effective and productive").  Here, the Companies have attached their brief in opposition to Defendants' Motion so that, in the event this Court determines that the Companies' intervention is

proper, the parties can move forward with no delay.  This case is not currently poised for a decision on the merits; summary judgment briefing does not begin until June 2021.  Consent Order Modifying the Scheduling Order, *Fridman v. Bean*, No. 1:17-cv-02041-RJL (D.D.C. Jan. 9, 2020), Dkt. 74.  The Companies have also only asked this Court for a limited intervention to litigate the specific issue of whether the Documents are in the possession, custody, or control of Plaintiffs. The Companies do not seek to participate in the litigation outside of this discrete issue.  Further, similar to the intervention in *Phillip Morris*, the original parties would not only not be disadvantaged, but would likely *benefit* from the Companies' intervention as resolving the underlying substantive issue of whether Plaintiffs have possession, custody, or control of the Documents after hearing from all interested parties will likely "prove more effective and productive" in "the long run."  *Phillip Morris*, 2003 WL 25572283, at *2.

The Companies' motion is also timely because it was filed soon after the Companies' interests diverged from Plaintiffs.  *See Smoke*, 252 F.3d at 471 (finding intervention timely when potential intervenor waited until it was informed by the government, with whom it had a common interest, that it would not pursue an appeal); *United States v. Am. Tel. & Tel. Corp.*, 642 F.2d 1285, 1295 (D.C. Cir. 1980) (hereinafter "*AT&T*") (finding intervention timely when it was filed "soon after it became reasonable to expect inadequate representation" by the original parties).  Here the Companies filed a motion for intervention promptly after their interest in protecting the Documents could no longer adequately be represented by Plaintiffs.  Defendants' Motion raised the possibility that Plaintiffs could be compelled by this Court to produce the Documents.  *See Phillip Morris*, 2003 WL 25572283, at *2 (determining that intervenor's interests "sharply diverged" from party when the Court compelled production of its documents).  The Companies therefore promptly filed a motion for limited intervention to protect their interests, which was timely.

2.    *The Companies Have a Legally Protected Interest*

In determining whether a potential intervenor has a legally protected interest, the courts in this Circuit view the test "in large part as a 'practical guide,' with the aim of disposing of disputes with as many concerned parties as may be compatible with efficiency and due process." *Wildearth Guardians v. Salazar*, 272 F.R.D. 4, 12-13 (D.D.C. 2010).  Defendants seek to compel Plaintiffs to produce the Documents.  The Documents contain the Companies' privileged, confidential, and other sensitive commercial information.  The Companies have a legally protected interest in maintaining their privilege and preventing disclosure of any confidential or sensitive commercial information.

The Companies have a legally protected interest in protecting their privileged documents. *See AT&T*, 642 F.2d at 1291-93 (finding that intervenor had a legally protected interest in claiming work product over documents in discovery); *Phillip Morris*, 2003 WL 25572283, at *2 (recognizing that intervenor had a cognizable interest under Rule 24 in "protecting any privilege its documents may deserve").  As the D.C. Circuit noted in *AT&T*, "[w]ithout the right to intervene in discovery proceedings, a third party with a claim of privilege in otherwise discoverable materials could suffer 'the obvious injustice of having his claim erased or impaired by the court's adjudication without ever being heard.'"  *AT&T*, 642 F.2d at 1292.  Here, Defendants' Motion would remove the Companies from the discovery process for its own documents, which contain attorney-client privileged communications, attorney work product, and confidential business information.  Defendants' Motion would therefore put the Companies at risk of having their claims of privilege "erased or impaired" by the Court's adjudication.  *Id.*

Courts in this Circuit also recognize a legal interest in preventing disclosure of confidential or sensitive commercial information.  *See Gov't Accountability Project*, 181 F. Supp. 3d at 96 (noting that "preventing the disclosure of commercially-sensitive and confidential information is

a well-established interest sufficient to justify intervention under Rule 24(a)") (quoting *100Reporters LLC v. U.S. Dep't of Justice*, 307 F.R.D. 269, 275-76 (D.D.C. 2014)).  As this Court recognized, "federal courts regularly have recognized preserving confidentiality as a sufficient interest under Rule 24(a), both when a statutory privilege is as stake or, more relevantly, when there exists a general interest in protecting the confidentiality of information without relation to a specific right."  *100Reporters*, 307 F.R.D. at 277-78 (collecting cases).  Here, the Documents contain privileged matters and confidential and sensitive commercial information that would be potentially harmful to the Companies if it were disclosed during discovery.   This is especially troubling to the Companies considering the general inadequacy of the protective order governing litigation in this matter. If Defendants' Motion is successful, the Documents would likely be produced to the Defendants, at which point confidential information may be disclosed publicly through this litigation or possibly other means.[5]

### 3.  *Defendants' Motion Threatens to Impair the Companies' Interests*

Defendants' Motion threatens to impair the Companies' interests because it would require that Plaintiffs produce the Documents, which contain the Companies' privileged, confidential, and sensitive commercial information.  In the D.C. Circuit, "[t]he inquiry is not a rigid one: consistent with the Rule's reference to dispositions that may 'as a practical matter' impair the putative intervenor's interest, Fed. R. Civ. P. 24(a)(2), courts look to the 'practical consequences' of denying intervention."  *Wildearth Guardians*, 272 F.R.D. at 13 (citing *Funds for Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003)).   The "practical consequences" of denying the Companies' motion is that the Companies would not be able to oppose Defendants' Motion, which,

---

[5]   Defendants' business model includes feeding reporters sensitive information "on background" so that it can be used in the publication of news articles.  *See*, *supra* note 1.

if successful, would lead to a court order compelling Plaintiffs to produce the Documents, which contain the Companies' privileged, confidential, and sensitive commercial information.

Courts in this Circuit have recognized that an action which could lead to the forced disclosure of an intervenor's privileged, confidential, or sensitive commercial information threatens a legally protected interest.  *See Gov't Accountability Project*, 181 F. Supp. 3d at 96 (finding the impairment prong satisfied when action would lead to the "disclosure of commercially-sensitive and confidential information"); *Appleton v. FDA*, 310 F. Supp. 2d 194, 197 (D.D.C. 2004) (finding that impairment requirement satisfied when "disclosures resulting from the disposition of this action could impair the applicants' ability to protect their trade secrets or confidential information"); *see also Phillip Morris*, 2003 WL 25572283, at *2 (finding impairment prong satisfied when party was ordered to produce potential intervenor's potentially privileged documents).  Here, Defendants' Motion could lead to the production of the Documents, which contain the Companies' privileged, confidential, and sensitive commercial information. The Companies would lose their ability to assert privilege over their documents and would lose the ability to protect their commercially confidential or sensitive information from production to Defendants, including possible public disclosure.  A ruling that the Documents are in the possession, custody, or control of Plaintiffs could also impair or impede the Companies' ability to protect their privileged and confidential documents from disclosure in future litigation as well.

4.    *No Party Adequately Represents the Companies' Interests*

No party adequately represents the Companies' interests in protecting their documents. The Supreme Court has explained that the adequate representation requirement under Rule 24(a) "is satisfied if the applicant shows that representation of his interest '*may be*' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972) (emphasis added).  Similarly, the D.C. Circuit has described the

13

requirement as "not onerous." *Diamond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986). A potential intervenor "ordinarily should be allowed to intervene unless it is clear that the party will provide adequate representation for the absentee." *AT&T*, 642 F.2d at 1293 (citation omitted).

The interests of Plaintiffs and the Companies began to diverge in this litigation when Defendants filed their motion to compel Plaintiffs to produce the Documents. *See Phillip Morris*, 2003 WL 25572283, at *2 (stating that interests "sharply diverged" when party was compelled to produce potential intervenor's documents and that the threat of sanctions prevented party from adequately representing the potential intervenor's interests). Prior to Defendants' Motion, Plaintiffs maintained—after requesting permission from the Companies to produce the requested documents and the Companies denying such request on the ground that the documents are within the exclusive possession, custody, or control of the Companies—that the Documents were in the possession, custody, or control of the Companies and that it was the Companies' right to control any production of the Documents. The Companies planned to address production of the Documents through negotiation. However, attempts to resolve this issue with Defendants were completely rebuffed as the Companies were told that Defendants would only engage with Plaintiffs on such issues. Even the offer to produce documents in the absence of a subpoena, without forcing Defendants to proceed under the Hague Evidence Convention or the letters rogatory process and agreeing to produce documents relevant to the truth or falsity of the defamatory statements in CIR 112 within a reasonable time period was entirely ignored. Now, however, Plaintiffs face a motion to compel and the possibility of repercussions if they continue to assert that the Documents can only be produced by the Companies. This divergence is enough to find that it is no longer "clear that the party will provide adequate representation for the absentee," *AT&T*, 642 F.2d at 1293, and

it meets the "minimal" burden of showing that the Companies' interests "may be" inadequately represented. *Trbovich*, 404 U.S. at 538 n.10 (1972).  Therefore, the Companies have established that no party adequately represents the Companies' interests in litigating Defendants' Motion.

**B.      Intervention is Appropriate Because the Companies are the Proper Source of Several Key Arguments**

Intervention is also appropriate because the Companies are well-positioned to make arguments about the control of the Documents that Plaintiffs are not.  The issue of control involves an analysis of foreign law and a clear understanding of the complex corporate structure of the Companies.  The Companies, and their counsel, who are familiar with these issues, are better suited to providing this Court the proper information on which to base its decision.  The Companies are also the proper party to clarify the interactions between the Companies' counsel and Defendants' counsel.  As explained in more detail in the Companies' substantive brief, which is attached to this motion at Exhibit 1, the Companies are better positioned than Plaintiffs to make the arguments listed briefly here.

### 1.      *Defendants' Motion is Premature*

Defendants' Motion should be denied because it is premature. The crux of Defendants' Motion is that they are unable to obtain potentially beneficial documents from the Companies. However, the record shows that this is not the case.  The Companies proactively reached out to Defendants and made concerted and substantial efforts to accommodate Defendants' document requests and clear any impediments that might stand in the way of a meaningful production.  As a sign of good faith, the Companies offered to produce relevant documents in the absence of a subpoena and without forcing Defendants to invoke the Hague Evidence Convention or letters rogatory process.  Dkt 78-32, at 2 (May 1, 2020 email).  The Companies also proposed a universe of documents it was willing to produce, offering to produce documents related to the truth or falsity

of the allegations in CIR 112 dated within a "reasonable time period."  Dkt. 78-33, at 2 (May 8, 2020 email).  If Defendants had any concern about the Companies' production proposal, the Companies urged counsel for Defendants to begin a dialogue with the Companies to resolve any outstanding issues.  However, Defendants refused to even discuss the issue with counsel for the Companies and instead ran to this Court.

The Court need not burden itself with what Defendants themselves concede is a "highly fact-specific" inquiry.  Defs.' Br. at 18 (devoting over a page simply to listing the "number of factors" that courts must analyze when determining whether a party has possession, custody, or control of specified documents).  This expenditure of judicial resources is especially unnecessary when Defendants' claims of prejudice are insufficient and speculative at this stage.  Rather than expend considerable judicial resources to wade through the multiple factors of this fact-specific analysis, the Court should require Defendants first to negotiate with the Companies in an effort to resolve this dispute out of court.

        2.     *Plaintiffs Lack the Legal Right or Authority to Obtain the Companies' Documents*

In addition to being premature, Defendants' Motion should also be denied because Plaintiffs do not have the legal right or authority to obtain the Documents from the Companies.  In assessing whether a litigant has the legal right or authority to obtain documents in the possession of a foreign company, a court should consider the effect that foreign law has on the litigant's ability to obtain the documents.  *See Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 139 (2d Cir. 2007) (reversing the district court's order granting sanctions against plaintiff, a chairman and shareholder of a Russian company, for failing to produce documents in the possession of the Russian company, and concluding that "remand is … necessary to explore Russian law").  The legal and practical inability of a litigant to obtain documents from a non-party, by reason of foreign law, may place

the documents beyond the control of the litigant who has been served with a request under Federal Rule of Civil Procedure 34.   *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571 (RJH) (HBP), 2009 WL 8588405, at *2 (S.D.N.Y. July 10, 2009).

Here, as declarations from foreign counsel explain, Plaintiffs do not have the legal right or authority to obtain the Companies' documents under the laws of either Russia or Luxembourg. *See* Decl. of Aleksandr V. Berezin (July 2, 2020); Decl. of Philippe Hoss (July 2, 2020).   The Companies' documents are therefore "beyond the control" of the Plaintiffs in light of Plaintiffs' legal inability to obtain the Companies' documents under foreign law.

> 3.     *Plaintiffs Do Not Have the Practical Ability to Obtain the Companies' Documents*

Finally, Defendants' Motion should be denied because their claim that Plaintiffs have the practical ability to obtain the Companies' documents is unavailing.   It is Defendants' burden as movant to establish that Plaintiffs have control of the documents they seek.   *Norex Petroleum Ltd. v. Chubb Ins. Co. of Canada*, 384 F. Supp. 2d 45, 56 (D.D.C. 2005) ("The burden of establishing control over the documents sought is on the party seeking production.") (quoting 7 Moore's Federal Practice § 34.14(2)(b) (2004)).   However, Defendants' arguments contain a number of crucial factual errors about the nature of the Companies and Plaintiffs' alleged interests in the Companies as well as pure speculation about Plaintiffs' control over the Companies' documents. Defendants also cite to inapposite law and ignore relevant factors such as the Companies' good faith attempts to produce the documents without court intervention and the obstacles posed by foreign law and the Companies' internal policies.   Defendants cannot meet their burden based on these arguments.

17

### C.      Limited Intervention is Appropriate

The Companies seek only limited intervention to litigate the specific matter of Defendants'
Motion and are not subjecting themselves to the general jurisdiction of the Court.  The D.C. Circuit
recognizes that limited intervention is "favored . . . for individual issues when appropriate to
protect particular interests." *AT&T*, 642 F.2d at 1291.  In *AT&T*, the D.C. Circuit allowed limited
intervention for the purpose of appealing a discovery order.  *Id.* at 1295.  Similarly, in *Phillip
Morris*, limited intervention was granted for the purpose of asserting privilege on the intervenor's
documents.  *Phillip Morris*, 2003 WL 25572282, at *3.  Here, limited intervention is appropriate
as the Companies' legal interests involve litigating Defendants' Motion and not the other issues in
this matter.

Courts in this Circuit have allowed applicants to seek limited intervention without
submitting to the general jurisdiction of the court.  *See id.* at *1 (granting limited intervention after
noting that "[potential intervenor] has made it very clear in its Motion papers that it is not
submitting to the general jurisdiction of this Court and is seeking intervention upon condition that
it be protected against 'discovery, service of process, claims of liability, and all other
vulnerabilities of an existing or potential party to this action.'").  Similarly, the Companies are
seeking a limited intervention to protect their interests in their documents and are not submitting
to the general jurisdiction of this Court.

## II.      In the Alternative, the Court Should Permit the Companies to Intervene Under Rule
24(b)

In the alternative, the Court should grant the Companies permissive intervention under
Rule 24(b) to allow the Companies to intervene for the limited purpose of litigating Defendants'
Motion.  District courts have "wide latitude" to allow permissive intervention under Rule 24(b).
*In re Endangered Species Act Section 4 Deadline Litig.*, 704 F.3d 972, 980 (D.C. Cir. 2013).

Courts may permit permissive intervention under Rule 24(b) where (1) the intervenor has a claim or defense that raises questions of law or fact in common with those raised by the original parties, and (2) the intervention will not unduly delay or prejudice the original parties to the action.  Fed. R. Civ. P. 24(b).  Both requirements are met here.  First, the Companies seek to participate in the parties' preexisting dispute regarding whether the Documents are in the possession, custody, or control of Plaintiffs.  Second, as explained above, a limited intervention will not cause undue delay or prejudice to the original parties.  The Companies should therefore be granted permissive intervention for the limited purpose of litigating Defendants' Motion.

## CONCLUSION

For the foregoing reasons, the Court should grant the Companies' Motion for Leave to Intervene for the Limited Purpose of Litigating Defendants' Motion to Compel Plaintiffs' Production of Their Documents.


Dated:  July 2, 2020

Respectfully submitted,

  /s/ Margaret E. Krawiec
Margaret E. Krawiec (DC Bar No. 490066)
Michael A. McIntosh (DC Bar No. 1012439)
SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
T: (202) 371-7303
F: (202) 661-9123
margaret.krawiec@skadden.com
michael.mcintosh@skadden,com

*Attorneys for LetterOne, Alfa Bank, and ABHH*

19

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Memorandum of Points and Authorities in Support of AO Alfa-Bank, ABH Holdings S.A., and LetterOne's Motion for Leave to Intervene for the Limited Purpose of Litigating Defendants' Motion to Compel Plaintiffs' Production of Their Documents was filed electronically by the Clerk of Court on July 2, 2020, using the CM/ECF system, which will send notification of such filing to all counsel of record.

