**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

------------------------------------------------------------ X

MIKHAIL FRIDMAN, PETR AVEN, and　　　　　:
GERMAN KHAN,

　　　　　　　　　　　　　　　　　　　　　:

　　　　　　　　　*Plaintiffs*,　　　　　　　:

　　　　　　　　　　　　　　　　　　　　　:　　　Case No. 1:17-cv-02041 (RJL)
　　　　　v.　　　　　　　　　　　　　　　:

　　　　　　　　　　　　　　　　　　　　　:

BEAN LLC (a/k/a FUSION GPS) and GLENN　:
SIMPSON,

　　　　　　　　　　　　　　　　　　　　　:

　　　　　　　　　*Defendants*.　　　　　　:

------------------------------------------------------------ X

**PLAINTIFFS' MOTION FOR ISSUANCE OF**
**LETTER OF REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE**

Plaintiffs respectfully file this motion asking the Court to issue a Letter of Request for

International Judicial Assistance to the Senior Master of the High Court (Queen's Bench

Division) of England and Wales, pursuant to the Hague Convention of 18 March 1970 on the

Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Convention"), 28

U.S.C. § 1781, and Rules 28(b) and 26 of the Federal Rules of Civil Procedure.  As set forth in

the accompanying Memorandum of Points and Authorities, the request seeks the oral testimony

of Christopher Steele, Christopher Burrows, Edward Baumgartner, and Sir Andrew Wood and

the production of documentary evidence from Mr. Steele, Mr. Baumgartner, Sir Andrew Wood,

and Orbis Business Intelligence Ltd., each of which is located in the United Kingdom of Great

Britain and Northern Ireland and have information relevant and material to this case for use at

trial.  Accordingly, Defendants respectfully request that the Court grant this motion, and order

that the Letter of Request be issued.  The Letter of Request and Proposed Order, along with a

Declaration of Alan S. Lewis, accompany this motion.

Pursuant to Local Civil Rule 7(m), on Monday, August 3, 2020 Plaintiffs' counsel met and conferred with Defendants' counsel with respect to the requested relief.  Defendants' counsel indicated that, while they have not seen the motion papers, they do not oppose the relief requested, and otherwise take no position on the motion.

Dated: Washington, D.C.
      August 4, 2020

Respectfully submitted,

/s/ Kim Sperduto
Alan S. Lewis (#NY0252)
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005
Tel: (212) 732-3200
Fax: (212) 732-3232
lewis@clm.com

-and-

Kim Sperduto (DC Bar No. 416127)
SERDUTO THOMPSON & GASSLER PLC
1747 Pennsylvania Avenue, NW, Suite 1250
Washington, D.C. 20006
Tel: (202) 408-8900
Fax: (202) 408-8910
ksperduto@stglawdc.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served electronically via the CM/ECF electronic filing system on all counsel or parties of record this 4th day of August, 2020.

/s/ Kim Sperduto
Kim Sperduto

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------------- X

MIKHAIL FRIDMAN, PETR AVEN, and : 
GERMAN KHAN, :

                 *Plaintiffs*, :

              v. :    Case No. 1:17-cv-02041 (RJL)

BEAN LLC (a/k/a FUSION GPS) and GLENN :
SIMPSON, :

             *Defendants*. :

-------------------------------------------------------------- X

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR ISSUANCE
<u>OF LETTER OF REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE</u>**

Plaintiffs respectfully ask the Court to issue a letter of request for international judicial assistance to the Senior Master of the High Court (Queen's Bench Division) of England and Wales, pursuant to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, 28 U.S.C. § 1781, and Rules 28(b) and 26 of the Federal Rules of Civil Procedure.  The request seeks the oral testimony of Christopher Steele, Christopher Burrows, Edward Baumgartner, and Sir Andrew Wood and the production of documentary evidence from Messrs. Steele and Baumgartner, Sir Andrew Wood and Orbis Business Intelligence Ltd., each of whom is located in the United Kingdom of Great Britain and Northern Ireland ("United Kingdom") and have information relevant and material to this case for use at trial.  The Letter of Request sought to be issued by the Court and the Proposed Order accompany this motion.

**I.  THE LEGAL STANDARD**

1.      The Hague Convention Treaty on the Taking of Evidence Abroad in Civil and

Criminal Matters ("Hague Convention"), 23 U.S.T. 2444, T.I.A.S. No. 7444, 28 U.S.C. § 1781,

is an international treaty that provides a mechanism for obtaining evidence from persons and

entities located in a foreign country (documentary evidence and testimony), in which a judicial

authority in one contracting state may request evidence located in another contracting state.  *Dist.

Title v. Warren*, Civil Action No. 14-1808 (ABJ/DAR), 2016 U.S. Dist. LEXIS 201347, *10-11

(D.D.C Dec. 23, 2016) (citing *Estate of Klieman v. Palestinian Auth.*, 272 F.R.D. 253, 255

(D.D.C. 2011)).  The United States and the United Kingdom are parties to the Hague

Convention.[1]

2.      Under the procedures, a U.S. court issues a letter of request which is then

transmitted to the jurisdiction from which a party to a U.S. civil litigation seeks documentary

evidence or testimony relevant to the issues in the U.S. action.  *See* Fed. R. Civ. Pro. 28(b)(1)(B);

28 U.S.C. § 1781. The Hague Convention procedures are "available whenever they will facilitate

the gathering of evidence by the means authorized in the Convention."  *Societe Nationale

Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 541 (1987).

Resort to the Hague Evidence Convention procedures is appropriate after examining "in each

case ... the particular facts, sovereign interests, and likelihood that resort to those procedures will

prove effective."  *Id.* at 544.  It has been held that, "[w]hen discovery is sought from a non-party

in a foreign jurisdiction, application of the Hague [Evidence] Convention, which encompasses

principles of international comity, is virtually compulsory." *Tulip Computers Int'l B. V. v. Dell

Computer Corp.*, 254 F. Supp. 2d 469, 474 (D. Del. 2003).

---

[1] *See* https://www.hcch.net/en/instruments/conventions/status-table/?cid=82

3.      In this case, the individuals to be deposed are non-parties to this matter and are

located in a foreign jurisdiction—the United Kingdom—which is a party to the Hague

Convention. Under Federal Rule of Civil Procedure 28(b), a deposition may be taken outside of

the United States, *inter alia*, "under an applicable treaty or convention" or "under a letter of

request, whether or not captioned a 'letter rogatory.'"  Even in the absence of an applicable

treaty, Rule 28 further provides that the Court may issue a letter of request for a deposition in a

foreign country, "(A) on appropriate terms after an application and notice of it; and (B) without a

showing that taking the deposition in another manner is impractical or inconvenient." *See

Hyundai Motor Co. v. Direct Techs. Int'l*, Civil Case No. 1:19-mc-00206 (TNM), 2019 U.S. Dist.

LEXIS 219865, *4 (D.D.C. Dec. 23, 2019) ("the Rule . . . explicitly disclaims any requirement

for 'a showing that taking the deposition in another manner is impracticable or inconvenient'")

(internal citation omitted).  "Harmonizing that tone, the D.C. Circuit has held there must be

'good reason' to deny a party's request." *Id.* at *2 (citing *Zassenhaus v. Evening Star

Newspaper Co.*, 404 F.2d 1361, 1364 (D.C. Cir. 1968)).  "[FRCP] 28(b) functions within the

larger discovery framework, outlined in [FRCP] 26, which allows 'parties to obtain discovery

regarding any non-privileged matter that is relevant to any party's claim or defense.'" *Dist. Title*,

2016 U.S. Dist. LEXIS 201347, at *12 (internal alterations omitted).  A court may not weigh the

evidence that is to be adduced or attempt to predict, whether, in fact, the witnesses will be able to

give the testimony which is sought (*id.*), however Plaintiffs have nevertheless demonstrated

herein that Messrs. Steele, Burrows, and Baumgartner, Sir Andrew Wood, and Orbis Business

Intelligence Ltd. ("Orbis"), have information relevant to the issues in this Action.

4.      28 U.S.C. § 1781(b) also provides that letters of request may be transmitted

directly from a tribunal in the United States to the foreign or international tribunal, officer, or

agency to whom it is addressed and its return in the same manner.  *Dist. Title*, 2016 U.S. Dist. LEXIS 201347 at *13.

5.      As set forth herein, the documentary evidence and testimony sought by Plaintiffs is relevant to the parties' claims and defenses in the Action, and this Court should order that this motion be granted and issue the accompanying Letter of Request.

## II.  BACKGROUND REGARDING NEED FOR TESTIMONY AND EVIDENCE

6.      Plaintiffs commenced this civil action on or about October 3, 2017, alleging that they were defamed by Defendants' 2016 publication of statements that accuse Plaintiffs of bribery and corruption in their relationship with Vladimir Putin and suggest that Plaintiffs cooperated with a Kremlin-orchestrated illegal campaign to interfere with the 2016 U.S. presidential election.

7.      The defamatory statements were in a two-page memorandum or "report" labeled Company Intelligence Report 112 ("CIR 112").[2]  CIR 112 was prepared by former British intelligence agent Christopher Steele after he and the company he co-founded, Orbis, were hired by Defendants to do so.  Mr. Steele prepared at least 15 other memoranda for Defendants, as a part of that same assignment.  Defendants had been engaged by a law firm for the Democratic National Committee and/or the Hillary Clinton Campaign in 2016 to produce political opposition research about then-presidential candidate Donald Trump, and Defendants hired Mr. Steele and Orbis to assist them on that engagement.[3]  The memoranda that Mr. Steele drafted and compiled for Defendants, although written over the course of a six-month period about different subjects,

---

[2] Declaration of Alan S. Lewis in Support of Motion for Issuance of Letter of Request for International Judicial Assistance, dated August 4, 2020, Exhibit ("Ex.") L.
[3] *See* Ex. A, attaching excepts from the book authored by Defendant Simpson and Peter Fritsch, *Crime in Progress, Inside the Steele Dossier and the Fusion GPS Investigation of Donald Trump* (2019) ("Crime in Progress") at 56-60 (explaining that Perkins Coie LLP, a law firm that represented the Democratic National Committee and Hillary Clinton campaign, engaged Fusion in 2016 to conduct research on Mr. Trump).

came to be referred to singularly by the media as the "Trump Dossier," "Steele Dossier" or the "Dossier" (referred to herein as the "Dossier" or the "reports").

8.       In spite of the Trump-focused nature of the Defendants' research which was partially sub-contracted to Mr. Steele, the report containing the statements defamatory of Plaintiffs (CIR 112) does not mention Mr. Trump or his campaign.  Instead it accuses Plaintiffs of having a corrupt relationship with Vladimir Putin and the Kremlin. Specifically, it defames Plaintiffs in the following ways:

a.       The heading of CIR 112, "RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP COOPERATION," coupled with Plaintiffs and Alfa[4] being the subject of CIR 112, falsely suggests that Plaintiffs and Alfa cooperated with a Kremlin-orchestrated illegal campaign to influence the outcome of the 2016 U.S. presidential election.

b.       CIR 112 also states: "Significant favours continued to be done in both directions, primarily political ones for PUTIN and business/legal ones for Alpha." That sentence defames Plaintiffs by accusing them of maintaining a relationship with Mr. Putin that includes bribery and corruption.

c.       CIR 112 also contains the following defamatory passage:

during the 1990s GOVORUN had been Head of Government
Relations at Alpha Group and in reality, the "driver" and "bag
carrier" used by FRIDMAN and AVEN to deliver large amounts of
illicit cash to the Russian president, at that time deputy Mayor of
St Petersburg. Given that and the continuing sensitivity of the
PUTIN-Alpha relationship, and need for plausible deniability,
much of the contact between them was now indirect and entrusted
to the relatively low profile GOVORUN.

---

[4] In CIR 112, Alfa was misspelled as "Alpha" but the reference has been interpreted as meaning the Alfa Group of entities, including Alfa Bank, with which Plaintiffs are affiliated.

The defamatory meaning of the first sentence of this passage is an accusation of bribery—illicit cash paid by Plaintiffs Fridman and Aven to a government official, Vladimir Putin—through an intermediary, Oleg Govorun. The defamatory meaning of the second sentence of this passage is that it accuses Plaintiffs of continuing to use Mr. Govorun to have indirect "contact" with Mr. Putin because of the alleged past cash bribes delivered through Mr. Govorun and the need for "plausible deniability."  Ex. B, Plaintiffs' Supplemental Responses to Interrogatory No. 2.

The foregoing allegations in CIR 112 are false and defamatory, as alleged in Plaintiffs' Amended Complaint (the "Complaint") in this Action.  Dkt. 17.  Plaintiffs seek a judgment against Defendants finding that statements about Plaintiffs in CIR 112 are false and defamatory and that Defendants published them. Plaintiffs seek compensatory and/or punitive damages in amounts to be proven at trial, together with interest and costs and fees.

9.      Defendants deny any liability to Plaintiffs and have asserted several defenses, including that the statements about Plaintiffs are not materially false; the publication of the statements was privileged or otherwise protected by, *inter alia*, the First Amendment of the U.S. Constitution, the neutral report privilege, and/or the fair report privilege (under New York Civil Rights Law Section 74); and Plaintiffs should be treated as "public figures" (either general purpose public or limited purpose), a category which subjects Plaintiffs to a burden to show that the defamatory statements were published with "actual malice" (*i.e.*, published with the knowledge that the statements were false or with reckless disregard to whether they were true or false).

10.      In the years after Defendants published CIR 112 and the other election reports that Mr. Steele prepared for Defendants, the reliability and accuracy of what Mr. Steele produced

has been the subject of: (a) a 2019 report by Michael Horowitz, the Inspector General for the U.S. Department of Justice (the "Horowitz Report"); and (b) a 2020 court judgment rendered in connection with a lawsuit filed by Plaintiffs against Mr. Steele's company, Orbis, (the "U.K. Judgment" or the "U.K. Proceeding").  Although CIR 112 was not itself central to the focus of the Horowitz Report, the Horowitz Report was broadly critical of the work Mr. Steele did for Defendants as unreliable.[5]  CIR 112 *was* central to the U.K. Court Judgment against Mr. Steele. In the U.K. Judgment, the English High Court rendered a judgment against Orbis in favor of Plaintiffs, determining that the statements about Plaintiffs in CIR 112 are "inaccurate or misleading as a matter of fact."[6]

Plaintiffs have represented that they do not seek disclosure of communications or documents that are protected from disclosure by the attorney-client privilege, work product doctrine, or other applicable privilege, nor do they seek to circumvent any privilege assertions, however Plaintiffs do not waive the right to object to or challenge the propriety or validity of claims that documents are privileged and the basis of such privilege claims.  Although Orbis produced to Plaintiffs some documents of Orbis and Mr. Steele in the U.K. Proceeding, no documents relating to the creation or publication of CIR 112 were produced and Plaintiffs have a good faith belief, bolstered by recent admitted failures of disclosure by Mr. Steele in a similar

---

[5] *See*  Ex. D, Officer of the Inspector General Michael Horowitz, U.S. Department of Justice, Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation (Dec. 2019), available at https://www.justice.gov/storage/120919-examination.pdf  ("Horowitz Report") at 384 ("In addition to the lack of corroboration, we found that the FBI's interviews of Steele, the Primary Sub-source, and a second sub-source, and other investigative activity, revealed potentially serious problems with Steele's description of information in his election reports."); 186 ("FBI conducted interviews . . . that raised significant questions about the reliability of the Steele election reporting.").

[6] Ex. G, Judgment dated July 8, 2020, *Aven and others v. Orbis Business Intelligence Ltd.*, [2020] EWHC 1812 (QB), available at https://www.bailii.org/ew/cases/EWHC/QB/2020/1812.html ("U.K. Judgment") at ¶ 204.

matter involving Mr. Steele in the U.K.,[7] that relevant documents exist and/or that Orbis and/or

Mr. Steele neglected to produce them.  In addition, due to (i) Mr. Steele's recent challenge to the

U.S. Department of Justice seeking copies of certain of documents from the U.K. Proceeding that

would normally be available under applicable English law[8] and (ii) the restrictions on the use of

certain other documents produced in the U.K. Proceeding pursuant to rule 31.22 of the English

Civil Procedure Rules ("CPR"), Plaintiffs seek a separate order from the High Court permitting

disclosure of evidence for use in this U.S. proceeding.[9]

11.   **Christopher Steele**, co-founder and director of Orbis,[10] conducted the research

for and compiled the information in CIR 112, including the defamatory statements about

Plaintiffs at issue in this Action, and disclosed or provided CIR 112 (and the other reports that

have collectively become known as the "Dossier") to multiple journalists and to other non-

parties.[11]  Defendants have formally identified Mr. Steele as an individual likely to have

information relevant to this Action and Defendants' claims and defenses, specifically

information regarding the "experience, work, process, and engagement by Defendants; [Mr.

Steele's] communications with the FBI, Senator John McCain, the U.S. Department of Justice,

and other governmental agencies and officials; CIR 112, including recipients of CIR 112,

research related to matters in CIR 112, events related to topics in CIR 112, and delivery of CIR

---

[7] In the proceedings captioned *Aleksej Gubarev and another v (i)  Orbis Business Intelligence Limited and (ii) Christopher Steele*, Claim No. HQ17D00413, in the High Court of Justice, Queen's Bench Division, the trial of which recently took place between 20-24 July 2020 ("Gubarev U.K. Proceeding").  *See* Ex. M, Defendants' Closing Submissions in the Gubarev U.K. Proceeding (which were made public during the trial) at 52-57.

[8] In the matter of an application by the United States of America (the United States Department of Justice) made in the U.K. Proceeding.

[9] Pursuant to CPR 31.22, documents disclosed between parties in a U.k. legal proceeding may only be used "for the purpose in which it is disclosed" unless certain exceptions apply, such as if the "the court gives permission" or "the document has been read to or by the court, or referred to, at a hearing which has been held in public."

[10] Mr. Steele is a director and joint founder of Orbis.  *See* https://orbisbi.com/about-orbis/.

[11] *See, e.g.*, Ex. A, Crime in Progress at 109-111 (describing Defendant Glenn Simpson's and Mr. Steele's briefings to journalists); 127-128 (describing Mr. Steele's briefing of David Kramer, and Defendant Simpson's provision of a copy of the entire so-called Dossier to Mr. Kramer).

112." Ex. C (Defendants' First Amended Rule 26(a)(1) Initial Disclosures ("Defendants' Initial Disclosures"), Section 1).

12.   **Christopher Burrows** co-founded Orbis with Mr. Steele,[12] and Mr. Burrows played a role in shaping the content of the Dossier, is knowledgeable about the source(s) of the allegations in the Dossier, and participated in briefings about the Dossier and dissemination of its contents.[13]   Additionally, Defendants have identified Mr. Burrows as an individual likely to have information relevant to this Action and Defendants' claims and defenses, specifically knowledge of "relevant conduct of Orbis and Christopher Steele; Christopher Steele, including his experience, work, process, and engagement by Defendants."   Ex. C, Defendants' Initial Disclosures, Section 1.

13.   **Orbis** is the U.K.-based intelligence gathering firm founded by Mr. Steele and Mr. Burrows which was retained by Defendants in 2016 and which produced CIR 112, including the statements about Plaintiffs at issue in this Action.   Defendants acknowledge engaging Orbis to "look into then-candidate Trump's activities in Russia, in support of Defendants' ongoing research activities" and that Mr. Steele and Mr. Burrows were some of the people at Orbis with whom "Defendants mainly communicated."   Ex. F, Defendants' Answer to Interrogatory No. 12.

14.   **Edward Baumgartner** is the co-founder of the U.K.-based research and intelligence firm Edward Austin Limited.[14]   Defendants have formally identified Mr.

---

[12] Mr. Burrows is a director and joint founder of Orbis.  *See* https://orbisbi.com/about-orbis/.

[13] *See, e.g.*, Ex. A, Crime in Progress at 77 (discussing Mr. Burrows' role in 2016 selecting information that was included in the Dossier), 82-84 (stating that Mr. Burrows and Mr. Steele have refused to reveal the identity of source(s) for the information in the Dossier, and discussing the briefing of an FBI agent in 2016 by Mr. Burrows and Mr. Steele of their "findings and sources").

[14] Mr. Baumgartner is a founder and managing director of Edward Austin Limited. *See* https://www.edward-austin.com/about/team/.

Baumgartner as an individual likely to have information relevant to this Action and Defendants'

claims and defenses, specifically:

> Relevant conduct of Plaintiffs; Plaintiffs' roles in the business
> world; Plaintiffs' ties, communications, meetings, and relations
> with the Kremlin, Vladimir Putin, and those representing them or
> acting on their behalf; Alfa, including entities affiliated with Alfa;
> Alfa's ties to the Kremlin and Vladimir Putin; Alfa's investments
> in U.S. companies; research related to matters in CIR 112.

Ex. C, Defendants' Initial Disclosures, Section 1.

15.     **Sir Andrew Wood** is a former British diplomat who is an Associate Fellow in the

Russia and Eurasia Programme at Chatham House in the U.K.[15]  He has been identified as a

mentor to Mr. Steele with whom Mr. Steele discussed or transmitted the research at issue in this

Action in 2016 at around the time that CIR 112 was completed and sent to Defendant Fusion.

He also communicated with David Kramer and Senator John McCain about Mr. Steele's research

in the reports and arranged a meeting between Mr. Kramer and Mr. Steele regarding the

reports.[16]  Defendants have formally identified Sir Andrew Wood as an individual likely to have

information relevant to this Action and Defendants' claims and defenses, including the "receipt

and delivery of CIR 112."[17]

16.     Plaintiffs seek relevant evidence for use at trial on the merits of the case.

Plaintiffs do not seek disclosure of communications or documents that are  protected from

disclosure by the attorney client privilege, work product doctrine, or other applicable privilege,

nor do they seek to circumvent any privilege assertions, however Plaintiffs do not waive the right

---

[15] *See*  https://www.chathamhouse.org/expert/sir-andrew-wood.
[16] Ex. A, Crime in Progress at 107 (Mr. Steele "reached out to a mentor, Sir Andrew Wood, Britain's former ambassador to Moscow, to seek his advice and share the intelligence he had gathered."); 126-27 (meeting between Sir Andrew Wood and David Kramer and Senator John McCain in Halifax, Nova Scotia, which involved discussions of Mr. Steele's research and reports;  Sir Andrew Wood arranged a meeting in London between Mr. Steele and Mr. Kramer).
[17] Ex. C, Defendants' Initial Disclosures, Section 1.

to object to or challenge the propriety or validity of claims that documents are privileged and the basis of such privilege claims.

17.     Plaintiffs respectfully request that the Court issue the attached Letter of Request for International Judicial Assistance which requests the production of relevant evidence and testimony from the aforementioned individuals and Orbis.[18]  Plaintiffs' proposed requests to each individual and to Orbis, and the relevance to this Action of the evidence requested from each, is set forth below.

### III. PLAINTIFFS' REQUESTS FOR ORAL EXAMINATION AND THE PRODUCTION OF DOCUMENTARY EVIDENCE

**A.**     ***Christopher Steele***

18.     **Oral Examination of Mr. Steele**.  It is expected that Mr. Steele will be able to provide crucial and relevant testimony on a number of topics.  Those topics, and the relevance of each, are set forth below:

**No. 1:** In general terms, Mr. Steele's educational background, employment history, professional qualifications and personal preparation for the examination (including contacts with the parties, their lawyers, insurers, or representatives), excluding any privileged communications or confidential details regarding any government service.

**Relevance:**  Mr. Steele's general educational and employment background are relevant to his credibility and reliability as a witness and as an expert on matters relating to Russia.  Mr. Steele holds himself out as an expert related to Russia and compiled CIR 112 as part of an engagement that was based on his claimed Russia expertise.  Additionally, Defendants asked Mr.

---

[18] The term "documents" shall have the same broad meaning and scope as given to these terms in or pursuant to the Federal Rules of Civil Procedure and applicable law, and shall include hard copy documents and files as well electronic or computerized data, e-mails, text messages, etc.  The term "communications" shall mean the transmittal of data or information by any means, including meetings, conversations, discussions, documents, correspondence, messages, text messages, e-mails, notes, WhatsApp messages, Slack messages, Skype messages, or other means of transmittal.

Steele and Orbis to prepare CIR 112,[19] and Defendants have acknowledged that they "obtained CIR 112 from Mr. Steele"; have stated that Mr. Steele is "a trusted, experienced, and well-respected source" as a basis for trusting the veracity of the statements in CIR 112; and have indicated they had conversations with Mr. Steele regarding "the content of CIR 112, the quality of the sourcing, the competence of Mr. Steele's team, the potential for misinformation, and efforts to verify the information in CIR 112"—all of which is relevant to the issues in the Action. *See* Ex. F, Defendants' Answer to Interrogatory No. 5.  Plaintiffs should be entitled to ask Mr. Steele general background questions to probe the basis for his alleged expertise and to provide context to his qualifications and credibility as a witness.

**No. 2:** Retention of Mr. Steele and/or Orbis in 2016 by Fusion relating to CIR 112 and the scope and purpose of the retention.

**Relevance:** In order to prevail on their claim for defamation, Plaintiffs must demonstrate that the defamatory statements are false and that Defendants acted with fault in publishing the defamatory statements.  *See Farah v. Esquire Mag.*, 736 F.3d 528, 533-34 (D.C. Cir. 2013). Plaintiffs contend the relevant fault standard is negligence; the Defendants contend the relevant fault standard is actual malice.[20]  The scope and purpose of the retention of Orbis and Mr. Steele

---

[19] As indicated in the recent Judgment in the proceeding brought by Plaintiffs against Orbis under the U.K. Data Protection Act, Mr. Steele and Orbis communicated with and received instructions in or about July 2016 from Defendant Fusion to conduct research on Alfa and Plaintiffs and to prepare CIR 112 in connection with concerns about potential Russian interference in the U.S. Presidential election process and suspected communications between the servers of Alfa Bank and Trump Tower.  Ex. G, U.K. Judgment ¶¶ 74, 87.

[20] One of Defendants' affirmative defenses is that Plaintiffs are limited purpose public figures and that they must show that Defendants published the statements with actual malice, a standard that is met if it can be shown that the statement was made with a "reckless disregard for whether or not the statement was false."  *See, e.g. St. Amant v. Thompso*n, 390 U.S. 727, 728 (1968).  Plaintiffs dispute that they are public figures and that the actual malice standard is applicable.

To determine whether Plaintiffs are limited purpose public figures, the Court must determine what controversy "gave rise" to the defamatory statements.  *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974) (in determining public figure status, courts look "to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation").  The parties disagree as to whether the relevant controversy is Russian interference with the 2016 election (as reflected in the title of CIR 112 and the subject of Mr. Steele's report), or the

by Defendant Fusion which led to the preparation of CIR 112 by Orbis and Mr. Steele is relevant

to whether the research was intended to convey truthful information, the level of care that was

taken to ensure the information was truthful, and the motives for publication and dissemination

of CIR 112.

Defendants acknowledge engaging Orbis, which Steele co-founded, to "look into then-

candidate Trump's activities in Russia, in support of Defendants' ongoing research activities,"

and that Steele was one of the people at Orbis with whom "Defendants mainly communicated."

Ex. F, Defendants' Answer to Interrogatory No. 12.  Defendants acknowledge that they "had a

copy of an engagement letter with Orbis and/or Christopher Steele" but no longer have a copy

and "do not recall whether [it] was returned to [Orbis/Steele] or destroyed."  Ex. F, Defendants'

Answer to Interrogatory No. 23.  And Orbis and Mr. Steele prepared several research reports,

including CIR 112 (dated September 14, 2016) which contains the defamatory statements, and

transmitted CIR 112 to Defendants and others.

**No. 3:** Communications and meetings in 2016 and 2017 between Mr. Steele and
Defendants Glenn Simpson or Fusion or any Fusion sub-contractors regarding Plaintiffs, Alfa,
CIR 112, or the statements about Plaintiffs in CIR 112.

**Relevance:**  As set forth in No. 2, *supra*, relevant issues in this Action include whether

the defamatory statements about Plaintiffs in CIR 112 are false and whether Defendants acted

with fault (either negligence or actual malice) in publishing the defamatory statements.

Communications between Mr. Steele and Fusion regarding Plaintiffs, Alfa, CIR 112, and the

---

broader subject of Russian oligarchs and their business interests and relationship with the Kremlin.  Accordingly, the
reasons why the defamatory statements were created and published are relevant issues, and thus the scope and
purpose of Orbis's retention by Fusion for the preparation of CIR 112 are relevant.

In addition, to the extent that Plaintiffs are found to be limited purpose public figures, the Defendants' motive for
publishing the defamatory statements is relevant to whether the defendant acted with actual malice.  *See Harte-
Hanks Commc's, Inc. v. Connaughton*, 491 U.S. 657, 664-65, 667-68, 689 n. 36 (1989); *accord Tavoulareas v. Piro*,
817 F.2d 762, 796 (D.C. Cir. 1987).  Communications between Defendants and Orbis and Mr. Steele regarding the
scope of the retention are in turn relevant to the motives for compiling and publishing CIR 112.

statements about Plaintiffs in CIR 112 are relevant to whether the defamatory statements were false, and whether the Defendants acted negligently or recklessly in publishing the statements. It has been acknowledged that Mr. Steele and Defendants communicated about the research and sourcing for the Dossier (which included CIR 112).[21]

**No. 4:** Communications and meetings in 2016 and 2017 between Mr. Steele and Jonathan Winer regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

**Relevance:** Mr. Winer was an official at the U.S. State Department during the relevant time period, to whom Defendants disclosed a copy of CIR 112. Ex. F, Defendants' Answer to Interrogatory No. 9. Mr. Steele discussed the research reports with Mr. Winer and Mr. Winer served as a conduit between Mr. Steele and the State Department.[22] Mr. Steele's communications and meetings with Mr. Winer in 2016 about the Dossier have been described by Defendant Simpson.[23] Communications and meetings with Mr. Winer, or other government

---

[21] Defendants acknowledge that Mr. Steele was one of the people at Orbis with whom "Defendants mainly communicated." Ex. F, Defendants' Answer to Interrogatory No. 12. *See also* Ex. A, Crime in Progress at 5-6 (referencing 2016 communications between Defendants and Mr. Steele about the Dossier, which included CIR 112); 77 (after Mr. Steele sent Defendants the first report in June 2016, Defendant Simpson spoke with Mr. Steele about sourcing via an encrypted phone line); 108-12 (discussions in 2016 about the research in the Dossier with reporters and media members involving Mr. Steele and Defendant Simpson); 149-50 (communications with Defendants in 2017 after the Dossier was published); 230-31 (communications about the Dossier later in 2017 in connection with investigations by U.S. authorities).

*See also* Ex. G, U.K. Judgment at ¶¶ 74, 87 (Mr. Steele and Orbis communicated with and received instructions from Fusion to conduct research on Alfa and Plaintiffs and to prepare CIR 112 in connection with concerns about potential Russian interference in the U.S. Presidential election process and suspected communications between the servers of Alfa Bank and Trump Tower).

[22] *See* Ex. H, Jonathan M. Winer, *Devin Nunes is investigating me. Here's the truth*, Wash. Post (Feb. 8, 2018), https://www.washingtonpost.com/opinions/devin-nunes-is-investigating-me-heres-the-truth/2018/02/08/cc621170-0cf4-11e8-8b0d-891602206fb7_story.html (Mr. Winer wrote that he "alert[ed]" the U.S. State Department of the allegations in Mr. Steele's memoranda.).

[23] *See* Ex. A, Crime in Progress at 107 (reporting that on September 14, 2016, when Mr. Steele sent his seventh research report to Fusion (*i.e.,* CIR 112), Mr. Steele "messaged his contact at the State Department, Jonathan Winer, to let him know he had developed disturbing information about Trump's ties to Russia" and "asked to meet [Winer] in person the next time [Steele] was in Washington"); 112-13 (regarding a September 2016 meeting between Mr. Steele and Mr. Winer in which Mr. Steele disclosed to Mr. Winer the contents of the research in the Dossier, which led Mr. Winer to contact Peter Fritsch, co-founder of Defendant Fusion, who allowed Mr. Winer to review the reports and take notes for further dissemination of the information).

*See also* Ex. D, Horowitz Report at 117 (Mr. Steele met with Jonathan Winer on 11 October 2016, and notes of the meeting reflect that Mr. Steele addressed a wide array of topics, including the role of Alfa Bank as a conduit for

officials, and what was said about the credibility of the allegations about Plaintiffs in CIR 112

and Mr. Steele's reports and research generally, are relevant to the falsity of the statements and

whether Defendants acted negligently or recklessly in publishing CIR 112—which are issues

relevant in this Action.  *See* No. 3 above, *supra*.

**No. 5:** Communications and meetings in 2016 and 2017 between Mr. Steele and reporters
or news or media organizations regarding Plaintiffs, Alfa, CIR 112, or the statements about
Plaintiffs in CIR 112.

**Relevance:**  In order to prevail on their claim for defamation, Plaintiffs must show that

Defendants published the defamatory statements.  *Farah*, 736 F.3d at 533-34.  In the Complaint,

Plaintiffs have alleged that the Defendants "arranged for Steele to brief selected members of the

print and online media about the information he was compiling."  Am. Compl. ¶ 6, Dkt. 17.

Defendant Simpson has reported that he and Mr. Steele had meetings and communications in

2016 with reporters and media companies regarding the election-related research in the Dossier,

and Mr. Steele has similarly reported having meetings in 2016 with the media, at the direction of

Defendant Fusion, to discuss the election-related research findings.[24]  Defendants acknowledge

that they provided copies of CIR 112 to the *New York Times*, *Mother Jones*, and other third

---

secret communications between the Trump campaign and the Kremlin); 119 (Two days after the meeting on 11
October, Kathleen Kavalec of the U.S. State Department emailed a FBI Section Chief a document received from Mr.
Winer which discussed allegations about a linkage between Alfa Bank and the Trump Campaign, and Ms. Kavalec
said that the information in the document related to Mr. Steele's investigation.).

[24] *See* Ex. A, Crime in Progress at 108-112 (regarding Mr. Steele's meetings with reporters from various
publications to disclose the contents of the reports that became known as the Dossier); 118-19 (regarding a three
way Skype call on October 31, 2016 regarding the research and information in the Dossier with David Corn of
*Mother Jones*, Mr. Steele, and Defendant Simpson); 141-43 (referring to a December 31, 2016 text message from
Ken Bensinger of *BuzzFeed* to Mr. Steele on the day that Mr. Bensinger obtained a copy of the Dossier from David
Kramer, and wanting to meet Mr. Steele in London on January 3, a few days before Mr. Bensinger published the
Dossier as part of a *BuzzFeed* article).

*See also* Ex. D, Horowitz Report at 104-05 (in late September 2016, Mr. Steele, as tasked by Fusion, briefed
journalists from *The New York Times*, *The Washington Post*, *Yahoo News*, *The New Yorker* and *CNN* regarding his
research and reports on election interference by Russia); 117 (Mr. Steele returned in mid-October 2016 to give
further briefings to *the New York Times*, *The Washington Post* and *Yahoo News*).

parties in 2016.  Ex. F, Defendants' Answer to Interrogatory No. 9.  In addition, according to

Defendant Simpson, Mr. Steele communicated via text message with Mr. Bensinger of BuzzFeed

on December 31, 2016 and met with Mr. Bensinger on January 3, 2016 regarding the reports—

days before Mr. Bensinger and BuzzFeed published all the reports on the internet.[25]  Mr. Steele's

and Defendants' meetings and communications with reporters, or news or media organizations

are directly relevant to Defendants' "publication" of CIR 112—a relevant issue in this

defamation Action.  Further, what was conveyed to the media and other third parties is relevant

to the falsity of the statements in CIR 112 and whether publication was done negligently or

recklessly—relevant issues in this Action.

Additionally, in their motion to dismiss, Defendants claimed that any briefing to

journalists would "not have included any mention of Plaintiffs or the contents of CIR 112."

Defendants' Motion to Dismiss the Amended Complaint for Failure to State a Claim ("Mot.

Dismiss") at 33, Dkt. 20.  Plaintiffs should be entitled to test this assertion by questioning Mr.

Steele as to whether he mentioned or discussed Plaintiffs, Alfa, or CIR 112 during his meetings

with reporters, or news or media organizations.

**No. 6:** Communications and meetings in 2016 and 2017 between Mr. Steele and David
Kramer regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

**Relevance:** Defendants have acknowledged providing a copy of CIR 112 in 2016 to Mr.

Kramer, a former U.S. State Department official and adviser to U.S. Senator John McCain (Ex.

F, Defendants' Answer to Interrogatory No. 9), and that Mr. Steele had communications and

meetings with Mr. Kramer in 2016 regarding his election-related research and reports,

dissemination of the reports (including CIR 112), and the factual support for and "credibility of

---

[25] Ex. A, Crime in Progress at 143-44.

the reporting."[26]  These facts are relevant to the issues of publication, falsity of the statements

about Plaintiffs, and Defendants' negligence or recklessness (based on what was said in such

meetings and communications).

Defendants have claimed that they did not provide CIR 112 to Mr. Bensinger or

BuzzFeed (Mot. Dismiss at 15, Dkt. 20), however it has been reported and acknowledged that

Mr. Steele asked Defendant Simpson to provide a copy of the Dossier (which included CIR 112)

to Mr. Kramer in 2016 after meeting with Mr. Kramer in London, and that Defendants published

the defamatory statements to Mr. Kramer by providing him a copy, as alleged in the Complaint.

Am. Compl. ¶ 7, Dkt. 17; Ex. A, Crime in Progress at 127-28, and Ex. F, Defendants' Answer to

Interrogatory No. 9.  In another litigation emanating from the publication of the Dossier, Mr.

Kramer has been found to have provided "all seventeen [Steele] memos" (including CIR 112) to

BuzzFeed (which then published the 17 memos on the internet).  *See Gubarev v. BuzzFeed, Inc.*,

340 F. Supp. 3d 1304, 1311 (S.D. Fla. 2018).  Accordingly, Mr. Steele's communications with

Mr. Kramer (on behalf of Defendants) are relevant to Defendants' role in publishing CIR 112 for

wide dissemination.

No. 7: The drafting and compilation in 2016 of CIR 112 and its promotion.

---

[26] *See* Ex. A, Crime in Progress at 127 (Mr. Steele met with Mr. Kramer in November 2016 and showed him the
Dossier (including CIR 112) and they discussed the reports, the research, and the factual support); 128 (Mr. Steele
asked Defendant Simpson to provide a copy of the reports to Mr. Kramer, which he did); 142 (referencing
December 29, 2016 text messages between Mr. Kramer and Mr. Steele regarding communications with Ken
Bensinger of BuzzFeed, which ultimately published the reports with an article on January 10, 2017); 143 (Mr.
Kramer allowed Mr. Bensinger to copy the reports, which Mr. Bensinger then published along with the January 10
article*). See also* Ex. G, U.K. Judgment at ¶¶ 51-52 (Mr. Steele disclosed CIR 112 and other memoranda to Mr.
Kramer in 2016, and "at some point between late November 2016 and 10 January 2017, Mr. Kramer gave Buzzfeed
access to the Steele Dossier, thereby causing or contributing to the publication of the Buzzfeed Article"), 53
(communications between Mr. Steele and Mr. Kramer in December 2016 regarding disclosure of CIR 112 to a
senior US national security official); 118 (meeting between Mr. Steele and Mr. Kramer in November 2016 and
subsequent request for copies of the reports including CIR 112).

**Relevance:** Defendants acknowledge engaging Orbis, which Mr. Steele co-founded, to

"look into then-candidate Trump's activities in Russia, in support of Defendants' ongoing

research activities," that Orbis and Mr. Steele prepared CIR 112 and Defendants "obtained CIR

112 from Mr. Steele" and Orbis, and that Defendants had conversations with Mr. Steele

regarding "the content of CIR 112, the quality of the sourcing, the competence of Mr. Steele's

team, the potential for misinformation, and efforts to verify the information in CIR 112" (Ex. F,

Defendants' Answers to Interrogatory Nos. 5, 12)[27]—all of which is relevant to the issues in the

Action (including the falsity of the statements about Plaintiffs, and the negligence or recklessness

in publication of such statements).  In addition, Department of Justice Inspector General Michael

Horowitz was broadly critical of the work Steele did for Defendants as unreliable[28] and the

recent English High Court judgment against Orbis in favor of Plaintiffs (under the U.K. Data

Protection Act) determined that the statements about Plaintiffs in CIR 112 are "inaccurate or

misleading as a matter of fact."[29]  Accordingly, Plaintiffs should be able to question Mr. Steele

---

[27] *See also* Ex. G, U.K. Judgment at ¶¶ 74-75, 87 (regarding engagement of Orbis and Mr. Steele to prepare CIR 112 and the preparation thereof).

[28] *See* Ex. D, Horowitz Report at 384 ("In addition to the lack of corroboration, we found that the FBI's interviews of Steele, the Primary Sub-source, and a second sub-source, and other investigative activity, revealed potentially serious problems with Steele's description of information in his election reports."); 187 (a source indicated that Mr. Steele "misstated or exaggerated …statements in multiple sections of the reporting"); 188 (a source reported that "the tenor of Steele's reports was far more 'conclusive' than was justified");  186 ("FBI conducted interviews . . . that raised significant questions about the reliability of the Steele election reporting.");  133 ("neither Steele nor the Primary Sub-source had direct access to the information being reported").

The U.S. Senate Judiciary Committee was also critical of Mr. Steele's research and reporting.  *See* Ex. E, Senate Judiciary Committee Release, July 17, 2020 available at https://www.judiciary.senate.gov/press/rep/releases/judiciary-committee-releases-declassified-documents-that-substantially-undercut-steele-dossier-page-fisa-warrants (evidence shows "how unsubstantiated and unreliable the Steele dossier was;" the "primary 'source' of Steele's election reporting was not some well-connected current or former Russian … [and] information that Steele's primary source provided him was second and third-hand information and rumor at best").

[29] Ex. G, U.K. Judgment at ¶ 204.

about these credibility and accuracy problems that bedeviled his project for Defendants (which

including the preparation of CIR 112).

In support of their motion to dismiss, Defendants claimed that much of the complained-of

statements in CIR 112 are not defamatory because they do not suggest a corrupt relationship

between Plaintiffs and Russian President Vladimir Putin.  *See*, *e.g.* Mot. Dismiss at 19-20, Dkt.

20.  Although Plaintiffs contend that Defendants' interpretation is nonsensical and the

defamatory import of being accused of a close relationship with Mr. Putin in which "favours"

were done in both directions is inarguable, Defendants have placed the meaning and

interpretation of these words at issue.  Accordingly, Plaintiffs should be entitled to question Mr.

Steele as to the drafting and compilation of CIR 112 and what was intended to be conveyed by

the description of their relationship with Mr. Putin.

Plaintiffs have alleged that CIR 112's heading defames them by linking them to Russian

interference in the 2016 presidential election.  Am. Compl. ¶ 19, Dkt. 17.  Defendants have

claimed that CIR 112 did not link Plaintiffs to the election interference controversy because the

contents of CIR 112 (as opposed to its heading) do not concern the 2016 presidential election or

Mr. Trump.  Mot. Dismiss at 17-18, Dkt. 20. Plaintiffs should be entitled to question Mr. Steele

regarding the structure of CIR 112, including why it was given the heading it bears, which is

relevant to the defamatory import of CIR 112.

**No. 8:** Delivery, transmission, or disclosure of CIR 112 in 2016 and 2017 to other
persons or entities, including Defendants, Mr. Kramer, Mr. Winer, reporters and members of the
media.

**Relevance:**  Defendants acknowledge that Orbis and Mr. Steele delivered or transmitted

CIR 112 to Defendants and that Defendants disclosed or transmitted copies of CIR 112 to several

third parties, including Mr. Kramer, Mr. Winer, reporters and members of the media.  Ex. F,

Defendants' Answers to Interrogatory Nos. 5, 9.  Mr. Steele and Orbis also disclosed or

transmitted copies of CIR 112 to others, such as the FBI, Strobe Talbott, a U.K. government

official, and David Kramer.[30]  This topic concerns the publication of CIR 112, which, as

discussed, is a relevant issue in the Action.

Defendants claim that even if they are liable for publishing CIR 112, their liability is

limited because all they did was tell "a select few journalists about the contents of other reports"

in the collection of memoranda and did not give journalists copies of the memoranda.  Mot.

Dismiss at 36, Dkt. 20.  Mr. Steele was present during the media briefings regarding his reports,

disclosed information regarding his reports to members of the media at Defendants' direction,

and assisted Defendants in disseminating the reports to a wide audience by meeting with

government officials, in which Alfa was discussed.[31]  In his December 2019 report, U.S.

Department of Justice Inspector General Horowitz reported that in October 2016, Mr. Steele

talked about Alfa Bank during a meeting with the U.S. State Department.  Specifically, Steele

mentioned an allegation that Alfa was a  "conduit for secret communications between [Paul]

Manafort and the Kremlin," and another "about a linkage between Alfa Bank and the Trump

Campaign."[32]  And while those allegations were not included in CIR 112, Mr. Steele evidently

disclosed CIR 112 to a reporter from *Mother Jones*."[33]  Plaintiffs should be entitled to

---

[30] *See* Ex. G, U.K. Judgment at ¶ 51 (summarizing the disclosures by Mr. Steele and Orbis).

[31] *See, e.g.,* Ex. A, Crime in Progress 108-11 (describing Defendant Simpson's and Mr. Steele's briefings to journalists); 112 (Mr. Steele met with U.S. State Department Official Jonathan Winer regarding the Dossier); 128 (Mr. Steele told David Kramer that he had shared his research information with the FBI and facilitated Defendant Simpson providing a copy of CIR 112 to Mr. Kramer so that it could be further disseminated to a government official). *See also* Ex. G, U.K. Judgment at ¶¶ 59, 113(5) ("Mr. Steele admits briefing journalists about Orbis' work, and the documentary evidence and cross-examination make it clear that, in and after late September 2016 he was heavily and enthusiastically involved in doing so.").

[32] *See* Ex. D, Horowitz Report 117, 119.

[33] *See* Ex. D, Horowitz Report 175.

information relating to Defendants' role in disclosing and publishing CIR 112 on which Mr. Steele has knowledge.

**No. 9:** The steps taken by Mr. Steele, Orbis, or Defendants to corroborate, verify or investigate the information and statements about Plaintiffs in CIR 112.

**Relevance:** In order to prevail on their claim for defamation, Plaintiffs must prove that the defamatory statements are false and that Defendants acted with fault (either negligence or actual malice) in publishing the defamatory statements. *See Farah*, 736 F.3d at 533-34. Defendants have indicated that they "do not know the identity of Steele's sources for CIR 112" but trusted Mr. Steele and had conversations with him about "the efforts to verify the information in CIR 112." Ex. F, Defendants' Answers to Interrogatory Nos. 4, 5. In addition, the U.S. Department of Justice has reported on the problems with the sourcing and accuracy of Mr. Steele's reports. *See* page 7, note 5, *supra*.

The steps taken, if any, to corroborate, verify, or investigate the statements about Plaintiffs in CIR 112 are directly relevant to this Action, and efforts (or lack thereof) by Defendants and their subcontractors, such as Mr. Steele who compiled CIR 112, are relevant to Defendants' negligence or recklessness in publishing CIR 112. If Defendants, Orbis, or Mr. Steele (a) attempted to, but did not succeed in, corroborating the statements in CIR 112, (b) failed to investigate or corroborate statements from sources, or (c) found any information that contradicted the statements in CIR 112—it supports the inference that they were negligent or reckless in publishing false statements about Plaintiffs, which are relevant issues in the Action.

**No. 10:** The destruction, return, or non-retention of the following documents: (a) CIR 112, including work product, memoranda, source information, drafts or analysis relating to CIR 112; (b) communications between Mr. Steele and Defendants Simpson or Fusion in respect to CIR 112; and (c) engagement agreements between Mr. Steele and/or Orbis on one hand and Fusion on the other which govern the creation or promotion of CIR 112.

**Relevance:** Defendants have not produced any documents relating to CIR 112, and Defendants, Orbis, and Mr. Steele have all previously indicated that they routinely destroy or return documents and did not retain documents relating to CIR 112 that are relevant to this Action. For example, Defendants acknowledge that they had a copy of an engagement letter with Orbis and/or Mr. Steele, but no longer have a copy and do not recall whether it was returned to Orbis/Mr. Steele or destroyed. Ex. F, Defendants Answer to Interrogatory 23. Defendants also acknowledge that they previously had an encrypted copy of CIR 112 that was received from Orbis, as well as documents relating to the statements about Plaintiffs in CIR 112 (responsive to Plaintiffs' Document Request 26), including a memorandum, but that they no longer have copies of such documents and "do not recall whether document[s] [were] returned to [Orbis] or destroyed." *Id.* In the proceeding brought by Plaintiffs under the U.K. Data Protection Act, Mr. Steele admitted that he destroyed relevant documents regarding his research for the reports (which include CIR 112).[34] Plaintiffs should be entitled to probe this assertion to determine when documents were destroyed, whether it was at the direction of Defendants, whether it was done when litigation should have been anticipated, and whether any destroyed documents can be recovered. If Defendants destroyed (or instructed others to destroy) relevant documents when there was an anticipation of litigation, then Defendants could be subject to sanctions in this Action. If Defendants returned relevant documents to Mr. Steele or to Orbis, Plaintiffs will want to obtain such documents from Mr. Steele or Orbis. Plaintiffs should also be entitled to question

---

[34] Ex. G, U.K. Judgment at ¶¶ 81 (Other than notes of a July 2016 meeting with the FBI, Mr Steele "kept few records" regarding his research and "most of these he did keep have been lost or destroyed."), 175 (CIR 112 "was based on intelligence provided by a single source and a single sub-source" and "Mr Steele had a 2-hour meeting with the source, and wrote up the memorandum shortly after, destroying the manuscript notes.")

Mr. Steele as to why certain documents were retained (such as certain meeting notes) but not other documents.

**No. 11:** Communications and meetings in 2016 and 2017 between Mr. Steele and Igor Danchenko regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

**Relevance:** It was recently reported in the media that Mr. Steele's primary source for his election-related research and reports was Igor Danchenko, a U.S.-based researcher hired by Orbis (not a well-connected official in Russia, as many previously believed).[35]  Mr. Steele's meetings and communications with Mr. Danchenko regarding the subject matter of Mr. Steele's "Dossier" of memos (which included CIR 112) are relevant to the reliability of the research, Defendants' knowledge that Mr. Danchenko was a primary source, the falsity of the statements in CIR 112, and whether Defendants' publication was done negligently or recklessly—relevant issues in this Action.

19. **Documentary Evidence from Mr. Steele**. It is expected that Mr. Steele will be able to provide documentary evidence relevant and material to a number of issues in this Action. The documents requested from Mr. Steele, and their relevance, are set forth below:

**No. 1:** Documents setting out the terms of Orbis's and/or Mr. Steele's engagement with or retention by Fusion in connection with the compilation or preparation of CIR 112 and its promotion.

**No. 2:** Documents setting out the scope and purpose of the work that Mr. Steele and Orbis were to perform in connection with the compilation or preparation of CIR 112 and its promotion.

**Relevance:** For the same reasons that testimony from Mr. Steele on the issues of Orbis's and Mr. Steele's engagement by Fusion and the scope and purposes of the work to be performed

---

[35] *See* Ex. N, Adam Goldman and Charlie Savage, *The F.B.I. Pledged to Keep a Source Anonymous. Trump Allies Aided His Unmasking,* N.Y. Times (July 25, 2020), https://www.nytimes.com/2020/07/25/us/politics/igor-danchenko-steele-dossier.html?  Mr. Danchenko's lawyer has indicated that he did not seek to have his identity withheld from these media reports because his "name has already been exposed." *Id.*

23

are relevant in this Action, as set forth in Paragraph 18, No. 2, *supra*, documents relating to these issues are relevant and should be produced.  Mr. Steele was involved in communications about these issues, and Defendants have stated that documents relating to the engagement of Mr. Steele or his firm Orbis once existed, but that Defendants destroyed such documents or returned them to Mr. Steele or Orbis.

**No. 3:** Communications between Mr. Steele and Defendants Glenn Simpson or Fusion (including documents referencing or referenced in such communications) regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, within the period 01 April 2016 to 03 October 2017.

**Relevance:** As set forth in Paragraph 18, No. 3, *supra*, Mr. Steele and Defendants had communications regarding the research and sourcing for the Dossier (which included the defamatory statements about Plaintiffs in CIR 112).  Documents, including communications, between Orbis or Mr. Steele and Defendants regarding Plaintiffs, Alfa, and CIR 112 are relevant to whether the defamatory statements are false, and whether the Defendants acted negligently or recklessly in publishing the statements.  The date range of this request is from the month (April) that Fusion was retained in 2016 for the election-related research until the date Plaintiffs filed their complaint in this Action.

**No. 4:** Communications between Mr. Steele and Jonathan Winer (including documents referencing or referenced in such communications) regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, within the period 01 September 2016 to 10 January 2017.

**No. 5:** Communications within the period 01 September 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Mr. Steele and Mr. Winer relating to meetings regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including the meeting between Mr. Steele and U.S. Department of State officials and Mr. Winer on or about 11 October 2016.

**Relevance:**  As set forth in Paragraph 18, No. 4, *supra*, relating to oral examination on this subject, Defendants disclosed CIR 112 to Mr. Winer, a U.S. State Department official, and Mr. Steele had communications with Mr. Winer about his election-related reports.  Documents

24

relating to these communications are relevant to issues in the Action, such as the publication of

the defamatory statements and whether Defendants acted negligently or recklessly in publishing

CIR 112.  The date range of this request is from the month (September) in 2016 that CIR 112

was completed and Mr. Steele communicated and met with Mr. Winer regarding the reports until

the date that BuzzFeed published the Dossier on the internet (January 10, 2017).

**No. 6:** Communications within the period 01 September 2016 to 10 January 2017
(including documents referencing or referenced in such communications) between Mr. Steele
and the *New York Times*, the *New Yorker*, the *Washington Post*, *Yahoo! News*, *CNN, Mother
Jones* and/or *BuzzFeed*, relating to meetings regarding Plaintiffs, Alfa, CIR 112, or the
statements about Plaintiffs in CIR 112,  including the meeting between Mr. Steele and Michael
Isikoff and Jane Mayer at the Tabard Inn on or about 22 September 2016.

**No. 7:** Communications within the period 01 September 2016 to 10 January 2017
(including documents referencing or referenced in such communications) between Mr. Steele
and the *New York Times*, the *New Yorker*, the *Washington Post*, *Yahoo! News*, *CNN, Mother
Jones,* and/or *BuzzFeed* regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in
CIR 112.

**No. 8:** Communications (including documents referencing or referenced in such
communications) between Mr. Steele and David Corn of *Mother Jones* via Skype on 31 October
2016 regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

**Relevance:**  As set forth in Paragraph 18, No. 5, *supra*, Mr. Steele and Defendant

Simpson met and had communications with media organizations and reporters (including those

referenced in the above requests) in 2016 to discuss the content of the memos prepared at the

direction of Defendants, and provided copies of CIR 112 to certain media organizations.

Documents relating to these communications are material to relevant issues in this Action,

including Defendants' publication of the defamatory statements, the falsity of the statements, and

whether publication was done negligently or recklessly.  The date range of these requests is from

the month (September) in 2016 that CIR 112 was completed and Mr. Steele first met with

reporters about the research and reports until the date that BuzzFeed published the Dossier on the

internet (January 10, 2017).

**No. 9:** Communications within the period 01 September 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Mr. Steele and David Kramer regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including text messages or other types of messages between Mr. Steele and Mr. Kramer on or about 29 December 2016.

**Relevance:** *See* Paragraph 18, No. 6, *supra*, which explains the relevance of testimony about Mr. Steele's communications regarding his reports with Mr. Kramer, who received the reports (including CIR 112) from Mr. Steele and Defendants and provided the memoranda to other parties and BuzzFeed. For the same reasons, documents relating to these communications are relevant to this Action and should be produced. The date range of this request is from the month (September) in 2016 that CIR 112 was completed through November (when Mr. Steele communicated and met with Mr. Kramer regarding the reports) and December (when Mr. Kramer allowed BuzzFeed to copy the Dossier) until the date that BuzzFeed published the Dossier on the internet (January 10, 2017).

**No. 10:** Documents within the period 01 July 2016 to 10 January 2017 relating to the drafting and compilation of CIR 112; notes, research, investigative files used in the drafting of CR112; and drafts or different versions of CIR 112.

**Relevance:** As set forth in Paragraph 18, No. 7, *supra*, Defendants engaged Orbis and Mr. Steele to conduct research relating to Russian interference in the 2016 election. During the course of that research and as part of the same project, at Defendants' request, Mr. Steele and Orbis prepared and compiled a memo, CIR 112, whose subjects are Plaintiffs and Alfa, and Mr. Steele transmitted it to Defendants on or about September 14, 2016. Defendants had conversations with Mr. Steele regarding the content of CIR 112 and the factual support for the statements therein. Further, Mr. Steele took notes regarding factual support for CIR 112, but

claims to have destroyed such notes.[36]  Plaintiffs should be entitled to documents and

communications relating to the drafting or compilation of CIR 112 (and the factual support

therefor).  Such documents are directly relevant to the issues in the Action, including the falsity

of the statements about Plaintiffs, and the negligence or recklessness in publication of such

statements.   The date range of this request is from the month (July) in 2016[37] that Mr. Steele and

Orbis were asked by Defendant to conduct research regarding Alfa and Plaintiffs and to prepare

a report (CIR 112) through the months that CIR 112 was completed and Mr. Steele met with and

communicated with third parties regarding the research and reports until the date that BuzzFeed

published the Dossier on the internet (January 10, 2017).

     **No. 11:** Communications within the period 01 September 2016 to 10 January 2017
(including documents referencing or referenced in such communications) between Mr. Steele
and Defendants, Mr. Kramer, Mr. Winer, reporters and members of the media, or others
regarding the delivery, transmission, or disclosure of CIR 112.

     **Relevance:**  As set forth in Paragraph 18, No. 8, *supra*, Orbis, Mr. Steele, and

Defendants disclosed or transmitted CIR 112 to various people and entities in 2016, which is

relevant to the issue of publication.  Defendants should be entitled to any documents relating to

these disclosures.  The date range of this request is from the month (September) in 2016 that CIR

112 was completed through the months that CIR 112 was disseminated and disclosed to third

parties until the date that BuzzFeed published the Dossier on the internet (January 10, 2017).

     **No. 12:** Communications within the period 01 July 2016 to 10 January 2017 (including
documents referencing or referenced in such communications) between Mr. Steele and
Defendants, Mr. Kramer, Mr. Winer, reporters and members of the media, or others concerning
the steps taken by Mr. Steele, Orbis, or Defendants to corroborate, verify, or investigate the
information and statements about Plaintiffs in CIR 112.

---

[36] *See* Ex. G, U.K. Judgment at ¶ 175 (Mr. Steele kept "manuscript notes" relating to factual support for CIR 112 and "then destroyed them" after drafting the memorandum).

[37] *Id.* at ¶ 87.

**Relevance:**  As set forth in Paragraph 18, No. 9, *supra*, steps taken by Mr. Steele, Orbis or Defendants to corroborate, verify, or investigate the statements in CIR 112 relate to the falsity of the statements in CIR 112 and to Defendants' role and fault in disseminating and publishing CIR 112, which are relevant issues in this Action.  Defendants had conversations with Mr. Steele regarding "the content of CIR 112, the quality of the sourcing, the competence of Mr. Steele's team, the potential for misinformation, and efforts to verify the information in CIR 112"—all of which is relevant to the issues in the Action.  And Mr. Steele, at one time, had notes relating to the factual support for CIR 112.  Plaintiffs should be entitled to relevant documents relating to steps taken to corroborate, verify, or investigate the statements in CIR 112. The date range of this request is from the month (July) in 2016 that Mr. Steele and Orbis were asked by Defendant to conduct research regarding Alfa and Plaintiffs and to prepare a report (CIR 112) through the months that CIR 112 was completed and Mr. Steele met with communicated with third parties regarding the research and reports until the date that BuzzFeed published the Dossier on the internet (January 10, 2017).

**No. 13:** Documents concerning the destruction, return, or non-retention of documents within the period 01 July 2016 to the present in respect to: (a) CIR 112, including work product, memoranda, source information, drafts or analysis relating thereto; (b) communications between Mr. Steele and Defendants Simpson or Fusion in respect to CIR 112; and (c) engagement agreements between Orbis and/or Mr. Steele on one hand and Fusion on the other which govern the creation or promotion of CIR 112.

**Relevance:**  As set forth in Paragraph 18, No. 10, *supra*, Defendants and Mr. Steele have previously indicated that they destroyed or did not retain documents relating to CIR 112 that are relevant to this Action.  Defendants have produced no documents relating to CIR 112. Documents relating to this destruction or non-retention of relevant documents should be produced to Plaintiffs.  The date range of this request is from the month (July) in 2016 that Orbis Business Intelligence Ltd. ("Orbis"), Steele and Orbis were asked by Defendant to conduct

research regarding Alfa and Plaintiffs and to prepare a report (CIR 112) until the present, as there

was an ongoing duty to preserve any relevant documents from the time that litigation could have

been anticipated.

No. 14: Communications within the period 01 April 2016 to 03 October 2017 (including documents referencing or referenced in such communications) between Mr. Steele and Igor Danchenko regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

Relevance: As set forth in Paragraph 18, No. 11, *supra*, Mr. Danchenko was a source for

Mr. Steele's research and reports.  Documents, including communications, between Mr.

Danchenko and Mr. Steele regarding Plaintiffs, Alfa, and CIR 112 are relevant to the reliability

of the research, Defendants' knowledge of  Mr. Danchenko as a source, the falsity of the

statements in CIR 112, and whether Defendants' publication was done negligently or

recklessly—relevant issues in this Action.  The date range is explained above in No. 3.

B. **_Orbis Business Intelligence Ltd._**

20. **Documentary Evidence from Orbis**.  Orbis was engaged to prepare CIR 112

and Mr. Steele is a co-founder and director of Orbis.  Thus, similar document requests to those

made of Mr. Steele are being made to Orbis, to the extent only that relevant documents are in the

possession, custody, or control of Orbis (and not Mr. Steele).  For the avoidance of doubt,

Plaintiffs are not seeking duplicative production of the same documents.  The request is limited

to the additional relevant documents that are not produced by Mr. Steele.  Accordingly, as

indicated below, the relevance explanations applicable to Mr. Steele are also generally applicable

to Orbis.  It is expected that Orbis will be able to provide relevant and material documentary

evidence on a number of topics.  The documents requested from Orbis, and the relevance to this

Action of each request, is set forth below:

**No. 1:** Documents setting out the terms of Orbis's and/or Mr. Steele's engagement with or retention by Fusion in connection with the compilation or preparation of CIR 112 and its promotion.

**No. 2**. Documents setting out the scope and purpose of the work that Orbis and Mr. Steele were to perform in connection with the compilation or preparation of CIR 112 and its promotion.

**Relevance:** *See* Paragraph 18, No. 2, and Paragraph 19, Nos. 1 and 2, *supra*, which set

forth the relevance of these documents also being requested of Mr. Steele.

**No. 3:** Communications between Orbis or Mr. Steele and Defendants Glenn Simpson or Fusion (including documents referencing or referenced in such communications) regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, within the period 01 April 2016 to 03 October 2017.

**Relevance:** *See* Paragraph 18, No. 3, and Paragraph 19, No. 3, *supra*, which set forth the

relevance of these documents also being requested of Mr. Steele.

**No. 4:** Communications between Orbis or Mr. Steele and Jonathan Winer (including documents referencing or referenced in such communications) regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, within the period 01 September 2016 to 10 January 2017.

**No. 5:** Communications within the period 01 September 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Orbis or Mr. Steele and Mr. Winer relating to meetings regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including the meeting between Mr. Steele and U.S. Department of State officials and Mr. Winer on or about 11 October 2016.

**Relevance:** *See* Paragraph 18, No. 4, and Paragraph 19, Nos. 4 and 5, *supra*, which set

forth the relevance of these documents also being requested of Mr. Steele.

**No. 6:** Communications within the period 01 September 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Orbis or Mr. Steele and the *New York Times*, the *New Yorker*, the *Washington Post*, *Yahoo! News*, *CNN, Mother Jones* and/or *BuzzFeed*, relating to meetings regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including the meeting between Mr. Steele and Michael Isikoff and Jane Mayer at the Tabard Inn on or about 22 September 2016.

**No. 7**: Communications within the period 01 September 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Orbis or Mr. Steele and the *New York Times*, the *New Yorker*, the *Washington Post*, *Yahoo! News*, *CNN*,

*Mother Jones,* and/or *BuzzFeed* regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

**No. 8**: Communications (including documents referencing or referenced in such communications) between Orbis or Mr. Steele and David Corn of *Mother Jones* via Skype on 31 October 2016 regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

**Relevance:** *See* Paragraph 18, No. 5, and Paragraph 19, Nos. 6, 7, and 8, *supra*, which set

forth the relevance of these documents also being requested of Mr. Steele.

**No. 9:** Communications within the period 01 September 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Orbis or Mr. Steele and David Kramer regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including text messages or other types of messages between Mr. Steele and Mr. Kramer on or about 29 December 2016.

**Relevance:** *See* Paragraph 18, No. 6, and Paragraph 19, No. 9, *supra*, which set forth the

relevance of these documents also being requested of Mr. Steele.

**No. 10:** Documents within the period 01 July 2016 to 10 January 2017 relating to the drafting and compilation of CIR 112; notes, research, investigative files used in the drafting of CR112; and drafts or different versions of CIR 112

**Relevance:** *See* Paragraph 18, No. 7, and Paragraph 19, No. 10, *supra*, which set forth

the relevance of these documents also being requested of Mr. Steele.

**No. 11:** Communications within the period 01 September 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Orbis or Mr. Steele and Defendants, Mr. Kramer, Mr. Winer, reporters and members of the media, or others regarding the delivery, transmission, or disclosure of CIR 112.

**Relevance:** *See* Paragraph 18, No. 8, and Paragraph 19, No. 11, *supra*, which set forth

the relevance of these documents also being requested of Mr. Steele.

**No. 12:** Communications within the period 01 July 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Orbis or Mr. Steele and Defendants, Mr. Kramer, Mr. Winer, reporters and members of the media, or others concerning the steps taken by Mr. Steele, Orbis, or Defendants to corroborate, verify, or investigate the information and statements about Plaintiffs in CIR 112.

**Relevance:** *See* Paragraph 18, No. 9, and Paragraph 19, No. 12, *supra*, which set forth the relevance of these documents also being requested of Mr. Steele.

**No. 13:** Documents concerning the destruction, return, or non-retention of documents within the period 01 September 2016 to the present in respect to: (a) CIR 112, including work product, memoranda, source information, drafts or analysis relating thereto; (b) communications between Orbis or Mr. Steele and Defendants Simpson or Fusion in respect to CIR 112; and (c) engagement agreements between Orbis and/or Mr. Steele on one hand and Fusion on the other which govern the creation or promotion of CIR 112.

**Relevance:** *See* Paragraph 18, No. 10, and Paragraph 19, No. 13, *supra*, which set forth the relevance of these documents also being requested of Mr. Steele.

### C.    *Christopher Burrows*

21.    **Oral Examination of Mr. Burrows**. Orbis was engaged to prepare CIR 112.  Mr. Burrows is a co-founder and director of Orbis, like Mr. Steele, and was involved in aspects of Orbis's and Mr. Steele's election-related research and reports done for Fusion in 2016.  It is expected that Mr. Burrows will be able to provide crucial and relevant testimony on a number of topics on which Mr. Steele may be unable to provide testimony.  Those topics, and the relevance of each, are set forth below:

**No. 1:** In general terms, Mr. Burrows's educational background, employment history, professional qualifications and personal preparation for the examination (including contacts with the parties, their lawyers, insurers, or representatives), excluding any privileged communications or confidential details regarding any government service.

**Relevance:**  Mr. Burrows was the co-founder of Orbis, which was engaged by Fusion and prepared CIR 112 which included the defamatory statements.  Mr. Burrows is identified by Defendants as "likely to have discoverable information that Defendants may use to support their claims or defenses" in this Action.  Ex. C, Defendants' Initial Disclosures, Section 1.  Mr. Burrows's general educational and employment background are relevant to his credibility as a witness and to the credibility and reliability of the research at issue in this Action which was

compiled and produced by Orbis.  This background information is also relevant to his exercise of
decision-making authority as to content that was included in CIR 112.[38]  Plaintiffs should be
entitled to ask Mr. Burrows general background questions to probe the basis for the exercise of
his decision-making authority, to provide context to his qualifications and credibility as a
witness, and to assess the credibility and reliability of Orbis's research at issue in this Action.

**No. 2:** The drafting and compilation in 2016 of CIR 112 and its promotion.

**Relevance:**  Mr. Burrows's testimony regarding the drafting and compilation of CIR 112
and the factual support therefor is relevant to the issues in the Action such as the falsity of the
statements about Plaintiffs and the negligence or recklessness in publication of such statements.

Defendants acknowledge engaging Orbis, which Mr. Burrows co-founded, to "look into
then-candidate Trump's activities in Russia, in support of Defendants' ongoing research
activities" and that Burrows was one of the people at Orbis with whom "Defendants mainly
communicated."  Ex. F, Defendants' Answer to Plaintiffs' Interrogatory No. 12.  As part of this
engagement, Orbis produced several reports, including CIR 112.  Defendant Simpson has
reported that Mr. Burrows played a role in selecting what content would be included in the
reports.[39]  As set forth, page 7, note 5, *supra*, in 2019 the U.S. government questioned the
reliability of Steele's reports in general, and a recent English High Court judgment determined
that the specific  statements about Plaintiffs in CIR 112 are inaccurate or misleading.  Therefore,
Plaintiffs should be entitled to question Mr. Burrows as to the compilation of CIR 112, decisions
regarding the content of CIR 112, and the basis for including the defamatory statements in CIR

---

[38] *See* Ex. A, Crime in Progress at 77 (discussing Mr. Burrows' role in 2016 selecting information that was included
in the Dossier), 82-84 (stating that Mr. Burrows and Mr. Steele have refused to reveal the identity of source(s) for
the information in the Dossier, and discussing the briefing of an FBI agent in July 2016 by Mr. Burrows and Mr.
Steele of their "findings and sources" for the research for Fusion).

[39] Ex. A, Crime in Progress at 77 (discussing Mr. Burrows' role in 2016 selecting information that was included in
the Dossier).

112.  Additionally, as with Proposed Topic No. 7 for Mr. Steele, Plaintiffs should be entitled to

question Mr. Burrows as to what was intended to be conveyed by the heading of CIR 112 and the

description of Plaintiffs' relationship with President Putin.

      **No. 3:**  The destruction, return, or non-retention of the following documents: (a) CIR 112, including work product, memoranda, source information, drafts or analysis relating to CIR 112; (b) communications with Defendants Glenn Simpson or Fusion in respect to CIR 112; and (c) engagement agreements between Orbis and/or Mr. Steele on one hand and Fusion on the other which govern the creation or promotion of CIR 112.

      **Relevance:**  As set forth in Paragraph 18, No. 10, *supra*, Defendants, Orbis, and Mr.

Steele have destroyed or not retained documents relating to CIR 112 that are relevant to this

Action.  In the proceeding brought by Plaintiffs against Orbis under the U.K. Data Protection

Act, Mr. Steele admitted that he destroyed relevant documents regarding his research for the

Dossier and CIR 112, except for certain notes of a meeting with the FBI that was attended by Mr.

Burrows.[40]  And Defendants have produced no documents relating to CIR 112.  Plaintiffs should

be entitled to question Mr. Burrows to determine when documents were destroyed, whether it

was at the direction of Defendants, and whether it was done when litigation should have been

anticipated.  Plaintiffs should also be entitled to question Mr. Burrows as to why certain

documents were retained (such as certain meeting notes) but not other documents.

      **No. 4**: Delivery, transmission, or disclosure of CIR 112 in 2016 to other persons or entities, including Defendants, David Kramer, Jonathan Winer, reporters and members of the media.

      **Relevance:**  *See* Paragraph 18, No. 8, *supra*, which sets forth the relevance of testimony

on this topic also being requested of Mr. Steele.  For the same reasons, Plaintiffs should be

entitled to testimony from Mr. Burrows, who was Mr. Steele's partner at Orbis and privy to the

research in CIR 112 and the dissemination thereof.  Mr. Burrows was present at meetings in

---

[40] *See* Ex. G, U.K. Judgment at ¶¶ 51, 81 (reflecting the meeting in July 2016).

which the research findings in the reports were discussed and disclosed, played a role in deciding

what to include in the reports, and communicated with the media and with Defendants and Mr.

Steele in 2017 after BuzzFeed published the research reports online.[41]

No. 5:  The steps taken by Mr. Burrows, Mr. Steele, Orbis, or Defendants to corroborate, verify or investigate the information and statements about Plaintiffs in CIR 112.

Relevance:  As set forth in Paragraph 18, No. 9, *supra*, steps taken by Mr. Steele, Orbis

or Defendants to corroborate, verify, or investigate the statements in CIR 112 relate to the falsity

of the statements in CIR 112 and to Defendants' role and fault in disseminating and publishing

CIR 112, which are relevant issues in this Action.  For the same reasons, Plaintiffs should be

entitled to testimony on these issues from Mr. Burrows, who was Mr. Steele's partner at Orbis

and privy to the research in Orbis's reports (which included CIR 112).

## D.  *Edward Baumgartner*

22.  **Oral Examination of Mr. Baumgartner**.  As indicated in Part II, paragraph 14,

*supra*, Defendants have specifically identified Mr. Baumgartner as an individual likely to have

information relevant to this Action and Defendants' claims and defenses, including the "research

related to matters in CIR 112"; "Plaintiffs' conduct"; "Plaintiffs' ties, communications, meetings,

and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their

behalf"; and "Alfa's ties to the Kremlin and Vladimir Putin."  Ex. C, Defendants' Initial

Disclosures, Section 1.  It is expected that Mr. Baumgartner will be able to provide relevant and

crucial testimony on a number of topics.  Those topics, and the relevance of each, are set forth

below:

---

[41] *Id. See also* Ex. A, Crime in Progress at 10, 148 (Mr. Burrows was confronted by a reporter after BuzzFeed published the reports online, and Mr. Burrows then communicated with Defendants and Mr. Steele about the dissemination of the reports.); 125, 133 (Mr. Burrows and Mr. Steele met with U.K. officials in November and December 2016 to discuss their research findings and the content of the reports); 205 (In September 2017, Mr. Burrows and Mr. Steele met in London with FBI agents and U.S. prosecutors to discuss the research findings.).

**No. 1:**  In general terms, Mr. Baumgartner's educational background, employment history, professional qualifications and personal preparation for the examination (including contacts with the parties, their lawyers, insurers, or representatives), excluding any privileged communications or confidential details regarding any government service.

**Relevance:**  Mr. Baumgartner played a role in the research that Fusion was engaged to conduct which led to the reports compiled by Orbis (including CIR 112).  Mr. Baumgartner's general educational and employment background are relevant to his credibility as a witness and to the credibility and reliability of the research at issue in this Action.  Plaintiffs should be entitled to ask Mr. Baumgartner general background questions to provide context to his qualifications and credibility as a witness, and to assess the credibility and reliability of the research at issue in this Action.

**No. 2**: The nature and terms of Mr. Baumgartner's, and/or his firm's, engagement by Fusion in 2016 relating to Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, and the scope and purpose of the engagement.

**Relevance**:  Defendants have identified Mr. Baumgartner as likely to have information relevant to the issues in this Action, including the research relating to the statements about Plaintiffs in CIR 112, as well as Plaintiffs' conduct and the relationships between Plaintiffs and Alfa and the Kremlin or Putin, which are the subject of CIR 112.  In addition, Defendant Simpson has indicated that Mr. Baumgartner assisted Defendant Fusion in 2016 as a subcontractor in connection with the election-related research.[42]

As set forth in Paragraph 18, No. 2, *supra*, regarding the relevance of Defendants' retention of Orbis, the scope and purpose of Defendants' retention of Mr. Baumgartner in connection with the election-related research in 2016 is relevant to issues in this Action, such as the falsity of the statements in CIR 112, the motives for the research and publication, and

---

[42] Ex. I, Transcript of Interview of Glenn Simpson dated August 22, 2017, U.S. Senate Judiciary Committee, at 83-85, 103, 189.

whether the publication was negligent or reckless.  Accordingly, Plaintiffs should be entitled to testimony from Mr. Baumgartner on these issues.

**No. 3:**  Mr. Baumgartner's research regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

**Relevance:**  Defendants have identified Mr. Baumgartner as likely to have information relevant to the issues in this Action, including the research relating to the statements about Plaintiffs in CIR 112, as well as Plaintiffs' conduct and the relationships between Plaintiffs and Alfa and the Kremlin or Mr. Putin, which are the subject of CIR 112.  If any pre-2016 research was relied upon or used in connection with CIR 112, such research would also be relevant.

Mr. Baumgartner's research and/or knowledge regarding Plaintiffs, Alfa, CIR 112, and the statements in CIR 112, are relevant to issues in this Action, such as whether the defamatory statements are false and whether the Defendants acted negligently or recklessly in publishing the statements.  *See* Paragraph 18, No. 2, *supra* (summarizing the legal standards and issues in this Action).  Plaintiffs should be entitled to testimony from Mr. Baumgartner regarding these issues.

**No. 4:**  Preparation of Mr. Baumgartner's report titled "ALFA Dossier Open Sources."

**Relevance:**  In response to Interrogatory No. 18 (Ex. F), which asks Defendants to identify any documents or evidence reflecting or demonstrating any "questionable, unethical and illegal conduct" by Plaintiffs concerning "the entanglement of Russian oligarchs' political and business interests and those of the Russian state and/or President Putin," as referenced in their Affirmative Defenses, Defendants identify a document entitled "Report re: ALFA Dossier Open Source" ("Dossier Alfa Report") and Mr. Baumgartner as the author.

Plaintiffs should be entitled to testimony from Mr. Baumgartner regarding this document being relied upon by Defendants in this Action (as support for the statements in CIR 112 or

otherwise), which is relevant to whether the defamatory statements are false and whether the Defendants acted negligently or recklessly in publishing the statements.

**No. 5**: Communications in 2016 or 2017 between Mr. Baumgartner and Defendants Glenn Simpson or Fusion regarding the report titled "ALFA Dossier Open Sources."

**No. 6**: Communications in 2016 or 2017 between Mr. Baumgartner and Defendants Simpson or Fusion regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

**Relevance:**  Defendants have identified Mr. Baumgartner as likely to have information relevant to the issues in this Action, have acknowledged retaining and communicating with Mr. Baumgartner in 2016 relating to the election-related research, and have cited the Dossier Alfa Report as a document on which they will rely in this Action.  Plaintiffs should be entitled to testimony from Mr. Baumgartner regarding his communications with Defendants about Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, and the timing of such communications, which are relevant to issues in this Action (such as the falsity of the defamatory statements and the fault in publishing the statements).

23.     **<u>Documentary Evidence from Mr. Baumgartner</u>**.  It is expected that Mr. Baumgartner will be able to provide relevant and material documentary evidence on a number of topics.  The documents requested from Mr. Baumgartner, and the relevance of each request, is set forth below:

**No. 1:**  Documents setting out the terms and scope of Mr. Baumgartner's engagement by Fusion relating to Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112 or its promotion.

**Relevance:**  For the same reasons that testimony from Mr. Baumgartner on the issues of his engagement by Fusion and the scope and purposes of the work to be performed are relevant in this Action, as set forth in Paragraph 22, No. 2, *supra*, documentary evidence relating to these issues are relevant and should be produced.

**No. 2:**  Documents within the period 01 April 2016 to 03 October 2017 related to the preparation of the report titled "ALFA Dossier Open Sources."

**Relevance:**  *See* Paragraph 22, No. 4, *supra*, which indicates the relevance of testimony from Mr. Baumgartner regarding his preparation of the Dossier Alfa Report (on which Defendants rely in this Action).  For the same reasons, documents relating to the preparation of this report should be produced by Mr. Baumgartner. The date range of this request is from April 2016 (the month Fusion was retained in 2016 for the election related research) until the date Plaintiffs filed their complaint in this Action.

**No. 3**: Communications within the period 01 April 2016 to 03 October 2017 between Mr. Baumgartner and Defendants Glenn Simpson or Fusion regarding the report titled "ALFA Dossier Open Sources."

**No. 4**: Communications within the period 01 April 2016 to 03 October 2017 between Mr. Baumgartner and Defendants Simpson or Fusion regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

**Relevance:**  *See* Paragraph 22, Nos. 5 and 6, which indicates the relevance of testimony from Mr. Baumgartner regarding his communications with Defendants regarding his preparation of the Dossier Alfa Report (on which Defendants rely in this Action) and regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.  For the same reasons, documents relating to these communications are relevant to issues in this Action and should be produced by Mr. Baumgartner. The date range is explained above in No. 2.

**No. 5**: Documents regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, within the period 01 April 2016 to 03 October 2017.

**Relevance:**  *See* Paragraph 22, No. 3, *supra*, which sets forth the relevance of testimony from Mr. Baumgartner regarding his research relating to Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.  Mr. Baumgartner's documents relating to these topics

are similarly relevant and should be produced to Plaintiffs.  The date range is explained above in No. 2.

E.   *Sir Andrew Wood*

24.   **Oral Examination of Sir Andrew Wood**.  As indicated in Part II, paragraph 15, *supra*, Defendants have specifically identified Sir Andrew Wood as an individual likely to have information relevant to this Action and Defendants' claims and defenses, including the "receipt and delivery of CIR 112."  Ex. C, Defendants' Initial Disclosures, Section 1.  It is expected that Sir Andrew Wood will be able to provide relevant and crucial testimony on a number of topics. Those topics, and the relevance of each, are set forth below:

**No. 1:**  In general terms, Sir Andrew Wood's educational background, employment history, professional qualifications and personal preparation for the examination (including contacts with the parties, their lawyers, insurers, or representatives), excluding any privileged communications or confidential details regarding any government service.

**Relevance:** Sir Andrew Wood communicated with Mr. Steele and others relating to CIR 112 and Mr. Steele's research, and vouched for Mr. Steele's reliability in the context of the election-related research and reports.[43]  Sir Andrew Wood's general educational and employment background are relevant to his credibility as a witness and to the credibility and reliability of Mr. Steele's research at issue in this Action.  Plaintiffs should be entitled to ask Sir Andrew Wood general background questions to provide context to his qualifications and credibility as a witness, and to assess the credibility and reliability of the research at issue in this Action.

**No. 2**: Communications in 2016 and 2017 between Sir Andrew Wood and Christopher Steele regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including in September 2016 around the time that Mr. Steele and Orbis transmitted CIR 112 to Defendant Fusion.

---

[43] *See* Ex. A, Crime in Progress at 127 (after being briefed by Sir Andrew Wood about Mr. Steele's reports, Senator McCain sent David Kramer to London to meet with Mr. Steele after being "[r]eassured by [Sir Andrew] Wood that Steele was reliable").

**Relevance**:  Defendants have identified Sir Andrew Wood as likely to have information relevant to the issues in this Action, specifically the receipt and delivery of CIR 112.  Defendant Simpson has indicated that Sir Andrew Wood was a mentor to Mr. Steele who Mr. Steele contacted in September 2016 (around the time that Mr. Steele completed and transmitted CIR 112 to Fusion) to "seek his advice and share the intelligence he had gathered."[44]  Sir Andrew Wood's communications with Mr. Steele regarding his research and CIR 112 is relevant to the falsity of the statements in CIR 112, the motives for the research and publication, and whether the publication was negligent or reckless.  Accordingly, Plaintiffs should be entitled to testimony from Sir Andrew Wood on these issues.

**No. 3:**  Communications and meetings in 2016 and 2017 between Sir Andrew Wood and David Kramer or U.S. Senator John McCain regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including the meetings with Mr. Kramer and Senator McCain in November 2016 in Halifax, Nova Scotia.

**No. 4**: Communications and meetings between Mr. Kramer and Mr. Steele in 2016 and 2017 regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including the meeting between Mr. Kramer and Mr. Steele in London in November 2016 which Sir Andrew Wood arranged.

**Relevance:**  As indicated by Defendant Simpson, after Sir Andrew Wood had been briefed by Mr. Steele regarding the research in the reports in September 2016, Sir Andrew Wood encouraged Mr. Steele to disclose the reports to government officials.  Then, in November 2016, in Halifax, Nova Scotia, Sir Andrew Wood met with and conveyed information from Mr. Steele's reports to David Kramer, an advisor to Senator John McCain, and to Senator McCain.  Subsequently, after reassuring Senator McCain of Mr. Steele's reliability, Sir Andrew Wood arranged for Mr. Kramer to meet with Mr. Steele in London where Mr. Steele shared his reports

---

[44] Ex. A, Crime in Progress at 107.

with Mr. Kramer.  Mr. Kramer then obtained a copy of the reports (including CIR 112) from Defendant Simpson.[45]

Sir Andrew Wood's dissemination of Mr. Steele's election-related research, and his statements about the reliability of Mr. Steele and his reports, are relevant to issues in this Action, such as the publication of the defamatory statements, whether the defamatory statements are false, and whether the Defendants acted negligently or recklessly in publishing the statements. *See* Paragraph 18, No. 2, *supra* (summarizing the legal standards and issues in this Action). Plaintiffs should be entitled to testimony from Sir Andrew Wood regarding these issues.

**No. 5**: The steps taken by Sir Andrew Wood, Mr. Steele, Orbis, or Defendants to corroborate, verify or investigate the information and statements about Plaintiffs in CIR 112.

**Relevance:**  As set forth in Paragraph 18, No. 9, *supra*, steps taken by Mr. Steele, Orbis or Defendants to corroborate, verify, or investigate the statements in CIR 112 relate to the falsity of the statements in CIR 112 and to Defendants' role and fault in disseminating and publishing CIR 112, which are relevant issues in this Action.  Mr. Steele confided in Sir Andrew Wood regarding the election-related research and reports and Sir Andrew Wood vouched for Mr. Steele's reliability and communicated his research to others.  Plaintiffs should be entitled to testimony on these issues, including any corroboration or verification of the statements in CIR 112 by Sir Andrew Wood.

25.    **<u>Documentary Evidence from Sir Andrew Wood</u>**.  It is expected that Sir Andrew Wood will be able to provide relevant and material documentary evidence on a number of topics.  The documents requested from Sir Andrew Wood, and the relevance of each request, is set forth below:

**No. 1**: Communications within the period 01 September 2016 to 10 January 2017

---

[45] Ex. A, Crime in Progress at 126-31.

between Sir Andrew Wood and Mr. Steele (including documents referencing or referenced in such communications) regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including in September 2016 around the time that Mr. Steele and Orbis transmitted CIR 112 to Defendant Fusion and relating to the meeting between Mr. Kramer and Mr. Steele in London in November 2016.

**Relevance:**  As set forth in Paragraph 24, Nos. 2, 4, *supra*, Sir Andrew Wood's communications with Mr. Steele regarding the research and CIR 112 is relevant to the falsity of the statements in CIR 112, the motives for the research and publication, and whether the publication was negligent or reckless.  Accordingly, relevant documents should be produced to Plaintiffs.

**No. 2**: Communications within the period 01 September 2016 to 10 January 2017 between Sir Andrew Wood and David Kramer or U.S. Senator John McCain (including documents referencing or referenced in such communications) regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including the meetings with Mr. Kramer and Senator McCain in November 2016 in Halifax, Nova Scotia.

**Relevance:**  For the same reasons that testimony from Sir Andrew Wood relating to communications with David Kramer or U.S. Senator John McCain regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, is relevant, as set forth in Paragraph 24, No. 3 *supra*, documentary evidence relating to these issues is relevant and should be produced.

**No. 3**: Communications within the period 01 September 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Sir Andrew Wood and Mr. Steele, Mr. Kramer, Orbis, or Defendants concerning the steps taken by Sir Andrew Wood, Mr. Steele, Orbis, or Defendants to corroborate, verify, or investigate the information and statements about Plaintiffs in CIR 112

**Relevance:**  As set forth in Paragraph No. 24, No. 5, *supra*, the steps taken by Mr. Steele, Orbis or Defendants to corroborate, verify, or investigate the statements in CIR 112 relate to the falsity of the statements in CIR 112 and to Defendants' role and fault in disseminating and publishing CIR 112, which are relevant issues in this Action.  For the same reasons, Plaintiffs should be entitled to documentary evidence on these issues.

26.     In light of the foregoing, Plaintiffs submit that they have a need to secure for trial the testimony of Messrs. Steele, Burrows, and Baumgartner, and Sir Andrew Wood, and documentary evidence from Messrs. Steele and Baumgartner, and Sir Andrew Wood, and Orbis.

27.     Messrs. Steele, Burrows, and Baumgartner, and Sir Andrew Wood are British citizens residing in London in the United Kingdom, and Orbis is a company organized under the laws of the United Kingdom.  Messrs. Steele, Burrows, and Baumgartner, and Sir Andrew Wood, and Orbis, therefore, are beyond the jurisdiction of this or any U.S. Court and Plaintiffs will not be able to compel production of evidence from them for use at trial.

28.     Mr. Steele and Orbis are parties to a proceeding brought in the Superior Court of the District of Columbia and subsequently appealed to the D.C. Court of Appeals relating to the same subject matter (the "Steele D.C. Matter").[46]  Mr. Steele and Orbis appeared in both of those courts and are represented by counsel in that matter.  Plaintiffs attempted to secure, through counsel who represents Mr. Steele and Orbis in the Steele D.C. Matter, their consent to the service of subpoenas issued to Mr. Steele, Mr. Burrows, and Orbis by Plaintiffs pursuant to Rule 45 in connection with this Action.  U.S. counsel for Mr. Steele and Orbis declined to accept service of subpoenas on behalf of Mr. Steele, Mr. Burrows, and Orbis and directed Plaintiffs to utilize Hague Convention procedures to obtain discovery from Mr. Steele and Orbis.  Ex. J, emails dated May 8, 2020 and May 18, 2020, and Ex. K, emails dated July 15-16, 2020.  Plaintiffs have provided U.S. counsel for Mr. Steele, Mr. Burrows, and Orbis with notice of this application and have provided their counsel with all relevant papers by email.

---

[46] The counsel identified for Mr. Steele and Orbis represents them in connection with the proceeding captioned *Khan v. Orbis Business Intelligence Ltd.*, Case No. 18-CV-0919.  That case was originally brought in the Superior Court of the District of Columbia, which dismissed it based on a local statute known as the D.C. Anti-SLAPP Act. Its current posture involves the drafting of a petition by Plaintiffs to the United States Supreme Court.  Mr. Steele and Orbis are not parties to the Action in connection with which this Request is made.

29.     Plaintiffs are not aware of any counsel or representative for Mr. Baumgartner in the United States.  U.K. counsel for Plaintiffs wrote to Mr. Baumgartner directly at his Edward Austin business address (copied to the business email address) and asked whether Mr. Baumgartner would voluntarily produce documentary evidence and appear for an examination. Plaintiffs will update the Court as to any response received from Mr. Baumgartner.

30.      Plaintiffs are not aware of any counsel or representative for Sir Andrew Wood in the United States.  U.K. counsel for Plaintiffs wrote to Sir Andrew directly at his Chatham House business address (copied to the gmail email address given on Sir Andrew's Chatham House online biography) and asked if Sir Andrew Wood would voluntarily produce documentary evidence and appear for an examination. Plaintiffs will update the Court as to any response received from Sir Andrew Wood.

31.     To ensure that Plaintiffs can take the depositions of Messrs. Steele, Burrows, and Baumgartner, and Sir Andrew Wood and preserve their testimony for trial, and to ensure the preservation of relevant and material documentary evidence from Messrs. Steele and Baumgartner, Sir Andrew Wood, and Orbis, Plaintiffs ask this Court to issue the accompanying Letter of Request for International Judicial Assistance to the High Court (Queen's Bench Division) of England and Wales to compel the testimony of Christopher Steele, Christopher Burrows, Edward Baumgartner, and Sir Andrew Wood, and to compel the production of documentary evidence from Messrs. Steele and Baumgartner, Sir Andrew Wood, and Orbis.

Dated: Washington, D.C.
        August 4, 2020

                                    Respectfully submitted,

                                    /s/ Kim Sperduto
                                    Alan S. Lewis (#NY0252)
                                    CARTER LEDYARD & MILBURN LLP

45

2 Wall Street
New York, NY 10005
Tel: (212) 732-3200
Fax: (212) 732-3232
lewis@clm.com

-and-

Kim Sperduto (DC Bar No. 416127)
SERDUTO THOMPSON & GASSLER PLC
1747 Pennsylvania Avenue, NW, Suite 1250
Washington, D.C. 20006
Tel: (202) 408-8900
Fax: (202) 408-8910
ksperduto@stglawdc.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served electronically via the CM/ECF electronic filing system on all counsel or parties of record this 4th day of August, 2020.

/s/ Kim Sperduto
Kim Sperduto

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------------ X

MIKHAIL FRIDMAN, PETR AVEN, and
GERMAN KHAN,

                *Plaintiffs*,

          v.

BEAN LLC (a/k/a FUSION GPS) and GLENN
SIMPSON,

                *Defendants*.

:
:
:
:
:
:
:
:
:
:
:
:

Case No. 1:17-cv-02041 (RJL)

------------------------------------------------------------ X

**DECLARATION OF ALAN S. LEWIS IN SUPPORT OF
MOTION FOR ISSUANCE OF LETTER OF
REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE**

I, Alan S. Lewis, declare under penalty of perjury as follows:

1.      I am an attorney duly licensed to practice law in this Court.  I am a partner at the

law firm of Carter Ledyard & Milburn LLP, and represent Plaintiffs Mikhail Fridman, Petr

Aven, and German Kahn, in the above-captioned case.

2.      This Declaration is submitted in support of Plaintiffs' motion for the issuance of a

letter of request for international judicial assistance to the Senior  Master of the High Court

(Queen's Bench Division) of England and Wales, in order to obtain oral testimony and/or

documentary evidence from Christopher Steele, Christopher Burrows, Edward Baumgartner, Sir

Andrew Wood, and Orbis Business Intelligence Ltd., each of whom is located in the United

Kingdom of Great Britain and Northern Ireland.  I am fully familiar with the facts and

circumstances of this case.

3.    Annexed hereto as **Exhibit A** is a true and correct copy of excerpts of the book titled *Crime in Progress, Inside the Steele Dossier and the Fusion GPS Investigation of Donald Trump* (2019), authored by Defendant Glenn Simpson and Peter Fritsch.

4.    Annexed hereto as **Exhibit B** is a true and correct copy of Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 2, dated May 18, 2020.

5.    Annexed hereto as **Exhibit C** is a true and correct copy of Defendants' First Amended Rule 26(a)(1) Initial Disclosures, dated May 18, 2020.

6.    Annexed hereto as **Exhibit D** is a true and correct copy of excerpts of the report titled *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation* (Dec. 2019) from the Officer of the Inspector General Michael Horowitz, U.S. Department of Justice, available at https://www.justice.gov/storage/120919-examination.pdf.

7.    Annexed hereto as **Exhibit E** is a true and correct copy of the U.S. Senate Judiciary Committee Release, dated July 17, 2020, available at https://www.judiciary.senate.gov/press/rep/releases/judiciary-committee-releases-declassified-documents-that-substantially-undercut-steele-dossier-page-fisa-warrants.

8.    Annexed hereto as **Exhibit F** is a true and correct copy of Defendants' Revised Answers to Plaintiffs' First Set of Interrogatories and Answers to Plaintiffs' Second Set of Interrogatories, dated May 18, 2020.

9.    Annexed hereto as **Exhibit G** is a true and correct copy of excerpts of the U.K. High Court Judgment dated July 8, 2020 in *Aven and others v. Orbis Business Intelligence Ltd.*, [2020] EWHC 1812 (QB), available at

https://www.bailii.org/ew/cases/EWHC/QB/2020/1812.html.

Case 1:71-cv-05031-BLF Document 05-3 Filed 08/10/RSD Page 5 of 197

10.     Annexed hereto as **Exhibit H** is a true and correct copy of an op-ed article entitled *Devin Nunes is investigating me.  Here's the truth*, Wash. Post, Feb. 8, 2018, authored by Jonathan M. Winer.

11.     Annexed hereto as **Exhibit I** is a true and correct copy of excerpts of the transcript of the interview of Glenn Simpson dated August 22, 2017 before the U.S. Senate Judiciary Committee.

12.     Annexed hereto as **Exhibit J** is an email dated May 8, 2020 from me, as counsel for Plaintiffs, to Christy Hull Eikhoff of the law firm of Alston & Bird, U.S. counsel for Christopher Steele and Orbis Business Intelligence Ltd., and from Ms. Eickhoff to me dated May 18, 2020, which reflect Plaintiffs' request that Ms. Eickhoff accept service of subpoenas on behalf of Mr. Steele and Orbis and her refusal to do so, indicating that Plaintiffs must seek documents or testimony from such parties via the Hague Convention procedures.

13.     Annexed hereto as **Exhibit K** is an email exchange dated July 15-16, 2020 from me, as counsel for Plaintiffs, to Christy Hull Eikhoff of the law firm of Alston & Bird, U.S. counsel for Christopher Steele and Orbis Business Intelligence Ltd., and from Ms. Eickhoff to me, which reflect Plaintiffs request that Ms. Eickhoff accept service of subpoenas on behalf of Mr. Burrows and her refusal to do so, indicating that Plaintiffs must seek documents or testimony from such parties via the Hague Convention procedures.

14.     Annexed hereto as **Exhibit L** is a true and correct copy of Company Intelligence

Case 1:17-cv-02041-RJL   Document 85-1   Filed 08/03/20   Page 3 of 131

Report 112 prepared by former British intelligence agent Christopher Steele, as posted to the internet by BuzzFeed.

15.     Annexed hereto as **Exhibit M** is a true and correct copy of excerpts of Defendants' Closing Submissions in the proceedings captioned *Aleksej Gubarev and another v.*

*(i) Orbis Business Intelligence Limited and (ii) Christopher Steele*, Claim No. HQ17D00413, in the High Court of Justice, Queen's Bench Division.

16.     Annexed hereto as **Exhibit N** is a true and correct copy of an article entitled *The F.B.I. Pledged to Keep a Source Anonymous. Trump Allies Aided His Unmasking*, NY Times, July 25, 2020.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 4, 2020

*Alan Lewis*
_____
Alan S. Lewis

# EXHIBIT A



# CRIME iN PROGRESS

## INSIDE THE STEELE DOSSIER AND THE FUSION GPS INVESTIGATION OF DONALD TRUMP

### GLENN SIMPSON and PETER FRITSCH

Co-founders of Fusion GPS

Democratic National Committee. Fusion began to wonder if these events were related.

Steele's task was to tap his Russian source network to answer some nagging questions arising from the information on Trump that Fusion had already gathered: Why had Trump made so many trips to Russia over the years, without ever getting a single development project off the ground? Why did so many threads in the Trump story lead to Moscow and figures close to Putin? And why was Trump so smitten with Putin, who seemed fond of Trump in return?

Simpson had spent fifteen years in Washington and Europe as a *Wall Street Journal* investigative reporter, focusing much of his work on the emerging scourge of transnational crime. To his surprise, some of the characters from the ex–Soviet Union who surfaced in the initial phase of Fusion's investigation of Trump were people he had written about a decade earlier while investigating Russian corruption and organized crime for the *Journal,* stories Fritsch had edited while the two worked in Brussels.

Simpson wasn't completely surprised by the news of the Bernstein call. He told Fritsch that he had recently heard from a friend at *The Washington Post* that Fred Hiatt, the paper's editorial page editor, was talking about some sensational memoranda that sounded a lot like Steele's work.

Someone was leaking—that was clear. This had the potential to be a big problem.

The Steele reports—soon to be known as "the dossier"—were field intelligence from one of the West's most senior Russia watchers. The memos he produced were never meant to be viewed outside of a tiny circle of people, much less shared with the public. In unredacted form, the reports could expose Steele's sources and jeopardize lives. Steele took great care to mask those sources in his reports to Fusion. Still, the information clearly came from people with extraordinary access in Russia, and Russian intelligence could figure out who they were and track them down. Those sources included a number of people inside Russia and field operatives outside the country who needed protecting at all costs. Unredacted memos flying around among the Washington press corps risked exposing people to real danger.

Given the control Fusion had maintained over the memos, there was only one likely suspect for the leak: David Kramer, a longtime adviser to Republican senator John McCain.

At Steele's urging, Simpson had provided a set of the memos to Kramer a few weeks after the election. This was done for the sole purpose of passing them to McCain, who would then provide them to the head of the FBI. Steele had been secretly working with FBI agents for months, trying to sound the alarm, while Simpson had provided updates to a longtime contact at the Justice Department. Still, the feds seemed to be slow on the uptake, and Steele, Simpson, and Fritsch were concerned that the information was not getting through to the top brass. An alarmed McCain had promised to fix that.

Senator McCain, still many months from a dire brain cancer diagnosis, wanted to put a copy of Steele's memos in front of FBI Director James Comey—a decision his friend and fellow Republican senator Lindsey Graham encouraged. McCain wanted to know if the FBI was doing anything about credible information from a trusted ex–intelligence official in the U.K. that a hostile foreign power might have influence over the U.S. president-elect.

Simpson agreed to entrust Kramer with a copy of the Steele memos, for McCain's eyes only, because he knew that Kramer's dislike of Putin ran deep. While still a reporter, Simpson had turned to Kramer as a source a decade earlier for stories on Russia's growing political influence in Washington. But Kramer's alarm was so acute that he could easily do something rash. Lately, he had been telling associates that he still hoped to find a way—any way—to stop Trump from being inaugurated. He thought that exposing Trump's Russia ties might just be the answer. How he planned to do that was unclear.

Kramer's theory was about to be tested.

The story blew open at 5:10 P.M. on the afternoon of January 10, 2017, in a live broadcast by CNN that revealed just how far up the chain the Steele reporting had traveled. Above the chyron "INTEL CHIEFS PRESENTED TRUMP WITH CLAIMS OF RUSSIAN EFFORTS TO COMPROMISE HIM," a phalanx of three top CNN correspondents, plus Carl Bernstein, announced that senior intelligence officials had appended a two-page synopsis of some disturbing information to a classified briefing presented to both President Obama and President-elect Trump.

Jim Sciutto, CNN's longtime national security correspondent, delivered the overview: "Classified documents on Russian interference in the 2016 U.S. election," he said, had been presented to Obama and Trump.

and had backed into a ditch on a meandering dirt road high above Gey-serville. A Fusion search party later found him and freed his car.

Later, over drinks, they discussed—off the record—Trump's docu-mented ties to Russia, setting Bensinger on a reporting trail that ulti-mately brought him to the Washington office of one David Kramer.

Simpson hung up and dialed *BuzzFeed* editor in chief Ben Smith. Smith had been lured away from *Politico* in 2011 to run *BuzzFeed*, with a mandate to make it a more serious news outfit. This was not what pros do, Simpson screamed. "Take down those reports *right now!*"

Smith was implacable. The dossier had been briefed to the incoming and outgoing presidents, he said. President Obama had ordered a mas-sive investigation of Russian interference in the election. This was all a matter of national importance that deserved to be vetted and scruti-nized. It was the first version of the high-minded journalistic argument he would make repeatedly in coming days to defend his decision to pub-lish source intelligence on the Internet.

Simpson argued that Smith was missing the more immediate point. The reports could help Putin track down the sources—not just Steele, but the sources he had relied on *within Russia*. There were lives at risk. Smith said he hadn't pondered that, but he said he had no intention of taking the post offline. It was too late for that anyway.

Simpson and Fritsch again reached Steele on an encrypted line. It was late in England. Steele was angry but calm. He, too, suspected that the McCain camp had acted irresponsibly and betrayed them. Fusion and Orbis would figure that out later. Right now, Steele had higher pri-orities. He was already making plans to, as he put it, "go to ground"—spy-speak for going into hiding. "Let's reassess in the morning," Steele said.

His preparations were put to use almost immediately. The following day, January 11, Steele's longtime partner in Orbis, a former British agent named Christopher Burrows, received an unannounced visit at his home outside London from a reporter for *The Wall Street Journal*. Could Burrows confirm that Christopher Steele was the author of the memoranda published in *BuzzFeed*? The reporter said he was on dead-line and urgently needed a comment. Burrows politely declined. A flurry of calls ensued between Burrows, Simpson, Steele, Fritsch, and eventually Kramer.

While Kramer claimed not to know how the *Journal* had obtained Steele's name, he also said he had interceded with the *Journal*'s editors in an attempt to persuade them not to publish Steele's name, for security

trons had apparently not given up hope of somehow stopping Trump before the Republican convention in July. One reason appeared to be that they had been persuaded by Fusion's research that Trump was vulnerable on his ties to Russia.

That view solidified with Manafort's arrival on the scene at the end of the month. The *Free Beacon* team was initially eager to expose Manafort's Russian entanglements and his adventures in Ukraine. Two days after Manafort joined the Trump campaign, the *Beacon* posted a story on a theme that others in the mainstream media would write about only later: "Lawsuit: Trump Aide Funneled Mob-Linked Ukrainian Oligarch's Fortune into U.S. Real Estate." Soon, the *Free Beacon*'s appetite for attacking Trump began to wane as Trump's nominating position grew stronger, which suggested to Fusion that even Trump's most ardent conservative critics were unlikely to abandon the Republican banner if Trump emerged as their standard-bearer. Email queries slowed to a trickle, and there was no longer the same hunger for fresh material.

On April 19, Trump took the New York primary with 59 percent of the vote.

The next day, Simpson and Fritsch sat down in Washington with Marc Elias, an attorney at Perkins Coie, a Seattle-based law firm with a large political practice in D.C. on the Democratic side of the aisle. Fusion's Democratic contact had made the introduction to Elias, arguably the most powerful attorney in Democratic politics. He served as general counsel to both the Democratic National Committee and the Hillary for America campaign. He was also personal counsel to many Democratic senators. As a voting rights specialist, he had argued—and won—multiple cases before the U.S. Supreme Court.

Despite his résumé, Elias is a supremely informal character. He is a large, balding man who looks like he could have played on the offensive line of his favorite NFL team, the New York Giants. His shoes are sensible, his sentences short. He is as happy talking about his dog, Bode, as he is discussing election law or politics. A dog bed shares space in his office with Giants swag and framed letters of appreciation from every Democratic senator you can name, and a few you can't.

Elias didn't need much convincing. He had heard of the research Fusion had done on Mitt Romney and Bain Capital during the 2012 campaign and said he needed that kind of deep research on Trump. The

existing in-house research at the DNC and the campaign was incomplete. The campaign wanted a belt-and-suspenders approach to its research efforts; redundancy was tolerable if that meant the campaign ended up with the very best information at its disposal.

Money wouldn't be a problem, Elias said. Clinton, the Democratic Party, and related PACs would go on to raise over $1.2 billion for her campaign.

Elias said the campaign knew what it needed to know about Trump on a lot of the issues—Trump's cynical flip-flops to a pro-life stance on abortion rights and his latter-day opposition to a ban on assault weapons. Less understood, he said, was how Trump had managed to recover from a string of bankruptcies that should have ruined him. Where did his money come from, how much did he really have, and who helped him? "We know what he says," Elias said. "We need you guys to figure out who he *is*."

Fritsch disclosed that Fusion was currently engaged by an unnamed Republican client to do research on Trump but expected that engagement to end soon. Simpson said the firm couldn't share the written reports it had done for the Republicans but had a wealth of knowledge and promising leads gleaned from public records that could be drawn upon in new, general-election-focused research. Elias didn't see a conflict or a problem.

Elias said Fusion would be reporting only to him, which sounded great to Fritsch and Simpson. They didn't want to have any contact with the campaign brass. Elias wanted it that way for legal reasons: If Fusion's communications were with a lawyer, they could be considered privileged and kept confidential. Political work like this can be perilous, provoking lawsuits down the road—as this job would later prove. Elias also didn't want Fusion drawn into the daily fire drill of a presidential campaign, forced to respond to the jack-in-the-box demands of political operatives. He wanted Fusion to focus on the big picture, and Trump himself.

For all the conspiracy theories and accusations that came later, that rule was strictly applied. As far as Fusion knew, Clinton herself had no idea who they were. To this day, no one in the company has ever met or spoken to her.

"Okay, what do you guys got?" Elias said, turning the conversation back to the substance of the case. "Plenty," Simpson replied.

Fritsch and Simpson ran through some highlights of Fusion's Trump

public record research thus far: the Trump University scam, his history of not paying his debts, his hypocrisy on immigration, and the mounting evidence that he was lying about his wealth. The most perplexing element of the work to date, they told him, was Trump's intense and long-lasting fascination with Russia—and his failure to consummate any meaningful deal there. His business world intersected repeatedly with the Russian Mafia in New York, while the sudden re-emergence of Manafort—a consultant who had remade the Kremlin's favorite Ukrainian politician in Manafort's own image—was a major red flag.

"We think you guys will really want to pay attention to the Russia angle," Fritsch said. It was obvious from Elias's reaction that the Russia element was new to him. "Can you tell me more?" he said.

Trump's affiliations with Russians of all kinds, Simpson said, went way back to the opening of Trump Tower in the early 1980s, when known Russia-connected mobsters like David Bogatin began scooping up units, often to obscure the source of criminal profits. The five luxury condos Bogatin bought in 1984 were later seized by the feds as part of a massive money-laundering case. This would soon emerge as a distinct pattern, they told Elias. In project after project, from Florida to Panama to Toronto, Russians with dubious résumés and questionable pasts turned out in great numbers to buy Trump-branded units.

Elias was intrigued, if a bit befuddled by all the names and dates. He wasn't in a hurry, and his face said: *Keep going.* Simpson cracked open his MacBook to walk him through some documents.

As Trump's own financial travails grew in the late 1980s, so did his outreach and ties to Russia. In 1987, he took an all-expenses-paid trip to Moscow at the invitation of the Soviet ambassador to the United States. While there, he and his then-wife, Ivana, toured several sites for a proposed Trump Tower. No deal seemed likely, but soon after he came back Trump spoke of running for the White House and took out a full-page ad in several U.S. papers arguing that the United States should stop spending so much to defend foreign countries, foreshadowing the pro-Russian, anti-NATO stance he would take on the campaign trail thirty years later.

Trump tried again in 1996 to cook up a big Moscow project, Simpson and Fritsch told Elias, this time with the help of Howard Lorber, one of Trump's only true friends and a broker for wealthy Russians seeking real estate investments in the United States. That project, too, fell flat. The Trumps kept trying to kindle something, making repeated trips to Moscow to view potential sites or talk to possible partners.

While Trump hadn't succeeded in investing in Russia, they said, the Russians had definitely begun making an investment in Trump. Many had troubling backgrounds, and they highlighted the criminal record of Felix Sater and Trump's history of lying about their relationship. By 2008, Donald Trump Jr. was boasting that Russians "make up a pretty disproportionate cross-section of a lot of our assets." Five years later, in Moscow for the Miss Universe pageant, Trump again suggested that he was deep into talks for a Trump skyscraper. (Only much later would investigators uncover that his own representatives were trying to cook up a Trump project in Moscow even as he campaigned to be president.)

In other words, Fritsch and Simpson stated what seemed obvious: The party of Ronald Reagan, whose antipathy to the Soviet Union had helped precipitate its collapse, might have real qualms about a nominee with such close ties to the remnants of what Reagan had called the Evil Empire.

This angle was all new to Elias, and he loved it. The research book the DNC had put together on Trump, he said, contained none of this stuff. Fusion's research team would soon be hired and given wide latitude to go where the story led it.

Formalizing the engagement with Perkins Coie, Elias's firm, would take weeks.

The biggest sticking point was the matter of indemnification. In 2013, Fusion had been drawn into a defamation lawsuit against *Mother Jones* by a rich Romney donor and campaign finance official who had concluded—wrongly—that Fusion was behind an unflattering article about him published the previous year. *Mother Jones* eventually won that suit, but Fusion had to defend against a third-party subpoena that sought to expose its client and its work. That had cost the company tens of thousands of dollars in legal fees—costs its client declined to cover. If something like that happened again, Fusion wanted to know it wouldn't again be stuck with the legal fees. Trump was famously litigious, and the last thing Fusion wanted was a legal fight with a vindictive tabloid figure with a long history of aggressive litigation.

The potential for an ugly, public fight is one big reason most private consultants like Fusion eschew political work. (A pay scale below that of commercial work is the other.) In a political battle with high stakes, there is a huge incentive to attack the credibility of anyone bearing bad tidings about a candidate or elected official, however well substantiated.

In the end, Perkins Coie would not guarantee to cover Fusion's costs in a legal fight. That realization was the point when Fusion might have said to Elias: *Thanks, but no thanks.* Fusion's partners, in fact, discussed bailing on the project but eventually decided the risk was worth it. The Trump project was just too important and interesting a research subject.

The costliest component of the work, they told Elias, would be some on-the-ground reporting they envisioned doing outside the United States. They ran through Trump's many trouble-plagued projects in developing countries and business dealings abroad; the budget would need to include funding for foreign investigators in Mexico and other countries. The riskiest bit of fieldwork, which they didn't yet share with Elias, would be in Russia. They knew just the guy for the job: a Russian-speaking former spy. They figured they could do that work discreetly. No one would ever find out about it.

bungled some bribe. Or perhaps some information that would help Fusion fill out the picture of Trump's odd associations with Sater and other criminals. Simpson later told congressional investigators: "We threw a line in the water and Moby Dick came back."

After reading the memo, Simpson walked a copy over to Fritsch's office and closed the door behind him. Fritsch read it, too. Once he was finished, he looked up at Simpson, aghast. "What the fuck?" he said. "I know," Simpson said. They called Steele and had a brief conversation about sourcing. They kept things vague and understated over the phone, even on an encrypted line.

"Chris, Peter's here with me," Simpson said. "We read your report. Very interesting, to say the least. You feel pretty good about the sourcing here?"

Steele was elliptical but firm. The sources were good: Source A was "a senior Russian Foreign Ministry figure"; source B "a former top-level intelligence officer still active in the Kremlin"; source C "a senior Russian financial official"; source D "a close associate of Trump"; sources E and F were inside the Ritz; and source G was "a senior Kremlin official."

Steele offered a bit more detail on the specific placement of these sources, which only confirmed their credibility in the Fusion partners' minds. That was all he wanted to say over the phone.

Stylistically, the memo was typical of a field intelligence report: a sober recitation of what sources had said, without much elaboration or context. As with the other fifteen memos that Steele would file over the course of the summer and fall, it didn't purport to be flawless or 100 percent accurate, but it did purport to be credible, a crucial distinction. His memoranda, like all such humint products, are designed to pass along meaningful tips from credible sources to help flesh out or buttress other reporting. And, equally important, they are meant for an intentionally small audience who understands their context and purpose but also their idiosyncrasies and limitations.

Steele and Burrows had agreed between themselves to include the "golden showers" incident, Steele said, since it seemed to reflect a political statement about Trump's hatred for Obama and its availability as a potential weapon of blackmail, not because of its salaciousness. But Burrows objected to Steele's characterization of the act as "perverted." He believed that was subjective and imposed a value judgment that didn't belong in a client report.

As an intelligence specialist, Steele was trained to filter out disinfor-

Steele said that one of his collectors was among the finest he had ever worked with, an individual known to U.S. intelligence and law enforcement. Neither Simpson nor Fritsch was told the name of this source, nor the source's precise whereabouts, but Steele shared enough about the person's background and access that they believed the information they planned to pass along was credible.*

But just because the source was credible did not mean everything the source produced would turn out to be true. In intelligence, as journalism, all sources merely pass along what they see, hear, or think—not all of which turns out to be correct. Eyewitnesses to a car accident routinely give strikingly different versions of how it happened. That's why news organizations require reporters to have two sources for every key claim in a story. But having two sources in intelligence is oftentimes a luxury.

Steele added that his team had identified a U.S.-based Russian American in the Trump orbit. This person purported to know a good deal about Trump's activities in Russia and the Kremlin's alleged support for the Trump campaign, and was prone to talking about it with others outside his circle. His role in the events of 2016 remains underappreciated, even today. His name was Sergei Millian, though he has had others.

Millian had popped up in Nellie Ohr's early reporting in November 2015 for his ties to Trump, but Fusion had yet to research him in depth. Within days of Steele telling Fusion his name, researchers at the firm began digging deeper into Millian, a self-promoter whose record suggested a background entirely consistent with that of some sort of state intelligence asset. A linguist by training, Millian was the head of an obscure trade group with a grandiose name, the Russian American Chamber of Commerce in the U.S.A. He had changed his name at some point in the 2000s from Siarhei Kukuts, around the time one of his associates got into legal trouble. Millian was from Belarus, a small neighboring Russian satellite state sometimes adopted as a cover for Russian operatives seeking to distance themselves from Russia proper.

Just two months earlier, Millian had boasted of his business ties to Trump and extolled Trump's virtues in an interview with a Russian-government-controlled "news" outlet, RIA Novosti, that Putin converted to a Kremlin propaganda outlet in 2013. The article carried a

---

* Steele and Burrows have vowed to never reveal the source's identity. That anonymity "is a bit of a shame, really," Steele later told friends. "This is a remarkable person with a remarkable story who deserves a medal for service to the West."

photo of Millian and Trump along with the billionaire real estate developer Jorge Pérez. Dozens of other articles regurgitated the interview across other Russian-government-controlled press outlets under headlines such as "President Trump Is Capable of Saving Ukraine and Coming to Agreement with Moscow."

Millian claimed to be working with Trump's fixer, Michael Cohen, on a variety of real estate projects. He displayed knowledge of other projects as well, including bits of information that, while public, were not well known, such as the identity of Trump's main partner in the Trump SoHo project. He also seemed to be familiar with the status of Trump's real estate ambitions in Russia and even claimed that he had helped Trump study the Moscow real estate market. Trump, he added, was "keeping Moscow in his sights and is waiting for an appropriate time" to launch a new project there. In retrospect, Millian's cryptic statement about "keeping Moscow in his sights" was eerily on target. At the same time Millian was making these comments, Trump and Cohen were in the thick of a secret project to build a giant new tower in Moscow.

It went without saying that Steele, when he met with the FBI, would be asked where his information came from and who had engaged him. Fusion expected Steele to disclose the little he then knew about his clients—that they were working for some Democrats opposed to Trump. But he would not be able to tell them that the ultimate clients were the Democratic National Committee and Hillary for America, because he didn't know that yet.

That was a big reason Fusion raised no objection to Steele going to the FBI and felt no burning need to loop Elias in on his plans. The less politics entered into Steele's discussions with the FBI, the better.

Steele, like all contractors, had signed a strict nondisclosure agreement with Fusion. But his intel had created an exceptional situation. As Simpson would tell Senate investigators a year later, "This was not considered by me to be part of the work that we were doing. . . . This was like, you know, you're driving to work and you see something happen and you call 911."

At the end of June, Steele reached out to Michael Gaeta, the veteran FBI agent he had worked with to blow the whistle on corruption in the global governing body for soccer, FIFA. Gaeta was one of the Bureau's most knowledgeable experts on Russian organized crime and under-

stood the nexus between the Kremlin and the Mafia. He had even had some tangential dealings with Trump's world; for years, he had pursued a notorious Russian gangster known as Taiwanchik who ran his operations out of Trump Tower in New York. It was Gaeta's pursuit of Taiwanchik that first led him to Steele in 2010. Gaeta was now working at the U.S. embassy in Rome as the Bureau's legal attaché to the Italian police and security services.

Gaeta showed up in London on Tuesday, July 5. In a meeting with Steele and Burrows at the Orbis offices, near Victoria Station, Steele briefed Gaeta on both his findings and sources for his early reporting to Fusion. Gaeta reacted much the way Simpson and Fritsch had—"flabbergasted," as Steele later put it—and remarked that such matters were far above his pay grade. He thanked them for the information and said he would pass word up the ladder.

Steele told Simpson that he gave the information to a contact at the FBI, whom he didn't identify.

Neither Fusion nor Orbis knew exactly what Gaeta did with Steele's information, but James Comey later revealed that the FBI had in fact opened an investigation into the Trump campaign's possible coordination with Russia a few weeks later. As it happened, Steele met with Gaeta the day Director Comey announced an end to the FBI's Clinton email inquiry, declining to charge her but saying her conduct had been "extremely careless"—an unusual rebuke of a politician from an FBI director.

Unbeknownst to Steele or Fusion, the FBI was also getting word of possible Russian coordination with the Trump campaign from a separate track. In the wake of the hacking revelations, Australia's then-top diplomat in the U.K., Alexander Downer, reported to his own government a May 2016 meeting he'd had with Trump campaign foreign policy adviser George Papadopoulos in which Papadopoulos claimed Russia had compromising information on Clinton. After tense internal discussions about how to proceed, the Australians decided to share that information with U.S. investigators. The FBI then flew two agents to London to get the details of the conversation from Downer. This meeting, unknown to the outside world at the time, would later become another element in the bitter partisan feud over the origins of the FBI's inquiry into Russian meddling in the 2016 election. Republicans would come to insist it was Steele's dossier, which they saw as a political hit piece, that sparked the inquiry, while Democrats (and the FBI) asserted that the

## CHAPTER NINE

# HAIL MARY TIME

THE STEADY STREAM OF FRESH RUSSIA INTELLIGENCE FROM Steele's sources fed his growing anxiety. On September 14, he sent Fusion another report, his seventh, and one that would prove to be among his most prescient. "Russians do have further 'kompromat' on CLINTON (e-mails) and considering disseminating it after Duma [legislative elections] in late September," he wrote. The stolen emails would be released through "plausibly deniable" channels, he added. Channels like WikiLeaks.

That same day, it would later emerge, Russian military intelligence officers posing as tipsters began contacting American reporters over Twitter to give them passwords to protected sections of the DCLeaks website that housed hacked DNC information. The next day, the Russians reached out to WikiLeaks to begin arranging the transfer of yet another huge cache of emails. The emails had been stolen by the Russians from the personal account of Clinton campaign chairman John Podesta.

By now, Steele had become alarmed about what he perceived to be the FBI's foot-dragging. He reached out to a mentor, Sir Andrew Wood, Britain's former ambassador to Moscow, to seek his advice and share the intelligence he had gathered. He also messaged his contact at the State Department, Jonathan Winer, to let him know he had developed disturbing information about Trump's ties to Russia. Steele asked to meet in person the next time he was in Washington.

In mid-September, Steele heard from the FBI's Gaeta via Skype.

Would Steele be willing to meet with the FBI team in Rome and share his reporting on Trump? Gaeta and Steele immediately established a secure system for transmission, and the reports began flowing. This sudden flash of interest by the FBI made it clear to Steele and Fusion that the Bureau was indeed now investigating Trump—and they had apparently picked up something that suddenly made Steele's memos seem a lot more urgent and relevant. Operation Crossfire Hurricane had finally caught up with Steele. He would go to Rome on his own dime two weeks later.

Fusion had no way of knowing how serious the FBI probe was, and warned Steele that it was doubtful anything dramatic would be done before the election, thanks to long-established Justice Department rules about refraining from any overt enforcement actions that could affect an election in the homestretch of a campaign. Steele was always annoyed by this explanation. Surely, he would say, national security trumps politics.

The Fusion team said nothing about the FBI's outreach to anyone. Simpson and Fritsch decided that if Hillary's campaign operatives got wind of a possible FBI investigation, it might be unable to resist the temptation to leak it to the press. That could compromise the investigation (by alerting the targets) and subject the FBI to political attacks from Republicans that would undermine the probe's credibility. To the Republicans, with their own history of misusing the government's legal powers to smear and punish their political opponents, that explanation later seemed impossible to believe.

Steele was encouraged by the FBI's outreach. Still, he was losing faith that the Bureau would move quickly enough to put a stop to whatever the Trump campaign and the Russians were planning.

Despite Simpson and Fritsch's skepticism, they agreed it was important to at least try to make people aware of what was happening, even if the truth about Trump and Russia only came out after the election. Sooner or later, the American national security establishment was going to have to clean up the Russia mess. And the best way to make sure the government did its job, they thought, was to involve the media as a watchdog.

Christopher Steele was about to break cover.

Fusion wanted Steele to come to Washington and meet the press, face-to-face. The idea of briefing the American media was a novel proposi-

tion for Steele, who had had little contact with reporters and eyed them skeptically. Journalists often behaved irresponsibly, he believed, and were capable of mishandling sensitive information or selling out a source for a good story. He had never confirmed to anyone that he had worked for MI6, even after he was outed in 1999, and he didn't want to start now.

*Trust us,* Simpson and Fritsch said. There was some risk to the strategy, for sure, but it could be managed. They would introduce him to a handful of reporters they knew and could trust to protect sources. All were seasoned national security or investigative reporters who dealt regularly with confidential whistleblowers and former intelligence and law enforcement officials.

Steele wouldn't have to mention MI6 or name a single source, they told him. His name and nationality will be off-limits.

"Do you think they'll write stories based on what I say?" Steele wanted to know.

Probably not, they said.

Much like the Justice Department's policy against taking overt investigative steps against candidates in the sixty days before an election, reporters try to begin wrapping up their investigative work on the presidential campaigns soon after Labor Day, to avoid the risk of being manipulated by one side or the other into an unfair or untrue "late hit."

The idea, Simpson told Steele, was to alert some leading journalists in the national security community to a potential crime in progress in the hope that they would investigate it, whether or not Trump won. Multiple signs pointed to active cooperation between the Trump team and Moscow. At a minimum, Putin's men were openly aiding the campaign in ways that violated U.S. law. If the two sides weren't working hand in hand, then at the very least the Russians were manipulating top aides and advisers to the Republican candidate. All of this warranted scrutiny, even if it seemed unlikely that the story would become public before Election Day. That shouldn't matter: Clinton seemed almost certain to win.

Steele flew to Washington on September 21.

Fritsch reserved two private rooms at 10 A.M. the next day at the Tabard Inn, a quiet, discreet, and charmingly shabby spot a bit removed from Washington's power corridors. The meetings were organized in one-

hour sessions, with breaks staggered between the rooms to prevent journalists from bumping into one another as they came and went. The guest list included Jane Mayer of *The New Yorker*, Michael Isikoff of *Yahoo News*, Matthew Mosk of ABC News, and Eric Lichtblau and David Sanger of the *Times*. Later, the Fusion partners took Steele to the offices of *The Washington Post*, where they met with Tom Hamburger and Dana Priest. Collectively, these reporters boasted more than 150 years of experience reporting in Washington and had won virtually every award the news profession has to offer.

Fusion laid the ground rules. Steele would speak only on background, meaning any information the reporters wished to quote could only be attributed to a "former senior Western intelligence official." His name and nationality were off-limits. Fusion, they explained, had hired Steele to look into Trump's business dealings with Russia. But he had developed information along the way that pointed to a more sinister relationship, one with serious national security implications. The information was Steele's, not Fusion's. Yes, Fusion was working for a client opposed to Trump. No, Fusion would not identify that client. If that meant the reporters didn't want to hear from Steele, no problem.

The reporters all agreed to those terms. The Steele memos that would later come to be known as the dossier were not shown or given to any of the reporters.

Fusion explained Steele's background as a reliable source of intelligence to U.S. law enforcement and invited them to check his reputation with their sources. Many of the reporters wanted to know if the U.S. government was aware of what Steele had found and whether it was investigating. Not wanting to compromise the FBI's investigation, Simpson and Fritsch kept it vague: It would be fair to assume the U.S. government was aware of Steele's information, they said. Only Isikoff pressed the question aggressively, eventually squeezing out of Steele an admission that he had briefed the FBI about Carter Page and other matters.

Steele did almost all the talking. Simpson and Fritsch would interject occasionally for context and explain how Steele's conclusions jibed with what was in the public record.

In the meetings, Steele ran through his key findings. He played down the hard-to-confirm details of Trump's alleged nocturnal exploits during the Miss Universe pageant in 2013 and emphasized his reporting on Page's mysterious Moscow mission and meetings with people from the

Kremlin and Rosneft—the fattest hog in Putin's kleptocratic corporate pigsty. He noted that his sources had mentioned discussions between Page and Russian officials about Trump lifting U.S. sanctions on Russians in return for other favors. The sourcing there was particularly solid.

In a *New Yorker* article, Jane Mayer would later describe her session with Steele. "Despite Steele's generally cool manner, he seemed distraught about the Russians' role in the election. He did not distribute his dossier, provided no documentary evidence, and was so careful about guarding his sources that there was virtually no way to follow up." Mayer's published account was faithful to her real-time reaction: *Interesting, but what is the point of this if none of it can be confirmed?*

Isikoff decided to see what, if anything, he could run down with his own law enforcement sources. After verifying Steele's bona fides, he got through to a senior law enforcement official who confirmed investigative interest in Page's supposed meetings with Sechin and other Kremlin types. The day after his encounter with Steele, Isikoff published a story under the headline "U.S. Intel Officials Probe Ties Between Trump Adviser and Kremlin." The story recalled Senator Reid's blind reference to what must have been Page in his letter to Comey and reported the alleged Sechin meeting Steele had described. The story also mentioned another alleged meeting Page had with a top Kremlin official, Igor Divyekin.

Isikoff's September 23 story made a modest splash for a day or two. A few days later, Page told the *Post* that he would be taking a "leave of absence" from the Trump campaign and trashed Isikoff's story as "complete garbage." The core allegation of the story, that Page was being investigated for allegations that he had "opened up private communications with senior Russian officials—including talks about the possible lifting of economic sanctions if the Republican nominee becomes president," was later proven to be accurate by congressional investigations.

The campaign's swift moves to distance itself from Manafort and Page limited the fallout and contained the story, but at least Fusion and Steele felt satisfied that their work had helped lead to two of the Trump campaign's suspected intermediaries with the Russians being taken off the field.

"The primary objective of most counterintelligence operations is disruption, so we're not doing badly," Steele pointed out.

The following month, the Foreign Intelligence Surveillance Court

approved a wiretap of Page—a fact that wouldn't emerge until well after the election. A highly redacted copy of the court's order said that Page had "established relationships with Russian government officials, including Russian intelligence officers," and that the FBI thought "the Russian government's efforts are being coordinated with Page and perhaps other individuals" tied to the Trump campaign. Still later, it came out that Russian intelligence had tried to recruit Page in 2013. The FBI had even asked him about his Russian contacts in March 2016—the month Trump introduced him to the editorial board of the *Post* as part of his foreign policy team. And this was all long before Steele had ever heard of Carter Page, much less put his name in a report.

Trump defenders would later try to advance the notion that the briefings at the Tabard Inn had led to a spate of oppo-driven stories in the final weeks of the campaign. The truth is, the story in *Yahoo News* was the only one that emerged from the Steele sessions.


After making the rounds with journalists, Steele met with longtime former State Department official Jonathan Winer in a Washington hotel and gave him a rundown of the intel he'd gathered, akin to the one he had just given reporters.

Simpson and Fritsch had known Winer for years. The lawyer and diplomat knew a lot of journalists in town, dating back to his days as an Iran-contra investigator for Senator John Kerry. He was a specialist in money laundering and transnational crime. After leaving government in 1999 for private consulting, he developed a specialty in the countries of the former Soviet Union. He met Steele soon after Orbis was founded in 2009.

Winer returned to government in 2013 at then–Secretary of State Kerry's request as special envoy for Libya. On the side, he acted as an informal pipeline between Steele and State Department official Victoria Nuland for Orbis's reporting on Russia. Again, Steele shared that work for free, in the interest of helping an ally augment its understanding of a place where good source intelligence was hard to come by, increasingly so since the shift in the Intelligence Community's focus to Islamic terror after 9/11.

Winer was stunned by Steele's Trump findings and vowed to do what he could to bring the matter to Secretary Kerry's attention. As a lawyer and veteran of many D.C. political scrapes, Winer was also sensitive to

the optics of the situation: Here was a former British spy working for some former journalists who, he knew, were probably working for the Democrats.

Soon after his meeting with Steele, Winer called Fritsch and asked to talk. Winer and Fritsch live in the same neighborhood in the Washington suburbs. One evening in late September, Fritsch went to Winer's house with a copy of all the reports Steele had produced to date. Fritsch allowed Winer to read them and take notes, for the express purpose of making Kerry aware of the substance of Steele's reporting.

Winer then pulled out a document of his own for Fritsch to review. It was a report that appeared to be written by some kind of investigator, but it was sloppy and unformatted; it looked like a reporter's raw notes. Its findings, however, were explosive: They echoed Steele's own reporting that the Russian FSB spy service had tapes of Trump having sex with prostitutes in Moscow. It was now Fritsch's turn to be stunned.

This appeared to be a totally different reporting stream, providing a measure of corroboration for Steele's reporting. But was this report legitimate? It made reference to conversations with journalists, including the *Journal*'s former Moscow correspondent Alan Cullison. Was this all just hearsay or reporter gossip? There was no way to know. Winer would only say that it came from a trusted friend. Fritsch had a few suspicions about who that was. Winer had long been friends with Sidney Blumenthal, a former journalist who had gone on to work in the Clinton White House and become very close to both Bill and Hillary. Fusion knew that Blumenthal worked with a Los Angeles–based freelance journalist named Cody Shearer to generate opposition research for the Clintons. Fritsch asked if his hunch was right, but Winer would neither confirm nor deny.

When Fritsch returned to the office and described the document to his colleagues, Simpson sighed and said, "We don't want to get within a thousand miles of that." But the parallels to the dossier were admittedly intriguing. Fusion's suspicions later proved correct. Shearer was, in fact, the author of the document, and Blumenthal had indeed passed it to Winer, who also shared a copy with Steele.

Steele had no idea who Blumenthal was and had trouble accepting Fusion's warnings to him that anything the Clinton operative touched, no matter how legitimate, was destined to be branded as hopelessly partisan. Winer had explained to Steele the origin and chain of custody of the document. Even still, Steele believed the parallels to his own report-

Steele and the Fusion partners exchanged a flurry of calls over the weekend and entertained a variety of options, including bringing Steele back to the United States to speak publicly about his findings and dealings with the FBI. Perhaps a press conference on the steps of the Capitol? That was quickly ruled out as too silly and likely to backfire.

No, the best route was to find a reporter who trusted Fusion and who just might have the aggressiveness to write a story this explosive in the final days of a presidential campaign. David Corn, the Washington correspondent for *Mother Jones,* fit the bill. He was an old acquaintance of Simpson's and occasionally reached out to him for news leads.

After the Comey letter was released, it occurred to Simpson that Corn was an espionage buff who'd written a well-researched biography of a notorious former CIA official. He would be capable of evaluating Steele and his information much more quickly than a typical political reporter. Simpson texted him and suggested they meet.

That weekend, Corn and Simpson met at the Pain Quotidien off Dupont Circle. Simpson described the contents of the dossier and then, when they were done eating, walked Corn back to the Fusion office and, later, let him review a copy. "This is crazy stuff," said Corn. "But how am I supposed to know if any of it is true?" Simpson explained that it had come from MI6's former lead Russianist. Corn lobbied to speak with the author as soon as possible.

The next day, October 31, Simpson arranged a three-way Skype conversation with Steele and Corn, something Steele was reluctant to do. The ground rules were the same: You could quote him as a former senior intelligence official, but you could not identify Steele's name or nationality. In short order, Corn satisfied himself that Steele was the real thing and that the authorities were indeed taking his information seriously. Hours later, Corn went online with his story: "A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump."

That story would cause the FBI to cut Steele loose as a source. Gaeta called Steele after the story ran, and the two exchanged sharp words. Steele said he had been led to believe the story wouldn't be explicit about his relationship with the FBI, adding angrily that "any misstep by Orbis or Fusion pales in comparison to what Comey did in disclosing the Hillary investigation."

Referring to Steele by the acronym CHS (confidential human source), the FBI typed up a form FD-1040a, titled "SOURCE CLOSING COMMUNICATION." Steele had "confirmed to an outside third party" that

he had a confidential relationship with the FBI. That relationship now appeared to be over.

At this point, Steele didn't really care. Nor did Fusion. Comey had demonstrated bad faith in publicly reviving the FBI's investigation of the Clinton email server while burying an investigation of Russia's attempts to compromise a presidential candidate. "The public absolutely needs to be made aware of this information," Steele said.

Corn's story caused a minor stir, which was disappointing but not terribly surprising. Another potentially impactful story was posted by *Slate* barely a half hour later, at 5:36 P.M., written by Washington journalist Franklin Foer.

Foer recounted the efforts of some of the country's most renowned computer scientists to analyze Internet traffic they'd stumbled on linking a computer server sitting in Trump Tower with a politically connected bank in Moscow. The headline, "Was a Trump Server Communicating with Russia?," was a bit equivocal, but the facts were intriguing, at the least. According to *Slate*, the servers appeared to be specially configured to communicate with each other, the equivalent of a hotline.

The institution in question, Alfa Bank, was known to Fusion. Its owners were billionaire oligarchs close to Putin. One owner, Petr Aven, would later testify to special counsel Robert Mueller that he "met on a quarterly basis with Putin, including . . . shortly after the U.S. presidential election." Aven made clear that he took his orders from the Kremlin: As the Mueller report later stated, "Aven said that he took these meetings seriously and understood that any suggestions or critiques that Putin made during these meetings were implicit directives, and that there would be consequences for Aven if he did not follow through."*

Foer's story lit up Twitter. It was a complicated but deeply reported tale with authoritative sourcing. At a minimum, it called for further investigation. The Clinton campaign jumped on it instantly, taking to Twitter. They had hoped the big boys would follow up and rebalance the scales, post-Comey.

Fritsch knew the story would cause heartburn for other reporters in town, particularly at the *Times* and the *Post*. Both publications had been chasing the Alfa story, but Fusion had heard that senior editors had

---

* Another Alfa owner, German Khan, is the father-in-law of Alex van der Zwaan, a former Skadden Arps lawyer who pleaded guilty to lying to Mueller. Marshall Cohen, "Dutch Lawyer Who Pleaded Guilty in Mueller Probe Serving Sentence in Pennsylvania," CNN Politics, May 9, 2018.

year and what we want to do next," Fritsch wrote. "We are going to need a real budget from a solid group of donors who really love this country." The early responses were encouraging.

Simpson and Fritsch felt certain there was an active FBI investigation of the president-elect and thought they had a responsibility to now go beyond the steps they had taken before the election. The national security community and the public needed to understand their concerns about Trump's possible compromise.

That's where Steele's mind was, too.

In its seven-year history, Orbis had twice stepped outside its role as private consultants to warn the government of a potential national security emergency. In 2014, it went to the German government with credible information indicating that ISIS was planting operatives among Syrian refugees headed to Western Europe. In 2015, Steele and Burrows helped a former MI6 officer in China make a discreet report to the U.K. government about an attempt by Chinese intelligence to recruit him.

During the 2016 campaign, they decided to hold off on reporting their concerns about Trump and the Russians to the U.K. authorities. "The FBI was against our doing that," Steele recalled. "We made the critical decision not to go to the U.K. government unless Trump was elected."

Steele and Burrows believed, however, that Trump's election had profound implications for U.K. security and decided to alert British authorities. On November 15, Steele went to the Wimbledon home of Sir Charles Blandford Farr, chairman of the Joint Intelligence Committee, a cabinet-level position roughly equivalent to director of national intelligence in the United States. Farr was himself a former spy who had served MI6 in Afghanistan in the 1980s and was friendly with Steele and Burrows. Steele gave Farr a summary of their findings.

"He took our reporting extremely seriously," Steele recalled. After the meeting, Farr wrote an executive summary of the reporting that, he told Steele, went in early December to Andrew Parker, head of MI5, Britain's domestic security and counterintelligence agency, and to the wider cabinet.

In Steele's view, the U.K. government eventually concluded that the contents of the dossier constituted as much a political problem as a counterintelligence issue. The United States is London's closest ally. The two countries stand together on nearly every issue of international significance. There was little chance the electoral outcome would be re-

versed. In that context, the political class came to the conclusion that it would be unwise to make a stink about Steele's intelligence reporting with an incoming administration it would have to deal with for at least four years. That appeared to be that.

What Steele didn't know, however, was that concern about Russia's influence on the incoming administration was building fast in Washington. Two days after the election, President Obama used a ninety-minute meeting with Trump to advise his successor against the appointment of Michael Flynn as his national security adviser, a warning reported only later, after Flynn's extensive contacts with Russia's U.S. ambassador became known.

On November 18, Trump named Flynn to the post.

That same day, some three hundred leading lights of the international security community arrived in Halifax, Nova Scotia, for a three-day annual conference. Among the attendees were Senator John McCain and Sir Andrew Wood, the former U.K. ambassador to Russia and mentor to Steele. During a break, Wood pulled aside McCain advisor David Kramer. Wood said he "was aware of information that he thought I should be aware of and that Senator McCain might be interested," Kramer later recalled.

The meeting wasn't pure coincidence. Weeks earlier, Steele had taken Wood into his confidence about the information in the dossier and sought his opinion on whether he should take more aggressive action to alert authorities on both sides of the Atlantic. Prior to going to Halifax, Wood had stopped by Orbis's offices in London and discussed the idea of approaching McCain.

"You don't have a choice. At least, you don't have an honorable choice," Wood told Steele, adding that he needed to loop in "the right sort of people."

McCain, a senior senator and a renowned Russia hawk, was the ideal messenger. As the chairman of the Armed Services Committee, he had the authority to call on the FBI director. He also had the respect of leaders in both parties and the clout to make bureaucrats jump. And he wasn't afraid of contradicting his own party's leadership if he felt strongly about something. Wood didn't know him personally, however, so he decided to approach Kramer, who he knew was close to McCain.

In Halifax, Wood told Kramer about the basic findings of the dossier

and that the information came from Steele, a highly credible source. This was information McCain needed to hear right away, Kramer concluded. Later that afternoon, he and Wood briefed the senator in a small breakout room used for private meetings. Wood mentioned the possibility of a video showing the president-elect in a compromising situation in a Moscow hotel suite. "The senator listened very carefully. He didn't really have much in the way of a reaction," Kramer said. McCain then "turned to me and asked me if I would go to London to meet what turned out to be Mr. Steele."

McCain recalled the encounter in his book *The Restless Wave*: "Our impromptu meeting felt charged with a strange intensity. No one wisecracked to lighten the mood. We spoke in lowered voices. The room was dimly lit, and the atmosphere was eerie." Reassured by Wood that Steele was reliable, McCain concluded that "even a remote risk that the President of the United States might be vulnerable to Russian extortion had to be investigated."

Fusion didn't learn of this meeting until days after it occurred.

The Sunday after Thanksgiving, Kramer took an overnight flight from Washington to London, using his own frequent-flier miles. He gave Wood his cellphone number and boarded the flight, knowing only that he would be met upon his arrival at Heathrow. Once on the ground, he received a text message from Steele instructing him to look for a man in a blue coat holding a copy of the *Financial Times* (a bit hokey, perhaps, but sometimes life imitates pulp fiction). Kramer located Steele outside customs. Steele then drove Kramer to his home in Farnham, about thirty miles southwest of Heathrow.

Once they had settled in the living room, Steele handed Kramer the memos Orbis had produced to date and explained that they were field intelligence collected for a private client he did not name. The sources had proven extremely reliable in the past, and their information had checked out. "He explained again that the information he gathered was what he found, not what he thought the client might want," Kramer later said. "He stressed that point to me several times."

Steele explained his sourcing and provided Kramer with sufficient background information to explain how each person was in a position to know what they knew. Simpson and Fritsch had been similarly briefed during the election; the detail about the quality of the sources significantly increased the credibility of the reporting in their minds. Steele declined to give Kramer a copy of the memos; he worried that Kramer

might be searched upon reentering the United States. He also hadn't had a chance to confer with Fusion.

Steele told Kramer that he had shared his information with the FBI but that the relationship had soured, and that he understood Kramer might be in a position to get his reports to Senator McCain for the express purpose of asking FBI Director Comey what was going on. Kramer said that, yes, he represented McCain in an unofficial capacity and he believed he could do that.

After they walked through the memos, Steele took Kramer to lunch and then back to Heathrow for a 4:20 P.M. United flight back to Washington. Steele said that, once Kramer was back in the United States, he could get him a copy of the reports from Simpson, who Steele said had hired him. Kramer had spent a total of about eight hours in the U.K.

Once Kramer was airborne, Steele checked in with Simpson and told him of his hastily arranged rendezvous with Kramer. Was Kramer as close to McCain as he claimed, and could he be trusted with a copy of the dossier? Steele asked.

"Yes," Simpson replied. "I've known David for a long time. . . . He's legit." He recounted the role Kramer had played as a confidential source for *Wall Street Journal* stories in 2007 and 2008 outing Oleg Deripaska's visa problems and his Washington lobbying activities.

"David loathes Putin and his oligarchs with a passion," Simpson told Steele. "I'm not really sure what accounts for the virulence of his animosity, but it might be because he saw disturbing classified information about Deripaska and Putin when he was at State. In any event, we definitely do not need to worry about where he stands on the Russians."

Steele asked Simpson to provide a copy of the Steele memos to Kramer so that he could pass them along to McCain, who Kramer said had promised to raise them directly in a private meeting with Comey. Simpson agreed.

The next day, November 29, Kramer made his way to the Fusion office in Dupont Circle for a 5 P.M. meeting with Simpson. Fritsch was out of town, so Simpson asked Berkowitz to join.

It had already turned into another hair-raising day. That morning, Orbis sent over a fresh memo (it was continuing its work pro bono) relating some chatter out of Moscow concerning Trump's recruitment of Mitt Romney to be his secretary of state. The choice struck many as odd,

not just because Romney was a vocal critic of Trump but also because he had presciently stated in 2012 that Russia "is, without question, our number-one geopolitical foe. . . . They fight every cause for the world's worst actors."

Steele contributed a disturbing new snippet:

> Speaking on November 29 2016, a senior official working at the Russian MFA reported that a rumour is currently circulating there that US President-elect TRUMP's delay in appointing a new Secretary of State is the result of an intervention by President PUTIN/the Kremlin. The latter reportedly have asked that TRUMP appoint a Russia-friendly figure to this position, who was prepared to move quickly on lifting Ukraine-related sanctions and cooperation ("security") in Syria.

Steele had asked Simpson, who, he knew, planned to meet with Kramer later in the day, to pass along the latest memo, too. (Two weeks later, Trump abruptly decided to dump Romney in favor of oil executive Rex Tillerson, whom Putin had awarded the Russian Federation's Order of Friendship in 2013.)

Simpson and Kramer did a little catching up, then Simpson walked Kramer through Fusion's research into Trump's Russia ties. He also told Kramer, as Steele had, that there were indications the FBI had an active investigation of Trump and how it appeared the Bureau had deliberately thrown the *Times* off the scent in late October (as would later prove true). Maybe, he said, someone in the FBI was trying to suppress information about Trump's relationship with the Kremlin.

Those concerns, Simpson said, had been amplified by a story written by Trump's nemesis Wayne Barrett in *The Daily Beast* just a few days before the election, disclosing the existence of a pro-Trump faction within the FBI that appeared to be working closely with longtime Trump ally Rudolph Giuliani. The report was quickly confirmed by both the *Times* and *The Guardian,* with one anonymous agent telling *The Guardian* that the FBI was "Trumpland," while Hillary Clinton was "the antichrist personified to a large swath of FBI personnel."*

---

* While Republicans on the Hill would later warp Special Agent Strzok's concern about the potential threat posed by Trump to national security into a paranoid fantasy about a partisan inside the FBI working to advance his political beliefs, the Republican committee chairs would not raise a peep—let alone hold a single hearing—about the bias against Hillary Clinton within the ranks of the FBI.

Simpson and Kramer then recalled Russia's covert attempts to culti-
vate influence in Washington since the mid-2000s, along with Kremlin
efforts to cozy up to some of the sleazier and more powerful members of
the U.S. Congress. It appeared that the Russians had initially targeted
the leading figures in *both* major political parties, Simpson said, adding
that there were indications that the Russians also made efforts to influ-
ence Hillary Clinton and her advisers with suspicious business proposi-
tions and generous donations to the Clinton Foundation.

Eventually, though, the Russians appeared to have tilted toward the
Republicans. There were circumstantial reasons to believe that top fig-
ures in the Republican Party—not just the Trump campaign leadership—
were well aware that the Russians favored their party. There were credible
news reports that top congressional leaders, including Senate Majority
Leader Mitch McConnell, had been warned by the Intelligence Com-
munity about Russian cyberattacks on Democrats as far back as 2015,
Simpson said.*

Russia's ambitions also appeared to go beyond the United States.
Simpson said Fusion's research indicated that the Russians were con-
ducting similar operations in Europe to destabilize the European Union
and may have made comparable efforts in the U.K. to sway the Brexit
referendum. Steele had made similar observations to Kramer based on
the work Orbis did in early 2016, Project Charlemagne. That reporting
examined Russian interference in the domestic politics of France, Italy,
the U.K., Turkey, and Germany. It all made sense to Kramer, who re-
counted Putin's prolific human rights abuses and military adventures.

"His best export to the West is corruption," Kramer said, adding that
he believed Putin was capable of doing "whatever he thinks is neces-
sary" to defeat the West.†

Kramer, who had helped drive Paul Manafort out of the McCain
presidential campaign in 2008 over Manafort's suspected ties to the Rus-

---

*Ten days after Simpson and Kramer met, *The Washington Post* reported that
McConnell—after receiving a classified intelligence briefing in September outlining
Russian efforts to boost Trump—told the Obama administration that he would
publicly dispute those findings if the White House called out Moscow. Critics would
later blame McConnell for putting party before country at a critical moment before
the vote.

† Days before the 2016 election, Kramer made similar comments at a McCain
Institute forum. "Campaign 2016 and Russia," C-SPAN, October 27, 2016, https://
www.c-span.org/video/?417539-1/discussion-focuses-campaign-2016-
russia&start=1318.

sians, did not need to be persuaded that the Kremlin had now success-
fully infiltrated his party. Kramer recounted his own efforts to alert the
Republican political establishment to what he'd long believed was an
insidious and unrecognized threat.

Simpson then told Kramer that Fusion's research had found a pat-
tern of connections between Trump campaign figures and the Russians
that raised questions about a possible conspiracy. Steele's memos were
field intelligence, he added, and did not include any of Fusion's own re-
search.

At the end of the meeting, Simpson handed over the memos in a
manila folder, emphasizing the extreme sensitivity of the material and
extracting a promise to provide the documents to McCain and no one
else.

Twenty-four hours later, Kramer met with McCain in his office on
Capitol Hill. After reviewing the memoranda, McCain asked for Kram-
er's recommendation. *Take it to the directors of the FBI and the CIA,*
Kramer said. McCain said he needed some time to think about how to
approach the agencies. Kramer said he would follow up with Christian
Brose, McCain's right-hand man and staff director of the Senate Armed
Services Committee. Brose had been in Halifax with McCain.

"The allegations were disturbing, but I had no idea which if any were
true," McCain later wrote. "I could not independently verify any of it, and
so I did what any American who cares about our nation's security should
have done. I put the dossier in my office safe, called the office of the direc-
tor of the FBI, Jim Comey, and asked for a meeting." McCain's friend
and colleague Lindsey Graham later admitted that he had encouraged
McCain to turn the dossier over to the FBI. Months later Graham would
feign outrage over the dossier during congressional hearings.

The next day, December 1, Fusion management converged on the San
Francisco Bay Area for a year-end retreat. Fusion's newest hire, Neil
King Jr., a friend and former *Journal* colleague, had cadged access to a
house in the Sonoma hills for the weekend. The plan was to do some
hiking, drink some wine, and begin mapping out a strategy for the
Trump era. Should they continue with political work? Should they keep
working with Steele? If so, how could they pay for it? King, Simpson,
and Fritsch were joined by Fusion partners Tom Catan, from D.C., and
Jason Felch, from Los Angeles.

The Fusion team figured Bensinger might be in a position to tell them how deeply the FBI had relied on Steele in the FIFA case, something Steele himself didn't want to discuss. Simpson thought that, depending on how close Bensinger was to Gaeta, he might have an outside shot at confirming the active investigation of the president-elect's Russia entanglements.

By the time Bensinger got to the house it was late, and the rest of the Fusion team soon rolled off to bed. Simpson and Bensinger stayed up, and Simpson described—off the record and in general terms—the contents of Steele's reports and Fusion's relationship with the former spy. Simpson didn't show or give Bensinger any of Steele's reports but suggested that he reach out to Steele directly, given their prior contact on the FIFA story.

Bensinger had an early flight back home to L.A. the next morning. He was gone before any of his hosts arose, armed with a good lead and a source in London he knew to be highly reliable.


The next day, Steele was sitting with Burrows in London's Garrick Club, an ornate gentlemen's retreat whose past members include Charles Dickens, H. G. Wells, and Sir Laurence Olivier. They were there to brief their old boss, Sir Richard Dearlove, former chief of MI6. Dearlove was a legendary spy, who had served in Prague and Nairobi and ran the Washington, D.C., station before rising to run the agency from 1999 to 2004. Steele and Burrows desperately wanted to escalate their findings, and Dearlove, knighted by Queen Elizabeth in 2001, would be the man to do it.

They pulled out a copy of the dossier and the spy chief read it carefully. They walked him through some of the sourcing, in the most general terms. The reporting was credible, Dearlove said. He then surprised Steele and Burrows by indicating that he was already aware that the British government had suspicions about links between Russia and members of the Trump campaign. It seemed the British government had made a political decision to not push the matter further.

This news irritated Steele while at the same time reinforcing his view that his reporting was strong. If MI6 had reason to believe that the incoming head of state of Britain's top ally could, in fact, be compromised by Moscow, he asked himself, why would the government be willing to "kick it into the long grass?"

*Times* reporters through Trump's business entanglements with Russia and the elements of the dossier. They also walked through Fusion's role in the research. They stopped short of identifying their two anti-Trump clients, other than giving some generalities that Simpson and Fritsch had previously agreed upon: *In the beginning, there was a Republican. Then, there was a Democrat.*

As the meeting wound to a close, Mazzetti asked if they might have a copy of the Steele reports, on a strictly off-the-record basis. It was not to be reprinted, shared, or published. The Fusion partners hadn't checked with Orbis, but they agreed and passed them across the table.

Little did the two Fusion partners know, but thanks to David Kramer, awareness of the dossier around Washington was spreading—far beyond the confines of the discreet confidential encounters they'd had with the *Times*.

At McCain's behest, Kramer briefed the dossier's contents to a pair of Obama administration Russia hawks: Celeste Wallander, senior director for Russian affairs at the National Security Council, and Victoria Nuland, assistant secretary of state for Europe and Eurasian affairs. Both, Kramer later said, knew of Steele and believed his work to be credible. But Simpson and Fritsch had never met or talked with either of them—and Kramer never asked them to.

By the turn of the year, Kramer had also given copies of the dossier to a Republican congressman from Illinois whom Kramer knew and to a top aide to Speaker Paul Ryan.

All that would become known only later. At the time, Fusion had no inkling of what Kramer was doing and would have objected strongly had they known. The deal they had made with Kramer was a simple one: He could have Steele's memos for the express purpose of giving them to McCain so that he could share with Comey. Period.

As the inauguration of Trump drew closer, Kramer's evangelizing for the Steele memoranda grew ever more frenzied and would take a fateful turn when *BuzzFeed* reporter Ken Bensinger reentered the picture shortly after Christmas.

Bensinger, who was based in Los Angeles, was a resourceful and energetic reporter eager to follow up on Simpson's tips from their California conversation in hopes of netting a juicy scoop for his FIFA book, at a minimum. He had previously arranged to meet with Steele in London

on January 24 to do more reporting on his book. But Bensinger now knew about Steele's reports and had grown worried that Steele might be less willing to talk by that date, which was four days after Trump was scheduled to be inaugurated.

Bensinger texted Steele on December 23 to say that something had come up and he now wanted to come earlier. Steele asked what was so urgent—couldn't it wait until after the holidays? The next day, Bensinger texted that "people" were telling him about a dossier describing how Trump had been compromised by the Kremlin.

"Can we discuss?" he asked.

Steele, who knew nothing of Fusion's chance encounter with Bensinger in Sonoma, didn't reply.


On December 29, Bensinger hopped on a flight from L.A. to Washington.

Soon thereafter, Steele got a text message from Kramer saying he had spoken to Bensinger and given him "the broad picture." Kramer later claimed he'd done so at Steele's urging; Steele disputes that.

In any event, Bensinger was now hot on the trail of the dossier, pushing all his sources—none more so than Simpson, whom Bensinger implored to give him a copy of the rumored memoranda. Failing that, could he at least show him a copy? Simpson declined. He was not going to provide such sensitive written material to a reporter he barely knew.

Undeterred, Bensinger went to meet Kramer. He had learned from an unknown source—not Fusion and not Orbis—that Kramer had a copy of the Steele memos and arranged to meet with him. The two met at the McCain Institute's deserted offices near the State Department in Foggy Bottom. The offices were closed for the week, but Kramer was there and had the dossier sitting on a table in front of him. Russia was still very much in the news. Indeed, that very same day, President Barack Obama had expelled thirty-five Russian diplomats and announced other measures in retaliation for Russia's hack attacks and election interference.

How exactly Bensinger obtained page-by-page photos of the highlighted dossier from Kramer was later the subject of some dispute. Kramer initially claimed he had not known that Bensinger would photograph the documents. "He said he wanted to read them, he asked me if I could take photos of them," Kramer testified in a defamation case. "I

asked him not to. He said he was a slow reader, he wanted to read it. And so I said, you know, I got a phone call to make and I had to go to the bathroom . . . and so I left him to read for 20, 30 minutes."

Bensinger photographed the dossier with his iPhone.

In journalism and politics, the old "I left the room for twenty minutes" is a familiar ruse by sources who want plausible deniability for sharing confidential information. Kramer had been a senior government official who was accustomed to speaking to the media under a cloak of anonymity; he had done so with Simpson himself a decade earlier. Kramer likely knew exactly what he was doing—despite the explicit conditions he'd agreed to with Simpson that the memos were for Senator McCain and no one else.

Indeed, Kramer later admitted to having given a copy of the memoranda to two reporters for McClatchy newspapers in early December 2016 and eventually to at least four other news organizations.

Bensinger later testified that Kramer had explicitly allowed him to photograph the dossier with his iPhone. Kramer was forced to clarify for the record and say that he "had no objection" to Bensinger taking the report with him.

Bensinger had dinner that night with Simpson at a trendy farm-to-table restaurant on Connecticut Avenue called Buck's Fishing & Camping. Over dinner, Bensinger informed Simpson that he would no longer need to pester him for a look at the Steele memos. He said he had taken care of that with a new source—someone in Foggy Bottom. Simpson assumed that Kramer had simply briefed Bensinger on the contents and that Bensinger had left satisfied.

On New Year's Eve, Simpson flew to Mexico on vacation. That same day, Bensinger texted Steele asking if he was available to meet in London on January 3. Based on Bensinger's Christmas Eve text, Steele was concerned that he would want to talk about the Trump investigation, but he took the meeting based on Bensinger's claim that he wanted to discuss FIFA.

Ever the intelligence officer, he also wanted to find out what Bensinger had learned in Washington. At their meeting, Bensinger gave no hint that he had a copy of the dossier. When Bensinger turned the conversation to the substance of the Trump reports, Steele grew more guarded, and Bensinger left soon after.

Unbeknownst to Fusion or Steele, by then the Steele memos were all over town, thanks to Kramer. *The Wall Street Journal* had a copy. So did

NPR. And just as Steele was meeting with Bensinger in London, Kramer was meeting with Watergate legend Carl Bernstein in New York. Bernstein, who consulted for CNN, was now also in possession of a copy of the dossier. It was only a matter of time before it all burst into public view.

tle shop above a Starbucks and a consignment store had kept such a low profile, it barely warranted a page of mentions on Google. Its deliberately barebones company website featured little more than a one-paragraph statement of purpose and an email address, which fed an inbox that was largely empty.

Within hours, that comfortable sense of anonymity went up in a puff of headlines and cable hits as the people behind the dossier became known. First to fall was the shroud around Steele.

In London, *Wall Street Journal* reporter Alan Cullison began calling Steele's friends and workmates. Kramer had given Cullison a copy of the memos in December. Now Cullison was reaching out directly to Steele, who told him he'd be willing to talk one day but that at the moment it was "too hot." Circumstances had now changed: The *Journal* seemed intent on outing Steele as the dossier's author.

Orbis and Fusion grew concerned that the media frenzy over the memos would cause outlets to override previous promises of confidentiality, raising possible safety concerns for staff. That became a near certainty on January 10 when a young reporter for the *Journal* showed up at the home of Steele's business partner, Chris Burrows, some seventy miles southwest of London and explained that he'd just traveled about ninety minutes on the U.K.'s notoriously shoddy South West service.

"You poor sod, you've been on South West Trains!" Burrows said cheerily. "You'd better come in." As they stood in his kitchen, the reporter explained his mission and brandished a copy of the Steele memos. "Is this yours?" he asked. Burrows said he could neither confirm nor deny, sent the reporter packing, and immediately phoned Steele.

Steele suspected that Kramer was the leak and phoned him to try to figure out what was happening. Kramer denied he had leaked but volunteered to try to convince the *Journal* to protect Steele's identity. "They had already made up their mind, it was clear to me, although I spent a good hour or two talking to them, explaining why this was a terrible decision on their part," Kramer later recalled.

The story went up on the *Journal*'s webpage that evening. Steele had already taken his family and fled his house, so by 10 P.M., British tabloid journalists were outside the Burrows house. By the following morning, the TV trucks were there. There was also a large media scrum camped outside the Orbis office in London, near Victoria Station.

The British government swiftly issued a so-called DSMA-Notice—an informal, voluntary request asking newspaper editors to refrain from

publishing information that would be harmful to national security. "The public disclosure" of Steele's name "would put the personal security of that individual directly at risk," read the statement by secretary of the Defense and Security Media Advisory Committee. It was a noble but futile gesture.

A few of the reporters who played a role in exposing Steele would later express regrets about the personal consequences for Steele. Among the first was *BuzzFeed*'s Bensinger.

"I am sorry this has been a difficult week," he texted Steele after the *Journal* story. "I was very upset to hear you were forced to go into hiding. For what it is worth, which I suspect is not much, I have not told anyone we met and do not plan to, and have not mentioned your name to anyone."

For weeks and from his various hiding places, Steele would phone Simpson and Fritsch around 11 or 12 at night in the U.K., which was the end of the working day in Washington and around the time the cable news networks began giving their wrap-ups of the latest developments. In a hushed and often strained voice, Steele would provide vague accounts of his whereabouts and ask for a read on what was likely to happen next—always with an eye toward whether his sources might be exposed in the coming investigations. The Fusion partners would do their best to hold his hand while explaining how hard it is under the U.S. legal system to keep even sensitive information under wraps. "You can expect for every detail of our work together to become known, sooner or later," Fritsch told him one night.

"Utterly outrageous that a government can't keep its secrets," Steele replied.

Next to be exposed was the firm that hired Steele.

In Washington, Simpson received a call from *Times* reporter Scott Shane, who said he was reporting on the origin of the Steele memos and wanted to review the history confidentially. Simpson walked him through some of the basics. Simpson then mentioned that he'd heard the website Gizmodo, at that very moment, was attempting to out Fusion as the firm that had commissioned the Steele memos. *Then why not go on the record with me?* Shane asked. Simpson declined, reminding Shane that the paper had agreed to keep Fusion's identity under wraps.

As the media frenzy reached a crescendo that night, Simpson grew concerned that Shane might not keep that deal. So he called a *Times* editor he knew in New York. "I have a feeling you're getting ready to out

us," he said, protesting that such a move would be improper, since Fusion had honored its end of the confidential source agreement.

*You should be outing your government sources instead,* Simpson argued—the ones who, it now seemed clear, had deliberately misled the paper the previous October about the seriousness of the FBI's Trump-Russia investigation. The editor gave no promises on Fusion's fate, but readers, he said, hadn't seen the last of the October episode.

At 9:17 that night, the *Times*'s story hit the Web: "How a Sensational, Unverified Dossier Became a Crisis for Donald Trump." It identified Fusion as the firm that had hired Steele, and described it as a firm "sometimes hired by candidates, party organizations or donors to do political 'oppo' work."

Fritsch and Simpson were furious. The *Times* had used information about Fusion it had learned off the record and put it on the record unilaterally. Fritsch fired off a couple of angry emails to *Times* reporters that he instantly regretted. The truth was that Fusion's identity was bound to come out—and the *Times* story wasn't unfair. The heated reaction was fueled as much by an anticipatory dread of what Fusion feared could happen next: angry attacks from Trump supporters; nervous clients wanting to ditch Fusion; retribution from the incoming administration.

"We are in for some serious shit now," Fritsch told Catan that night.

Simpson locked himself in a spare bedroom and watched as his phone vibrated every few minutes with another message—a TV station in Japan, an old college friend, a Trump supporter. Scenarios for what might happen next played out in his head. One thing was for sure: Fusion would come under investigation by the Republican-controlled Congress, which had already vowed to look into the Russian attack on the election. The moment reminded Simpson of how he had felt after the death of a close friend in a plane crash: Something awful had suddenly happened, but there was nothing to do about it.

The next day, the main topic of conversation in the Simpson and Fritsch households was security. Simpson's house was less than a mile from Comet Ping Pong, the local pizzeria that had been shot up three weeks earlier by a Trump supporter who was convinced the restaurant was operating a child sex abuse dungeon tied to the Clintons. Simpson and his wife began to discuss whether their home was safe and decided to spend thousands of dollars to replace their flimsy backyard fence with a stout wooden wall seven feet high.

The special counsel devoted several pages of its report to describing the activities of the Ledeens but never established whether any of that was true. Smith's effort, which he did communicate to Trump campaign co-chairman Sam Clovis, never found any Clinton emails. However, the report established that Smith appeared to have inside information late in the campaign about WikiLeaks's plans to publish John Podesta's hacked emails, reporting that the group "will save its best revelations for last."

In May 2017, Smith checked into a motel in Rochester, Minnesota, near the Mayo Clinic, and tied a plastic bag over his head. His death was ruled a suicide.

Many of the details of the role played by one of Grassley's own staff members in the Trump campaign's effort to procure Hillary Clinton's emails from the Russians would remain a closely guarded secret for another two years. There was much irony in Grassley's focus on Fusion at a time when a senior member of his team was being investigated for Russia ties by the law enforcement community he purported to oversee.


In the summer of 2017, of course, the public knew little about what Mueller and his team were doing. The political stakes of his probe were incredibly high, and his staff were under strict orders not to leak. And they didn't. Reporters would stake out the special counsel's office in Washington, trying to figure out who came and went, striking out more often than not.

Fusion was also keeping its secrets. After Mueller's appointment, Simpson again began pressing Steele to connect the FBI with one of his sources who was outside Russia. Sometime after Mueller was appointed, Steele told Ohr how to find the source, which Ohr then relayed to the Bureau.

With strong encouragement from Simpson and Fritsch, Steele and Burrows had also sat down in September 2017 with a team of prosecutors and FBI agents from the special counsel's office at a London hotel. Steele already knew one of the agents. There was a little chest-beating at the start: Steele and Burrows reminded the investigators that they'd spent their entire careers being loyal allies of the United States and had no intention of changing course. They had nothing to hide, Steele said, but he demanded assurances that any information they provided about sources would not leak and put them in physical danger. The interview

## CHAPTER SEVENTEEN

# "WHAT I'M GOING TO DO TO YOU . . ."

FIGHTING BACK FELT GOOD, VERY GOOD.

The *Times* op-ed triggered a large wave of positive media coverage—as well as limp denials and denunciations from Republicans. "Hero-grams have temporarily replaced threats" in messages landing in Fusion's general email account, Catan told the partners.

The uplift was short-lived.

Two days later, a federal judge rejected Fusion's effort to block the House Intelligence Committee from obtaining more of its bank records. "Federal Judge Obliterates Fusion GPS' Attempt to Hide Info from Investigators," screamed one right-wing website. The next day, Grassley and his new wingman, Lindsey Graham, launched a counter-offensive against Fusion and Orbis, announcing they'd sent a letter to the Justice Department demanding a criminal investigation of Christopher Steele for supposedly lying to the FBI. The FBI was fully capable of referring for criminal prosecution any individual it believed had knowingly lied to or misled them. That had not happened. The Graham-Grassley referral was a transparent political stunt. On Friday, TD Bank dispatched a copy of Fusion's account records to the House.

It made for a lousy, wintry weekend. Of all the accusations leveled against Orbis and Fusion in the year since the dossier became public, the accusation by Grassley and Graham against Steele was perhaps the most outrageous. Steele phoned Simpson and Fritsch, distraught by these developments.

"I have served my country loyally for twenty years and only did what I thought was right," he told Simpson. "This is how I am thanked? These people have no shame."

Fritsch and Simpson spent the weekend reassuring Steele and Burrows that this was just politics. The Justice Department and the FBI would be hard-pressed to pursue a criminal case against someone outside of the country, let alone a British citizen who'd helped them repeatedly and honestly. "At least I hope that's still the case," Simpson told Fritsch privately.

Fritsch's and Simpson's words were small consolation to Steele. The Grassley accusation was all over the U.K. press, and Steele thought no one there would appreciate the political context of it—especially since Grassley had lobbed the charge for maximum publicity while refusing to make public any specifics. What was it that Steele had lied about? Grassley wouldn't say.

The unhappiness only deepened the following week when *The New York Times* published a less-than-flattering profile of Simpson, describing him as "brash, obsessive, occasionally paranoid, perhaps with cause." That's fair enough, they guessed, but the story also dredged up a tragic incident from Simpson's high school years, one that had haunted him for years. After a night of drinking at Simpson's house in the spring of 1982, a friend stumbled into the road and was killed by a car. Simpson's mother was arrested and charged with allowing her son to throw a party with alcohol. (The charges were later dismissed.) The anecdote felt like a cheap shot, and it landed. Simpson and his mother had to relive the horrible episode all over again.

"Well, that was gratuitous," Simpson told Fritsch. "Yeah," he replied. "Really uncool."

The wind then shifted again, this time for the better. A day after the *Times* story ran, Dianne Feinstein, the normally reserved Democratic senator from California, abruptly released the confidential transcript of Simpson's testimony before the Judiciary Committee—just as Fritsch and Simpson had called for in their op-ed a week earlier. She had had enough of Republican spin. "The innuendo and misinformation circulating about the transcript are part of a deeply troubling effort to undermine the investigation into potential collusion and obstruction of justice," she said.

For the first time, the press and the public now had a firsthand account of the long history of Orbis's and Fusion's investigations into

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

——————————————————————X
                                                      :
MIKHAIL FRIDMAN, PETR AVEN, AND      :          Case 1:17-CV-02041 (RJL)
GERMAN KHAN,                                      :
                                                      :
                    Plaintiffs,                  :
                                                      :
            -v-                                       :
                                                      :
BEAN LLC (A/K/A FUSION GPS) AND GLENN  :
SIMPSON,                                          :
                                                      :
                    Defendants.                  :
                                                      :
——————————————————————X

## PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (the "Federal Rules") and the Local Rules of the District Court for the District of Columbia (the "Local Rules"), Plaintiffs Mikhail Fridman, Petr Aven, and German Khan hereby supplement their November 11, 2019 initial responses and objections ("Initial Responses") to Defendants' First Set of Interrogatories,  dated October 11, 2019 (each an "Interrogatory," and together, the "Interrogatories"), as follows:

## GENERAL STATEMENTS AND OBJECTIONS

A.    These supplemental responses and objections (each a "Response" and together the "Responses") are being provided based upon documents and information presently available and known to Plaintiffs.

B.     All objections, responses, reservations of rights, and definitions from Plaintiffs' Initial Responses are applicable to these Responses and incorporated by reference as though fully set forth.

C.      In supplementing their Responses, Plaintiffs are responding only based upon information within Plaintiffs' possession, custody, or control. As indicated in Plaintiffs' Initial Responses, Plaintiffs object to Interrogatories that seek or are intended to seek information within the possession, custody, or control of non-parties.

D.      Plaintiffs continue to reserve all rights to further supplement, amend, modify, or clarify these Responses.  If there is no supplemental response to specific Interrogatories being provided at this time, such specific Requests are not reflected below.

E.      The foregoing General Statements and Objections are incorporated by reference in each of the specific Responses appearing below.

## SUPPLEMENTAL RESPONSES AND OBJECTIONS

### INTERROGATORY NO. 2

Identify all of the specific statements of and concerning you that you allege in this action amount to defamation by the Defendants and for each of those statements, explain the alleged defamatory meaning of the statement as it applies to you.

### RESPONSE TO INTERROGATORY NO. 2

The heading of CIR 112, "RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP COOPERATION," coupled with Plaintiffs and Alfa being the subject of CIR 112, falsely suggests that Plaintiffs and Alfa cooperated with a Kremlin-orchestrated illegal campaign to interfere with the 2016 U.S. presidential election.

A second defamatory statement in CIR 112 reads as follows: "Significant favours continued to be done in both directions, primarily political ones for PUTIN and business/legal ones for Alpha." That sentence is defamatory by accusing Plaintiffs of corruption and bribery in their relationship with Putin.  It has that meaning because the alleged provision of business and economic "favors" by a government official (in this case Putin) to private business people (in this case Plaintiffs) in exchange for the provision of services beneficial to the individual

2

government official (political favors to Putin) who is causing the government to provide business and economic favors describes bribery. CIR 112 is not explicit about when the corrupt, alleged exchange of favors began. However, by using the word "continued," it does clearly allege that a corrupt relationship and bribery were continuing in 2016, when CIR 112 was written. Therefore, for the purposes of this lawsuit, Plaintiffs' claim treats the allegation of corruption and bribery—exchanging political favors for economic/business favors—as an allegation of conduct during 2016.

The following content of CIR 112 is also defamatory:

during the 1990s GOVORUN had been Head of Government Relations at Alpha Group and in reality, the "driver" and "bag carrier" used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St Petersburg. Given that and the continuing sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN.

The defamatory meaning of the first sentence of this passage is an accusation of bribery—illicit cash paid by Plaintiffs Fridman and Aven to a government official, Vladimir Putin—through an intermediary, Govorun. The defamatory meaning of the second sentence of this passage is that it accuses the Plaintiffs of constructing their present-day form of "contact" with Putin as indirect because of the alleged past cash bribes delivered through Govorun. This sentence ties the Plaintiffs current actions to the Govorun bribery allegation with the words "given that"—which clearly refer back to the Govorun bribery allegation. The statement that Plaintiffs "entrust" "much of" of their contact with Putin in 2016 to Govorun is also defamatory in the context of the allegation that Govorun previously acted for the Plaintiffs as the "bag carrier" of their "illicit cash."

3

Dated: New York, New York
      May 18, 2020

                                CARTER LEDYARD & MILBURN LLP

By:    *Alan Lewis*
                  _____
                  Alan S. Lewis
                  John J. Walsh
                  2 Wall Street
                  New York, NY 10005
                  Tel: (212) 732-3200

                  Kim H. Sperduto
                  SPERDUTO THOMPSON & GASSLER PLC
                  1747 Pennsylvania Avenue, NW, Suite 1250
                  Washington, DC 20006
                  Tel: (202) 408-8900

                  *Attorneys for Plaintiffs*

## <u>**VERIFICATION**</u>

I, **MIKHAIL FRIDMAN**, am a plaintiff in the above-captioned action.  I have read the Supplemental Responses and Objections to Defendants' First Set of Interrogatories dated May 18, 2020, and know the contents thereof and, as the responses pertain to me individually, I declare under penalty of perjury under the laws of the United States of America that they are true and correct to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I declare under penalty of perjury under the laws of the United States of America that I believe them to be true as they pertain to me individually.

Executed on 18 May 2020.

Mikhail Fridman

**VERIFICATION**

I, PETR AVEN, am a plaintiff in the above-captioned action. I have read the Supplemental Responses and Objections to Defendants' First Set of Interrogatories dated May 18, 2020, and know the contents thereof and, as the responses pertain to me individually, I declare under penalty of perjury under the laws of the United States of America that they are true and correct to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I declare under penalty of perjury under the laws of the United States of America that I believe them to be true as they pertain to me individually.

Executed on _____

_____
Petr Aven

## **VERIFICATION**

I, **GERMAN KHAN**, am a plaintiff in the above-captioned action.  I have read the Supplemental Responses and Objections to Defendants' First Set of Interrogatories dated May 18, 2020, and know the contents thereof and, as the responses pertain to me individually, I declare under penalty of perjury under the laws of the United States of America that they are true and correct to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I declare under penalty of perjury under the laws of the United States of America that I believe them to be true as they pertain to me individually.

Executed on _18ᵗʰ May 2020_

_____
German Khan

# EXHIBIT C

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MIKHAIL FRIDMAN, PETR AVEN, and
GERMAN KHAN,

                Plaintiffs,

      v.

BEAN LLC a/k/a FUSION GPS, and GLENN
SIMPSON,

                Defendants.

Civil Case No. 1:17-cv-2041-RJL

## DEFENDANTS' FIRST AMENDED RULE 26(a)(1) INITIAL DISCLOSURES

Pursuant to Federal Rules of Civil Procedure 26(a)(1) and 26(e), Defendants Bean LLC (a/k/a Fusion GPS) and Glenn Simpson, through undersigned counsel, make the following amended initial disclosures. These disclosures are based on information known and reasonably available to Defendants which Defendants believe they may use to support their claims and defenses. As discovery progresses, Defendants may learn of additional potential witnesses and documents. Therefore, Defendants reserve the right to supplement these initial disclosures.

By providing these initial disclosures, Defendants do not represent that they are identifying every document, tangible thing, or witness possibly relevant to this action. In addition, Defendants make these disclosures without in any way waiving their right to object to any discovery request or proceeding involving or relating to the subject matter of these disclosures, including privilege, relevance, undue burden, or any other grounds. These disclosures are not an admission by Defendants regarding any matter.

1. **Individuals Likely to Have Discoverable Information That Defendants May Use to Support Their Claims or Defenses**

Individuals likely to have discoverable information that Defendants may use to support their claims or defenses are set forth below.

| Name | Subject Matter | Address, if known |
|---|---|---|
| Glenn Simpson | Full knowledge of dispute | c/o Joshua A. Levy Cunningham Levy Muse LLP 1401 K St. NW, Suite 600 Washington, DC 20005 |
| Peter Fritsch | Full knowledge of dispute | c/o Joshua A. Levy Cunningham Levy Muse LLP 1401 K St. NW, Suite 600 Washington, DC 20005 |
| Jake Berkowitz | Full knowledge of dispute | c/o Joshua A. Levy Cunningham Levy Muse LLP 1401 K St. NW, Suite 600 Washington, DC 20005 |
| Jason Felch | Full knowledge of dispute | c/o Joshua A. Levy Cunningham Levy Muse LLP 1401 K St. NW, Suite 600 Washington, DC 20005 |
| Petr Aven | Full knowledge of dispute | |
| Mikhail Fridman | Full knowledge of dispute | |
| German Khan | Full knowledge of dispute | |
| Corporate representative of Alfa Group | All entities affiliated with Alfa; Alfa's ties to the Kremlin and Vladimir Putin; Alfa's investments in U.S. companies; Plaintiffs' access to Alfa public relations staff; events related to topics in CIR 112; | |

2

| | any connections or communications between a server linked to the Trump Organization and Alfa server(s) | |
|---|---|---|
| Alfa Fellowship Program corporate representative | Relevant conduct of Plaintiffs; Plaintiffs' communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations, the presidential election, the Trump Organization; Plaintiffs' wealth and notoriety; Plaintiffs' interactions with the media; Plaintiffs' roles in the business world; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' public relations activities in the United States | c/o Cultural Vistas 233 Broadway Suite 2120 New York, New York 10279 |
| Representative of Amsterdam Trade Bank | Plaintiffs' roles in the business world; Plaintiffs' access to public relations staff; Plaintiffs' communications and statements regarding relationships with the Kremlin/Putin; Plaintiffs' wealth and notoriety | |
| Corporate representative of APCO | Relevant conduct of Plaintiffs; Plaintiffs' roles in the business world; Plaintiffs' control of Alfa; Plaintiffs' access to public relations staff; Plaintiffs' relationships with the Kremlin/Putin | APCO Worldwide 90 Long Acre London WC2E 9RA UK |
| Howard Ash | Plaintiffs' investments in the U.S.; Plaintiffs' roles in the business world; Plaintiffs' control of Alfa | 3363 NE 163rd Street, Suite 705, North Miami Beach, Florida 33160 |
| Anders Aslund | Relevant conduct of Plaintiffs, including Plaintiffs' investments in the United States; Plaintiffs' communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations, the presidential election, the Trump Organization; Plaintiffs' wealth and notoriety; Plaintiffs' interactions with the media; Plaintiffs' roles in the business world; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' public relations activities in the United States | Atlantic Council, 1030 15th St NW, Washington, DC 20005 |

| Representative of Atlantic Council | Relevant conduct of Plaintiffs; speeches by Plaintiffs at Atlantic Council events; Plaintiffs' meetings with US officials; contributions by Plaintiffs to Atlantic Council; Plaintiffs as public figures; Plaintiffs' public relations activities in the United States; Plaintiffs' lobbying efforts in the United States and abroad; relationship between Plaintiffs and Kremlin/Putin | 1030 15th Street NW, 12th floor, Washington, D.C. 20005 |
|---|---|---|
| James A. Baker III | Plaintiffs' notoriety; Plaintiffs' communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations; Plaintiffs' roles in the business world; Plaintiffs' public relations activities in the United States | |
| James Baker | Relevant conduct of David Corn and Chris Steele; Recipients of CIR 112; research related to matters in CIR 112; events related to topics in CIR 112; delivery of CIR 112; Russian interference in and/or influence on U.S. policy and/or U.S. politics; Russian interference in and/or influence on U.S. elections; FBI's knowledge of CIR 112; Government investigations into Russian interference in U.S. politics, elections, and policy | |
| Mike Baker | Plaintiffs' investments in the United States; Plaintiffs' roles in the business world; Plaintiffs' interactions with the media; Plaintiffs' involvement in Alfa dispute with IPOC; Plaintiffs' public relations activities in the United States | Diligence USA LLC, New York<br>33 Irving Place<br>3rd Floor<br>New York, NY 10003 |
| Gov. Haley Barbour | Plaintiffs' lobbying efforts in the U.S. and abroad; Plaintiffs' interactions with the media; Plaintiffs' public relations activities in the United States; Plaintiffs' and Alfa's roles in the business world | BGR Group, 601 13th St NW, Washington, DC 20005 |
| Edward Baumgartner | Relevant conduct of Plaintiffs; Plaintiffs' roles in the business world; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Alfa, including | |

| | | |
|---|---|---|
| | entities affiliated with Alfa; Alfa's ties to the Kremlin and Vladimir Putin; Alfa's investments in U.S. companies; research related to matters in CIR 112 | |
| Ken Bensinger | Relevant conduct of Buzzfeed; recipients of CIR 112; delivery of CIR 112 | |
| Corporate representative of BGR | Plaintiffs' lobbying efforts in the U.S. and abroad; Plaintiffs' interactions with the media; Plaintiffs' public relations activities in the United States | |
| Jeffrey Birnbaum | Plaintiffs' lobbying efforts in the U.S. and abroad; Plaintiffs' interactions with the media; Plaintiffs' public relations activities in the United States | BGR Group, 601 13th St NW, Washington, DC 20005 |
| Sir Leonard Blavatnik | Plaintiffs' roles in the business world; Plaintiffs' access to public relations staff; Plaintiffs' communications and statements regarding relationships with the Kremlin/Putin; Plaintiffs' wealth and notoriety; Plaintiffs' investments in the United States; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Plaintiffs' accumulation of wealth | Access Industries 40 West 57th Street 28th Floor New York, New York 10019 |
| Corporate representative for BP | Relevant conduct of Plaintiffs, Alfa; Plaintiffs' roles in the business world; events related to topics in CIR 112; Plaintiffs' notoriety; Plaintiffs' relationships with the Kremlin/Putin | |
| Christopher Brose | recipients of CIR 112, delivery of CIR 112 | |
| Nicholas Burgess | Plaintiffs' roles in the business world; Plaintiffs' control of Alfa | 21 Tudor St, Temple, London EC4Y 0DJ, UK |
| William J. Burns | Plaintiffs' interactions with the Carnegie Endowment for International Peace; Plaintiffs' relationship with the Kremlin/Putin | President, Carnegie Endowment for International Peace, 1779 Massachusetts Ave NW, Washington, DC 20036 |
| Chris Burrows | Relevant conduct of Orbis and Christopher Steele; Christopher Steele, including his experience, work, process, and engagement by Defendants; | |

| Richard Burt | Public relations and lobbying efforts of Plaintiffs in the US and abroad; Plaintiffs' visits to the White House and contacts with White House officials; relevant conduct of Plaintiffs; Plaintiffs' investments in the US; Plaintiffs' interactions with the media; Plaintiffs' roles in the business world; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Plaintiffs' wealth and notoriety; Plaintiffs' communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations, the presidential election, the Trump Organization; Plaintiffs' contacts with the Trump Organization, the Trump Campaign, and the Trump Administration; Russian interference in and/or influence on U.S policy and/or in U.S. elections; Alfa's relevant conduct, including all entities affiliated with Alfa, Alfa's ties to the Kremlin and Vladimir Putin, and Alfa's investments in U.S. companies | McLarty Associates 900 17th Street NW, Suite 800 Washington, DC 20006 |
| Fred Burton | Relevant conduct of Plaintiffs and Alfa; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf | Stratfor Enterprises LLC 221 W. 6th Street Suite 400 Austin, Texas 78701 |
| Groslyn Burton | Plaintiffs' visits to the White House and contacts with White House officials | The Asia Group 2101 L Street NW Suite 310 Washington, DC 20037 |
| Jean Camp | Relevant conduct of Alfa and the Plaintiffs concerning Alfa servers | |
| Corporate representative of Carnegie Endowment for International Peace | Plaintiffs' and Alfa's interactions with Carnegie Endowment for International Peace; Plaintiffs' donations to charitable organizations and foundations | 1779 Massachusetts Ave NW, Washington, DC 20036 |

| Charlie Carr | Relevant conduct of Plaintiffs and Alfa; Plaintiffs' and Alfa's relationship with the Kremlin/Putin; Plaintiffs as public figures | C and F Partners Limited 64 Baker Street, 1St Floor London W1U 7GB UK |
|---|---|---|
| Representative of Center for the National Interest | Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Plaintiffs' communications, positions, and statements concerning U.S. politics; U.S. non-profits and foundations; the presidential election; the Trump Organization; Government investigations into Russian interference in U.S. politics, elections, and policy | 1025 Connecticut Avenue NW, Suite 1200, Washington, D.C. 20036 |
| Representative of Chabad House at Harvard | Plaintiffs contacts with Chabad House; Plaintiffs' donations to charitable organizations and foundations | Chabad House at Harvard 38 Banks Street Cambridge, MA 02138 |
| Jim Cobery | Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' involvement with the Genesis Prize Foundation | VP & General Counsel, The Kraft Group, The Kraft Group, One Patriot Place, Foxborough, MA 02035 |
| James Comey | Relevant conduct of Plaintiffs, Alfa; FBI's knowledge of CIR 112; Government investigations into Russian interference in U.S. politics, elections, and policy; Russian interference in U.S. elections; Russian interference in and/or influence on U.S policy; Russian interference in and/or influence on U.S. politics | |
| Council on Foreign Relations | Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' roles in the business world; Plaintiffs' notoriety; Plaintiffs' communications, positions, and statements concerning U.S. politics, US-Russian policy, U.S. non-profits and foundations; Plaintiffs' foreign policy experience | 58 East 68th Street, New York, NY 10065 |
| Jonathan Davis | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; | Kirkland & Ellis LLP, 601 Lexington Avenue New York, NY 10022 |

| | relevant conduct and transactions of Alfa; events related to topics in CIR 112 | |
|---|---|---|
| Representative of the U.S. Department of Justice | Relevant conduct of Plaintiffs, Alfa; FBI's knowledge of CIR 112; Government investigations into Russian interference in U.S. politics, elections, and policy; Russian interference in U.S. elections; Russian interference in and/or influence on U.S policy; Russian interference in and/or influence on U.S. politics | |
| Dimitry Dikman | Relevant conduct of Plaintiffs; Plaintiffs' creation and involvement in Genesis Philanthropy Group; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' involvement with the Genesis Prize Foundation | Genesis Philanthropy Group, 499 Seventh Avenue, 15th Floor North, New York, NY 10018 |
| Jill Dougherty | Relations between Plaintiffs and the media | 1621 N 40th Street Seattle, WA 98103 |
| Robert Dudley | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112 | BP, 50I Westlake Park Boulevard Houston, TX 77079 |
| David Edwards | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112 | Skadden Arps 40 Bank St, Canary Wharf, London E14 5DS, UK |
| Maria Faasen (née Putin) | Relevant conduct of Plaintiffs and Alfa; Plaintiffs' relations with Vladimir Putin and family | |
| Representative of the U.S. Federal Bureau of Investigation | Relevant conduct of Plaintiffs, Alfa; FBI's knowledge of CIR 112; Government investigations into Russian interference in U.S. politics, elections, and policy; Russian interference in U.S. elections; Russian interference in and/or influence on U.S policy; Russian interference in and/or influence on U.S. politics | |
| Jeffrey W. Ferguson | Plaintiffs' investment in the United States; publication of such investment | Carlyle Group, 1001 Pennsylvania Avenue NW Washington, DC 20004 |
| Oleg Firer | Plaintiffs' investments in the U.S.; Plaintiffs as public figures; Plaintiffs' control of Alfa | Net Element, 3363 NE 163RD Street, Suite 705, |

| | | North Miami Beach, FL 33160 |
|---|---|---|
| Michael Froman | Plaintiffs' relationships with the Kremlin/Putin; Plaintiffs' communications, positions, and statements regarding foreign policy; Plaintiffs' public relations and lobbying efforts in the U.S. and abroad; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf | |
| Mark Galeotti | Plaintiffs' relationship with the Kremlin/Putin; relationships between Russian oligarchs and the Kremlin/Putin; influence of Russian oligarchs on the Kremlin/Putin; corruption in Russia; the privatisation of Russia | |
| Toby Gati | Relevant conduct of Plaintiffs, including Plaintiffs' investments in the United States; Plaintiffs' communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations; Plaintiffs' wealth and notoriety; Plaintiffs' interactions with the media; Plaintiffs as public figures; Plaintiffs' public relations activities in the United States; relationships between Russian oligarchs and the Kremlin/Putin | 1177 22nd Street NW, Unit 7C Washington, DC 20037 |
| Gennady Gazin | Relevant conduct of Plaintiffs; Plaintiffs' creation and involvement in Genesis Philanthropy Group; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' involvement with the Genesis Prize Foundation | Genesis Philanthropy Group, 499 Seventh Avenue, 15th Floor North, New York, NY 10018 |
| Genesis Philanthropy Group corporate representative | Relevant conduct of Plaintiffs; Plaintiffs' creation and involvement in Genesis Philanthropy Group; Plaintiffs' donations to charitable organizations and foundations Plaintiffs' involvement with the Genesis Prize Foundation; | 499 Seventh Avenue, 15th Floor North, New York, NY 10018 |
| Thomas W. Gilligan | Relevant conduct of Plaintiffs and Alfa; Plaintiffs' donations to charitable organizations and foundations | Director, Hoover Institution 434 Galvez Mall Stanford University Stanford, CA 94305-6003 |

| | | |
|---|---|---|
| Jose Grinda Gonzalez | Investigations into alleged illegal transactions by Mikhail Fridman | Fiscalia Especial Contra La Corrupcion y La Criminalidad Organizada Manuel Silvela, 4 Madrid, 28010 Spain |
| Oleg Govorun | Relevant conduct of Plaintiffs, Alfa, Putin, Kremlin; events related to topics in CIR 112 | |
| David Grenker | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112 | Kirkland & Ellis LLP, 601 Lexington Avenue New York, NY 10022 |
| Steven Hall | Relationship between Plaintiffs and Kremlin/Putin | |
| John Halsted | Relevant conduct of Mikhail Fridman; national security concerns regarding investment by Mikhail Fridman | Pamplona Capital Management, 375 Park Avenue, 17th Floor, New York, NY 10152 |
| Andrew Hayes | Public relations activities of Plaintiffs; Plaintiffs as public figures; Plaintiffs' interactions with the media; | Hudson Sandler, 25 Charterhouse Square London EC1M 6AE |
| Fred Hiatt | Plaintiffs' relations with the media; communications with Plaintiffs and their media representatives; knowledge of Plaintiffs' media representatives | Washington Post editorial board 1301 K Street NW Washington, DC 20071 |
| David Higgins | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112 | Kirkland & Ellis LLP, 30 St Mary Axe, London, EC3A 8AF, United Kingdom |
| Representative of Hill+Knowlton Strategies | Public relations activities of Plaintiffs; Plaintiffs as public figures; Plaintiffs' interactions with the media; | |
| Daniel Hoffman | Oligarchs and their ties to the Kremlin; relevant conduct of Alfa and Plaintiffs; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf | |

| | | |
|---|---|---|
| Karl V. Hopkins | Relevant conduct of Plaintiffs; speeches by Plaintiffs at Atlantic Council events; Plaintiffs' meetings with US officials; contributions by Plaintiffs to Atlantic Council; Plaintiffs as public figures; Plaintiffs' public relations activities in the United States; Plaintiffs' lobbying efforts in the United States and abroad; relationship between Plaintiffs and Kremlin/Putin | SNR Denton LLP, 1900 K Street NW, Washington, DC 20006 |
| Matthias Horbach | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112; Plaintiffs as public figures | |
| Robert Hormats | Meetings with Plaintiffs; communications and their representatives; relationship between Plaintiffs and US government officials | Kissinger Associates 350 Park Ave #26, New York, NY 10022 |
| Corporate representative of Hudson Sandler | Public relations activities of Plaintiffs; Plaintiffs as public figures; Plaintiffs' interactions with the media; | 25 Charterhouse Square London EC1M 6AE |
| David Ignatius | Plaintiffs' relations with the media; communications with Plaintiffs and their media representatives; knowledge of Plaintiffs' media representatives; relationship between Plaintiffs and Kremlin/Putin | |
| Andrey Illiaronov | Relationship between Plaintiffs and Kremlin/Putin; Plaintiffs' public appearances; Plaintiffs' and Alfa's business tactics; Plaintiffs as public figures | CATO Institute 1000 Massachusetts Avenue NW Washington, DC 20001 |
| Carl Jenkins | Plaintiffs' roles in the business world; Plaintiffs' notoriety; Plaintiffs' business tactics; Plaintiffs' dispute with IPOC | Global Head of Governance, Risk, Investigations and Disputes for Kroll 55 East 52nd Street New York New York 10055 |
| Ryan Junck | Plaintiffs' relationships with the Kremlin/Putin; Plaintiffs' communications, positions, and statements regarding foreign policy; Plaintiffs' public relations and lobbying efforts in the U.S. and abroad; Plaintiffs' | |

11

| | | |
|---|---|---|
| | ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf | |
| Adrian Karatnycky | Lobbying on behalf of Plaintiffs and Alfa; Plaintiffs' relations with the media and US government officials; access to public relations | Myrmidon Group LLC 53 Saint Mark's Place New York, New York 10003 |
| Keenan Center corporate representative | Plaintiffs' interactions with the media; Plaintiffs' wealth and notoriety; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' investments in the United States; Plaintiffs as public figures; Plaintiffs' public relations activities in the United States; Plaintiffs' lobbying efforts in the United States and abroad | |
| Fred Kempe | Relevant conduct of Plaintiffs; speeches by Plaintiffs at Atlantic Council events; Plaintiffs' meetings with US officials; contributions by Plaintiffs to Atlantic Council; Plaintiffs as public figures; Plaintiffs' public relations activities in the United States; Plaintiffs' lobbying efforts in the United States and abroad; relationship between Plaintiffs and Kremlin/Putin | Atlantic Council, 1030 15th St NW, Washington, DC 20005 |
| Alexa King | Communications between Plaintiffs/Alfa and the Trump Campaign/Trump Organization | 601 McCarthy Blvd. Milpitas, CA 95035 |
| Corporate representative of Kirkland & Ellis LLP | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112; Plaintiffs as public figures | |
| Denis Klimentchenko | Plaintiffs' control of Alfa; TNK-BP transaction; Plaintiffs' transactions and their relationship with the Kremlin/Putin; favors exchanged between Putin and Plaintiffs | Skadden Arps 40 Bank St, Canary Wharf, London E14 5DS, UK |
| Alex Knaster | Relevant conduct of Mikhail Fridman; national security concerns regarding investment by Mikhail Fridman | Pamplona Capital Management, 25 Park Lane, London W1K 1RA, England, United Kingdom |

| | | |
|---|---|---|
| Yuri Koshkin | Relevant conduct of Plaintiffs and Alfa; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf | Trident Group L.L.C., 1901 N. Fort Myer Driver, Arlington VA 22209 |
| Robert Kraft | Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' involvement with the Genesis Prize Foundation; | The Kraft Group, One Patriot Place, Foxborough, MA 02035 |
| David Kramer | Delivery and receipt of CIR 112; privileged publication | |
| Corporate representative of Kroll | Plaintiffs' roles in the business world; Plaintiffs' notoriety; Plaintiffs' business tactics; Plaintiffs' dispute with IPOC; Defendants' background knowledge of Alfa and the Plaintiffs; Plaintiffs' and Alfa's relationship with the Kremlin/Putin | |
| Jeremy M. Kroll | Plaintiffs' roles in the business world; Plaintiffs' notoriety; Plaintiffs' business tactics; Plaintiffs' dispute with IPOC; Defendants' background knowledge of Alfa and the Plaintiffs; Plaintiffs' and Alfa's relationship with the Kremlin/Putin | K2 Intelligence, 845 Third Avenue, New York, NY 10022 |
| Jules B. Kroll | Plaintiffs' roles in the business world; Plaintiffs' notoriety; Plaintiffs' business tactics; Plaintiffs' dispute with IPOC; Defendants' background knowledge of Alfa and the Plaintiffs; Plaintiffs' and Alfa's relationship with the Kremlin/Putin | K2 Intelligence, 845 Third Avenue, New York, NY 10022 |
| Simon Kukes | Plaintiffs' roles in the business world; Plaintiffs' notoriety; Plaintiffs' business tactics; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf | Pacific Energy Development 4125 Blackhawk Plaza Cir # 201, Danville, CA 94506 |
| Josh Kushner | Plaintiffs' investments in the U.S.; Plaintiffs' wealth and notoriety; Plaintiffs' roles in the business world | Thrive Capital 295 Lafayette Street Suite 701 New York, NY 10012 |
| James C. Langdon Jr. | Plaintiffs' roles in the business world; Plaintiffs' control of Alfa; Plaintiffs' business tactics | Senior Counsel, Akin Gump Strauss Hauer & Feld LLP 2001 K Street NW |

| | | Washington, DC 20006 |
|---|---|---|
| Amb. Ronald Lauder | Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' public relations activities in the United States; Plaintiffs' lobbying efforts in the United States and abroad; Plaintiffs' interactions with the media | Ronald S. Lauder Foundation, 767 5th Ave., Ste. 4200, New York City, NY 10153-0185 |
| Vladimir Lechtman | Relevant conduct of Plaintiffs regarding creation of LetterOne; Plaintiffs' control of Alfa | Jones Day, Ducat III, 12th Floor 6 Gasheka Street 125047 Moscow, Russia |
| Eric Lichtblau | Receipt and delivery of CIR 112 | |
| David Lipton | Relevant conduct of Plaintiffs; Plaintiffs' public relations activities in the United States; Plaintiffs' lobbying efforts in the United States and abroad; Plaintiffs' interactions with the media; Plaintiffs' roles in the business world | International Monetary Fund 700 19th Street NW Washington, DC 20431 |
| Mark MacDougall | Plaintiffs' relationship with the Kremlin; Plaintiffs' notoriety; Plaintiffs' conduct regarding the IPOC dispute; Defendants' knowledge of Plaintiffs; Plaintiffs' use of Kroll | Akin Gump Strauss Hauer & Feld LLP 2001 K Street NW Washington, DC 20006 |
| Maria Mammina | Relevant conduct of Plaintiffs; Plaintiffs' communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations, the presidential election, the Trump Organization; Plaintiffs' wealth and notoriety; Plaintiffs' interactions with the media; Plaintiffs' roles in the business world; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' public relations activities in the United States | 628 Willoughby Avenue Apartment 3 Brooklyn, New York 11206 |
| Kevin Mandia | Any connections or communications between a server linked to the Trump Organization and Alfa server(s) | 601 McCarthy Blvd. Milpitas, CA 95035 |
| Corporate representative of Mandiant | Any connections or communications between a server linked to the Trump Organization and Alfa server(s) | |
| Peter Martelli | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; | Kirkland & Ellis LLP, 601 Lexington Avenue |

14

| | relevant conduct and transactions of Alfa; events related to topics in CIR 112 | New York, NY 10022, United States |
|---|---|---|
| Andrew McCabe | Relevant conduct of Plaintiffs, Alfa; FBI's knowledge of CIR 112; Government investigations into Russian interference in U.S. politics, elections, and policy; Russian interference in U.S. elections; Russian interference in and/or influence on U.S policy; Russian interference in and/or influence on U.S. politics | |
| Michael McFaul | Plaintiffs' relationships with the Kremlin/Putin; Plaintiffs' communications, positions, and statements regarding foreign policy; Plaintiffs' public relations and lobbying efforts in the U.S. and abroad; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf | |
| Joy McGrath | Relevant conduct of Petr Aven; Aven's communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations, the presidential election, the Trump Organization; Aven's wealth and notoriety; Aven's donations to charitable organizations and foundations; Plaintiffs' public relations activities in the United States | Chief of Staff, Office of President, Yale University, 3 Prospect Street, New Haven, CT 06511 |
| Corporate representative of McLarty Associates | Public relations and lobbying efforts of Plaintiffs in the US and abroad; Plaintiffs' visits to the White House and contacts with White House officials; relevant conduct of Plaintiffs; Plaintiffs' investments in the US; Plaintiffs' interactions with the media; Plaintiffs' roles in the business world; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Plaintiffs' wealth and notoriety; Plaintiffs' communications, positions, and | 900 17th Street NW, Suite 800 Washington, DC 20006 |

| | statements concerning U.S. politics, U.S. non-profits and foundations, the presidential election, the Trump Organization; Plaintiffs' contacts with the Trump Organization, the Trump Campaign, and the Trump Administration; Russian interference in and/or influence on U.S policy and/or in U.S. elections; Alfa's relevant conduct, including all entities affiliated with Alfa, Alfa's ties to the Kremlin and Vladimir Putin, and Alfa's investments in U.S. companies | |
|---|---|---|
| Ed Mermelstein | Public relations and lobbying efforts of Plaintiffs in the US and abroad; Plaintiffs' investments in the US; Plaintiffs' interactions with the media; Plaintiffs' roles in the business world; Plaintiffs' communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations, the presidential election, the Trump Organization; Alfa's relevant conduct, including all entities affiliated with Alfa, Alfa's ties to the Kremlin and Vladimir Putin, and Alfa's investments in U.S. companies | 20 W. 36th Street, 12th Floor New York, NY 10018 |
| Clark R. Moore | Plaintiffs as public figures; Plaintiffs' notoriety; Plaintiffs' business tactics; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf | Pacific Energy Development 4125 Blackhawk Plaza Cir # 201, Danville, CA 94506 |
| Alejandro Moreno | Relationship between Plaintiffs and Kremlin/Putin | Access Industries 40 West 57th Street 28th Floor New York, New York 10019 |
| Michael Movsovich | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112; Plaintiffs as public figures | Kirkland & Ellis LLP, 601 Lexington Avenue New York, NY 10022 |

| | | |
|---|---|---|
| Myrmidon Group LLC corporate representative | Lobbying on behalf of Plaintiffs and Alfa; Plaintiffs' relations with the media and US government officials; access to public relations | |
| Corporate representative of Neue Galerie | Public relations and lobbying efforts of Plaintiffs in the US and abroad; Plaintiffs' investments in the US; Plaintiffs' interactions with the media; Plaintiffs' donations to the Neue Galerie | 1048 Fifth Avenue New York, New York 10028 |
| Corporate representative of the New York Times | Receipt and delivery of CIR 112 | |
| Eric Nitcher | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112; Plaintiffs as public figures | General Counsel for BP 50I Westlake Park Boulevard Houston, TX 77079 |
| Victoria Nuland | Relevant conduct of Plaintiffs, Alfa; Government's receipt, delivery, and knowledge of CIR 112; Government investigations into Russian interference in US politics, elections, and policy; Russian interference in US elections; Russian interference in and/or influence on US policy; Russian interference in and/or influence on US politics; communications with Plaintiffs; Plaintiffs' communications and relationships with US government officials | |
| Representative of the U.S. Office of Foreign Assets Control (OFAC) | Relationships, ties, or communications between Plaintiffs and Vladimir Putin and/or the Kremlin; relevant conduct of oligarchs and Putin; sanctions on Russian oligarchs and businesses | |
| Richard Palmer | Plaintiffs as public figures; Plaintiffs' notoriety; Plaintiffs' business tactics; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Alfa's business tactics; Alfa's ties, communications, and relations with the | Cachet International Inc. 8905 Potomac Station Lane Potomac, Maryland 20854 |

| | Kremlin, Vladimir Putin, and those representing them or acting on their behalf; events related to topics in CIR 112 | |
|---|---|---|
| Javier Perez Dolset | Relevant conduct of Plaintiff Mikhail Fridman and Alfa entities; | |
| The Peter G. Peterson Institute for International Economics corporate representative | Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' roles in the business world; Plaintiffs' notoriety; Plaintiffs' communications, positions, and statements concerning U.S. politics; U.S. non-profits and foundations | 1750 Massachusetts Ave., NW, Washington DC 20009 |
| Stan Polovets | Public relations and lobbying efforts of Plaintiffs in the US and abroad; Plaintiffs' visits to the White House and contacts with White House officials; relevant conduct of Plaintiffs; Plaintiffs' investments in the US; Plaintiffs' interactions with the media; Plaintiffs' roles in the business world; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Plaintiffs' wealth and notoriety; Plaintiffs' communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations, the presidential election, the Trump Organization; Plaintiffs' contacts with the Trump Organization, the Trump Campaign, and the Trump Administration; Russian interference in and/or influence on U.S policy and/or in U.S. elections; Alfa's relevant conduct, including all entities affiliated with Alfa, Alfa's ties to the Kremlin and Vladimir Putin, and Alfa's investments in U.S. companies | 9 W 84th St., Apt. 1, New York, NY 10024 |
| Adam Posen | Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' roles in the business world; Plaintiffs' notoriety; Plaintiffs' communications, | The Peter G. Peterson Institute for International Economics, 1750 Massachusetts Ave., NW, Washington DC 20009 |

|  | positions, and statements concerning U.S. politics, U.S. non-profits and foundations |  |
|---|---|---|
| Bill Priestap | Relevant conduct of Plaintiffs, Alfa; FBI's knowledge of CIR 112; Government investigations into Russian interference in U.S. politics, elections, and policy; Russian interference in U.S. elections; Russian interference in and/or influence on U.S policy; Russian interference in and/or influence on U.S. politics |  |
| Vladimir Putin | Full knowledge of dispute; events described in CIR 112; |  |
| Stephen Rademaker | Plaintiffs' lobbying efforts in the U.S. and abroad; Plaintiffs' interactions with the media; Plaintiffs' public relations activities in the United States; Plaintiffs' and Alfa's roles in the business world | Covington & Burling 850 10th St NW, Washington, DC 20001 |
| Rand Corporation | Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' roles in the business world; Plaintiffs' notoriety; Plaintiffs' communications, positions, and statements concerning U.S. politics, US-Russian policy, U.S. non-profits and foundations; Plaintiffs' foreign policy experience | 1776 Main Street PO Box 2138, Santa Monica, CA 90407-2138 |
| Tom Reed | Plaintiffs' roles in the business world; Plaintiffs as public figures; Plaintiffs' control of Alfa; Plaintiffs' business tactics |  |
| Alexey Reznikovich | Relationship between Plaintiffs and Kremlin/Putin; Plaintiffs' control of Alfa; Plaintiffs' corrupt and criminal activity | 43 Berkeley Square London, W1J 5AP United Kingdom |
| Ed Rogers | Plaintiffs' lobbying efforts in the U.S. and abroad; Plaintiffs' interactions with the media; Plaintiffs' public relations activities in the United States; Plaintiffs' and Alfa's roles in the business world | BGR Group, 601 13th St NW, Washington, DC 20005 |
| Mathew Rojansky | Plaintiffs' interactions with the media; Plaintiffs' wealth and notoriety; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' investments in the United States; Plaintiffs' roles in the business world; Plaintiffs' public relations activities in | Director, Wilson Center, Kennan Institute, Ronald Reagan Building and International Trade Center One Woodrow Wilson Plaza, 1300 Pennsylvania Ave. NW Washington, DC 20004-3027 |

19

| | | |
|---|---|---|
| | the United States; Plaintiffs' lobbying efforts in the United States and abroad | |
| Jack Rosen | Relevant conduct of Fridman; Fridman's efforts to invest in US real estate | Rosen Partners LLC, 745 Fifth Avenue, 30th floor, New York, NY 10151 |
| Laura Rosenberger | Plaintiffs' relationships with the Kremlin/Putin; Plaintiffs' communications, positions, and statements regarding foreign policy; Plaintiffs' public relations and lobbying efforts in the U.S. and abroad; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf | |
| David M. Rubenstein | Plaintiffs' investments in the United States; Plaintiffs' wealth and notoriety | Carlyle Group 1001 Pennsylvania Avenue NW Washington, DC 20004 |
| Ilia Salita | Relevant conduct of Plaintiffs; Plaintiffs' creation and involvement in Genesis Philanthropy Group; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' involvement with the Genesis Prize Foundation; Plaintiffs' public appearances | Genesis Philanthropy Group, 499 Seventh Avenue, 15th Floor North, New York, NY 10018 |
| Peter Salovey | Relevant conduct of Petr Aven; Aven's communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations, the presidential election, the Trump Organization; Aven's wealth and notoriety; Aven's donations to charitable organizations and foundations; Plaintiffs' public relations activities in the United States | Office of President, Yale University, 3 Prospect Street, New Haven, CT 06511 |
| Natan Sharansky | Relevant conduct of Plaintiffs; Plaintiffs' creation and involvement in Genesis Philanthropy Group; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' involvement with | Genesis Philanthropy Group, 499 Seventh Avenue, 15th Floor North, New York, NY 10018 |

| | the Genesis Prize Foundation; Plaintiffs' public appearances | |
|---|---|---|
| Dimitri Simes | Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Plaintiffs' communications, positions, and statements concerning U.S. politics; U.S. non-profits and foundations; the presidential election; the Trump Organization; Government investigations into Russian interference in U.S. politics, elections, and policy | 8905 Potomac Station Lane Potomac, Maryland 20854 |
| Scott V. Simpson | Plaintiffs' corrupt and criminal activity; Plaintiff's control of Alfa | Skadden Arps 40 Bank St, Canary Wharf, London E14 5DS, UK |
| Ben Smith | Relevant conduct of Buzzfeed, recipients of CIR 112; delivery of CIR 112 | |
| Jill W. Smith | Relevant conduct of Plaintiffs; Plaintiffs' creation and involvement in Genesis Philanthropy Group; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' involvement with the Genesis Prize Foundation; Plaintiffs' public appearances | Genesis Philanthropy Group, 499 Seventh Avenue, 15th Floor North, New York, NY 10018 |
| Christopher Steele | Experience, work, process, and engagement by Defendants; his communications with the FBI, Senator John McCain, the U.S. Department of Justice, and other governmental agencies and officials; CIR 112, including recipients of CIR 112, research related to matters in CIR 112, events related to topics in CIR 112, and delivery of CIR 112 | |
| Corporate representative of Stroz Freidberg | Any connections or communications between a server linked to the Trump Organization and Alfa server(s) | |
| Bernard Sucher | Relevant knowledge of Alfa, including all entities affiliated with Alfa, Alfa's ties | 715 Sevilla Avenue, Coral Gables, FL  33134 |

| | | |
|---|---|---|
| | to the Kremlin and Vladimir Putin, and Alfa's investments in U.S.'s companies; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Plaintiffs' roles in the business world | |
| Lawrence Summers | Communications with Plaintiffs; relations and communications between Plaintiffs and US government officials; meetings between Plaintiffs and US Government Officials; Plaintiffs' experience with foreign policy; privatization of Russia | 207 Fisher Avenue Brookline, MA  02445 |
| Vladislav Surkov | Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; events related to topics in CIR 112; Russian interference in and/or influence on U.S. politics, elections, and/or policy; any connections or communications between a server linked to the Trump Organization; Alfa's ties to the Kremlin and Vladimir Putin, on and Alfa server(s) | |
| Marc Tessier-Lavigne | Relevant conduct of Plaintiffs and Alfa; Plaintiffs' donations to charitable organizations and foundations | President, Stanford University Lasuen Mall Building 10, Stanford, CA 94305 |
| Representative of Trident Group, LLC | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112 | 1901 N. Fort Myer Driver, Arlington VA 22209 |
| Pranav L. Trivedi | Plaintiffs' communications, positions, and statements concerning U.S. politics; U.S. non-profits and foundations; the presidential election; the Trump Organization; communications with the Russian government | Skadden Arps 40 Bank St, Canary Wharf, London E14 5DS, UK |
| Representative of Trump Organization | Plaintiffs' communications, positions, and statements concerning U.S. politics; U.S. non-profits and foundations; the presidential election; the Trump | 725 Fifth Avenue New York, NY 10022 |

| | Organization; communications with the Russian government | |
|---|---|---|
| Representative of 2016 Trump Presidential Campaign | Plaintiffs' communications, positions, and statements concerning U.S. politics; U.S. non-profits and foundations; the presidential election; the Trump Organization; communications with the Russian government | |
| Unknown PR representatives of Plaintiffs | Public relations activities of Plaintiffs; Plaintiffs' prominent roles in the business world; Plaintiffs' interactions with the media | |
| Representative of U.S.-Russia Business Council | Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Plaintiffs' communications, positions, and statements concerning U.S. politics; U.S. non-profits and foundations | 1101 17th Street, NW Suite 600 Washington DC 20036 |
| Anton Vaino | Events related to topics in CIR 112; Russian interference in and/or influence on U.S policy; Plaintiffs' investments in the United States; Russian interference in and/or influence on U.S. politics; Russian interference in U.S. elections; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf | |
| Corporate representative of the Wall Street Journal | Defendants' research and knowledge of Alfa and Plaintiffs | |
| Celeste Wallander | Relevant conduct of Plaintiffs, Alfa; Government's receipt, delivery, and knowledge of CIR 112; Government investigations into Russian interference in U.S. politics, elections, and policy; Russian interference in U.S. elections; | |

| | | |
|---|---|---|
| | Russian interference in and/or influence on U.S policy; Russian interference in and/or influence on U.S. politics | |
| Matthias Warnig | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112; Plaintiffs' relationships with the Kremlin/Putin | |
| Andrew Weissman | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112 | |
| Eric J. Wendel | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112 | Kirkland & Ellis LLP, 601 Lexington Avenue New York, NY 10022 |
| Jonathan Winer | Delivery and receipt of CIR 112; privileged publication | |
| Andrej Wolf | Delivery and receipt of CIR 112; privileged publication | Kirkland & Ellis LLP, 30 St Mary Axe, London, EC3A 8AF, United Kingdom |
| Curtis Wolfe | Plaintiffs' investments in the U.S.; Plaintiffs' roles in the business world; Plaintiffs' control of Alfa | Shutts & Bowen LLP, 200 S Biscayne Blvd Ste 4100 Miami, FL 33131-2362 |
| Sir Andrew Wood | Receipt and delivery of CIR 112 | |
| Bob Wood | Plaintiffs' lobbying efforts in the U.S. and abroad; Plaintiffs' interactions with the media; Plaintiffs' public relations activities in the United States; Plaintiffs' and Alfa's roles in the business world | BGR Group, 601 13th St NW, Washington, DC 20005 |
| Representative of Yale University's President's Council on International Activities | Relevant conduct of Petr Aven; Aven's communications, positions, and statements concerning U.S. politics; U.S. non-profits and foundations; the presidential election; the Trump Organization; Aven's wealth and notoriety; Aven's donations to charitable organizations and foundations; Plaintiffs' public relations activities in the United States | Office of the President Yale University 3 Prospect Street, New Haven, CT 06511 |

| Rabbi Hirschy Zarchi | Plaintiffs contacts with Chabad House; Plaintiffs' donations to charitable organizations and foundations | Chabad House at Harvard 38 Banks Street Cambridge, Massachusetts 02138 |
| --- | --- | --- |
| Ilya Zaslavsky | Plaintiffs' roles in the business world; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Alfa, including entities affiliated with Alfa; Alfa's ties to the Kremlin and Vladimir Putin; Alfa's investments in U.S. companies; research related to matters in CIR 112 | |
| Mike Zoi | Plaintiffs' investments in the U.S.; Plaintiffs' roles in the business world; Plaintiffs' control of Alfa | 3363 NE 163rd Street, Suite 705, North Miami Beach, FL 33160 |
| Debra L. Zumwalt | Relevant conduct of Plaintiffs and Alfa; Plaintiffs' donations to charitable organizations and foundations | Vice President and General Counsel Building 170, Main Quad, Stanford, CA 94305 |
| Alex Van der Zwaan | Relevant conduct of German Khan; German Khan's role in the business world; German Khan's relationship with Skadden Arps. | Flat 1, 16 St. Stephens Gardens, London W2 5QX |

## 2. **Description of Documents**

The following list sets forth the documents in Defendants' possession, custody, or control that Defendants may use to support their defenses and/or counterclaim:

a. Electronically stored documents and e-mail messages on Fusion GPS's system

b. Personal records of Glenn Simpson

## 3. **Computation of Damages**

Defendants deny liability for damages. As damages for their counterclaim, Defendants seek their litigation costs including reasonable attorney's fees pursuant to D.C. Code § 16-5504.

4. **Insurance**

None.

Dated:   May 18, 2020

          */s/* Joshua A. Levy

Joshua A. Levy (D.C. Bar No. 475108)
Rachel M. Clattenburg (D.C. Bar No. 1018164)
**LEVY FIRESTONE MUSE LLP**
1401 K St. NW, Suite 600
Washington, DC 20005
Tel: (202) 845-3215
Fax: (202) 595-8253
jal@cunninghamlevy.com
rmc@cunninghamlevy.com

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 18, 2020, the foregoing Revised Rule 26(a)(1) initial disclosures were e-mailed to counsel of record.


_/s/_ Joshua A. Levy_____
Joshua A. Levy

# EXHIBIT D



# Office of the Inspector General
## U.S. Department of Justice

**OVERSIGHT ★ INTEGRITY ★ GUIDANCE**



# Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation

Oversight and Review Division 20-012      December 2019 (Revised)

the FBI in November and December 2016 by a journalist, Senator John McCain, and Ohr. When we asked Steele why he failed to provide all of his then-existing reports to the FBI, he could not provide us with an explanation and said that he should have given them to the FBI at the time.

### E. Steele Discusses His Reporting with Third Parties in Late September 2016 and the *Yahoo News* Article

During late September 2016, with Fusion GPS's authorization, Steele met with numerous persons outside the FBI to discuss the intelligence he had obtained, as part of his paid work for Fusion GPS, concerning Russian interference with the 2016 U.S. elections and allegations regarding the Trump campaign and candidate Trump.[232] For example, as we discuss in Chapter Nine, emails exchanged between Steele and Ohr show that Steele visited Washington, D.C., beginning around September 21, 2016, and met with Ohr on September 23, at which time the two discussed multiple issues involving election related intelligence that Steele had collected. Steele told us that during this visit he also met with an attorney from Perkins Coie, who was general counsel to the Clinton campaign.[233]

Steele also met with journalists during his September trip to Washington, D.C. According to a filing that Steele made in 2017 in foreign litigation, at Fusion GPS's instruction, he briefed reporters from *The New York Times, The Washington*

---

> information against Trump given how cooperative his team had been over several years of late);
>
> - Report 105 (during a secret meeting between Putin and ex-Ukrainian President Yanukovych, Yanukovych confided to Putin that he did authorize and order substantial kick-back payments to Manafort but reassured Putin that no documentary trail was left behind; Putin and Russian leadership were skeptical of the ex-President's assurances that there were no traces of the payments; Manafort's departure from the Trump campaign was attributable to Ukrainian corruption revelations as well as infighting with campaign advisors);
>
> - Report 112 (the leading figures of the Alpha group of businesses led by three Russian oligarchs are on very good terms with Putin; Alpha held compromising information on Putin and his corrupt business activities from the 1990s); and
>
> - Report 113 (sources based in St. Petersburg reported that Trump has paid bribes and engaged in sexual activities in St. Petersburg, including participating in sex parties, but that witnesses had been "silenced," *i.e.*, bribed or coerced to disappear).

[232] This was not the first time that information included in Steele's reports concerning the Trump campaign was known to individuals outside the FBI. For example, Handling Agent 1 emailed an FBI supervisor on July 28, 2016, explaining that Steele had advised him that information from Reports 80 and 94 "may already be circulating at a 'high level' in Washington, D.C." Two days earlier, according to a text between Carter Page and a *Wall Street Journal* reporter (that Page has since made public), the reporter contacted Page inquiring whether Page had met with Sechin and Divyekin. The FBI also received correspondence from Members of Congress in August 2016 that described information included in the Steele reports. Additionally, then Assistant Secretary of State for European and Eurasian Affairs Victoria Nuland publicly stated during an interview in 2018 that Steele's election reporting was first provided to the State Department in July 2016.

[233] Steele told us that he had a second meeting with this attorney in October 2016, and that he had met with another attorney from Perkins Coie in July 2016.

*Post, Yahoo News, The New Yorker*, and CNN. The filing states that the briefings were verbal, occurred at the end of September, and "involved the disclosure of limited intelligence regarding indications of Russian interference with the U.S. election process and the possible coordination of members of Trump's campaign team and Russian government officials."

Steele told us that the press briefings were taskings from his client, Fusion GPS, that his firm had to honor, and Simpson has testified that Simpson attended the briefings.[234]  Steele said that they were "off-the-record" and, while he made mention of the reports, Steele did not distribute them to the journalists.  Steele explained that he discussed "general themes" from his reporting that lacked sufficient specificity to identify his sources, and that he avoided answering questions about whether he had reported his findings to authorities.[235]

We asked Steele whether he believed his participation in the press briefings was contrary to any admonishments that he had received previously from Handling Agent 1.  He said that he did not recall the FBI telling him he could not talk to journalists about work that he performed on behalf of his firm's clients.  According to Steele, the election reporting was a "Pipeline 1" assignment and therefore the FBI did not have a role in setting terms for his interactions with third parties, such as news organizations.  He said that if the FBI had tried to interfere in his assignment for Fusion GPS, he would have objected and that such an attempt would have been a "showstopper."  Steele stated that Orbis' client for the election reporting was Fusion GPS, which controlled and directed the terms for interactions with third parties.

Handling Agent 1 told us that he understood why Steele would believe in September 2016 that he did not have an obligation to discuss his press contacts with him given that:  (1) Steele's work resulted from a private client engagement; and (2) Handling Agent 1 told Steele on July 5 that he was not collecting his election reporting on behalf of the FBI.  However, Handling Agent 1's view was that while it was obvious that Fusion GPS would want to publicize Steele's election information, it was not apparent that Steele would be conducting press briefings and otherwise interjecting himself into the media spotlight.  Handling Agent 1 told us that he would have recommended that Steele be closed in September 2016 if he had known about the attention that Steele was attracting to himself.  According to Handling Agent 1, Steele should have had the foresight to recognize this fact and the professionalism to afford Handling Agent 1 an opportunity to assess the situation.  However, we are unaware of any FBI admonishments that Steele violated by speaking to third parties, including the press, about work that he had

---

[234] *Simpson Senate Testimony,* at 207.

[235] According to a book co-authored by a *Yahoo News* reporter who was present for a Steele September 2016 press briefing, Steele told him at the meeting that he had provided his election reporting to the FBI and that there were "people in the [FBI] taking this very seriously."  *See Russian Roulette:  The Inside Story of Putin's War on America and the Election of Donald Trump* (New York: Grand Central Publishing, 2018), 226.

Trump and was an "open secret" in Putin's government; (2) sex videos existed of Trump; and (3) the FSB funneled payments to Trump through an Azerbaijani family.  According to Steele's notation to the report, Steele did not have a way to verify the source(s) or the information but noted that, even though the reporting originated from a different source network, some of it was "remarkably similar" to Steele's reporting, especially with regard to the alleged 2013 Ritz Carlton incident involving Trump and prostitutes, Trump's compromise by the FSB, and the Kremlin's funding of the Trump campaign by way of the Azerbaijani family.  The Supervisory Intel Analyst characterized the report as "yet another report that would need to be evaluated."

In addition to continuing to provide reporting to the FBI, Steele also was, unbeknownst to the FBI at the time, continuing his outreach to the media concerning alleged contacts between the Trump campaign and the Russian government.  According to information from the foreign litigation noted above, Steele returned to Washington, D.C., in mid-October and provided additional briefings to *The New York Times*, *The Washington Post*, and *Yahoo News*.  We asked Steele why he did not advise the FBI of his engagements with the media.  He stated that he did not alert the FBI because the media briefings were part of his contract with Fusion GPS and were set up and attended by Simpson.  As noted above, Steele did not believe that the FBI had raised the issue of media contacts with him at the early October meeting, and his contemporaneous notes from that meeting do not mention the issue.

Further, Steele met on October 11 at the State Department with Winer and Deputy Assistant Secretary Kathleen Kavalec, who was a deputy to then Assistant Secretary Victoria Nuland.  Steele told us that Winer had originally contacted him to request that he meet with Nuland, who ultimately did not attend.[255]  Notes of the meeting taken by State Department staff reflect that Steele addressed a wide array of topics during the meeting, including:

- Derogatory information on Trump;
- Manafort's role as a "go-between" with the campaign and Kremlin;
- The role of Alfa Bank, one of Russia's largest privately owned banks, as a conduit for secret communications between Manafort and the Kremlin;
- Manafort's debts to the Russians;
- Carter Page's meeting with Sechin;
- The Russian Embassy's management of a network of Russian émigrés in the United States who carry out hacking and recruiting operations; and

---

[255] Steele told us that he was delayed from the airport and arrived late for the meeting, by which time Nuland had departed.

FBI liaison told us that he received no directives from the Crossfire Hurricane team to gather information from Kavalec regarding her contact with Steele.

In anticipation of an FBI interview, Kavalec said she prepared a typewritten summary of the meeting within 1 to 2 weeks after talking with the liaison. The typed summary began by noting that Steele said at the meeting that he had undertaken the investigation "at the behest of an institution he declined to identify that had been hacked." The summary also noted that Steele told the attendees that the "institution…is keen to see this information come to light prior to November 8." However, the FBI did not interview Kavalec nor did they seek her notes.

Two days after the meeting with Steele, Kavalec emailed an FBI CD Section Chief a document that Kavalec received from Winer discussing allegations about a linkage between Alfa Bank and the Trump campaign, a topic that was discussed at the October 11 meeting.[259] Kavalec advised the FBI Section Chief in the email that the information related to an investigation that Steele's firm had been conducting. The Section Chief forwarded the document to SSA 1 the same day.

We asked Steele why he did not inform the FBI of the meeting at the State Department and why he did not abide by the FBI's request for exclusivity. He said he did not think it was appropriate to turn down a meeting request from an Assistant Secretary of State, which he said he received on short notice. He also stated that, at the time he received the meeting request, the meeting agenda was unclear, and he was uncertain what topics he would be asked to discuss. He said it was his understanding that the FBI did not object to his discussing general themes with other agencies as opposed to "details" about his intelligence and source network.

Handling Agent 1 told us that he believed Steele should have alerted him to both his media contacts in September and October and his meeting with State Department staff in October. As noted above, the Crossfire Hurricane team first learned of Steele's October meeting with the State Department from the FBI liaison on November 18, by which date the FBI had already closed Steele as a CHS because of his *Mother Jones* disclosure, which we discuss in Chapter Six. Handling Agent 1 explained that Steele should have recognized the need to provide this notice to the FBI, especially given the discussions that took place with the Crossfire Hurricane team in early October.

_____

[259] Steele separately wrote in Report 112, dated September 14, 2016, that Alfa Bank allegedly had close ties to Putin. The Crossfire Hurricane team received Report 112 on or about November 6, 2016, from a *Mother Jones* journalist through then FBI General Counsel James Baker. Additionally, Ohr advised the FBI on November 21, 2016, according to an FBI FD-302, that Steele had told Ohr that the Alfa Bank server was a link to the Trump campaign and that Person 1's Russia/American organization in the U.S. had used the Alfa Bank server two weeks prior. Steele told us that the information about Alfa Bank was not generated by Orbis. The FBI investigated whether there were cyber links between the Trump Organization and Alfa Bank, but had concluded by early February 2017 that there were no such links. The Supervisory Intel Analyst told us that he factored the Alfa Bank/Trump server allegations into his assessment of Steele's reporting.

Hurricane team: "If the reporting is being made by a primary source, but based on sub-sources, why is it reliable—even though second/third hand?" The OIG did not find a written response to this specific question, and the OI Attorney did not recall a response. However, the OI Attorney told us that the Crossfire Hurricane team eventually briefed him on the sub-source information they learned from Steele after their early October meeting with him (described in Chapter Four). He also received a written summary of this information that the Supervisory Intel Analyst prepared shortly after the October meeting. The OI Attorney told us that based on the information the FBI provided, he thought at the time that some of the sub-sources were "definitely" in a position to have had access to the information Steele was reporting.

Ultimately, the initial drafts provided to OI management, the read copy, and the final application submitted to the FISC contained a description of the source network that included the fact that Steele relied upon a Primary Sub-source who used a network of sub-sources, and that neither Steele nor the Primary Sub-source had direct access to the information being reported. The drafts, read copy, and final application also contained a separate footnote on each sub-source with a brief description of his/her position or access to the information he/she was reporting. The Supervisory Intel Analyst assisted the case agent in providing information on the sub-sources and reviewed the footnotes for accuracy. According to the OI Attorney, the application contained more information about the sources than is typically provided to the court in FISA applications. According to Evans, the idea was to present the source network to the court so that the court would have as much information as possible.

## B.    Review and Approval Process

As described in Chapter Two, once an FBI case agent affirms the accuracy of the information in the read copy of an application, an OI Unit Chief or Deputy Unit Chief is usually the final and only approver before a read copy is submitted to the FISC. The Unit Chief or Deputy is also usually the final approver that "signs out" the final application (cert copy) to the FBI for completion of the Woods Procedures and Director's certification before presentation to either the Assistant Attorney General (AAG) of NSD, the DAG, or Attorney General for final signature. The final signatory receives an oral briefing, the cert copy, and a cover memorandum (cert memo) describing each application. In most cases, the start of the oral briefing, or shortly beforehand, is the first time the application is presented to the final signatory. According to NSD, most FISA applications do not get singled out for additional review and, to place that in perspective, there are approximately 1,300 applications submitted to the FISC each year and roughly 25-40 final applications go to the AAG, DAG, or the Attorney General for signature in any given week.

However, in some cases, according to NSD, a FISA application will receive additional review and scrutiny, particularly if it presents a novel or complicated issue or otherwise has been flagged for further review. In this case, as described immediately below, documents and witness testimony reflect that the first Carter Page FISA application underwent a lengthy review and editing process within NSD, the FBI, and ODAG. According to Evans and other witnesses, this application had

and Case Agent 1 told us they did not recall any discussions about changing the FBI's assessment in the FISA application concerning the *Yahoo News* disclosure after learning Steele was responsible for the disclosure to *Mother Jones*. On December 19, 2016, Case Agent 1 interviewed then FBI General Counsel James Baker regarding his interactions with a *Mother Jones* reporter and Baker told Case Agent 1 that the reporter advised Baker that a former intelligence official "was passing information 'around town'" about Trump. Case Agent 1 said that by this time, the team had also heard rumors that Steele's reporting had been "floated around," so it was not clear to them who made the *Yahoo News* disclosure. Further, we were told that, after the FBI closed Steele as a CHS, the team was not going to have further communications with Steele.

## II.    The FBI Receives Additional Steele Reporting Post-Election

Following the November 2016 U.S. elections, several third parties provided the FBI with additional Steele election reporting, which the FBI included in its validation efforts. Baker told the OIG that a *Mother Jones* reporter contacted him and furnished him with nine reports from Steele, four of which Steele had not previously provided to the FBI.[317] As described above, Baker was interviewed by Case Agent 1 and Baker's discussion with the *Mother Jones* reporter was documented in an FBI FD-302 report. According to the FD-302, Baker received a collection of Steele's reports from the *Mother Jones* reporter, which Baker forwarded to Priestap for analysis.[318]

Several weeks later, on December 9, 2016, Senator John McCain provided Comey with a collection of 16 Steele election reports, 5 of which Steele had not given the FBI.[319] McCain had obtained these reports from a staff member at the McCain Institute. The McCain Institute staff member had met with Steele and later acquired the reports from Simpson. Steele told the OIG that a former European Ambassador to Russia who generally was familiar with Steele's election reporting informed Steele that the former Ambassador would be meeting with Senator McCain at a conference in Nova Scotia in November, and asked Steele whether he wanted the former Ambassador to talk with McCain about the election reporting. Steele said he replied that he did, which resulted in the McCain Institute staff member visiting Steele in Europe in late November. According to deposition testimony the McCain Institute staff member provided in foreign litigation, during

---

[317] The nine Steele reports were Reports 80, 94, 95, 97, 105, 111, 112, 134, and 136. The FBI had not previously obtained Reports 97, 105, and 112 from Steele. According to an FBI FD-302, in a conversation later that month, the *Mother Jones* reporter advised Baker that the Steele reports also had been furnished to two Members of Congress, and that Steele was surprised that his reporting had not received more attention in the media.

[318] The *Mother Jones* reporter has stated publicly that he provided Steele reports to Baker. *See* "A New Right-Wing Smear Campaign Targets a Former FBI Official to Distract From Russia Scandal," *Mother Jones*, www.motherjones.com/politics/2019/01/a-new-right-wing-smear-campaign-targets-a-former-fbi-official-to-distract-from-russia-scandal/ (accessed November 22, 2019).

[319] These were Steele Reports 80, 86, 94, 95, 97, 100, 101, 102, 105, 111, 112, 113, 130, 134, 135, and 136. FBI records show that the FBI had not previously received Reports 86, 97, 105, 112 and 113 from Steele.

allegations, and that it would not be appropriate to characterize all of the factual information in the Steele election reporting as "uncorroborated."[333]

Lastly, the validation report included a recommendation that   Source reporting must accurately describe the reliability of the information or its origin.

### C.    The FBI Identifies and Interviews the Primary Sub-Source in Early 2017

An important aspect of the FBI's assessment of Steele's election reporting involved evaluating Steele's source network, especially whether the sub-sources had access to reliable information.  As noted in the first FISA application, Steele relied on a primary sub-source (Primary Sub-source) for information, and this Primary Sub-source used a network of sub-sources to gather the information that was relayed to Steele; Steele himself was not the originating source of any of the factual information in his reporting.[334]  The FBI employed multiple methods in an effort to ascertain the identities of the sub-sources within the network, including meeting with Steele in October 2016 (prior to him being closed for cause) and conducting various investigative inquiries.  For example, the FBI determined it was plausible that at least some of the sub-sources had access to intelligence pertinent to events described in Steele's election reporting.  Additionally, the FBI's evaluation of Steele's sub-sources generated some corroboration for the election reporting (primarily routine facts about dates, locations, and occupational positions that was mostly public source information).  Further, by January 2017 the FBI was able to identify and arrange a meeting with the Primary Sub-source.[335]

The FBI conducted interviews of the Primary Sub-source in January, March, and May 2017 that raised significant questions about the reliability of the Steele election reporting.  In particular, the FBI's interview with Steele's Primary Sub-source in January 2017, shortly after the FBI filed the Carter Page FISA Renewal

---

[333]  We discuss the FBI's conclusions about the reporting in Section V of this chapter.

[334]  When interviewed by the FBI, the Primary Sub-source stated that

The Primary Sub-source was

[335]  Steele did not disclose the identity of the Primary Sub-source to the FBI.

Application No. 1 and months prior to Renewal Application No. 2, raised doubts about the reliability of Steele's descriptions of information in his election reports. During the FBI's January interview, at which Case Agent 1, the Supervisory Intel Analyst, and representatives of NSD were present, the Primary Sub-source told the FBI that he/she had not seen Steele's reports until they became public that month, and that he/she made statements indicating that Steele misstated or exaggerated the Primary Sub-source's statements in multiple sections of the reporting.[336]  For example, the Primary Sub-source told the FBI that, while Report 80 stated that Trump's alleged sexual activities at the Ritz Carlton hotel in Moscow had been "confirmed" by a senior, western staff member at the hotel, the Primary Sub-source explained that he/she reported to Steele that Trump's alleged unorthodox sexual activity at the Ritz Carlton hotel was "rumor and speculation" and that he/she had not been able to confirm the story.  A second example provided by the Primary Sub-source was Report 134's description of a meeting allegedly held between Carter Page and Igor Sechin, the President of Rosneft, a Russian energy conglomerate.[337]  Report 134 stated that, according to a "close associate" of Sechin, Sechin offered "PAGE/TRUMP's associates the brokerage of up to a 19 percent (privatized) stake in Rosneft" in return for the lifting of sanctions against the company.[338]  The Primary Sub-source told the FBI that one of his/her sub-sources furnished information for that part of Report 134 through a text message, but said that the sub-source never stated that Sechin had offered a brokerage interest to Page.[339]  We reviewed the texts and did not find any discussion of a bribe, whether as an interest in Rosneft itself or a "brokerage."[340]

---

[336]  David Laufman, then Chief of NSD's Counterintelligence and Export Control Section (CES), covered the first portion of the January interview and his Deputy Section Chief covered the remaining portions of the January interview.  Laufman told us that he negotiated with the Primary Sub-source's counsel to facilitate the FBI's interview and sought to "build a cooperative relationship that could…result in the Bureau's being in a position to assess the validity of information in the [Steele election reporting] resulting from [the Primary Sub-source's] activities or the collection of [his/her] sub-subsources.  So I saw my role as a broker to get that relationship consolidated."  Laufman said that the portion of the interview he attended established the line of communication with the Primary Sub-source and, as he recalled, generally covered the facts in a "superficial" way.  He said that after the completion of the interview, he never saw the FBI's written summary of the interview.

[337]  According to the Supervisory Intel Analyst, the FBI was not able to prove or disprove Page's meeting with Sechin.  The Analyst explained that Page did meet with a Rosneft official—Andrey Baranov, during his July 2016 trip to Moscow and that Page told the FBI that Baranov might have mentioned the possible sale of a stake in Rosneft.  The Analyst stated that Report 134's mention of Sechin could be a "garble" for Baranov.

[338]  Report 134 contained differing information on the alleged bribe offered by Sechin to Page.  The Report first stated that Sechin offered Page a "large stake in Rosneft in return for lifting sanctions on Russia."  Later, the same report stated that Sechin had offered Page a much smaller sum of money, "the brokerage of up to a 19 per cent (privatized) stake in Rosneft."

[339]  The Primary Sub-source also told the FBI at these interviews that the sub-source who provided the information about the Carter Page-Sechin meeting ███████████████████████████████ ████████████████████████████████████████████████████████████████████████ .

[340]  According to a press report prior to the date of Report 134, a 19-percent stake in Rosneft could have sold for more than $10 billion.  *See* https://www.cnbc.com/2016/06/08/russias-oil-giant-

The Primary Sub-source was questioned again by the FBI beginning in March 2017 about the election reporting and his/her communications with Steele. The Washington Field Office agent (WFO Agent 1) who conducted that interview and others after it told the OIG that the Primary Sub-source felt that the tenor of Steele's reports was far more "conclusive" than was justified. The Primary Sub-source also stated that he/she never expected Steele to put the Primary Sub-source's statements in reports or present them as facts. According to WFO Agent 1, the Primary Sub-source said he/she made it clear to Steele that he/she had no proof to support the statements from his/her sub-sources and that "it was just talk." WFO Agent 1 said that the Primary Sub-source explained that his/her information came from "word of mouth and hearsay;" "conversation that [he/she] had with friends over beers;" and that some of the information, such as allegations about Trump's sexual activities, were statements he/she heard made in "jest."[341] The Primary Sub-source also told WFO Agent 1 that he/she believed that the other sub-sources exaggerated their access to information and the relevance of that information to his/her requests. The Primary Sub-source told WFO Agent 1 that he/she "takes what [sub-sources] tell [him/her] with 'a grain of salt.'"

In addition, the FBI interviews with the Primary Sub-source revealed that Steele did not have good insight into how many degrees of separation existed between the Primary Sub-source's sub-sources and the persons quoted in the reporting, and that it could have been multiple layers of hearsay upon hearsay. For example, the Primary Sub-source stated to WFO Agent 1 that, in contrast to the impression left from the election reports, his/her sub-sources did not have direct access to the persons they were reporting on. Instead, the Primary Sub-source told WFO Agent 1 that their information was "from someone else who may have had access."

The Primary Sub-source also informed WFO Agent 1 that Steele tasked him/her after the 2016 U.S. elections to find corroboration for the election reporting and that the Primary Sub-source could find none. According to WFO Agent 1, during an interview in May 2017, the Primary Sub-source said the corroboration was "zero." The Primary Sub-source had reported the same conclusion to the Crossfire Hurricane team members who interviewed him/her in January 2017.

Following the January interview with the Primary Sub-source, on February 15, 2017, Strzok forwarded by email to Priestap and others a news article referencing the Steele election reporting; Strzok commented that "recent interviews and investigation, however, reveal [Steele] may not be in a position to judge the reliability of his sub-source network." According to the Supervisory Intel Analyst, the cause for the discrepancies between the election reporting and explanations

---

just-saw-its-profits-drop-75.html (accessed Dec. 8, 2019). We discuss below the issue of Steele or the sub-sources presenting their analyses as statements of Kremlin officials or others.

[341] According to WFO Agent 1, the Primary Sub-source told him that he/she spoke with at least one staff member at the Ritz Carlton hotel in Moscow who said that there were stories concerning Trump's alleged sexual activities, not that the activities themselves had been confirmed by the staff member as stated in Report 80.

In addition to the lack of corroboration, we found that the FBI's interviews of Steele, the Primary Sub-source, and a second sub-source, and other investigative activity, revealed potentially serious problems with Steele's description of information in his election reports. For example, as noted above, the Primary Sub-source's accounting of events during his/her January 2017 interview with the FBI (after the filing of the first FISA application and Renewal Application No. 1, but before the filing of Renewal Application No. 2) was not consistent with and, in fact, contradicted the allegations in Reports 95 and 102 attributed to Person 1, as well as those in Report 94 concerning the meeting between Page and Sechin. In addition, another sub-source told the FBI in August 2017 (after the filing of Renewal Application No. 3) that information in Steele's election reporting attributable to him/her had been "exaggerated." Because the sub-sources themselves could have furnished exaggerated or false information to Steele, as well as to the FBI during their interviews, the cause of these inconsistencies remains unknown. According to the Supervisory Intel Analyst, the FBI ultimately determined that some of the allegations contained in Steele's election reporting were inaccurate, such as the allegation that Manafort used Page as an intermediary (Report 95) and that Michael Cohen had travelled to Prague for meetings with representatives of the Kremlin (Reports 134, 135, 136, and 166). Although the Supervisory Intel Analyst also stated that some of the broader themes in Steele's election reporting were consistent with USIC assessments, such as Russia's desire to sow discord in the Western Alliance, he further told us that, as of September 2017, the FBI had corroborated limited information in the Steele election reporting, and much of that information was publicly available.[507]

As we described earlier in our analysis, the FBI failed to notify OI, which was working on the Carter Page FISA applications, of the potentially serious problems identified with Steele's election reporting that arose as early as January 2017 through the efforts described above. As previously stated, we believe it was the obligation of the agents who were aware of this information to ensure that OI and the decision makers had the opportunity to consider it, both for their own assessment of probable cause and for consideration of whether to include the information in the applications so that the FISC received a complete and accurate recitation of the relevant facts. Moreover, even as the FBI developed this

---

[507] As discussed in detail in Chapter Six, FBI leadership, including Comey and McCabe, advocated for the Steele election reporting to be included in the Intelligence Community Assessment (ICA) on Russian election interference that was being prepared in December 2016. For example, in a December 17 telephone call with the Director of National Intelligence (DNI), Comey stated that the FBI was "proceeding cautiously to understand and attempt to verify the reporting as best we can, but we thought it important to bring it forward to the IC effort." However, according to the Intel Section Chief and Supervisory Intel Analyst, as the interagency editing process for the ICA progressed, the CIA expressed concern about using the Steele election reporting in the body of the ICA, and recommended that it be moved to an appendix. In a December 28, 2016 email to the Office of the Director of National Intelligence (ODNI) Principal Deputy Director, McCabe objected to this recommendation, stating, "We oppose CIA's current plan to include [the election reporting] as an appendix." However, the FBI Intel Section Chief told us that the CIA viewed the Steele reporting as "internet rumor." The FBI's view did not prevail, and the final ICA report included a short summary of the Steele election reporting in an appendix.

# EXHIBIT E

7/20/2020          Judiciary Committee Releases Declassified Documents that Substantially Undercut Steele Dossier, Page FISA Warrants | United States …

Case 1:17-cv-02041-RJL Document 90-2 Filed 08/04/20 Page 95 of 191

JULY 17, 2020

# Judiciary Committee Releases Declassified Documents that Substantially Undercut Steele Dossier, Page FISA Warrants

**WASHINGTON** – Today, as part of the Senate Judiciary Committee's ongoing investigation into the Crossfire Hurricane investigation and related FISA abuses, Chairman Lindsey Graham (R- South Carolina) released two recently declassified documents that significantly undercut the reliability of the Steele dossier and the accuracy and reliability of many of the factual assertions in the Carter Page FISA applications.

**"I'm very pleased the investigation in the Senate Judiciary Committee has been able to secure the declassification of these important documents,"** said Chairman Graham. **"I want to thank Attorney General Barr for releasing these documents and allowing the American People to judge for themselves.**

**"What have we learned from the release of these two documents by the Department of Justice? Number one, it is clear to me that the memo regarding the FBI interview of the primary sub-source in January 2017 should have required the system to stop and reevaluate the case against Mr. Page.**

**"Most importantly after this interview of the sub-source and the subsequent memo detailing the contents of the interview, it was a miscarriage of justice for the FBI and the Department of Justice to continue to seek a FISA warrant against Carter Page in April and June of 2017.**

**"The dossier was a critical document to justify a FISA warrant against Mr. Page and this DOJ memo clearly indicates that the reliability of the dossier was completely destroyed after the interview with the primary sub-source in January 2017. Those who knew or should have known of this development and continued to pursue a FISA warrant against Mr. Page anyway are in deep legal jeopardy in my view.**

**"Secondly, the comments of Peter Strzok regarding the February 14 New York Times article are devastating in that they are an admission that there was no reliable evidence that anyone from the Trump Campaign was working with Russian Intelligence Agencies in any form.**

**"The statements by Mr. Strzok question the entire premise of the FBI's investigation of the Trump Campaign and make it even more outrageous that the Mueller team continued this investigation for almost two and a half years. Moreover, the statements by Strzok raise troubling questions as to whether the FBI was impermissibly unmasking and analyzing intelligence gathered on U.S. persons.**

**"These documents, which I have long sought, tell a damning story for anyone who's interested in trying to find the truth behind the corrupt nature of the FBI's investigation into the Trump campaign in 2016 and beyond."**

The first document is a 57-page summary of a three-day interview the FBI conducted with Christopher Steele's so-called "Primary Sub-source" in January of 2017. [Document 1]

- This document not only demonstrates how unsubstantiated and unreliable the Steele dossier was, it shows that the FBI was on notice of the dossier's credibility problems and sought two more FISA application renewals after gaining this awareness.

- The document reveals that the primary "source" of Steele's election reporting was not some well-connected current or former Russian official, but a non-

Russian based contract employee of Christopher Steele's firm. Moreover, it demonstrates that the information that Steele's primary source provided him was second and third-hand information and rumor at best.

- Critically, the document shows that Steele's "Primary Sub-source" disagreed with and was surprised by how information he gave Steele was then conveyed by Steele in the Steele dossier. For instance, the "Primary Sub-source": did not recall or did not know where some of the information attributed to him or his sources came from; was never told about or never mentioned to Steele certain information attributed to him or his sources; he said that Steele re-characterized some of the information to make it more substantiated and less attenuated than it really was; that he would have described his sources differently; and, that Steele implied direct access to information where the access to information was indirect.

- In total, this document demonstrates that information from the Steele dossier, which "played a central and essential role" in the FISA warrants on Carter Page, should never have been presented to the FISA court.

The second document contains Peter Strzok's type-written comments disagreeing with assertions made in a *New York Times* article about alleged Russian intelligence ties to the Trump campaign. [Document 2]

- The document demonstrates that Peter Strzok and others in FBI leadership positions must have been aware of the issues with the Steele dossier that the FBI's interview with Steele's "Primary Sub-source" revealed, because Strzok commented that "[r]ecent interviews and investigation, however, reveal Steele may not be in a position to judge the reliability of his sub-source network."

- The document further shows that the FBI's assertion to the FISA court that "the FBI believes that Russia's efforts to influence U.S. policy were likely being coordinated between the RIS [Russian Intelligence Services] and Page, and possibly others" appears to be a misrepresentation. This is because, in his comments on the *Times* article, Strzok asserts that "[w]e have not seen evidence of any individuals affiliated with the Trump team in contact with IOs [Intelligence Officials]. . . . We are unaware of ANY Trump advisors engaging in conversations with Russian intelligence officials."

- The document also indicates that the FBI may have been using foreign intelligence gathering techniques to impermissibly unmask and analyze existing and future intelligence collection regarding U.S. persons associated with the

Trump campaign: "Both the CIA and NSA are aware of our subjects and throughout the summer we provided them names and selectors for queries of their holdings as well as prospective collection." The quote does not provide enough information to fully understand exactly what the FBI was doing but impermissible unmasking and analysis of existing and future incidental intelligence collection of U.S. persons would be troubling.

- The document also raises questions as to whether the FBI was properly using intelligence techniques and databases "throughout the summer" considering that the earliest formal investigation of a U.S. person associated with the Trump campaign was not officially opened until July 31, 2016.

These declassified documents and other related material may be accessed at the following link: judiciary.senate.gov/fisa-investigation.

# EXHIBIT F

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MIKHAIL FRIDMAN, PETR AVEN, and GERMAN KHAN, <br><br>           Plaintiffs, <br><br>     v. <br><br> BEAN LLC a/k/a FUSION GPS, and GLENN SIMPSON, <br><br>           Defendants. | Civil Case No. 1:17-cv-2041-RJL |

**DEFENDANTS' REVISED ANSWERS TO PLAINTIFFS' FIRST SET OF
INTERROGATORIES AND ANSWERS TO PLAINTIFFS' SECOND SET OF
INTERROGATORIES**

Defendants Bean LLC a/k/a Fusion GPS and Glenn Simpson hereby revise their response

to Plaintiffs' first set of interrogatories, and answer Plaintiffs' second set of interrogatories, as set

forth below.

(a) The information in these Answers is not based solely on the knowledge of the executing

party, but includes the knowledge of the executing party's agents, representatives and attorneys

unless privileged.

(b) The word usage and sentence structure are those of the attorney and do not purport to

be the exact language of the executing party.

(c) The disclosure of any documents or information does not constitute an admission by

Defendants that such documents or information are relevant to the Action or admissible in

evidence.

1

<u>ANSWERS</u>

**1.      Other than litigation counsel of record in this Action, identify the individuals who provided the answers to these Interrogatories or contributed information used in answering these Interrogatories. If more than one person provided the answers or information, identify each individual person, state whether he or she answered or contributed information used in answering specific Interrogatories—identify those Interrogatories, and explain specifically what information was contributed by each person to each answer.**

ANSWER: The following individuals contributed information to these Answers: Glenn Simpson, Peter Fritsch, Jake Berkowitz, and Laura Seago.

**2.      With regard to the individuals you identified in Part 1 of your Initial Disclosures, dated September 25, 2019, describe the specific subjects on which such individuals are likely to have information relevant to the subject matter of this Action.**

ANSWER: Objection. Defendants object because this Interrogatory is vague, overly broad, and not proportional to the needs of the case, because it seeks information that is not relevant to any party's claim or defense in this action. Rule 26(b)(1) limits the scope of discovery to matters that are "relevant to any party's claim or defense and proportional to the needs of the case," whereas this Interrogatory seeks information "relevant to the subject matter of this Action," which is broader than the scope permitted by Rule 26(b)(1). Defendants object to the term "you." Plaintiffs' definition of "you" includes "persons or entities acting . . . in concert with" the Defendants, but information in the possession, custody, or control of persons or entities acting "in concert with" the Defendants is not in Defendants' possession, custody, or control and the Defendants therefore cannot provide that information. Defendants also object because this Interrogatory calls for a response that is more suitable to a deposition. Additionally, Defendants are not aware of all subjects on which these individuals are likely to have information.

With respect to the non-objectionable portion of the Interrogatory, Defendants, based on what they know today, identify the following specific subjects on which the individuals identified in Part 1 of their amended initial disclosures, dated May 18, 2020, are likely to have information that is relevant to any party's claim or defense:

| Name | Subject Matter |
|---|---|
| Glenn Simpson | Full knowledge of dispute |
| Peter Fritsch | Full knowledge of dispute |
| Jake Berkowitz | Full knowledge of dispute |
| Jason Felch | Full knowledge of dispute |
| Petr Aven | Full knowledge of dispute |

| Mikhail Fridman | Full knowledge of dispute |
|---|---|
| German Khan | Full knowledge of dispute |
| Corporate representative of Alfa Group | All entities affiliated with Alfa; Alfa's ties to the Kremlin and Vladimir Putin; Alfa's investments in U.S. companies; Plaintiffs' access to Alfa public relations staff; events related to topics in CIR 112; any connections or communications between a server linked to the Trump Organization and Alfa server(s) |
| Alfa Fellowship Program corporate representative | Relevant conduct of Plaintiffs; Plaintiffs' communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations, the presidential election, the Trump Organization; Plaintiffs' wealth and notoriety; Plaintiffs' interactions with the media; Plaintiffs' roles in the business world; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' public relations activities in the United States |
| Representative of Amsterdam Trade Bank | Plaintiffs' roles in the business world; Plaintiffs' access to public relations staff; Plaintiffs' communications and statements regarding relationships with the Kremlin/Putin; Plaintiffs' wealth and notoriety |
| Corporate representative of APCO | Relevant conduct of Plaintiffs; Plaintiffs' roles in the business world; Plaintiffs' control of Alfa; Plaintiffs' access to public relations staff; Plaintiffs' relationships with the Kremlin/Putin |
| Howard Ash | Plaintiffs' investments in the U.S.; Plaintiffs' roles in the business world; Plaintiffs' control of Alfa |
| Anders Aslund | Relevant conduct of Plaintiffs, including Plaintiffs' investments in the United States; Plaintiffs' communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations, the presidential election, the Trump Organization; Plaintiffs' wealth and notoriety; Plaintiffs' interactions with the media; Plaintiffs' roles in the business world; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' public relations activities in the United States |
| Representative of Atlantic Council | Relevant conduct of Plaintiffs; speeches by Plaintiffs at Atlantic Council events; Plaintiffs' meetings with US officials; contributions by Plaintiffs to Atlantic Council; Plaintiffs as public figures; Plaintiffs' public relations activities in the United States; |

| | |
|---|---|
| | Plaintiffs' lobbying efforts in the United States and abroad; relationship between Plaintiffs and Kremlin/Putin |
| James A. Baker III | Plaintiffs' notoriety; Plaintiffs' communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations; Plaintiffs' roles in the business world; Plaintiffs' public relations activities in the United States |
| James Baker | Relevant conduct of David Corn and Chris Steele; Recipients of CIR 112; Research related to matters in CIR 112; events related to topics in CIR 112; delivery of CIR 112; Russian interference in and/or influence on U.S. policy and/or U.S. politics; Russian interference in and/or influence on U.S. elections; FBI's knowledge of CIR 112; Government investigations into Russian interference in U.S. politics, elections, and policy |
| Mike Baker | Plaintiffs' investments in the United States; Plaintiffs' roles in the business world; Plaintiffs' interactions with the media; Plaintiffs' involvement in Alfa dispute with IPOC; Plaintiffs' public relations activities in the United States |
| Gov. Haley Barbour | Plaintiffs' lobbying efforts in the U.S. and abroad; Plaintiffs' interactions with the media; Plaintiffs' public relations activities in the United States; Plaintiffs' and Alfa's roles in the business world |
| Edward Baumgartner | Relevant conduct of Plaintiffs; Plaintiffs' roles in the business world; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Alfa, including entities affiliated with Alfa; Alfa's ties to the Kremlin and Vladimir Putin; Alfa's investments in U.S. companies; research related to matters in CIR 112 |
| Ken Bensinger | Relevant conduct of Buzzfeed; recipients of CIR 112; delivery of CIR 112 |
| Corporate representative of BGR | Plaintiffs' lobbying efforts in the U.S. and abroad; Plaintiffs' interactions with the media; Plaintiffs' public relations activities in the United States |
| Jeffrey Birnbaum | Plaintiffs' lobbying efforts in the U.S. and abroad; Plaintiffs' interactions with the media; Plaintiffs' public relations activities in the United States |
| Sir Leonard Blavatnik | Plaintiffs' roles in the business world; Plaintiffs' access to public relations staff; Plaintiffs' communications and statements regarding relationships with the Kremlin/Putin; Plaintiffs' wealth and |

4

| | |
|---|---|
| | notoriety; Plaintiffs' investments in the United States; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Plaintiffs' accumulation of wealth |
| Corporate representative for BP | Relevant conduct of Plaintiffs, Alfa; Plaintiffs' roles in the business world; events related to topics in CIR 112; Plaintiffs' notoriety; Plaintiffs' relationships with the Kremlin/Putin |
| Christopher Brose | recipients of CIR 112, delivery of CIR 112 |
| Nicholas Burgess | Plaintiffs' roles in the business world; Plaintiffs' control of Alfa |
| William J. Burns | Plaintiffs' interactions with the Carnegie Endowment for International Peace; Plaintiffs' relationship with the Kremlin/Putin |
| Chris Burrows | Relevant conduct of Orbis and Christopher Steele; Christopher Steele, including his experience, work, process, and engagement by Defendants |
| Richard Burt | Public relations and lobbying efforts of Plaintiffs in the US and abroad; Plaintiffs' visits to the White House and contacts with White House officials; relevant conduct of Plaintiffs; Plaintiffs' investments in the US; Plaintiffs' interactions with the media; Plaintiffs' roles in the business world; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Plaintiffs' wealth and notoriety; Plaintiffs' communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations, the presidential election, the Trump Organization; Plaintiffs' contacts with the Trump Organization, the Trump Campaign, and the Trump Administration; Russian interference in and/or influence on U.S policy and/or in U.S. elections; Alfa's relevant conduct, including all entities affiliated with Alfa, Alfa's ties to the Kremlin and Vladimir Putin, and Alfa's investments in U.S. companies |
| Fred Burton | Relevant conduct of Plaintiffs and Alfa; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf |

| | |
|---|---|
| Groslyn Burton | Plaintiffs' visits to the White House and contacts with White House officials |
| Jean Camp | Relevant conduct of Alfa and the Plaintiffs concerning Alfa servers |
| Corporate representative of Carnegie Endowment for International Peace | Plaintiffs' and Alfa's interactions with Carnegie Endowment for International Peace; Plaintiffs' donations to charitable organizations and foundations |
| Charlie Carr | Relevant conduct of Plaintiffs and Alfa; Plaintiffs' and Alfa's relationship with the Kremlin/Putin; Plaintiffs as public figures |
| Representative of Center for the National Interest | Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Plaintiffs' communications, positions, and statements concerning U.S. politics; U.S. non-profits and foundations; the presidential election; the Trump Organization; Government investigations into Russian interference in U.S. politics, elections, and policy |
| Representative of Chabad House at Harvard | Plaintiffs contacts with Chabad House; Plaintiffs' donations to charitable organizations and foundations |
| Jim Cobery | Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' involvement with the Genesis Prize Foundation |
| James Comey | Relevant conduct of Plaintiffs, Alfa; FBI's knowledge of CIR 112; Government investigations into Russian interference in U.S. politics, elections, and policy; Russian interference in U.S. elections; Russian interference in and/or influence on U.S policy; Russian interference in and/or influence on U.S. politics |
| Council on Foreign Relations | Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' roles in the business world; Plaintiffs' notoriety; Plaintiffs' communications, positions, and statements concerning U.S. politics, US-Russian policy, U.S. non-profits and foundations; Plaintiffs' foreign policy experience |

| | |
|---|---|
| Jonathan Davis | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112 |
| Representative of the U.S. Department of Justice | Relevant conduct of Plaintiffs, Alfa; FBI's knowledge of CIR 112; Government investigations into Russian interference in U.S. politics, elections, and policy; Russian interference in U.S. elections; Russian interference in and/or influence on U.S policy; Russian interference in and/or influence on U.S. politics |
| Dimitry Dikman | Relevant conduct of Plaintiffs; Plaintiffs' creation and involvement in Genesis Philanthropy Group; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' involvement with the Genesis Prize Foundation |
| Jill Dougherty | Relations between Plaintiffs and the media |
| Robert Dudley | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112 |
| David Edwards | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112 |
| Maria Faasen (née Putin) | Relevant conduct of Plaintiffs and Alfa; Plaintiffs' relations with Vladimir Putin and family |
| Representative of the U.S. Federal Bureau of Investigation | Relevant conduct of Plaintiffs, Alfa; FBI's knowledge of CIR 112; Government investigations into Russian interference in U.S. politics, elections, and policy; Russian interference in U.S. elections; Russian interference in and/or influence on U.S policy; Russian interference in and/or influence on U.S. politics |
| Jeffrey W. Ferguson | Plaintiffs' investment in the United States; publication of such investment |
| Oleg Firer | Plaintiffs' investments in the U.S.; Plaintiffs as public figures; Plaintiffs' control of Alfa |
| Michael Froman | Plaintiffs' relationships with the Kremlin/Putin; Plaintiffs' communications, positions, and statements regarding foreign policy; Plaintiffs' public relations and lobbying efforts in the U.S. |

| | and abroad; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf |
|---|---|
| Mark Galeotti | Plaintiffs' relationship with the Kremlin/Putin; relationships between Russian oligarchs and the Kremlin/Putin; influence of Russian oligarchs on the Kremlin/Putin; corruption in Russia; the privatisation of Russia |
| Toby Gati | Relevant conduct of Plaintiffs, including Plaintiffs' investments in the United States; Plaintiffs' communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations; Plaintiffs' wealth and notoriety; Plaintiffs' interactions with the media; Plaintiffs as public figures; Plaintiffs' public relations activities in the United States; relationships between Russian oligarchs and the Kremlin/Putin |
| Gennady Gazin | Relevant conduct of Plaintiffs; Plaintiffs' creation and involvement in Genesis Philanthropy Group; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' involvement with the Genesis Prize Foundation |
| Genesis Philanthropy Group corporate representative | Relevant conduct of Plaintiffs; Plaintiffs' creation and involvement in Genesis Philanthropy Group; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' involvement with the Genesis Prize Foundation |
| Thomas W. Gilligan | Relevant conduct of Plaintiffs and Alfa; Plaintiffs' donations to charitable organizations and foundations |
| Jose Grinda Gonzalez | Investigations into alleged illegal transactions by Mikhail Fridman |
| Oleg Govorun | Relevant conduct of Plaintiffs, Alfa, Putin, Kremlin; events related to topics in CIR 112 |
| David Grenker | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112 |
| Steven Hall | Relationship between Plaintiffs and Kremlin/Putin |
| John Halsted | Relevant conduct of Mikhail Fridman; national security concerns regarding investment by Mikhail Fridman |

| | |
|---|---|
| Andrew Hayes | Public relations activities of Plaintiffs; Plaintiffs as public figures; Plaintiffs' interactions with the media; |
| Fred Hiatt | Plaintiffs' relations with the media; communications with Plaintiffs and their media representatives; knowledge of Plaintiffs' media representatives |
| David Higgins | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112 |
| Representative of Hill+Knowlton Strategies | Public relations activities of Plaintiffs; Plaintiffs as public figures; Plaintiffs' interactions with the media; |
| Daniel Hoffman | Oligarchs and their ties to the Kremlin; relevant conduct of Alfa and Plaintiffs; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf |
| Karl V. Hopkins | Relevant conduct of Plaintiffs; speeches by Plaintiffs at Atlantic Council events; Plaintiffs' meetings with US officials; contributions by Plaintiffs to Atlantic Council; Plaintiffs as public figures; Plaintiffs' public relations activities in the United States; Plaintiffs' lobbying efforts in the United States and abroad; relationship between Plaintiffs and Kremlin/Putin |
| Matthias Horbach | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112; Plaintiffs as public figures |
| Robert Hormats | Meetings with Plaintiffs; communications and their representatives; relationship between Plaintiffs and US government officials |
| Corporate representative of Hudson Sandler | Public relations activities of Plaintiffs; Plaintiffs as public figures; Plaintiffs' interactions with the media; |
| David Ignatius | Plaintiffs' relations with the media; communications with Plaintiffs and their media representatives; knowledge of Plaintiffs' media representatives; relationship between Plaintiffs and Kremlin/Putin |

| Andrey Illiaronov | Relationship between Plaintiffs and Kremlin/Putin; Plaintiffs' public appearances; Plaintiffs' and Alfa's business tactics; Plaintiffs as public figures |
|---|---|
| Carl Jenkins | Plaintiffs' roles in the business world; Plaintiffs' notoriety; Plaintiffs' business tactics; Plaintiffs' dispute with IPOC |
| Ryan Junck | Plaintiffs' relationships with the Kremlin/Putin; Plaintiffs' communications, positions, and statements regarding foreign policy; Plaintiffs' public relations and lobbying efforts in the U.S. and abroad; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf |
| Adrian Karatnycky | Lobbying on behalf of Plaintiffs and Alfa; Plaintiffs' relations with the media and US government officials; access to public relations |
| Kennan Institute Corporate Representative | Plaintiffs' interactions with the media; Plaintiffs' wealth and notoriety; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' investments in the United States; Plaintiffs as public figures; Plaintiffs' public relations activities in the United States; Plaintiffs' lobbying efforts in the United States and abroad |
| Fred Kempe | Relevant conduct of Plaintiffs; speeches by Plaintiffs at Atlantic Council events; Plaintiffs' meetings with US officials; contributions by Plaintiffs to Atlantic Council; Plaintiffs as public figures; Plaintiffs' public relations activities in the United States; Plaintiffs' lobbying efforts in the United States and abroad; relationship between Plaintiffs and Kremlin/Putin |
| Alexa King | Communications between Plaintiffs/Alfa and the Trump Campaign/Trump Organization |
| Corporate representative of Kirkland & Ellis LLP | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112; Plaintiffs as public figures |
| Denis Klimentchenko | Plaintiffs' control of Alfa; TNK-BP transaction; Plaintiffs' transactions and their relationship with the Kremlin/Putin; favors exchanged between Putin and Plaintiffs |

| | |
|---|---|
| Alex Knaster | Relevant conduct of Mikhail Fridman; national security concerns regarding investment by Mikhail Fridman |
| Yuri Koshkin | Relevant conduct of Plaintiffs and Alfa; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf |
| Robert Kraft | Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' involvement with the Genesis Prize Foundation; |
| David Kramer | Delivery and receipt of CIR 112; privileged publication |
| Corporate representative of Kroll | Plaintiffs' roles in the business world; Plaintiffs' notoriety; Plaintiffs' business tactics; Plaintiffs' dispute with IPOC; Defendants' background knowledge of Alfa and the Plaintiffs; Plaintiffs' and Alfa's relationship with the Kremlin/Putin |
| Jeremy M. Kroll | Plaintiffs' roles in the business world; Plaintiffs' notoriety; Plaintiffs' business tactics; Plaintiffs' dispute with IPOC; Defendants' background knowledge of Alfa and the Plaintiffs; Plaintiffs' and Alfa's relationship with the Kremlin/Putin |
| Jules B. Kroll | Plaintiffs' roles in the business world; Plaintiffs' notoriety; Plaintiffs' business tactics; Plaintiffs' dispute with IPOC; Defendants' background knowledge of Alfa and the Plaintiffs; Plaintiffs' and Alfa's relationship with the Kremlin/Putin |
| Simon Kukes | Plaintiffs' roles in the business world; Plaintiffs' notoriety; Plaintiffs' business tactics; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf |
| Josh Kushner | Plaintiffs' investments in the U.S.; Plaintiffs' wealth and notoriety; Plaintiffs' roles in the business world |
| James C. Langdon Jr. | Plaintiffs' roles in the business world; Plaintiffs' control of Alfa; Plaintiffs' business tactics |
| Amb. Ronald Lauder | Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' public relations activities in the United States; Plaintiffs' |

11

| | |
|---|---|
| | lobbying efforts in the United States and abroad; Plaintiffs' interactions with the media |
| Vladimir Lechtman | Relevant conduct of Plaintiffs regarding creation of LetterOne; Plaintiffs' control of Alfa |
| Eric Lichtblau | Receipt and delivery of CIR 112 |
| David Lipton | Relevant conduct of Plaintiffs; Plaintiffs' public relations activities in the United States; Plaintiffs' lobbying efforts in the United States and abroad; Plaintiffs' interactions with the media; Plaintiffs' roles in the business world |
| Mark MacDougall | Plaintiffs' relationship with the Kremlin; Plaintiffs' notoriety; Plaintiffs' conduct regarding the IPOC dispute; Defendants' knowledge of Plaintiffs; Plaintiffs' use of Kroll |
| Maria Mammina | Relevant conduct of Plaintiffs; Plaintiffs' communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations, the presidential election, the Trump Organization; Plaintiffs' wealth and notoriety; Plaintiffs' interactions with the media; Plaintiffs' roles in the business world; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' public relations activities in the United States |
| Kevin Mandia | Any connections or communications between a server linked to the Trump Organization and Alfa server(s) |
| Corporate representative of Mandiant | Any connections or communications between a server linked to the Trump Organization and Alfa server(s) |
| Peter Martelli | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112 |
| Andrew McCabe | Relevant conduct of Plaintiffs, Alfa; FBI's knowledge of CIR 112; Government investigations into Russian interference in U.S. politics, elections, and policy; Russian interference in U.S. |

| | elections; Russian interference in and/or influence on U.S policy; Russian interference in and/or influence on U.S. politics |
| --- | --- |
| Michael McFaul | Plaintiffs' relationships with the Kremlin/Putin; Plaintiffs' communications, positions, and statements regarding foreign policy; Plaintiffs' public relations and lobbying efforts in the U.S. and abroad; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf |
| Joy McGrath | Relevant conduct of Petr Aven; Aven's communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations, the presidential election, the Trump Organization; Aven's wealth and notoriety; Aven's donations to charitable organizations and foundations; Plaintiffs' public relations activities in the United States |
| Corporate representative of McLarty Associates | Public relations and lobbying efforts of Plaintiffs in the US and abroad; Plaintiffs' visits to the White House and contacts with White House officials; relevant conduct of Plaintiffs; Plaintiffs' investments in the US; Plaintiffs' interactions with the media; Plaintiffs' roles in the business world; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Plaintiffs' wealth and notoriety; Plaintiffs' communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations, the presidential election, the Trump Organization; Plaintiffs' contacts with the Trump Organization, the Trump Campaign, and the Trump Administration; Russian interference in and/or influence on U.S policy and/or in U.S. elections; Alfa's relevant conduct, including all entities affiliated with Alfa, Alfa's ties to the Kremlin and Vladimir Putin, and Alfa's investments in U.S. companies |
| Ed Mermelstein | Public relations and lobbying efforts of Plaintiffs in the US and abroad; Plaintiffs' investments in the US; Plaintiffs' interactions with the media; Plaintiffs' roles in the business world; Plaintiffs' communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations, the presidential election, the Trump Organization; Alfa's relevant conduct, including all entities affiliated with Alfa, Alfa's ties to the Kremlin and Vladimir Putin, and Alfa's investments in U.S. companies |
| Clark R. Moore | Plaintiffs as public figures; Plaintiffs' notoriety; Plaintiffs' business tactics; Plaintiffs' ties, communications, meetings, and relations |

13

| | with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf |
|---|---|
| Alejandro Moreno | Relationship between Plaintiffs and Kremlin/Putin |
| Michael Movsovich | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112; Plaintiffs as public figures |
| Myrmidon Group LLC corporate representative | Lobbying on behalf of Plaintiffs and Alfa; Plaintiffs' relations with the media and US government officials; access to public relations |
| Corporate representative of Neue Galerie | Public relations and lobbying efforts of Plaintiffs in the US and abroad; Plaintiffs' investments in the US; Plaintiffs' interactions with the media; Plaintiffs' donations to the Neue Galerie |
| Corporate representative of the New York Times | Receipt and delivery of CIR 112 |
| Eric Nitcher | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112; Plaintiffs as public figures |
| Victoria Nuland | Relevant conduct of Plaintiffs, Alfa; Government's receipt, delivery, and knowledge of CIR 112; Government investigations into Russian interference in US politics, elections, and policy; Russian interference in US elections; Russian interference in and/or influence on US policy; Russian interference in and/or influence on US politics; communications with Plaintiffs; Plaintiffs' communications and relationships with US government officials |
| Representative of the U.S. Office of Foreign Assets Control (OFAC) | Relationships, ties, or communications between Plaintiffs and Vladimir Putin and/or the Kremlin; relevant conduct of oligarchs and Putin; sanctions on Russian oligarchs and businesses |
| Richard Palmer | Plaintiffs as public figures; Plaintiffs' notoriety; Plaintiffs' business tactics; Plaintiffs' ties, communications, meetings, and relations |

| | |
|---|---|
| | with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Alfa's business tactics; Alfa's ties, communications, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; events related to topics in CIR 112 |
| Javier Perez Dolset | Relevant conduct of Plaintiff Mikhail Fridman and Alfa entities; |
| The Peter G. Peterson Institute for International Economics corporate representative | Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' roles in the business world; Plaintiffs' notoriety; Plaintiffs' communications, positions, and statements concerning U.S. politics; U.S. non-profits and foundations |
| Stan Polovets | Public relations and lobbying efforts of Plaintiffs in the US and abroad; Plaintiffs' visits to the White House and contacts with White House officials; relevant conduct of Plaintiffs; Plaintiffs' investments in the US; Plaintiffs' interactions with the media; Plaintiffs' roles in the business world; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Plaintiffs' wealth and notoriety; Plaintiffs' communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations, the presidential election, the Trump Organization; Plaintiffs' contacts with the Trump Organization, the Trump Campaign, and the Trump Administration; Russian interference in and/or influence on U.S policy and/or in U.S. elections; Alfa's relevant conduct, including all entities affiliated with Alfa, Alfa's ties to the Kremlin and Vladimir Putin, and Alfa's investments in U.S. companies |
| Adam Posen | Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' roles in the business world; Plaintiffs' notoriety; Plaintiffs' communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations |
| Bill Priestap | Relevant conduct of Plaintiffs, Alfa; FBI's knowledge of CIR 112; Government investigations into Russian interference in U.S. politics, elections, and policy; Russian interference in U.S. elections; Russian interference in and/or influence on U.S policy; Russian interference in and/or influence on U.S. politics |

| Vladimir Putin | Full knowledge of dispute; events described in CIR 112; |
|---|---|
| Stephen Rademaker | Plaintiffs' lobbying efforts in the U.S. and abroad; Plaintiffs' interactions with the media; Plaintiffs' public relations activities in the United States; Plaintiffs' and Alfa's roles in the business world |
| Rand Corporation | Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' roles in the business world; Plaintiffs' notoriety; Plaintiffs' communications, positions, and statements concerning U.S. politics, US-Russian policy, U.S. non-profits and foundations; Plaintiffs' foreign policy experience |
| Tom Reed | Plaintiffs' roles in the business world; Plaintiffs as public figures; Plaintiffs' control of Alfa; Plaintiffs' business tactics |
| Alexey Reznikovich | Relationship between Plaintiffs and Kremlin/Putin; Plaintiffs' control of Alfa; Plaintiffs' corrupt and criminal activity |
| Ed Rogers | Plaintiffs' lobbying efforts in the U.S. and abroad; Plaintiffs' interactions with the media; Plaintiffs' public relations activities in the United States; Plaintiffs' and Alfa's roles in the business world |
| Mathew Rojansky | Plaintiffs' interactions with the media; Plaintiffs' wealth and notoriety; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' investments in the United States; Plaintiffs' roles in the business world; Plaintiffs' public relations activities in the United States; Plaintiffs' lobbying efforts in the United States and abroad |
| Jack Rosen | Relevant conduct of Fridman; Fridman's efforts to invest in US real estate |
| Laura Rosenberger | Plaintiffs' relationships with the Kremlin/Putin; Plaintiffs' communications, positions, and statements regarding foreign policy; Plaintiffs' public relations and lobbying efforts in the U.S. and abroad; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf |
| David M. Rubenstein | Plaintiffs' investments in the United States; Plaintiffs' wealth and notoriety |

| | |
|---|---|
| Ilia Salita | Relevant conduct of Plaintiffs; Plaintiffs' creation and involvement in Genesis Philanthropy Group; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' involvement with the Genesis Prize Foundation; Plaintiffs' public appearances |
| Peter Salovey | Relevant conduct of Petr Aven; Aven's communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations, the presidential election, the Trump Organization; Aven's wealth and notoriety; Aven's donations to charitable organizations and foundations; Plaintiffs' public relations activities in the United States |
| Natan Sharansky | Relevant conduct of Plaintiffs; Plaintiffs' creation and involvement in Genesis Philanthropy Group; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' involvement with the Genesis Prize Foundation; Plaintiffs' public appearances |
| Dimitri Simes | Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Plaintiffs' communications, positions, and statements concerning U.S. politics; U.S. non-profits and foundations; the presidential election; the Trump Organization; Government investigations into Russian interference in U.S. politics, elections, and policy |
| Scott V. Simpson | Plaintiffs' corrupt and criminal activity; Plaintiff's control of Alfa |
| Ben Smith | Relevant conduct of Buzzfeed, recipients of CIR 112; delivery of CIR 112 |
| Jill W. Smith | Relevant conduct of Plaintiffs; Plaintiffs' creation and involvement in Genesis Philanthropy Group; Plaintiffs' donations to charitable organizations and foundations; Plaintiffs' involvement with the Genesis Prize Foundation; Plaintiffs' public appearances |
| Christopher Steele | Experience, work, process, and engagement by Defendants; his communications with the FBI, Senator John McCain, the U.S. Department of Justice, and other governmental agencies and officials; CIR 112, including recipients of CIR 112, research related |

| | |
|---|---|
| | to matters in CIR 112, events related to topics in CIR 112, and delivery of CIR 112 |
| Corporate representative of Stroz Freidberg | Any connections or communications between a server linked to the Trump Organization and Alfa server(s) |
| Bernard Sucher | Alfa, including all entities affiliated with Alfa, Alfa's ties to the Kremlin and Vladimir Putin, and Alfa's investments in U.S. companies; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Plaintiffs' roles in the business world |
| Lawrence Summers | Communications with Plaintiffs; relations and communications between Plaintiffs and US government officials; meetings between Plaintiffs and US Government Officials; Plaintiffs' experience with foreign policy; privatization of Russia |
| Vladislav Surkov | Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; events related to topics in CIR 112; Russian interference in and/or influence on U.S. politics, elections, and/or policy; any connections or communications between a server linked to the Trump Organization; Alfa's ties to the Kremlin and Vladimir Putin, on and Alfa server(s) |
| Marc Tessier-Lavigne | Relevant conduct of Plaintiffs and Alfa; Plaintiffs' donations to charitable organizations and foundations |
| Representative of Trident Group, LLC | Relevant conduct of Plaintiffs and Alfa; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf |
| Pranav L. Trivedi | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112 |
| Representative of Trump Organization | Plaintiffs' communications, positions, and statements concerning U.S. politics; U.S. non-profits and foundations; the presidential election; the Trump Organization; communications with the Russian government |

| | |
|---|---|
| Representative of 2016 Trump Presidential Campaign | Plaintiffs' communications, positions, and statements concerning U.S. politics; U.S. non-profits and foundations; the presidential election; the Trump Organization; communications with the Russian government |
| Unknown PR representatives of Plaintiffs | Public relations activities of Plaintiffs; Plaintiffs' prominent roles in the business world; Plaintiffs' interactions with the media |
| Representative of U.S.-Russia Business Council | Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Plaintiffs' communications, positions, and statements concerning U.S. politics; U.S. non-profits and foundations |
| Anton Vaino | Events related to topics in CIR 112; Russian interference in and/or influence on U.S policy; Plaintiffs' investments in the United States; Russian interference in and/or influence on U.S. politics; Russian interference in U.S. elections; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf |
| Corporate representative of the Wall Street Journal | Defendants' research and knowledge of Alfa and Plaintiffs |
| Celeste Wallander | Relevant conduct of Plaintiffs, Alfa; Government's receipt, delivery, and knowledge of CIR 112; Government investigations into Russian interference in U.S. politics, elections, and policy; Russian interference in U.S. elections; Russian interference in and/or influence on U.S policy; Russian interference in and/or influence on U.S. politics |
| Matthias Warnig | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112; Plaintiffs' relationships with the Kremlin/Putin |

19

| Andrew Weissman | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112 |
| Eric J. Wendel | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112 |
| Jonathan Winer | Delivery and receipt of CIR 112; privileged publication |
| Andrej Wolf | Relevant conduct of Plaintiffs, including business roles, transactions, notoriety; relevant conduct and transactions of Alfa; events related to topics in CIR 112 |
| Curtis Wolfe | Plaintiffs' investments in the U.S.; Plaintiffs' roles in the business world; Plaintiffs' control of Alfa |
| Sir Andrew Wood | Receipt and delivery of CIR 112 |
| Bob Wood | Plaintiffs' lobbying efforts in the U.S. and abroad; Plaintiffs' interactions with the media; Plaintiffs' public relations activities in the United States; Plaintiffs' and Alfa's roles in the business world |
| Representative of Yale University's President's Council on International Activities | Relevant conduct of Petr Aven; Aven's communications, positions, and statements concerning U.S. politics, U.S. non-profits and foundations, the presidential election, the Trump Organization; Aven's wealth and notoriety; Aven's donations to charitable organizations and foundations; Plaintiffs' public relations activities in the United States |
| Rabbi Hirschy Zarchi | Plaintiffs contacts with Chabad House; Plaintiffs' donations to charitable organizations and foundations |
| Ilya Zaslavsky | Plaintiffs' roles in the business world; Plaintiffs' ties, communications, meetings, and relations with the Kremlin, Vladimir Putin, and those representing them or acting on their behalf; Alfa, including entities affiliated with Alfa; Alfa's ties to the Kremlin and Vladimir Putin; Alfa's investments in U.S. companies; research related to matters in CIR 112 |
| Mike Zoi | Plaintiffs' investments in the U.S.; Plaintiffs' roles in the business world; Plaintiffs' control of Alfa |

20

| | |
|---|---|
| Debra L. Zumwalt | Relevant conduct of Plaintiffs and Alfa; Plaintiffs' donations to charitable organizations and foundations |
| Alex Van der Zwaan | Relevant conduct of German Khan; German Khan's role in the business world; German Khan's relationship with Skadden Arps. |
| US-Russia Business Council | Plaintiffs' roles in the business world; Plaintiffs' notoriety; Plaintiffs' communications, positions, and statements concerning U.S. politics; U.S. non-profits and foundations |

**3.** **Identify the custodians known to you of any documents concerning the subject matter of the Action, along with a general description of such documents and, if known, the documents' location(s).**

**ANSWER:** Objection. Defendants object because this Interrogatory is vague, overly broad, and not proportional to the needs of the case, as it seeks information that is not relevant to any party's claim or defense in this action. Rule 26(b)(1) limits the scope of discovery to matters that are "relevant to any party's claim or defense and proportional to the needs of the case," whereas this Interrogatory seeks information "concerning the subject matter of the Action," which is broader than the scope permitted by Rule 26(b)(1). Defendants object to the term "you." Plaintiffs' definition of "you" includes "persons or entities acting . . . in concert with" the Defendants, but information in the possession, custody, or control of persons or entities acting "in concert with" the Defendants is not in Defendants' possession, custody, or control and the Defendants therefore cannot provide that information.

With respect to that portion of the Interrogatory to which Defendants do not object, Defendants refer Plaintiffs to Defendants' Rule 26(a)(1) Initial Disclosures and answer that the individuals identified therein are likely to have documents concerning the claims and defenses in this action.

In addition, the following custodians likely have documents concerning the claims and defenses in this action (where known, Defendants also describe the documents these custodians likely have): U.S. Department of Justice, including all of the agencies and bureaus that report thereto, e.g., the Federal Bureau of Investigation (FBI); the Office of the Director of National Intelligence (ODNI) and all of the members of the U.S. Intelligence Community that report thereto, e.g., Central Intelligence Agency (CIA) and National Security Agency (NSA); U.S. Senate Select Committee on Intelligence, U.S. Senate Judiciary Committee, U.S. House Permanent Select Committee on Intelligence, and U.S. House Judiciary Committee, all of which likely have documents related to their respective investigations into Russian interference in the 2016 U.S. presidential election, including testimony and documents from witnesses; U.S. Department of Treasury (documents related to Mikhail Fridman's and Petr Aven's meeting with Secretary Paulson,

for instance); U.S. Federal Reserve (documents concerning Alfa's efforts to obtain U.S. banking licenses); U.S. Department of Commerce; U.S. Department of Energy; U.S. Department of State; the Committee on Foreign Investment in the United States (documents about national security concerns involving Plaintiffs); Center for Public Integrity (documents received in the course of litigation with Mikhail Fridman, Petr Aven, and OAO Alfa Bank); David Corn; Florida Office of Financial Regulation (documents concerning attempts by Plaintiffs to engage in banking activities); Norex Petroleum Ltd. (corrupt activities involving plaintiffs in Russia and elsewhere); Marks & Sokolov (corrupt activities involving Plaintiffs in Russia and elsewhere); Telenor (corrupt activities involving plaintiffs in Russia and elsewhere), United Nations (corrupt activities in Iraq), Hogan Lovells (IPOC and other matters involving Plaintiffs' involvement in Russian politics); Government of the Netherlands (Plaintiffs' involvement in corruption); Jeff Sessions; Vitaly Pruss and TriGlobal Strategic Ventures; Peter S. Watson and Armitage Associates, LC; Hoover Institution: Inventory of the David E. Hoffman papers; UK Financial Conduct Authority.

Defendants do not know the location of these documents.

**4.      Identify all sources consulted by Steele and individuals who contributed to, or assisted Steele, in connection with investigating and compiling the information in CIR 112 and the Dossier, including any employees or contractors of Orbis, intermediaries, third party sources, or government contacts or officials.**

> **ANSWER:** Objection. Defendants object to this Interrogatory to the extent it asks them to identify information concerning "the Dossier" because that calls for information that is not relevant to any party's claim or defense. Specifically, because Plaintiffs claim they were defamed by statements in CIR 112, not by "the Dossier," information concerning the sources "who contributed to, or assisted Steele" with regard to CIR reports other than CIR 112 is not relevant to any party's claims or defense.

> With respect to the non-objectionable portion of the Interrogatory, Defendants answer that they do not know the identity of Steele's sources for CIR 112.

**5.      Identify and describe the steps that you took, methods you employed, procedures undertaken, and/or sources you consulted (and dates thereof) to verify or research the truth or falsity of the information contained in CIR 112 and the Dossier prior to January 10, 2017.**

> **ANSWER:** Objection. Defendants object to this Interrogatory on the grounds that it calls for information that is protected by the attorney-client and attorney work product privileges. Defendants object to this Interrogatory to the extent it asks them to identify steps taken to verify or research the information contained in "the Dossier" because that calls for information that is not relevant to any party's claim or defense. Specifically, because Plaintiffs claim they were defamed by statements in CIR 112, not by "the Dossier," methods used to verify statements in reports other than CIR 112 are not relevant. Defendants object to the term "you," because Plaintiffs define "you" to include "persons or entities acting . . . in concert with" the Defendants, but information in the possession,

custody, or control of persons or entities acting "in concert with" the Defendants is not in Defendants' possession, custody, or control and the Defendants therefore cannot provide that information.

Regarding the non-objectionable portion of the Interrogatory, Defendants answer:

Defendant Glenn Simpson and the principals of Defendant Bean LLC are former journalists and/or editors, and they applied journalistic methods and procedures to verifying and researching the information in CIR 112. Those methods consist primarily of the acquisition and review of public information, such as books and news articles, government records, and court filings.

Defendants obtained CIR 112 from a trusted, experienced, and well-respected source: Christopher Steele, who for more than 20 years had worked in Britain's Secret Intelligence Service, MI6, focusing on Russia. In the later part of his career, Mr. Steele ran the Russia desk at MI6 headquarters. Mr. Steele had worked with the FBI and U.S. intelligence services on other high profile, international investigations. In and around the time they received CIR 112, Defendants had conversations with Mr. Steele that covered topics such as the content of CIR 112, the quality of the sourcing, the competence of Mr. Steele's team, the potential for misinformation, and efforts to verify the information in CIR 112.

Defendants obtained and evaluated CIR 112 in the context of events that corresponded with information in CIR 112. These events occurred prior to and after Defendants' receipt of CIR 112, such as news reports that were published before and after Defendants obtained CIR 112 and other public records, corroborating information in CIR 112 and furthering Defendants' belief that the information contained in CIR 112 was credible and accurate. For example, Defendants had seen reporting of a server registered to the Trump Organization that might have been communicating almost exclusively with a server owned by Alfa, which Plaintiffs own and control.

For years, Defendants had conducted extensive research on Alfa, Plaintiffs, Russian organized crime, Russian oligarchs, corruption in Russia, US government concerns and warnings about the increasing involvement of Russian oligarchs in the American economy and political system, foreign interference in American elections, and other related topics, which helped corroborate information in CIR 112. Cross-checking the information in CIR 112 against publicly available records, Defendants found material that supported CIR 112 and found nothing to contradict it.

Defendants, and in particular Defendant Glenn Simpson, have extensive knowledge and expertise on Alfa, Russia, the Kremlin, foreign interference in US elections, Russian organized crime, Russian lobbying and public relations activities in the United States, and transnational crimes. They concluded that the information in CIR 112 corresponded with their research and understanding of these areas. For instance, while a journalist, Defendant Simpson for many years investigated the Alfa-IPOC dispute, during which he discovered that the Plaintiffs were politically and legally "protected" within Russia and that Putin and the Kremlin would give Plaintiffs a free hand to engage in Russian-style corporate raiding ("reiderstvo") and use aggressive and legally questionable methods to pursue their business

and political objectives without fear of restraint or reprisals such as imposed by the Kremlin on other oligarchs.

**6.     Identify your standard policies or methodologies, if any, relating to verifying or researching information obtained from investigative firms prior to publishing or disseminating the information to third parties, including clients or the media, and whether any such policies are in writing.**

>   **ANSWER:** Objection. Defendants object to the phrase "standard policies or methodologies" because it is vague and it is unclear what is meant by this, specifically the term "standard." Defendants further object that the Interrogatory calls for a legal conclusion insomuch as it requests identification of policies for verifying information prior to "publishing" the information, as publication is a legal term of art. Defendants object to the term "your," because Plaintiffs define "your" to include "persons or entities acting . . . in concert with" the Defendants, but information in the possession, custody, or control of persons or entities acting "in concert with" the Defendants is not in Defendants' possession, custody, or control and the Defendants therefore cannot provide that information. To the extent Plaintiffs are asking for a recitation of a written document describing Defendants' methods for "verifying or researching information obtained from investigative firms," Defendants answer that no such document exists.

>   With respect to the non-objectionable portion of the Interrogatory, Defendants answer that they rely on their extensive experience as investigative journalists and/or editors and the journalistic skills they have honed over their careers to research, evaluate, and verify the accuracy, credibility and reliability of information they obtain through their work. When it comes to human intelligence, as was involved in CIR 112, Defendants employ various methods to evaluate the credibility of the information. For instance, similar to the interview process in journalism, Defendants research the names, places, and people in the information they receive to see if it matches information from other sources, such as scholarly work on the subject or public records. In other words, they examine whether the details check out and whether they make sense. Defendants also look into whether information from other sources supports or contradicts information from the human intelligence source. Defendants evaluate whether the information provided corresponds with their own knowledge of the topic. Defendants also evaluate the credibility and reliability of their sources, including the source's methods, the source's experience, the source's professional background, the source's access to information, and whether the source has provided reliable information in the past. Defendants engage in these sorts of checks and processes to evaluate whether the human intelligence information they receive is credible.

**7.     Identify and describe your receipt of the CIRs constituting the Dossier, including CIR 112, that were "delivered to [you] over the course of several months in 2016," as alleged in Paragraph 3 of the Answer, including the date(s), the sender, the recipient, and the delivery format.**

>   **ANSWER:** Objection. Defendants object to this Interrogatory because it is overly broad and calls for information that is not relevant to any party's claim or defense, as it asks for

information about the receipt of CIRs other than CIR 112, but Plaintiffs claim only that they were harmed by the alleged publication of statements in CIR 112. Accordingly, information about the receipt of other CIRs is not relevant. Defendants object to the terms "you" and "your," because Plaintiffs define them to include "persons or entities acting . . . in concert with" the Defendants, but information in the possession, custody, or control of persons or entities acting "in concert with" the Defendants is not in Defendants' possession, custody, or control and the Defendants therefore cannot provide that information.

To the extent the Interrogatory is limited to CIR 112, Defendants answer that they do not recall the exact date of the transmission of CIR 112. Laura Seago at Defendant Bean LLC received CIR 112 via a PGP link on or just after the date of CIR 112, September 14, 2016. Sam Stainer, at Orbis, transmitted CIR 112 to Ms. Seago.

**8.     Identify all persons, including representatives of Orbis, Perkins Coie, McCain, Kramer, BuzzFeed, members of the media, the FBI, government employees or officials, and members of Congress, with whom you communicated regarding Plaintiffs, CIR 112, the Dossier, or publication of the Dossier.**

**ANSWER:** Objection. Defendants object to this Interrogatory because it is overly broad, vague, and requests information that is not relevant to any party's claims or defenses in this action, and is not proportional to the needs of this case, because the Interrogatory does not limit the request to a specified time period and because it seeks communications with "all persons," without any limitation. Defendants also object that in seeking communications with "all persons" without limitation in time, the Interrogatory seeks information that has no bearing on the alleged defamatory statements in CIR 112 and therefore will not help resolve the issues before the court. Moreover, the Interrogatory asks for information that is not relevant because it asks for communications concerning "the Dossier, or publication of the Dossier," but Plaintiffs' claims in this action are limited to statements in CIR 112. Defendants further object that the Interrogatory calls for a legal conclusion insomuch as it requests information concerning "publication" of the Dossier. Defendants also object to the term "you," because Plaintiffs define "you" to include "persons or entities acting . . . in concert with" the Defendants, but information in the possession, custody, or control of persons or entities acting "in concert with" the Defendants is not in Defendants' possession, custody, or control and the Defendants therefore cannot provide that information.

The term "communicated" is likewise vague. Inasmuch as Defendants communicated with anyone at Perkins Coie LLP, those communications are protected by the attorney-client privilege and the attorney work product doctrine, and Defendants are not authorized to waive those privileges.

**Supplemental Answer:** Defendants agreed, through the meet and confer process, to supplement this answer to identify the people with whom Defendants discussed CIR 112 or Plaintiffs prior to January 10, 2017.

Defendants recall discussing CIR 112 with: Christopher Steele; Marc Elias; Michael Sussman.

25

Defendants recall communicating about Plaintiffs with: Christopher Steele; Marc Elias; Michael Sussman; Franklin Foer; Newt Royce; Peter Eisner; Charles Lewis; Catherine Belton; Connie Bruck; Mark Hosenball; Eric Lichtblau; Michael Isikoff.

**9.     Identify and describe each transmission, delivery, oral or written communication, or publication by you, Steele, or Orbis of the Dossier or any of the CIRs (or information contained in such CIRs), including CIR 112, to any third persons, including Perkins Coie, McCain, Kramer, Winer, BuzzFeed, members of the media, government employees or officials, and members of Congress, as set forth in Paragraphs 1 through 3 of the Affirmative Defenses in the Answer. Include the date(s), the sender, the recipient, and the delivery format.**

> **ANSWER:** Objection. Defendants object to this Interrogatory in part because it seeks discovery that is not relevant to any party's claim or defense as it seeks information concerning each transmission, delivery, etc. of "any of the CIRs." Plaintiffs' claims of defamation relate only to the alleged publication of CIR 112. Accordingly, information about the transmission of other CIRs is not relevant to any party's claim or defense. Defendants also object to this Interrogatory on the grounds that it calls for information that is protected by the attorney-client and attorney work product privileges, because it asks for information about communications between Defendants and Perkins Coie, and Defendants are not authorized to waive such privileges. Defendants further object that the Interrogatory calls for a legal conclusion insomuch as it requests a description of each "publication," a legal term of art. Defendants also object to this Interrogatory as overly broad, vague, and not proportional to the needs of this case, because it does not specify a time period for the information requested. Defendants also object to the term "you," because Plaintiffs define "you" to include "persons or entities acting . . . in concert with" the Defendants, but information in the possession, custody, or control of persons or entities acting "in concert with" the Defendants is not in Defendants' possession, custody, or control and the Defendants therefore cannot provide that information.
>
> With respect to the non-objectionable parts of the Interrogatory, and to the extent the time period for the request is limited to prior to January 10, 2017, and the request is limited to information concerning CIR 112 only, Defendants answer as follows.
>
> Defendant Glenn Simpson provided an electronic copy of CIR 112 to Bruce Ohr, U.S. Department of Justice employee, at some point after Thanksgiving of 2016.
>
> Defendants provided David Kramer with a copy of CIR 112 at some point in late November or December 2016.
>
> Defendants provided a hard copy of CIR 112 to the *New York Times*, at some point in November or December of 2016.
>
> Defendants provided a copy of CIR 112 to David Corn of *Mother Jones* in November 2016.
>
> Defendants showed a hard copy of CIR 112 to Jonathan Winer on or around September 23, 2016.

**SUPPLEMENTAL ANSWER:** Defendants agreed, as part of the meet and confer process, to supplement their answer to this interrogatory to identify the names of the *New York Times* reporters with whom they shared CIR 112 or the Dossier, to the extent Defendants recall the names.

Defendants recall sharing CIR 112 or the Dossier with the following *New York Times* reporters: Mark Mazzetti; Steven Lee Myers; Eric Lichtblau; Scott Shane; Matt Apuzzo.

**10.    Identify any code names or other names you used for matters relating to CIR 112 or the Dossier.**

**ANSWER:** Objection. Defendants object to this Interrogatory as seeking information that is not relevant to any party's claim or defense because it asks for code names "used for matters relating to … the Dossier." Plaintiffs' claims of defamation relate only to the alleged publication of CIR 112. Accordingly, information about the Dossier is not relevant to any party's claim or defense. Defendants object to the term "you," because Plaintiffs define "you" to include "persons or entities acting . . . in concert with" the Defendants, but information in the possession, custody, or control of persons or entities acting "in concert with" the Defendants is not in Defendants' possession, custody, or control and the Defendants therefore cannot provide that information.

As to the remaining portion of the Interrogatory to which Defendants do not object, Defendants answer that the name that Defendant Bean LLC used for its project investigating Trump's activities and dealings in Russia was "Bangor."

**11.    Identify and describe the circumstances of your engagement by the Washington Free Beacon in 2015 and by Perkins Coie (or the Democratic National Committee, the campaign of Hillary Clinton, or HFACC, Inc.), as referenced in Paragraph 15 of the Answer, including the scope of the engagement, the persons with whom you communicated, documents memorializing the engagement, and the amounts paid to you in connection with such engagements.**

**ANSWER:** Objection. Defendants object to this Interrogatory because it calls for information that is not relevant to any party's claims or defenses, because Defendants did not engage with Orbis or receive CIR 112 as part of Defendants' engagement with the Washington Free Beacon. Defendants also object to this Interrogatory on the grounds that it calls for information that is protected by the attorney-client and attorney work product privileges, because it asks for information about communications between Defendants and Perkins Coie, and Defendants are not authorized to waive such privileges. Defendants object to the terms "you" and "your," because Plaintiffs define "you" to include "persons or entities acting . . . in concert with" the Defendants, but information in the possession, custody, or control of persons or entities acting "in concert with" the Defendants is not in Defendants' possession, custody, or control and the Defendants therefore cannot provide that information.

With respect to the non-objectionable portion of this Interrogatory, Defendants answer that with respect to Perkins Coie, their engagement began approximately April 1, 2016, and

27

ended on or about the end of October 2016/early November 2016. Perkins Coie engaged Defendants to provide consulting services in support of Perkins Coie's rendering of legal advice to its clients, including with respect to actual and potential litigation. Defendants' consulting services in support of Perkins Coie's provision of legal advice to its clients included research, such as requesting, pulling, and analyzing publicly available records, and compiling information gathered by its subcontractors. Defendants communicated primarily with Marc Elias at Perkins Coie. Perkins Coie paid Defendants $50,000 per month pursuant to the terms of the engagement, and a total of approximately $1,024,000. Defendants refer Plaintiffs to the non-privileged, responsive, relevant documents regarding the engagement and payment.

**12.     Identify and describe the circumstances of your engagement of Orbis and/or Steele, as referenced in Paragraph 3 of the Answer, including the scope of the engagement, the persons with whom you communicated, documents memorializing the engagement, and amounts paid to Orbis and/or Steele in connection with such engagements.**

**ANSWER:** Defendants object to the terms "you" and "your," because Plaintiffs define "you" to include "persons or entities acting . . . in concert with" the Defendants, but information in the possession, custody, or control of persons or entities acting "in concert with" the Defendants is not in Defendants' possession, custody, or control and the Defendants therefore cannot provide that information.

Defendants' initial engagement of Orbis was for 20 or 30 days, and Defendants paid Orbis a set amount of money to look into then-candidate Trump's activities in Russia, in support of Defendants' ongoing research activities, without further specifying any goal or result. The total amount ultimately paid to Orbis was approximately $162,000. At Orbis, Defendants mainly communicated with Sam Stainer, Tatiana Duran, Christopher Steele, and Christopher Burrows. Defendants had an engagement letter with Orbis at one point, but they no longer have it. Defendants refer Plaintiffs to documents that have been produced concerning Orbis's engagement.

**13.     Identify what you knew on or before January 10, 2017 about whether CIR 112 was the subject of any judicial proceeding, legislative proceeding, or other official proceeding, and identify the basis for any such knowledge and all documents in support thereof.**

**ANSWER:** Objection. This Interrogatory calls for information that is based on privileged information, because it implicates information that is protected by the attorney-client privilege and the attorney work product doctrine. Defendants object to the term "you," because Plaintiffs define "you" to include "persons or entities acting . . . in concert with" the Defendants, but information in the possession, custody, or control of persons or entities acting "in concert with" the Defendants is not in Defendants' possession, custody, or control and the Defendants therefore cannot provide that information.

Defendants can provide the following information without implicating privileged communications:

- In or around September 2016, the FBI, through FBI special agent and assistant legal attaché in Rome Michael Gaeta, asked Christopher Steele for copies of the intelligence reports Mr. Steele had compiled in what is now referred to as the Dossier, including CIR 112. Mr. Steele told Defendants about this request from the FBI and his compliance with it. As Simpson testified to the Senate Judiciary Committee, Steele informed Simpson in September 2016 with words to this effect: "I heard back from the FBI and they want me to come talk to them and they said they want everything I have." The urgency was such that the FBI requested that Mr. Steele fly to Rome. Afterwards, he informed Simpson, "I gave them a full briefing."

- In November or December 2016, Senator John McCain asked Christopher Steele for copies of the intelligence reports Mr. Steele had compiled in what is now referred to as the Dossier, including CIR 112. Mr. Steele, through Glenn Simpson and David Kramer, had these reports delivered to Senator McCain. Defendants knew that Senator McCain had asked for and received CIR 112 because Mr. Steele told them.

- In or around November 2016, Bruce Ohr of the U.S. Department of Justice, asked Mr. Steele for copies of the intelligence reports Mr. Steele had compiled in what is now referred to as the Dossier, including CIR 112.

- On or around September 23, 2016, Jonathan Winer of the U.S. Department of State asked to review copies of the intelligence reports Mr. Steele had compiled in what is now referred to as the Dossier, including CIR 112.

14.     **Identify and describe the steps that you took, methods you employed, procedures undertaken, and/or sources you consulted (and the dates thereof) to ascertain whether CIR 112 was the subject of any judicial proceeding, legislative proceeding, or other official proceeding, including any official government proceeding or action, briefings of President Obama and/or President-elect Trump, and any investigation or other inquiry by the Federal Bureau of Investigations.**

ANSWER: Objection. Defendants object to the term "you," because Plaintiffs define "you" to include "persons or entities acting . . . in concert with" the Defendants, but information in the possession, custody, or control of persons or entities acting "in concert with" the Defendants is not in Defendants' possession, custody, or control and the Defendants therefore cannot provide that information.

Defendants refer Plaintiffs to their answer to Interrogatory No. 13.

15.     **Identify each of the Briefings, the persons who attended the Briefings, and your involvement in any of the Briefings, including whether you attended the Briefings and with whom you communicated regarding the Briefings prior to them taking place, as Simpson testified about on August 22, 2017 before the Senate Judiciary Committee (Tr. at 205-09).**

**ANSWER:** Objection. Defendants object to this Interrogatory because it calls for information that is not relevant to any party's claims or defenses, because Defendants have no recollection of any discussion of the contents of CIR 112 at these Briefings and do not believe any such discussion occurred owing to the introductory and general nature of these discussions. Defendants also object to the terms "you" and "your," because Plaintiffs define "you" to include "persons or entities acting . . . in concert with" the Defendants, but information in the possession, custody, or control of persons or entities acting "in concert with" the Defendants is not in Defendants' possession, custody, or control and the Defendants therefore cannot provide that information.

**SUPPLEMENTAL ANSWER:** Defendants do not waive any of their objections and continue to maintain that they do not recall discussing CIR 112 or Plaintiffs at the Briefings. Defendants agreed to supplement their answer to disclose the names of the people with whom they recall meeting at the Briefings:

Michael Isikoff, Jane Mayer, David Sanger, Eric Lichtblau, Matthew Mosk, Tom Hamburger, Dana Priest

**16.    Identify any and all litigation, court proceedings, governmental proceedings, or government agency requests in which you produced documents or provided information (or in which you received documents or information) concerning the Dossier, CIR 112, Plaintiffs, or subject matter of this Action.**

**ANSWER:** Objection. Defendants object because this Interrogatory is vague, overly broad, and seeks information that is not proportional to the needs of the case because it asks for information that is not relevant to any party's claims or defenses in this action. Rule 26(b)(1) limits the scope of discovery to matters that are "relevant to any party's claim or defense and proportional to the needs of the case," whereas this Interrogatory seeks information "concerning … the subject matter of this Action," which is broader than the scope permitted by Rule 26. Defendants also object because it is unclear what is meant by "provided information." Defendants object to the term "you," because Plaintiffs define "you" to include "persons or entities acting . . . in concert with" the Defendants, but information in the possession, custody, or control of persons or entities acting "in concert with" the Defendants is not in Defendants' possession, custody, or control and the Defendants therefore cannot provide that information.

Defendants answer this request as it applies to CIR 112, interpret "provided information" to mean testimony or affidavits, and exclude the definition of "you" objected to herein. Defendants answer that they produced documents or provided information in the following proceedings:

- U.S. Senate, Senate Judiciary Committee

- U.S. Senate, Senate Select Committee on Intelligence

- U.S. House of Representatives, Permanent Select Committee on Intelligence, Investigation into Russian Active Measures

30

- *Bean LLC v. John Doe Bank*, 17-cv-2187 (D.D.C.)

- *Gubarev v. Buzzfeed, Inc.*, Case No. 0:17-cv-60426-UU (S.D. Fla.)

**17.     Identify the occurrence, dates, and context for any testimony or interviews, including but not limited to deposition testimony, that you have given or taken in any litigation or court or government proceeding (including Congressional activity) concerning the Dossier, CIR 112, or the subject matter of this Action.**

> **ANSWER:** Objection. Defendants object because this Interrogatory is vague, overly broad, and seeks information that is not proportional to the needs of the case because it asks for information that is not relevant to any party's claim or defense in this action. Rule 26(b)(1) limits the scope of discovery to matters that are "relevant to any party's claim or defense and proportional to the needs of the case," whereas this Interrogatory seeks information "concerning … the subject matter of this Action," which is broader than the scope permitted by Rule 26. Defendants object to the term "you," because Plaintiffs define "you" to include "persons or entities acting . . . in concert with" the Defendants, but information in the possession, custody, or control of persons or entities acting "in concert with" the Defendants is not in Defendants' possession, custody, or control and the Defendants therefore cannot provide that information.
>
> In addition, Defendants object because this Interrogatory calls for information that is required to be kept highly confidential pursuant to a protective order. Accordingly, Defendants answer this Interrogatory excluding the definition of "you" objected to herein, and only as to CIR 112, and do not answer as to information subject to a protective order.

- U.S. Senate, Senate Judiciary Committee, Committee to Investigate Russia, August 22, 2017, voluntary interview of Glenn Simpson at the Committee's request

- U.S. Senate, Senate Select Committee on Intelligence, Nov. 15, 2017, voluntary interview of Glenn Simpson at the Committee's request

- U.S. House of Representatives, Permanent Select Committee on Intelligence, Investigation into Russian Active Measures, November 14, 2017, Interview of Glenn Simpson; November 8, 2017, voluntary interview of Glenn Simpson at the Committee's request

- *Gubarev v. Buzzfeed, Inc.*, Case No. 0:17-cv-60426-UU (S.D. Fla.), August 30, 2018, Deposition of Peter Fritsch, pursuant to subpoena

- *Bean LLC v. John Doe Bank,* 17-cv-2187 (D.D.C.), Declaration of Peter Fritsch in Support of Fusion's Unopposed Motion for Temporary Restraining Order and Preliminary Injunction (Oct. 19, 2017); Second Declaration of Peter Fritsch in Support of Fusion GPS's Motion for a Temporary Restraining Order and Preliminary Injunction (October 23, 2017).

18.    Identify any documents or evidence reflecting or demonstrating any "questionable, unethical and illegal conduct" by Plaintiffs concerning "the entanglement of Russian oligarchs' political and business interests and those of the Russian state and/or President Putin," as referenced in Paragraph 13.a. of the Affirmative Defenses in the Answer.

ANSWER: Defendants refer Plaintiffs to the news articles, publications, and judicial decisions cited in their Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss the Amended Complaint for Failure to State a Claim, Dkt. No. 20-1, in this Action; the documents Defendants will be producing; as well as additional examples of such information, including:

- Background Investigation and Assessment of Tyumen Oil Company, Confidential BP Memo, 9 September 1999

- Fusion GPS, Alfa Access Memo, Feb. 7, 2012

- Fusion GPS, Ames Report, Feb 15, 2012

- Fusion GPS, Ames Update, Sept. 5, 2012

- Fusion GPS, DT Russia, Draft Open Source Report, 4 March 2016

- Edward Baumgartner, Report re: ALFA Dossier Open Source

- Fusion GPS, Conflict With IPOC, date unknown

- The Alfa Playbook, due diligence report, source unknown

- Letter from Alex Rotzang, CEO, Norex to Redacted Personnel in Washington DC, Aug. 30, 2004. Evidence of US Citizens and Corporations Involvement In Iraq Oil Deals; Crown/TNK/Alfa-Eco/Bayoil Iraq Oil Price and Oil Transactions Manipulations

- Information about the materials regarding Mr. Fridman M.M., Mr. Kuzmichev A.V., Mr. Khan G.B., Mr. Blavatnik L., Mr. Vekselberg V.F., (Export-Import Bank files), a due diligence report, source unknown

- Undated Due Diligence report on Alfa Bank, Peter Bond, Valmet, Menatep (source unknown)

- Letters to Export-Import Bank regarding TNK, from US Congress, House of Representatives, November and December 1999, filed as exhibits to the Declaration of Philip Murray in *Norex Petroleum Ltd. v Access Industries, Inc.*, Case No. 02-cv-1499 (S.D.N.Y., complaint filed Feb. 26, 2002).

32

- Translation of August 9, 2001 Letter to Vladimir Remizyuk, Investigator, Russian Ministry of Internal Affairs from A.V. Kuzmitchev re: Alfa-Eco's legal problems

- Donor List, New Economic School, 2016 - https://web.archive.org/web/20160916074601/http://www.nes.ru/ru/school/management/

- Correspondence from V.V. Putin to P.O. Aven on Purchasing Food from Abroad, http://miamioh.edu/cas/_files/documents/havighurst/salye/From%20VV%20Putin%20to%20PO%20Aven%20on%20Purchasing%20Food%20From%20Abroad.pdf

- Correspondence Between AP Pakhonov and PO Aven on NorthWest Region and Committee on Foreign Economic Relations of St. Petersburg, http://miamioh.edu/cas/_files/documents/havighurst/salye/Correspondence%20Between%20AP%20Pakhonov%20and%20PO%20Aven%20on%20NorthWest%20Region%20and%20Committee%20on%20Foreign%20Economic%20Relations%20of%20St%20Petersburg.pdf

- "RUSSIA – Russian tandem power shifts analyzed in wake of Medvedev's reshuffle," https://wikileaks.org/gifiles/docs/13/131883_russia-russian-tandem-power-shifts-analyzed-in-wake-of.html

- Alfa Group: Our Businesses, http://www.alfagroup.org/business/investment/a1/ (last visited Oct. 28, 2019)

- Official Photo of Aven Meeting Putin in 2010, http://archive.premier.gov.ru/eng/events/news/11335/

- Exhibits filed in *Norex Petroleum Ltd. v Access Industries, Inc.*, Case No. 02-cv-1499 (S.D.N.Y., complaint filed Feb. 26, 2002)

- Exhibits filed in *Norex Petroleum Ltd. v. Blavatnik*, Case. No. 650591-2011 (N.Y. Sup. Ct., complaint filed March 7, 2011)

- Exhibits A & C to Affidavit of Barry Ostrager (filed Oct. 26, 2011), *Norex Petroleum Ltd. v. Blavatnik*, 0650691-2011 (N.Y. Sup. Ct)

- Information (Dkt. No. 2), *United States v. Vimpelcom Ltd.*, Case No. 1:16-cr-00137-ER (filed Feb. 18, 2016).

- *RSM Production Corp. v. Fridman*, Case No. 1:06-cv-11512-EJW (S.D.N.Y., filed Nov. 1, 2006) (complaint and exhibits filed therein)

- Fourth Affidavit of Jeffrey Galmond and exhibits, Aug 6, 2004, *IPOC International Growth Fund Limited v. LV Finance Group Ltd.*, Eastern Caribbean Supreme Court (BVI)

- Transcript of Conversation between James Hatt and Jeff Galmond (Sept. 6, 2004), Exhibit 4, Second Affidavit of Christopher George Hardman, *IPOC International Growth Fund Limited v. LV Finance Group Ltd.*, Eastern Caribbean Supreme Court (BVI)

- Investigation Report to Fiscalía Especial Contra Corrupción y Crimen Organizado (Special Prosecutor for Corruption and Organized Crime)*,* May 10, 2017, https://tbcarchives.org/wp-content/uploads/HANTA.-Fridman.pdf

- Complaint, Special Prosecutor for Corruption and Organized Crime, https://criminalarchive.com/wp-content/uploads/Fridman-Engibaryan-Dolcet-Spain.pdf

- Landeskriminalamt Baden-Württemberg (Office of Criminal Investigation), https://tbcarchives.org/wp-content/uploads/Ismailovskaja-Vernehmung-LG-Stuttgart-1.pdf

- The Russian Presidential Elections, Hearing Before the Subcomm. on European Affairs, U.S. Senate, Committee on Foreign Relations, Sen. Arg. 106-702 (April 12, 2000), https://www.gpo.gov/fdsys/pkg/CHRG-106shrg67222/html/CHRG-106shrg67222.htm

- Russian Government and the Politics-Business Nexus: 1998-2003, Hearing Before the Senate Permanent Subcommittee on Investigations, May 17, 2005 (Testimony by Peter Reddaway), https://www.hsgac.senate.gov/imo/media/doc/STMTReddaway.pdf

- Andrew Jack, Inside Putin's Russia 203 (2004)

- Peter Baker & Susan Glasser, Kremlin Rising: Vladimir Putin's Russia and the End of Revolution 286 (2005)

- Anna Politkovskaya, A Russian Diary: A Journalist's Final Account of Life, Corruption, and Death in Putin's Russia 260 (2007)

- Lilia Shevtsova, Putin's Russia 87 (2010)

- David E. Hoffman, The Oligarchs: Wealth and Power in the New Russia (2011)

- Yuri Felshtinsky & Vladimir Pribylovsky, The Putin Corporation: The Story of Russia's Secret Takeover 72 (2012)

- Fiona Hill & Clifford G. Gaddy, Mr. Putin: Operative in the Kremlin 174, 227 (2013)

- Petr Aven & Alfred Kokh, Gaidar's Revolution (2015)

- Karen Dawisha, Putin's Kleptocracy: Who Owns Russia 196 (2015)

- Mikhail Zygar, All the Kremlin's Men: Inside the Court of Vladimir Putin (2016)

- Reporting on Russia By GR Simpson, reporting archive, created 2009

- "Alleged violations in the Chernogorneft Bankruptcy Process," CIA Letter, June 3, 2003, https://www.cia.gov/library/readingroom/docs/DOC_0001341232.pdf

- "The 'Evolving Oligarch'," *Institutional Investor*, Sept. 1, 2003, https://www.institutionalinvestor.com/article/b15135r36rgw6y/the-evolving-oligarch

- Paul Volcker et al., "Manipulation of the Oil-For-Food Programme by the Iraqi Regime," United Nations Oil for Food Report, (Oct. 27, 2005) https://www.foxnews.com/projects/pdf/final_off_report.pdf

- "Kremlin Unhappiness Causes Moscow's 'Domashniy' Channel to Pull Talk Show," Wikileaks Cable, Sept. 21, 2006, https://wikileaks.org/plusd/cables/06MOSCOW10605_a.html

- Stratfor, "Mikhail Fridman: Profile and Perception," Jan. 29, 2007, https://wikileaks.org/gifiles/attach/175/175793_Mikhail%20Fridman%20-%20Profile%20and%20Perception.pdf

- Stratfor, "Mikhail Fridman: Background Investigation," Aug. 3, 2007, https://wikileaks.org/gifiles/attach/175/175991_Mikhail%20Fridman%20-%20Background%20Investigation.pdf

- "What's Behind the Raids on TNK-BP and BP," Wikileaks Cable, Mar. 28, 2008, https://wikileaks.org/plusd/cables/08MOSCOW864_a.html

- "TNK-BP Update: Court Bars Dudley From Post for Sham Labor Violations," Passed to the *Telegraph* by Wikileaks, Jan. 31, 2011 (cable dated Aug. 18, 2008), https://www.telegraph.co.uk/news/wikileaks-files/bp-wikileaks/8294146/TNK-BP-UPDATE-COURT-BARS-DUDLEY-FROM-POST-FOR-SHAM-LABOR-VIOLATIONS.html

- Thomas Firestone, "Criminal Corporate Raiding in Russia," 42 Int'l L. 1207 (2008)

- Luke Harding, "Oil: 'Harassed' Head of BP Venture Exits Moscow," *The Guardian*, July 25, 2008, https://www.theguardian.com/business/2008/jul/25/bp.oil

- Anastasia Kirilenko, "Why Marina Salie Was Silent About Putin for 10 years?" Radio Liberty, March 2, 2010, https://www.svoboda.org/a/1972366.html

35

- Vladimir Ivanidze, "Saving Lieutenant Colonel Putin: The Second Attempt," Radio Liberty, March 16, 2010, https://www.svoboda.org/a/1983851.html

- Mikhail Fridman, "How I Became an Oligarch," (Lecture, Lviv, Ukraine, Nov. 14, 2010), https://www.opendemocracy.net/od-russia/mikhail-fridman/fridman-how-i-became-oligarch

- Gregory L. White, "TNK-BP Russian Partner Relishes Conflict," *Wall St. J.*, Nov. 14, 2011, https://www.wsj.com/articles/SB10001424052970203503204577036000854767804

- Bill Alpert, "How a Putin Aide Gained $119 Million," *Barron's*, Dec. 3, 2011, https://www.barrons.com/articles/SB50001424052748703827804577056191874119450

- Vladimir Soldatkin & Andrew Callus, "Rosneft Pays Out in Historic TNK-BP Deal Completion," Reuters, March 21, 2013, https://www.reuters.com/article/us-rosneft-tnkbp-deal/rosneft-pays-out-in-historic-tnk-bp-deal-completion-idUSBRE92K0IZ20130321

- Memorandum from Mikhail Fridman to Anton Kudryashov, May 29, 2013 (Zed Plus)  -  https://www.elconfidencial.com/empresas/2017-01-23/los-informes-de-pricewaterhouse-sobre-los-sobornos-de-zed-en-rusia_1319784/

- Connie Bruck, "The Billionaire's Playlist," *The New Yorker*, Jan. 12, 2014, https://www.newyorker.com/magazine/2014/01/20/the-billionaires-playlist

- Philip Hanson, "*Reiderstvo*: Asset-Grabbing in Russia," *Chatham House*, March 1, 2014, https://www.chathamhouse.org/publications/papers/view/198133

- Michael Weiss, "The Kremlin's $220 Million Man," *Foreign Policy*, Oct. 29, 2014, http://foreignpolicy.com/2014/10/29/the-kremlins-220-million-man/

- Nathan Vardi, "The Four Horsemen of Russia's Economic Apocalypse," *Forbes*, Jan. 21, 2015, https://www.forbes.com/sites/nathanvardi/2015/01/21/the-four-horsemen-of-russias-economic-apocalypse/#666f90001542

- RWE Utility Closes $5.7 Billion Deal," *Oil & Gas 360*, March 2, 2015, https://www.oilandgas360.com/rwe-utility-closes-5-7-billion-deal/

- "Putin Advises Russian Businessmen To Wait To Sell Their Assets In Ukraine," *UAWire*, March 25, 2016, http://uawire.org/news/putin-advises-russian-businessmen-to-wait-to-sell-their-assets-in-ukraine#

- "Putin Awarded Five Russian Billionaires," Gazeta, May 29, 2015, https://www.gazeta.ru/business/news/2015/05/29/n_7241257.shtml

- "Armenia: The Vanishing Profits," *Internet Ownership Project*, Sept. 28, 2015, https://www.reportingproject.net/internetownership/?p=111

- Stephen Grey & Elizabeth Piper, "Putin's Older Daughter: A Specialist In Biomedical Science," *Reuters*, Nov. 10, 2015, https://www.reuters.com/article/us-russia-capitalism-maria/putins-older-daughter-a-specialist-in-biomedical-science-idUSKCN0SZ1DG20151110#1exov5f4EmMM0wuE.99

- "Exclusive 'No Tie' Interview With Head Of The Alfa Banking Holding, Petr Aven On Business, Childhood And Friends," *Jewish Business News*, Nov. 19, 2015, http://jewishbusinessnews.com/2015/11/19/exclusive-no-tie-interview-with-alfa-banks-president-peter-aven-on-business-childhood-and-friends/

- James Carden, "Trump Attempted a Foreign Policy Makeover Today. Did it Work?" *The Nation*, Apr. 27, 2016, https://www.thenation.com/article/trump-attempted-a-foreign-policy-makeover-today-did-it-work/

- James Kirchick, "Donald Trump's Russia Connections," *Politico*, Apr. 27, 2016, https://www.politico.eu/article/donald-trumps-russia-connections-foreign-policy-presidential-campaign/

- Ilya Zaslavsky, "Offshore Is A Sure Thing," *Khodorkovsky*, June 14, 2016, https://webcache.googleusercontent.com/search?q=cache:rF85g61v3FEJ:https://www.khodorkovsky.com/offshore-is-a-sure-thing/+&cd=7&hl=en&ct=clnk&gl=us

- Franklin Foer, "Was a Trump Server Communicating with Russia?", *Slate*, Oct. 31, 2016, http://www.slate.com/articles/news_and_politics/cover_story/2016/10/was_a_server_registered_to_the_trump_organization_communicating_with_russia.html.

- Ilya Zaslavskiy Comments, Nov. 2, 2016, https://m.facebook.com/zaslavskiy/posts/10155483460048916

- Liz Spayd, "Trump, Russia, and the News Story That Wasn't," *N.Y. Times*, Jan. 20, 2017, https://nyti.ms/2jHyede

- "Lavrov's Son-In-Law Became Owner of the Largest Pharmaceutical Distributor in Russia," Crime Russia, Feb. 2, 2017, https://en.crimerussia.com/gromkie-dela/lavrov-s-son-in-law-became-owner-of-the-largest-pharmaceutical-distributor-in-russia/

- Alec Luhn, "The 'Darth Vader' of Russia: meet Igor Sechin, Putin's Right-Hand Man," *Vox*, Feb. 8, 2017, https://www.vox.com/world/2017/2/8/14539800/igor-sechin-putin-trump-sanctions-oil-rosneft-tillerson-secretary-of-state-kremlin

- "Vinokurov steps down as A1 President to head own investment company," Interfax.com, May 15, 2017, http://www.interfax.com/newsinf.asp?id=754010

- Stephanie Kirchgaessner, "Lobbyist for Russian Interests Says He Attended Dinners Hosted by Sessions," June 15, 2017, *The Guardian*, https://www.theguardian.com/us-news/2017/jun/15/lobbyist-russian-interests-jeff-sessions-testimony

- Sam Biddle, "Russian Bank Accused of Trump Connection Tries to Clear Name By Pressuring U.S. Computer Researcher," *The Intercept*, Oct. 26, 2017, https://theintercept.com/2017/10/26/russian-bank-accused-of-trump-connection-tries-to-clear-name-by-pressuring-u-s-computer-researcher/

- Amy Knight, "Why Mueller Named a Russian Oligarch in Court, *Daily Beast*, Apr. 6, 2018, https://www.thedailybeast.com/is-muellers-eye-on-some-russian-oligarchs

- Rafael Saakov, "US Think Tank Takes Heat for Hosting Putin-Linked Oligarchs," *VOA News*, May 23, 2018, https://www.voanews.com/usa/us-think-tank-takes-heat-hosting-putin-linked-oligarchs

- Damir Marusic & Karina Orlova, "The Great Oligarch Whitewash," *The American Interest*, May 30, 2018, https://www.the-american-interest.com/2018/05/30/the-great-oligarch-whitewash/

- Jason Leopold & Anthony Cormier, "Here is the Money Trail from the Russian 'Agent' and her Republican Partner," *BuzzFeedNews.com*, July 31, 2018, https://www.buzzfeednews.com/article/jasonleopold/maria-butina-paul-erickson-suspicious-bank-money-russia

- Betsy Swan et al., "Exclusive: This is Accused Russian Spy Maria Butina's Secrety Money Man in Moscow, Sources Say," *The Daily Beast*, Aug. 22, 2018, https://www.thedailybeast.com/exclusive-this-is-accused-russian-spy-maria-butinas-secret-money-man-in-moscow-sources-say

- Dexter Filkins, "Was There a Connection between a Russian Bank and the Trump Campaign?," *The New Yorker*, Oct. 15, 2018 (print edition), https://www.newyorker.com/magazine/2018/10/15/was-there-a-connection-between-a-russian-bank-and-the-trump-campaign

- Jason Corcoran,"Kremlin to Buy Alfa Bank from Oligarch Fridman," *Intellinews*, Dec. 5, 2018, https://www.intellinews.com/kremlin-to-buy-alfa-bank-from-oligarch-fridman-153149/

- Special Counsel Robert S. Mueller, III, *Report on the Investigation into Russian Interference in the 2016 Presidential Election*, Vols. I & II (March 2019), https://www.justice.gov/storage/report.pdf

- Angel Au-Yeung, "Russian Billionaire Vs. The U.S. Government: A Look At Oleg Deripaska's Puzzling Lawsuit," *Forbes*, March 26, 2019,

38

https://www.forbes.com/sites/angelauyeung/2019/03/26/russian-billionaire-vs-the-us-government-a-look-at-oleg-deripaskas-puzzling-lawsuit/#2f2d7a756a1c

- Will Louch et al., "Russia-Linked Buyout Firm Violates Deal With U.S. National Security Panel to Sell Stake," *Wall St. J.*, July 30, 2019, https://www.wsj.com/articles/russia-linked-buyout-firm-violates-deal-with-u-s-national-security-panel-to-sell-stake-11564479001

- Donna Ladd & Nick Judin, "Mississippi Lobbyists, Associates in Thick of Trump's Ukraine-Russia Web," *Jackson Free Press*, Oct. 2, 2019, https://www.jacksonfreepress.com/news/2019/oct/02/mississippi-lobbyists-associates-thick-trumps-ukra/

- Gregory L. White, "As Russia Squeezes Big Business, a Tycoon Decides to Pick a Fight," *Wall St. J.*, Oct. 28, 2019, https://www.wsj.com/articles/SB112856247619561303

**19.    Identify any documents or evidence reflecting or demonstrating that Plaintiffs had any involvement or participation in an "attempt to interfere in the 2016 U.S. Presidential election," as referenced in Paragraph 13.b. of the Affirmative Defenses in the Answer.**

**ANSWER:** Defendants refer Plaintiffs to the answer to Interrogatory No. 18 and to the documents Defendants have produced.

**20.    Identify and describe any information, documents, communications, evidence, or sources relating to how the headline of CIR 112 ("RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP COOPERATION") relates to the contents of CIR 112, including any evidence of Plaintiffs' involvement in interference with the 2016 U.S. Presidential election.**

**ANSWER:** Objection. Defendants object to this Interrogatory's use of the phrase "headline of CIR 112," because it rests on a false premise, namely that CIR 112 has a "headline." Because CIR 112 is an intelligence report, not a news article, it does not contain a "headline." Defendants also object to this Interrogatory because it is vague and unclear, as it is not evident what is meant by the request for information "relating to how the headline [sic] of CIR 112 … relates to the contents of CIR 112." Defendants also object on the grounds that they are not the author of CIR 112 and to the extent this Interrogatory asks for Defendants to speculate as to what Christopher Steele was thinking when he drafted the report, the Interrogatory improperly calls for speculation.

With respect to the remaining unobjectionable portions of the Interrogatory, Defendants refer Plaintiffs to Defendants' Answers to Interrogatories No. 18 and 19.

**21.    Identify and describe all document retention or destruction policies you have or had in place during the Relevant Period, including all electronic document, e-mail, and instant message back-up and deletion policies.**

**ANSWER:** Objection. Defendants object to this Interrogatory because it calls for information and the identification of documents that are covered by the attorney-client privilege and the attorney work product doctrine. Defendants also object to this Interrogatory because it uses a term that is not defined: "Relevant Period." Defendants object to the term "you," because Plaintiffs define "you" to include "persons or entities acting . . . in concert with" the Defendants, but information in the possession, custody, or control of persons or entities acting "in concert with" the Defendants is not in Defendants' possession, custody, or control and the Defendants therefore cannot provide that information.

As to the non-objectionable portion of the Interrogatory, Defendants provide the following answer that does not implicate these privileges:

Defendants' work product for clients is the property of the client. At the end of each engagement, Defendants return or destroy the work product as directed by the client.

Upon receipt of any request for information or documents from a third party (e.g., a congressional committee), or upon service of notice of a complaint, Defendants received and complied with memoranda from counsel, requiring Defendants to preserve documents related to the subject matter of the requests and litigation.

**22.     Identify all persons who Defendants intend to call as witnesses at trial, and the subjects on which each person is expected to testify.**

**ANSWER:** Objection. Defendants object to this Interrogatory because it seeks premature disclosure of witnesses. Defendants' counsel have not identified witnesses they intend to call at trial. Defendants will timely disclose witnesses subject to the Federal Rules, this Court's Local Rules, and the Scheduling Order in this Action.

**23.     Identify (consistent with Instructions H.(v) and (vi)) in Plaintiffs' Second Set of Interrogatories any documents responsive to any Interrogatory or Document Request propounded by the Plaintiffs, or otherwise relevant to any of the issues in this Action, that were "return[ed] or destroy[ed]" (including work product, memos, source information or analysis, engagement agreement with Steele or Orbis, etc.) in accordance with the procedure identified in Response to Interrogatory No. 21.**

**ANSWER:** Objection. Defendants object to this Interrogatory because it calls for information and the identification of documents that are covered by the attorney-client privilege and the attorney work product doctrine. Defendants also object to this Interrogatory because it is vague and ambiguous, as it does not specify to which of Defendants' clients it refers when it says "that were 'return[ed] or destroy[ed].'"

As to the non-objectionable portion of the Interrogatory, Defendants provide the following answer that does not implicate the claimed privileges:

Aside from the following three items, Defendants cannot recall what specific, individual documents they had that would have been responsive to any Interrogatory or Document Request or relevant to any of the issues in this Action and that "were 'returne[ed] or

destroy[ed]' in accordance with the procedure identified in Response to Interrogatory No. 21."

- Defendants had a copy of an engagement letter with Orbis and/or Christopher Steele. As set forth in Answer to Interrogatory No. 21, such document was the property of the client and at the end of the engagement, Defendants regularly destroy or return documents to clients. Defendants do not recall whether the document was returned to the client or destroyed, and they do not recall the specific date in November or December 2016 when the document was returned or destroyed. Peter Fritsch can testify regarding these matters.

- Defendants had a copy of a memorandum responsive to Document Request No. 26. As set forth in Answer to Interrogatory No. 21, such document was the property of the client and at the end of the engagement, Defendants regularly destroy or return documents to clients. Defendants do not recall whether the document was returned to the client or destroyed, and they do not recall the specific date in November or December 2016 when the document was returned or destroyed. Peter Fritsch can testify regarding these matters.

- Defendants had a communication from Orbis transmitting an encrypted copy of CIR 112, but they do not recall whether such communication was an e-mail or other form of communication. As set forth in Answer to Interrogatory No. 21, such document was the property of the client and at the end of the engagement, Defendants regularly destroy or return documents to clients. Defendants do not recall whether the document was returned to the client or destroyed, and they do not recall the specific date in November or December 2016 when the document was returned or destroyed. Peter Fritsch can testify regarding these matters.

Dated:  May 18, 2020                         By:      */s/* Joshua A. Levy


                                             Joshua A. Levy (D.C. Bar No. 475108)
                                             Rachel M. Clattenburg (D.C. Bar No. 1018164)
                                             LEVY FIRESTONE MUSE LLP
                                             1401 K St. NW, Suite 600
                                             Washington, DC 20005
                                             Tel: (202) 845-3215
                                             Fax: (202) 595-8253
                                             jal@cunninghamlevy.com

                                             *Counsel for Defendants*

41

## VERIFICATION OF ANSWERS TO INTERROGATORIES

I, Glenn Simpson, believe, based on reasonable inquiry, that the foregoing answers are true and correct to the best of my knowledge, information and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on _6-18-20_

_____
Glenn Simpson

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 18, 2020 the foregoing Answers to Interrogatories were

served via email on counsel of record:


Alan S. Lewis, Esquire
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005
Tel: (212) 238-8647
Lewis@clm.com

Kim Hoyt Sperduto, Esquire
SPERDUTO THOMPSON PLC
1133 Twentieth Street, NW
Second Floor
Washington, D.C. 20036
Tel: (202) 408-8900
ksperduto@sperdutothompson.com


                                              /s/    Joshua A. Levy_____
                                                      Joshua A. Levy

# EXHIBIT G



<u>Neutral Citation Number: [2020] EWHC 1812 (QB)</u>

<u>Case No: QB-2018-006349</u>

**<u>IN THE HIGH COURT OF JUSTICE</u>**
**<u>QUEEN'S BENCH DIVISION</u>**
**<u>MEDIA AND COMMUNICATIONS LIST</u>**

<u>Royal Courts of Justice</u>
<u>Strand, London, WC2A 2LL</u>

<u>Date: 08/07/2020</u>

**Before**:

**<u>MR JUSTICE WARBY</u>**
- - - - - - - - - - - - - - - - - - - - -
**Between:**

**(1) Petr Aven**
**(2) Mikhail Fridman**
**(3) German Khan**                                    **<u>Claimants</u>**

**- and -**

**Orbis Business Intelligence Limited**          **<u>Defendant</u>**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Hugh Tomlinson QC and Kirsten Sjøvoll** (instructed by **CMS Cameron McKenna Nabarro Olswang LLP**) for the **Claimants**
**Gavin Millar QC and Robin Hopkins** (instructed by **Reynolds Porter Chamberlain LLP**) for the **Defendant**

Hearing dates: 16 - 19 March 2020
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

*Aven v Orbis Business Intelligence* [2020] EWHC 1812 (QB)

| INDEX | |
| --- | --- |
| **Section** | **Paragraphs** |
| **Introduction** | 1-9 |
| **The Trial** | 10-11 |
| **The overall legal framework** | 12-17 |
| **Issues on liability** | 18-19 |
| **The Personal Data Issue** | 20-45 |
| **A narrative** | 46-62 |
| **The Legal Purposes Issue** | |
| The relevant provisions | 63-73 |
| The parties' contentions | 74-78 |
| Assessment | 79-104 |
| **The National Security Issue** | |
| The law | 105-112 |
| The facts | 113-118 |
| Submissions | 119-122 |
| Assessment | 123-129 |
| **The Fairness Issue** | |
| Conclusions | 130 |
| Reasons | 131-144 |
| **The Accuracy Issue** | |
| The issues in dispute | 145-149 |
| Fact or opinion? | 150-151 |
| Inaccurate or misleading? | 152-174 |
| Accurate recording? | 175-176 |
| Reasonable steps? | 177-187 |
| **Remedies** | 188-203 |
| **Summary of Conclusions** | 204 |

48.   Orbis worked with Fusion on a handful of occasions between 2010 and 2016. Sometimes, Orbis would engage Fusion, and on other occasions Fusion would engage Orbis.

49.   In about late May 2016, Mr Simpson, on behalf of Fusion, contacted Mr Steele with instructions to investigate Donald Trump and his alleged links with Russia and Russian officials, specifically President Putin.  Mr Trump was then the presumptive Republican candidate for the Presidency. Fusion was acting on the instructions of a Washington DC law firm called Perkins Coie, which in turn was acting on the instructions of one or more persons or bodies at the top of the Democratic Party ("the Ultimate Client").

50.   Pursuant to Fusion's instructions, between June 2016 and the Presidential Election on 8 November 2016, Orbis produced the 16 memoranda that were eventually published in the Buzzfeed Article. The first memorandum was dated 20 June 2016.  Four more were prepared in July, four in August, three in September, and four in October 2016. For this work, Orbis was paid a retainer of £100,000, in five monthly instalments. Orbis invoiced and was paid by Fusion.

Disclosures

51.   Orbis, through Mr Steele, admit or maintain that they made or authorised disclosures of memoranda from the Steele Dossier on the following occasions:

(1)   On 5 July 2016, Mr Steele and Mr Burrows met FBI officials at Orbis' offices in London.  Mr Steele provided the FBI with the reports which Orbis had prepared by that point. This did not include Memorandum 112.  Mr Steele made a note of this meeting ("the FBI Note").

(2)   In August 2016, Mr Steele provided the FBI with all the memoranda prepared to date. These did not include Memorandum 112. He promised to provide further reports.

(3)   On 14 September 2016, Memorandum 112 was delivered to Fusion.  Orbis has dubbed this "the Fusion Disclosure" and I shall adopt that label.

(4)   In September 2016, to the FBI.  Orbis' pleaded case is that it delivered a copy of Memorandum 112 to "a senior US national security official" in or around September 2016. Mr Steele's evidence is that within a few days of the Fusion Disclosure, that is to say in about mid-September 2016, he provided a copy of Memorandum 112 to the FBI. That is disputed.

(5)   In November 2016, Mr Steele made three further disclosures of Memorandum 112 and other memoranda from the Steele Dossier, to politicians and government officials: -

a)   Strobe Talbott, a former US Deputy Secretary of State;

b)   an unnamed individual described by Mr Steele as a "UK government national security official"; and

c)   David Kramer, a former US Assistant Secretary of State for Democracy, Human Rights and Labor, in the Bush Administration.

52.   At some point between late November 2016 and 10 January 2017, Mr Kramer gave Buzzfeed access to the Steele Dossier, thereby causing or contributing to the publication of the Buzzfeed Article.

53.   In December 2016, Mr Kramer asked Mr Steele to agree to him discussing the Steele Dossier with a senior US national security official, Celeste Wallander. Mr Steele maintains that he did not give or withhold consent, but in any event did not authorise the disclosure of Memorandum 112 by Mr Kramer to Ms Wallander. That has not been challenged, so I do not need to address any disclosure that may have been made by Mr Kramer to Ms Wallander.

54.   Orbis has given a collective label to four disclosures of Memorandum 112: Mr Steele's alleged disclosure to the FBI in September 2016, and the three disclosures of November 2016 for which he admits responsibility. Orbis calls these "the National Security Disclosures".  It is helpful to have a collective label, and I shall adopt this one, but without adopting any tendentious overtones it may possess. It is not disputed that Mr Steele's motivation in making these disclosures was to protect the national security of the UK and/or the US. The question is whether that purpose requires that the data in question be exempted from the relevant aspects of the DPA.

*Responsibility for disclosure*

55.   Orbis accepts responsibility for the Fusion Disclosure and the National Security Disclosures. The only issue in dispute about those disclosures is whether Orbis did in fact disclose Memorandum 112 to the FBI in September 2016.

56.   Orbis denies responsibility for any other disclosures, or any other processing activities of other controllers. That includes any disclosures to or publications by Buzzfeed, or other media organisations, which Orbis maintains are the responsibility of the media or of other individuals.

57.   In his opening submissions, in cross-examination, and in his argument on remedies, Mr Tomlinson raised the question of whether Orbis was responsible for disclosures of Memorandum 112 made by Mr Kramer to the *Washington Post* and to Buzzfeed, and thereby responsible for media publication of the personal data in Memorandum 112. In cross-examination, Mr Tomlinson showed Mr Steele the transcript of Mr Kramer's deposition on 13 December 2017 in *Gubarev v Buzzfeed Inc.,* a case brought in the US District Court for the Southern District of Florida. Mr Kramer gave evidence, in those proceedings, that Mr Steele knew that Mr Kramer was going to provide a copy of Memorandum 112 to the *Washington Post*. As for Buzzfeed, Mr Tomlinson secured an admission that Mr Steele had put Mr Kramer in touch with Ken Bensinger of Buzzfeed. He put it to Mr Steele that he did that when he knew, or should at least have foreseen, that Mr Bensinger would ask for the dossier and that Kramer would provide it.

58.   I was a little surprised by this aspect of the claimants' case, as I had not detected any clear averment to this effect in the Particulars of Claim. There is mention there of disclosure to "third parties" including "the media" but no details, and no allegation that Orbis disclosed to Buzzfeed, or the *Washington Post*, or that it caused or authorised any such disclosure.  The Particulars of Claim state that details of the identity of the recipients of Memorandum 112, other than Fusion, would be added after disclosure and/or the provision of further information by Orbis. But this was never done. Nor am

I aware that any notice was given of an intention to rely on the Kramer transcript as hearsay evidence at the trial. In any event, the claimants have not persuaded me that any disclosures of Memorandum 112 by Mr Kramer represented the processing of data by or on behalf of Orbis.

59.   Mr Steele admits briefing journalists about Orbis' work, and the documentary evidence and cross-examination make it clear that, in and after late September 2016 he was heavily and enthusiastically involved in doing so. His explanation is that he wished to make known what he regarded as "wholescale Russian US election interference project". But oral disclosures are not caught by the DPA: *Scott v LGBT Foundation* [2020] EWHC 483 (QB) [55] (Saini J). And encouraging the media to report on a story, and giving them background information about it, are not the same thing as providing or authorising the provision of documents for that purpose. The high point of this aspect of the claimants' case would seem to be an article in *Mother Jones* dated 31 October 2016, for which Mr Steele has admitted he was a source. That article states that the authors have reviewed some of the Orbis reports, and appears to quote from them. The OIG report corroborates this, suggesting that a *Mother Jones* journalist provided one of Mr Steele's reports to the FBI (footnote 259). Cross-examined, however, Mr Steele insisted that he had not given or read any of his reports to Mother Jones. He has been clear and consistent in his denials that he provided any journalist with a copy of Memorandum 112, or any other part of the Dossier, or authorised others to do so. In paragraph 57 of his revised first witness statement he said he did not disclose or discuss the content of Memorandum 112 with the media, and did not intend, authorise or envisage that the Memorandum "and the information it contains about the First and Second Claimants" would become more widely disseminated. In paragraph 58 he specifically denied giving permission for the provision of a copy of the Dossier to Ken Bensinger. That was not directly challenged.

60.   The deposition of Mr Kramer is not a satisfactory basis for an invitation to reject Mr Steele's evidence and find Orbis liable for disclosure and publication of Memorandum 112 made by others. Besides the procedural shortcomings I have identified, the deposition is provided to me shorn of its context. I am told nothing else about the *Gubarev v Buzzfeed* litigation, and very little about Mr Kramer except that (as is obvious) he had a clear motive for tailoring his evidence. In any event, knowledge that a person intends to make a disclosure is not enough to bring home liability. And the substance of Mr Kramer's evidence, so far as Buzzfeed is concerned, is this. Mr Steele asked him to meet Mr Bensinger, but without asking him to provide a copy of the Dossier; Mr Kramer did not provide Mr Bensinger with a copy, but left him in a room with the memos for 20-30 minutes, on the agreed basis that Mr Bensinger would use the time to read them; in that period, Mr Bensinger took photos of the documents, without Mr Kramer's knowledge or consent; and Mr Kramer only found out about this when he saw the Buzzfeed Article, and did not intend the Dossier to be published. Mr Tomlinson, having effectively called Mr Kramer as his witness, could not and did not question this account. It undermines the case he sought to advance.

61.   On the basis of this evidence, I see no room for concluding that Mr Kramer made a disclosure to the *Washington Post* or Buzzfeed of the personal data contained in Memorandum 112 which amounted to processing of those data by or on behalf of Orbis, still less that the publication of those data by the *Washington Post* and Buzzfeed represented, or even resulted from, processing by or on behalf of Orbis. A data

(b) is satisfied on the application of a data subject that personal data of which he was the data subject and which have been rectified, blocked, erased or destroyed were inaccurate,

it may, where it considers it reasonably practicable, order the data controller to notify third parties to whom the data have been disclosed of the rectification, blocking, erasure or destruction."

The parties' contentions

74.     Orbis' case is that the creation of Memorandum 112, and the Fusion Disclosure which followed, were necessary, in the sense I have identified, for the carrying out of instructions Orbis received from Fusion, at the instigation of Perkins Coie, shortly after 29 July 2016. The purpose of those instructions, it is said, was

> "to facilitate an understanding of the extent to which Alfa worked with President Putin, given concerns about (i) potential interference by the Russian state in the US Presidential election process and (ii) suspected communications between the servers of Alfa Bank and Trump Tower."

75.     It is submitted that Mr Steele understood that the intelligence he gathered would be used to advise the Ultimate Client on the prospect of legal proceedings and, if necessary, deployed in such proceedings to challenge the eventual outcome of the Presidential Election. Orbis' instructions, and thus the Fusion Disclosure, were reasonably necessary to enable such advice to be given and for decisions to be made about the legal implications of those matters and/or to assist the Ultimate Client with those implications. Specifically, it is said that the Fusion Disclosure was necessary as a step towards establishing whether any rights under electoral law might flow from the matters recorded in the memoranda. That brings the case within the concept of "establishing legal rights" in s 35(2).

76.     This has the following consequences, submits Mr Millar:-

(1)     The Fourth Principle "falls away".  Memorandum 112 was an intelligence report, the fruit of investigative activities. It was a "piece of the mosaic" on unresolved questions which were the subject of continuing enquiry, as part of a wider exercise of assessing the alleged links between Russia and the Trump campaign. That was a matter of some urgency, given the election on 8 November 2016. In all these circumstances, compliance with the duty of accuracy would have been inconsistent with the purposes for which Memorandum 112 was compiled and disclosed.

(2)     The Notice Requirements also "fall away".  The purposes of the Fusion Disclosure, and the duties of confidence owed to clients in such contexts, were plainly inconsistent with a requirement to give the data subjects advance notice.

(3)     Although the duty to comply with a Schedule 2 condition and (on the basis of my findings) a Schedule 3 condition remains in place, that duty is discharged by virtue of the very purposes that justify the application of the Legal Purposes Exemption.

81.   This task faces some obstacles.  There were a number of participants who were directly involved, and could have shed light on the questions for determination, but I have evidence from only one of them: Mr Steele. He has given two very different versions of events, which are mutually inconsistent in a number of respects. This was, on any view, an intelligence-gathering exercise, inherently unlikely to be heavily documented. Mr Steele kept few records, and most of these he did keep have been lost or destroyed. One contemporaneous record of relevance has survived: the FBI Note, recording the substance of a meeting on 5 July 2016. But this only helps with some relatively minor aspects of the story.  There is little other documentation that throws any light on the facts. Much of what there is consists of press cuttings, from several months after the events to which they relate, containing hearsay from anonymous or unidentified sources. Against that background I take a cautious approach, but find the following relevant facts.

82.   Orbis' engagement by Fusion was first mooted at a meeting between Mr Simpson and Mr Steele at Carluccio's restaurant at Heathrow Airport in late May 2016, and confirmed by Mr Simpson in a telephone conversation between them about a week later. I accept Mr Steele's evidence: the words used were to the effect that Orbis was to collect intelligence from sources on Trump-Russia issues and interference in the US Presidential campaign, which would be "fed to" a "respectable" law firm based in Washington DC which was Fusion's client.  The initial engagement was for one month on a retainer of $20,000. The retainer was in due course increased. But there was no documentation, at that time or later.  The law firm, though not named at the time, was Perkins Coie. As was apparent to Mr Steele, the law firm had a principal: the Ultimate Client.

83.   Mr Steele's evidence is that he now believes the Ultimate Client was the Democratic National Committee.  Mr Millar submits that the Ultimate Client was the Clinton election campaign, "Hillary for America". This is in line with the FBI Note of 5 July 2016, which records Mr Steele telling the FBI that Orbis had been instructed by Mr Simpson of Fusion and "Democratic Party Associates" but that "the ultimate client were (sic) the leadership of the Clinton presidential campaign". The FBI Note also indicates that Mr Steele had been told by that stage that Mrs Clinton herself was aware of what Orbis had been commissioned to do.

84.   I have little reliable evidence as to who exactly was the Ultimate Client, but I have enough to find that Perkins Coie were instructed by one or more people or organisations within the upper echelons of the Democratic Party, concerned to ensure Hillary Clinton's election as President. I also find that Mr Steele knew this much from early June 2016, at least.  I do not believe it is necessary, or relevant, to go further. I shall continue to refer to the Ultimate Client, without identifying who they were.

85.   It would be naïve and unreal to suppose that the Ultimate Client, when instructing Perkins Coie, did not have political aims. The role and position of the Ultimate Client, the relationship in which that client stood to Mr Trump, and the nature of the instructions, make it obvious that they did.  But it does not follow that there was no legal purpose. In my judgment, on the evidence before me at this trial, there was one, and it applied to the commissioning of the Dossier as a whole, including the creation and delivery of Memorandum 112. The purpose was obtaining legal advice.

86.     The Ultimate Client's instructions were not given to Orbis or to Fusion. They were given to a law firm, and passed on by that firm to the investigative organisations. The plan from the outset was that the output of the investigative activities that Perkins Coie commissioned would then (to use Mr Steele's words) be "fed back" to the law firm. This raises the question of why a law firm was involved at all.   In cross-examination, Mr Tomlinson put it to Mr Steele that Perkins Coie were effectively the "legal arm" of the Democratic Party. He accepted that, but I cannot give any real weight to this rather vague proposition. Nor can I uphold the further proposition about the firm that was put by Mr Tomlinson to Mr Steele:

> "they instruct investigators to obtain material about political opponents in a privileged setting so it can then be used for campaigning by the Democratic Party".

There is no evidence before me that could sustain that suggestion.

87.     My conclusion is that Perkins Coie were approached by the Ultimate Client and given the instructions they were with a view to obtaining information for the purpose (though not the exclusive purpose) of taking legal advice on its legal implications and what, if any, legal steps could be taken as a result. On the balance of probabilities, Perkins Coie's sole or dominant purpose in commissioning the Dossier was to obtain information for the purpose of providing legal advice. These are not mere assumptions nor are they speculation, as suggested by Mr Tomlinson.   They are reasonable inferences from the fact that a law firm was instructed at all, and from such of the evidence as I accept about the nature of the firm, its dealings with Fusion and Orbis, and the individual lawyers who were involved.

(1)     It was in the latter part of July 2016 that Mr Steele first learned the identity of the law firm, the existence and role of which had been known to him from the outset. He was given the name by Mr Simpson and looked up the firm's website. It is on that basis that he accepted the proposition that the firm was "the legal arm" of the Democratic Party.

(2)     After this, on about 29 July 2016, Mr Steele and Mr Simpson met a partner from the firm's Privacy and Data Security Practice, named Michael Sussman.   Mr Sussman mentioned allegations about suspicious server activity involving Alfa Bank and the Trump organisation.

(3)     At this meeting, Mr Steele was told that the team instructing him and Fusion included another partner, Marc Elias.   Mr Elias was General Counsel to the Clinton Presidential campaign, and an electoral law specialist. The firm's website suggests that he is one of the foremost electoral litigators in the United States. Mr Steele gave evidence suggesting that Mr Elias was or may have been in an adjacent room at the time of this meeting. I am not confident of that, and make no finding on it. I do find that Mr Elias was not at the meeting.

(4)     It was shortly after this meeting that Mr Simpson gave instructions by telephone for Orbis to produce a Memorandum on Alfa Bank's links with the Kremlin. Memorandum 112 responded to those instructions, and was prepared over the four to six weeks immediately preceding the Fusion Disclosure.

(5)     After the Fusion Disclosure Mr Steele had a second meeting with Perkins Coie, at which its contents were discussed. This was on or about 22 September 2016.

(6)     At some point in his dealings with Perkins Coie, Mr Steele was told by them that they wanted to obtain information and monitor irregularities in the election campaign.

88.    These findings represent an acceptance of evidence given by Mr Steele in his second witness statement dated 15 March 2020, and on oath at the trial. They mean that the account given in first witness statement was significantly mistaken. That statement said that Mr Steele had one meeting with the lawyers in late July, then another which took place on 11 September 2016, which is when he was instructed to produce Memorandum 112. This is a big change of story, and that obviously casts doubt on the revised account. The new account comes several years after the events.

89.    I have given careful thought to this, but I accept Mr Steele's revised account. It is coherent, more probable than the original one, and there is an explanation, supported by documents. Mr Steele says that when preparing to give evidence he was prompted to reconsider his original account by noting something in the December 2019 Report of the Office of the Inspector General ("OIG"). This recorded that Mr Steele had met a Department of Justice official on 23 September 2016. Examination of his passport shows that he entered the USA on 29 July and 21 September 2016. A credit card statement shows he flew out of London on 21 September, and on 24 September paid for a stay at the Hilton Hotel in Washington DC. All this was at odds with a meeting on 11 September.

90.    As for the late July meeting, I have taken account of Mr Tomlinson's challenge to the suggestion that Perkins Coie briefed Mr Steele on suspicious server activity at that time. Mr Tomlinson relied on two media articles, one by Franklin Foer in *Slate*, dated 31 October 2016, entitled "Was a Trump Server Communicating With Russia", and another by Dexter Filkins in *The New Yorker* dated 15 October 2018, entitled "Was there a connection between a Russian Bank and the Trump Campaign?"  Mr Steele was cross-examined to the effect that these articles were inconsistent with his evidence. It was put to him that there was not a shred of evidence that, in late July 2016, anyone had reached the conclusions that, according to Mr Steele, were put to him by Perkins Coie. These are articles based on anonymous sources which sought to tell the story of an emerging "scandal", months or years after the event. They both suggest that computer scientists were investigating the possibility of Russian hacking of the Republican Party from as early as June 2016. The articles were not aimed at, and did not confront, the propositions advanced by Mr Steele in his evidence to me. They do not profess to set out a minutely detailed chronology. Neither the authors nor their sources have given evidence or addressed the specifics of Orbis' case in writing.   I do not regard this anonymous second-hand hearsay as a sound basis for rejecting Mr Steele's evidence.

91.    As for the prospect of taking legal action, Mr Tomlinson is right: there is no evidence of any legal action being taken, or of any thought being given to it, or as to what might have been done, legally.   I can however draw inferences. My conclusion is that the possibility of litigation may well have been in the minds of the Ultimate Client and Perkins Coie at the outset, in the sense that it would have been devoutly hoped for, and would have been pursued if favourable advice had been given.  By the time of the

111. The structure and the language of s 28 are both different from those of the Legal Purposes Exemption. It might be said that the differences are more semantic and apparent than real. There are however two points about the language which are, in my judgment, significant for present purposes.

   (1) The first is that the s 28 exemption applies to *personal data* and not to a *disclosure*. This is a broad exemption which protects, or is capable of protecting, specified kinds or categories or descriptions of information rather than disclosures that take place for certain kinds of purpose. It can be a class-based exemption. This is reflected in s 28(3), which provides that a Ministerial certificate may "identify the personal data to which it applies by means of a general description".

   (2) Secondly, the test imposed by s 28 is not whether the application of a principle or provision would be "inconsistent with" a disclosure which is "necessary" for a purpose. The question posed is whether the exemption is "required" for the specified purpose.

112. The concept of necessity is a familiar one, much used, much litigated and well understood in the context of human rights and data protection law. "Necessary" is the term used in the "parent" of s 28(1), namely Article 13(1)(a) of the Directive which provides that

> "Member States may adopt legislative measures to restrict the scope of the obligations … provided for in Article… 6(1) … when such a restriction constitutes a necessary measure to safeguard: (a) national security …"

It would have been easy, indeed natural, to use the same word in s 28(1), but Parliament chose a different term. The Court should treat that choice as significant. It cannot denote a broader concept than the word "necessary". The intention I attribute to Parliament is to impose a more exacting test, limiting the scope of this broad exemption to cases where it is judged to be indispensable to the safety and well-being of the nation that certain personal data be exempt from a Data Protection Principle or other DPA provision. If this analysis is correct, it follows that there may be cases in which a disclosure of personal data is "reasonably necessary" for the purposes of national security but the purpose of safeguarding national security does not require that the personal data be exempt from any of the specified DPA provisions.

The facts

113. I have set out Orbis' case on the facts at 51(2)-(3), (4) and (5) above. Mr Steele has given evidence supporting that case. For the most part, he was not challenged about what took place. On the one disputed issue, namely whether Mr Steele provided the FBI with a copy of Memorandum 112 in September 2016, within a few days of the Fusion Disclosure, I find in favour of Orbis.

   (1) The FBI Note indicates that the meeting of 5 July 2016 was one at which Mr Steele volunteered disclosures to the FBI. It records that the FBI officials were "generally impressed with the reporting", "stunned" by one aspect, and asked when there might be follow-up opportunities. One of the officers said he would

circulate the reporting to "a small group of senior managers and analysis at FBI HQ". The note was made on 8 July 2016, apparently for internal purposes. It reflects Mr Steele's state of mind at that time, and I consider it likely to be an accurate reflection of what actually happened.

(2)    In oral evidence he elaborated, by explaining that his understanding in July 2016 was that the FBI officer he met had cleared his lines with the Assistant Secretary of State, Victoria Nuland. He was challenged over that, which was not in his statement, but I accept it.

(3)    It is an agreed fact that, by 31 July 2016, the FBI had opened an investigation into allegations of foreign interference with the US Presidential Elections, under the name "Crossfire Hurricane".

(4)    It is an undisputed fact, and I accept, that Mr Steele provided further "Dossier" memoranda to the FBI in August 2016. I accept his evidence, which has not been contradicted, that he did so, without seeking permission from his principals, because the FBI asked him "to provide them with all the intelligence we had gathered in the course of our engagement by Fusion", he considered the intelligence to be important, and considered it his duty to the Crown to seek to ensure that the intelligence was brought to the attention of appropriate authorities and thoroughly investigated.

(5)    As already mentioned, by late September, Mr Steele was enthusiastically briefing journalists about Orbis' findings.

(6)    Mr Steele's evidence that he provided Memorandum 112 to the FBI in September is consistent with the pattern of these other items of evidence.

(7)    There is documentary evidence of a meeting on 11 October 2016, between Mr Steele, another Orbis representative, and Kathy Kavalec of the State Department at which Orbis' "investigation into the Russia/Trump connection" was discussed. Mr Steele was, at this stage, still regarded by the FBI as a covert human source. He told me that it was clear to him at this meeting that the Memorandum was being discussed between the FBI and State Department. A State Department note of this meeting provides some support for that evidence. It refers to three "Russian lines of effort" that are being tracked by Orbis. One is "Contacts between Trump – via Manafort – and the Kremlin". This section of the note contains the following:

> "Peter Aven of Alfa Bank has been the conduit for secret communications between the Kremlin and Manafort; messages are encrypted via TOR software and run between a hidden server managed by Alfa Bank (see separate paper on this channel) … Steele said Aven's contacts with Putin go back to St Petersburg, when Putin made $100M in the oil-for-food business while Aven was Minister of Foreign Trade."

This further demonstrates Mr Steele's enthusiasm for providing the US authorities with information of the kind contained in Memorandum 112, and

suggests that the State Department already had a separate paper on the topic of communications via a hidden server managed by Alfa Bank.

(8)    The claimants rely on three footnotes to the OIG Report.  Footnote 231 identifies Memorandum 112 as one of a four "reports … that Steele did not furnish to the FBI, which range in date from July 30 to September 2016". Footnote 259 states that the Crossfire Hurricane team received Memorandum 112 "on or about November 6, 2016, from a *Mother Jones* journalist through then FBI Counsel James Baker". Footnote 319 refers to the provision of (among others) Memorandum 112 to the FBI by Senator John McCain, on 9 December 2016. It states that FBI records show that it "had not previously received" that report from Steele.

(9)    There is no evidence to explain these footnotes. The sources on which they are based have not been identified to me. Again, I am asked to prefer multiple hearsay evidence from unidentified sources to that of a witness, supported to some extent by a contemporaneous document. In my judgment, it is unlikely that Mr Steele failed to provide the FBI with a report on matters which he plainly considered to be important, and which he was briefing journalists about and discussing with the State Department within a month of making the Fusion Disclosure. On the balance of probabilities, the footnotes are mistaken insofar as they suggest that Mr Steele did not provide Memorandum 112 to the FBI. That could be because its provision was somehow not recorded, or that the records were not identified in the course of preparing the OIG Report, or for some other reason.

114.    This means that there are four National Security Disclosures for consideration. My findings, about those disclosures are as follows.

**September 2016: The FBI**

115.    The memorandum was volunteered by Mr Steele, rather than requisitioned or demanded by the FBI.  He did this because he felt "duty bound" to make the disclosure. He probably did it by secure email, this being the method he used to provide the FBI with other Dossier reports. The State Department note indicates that a record was made at that department. The evidence does not suggest, however, that the FBI or the State Department took any particular interest in the claimants, or Alfa, or Memorandum 112. The best explanation for the footnotes to the OIG report may be that the FBI did not regard the contents of Memorandum 112 as of high importance.

**Early November 2016: Strobe Talbott**

116.    In early November, Mr Steele personally provided a copy of the Dossier, including Memorandum 112, to Mr Talbott. The background, as explained in Mr Steele's first witness statement, is this. Mr Talbott, who was at the time the President of the Brookings Institution and a member of the Council on Foreign Relations, approached Mr Steele. He said that he was due to meet a group of individuals at the State Department, and asked Mr Steele to "share a copy of the Dossier with him, with a view to him being able to discuss the national security issues raised with these individuals". Mr Steele agreed. He did so on the understanding that Mr Talbott had been speaking to the US Secretary of State John Kerry, and Ms Nuland, who knew of the Dossier and its

broad content; and that the individuals whom Mr Talbott was due to meet included the then US Deputy Secretary of State, Tony Blinken.

**Mid-November 2016: the UK government national security official**

117.     By mid-November, Mr Steele had come to the view that the intelligence he was receiving had national security implications for the UK, which he thought "could be exposed to similar risks as those apparently arising in the US". He considered he owed a continuing duty to report to his former employer on "any matter pertinent to UK national security". On or about 15 November 2016, he conferred with a former colleague, without providing copies of his memoranda or discussing the content. They agreed he should report to "the national security apparatus of the UK government", for the purpose of helping safeguard UK national security. He therefore contacted "a senior UK government national security official", who indicated agreement with Mr Steele's assessment that he should report the relevant intelligence. The official requested and Mr Steele provided copies of the memoranda, including Memorandum 112.

**Late November 2016: David Kramer**

118.     On 28 November 2016, Mr Steele met Mr Kramer.  Shortly afterwards, Mr Steele arranged for Fusion, in the person of Mr Simpson, to print copies of his memoranda and provide them to Mr Kramer. The background to this is explained in Mr Steele's first witness statement, and can be summarised as follows.

   (1)     Orbis had a relationship with a former British diplomat, Sir Andrew Wood, a Russianist, a former Ambassador to Russia, and a friend of Mr Steele. In early November, Mr Steele confided the substance of his reports to Sir Andrew.

   (2)     Sir Andrew then met David Kramer at an international security conference, where they discussed mutual concerns about Mr Trump's links to Russia. Mr Kramer was at that time the aide to Senator McCain. Senator McCain was Chair of the Senate Armed Services Committee.

   (3)     Mr Kramer introduced Sir Andrew to Senator McCain, who asked him to arrange a meeting between Mr Kramer and Mr Steele "to share the concerns about Russian interference in the US presidential election arising from the intelligence we had gathered and give him sight of this intelligence on a confidential basis".

   (4)     When that meeting took place, on 28 November, Mr Kramer said that he considered the intelligence raised issues of potential national security importance to the US. Mr Steele showed him, and they discussed, the reports that had been prepared by then, including Memorandum 112.

   (5)     After Mr Kramer had returned to the US, he asked for copies. Mr Steele arranged this, understanding the purpose to be the provision of those copies to Senator McCain by Mr Kramer, in person, with a view to taking appropriate action, such as discussion with senior Congressional colleagues.

concluded that this was in fact the case. But I do not consider this to be a satisfactory basis on which to reject Mr Aven's evidence to me.

Accurate recording?

175.   The evidence on this and the next issue comes of course from Mr Steele. His account is that the Dossier comprised intelligence obtained from 3 sources and approximately 20 sub-sources, all of whose identities were known to him. His contacts were with the sources. He met the sources and, during the meeting, made a manuscript note of what he was told. Within a day or so, he would compile a memorandum. He kept the manuscript notes for as long as necessary for that purpose, then destroyed them. Memorandum 112 was based on intelligence provided by a single source and a single sub-source. Mr Steele had a 2-hour meeting with the source, and wrote up the memorandum shortly after, destroying the manuscript notes.

176.   Mr Tomlinson invites me to find that Orbis has failed to prove that Memorandum 112 accurately records the information provided by the source. He relies on passages in the OIG report, that record that the source told that investigation that Mr Steele had "misstated and exaggerated his statements in multiple sections of his reporting" and that had made it clear that it was "just talk". The submission is that Mr Steele failed convincingly to counter these criticisms. I do not think that is the right approach. The question, rather, is whether the hearsay passages from the OIG report, summarising aspects of what the source said to the Department of Justice in January and March 2017, undermine the reliability of Mr Steele's written and oral evidence to me about Memorandum 112. None of the statements goes directly to the content of Memorandum 112. It is clear that the source may have had an axe to grind. I accept Mr Steele's account and find that the memorandum records accurately what he was told by the source.

Reasonable steps?

177.   Mr Steele describes in his witness statement the steps he took "to ensure as far as possible the reliability" of the content of the memoranda in the Dossier, including Memorandum 112:

> "I assessed the intelligence I received having regard to what I knew of the sources and sub-sources and their roles, my knowledge of the structure of the Russian political system and its inter-connections with business, and the credibility of their story. I asked others about the individual source or sub-source and their story, and I cross-referenced the information I received against open source data where possible. I asked myself whether the appearance of the information (for example, whether it seemed sensationalist, had any discrepancies or any seemingly misleading information etc), the access of the individual, and the story itself added up and tallied with the intelligence being received from others, and was consistent with my own knowledge and experience. I did not take what was said at face value but instead looked at the open source data pertaining to the individuals involved, other reporting, including that provided by other sources, and tried to find out whether other government and intelligence institutions internationally had any relevant

number of allegations about them. It is said, for instance that "It has been alleged that the First and Second Claimants were involved in trafficking heroin from Burma to East Germany…".  It is said that the New York Times has "reported on allegations of criminality, including drug dealing/running, corruption and embezzlement". Reliance is placed on the judgment of Judge Bates, which refers to media reports. Mr Millar argues that the claimants' complaint that Memorandum 112 represented a serious intrusion into their rights is "unsustainable" in the light of this material.

201.    These submissions are contrary to established principle. A defendant can mitigate damages by proving that the claimant had an existing bad reputation, but (1) evidence is only admissible in respect of the "relevant sector" of the claimant's reputation; proof of a bad reputation for something different is irrelevant; (2) bad reputation in the relevant sector cannot be proved by relying on specific acts of misconduct or third party reports, rumours, newspaper cuttings or media reports of bad behaviour: see *Barron v Vines* [21(5)-(6)], [23-24]. Those passages show that these rules have been firmly established since 1858, and were reaffirmed by the House of Lords in 1964, and the Court of Appeal in 2001. The rule against mitigation of damages by reliance on other publications was reaffirmed once more by the Supreme Court in 2019: see *Lachaux v Independent Print Ltd* [2019] UKSC 27 [2020] AC 612 [22], [24] (Lord Sumption).

202.    That said, the "publication" I am concerned with is limited.  I have no evidence that the opinion of any of the recipients was of particular concern to these claimants, or that the recipients took any particular steps that led to identifiable harm. This is one of those cases in which the fact and content of a reasoned judgment should have a moderating effect on the sum that is appropriate by way of vindication.

203.    My conclusion is that I should award each of the first and second claimants compensation in the sum of £18,000.

## Summary of Conclusions

204.    For the reasons given in this judgment I have reached the following main conclusions on the issues identified at [18] above:

(1)    The personal data about the delivery of "illicit cash" to Mr Putin did amount to sensitive personal data about alleged criminality.

(2)    The Fusion Disclosure was made for purposes falling within the Legal Purposes Exemption. The Fusion Disclosure was, for that reason, exempt from the Notice Requirement contained in Schedule 1 Part II para 2; the application of that requirement would be inconsistent with the disclosure. But the Fusion Disclosure was not exempt from the Fourth Principle, or from s 14(1)-(3).

(3)    The purpose of national security requires that the National Security Disclosures be exempt from the Notice Requirement. But it does not require any further exemption from the First or Fourth Principles.

(4)    Neither the Fusion Disclosure nor the National Security Disclosures were in breach of the First Principle. They all satisfied at least one condition in Schedule 2 and one in Schedule 3.

(5)     The personal data of which complaint is made are all factual, and not matters of opinion. The claimants have discharged the burden of proving that the data are inaccurate or misleading as a matter of fact.

(6)     No breach of the Fourth Principle has been established in relation to propositions (a), (b), (c) or (e), because Orbis has proved that this was third party information which it recorded accurately, and took reasonable steps to verify. But Orbis failed to take reasonable steps to verify the allegation in proposition (d), that the first and second claimant used Mr Govorun to deliver illicit cash to Mr Putin in the 1990s. A breach of the Fourth Principle is made out in that respect.

(7)     I am prepared to grant a limited order for rectification in respect of all the inaccurate data, but I decline to grant any wider remedy under DPA s 14(1)-(3), on the grounds that this is not necessary or appropriate. I decline, for similar reasons, to make a declaration. But I award compensation to each of the first and second claimants. I assess the appropriate sum as £18,000 each.

# EXHIBIT H

The Washington Post

Opinions

# Devin Nunes is investigating me. Here's the truth.

By **Jonathan M. Winer**  February 8

*Jonathan M. Winer, a Washington lawyer and consultant, is a former U.S. deputy assistant secretary of state for international law enforcement and former special envoy for Libya.*

House Intelligence Committee Chairman Devin Nunes (R-Calif.) announced last week that the next phase of his investigation of the events that led to the appointment of special counsel Robert S. Mueller III will focus on the State Department. His apparent area of interest is my relationship with former British intelligence professional Christopher Steele and my role in material that Steele ultimately shared with the FBI.

Here's the real story: In the 1990s, I was the senior official at the State Department responsible for combating transnational organized crime. I became deeply concerned about Russian state operatives compromising and corrupting foreign political figures and businessmen from other countries. Their modus operandi was sexual entrapment and entrapment in too-good-to-be-true business deals.

After 1999, I left the State Department and developed a legal and consulting practice that often involved Russian matters. In 2009, I met and became friends with Steele, after he retired from British government service focusing on Russia. Steele was providing business intelligence on the same kinds of issues I worked on at the time.

In 2013, I returned to the State Department at the request of Secretary of State John F. Kerry, whom I had previously served as Senate counsel. Over the years, Steele and I had discussed many matters relating Russia. He asked me whether the State Department would like copies of new information as he developed it. I contacted Victoria Nuland, a career diplomat who was then assistant secretary of state for European and Eurasian affairs, and shared with her several of Steele's reports. She told me they were useful and asked me to continue to send them. Over the next two years, I shared more than 100 of Steele's reports with the Russia experts at the State Department, who continued to find them useful. None of the reports related to U.S. politics or domestic U.S. matters, and the reports constituted a very small portion of the data set reviewed by State Department experts trying to make sense of events in Russia.

In the summer of 2016, Steele told me that he had learned of disturbing information regarding possible ties between Donald Trump, his campaign and senior Russian officials. He did not provide details but made clear the information involved "active measures," a Soviet intelligence term for propaganda and related activities to influence events in other countries.

In September 2016, Steele and I met in Washington and discussed the information now known as the "dossier." Steele's sources suggested that the Kremlin not only had been behind the hacking of the Democratic National Committee and the Hillary Clinton campaign but also had compromised Trump and developed ties with his associates and campaign.

I was allowed to review, but not to keep, a copy of these reports to enable me to alert the State Department. I prepared a two-page summary and shared it with Nuland, who indicated that, like me, she felt that the secretary of state needed to be made aware of this material.

In late September, I spoke with an old friend, Sidney Blumenthal, whom I met 30 years ago when I was investigating the Iran-contra affair for then-Sen. Kerry and Blumenthal was a reporter at The Post. At the time, Russian hacking was at the front and center in the 2016 presidential campaign. The emails of Blumenthal, who had a long association with Bill and Hillary Clinton, had been hacked in 2013 through a Russian server.

While talking about that hacking, Blumenthal and I discussed Steele's reports. He showed me notes gathered by a journalist I did not know, Cody Shearer, that alleged the Russians had compromising information on Trump of a sexual and financial nature.

What struck me was how some of the material echoed Steele's but appeared to involve different sources.

On my own, I shared a copy of these notes with Steele, to ask for his professional reaction. He told me it was potentially "collateral" information. I asked him what that meant. He said that it was similar but separate from the information he had gathered from his sources. I agreed to let him keep a copy of the Shearer notes.

Given that I had not worked with Shearer and knew that he was not a professional intelligence officer, I did not mention or share his notes with anyone at the State Department. I did not expect them to be shared with anyone in the U.S. government.

But I learned later that Steele did share them — with the FBI, after the FBI asked him to provide everything he had on allegations relating to Trump, his campaign and Russian interference in U.S. elections.

I am in no position to judge the accuracy of the information generated by Steele or Shearer. But I was alarmed at Russia's role in the 2016 election, and so were U.S. intelligence and law enforcement officials. I believe all Americans

5/15/2018

should be alarmed — and united in the search for the truth about Russian interference in our democracy, and whether Trump and his campaign had any part in it.

**Read more on this topic:**

Josh Rogin: Trump allies seek to tie Kerry's State Department to the Steele dossier

David Ignatius: The truth about the FBI's Russia probe

Greg Sargent and Paul Waldman: The Nunes memo is out. It's a joke and a sham.

💬 **3860 Comments**

# The story must be told.

Your subscription supports journalism that matters.

**Try 1 month for $1**

# EXHIBIT I

Glenn Simpson                                                    August 22, 2017

Washington, DC

```
                                                      Page 1

 1                 SENATE JUDICIARY COMMITTEE

 2                       U.S. SENATE

 3                    WASHINGTON, D.C.

 4

 5

 6

 7            INTERVIEW OF:  GLENN SIMPSON

 8

 9

10

11             TUESDAY, AUGUST 22, 2017

12                  WASHINGTON, D.C.

13

14

15

16

17       The interview in this matter was held at the

18   Hart Senate Office Building, commencing at 9:34 a.m.

19

20

21

22

23

24

25
```

Glenn Simpson                                          August 22, 2017
                        Washington, DC

                                                              Page 83

 1   we gave Chris a sort of assignment that would be

 2   typical for us which was pretty open ended.  We

 3   said see if you can find out what Donald Trump's

 4   been doing on these trips to Russia.  Since Chris

 5   and I worked together over the years there's a lot

 6   that didn't need to be said.  That would include

 7   who is he doing business with, which hotels does he

 8   like to stay at, you know, did anyone ever offer

 9   him anything, you know, the standard sort of things

10   you would look at.  I don't think I gave him any

11   specific instructions beyond the general find out

12   what he was up to.

13        Q. And was anyone else -- did you engage

14   anyone else to do that particular research?

15        A. In Russia?

16        Q. Yes.

17        A. So we had other people like Ed Baumgartner

18   who, you know, by this time -- I guess Prevezon was

19   still winding down, but who would do Russian

20   language research which didn't involve going to

21   Russia.  It just involves reading Russian newspaper

22   accounts and that sort of thing.

23        Q. So was Mr. Baumgartner also working on

24   opposition research for Candidate Trump?

25        A. At some point, I think probably after the

Glenn Simpson                                          August 22, 2017
Washington, DC

Page 84

1    end of the Prevezon case we asked him to help with

2    I think -- my specific recollection is he worked on

3    specific issues involving Paul Manafort and

4    Ukraine.

5         Q. With regard to the presidential election

6    of 2016?

7         A. Yes.

8         Q. We had talked about work for multiple

9    clients.  What steps were taken, if any, to make

10   sure that the work that Mr. Baumgartner was doing

11   for Prevezon was not shared across to the clients

12   you were working for with regard to the

13   presidential election?

14        A. He didn't deal with them.  He didn't deal

15   with the clients.  There wouldn't have been any

16   reason to -- he operates under the same rules that

17   I do.

18        Q. And with regard to Mr. Steele, did he ever

19   do any work for Fusion GPS on the Prevezon

20   litigation matter?

21        A. No.

22        Q. It's my understanding that Mr. Steele

23   works with a company called Orbis & Associates.

24   Did anyone else at Orbis, to the best of your

25   knowledge, work with Mr. Steele on the engagement

Glenn Simpson                                                    August 22, 2017
Washington, DC

Page 85

1    that you had with him related to Candidate Trump?

2         A. I mean, I don't know their names.

3         Q. So do you know whether anyone else worked

4    with him?

5         A. Yes.  I mean, do you mean as

6    subcontractors or within his company?

7         Q. First within his company.

8         MR. LEVY:  If you know.

9    BY THE WITNESS:

10        A. I mean, I just don't remember their names.

11   I remember meeting somebody in London who I think

12   worked on it, but I just don't remember.

13        Q. Somebody else associated with Orbis?

14        A. Yes.

15        Q. With regard to the assignment that you

16   gave to Mr. Steele to do Russia-related research

17   for Candidate Trump, is that an accurate way to

18   describe it?  I said Russia-related research with

19   regard to Candidate Trump.  Would that be a fair

20   way to describe the assignment?

21        A. Yes.

22        Q. Did you have any input into the actual

23   work that he did?  Did you give him directions as

24   to what to research specifically?

25        A. I don't recall giving him specific

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 103

```
 1   that they had provided to Fusion?

 2        A. I'm sorry.  Can you say that again.

 3        Q. Did Baker Hostetler or Prevezon direct

 4   Fusion to relay to the media information that they

 5   had provided to you?

 6        A. I don't specifically recall an example of

 7   that, but I think as a general sort of operating

 8   principle we were working at their direction and

 9   they were providing us with, you know, case

10   information.  So I think so, but I just don't have

11   an idea.

12        Q. And did anyone at Fusion or perhaps

13   Mr. Baumgartner review Russian documents related to

14   the Prevezon matter?

15        A. Yes.

16        Q. Do any --

17        A. Most of them were Russian court

18   documents.

19        Q. Do any Fusion employees or associates

20   speak Russian?

21        A. No.  I'll qualify that.  Depends on how

22   you define associate.  Edward isn't an employee of

23   the company, but he speaks Russian.  He's a

24   subcontractor.

25        Q. Aside from Mr. Baumgartner, do you have
```

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 189

1          MR. LEVY:  The meetings?

2          MR. DAVIS:  The dinner after the hearing.

3    BY THE WITNESS:

4          A. The purpose of the trip was the hearing.

5    It was routine for me to attend hearings.  So I

6    would bill them -- my office would bill them for my

7    train trips and hotels depending on whether there

8    was -- whether it was specifically for the Prevezon

9    case.  I don't know if -- I don't know for a fact

10   that we billed them.

11         Q. Did you travel with any other members of

12   the Prevezon team either to or from New York?

13         A. I don't think so.

14         Q. So I think you've already stated that Ed

15   Baumgartner worked on both projects, on the

16   Prevezon project and another Trump investigation.

17   To the best of your knowledge, does Mr. Baumgartner

18   know Rinat Akhmetshin?

19         A. I don't know.  I'd just like to clarify,

20   you know, my recollection is that Ed worked -- the

21   Prevezon thing wound down and I don't think I

22   brought Ed on until it was either ending or had

23   already ended.

24         Q. Can you clarify the time frame for when it

25   was winding down?

# EXHIBIT J

| **From:** | Lewis, Alan S. |
|---|---|
| **Sent:** | Friday, May 8, 2020 5:52 PM |
| **To:** | 'Eikhoff, Christy Hull' |
| **Subject:** | Fridman et al v. Bean et al  subpoenas to Steele and Orbis |
| **Attachments:** | Plaintiffs Subpoena to Orbis Business Intelligence (Fridman v. Bean).pdf; Plaintiffs Subpoena to Christopher Steele (Fridman v. Bean).pdf |

Hi Christy,

I hope that you are well.

Attached are subpoenas to Mr. Steele and to Orbis, for documents and testimony, in the lawsuit brought by my clients against Simpson et al pending in federal district court in D.C.

Will you accept service of these subpoenas? I'd appreciate your letting me know.

Best,

Alan


Alan S. Lewis, Esq.
**Carter Ledyard & Milburn LLP**
2 Wall Street | New York, NY 10005
Direct 212.238.8647 | Fax 212.732.3232
lewis@clm.com | www.clm.com

| | |
|---|---|
| **From:** | Eikhoff, Christy Hull <Christy.Eikhoff@alston.com> |
| **Sent:** | Monday, May 18, 2020 4:57 PM |
| **To:** | Lewis, Alan S. |
| **Cc:** | Ramsay, Kristi; Barnaby, Kelley |
| **Subject:** | RE: Fridman et al v. Bean et al  subpoenas to Steele and Orbis |

Alan,

We will not accept service of these third-party discovery requests for our client, a British national in the United Kingdom. Proper service can be effectuated through the Hague Convention following procedures used to obtain discovery from these same third parties in *Gubarev v. v. BuzzFeed,* No. 17-60426-CV, S.D. Fla., a case in which we understand you have entered, supported plaintiffs and followed closely.

Christy Hull Eikhoff
Alston & Bird
404-881-4496 direct
404-550-4823 mobile
Legal Assistant: Scott Bobo (scott.bobo@alston.com)

1

# EXHIBIT K

| | |
|---|---|
| **From:** | Eikhoff, Christy Hull <Christy.Eikhoff@alston.com> |
| **Sent:** | Thursday, July 16, 2020 10:36 AM |
| **To:** | Lewis, Alan S.; Ramsay, Kristi |
| **Cc:** | Kim Sperduto (ksperduto@stglawdc.com); Walsh, John J.; Dunn, Matthew D.; Barnaby, Kelley |
| **Subject:** | RE: Compliance with Judge Epstein Order/ Christopher Burrows |

We have sent confirmation of filing of the joint report.

Regarding the subpoenas, wwe will not accept service of these third-party discovery requests for Mr. Burrows, a British national in the United Kingdom.  Proper service can be effectuated through the Hague Convention following procedures used to obtain discovery from these same third parties in *Gubarev v. v. BuzzFeed,* No. 17-60426-CV, S.D. Fla., a case in which we understand you have entered, supported plaintiffs and followed closely.

Regards,

Christy Hull Eikhoff
Alston & Bird
404-881-4496 direct
404-550-4823 mobile
Legal Assistant: Scott Bobo (scott.bobo@alston.com)

**From:** Lewis, Alan S. <Lewis@clm.com>
**Sent:** Wednesday, July 15, 2020 11:59 AM
**To:** Eikhoff, Christy Hull <Christy.Eikhoff@alston.com>; Ramsay, Kristi <Kristi.Ramsay@alston.com>
**Cc:** Kim Sperduto (ksperduto@stglawdc.com) <ksperduto@stglawdc.com>; Walsh, John J. <walsh@clm.com>; Dunn, Matthew D. <MDunn@clm.com>; Barnaby, Kelley <Kelley.Barnaby@alston.com>
**Subject:** RE: Compliance with Judge Epstein Order/ Christopher Burrows

**EXTERNAL SENDER – Proceed with caution**

Christy,

Please see the attached status report with Plaintiffs' position inserted.

On another subject, would you accept service of subpoenas to Christopher Burrows for documents and testimony in the lawsuit brought by my clients against Simpson et al pending in federal district court in D.C.  While I can anticipate your answer, based on my previous question about subpoenas to Mr. Steele, it is nevertheless appropriate that I ask.

Alan

Alan S. Lewis, Esq.

**Carter Ledyard & Milburn LLP**
2 Wall Street | New York, NY  10005
Direct 212.238.8647 | Fax 212.732.3232
lewis@clm.com | www.clm.com

# EXHIBIT L

COMPANY INTELLIGENCE REPORT 2016/112

RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION

Summary

- Top level Russian official confirms current closeness of Alpha Group-PUTIN relationship. Significant favours continue to be done in both directions and FRIDMAN and AVEN still giving informal advice to PUTIN, especially on the US

- Key intermediary in PUTIN-Alpha relationship identified as Oleg GOVORUN, currently Head of a Presidential Administration department but throughout the 1990s, the Alpha executive who delivered illicit cash directly to PUTIN

- PUTIN personally unbothered about Alpha's current lack of investment in Russia but under pressure from colleagues over this and able to exploit it as lever over Alpha interlocutors

Detail

1. Speaking to a trusted compatriot in mid-September 2016, a top level Russian government official commented on the history and current state of relations between President PUTIN and the Alpha Group of businesses led by oligarchs Mikhail FRIDMAN, Petr AVEN and German KHAN. The Russian government figure reported that although they had had their ups and downs, the leading figures in Alpha currently were on very good terms with PUTIN. Significant favours continued to be done in both directions, primarily political ones for PUTIN and business/legal ones for Alpha. Also, FRIDMAN and AVEN continued to give informal advice to PUTIN on foreign policy, and especially about the US where he distrusted advice being given to him by officials.

2. Although FRIDMAN recently had met directly with PUTIN in Russia, much of the dialogue and business between them was mediated through a senior Presidential Administration official, Oleg GOVORUN, who currently headed the department therein responsible for Social Co-operation With the CIS. GOVORUN was trusted by PUTIN and recently had accompanied him to Uzbekistan to pay respects at the tomb of former president KARIMOV. However according to the top level Russian government official, during the 1990s GOVORUN had been Head of Government Relations at Alpha Group and in reality, the "driver" and "bag carrier"

25

used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St Petersburg. Given that and the continuing sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN.

3.  The top level Russian government official described the PUTIN-Alpha relationship as both carrot and stick. Alpha held 'kompromat' on PUTIN and his corrupt business activities from the 1990s whilst although not personally overly bothered by Alpha's failure to reinvest the proceeds of its TNK oil company sale into the Russian economy since, the Russian president was able to use pressure on this count from senior Kremlin colleagues as a lever on FRIDMAN and AVEN to make them do his political bidding.

**14 September 2016**

# EXHIBIT M

<u>IN THE HIGH COURT OF JUSTICE</u>                    Claim No. HQ17D00413

<u>QUEEN'S BENCH DIVISION</u>

**BETWEEN:-**

### (1)  ALEKSEJ GUBAREV
### (3)  WEBZILLA LIMITED

<u>**Claimants**</u>

### -and-

### (1)  ORBIS BUSINESS INTELLIGENCE LIMITED
### (2)  CHRISTOPHER STEELE

<u>**Defendants**</u>

_____

## DEFENDANTS' CLOSING SUBMISSIONS
_____

## <u>TABLE OF CONTENTS</u>

| *Description* | *Paragraphs* |
|---|---|
| **A. Introduction** | **1 - 13** |
| **B.   Liability   for   Publication   of   the   December Memorandum by BuzzFeed** | **14 - 91** |
| The obscure and changing nature of the Claimants' case | 14 - 18 |
| What is the applicable legal test for determining whether the Defendants are liable as co-publishers in respect of the BuzzFeed publication? | 19- 32 |
| Application of the relevant legal test to the facts of this case | 33- 91 |
| **D. Qualified Privilege** | **92 - 104** |
| Legal principles | 92 - 95 |
| Submissions on qualified privilege | 96 - 104 |
| **E. Meaning of the Words Complained Of** | **105 - 116** |
| The words complained of | 105 |

1

"*copies of the memoranda were not disclosed by Fusion to its clients*".
Both documents explain clearly that Fusion <u>did not</u> provide <u>copies</u> of
the pre-election memoranda to Perkins Coie.

### The Defendants' disclosure

76.  Lastly, in an attempt to overcome the self-evident weakness of their case, the
Claimants have resorted to urging the Court to draw "adverse inferences"
regarding the Defendants' evidence on the basis of the Defendants' approach to
disclosure.  However, there is no basis for drawing adverse inferences against
the Defendants on this basis.

77.  <u>**First**</u>, as explained in Mr Mathieson's witness statement **{F/28/1}**, the Defendants
have been the blameless victims of serious professional failures by the partner at
RPC who had responsibility for this matter until very recently.  A summary of the
serious defects in her conduct of matters relating to disclosure is set out at §§15-
21 of the Defendants' skeleton argument for the hearing on 30 March 2020, which
the Court is requested to read **{F/30/5-9}**. As Mr Mathieson summarises, "*the
partner at RPC with responsibility for this case until mid-February 2020 actively,
seriously and repeatedly misled the Defendants about these proceedings*"
**{F/26/3}**. That misconduct included (but was not limited to):

(1)  withholding the Defendants' disclosure for many months in breach of a court
order and without telling the Defendants;

(2)  concealing the Claimants' repeated complaints about the failure to provide
disclosure for many months;

(3)  concealing the fact that the Claimants had applied for an order striking out
the Defendants' defence if they did not provide their disclosure;

(4)  failing to show the Defendants' disclosure statement and list dated 29 July
2019 to the Defendants (and instead signing it herself and then serving it on
12 December 2019 without showing the Defendants)[125];

---

[125]    See WS Mathieson at §24 **{F/28/10}**

(5)    concealing the fact that in late December 2016 the court made an unless order and an indemnity costs order against the Defendants;

(6)    concealing the fact that the partner had served a witness statement in late December 2019 which purported to explain why the earlier disclosure order had been breached; and

(7)    providing the Defendants with a falsified version of a court order in order to conceal the true orders made by the court.

78.    The Claimants' criticisms of the Defendants' disclosure must be assessed with this important – indeed quite extraordinary – background firmly in mind.

79.    Further, as Mr Mathieson describes in his statement[126] – and as will have been evident to the Court during Mr Steele's cross-examination – Mr Steele was shocked and dismayed when he was first informed in March 2020[127] of the many serious lapses committed by the former RPC partner.  He remains extremely upset and distressed by those serious lapses, for which he and Orbis bear no responsibility whatsoever.  Mr Steele's evident dismay is entirely consistent with him being an honest witness and litigant.

80.    **Secondly**, specific criticism is made of the fact that the Defendants did not disclose copies of communications between Mr Steele and Mr Bensinger until earlier this year.  Specific criticism is also made of a sentence in a letter from RPC dated Friday 27 March 2020[128], which failed to mention Mr Steele's meeting with Mr Bensinger in January 2017.

81.    In respect of the 27 March letter:

(1)    The focus of the letter was on disclosure of electronic documents. It was sent on the last working day before a hearing of the Claimants' application

---

[126]    See WS Mathieson at §15 **{F/28/5}**

[127]    Mr Mathieson informed the Defendants of the position in the week commencing 2 March 2020: see WS Mathieson at §17 **{F/28/5}**

[128]    The sentence in question reads: "*Finally, other than the face to face meetings that have been admitted, we are informed that Mr Steele did not conduct communications with Schedule A/B individuals by any other method.*" **{F/33/50}**

53

for specific disclosure of various categories of documents. The sentence in question was made in direct response to the section of MWE's letter dated 25 March headed "*Communications by WhatsApp, Signal and Skype*"[129].

(2) It was in this context of documentary disclosure that the statement by RPC regarding "*method[s]*" of communication was made. Mr Steele is unsure whether he had even read the letter before it was sent.[130] If he did, it is perhaps unsurprising that he would not have noticed that a single sentence in a three-page letter drafted by his solicitors concerning disclosure of electronic documents was erroneous because it failed to reference the existence of a particular face-to-face (i.e. non-documentary) conversation. It is particularly understandable that Mr Steele would have failed to notice that error in circumstances where he was still reeling from the discovery just three weeks earlier of the extensive wrongdoing by the former RPC partner.

(3) When asked to revisit and consider the sentence during cross-examination, Mr Steele candidly admitted that the sentence in question was an error.[131] In any event, it was an error of no consequence (and certainly no detriment to the Claimants) because:

(a) Two weeks after RPC's letter was sent the communications with Mr Bensinger were fully disclosed (as explained below); and

(b) Less two weeks after that, on 20 April 2020 Mr Steele served his witness statement which provided a full and honest account of his interactions with Mr Bensinger.

82. In relation to the messages between Mr Steele and Mr Bensinger, these were fully disclosed on 10 April 2020 following a comprehensive set of further searches and reviews under the supervision of solicitors and counsel who (unlike the former RPC partner who oversaw the previous disclosure exercise) acted diligently in accordance with their professional duties. This new disclosure process:

---

[129]     **{F/33/46}**
[130]     **{Day4/110:13-15}**
[131]     **{Day4/117:21}**

(1)   was conducted under the careful <u>supervision of a new and highly experienced partner at RPC</u> (Mr Mathieson) who had taken over conduct of the case the previous month;

(2)   involved both extensive <u>manual and electronic</u> searches of relevant repositories of documents;

(3)   involved the application of an <u>expanded date range</u>[132] and a <u>new set of 80 keyword search terms</u>; and

(4)   involved <u>reviews of responsive documents by both the Defendants' leading and junior counsel</u> (who each personally reviewed all of the messages between Mr Steele and David Kramer and between Mr Steele and Mr Bensinger for the purpose of identifying which messages fell within the scope of the Defendants' standard disclosure obligations[133]).

83.   The full disclosure of the Bensinger messages following a rigorous properly managed disclosure review – in which the Defendants fully participated – is inconsistent with any attempt to "suppress" that evidence.

84.   Mr Steele has clearly explained that he did not discuss the pre-election memoranda or the December memorandum with Mr Bensinger, nor did he authorise or intend Mr Kramer to do so. There is no proper basis to doubt the truthfulness of that evidence. It therefore follows that Mr Steele had no motive for concealing either his meeting or his communications with Mr Bensinger.

85.   **Third**, it is not uncommon for parties to make innocent errors with disclosure. Indeed, this is reflected by the Claimants' own disclosure in these proceedings, which has been supplemented on a number of occasions after disclosable documents were inadvertently not disclosed.  To give one particularly recent

---

[132]    Under the original disclosure order the date range for the Defendants' disclosure searches ended with the date of BuzzFeed's publication (10 January 2017) (see **{F/25/1-5}**). In March 2020, the Defendants agreed to a consent order which expanded the end of that date range to April 2017 in relation to communications with Mr Kramer and Mr Bensinger (see §2(2) of the consent order at **{B/14/2}**

[133]    The terms of the consent order were expressly agreed on the basis that the Defendants' counsel would undertake such a review.

example, as a result of an "*oversight*"[134] (by the Claimants or their solicitors – it is not clear which) the Third Claimant's financial statements for 2018 – an obviously important set of document in the context of the serious financial loss issue – were not disclosed until mid-way through Mr Gubarev's cross-examination on the second day of the trial.  The Defendants have not sought to invite any adverse inference to be drawn from the late and unexplained disclosure of this document. This is because unintentional errors in disclosure (even careless ones) do not provide a proper basis for drawing adverse inferences.

86.   **Fourth**, the Claimants' criticisms of the Defendants' disclosure cannot be considered in isolation from the Claimants' approach to their own disclosure. Indeed, there is an element of hypocrisy to a number of the Claimants' criticisms. For example, Mr Steele is criticised for what is said to be the "*peculiar*" fact that certain messages were disclosed in the form of "*screenshots from his [Mr Steele's] mobile phone*".[135]  Yet the Claimants have done exactly the same thing. The messages which are referred to and quoted at paragraph 11.5(b) of the RRRAPOC **{A/12/5}** were disclosed in the form of screenshots from a mobile phone and computer; the native electronic versions were never provided to the Defendants.  In cross-examination, Mr Dvas expressly confirmed that, "*My understanding was it was okay to give them to our lawyers in that form*"[136] and admitted that he had failed to disclose other communications with the individual in question that took place between the dates of the disclosed communications.[137]

87.   Again, the Defendants did not – and indeed could not – suggest that the disclosure of screenshots (apparently on the instructions of the Claimants' solicitors) and the omission to disclose intervening messages in Mr Dvas' chain of communications was a dishonest attempt to suppress disclosable evidence.

88.   **Finally**, the suggestion that any litigant has deliberately suppressed documents and then given a dishonest account to the Court about this is a very serious allegation. It is a particularly serious allegation to level against a former senior

---

[134]   See email from Lynsey McIntyre to RPC at 08:01 on 21 July 2020
[135]   Claimants' Opening Submissions §99 **{A/27/22}**
[136]   **{Day3/25:19} - {Day3/26:1}**
[137]   **{Day3/22:13-16}**

Crown servant of good character and with a distinguished record of responsible public service.

89.   It is trite law that serious allegations require cogent evidence in order to be established.  As Andrew Smith J explained in *Fiona Trust v Privalov* [2010] EWHC 3199 (Comm) at [1438]:

> "***It is well established that "cogent evidence is required to justify a finding of fraud or other discreditable conduct"***: per *Moore-Bick LJ in Jafari-Fini v Skillglass Ltd., [2007] EWCA Civ 261 at para.73*. ***This principle reflects the court's conventional perception that it is generally not likely that people will engage in such conduct: "where a claimant seeks to prove a case of dishonesty, its inherent improbability means that, even on the civil burden of proof, the evidence needed to prove it must be all the stronger"***, per *Rix LJ in Markel v Higgins, [2009] EWCA 790 at para 50. The question remains one of the balance of probability, although typically, as Ungoed-Thomas J put it in In re Dellow's Will Trusts, [1964] 1 WLR 415 , 455 (cited by Lord Nicholls in In re H, [1996] AC 563 at p.586H), **"The more serious the allegation the more cogent the evidence required to overcome the unlikelihood of what is alleged and thus to prove it". Associated with the seriousness of the allegation is the seriousness of the consequences, or potential consequences, of the proof of the allegation because of the improbability that a person will risk such consequences**: see R(N) v Mental Health Review Tribunal (Northern Region), [2005] EWCA 1605 para 62, cited in Re Doherty, [2008] UKHL 33 para 27 per Lord Carswell."* (Emphasis added) [138]

90.   Applying those well-established principles here, the evidence comes nowhere close to providing a basis for the Court to conclude that Mr Steele has made any attempt to suppress disclosable documents or to provide untruthful evidence to the Court on any matter. There is therefore no basis for drawing any adverse inference against the Defendants.

---

[138]   For a recent example of the application of this principle, see the judgment of the High Court in *Ras Al Khaimah Investment Authority v Azima* [2020] EWHC 1327 (Ch) at [375] *et seq.*

# EXHIBIT N

Case 1:17-cv-00041-RJL Document 90-2 Filed 08/04/20 Page 189 of 191

**The New York Times** | https://nyti.ms/2WU7EjD

# The F.B.I. Pledged to Keep a Source Anonymous. Trump Allies Aided His Unmasking.

After a Russia expert who had collected research on Donald Trump for a disputed dossier agreed to tell the F.B.I. what he knew about it, law enforcement officials declassified a road map to identifying him.

 

**By Adam Goldman and Charlie Savage**

July 25, 2020

WASHINGTON — Not long after the early 2017 publication of a notorious dossier about President Trump jolted Washington, an expert in Russian politics told the F.B.I. he had been one of its key sources, drawing on his contacts to deliver information that would make up some of the most salacious and unproven assertions in the document.

The F.B.I. had approached the expert, a man named Igor Danchenko, as it vetted the dossier's claims. He agreed to tell investigators what he knew with an important condition, people familiar with the matter said — that the F.B.I. keep his identity secret so he could protect himself, his sources and his family and friends in Russia.

But his hope of remaining anonymous evaporated last week after Attorney General William P. Barr directed the F.B.I. to declassify a redacted report about its three-day interview of Mr. Danchenko in 2017 and hand it over to Senator Lindsey Graham, Republican of South Carolina and chairman of the Senate Judiciary Committee. Mr. Graham promptly made the interview summary public while calling the entire Russia investigation "corrupt."

The report blacked out Mr. Danchenko's name and other identifying information. But within two days, a post on a newly created blog entitled "I Found the Primary Subsource" identified him, citing clues left visible in the F.B.I. document. A pseudonymous Twitter account created in May then promoted the existence of the blog. And the next day, RT, the Kremlin-owned, English-language news and propaganda outlet, published an article amplifying Mr. Danchenko's identification.

The decision by Justice Department and F.B.I. leaders to divulge such a report was highly unusual and created the risk it would help identify a person who had confidentially provided information to agents, even if officials did not intend to provide such a road map. The move comes at a time when Mr. Barr, who is to testify before lawmakers on Tuesday, has repeatedly been accused of abusing his powers to help Mr. Trump politically.

Former law enforcement officials said the outing will make it harder for F.B.I. agents to gain the trust of people they need to cooperate in future and unrelated investigations.

"These things have to remain very closely held because you put witnesses at risk," said James W. McJunkin, a former F.B.I. assistant director for counterterrorism. "To release sensitive information unnecessarily that could jeopardize someone's life is egregious."

A lawyer for Mr. Danchenko, Mark E. Schamel, said that because his client's name had already been exposed, he would not ask The New York Times to withhold it. He acknowledged that "Igor Danchenko has been identified as one of the sources who provided data and analysis" to Christopher Steele, the British former spy who compiled the dossier and whose last name has become shorthand for it.

Mr. Danchenko's identity is noteworthy because it further calls into question the credibility of the dossier. By turning to Mr. Danchenko as his primary source to gather possible dirt on Mr. Trump involving Russia, Mr. Steele was relying not on someone with a history of working with Russian intelligence operatives or bringing to light their covert activities but instead a researcher focused on analyzing business and political risks in Russia.

Spokespeople at both the F.B.I. and the Justice Department declined to comment. An email sent to an address listed on the blog was not returned.

Mr. Trump's supporters on Capitol Hill have long sought access to Justice Department and F.B.I. documents about the Russia investigation. The F.B.I. director, Christopher A. Wray, told lawmakers in late 2017 that the bureau was wary of turning over records related to its effort to verify the Steele dossier to Congress. "We are dealing with very, very dicey questions of sources and methods, which is the lifeblood of foreign intelligence and our liaison relationships with our foreign partners," he said.

But since his confirmation early last year, Mr. Barr and other Trump appointees have approved a wave of extraordinary declassifications that the president's allies, including Mr. Graham, have used to attack the Russia inquiry.

Mr. Graham said he had asked the F.B.I. to declassify the interview report after it was described in an inspector general report last year because he wanted the public to read it. He stressed that he did not know the identity of Mr. Steele's source and said he did not know whether the F.B.I. released identifying information it should have protected, saying the bureau had appeared to be "painstaking" in redacting such details.

"I don't know how he was exposed," Mr. Graham said in an interview on Friday. "I didn't see anything in the memo exposing who he was. I mean, you can believe these websites if you want to — I don't know. I know this: It's important for the country to understand what happened here."

In addition to their political implications, the documents have at times revealed the closely held secrets that Mr. Wray feared jeopardizing: sources of information and the methods used for gathering it.



The F.B.I.'s headquarters in Washington. The disclosures will make it harder for F.B.I. agents to gain the trust of potential sources, former law enforcement officials said.   Anna Moneymaker/The New York Times

Transcripts of recordings released in April resulted in the identification of a confidential F.B.I. informant who had agree to wear a wire when talking to George Papadopoulos, a former Trump adviser who was convicted of lying to the F.B.I. Other released transcripts of a Russian diplomat's conversations with former national security adviser Michael T. Flynn revealed that the bureau was able to monitor the phone line of the Russian Embassy in Washington even before a call connected with Mr. Flynn's voice mail.

The unmaskings from the release of the F.B.I. report have already spiraled beyond Mr. Danchenko. Building on the knowledge of his identity, another Twitter user named a likely source for Mr. Danchenko. Online sleuths were trying to identify others from his network who were cited but not named in the Steele dossier.

The release of Mr. Danchenko's interview summary likely put him and other sources in Russia's sights, said Senator Mark Warner of Virginia, the top Democrat on the Senate Intelligence Committee.

"Under Attorney General Barr, the levers of the Department of Justice continue to be weaponized in defense of the president's political agenda, even at the expense of national security," said Mr. Warner, who did not confirm that Mr. Danchenko was Mr. Steele's primary source or discuss his committee's own investigation into Russian election interference. "I'm deeply concerned by this release. There is no doubt that the Russians are poring over it to see if they can identify this individual or other sources."

Mr. Danchenko also cooperated with the intelligence committee on condition of confidentiality, according to two people familiar with its investigation.

Some posts on the blog that revealed Mr. Danchenko's name are dated before Mr. Graham released the interview report, but the Twitter user who promoted the blog said he or she had backdated the posts to change their order.

Born in Ukraine, Mr. Danchenko, 42, is a Russian-trained lawyer who earned degrees at the University of Louisville and Georgetown University, according to LinkedIn. He was a senior research analyst from 2005 to 2010 at the Brookings Institution, where he co-wrote a research paper showing that, as a student, President Vladimir V. Putin of Russia appeared to have plagiarized part of his dissertation.

According to his interview with the F.B.I., Mr. Steele contacted Mr. Danchenko around March 2016 and assigned him to ask people he knew in Russia and Ukraine about connections, including any ties to corruption, between a pro-Russian government in Ukraine and the veteran Republican strategist Paul Manafort. Mr. Steele did not explain why, but Mr. Manafort joined the Trump campaign around that time and

was later promoted to its chairman. He was convicted in 2018 of tax and bank fraud and other charges that grew out of the Russia investigation.

Mr. Steele later expanded Mr. Danchenko's assignment to look for any compromising information about Mr. Trump.

By Jan. 13, 2017, the F.B.I. had identified Mr. Danchenko, who soon agreed to answer investigators' questions in exchange for immunity.

The F.B.I. told a court it found Mr. Danchenko "truthful and cooperative," according to the report by the Justice Department inspector general, Michael E. Horowitz, although a supervisory F.B.I. intelligence analyst said Mr. Danchenko may have minimized aspects of what he told Mr. Steele.

Mr. Graham said he wanted the public to be able to see for itself how the interview report "clearly shows that the dossier was not reliable and they continued to use it anyway."

Mr. Danchenko did nothing wrong in accepting a paid assignment to gather allegations about Mr. Trump's ties to Russia and conveying them to Mr. Steele's research firm, Orbis Business Intelligence, said Mr. Schamel, who attended his client's F.B.I. debriefings but whose name was redacted from the report about them.

"Mr. Danchenko is a highly respected senior research analyst; he is neither an author nor editor for any of the final reports produced by Orbis," Mr. Schamel said. "Mr. Danchenko stands by his data analysis and research and will leave it to others to evaluate and interpret any broader story with regard to Orbis's final report."

The Steele dossier was deeply flawed. For example, it included a claim that Mr. Trump's former lawyer Michael D. Cohen had met with a Russian intelligence officer in Prague to discuss collusion with the campaign. The report by the special counsel who took over the Russia investigation, Robert S. Mueller III, found that Mr. Cohen never traveled to Prague.

And Mr. Danchenko's statements to the F.B.I. contradicted parts of the dossier, suggesting that Mr. Steele may have exaggerated the soundness of other allegations, making what Mr. Danchenko portrayed as rumor and speculation sound more solid.

The Steele dossier played no role in the F.B.I.'s opening of the Russia investigation in July 2016, and Mr. Mueller did not rely on it for his report.

But its flaws have taken on outsized political significance, as Mr. Trump's allies have sought to conflate it with the larger effort to understand Russia's covert efforts to tilt the 2016 election in his favor and whether any Trump campaign associates conspired in that effort. Mr. Mueller laid out extensive details about Russia's covert operation and contacts with Trump campaign associates, but found insufficient evidence to bring any conspiracy charges.

The dossier did play an important role in a narrow part of the F.B.I.'s early Russia investigation: the wiretapping of Carter Page, a former Trump campaign adviser with close ties to Russian officials, which began in October 2016 and was extended three times in 2017. The Justice Department's applications for court orders authorizing the wiretap relied in part on information from the dossier in making the case that investigators had reason to believe that Mr. Page might be working with Russians.

Mr. Page was never charged, and Mr. Mueller's report only briefly discussed him. Mr. Horowitz scathingly portrayed the wiretap applications as riddled with errors and omissions.

Mr. Danchenko provided information to Mr. Steele that figured into one of the biggest flaws with those applications. Mr. Horowitz first brought to public light that when the F.B.I. interviewed Mr. Steele's primary source — who turned out to be Mr. Danchenko — his account was inconsistent with important aspects of the dossier.

But law enforcement officials recycled the same language derived from the dossier in their final two applications for court orders to continue wiretapping Mr. Page. They also told a court they had spoken to Mr. Steele's primary source but without revealing that his statements raised questions about the dossier's credibility, which Mr. Horowitz said was misleading.

After the inspector general report, the F.B.I. conceded to the court that it should not have sought the last two renewals.

The disclosure of Mr. Danchenko's identity — which the inspector general report concealed — also brought into focus another questionable statement in the wiretap applications. Mr. Horowitz wrote that the last two applications described Mr. Steele's source as "Russian-based." Though Mr. Danchenko visited Moscow while gathering information for Mr. Steele, he lives in the United States.

A criminal prosecutor appointed by Mr. Barr to scrutinize the Russia investigation, John H. Durham, the U.S. attorney in Connecticut, has also focused on the dossier and asked questions about Mr. Danchenko, according to people familiar with aspects of his inquiry. Mr. Schamel said he had not been contacted by Mr. Durham or his investigators.

Nicholas Fandos contributed reporting.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

----------------------------------------------------------- X

MIKHAIL FRIDMAN, PETR AVEN, and                     :
GERMAN KHAN,                                        :
                                                    :
                         *Plaintiffs*,              :
                                                    :         Case No. 1:17-cv-02041 (RJL)
                 v.                                 :
                                                    :
BEAN LLC (a/k/a FUSION GPS) and GLENN               :
SIMPSON,                                            :
                                                    :
                         *Defendants*.              :

----------------------------------------------------------- X

<u>**PROPOSED ORDER**</u>

Upon consideration of Plaintiffs' Motion for Issuance of Letters of Request for

International Judicial Assistance (the "Motion"), the Court ORDERS that:

The Motion is GRANTED; and

The Clerk is directed to issue the attached Letters of Request to the Queen's Bench

Division, High Court of Justice, Royal Courts of Justice, Strand, London WC2A 2LL, United

Kingdom.

_____
Richard J. Leon
Senior United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

--------------------------------------------------------------- X

| | |
|---|---|
| MIKHAIL FRIDMAN, PETR AVEN, and GERMAN KHAN, | : |
| | : |
| *Plaintiffs*, | : |
| | : |
| v. | : |
| | : |
| BEAN LLC (a/k/a FUSION GPS) and GLENN SIMPSON, | : |
| | : |
| *Defendants*. | : |

Case No. 1:17-cv-02041 (RJL)

--------------------------------------------------------------- X

## LETTER OF REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS

The United States District Court for the District of Columbia (the "District Court" or the "Court") presents its compliments to the Senior Master of the High Court (Queen's Bench Division) of England and Wales, and requests assistance in obtaining evidence to be used in a civil proceeding before this Court in the above-captioned proceedings (the "Action").

This request is made pursuant to, and in conformity with *The Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters* (the "Hague Convention"), to which both the United States and the United Kingdom are a party; the *Evidence (Proceedings in Other Jurisdictions) Act 1975*, the Rules of the United States District Court for the District of Columbia; and the Federal Rules of Civil Procedure.

The purpose of this Letter of Request (the "Request") is to obtain oral testimony and documentary evidence for use at trial from three non-party witnesses who all reside within your jurisdiction: Mr. Christopher Steele, Mr. Edward Baumgartner, and Sir Andrew Wood, and (oral testimony only) Mr. Christopher Burrows.  The Request also seeks the production of

documentary evidence from Orbis Business Intelligence Ltd. ("Orbis"), being a company co-founded by Mr. Steele and Mr. Burrows.

The District Court considers that the evidence sought is directly relevant to the issues in dispute and is not discovery within the meaning of Article 23 of The Hague Convention; that is, it is discovery intended to lead to relevant evidence for trial. It is expected, based on existing timetables, that the District Court will schedule a trial to commence in or about late 2021.

It has been demonstrated to this Court that justice cannot be done amongst the parties to the Action without the testimony and documentary evidence of the abovenamed witnesses. In conformity with Article 3 of the Hague Convention, this Court respectfully submits the following Request.

The District Court requests the assistance of an appropriate English judicial officer to compel the appearance of the witnesses to give oral sworn testimony and to produce documents on the subject matters for the date ranges as described in this Request.

It is requested that the appropriate judicial officer of England and Wales issue such orders as are necessary to implement this Request for the witnesses to produce documents and to appear before an examiner or other appropriate judicial authority in England and Wales to take their oral sworn testimony at deposition in conformity with the procedures of the U.S. Federal Rules of Civil Procedure or such other procedures as are acceptable.

The testimonies and document production sought are material to the issue pending in the Action. Plaintiffs have approached the witnesses (or their known counsel or representative) as follows in order to ascertain whether they would be willing to provide their voluntary assistance in the Action in the United States.

2

a) Mr. Steele, Mr. Burrows, and Orbis.  Plaintiffs communicated with known United States counsel for Mr. Steele, Mr. Burrows, and Orbis, in order to ascertain whether they would be willing to accept service of subpoenas on their behalf in the United States to provide oral testimony and/or produce documents.  Counsel indicated that they are unwilling to accept service of subpoenas on their behalf in the United States.

b) Mr. Baumgartner.  Plaintiffs are not aware of any counsel or representative for Mr. Baumgartner in the United States.  U.K. counsel for Plaintiffs wrote to Mr. Baumgartner directly at his Edward Austin business address (copied to the business email address) and asked whether Mr. Baumgartner would voluntarily produce documentary evidence and appear for an examination. Plaintiffs will update the Court as to any response received from Mr. Baumgartner.

c) Sir Andrew Wood. Plaintiffs are not aware of any counsel or representative for Sir Andrew Wood in the United States.  U.K. counsel for Plaintiffs wrote to Sir Andrew directly at his Chatham House business address (copied to the gmail email address given on Sir Andrew's Chatham House online biography) and asked if Sir Andrew would voluntarily produce documentary evidence and appear for an examination. Plaintiffs will update the Court as to any response received from Sir Andrew Wood.

The District Court is authorized by Title 28, United States Code, sections 1781 and 1782 to extend similar assistance on request of the judicial authorities of England and Wales.

The District Court, through the offices of the representatives of Plaintiffs, is prepared to reimburse the High Court of England and Wales and/or office for all costs incurred in executing the instant Request and the assurance of its highest consideration.

The particulars of this Request pursuant to the Hague Convention are as follows:

| | | |
|---|---|---|
| **1.** | **Sender:** | Honorable Richard J. Leon<br>Senior United States District Judge<br>United States District Court for the District of Columbia<br>333 Constitution Avenue N.W.<br>Washington, D.C. 20001 |
| **2.** | **Central Authority of the Requested State:** | COMPETENT AUTHORITY FOR<br>ENGLAND AND WALES<br>Senior Master<br>Queen's Bench Division<br>High Court of Justice<br>Royal Courts of Justice<br>Strand<br>London WC2A 2LL<br>UNITED KINGDOM |
| **3.** | **Person to whom the executed request is to be returned:** | **Plaintiff's Legal Representative in the U.K.:**<br><br>Bernard O'Sullivan<br>Louise Boswell<br>CMS Cameron McKenna Nabarro Olswang LLP<br>Cannon Place<br>78 Cannon Street<br>London EC4N 6AF<br>United Kingdom<br>T +44 20 7067 3594<br>F +44 20 7367 2000<br>E bernard.o'sullivan@cms-cmno.com<br>  louise.boswell@cms-cmno.com<br><br>On behalf of:<br><br>Honorable Richard J. Leon<br>Senior United States District Judge<br>United States District Court for the District of Columbia<br>333 Constitution Avenue N.W.<br>Washington D.C. 20001 |

**In conformity with Article 3 of the Convention, the undersigned applicant has the honor to submit the following requests:**

| | | |
|---|---|---|
| **4a.** | **Requesting Judicial Authority:** | Honorable Richard J. Leon<br>Senior United States District Judge<br>United States District Court for the District of Columbia<br>333 Constitution Avenue N.W. |

4

|       |                                                    | Washington D.C. 20001 |
|-------|----------------------------------------------------|-----------------------|
| **4b.** | **To the competent authority of:**               | THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND |
| **4.c.** | **Names of the case and any identifying number** | *Fridman v. Bean LLC,* Case No. 1:17-CV-02041 (RJL), United States District Court for the District of Columbia |
| **5.** | **Names and addresses of the parties and their representatives:** | |
|       | **a.  Plaintiffs:**                                | Mikhail Fridman, Petr Aven, and German Khan |

**Represented in the U.S. by:**
Alan S. Lewis
John J. Walsh
Carter Ledyard & Milburn LLP
2 Wall Street
New York, NY 10005
Tel: +1 (212) 732-3200

-AND-

Kim H. Sperduto
Sperduto Thompson & Gassler PLC
1747 Pennsylvania Avenue, NW, Suite 1250
Washington, DC 20006
Tel: +1(202) 408-8900

**Represented in the U.K. by:**
Bernard O'Sullivan
Louise Boswell
CMS Cameron McKenna Nabarro Olswang LLP
Cannon Place
78 Cannon Street
London EC4N 6AF
United Kingdom
T +44 20 7067 3594
F +44 20 7367 2000
E bernard.o'sullivan@cms-cmno.com
Louise.boswell@cms-cmno.com

|       | **b.  Defendants:** | Bean LLC (a/k/a Fusion GPS) and Glenn Simpson |

**Represented in the U.S. by:**

5

|                                  | Joshua A. Levy |
|----------------------------------|----------------|
|                                  | Rachel Clattenburg |
|                                  | Levy Firestone Muse LLP |
|                                  | 1401 K St. NW, Suite 600 |
|                                  | Washington, DC 20005 |
|                                  | Tel: +1(202) 845-3215 |

**c.  Other parties.  The following non-parties, which are the subject of this application are as follows:**

Christopher Steele
c/o Orbis Business Intelligence Ltd.,
 9-11 Grosvenor
Gardens, London SW1W 0BD

**Represented in the U.S.[1] by:**
Christina Hull Eikhoff
Kristin Ramsay
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
Tel: +1 (404) 881-7000

-AND-

Kelley C. Barnaby
Alston & Bird LLP
950 F Street, NW
Washington, D.C. 20004
Tel: +1 (202) 239-3687

**Represented in the U.K.[2] by:**
Reynolds Porter Chamberlain LLP
Tower Bridge House
St. Katharine's Way
London E1W 1AA
United Kingdom
T: +44 20 3060 6000

---

[1] The counsel identified for Mr. Steele and Orbis represents them in connection with the proceeding captioned *Khan v. Orbis Business Intelligence Ltd.*, Case No. 18-CV-0919.  That case was originally brought in the Superior Court of the District of Columbia, which dismissed it based on a local statute known as the D.C. Anti-SLAPP Act.  Its current posture involves the drafting of a petition by Plaintiffs to the United States Supreme Court.  Mr. Steele and Orbis are not parties to the Action in connection with which this Request is made.

[2] The counsel identified for Mr. Steele and Orbis represents Orbis in connection with the Action captioned *Aven and others v. Orbis Business Intelligence Ltd.*, Claim No. HQ18M01646 / QB-2018-006349, in the High Court of Justice, Queen's Bench Division, Media & Communications List (the "U.K. Proceeding"), in which the High Court recently rendered a judgment in favor of Plaintiffs on July 8, 2020.  *See* Judgment, [2020] EWHC 1812 (QB), available at https://www.bailii.org/ew/cases/EWHC/QB/2020/1812.html.  Mr. Steele and Orbis are not parties to the Action in connection with which this Request is made.

Orbis Business Intelligence Ltd.
9-11 Grosvenor
Gardens, London SW1W 0BD
**See counsel identified on behalf of Christopher Steele**

Christopher Burrows
c/o Orbis Business Intelligence Ltd.,
 9-11 Grosvenor
Gardens, London SW1W 0BD
**See counsel identified on behalf of Christopher Steele and Orbis**

Edward Baumgartner
c/o Edward Austin Limited
4 Old Park Lane
London W1K 1QW
United Kingdom
info@edward-austin.com
**Counsel/representative unknown**

Sir Andrew Wood
c/o The Royal Institute of International Affairs
Chatham House
10 St James's Square
London SW1Y 4LE
United Kingdom
andrewwood40@gmail.com
**Counsel/representative unknown**

6.    **Nature and purpose of the proceedings and summary of the facts:**

This civil Action concerns claims of defamation brought by Plaintiffs. The statements alleged to be defamatory are in a two-page document (sometimes referred to as a "memorandum or a "report") that was prepared by Christopher Steele and Orbis Business Intelligence Ltd. ("Orbis")[3] and bears the label "Company Intelligence Report 2016" ("CIR 112").  Plaintiffs allege that Mr. Steele and Orbis prepared CIR 112 at the behest of Defendants Bean LLC (a/k/a

---

[3] References to "Orbis" in this Request shall include Orbis's directors, principles, employees, contractors, agents, and representatives.

7

Fusion GPS) ("Fusion")[4] and Glenn Simpson (together, with Fusion, the "Defendants") and that Defendants thereafter published CIR 112, including its defamatory content, to members of the media and others.  As alleged by Plaintiffs, the challenged statements are defamatory because they falsely accuse Plaintiffs of bribery and corruption, specifically related to Vladimir Putin, and suggest that Plaintiffs cooperated with a Kremlin-orchestrated illegal campaign to interfere with the 2016 U.S. presidential election.

Plaintiffs seek a judgment against Defendants finding that statements about Plaintiffs in CIR 112 are false and defamatory and that Defendants published them.  Plaintiffs seek compensatory and/or punitive damages in amounts to be proven at trial, together with interest and costs and fees.

Defendants deny any liability to Plaintiffs and have asserted several defenses, including that the statements about Plaintiffs are not materially false; the publication of the statements was privileged or otherwise protected by, *inter alia*, the First Amendment of the U.S. Constitution, the neutral report privilege, and/or the Fair Report Privilege (under New York Civil Rights Law Section 74); and Plaintiffs should be treated as "public figures" (either general purpose public or limited purpose)—a category which subjects Plaintiffs to a burden to show that the defamatory statements were published with "actual malice", *i.e.*, published with the knowledge that the statements were false or with reckless disregard to whether they were true or false.

Plaintiffs have represented that they do not seek disclosure of communications or documents that are  protected from disclosure by the attorney client privilege, work product doctrine, or other applicable privilege, nor do they seek to circumvent any privilege assertions,

---

[4] References to "Fusion" in this Request shall include Fusion's directors, principles, employees, contractors, agents, and representatives.

however Plaintiffs do not waive the right to object to or challenge the propriety or validity of claims that documents are privileged and the basis of such privilege claims.

Although Orbis produced to Plaintiffs some documents of Orbis and Mr. Steele in the U.K. Proceeding, no documents relating to the creation or publication of CIR 112 were produced and Plaintiffs have a good faith belief, bolstered by recent admitted failures of disclosure by Mr. Steele in a similar matter involving Mr. Steele in the U.K.,[5] that relevant documents exist and/or that Orbis and/or Mr. Steele neglected to produce them.  In addition, due to (i) Mr. Steele's recent challenge to the U.S. Department of Justice seeking copies of certain of documents from the U.K. Proceeding that would normally be available under applicable English law[6] and (ii) the restrictions on the use of certain other documents produced in the U.K. Proceeding pursuant to Rule 31.22 of the English Civil Procedure Rules, Plaintiffs seek a separate order from the High Court permitting disclosure of evidence for use in this U.S. proceeding.

**STAGE OF THE PROCEEDINGS**

This Action was commenced by the filing of a Complaint by the Plaintiffs on October 3, 2017.  The parties exchanged written discovery requests in October 2019.  Written responses to the requests were exchanged in November 2019 and supplemented in May 2020.  Depositions have not yet taken place.  Fact discovery is scheduled to be concluded by January 12, 2021.  A trial is expected in or about late 2021.

**THE WITNESSES AND ENTITIES FROM WHICH EVIDENCE IS SOUGHT**

---

[5] In the proceedings captioned *Aleksej Gubarev and another v (i)  Orbis Business Intelligence Limited and (ii) Christopher Steele*, Claim No. HQ17D00413, in the High Court of Justice, Queen's Bench Division, the trial of which recently took place between 20-24 July 2020 ("Gubarev U.K. Proceeding").   *See* Declaration of Alan Lewis in support of the Motion, Exhibit ("Motion Ex.") M, Defendants' Closing Submissions in Gubarev U.K. Proceeding (which were made public during the trial) at 52-57.

[6] In the matter of an application by the United States of America (the United States Department of Justice) made in the U.K. Proceeding.

**Christopher Steele**,[7] c/o Orbis Business Intelligence Ltd., located at 9-11 Grosvenor Gardens, London SW1W 0BD.

**Orbis Business Intelligence Ltd.**, located at 9-11 Grosvenor Gardens, London SW1W 0BD.

**Christopher Burrows**,[8] c/o Orbis Business Intelligence Ltd., located at 9-11 Grosvenor Gardens, London SW1W 0BD.

**Edward Baumgartner**,[9] c/o Edward Austin Limited, located at 4 Old Park Lane, London W1K 1QW.

**Sir Andrew Wood**,[10] c/o The Royal Institute of International Affairs, Chatham House, 10 St James's Square, London SW1Y 4LE.

## THE RELEVANCE OF EVIDENCE IS SOUGHT

**Mr. Steele** is the co-founder and director of Orbis and compiled the information in CIR 112, including the defamatory statements about Plaintiffs at issue in this Action, and disclosed or provided CIR 112 (and the other reports that have collectively become known as the "Dossier") to others.  As set forth in Plaintiffs' Motion In Support of Request for International Judicial Assistance ("Motion"), Defendants have formally identified Mr. Steele as an individual likely to have information relevant to this Action and Defendants' claims and defenses, such as information relating to "CIR 112, including recipients of CIR 112, research related to matters in CIR 112, events related to topics in CIR 112, and delivery of CIR 112."[11]

---

[7] Mr. Steele is a director and joint founder of Orbis.  *See* https://orbisbi.com/about-orbis/.
[8] Mr. Burrows is a director and joint founder of Orbis.  *See* https://orbisbi.com/about-orbis/.
[9] Mr. Baumgartner is a founder and managing director of Edward Austin Limited ("Edward Austin"). *See* https://www.edward-austin.com/about/team/.
[10] Sir Andrew Wood is an Associate Fellow in the Russia and Eurasia Programme at Chatham House. *See* https://www.chathamhouse.org/expert/sir-andrew-wood
[11] Motion Ex. C, Defendants' First Amended Rule 26(a)(1) Initial Disclosures ("Defendants' Initial Disclosures"), Section 1.

**Mr. Burrows** co-founded Orbis with Mr. Steele and was involved in briefings regarding the research project relating to the defamatory statements, the content of the research, and the engagement of Orbis for this research project.  Defendants have identified Mr. Burrows as an individual likely to have information relevant to this Action and Defendants' claims and defenses, such as the "relevant conduct of Orbis and Christopher Steele; Christopher Steele, including his experience, work, process, and engagement by Defendants."[12]

**Orbis** is the intelligence gathering firm founded by Mr. Steele and Mr. Burrows which was retained by Defendants in 2016 and which produced CIR 112, including the statements about Plaintiffs at issue in this Action.  Defendants acknowledge engaging Orbis to "look into then-candidate Trump's activities in Russia, in support of Defendants' ongoing research activities" and that Mr. Steele and Mr. Burrows were some of the people at Orbis with whom "Defendants mainly communicated."[13]  Orbis is likely to have information and documentary evidence relevant to the issues in this Action, including the engagement of Orbis, the research conducted, the compilation of CIR 112, and the statements about Plaintiffs at issue in this Action.

**Edward Baumgartner** co-founded the U.K. based research and intelligence firm Edward Austin and assisted Fusion with the 2016 research at issue in this Action.  Defendants have formally identified Mr. Baumgartner as an individual likely to have information relevant to this Action and Defendants' claims and defenses, including the "research related to matters in CIR 112."[14]

---

[12] Motion Ex. C, Defendants' Initial Disclosures, Section 1.
[13] Motion Ex. F, Defendants' Answer to Interrogatory No. 12.
[14] Motion Ex. C, Defendants' Initial Disclosures, Section 1.

**Sir Andrew Wood** is a former British diplomat with or to whom Mr. Steele discussed or transmitted the research at issue in this Action in 2016.  Defendants have formally identified Sir Andrew Wood as an individual likely to have information relevant to this Action and Defendants' claims and defenses, including the "receipt and delivery of CIR 112."[15]

## SUBJECTS FOR ORAL EXAMINATION AND REQUESTS FOR PRODUCTION OF DOCUMENTARY EVIDENCE

The District Court requests that **Christopher Steele** be ordered to attend for examination to give evidence about the matters identified in **Attachment A** hereto and be ordered to produce documentary evidence responsive to the requests identified in **Attachment B** hereto.

The District Court requests that **Orbis Business Intelligence Ltd.** be ordered to produce documentary evidence responsive to the requests identified in **Attachment C** hereto.

The District Court requests that **Christopher Burrows** be ordered to attend for examination to give evidence about the matters identified in **Attachment D** hereto.

The District Court requests that **Edward Baumgartner** be ordered to attend for examination to give evidence about the matters identified in **Attachment E** hereto and be ordered to produce documentary evidence responsive to the requests identified in **Attachment F** hereto.

The District Court requests that **Sir Andrew Wood** be ordered to attend for examination to give evidence about the matters identified in **Attachment G** hereto and be ordered to produce documentary evidence responsive to the requests identified in **Attachment H** hereto.

For the reasons set forth in the Plaintiffs' Motion in Support of Request for International Judicial Assistance, the District Court believes that the witnesses (whose contact details are

---

[15] Motion Ex. C, Defendants' Initial Disclosures, Section 1.

given below) will be able to provide documentary evidence and testimony directly relevant to the

main issues between the parties in the Action and without which the ends of justice could not be

properly met.[16]  The District Court believes that this information is not available from any other

source.

| | | |
|---|---|---|
| **7.** | **Evidence to be obtained:** | Plaintiffs seek oral testimony from Christopher Steele, Christopher Burrows, Edward Baumgartner, and Sir Andrew Wood.  These individuals are not parties to the Action and the Plaintiffs are not seeking any relief against any of these witnesses. |
| | | Plaintiffs seek documentary evidence from Christopher Steele, Edward Baumgartner, Sir Andrew Wood, and Orbis Business Intelligence Ltd. |
| **8.** | **Identity and addresses of persons to be examined:** | Christopher Steele c/o Orbis Business Intelligence Ltd., located at 9-11 Grosvenor Gardens, London SW1W 0BD |
| | | Christopher Burrows c/o Orbis Business Intelligence Ltd., located at 9-11 Grosvenor Gardens, London SW1W 0BD |
| | | Edward Baumgartner c/o Edward Austin Limited 4 Old Park Lane London W1K 1QW |
| | | Sir Andrew Wood c/o The Royal Institute of International Affairs Chatham House 10 St James's Square London SW1Y 4LE United Kingdom |

---

[16] The term "documents" shall have the same broad meaning and scope as given to these terms in or pursuant to the U.S. Federal Rules of Civil Procedure and applicable law, including (but not limited to) hard copy documents and files as well electronic or computerized data, e-mails, text messages, etc.  The term "communications" shall mean the transmittal of data or information by any means, including (but not limited to) meetings, conversations, discussions, documents, correspondence, messages, text messages, e-mails, notes, WhatsApp messages, Slack messages, Skype messages, or other means of transmittal.

| | | |
|---|---|---|
| 9. | **Subject matter about which the witnesses will be examined:** | The subject matter for the examination of the relevant witnesses are itemized in **Attachments A, D, E, and G**. |
| 10. | **Documents or other property to be inspected** | Plaintiffs request that the relevant witnesses produce to the Examiner and to Plaintiffs' Counsel, no later than 7 calendar days before the date on which the Examination is due to commence the documents set out under **Attachments B, C, F** and **H**. |
| 11. | **Any requirement that the evidence be given on oath or affirmation and any specific form to be used:** | The witnesses should be examined under oath or affirmation or in the alternative should be instructed of the consequences of giving untruthful and false answers under the laws of England and Wales. |

12.    **Special methods or procedures to be followed:**

The District Court respectfully requests the following with respect to the oral testimony and production of documents being sought:

(1) that the High Court appoint an English Examiner for the purpose of compelling oral testimony for use at trial from English witnesses;

(2) that the parties' representatives or their designees, a court reporter, and a videographer be permitted to be present during the examination either physically or via remote or virtual means; that the representatives or designees be permitted to examine and cross-examine the witnesses directly; and that a court reporter and a videographer be permitted to make a verbatim record of the proceedings; and

(3) in connection with the taking of testimony of the witnesses, Plaintiffs have permission to refer the witnesses to documents previously produced or available in the Action.

14

| 13. | **Request for notification of the times and place for the execution of the Request and identity of the person to be notified:** | It is requested that testimony be taken at such place, date or time as ordered by the Senior Master and/or as otherwise scheduled by the representatives of the Plaintiffs and/or as otherwise agreed to by the witnesses and the respective representatives of the parties. |
|---|---|---|
| 14. | **Request for attendance or participation of judicial personnel of the requesting authority at the execution of the Letter of Request:** | None. |
| 15. | **Specification of privilege or duty to refuse to give evidence under the laws of the State of origin:** | In relation to claims for privilege under the laws of the United States or the laws of England and Wales, regard shall be had to section 3 of the *Evidence (Proceedings in Other Jurisdictions) Act 1975*. |

Under the laws of the United States, a party has a privilege to refuse to give evidence if the evidence discloses a confidential communication between that party and an attorney for that party that was made for the purpose of obtaining legal advice.

Parties also enjoy limited privileges on other grounds not expected to be relevant here such as communications between physician and patient, psychotherapist and patient, husband and wife, or clergy and penitent.

U.S. law also recognizes a privilege against criminal self-incrimination.

Outside the strict area of privilege, certain limited immunities are available that may place restrictions on the giving of evidence, such as the limited protection of documents created as the work product of attorneys during or in anticipation of litigation.

| 16. | **Fees and costs:** | The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Hague Convention will be borne by Plaintiffs. |

| 17. | **Date of Request:** | _____, 2020 |

| 18. | **Signature and seal of the Requesting Authority:** | UNITED STATES OF AMERICA<br>United States District Court for the District of Columbia |

_____

By: Honorable Richard J. Leon
Senior United States District Judge
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
333 Constitution Avenue N.W.
Washington, D.C. 20001

## ATTACHMENT A

### Proposed Subjects for Oral Examination of Christopher Steele

1. In general terms, Mr. Steele's educational background, employment history, professional qualifications and personal preparation for the examination (including contacts with the parties, their lawyers, insurers, or representatives), excluding any privileged communications or confidential details regarding any government service.

2. Retention of Mr. Steele and/or Orbis in 2016 by Fusion relating to CIR 112 and the scope and purpose of the retention.

3. Communications and meetings in 2016 and 2017 between Mr. Steele and Defendants Glenn Simpson or Fusion or any Fusion sub-contractors regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

4. Communications and meetings in 2016 and 2017 between Mr. Steele and Jonathan Winer regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

5. Communications and meetings in 2016 and 2017 between Mr. Steele and reporters or news or media organizations regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

6. Communications and meetings in 2016 and 2017 between Mr. Steele and David Kramer regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

7. The drafting and compilation in 2016 of CIR 112 and its promotion.

8. Delivery, transmission, or disclosure of CIR 112 in 2016 and 2017 to other persons or entities, including Defendants, Mr. Kramer, Mr. Winer, reporters and members of the media.

9. The steps taken by Mr. Steele, Orbis, or Defendants to corroborate, verify or investigate the information and statements about Plaintiffs in CIR 112.

10. The destruction, return, or non-retention of the following documents: (a) CIR 112, including work product, memoranda, source information, drafts or analysis relating to CIR 112; (b) communications between Mr. Steele and Defendants Simpson or Fusion in respect to CIR 112; and (c) engagement agreements between Mr. Steele and/or Orbis on one hand and Fusion on the other which govern the creation or promotion of CIR 112.

11. Communications and meetings in 2016 and 2017 between Mr. Steele and Igor Danchenko regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

## ATTACHMENT B

**Proposed Requests for Production of Documentary Evidence from Christopher Steele**

1. Documents setting out the terms of Orbis's and/or Mr. Steele's engagement with or retention by Fusion in connection with the compilation or preparation of CIR 112 and its promotion.

2. Documents setting out the scope and purpose of the work that Mr. Steele and Orbis were to perform in connection with the compilation or preparation of CIR 112 and its promotion.

3. Communications between Mr. Steele and Defendants Glenn Simpson or Fusion (including documents referencing or referenced in such communications) regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, within the period 01 April 2016 to 03 October 2017.

4. Communications between Mr. Steele and Jonathan Winer (including documents referencing or referenced in such communications) regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, within the period 01 September 2016 to 10 January 2017.

5. Communications within the period 01 September 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Mr. Steele and Mr. Winer relating to meetings regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including the meeting between Mr. Steele and U.S. Department of State officials and Mr. Winer on or about 11 October 2016.

6. Communications within the period 01 September 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Mr. Steele and the *New York Times*, the *New Yorker*, the *Washington Post*, *Yahoo! News*, *CNN, Mother Jones*, and/or *BuzzFeed*, relating to meetings regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including the meeting between Mr. Steele and Michael Isikoff and Jane Mayer at the Tabard Inn on or about 22 September 2016.

7. Communications within the period 01 September 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Mr. Steele and the *New York Times*, the *New Yorker*, the *Washington Post*, *Yahoo! News*, *CNN*, *Mother Jones*, and/or *BuzzFeed* regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

8. Communications (including documents referencing or referenced in such communications) between Mr. Steele and David Corn of *Mother Jones* via Skype on 31 October 2016 regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

9. Communications within the period 01 September 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Mr. Steele and David Kramer regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including text messages or other types of messages between Mr. Steele and Mr. Kramer on or about 29 December 2016.

10. Documents within the period 01 July 2016 to 10 January 2017 relating to the drafting and compilation of CIR 112; notes, research, investigative files used in the drafting of CIR 112; and drafts or different versions of CIR 112.

11. Communications within the period 01 September 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Mr. Steele and Defendants, Mr. Kramer, Mr. Winer, reporters and members of the media, or others regarding the delivery, transmission, or disclosure of CIR 112.

12. Communications within the period 01 July 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Mr. Steele and Defendants, Mr. Kramer, Mr. Winer, reporters and members of the media, or others concerning the steps taken by Mr. Steele, Orbis, or Defendants to corroborate, verify, or investigate the information and statements about Plaintiffs in CIR 112.

13. Documents concerning the destruction, return, or non-retention of documents within the period 01 July 2016 to the present in respect to: (a) CIR 112, including work product, memoranda, source information, drafts or analysis relating thereto; (b) communications between Mr. Steele and Defendants Simpson or Fusion in respect to CIR 112; and (c) engagement agreements between Orbis and/or Mr. Steele on one hand and Fusion on the other which govern the creation or promotion of CIR 112.

14. Communications within the period 01 April 2016 to 03 October 2017 (including documents referencing or referenced in such communications) between Mr. Steele and Igor Danchenko regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

**ATTACHMENT C**

**Proposed Requests for Production of Documentary Evidence from Orbis Business Intelligence Ltd.**

1. Documents setting out the terms of Orbis's and/or Mr. Steele's engagement with or retention by Fusion in connection with the compilation or preparation of CIR 112 and its promotion.

2. Documents setting out the scope and purpose of the work that Orbis and Mr. Steele were to perform in connection with the compilation or preparation of CIR 112 and its promotion.

3. Communications between Orbis or Mr. Steele and Defendants Glenn Simpson or Fusion (including documents referencing or referenced in such communications) regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, within the period 01 April 2016 to 03 October 2017.

4. Communications between Orbis or Mr. Steele and Jonathan Winer (including documents referencing or referenced in such communications) regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, within the period 01 September 2016 to 10 January 2017.

5. Communications within the period 01 September 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Orbis or Mr. Steele and Mr. Winer relating to meetings regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including the meeting between Mr. Steele and U.S. Department of State officials and Mr. Winer on or about 11 October 2016.

6. Communications within the period 01 September 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Orbis or Mr. Steele and the *New York Times*, the *New Yorker*, the *Washington Post*, *Yahoo! News*, *CNN*, *Mother Jones* and/or *BuzzFeed*, relating to meetings regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including the meeting between Mr. Steele and Michael Isikoff and Jane Mayer at the Tabard Inn on or about 22 September 2016.

7. Communications within the period 01 September 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Orbis or Mr. Steele and the *New York Times*, the *New Yorker*, the *Washington Post*, *Yahoo! News*, *CNN*, *Mother Jones*, and/or *BuzzFeed* regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

8. Communications (including documents referencing or referenced in such

communications) between Orbis or Mr. Steele and David Corn of *Mother Jones* via Skype on 31 October 2016 regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

9.  Communications within the period 01 September 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Orbis or Mr. Steele and David Kramer regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including text messages or other types of messages between Mr. Steele and Mr. Kramer on or about 29 December 2016.

10. Documents within the period 01 July 2016 to 10 January 2017 relating to the drafting and compilation of CIR 112; notes, research, investigative files used in the drafting of CIR 112; and drafts or different versions of CIR 112.

11. Communications within the period 01 September 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Orbis or Mr. Steele and Defendants, Mr. Kramer, Mr. Winer, reporters and members of the media, or others regarding the delivery, transmission, or disclosure of CIR 112.

12. Communications within the period 01 July 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Orbis or Mr. Steele and Defendants, Mr. Kramer, Mr. Winer, reporters and members of the media, or others concerning the steps taken by Mr. Steele, Orbis, or Defendants to corroborate, verify, or investigate the information and statements about Plaintiffs in CIR 112.

13. Documents concerning the destruction, return, or non-retention of documents within the period 01 September 2016 to the present in respect to: (a) CIR 112, including work product, memoranda, source information, drafts or analysis relating thereto; (b) communications between Orbis or Mr. Steele and Defendants Simpson or Fusion in respect to CIR 112; and (c) engagement agreements between Orbis and/or Mr. Steele on one hand and Fusion on the other which govern the creation or promotion of CIR 112.

## ATTACHMENT D

### Proposed Subjects for Oral Examination of Christopher Burrows

1. In general terms, Mr. Burrows's educational background, employment history, professional qualifications and personal preparation for the examination (including contacts with the parties, their lawyers, insurers, or representatives), excluding any privileged communications or confidential details regarding any government service.

2. The drafting and compilation in 2016 of CIR 112 and its promotion.

3. The destruction, return, or non-retention of the following documents: (a) CIR 112, including work product, memoranda, source information, drafts or analysis relating to CIR 112; (b) communications with Defendants Glenn Simpson or Fusion in respect to CIR 112; and (c) engagement agreements between Orbis and/or Mr. Steele on one hand and Fusion on the other which govern the creation or promotion of CIR 112.

4. Delivery, transmission, or disclosure of CIR 112 in 2016 to other persons or entities, including Defendants, David Kramer, Jonathan Winer, reporters and members of the media.

5. The steps taken by Mr. Burrows, Mr. Steele, Orbis, or Defendants to corroborate, verify or investigate the information and statements about Plaintiffs in CIR 112.

**ATTACHMENT E**

**Proposed Subjects for Oral Examination of Edward Baumgartner**

1. In general terms, Mr. Baumgartner's educational background, employment history, professional qualifications and personal preparation for the examination (including contacts with the parties, their lawyers, insurers, or representatives), excluding any privileged communications or confidential details regarding any government service.

2. The nature and terms of Mr. Baumgartner's, and/or his firm's, engagement by Fusion in 2016 relating to Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, and the scope and purpose of the engagement.

3. Mr. Baumgartner's research regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

4. Preparation of Mr. Baumgartner's report titled "ALFA Dossier Open Sources."

5. Communications in 2016 or 2017 between Mr. Baumgartner and Defendants Glenn Simpson or Fusion regarding the report titled "ALFA Dossier Open Sources."

6. Communications in 2016 or 2017 between Mr. Baumgartner and Defendants Simpson or Fusion regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

## <u>ATTACHMENT F</u>

**Proposed Requests for Production of Documentary Evidence from Edward Baumgartner**

1. Documents setting out the terms and scope of Mr. Baumgartner's engagement by Fusion relating to Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112 or its promotion.

2. Documents within the period 01 April 2016 to 03 October 2017 related to the preparation of the report titled "ALFA Dossier Open Sources."

3. Communications within the period 01 April 2016 to 03 October 2017 between Mr. Baumgartner and Defendants Glenn Simpson or Fusion regarding the report titled "ALFA Dossier Open Sources."

4. Communications within the period 01 April 2016 to 03 October 2017 between Mr. Baumgartner and Defendants Simpson or Fusion regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112.

5. Documents regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, within the period 01 April 2016 to 03 October 2017.

## ATTACHMENT G

### Proposed Subjects for Oral Examination of Sir Andrew Wood

1.  In general terms, Sir Andrew Wood's educational background, employment history, professional qualifications and personal preparation for the examination (including contacts with the parties, their lawyers, insurers, or representatives), excluding any privileged communications or confidential details regarding any government service.

2.  Communications in 2016 and 2017 between Sir Andrew Wood and Christopher Steele regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including in September 2016 around the time that Mr. Steele and Orbis transmitted CIR 112 to Fusion.

3.  Communications and meetings in 2016 and 2017 between Sir Andrew Wood and David Kramer or U.S. Senator John McCain regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including the meetings with Mr. Kramer and Senator McCain in November 2016 in Halifax, Nova Scotia.

4.  Communications and meetings between Mr. Kramer and Mr. Steele in 2016 and 2017 regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including the meeting between Mr. Kramer and Mr. Steele in London in November 2016 which Sir Andrew Wood arranged.

5.  The steps taken by Sir Andrew Wood, Mr. Steele, Orbis, or Defendants to corroborate, verify or investigate the information and statements about Plaintiffs in CIR 112.

**ATTACHMENT H**

**Proposed Requests for Production of Documentary Evidence from Sir Andrew Wood**

1. Communications within the period 01 September 2016 to 10 January 2017 between Sir Andrew Wood and Mr. Steele (including documents referencing or referenced in such communications) regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including in September 2016 around the time that Mr. Steele and Orbis transmitted CIR 112 to Defendant Fusion and relating to the meeting between Mr. Kramer and Mr. Steele in London in November 2016.

2. Communications within the period 01 September 2016 to 10 January 2017 between Sir Andrew Wood and David Kramer or U.S. Senator John McCain (including documents referencing or referenced in such communications) regarding Plaintiffs, Alfa, CIR 112, or the statements about Plaintiffs in CIR 112, including the meetings with Mr. Kramer and Senator McCain in November 2016 in Halifax, Nova Scotia.

3. Communications within the period 01 September 2016 to 10 January 2017 (including documents referencing or referenced in such communications) between Sir Andrew Wood and Mr. Steele, Mr. Kramer, Orbis, or Defendants concerning the steps taken by Sir Andrew Wood, Mr. Steele, Orbis, or Defendants to corroborate, verify, or investigate the information and statements about Plaintiffs in CIR 112.