 /s/ Margaret E. Krawiec
Margaret E. Krawiec

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MIKHAIL FRIDMAN, PETR AVEN, AND GERMAN KHAN,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**BEAN LLC a/k/a FUSION GPS, and GLENN SIMPSON,**<br><br>**Defendants.** | **Civil Action No. 17-2041-RJL** |

## <u>DECLARATION OF ALEKSANDR V. BEREZIN</u>

1.      I am an attorney practicing at my own law office in Moscow, Russia, and have been a member of the Moscow Bar Chamber since 2002.  Prior to that, I was the Director for Corporate Legal Affairs at ZAO Media Most, a Russian company, a Deputy Managing Director of the independent Moscow television station TV-6, and an associate at Akin Gump Strauss Hauer & Feld LLP.  I received a law degree with honors from the Moscow Institute of International Relations, Law Department, in 1994, and an L.L.M. from the New York University School of Law in 1996.  I currently reside with my family in Moscow, Russia.

2.      In connection with discovery matters in the above-captioned proceedings, I represent Joint Stock Company Alfa-Bank ("Alfa").

3.      I was requested by counsel to Alfa in these proceedings to provide an opinion under Russian law responding to the following question: whether Mikhail Fridman, Petr Aven, and German Khan (collectively, the "Plaintiffs"), as indirect shareholders of Alfa, have the legal right to obtain Alfa's documents under Russian law.  Specifically, I was requested to analyze

Plaintiffs' legal rights based on their indirect shareholdings in Alfa (through a direct share ownership in ABH Holdings S.A., which in turn owns 97.4% of Alfa) and their positions of authority.  For purposes of this analysis, I was requested to consider Plaintiffs' legal right to obtain both their own company documents (such as emails stored in their corporate accounts), as well as all other potentially relevant Alfa documents, even those not created by or distributed to Plaintiffs.

     4.     For purposes of this analysis, I have used the following information and documents from https://alfabank.ru, https://www.abhh.lu and(or) http://e-disclosure.ru/portal/company.aspx?id=1389, unless otherwise specified:

A) Alfa is 99.99% owned by AO AB Holding, a Russian joint-stock company ("AB Holding").  AB Holding is ultimately beneficially owned by ABH Holdings S.A., a Luxembourg company ("ABH Holdings"), where Mr. Fridman (32.8632%), Mr. Khan (20.9659%) and Mr. Aven (12.4018%) own directly shares of ABH Holdings' share capital.

B) I have been advised, and therefore assumed, that there is no shareholders' agreement or similar document regulating Mr. Fridman's, Mr. Khan's and Mr. Aven's ownership in ABH Holdings.

C) Mr. Aven is Chairman of the Board of Directors of Alfa (Alfa has a 12-member Board of Directors) and Chairman of the Board of Directors of ABH Holdings (ABH Holdings has a seven-member Board of Directors); between 1994 and July 2011, he was Alfa's President.

D) Mr. Fridman is a Member of the Board of Directors of Alfa and Member of the Board of Directors of ABH Holdings.

E)  According to Alfa, Mr. Khan was a Member of the Board of Directors of Alfa during the periods of (i) December 20, 1990 through November 2, 1998 and (ii) June 29, 2000 through February 27, 2006.

F)  None of the Plaintiffs are currently officers at Alfa.

G)  According to Article 16.2 of the Charter (as hereinafter defined), Alfa's corporate governance is structured in three levels: (i) general meeting of shareholders, (ii) Board of Directors, and (iii) Executive Board as its collegial executive body and Chairman of the Executive Board as Alfa's chief executive officer.

H)  According to the information from the Whois database of RU-Center, one of the largest Russian domain registrars and hosting-providers, the domain under *alfabank.ru* is owned by Alfa.

I)  Documents:

   i)   Alfa's Charter, as approved on June 27, 2018, as amended ("Charter");

   ii)  Alfa's Regulation on the Board of Directors, as approved on June 27, 2018 ("Board of Directors Regulation");

   iii) Alfa's Code of Corporate Governance, as approved on December 2, 2013 ("Code of Corporate Governance");

   iv)  Alfa's Code of Corporate Ethics ("Code of Corporate Ethics");

   v)   Alfa's Regulations in respect of protection of confidential information, commercial and banking secret privilege and internal information limited for disclosure, as approved on December 10, 2008 by Order of the Chairman of the Executive Board of the Bank No.1305, as amended ("Confidentiality and Commercial Secret Regulation");

vi) Alfa's Policy in respect of Personal Data Processing, as approved on December 6, 2019 by Order of the Bank No.1458 ("Personal Data Processing Policy").

5.      The following paragraphs summarize the applicable provisions of the Russian law and Alfa's documents.

A) Russian Federal Law on Information, Information Technologies and Protection of Information dated July 27, 2006 ("Federal Law on Information"), as amended:

i) Proprietor of the information is defined as the person who: (a) created it, or (b) obtained by lawful means the right to grant or limit access to such information.[1]

ii) Proprietary information may be protected regardless of its form or medium (*i.e.,* taking form of a document, letter, email message etc.) by, *inter alia*: (a) limiting access to such information, and (b) by setting the terms of such access and its disclosure;[2]

iii) Any information the access to which is lawfully limited, and which is subject to any privilege, including the commercial secret privilege, shall be kept confidential, i.e. shall not be disclosed by a person who obtained access to such information to any third party without its proprietor's consent.[3]

B) Russian Federal Law on Commercial Secret dated July 15, 2004 ("Federal Law on Commercial Secret"), as amended:

---

[1] Art.2, Subsec.5

[2] Art.2, Subsec.1; Art.6, Subsec.3

[3] Art.9, Subsec.4; Art.2, Subsec.7; Art.16, Subsec.1

i)   Information subject to commercial secret privilege is defined as information of any

character (production, technical, economic, organizational, etc.), including[4] that on

the results of intellectual activity in the scientific and technical area, as well as

information on the methods of professional activity, which has actual or potential

commercial value due to it being unknown to third persons, and which is unavailable

to third persons.[5]  This may be interpreted as follows: if a proprietor of the

information of certain character which is unavailable to third persons and for that

reason has actual or potential commercial value, has stipulated that such information

is subject to commercial secret privilege, then the privilege shall protect such

information in the manner prescribed by the Federal Law on Commercial Secret.

ii)   The commercial secret privilege shall protect the information subject to it such that

enabling its proprietor to increase its revenues, avoid unjustified expenses, retain its

position in the market, or to derive other commercial benefits under the existing or

probable conditions.[6]

iii)  The proprietor of the information comprising the commercial secret shall have the

right to, *inter alia*:[7]

(1)  determine, in its sole discretion, whether such information shall be subject to the

commercial secret privilege;

---

[4] with certain exceptions named in the Federal Law

[5] Art.3, Subsec.2

[6] Art.3, Subsec.1

[7] Art.6.1, Subsec.2

(2) grant or deny access to such information, as well as set forth the terms of access to such information;

(3) demand that persons who were granted access to such information, or who obtained such information inadvertently or by mistake, protect the confidentiality of such information.

iv) Any employee who was granted access to the information subject to the commercial secret privilege:[8]

(1) shall not disclose such information, or the information which is subject to the commercial secret privilege of the counterparties to agreements with their employer, or use it for personal means;

(2) shall be liable to their employer in the event of wrongful disclosure of such information.

v) Any person who discloses the information subject to the commercial secret privilege shall bear civil or criminal liability for wrongful disclosure of such information.[9]

vi) The commercial secret privilege shall take effect provided that the proprietor of the information subject to it applies the following measures:[10]

(1) specification of the information that shall be subject to the commercial secret privilege,

(2) limitation of access to such information and approval of the terms of its handling, as well as the procedure of their enforcement,

---

[8] Art.11

[9] Art.14

[10] Art.10

6

(3) maintenance of a record of the persons who were granted access to the information subject to the commercial secret privilege, as well as the persons to whom it was transmitted or provided,

(4) application of rules on the use of the information subject to the commercial secret privilege by its employees or contractual counterparties,

(5) specification on the media or in the text or metadata of the documents containing the information subject to the commercial secret privilege by way of a corresponding reference.

C) Legal rules in respect of banking secret:

    i) Russian Civil Code provides that:[11]

        (1) banks shall guarantee the secret of accounts, deposits, operations on the accounts, as well as other client's data;

        (2) any information comprising the banking secret may only be disclosed to the clients and their representatives or otherwise – in the events established by law.

    ii) Russian Federal Law on Banks and Banking Activity dated December 2, 1990 ("Federal Law on Banks"), as amended:[12]

        (1) all employees of a credit organization shall keep in secret any information about operations, accounts, deposits of its clients and corresponding credit organizations, as well as other information specified by such credit organization.

D) Russian Federal Law on Personal Data dated July 27, 2006 ("Federal Law on Personal Data"), as amended:

---

[11] Art.857 Subsec.1 and 2

[12] Art.26

i)  Provides that operators of personal data (as defined in the Federal Law on Personal Data; Alfa falls within that definition) are required, *inter alia*, to: (1) obtain consent of persons whose personal data is collected to its processing (including their express consent to the cross-border transfer of their personal data), (2) collect and process personal data on a valid and fair basis, for specific and expressly stipulated legitimate purposes, (3) comply with the purposes and rules of data processing, such that only personal data responsive and not excessive in relation to the disclosed purposes may be collected and processed, (4) preserve confidentiality and protection of the collected personal data, (5) retain the collected personal data no longer than it is required in connection with the purposes of its collection whereupon it should be deleted or depersonalized.[13]

ii) Under the Federal Law on Personal Data, cross-border transfer of personal data is subject to the 1981 Convention for the Protection of Individuals with regard to Automatic Processing of Personal Data (the "Convention"), of which the United States is not a party.  According to the Federal Law on Personal Data, cross-border transfer of personal data to jurisdictions which are not parties to the Convention is subject to an express consent by the persons whose personal data is collected and to other requirements of the Russian laws and international treaties of the Russian Federation.[14]

E)  Alfa's Charter (for purposes of this Declaration, the term "Bank" shall mean Alfa):

---

[13] Art.5-7

[14] Art.12

i)   Shareholders [of the Bank] shall keep in confidentiality all matters related to the Bank's activities, including during the period of three years after they discontinue to be the Bank's shareholders, and shall not disclose any confidential information about the Bank's activities.[15]

ii)  All employees and officers of the Bank, its shareholders and their representatives shall keep in secret any operations, accounts and deposits of the Bank, its clients and corresponding credit organizations, as well as other information specified by the Bank to the extent [such specification] does not contradict federal laws.[16]

iii) All employees and officers of the Bank, its shareholders and their representatives, auditors shall comply with the Bank's commercial secret privilege.  The information subject to the Bank's commercial secret privilege shall be specified in the manner prescribed by the Russian law, as approved by the Chairman of the Executive Board of the Bank.[17]

iv)  Any information created, acquired or accumulated in the process of the Bank's activities, as well as other information located in the Bank on paper, magnetic or other media and made subject to the commercial secret privilege in the approved manner, shall not be sold, transferred, copied, reproduced, exchanged or otherwise distributed or replicated in any form without consent by the Bank's authorized persons.  The manner of handling the Bank's information which is subject to the

---

[15] Sec.8.3, fourth and twelfth paragraphs.

[16] Sec.14.5 of the Charter; Sec.8 of the Code of Corporate Governance

[17] Sec.14.7 of the Charter; Sec.8 of the Code of Corporate Governance

Bank's commercial secret privilege and the liability for its violation shall be established by the Chairman of the Executive Board of the Bank.[18]

v)   Members of the Board of Directors [of the Bank] shall:

   (1) exercise their duties in good faith and reasonably in the interests of the shareholders and the Bank itself [...];[19]

   (2) keep in secret any operations, accounts and deposits of the clients and corresponding credit organizations, as well as other information which is subject to the Bank's commercial secret privilege in accordance with its internal documents;[20]

   (3) be liable to the Bank for any undue execution of their duties or damages caused by their willful actions (or omissions to act).[21]

vi)   The Chairman of the Executive Board of the Bank shall establish the information which is subject to the Bank's commercial secret privilege and the manner of its handling.[22]  Although the Chairman of the Executive Board of the Bank may delegate points of his(her) authority to other members of the Executive Board of the Bank and certain other Bank's officers, the Charter does not provide for the delegation of

---

[18] Sec.14.8 of the Charter; Sec.8 of the Code of Corporate Governance

[19] Sec.18.10 and 20.2 of the Charter; Sec.5.2 of the Board of Directors Regulation; Sec.3 of the Code of Corporate Governance

[20] Sec.20.1

[21] Sec.20.2, second paragraph

[22] Sec.19.7, subsec.18

his(her) authority to any member of the Board of Directors or the Bank who is not the Bank's officer.[23]

F) Alfa's Board of Directors Regulation:

   i)  Members of the Board of Directors shall not disclose or use for personal purposes any confidential information on the Bank's activities, insider information or any information which is subject to the Bank's commercial secret privilege in accordance with its internal documents, which became known to them;[24]

   ii) Any documents or materials on the matters included in the agenda of any Board of Directors meeting shall be designated as confidential information which shall not be disclosed, made known to third persons or distributed by any means.[25]

G) Alfa's Code of Corporate Governance:

   i)  Sets the Bank's internal rules on, *inter alia*, the information disclosure.  In particular, such rules provide for:[26]

       (1) Information disclosure by the Bank shall ensure informed and well-founded decision-making by the Bank's shareholders and investors subject to the balance of interests between the Bank and individual shareholders.  The information shall also be provided to the Bank's shareholders, investors and other interested parties in connection with their decision-making on management and investment matters. Sec.2 of the Code of Corporate Governance provides that [the Bank's]

---

[23] Sec.19.7-19.10

[24] Sec.5.9

[25] Sec.6.6

[26] Sec.8 of the Code of Corporate Governance

shareholders shall not use their rights in bad faith.  As such, the Bank's information disclosure mechanisms may not be used by individual shareholders in pursuit of purposes other than the Bank's management and their investment decision-making.

(2) The bank shall timely disclose its (a) quarterly reports, (b) information on material events, (c) annual reports, (d) annual accounting reports, (e) consolidated financial reports, (f) list of affiliates, (g) other information required to be disclosed in accordance with the Federal laws and applicable regulations.

(3) The Bank shall approve its internal regulations detailing the disclosure procedures.  The disclosure shall be made through all appropriate channels, primarily via its website at http://www.alfabank.ru or at http://www.e-disclosure.ru/portal/company.aspx?id=1389, which provide for free and unencumbered access to the disclosed information.

(4) The Bank shall also control the access to and the use of insider information in accordance with the law, the Charter and the Bank's internal documents.

ii) Although Sec.3 of the Code of Corporate Governance provides that the members of the Board of Directors shall have the right to receive all information required to exercise their duties, it follows from the text of this provision that such information may only be made available to the members of the Board of Directors for purposes of exercising their duties, and not for any other purposes.

iii) To clarify, nothing in the Code of Corporate Governance, other internal Alfa documents or the Russian law applicable to the rights of shareholders and investors

requires Alfa to mandatorily disclose any correspondence to any party to which is

Alfa's employees or members of its Board of Directors.

iv) All laws and documents analyzed for purposes of this Declaration deal only with the

concept of direct shareholding, and do not grant any rights to indirect shareholders.

H) Alfa's Code of Corporate Ethics:

i) The volume of information disclosed to [the Bank's] clients and business partners

shall be commensurable to the volume of banking services provided to them and shall

otherwise comply with Russian law, the Code of Corporate Ethics and other internal

documents.[27]

ii) Any information about the Bank's employees, [the Bank's] internal structure,

operation procedures, cashflow, about the operations, accounts and deposits of [the

Bank's] clients, business partners and representatives of the state or municipal

authorities shall be confidential unless the mandatory disclosure of such information

is required by Russian law.  All employees of the Bank (including members of the

Board of Directors) shall assume confidentiality undertakings.[28]

iii) The Code of Corporate Ethics provides that its rules shall have equal force for all

employees, members of the Board of Directors and members of the Executive Board

of the Bank.[29]

I) Alfa's Confidentiality and Commercial Secret Regulation:

---

[27] Sec.11.2

[28] Sec.11.5

[29] Sec.2.2

i) Sets forth and details the manner of handling the Bank's confidential information, the information subject to the banking and commercial secret privilege and other information which is limited for disclosure ("Information Restricted for Disclosure").

ii) The Bank shall be the proprietor of any Information Restricted for Disclosure which has been obtained by the Bank by lawful means.  The Bank shall have the exclusive rights to any Information Restricted for Disclosure which has been obtained or created by the Bank's employees in connection with their employment duties.[30]

iii) The Bank as the proprietor of the Information Restricted for Disclosure shall, *inter alia*:[31]

   (1) establish, modify or cancel, in its sole discretion, the commercial secret privilege over it;

   (2) use the Information Restricted for Disclosure for its own needs and purposes;

   (3) grant or deny access to the Information Restricted for Disclosure, as well as set forth the terms of such access;

   (4) protect its rights in connection with use of the Information Restricted for Disclosure.

iv) The Chairman of the Executive Board of the Bank shall:[32]

   (1) identify which information shall be included in the Information Restricted for Disclosure;

---

[30] Sec.5.1 and 5.3.6

[31] Sec.5.2

[32] Sec.2.1

(2) approve and enforce other internal regulations of the Bank in respect of handling of the Information Restricted for Disclosure.

v)   Any modifications to the list of the Information Restricted for Disclosure shall be subject to the proposal by the Bank's internal departments and divisions and if confirmed by the security and legal departments of the Bank, shall be approved by the Chairman of the Executive Board of the Bank.[33]

vi)  The Bank's internal departments and divisions, including its security department, shall ensure the implementation of and the compliance with the Confidentiality and Commercial Secret Regulation.[34]

vii) It follows from the provisions of the Confidentiality and Commercial Secret Regulation, as well as other Bank's internal documents reviewed above, that a member of the Board of Directors of the Bank may not disclose any of the Bank's information without (a) an independent review of whether such information falls within the Information Restricted for Disclosure by the appropriate internal department of Bank, including its security department, and (b) the approval of the Chairman of the Executive Board of the Bank.

J)   Alfa's Personal Data Processing Policy:

i)   Sets forth and details the rules in respect of collection and processing of personal data by the Bank, including the purposes for which the personal data is collected and processed.  Provides that cross-border transfer of personal data shall be subject to a written consent by the persons whose personal data is collected and processed and

---

[33] Sec.4.1

[34] Sec.2.2, 2.3, 6.2 and 6.3

also subject to such purposes of the personal data collection and processing as set forth in the Personal Data Processing Policy.[35]

ii) The purposes of the personal data collection and processing set forth in the Personal Data Processing Policy do not include the use of personal data for purposes of the litigation where Alfa's shareholders or directors are parties.[36]  Any company documents (such as emails stored in corporate accounts), as well as all other potentially relevant Alfa documents may contain personal data collected and processed by Alfa, and their provision in these proceedings will very likely involve cross-border transfer of such personal data from Russia to the United States. Therefore, the use of such personal data for purposes of these proceedings and its cross-border transfer to the United States may require (1) a separate express written consent of the persons whose personal data is included in the documents provided, or (2) deletion or depersonalization of the data from such documents.

iii) Compliance with the Personal Data Processing Policy is subject to the review by the Bank officer responsible for the organization of personal data processing who is appointed by the Chairman of the Executive Board of the Bank.[37]  Therefore, any matters or questions under the Personal Data Processing Policy, as well as the manner of handling the documents containing personal data are subject to the action by such officer, and not to the authority of the Bank's shareholders or members of its Board of Directors.

---

[35] Sec.7.6, 7.7

[36] Sec.4

[37] Sec.3 and 12

16

6.      Conclusion.

A)  According to Art.2 subsec.5 of the Federal Law on Information, any person who created

any information or obtained by lawful means the right to grant or limit access to the

information, regardless of its medium or form, is the proprietor of such information.

According to Sec.14.8 of the Charter and Sec.8 of the Code of Corporate Governance,

any information created, acquired or accumulated in the process of the Bank's activities,

as well as other information located in the Bank on paper, magnetic or other media and

made subject to the commercial secret privilege in the approved manner, shall not be

sold, transferred, copied, reproduced, exchanged or otherwise distributed or replicated in

any form without consent by the Bank's authorized persons.  According to Sec.5.3.6 of

the Confidentiality and Commercial Secret Regulation, the Bank shall be the proprietor

of any Information Restricted for Disclosure which has been obtained by the Bank by

lawful means and shall have the exclusive rights to any Information Restricted for

Disclosure which has been obtained or created by the Bank's employees in connection

with their employment duties.  According to Sec.2.2 of the Code of Corporate Ethics, its

rules shall have equal force for all employees, members of the Board of Directors and

members of the Executive Board of the Bank.  Members of the Board of Directors, in

fact, have the same or higher standards of duty owed to the Bank in general and in respect

of the Information Restricted for Disclosure, in particular.[38]

B)  It follows from the application of the above rules that the Bank is the *prima facie*

proprietor of any information which is contained or stored on any media and in any form

(whether in a file, document or in an email message) created or lawfully obtained by it,

---

[38] See 5.E)v), 5.F)i)-5.F)ii) *supra*

including that located on the corporate domain *alfabank.ru*.  The fact that the Bank's employees or members of its Board of Directors placed any information in email messages sent via accounts on the Bank's corporate domain is the evidence that such information has been created or used in connection with their employment or directorship duties and as such, is subject to proprietary rights of the Bank.

C) The Bank as the proprietor of the information regulates the terms of access to it, the manner of its handling, including the election of any privilege applicable to it, at its sole discretion.  Therefore, only the Bank may waive any privilege in respect of such information or remove any restrictions in respect of access to it, its disclosure or distribution.  Similarly, the Bank is the only proper respondent or defendant in any proceedings or procedural actions, the subject-matter of which is enforcement of the disclosure of such information.  Even if any member of the Bank's Board of Directors mishandled any Information Restricted for Disclosure, such action does not constitute a waiver of any privilege nor does it amount to the removal of any restrictions in respect of such information, but may only serve as grounds for such member of the Bank's Board of Directors liability.

D) According to Sec.8.3 of the Charter, the [Bank's] shareholders shall keep in confidentiality all matters related to the Bank's activities, including during the period of three years after they discontinue being the Bank's shareholders, and shall not disclose any confidential information about the Bank's activities.  According to Sec.14.5 and 14.7 of the Charter and Sec.8 of the Code of Corporate Governance, all of the Bank's shareholders and their representatives shall comply with the Bank's banking and commercial secret privilege.  According to Sec.8 of the Code of Corporate Governance,

any information which is subject to disclosure to the Bank's shareholders, investors and general public on the basis of the applicable legal requirements shall be made available through all appropriate channels, primarily via the Bank's website at http://www.alfabank.ru or via the website of the Center of Corporate Information Disclosure at http://www.e-disclosure.ru/portal/company.aspx?id=1389, which provide for free and unencumbered access to the disclosed information.

E) As follows from Sec.2 and 8 of the Code of Corporate Governance, information provided to the Bank's shareholders, investors and other persons is provided with the aim to ensure informed and well-founded decision-making by the Bank's shareholders and investors subject to the balance of interests between the Bank and individual shareholders.  The Bank's shareholders shall not use their rights in bad faith.  Therefore, the Bank's information disclosure mechanisms may not be used by individual shareholders in pursuit of purposes other than the Bank's management and their investment decision-making.

F) According to Sec.14.7, 14.8, 19.7 subs.18 of the Charter, Sec.8 of the Code of Corporate Governance, Sec.2.1, 2.2., 2.3, 4.1, 6.2 and 6.3 of the Confidentiality and Commercial Secret Regulation, all matters in respect of determination as to which information constitutes the Information Restricted for Disclosure, as well as access to, disclosure and handling of the Information Restricted for Disclosure are subject to the authority of the Chairman of the Executive Board of the Bank in consultations with the appropriate departments of the Bank.  Therefore, the Chairman of the Executive Board of the Bank, in consultations with the appropriate departments of the Bank, but not the Board of Directors of the Bank or any member thereof, has the sole right to determine if the information (i) is subject to any other person's proprietary rights, (ii) constitutes the

Information Restricted for Disclosure, (iii) is subject to any privilege or restrictions (and if so, to which), as well if such privilege or restrictions is waivable and may be waived.

7.      The contents of the above is subject to the following qualifications and reservations:

A) This Declaration is prepared addressing the specific questions identified herein and shall not be construed as extending to any other matter.

B) In this Declaration, Russian legal terms and concepts are expressed by way of translation into English language and therefore may not be identical to the concepts described by the same English terms as they exist under the laws of other jurisdictions.

C) Any information or statement provided herein is so provided as of the date of this Declaration.

D) All copies of Alfa's internal documents referred to herein and available from the sources specified herein or otherwise provided to the undersigned are complete and conform to the originals; each of such Alfa's internal documents was duly approved in accordance with Alfa's Charter or the applicable law, is valid, has not been cancelled and is in full force and effect on the date hereof.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 2, 2020 at Moscow, Russia.

By:

Aleksandr V. Berezin
Attorney-at-Law
Gamsonovskiy lane, 5
Moscow 115191 Russia
+7 (495) 969-23-64
a.berezin@camost.ru

21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MIKHAIL FRIDMAN, PETR AVEN, AND
GERMAN KHAN,

**Plaintiffs,**

v.

BEAN LLC a/k/a FUSION GPS, and GLENN
SIMPSON,

**Defendants.**

Civil Action No. 17-2041-RJL

## DECLARATION OF PHILIPPE HOSS

### I.   INTRODUCTION

1.1.   I am Philippe Hoss, *maître en droit*, and hold a post graduate (master) degree (DEA) in business law from the University of Panthéon-Sorbonne, Paris. I am a member of the Luxembourg Bar since 1987.

1.2.   I am a partner at Elvinger Hoss Prussen, *société anonyme* ("Elvinger Hoss Prussen"), a Luxembourg law firm which is also a member of the Luxembourg Bar. Before joining Elvinger Hoss & Prussen, a partnership which is the predecessor of Elvinger Hoss Prussen, *société anonyme*, in 1988, I worked as an assistant with Slaughter and May (London) in 1987-1988. I became a partner at Elvinger Hoss & Prussen in 1990.

1.3.   My principal fields of activity are capital markets, mergers and acquisitions, corporate law, securitisations, banking and finance.

1.4.   I lecture on Luxembourg company law since 2010 in the yearly course organised by the Minister of Justice for admittance to the Luxembourg Bar. As part of the LLM on European

finance and business law at Luxembourg University, I currently lecture on fiduciary agreements and trusts, and on take-over law. I have in the past lectured on collective investment funds and on listed companies in the graduate year of business law (*Maîtrise en droit financier*) at the University of Luxembourg. I have been a visiting lecturer on take-over law at Ohio State University Moritz College of Law, Columbus, Ohio, USA.

1.5.    I am the author of the first English translation of Luxembourg company law which I regularly update. I also authored the first English translation of the Luxembourg UCITS legislation.

1.6.    In connection with discovery matters in the above-captioned proceedings, Elvinger Hoss Prussen represents LetterOne Investment Holdings S.A. ("LOIH").

1.7.    We have been asked to draw up this declaration on the question of whether Plaintiffs have the legal right under the laws of Luxembourg to obtain documents from a Luxembourg legal person (namely LOIH and LetterOne Holdings S.A. ("LetterOne" and, together with LOIH, the "Companies")) in which they hold stakes as ultimate beneficial owners and/or in which they hold the positions of board members.

1.8.    Otherwise than in relation with the above-captioned proceedings, this declaration is not to be transmitted (in whole or in part) to anyone else or relied upon by anyone else or for any other purpose, or quoted or referred to in any document or filed with anyone without my express written consent. Elvinger Hoss Prussen does not accept any responsibility or legal liability to any other person in relation to the contents of the declaration even if this declaration has been disclosed with its consent.

1.9.    This declaration relates only to the laws of the Grand Duchy of Luxembourg as the same are in force and are construed at the date hereof.

## II.   DISCLAIMERS AND ASSUMPTIONS

2.1.    This declaration covers the rights of shareholders and members of the board of directors in a non-listed public limited liability company (*société anonyme*) governed by the laws of the Grand Duchy of Luxembourg.

2.2.    I have been advised and therefore have assumed that there is no shareholders' agreement or similar instrument existing at the level of the Companies or any of their affiliates, which could affect the conclusions set out herein.

2.3.    I have assumed that the Plaintiffs, who are each a director of each of the Companies, have no separate employment contract with the Companies which may contain inter alia additional restrictions on the disclosure of information.

2.4.    I have reviewed a scanned emailed copy of the consolidated articles of association of LOIH dated 12 October 2016 and LetterOne respectively (together the "Articles") for the purpose of the present declaration. I have assumed that the Articles are up-to-date, accurate, complete, have not been amended or rescinded and are in full force and effect.

## III.   LEGAL ANALYSIS

### 3.1.   Property rights of legal persons over documents and information

3.1.1.    The legal personality of companies is recognized as such under Article 100-2, paragraph 2 of the Law of 10 August 1915 relating to commercial companies (the "1915 Law").[1]

3.1.2.    Each of the Companies is incorporated under the laws of Luxembourg and organized in the form of a public limited liability company (*société anonyme*) with registered office at 1-3 boulevard de la Foire, L-1528 Luxembourg, Grand Duchy of Luxembourg and

---

[1] WINANDY, Jean-Pierre, Manuel de Droit des Sociétés, *Legitech, p. 220 et s.*

registered with the Luxembourg trade and companies register under number B181082 and number B176010 respectively.

3.1.3.   Each of them benefits from legal personality.

3.1.4.   Luxembourg civil law recognizes the ability for legal persons, including companies[2], to claim and exercise ownership rights on private assets including documentation and data.

3.1.5.   Luxembourg legislation in fact expressly recognizes the ability for a company to exercise property rights on non-fungible intangible assets such as electronic data.[3] The intention of the legislator was specifically to target data.[4]

3.1.6.   Luxembourg's Supreme Court (*Cour de cassation*) (the highest court in civil, commercial and criminal matters) has ruled that electronic data constitute assets that are capable of being misappropriated or simply taken in a way that deprives the owner of the data and can therefore be the subject of and sanctioned as theft within the meaning of the Luxembourg Criminal Code.[5] Similarly, Luxembourg's Supreme Court ruled that electronic data saved on a company's server and which is its exclusive property from a legal standpoint constitute intangible assets which are capable of being apprehended by way of downloading.[6]

3.1.7.   Article 509-1 of the Luxembourg Criminal Code prohibits the fraudulent access in an automated data processing system. This confirms that data are capable of being owned by, and protected as being the property of, a legal person. In this regard, the above-mentioned decision of

---

[2] MALAURIE Philippe, AYANÈS Laurent, Droit des biens, LGDJ p. 31.

[3] Article 567 of the Luxembourg Commerce Code.

[4] Loi 9 juillet 2013 portant modification de l'article 567 du Code de Commerce, Exposé des motifs.

[5] CSJ, 29 janvier 2008, n°57/08, Recueil de Jurisprudence Pénale, 2012, p. 341, Jean-Luc PUTZ.

[6] Cass, 03 avril 2014, N° 17 / 2014.

the Supreme Court also stated that the fact of rightfully accessing a server or a network does not

imply that remaining in the system is necessary rightful and the fact of remaining in the network

to perform unauthorized actions renders the continuing access fraudulent.

    3.1.8.   Company data and documents comprise documents and data stored on the servers

of the Companies including those accessible via remote or mobile devices and those sent to or

from the Plaintiffs' Companies email address.

    3.1.9.   It results from the above that documents and data in whatever form, including

emails, other electronic documents and hard copy documents of a company constitute tangible or

intangible assets forming part of the assets of the relevant Company, irrespective of whether the

document is accessible from a distance via a mobile device. The use of such data and its sharing

with others outside the Companies must therefore be in, and compatible with, the relevant

Company's interest.

    **3.2.**    **Shareholders and board members rights/power to obtain and share Company**

**records or data**

    3.2.1.   *Rights of shareholders*

    3.2.1.1.   The rights of shareholders in public limited liability companies (*sociétés*

*anonymes*) are provided for in the 1915 Law. In addition, the articles of association of a company

may provide for certain additional shareholder rights.

    3.2.1.2.   As a general rule, shareholders exercise their rights in the context of general

meetings. The rights of the general meeting of shareholders are provided for in the 1915 Law.

These rights include inter alia the power to appoint and remove the members of the management

body of a company, to amend the articles of association of a company, to approve the annual

accounts of a company and to decide on a possible merger/demerger as well as the dissolution and liquidation of a company.

3.2.1.3.      In the context of exercising these rights, shareholders have certain specifically identified information rights. The 1915 Law does not contain an overarching disposition setting out a general right to information of shareholders. Instead, the right to information results from specific provisions of the 1915 Law applicable to some forms of commercial companies as well as general principles of Luxembourg law. The information rights of shareholders generally cover specific scenarios. For example, each shareholder is entitled to examine the shareholders' register at the registered office of the company.[7]

3.2.1.4.      The balance sheet and profit and loss statements as well as certain reports of the directors and of the auditors and certain ancillary information, and in case of amendments to the articles of association, the text of the proposed amendments and the draft consolidated articles constitute the company information that must be made available to shareholders.[8]

3.2.1.5.      In addition, shareholders have the right to ask questions during any general meeting of shareholders. However, this right is limited. First, the right of shareholders to ask questions is limited to questions with respect to items on the agenda of the meeting. Second, it is for the directors to determine, under their own responsibility, whether there exist legitimate grounds for refusing to answer a question put to them by a shareholder. Legitimate grounds for refusing to answer include the protection of the corporate interest (*intérêt social*) of the company or because the questions whilst falling within the ambit of the agenda, are clearly and undeniably unnecessary in order to allow an informed participation in the discussions and the vote.

---

[7] Article 430-3 of the 1915 Law.

[8] Article 461-6 of the 1915 Law.

3.2.1.6.       Other than these shareholder rights, the 1915 Law contains no individual right of information or right of a shareholder in a *société anonyme* to require documents or data from the company.

3.2.1.7.       Put differently, shareholders do not have an individual right of investigation[9] which could allow them to obtain company documents.

3.2.1.8.       For the sake of completeness, the Articles of none of the Companies contain provisions extending the right of shareholders to request any documents from the relevant Company other than those provided for by law.

3.2.1.9.       Finally, the limited information rights mentioned above belong to persons who directly hold shares in a company. However, we understand none of the Plaintiffs is a direct shareholder of any of the Companies. They therefore have as such none of the limited rights mentioned above.

3.2.1.10.      Plaintiffs, because they are not direct shareholders of the Companies, have no legal right to obtain documents and data from the Companies.

3.2.2.   *Rights of members of the board of directors*

3.2.2.1.       The Companies are public limited liability companies (*sociétés anonyme*) having a board of directors. Under Luxembourg law (and except for single shareholder *sociétés anonymes*), management of a public limited liability company (*société anonyme*) is by a collegial body. Indeed, article 444-3 of the 1915 Law states that the directors form collegiate bodies while article 441-5 of the 1915 Law allocates management to the board of directors and not to directors individually. A director has in principle no individual management powers which could give him unfettered access to company information.

_____
[9] Jean-Pierre Winandy, Manuel de droit des sociétés, 2019, p. 192.

3.2.2.2.       Each of the Plaintiffs is a director in each of the Companies' ten-member Boards of Directors. In that capacity, each Plaintiff is required to act in accordance with the duties and obligations of a director. We have been advised none of the Plaintiffs holds any other positions within the Companies.

3.2.2.3.       Luxembourg company law requires every director to act in an informed manner. The corollary of such duty is the right of a director to be informed about the company's affairs. The information rights of a director, however, are limited.

3.2.2.4.       First, the director's right to be informed covers information only to the extent it is needed for exercising his duties as a director. Indeed, article 444-3, paragraph 4, of the 1915 Law provides that "each member of the board of directors [...] shall be entitled to examine all information submitted to the relevant board". This provision is looking to allow every director to be adequately informed while exercising his or her mandate by providing him or her the supporting materials prior to a board meeting.

3.2.2.5.       Second, the information right of a director is exercised by the board of directors itself, acting as a collegiate body.[10] Subject to the next paragraph, a director has no individual power to directly request information from management. Such requests are expressly or implicitly made by the board of directors.

3.2.2.6.       Directors do however have an individual investigation right which allows them to seek, on their own initiative, information deemed useful or necessary for the exercise of their mandate.[11] However, this individual investigation right is limited. Indeed, a director wishing

---

[10] Alain Steichen, Précis de droit des sociétés, Editions Saint-Paul 2018, p. 663.

[11] Simont, L'administrateur d'une S.A. agissant isolément a-t-il un droit d'investigation individuel ? RPS 1963, p. 189.

to exercise its individual investigation right should avoid disrupting the normal functioning of the company and must keep all information so collected confidential.[12] Most importantly, however, the investigation right of a director is limited to investigations which are necessary for the exercise of his or her mandate.[13]

3.2.2.7.       Again, the purpose of this individual investigation right is to allow directors to be adequately informed when exercising their mandate. Stated differently, it may not be used by the director for personal purposes. Indeed, Luxembourg courts have decided that information obtained by or available to a director must only be used by the director for the exercise of his mandate as director and that any disclosure or indiscretion with respect to this information constitutes misconduct on the part of the director.[14]

3.2.2.8.       A director may as a result not request or use company data or documents for personal purposes.

3.2.2.9.       Plaintiffs have therefore no right to obtain any documents of the Companies or use any documents of the Companies to which they have access (e.g. though their mailbox) for their personal purposes.

3.2.2.10.      It is not only established that directors have no right to obtain company documents and data for personal purposes but also that a director may not use for personal purposes the information to which he or she has access in the course of his or her duties.[15]

---

[12] As ruled by Lux. 21 janvier 1988, n° 37 823.

[13] Cour d'appel 10 juillet 1991, n° 10 974.

[14] Lux. 21 janvier 1988, n° 37 823.

[15] Didier Willermain, Les devoirs des dirigeants sociaux, spécialement des administrateurs de sociétés anonymes, Bruylant 2012, p. 75.

3.2.2.11.     In fact, the counterpart of the director's information and investigation right is illustrated by the duty of confidentiality which binds every member of the board of directors.[16] The duty of confidentiality is explicitly provided for by article 444-6 of the 1915 Law which states that "the directors […] shall be under a duty, even after they have ceased to hold office, not to divulge any information which they have concerning the *société anonyme*, the disclosure of which might be prejudicial to the company's interests, except where such disclosure is required or permitted by a legal or regulatory provision applicable to *sociétés anonymes* or is in the public interest".

3.2.2.12.     As a result of the director's duty of confidentiality, a director may not disclose or use information or any document received in the exercise of his or her duties. This covers any information and document which is in possession of the directors as well as any information and document which a director could obtain when exercising his information and investigation rights.

3.2.2.13.     Applied to the case at hand, Plaintiffs, in their capacity as directors of the Companies, have no right to request, communicate or use Company documents and data (including those available in their email accounts) for personal uses.

## IV.   PERSONAL DATA PROTECTION MATTERS

4.1.     Documents belonging to any commercial company, emails in particular, will very often (if not always in relation to emails) comprise personal data, also known outside of the European Union as personally identifiable information.

---

[16] Père, L'obligation de discrétion des membres du conseil d'administration, D. 2004, p. 1786 ; Tilleman, L'obligation au secret et à la discrétion des administrateurs de sociétés, J.T. 1993, p. 549 ; Tilleux et Salteur, Administrateur de société, une fonction aux devoirs multiples, RPS 2016, p. 333.

4.2.    In the European Union, the protection of natural persons with regard to the processing of personal data is governed by the EU General Data Protection Regulation (the "GDPR")[17], which is directly applicable in all EU member States including Luxembourg.

4.3.    Personal data transfers, referred to under the GDPR as transfers to third countries i.e. outside of the European Economic Area (the "EEA") or international organisations, must be based on one of the legal basis exhaustively listed in the GDPR, namely (a) the existence of an adequacy decision adopted by the EU Commission and covering either the country of destination or the data importer itself or, failing that, (b) the implementation of appropriate safeguards or binding corporate rules or, failing that, (c) the reliance on a valid derogation.

4.4.    The United States of America (the "U.S.") are covered by an adequacy decision benfitting only to the entities who adhered to the EU-US Privacy Shield Framework. For transfers to be possible on this basis in the context at hand, the District Court for the District of Columbia and the defendants would be required to be listed on the relevant website of the U.S. Department of Commerce (i.e. https://www.privacyshield.gov/list).

4.5.    In the absence of an adequacy decision, personal data transfers to third countries are allowed provided that appropriate safeguards are in place, such as standard data protection clauses adopted by the EU Commission to be entered into between the data exporter and the data importer or binding corporate rules concluded within a group of undertakings or enterprises engaged in a joint economic activity.

4.6.    In the absence of an adequacy decision or of appropriate safeguards, Article 49 of the GDPR lists derogations for specific situations under which transfers to third countries may be

---

[17] Regulation (EU) 2016/679 of the European Parliament and of The Council of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data, and repealing Directive 95/46/EC (General Data Protection Regulation).

permitted. According to guidance from the European Data Protection Board, the conference of the data protection authorities of all EU member States (the "EDPB"), "derogations under Article 49 are exemptions from the general principle that personal data may only be transferred to third countries if an adequate level of protection is provided for in the third country or if appropriate safeguards have been adduced and the data subjects enjoy enforceable and effective rights in order to continue to benefit from their fundamental rights and safeguards. Due to this fact and in accordance with the principles inherent in European law, the derogations must be interpreted restrictively so that the exception does not become the rule. This is also supported by the wording of the title of Article 49 which states that derogations are to be used for specific situations ('Derogations for specific situations')."[18]

    4.7.    Specifically as regards discovery procedures, the EDPB notes as follows in relation to the derogation under Article 49(1)(e) of the GDPR which allows data transfers which are necessary for the establishment, exercise or defense of legal claims: "Recital 111 [of the GDPR] states that a transfer can be made where it is 'occasional and necessary in relation to a contract or a legal claim, regardless of whether in a judicial procedure or whether in an administrative or any out-of-court procedure, including procedures before regulatory bodies'. This covers a range of activities for example, in the context of a criminal or administrative investigation in a third country (e.g. anti-trust law, corruption, insider trading or similar situations), where the derogation may apply to a transfer of data for the purpose of defending oneself or for obtaining a reduction or waiver of a fine legally foreseen e.g. in anti-trust investigations. As well, data transfers for the purpose of **formal pre-trial discovery procedures in civil litigation may fall under this**

---

[18] EDPB Guidelines 2/2018 on derogations of Article 49 under Regulation 2016/679 adopted on 25 May 2018. This document seeks to provide guidance as to the application of Article 49 of the GDPR on derogations in the context of transfers of personal data to third countries.

**derogation** (emphasis added). (…) As a transfer needs to be made in a procedure, a close link is necessary between a data transfer and a specific procedure regarding the situation in question. The abstract applicability of a certain type of procedure would not be sufficient. Data controllers and data processors need to be aware that national law may also contain so-called 'blocking statutes', prohibiting them from or restricting them in transferring personal data to foreign courts or possibly other foreign official bodies."[19]

4.8.    In relation to the overarching principle of necessity of the data transfer, the EDPD adds: "A data transfer in question may only take place when it is necessary for the establishment, exercise or defense of the legal claim in question. This 'necessity test' requires a close and substantial connection between the data in question and the specific establishment, exercise or defense of the legal position. The mere interest of third country authorities or possible 'good will' to be obtained from the third country authority as such would not be sufficient. Whilst there may be a temptation for a data exporter to transfer all possibly relevant personal data in response to a request or for instituting legal procedures, this would not be in line with this derogation or with the GDPR more generally as this (in the principle of data minimization) emphasizes the need for personal data to be adequate, relevant and limited to what is necessary in relation to the purposes for which they are processed. In relation to litigation proceedings the WP29 [i.e. the Article 29 Working Party], predecessor of the EDPB, has already set out a **layered approach to the question of whether the personal data should be transferred, including the application of this principle. As a first step, there should be a careful assessment of whether anonymized data would be sufficient in the particular case. If this is not the case, then transfer of pseudonymized data could be considered. If it is necessary to send personal data to a third**

---

[19] Id., p 11.

13

<u>country, its relevance to the particular matter should be assessed before the transfer – so</u>

<u>only a set of personal data that is actually necessary is transferred and disclosed</u>"(emphasis

added)[20].

4.9.     The above obligations will apply to the Companies as data controllers (within the

meaning of the GDPR).

**V.     CONCLUSION**

5.1.     Direct shareholders only have limited information rights which do not include the

power to obtain from the Companies data and documents other than those specifically provided by

the law. Persons not directly holding shares in a *société anonyme* do not have any information

rights.

5.2.     The members of the board of directors of a *société anonyme* do not have the power

to obtain documents belonging to the company for their own needs, as individuals not acting within

the framework of their position or mandate in the context of a dispute which does not concern that

company.

5.3.     I understand the Plaintiffs are acting personally in the relevant litigation and not in

their capacity as shareholders or members of the board of directors of the Companies. They do not

have the power to obtain, give access to or otherwise disclose documents belonging to the

Companies.

5.4.     This applies to any of the documents and data available to the Plaintiffs, e.g.

through their personal devices or any remote connection made available to them by the Companies

in their capacity as directors and also to the documents stored on the servers of the Companies to

which they do not have direct access.

---

[20] Id., p 12.

5.5.    The above conclusion indistinctly applies whether the documents exist in paper or in electronic format and whether or not they have been created by or distributed to Plaintiffs.

## VI.    ABH HOLDINGS S.A.

6.1.    The developments and conclusion set out above equally apply to ABH Holdings S.A. ("ABH").  We understand that, ABH, incorporated under the laws of Luxembourg and organized in the form of a public limited liability company (*société anonyme*) with registered office at 3 boulevard du Prince Henri, L-1724 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg trade and companies register under number B151018, is an indirect parent company of Russian Joint Stock Company Alfa-Bank ("Alfa Bank").

6.2.    In addition, as a matter of Luxembourg law, the Plaintiffs as shareholders of ABH do not have the right to obtain, through ABH, documents or data of Alfa Bank.

I, on behalf of Elvinger Hoss Prussen, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 2, 2020 at 2, place Winston Churchill, L-1340 Luxembourg.

By: _____
Philippe Hoss
Elvinger Hoss Prussen, *société anonyme*
2, place Winston Churchill
L-1340  Luxembourg
Grand-Duchy Luxembourg
RCS  Luxembourg: B209469
+352 446644 5311
philippehoss@elvingerhoss.lu

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MIKHAIL FRIDMAN, PETR AVEN, AND GERMAN KHAN,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 17-2041-RJL** |
| **BEAN LLC a/k/a FUSION GPS, and GLENN SIMPSON,** | |
| **Defendants.** | |

## INTERVENORS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL PLAINTIFFS' PRODUCTION OF THEIR DOCUMENTS

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ......................................................................................................2

I.      The Companies' Corporate Structures...........................................................2

        A.      LetterOne ...............................................................................2

        B.      Alfa .......................................................................................2

II.     The Companies' Proactive Outreach to Defendants ........................................2

        A.      The Companies' Denial of Plaintiffs' Requests for Documents............................3

        B.      The Companies' Repeated Offers to Produce Responsive Documents to
                Defendants ..............................................................................5

ARGUMENT .......................................................................................................7

I.      The Court Should Deny Defendants' Motion to Compel as Premature. ...........................7

II.     The Plaintiffs Lack the Legal Right or Authority to Obtain the Companies'
        Documents ......................................................................................14

        A.      Plaintiffs Lack the Legal Right or Authority to Obtain Alfa Bank's
                Documents ..............................................................................15

        B.      Plaintiffs Lack the Legal Right or Authority to Obtain LetterOne's
                Documents ..............................................................................17

III.    Plaintiffs Do Not Have The Practical Ability To Obtain The Companies'
        Documents ......................................................................................19

        A.      Plaintiffs' Leadership Positions and Ownership Interests Do Not Give
                Them Control of the Documents.........................................................21

                1.      Plaintiffs Do Not Have Control Over the Companies' Documents
                        Simply Because They Are Officers, Directors, and Founders..................21

                2.      Plaintiffs' Interests in the Companies Do Not Give Plaintiffs
                        Access to Company Documents .............................................24

        B.      Plaintiffs Do Not Have Influence Over Other Corporate Officers and
                Board Members...........................................................................27

i

C.  Defendants Mischaracterize the Companies' "Stake" in This Litigation ..............30

D.  Plaintiffs Are Not Holding Themselves Out as Controlling the Companies
    and Shielding Documents ......................................................................................31

E.  Defendants Fail to Establish Close Coordination Between the Companies
    and Plaintiffs ........................................................................................................33

F.  Plaintiffs' Use of Email Does Not Give Them the Practical Ability to
    Obtain All Documents from the Companies............................................................34

G.  Plaintiffs Have Made a Good Faith Effort to Obtain Documents.........................36

CONCLUSION.....................................................................................................................37

# TABLE OF AUTHORITIES

## CASES

*Afros S.P.A. v. Krauss-Maffei Corp.*,
    113 F.R.D. 127 (D. Del. 1986) ...................................................................31

*Annunziato v. Collecto, Inc.*,
    304 F.R.D. 360 (E.D.N.Y. 2015) ..........................................................28, 35

*Appleton Papers, Inc. v. George A. Whiting Paper Co.*,
    No. 08-C-16, 2009 WL 2408898 (E.D. Wis. July 31, 2009) ......................32, 33

*In re Application of Bloomfield Investment Resources Corp.*,
    315 F.R.D. 165 (S.D.N.Y. 2016) ...........................................................24, 34

*Bush v. Ruth's Chris Steak House, Inc.*,
    286 F.R.D. 1 (D.D.C. 2012)......................................................................20

*Chevron Corp. v. Donziger*,
    296 F.R.D. 168 (S.D.N.Y. 2013) ..................................................................32

*Chevron Corp. v. Salazar*,
    275 F.R.D. 437 (S.D.N.Y. 2011) ..................................................................35

*City of Harper Woods Employees' Retirement System v. Olver*,
    589 F.3d 1292 (D.C. Cir. 2009) ..................................................................14

*Cohen v. Horowitz*,
    No. 07 Civ. 5834 (PKC), 2008 WL 2332338 (S.D.N.Y. June 4, 2008) ...................10, 20

*Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Philips Petroleum Co.*,
    105 F.R.D. 16 (S.D.N.Y. 1984) ..................................................................31

*Cooper Industries, Inc. v. British Aerospace, Inc.*,
    102 F.R.D. 918 (S.D.N.Y. 1984) ..................................................................35

*Edgar v. MITE Corp.*,
    457 U.S. 624 (1982)......................................................................14

*In re Flag Holdings, Ltd. Securities Litigation*,
    236 F.R.D. 177 (S.D.N.Y. 2006) ...........................................................34, 35

*Gross v. Lunduski*,
    304 F.R.D. 136 (W.D.N.Y. 2014)..................................................................30

*In re Kidd*,
    No. 3:20-MC-00016-TOF, 2020 WL 2404928 (D. Conn. May 12, 2020)......................23

*Kifle v. Parks & History Ass'n*,
    No. Civ. A., 98-00048 (CKK), 1998 WL 1109117 (D.D.C. Oct. 15, 1998) ...................11

*McKesson v. Islamic Republic of Iran*,
    185 F.R.D. 70 (D.D.C. 1999) ...........................................................................................33

*Mindspirit, LLC v. Evalueserve Ltd.*,
    346 F. Supp. 3d 552 (S.D.N.Y. 2018) ............................................................................14

*New York ex rel. Boardman v. National Railroad Passenger Corp.*,
    233 F.R.D. 259 (N.D.N.Y. 2006) ....................................................................................32

*\*Norex Petroleum Ltd. v. Chubb Insurance Co. of Can.*,
    384 F. Supp. 2d 45 (D.D.C. 2005) ......................................................................19, 22, 24

*Royal Park Investment SA/NV v. Deutsche Bank National Trust Co.*,
    314 F.R.D. 341 (S.D.N.Y. 2016) .....................................................................................11

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.*,
    490 F.3d 130 (2d Cir. 2007)...............................................................................14, 21, 25

*Shcherbakovskiy v. Seitz*,
    No. 03 CV 1220 RPP, 2010 WL 3155169 (S.D.N.Y. July 30, 2010), *aff'd*, 450 F.
    App'x 87 (2d Cir. 2011)......................................................................................25, 28, 29

*Tavoulareas v. Piro*,
    93 F.R.D. 11 (D.D.C. 1981).............................................................................................36

*Tomlinson v. El Paso Corp.*,
    245 F.R.D. 474 (D. Colo. 2007) .....................................................................................28

*\*U.S. International Trade Commission v. ASAT, Inc.*,
    411 F.3d 245 (D.C. Cir. 2005)............................................................................20, 25, 30

*U.S. Philips Corp. v. Synergy Dynamics International, LLC*,
    No. 2:05-cv-00577-PWP-GWF, 2007 WL 9734384 (D. Nev. July 9, 2007) ...................23

*United States v. Funds Held in the Name or for the Benefit of Wetterer*,
    210 F.3d 96 (2d Cir. 2000)...............................................................................................14

*\*In re Vivendi Universal, S.A. Securities Litigation*,
    No. 02 Civ. 5571 (RJH) (HBP), 2009 WL 8588405 (S.D.N.Y. July 10, 2009) ..........14, 15

*Weaver v. Gross*,
    107 F.R.D. 715 (D.D.C. 1985).........................................................................................22

## RULES

Federal Rule of Civil Procedure 34 ................................................................................14, 19, 21

iv

**OTHER AUTHORITIES**

7 Moore's Federal Practice § 34.14(2)(b) (2004) ........................................................................19

U.S. Department of State—Bureau of Consular Affairs, Russian Federation,
     https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-
     Information/RussianFederation.html ................................................................................7

Wright & Miller, Fed. Prac. & Proc. § 2210...............................................................................19

## PRELIMINARY STATEMENT

Forsaking good-faith cooperation for adversarial litigation, Defendants seek to burden this Court with unnecessary motions practice.  Taken at face value, the crux of Defendants' motion to compel is that they are unable to obtain potentially relevant documents from AO Alfa-Bank ("Alfa Bank") and LetterOne (collectively, the "Companies"), and that this Court's intervention is necessary to ensure that Defendants are not prejudiced going forward.  But the record belies Defendants' tale and defeats the cornerstone of their motion.  The Companies, in fact, proactively reached out to Defendants on multiple occasions to negotiate the production of potentially relevant documents.  As a concrete and significant sign of good faith, the Companies even offered to produce relevant documents in the absence of formal process and without forcing Defendants to invoke the unwieldy procedures for obtaining foreign documents in the normal course.  Defendants stonewalled these overtures and substantial accommodations, refusing to engage even in preliminary discussions with the Companies to determine whether a mutually agreeable resolution was possible.

Defendants' stubborn refusal to engage with the Companies dooms their motion.  Had Defendants participated in a good-faith dialogue with the Companies, this motion might well have been mooted.  At the very least, such discussions likely would have narrowed the issues in dispute and reduced the litigation burdens on the parties and this Court.  Because Defendants blocked all efforts at cooperation, their claims of prejudice are insufficient and speculative and should be rejected.  And no amount of mudslinging and conjecture from Defendants about the Companies' purported hidden motives can distract from the blatant prematurity of this motion.  Accordingly, the Court should deny the motion as premature and order Defendants to negotiate in good faith with the Companies in an effort to resolve all outstanding issues without resort to burdensome motions practice.

1

Even if the Court proceeds to consider the merits of Defendants' motion, it should rule that the Companies' documents are not within the possession, custody, or control of Plaintiffs. Plaintiffs lack the legal authority to obtain the documents that Defendants seek under the relevant foreign law.  As foreign local counsel from Russia and Luxembourg explain, neither Plaintiffs' interests relating to Alfa Bank and LetterOne nor their positions of authority within Alfa Bank and LetterOne grant them any legal rights to obtain the requested documents.  Further, it is Defendants' burden to establish that Plaintiffs have the practical ability to obtain the documents from the Companies, and Defendants fail to satisfy that burden, particularly in light of the obstacles to production detailed in the reports of foreign local counsel and Defendants' refusal to engage with the Companies.

## BACKGROUND

### I.   THE COMPANIES' CORPORATE STRUCTURES

#### A.   LetterOne

LetterOne is comprised of LetterOne Investment Holdings S.A. and LetterOne Holdings S.A. The LetterOne entities are formed under Luxembourgian law, with headquarters in Luxembourg and offices in England and Gibraltar.

#### B.   Alfa

AO Alfa-Bank ("Alfa Bank") is a joint stock company formed under Russian law with its headquarters in Russia.  Alfa Bank is part of a larger group of entities informally referred to as the Alfa Group ("Alfa").  ABH Holdings S.A. ("ABHH"), a Luxembourg company formed under Luxembourg law, serves as Alfa Bank's indirect parent company.

### II.   THE COMPANIES' PROACTIVE OUTREACH TO DEFENDANTS

The record makes two points perfectly clear.  *First*, the Companies expressly rejected Plaintiffs' requests for Company documents, and Plaintiffs and the Companies repeatedly have

communicated this to Defendants.  ***Second***, the Companies have reached out to Defendants on multiple occasions to negotiate the production of documents in good faith—offering to disclose responsive documents in the absence of a subpoena and without requiring Defendants to invoke the Hague Evidence Convention or letters rogatory process and proposing a reasonable date range to produce documents relevant to the truth or falsity of the defamatory statements at issue—and Defendants have stonewalled at every turn, preferring to burden this Court with unnecessary and premature motions practice.

### A.    The Companies' Denial of Plaintiffs' Requests for Documents

As counsel for both Plaintiffs and the Companies have explained to counsel for Defendants on a number of occasions, the Companies expressly rejected Plaintiffs' request for access to and use of company documents for purposes of this litigation.  In December 2019, as the parties began considering issues related to party document production, Plaintiffs' counsel, on behalf of Plaintiffs, spoke to the Companies' counsel and requested that Plaintiffs be given access to company documents (including their emails for purposes of reviewing and producing responsive documents to Defendants).  That same month, counsel for the Companies, on behalf of the Companies, denied Plaintiffs' request on the basis that Plaintiffs' emails generated using work email addresses and other documents generated on work-based platforms or databases are within the exclusive possession, custody, or control of the Companies.

In March 2020, as the parties began to engage in the substantive meet-and-confer process regarding their production obligations, Plaintiffs, through their counsel, once more requested access to and use of the Companies' documents for this litigation.  Counsel for the Companies informed LetterOne Investment Holdings S.A. and LetterOne Holdings S.A. (which compose the LetterOne Group) of Plaintiffs' request and it was confirmed that Plaintiffs lack unfettered access to company documents and that LetterOne refused to grant them access to and use of company

documents for review and production in this litigation.  Counsel for the Companies also informed ABHH of the Plaintiffs' request and the request was discussed by Alfa.  Counsel for the Companies received confirmation from both ABHH and Alfa Bank that Plaintiffs' request had been considered and rejected and that those entities refused to grant Plaintiffs access to and use of company documents for review and production in this litigation.

Both Plaintiffs and the Companies have been transparent about the Companies' position throughout this litigation.  As far back as November 2019, when serving their objections to Defendants' first requests for production of documents, Plaintiffs made clear that they were "not responding on behalf of" the Companies.  Dkt. 78-5, at 4–5.  Throughout the duration of the meet-and-confer process, moreover, Plaintiffs reaffirmed and emphasized that they had requested potentially relevant documents from the Companies, and that the Companies had refused on the ground that such documents belong to, and are within the exclusive possession, custody, or control of, the Companies.  *See, e.g.*, Dkt. 78-9, at 2 (Apr. 2, 2020 email); Dkt. 78-11, at 6 (Apr. 24, 2020 letter); Dkt. 78-13, at 3 (May 15, 2020 letter); Dkt. 78-17, at 4 (June 2, 2020 letter).  Were that not enough, the Companies themselves proactively reached out to Defendants to make clear that the Companies had refused Plaintiffs' requests for access to and use of documents for purposes of this litigation.  Dkt. 78-32, at 2 (May 1, 2020 email) ("On behalf of the plaintiffs, CLM asked whether Alfa and LetterOne would give them access to such documents for use in the Bean litigation.  On behalf of Alfa and LetterOne, we denied that request on the basis that such documents are within the possession, custody, or control of Alfa or LetterOne."); Dkt. 78-33, at 2 (May 8, 2020 email) ("Alfa and LetterOne rejected the plaintiffs' request for access to and the use of company documents for purposes of this litigation.").

4

**B.  The Companies' Repeated Offers to Produce Responsive Documents to Defendants**

In a good-faith effort to provide Defendants with documents related to this case and to resolve production issues without burdening the Court with unnecessary motions practice, counsel for the Companies proactively reached out to counsel for Defendants on two separate occasions. Dkt. 78-32, at 2 (May 1, 2020 email); Dkt. 78-33 (May 8, 2020 email).

In a May 1, 2020 email to counsel for Defendants, counsel for the Companies explained that the Companies "are willing to work with you to produce documents related to the matters at issue in the Bean litigation." Dkt. 78-32, at 2.  Specifically, counsel explained that the Companies "are willing to negotiate with you in good faith—*in the absence of a subpoena*—and to consider producing documents *without requiring compliance with the Hague Evidence Convention and letters rogatory procedures* provided that we are able to come to a mutual agreement as to the scope of any request." *Id.* (emphasis added).  Counsel expressed the "hope . . . that we can reach a mutually agreeable resolution that avoids the need to litigate these issues" before this Court and asked counsel for Defendants for a call to discuss the requests and production. *Id.*

After counsel for Defendants largely ignored the Companies' accommodative proposal, counsel for the Companies repeated this good-faith offer to negotiate and produce responsive documents in a May 8, 2020 email.  Counsel noted that, because responsive documents are located in foreign countries, Defendants "in the normal course would be required to invoke the Hague Evidence Convention or the letters rogatory process to obtain responsive documents."  Dkt. 78-33, at 2.  "In recognition of the[] difficulties" in obtaining documents through these "cumbersome" processes and "out of a desire to avoid unnecessary litigation," counsel for the Companies repeated their "offer[] to negotiate with . . . [D]efendants in good faith and to produce responsive documents, provided that we are able to settle on a mutually agreeable scope of production." *Id.*  Not only

5

that, counsel for the Companies noted that they were "prepared to search for and produce documents from . . . [P]laintiffs' Alfa and LetterOne email accounts that relate to the truth or falsity of the allegedly defamatory allegations in CIR 112 and are dated within a reasonable time period." *Id.* Counsel closed by proposing once more to discuss the issues with counsel for Defendants on a phone call. *Id.* Once more, counsel for Defendants refused to discuss non-adversarial options for working through document production.[1]

Having rebuffed the Companies' genuine efforts to accommodate their litigation needs and evidently preferring to leapfrog the standard meet-and-confer process, Defendants headed straight to motions practice by filing a motion to compel.

---

[1]  In addition to direct outreach by the Companies, counsel for Plaintiffs consistently informed Defendants that the Companies stood willing and ready to negotiate the production of documents in good faith. *See, e.g.*, Dkt. 78-8, at 6 (Mar. 12, 2020 letter) (providing the name and law firm of counsel for the Companies); Dkt. 78-9, at 2 (Apr. 2, 2020 email) (explaining that counsel for the Companies "would handle directly any specific discovery requests made by Defendants for Alfa or LetterOne ESI or documents"); Dkt. 78-11, at 6 (Apr. 24, 2020 letter) (noting that counsel for Plaintiffs "have conveyed to [counsel for Defendants] verbally that you should contact [counsel for the Companies] and that we understand that such counsel intended to act in good faith with respect to discovery from the entities," and "urg[ing]" Defendants to contact the Companies' counsel, "who have expressed their willingness to work cooperatively with you to resolve any issues short of litigation"); Dkt. 78-13, at 4 (May 15, 2020 letter) ("We understand that counsel for Alfa and LetterOne is willing to discuss Defendants' requests for documents, perhaps without requiring that Defendants serve a subpoena or follow foreign service formalities, thus your claim of prejudice is, at best, premature."); Dkt. 78-17, at 4 (noting that counsel for the Companies has not "taken the position that Defendants must obtain the entity documents via the Hague Convention or other foreign service formalities" and "again encourag[ing] you to take the opportunity to communicate with counsel for Alfa and LetterOne to obtain discovery from the entities you believe necessary for your clients' defense").

## ARGUMENT

**I.    THE COURT SHOULD DENY DEFENDANTS' MOTION TO COMPEL AS PREMATURE**

As a threshold matter, the Court need not—and should not—wade through the thicket of legal and factual issues presented by Defendants' motion to compel.  In light of the demonstrated record of the Companies' good-faith offers to negotiate, there is every reason to believe that Defendants' document requests can be accommodated through negotiation, sparing the Court the burden of analyzing the fact-laden question whether Plaintiffs have possession, custody, or control of the Companies' documents.  Accordingly, the Court should deny Defendants' motion as premature and order Defendants to engage in a good-faith meet-and-confer process with the Companies.

As detailed above, the Companies have made concerted and substantial efforts to accommodate Defendants' document requests and clear any impediments that might stand in the way of a meaningful production.  The Companies expressed their willingness to permit Defendants to bypass the Hague Evidence Convention and the letters rogatory process.  In the ordinary course, Defendants could obtain Company documents only through the formal procedures spelled out in the Hague Evidence Convention or other diplomatic processes, which can be cumbersome at best and limit the amount of information that a party can obtain.  And, as a practical matter, Defendants would have been blocked from obtaining any documents located in Russia, which is not a signatory to the Hague Evidence Convention and refuses to cooperate with requests for evidence submitted via letters rogatory.[2]  In recognition of the burdens imposed on Defendants by forcing them to

---

[2]    *See* U.S. Department of State—Bureau of Consular Affairs, Russian Federation, https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/RussianFederation.html.

navigate these channels, the Companies offered to produce documents outside the bounds of formal diplomatic frameworks in the interest of proactively seeking to protect the Companies' interests in their documents.

Likewise, the Companies agreed to negotiate and produce documents in the absence of a subpoena. Without this concession by the Companies, Defendants would have been required to invoke diplomatic processes to serve subpoenas on the Companies—a tedious endeavor whenever seeking documents abroad and nearly impossible in Russia. The Companies' good faith thus spared Defendants' the time and expense of serving a subpoena in a foreign county for LetterOne's documents and made it possible for them to obtain documents from Alfa Bank in Russia.[3]

As a further accommodation and sign of good faith, the Companies proactively set out the universe of documents that they proposed disclosing. The Companies agreed to produce documents related to the truth or falsity of the allegations in CIR 112 dated within a "reasonable time period." Dkt. 78-33, at 2. And, in the event that Defendants had concerns about the production proposal or the substance of disclosure, the Companies urged counsel for the Defendants to begin a dialogue with the Companies to resolve all outstanding issues.

Unfortunately and disappointingly, Defendants greeted the Companies' significant concessions and good-faith efforts with stonewalling. Defendants' only substantive response prior to filing the motion to compel was the following: "We have your email. It is Defendants' position that these documents are in Plaintiffs' control, and that Plaintiffs cannot proceed with their case without reviewing and producing them. Thank you." *Id.* at 2. Defendants offered no justification

---

[3]   The Companies will of course continue to negotiate in good faith from the position that it is not necessary for Defendants to serve a subpoena on the Companies or invoke diplomatic processes in the event that Defendants' withdraw their motion to compel or this Court denies the Defendants' motion to compel.

for their steadfast refusal to engage with the Companies.  Had they identified the perceived problems, if any, with the Companies' proposal, Defendants and the Companies might well have worked through their issues in a cooperative manner and reached a mutually agreeable resolution.

Instead, Defendants broke off all communication with the Companies and filed this motion. In doing so, Defendants call on this Court to undertake what they frankly concede is a "highly fact-specific" inquiry.  Defs.' Br. at 18.  Indeed, Defendants' brief underscores the burden on this Court, devoting over a page simply to listing the "number of factors" that courts must analyze when determining whether a party has possession, custody, or control of specified documents.  *Id.* at 18–19 (listing "a variety of non-exclusive factors," including "whether the litigating party's involvement in the non-party corporation is sufficient to give him control of the board; the extent of the litigating party's ownership interest in the non-party corporation; the degree to which the litigating party can influence the leadership of the non-party corporation; whether the litigating party is 'an officer, director or shareholder' of the non-party corporation; whether the litigating party 'founded, ran, and housed' the non-party corporation; . . . whether the litigating party and the non-party have 'a common interest in this litigation'"; "whether the litigating party has 'access to documents when the need arises in the ordinary course of business'; whether the litigating party is an agent of the non-party corporation; and 'any benefit or involvement by the non-party corporation in the transaction' at issue").  Rather than expend considerable resources to evaluate these nine "non-exclusive factors," the Court should require Defendants first to negotiate with the Companies in an effort to resolve this dispute outside of court.

What Defendants want, at bottom, is to have their cake and eat it too.  To justify their efforts to obtain Company documents, Defendants earnestly seek to treat the Companies as parties to the litigation, artificially and erroneously synonymizing them with Plaintiffs.  At the same time,

however, Defendants refuse to carry out the obligations that underlie party discovery, altogether bypassing the meet-and-confer process.  The Court should not reward Defendants' intransigence by classifying the Companies as virtual parties to this litigation, thereby opening their files to Defendants by way of Plaintiffs, while at the same time relieving Defendants of their obligation to negotiate in good faith before rushing to seek judicial intervention.  Rather, the Court should enforce the normal order of operations by denying this motion as premature and requiring Defendants to resolve the dispute through negotiation.  *See Cohen v. Horowitz*, No. 07 Civ. 5834 (PKC), 2008 WL 2332338, at *2 (S.D.N.Y. June 4, 2008) ("[E]ven where there is no legal or practical impediment [to a party's ability to obtain the requested documents], a Court may properly require the party seeking the documents to endeavor to obtain them from the non-party in the first instance.").

Although largely ignoring the inconvenient issue of the prematurity of their motion, Defendants seek to justify their brush-off of the Companies in two primary ways.  Neither is persuasive.

*First*, Defendants claim that seeking documents from the Companies will prejudice them.  As an initial matter, however, Defendants do not argue that simply participating in the meet-and-confer process with the Companies to try to find common ground will harm them.  Nor can they.  At a minimum, then, the Court should direct Defendants to engage in such conversations before launching motions practice.

In any event, Defendants' prejudice objections are facially deficient, predicated on misstatements of the record or otherwise premature.  For example, Defendants complain about being forced to undertake "the far more taxing route of . . . draft[ing] a subpoena for Alfa" and "serv[ing] the subpoena."  Defs.' Br. at 18.  But the Companies in fact expressly stated to counsel

for Defendants that they would *voluntarily* produce documents in the absence of a subpoena should the parties reach a mutually agreeable resolution.[4]  The Companies also note that Defendants have not found it particularly burdensome to draft and serve subpoenas on a wide range of third parties in this matter and question the suggestion that drafting and serving subpoenas on the Companies to obtain "crucial" documents, Defs.' Br. at 3, is somehow too burdensome of an undertaking for Defendants' counsel.  Nevertheless, the Companies are not even imposing such a burden on the Defendants.  Defendants' other allusions to prejudice are speculative, only highlighting the prematurity of their motion.  *See id.* at 16 (asserting that the Companies' status as nonparties "*very well could* curtail the scope of discovery") (emphasis added); *id.* at 17 (claiming that the Companies' status as nonparties "*could* result in obtaining fewer relevant documents from Alfa than [Defendants] would be able to obtain from Plaintiffs") (emphasis added); *id.* ("[D]iscovery from a non-party *can be* much more costly to Defendants.") (emphasis added).  And the fault for any inconvenience caused by a purported "redundant process" that would result if Defendants were required to negotiate with the Companies "given the months-long meet-and-confer process undertaken between the parties on the same exact requests" lies squarely with Defendants, who have refused for several months to negotiate these issues with the Companies—despite being on

---

[4]   Given the Companies' multiple and significant accommodations to Defendants, this case is far different from one in which the court relieved a party of the need "to pursue 'an effort *guaranteed* to be expensive, time-consuming, and cumbersome, with no corresponding guarantee of success.'"  Defs.' Br. at 14 (quoting *Royal Park Inv. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 314 F.R.D. 341, 347 (S.D.N.Y. 2016)).  Defendants' failure to make even a single request for documents from the Companies likewise distinguishes this case from one in which plaintiffs "essentially [sought] to skirt Rule 26(e)'s supplementation requirement by imposing on [defendant] an unrecognized duty to direct repeated requests for information to various healthcare providers."  *Kifle v. Parks & History Ass'n*, No. Civ. A. 98-00048 (CKK), 1998 WL 1109117, at *2 (D.D.C. Oct. 15, 1998).

notice as far back as November 2019 that the documents are within the exclusive possession, custody, or control of the Companies.

**Second**, Defendants throw everything but the kitchen sink at Plaintiffs and the Companies in an effort to distract from their obstinate and unreasonable refusal to engage with the Companies. Defendants first strain to characterize the Companies' proactive outreach as suspicious. *See, e.g.*, Defs.' Br. at 13 n.5 (citing exhibit as "describing the *bizarre eagerness* with which Plaintiffs and counsel for Alfa have sought to have Defendants pursue documents from Alfa") (emphasis added); *id.* at 14 (referring to "Plaintiffs' and Alfa's *dogged entreaties* for Defendants to seek Plaintiffs' documents from Alfa") (emphasis added); *id.* at 15 (referring to "Plaintiffs'—*and most bizarrely*, Alfa's—repeated insistence that Defendants go to Alfa's counsel to request documents") (emphasis added).  But Defendants' argument-by-pejorative cannot hide the cold truth of the record, which establishes that the Companies reached out to and accommodated Defendants in an effort to avoid embroiling this Court in a dispute that could have been resolved through garden-variety negotiations.

Defendants then double down on their unsupported—and unsupportable—allegations of underhanded motives on the part of the Companies.  Defendants—without any evidence—accuse the Companies of "manipulat[ing]" the Federal Rules "to burden an opposing party," *id.* at 14; "shirk[ing] [their] discovery obligations," *id.* at 13–14; and "attempt[ing] to goad Defendants into legitimating a legally indefensible position," *id.* at 14.  Here again, Defendants offer not a scintilla of support for their charged claims that the Companies are acting in anything but good faith.[5]  Nor can they, given the Companies' demonstrated efforts—backed up by significant and concrete

---

[5]   The Companies would also point out that offering to produce the sought-after documents, as the Companies have done here, would be an odd strategy for "manipulat[ing]" the federal rules or "shirk[ing] discovery obligations."

concessions and accommodations—to reach a mutually agreeable solution to document production outside of court.

Were that not enough, Defendants move to impugning counsel for the Companies, trying in vain to link the Companies' proactive outreach to some kind of nefarious plot stemming from the investigation of the Special Counsel's Office. *See, e.g.*, Defs.' Br. at 14–15 (claiming, without support, that "Plaintiffs have coordinated with Alfa—whose corporate counsel, Skadden Arps, has direct ties to at least two of the Plaintiffs—to shield Plaintiffs' documents and prejudice Defendants"); *id.* at 39 (similar); *id.* at 15 (suggesting that "Plaintiffs and Alfa planned to conceal Plaintiffs' documents from the start when they filed this lawsuit"); *id.* at 15–16 (claiming, without support, that "Alfa's counsel, Skadden, lacks an arm's length relationship with Plaintiffs, as Skadden has represented Plaintiff Aven personally in the Special Counsel's investigation, served as long-time counsel to Alfa and LetterOne, and employed Plaintiff Khan's son-in-law"). These reckless and unsupported allegations smack of nothing more than desperation. The Special Counsel's investigation has been concluded for months and has no bearing on this matter. To somehow link this litigation to that matter is disingenuous and an unwarranted distraction at best. There also is nothing unusual about a company turning to its "long-time counsel" to represent an executive in an investigation. That Defendants have no response beyond name calling to the Companies' good-faith efforts to meet and confer with Defendants is itself telling.

**Finally**, apparently blind to the irony of the argument, Defendants maintain that granting their motion is necessary to further the "injunction of Rule 1" that the Federal Rules "be construed to secure the just, speedy, and inexpensive determination of every action." *Id.* at 14. A steadfast refusal to resolve disputes out of court, of course, is diametrically opposed to the aims of speed, efficiency, and cost effectiveness. Had counsel for Defendants simply picked up the phone and

13

called counsel for the Companies, or engaged when counsel for Defendants attempted to discuss these issues on a conference call, this dispute might well have been avoided, with the effect of saving both parties substantial time and money and sparing the Court the unnecessary burden of refereeing this dispute. This Court can preserve some of these efficiencies by denying Defendants' motion as premature and ordering them to meet and confer in good faith with Defendants. At worst, negotiations will narrow the issues that need to be briefed, argued, and considered by this Court. At best, the process will yield a mutually agreeable resolution that obviates the need for any motions practice.

## II.     THE PLAINTIFFS LACK THE LEGAL RIGHT OR AUTHORITY TO OBTAIN THE COMPANIES' DOCUMENTS

In assessing whether a litigant has the legal right or authority to obtain documents in the possession of a foreign company, a court should consider the effect that foreign law has on the litigant's ability to obtain the documents. *See Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 139 (2d Cir. 2007) (reversing the district court's order granting sanctions against plaintiff, a chairman and shareholder of a Russian company, for failing to produce documents in the possession of the Russian company, and concluding that "remand is … necessary to explore Russian law").[6] The legal and practical inability of a litigant to obtain documents from a non-party, by reason of foreign law, may place the documents beyond the control of the litigant who has been served with a request under Federal Rule of Civil Procedure 34 ("Rule 34"). *In re Vivendi*

---

[6]   Questions relating to the internal affairs of corporate entities should be decided in accordance with the law of the place of incorporation. *See City of Harper Woods Employees' Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009); *United States v. Funds Held in the Name or for the Benefit of Wetterer*, 210 F.3d 96, 106 (2d Cir. 2000). A company's internal affairs include matters peculiar to the relationships among or between the corporate entity and its directors and shareholders. *See Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 3d 552, 580 (S.D.N.Y. 2018); *see also Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982).

*Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571 (RJH) (HBP), 2009 WL 8588405, at *2 (S.D.N.Y. July 10, 2009).

In *In re Vivendi*, plaintiffs sought documents from a non-party that were in the possession of the non-party's wholly owned subsidiary in Luxembourg.  2009 WL 8588405, at *1.  The non-party objected on a number of grounds including the obstacles imposed by Luxembourg law.  *Id.*  In support of its position, the non-party submitted a declaration by its General Counsel explaining, in part, that the non-party "does not have the legal right or authority" to obtain the documents sought by the plaintiffs.  *See id.*  Based in part on the General Counsel's declaration, the court denied plaintiffs' motion to compel the non-party to produce the requested documents.  *Id.* at *5.

That is *precisely* the case here.  Contrary to Defendants' assertions, under the relevant foreign law, simply because Plaintiffs have indirect interests in Alfa Bank and LetterOne does <u>not</u> provide them with the legal right or authority to obtain the Companies' documents.  As foreign counsel explain, Plaintiffs do not have the legal right or authority to obtain the Companies' documents under the laws of either Russia or Luxembourg.  The documents are "beyond the control" of the Plaintiffs in light of Plaintiffs' legal inability to obtain the Companies' documents under foreign law.

### A.   Plaintiffs Lack the Legal Right or Authority to Obtain Alfa Bank's Documents

As the declaration of Russian local counsel makes clear, Plaintiffs do not possess the legal right to obtain the sought-after documents from Alfa Bank under Russian law.  Decl. of Aleksandr V. Berezin (July 2, 2020) ("Berezin Decl.").  Defendants devote nearly seven full pages to argue that Plaintiffs have the legal right to obtain Alfa Bank's documents based on Plaintiffs' alleged "ownership interests" and positions of authority with respect to Alfa Bank.  Defs.' Br. at 20–26.

However, that is simply not supported by Russian law, which Defendants noticeably fail to reference.

*First*, under Russian law, Alfa Bank is the *prima facie* owner of <u>any</u> information which is contained or stored on any media, in any form, and was created or lawfully obtained by Alfa Bank, including information located on Alfa Bank's corporate domain, *alfabank.ru*.  Berezin Decl. at 6(B).  This includes information placed by employees or directors in email messages sent via accounts on Alfa Bank's corporate domain.  *Id.*  As the owner of this information, Alfa Bank, *in its sole discretion*, regulates the terms of access to the information, the manner of handling the information, and the election of any privileges applicable to the information under Russian law. *Id.* at 6(C).  Accordingly, Alfa Bank is "the only proper respondent or defendant in any proceedings or procedural actions, the subject-matter of which is enforcement of the disclosure of such information." *Id.*

*Second*, Plaintiffs' positions as Alfa Bank's directors do not provide them with the legal authority to obtain Alfa Bank's documents.  Russian law and Alfa Bank's internal policies regulate access to, and disclosure of, Alfa Bank's documents and information.  *Id.* at 5(A)–6(A).  As previously mentioned, Alfa Bank regulates the access, handling, and disclosure of its documents and information.  *See id.* at 6(C).

*Third*, Plaintiffs do not have the legal right to obtain the sought-after documents from Alfa Bank based on their alleged "ownership interests."   Under Russian law, any rights that shareholders have to obtain certain documents and information from a Russian corporate entity are limited to the *direct* shareholders of that entity.  *See id.* at 5(G)(iv).  Even if Plaintiffs were direct shareholders in Alfa Bank, <u>which they are not</u>, nothing in Russian law would grant them the legal authority to obtain the type of documents Defendants seek—namely emails on Alfa Bank's

16

domain.  *See id.* at 5(G)(iii).  Moreover, even direct shareholders are subject to confidentiality and privilege obligations and any disclosures made to such shareholders may not be used in pursuit of purposes beyond the management of Alfa Bank or the shareholders' investment decision-making.  *Id.* at 6(D)–(E).

*Finally*, Plaintiffs lack the legal right, under Luxembourg law, to obtain Alfa Bank's documents through their interests in ABHH, a Luxembourg entity.  Decl. of Philippe Hoss, (July 2, 2020) ("Hoss Decl.") at 6.2.  ABHH is the indirect parent company of Alfa Bank.  *See* Berezin Decl. at 4(A); Hoss Decl. at 6.1.  Plaintiffs have ownership interests in ABHH.  Berezin Decl. at 4(A).  Under the principles of Luxembourg law, described further below, Plaintiffs' status as ABHH shareholders does not provide them with any legal right to obtain, through ABHH, documents or data belonging to Alfa Bank.  *See* Hoss Decl. at 6.1.

## B.   Plaintiffs Lack the Legal Right or Authority to Obtain LetterOne's Documents

Plaintiffs do not have the legal right to obtain the sought-after documents from LetterOne under Luxembourg law.  *See* Hoss Decl. at 5.1–5.5.  As an initial matter, Defendants incorrectly conflate LetterOne and Alfa Bank as being one and the same.   Defs.' Br. at 8–9.  LetterOne and Alfa Bank are legally, functionally and operationally completely separate and independent of each other with independent Boards of Directors, officers and executives.  Because of this inaccurate description of the relationship between Alfa Bank and LetterOne, Defendants' arguments regarding Plaintiffs' legal rights to obtain documents from LetterOne are identical to their arguments with respect to Alfa Bank—namely that Plaintiffs' alleged "ownership interests" and

positions of authority with respect to LetterOne give them the legal right to obtain LetterOne's documents.  Defs.' Br. at 20–26.  This, too, is unsupported by the relevant law.[7]

*First*, under Luxembourg law, LetterOne can claim and exercise ownership rights on its private assets, including documentation and data.  Hoss Decl. at 3.1.4.  LetterOne has the right to exercise ownership rights over documents and data in whatever form, including email, other electronic documents and hard copy documents, even where such documents are accessible remotely.  *Id.* at 3.1.9  The use of such documents and data, and any sharing of such materials, must be in, and compatible with, LetterOne's interests.  *See id.*

*Second*, Plaintiffs' positions as directors of LetterOne do not provide them with the legal right to obtain the types of documents Defendants seek.  Plaintiffs do not individually possess the legal authority to exercise unfettered access to LetterOne's information.  *See id.* at 3.2.2.1.  And, what limited informational rights directors do have, must be exercised in ways that are necessary to carry out their mandate as directors, not for personal uses.  *See id.* at 3.2.2.7–3.2.2.13, 5.2.  Plaintiffs do not have the legal right to obtain, give access to, or otherwise disclose documents belonging to LetterOne.  *Id.* at 5.3.  This applies to LetterOne documents and data that are accessible remotely and documents and data stored on LetterOne's servers.  *Id.* at 5.4.  In short, Plaintiffs have no right, as directors, to request, communicate or use LetterOne's documents and data (including those available in Plaintiffs' email accounts) for personal uses.  *Id.* at 5.2–5.5.

*Finally*, Plaintiffs' interests in LetterOne do not provide them with the legal authority to obtain LetterOne documents.  As Mr. Hoss explains, *direct* shareholders only have limited rights

---

[7]   While Defendants at least acknowledge the applicability of Luxembourg law, *see* Defs.' Br. at 23–24, they miss the mark by citing law concerning the voting strength of *direct* shareholders—something that Plaintiffs are <u>not</u>—rather than the more salient law concerning whether persons who are <u>not</u> direct shareholders have any legal right to obtain the requested documents.

to obtain information from a company.  *Id.* at 5.1.  But Plaintiffs are <u>not</u> direct shareholders of LetterOne.  And under Luxembourg law, persons who do not directly hold shares in LetterOne have no legal right to obtain information from the company.  *Id.* at 5.1.

## III.   PLAINTIFFS DO NOT HAVE THE PRACTICAL ABILITY TO OBTAIN THE COMPANIES' DOCUMENTS

Defendants' claim that the Plaintiffs control the documents because they have the practical ability to obtain the documents is misguided and unavailing.  It is Defendants' burden as movant to establish that Plaintiffs have control of the documents.  *Norex Petroleum Ltd. v. Chubb Ins. Co. of Can.*, 384 F. Supp. 2d 45, 56 (D.D.C. 2005) ("The burden of establishing control over the documents sought is on the party seeking production.") (quoting 7 Moore's Federal Practice § 34.14(2)(b) (2004)).  Defendants fail to meet this burden repeatedly through their arguments.

Defendants are correct that a determination of control under Rule 34 is "highly fact-specific."  Defs.' Br. at 18 (quoting Wright & Miller, Fed. Prac. & Proc. § 2210).  However, Defendants' arguments that Plaintiffs have control of the Documents due to the "practical ability" to obtain the Documents is riddled with factual errors, wild speculation, and inapposite law.

***First***, Defendants make a number of factual errors about the Plaintiffs and the Companies, the most egregious of which is to suggest that Alfa and LetterOne are the same entity.  Defs.' Br. at 8–9.  As explained above, Alfa and LetterOne are separate entities with separate control structures and Plaintiffs have never suggested otherwise.[8]  This mischaracterization of the Companies serves to confuse Defendants' muddled arguments further as a fact that applies to Alfa

---

[8]   Defendants' argument that they are the same appears to be predicated on the fact that Plaintiffs included a search term request that listed both "Alfa" and "LetterOne."  The leap in logic from including two terms in the same search request to suggesting that Plaintiffs therefore view them as the same entity is difficult to comprehend.  Regardless, as explained above, LetterOne and Alfa are completely separate entities.

*(cont'd)*

cannot be said to apply to LetterOne (and vice versa), yet Defendants continually improperly conflate the two.[9]

**Second**, Defendants engage in speculation about Plaintiffs, their interests in the Companies, and their abilities to influence the directors and officers of the Companies. Such speculation cannot be the basis of a determination of control. *See U.S. Int'l Trade Comm'n v. ASAT, Inc.*, 411 F.3d 245, 255–56 (D.C. Cir. 2005) (rejecting arguments of control based on "pure speculation without support in the record").

**Third**, Defendants also employ inapposite law throughout their arguments, including a misguided attempt to establish principles of foreign law without consulting foreign counsel.

**Fourth**, while Defendants lead this Court through a lengthy recitation of factors they consider relevant (and which are rebutted below), they fail to address the most salient factor when it comes to the current motion: that there are significant obstacles presented by the Companies' internal policies and foreign law that require a complicated analysis that could be avoided if Defendants would engage with the Companies instead of stonewalling on this issue. In the interest of judicial economy, courts suggest that parties do so rather than burden the court. *See Bush v. Ruth's Chris Steak House, Inc.*, 286 F.R.D. 1, 6, 6 n.2 (D.D.C. 2012) (ordering parties to split a retrieval fee for documents from vendor rather than requiring "a large investment of the court's time to determine whether Defendants control this third party vendor" and suggesting that the parties should resolve disputes themselves in the future rather than require the court to engage in such analysis); *see also Cohen*, 2008 WL 2332338, at *2 ("Legal and practical inability to obtain the requested documents from the non-party, including by reason of foreign law, may place the

---

[9]   Even if Defendants were able to establish that Plaintiffs had control over Alfa Bank documents, which they do not, it would not mean that Plaintiffs also had control over LetterOne documents.

documents beyond the control of the party who has been served with the Rule 34 request. But, even where there is no legal or practical impediment, a Court may properly require the party seeking the documents to endeavor to obtain them from the non-party in the first instance.") (citations omitted).

**Finally**, Plaintiffs, through foreign counsel, have detailed the impediments Plaintiffs face in attempting to obtain the documents. Plaintiffs are prevented from control of the documents by both the Companies' internal policies as well as foreign law. As mentioned above, issues of foreign law should be considered when determining control of a non-party's documents. *See Shcherbakovskiy*, 490 F.3d at 139 (reversing the district court's order granting sanctions against plaintiff, a chairman and shareholder of a Russian company, for failing to produce documents in the possession of the Russian company, and concluding that "remand is … necessary to explore Russian law").

Because Defendants have failed to establish their burden and because Plaintiffs have established that they are prevented from producing the documents due to the internal policies of the Companies and issues related to foreign law, Defendants' motion should be denied, particularly where the Companies have attempted to engage directly with the Defendants and proactively offered to work with Defendants in the absence of a subpoena and without requiring compliance with the Hague Evidence Convention.

## A.     Plaintiffs' Leadership Positions and Ownership Interests Do Not Give Them Control of the Documents

### 1.     *Plaintiffs Do Not Have Control Over the Companies' Documents Simply Because They Are Officers, Directors, and Founders*

Defendants claim that simply by nature of being officers, directors, and founders of the Companies, that Plaintiffs are entitled to control over all documents at the Companies. To support this argument, Defendants cite numerous cases that stand for the unsurprising proposition that

being an officer, director, or founder can be *a* factor in the "fact-intensive" inquiry into whether a party has possession, custody, or control of non-party documents.  What Defendants fail to do, however, is offer any support for their argument that the mere fact that Plaintiffs may be one of several directors creates *de facto* control of the documents at the Companies.  Further, as is made clear in the declarations from foreign counsel, Plaintiffs' positions as directors at the Companies do not provide them the legal right or ability to produce the Companies' documents.  *See* Hoss Decl. at 5.2–5.5; Berezin Decl. at 6(C) and (F).  Plaintiffs' failed attempts to seek the documents from the Companies further bolster their argument that their positions do not afford them control over the documents.  It is Defendants' burden as movant to establish that Plaintiffs have control of the documents.  *Norex Petroleum Ltd.,* 384 F. Supp. 2d at 56 ("The burden of establishing control over the documents sought is on the party seeking production.").  Merely stating that Plaintiffs hold certain titles, without establishing that this grants them control over the documents does not meet this burden, especially in light of the clear, thorough analysis from foreign counsel detailing why Plaintiffs' relationships with the Companies do not allow for control over the documents.

While Defendants are correct that being an officer or director can be *one* of the criteria in determining whether a party has control over documents, position alone does not create control. The moving party has to establish not only that a party is an officer or director of a non-party entity, but that there are factors that establish that the party's role as a director or officer provides them the ability to obtain documents from that entity.  *See Weaver v. Gross*, 107 F.R.D. 715, 718 (D.D.C. 1985) (determining that President and Chief Executive Officer ("CEO") of an entity had the ability to obtain documents only after noting that the distinction between the President and CEO at the entity was unwarranted in the context of an employment discrimination claim and that it was factually established that defendant had a "personal involvement in the operations and

activities" of the corporation and a "pervasive influence in corporate activities"). Here, Defendants have not established that Plaintiffs' positions in the Companies would lead to the practical ability to obtain documents, and the declarations from foreign counsel establish that their positions would *not* afford them control over the Companies' documents.

Defendants similarly cite other cases that merely suggest that a corporate officer can be compelled to produce a non-party's documents, when, in addition to being an officer, it is established that he or she has the practical ability to do so and there are no facts to suggest that the officer cannot produce the non-party documents. *See, e.g.*, *In re Kidd*, No. 3:20-MC-00016-TOF, 2020 WL 2404928, at *12 (D. Conn. May 12, 2020) (stating that "a party *can* ordinarily tell the officer of a company to produce otherwise-discoverable documents *that the officer has the practical ability to obtain*" and noting that the party had not alleged or attempted to establish he had no practical ability to obtain the documents) (second emphasis added); *U.S. Philips Corp. v. Synergy Dynamics Int'l, LLC*, No. 2:05-cv-00577-PWP-GWF, 2007 WL 9734384, at *9 (D. Nev. July 9, 2007) (noting that a party can be compelled to produce documents of a non-party corporation of which he is an officer "and which he has the practical ability to produce," and stating that there was no information that the party would not be able to produce the documents if ordered to do so). Here, Plaintiffs have consistently affirmed that they do not have control over the requested documents, which is supported by the analyses of foreign counsel.

Defendants' factual support is also lacking as they attempt to establish that Plaintiffs have control of the documents by merely listing their roles as directors of different Alfa entities.[10] Defendants' burden, however, is to establish that Plaintiffs' positions as directors afford them

---

[10]   Notably, this would have no effect on their ability to obtain LetterOne documents because LetterOne and Alfa are completely separate entities.

control over the Companies' documents.  *See Norex Petroleum Ltd.*, 384 F. Supp. 2d at 56 (burden

is on the moving party to establish control).  As Plaintiffs have noted, despite their positions, the

Companies rebuffed their requests for the documents, which evidences their inability to obtain the

documents despite their positions at the Companies.  The analyses by foreign counsel further

support that the Plaintiffs do not have the ability to use Company data for personal use.  *See, e.g.*,

Hoss Decl. at 3.3.3.10 ("It is not only established that directors have no right to obtain company

documents and data for personal purposes but also that a director may not use for personal purposes

the information to which he or has access in the course of his or her duties").  Absent some

evidence contradicting Plaintiffs' assertions that they were not able to coerce the Companies to

release the requested documents or some analysis contradicting foreign counsels' declarations,

Defendants have failed to meet their burden.

   2.    *Plaintiffs' Interests in the Companies Do Not Give Plaintiffs Access to
          Company Documents*

   Plaintiffs' interests in the Companies do not give them control over the entities such that

they have control over the documents or the ability to influence the Companies' decisions.  As

explained above, even if Plaintiffs were direct shareholders, which they are not, Plaintiffs would

not have the power to obtain the Companies' documents.  *See* Hoss Decl. at 5.1; Berezin Decl. at

5(G)(iii)–(iv), 6(D)–(E).  Defendants offer little more than wholly inaccurate facts and inapposite

law in support of their claim and thus fail to meet their burden.

   Defendants cite a number of cases that suggest that a party owning a majority interest in a

non-party corporation is a factor in determining whether a party has the practical ability to obtain

documents from a non-party corporation.  *See, e.g., In re Application of Bloomfield Inv. Res. Corp.*,

315 F.R.D. 165, 168 (S.D.N.Y. 2016) (determining that the majority shareholder who was listed

as the "ultimate controlling party" of an entity had the practical ability to obtain documents from

non-party corporation).   None of the Plaintiffs, however, are the majority shareholder, or even a

direct shareholder, of the Companies.[11]   Further, as explained by foreign counsel and in the analysis

above, Plaintiffs' interests in the Companies do not provide them the ability to compel production

of the Companies' documents.   *See* Hoss Decl. at 5.1, 6.1–6.2; Berezin Decl. at 5(G)(iii)–(iv),

6(D)–(E).

Defendants also fail to establish that Plaintiffs wield "undisputed control of the board" of

either Alfa Bank or LetterOne.   *See Shcherbakovskiy*, 490 F.3d at 139 (stating that an order to

produce a non-party entity's documents would be appropriate if the district court found the non-

party corporation to be a minority shareholder's "alter ego" or that his investment was "sufficient

to give him undisputed control of the board").   Even if Plaintiffs were direct shareholders, which

they are not, the analyses of foreign counsel explain why their interest would not allow Plaintiffs

to coerce the Companies to produce the Documents.   *See* Hoss Decl. at 5.1, 6.1–6.2; Berezin Decl.

at 5(G)(iii)–(iv), 6(D)–(E).   Defendants' speculation about Plaintiffs' ability to "influence and

direct" the Companies is completely unsupported by law or facts and should not be relied on by

this Court.   *See U.S. Int'l Trade Comm'n*, 411 F.3d at 255–56 (rejecting arguments of control based

on "pure speculation without support in the record").

Defendants also attempt to opine on foreign law (conceding the relevance of foreign law

to this analysis) to support their argument, Defs.' Br. at 23–24, but the result is overgeneralized,

---

[11]   Defendants cite *Shcherbakovskiy v. Seitz*, No. 03 CV 1220 RPP, 2010 WL 3155169 (S.D.N.Y.
July 30, 2010), *aff'd*, 450 F. App'x 87 (2d Cir. 2011), to suggest that a minority shareholder
would have control over an entities' documents.   However, in *Shcherbakovskiy*, the Second
Circuit reversed the earlier determination that the minority shareholder had control of the
documents until the opposing party was able to supplement the factual record.   *See
Shcherbakovskiy*, 490 F.3d at 139.   The minority shareholder was only determined to have
control over the documents once it was established that he used to own 100% of the entity and
that the other two board members were "beholden" to him because he had transferred a portion
of his ownership stake to each.   2010 WL 3155169, at *10.

irrelevant, and incomplete.  Defendants' "analysis" is cursory with respect to foreign laws and does not address the specific structure or governance of the Companies.  Also, to the Companies' knowledge, Defendants are not qualified to opine on Luxembourg law nor do they appear to have consulted anyone who is.  As the analysis from counsel actually qualified to practice law in Luxembourg attests, Plaintiffs cannot force the Companies to allow production of the Documents based on their interests.  *See Hoss Decl.* at 5.1, 6.1–6.2.

Further, Defendants' factual support mischaracterizes the documents cited and undercuts their own argument.  For example, Defendants' use of change in control provisions in bond indentures, Defs.' Br. at 25, shows a misunderstanding of how debt instruments work.  A change in control provision is imposed by creditors and is not offered voluntarily by the bond issuer or its shareholders; the fact that *creditors* sought to protect themselves in the event that the founding shareholders cease to be involved with Alfa Bank is not evidence that Plaintiffs "have established formal voting blocs" as Defendants suggest.  *Id.*  The base prospectus highlights another flaw that Defendants attempt to elide; the documents suggest that there are significant voices with control over the Companies in addition to the Plaintiffs.  *See, e.g.*, Dkt. 78-47, at 6–7 (Base Prospectus for Alfa Bank Bond Issuance Program (Sept. 17, 2019)) (listing Alexei Kuzmichev as a "principal shareholder"); Dkt. 78-49, at 6 (DEA Finance Offering Memorandum (Oct. 17, 2016)) (listing other individuals who founded LetterOne along with the Plaintiffs and listing three individuals other than Plaintiffs as "Original Investor[s]").  Other than speculation, Defendants have not offered any support for the assertion that Plaintiffs somehow control these other individuals such that Plaintiffs have "undisputed control of the board."

In addition, Defendants admit a lack of knowledge about the Companies but make broad assertions about control based on their assumptions.  For example, Defendants suggest that

26

Plaintiffs' alleged interests in the Alfa Banking Group provides them control over all Alfa documents. *See* Defs.' Br. at 23 ("Plaintiffs own a combined majority of the Alfa Banking Group's shares – over 66% - establishing Plaintiffs' right, authority, or ability to obtain their Alfa documents.").  However, even if Defendants established that Plaintiffs had control over Alfa Banking Group[12] it would not follow that Plaintiffs had control over all Alfa documents as Alfa is not a formal entity, and ownership over one constituent part would not extend to the larger group. Defendants continually conflate various entities without acknowledgment of that fact and make assertions of control founded on critical factual errors.

Defendants cannot be said to have met their burden based on their incomplete analysis of foreign law, mischaracterization of documents, and confused analysis of corporate structures, especially in light of the compelling analyses by foreign counsel explaining why Plaintiffs would not be able to force the Companies to concede to production of the documents.

**B.    Plaintiffs Do Not Have Influence Over Other Corporate Officers and Board Members**

Defendants' arguments that Plaintiffs have sufficient control over Alfa Bank and LetterOne's board members to force the release of documents are similarly unavailing.  Defendants cite to inapposite case law and merely speculate about Plaintiffs' influence.  Defendants again fail to establish control over the documents and therefore fail to meet their burden.

***First***, the case law that Defendants cite to suggest that Plaintiffs can influence the remainder of the board of directors at the Companies is completely inapposite and merely suggests that influence stemming from contractual relationships or statutory requirements can lead to a determination of control.  For example, in *Annunziato v. Collecto, Inc.*, 304 F.R.D. 360 (E.D.N.Y.

---

[12]   The Companies reject any assertion that Plaintiffs have control over Alfa Banking Group.

2015), the "influence" came from the fact that the debt collection action had a contractual provision stating that the non-party entity would provide the requested documentation upon request. *Id.* at 363; *see also Tomlinson v. El Paso Corp.*, 245 F.R.D. 474, 477 (D. Colo. 2007) (finding that party had ability to obtain documents when it was required by statute to retain certain records). Here, Defendants can point to neither a contractual nor statutory basis for claiming that Plaintiffs can influence the Companies to provide documents. Nor do Defendants point to any other non-speculative basis for asserting such influence exists.

**Second**, Defendants also suggest that specific members of the Board of Directors are "beholden" to Plaintiffs. However, Defendants offer nothing more than (absurd) speculation that Plaintiffs can bend these individuals to their will. In *Shcherbakovskiy v. Seitz*, No. 03 CV 1220 RPP, 2010 WL 3155169 (S.D.N.Y. July 30, 2010), *aff'd*, 450 F. App'x 87 (2d Cir. 2011), which Defendants cite to support their proposition, a court found that two board members of an entity were beholden to the founder and third board member of the entity after the founder transferred a portion of his 100% interest in the entity to both members, who were his employees at the time. *Id.* at *10. Here, however, Defendants have offered no reason to suggest that the named individuals are "beholden" to Plaintiffs. Nor is it likely that these individuals would feel "beholden" to anyone. Richard Burt is the former Ambassador to Germany and a successful diplomat and consultant. Defendants suggest that Ambassador Burt is a Board member of LetterOne and has worked with Plaintiffs in the past but offer no evidence of why he would feel beholden to Plaintiffs.[13]

---

[13] Defendants' reasons for including Ambassador Burt appear likely to be the opportunity to unnecessarily invoke the Special Counsel's Investigation for the purpose of mudslinging. Ambassador Burt, a non-executive director, is the only individual listed who has no ownership stake in LetterOne or Alfa Bank. Plaintiffs offer no evidence for how Plaintiffs would "influence" Ambassador Burt, and his inclusion seems aimed at attempting to embarrass Plaintiffs, rather than any legitimate legal argument.

Defendants also suggest that Andrei Kosogov and Alexey Kuzmichev, both high net worth co-founders of LetterOne, are also able to be influenced by Plaintiffs.  As both Kosogov and Kuzmichev have interests in, and are co-founders of, LetterOne, it is not clear what influence Plaintiffs would have over them.  Defendants also fail to consider that the Companies have other strong, independent voices leading the Companies outside of those listed by the Defendants.  For example, Lord (Mervyn) Davies of Abersoch, the Non-Executive Chairman of LetterOne, is, among other accomplishments, Chairman of Corsair Capital; Chairman of the UK Lawn Tennis Association; former Chairman of the Royal Academy of Arts Trustees; a former Minister for Trade, Investment, Small Business and Infrastructure in the UK Government; and former Chairman and CEO of Standard Chartered PLC.  Defendants fail to offer any evidence to support their assertions that Plaintiffs could influence these individuals, or any other individual who could grant Plaintiffs access to the Companies' documents.  Defendants further suggest that senior executives would be beholden to Plaintiff Fridman because he "approves the employment of senior executives." Defs.' Br. at 29.  Defendants offer no legal support suggesting that approval of senior executives' employment would indicate that Plaintiff Fridman has control of LetterOne, and Defendants point to no senior executives who are "beholden" to Plaintiff Fridman.[14]  Defendants' "pure speculation" about Plaintiffs' influence should be disregarded by this Court and cannot form the basis of a determination of control.  *See ASAT, Inc.*, 411 F.3d at 255–56 (rejecting arguments of control based on "pure speculation without support in the record").

---

[14]  Defendants' attempt to use *Shcherbakovskiy* is completely inapposite.  In that case, two board members were given an interest in the entity by the founder and 100% owner.  2010 WL 3155169, at *10.  Here, Plaintiff Fridman's role on the Nomination and Remuneration Committee arises solely by virtue of his being a director of LetterOne, not some attempt to establish control over the executives.  Plaintiff Fridman merely approves, along with two other directors, neither of which are Plaintiffs, the employment of certain executives.

Defendants have offered nothing beyond mere speculation and conjecture that Plaintiffs may be able to influence some individuals and no concrete suggestion that any influence would lead to effective control over the documents.  Defendants, again, have failed to meet their burden.

### C. Defendants Mischaracterize the Companies' "Stake" in This Litigation

Defendants claim that the Companies' "stake" and "clear connection" to this litigation provides Plaintiffs control over the documents in discovery.  Defendants are incorrect about the Companies' involvement in this matter and mischaracterize the law.  Defendants have once again failed to meet their burden.

Plaintiffs filed this suit in their individual capacities and the Companies do not wish to be involved outside of litigating the specific issue of possession, custody, or control of the Companies' documents.[15]

Further, Defendants mischaracterize the case law of when a "stake" in litigation is relevant. The case law Defendants cite suggests that a "stake" may be considered as a relevant factor when the non-party would be harmed by the litigation and has shared documents during similar litigation in the past or where the non-party would benefit financially from the litigation and has frustrated the discovery process.  *See Gross v. Lunduski*, 304 F.R.D. 136, 143–44 (W.D.N.Y. 2014) (determining that corrections officer had ability to obtain documents when Department of Corrections would indemnify the officer and had a "history of cooperation demonstrating [the Department of Corrections'] willingness to produce documents required in the defense of a

---

[15]   As addressed in the Companies' motion to intervene, the Companies seek only limited intervention to litigate the specific matter of Defendants' Motion to Compel and therefore do not subject themselves to the general jurisdiction of the Court.  As further stated therein, the Companies filed the motion to intervene on the condition that the Companies shall be deemed and treated as non-parties to this action, and the Companies shall be immune from all forms of party discovery, service of process, claims of liability, and all other obligations of a party.

corrections officer"); *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Philips Petroleum Co.*, 105 F.R.D. 16, 35 (S.D.N.Y. 1984) (stating that because the French government was the ultimate beneficiary of any award, "it is unacceptable to allow that government to refuse to produce documents for full and fair litigation of this action"); *Afros S.P.A. v. Krauss-Maffei Corp.*, 113 F.R.D. 127, 131 (D. Del. 1986) ("If a non-party will directly receive the benefit of an award, then it is unjust that it can frustrate the discovery process and the complete resolution of the issues by refusing to furnish documents in its possession."). Here, Plaintiffs will not be harmed by the litigation nor will they receive any financial benefit. Regardless, it certainly is inaccurate to suggest that the Plaintiffs have in any way "frustrated" the discovery process. As detailed above, the Companies have repeatedly tried to engage in good faith negotiations to produce documents to Defendants. Instead, Defendants have frustrated the process by unnecessarily running to this Court and dragging the discovery process out further.

Further, any "stake" in this litigation would not negate the obstacles posed by the Companies' internal policies and foreign law detailed by the declarations of foreign counsel that prevent Plaintiffs from controlling the Companies' documents.

Defendants' weak and unsubstantiated argument that Plaintiffs have control of the Companies' documents due to some vague "stake" in this litigation is not persuasive as a matter of law or fact, particularly when Defendants have been the party to frustrate the discovery process. Therefore, Defendants have failed again to meet their burden.

### D. Plaintiffs Are Not Holding Themselves Out as Controlling the Companies and Shielding Documents

Defendants' argument that Plaintiffs "hold themselves out" as controlling the Companies and thus have the ability to obtain documents is also unavailing. Similar to Defendants' other arguments, it is propped up by inapposite law and non-relevant facts.

*First*, Defendants once again cite to inapposite law in their attempt to suggest that Plaintiffs hold themselves out as controlling the Companies and therefore can obtain the documents.  *See, e.g.*, *New York ex rel. Boardman v. Nat'l R.R. Passenger Corp.*, 233 F.R.D. 259, 267 n.9 (N.D.N.Y. 2006) (exploring issue of control between state and state agency and denying motion to compel); *Appleton Papers, Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2009 WL 2408898, at *3 (E.D. Wis. July 31, 2009) (exploring the closeness of a corporate relationship between a subsidiary and parent); *Chevron Corp. v. Donziger*, 296 F.R.D. 168 (S.D.N.Y. 2013) (exploring relationship between defendant attorney and foreign legal team working on the same matter).  None of these cases represent a useful analogy to Plaintiffs' position in regard to the Companies or feature an individual "boasting" about control over an entity, as Defendants allege.

*Second*, even if the law supported Defendants' argument, the facts offered would still not establish that Plaintiffs "boast" about their control of the Companies.  The crux of Defendants' argument is that Plaintiffs "hold themselves out as the owners of Alfa."  Defs.' Br. at 31.  However, Defendants point to no statements *from the Plaintiffs*.  Instead, Defendants offer a number of statements from press releases, foreign court documents, and articles from the media.[16]  These statements do not come from the Plaintiffs and certainly do not feature Plaintiffs boasting of control of the Companies.  Despite Defendants' suggestion otherwise, Plaintiffs' decision not to demand a correction from every newspaper or magazine that includes a vague assertion that

---

[16]   Defendants also list two documents filed with the SEC.  One document contains an interview with Plaintiff Fridman from 2009 where the author identified him as "Alfa Group owner Mikhail Fridman" and the other document is from 2010 and describes Plaintiff Fridman as having "taken an active role in managing the Alfa Group."  Dkt. 78-63; Dkt. 78-64.  In addition to being over ten years old, neither of these statements suggest that Plaintiffs are boasting of their control of the Companies.

Plaintiffs are involved in the ownership of the Companies does not establish control over the Companies' documents.

**Finally**, even if Plaintiffs' did "hold themselves out" as the owners of the Companies, which they did not, it would not change the fact that Plaintiffs would not be able to compel the Companies to produce the Documents for the reasons explained by foreign counsel.

Defendants, who carry the burden of establishing control, fail to do so once again here.

### E.    Defendants Fail to Establish Close Coordination Between the Companies and Plaintiffs

Defendants next argue that Plaintiffs' "close coordination" with the Companies shows the Plaintiffs' practical control over the documents.  However, this argument again offers irrelevant speculation and vague assertions of "closeness" that fail to establish Plaintiffs' control over the documents.

Defendants claim that an individual associated with an entity would therefore have control over its documents is not supported by the cases that Defendants cite, which explore a principal-agent relationship and the relationship between two sister companies in the same corporate structure.  *See McKesson v. Islamic Republic of Iran*, 185 F.R.D. 70, 77 (D.D.C. 1999) (finding Iran had a principal-agent relationship with a dairy and granting motion to compel inspection); *Appleton Papers*, 2009 WL 2408898, at *3 (finding that corporate entity in same corporate structure with non-party could be compelled to produce the non-party's documents).  Neither case supports the proposition that an individual associated with a corporation would have the ability to obtain its documents, especially here, where Russian and Luxembourg law, as applied to the issues here, prohibit the same.  Defendants also fail to establish how Plaintiffs' mere association with the Companies grants them the ability to obtain documents in the control of the Companies.  Finally, Defendants provide additional speculative comments, claiming that Plaintiffs have a "pervasive

influence" in Alfa activities such that they have control over the documents with no clear factual basis and without explaining what those activities entail.  Defs.' Br. at 35.

Defendants fail to meet their burden due to their failure to cite applicable law or facts that establish Plaintiffs' control over the Companies' documents.

> **F.**     **Plaintiffs' Use of Email Does Not Give Them the Practical Ability to Obtain All Documents from the Companies**

Defendants next argue that Plaintiffs' use of corporate email addresses gives them control over the documents for production.  Defendants' assertion that having a corporate email account can establish control over corporate documents is not supported by law, and the facts cited by Defendants do little more than establish that Plaintiffs Aven and Fridman have corporate email addresses at Alfa Bank and LetterOne, which the Companies have never denied.  Further, the analyses provided by foreign counsel explain that using a corporate email address does not lead to control over company documents.  Defendants cannot meet their burden when they fail to cite applicable law and foreign counsel makes clear that use of a corporate email address does not create control of the Companies' documents.

Defendants again cite inapposite law to support their arguments.  *See, e.g.*, *In re Flag Holdings, Ltd. Sec. Litig.*, 236 F.R.D. 177, 181–82 (S.D.N.Y. 2006) (finding individual defendants had access to documents after noting "attempts to thwart plaintiffs' discovery" and the fact that individual defendant's employment agreement specifically allowed for production of documents if they were required to be disclosed by law); *see also In re Application of Bloomfield Inv. Res. Corp.*, 315 F.R.D. at 168 (finding parties had access to non-party documents when, among other things, they did not provide any basis for argument opposing control).[17]  In *Flag Holdings*, the

---

[17]   Defendants also cite other cases that have little to no bearing on the current matter, many of them re-treads from Defendants' other unsuccessful arguments.  *See Annunziato*, 304 F.R.D.

*(cont'd)*

court granted the motion to compel after the defendants tried to "thwart plaintiff's discovery" and after the foreign non-party corporation refused to produce any documents unless plaintiffs proceeded through the Hague Convention. 236 F.R.D. at 181. Here, however, the Companies have assured Defendants that they would not be required to go through the Hague Convention or letters rogatory process, or even issue a subpoena to obtain documents.

In addition, foreign counsel has explained that the use of corporate email does not allow Plaintiffs to gain control of documents. As Mr. Hoss explains of Luxembourgian law, the use of a corporate email account does not allow Plaintiffs to produce the documents:

> *It results from the above that documents and data in whatever form, including emails, other electronic documents and hard copy documents of a company constitute tangible or intangible assets forming part of the assets of the relevant Company, irrespective of whether the document is accessible from a distance via a mobile device. The use of such data and its sharing with others outside the Companies must therefore be in, and compatible with, the relevant Company's interest.*

Hoss Decl. at 3.1.9. Mr. Berezin similarly explained that use of an email address does not take the documents outside of Company control. *See* Berezin Decl. at 6(B) ("The fact that the Bank's employees or members of its Board of Directors placed any information in email messages sent via accounts on the Bank's corporate domain is the evidence that such information has been created or used in connection with their employment or directorship duties and as such, is subject to proprietary rights of the Bank.").

---

at 363 (finding control in contractual principal-agent relationship); *Chevron Corp. v. Salazar*, 275 F.R.D. 437 (S.D.N.Y. 2011) (finding control between attorney and group of foreign attorneys working on same matter); *Cooper Indus., Inc. v. British Aerospace, Inc.*, 102 F.R.D. 918 (S.D.N.Y. 1984) (finding control between party and corporate non-party corporate affiliate when party was "[e]ssentially . . . the distributer and servicer in the United States of the British affiliate's planes"). None of these cases address the relationship between directors and corporations or suggests that merely having a corporate email address overcomes a clear assertion from a corporation that the documents are not in a party's control.

Further, Defendants factual support does little more than indicate that Plaintiffs Fridman and Aven have corporate email addresses that each use.  Defendants do not establish that use of a corporate email address creates control of the Companies' documents and, as mentioned above, foreign counsel specifically notes that use of a corporate email address would *not* create control. Based on their failure to cite applicable law and the analysis by foreign counsel, Defendants cannot meet their burden of establishing that possessing a corporate email address from the Companies establishes control of the Companies' documents.

### G.    Plaintiffs Have Made a Good Faith Effort to Obtain Documents

Defendants' assertion that Plaintiffs have not made a good faith effort to obtain documents is belied by the record.  As detailed above, Plaintiffs' counsel has been transparent about Plaintiffs' stance that the documents belong to, and are within the possession, custody, or control of, the Companies.  Plaintiffs' counsel has also made requests of the Companies to produce the documents but such requests were denied.  Further, as detailed by the declarations of foreign counsel, Plaintiffs cannot compel the Companies to allow production of the Companies' documents.  Defendants' suggestion that Plaintiffs have not acted in good faith is not supported by law and is contradicted by the record.

Defendants can point to no case law to support their position that Plaintiffs have not acted in good faith.  In *Tavoulareas v. Piro*, 93 F.R.D. 11 (D.D.C. 1981), which Defendants cite, the Court noted that a party had not indicated *any* attempt to seek documents from an entity of which he owned a controlling share.  *Id.* at 20–21.  Here, Plaintiffs' counsel have explained that Plaintiffs

sought the documents and the requests were denied.  While Defendants' counsel may not be satisfied with the answer, nothing more is required.[18]

Further, as already explained in detail above, the Companies reached out in good faith to Defendants to produce documents.  Rather than engage in conversation with the Companies, the Defendants ran to this Court and burdened it with an unnecessary motion.  Any delay in the production of the sought-after documents stems from the lack of good faith from the Defendants, not Plaintiffs.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendants' Motion to Compel Plaintiffs' Production of Their Documents.

Dated:  July 2, 2020

Respectfully submitted,

/s/ Margaret E. Krawiec
Margaret E. Krawiec (D.C. Bar No. 490066)
Michael A. McIntosh (D.C. Bar No. 1012439)
SKADDEN,  ARPS,  SLATE,  MEAGHER  &
    FLOM LLP
1440 New York Ave. NW
Washington, DC 20005
T: (202) 371-7000
F: (202) 661-9123
margaret.krawiec@skadden.com
michael.mcintosh@skadden.com

---

[18]   Defendants also engage in additional unnecessary mudslinging, suggesting, without any basis, that Plaintiffs' counsel was not truthful when he relayed that Plaintiffs had requested the documents from the Companies, and suggesting, again with no basis, that Plaintiffs instructed the Companies not to approve production of the documents. Defs.' Br. at 39.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MIKHAIL FRIDMAN, PETR AVEN, and GERMAN KHAN,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 17-2041-RJL** |
| **BEAN LLC a/k/a FUSION GPS, and GLENN SIMPSON,** | |
| **Defendants.** | |

**[PROPOSED] ORDER GRANTING AO ALFA-BANK, ABH HOLDINGS S.A., LETTERONE HOLDINGS S.A., AND LETTERONE INVESTMENT HOLDINGS S.A.'S MOTION FOR LEAVE TO INTERVENE FOR THE LIMITED PURPOSE OF LITIGATING  DEFENDANTS' MOTION TO COMPEL PLAINTIFFS'  PRODUCTION OF THEIR DOCUMENTS**

Upon consideration of AO Alfa-Bank, ABH Holdings S.A., LetterOne Holdings S.A., and LetterOne Investment Holdings S.A.'s (collectively, the "Intervenors") Motion for Leave to Intervene for the Limited Purpose of Litigating Defendants' Motion to Compel Plaintiffs' Production of Their Documents (the "Motion"), it is hereby **ORDERED** that the Motion is **GRANTED**.  The Clerk of the Court is directed to file the Intervenors' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Compel Plaintiffs' Production of Their Documents (attached as Exhibit 1 to the Motion).

So ordered this _____ day of _____, 2020.

_____
The Honorable Richard J. Leon
Senior United States District Judge