**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **MIKHAIL FRIDMAN**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | Civil Case No. 1:17-cv-2041-RJL |
| | ) | |
| **ORBIS BUSINESS INTELLIGENCE** | ) | |
| **LIMITED,** *et al.* | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**PLAINTIFFS' UNOPPOSED MOTION FOR LEAVE TO SERVE
SUBPOENAS ON DANIEL JONES AND THE DEMOCRACY
INTEGRITY PROJECT VIA ALTERNATIVE SERVICE**

Plaintiffs Mikhail Fridman, Petr Aven and German Khan respectfully move this

Court pursuant to Fed. R. Civ. P. 45 for an order granting them leave to serve certain third party

subpoenas via means of service other than personal service.  Specifically, Plaintiffs seek an order

stating that service on third parties Daniel J. Jones and The Democracy Integrity Project, a

defunct D.C. Corporation, through Mr. Jones as last reported principal officer, by (1) posting a

copy of the subpoena outside the lobby of Mr. Jones' place of residence and leaving a copy with

the concierge; (2) delivering a copy by certified mail to Mr. Jones' place of residence; 3) email to

the address info@advdem.org, which is the email address for Advance Democracy Inc., a

Delaware corporation with which Mr. Jones is associated; 4) email to daniel@thepqg.com, the

email address provided for Mr. Jones as registered agent for The Penn Quarter Group, a District

of Columbia limited liability company; and 5) certified mail to the Penn Quarter Group at "801

Pennsylvania Ave, NW, c/o Daniel Jones, Washington, D.C. 20004," which is the registered

business address and registered agent address for that company, shall be deemed good and

sufficient service under Rule 45.  Plaintiffs have expanded substantial time, energy, and money attempting to serve Mr. Jones and TDIP via personal service.  Because Mr. Jones appears to be attempting to evade service and service on Mr. Jones and TDIP in the above described manner is calculated to provide actual notice of the Subpoena, the Court should deem such service to be good and sufficient service under Rule 45.

Pursuant to Local Civil Rule 7(m), on Monday, August 3, 2020 Plaintiffs' counsel met and conferred with Defendants' counsel with respect to the requested relief.  Defendants' counsel indicated that, while they have not seen the motion papers, they do not oppose the relief requested, and otherwise take no position on the motion.

For the reasons set forth in Plaintiffs' Memorandum of Points and Authorities the Motion should be granted.  A proposed order is enclosed.

Dated:        Washington, D.C.
              August 5, 2020            Respectfully submitted,

                            /s/ Kim Sperduto
                            Alan S. Lewis (#NY0252)
                            CARTER LEDYARD & MILBURN LLP
                            2 Wall Street
                            New York, NY 10005
                            Tel: (212) 732-3200
                            Fax: (212) 732-3232
                            lewis@clm.com

                            -and-

                            Kim Sperduto (DC Bar No. 416127)
                            SERDUTO THOMPSON & GASSLER PLC
                            1747 Pennsylvania Avenue, NW, Suite 1250
                            Washington, D.C. 20006
                            Tel: (202) 408-8900
                            Fax: (202) 408-8910

ksperduto@stglawdc.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

     I hereby certify that on this 5th day of August 2020, I electronically filed and served the foregoing using the CM/ECF system.

/s/ Kim Sperduto
Kim Sperduto

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MIKHAIL FRIDMAN**, *et al.*, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | Civil Case No. 1:17-cv-2041-RJL |
| ) | |
| **ORBIS BUSINESS INTELLIGENCE** ) | |
| **LIMITED,** *et al.* ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF THEIR MOTION FOR ALTERNATIVE SERVICE**

**Preliminary Statement**

Plaintiffs Mikhail Fridman, Petr Aven, and German Khan (collectively, "Plaintiffs") submit this memorandum of points and authorities in support of their motion pursuant to Rule 45 of the Federal Rules of Civil Procedure to permit alternative service of subpoenas directed to Daniel Jones and The Democracy Integrity Project (or "TDIP"). Alternative service is necessary to obtain documents from Mr. Jones and TDIP and the attendance of Mr. Jones for essential testimony to this action. Rule 45 allows for such alternative service. Personal service has been attempted on both Mr. Jones and TDIP. Those efforts, including multiple stakeouts for some twenty-five hours at Mr. Jones' apartment building by the process server, proved unsuccessful. It is Plaintiffs' understanding and belief that Mr. Jones is attempting to evade service of his subpoena.

Mr. Jones is a former Senate Intelligence Committee staff member and the founder of TDIP. It is Plaintiffs' understanding and belief that both Mr. Jones and TDIP have

engaged Fusion and Orbis to continue those entities' work in investigating Russian efforts to

interfere in United States elections, and that Mr. Jones and TDIP possess information concerning

the falsity of the allegations in Company Intelligence Report 112 ("CIR 112") and the lack of

efforts to corroborate the defamatory allegations of CIR 112—which are relevant issues in this

action.  Alternative service is necessary to obtain this essential evidence and testimony.

## ARGUMENT

### ALTERNATIVE SERVICE IS APPROPRIATE UNDER RULE 45 WHEN PERSONAL SERVICE HAS BEEN ATTEMPTED AND IS UNSUCCESSUFUL

The motion should be granted because Plaintiffs have made numerous and

assiduous attempts to effect personal service on both Mr. Jones and TDIP and those efforts have

proven unsuccessful.  Indeed, as enumerated in the accompanying Affidavit of Michael Molash

from Same Day Process Service, beyond attempting personal delivery, Plaintiffs have conducted

at least six stakeouts at Mr. Jones' last known address.  Despite surveillance of that residence for

some twenty-five (25) hours on multiple days, personal delivery has proven impossible.

Rule 45 requires that service be effected by "delivering a copy to the named

person . . . ."  Older cases, including cases in this Circuit, interpreted the "delivery" requirement

to mean personal service.  *See F.T.C. v. Compagnie de Saint-Gobain-Pont-aMousson,* 636 F.2d

1300, 1312-13 (D.C. Cir. 1980) ("*Compagnie*").  The growing trend of modern cases addressing

the issue find alternative service under Rule 45 not only permissible, but also the most practical

interpretation of the Rule.  *See, e.g., Cardinali v. Plusfour, Inc.,* 2:16-cv-02046-JAD-NJK, 2019

WL 3456630, *5 (W.D. Nev. June 20, 2019) (noting courts are "trending" toward the conclusion

that personal service is not required); *TracFone Wireless, Inc. v. SCS Supply Chain LLC*, 330

F.R.D. 613, 616 (S.D. Fla. 2019) ("substantial recent authority from federal courts in Florida

support that Rule 45 does not require personal service; rather, it requires service reasonably

calculated to ensure receipt of the subpoena by the witness"); *In re New England Compounding Pharmacy, Inc. Prod. Liab. Litig.*, No. MDL 13-2419-FDS, 2013 WL 6058483, at \*4–5 (D. Mass. Nov. 13, 2013) (agreeing with the growing trend and finding that service was proper "where it was effectuated by a means reasonably calculated to complete delivery and the respondents received actual notice of the subpoena"); *In re Falcon Air Exp., Inc*., No. 06-11877-BKC-AJC, 2008 WL 2038799, at \*1 (Bankr. S.D. Fla. May 8, 2008) (rejecting "as antiquated the so-called majority position interpreting Rule 45 as requiring personal service" and instead adopting "the better-reasoned, modern, emerging minority position, which holds that substitute service of a subpoena is effective on a nonparty witness under Rule 45").

Federal civil procedure treatises note "in recent years a growing number of cases have departed from the view that personal service is required and alternatively have found service of a subpoena under Rule 45 proper absent personal service."  9A Wright & Miller, *Federal Practice and Procedure,* § 2454 (3d ed. 2020).  *Cf. Bland v. Fairfax County, Va.,* 275 F.R.D. 466, 468-71 (E.D. Va. 2011) (Cacheris, J.) (extensively canvassing case law and concluding methods other than personal service are sufficient).  The Commentary to Rule 45 even notes that "more recently" courts have permitted service by means other than personal service: "More recently, a number of courts have upheld service by certified mail or other forms of service that are reasonably calculated to achieve actual notice."  Indeed, contemporary courts note that the cited language in *Compagnie* is dicta and courts in this District have not hesitated to join the modern trend.  *See, e.g., United States ex rel. El-Amin v. George Washington Univ.,* 1:95-cv-02000 (TAF)(FAK), 2000 U.S. Dist. LEXIS 15635, \*2-3 (D.D.C. Oct. 23, 2000) (holding "there is sufficient authority to permit service of a subpoena by other than personal service" and permitting service by posting with a copy by certified mail).  In the face of this

ever-growing modern trend, including decisions by this Court, the D.C. Circuit has not "spoken" on the issue for the last 40 years.

Application of the modern rule here justifies service by alternative means. Plaintiffs' efforts at service on both Mr. Jones and TDIP have been numerous and extensive. (See a summary of those efforts in the accompanying Affidavit of Michael Molash sworn to July 30, 2020 ("Molash Aff.")).  For example, the original address where service was attempted came from TDIP's Internal Revenue Service tax Form 990 for tax year 2017, the most recent available. (Molash Aff. ¶ 3).  That address -- 1360 Beverley Road, McLean, Virginia -- turned out to be inaccurate.  When Same Day Process went to TDIP's listed office address at 1360 Beverley Road, McLean, they found it was not really TDIP's office but rather an accounting firm called Prager Metis.  An employee of Prager Metis reported to the process server that Mr. Jones was a client of Prager Metis but that Mr. Jones did not work there.  The employee declined to give Mr. Jones' home address even though that employee noted Mr. Jones was working from home. (Molash Aff. ¶ 4).

A "skip-trace" conducted by Same Day Process located an address for Mr. Jones at 801 P Street, N.W., # 1208, Washington, D.C. 20001.  (Molash Aff. ¶ 5).  When Same Day Process visited the building at 801 P Street, N.W., the concierge stated that there was no unit 1208.  Same Day Process also checked across the street at 800 P Street and was told that there was no unit 1208 nor any record of Mr. Jones in that building's directory.  (Molash Aff. ¶ 6).

On June 16, 2020, the employee at Prager Metis that talked to Same Day Process telephoned Same Day Process and provided yet another address for Mr. Jones, 915 F. Street, N.W. # 500, Washington, D.C.  20004.  (Molash Aff. ¶ 7).  When Same Day Process visited that building, it found the ground floor was occupied by the restaurant "Succotash."  Access through

the nearby McGill Alley, N.W. found the upper floors of the building were listed as being occupied by small businesses.  Current tenants were listed for the third, sixth, and seventh floors in the building directory.  There was also a listing for an entity called "Advance Democracy."[1] No one answered the intercom at that office suite.  Moreover, when a google search was run on the 915 F Street address, Same Day Process found that the fourth and fifth floors were listed as "for rent."  Mr. Jones was not located at the 915 F Street address either.   (Molash Aff. ¶ 8).

A review of the skip-trace found yet another address for Mr. Jones at 801 Pennsylvania Avenue, N.W., #1208, Washington, D.C.  20004.  (Molash Aff. ¶ 9).  As the Investigative Due Diligence Affidavits dated July 16, 2020, from three separate process servers demonstrate, even a stakeout and repeated efforts to serve Mr. Jones at 801 Pennsylvania Avenue proved unsuccessful.  (*See* Molash Aff. ¶ 10, Exs. 4-5).   On the first visit on June 16 at 5:23 p.m., the concierge at the building -- a "secured complex" -- "confirmed the subject resided at the address and attempted to reach the subject . . . but was unable to reach the subject."   (*See* Molash Aff. ¶ 10).  The entry for the June 24, 2020 evening stakeout indicates that "a Caucasian male with black and gray hair and a full beard which was also black and gray" came "out the main door to walk a dog."  The process server did not see that man return to the building by the time the stakeout ended at 10:45 p.m.  But "five minutes after observing that individual" a "Caucasian female" came out of 801 Pennsylvania Avenue, N.W. and stood behind the process server's vehicle taking pictures.  (Molash Aff. ¶ 13, Exs. 4-5).  Although the concierge confirmed that Mr. Jones lived at 801 Pennsylvania Avenue, N.W. stakeouts on six separate

---

[1] Advance Democracy, Inc. is a Delaware corporation to which Esquire Magazine has linked Mr. Jones.  *See* Jack Holmes, *The U.S. Has Never Held Anyone Accountable for Torture.  Daniel J. Jones Is Still Pissed Off About That*, ESQUIRE, Nov. 15, 2019, *available at* https://www.esquire.com/news-politics/a29796820/the-report-movie-senate-daniel-j-jones-cia-torture-true-story/.  A true and correct copy of the foregoing article is attached to the Molash Aff. as Exhibit 3.

dates (June 24, June 27, June 28, July 1, July 10 and July 12) did not observe Mr. Jones. (Molash Aff. ¶¶ 10, 12-13).  Entries for those dates in the Due Diligence Affidavits variously indicate the process server "did not observe the subject" or "no one matched the description of the subject" "nor did anyone look like the person in the picture."  (Molash Aff. Exs. 4-5).

Finally, 801 Pennsylvania Ave., N.W. is listed as an address for Mr. Jones in District of Columbia Department of Consumer and Regulatory Affairs ("DCRA") records. (Molash Aff. ¶ 11).  The Penn Quarter Group[2] 2019 registration information lists Mr. Jones as its agent for purposes of service of process and lists an email address for Mr. Jones as daniel@thepqg.com.  (*See* Molash Aff. ¶ 11, Ex. 6).  As noted later below, Plaintiffs expressly request that one means of alternative service of Mr. Jones, among others, be by email to that email address.

DCRA records indicate that TDIP's status in the District of Columbia is "revoked."  (Molash Aff. ¶ 15, Ex. 7).  Accordingly, Same Day Process effected service on TDIP by certified mail, return receipt requested, by serving the District of Columbia Superintendent of Corporations.  (Molash Aff. ¶ 16).  Such method of service is authorized by D.C. Code §29.10412(d) in circumstances where a business entity has failed to maintain a registered agent in the District of Columbia.  *See also* Mayor's Order 2009-65, dated April 24, 2009, ¶1.d.  Due to current COVID-19 restrictions, the DCRA office of the District of Columbia Superintendent of Corporations has been closed to the public; certified mail offered the only course of serving the Superintendent of Corporations.  (Molash Aff. ¶ 16).  To date, TDIP has failed to respond to Plaintiffs' subpoena.

---

[2] The Penn Quarter Group is led by Mr. Jones and advertises itself as offering "consulting, research, and global investigative services to businesses, law firms, public policy organizations, not-for-profits, and individuals."  *See* http://thepqg.com/; http://thepqg.com/leadership/.

One cannot help but conclude that Mr. Jones is attempting to evade service of the subpoena.

Accordingly, Plaintiffs request that their motion for effecting service on Daniel J. Jones and The Democracy Integrity Project by alternative means be granted.  As the accompanying proposed Order sets forth, Plaintiffs request that service by (1) posting a copy of the subpoena outside the lobby of Mr. Jones' place of residence and leaving a copy with the concierge; (2) delivering a copy by certified mail to Mr. Jones' place of residence; 3) email to the address info@advdem.org, which is the email address for Advance Democracy Inc., a Delaware corporation with which Mr. Jones is associated; 4) email to daniel@thepqg.com, the email address provided for Mr. Jones as registered agent for The Penn Quarter Group, a District of Columbia limited liability company; and 5) by certified mail to the Penn Quarter Group at "801 Pennsylvania Ave., c/o Daniel Jones, Washington, D.C. 20004," which is the registered business address and registered agent address for The Penn Quarter Group, be deemed good and sufficient service under Rule 45.   The concierge has confirmed that Mr. Jones resides in that building. The 801 Pennsylvania Ave., N.W. address -- without an apartment or suite number -- is the address at which Mr. Jones has consented to receive service on behalf of The Penn Quarter Group.  The "daniel@thepqg.com" email address is the email address for Mr. Jones as registered agent of The Penn Quarter Group currently on file with the District of Columbia.  The "info@advdem.org" is the email address for Advance Democracy, which is another organization with which Mr. Jones has publicly affiliated.  By implementing all five methods of service enumerated above, "actual notice" is bound to be achieved, the preferred result of the modern trend of cases pursuant to Rule 45.

Dated:          Washington, D.C.
                August 5, 2020                    Respectfully submitted,

/s/ Kim Sperduto
Alan S. Lewis (#NY0252)
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005
Tel: (212) 732-3200
Fax: (212) 732-3232
lewis@clm.com

-and-

Kim Sperduto (DC Bar No. 416127)
SERDUTO THOMPSON & GASSLER PLC
1747 Pennsylvania Avenue, NW, Suite 1250
Washington, D.C. 20006
Tel: (202) 408-8900
Fax: (202) 408-8910
ksperduto@stglawdc.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MIKHAIL FRIDMAN**, *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | )      Civil Case No. 1:17-cv-2041-RJL |
| | ) |
| **ORBIS BUSINESS INTELLIGENCE** | ) |
| **LIMITED,** *et al.* | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## AFFIDAVIT OF MICHAEL MOLASH

| | |
|---|---|
| **CITY OF WASHINGTON** | ) |
| | ) ss: |
| **DISTRICT OF COLUMBIA** | ) |

**MICHAEL MOLASH,** being first duly sworn, deposes and states:

1.    My name is Michael Molash and I am Vice President of Same Day Process Service ("Same Day Process" or "SDPS"), a Washington, D.C. company which provides service of process.  We provide services in Washington, D.C., Maryland, Virginia, and even nation-wide, and conduct services related to service of process such as skip-traces.  I have worked for Same Day Process since 2007.   I am a licensed private investigator who specializes in skip-tracing, and I have been responsible for developing many of the policies and procedures by which Same Day Process operated.  I make this Affidavit based on personal knowledge or on information provided to me in my role as Vice President of Same Day Process.

2.    In 2020, counsel for the Plaintiffs in the above-captioned case (the "Action") engaged SDPS for assistance in the service of various subpoenas on third-parties.

Among the persons Plaintiffs hired Same Day Process to serve were Daniel J. Jones and The Democracy Integrity Project ("TDIP").

3.      Same Day Process received Subpoenas for Mr. Jones and TDIP on June 15, 2020.  (Copies of the Jones and TDIP Subpoenas are attached as Exhibits 1 and 2, respectively).  Same Day Process prepared the subpoenas, attachments, and a check to Mr. Jones for service.  On June 15, 2020, I dispatched a process server to the addresses indicated on the Jones and TDIP Subpoenas: 1360 Beverley Road, McLean, Virginia.  According to Plaintiffs' counsel, this address came from TDIP's Internal Revenue Service tax Form 990 for tax year 2017, which was the most recent year available.

4.      When my process server arrived at the office address at 1360 Beverley Road, McLean, he found it was not TDIP's office, but rather an accounting firm called Prager Metis.  An employee of Prager Metis reported to my process server that Mr. Jones was a client of Prager Metis but that Mr. Jones did not work there.  The employee declined to give Mr. Jones home address even though that employee noted that Mr. Jones was working from home.

5.      After service could not be effected at the McLean address, Same Day Process performed a skip-trace on Mr. Jones.  A skip-trace is a computerized search in a number of proprietary databases that can provide information such as all current and previous addresses, employment, utilities, criminal records, or information of a similar nature, regarding the individual searched.  The skip-trace we ran on Mr. Jones returned 801 P Street, N.W., #1208, Washington, D.C. 20001 as an address being used by Mr. Jones.  On June 16, I re-directed my process server to this new address.

6.      When my process server arrived at the building located at 801 P Street, N.W., he was informed by the concierge stated that there was no unit 1208.  Just to be sure, my

server also checked across the street at the building located at 800 P Street, N.W. and was told that there was no unit 1208 or record of Mr. Jones in that building's directory.

7.     That same day, Same Day Process received a call from the employee at Prager Metis whom my server had talked to on June 15.  Over the telephone, the employee provided a new address for Mr. Jones, 915 F. Street, N.W. # 500, Washington, D.C.  20004.   I directed my server to this new address.

8.     When my server arrived at the F Street, N.W. address, he found the ground floor was occupied by the restaurant "Succotash."  After a restaurant employee directed my server to the nearby McGill Alley, N.W. for access to the offices located at that address, my server found that the upper floors of the building were listed as being occupied by small businesses.  Current tenants were listed for the third, sixth, and seventh floors in the building directory.  One listing was for an entity called "Advance Democracy," but no one answered the intercom at that office suite.  Access to that office space was restricted.  According to Esquire, Mr. Jones is affiliated with a nonprofit group called Advance Democracy.  *See* Jack Holmes, *The U.S. Has Never Held Anyone Accountable For Torture. Daniel J. Jones Is Still Pissed Off About That,* Esquire, November 15, 2019, https://www.esquire.com/ newspolitics/a29796820/the-report-movie-senate-daniel-j-jones-cia-torture-true-story/ (last visited July 28, 2020) attached as Exhibit 3.  When Same Day Process later conducted a google search on the 915 F Street address, we found that the fourth and fifth floors were listed as "for rent."

9.     Further review of the skip-trace results for Mr. Jones on June 16 indicated that Mr. Jones has also used the address 801 Pennsylvania Ave., N.W., #1208, Washington, D.C. 20004.  On June 16, I also dispatched an SDPS process server to this address.

10.     My server arrived at the 801 Pennsylvania Ave., N.W. address on June 16

at approximately 5:23 p.m.  My server found that this address was part of a secured complex.

The building's concierge informed my server that "no one was authorized to go upstairs and that

the subject would have to either escort me upstairs or grant my permission to go upstairs."  The

concierge did confirm to my server that Mr. Jones resided at the address and attempted to reach

Mr. Jones over the telephone.  The concierge was unsuccessful in reaching Mr. Jones.  My server

waited fifteen minutes for Mr. Jones, and then left a phone number with the concierge to pass

along to Mr. Jones before leaving.  Attached here as Exhibits 4 and 5 are Investigative Due

Diligence Affidavits dated July 16, 2020 for Mr. Jones and TDIP, respectively, that describe the

efforts made by Same Day Process servers to serve Mr. Jones and TDIP at 801 Pennsylvania

Ave., N.W. address on June 16 and in succeeding weeks ("Due Diligence Affidavits").

11.     On or about June 17, I undertook additional investigation into possible

businesses and addresses that might be associated with Mr. Jones.  I discovered via LinkedIn that

Mr. Jones appeared to be employed as the President of an entity called The Penn Quarter Group.

Further investigation of that company's website, http://thepqg.com/, confirmed Mr. Jones'

affiliation with the company, but failed to provide a useful address for service of process.  The

Penn Quarter Group's "Contact" page, http://thepqg.com/contact/, provides only a Washington,

D.C. P.O Box address and an email address for info@thePQG.com.  Later review of the DCRA

registration information for Penn Quarter Group (The) LLC indicated that the business address

and registered agent addresses for that company were: 801 Pennsylvania Ave., N.W., c/o Daniel

J. Jones, Washington, D.C. 20004.  DCRA also listed Mr. Jones as the registered agent for the

Penn Quarter Group, providing an email address of daniel@thePQG.com.  A printout of The

Penn Quarter Group LLC's information on file with DCRA as of July 24, 2020 is attached as Exhibit 6.

12.     Same Day Process then undertook a stakeout of the 801 Pennsylvania Ave., N.W. building on six separate dates (June 24, June 27, June 28, July 1, July 10 and July 12) for a total of approximately twenty-five hours. *See generally* Due Diligence Affidavits attached as Exhibits 4 and 5.

13.     During that time we were unable to conclusively identify Mr. Jones entering or exiting his residence building. On one occasion, however, the evening of June 24, 2020, at approximately 8:30 PM, Same Day Process's employee observed "a Caucasian male with black and gray hair and a full beard which was also black and gray" come "out the main door to walk a dog." Our server did not see that man return to the building by the time the stakeout ended at 10:45 p.m. However, at approximately 8:35 p.m., "five minutes after observing that individual" a "Caucasian female" came out of 801 Pennsylvania Avenue, N.W. and stood behind the process server's vehicle taking pictures. *See* Due Diligence Affidavits attached as Exhibit 4 and 5 at pgs 1-2.

14.     To date, Mr. Jones has not reached out by telephone or otherwise to Same Day Process.

15.     As of June 16, 2020, TDIP's registration status with the Washington, D.C. Department of Consumer and Regulatory Affairs was "revoked." *See* DCRA Printout for TDIP dated June 16, 2020 attached as Exhibit 7.

16.     On or about June 16, 2020, Same Day Process prepared the TDIP Subpoena for service via the D.C. Superintendent of Corporations. In connection with a separate matter, on June 17, 2020 Same Day Process visited the office of the D.C. Superintendent of

Corporations and found that the office was locked. Signs on the door indicated that the office was closed to the public due to COVID-19. As a consequence, the only way to conduct service via the D.C. Superintendent of Corporations was by mail. On June 19, I mailed the TDIP Subpoena, along with the required fees, copies, and forms, to the D.C. Superintendent of Corporations via certified mail, return receipt requested. Attached as Exhibit 8 is a copy of the Affidavit I executed certifying to service on TDIP via the D.C. Superintendent of Corporations. According to the return receipt, the D.C. Superintendent of Corporations received the TDIP Subpoena on June 22, 2020. Attached as Exhibit 9 are copies of the June 19 certified mail receipt and June 22 return receipt.

**Michael Molash**

Signed and sworn to before me this
____ day of July, 2020

Notary Public

K. Mack
Notary Public, District of Columbia
My Commission Expires 2/29/2024

# EXHIBIT 1

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| Mikhail Fridman et al. | ) | |
|---|---|---|
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  1:17-cv-02041-RJL |
| Bean LLC et al. | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:      Daniel Jones, The Democracy Integrity Project, 1360 Beverley Road, Suite 300, McLean, VA 22101

*(Name of person to whom this subpoena is directed)*

✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Schedule A

| Place: Sperduto Thompson & Gassler PLC<br>1747 Pennsylvania Ave., NW, Suite 1250<br>Washington, DC 20006 | Date and Time:<br><br>07/27/2020 10:00 am |
|---|---|

❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      06/15/2020

|  | |
|---|---|
| *CLERK OF COURT* | OR |
| _____ | /s Alan Lewis |
| *Signature of Clerk or Deputy Clerk* | _____ |
| | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*      Plaintiffs
_____ , who issues or requests this subpoena, are:

Alan Lewis, Esq., Carter Ledyard & Milburn LLP, 2 Wall Street, New York, NY 10005, lewis@clm.com, (212) 732-3200

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   1:17-cv-02041-RJL

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❒  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

**(i)** is a party or a party's officer; or

**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:

**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**

The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

## for the

### District of Columbia

| | | |
|---|---|---|
| Mikhail Fridman et al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  1:17-cv-02041-RJL |
| Bean LLC et al. | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:      Daniel Jones, The Democracy Integrity Project, 1360 Beverley Road, Suite 300, McLean, VA 22101

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

Subject matter of the requests in Schedule A

| Place: SPERDUTO THOMPSON & GASSLER PLC<br>1747 Pennsylvania Ave., NW, Suite 1250<br>Washington, D.C. 20006 | Date and Time:<br><br>10/21/2020 10:00 am |
|---|---|

The deposition will be recorded by this method:   video and stenographic means

☐ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   06/15/2020

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| | | /s Alan Lewis |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Plaintiffs
, who issues or requests this subpoena, are:

Alan Lewis, Esq., Carter Ledyard & Milburn LLP, 2 Wall Street, New York, NY 10005, lewis@clm.com, (212) 732-3200

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  1:17-cv-02041-RJL

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**Daniel Jones**
**President, The Democracy Integrity Project**
1360 Beverley Road, Suite 300
McLean, VA  22101

<u>**SCHEDULE A**</u>

<u>**INSTRUCTIONS AND DEFINITIONS**</u>

1.      The provisions and definitions contained in the Federal Rules of Civil Procedure

and Local Rules of the United States District Court for the District of Columbia are incorporated

by reference as if fully set forth herein.

2.      In producing documents and other things, you shall furnish all responsive

documents or things in your possession, custody, or control.

3.      Documents and things requested herein shall be produced as they are kept in the

usual course of business, with information indicating their source (e.g., the person(s) from whom

the documents were obtained).

4.      A Request calling for the production of any document shall be deemed to include,

in addition to the document itself, a request for any and all exhibits or attachments to the

document and any enclosures sent or kept with the document.  Documents attached to each other

shall not be separated.

5.      Documents maintained or stored electronically may be produced on CD, DVD,

File Transfer Protocol site, portable hard or flash drive, or other reasonably accessible media

format.  All such documents shall be produced in Group IV, 300 DPI, single-page TIFF format

with document-level extracted text files, and standard Concordance load files (.DAT, .OPT), and

shall include all metadata (including, without limitation, document boundaries, custodian

identification information, date and time, etc.).  If the text cannot be extracted, Optical Character

Recognition ("OCR") text must be provided.  In addition to producing TIFF files with text,

metadata, and standard load files, native files shall be produced for any PowerPoint presentations

containing audio or video, any Excel documents, any Access databases, or documents created

under equivalent software packages.  Data files shall not be zipped, encrypted, or otherwise

restricted or proprietarily protected for specific use.  If the native file format is derived from

software not accessible with Microsoft Office applications (or other common applications),

please state so in your response.

6.     Documents maintained in hardcopy shall be produced in TIFF image format with

corresponding OCR text, associated data identifying the beginning and ending Bates numbers

and, to the extent applicable, information associating document families or attachment ranges.

7.     The file or other container in which a document is kept is deemed to be an integral

part of the document and shall be produced with the document.  Whenever a document or group

of documents is maintained in the ordinary course of business in any file, folder, container, box

or other document storage or organization device, each Request herein shall be deemed to call

for the production of copies of, or the identification of, such file, folder, container, box or other

document storage or organization device and any labels or other form of identification set forth

thereon.

8.     Unless otherwise indicated, the documents to be produced include all documents

prepared, sent, dated, or received, or which otherwise existed or were possessed at any time

subsequent to January 1, 2015.

9.     Each document and thing requested herein shall be produced in its entirety and

without deletion or excisions, regardless of whether you consider the entire document to be

relevant or responsive to the Requests.  If you have redacted any portion of the document, you

shall stamp the word "redacted" on each page of the document that you have redacted.  If any

document covered by these Requests contains a redaction, you shall identify such document and

all redactions on a log prepared in accordance with Federal Rule 26(b)(5), specifically

identifying the following:  (i) the type of document; (ii) any addressor and addressee; (iii) any indicated or blind copies; (iv) the document's date; (v) the general subject matter of the document, number of pages, and a description of any attachments or appendices; (vi) all persons to whom the document was distributed, shown, or explained; and (vii) the nature and basis of the privilege or grounds for redaction being asserted.

10.     If any document requested herein is withheld from production on the basis of any claim or privilege or other protection or immunity from disclosure, you shall furnish a log in accordance with Federal Rule 26(b)(5), specifically identifying the following:  (i) the type of document; (ii) any addressor and addressee; (iii) any indicated or blind copies; (iv) the document's date; (v) the general subject matter of the document, number of pages, and a description of any attachments or appendices; (vi) all persons to whom the document was distributed, shown, or explained; and (vii) the nature and basis of the privilege or grounds for withholding being asserted.

11.     Documents not otherwise responsive to the Requests shall be produced if such documents mention, discuss, refer to or explain the documents which are called for by these Requests or constitute routing slips, transmittal memoranda or letters, comments, evaluations or similar materials.

12.     If any responsive documents were, but no longer are, in your possession, custody or control, state the disposition of such documents, including, but not limited to, the identity of the person(s) to whom the documents were forwarded, the state of such disposition and the identity, if known, of the person(s) currently in possession of such documents and the current or last known address of such person(s); and if the documents have been destroyed, the date and manner of their destruction, by whom they were destroyed, who authorized such destruction, and

for what purpose they were destroyed.

13.     Each Request should be interpreted broadly, so as to include all documents that could be responsive to each Request.  Plaintiffs reserve the right to supplement these Requests and seek supplementary responses to these Requests.

14.     As a non-party who has received a subpoena in this Action, you are covered by the Stipulated Confidentiality Agreement and Protective Order entered in the Action and you have the right to protect the confidentiality of documents produced in accordance with such Agreement and Order.  A copy of the Stipulated Confidentiality Agreement and Protective Order entered in the Action can be accessed on the docket at Document 67.

15.     The use of the singular form of any word includes the plural and vice versa.

16.     The masculine includes the feminine and neutral genders, and vice versa.

17.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Requests all documents that might otherwise be construed to be outside of its scope.

18.     The use of the terms "any" and "all" shall be construed to mean "any and all" as necessary to bring within the scope of these Requests all documents that might otherwise be construed outside of its scope.

19.     The term "including" shall not be construed as a limiting phrase but, rather, shall be construed to mean "including, without limitation."

20.     Each of the words "discussing," "reflecting," "concerning," "relating," "involving," "evidencing," or "referring" shall have common meanings and shall include indirect as well as direct references to the subject matter of the Request.

21.     The use of a verb in any tense shall be construed as the use of the verb in all other

4

tenses as necessary to bring within the scope of these Requests all documents that might otherwise be construed to be outside of its scope.

22.     "Requests" means, collectively, each numbered request which appear below under the heading DOCUMENTS REQUESTED.

23.     The terms "you," "your," and "yourself" refer to the party or parties to whom these Requests are directed, and any persons or entities acting on your behalf or in concert with you, as well as entities with which you are affiliated and/or manage, including TDIP (as defined below), Penn Quarter Group, and Advance Democracy.

24.     "TDIP" means The Democracy Integrity Project, its employees, officers, directors, and any persons or entities acting on behalf of or in concert with TDIP.

25.     The "Action" means the above-captioned litigation, *Fridman v. Bean LLC a/k/a Fusion GPS, et al.*, 17-cv-2041 (D.D.C.), including all pleadings and proceedings filed or had therein.  A copy of the complaint in this Action (the "Complaint") is enclosed separately herewith.

26.     "Plaintiffs" means, collectively, Mikhail Fridman, Petr Aven, and German Khan.

27.     "Defendants" means, collectively, Fusion (as defined below) and Glenn Simpson ("Simpson"), and any of their present or former agents, affiliates, predecessors, successors, assigns, parents, subsidiaries, officers, employees, directors, members, partners, shareholders, consultants, and representatives, or any one or more of the foregoing.

28.     The "Dossier" means the compilation of 17 separate memoranda or reports, totaling 35 pages, prepared by Christopher Steele, as described in Paragraphs 1 and 2 of the Complaint in the Action, which was published on January 10, 2017 by BuzzFeed along with, and referenced in, an article entitled "These Reports Allege Trump Has Deep Ties to Russia."   A

5

copy of the BuzzFeed article and Dossier, including CIR 112 (as defined below), are enclosed separately herewith.

29.     "CIR 112" means Company Intelligence Report ("CIR") 112 entitled "RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION," which was prepared by Christopher Steele and was included among the reports published by BuzzFeed that were referred to as the Dossier, and the contents therein.

30.     "Alfa" means the conglomerate of entities including Alfa-Bank JSC (also known as JSC Alfa-Bank and Alfa-Bank AO), ABH Holdings S.A., Alfa Capital, AlfaStrakhovanie Group, Alfa Asset Management (Europe) S.A., A1, X5 Retail Group, Rosvodokanal Group, and IDS Borjomi International Group, or any of their subsidiaries or affiliates.

31.     "Fusion" or "Bean" means Bean LLC, which does business as or is also known as Fusion GPS, and its and their subsidiaries, affiliates, founders (including Glenn Simpson and Peter Fritsch), employees, or representatives.

32.     "Orbis" means Orbis Business Intelligence Ltd., the London-based firm founded by Christopher Steele, and any employees or representatives.

33.     "Steele" means Christopher Steele, the former British intelligence officer and founder of Orbis who compiled the Dossier, as referenced in Paragraph 3 of the Complaint, and any representatives.

34.     "Perkins Coie" means Perkins Coie LLP, its partners and employees, and any persons or entities acting on behalf of or in concert with it.

35.     "DNC" means the Democratic National Committee and the DNC Services Corporation, their employees, officers, directors, and any persons or entities acting on behalf of or in concert with the DNC.

36.    "HFACC" means HFACC, Inc. (a/k/a Hillary for America), its employees, officers, directors, and any persons or entities acting on behalf of or in concert with HFACC.

37.    The terms "person" or "persons" mean natural persons as well as legal entities including, without limitation, firms, companies, proprietorships, corporations, partnerships, limited liability companies, associations, unincorporated associations, and governmental bodies, agencies, and officials and every other type of organization or entity.

38.    The terms "representative" or "representatives" when used in reference to a person, mean any past or present officer, director, partner, associate, member, employee, consultant, agent, subsidiary or affiliate of such persons, and any other person acting on behalf of, or in concert with, such person.

39.    The terms "document" and "documents" have the same meaning and scope as the broadest usage given to these terms in or pursuant to the Federal Rules and applicable federal law, including (without limitation) the following: all writings and records of any kind; electronic or computerized data compilations; embedded data and metadata; originals, drafts, and all non-identical copies; written or electronic correspondence, e-mail, voice mail, instant messages, text messages, WhatsApp messages, Slack messages, Signal messages, communications, records, memoranda, notes, diaries, calendars, statistics, letters, telegrams, minutes, contracts, agreements, reports, price lists, agendas, manuals, studies, checks, statements, ledgers of account and work papers; inter-office and intra-office communications; notes and notations in any form; recordings of telephone calls or meetings; minutes of meetings or other communications; bulletins; printed matter (including newspapers, magazines and other communications and articles and clippings); press releases; printouts; teletypes and telecopies; ledgers; work sheets; graphic or oral records of representations or presentations of any kind (including without

limitation photographs, charts, graphs, and PowerPoint presentations); microfiche, microfilm, and digital, video or film recordings; electronic, mechanical or electrical records; tapes, cassettes, disks, recordings or transcriptions thereof; any drafts, alterations, modifications, changes and amendments of any of the foregoing; and any other documents as defined in the Federal Rules and under applicable federal law.  The terms "document" and "documents" specifically include electronic data or information contained in or on computer networks, mainframes, computer files, pocket organizers, personal digital assistants, personal computers, LAN's local workstations, computer disks, file servers, e-mail systems, CD-ROMs, e-mails, hard drives, printer buffer or memories, fax memories, voice mail systems, or any related back-up or archived systems or tapes.

40.     The terms "communication" or "communications" mean the transmittal of data or information (in the form of facts, images, ideas, inquiries or otherwise) by any means or methodology, including (without limitation) any meeting, conversation, discussion, document, correspondence, message, e-mail, note, text message, WhatsApp messages, Slack messages, Signal messages, or other means of transmittal.

41.     The terms "concern" or "concerning" mean discussing, referring to, relating to, or mentioning in any way, whether explicitly or implicitly.

## **DOCUMENTS REQUESTED**

1.     Documents evidencing the terms of any engagement or agreement between you, TDIP, Penn Quarter Group, or Advance Democracy, on the one hand, and Fusion, Simpson, Steele, and/or Orbis, on the other hand, relating to research regarding interference with the 2016 presidential election or any topics contained in CIR 112, including documents evidencing the purpose of the work that was to be performed in connection with any engagement or agreement.

8

2.      Documents evidencing the terms of any engagement or agreement between you, TDIP, Penn Quarter Group, or Advance Democracy, on the one hand, and Edward Austin Ltd. and/or Edward Baumgartner, on the other hand, relating to research regarding interference with the 2016 presidential election or any topics contained in CIR 112, including documents evidencing the purpose of the work that was to be performed in connection with any engagement or agreement.

3.      Documents evidencing the purposes of (or reason for) funds paid to Bean by you, TDIP, Penn Quarter Group, or Advance Democracy, including, for example, funds paid by TDIP as reflected in TDIP's IRS Forms 990 for 2017 and 2018, to the extent such purposes or reasons relate to research regarding interference with the 2016 presidential election or any topics contained in CIR 112.

4.      Documents evidencing the purposes of (or reason for) funds paid to Edward Austin Ltd. by you, TDIP, Penn Quarter Group, or Advance Democracy, including, for example, funds paid by TDIP as reflected in TDIP's IRS Forms 990 for 2017 and 2018, to the extent such purposes or reasons relate to research regarding interference with the 2016 presidential election or any topics contained in CIR 112.

5.      All documents concerning any communications between or among you and Defendants relating to Plaintiffs, Alfa, CIR 112, the Dossier, or the contents of CIR 112 or the Dossier, including any communications with Simpson and Fusion in early 2017 as described in the book "Crime in Progress" (pp. 171-78).

6.      All documents concerning any communications between or among you, Orbis, or Steele relating to Plaintiffs, Alfa, CIR 112, the Dossier, or the contents of CIR 112 or the Dossier.

7.      All documents concerning any communications between or among you, Perkins Coie, the DNC, or HFACC, relating to Plaintiffs, Alfa, CIR 112, the Dossier, or the contents of CIR 112 or

9

the Dossier.

8.      All documents concerning any communications between you and any journalists, reporters, news outlets or publications, or members of the media, or any persons acting on their behalf, relating to Plaintiffs, Alfa, CIR 112, the Dossier, or the contents of CIR 112 or the Dossier.

9.      All documents concerning any communications, interviews, or testimony to or with governmental entities or representatives (including the FBI, DOJ, State Department, or Congress) regarding Plaintiffs, Alfa, CIR 112, the Dossier, or the contents of CIR 112 or the Dossier, including communications with members of Congress or Congressional committees, testimony before any governmental entity or body, and documents produced or provided to any governmental entity or body.

10.     All documents relating to the truth or falsity of the statements and allegations set forth in CIR 112 and the Dossier.

11.     All documents, to the extent not produced in response to Requests Nos. 1-10, concerning Plaintiffs, Alfa, CIR 112, the Dossier, the contents of CIR 112 or the Dossier, the dissemination or publication of CIR 112 or the Dossier,  or Steele or Steele's source(s) for CIR 112.

10

COMPLAINT

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
------------------------------------------------------------X
                                                            :
MIKHAIL FRIDMAN, PETR AVEN, AND                             :
GERMAN KHAN,                                                :        Case 1:17-cv-02041 (RJL)
                            Plaintiffs,                     :
                                                            :
            -v-                                             :
                                                            :
BEAN LLC (A/K/A FUSION GPS) AND                             :
GLENN SIMPSON,                                              :
                                                            :
                                                            :
                            Defendants.                     :
------------------------------------------------------------X

## AMENDED COMPLAINT
### JURY TRIAL DEMANDED

Plaintiffs Mikhail Fridman, Petr Aven, and German Khan, by their attorneys

Carter Ledyard & Milburn LLP, allege as follows:

## INTRODUCTION

1.      This is a defamation case brought by three international businessmen who

were defamed in widely disseminated political opposition research reports commissioned

by political opponents of candidate Donald Trump in the 2016 presidential election cycle.

The reports (which came to be known as the "Trump Dossier" and the "Dossier") were

published both before and after the 2016 election by the Defendants: the Washington,

D.C. based firm Fusion GPS ("Fusion") and its principal, Glenn Simpson, a former

journalist specializing in political opposition research.  In that role, the Defendants traffic

in procuring damaging information about political candidates.  The reports are gravely

damaging in that, directly or by implication, they falsely accuse the Plaintiffs—and Alfa

("Alfa"), a consortium in which the Plaintiffs are investors—of criminal conduct and

alleged cooperation with the "Kremlin" to influence the 2016 presidential election. But neither the Plaintiffs nor Alfa committed any of the acts recklessly attributed to them by the Defendants. To the contrary, the Plaintiffs and Alfa are collateral damage in a U.S. political operation conducted by the Defendants, whose focus is an alleged relationship (between the Kremlin and the Trump campaign) which has nothing whatsoever to do with the Plaintiffs.

      2.      The specific "report" that includes facially defamatory statements about the Plaintiffs is one of seventeen written Company Intelligence Reports 2016 ("CIRs") that comprise the Trump Dossier. The Defendants included Company Intelligence Report 112 (the "Report" or "CIR 112") (which makes statements about the Plaintiffs) in the Trump Dossier, even though the Dossier's purpose and intended subject matter have nothing to do with the Plaintiffs' past, current or intended future activities. Broadly, those reports purport to describe details of an alleged scheme between the Russian government and the Trump presidential campaign to unlawfully manipulate the result of the 2016 presidential election in favor of candidate Trump. The Defendants gathered these reports as part of their engagement to conduct "opposition research" (known as "oppo research" by its practitioners and the media) against Trump. Opposition research, in essence, is the gathering of information for the purpose of eventually discrediting or otherwise harming a candidate for a public office. Opposition research is neither objective nor neutral. Instead, it is skewed from the outset in favor of appearing to find negative information about individuals—the essence of the product that political opposition research practitioners such as the Defendants are hired to produce.

3.       As described below, the Defendants were initially hired to conduct this

opposition research by Republican political opponents of candidate Trump during the

primary phase of the 2016 election cycle.  That engagement was terminated when it

became clear that Mr. Trump would be the Republican nominee.  At that point,

Defendants solicited and obtained an engagement with the Democratic National

Committee and the campaign of candidate Hillary Clinton to gather discrediting

information about Mr. Trump, including any connections he might have to Russian

businesses or Russia's government.  To perform that research, the Defendants hired a

private investigator—a former British intelligence officer named Christopher Steele, who

operated through a London—based entity known as Orbis Business Intelligence Limited

("Orbis").  Steele claims to have used his own Russian sources—who were never

identified—to compile the reports, which were then delivered to the Defendants over the

course of several months in 2016.  Eventually, the reports, including the false and

defamatory Report at the heart of this case, were assembled in the document that has

come to be known to the public as the Trump Dossier.  Steele has acknowledged that his

reports are unverified "raw intelligence" and has refused to identify his alleged "sources."

Indeed, not one of the reports in the Dossier has ever been verified and none of its

sources has ever been publicly identified.  Defendants recklessly placed the Dossier's

allegations of criminal action by Plaintiffs beyond their control which allowed those

allegations to get into the hands of media devoted to breaking news on the hottest

subjects of the day:  the Trump candidacy and his election as President.

4.       CIR 112, dated September 14, 2016, falsely accuses the Plaintiffs of

criminal bribery in the 1990s and participation in an alleged Trump-Russia scheme to

influence the 2016 presidential election. That alleged scheme was the overall subject matter of the Dossier. At all relevant times Defendants were aware that CIR 112 was not verified, that its content was provided by unidentified sources whose credibility could therefore not be assessed by a reader of the Dossier, and that the accusations made in CIR 112 about Plaintiffs defamed them. Defendants could easily have removed that Report from the Dossier before they started peddling it to media and journalists in September and October 2016. They chose not to do so. Nor did they attempt to determine the veracity of that Report with the Plaintiffs themselves.

5.     At all times during the Defendants' engagement of Orbis and Steele, it was either intended or clearly foreseeable that if the Dossier's contents were made available to third parties, including journalists, such provocative material would be published and republished, including to the public at large. Indeed, that is the entire purpose of "oppo research" in American politics. Those third parties included government officials, as well as news media and journalists who could make its content public.

6.     On information and belief, Defendants arranged for Steele to brief selected members of the print and online media about the information he was compiling on candidate Trump and his campaign. Consistent with the intended purpose of "oppo research" to publicly discredit its target, Steele's briefings were designed to generate interest in the Dossier and secure eventual public dissemination of its content. Briefings were held for journalists from the *New York Times*, the *Washington Post, CNN, Yahoo News,* and others in September 2016. *The New York Times, The Washington Post* and

*Yahoo News* were given a second briefing.[1]  Shortly thereafter, Yahoo News published an article by Michael Isikoff that described some of the content of the Dossier (referred to there as "intelligence reports" and "reports"), which was still being compiled at that time.[2]  Many other media articles reported speculative accounts of the Dossier's existence and contents.  In late October 2016, Steele gave an interview to David Corn, a writer for *Mother Jones* magazine, which, on October 31, 2016, published an article by Corn headlined "A Veteran Spy Has Given The FBI Information Alleging a Russian Operation to Cultivate Donald Trump."[3]  Corn's article stated that he had "reviewed" the early reports in the Dossier, and then quoted from those reports as well as statements made by Steele in the interview.  The publication to third parties and public dissemination of the Dossier's content had begun in earnest.

7.     In addition to cultivating media interest, the Defendants also organized or approved a meeting in Great Britain between Steele and David Kramer, who held no public office but was the director of a private foundation affiliated with U.S. Senator John McCain.  The purpose of that meeting was to show Kramer the content of the sixteen pre-election reports in the Dossier so he could brief Senator McCain, who at the time was a well-known and outspoken critic of Trump's candidacy.  Subsequently, in November

---

[1] *Defendants' Response to Claimants Request For Information, Gubarev, et al. v. Orbis Business Intelligence Limited and Christopher Steele*, Claim No. HQ1700413, In the High Court of Justice, Queens Bench Division, May 18, 2017, p. 8 ("The Orbis/Steele Response").

[2] Michael Isikoff, *U.S. intel officials probe ties between Trump advisor and Kremlin*, Yahoo, News, Sept. 23, 2016, https://www.yahoo.com/news/u-s-intel-officials-probe-ties-between-trump-adviser-and-kremlin-175046002.html.

[3] David Corn, *A Verteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump*, Mother Jones, Politics, Oct. 31, 2016, https://www.motherjones.com/politics/2016/10/veteran-spy-gave-fbi-info-alleging-russian-operation-cultivate-donald-trump/

2016, Defendants provided (and thereby published) a copy of all sixteen of the Dossier's then existing reports to Kramer—for redelivery and further publication to Senator McCain—including the report (CIR 112) that falsely accused and defamed Plaintiffs.[4]

8.      As the 2016 presidential election neared, both print and online media in the United States and abroad began to expand their coverage of the Dossier and its alleged content.  That coverage only intensified after Trump won the election.  On January 10, 2017, one of those media entities, BuzzFeed, Inc., published the entire Dossier on the Internet, describing it there as "explosive."  The copy of the Dossier that BuzzFeed published included the false and defamatory allegations of CIR 112 about the Plaintiffs and Alfa, along with the article entitled "These Reports Allege Trump Has Deep Ties to Russia."[5]  The Dossier misspells Alfa's name throughout, incorrectly spelling it as "Alpha."  BuzzFeed's article did not mention CIR 112 or its allegations, but focused instead on president-elect Trump and his alleged relationships with Russia, explaining that it "was publishing the full document so that Americans can make up their minds about allegations about the president-elect that have circulated at the highest levels of the U.S. government."[6]

9.      The Defendants intended, anticipated, or foresaw a high likelihood that allowing their clients (named *infra),* third parties (like David Kramer and Senator

---

[4] The Orbis/Steele Response, pp. 5-6.

[5] Ken Bensinger, Miriam Elder, Mark Schoofs, *These Reports Allege Trump Has Deep Ties To Russia,* BuzzFeed News, Jan. 10, 2017, https://www.buzzfeed.com/kenbensinger/these-reports-allege-trump-has-deep-ties-to-russia?utm_term=.is1Q2ka2J.

[6] *Id.*

McCain) and the media access to the Dossier's defamatory content would result in its republication by news media outlets, including online news media such as BuzzFeed.

10.     Plaintiffs seek an award of compensatory and punitive damages for the harm to their personal and professional reputations, current business interests, and the impairment of business opportunities that resulted from the blatantly false and defamatory statements and implications about them published recklessly to third parties by the Defendants and republished by BuzzFeed and countless other media around the world.

<u>THE PARTIES</u>

11.     Plaintiffs Fridman, Aven, and Khan are ultimate beneficial owners of Alfa.  Fridman and Khan are each citizens of both Russia and Israel, and Aven is a citizen of Russia.  Plaintiffs are not widely known in the United States, had no role or involvement in any aspect of the 2016 U.S. presidential election, and made no public comments about it.

12.     On information and belief, defendant Bean LLC is a Delaware corporation that conducts business under the name Fusion GPS.  Fusion is registered to transact business in Washington, D.C., where it is headquartered and conducts its operations.

13.     Defendant Glenn Simpson, on information and belief, is a principal of Fusion.  He was the primary actor involved in securing the Dossier from Orbis and Steele, arranging for press briefings about it in the late summer and early fall of 2016, and publishing the Dossier to various recipients including Fusion's clients, third parties like David Kramer and Senator McCain, other government officials and the news

media.  Simpson conducts his business for Fusion from an office in Washington, D.C.,
where his business included his activities with respect to the Dossier.  Both Simpson and
his subcontractor Steele used their prior experience as, respectively, an investigative
journalist for the Wall Street Journal and an operative in British intelligence who had
covered Russian matters, to give their "oppo research" output a gloss of credibility and
reliability which, in this case, was unwarranted.  Simpson has described Fusion's work as
"journalism for rent" and claimed publicly that he and Fusion uphold strict standards that
Simpson developed in his years as a journalist:  "You can't just say what you know.  You
have to say how you know it.  And you have to be able to prove it."[7]  And yet, Simpson
and Fusion did not live up to their own professed standards when they published the
Dossier.  As Steele (Defendants' supplier of the Dossier's unverified, anonymous "raw
intelligence" content)  recently told a journalist, he did not interview his sources himself,
but gathered his information through "intermediaries" and "subsources."  And as Steele
further acknowledged, as much as 30% of the Dossier's content may not be "accurate."[8]
Those are the "standards" by which Defendants operated when they published  CIR 112.

---

[7] Jack Gillum, Shawn Boburg, *'Journalism for rent': Inside the secretive firm behind the Trump
dossier*, The Washington Post, Investigations, Dec. 11, 2017 (*available at*
https://www.washingtonpost.com/investigations/journalism-for-rent-inside-the-secretive-firm-
behind-the-trump-dossier/2017/12/11/8d5428d4-bd89-11e7-af84-d3e2ee4b2af1_story.html?
utm_term=.5152414bbcce).

[8] Luke Harding, *How Trump walked into Putin's web*, The Guardian, News, Nov. 15, 2017,
*https://*www.theguardian.com/news/2017/nov15/how-trump-walked-into-putins-web-luke;
https://theguardian.com/us-new/2017/nov15/christopher-steele-trump-russia-dossier-accurate.

## JURISDICTION AND VENUE

14.     This case is within this Court's jurisdiction pursuant to 28 U.S.C.

§ 1332(a)(2).  Venue is proper in this District pursuant to 28 U.S.C. § 1391.  The matter

in controversy in the cause of action asserted herein exceeds $75,000.

## FACTUAL ALLEGATIONS

15.     On information and belief, the Defendants were engaged in 2015 by the

Washington Free Beacon to conduct research from public sources about several

Republican candidates for President, an engagement which ended in May 2016 when

Donald J. Trump was emerging as the likely winner of the nomination.[9]  Even prior to

that termination, Defendants approached Perkins Coie, a law firm representing the

Democratic National Committee (DNC) and HFACC, Inc., the campaign organization

supporting Hillary Rodham Clinton's candidacy for President, to solicit an engagement

that would continue the research regarding Donald Trump which it had been pursuing on

behalf of its previous client.  Perkins Coie retained Defendants to provide such research

services in April 2016, an engagement which continued until October 2016.[10]  The

Defendants were tasked with conducting "oppo research" against Trump, including the

gathering of compromising and salacious information about Trump's personal behavior

---

[9] Alicia Cohn, *Conservative site funded project that led to Trump dossier*, The Hill, Home News,
Oct. 27, 2017, http://thehill.com/homenews/news/357599-conservative-publication-originally-
funded-trump-dossier-report.

[10] Adam Entous, Devlin Barrett, Rosalind S. Helderman, *Clinton campaign, DNC paid for
research that led to Russia dossier*, The Washington Post, National Security, Oct. 24, 2017
(available at https://www.washingtonpost.com/world/national-security/clinton-campaign-dnc-
paid-for-research-that-led-to-russia-dossier/2017/10/24/22).

and business dealings in Russia.  The Defendants in turn engaged Orbis and Steele for
assistance in fulfilling this task.

16.     Orbis proceeded to research Trump's personal behavior in Russia and
business dealings with Russian government officials, business leaders, and business
entities.  Steele compiled the "investigative" results into at least seventeen written CIRs
for delivery to the Defendants in Washington, D.C.  By Steele's own description, the
CIRs were "raw intelligence" containing unverified information from sources he did not
personally interview.[11]  The CIRs produced between June 2016 and the end of October
2016 (including CIR 112) were provided and thus published to lawyers at Perkins Coie
and by them to their clients at the DNC and the HFACC.

17.     After Trump received the Republican nomination for President in July
2016, many media reports subsequently surfaced asserting, correctly, that Fusion had
entered into a new engagement with Democratic Party operatives interested in using the
oppo research to support Hillary Clinton's candidacy.  These media reports vastly
increased other media's and the public's interest in the content of the Dossier.

18.     As they continued their work for their new clients, the Defendants knew,
anticipated or reasonably should have foreseen that, once in the hands of third parties
such as David Kramer, Senator McCain, journalists like Michael Isikoff and David Corn,
Perkins Coie, the political operatives at the DNC and HFACC, and their media contacts,
the CIRs would be further disseminated publicly, thereby fostering widespread discussion
about them in the United States when, in fact, Plaintiffs had no role whatsoever in any
actions the Russian government or other Russian actors may have taken with regard to

---

[11] The Orbis/Steele Response, p.7, #17.

the 2016 election in the United States. That is exactly what happened. Much of the ensuing media attention and public discussion focused on Defendants' and Steele's roles in the creation and dissemination of the Dossier, and the interviews solicited by them. During this campaign to promote the public dissemination of their "oppo research," which, upon information and belief, included the provision of background briefing to the media by Defendants without attribution, Defendants never vouched for the credibility of their sources or the accuracy and reliability of the content of the Dossier and CIR 112. Despite the fact that they did not know whether the unverified, anonymous, inherently harmful accusations in CIR 112 about Plaintiffs were true or false, Defendants intentionally published the Dossier, including CIR 112, to Perkins Coie, David Kramer and John McCain, and foresaw (or reasonably should have foreseen) that it would then be republished to (1) Perkins Coie's clients (the DNC and the HFACC); (2) employees of the DNC and the HFACC; and (3) journalists and media. Elements of the Dossier, possibly including CIR112, may have been published even more extensively by being made available for viewing during arranged briefings of certain journalists. Worldwide publication of the entire Dossier, whether by BuzzFeed or anyone else, was inevitable after these reckless actions by Defendants.

19.     CIR 112 specifically discusses the Plaintiffs. Its heading, "RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION," is defamatory in the Trump/Russia context of the entire Dossier, as this heading suggests that Alfa and its executives, including the Plaintiffs, cooperated in the alleged Kremlin-orchestrated campaign to interfere in the 2016 U.S. presidential election—the overriding focus of Steele's reports. This is a plausible and, indeed, inescapable inference of fact

based on the headings of fifteen of the sixteen CIR's that Defendants dated and/or

published before the end of October, 2016:

US PRESIDENTIAL ELECTION: REPUBLICAN CANDIDATE DONALD TRUMP'S ACTIVITIES IN RUSSIA AND COMPROMISING RELATIONSHIP WITH THE KREMLIN (CIR 80 – JUNE 20, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: FURTHER INDICATIONS OF EXTENSIVE CONSPIRACY BETWEEN TRUMP'S CAMPAIGN TEAM AND THE KREMLIN ( CIR 95 – UNDATED)

RUSSIA: SECRET KREMLIN MEETINGS ATTENDED BY TRUMP ADVISOR, CARTER PAGE IN MOSCOW (JULY 2016) (CIR 94 – JULY 19, 2016)

RUSSIA-US PRESIDENTIAL ELECTION: KREMLIN CONCERN THAT POLITICAL FALLOUT FROM DNC E-MAIL HACKING AFFAIR SPIRALING OUT OF CONTROL (CIR 97 – JULY 30, 2016)

RUSSIA/USA: GROWING BACKLASH IN KREMLIN TO DNC HACKING AND TRUMP SUPPORT OPERATIONS (CIR 100 - AUGUST 5, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: SENIOR KREMLIN FIGURE OUTLINES EVOLVING RUSSIAN TACTICS IN PRO-TRUMP, ANTI-CLINTON OPERATION (CIR 101 – AUGUST 10, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: REACTION IN TRUMP CAMP TO RECENT NEGATIVE PUBLICITY ABOUT RUSSIAN INTERFERENCE AND LIKELY RESULTING TACTICS GOING FORWARD (CIR 102 – AUGUST 10, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: FURTHER DETAILS OF TRUMP LAWYER COHEN'S SECRET LIAISON WITH THE KREMLIN (CIR 136 – OCTOBER 20, 2016)

RUSSIA/UKRAINE: THE DEMISE OF TRUMP'S CAMPAIGN MANAGER PAUL MANAFORT (CIR 105 – AUGUST 22, 2016)

RUSSIA/US: KREMLIN FALLOUT FROM MEDIA EXPOSURE OF MOSCOW'S INTERFERENCE IN THE US PRESIDENTIAL CAMPAIGN (CIR 111 – SEPTEMBER 14, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION (CIR 112 – SEPTEMBER 14, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: REPUBLICAN CANDIDATE
TRUMP'S PRIOR ACTIVITIES IN ST. PETERSBURG (CIR 113 – SEPTEMBER
14, 2016)

RUSSIA: KREMLIN ASSESSMENT OF TRUMP AND RUSSIA INTERFER-
ENCE IN US PRESIDENTIAL ELECTION (CIR 130 – OCTOBER 12, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: FURTHER DETAILS OF KREMLIN
LIAISON WITH TRUMP CAMPAIGN  (CIR 134 – OCTOBER 18, 2016)

20.     CIR 112 , in sections labeled "Summary" and "Detail," makes a series of

factual allegations about the "current closeness" of an "Alpha Group/PUTIN

relationship," including that "[s]ignificant favors continue to be done in both directions"

and that "FRIDMAN and AVEN [are] still giving informal advice to PUTIN, especially

on the US."

21.     The Summary section of CIR 112 identifies a former employee of Alfa,

Oleg Govorun, who is now the head of a government department in Putin's

administration, as a "key intermediary" in the "PUTIN-Alfa relationship."  CIR 112

alleges that Govorun "delivered illicit cash directly to PUTIN" "throughout the 1990s,"

when Govorun was an "Alpha executive" and Putin was the Deputy Mayor of St.

Petersburg.

22.     The first paragraph of the Detail section of CIR 112 states the full names

of Plaintiffs Fridman, Aven, and Khan.  It then includes a report from an unnamed

"Russian government official:"

> although they have had their ups and downs, the leading
> figures in Alpha currently are on very good terms with
> PUTIN.  Significant favors continued to be done in both
> directions, primarily political ones for PUTIN and
> business/legal ones for Alpha. Also, FRIDMAN and
> AVEN continued to give informal advice to PUTIN on

-13-

foreign policy, and especially about the US where he distrusted advice being given him by officials.

23.     Under any reasonable reading of CIR 112, alone, and in the context of the full Dossier and the headings of sixteen of its seventeen CIR's ("the Trump/Russia context"), Plaintiffs Fridman, Aven, and Khan, along with Alfa, are alleged to maintain a highly inappropriate, and even criminal, relationship with Putin, based on criminal interaction dating back to the 1990s.  By clear and defamatory implication, CIR 112 purports to tie the Plaintiffs to a Kremlin-orchestrated campaign to interfere in the 2016 U.S. election.

24.     The second paragraph of the Detail section alleges that Mr. Fridman "recently met directly with PUTIN" and that "much of the dialogue and business between them was mediated" by Govorun, the former Alfa employee.  The paragraph describes Govorun as a "senior Presidential Administration official" who is "trusted by PUTIN:"

> during the 1990s GOVORUN had been Head of
> Government Relations at Alpha Group and in reality the
> 'driver' and 'bag carrier' used by FRIDMAN and AVEN to
> deliver large amounts of illicit cash to the Russian
> president, at that time deputy Mayor of St. Petersburg.
> Given that and the continuing sensitivity of the PUTIN-
> Alpha relationship, and need for plausible deniability,
> much of the contact between them was now indirect and
> entrusted to the relatively low profile GOVORUN.

25.     These allegations are false.  Oleg Govorun was not employed by Alfa Bank until after Mr. Putin left St. Petersburg to join the Yeltsin administration in Moscow.  The defamatory nature of these allegations, even when read alone, is clear: CIR 112 alleges that, in the 1990s, Alfa (a member of "Alpha Group") and two of its

largest beneficial owners purportedly engaged in acts of criminal bribery of Vladimir

Putin, a public official, to secure favorable business treatment.

26.     Those statements, considered in the Trump/Russia context of the Dossier

as a whole, imply that the alleged improper relationship between Alfa, the Plaintiffs, and

Putin, which purportedly started in the 1990s, is currently ongoing, and that Govorun, the

alleged "bag carrier" of the 1990s, who is now a senior official in Putin's administration,

serves as the trusted intermediary between the Plaintiffs and Putin in the alleged

cooperation of Plaintiffs in the Trump/Russia conspiracy.

27.     The third paragraph of the Detail section characterizes the "PUTIN-Alpha

relationship as both a carrot and stick:"

> Alpha held 'kompromat' on PUTIN and his corrupt
> business activities from the 1990s whilst although not
> personally overly bothered by Alpha's failure to reinvest
> the proceeds of its TNK oil company sales into the Russian
> economy since, the Russian president was able to use
> pressure on this count from senior Kremlin colleagues as a
> lever on FRIDMAN and AVEN to make them do his
> political bidding.

28.     This passage is defamatory in several ways:  read in the context of the

Dossiser's Trump/Russia theme, it suggests that Plaintiffs Fridman and Aven use their

knowledge of past bribery of Putin—"kompromat"—as a means of criminally extorting

continuing favorable treatment for their business interests from his government.  It also

implies that Alfa and two of its largest beneficial owners, Plaintiffs Fridman and Aven,

willingly maintain a close relationship with Putin and cooperated in some unspecified

way in the Kremlin's alleged campaign to interfere in the U.S. election in an effort to

avoid retribution from Putin for not reinvesting business proceeds in Russia.

29.     The statements about the Plaintiffs in the context of the Dossier as a whole are false, defamatory, and gravely damaging.  The statements in the Detail section of CIR 112 about Plaintiffs allege a criminal relationship with Mr. Putin in the 1990s, in addition to and apart from the defamatory implications described above, even if considered independently, raising substantial questions about why these almost twenty-year-old allegations were included by Defendants in a Dossier of "oppo research" about Donald Trump.  The statements of CIR 112, published in an unverified report attributed to an anonymous "top level Russian official" of unknown credibility or existence, raise a clear and plausible inference of reckless disregard of truth or falsity by Defendants.

## CAUSE OF ACTION

30.     Plaintiffs repeat and reallege paragraphs 1-29 above.

31.     By their direct and intentional publication to third parties such as clients, news media, journalists, and others, and by the foreseeable republication of the Dossier and CIR 112 by someone in that group, the Defendants published to a worldwide public false and defamatory statements concerning Plaintiffs and Alfa, including that:

(a)     they are implicated in the scandalous allegations involving Russia and President Trump referred to in CIR 112 and the other CIRs in the Dossier;

(b)     they and other officials and employees of Alfa "cooperated" with an alleged Kremlin campaign to interfere in the U.S. presidential election;

(c)     they are parties to a highly inappropriate, and even criminal, relationship with Vladimir Putin;

-16-

(d)    they engaged in acts of criminal bribery of Vladimir Putin, then the Deputy Mayor of St. Petersburg, in the 1990s to secure favorable business treatment; and

(e)    they continue to use their knowledge of past bribery of Putin as a means of criminally extorting continuing favorable treatment for their business interests from the Putin government.

32.    Readers of the CIRs and Dossier were also led to understand, incorrectly, that as a result of their alleged past—and current—close relationships and corrupt dealings with Mr. Putin, the Plaintiffs and Alfa were and are required to do Putin's bidding, including by cooperating in the Kremlin's alleged efforts to influence the outcome of the recent U.S. presidential election.

33.    The false statements by the Defendants referred to above defamed the Plaintiffs and Alfa, and have caused and will continue to cause serious injury to their personal, professional, and institutional reputations.

34.    The false and defamatory statements published and republished by the Defendants concerning the Plaintiffs and Alfa, as well as the obvious implications of those statements, were made negligently or with reckless disregard of whether they were true or false.

35.    Defendants are liable for the defamation of Plaintiffs and Alfa, and the resulting harm caused by the news media coverage of the Dossier, including the republication by BuzzFeed and countless other media.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

-17-

WHEREFORE, Plaintiffs Mikhail Fridman, Petr Aven, and German Khan

demand judgment against Defendants Bean LLC, Fusion GPS, and Glenn Simpson for:

      a.    compensatory damages in an amount to be proved at trial, together with

interest and the costs and disbursements of this action, plus reasonable attorneys' fees;

      b.    punitive damages in an amount to be determined at trial; and

      c.    such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       December 12, 2017

    By:      /s/ Alan S. Lewis
           Alan S. Lewis, Esq. (#NY0252)
           John J. Walsh, Esq.
           CARTER LEDYARD & MILBURN LLP
           2 Wall Street
           New York, N.Y. 10005
           Telephone:  212-238-8647
           *Counsel for Plaintiffs*
           *Mikhail Fridman, et al.*

           *Of Counsel:*

           Kim H. Sperduto, Esq. (# 416127)
           SPERDUTO THOMPSON PLC
           1133 Twentieth Street, NW Second Floor
           Washington, D.C. 20036
           Telephone:   202-408-8900

BuzzFeed Article and Dossier

# BuzzFeed News

**REPORTING TO YOU**

# These Reports Allege Trump Has Deep Ties To Russia

A dossier, compiled by a person who has claimed to be a former British intelligence official, alleges Russia has compromising information on Trump. The allegations are unverified, and the report contains errors.


**Ken Bensinger**
BuzzFeed News Reporter


**Miriam Elder**
BuzzFeed News Reporter


**Mark Schoofs**
BuzzFeed News contributor

Last updated on January 10, 2017, at 9:09 p.m. ET
Posted on January 10, 2017, at 6:20 p.m. ET






*Drew Angerer | Getty Images*

A dossier making explosive — but unverified — allegations that the Russian government has been "cultivating, supporting and assisting" President-elect Donald Trump for years and gained compromising information about him has been circulating among elected officials, intelligence agents, and journalists for weeks.

The dossier, which is a collection of memos written over a period of months, includes specific, unverified, and potentially unverifiable allegations of contact between Trump aides and Russian operatives, and graphic claims of sexual acts documented by the Russians. BuzzFeed News reporters in the US and Europe have been investigating various alleged facts in the dossier but have not verified or falsified them. CNN reported Tuesday that a two-page synopsis of the report was given to President Obama and Trump.

Now BuzzFeed News is publishing the full document so that Americans can make up their own minds about allegations about the president-elect that have circulated at the highest levels of the US government.

The document was prepared for political opponents of Trump by a person who is understood to be a former British intelligence agent. It is not just unconfirmed: It includes some clear errors. The report misspells the

These Reports Allege Trump Has Deep Ties To Russia                                    Page 3 of 6

name of one company, "Alpha Group," throughout. It is
Alfa Group. The report says the settlement of Barvikha,
outside Moscow, is "reserved for the residences of the
top leadership and their close associates." It is not
reserved for anyone, and it is also populated by the very
wealthy.

The Trump administration's transition team did not
immediately respond to BuzzFeed News' request for
comment. However, the president-elect's attorney,
Michael Cohen, told *Mic* that the allegations were
absolutely false.

"It's so ridiculous on so many levels," he said. "Clearly,
the person who created this did so from their
imagination or did so hoping that the liberal media
would run with this fake story for whatever rationale
they might have."

And Trump shot back against the reports a short time
later on Twitter.

 FAKE NEWS - A TOTAL POLITICAL WITCH HUNT!   **Donald J. Trump**
                                                                 @realDonaldTrump

FAKE NEWS - A TOTAL POLITICAL WITCH HUNT!

01:19 AM - 11 Jan 2017

Reply      Retweet      Favorite

His former campaign manager and current senior White
House adviser, Kellyanne Conway, also denied the claims

during an appearance on *Late Night With Seth Meyers,* adding that "nothing has been confirmed." She also said Trump was "not aware" of any briefing on the matter.

The documents have circulated for months and acquired a kind of legendary status among journalists, lawmakers, and intelligence officials who have seen them. *Mother Jones* writer David Corn referred to the documents in a late October column.

Harry Reid spokesman Adam Jentleson tweeted Tuesday that the former Senate Democratic leader had seen the documents before writing a public letter to FBI Director James Comey about Trump's ties to Russia. And CNN reported Tuesday that Arizona Republican John McCain gave a "full copy" of the memos to Comey on Dec. 9, but that the FBI already had copies of many of the memos.

## If you have tips related to this story, write us at trumpstories@buzzfeed.com. To send us information confidentially, go here.

## Read the report here:

To print the document, click the "Original Document" link to open the original PDF. At this time it is not possible to print the document with annotations.

These Reports Allege Trump Has Deep Ties To Russia

**TOPICS IN THIS ARTICLE**

( Russia )

 Ken Bensinger is an investigative reporter for BuzzFeed News and is based in Los Angeles. He is the author of "Red Card," on the FIFA

 Miriam Elder is a political reporter for BuzzFeed News and is based in New York. Her secure PGP fingerprint is 5B5F EC17 C20B

scandal. His DMs are                        C11F 226D 3EBE 6205

The Village Voice, he
won the 2000 Pulitzer

CONFIDENTIAL/SENSITIVE SOURCE

COMPANY INTELLIGENCE REPORT 2016/080

## US PRESIDENTIAL ELECTION: REPUBLICAN CANDIDATE DONALD TRUMP'S ACTIVITIES IN RUSSIA AND COMPROMISING RELATIONSHIP WITH THE KREMLIN

### Summary

- Russian regime has been cultivating, supporting and assisting TRUMP for at least 5 years. Aim, endorsed by PUTIN, has been to encourage splits and divisions in western alliance

- So far TRUMP has declined various sweetener real estate business deals offered him in Russia in order to further the Kremlin's cultivation of him. However he and his inner circle have accepted a regular flow of intelligence from the Kremlin, including on his Democratic and other political rivals

- Former top Russian intelligence officer claims FSB has compromised TRUMP through his activities in Moscow sufficiently to be able to blackmail him. According to several knowledgeable sources, his conduct in Moscow has included perverted sexual acts which have been arranged/monitored by the FSB

- A dossier of compromising material on Hillary CLINTON has been collated by the Russian Intelligence Services over many years and mainly comprises bugged conversations she had on various visits to Russia and intercepted phone calls rather than any embarrassing conduct. The dossier is controlled by Kremlin spokesman, PESKOV, directly on PUTIN's orders. However it has not as yet been distributed abroad, including to TRUMP. Russian intentions for its deployment still unclear

### Detail

1. Speaking to a trusted compatriot in June 2016 sources A and B, a senior Russian Foreign Ministry figure and a former top level Russian intelligence officer still active inside the Kremlin respectively, the Russian authorities had been cultivating and supporting US Republican presidential candidate, Donald TRUMP for at least 5 years. Source B asserted that the TRUMP operation was both supported and directed by Russian President Vladimir PUTIN. Its aim was to sow discord and

CONFIDENTIAL/SENSITIVE SOURCE

disunity both within the US itself, but more especially within the Transatlantic alliance which was viewed as inimical to Russia's interests. Source C, a senior Russian financial official said the TRUMP operation should be seen in terms of PUTIN's desire to return to Nineteenth Century 'Great Power' politics anchored upon countries' interests rather than the ideals-based international order established after World War Two. S/he had overheard PUTIN talking in this way to close associates on several occasions.

2.  In terms of specifics, Source A confided that the Kremlin had been feeding TRUMP and his team valuable intelligence on his opponents, including Democratic presidential candidate Hillary CLINTON, for several years (see more below). This was confirmed by Source D, a close associate of TRUMP who had organized and managed his recent trips to Moscow, and who reported, also in June 2016, that this Russian intelligence had been "very helpful". The Kremlin's cultivation operation on TRUMP also had comprised offering him various lucrative real estate development business deals in Russia, especially in relation to the ongoing 2018 World Cup soccer tournament. However, so far, for reasons unknown, TRUMP had not taken up any of these.

3.  However, there were other aspects to TRUMP's engagement with the Russian authorities. One which had borne fruit for them was to exploit TRUMP's personal obsessions and sexual perversion in order to obtain suitable 'kompromat' (compromising material) on him. According to Source D, where s/he had been present, TRUMP's (perverted) conduct in Moscow included hiring the presidential suite of the Ritz Carlton Hotel, where he knew President and Mrs OBAMA (whom he hated) had stayed on one of their official trips to Russia, and defiling the bed where they had slept by employing a number of prostitutes to perform a 'golden showers' (urination) show in front of him. The hotel was known to be under FSB control with microphones and concealed cameras in all the main rooms to record anything they wanted to.

4.  The Moscow Ritz Carlton episode involving TRUMP reported above was confirmed by Source E, ███████████████████████████████████, who said that s/he and several of the staff were aware of it at the time and subsequently. S/he believed it had happened in 2013. Source E provided an introduction for a company ethnic Russian operative to Source F, a female staffer at the hotel when TRUMP had stayed there, who also confirmed the story. Speaking separately in June 2016, Source B (the former top level Russian intelligence officer) asserted that TRUMP's unorthodox behavior in Russia over the years had provided the authorities there with enough embarrassing material on the now Republican presidential candidate to be able to blackmail him if they so wished.

5.  Asked about the Kremlin's reported intelligence feed to TRUMP over recent years and rumours about a Russian dossier of 'kompromat' on

CONFIDENTIAL/SENSITIVE SOURCE

Hillary CLINTON (being circulated), Source B confirmed the file's existence. S/he confided in a trusted compatriot that it had been collated by Department K of the FSB for many years, dating back to her husband Bill's presidency, and comprised mainly eavesdropped conversations of various sorts rather than details/evidence of unorthodox or embarrassing behavior. Some of the conversations were from bugged comments CLINTON had made on her various trips to Russia and focused on things she had said which contradicted her current position on various issues. Others were most probably from phone intercepts.

6. Continuing on this theme, Source G, a senior Kremlin official, confided that the CLINTON dossier was controlled exclusively by chief Kremlin spokesman, Dmitriy PESKOV, who was responsible for compiling/handling it on the explicit instructions of PUTIN himself. The dossier however had not as yet been made available abroad, including to TRUMP or his campaign team. At present it was unclear what PUTIN's intentions were in this regard.

20 June 2016

CONFIDENTIAL/SENSITIVE SOURCE

3

CONFIDENTIAL/SENSITIVE SOURCE

COMPANY INTELLIGENCE REPORT 2016/086

## RUSSIA/CYBER CRIME: A SYNOPSIS OF RUSSIAN STATE SPONSORED AND OTHER CYBER OFFENSIVE (CRIMINAL) OPERATIONS

### Summary

- Russia has extensive programme of state-sponsored offensive cyber operations. External targets include foreign governments and big corporations, especially banks. FSB leads on cyber within Russian apparatus. Limited success in attacking top foreign targets like G7 governments, security services and IFIs but much more on second tier ones through IT back doors, using corporate and other visitors to Russia

- FSB often uses coercion and blackmail to recruit most capable cyber operatives in Russia into its state-sponsored programmes. Heavy use also, both wittingly and unwittingly, of CIS emigres working in western corporations and ethnic Russians employed by neighbouring governments e.g. Latvia

- Example cited of successful Russian cyber operation targeting senior Western business visitor. Provided back door into important Western institutions.

- Example given of US citizen of Russian origin approached by FSB and offered incentive of "investment" in his business when visiting Moscow.

- Problems however for Russian authorities themselves in countering local hackers and cyber criminals, operating outside state control. Central Bank claims there were over 20 serious attacks on correspondent accounts held by CBR in 2015, comprising Roubles several billion in fraud

- Some details given of leading non-state Russian cyber criminal groups

### Details

1. Speaking in June 2016, a number of Russian figures with a detailed knowledge of national cyber crime, both state-sponsored and otherwise, outlined the current situation in this area. A former senior intelligence officer divided Russian state-sponsored offensive cyber operations into four categories (in order of priority):- targeting foreign, especially

CONFIDENTIAL/SENSITIVE SOURCE

CONFIDENTIAL/SENSITIVE SOURCE

western governments; penetrating leading foreign business corporations, especially banks; domestic monitoring of the elite; and attacking political opponents both at home and abroad. The former intelligence officer reported that the Federal Security Service (FSB) was the lead organization within the Russian state apparatus for cyber operations.

2. In terms of the success of Russian offensive cyber operations to date, a senior government figure reported that there had been only limited success in penetrating the "first tier" foreign targets. These comprised western (especially G7 and NATO) governments, security and intelligence services and central banks, and the IFIs. To compensate for this shortfall, massive effort had been invested, with much greater success, in attacking the "secondary targets", particularly western private banks and the governments of smaller states allied to the West. S/he mentioned Latvia in this regard. Hundreds of agents, either consciously cooperating with the FSB or whose personal and professional IT systems had been unwittingly compromised, were recruited. Many were people who had ethnic and family ties to Russia and/or had been incentivized financially to cooperate. Such people often would receive monetary inducements or contractual favours from the Russian state or its agents in return. This had created difficulties for parts of the Russian state apparatus in obliging/indulging them e.g. the Central Bank of Russia knowingly having to cover up for such agents' money laundering operations through the Russian financial system.

3. In terms of the FSB's recruitment of capable cyber operatives to carry out its, ideally deniable, offensive cyber operations, a Russian IT specialist with direct knowledge reported in June 2016 that this was often done using coercion and blackmail. In terms of 'foreign' agents, the FSB was approaching US citizens of Russian (Jewish) origin on business trips to Russia. In one case a US citizen of Russian ethnicity had been visiting Moscow to attract investors in his new information technology program. The FSB clearly knew this and had offered to provide seed capital to this person in return for them being able to access and modify his IP, with a view to targeting priority foreign targets by planting a Trojan virus in the software. The US visitor was told this was common practice. The FSB also had implied significant operational success as a result of installing cheap Russian IT games containing their own malware unwittingly by targets on their PCs and other platforms.

4. In a more advanced and successful FSB operation, an IT operator inside a leading Russian SOE, who previously had been employed on conventional (defensive) IT work there, had been under instruction for the last year to conduct an offensive cyber operation against a foreign director of the company. Although the latter was apparently an infrequent visitor to Russia, the FSB now successfully had penetrated his personal IT and through this had managed to access various important institutions in the West through the back door.

CONFIDENTIAL/SENSITIVE SOURCE

CONFIDENTIAL/SENSITIVE SOURCE

5.  In terms of other technical IT platforms, an FSB cyber operative flagged
    up the 'Telegram' enciphered commercial system as having been of
    especial concern and therefore heavily targeted by the FSB, not least
    because it was used frequently by Russian internal political activists and
    oppositionists. His/her understanding was that the FSB now successfully
    had cracked this communications software and therefore it was no longer
    secure to use.

6.  The senior Russian government figure cited above also reported that
    non-state sponsored cyber crime was becoming an increasing problem
    inside Russia for the government and authorities there. The Central Bank
    of Russia claimed that in 2015 alone there had been more than 20
    attempts at serious cyber embezzlement of money from corresponding
    accounts held there, comprising several billions Roubles. More generally,
    s/he understood there were circa 15 major organised crime groups in the
    country involved in cyber crime, all of which continued to operate largely
    outside state and FSB control. These included the so-called 'Anunak',
    'Buktrap' and 'Metel' organisations.

26 July 2015

CONFIDENTIAL/SENSITIVE SOURCE

COMPANY INTELLIGENCE REPORT 2016/095

### RUSSIA/US PRESIDENTIAL ELECTION: FURTHER INDICATIONS OF EXTENSIVE CONSPIRACY BETWEEN TRUMP'S CAMPAIGN TEAM AND THE KREMLIN

## Summary

- Further evidence of extensive conspiracy between TRUMP's campaign team and Kremlin, sanctioned at highest levels and involving Russian diplomatic staff based in the US

- TRUMP associate admits Kremlin behind recent appearance of DNC e-mails on WikiLeaks, as means of maintaining plausible deniability

- Agreed exchange of information established in both directions. TRUMP's team using moles within DNC and hackers in the US as well as outside in Russia. PUTIN motivated by fear and hatred of Hillary CLINTON. Russians receiving intel from TRUMP's team on Russian oligarchs and their families in US

- Mechanism for transmitting this intelligence involves "pension" disbursements to Russian emigres living in US as cover, using consular officials in New York, DC and Miami

- Suggestion from source close to TRUMP and MANAFORT that Republican campaign team happy to have Russia as media bogeyman to mask more extensive corrupt business ties to China and other emerging countries

## Detail

1. Speaking in confidence to a compatriot in late July 2016, Source E, an ethnic Russian close associate of Republican US presidential candidate Donald TRUMP, admitted that there was a well-developed conspiracy of co-operation between them and the Russian leadership. This was managed on the TRUMP side by the Republican candidate's campaign manager, Paul MANAFORT, who was using foreign policy advisor, Carter PAGE, and others as intermediaries. The two sides had a mutual interest in defeating Democratic presidential candidate Hillary CLINTON, whom President PUTIN apparently both hated and feared.

2. Inter alia, Source E, acknowledged that the Russian regime had been behind the recent leak of embarrassing e-mail messages, emanating from the Democratic National Committee (DNC), to the WikiLeaks platform.

## CONFIDENTIAL/SENSITIVE SOURCE

CONFIDENTIAL/SENSITIVE SOURCE

The reason for using WikiLeaks was "plausible deniability" and the operation had been conducted with the full knowledge and support of TRUMP and senior members of his campaign team. In return the TRUMP team had agreed to sideline Russian intervention in Ukraine as a campaign issue and to raise US/NATO defence commitments in the Baltics and Eastern Europe to deflect attention away from Ukraine, a priority for PUTIN who needed to cauterise the subject.

3. In the wider context of TRUMP campaign/Kremlin co-operation, Source E claimed that the intelligence network being used against CLINTON comprised three elements. Firstly there were agents/facilitators within the Democratic Party structure itself; secondly Russian émigré and associated offensive cyber operators based in the US; and thirdly, state-sponsored cyber operatives working in Russia. All three elements had played an important role to date. On the mechanism for rewarding relevant assets based in the US, and effecting a two-way flow of intelligence and other useful information, Source E claimed that Russian diplomatic staff in key cities such as New York, Washington DC and Miami were using the émigré 'pension' distribution system as cover. The operation therefore depended on key people in the US Russian émigré community for its success. Tens of thousands of dollars were involved.

4. In terms of the intelligence flow from the TRUMP team to Russia, Source E reported that much of this concerned the activities of business oligarchs and their families' activities and assets in the US, with which PUTIN and the Kremlin seemed preoccupied.

5. Commenting on the negative media publicity surrounding alleged Russian interference in the US election campaign in support of TRUMP, Source E said he understood that the Republican candidate and his team were relatively relaxed about this because it deflected media and the Democrats' attention away from TRUMP's business dealings in China and other emerging markets. Unlike in Russia, these were substantial and involved the payment of large bribes and kickbacks which, were they to become public, would be potentially very damaging to their campaign.

6. Finally, regarding TRUMP's claimed minimal investment profile in Russia, a separate source with direct knowledge said this had not been for want of trying. TRUMP's previous efforts had included exploring the real estate sector in St Petersburg as well as Moscow but in the end TRUMP had had to settle for the use of extensive sexual services there from local prostitutes rather than business success.

CONFIDENTIAL/SENSITIVE SOURCE

**COMPANY INTELLIGENCE REPORT 2016/94**

**RUSSIA: SECRET KREMLIN MEETINGS ATTENDED BY TRUMP ADVISOR, CARTER PAGE IN MOSCOW (JULY 2016)**

### Summary

- TRUMP advisor Carter PAGE holds secret meetings in Moscow with SECHIN and senior Kremlin Internal Affairs official, DIVYEKIN

- SECHIN raises issues of future bilateral US-Russia energy co-operation and associated lifting of western sanctions against Russia over Ukraine. PAGE non-committal in response

- DIVEYKIN discusses release of Russian dossier of 'kompromat' on TRUMP's opponent, Hillary CLINTON, but also hints at Kremlin possession of such material on TRUMP

### Detail

1. Speaking in July 2016, a Russian source close to Rosneft President, PUTIN close associate and US-sanctioned individual, Igor SECHIN, confided the details of a recent secret meeting between him and visiting Foreign Affairs Advisor to Republican presidential candidate Donald TRUMP, Carter PAGE.

2. According to SECHIN's associate, the Rosneft President (CEO) had raised with PAGE the issues of future bilateral energy cooperation and prospects for an associated move to lift Ukraine-related western sanctions against Russia. PAGE had reacted positively to this demarche by SECHIN but had been generally non-committal in response.

3. Speaking separately, also in July 2016, an official close to Presidential Administration Head, S. IVANOV, confided in a compatriot that a senior colleague in the Internal Political Department of the PA, DIVYEKIN (nfd) also had met secretly with PAGE on his recent visit. Their agenda had included DIVEYKIN raising a dossier of 'kompromat' the Kremlin possessed on TRUMP's Democratic presidential rival, Hillary CLINTON, and its possible release to the Republican's campaign team.

4. However, the Kremlin official close to S. IVANOV added that s/he believed DIVEYKIN also had hinted (or indicated more strongly) that the Russian leadership also had 'kompromat' on TRUMP which the latter should bear in mind in his dealings with them.

9

19 July 2016

COMPANY INTELLIGENCE REPORT 2016/097

**RUSSIA-US PRESIDENTIAL ELECTION: KREMLIN CONCERN THAT POLITICAL FALLOUT FROM DNC E-MAIL HACKING AFFAIR SPIRALLING OUT OF CONTROL**

Summary

- Kremlin concerned that political fallout from DNC e-mail hacking operation is spiralling out of control. Extreme nervousness among TRUMP's associates as result of negative media attention/accusations

- Russians meanwhile keen to cool situation and maintain 'plausible deniability' of existing /ongoing pro-TRUMP and anti-CLINTON operations. Therefore unlikely to be any ratcheting up offensive plays in immediate future

- Source close to TRUMP campaign however confirms regular exchange with Kremlin has existed for at least 8 years, including intelligence fed back to Russia on oligarchs' activities in US

- Russians apparently have promised not to use 'kompromat' they hold on TRUMP as leverage, given high levels of voluntary co-operation forthcoming from his team

Detail

1. Speaking in confidence to a trusted associate in late July 2016, a Russian émigré figure close to the Republican US presidential candidate Donald TRUMP's campaign team commented on the fallout from publicity surrounding the Democratic National Committee (DNC) e-mail hacking scandal. The émigré said there was a high level of anxiety within the TRUMP team as a result of various accusations levelled against them and indications from the Kremlin that President PUTIN and others in the leadership thought things had gone too far now and risked spiralling out of control.

2. Continuing on this theme, the émigré associate of TRUMP opined that the Kremlin wanted the situation to calm but for 'plausible deniability' to be maintained concerning its (extensive) pro-TRUMP and anti-CLINTON operations. S/he therefore judged that it was unlikely these would be ratcheted up, at least for the time being.

3. However, in terms of established operational liaison between the TRUMP team and the Kremlin, the émigré confirmed that an intelligence exchange had been running between them for at least 8 years. Within this context PUTIN's priority requirement had been for intelligence on the activities, business and otherwise, in the US of leading Russian oligarchs and their families. TRUMP and his associates duly had obtained and supplied the Kremlin with this information.

4. Finally, the émigré said s/he understood the Kremlin had more intelligence on CLINTON and her campaign but he did not know the details or when or if it would be released. As far as 'kompromat' (compromising information) on TRUMP were concerned, although there was plenty of this, he understood the Kremlin had given its word that it would not be deployed against the Republican presidential candidate given how helpful and co-operative his team had been over several years, and particularly of late.

**30 July 2016**

12

COMPANY INTELLIGENCE REPORT 2016/100

RUSSIA/USA: GROWING BACKLASH IN KREMLIN TO DNC HACKING AND
TRUMP SUPPORT OPERATIONS

Summary

- Head of PA IVANOV laments Russian intervention in US presidential
  election and black PR against CLINTON and the DNC. Vows not to supply
  intelligence to Kremlin PR operatives again. Advocates now sitting tight
  and denying everything

- Presidential spokesman PESKOV the main protagonist in Kremlin
  campaign to aid TRUMP and damage CLINTON. He is now scared and
  fears being made scapegoat by leadership for backlash in US. Problem
  compounded by his botched intervention in recent Turkish crisis

- Premier MEDVEDEV's office furious over DNC hacking and associated
  anti-Russian publicity. Want good relations with US and ability to travel
  there. Refusing to support or help cover up after PESKOV

- Talk now in Kremlin of TRUMP withdrawing from presidential race
  altogether, but this still largely wishful thinking by more liberal elements
  in Moscow

Detail

1. Speaking in early August 2016, two well-placed and established Kremlin
   sources outlined the divisions and backlash in Moscow arising from the
   leaking of Democratic National Committee (DNC) e-mails and the wider
   pro-TRUMP operation being conducted in the US. Head of Presidential
   Administration, Sergei IVANOV, was angry at the recent turn of events.
   He believed the Kremlin "team" involved, led by presidential spokesman
   Dmitriy PESKOV, had gone too far in interfering in foreign affairs with
   their "elephant in a china shop black PR". IVANOV claimed always to have
   opposed the handling and exploitation of intelligence by this PR "team".
   Following the backlash against such foreign interference in US politics,
   IVANOV was advocating that the only sensible course of action now for
   the Russian leadership was to "sit tight and deny everything".

2. Continuing on this theme the source close to IVANOV reported that
   PESKOV now was "scared shitless" that he would be scapegoated by
   PUTIN and the Kremlin and held responsible for the backlash against
   Russian political interference in the US election. IVANOV was determined

to stop PESKOV playing an independent role in relation to the US going forward and the source fully expected the presidential spokesman now to lay low. PESKOV's position was not helped by a botched attempt by him also to interfere in the recent failed coup in Turkey from a government relations (GR) perspective (no further details).

3.   The extent of disquiet and division within Moscow caused by the backlash against Russian interference in the US election was underlined by a second source, close to premier Dmitriy MEDVEDEV (DAM). S/he said the Russian prime minister and his colleagues wanted to have good relations with the US, regardless of who was in power there, and not least so as to be able to travel there in future, either officially or privately. They were openly refusing to cover up for PESKOV and others involved in the DNC/TRUMP operations or to support his counter-attack of allegations against the USG for its alleged hacking of the Russian government and state agencies.

4.   According to the first source, close to IVANOV, there had been talk in the Kremlin of TRUMP being forced to withdraw from the presidential race altogether as a result of recent events, ostensibly on grounds of his psychological state and unsuitability for high office. This might not be so bad for Russia in the circumstances but in the view of the source, it remained largely wishful thinking on the part of those in the regime opposed to PESKOV and his "botched" operations, at least for the time being.

**5 August 2016**

14

COMPANY INTELLIGENCE REPORT 2016/101

RUSSIA/US PRESIDENTIAL ELECTION: SENIOR KREMLIN FIGURE OUTLINES EVOLVING RUSSIAN TACTICS IN PRO-TRUMP, ANTI-CLINTON OPERATION

Summary

- Head of PA, IVANOV assesses Kremlin intervention in US presidential election and outlines leadership thinking on operational way forward

- No new leaks envisaged, as too politically risky, but rather further exploitation of (WikiLeaks) material already disseminated to exacerbate divisions

- Educated US youth to be targeted as protest (against CLINTON) and swing vote in attempt to turn them over to TRUMP

- Russian leadership, including PUTIN, celebrating perceived success to date in splitting US hawks and elite

- Kremlin engaging with several high profile US players, including STEIN, PAGE and (former DIA Director Michael Flynn), and funding their recent visits to Moscow

Details

1. Speaking in confidence to a close colleague in early August 2016, Head of the Russian Presidential Administration (PA), Sergei IVANOV, assessed the impact and results of Kremlin intervention in the US presidential election to date. Although most commentators believed that the Kremlin was behind the leaked DNC/CLINTON e-mails, this remained technically deniable. Therefore the Russians would not risk their position for the time being with new leaked material, even to a third party like WikiLeaks. Rather the tactics would be to spread rumours and misinformation about the content of what already had been leaked and make up new content.

2. Continuing on this theme, IVANOV said that the audience to be targeted by such operations was the educated youth in America as the PA assessed that there was still a chance they could be persuaded to vote for Republican candidate Donald TRUMP as a protest against the Washington establishment (in the form of Democratic candidate Hillary CLINTON). The hope was that even if she won, as a result of this CLINTON in power would be bogged down in working for internal reconciliation in the US, rather than being able to focus on foreign policy which would damage Russia's interests. This also should give President PUTIN more room for manoeuvre in the run-up to Russia's own presidential election in 2018.

3. IVANOV reported that although the Kremlin had underestimated the strength of US media and liberal reaction to the DNC hack and TRUMP's links to Russia, PUTIN was generally satisfied with the progress of the anti-CLINTON operation to date. He recently had had a drink with PUTIN to mark this. In IVANOV's view, the US had tried to divide the Russian elite with sanctions but failed, whilst they, by contrast, had succeeded in splitting the US hawks inimical to Russia and the Washington elite more generally, half of whom had refused to endorse any presidential candidate as a result of Russian intervention.

4. Speaking separately, also in early August 2016, a Kremlin official involved in US relations commented on aspects of the Russian operation to date. Its goals had been threefold- asking sympathetic US actors how Moscow could help them; gathering relevant intelligence; and creating and disseminating compromising information ('kompromat'). This had involved the Kremlin supporting various US political figures, including funding indirectly their recent visits to Moscow. S/he named a delegation from Lyndon LAROUCHE; presidential candidate Jill STEIN of the Green Party; TRUMP foreign policy adviser

15

Carter PAGE; and former DIA Director Michael Flynn, in this regard and as successful in terms of perceived outcomes.

10 August 2016

COMPANY INTELLIGENCE REPORT 2016/102

RUSSIA/US PRESIDENTIAL ELECTION: REACTION IN TRUMP CAMP TO RECENT NEGATIVE PUBLICITY ABOUT RUSSIAN INTERFERENCE AND LIKELY RESULTING TACTICS GOING FORWARD

Summary

- TRUMP campaign insider reports recent DNC e-mail leaks were aimed at switching SANDERS (protest) voters away from CLINTON and over to TRUMP

- Admits Republican campaign underestimated resulting negative reaction from US liberals, elite and media and forced to change course as result

- Need now to turn tables on CLINTON's use of PUTIN as bogeyman in election, although some resentment at Russian president's perceived attempt to undermine USG and system over and above swinging presidential election

Detail

1. Speaking in confidence on 9 August 2016, an ethnic Russian associate of Republican US presidential candidate Donald TRUMP discussed the reaction inside his camp, and revised tactics therein resulting from recent negative publicity concerning Moscow's clandestine involvement in the campaign. TRUMP's associate reported that the aim of leaking the DNC e-mails to WikiLeaks during the Democratic Convention had been to swing supporters of Bernie SANDERS away from Hillary CLINTON and across to TRUMP. These voters were perceived as activist and anti-status quo and anti-establishment and in that regard sharing many features with the TRUMP campaign, including a visceral dislike of Hillary CLINTON. This objective had been conceived and promoted, inter alia, by TRUMP's foreign policy adviser Carter PAGE who had discussed it directly with the ethnic Russian associate.

2. Continuing on this theme, the ethnic Russian associate of TRUMP assessed that the problem was that the TRUMP campaign had underestimated the strength of the negative reaction from liberals and especially the conservative elite to Russian interference. This was forcing a rethink and a likely change of tactics. The main objective in the short term was to check Democratic candidate Hillary CLINTON's successful exploitation of the PUTIN as bogeyman/Russian interference story to tarnish TRUMP and bolster her own (patriotic) credentials. The TRUMP campaign was focusing on tapping into support in the American television media to achieve this, as they reckoned this resource had been underused by them to date.

3. However, TRUMP's associate also admitted that there was a fair amount of anger and resentment within the Republican candidate's team at what was perceived by PUTIN as going beyond the objective of weakening CLINTON and bolstering TRUMP, by attempting to exploit the situation to undermine the US government and democratic system more generally. It was unclear at present how this aspect of the situation would play out in the weeks to come.

10 August 2016

COMPANY INTELLIGENCE REPORT 2016/136

RUSSIA/US PRESIDENTIAL ELECTION: FURTHER DETAILS OF TRUMP LAWYER
COHEN'S SECRET LIAISON WITH THE KREMLIN

Summary

- Kremlin insider reports TRUMP lawyer COHEN's secret meeting/s with Kremlin officials in
  August 2016 was/were held in Prague

- Russian parastatal organisation Rossotrudnichestvo used as cover for this liaison and premises
  in Czech capital may have been used for the meeting/s

- Pro-PUTIN leading Duma figure, KOSACHEV, reportedly involved as "plausibly deniable"
  facilitator and may have participated in the August meeting/s with COHEN

Detail

1. Speaking to a compatriot and friend on 19 October 2016, a Kremlin insider provided further
   details of reported clandestine meeting/s between Republican presidential candidate, Donald
   TRUMP's lawyer Michael COHEN and Kremlin representatives in August 2016. Although the
   communication between them had to be cryptic for security reasons, the Kremlin insider
   clearly indicated to his/her friend that the reported contact/s took place in Prague, Czech
   Republic.

2. Continuing on this theme, the Kremlin insider highlighted the importance of the Russian
   parastatal organisation, Rossotrudnichestvo, in this contact between TRUMP campaign
   representative/s and Kremlin officials. Rossotrudnichestvo was being used as cover for this
   relationship and its office in Prague may well have been used to host the COHEN/Russian
   Presidential Administration (PA) meeting/s. It was considered a "plausibly deniable" vehicle
   for this, whilst remaining entirely under Kremlin control.

3. The Kremlin insider went on to identify leading pro-PUTIN Duma figure, Konstantin
   KOSACHEV (Head of the Foreign Relations Committee) as an important figure in the TRUMP
   campaign-Kremlin liaison operation. KOSACHEV, also "plausibly deniable" being part of the
   Russian legislature rather than executive, had facilitated the contact in Prague and by
   implication, may have attended the meeting/s with COHEN there in August.

Company Comment

We reported previously, in our Company Intelligence Report 2016/135 of 19 October 2016 from the
same source, that COHEN met officials from the PA Legal Department clandestinely in an EU
country in August 2016. This was in order to clean up the mess left behind by western media
revelations of TRUMP ex-campaign manager MANAFORT's corrupt relationship with the former
pro-Russian YANUKOVYCH regime in Ukraine and TRUMP foreign policy advisor, Carter
PAGE's secret meetings in Moscow with senior regime figures in July 2016. According to the
Kremlin advisor, these meeting/s were originally scheduled for COHEN in Moscow but shifted to

18

what was considered an operationally "soft" EU country when it was judged too compromising for him to travel to the Russian capital.

20 October 2016

19

COMPANY INTELLIGENCE REPORT 2016/105

## RUSSIA/UKRAINE: THE DEMISE OF TRUMP'S CAMPAIGN MANAGER PAUL MANAFORT

### Summary

- Ex-Ukrainian President YANUKOVYCH confides directly to PUTIN that he authorised kick-back payments to MANAFORT, as alleged in western media. Assures Russian President however there is no documentary evidence/trail

- PUTIN and Russian leadership remain worried however and sceptical that YANUKOVYCH has fully covered the traces of these payments to TRUMP's former campaign manager

- Close associate of TRUMP explains reasoning behind MANAFORT's recent resignation. Ukraine revelations played part but others wanted MANAFORT out for various reasons, especially LEWANDOWSKI who remains influential

### Detail

1. Speaking in late August 2016, in the immediate aftermath of Paul MANAFORT's resignation as campaign manager for US Republican presidential candidate Donald TRUMP, a well-placed Russian figure reported on a recent meeting between President PUTIN and ex-President YANUKOVYCH of Ukraine. This had been held in secret on 15 August near Volgograd, Russia and the western media revelations about MANAFORT and Ukraine had featured prominently on the agenda. YANUKOVYCH had confided in PUTIN that he did authorise and order substantial kick-back payments to MANAFORT as alleged but sought to reassure him that there was no documentary trail left behind which could provide clear evidence of this.

2. Given YANUKOVYCH's (unimpressive) record in covering up his own corrupt tracks in the past, PUTIN and others in the Russian leadership were sceptical about the ex-Ukrainian president's reassurances on this as relating to MANAFORT. They therefore still feared the scandal had legs, especially as MANAFORT had been commercially active in Ukraine right up to the time (in March 2016) when he joined TRUMP's campaign team. For them it therefore remained a point of potential political vulnerability and embarrassment.

20

3. Speaking separately, also in late August 2016, an American political figure associated with Donald TRUMP and his campaign outlined the reasons behind MANAFORT's recent demise. S/he said it was true that the Ukraine corruption revelations had played a part in this but also, several senior players close to TRUMP had wanted MANAFORT out, primarily to loosen his control on strategy and policy formulation. Of particular importance in this regard was MANAFORT's predecessor as campaign manager, Corey LEWANDOWSKI, who hated MANAFORT personally and remained close to TRUMP with whom he discussed the presidential campaign on a regular basis.

**22 August 2016**

21

COMPANY INTELLIGENCE REPORT 2016/111

**RUSSIA/US: KREMLIN FALLOUT FROM MEDIA EXPOSURE OF MOSCOW'S INTERFERENCE IN THE US PRESIDENTIAL CAMPAIGN**

Summary

- Kremlin orders senior staff to remain silent in media and private on allegations of Russian interference in US presidential campaign

- Senior figure however confirms gist of allegations and reports IVANOV sacked as Head of Administration on account of giving PUTIN poor advice on issue. VAINO selected as his replacement partly because he was not involved in pro-TRUMP, anti-CLINTON operation/s

- Russians do have further 'kompromat' on CLINTON (e-mails) and considering disseminating it after Duma (legislative elections) in late September. Presidential spokesman PESKOV continues to lead on this

- However, equally important is Kremlin objective to shift policy consensus favourably to Russia in US post-OBAMA whoever wins. Both presidential candidates' opposition to TPP and TTIP viewed as a result in this respect

- Senior Russian diplomat withdrawn from Washington embassy on account of potential exposure in US presidential election operation/s

Detail

1. Speaking in confidence to a trusted compatriot in mid-September 2016, a senior member of the Russian Presidential Administration (PA) commented on the political fallout from recent western media revelations about Moscow's intervention, in favour of Donald TRUMP and against Hillary CLINTON, in the US presidential election. The PA official reported that the issue had become incredibly sensitive and that President PUTIN had issued direct orders that Kremlin and government insiders should not discuss it in public or even in private.

2. Despite this, the PA official confirmed, from direct knowledge, that the gist of the allegations was true. PUTIN had been receiving conflicting advice on interfering from three separate and expert groups. On one side had been the Russian ambassador to the US, Sergei KISLYAK, and the Ministry of Foreign Affairs, together with an independent and informal network run by presidential foreign policy advisor, Yuri USHAKOV

22

(KISLYAK's predecessor in Washington) who had urged caution and the potential negative impact on Russia from the operation/s. On the other side was former PA Head, Sergei IVANOV, backed by Russian Foreign Intelligence (SVR), who had advised PUTIN that the pro-TRUMP, anti-CLINTON operation/s would be both effective and plausibly deniable with little blowback. The first group/s had been proven right and this had been the catalyst in PUTIN's decision to sack IVANOV (unexpectedly) as PA Head in August. His successor, Anton VAINO, had been selected for the job partly because he had not been involved in the US presidential election operation/s.

3. Continuing on this theme, the senior PA official said the situation now was that the Kremlin had further 'kompromat' on candidate CLINTON and had been considering releasing this via "plausibly deniable" channels after the Duma (legislative) elections were out of the way in mid-September. There was however a growing train of thought and associated lobby, arguing that the Russians could still make candidate CLINTON look "weak and stupid" by provoking her into railing against PUTIN and Russia without the need to release more of her e-mails. Presidential Spokesman, Dmitriy PESKOV remained a key figure in the operation, although any final decision on dissemination of further material would be taken by PUTIN himself.

4. The senior PA official also reported that a growing element in Moscow's intervention in the US presidential election campaign was the objective of shifting the US political consensus in Russia's perceived interests regardless of who won. It basically comprised of pushing candidate CLINTON away from President OBAMA's policies. The best example of this was that both candidates now openly opposed the draft trade agreements, TPP and TTIP, which were assessed by Moscow as detrimental to Russian interests. Other issues where the Kremlin was looking to shift the US policy consensus were Ukraine and Syria. Overall however, the presidential election was considered still to be too close to call.

5. Finally, speaking separately to the same compatriot, a senior Russian MFA official reported that as a prophylactic measure, a leading Russian diplomat, Mikhail KULAGIN, had been withdrawn from Washington at short notice because Moscow feared his heavy involvement in the US presidential election operation, including the so-called veterans' pensions ruse (reported previously), would be exposed in the media there. His replacement, Andrei BONDAREV however was clean in this regard.

23

**Company Comment**

The substance of what was reported by the senior Russian PA official in paras 1 and 2 above, including the reasons for Sergei IVANOV's dismissal, was corroborated independently by a former top level Russian intelligence officer and Kremlin insider, also in mid-September.

**14 September 2016**

COMPANY INTELLIGENCE REPORT 2016/112

## RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION

### Summary

- Top level Russian official confirms current closeness of Alpha Group-PUTIN relationship. Significant favours continue to be done in both directions and FRIDMAN and AVEN still giving informal advice to PUTIN, especially on the US

- Key intermediary in PUTIN-Alpha relationship identified as Oleg GOVORUN, currently Head of a Presidential Administration department but throughout the 1990s, the Alpha executive who delivered illicit cash directly to PUTIN

- PUTIN personally unbothered about Alpha's current lack of investment in Russia but under pressure from colleagues over this and able to exploit it as lever over Alpha interlocutors

### Detail

1. Speaking to a trusted compatriot in mid-September 2016, a top level Russian government official commented on the history and current state of relations between President PUTIN and the Alpha Group of businesses led by oligarchs Mikhail FRIDMAN, Petr AVEN and German KHAN. The Russian government figure reported that although they had had their ups and downs, the leading figures in Alpha currently were on very good terms with PUTIN. Significant favours continued to be done in both directions, primarily political ones for PUTIN and business/legal ones for Alpha. Also, FRIDMAN and AVEN continued to give informal advice to PUTIN on foreign policy, and especially about the US where he distrusted advice being given to him by officials.

2. Although FRIDMAN recently had met directly with PUTIN in Russia, much of the dialogue and business between them was mediated through a senior Presidential Administration official, Oleg GOVORUN, who currently headed the department therein responsible for Social Co-operation With the CIS. GOVORUN was trusted by PUTIN and recently had accompanied him to Uzbekistan to pay respects at the tomb of former president KARIMOV. However according to the top level Russian government official, during the 1990s GOVORUN had been Head of Government Relations at Alpha Group and in reality, the "driver" and "bag carrier"

25

used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St Petersburg. Given that and the continuing sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN.

3. The top level Russian government official described the PUTIN-Alpha relationship as both carrot and stick. Alpha held 'kompromat' on PUTIN and his corrupt business activities from the 1990s whilst although not personally overly bothered by Alpha's failure to reinvest the proceeds of its TNK oil company sale into the Russian economy since, the Russian president was able to use pressure on this count from senior Kremlin colleagues as a lever on FRIDMAN and AVEN to make them do his political bidding.

**14 September 2016**

26

COMPANY INTELLIGENCE REPORT 2016/113

### RUSSIA/US PRESIDENTIAL ELECTION- REPUBLICAN CANDIDATE TRUMP'S PRIOR ACTIVITIES IN ST PETERSBURG

#### Summary

- Two knowledgeable St Petersburg sources claim Republican candidate TRUMP has paid bribes and engaged in sexual activities there but key witnesses silenced and evidence hard to obtain

- Both believe Azeri business associate of TRUMP, Araz AGALAROV will know the details

#### Detail

1. Speaking to a trusted compatriot in September 2016, two well-placed sources based in St Petersburg, one in the political/business elite and the other involved in the local services and tourist industry, commented on Republican US presidential candidate Donald TRUMP's prior activities in the city.

2. Both knew TRUMP had visited St Petersburg on several occasions in the past and had been interested in doing business deals there involving real estate. The local business/political elite figure reported that TRUMP had paid bribes there to further his interests but very discreetly and only through affiliated companies, making it very hard to prove. The local services industry source reported that TRUMP had participated in sex parties in the city too, but that all direct witnesses to this recently had been "silenced" i.e. bribed or coerced to disappear.

3. The two St Petersburg figures cited believed an Azeri business figure, Araz AGALAROV (with offices in Baku and London) had been closely involved with TRUMP in Russia and would know most of the details of what the Republican presidential candidate had got up to there.

**14 September 2016**

COMPANY INTELLIGENCE REPORT 2016/130

RUSSIA: KREMLIN ASSESSMENT OF TRUMP AND RUSSIAN INTERFERENCE IN US PRESIDENTIAL ELECTION

Summary

- Buyer's remorse sets in with Kremlin over TRUMP support operation in US presidential election. Russian leadership disappointed that leaked e-mails on CLINTON have not had greater impact in campaign

- Russians have injected further anti-CLINTON material into the 'plausibly deniable' leaks pipeline which will continue to surface, but best material already in public domain

- PUTIN angry with senior officials who "overpromised" on TRUMP and further heads likely to roll as result. Foreign Minister LAVROV may be next

- TRUMP supported by Kremlin because seen as divisive, anti-establishment candidate who would shake up current international status quo in Russia's favor. Lead on TRUMP operation moved from Foreign Ministry to FSB and then to presidential administration where it now sits

Detail

1. Speaking separately in confidence to a trusted compatriot in early October 2016, a senior Russian leadership figure and a Foreign Ministry official reported on recent developments concerning the Kremlin's operation to support Republican candidate Donald TRUMP in the US presidential election. The senior leadership figure said that a degree of buyer's remorse was setting in among Russian leaders concerning TRUMP. PUTIN and his colleagues were surprised and disappointed that leaks of Democratic candidate, Hillary CLINTON's hacked e-mails had not had greater impact on the campaign.

2. Continuing on this theme, the senior leadership figure commented that a stream of further hacked CLINTON material already had been injected by the Kremlin into compliant western media outlets like Wikileaks, which remained at least "plausibly deniable", so the stream of these would continue through October and up to the election. However s/he understood that the best material the Russians had already was out and there were no real game-changers to come.

3. The Russian Foreign Ministry official, who had direct access to the TRUMP support operation, reported that PUTIN was angry at his subordinate's "over-promising" on the Republican presidential candidate, both in terms of his chances and reliability and being able to cover and/or contain the US backlash over Kremlin interference. More heads therefore were likely to roll, with the MFA the easiest target. Ironically, despite his consistent urging of caution on the issue, Foreign Minister LAVROV could be the next one to go.

4. Asked to explain why PUTIN and the Kremlin had launched such an aggressive TRUMP support operation in the first place, the MFA official said that Russia needed to upset the liberal international status quo, including on Ukraine-related sanctions, which was seriously

28

disadvantaging the country. TRUMP was viewed as divisive in disrupting the whole US political system; anti-Establishment; and a pragmatist with whom they could do business. As the TRUMP support operation had gained momentum, control of it had passed from the MFA to the FSB and then into the presidential administration where it remained, a reflection of its growing significance over time. There was still a view in the Kremlin that TRUMP would continue as a (divisive) political force even if he lost the presidency and may run for and be elected to another public office.

12 October 2016

COMPANY INTELLIGENCE REPORT 2016/134

RUSSIA/US PRESIDENTIAL ELECTION: FURTHER DETAILS OF KREMLIN LIAISON WITH TRUMP CAMPAIGN

Summary

- Close associate of SECHIN confirms his secret meeting in Moscow with Carter PAGE in July

- Substance included offer of large stake in Rosneft in return for lifting sanctions on Russia. PAGE confirms this is TRUMP's intention

- SECHIN continued to think TRUMP could win presidency up to 17 October. Now looking to reorientate his engagement with the US

- Kremlin insider highlights importance of TRUMP's lawyer, Michael COHEN in covert relationship with Russia. COHEN's wife is of Russian descent and her father a leading property developer in Moscow

Detail

1.  Speaking to a trusted compatriot in mid October 2016, a close associate of Rosneft President and PUTIN ally Igor' SECHIN elaborated on the reported secret meeting between the latter and Carter PAGE, of US Republican presidential candidate's foreign policy team, in Moscow in July 2016. The secret meeting had been confirmed to him/her by a senior member of SECHIN's staff, in addition to by the Rosneft President himself. It took place on either 7 or 8 July, the same day or the one after Carter PAGE made a public speech to the Higher Economic School in Moscow.

2.  In terms of the substance of their discussion, SECHIN's associate said that the Rosneft President was so keen to lift personal and corporate western sanctions imposed on the company, that he offered PAGE/TRUMP's associates the brokerage of up to a 19 per cent (privatised) stake in Rosneft in return. PAGE had expressed interest and confirmed that were TRUMP elected US president, then sanctions on Russia would be lifted.

3.  According to SECHIN's close associate, the Rosneft President had continued to believe that TRUMP could win the US presidency right up to 17 October, when he assessed this was no longer possible. SECHIN was keen to re-adapt accordingly and put feelers out to other business and political contacts in the US instead.

4.  Speaking separately to the same compatriot in mid-October 2016, a Kremlin insider with direct access to the leadership confirmed that a key role in the secret TRUMP campaign/Kremlin relationship was being played by the Republican candidate's personal lawyer Michael COHEN. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

30

**Source Comment**

5.  SECHIN's associate opined that although PAGE had not stated it explicitly to SECHIN, he had
    clearly implied that in terms of his comment on TRUMP's intention to lift Russian sanctions if
    elected president, he was speaking with the Republican candidate's authority.

**Company Comment**

6.

18 October 2016

31

COMPANY INTELLIGENCE REPORT 2016/135

### RUSSIA/US PRESIDENTIAL ELECTION: THE IMPORTANT ROLE OF TRUMP LAWYER, COHEN IN CAMPAIGN'S SECRET LIAISON WITH THE KREMLIN

**Summary**

- Kremlin insider outlines important role played by TRUMP's lawyer COHEN in secret liaison with Russian leadership

- COHEN engaged with Russians in trying to cover up scandal of MANAFORT and exposure of PAGE and meets Kremlin officials secretly in the EU in August in pursuit of this goal

- These secret contacts continue but are now farmed out to trusted agents in Kremlin-linked institutes so as to remain "plausibly deniable" for Russian regime

- Further confirmation that sacking of IVANOV and appointments of VAINO and KIRIYENKO linked to need to cover up Kremlin's TRUMP support operation

**Detail**

1. Speaking in confidence to a longstanding compatriot friend in mid-October 2016, a Kremlin insider highlighted the importance of Republican presidential candidate Donald TRUMP's lawyer, Michael COHEN, in the ongoing secret liaison relationship between the New York tycoon's campaign and the Russian leadership. COHEN's role had grown following the departure of Paul MANNAFORT as TRUMP's campaign manager in August 2016. Prior to that MANNAFORT had led for the TRUMP side.

2. According to the Kremlin insider, COHEN now was heavily engaged in a cover up and damage limitation operation in the attempt to prevent the full details of TRUMP's relationship with Russia being exposed. In pursuit of this aim, COHEN had met secretly with several Russian Presidential Administration (PA) Legal Department officials in an EU country in August 2016. The immediate issues had been to contain further scandals involving MANNAFORT's commercial and political role in Russia/Ukraine and to limit the damage arising from exposure of former TRUMP foreign policy advisor, Carter PAGE's secret meetings with Russian leadership figures in Moscow the previous month. The

overall objective had been to "to sweep it all under the carpet and make sure no connections could be fully established or proven"

3.  Things had become even "hotter" since August on the TRUMP-Russia track. According to the Kremlin insider, this had meant that direct contact between the TRUMP team and Russia had been farmed out by the Kremlin to trusted agents of influence working in pro-government policy institutes like that of Law and Comparative Jurisprudence. COHEN however continued to lead for the TRUMP team.

4.  Referring back to the (surprise) sacking of Sergei IVANOV as Head of PA in August 2016, his replacement by Anton VAINO and the appointment of former Russian premier Sergei KIRIYENKO to another senior position in the PA, the Kremlin insider repeated that this had been directly connected to the TRUMP support operation and the need to cover up now that it was being exposed by the USG and in the western media.

**Company Comment**

The Kremlin insider was unsure of the identities of the PA officials with whom COHEN met secretly in August, or the exact date/s and locations of the meeting/s. There were significant internal security barriers being erected in the PA as the TRUMP issue became more controversial and damaging. However s/he continued to try to obtain these.

**19 October 2016**

33

COMPANY INTELLIGENCE REPORT 2016/166

**US/RUSSIA: FURTHER DETAILS OF SECRET DIALOGUE BETWEEN TRUMP CAMPAIGN TEAM, KREMLIN AND ASSOCIATED HACKERS IN PRAGUE**

### Summary

- TRUMP's representative COHEN accompanied to Prague in August/September 2016 by 3 colleagues for secret discussions with Kremlin representatives and associated operators/hackers

- Agenda included how to process deniable cash payments to operatives; contingency plans for covering up operations; and action in event of a CLINTON election victory

- Some further details of Russian representatives/operatives involved; Romanian hackers employed; and use of Bulgaria as bolt hole to "lie low"

- Anti-CLINTON hackers and other operatives paid by both TRUMP team and Kremlin, but with ultimate loyalty to Head of PA, IVANOV and his successor/s

### Detail

1. We reported previously (2016/135 and /136) on secret meeting/s held in Prague, Czech Republic in August 2016 between then Republican presidential candidate Donald TRUMP's representative, Michael COHEN and his interlocutors from the Kremlin working under cover of Russian 'NGO' Rossotrudnichestvo.

2. ███████████████████████████████████████ provided further details of these meeting/s and associated anti-CLINTON/Democratic Party operations. COHEN had been accompanied to Prague by 3 colleagues and the timing of the visit was either in the last week of August or the first week of September. One of their main Russian interlocutors was Oleg SOLODUKHIN operating under Rossotrudnichestvo cover. According to ███████████████, the agenda comprised questions on how deniable cash payments were to be made to hackers who had worked in Europe under Kremlin direction against the CLINTON campaign and various contingencies for covering up these operations and Moscow's secret liaison with the TRUMP team more generally.

3,4

3. ▮▮▮▮▮▮▮▮▮ reported that over the period March-September 2016 a company called ▮▮▮▮▮▮▮ and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership. Entities linked to one ▮▮▮▮▮▮▮▮ were involved and he and another hacking expert, both recruited under duress by the FSB, ▮▮▮▮ ▮▮▮▮▮▮▮ were significant players in this operation. In Prague, COHEN agreed contingency plans for various scenarios to protect the operation, but in particular what was to be done in the event that Hillary CLINTON won the presidency. It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and other operators were stood down/able to go effectively to ground to cover their traces. (We reported earlier that the involvement of political operatives Paul MANAFORT and Carter PAGE in the secret TRUMP-Kremlin liaison had been exposed in the media in the run-up to Prague and that damage limitation of these also was discussed by COHEN with the Kremlin representatives).

4. In terms of practical measures to be taken, it was agreed by the two sides in Prague to stand down various "Romanian hackers" (presumably based in their homeland or neighbouring eastern Europe) and that other operatives should head for a bolt-hole in Plovdiv, Bulgaria where they should "lay low". On payments, IVANOV's associate said that the operatives involved had been paid by both TRUMP's team and the Kremlin, though their orders and ultimate loyalty lay with IVANOV, as Head of the PA and thus ultimately responsible for the operation, and his designated successor/s after he was dismissed by president PUTIN in connection with the anti-CLINTON operation in mid August.

**13 December 2016**

35

**deLuxe.** PAYMENT EXCHANGE

Are you a business? To save time, money, and resources, make payments using Deluxe Payment Exchange. Call 877-333-6964 to get started today!

## For your records

**Issued date:** 06/15/2020
**Check number:** VV1309
**From:** Same Day Process Service
**Amount:** $51.50
**Payable to:** Daniel Jones
**Delivery email:** None
**Memo:** #255362 witness fees

**Questions?** Visit **echecks.com** or call **877-333-6964**

**Does your financial institution have questions about this check?**

- This check was printed from an authorized check record. It is not a Check 21 Image Replacement Document.
- To confirm this check was issued by the account holder and details (pay to, amount, routing/account number) remain unmodified, the item's authenticity can be verified using the Deluxe Inc. Check Verification service at https://echecks.com/verify.

| **How to use this check** | | |
| --- | --- | --- |
| **Step 1** Print the check | **Step 2** Validate it printed correctly | **Step 3** Deposit like normal |
| ✔ Any printer works | ✔ **Correct if bank numbers are:** | 1. **Cut on the dotted line above** |
| ✔ Black or color ink | Centered in white space | 2. **Endorse the back** |
| ✔ Basic white paper | Parallel to edge of the page | 3. **Deposit like normal:** |
| | Clearly printed in dark black ink | In-person at a bank or credit union |
| | ✖ **Reprint if bank numbers are:** | Using an ATM |
| | Cut off, skewed, or off-center | Via smartphone mobile deposit |
| | Smudged or wrinkled | With an office check scanner |
| | Too light to read | |

**Need help?** Visit eChecks.com or call 877-333-6964

**Check appears upside down intentionally**

✂ Cut along this line

---



**Official eCheck**

**Same Day Process Service**
1413 K Street NW
Washington, DC 20005

This is a Deluxe eCheck. The PAY TO THE ORDER OF line designates the Payee. For questions, call Deluxe Payment Exchange customer support at 877-333-6964.

**VV1309**

Date   06/15/2020
Void after 90 days

PAY TO THE ORDER OF   Daniel Jones                    $ 51.50

Fifty-one and 50/100

                                                      Dollars

M & T Bank

*Michael Molash*

Memo   #255362 witness fees

Verify check at https://echeckz.com/verify

⑆001309⑆

# EXHIBIT 2

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

|  |  |  |
|---|---|---|
| Mikhail Fridman et al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   1:17-cv-02041-RJL |
| Bean LLC et al. | ) | |
| | ) | |
| *Defendant* | ) | |

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

To:        The Democracy Integrity Project, 1360 Beverley Road, Suite 300, McLean, VA 22101

*(Name of person to whom this subpoena is directed)*

✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Schedule A

| Place: Sperduto Thompson & Gassler PLC<br>1747 Pennsylvania Ave., NW, Suite 1250<br>Washington, DC 20006 | Date and Time:<br><br>07/27/2020 10:00 am |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:        06/15/2020

|  |  |  |
|---|---|---|
| *CLERK OF COURT* | OR | |
| _____ | | /s Alan Lewis |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*        Plaintiffs
_____ , who issues or requests this subpoena, are:

Alan Lewis, Esq., Carter Ledyard & Milburn LLP, 2 Wall Street, New York, NY 10005, lewis@clm.com, (212) 732-3200

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  1:17-cv-02041-RJL

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) For Other Discovery.** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) Command to Produce Materials or Permit Inspection.**
  **(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) Quashing or Modifying a Subpoena.**
  **(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  **(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
  **(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) Claiming Privilege or Protection.**
  **(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**The Democracy Integrity Project**
1360 Beverley Road, Suite 300
McLean, VA  22101

# SCHEDULE A

## INSTRUCTIONS AND DEFINITIONS

1.      The provisions and definitions contained in the Federal Rules of Civil Procedure and Local Rules of the United States District Court for the District of Columbia are incorporated by reference as if fully set forth herein.

2.      In producing documents and other things, you shall furnish all responsive documents or things in your possession, custody, or control.

3.      Documents and things requested herein shall be produced as they are kept in the usual course of business, with information indicating their source (e.g., the person(s) from whom the documents were obtained).

4.      A Request calling for the production of any document shall be deemed to include, in addition to the document itself, a request for any and all exhibits or attachments to the document and any enclosures sent or kept with the document.  Documents attached to each other shall not be separated.

5.      Documents maintained or stored electronically may be produced on CD, DVD, File Transfer Protocol site, portable hard or flash drive, or other reasonably accessible media format.  All such documents shall be produced in Group IV, 300 DPI, single-page TIFF format with document-level extracted text files, and standard Concordance load files (.DAT, .OPT), and shall include all metadata (including, without limitation, document boundaries, custodian identification information, date and time, etc.).  If the text cannot be extracted, Optical Character Recognition ("OCR") text must be provided.  In addition to producing TIFF files with text, metadata, and standard load files, native files shall be produced for any PowerPoint presentations containing audio or video, any Excel documents, any Access databases, or documents created

under equivalent software packages.  Data files shall not be zipped, encrypted, or otherwise restricted or proprietarily protected for specific use.  If the native file format is derived from software not accessible with Microsoft Office applications (or other common applications), please state so in your response.

6.      Documents maintained in hardcopy shall be produced in TIFF image format with corresponding OCR text, associated data identifying the beginning and ending Bates numbers and, to the extent applicable, information associating document families or attachment ranges.

7.      The file or other container in which a document is kept is deemed to be an integral part of the document and shall be produced with the document.  Whenever a document or group of documents is maintained in the ordinary course of business in any file, folder, container, box or other document storage or organization device, each Request herein shall be deemed to call for the production of copies of, or the identification of, such file, folder, container, box or other document storage or organization device and any labels or other form of identification set forth thereon.

8.      Unless otherwise indicated, the documents to be produced include all documents prepared, sent, dated, or received, or which otherwise existed or were possessed at any time subsequent to January 1, 2015.

9.      Each document and thing requested herein shall be produced in its entirety and without deletion or excisions, regardless of whether you consider the entire document to be relevant or responsive to the Requests.  If you have redacted any portion of the document, you shall stamp the word "redacted" on each page of the document that you have redacted.  If any document covered by these Requests contains a redaction, you shall identify such document and all redactions on a log prepared in accordance with Federal Rule 26(b)(5), specifically

2

identifying the following:  (i) the type of document; (ii) any addressor and addressee; (iii) any indicated or blind copies; (iv) the document's date; (v) the general subject matter of the document, number of pages, and a description of any attachments or appendices; (vi) all persons to whom the document was distributed, shown, or explained; and (vii) the nature and basis of the privilege or grounds for redaction being asserted.

10.     If any document requested herein is withheld from production on the basis of any claim or privilege or other protection or immunity from disclosure, you shall furnish a log in accordance with Federal Rule 26(b)(5), specifically identifying the following:  (i) the type of document; (ii) any addressor and addressee; (iii) any indicated or blind copies; (iv) the document's date; (v) the general subject matter of the document, number of pages, and a description of any attachments or appendices; (vi) all persons to whom the document was distributed, shown, or explained; and (vii) the nature and basis of the privilege or grounds for withholding being asserted.

11.     Documents not otherwise responsive to the Requests shall be produced if such documents mention, discuss, refer to or explain the documents which are called for by these Requests or constitute routing slips, transmittal memoranda or letters, comments, evaluations or similar materials.

12.     If any responsive documents were, but no longer are, in your possession, custody or control, state the disposition of such documents, including, but not limited to, the identity of the person(s) to whom the documents were forwarded, the state of such disposition and the identity, if known, of the person(s) currently in possession of such documents and the current or last known address of such person(s); and if the documents have been destroyed, the date and manner of their destruction, by whom they were destroyed, who authorized such destruction, and

3

for what purpose they were destroyed.

13.     Each Request should be interpreted broadly, so as to include all documents that could be responsive to each Request.  Plaintiffs reserve the right to supplement these Requests and seek supplementary responses to these Requests.

14.     As a non-party who has received a subpoena in this Action, you are covered by the Stipulated Confidentiality Agreement and Protective Order entered in the Action and you have the right to protect the confidentiality of documents produced in accordance with such Agreement and Order.  A copy of the Stipulated Confidentiality Agreement and Protective Order entered in the Action can be accessed on the docket at Document 67.

15.     The use of the singular form of any word includes the plural and vice versa.

16.     The masculine includes the feminine and neutral genders, and vice versa.

17.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Requests all documents that might otherwise be construed to be outside of its scope.

18.     The use of the terms "any" and "all" shall be construed to mean "any and all" as necessary to bring within the scope of these Requests all documents that might otherwise be construed outside of its scope.

19.     The term "including" shall not be construed as a limiting phrase but, rather, shall be construed to mean "including, without limitation."

20.     Each of the words "discussing," "reflecting," "concerning," "relating," "involving," "evidencing," or "referring" shall have common meanings and shall include indirect as well as direct references to the subject matter of the Request.

21.     The use of a verb in any tense shall be construed as the use of the verb in all other

tenses as necessary to bring within the scope of these Requests all documents that might otherwise be construed to be outside of its scope.

22.    "Requests" means, collectively, each numbered request which appear below under the heading DOCUMENTS REQUESTED.

23.    The terms "TDIP," "you," "your," and "yourself" refer to The Democracy Integrity Project, its employees, officers, directors, and any persons or entities acting on behalf of or in concert with TDIP, including Daniel Jones, Michael Balascio, and Adam Kaufmann.

24.    The "Action" means the above-captioned litigation, *Fridman v. Bean LLC a/k/a Fusion GPS, et al.*, 17-cv-2041 (D.D.C.), including all pleadings and proceedings filed or had therein.  A copy of the complaint in this Action (the "Complaint") is enclosed separately herewith.

25.    "Plaintiffs" means, collectively, Mikhail Fridman, Petr Aven, and German Khan.

26.    "Defendants" means, collectively, Fusion (as defined below) and Glenn Simpson ("Simpson"), and any of their present or former agents, affiliates, predecessors, successors, assigns, parents, subsidiaries, officers, employees, directors, members, partners, shareholders, consultants, and representatives, or any one or more of the foregoing.

27.    The "Dossier" means the compilation of 17 separate memoranda or reports, totaling 35 pages, prepared by Christopher Steele, as described in Paragraphs 1 and 2 of the Complaint in the Action, which was published on January 10, 2017 by BuzzFeed along with, and referenced in, an article entitled "These Reports Allege Trump Has Deep Ties to Russia."   A copy of the BuzzFeed article and Dossier, including CIR 112 (as defined below), are enclosed separately herewith.

28.    "CIR 112" means Company Intelligence Report ("CIR") 112 entitled

"RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION,"
which was prepared by Christopher Steele and was included among the reports published by
BuzzFeed that were referred to as the Dossier, and the contents therein.

29.     "Alfa" means the conglomerate of entities including Alfa-Bank JSC (also known
as JSC Alfa-Bank and Alfa-Bank AO), ABH Holdings S.A., Alfa Capital, AlfaStrakhovanie
Group, Alfa Asset Management (Europe) S.A., A1, X5 Retail Group, Rosvodokanal Group, and
IDS Borjomi International Group, or any of their subsidiaries or affiliates.

30.     "Fusion" or "Bean" means Bean LLC, which does business as or is also known as
Fusion GPS, and its and their subsidiaries, affiliates, founders (including Glenn Simpson and
Peter Fritsch), employees, or representatives.

31.     "Orbis" means Orbis Business Intelligence Ltd., the London-based firm founded
by Christopher Steele, and any employees or representatives.

32.     "Steele" means Christopher Steele, the former British intelligence officer and
founder of Orbis who compiled the Dossier, as referenced in Paragraph 3 of the Complaint, and
any representatives.

33.     "Perkins Coie" means Perkins Coie LLP, its partners and employees, and any
persons or entities acting on behalf of or in concert with it.

34.     "DNC" means the Democratic National Committee and the DNC Services
Corporation, their employees, officers, directors, and any persons or entities acting on behalf of
or in concert with the DNC.

35.     "HFACC" means HFACC, Inc. (a/k/a Hillary for America), its employees,
officers, directors, and any persons or entities acting on behalf of or in concert with HFACC.

36.     The terms "person" or "persons" mean natural persons as well as legal entities

6

including, without limitation, firms, companies, proprietorships, corporations, partnerships, limited liability companies, associations, unincorporated associations, and governmental bodies, agencies, and officials and every other type of organization or entity.

37.     The terms "representative" or "representatives" when used in reference to a person, mean any past or present officer, director, partner, associate, member, employee, consultant, agent, subsidiary or affiliate of such persons, and any other person acting on behalf of, or in concert with, such person.

38.     The terms "document" and "documents" have the same meaning and scope as the broadest usage given to these terms in or pursuant to the Federal Rules and applicable federal law, including (without limitation) the following: all writings and records of any kind; electronic or computerized data compilations; embedded data and metadata; originals, drafts, and all non-identical copies; written or electronic correspondence, e-mail, voice mail, instant messages, text messages, WhatsApp messages, Slack messages, Signal messages, communications, records, memoranda, notes, diaries, calendars, statistics, letters, telegrams, minutes, contracts, agreements, reports, price lists, agendas, manuals, studies, checks, statements, ledgers of account and work papers; inter-office and intra-office communications; notes and notations in any form; recordings of telephone calls or meetings; minutes of meetings or other communications; bulletins; printed matter (including newspapers, magazines and other communications and articles and clippings); press releases; printouts; teletypes and telecopies; ledgers; work sheets; graphic or oral records of representations or presentations of any kind (including without limitation photographs, charts, graphs, and PowerPoint presentations); microfiche, microfilm, and digital, video or film recordings; electronic, mechanical or electrical records; tapes, cassettes, disks, recordings or transcriptions thereof; any drafts, alterations, modifications, changes and

amendments of any of the foregoing; and any other documents as defined in the Federal Rules and under applicable federal law.  The terms "document" and "documents" specifically include electronic data or information contained in or on computer networks, mainframes, computer files, pocket organizers, personal digital assistants, personal computers, LAN's local workstations, computer disks, file servers, e-mail systems, CD-ROMs, e-mails, hard drives, printer buffer or memories, fax memories, voice mail systems, or any related back-up or archived systems or tapes.

39.     The terms "communication" or "communications" mean the transmittal of data or information (in the form of facts, images, ideas, inquiries or otherwise) by any means or methodology, including (without limitation) any meeting, conversation, discussion, document, correspondence, message, e-mail, note, text message, WhatsApp messages, Slack messages, Signal messages, or other means of transmittal.

40.     The terms "concern" or "concerning" mean discussing, referring to, relating to, or mentioning in any way, whether explicitly or implicitly.

## **DOCUMENTS REQUESTED**

1.     Documents evidencing the terms of any engagement or agreement between TDIP, on the one hand, and Fusion, Simpson, Steele, and/or Orbis, on the other hand, relating to research regarding interference with the 2016 presidential election or any topics contained in CIR 112, including documents evidencing the purpose of the work that was to be performed in connection with any engagement or agreement.

2.     Documents evidencing the terms of any engagement or agreement between TDIP, on the one hand, and Edward Austin Ltd. and/or Edward Baumgartner, on the other hand, relating to research regarding interference with the 2016 presidential election or any topics contained in CIR

8

112, including documents evidencing the purpose of the work that was to be performed in connection with any engagement or agreement.

3.      Documents evidencing the purposes of (or reason for) funds paid to Bean by TDIP, including, for example, funds paid by TDIP as reflected in TDIP's IRS Forms 990 for 2017 and 2018, to the extent such purposes or reasons relate to research regarding interference with the 2016 presidential election or any topics contained in CIR 112.

4.      Documents evidencing the purposes of (or reason for) funds paid to Edward Austin Ltd. by TDIP, including, for example, funds paid by TDIP as reflected in TDIP's IRS Forms 990 for 2017 and 2018, to the extent such purposes or reasons relate to research regarding interference with the 2016 presidential election or any topics contained in CIR 112.

5.      All documents, including invoices, reflecting payments to, on behalf of, or for the benefit of Orbis or Fusion.

6.      All documents concerning any communications between you and Defendants relating to Plaintiffs, Alfa, CIR 112, the Dossier, or the contents of CIR 112 or the Dossier, including any communications with Simpson and Fusion in early 2017 as described in the book "Crime in Progress" (pp. 171-78).

7.      All documents concerning any communications between or among you, Orbis, or Steele relating to Plaintiffs, Alfa, CIR 112, the Dossier, or the contents of CIR 112 or the Dossier.

8.      All documents concerning any communications between or among you, Perkins Coie, the DNC, or HFACC, relating to Plaintiffs, Alfa, CIR 112, the Dossier, or the contents of CIR 112 or the Dossier.

9.      All documents concerning any communications between you and any journalists, reporters, news outlets or publications, or members of the media, or any persons acting on their

9

behalf, relating to Plaintiffs, Alfa, CIR 112, the Dossier, or the contents of CIR 112 or the Dossier.

10.     All documents concerning any communications, interviews, or testimony to or with governmental entities or representatives (including the FBI, DOJ, State Department, or Congress) regarding Plaintiffs, Alfa, CIR 112, the Dossier, or the contents of CIR 112 or the Dossier, including communications with members of Congress or Congressional committees, testimony before any governmental entity or body, and documents produced or provided to any governmental entity or body.

11.     All documents relating to the truth or falsity of the statements and allegations set forth in CIR 112 and the Dossier.

12.     All documents, to the extent not produced in response to Requests Nos. 1-11, concerning Plaintiffs, Alfa, CIR 112, the Dossier, the contents of CIR 112 or the Dossier, the dissemination or publication of CIR 112 or the Dossier,  or Steele or Steele's source(s) for CIR 112.

COMPLAINT

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
-----------------------------------------------------------------X
                                                    :
MIKHAIL FRIDMAN, PETR AVEN, AND                     :
GERMAN KHAN,                                         :     Case 1:17-cv-02041 (RJL)
                              Plaintiffs,            :
                                                    :
         -v-                                         :
                                                    :
BEAN LLC (A/K/A FUSION GPS) AND                      :
GLENN SIMPSON,                                       :
                                                    :
                                                    :
                              Defendants.            :
-----------------------------------------------------------------X

## AMENDED COMPLAINT
### JURY TRIAL DEMANDED

Plaintiffs Mikhail Fridman, Petr Aven, and German Khan, by their attorneys

Carter Ledyard & Milburn LLP, allege as follows:

### INTRODUCTION

1.      This is a defamation case brought by three international businessmen who

were defamed in widely disseminated political opposition research reports commissioned

by political opponents of candidate Donald Trump in the 2016 presidential election cycle.

The reports (which came to be known as the "Trump Dossier" and the "Dossier") were

published both before and after the 2016 election by the Defendants: the Washington,

D.C. based firm Fusion GPS ("Fusion") and its principal, Glenn Simpson, a former

journalist specializing in political opposition research.  In that role, the Defendants traffic

in procuring damaging information about political candidates.  The reports are gravely

damaging in that, directly or by implication, they falsely accuse the Plaintiffs—and Alfa

("Alfa"), a consortium in which the Plaintiffs are investors—of criminal conduct and

alleged cooperation with the "Kremlin" to influence the 2016 presidential election. But neither the Plaintiffs nor Alfa committed any of the acts recklessly attributed to them by the Defendants. To the contrary, the Plaintiffs and Alfa are collateral damage in a U.S. political operation conducted by the Defendants, whose focus is an alleged relationship (between the Kremlin and the Trump campaign) which has nothing whatsoever to do with the Plaintiffs.

2.      The specific "report" that includes facially defamatory statements about the Plaintiffs is one of seventeen written Company Intelligence Reports 2016 ("CIRs") that comprise the Trump Dossier. The Defendants included Company Intelligence Report 112 (the "Report" or "CIR 112") (which makes statements about the Plaintiffs) in the Trump Dossier, even though the Dossier's purpose and intended subject matter have nothing to do with the Plaintiffs' past, current or intended future activities. Broadly, those reports purport to describe details of an alleged scheme between the Russian government and the Trump presidential campaign to unlawfully manipulate the result of the 2016 presidential election in favor of candidate Trump. The Defendants gathered these reports as part of their engagement to conduct "opposition research" (known as "oppo research" by its practitioners and the media) against Trump. Opposition research, in essence, is the gathering of information for the purpose of eventually discrediting or otherwise harming a candidate for a public office. Opposition research is neither objective nor neutral. Instead, it is skewed from the outset in favor of appearing to find negative information about individuals—the essence of the product that political opposition research practitioners such as the Defendants are hired to produce.

3.      As described below, the Defendants were initially hired to conduct this opposition research by Republican political opponents of candidate Trump during the primary phase of the 2016 election cycle.  That engagement was terminated when it became clear that Mr. Trump would be the Republican nominee.  At that point, Defendants solicited and obtained an engagement with the Democratic National Committee and the campaign of candidate Hillary Clinton to gather discrediting information about Mr. Trump, including any connections he might have to Russian businesses or Russia's government.  To perform that research, the Defendants hired a private investigator—a former British intelligence officer named Christopher Steele, who operated through a London—based entity known as Orbis Business Intelligence Limited ("Orbis").  Steele claims to have used his own Russian sources—who were never identified—to compile the reports, which were then delivered to the Defendants over the course of several months in 2016.  Eventually, the reports, including the false and defamatory Report at the heart of this case, were assembled in the document that has come to be known to the public as the Trump Dossier.  Steele has acknowledged that his reports are unverified "raw intelligence" and has refused to identify his alleged "sources."  Indeed, not one of the reports in the Dossier has ever been verified and none of its sources has ever been publicly identified.  Defendants recklessly placed the Dossier's allegations of criminal action by Plaintiffs beyond their control which allowed those allegations to get into the hands of media devoted to breaking news on the hottest subjects of the day:  the Trump candidacy and his election as President.

4.      CIR 112, dated September 14, 2016, falsely accuses the Plaintiffs of criminal bribery in the 1990s and participation in an alleged Trump-Russia scheme to

-3-

influence the 2016 presidential election. That alleged scheme was the overall subject matter of the Dossier. At all relevant times Defendants were aware that CIR 112 was not verified, that its content was provided by unidentified sources whose credibility could therefore not be assessed by a reader of the Dossier, and that the accusations made in CIR 112 about Plaintiffs defamed them. Defendants could easily have removed that Report from the Dossier before they started peddling it to media and journalists in September and October 2016. They chose not to do so. Nor did they attempt to determine the veracity of that Report with the Plaintiffs themselves.

5.       At all times during the Defendants' engagement of Orbis and Steele, it was either intended or clearly foreseeable that if the Dossier's contents were made available to third parties, including journalists, such provocative material would be published and republished, including to the public at large. Indeed, that is the entire purpose of "oppo research" in American politics. Those third parties included government officials, as well as news media and journalists who could make its content public.

6.       On information and belief, Defendants arranged for Steele to brief selected members of the print and online media about the information he was compiling on candidate Trump and his campaign. Consistent with the intended purpose of "oppo research" to publicly discredit its target, Steele's briefings were designed to generate interest in the Dossier and secure eventual public dissemination of its content. Briefings were held for journalists from the *New York Times*, the *Washington Post, CNN, Yahoo News,* and others in September 2016. *The New York Times, The Washington Post* and

*Yahoo News* were given a second briefing.[1]  Shortly thereafter, Yahoo News published an
article by Michael Isikoff that described some of the content of the Dossier (referred to
there as "intelligence reports" and "reports"), which was still being compiled at that
time.[2]  Many other media articles reported speculative accounts of the Dossier's existence
and contents.  In late October 2016, Steele gave an interview to David Corn, a writer for
*Mother Jones* magazine, which, on October 31, 2016, published an article by Corn
headlined "A Veteran Spy Has Given The FBI Information Alleging a Russian Operation
to Cultivate Donald Trump."[3]  Corn's article stated that he had "reviewed" the early
reports in the Dossier, and then quoted from those reports as well as statements made by
Steele in the interview.  The publication to third parties and public dissemination of the
Dossier's content had begun in earnest.

      7.     In addition to cultivating media interest, the Defendants also organized or
approved a meeting in Great Britain between Steele and David Kramer, who held no
public office but was the director of a private foundation affiliated with U.S. Senator John
McCain.  The purpose of that meeting was to show Kramer the content of the sixteen pre-
election reports in the Dossier so he could brief Senator McCain, who at the time was a
well-known and outspoken critic of Trump's candidacy.  Subsequently, in November

---

[1] *Defendants' Response to Claimants Request For Information, Gubarev, et al. v. Orbis Business Intelligence Limited and Christopher Steele*, Claim No. HQ1700413, In the High Court of Justice, Queens Bench Division, May 18, 2017, p. 8 ("The Orbis/Steele Response").

[2] Michael Isikoff, *U.S. intel officials probe ties between Trump advisor and Kremlin*, Yahoo, News, Sept. 23, 2016, https://www.yahoo.com/news/u-s-intel-officials-probe-ties-between-trump-adviser-and-kremlin-175046002.html.

[3] David Corn, *A Verteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump*, Mother Jones, Politics, Oct. 31, 2016, https://www.motherjones.com/politics/2016/10/veteran-spy-gave-fbi-info-alleging-russian-operation-cultivate-donald-trump/

2016, Defendants provided (and thereby published) a copy of all sixteen of the Dossier's then existing reports to Kramer—for redelivery and further publication to Senator McCain—including the report (CIR 112) that falsely accused and defamed Plaintiffs.[4]

8.       As the 2016 presidential election neared, both print and online media in the United States and abroad began to expand their coverage of the Dossier and its alleged content.  That coverage only intensified after Trump won the election.  On January 10, 2017, one of those media entities, BuzzFeed, Inc., published the entire Dossier on the Internet, describing it there as "explosive."  The copy of the Dossier that BuzzFeed published included the false and defamatory allegations of CIR 112 about the Plaintiffs and Alfa, along with the article entitled "These Reports Allege Trump Has Deep Ties to Russia."[5]  The Dossier misspells Alfa's name throughout, incorrectly spelling it as "Alpha."  BuzzFeed's article did not mention CIR 112 or its allegations, but focused instead on president-elect Trump and his alleged relationships with Russia, explaining that it "was publishing the full document so that Americans can make up their minds about allegations about the president-elect that have circulated at the highest levels of the U.S. government."[6]

9.       The Defendants intended, anticipated, or foresaw a high likelihood that allowing their clients (named *infra),* third parties (like David Kramer and Senator

---

[4] The Orbis/Steele Response, pp. 5-6.

[5] Ken Bensinger, Miriam Elder, Mark Schoofs, *These Reports Allege Trump Has Deep Ties To Russia,* BuzzFeed News, Jan. 10, 2017, https://www.buzzfeed.com/kenbensinger/these-reports-allege-trump-has-deep-ties-to-russia?utm_term=.is1Q2ka2J.

[6] *Id.*

McCain) and the media access to the Dossier's defamatory content would result in its republication by news media outlets, including online news media such as BuzzFeed.

10.     Plaintiffs seek an award of compensatory and punitive damages for the harm to their personal and professional reputations, current business interests, and the impairment of business opportunities that resulted from the blatantly false and defamatory statements and implications about them published recklessly to third parties by the Defendants and republished by BuzzFeed and countless other media around the world.

<u>THE PARTIES</u>

11.     Plaintiffs Fridman, Aven, and Khan are ultimate beneficial owners of Alfa. Fridman and Khan are each citizens of both Russia and Israel, and Aven is a citizen of Russia. Plaintiffs are not widely known in the United States, had no role or involvement in any aspect of the 2016 U.S. presidential election, and made no public comments about it.

12.     On information and belief, defendant Bean LLC is a Delaware corporation that conducts business under the name Fusion GPS. Fusion is registered to transact business in Washington, D.C., where it is headquartered and conducts its operations.

13.     Defendant Glenn Simpson, on information and belief, is a principal of Fusion. He was the primary actor involved in securing the Dossier from Orbis and Steele, arranging for press briefings about it in the late summer and early fall of 2016, and publishing the Dossier to various recipients including Fusion's clients, third parties like David Kramer and Senator McCain, other government officials and the news

-7-

media.  Simpson conducts his business for Fusion from an office in Washington, D.C.,
where his business included his activities with respect to the Dossier.  Both Simpson and
his subcontractor Steele used their prior experience as, respectively, an investigative
journalist for the Wall Street Journal and an operative in British intelligence who had
covered Russian matters, to give their "oppo research" output a gloss of credibility and
reliability which, in this case, was unwarranted.  Simpson has described Fusion's work as
"journalism for rent" and claimed publicly that he and Fusion uphold strict standards that
Simpson developed in his years as a journalist:  "You can't just say what you know. You
have to say how you know it.  And you have to be able to prove it."[7]  And yet, Simpson
and Fusion did not live up to their own professed standards when they published the
Dossier.  As Steele (Defendants' supplier of the Dossier's unverified, anonymous "raw
intelligence" content)  recently told a journalist, he did not interview his sources himself,
but gathered his information through "intermediaries" and "subsources."  And as Steele
further acknowledged, as much as 30% of the Dossier's content may not be "accurate."[8]
Those are the "standards" by which Defendants operated when they published  CIR 112.

---

[7] Jack Gillum, Shawn Boburg, *'Journalism for rent': Inside the secretive firm behind the Trump dossier*, The Washington Post, Investigations, Dec. 11, 2017 (*available at* https://www.washingtonpost.com/investigations/journalism-for-rent-inside-the-secretive-firm-behind-the-trump-dossier/2017/12/11/8d5428d4-bd89-11e7-af84-d3e2ee4b2af1_story.html?utm_term=.5152414bbcce).

[8] Luke Harding, *How Trump walked into Putin's web*, The Guardian, News, Nov. 15, 2017, *https://www.theguardian.com/news/2017/nov15/how-trump-walked-into-putins-web-luke*; https://theguardian.com/us-new/2017/nov15/christopher-steele-trump-russia-dossier-accurate.

## JURISDICTION AND VENUE

14.     This case is within this Court's jurisdiction pursuant to 28 U.S.C.

§ 1332(a)(2).  Venue is proper in this District pursuant to 28 U.S.C. § 1391.  The matter

in controversy in the cause of action asserted herein exceeds $75,000.

## FACTUAL ALLEGATIONS

15.     On information and belief, the Defendants were engaged in 2015 by the

Washington Free Beacon to conduct research from public sources about several

Republican candidates for President, an engagement which ended in May 2016 when

Donald J. Trump was emerging as the likely winner of the nomination.[9]  Even prior to

that termination, Defendants approached Perkins Coie, a law firm representing the

Democratic National Committee (DNC) and HFACC, Inc., the campaign organization

supporting Hillary Rodham Clinton's candidacy for President, to solicit an engagement

that would continue the research regarding Donald Trump which it had been pursuing on

behalf of its previous client.  Perkins Coie retained Defendants to provide such research

services in April 2016, an engagement which continued until October 2016.[10]  The

Defendants were tasked with conducting "oppo research" against Trump, including the

gathering of compromising and salacious information about Trump's personal behavior

---

[9]  Alicia Cohn, *Conservative site funded project that led to Trump dossier*, The Hill, Home News,
Oct. 27, 2017, http://thehill.com/homenews/news/357599-conservative-publication-originally-
funded-trump-dossier-report.

[10]  Adam Entous, Devlin Barrett, Rosalind S. Helderman, *Clinton campaign, DNC paid for
research that led to Russia dossier*, The Washington Post, National Security, Oct. 24, 2017
(available at https://www.washingtonpost.com/world/national-security/clinton-campaign-dnc-
paid-for-research-that-led-to-russia-dossier/2017/10/24/22).

and business dealings in Russia. The Defendants in turn engaged Orbis and Steele for assistance in fulfilling this task.

16.     Orbis proceeded to research Trump's personal behavior in Russia and business dealings with Russian government officials, business leaders, and business entities. Steele compiled the "investigative" results into at least seventeen written CIRs for delivery to the Defendants in Washington, D.C. By Steele's own description, the CIRs were "raw intelligence" containing unverified information from sources he did not personally interview.[11] The CIRs produced between June 2016 and the end of October 2016 (including CIR 112) were provided and thus published to lawyers at Perkins Coie and by them to their clients at the DNC and the HFACC.

17.     After Trump received the Republican nomination for President in July 2016, many media reports subsequently surfaced asserting, correctly, that Fusion had entered into a new engagement with Democratic Party operatives interested in using the oppo research to support Hillary Clinton's candidacy. These media reports vastly increased other media's and the public's interest in the content of the Dossier.

18.     As they continued their work for their new clients, the Defendants knew, anticipated or reasonably should have foreseen that, once in the hands of third parties such as David Kramer, Senator McCain, journalists like Michael Isikoff and David Corn, Perkins Coie, the political operatives at the DNC and HFACC, and their media contacts, the CIRs would be further disseminated publicly, thereby fostering widespread discussion about them in the United States when, in fact, Plaintiffs had no role whatsoever in any actions the Russian government or other Russian actors may have taken with regard to

---

[11] The Orbis/Steele Response, p.7, #17.

the 2016 election in the United States.  That is exactly what happened.  Much of the

ensuing media attention and public discussion focused on Defendants' and Steele's roles

in the creation and dissemination of the Dossier, and the interviews solicited by them.

During this campaign to promote the public dissemination of their "oppo research,"

which, upon information and belief, included the provision of background briefing to the

media by Defendants without attribution, Defendants never vouched for the credibility of

their sources or the accuracy and reliability of the content of the Dossier and CIR 112.

Despite the fact that they did not know whether the unverified, anonymous, inherently

harmful accusations in CIR 112 about Plaintiffs were true or false, Defendants

intentionally published the Dossier, including CIR 112, to Perkins Coie, David Kramer

and John McCain, and foresaw (or reasonably should have foreseen) that it would then be

republished to (1) Perkins Coie's clients (the DNC and the HFACC); (2) employees of

the DNC and the HFACC; and (3) journalists and media.  Elements of the Dossier,

possibly including CIR112, may have been published even more extensively by being

made available for viewing during arranged briefings of certain journalists.  Worldwide

publication of the entire Dossier, whether by BuzzFeed or anyone else, was inevitable

after these reckless actions by Defendants.

      19.    CIR 112 specifically discusses the Plaintiffs.  Its heading, "RUSSIA/US

PRESIDENTIAL ELECTION:  KREMLIN-ALPHA GROUP CO-OPERATION," is

defamatory in the Trump/Russia context of the entire Dossier, as this heading suggests

that Alfa and its executives, including the Plaintiffs, cooperated in the alleged Kremlin-

orchestrated campaign to interfere in the 2016 U.S. presidential election—the overriding

focus  of Steele's reports.  This is a plausible and, indeed, inescapable inference of fact

based on the headings of fifteen of the sixteen CIR's that Defendants dated and/or

published before the end of October, 2016:

US PRESIDENTIAL ELECTION: REPUBLICAN CANDIDATE DONALD
TRUMP'S ACTIVITIES IN RUSSIA AND COMPROMISING RELATIONSHIP
WITH THE KREMLIN (CIR 80 – JUNE 20, 2016)

RUSSIA/US PRESIDENTIAL ELECTION:  FURTHER INDICATIONS OF
EXTENSIVE CONSPIRACY BETWEEN TRUMP'S CAMPAIGN TEAM AND
THE KREMLIN ( CIR 95 – UNDATED)

RUSSIA:  SECRET KREMLIN MEETINGS ATTENDED BY TRUMP ADVISOR,
CARTER PAGE IN MOSCOW (JULY 2016)  (CIR 94 – JULY 19, 2016)

RUSSIA-US PRESIDENTIAL ELECTION:  KREMLIN CONCERN THAT
POLITICAL FALLOUT FROM DNC E-MAIL HACKING AFFAIR SPIRALING
OUT OF CONTROL (CIR 97 – JULY 30, 2016)

RUSSIA/USA:  GROWING BACKLASH IN KREMLIN TO DNC HACKING AND
TRUMP SUPPORT OPERATIONS (CIR 100 - AUGUST 5, 2016)

RUSSIA/US PRESIDENTIAL ELECTION:  SENIOR KREMLIN FIGURE
OUTLINES EVOLVING RUSSIAN TACTICS IN PRO-TRUMP, ANTI-CLINTON
OPERATION (CIR 101 – AUGUST 10, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: REACTION IN TRUMP CAMP TO
RECENT NEGATIVE PUBLICITY ABOUT RUSSIAN INTERFERENCE AND
LIKELY RESULTING TACTICS GOING FORWARD (CIR 102 – AUGUST 10,
2016)

RUSSIA/US PRESIDENTIAL ELECTION:  FURTHER DETAILS OF TRUMP
LAWYER COHEN'S SECRET LIAISON WITH THE KREMLIN (CIR 136 –
OCTOBER 20, 2016)

RUSSIA/UKRAINE:  THE DEMISE OF TRUMP'S CAMPAIGN MANAGER
PAUL MANAFORT (CIR 105 – AUGUST 22, 2016)

RUSSIA/US:  KREMLIN FALLOUT FROM MEDIA EXPOSURE OF
MOSCOW'S INTERFERENCE IN THE US PRESIDENTIAL CAMPAIGN (CIR
111 – SEPTEMBER 14, 2016)

RUSSIA/US PRESIDENTIAL ELECTION:  KREMLIN-ALPHA GROUP CO-
OPERATION (CIR 112 – SEPTEMBER 14, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: REPUBLICAN CANDIDATE
TRUMP'S PRIOR ACTIVITIES IN ST. PETERSBURG (CIR 113 – SEPTEMBER
14, 2016)

RUSSIA: KREMLIN ASSESSMENT OF TRUMP AND RUSSIA INTERFER-
ENCE IN US PRESIDENTIAL ELECTION (CIR 130 – OCTOBER 12, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: FURTHER DETAILS OF KREMLIN
LIAISON WITH TRUMP CAMPAIGN  (CIR 134 – OCTOBER 18, 2016)

20.     CIR 112 , in sections labeled "Summary" and "Detail," makes a series of

factual allegations about the "current closeness" of an "Alpha Group/PUTIN

relationship," including that "[s]ignificant favors continue to be done in both directions"

and that "FRIDMAN and AVEN [are] still giving informal advice to PUTIN, especially

on the US."

21.     The Summary section of CIR 112 identifies a former employee of Alfa,

Oleg Govorun, who is now the head of a government department in Putin's

administration, as a "key intermediary" in the "PUTIN-Alfa relationship."  CIR 112

alleges that Govorun "delivered illicit cash directly to PUTIN" "throughout the 1990s,"

when Govorun was an "Alpha executive" and Putin was the Deputy Mayor of St.

Petersburg.

22.     The first paragraph of the Detail section of CIR 112 states the full names

of Plaintiffs Fridman, Aven, and Khan.  It then includes a report from an unnamed

"Russian government official:"

> although they have had their ups and downs, the leading
> figures in Alpha currently are on very good terms with
> PUTIN.  Significant favors continued to be done in both
> directions, primarily political ones for PUTIN and
> business/legal ones for Alpha. Also, FRIDMAN and
> AVEN continued to give informal advice to PUTIN on

foreign policy, and especially about the US where he distrusted advice being given him by officials.

23.     Under any reasonable reading of CIR 112, alone, and in the context of the full Dossier and the headings of sixteen of its seventeen CIR's ("the Trump/Russia context"), Plaintiffs Fridman, Aven, and Khan, along with Alfa, are alleged to maintain a highly inappropriate, and even criminal, relationship with Putin, based on criminal interaction dating back to the 1990s. By clear and defamatory implication, CIR 112 purports to tie the Plaintiffs to a Kremlin-orchestrated campaign to interfere in the 2016 U.S. election.

24.     The second paragraph of the Detail section alleges that Mr. Fridman "recently met directly with PUTIN" and that "much of the dialogue and business between them was mediated" by Govorun, the former Alfa employee. The paragraph describes Govorun as a "senior Presidential Administration official" who is "trusted by PUTIN:"

> during the 1990s GOVORUN had been Head of Government Relations at Alpha Group and in reality the 'driver' and 'bag carrier' used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St. Petersburg. Given that and the continuing sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN.

25.     These allegations are false. Oleg Govorun was not employed by Alfa Bank until after Mr. Putin left St. Petersburg to join the Yeltsin administration in Moscow. The defamatory nature of these allegations, even when read alone, is clear: CIR 112 alleges that, in the 1990s, Alfa (a member of "Alpha Group") and two of its

.

-14-

largest beneficial owners purportedly engaged in acts of criminal bribery of Vladimir

Putin, a public official, to secure favorable business treatment.

26.     Those statements, considered in the Trump/Russia context of the Dossier

as a whole, imply that the alleged improper relationship between Alfa, the Plaintiffs, and

Putin, which purportedly started in the 1990s, is currently ongoing, and that Govorun, the

alleged "bag carrier" of the 1990s, who is now a senior official in Putin's administration,

serves as the trusted intermediary between the Plaintiffs and Putin in the alleged

cooperation of Plaintiffs in the Trump/Russia conspiracy.

27.     The third paragraph of the Detail section characterizes the "PUTIN-Alpha

relationship as both a carrot and stick:"

> Alpha held 'kompromat' on PUTIN and his corrupt
> business activities from the 1990s whilst although not
> personally overly bothered by Alpha's failure to reinvest
> the proceeds of its TNK oil company sales into the Russian
> economy since, the Russian president was able to use
> pressure on this count from senior Kremlin colleagues as a
> lever on FRIDMAN and AVEN to make them do his
> political bidding.

28.     This passage is defamatory in several ways:  read in the context of the

Dossiser's Trump/Russia theme, it suggests that Plaintiffs Fridman and Aven use their

knowledge of past bribery of Putin—"kompromat"—as a means of criminally extorting

continuing favorable treatment for their business interests from his government.  It also

implies that Alfa and two of its largest beneficial owners, Plaintiffs Fridman and Aven,

willingly maintain a close relationship with Putin and cooperated in some unspecified

way in the Kremlin's alleged campaign to interfere in the U.S. election in an effort to

avoid retribution from Putin for not reinvesting business proceeds in Russia.

29.   The statements about the Plaintiffs in the context of the Dossier as a whole are false, defamatory, and gravely damaging.  The statements in the Detail section of CIR 112 about Plaintiffs allege a criminal relationship with Mr. Putin in the 1990s, in addition to and apart from the defamatory implications described above, even if considered independently, raising substantial questions about why these almost twenty-year-old allegations were included by Defendants in a Dossier of "oppo research" about Donald Trump.  The statements of CIR 112, published in an unverified report attributed to an anonymous "top level Russian official" of unknown credibility or existence, raise a clear and plausible inference of reckless disregard of truth or falsity by Defendants.

## CAUSE OF ACTION

30.   Plaintiffs repeat and reallege paragraphs 1-29 above.

31.   By their direct and intentional publication to third parties such as clients, news media, journalists, and others, and by the foreseeable republication of the Dossier and CIR 112 by someone in that group, the Defendants published to a worldwide public false and defamatory statements concerning Plaintiffs and Alfa, including that:

(a)   they are implicated in the scandalous allegations involving Russia and President Trump referred to in CIR 112 and the other CIRs in the Dossier;

(b)   they and other officials and employees of Alfa "cooperated" with an alleged Kremlin campaign to interfere in the U.S. presidential election;

(c)   they are parties to a highly inappropriate, and even criminal, relationship with Vladimir Putin;

-16-

(d)     they engaged in acts of criminal bribery of Vladimir Putin, then the

Deputy Mayor of St. Petersburg, in the 1990s to secure favorable business

treatment; and

(e)     they continue to use their knowledge of past bribery of Putin as a

means of criminally extorting continuing favorable treatment for their business

interests from the Putin government.

32.     Readers of the CIRs and Dossier were also led to understand, incorrectly,

that as a result of their alleged past—and current—close relationships and corrupt

dealings with Mr. Putin, the Plaintiffs and Alfa were and are required to do Putin's

bidding, including by cooperating in the Kremlin's alleged efforts to influence the

outcome of the recent U.S. presidential election.

33.     The false statements by the Defendants referred to above defamed the

Plaintiffs and Alfa, and have caused and will continue to cause serious injury to their

personal, professional, and institutional reputations.

34.     The false and defamatory statements published and republished by the

Defendants concerning the Plaintiffs and Alfa, as well as the obvious implications of

those statements, were made negligently or with reckless disregard of whether they were

true or false.

35.     Defendants are liable for the defamation of Plaintiffs and Alfa, and the

resulting harm caused by the news media coverage of the Dossier, including the

republication by BuzzFeed and countless other media.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.

-17-

WHEREFORE, Plaintiffs Mikhail Fridman, Petr Aven, and German Khan

demand judgment against Defendants Bean LLC, Fusion GPS, and Glenn Simpson for:

      a.      compensatory damages in an amount to be proved at trial, together with

interest and the costs and disbursements of this action, plus reasonable attorneys' fees;

      b.      punitive damages in an amount to be determined at trial; and

      c.      such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       December 12, 2017

By:          */s/ Alan S. Lewis*
          Alan S. Lewis, Esq. (#NY0252)
          John J. Walsh, Esq.
          CARTER LEDYARD & MILBURN LLP
          2 Wall Street
          New York, N.Y. 10005
          Telephone:  212-238-8647
          *Counsel for Plaintiffs*
          *Mikhail Fridman, et al.*

          *Of Counsel:*

          Kim H. Sperduto, Esq. (# 416127)
          SPERDUTO THOMPSON PLC
          1133 Twentieth Street, NW Second Floor
          Washington, D.C. 20036
          Telephone:    202-408-8900

BuzzFeed Article and Dossier

# BuzzFeed News

**REPORTING TO YOU**

# These Reports Allege Trump Has Deep Ties To Russia

A dossier, compiled by a person who has claimed to be a former British intelligence official, alleges Russia has compromising information on Trump. The allegations are unverified, and the report contains errors.


**Ken Bensinger**
BuzzFeed News Reporter


**Miriam Elder**
BuzzFeed News Reporter


**Mark Schoofs**
BuzzFeed News contributor

Last updated on January 10, 2017, at 9:09 p.m. ET
Posted on January 10, 2017, at 6:20 p.m. ET






*Drew Angerer | Getty Images*

A dossier making explosive — but unverified — allegations that the Russian government has been "cultivating, supporting and assisting" President-elect Donald Trump for years and gained compromising information about him has been circulating among elected officials, intelligence agents, and journalists for weeks.

The dossier, which is a collection of memos written over a period of months, includes specific, unverified, and potentially unverifiable allegations of contact between Trump aides and Russian operatives, and graphic claims of sexual acts documented by the Russians. BuzzFeed News reporters in the US and Europe have been investigating various alleged facts in the dossier but have not verified or falsified them. CNN reported Tuesday that a two-page synopsis of the report was given to President Obama and Trump.

Now BuzzFeed News is publishing the full document so that Americans can make up their own minds about allegations about the president-elect that have circulated at the highest levels of the US government.

The document was prepared for political opponents of Trump by a person who is understood to be a former British intelligence agent. It is not just unconfirmed: It includes some clear errors. The report misspells the

name of one company, "Alpha Group," throughout. It is
Alfa Group. The report says the settlement of Barvikha,
outside Moscow, is "reserved for the residences of the
top leadership and their close associates." It is not
reserved for anyone, and it is also populated by the very
wealthy.

The Trump administration's transition team did not
immediately respond to BuzzFeed News' request for
comment. However, the president-elect's attorney,
Michael Cohen, told *Mic* that the allegations were
absolutely false.

"It's so ridiculous on so many levels," he said. "Clearly,
the person who created this did so from their
imagination or did so hoping that the liberal media
would run with this fake story for whatever rationale
they might have."

And Trump shot back against the reports a short time
later on Twitter.

 FAKE NEWS - A TOTAL POLITICAL WITCH                **Donald J. Trump**
                                                                        @realDonaldTrump

FAKE NEWS - A TOTAL POLITICAL WITCH HUNT!

01:19 AM - 11 Jan 2017

    Reply    Retweet    Favorite

His former campaign manager and current senior White
House adviser, Kellyanne Conway, also denied the claims

during <u>an appearance</u> on *Late Night With Seth Meyers,* adding that "nothing has been confirmed." She also said Trump was "not aware" of any briefing on the matter.

The documents have circulated for months and acquired a kind of legendary status among journalists, lawmakers, and intelligence officials who have seen them. *Mother Jones* writer David Corn referred to the documents in <u>a late October column.</u>

Harry Reid spokesman Adam Jentleson tweeted Tuesday that the former Senate Democratic leader had seen the documents before writing a public letter to FBI Director James Comey about Trump's ties to Russia. And CNN reported Tuesday that Arizona Republican John McCain gave a "full copy" of the memos to Comey on Dec. 9, but that the FBI already had copies of many of the memos.

## If you have tips related to this story, write us at trumpstories@buzzfeed.com. To send us information confidentially, go <u>here.</u>

## Read the report here:

To print the document, click the "Original Document" link to open the original PDF. At this time it is not possible to print the document with annotations.

**TOPICS IN THIS ARTICLE**

( Russia )

 Ken Bensinger is an
investigative reporter
for BuzzFeed News and
is based in Los Angeles.
He is the author of "Red
Card," on the FIFA

 Miriam Elder is a
political reporter for
BuzzFeed News and is
based in New York. Her
secure PGP fingerprint
is 5B5F EC17 C20B

These Reports Allege Trump Has Deep Ties To Russia

scandal. His DMs are

C11F 226D 3EBE 6205

The Village Voice, he
won the 2009 Pulitzer

CONFIDENTIAL/SENSITIVE SOURCE

COMPANY INTELLIGENCE REPORT 2016/080

## US PRESIDENTIAL ELECTION: REPUBLICAN CANDIDATE DONALD TRUMP'S ACTIVITIES IN RUSSIA AND COMPROMISING RELATIONSHIP WITH THE KREMLIN

### Summary

- Russian regime has been cultivating, supporting and assisting TRUMP for at least 5 years. Aim, endorsed by PUTIN, has been to encourage splits and divisions in western alliance

- So far TRUMP has declined various sweetener real estate business deals offered him in Russia in order to further the Kremlin's cultivation of him. However he and his inner circle have accepted a regular flow of intelligence from the Kremlin, including on his Democratic and other political rivals

- Former top Russian intelligence officer claims FSB has compromised TRUMP through his activities in Moscow sufficiently to be able to blackmail him. According to several knowledgeable sources, his conduct in Moscow has included perverted sexual acts which have been arranged/monitored by the FSB

- A dossier of compromising material on Hillary CLINTON has been collated by the Russian Intelligence Services over many years and mainly comprises bugged conversations she had on various visits to Russia and intercepted phone calls rather than any embarrassing conduct. The dossier is controlled by Kremlin spokesman, PESKOV, directly on PUTIN's orders. However it has not as yet been distributed abroad, including to TRUMP. Russian intentions for its deployment still unclear

### Detail

1. Speaking to a trusted compatriot in June 2016 sources A and B, a senior Russian Foreign Ministry figure and a former top level Russian intelligence officer still active inside the Kremlin respectively, the Russian authorities had been cultivating and supporting US Republican presidential candidate, Donald TRUMP for at least 5 years. Source B asserted that the TRUMP operation was both supported and directed by Russian President Vladimir PUTIN. Its aim was to sow discord and

CONFIDENTIAL/SENSITIVE SOURCE

CONFIDENTIAL/SENSITIVE SOURCE

disunity both within the US itself, but more especially within the Transatlantic alliance which was viewed as inimical to Russia's interests. Source C, a senior Russian financial official said the TRUMP operation should be seen in terms of PUTIN's desire to return to Nineteenth Century 'Great Power' politics anchored upon countries' interests rather than the ideals-based international order established after World War Two. S/he had overheard PUTIN talking in this way to close associates on several occasions.

2. In terms of specifics, Source A confided that the Kremlin had been feeding TRUMP and his team valuable intelligence on his opponents, including Democratic presidential candidate Hillary CLINTON, for several years (see more below). This was confirmed by Source D, a close associate of TRUMP who had organized and managed his recent trips to Moscow, and who reported, also in June 2016, that this Russian intelligence had been "very helpful". The Kremlin's cultivation operation on TRUMP also had comprised offering him various lucrative real estate development business deals in Russia, especially in relation to the ongoing 2018 World Cup soccer tournament. However, so far, for reasons unknown, TRUMP had not taken up any of these.

3. However, there were other aspects to TRUMP's engagement with the Russian authorities. One which had borne fruit for them was to exploit TRUMP's personal obsessions and sexual perversion in order to obtain suitable 'kompromat' (compromising material) on him. According to Source D, where s/he had been present, TRUMP's (perverted) conduct in Moscow included hiring the presidential suite of the Ritz Carlton Hotel, where he knew President and Mrs OBAMA (whom he hated) had stayed on one of their official trips to Russia, and defiling the bed where they had slept by employing a number of prostitutes to perform a 'golden showers' (urination) show in front of him. The hotel was known to be under FSB control with microphones and concealed cameras in all the main rooms to record anything they wanted to.

4. The Moscow Ritz Carlton episode involving TRUMP reported above was confirmed by Source E, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, who said that s/he and several of the staff were aware of it at the time and subsequently. S/he believed it had happened in 2013. Source E provided an introduction for a company ethnic Russian operative to Source F, a female staffer at the hotel when TRUMP had stayed there, who also confirmed the story. Speaking separately in June 2016, Source B (the former top level Russian intelligence officer) asserted that TRUMP's unorthodox behavior in Russia over the years had provided the authorities there with enough embarrassing material on the now Republican presidential candidate to be able to blackmail him if they so wished.

5. Asked about the Kremlin's reported intelligence feed to TRUMP over recent years and rumours about a Russian dossier of 'kompromat' on

CONFIDENTIAL/SENSITIVE SOURCE

CONFIDENTIAL/SENSITIVE SOURCE

Hillary CLINTON (being circulated), Source B confirmed the file's existence. S/he confided in a trusted compatriot that it had been collated by Department K of the FSB for many years, dating back to her husband Bill's presidency, and comprised mainly eavesdropped conversations of various sorts rather than details/evidence of unorthodox or embarrassing behavior. Some of the conversations were from bugged comments CLINTON had made on her various trips to Russia and focused on things she had said which contradicted her current position on various issues. Others were most probably from phone intercepts.

6. Continuing on this theme, Source G, a senior Kremlin official, confided that the CLINTON dossier was controlled exclusively by chief Kremlin spokesman, Dmitriy PESKOV, who was responsible for compiling/handling it on the explicit instructions of PUTIN himself. The dossier however had not as yet been made available abroad, including to TRUMP or his campaign team. At present it was unclear what PUTIN's intentions were in this regard.

20 June 2016

3

CONFIDENTIAL/SENSITIVE SOURCE

COMPANY INTELLIGENCE REPORT 2016/086

## RUSSIA/CYBER CRIME: A SYNOPSIS OF RUSSIAN STATE SPONSORED AND OTHER CYBER OFFENSIVE (CRIMINAL) OPERATIONS

### Summary

- Russia has extensive programme of state-sponsored offensive cyber operations. External targets include foreign governments and big corporations, especially banks. FSB leads on cyber within Russian apparatus. Limited success in attacking top foreign targets like G7 governments, security services and IFIs but much more on second tier ones through IT back doors, using corporate and other visitors to Russia

- FSB often uses coercion and blackmail to recruit most capable cyber operatives in Russia into its state-sponsored programmes. Heavy use also, both wittingly and unwittingly, of CIS emigres working in western corporations and ethnic Russians employed by neighbouring governments e.g. Latvia

- Example cited of successful Russian cyber operation targeting senior Western business visitor. Provided back door into important Western institutions.

- Example given of US citizen of Russian origin approached by FSB and offered incentive of "investment" in his business when visiting Moscow.

- Problems however for Russian authorities themselves in countering local hackers and cyber criminals, operating outside state control. Central Bank claims there were over 20 serious attacks on correspondent accounts held by CBR in 2015, comprising Roubles several billion in fraud

- Some details given of leading non-state Russian cyber criminal groups

### Details

1. Speaking in June 2016, a number of Russian figures with a detailed knowledge of national cyber crime, both state-sponsored and otherwise, outlined the current situation in this area. A former senior intelligence officer divided Russian state-sponsored offensive cyber operations into four categories (in order of priority):- targeting foreign, especially

CONFIDENTIAL/SENSITIVE SOURCE

CONFIDENTIAL/SENSITIVE SOURCE

western governments; penetrating leading foreign business corporations, especially banks; domestic monitoring of the elite; and attacking political opponents both at home and abroad. The former intelligence officer reported that the Federal Security Service (FSB) was the lead organization within the Russian state apparatus for cyber operations.

2.  In terms of the success of Russian offensive cyber operations to date, a senior government figure reported that there had been only limited success in penetrating the "first tier" foreign targets. These comprised western (especially G7 and NATO) governments, security and intelligence services and central banks, and the IFIs. To compensate for this shortfall, massive effort had been invested, with much greater success, in attacking the "secondary targets", particularly western private banks and the governments of smaller states allied to the West. S/he mentioned Latvia in this regard. Hundreds of agents, either consciously cooperating with the FSB or whose personal and professional IT systems had been unwittingly compromised, were recruited. Many were people who had ethnic and family ties to Russia and/or had been incentivized financially to cooperate. Such people often would receive monetary inducements or contractual favours from the Russian state or its agents in return. This had created difficulties for parts of the Russian state apparatus in obliging/indulging them e.g. the Central Bank of Russia knowingly having to cover up for such agents' money laundering operations through the Russian financial system.

3.  In terms of the FSB's recruitment of capable cyber operatives to carry out its, ideally deniable, offensive cyber operations, a Russian IT specialist with direct knowledge reported in June 2016 that this was often done using coercion and blackmail. In terms of 'foreign' agents, the FSB was approaching US citizens of Russian (Jewish) origin on business trips to Russia. In one case a US citizen of Russian ethnicity had been visiting Moscow to attract investors in his new information technology program. The FSB clearly knew this and had offered to provide seed capital to this person in return for them being able to access and modify his IP, with a view to targeting priority foreign targets by planting a Trojan virus in the software. The US visitor was told this was common practice. The FSB also had implied significant operational success as a result of installing cheap Russian IT games containing their own malware unwittingly by targets on their PCs and other platforms.

4.  In a more advanced and successful FSB operation, an IT operator inside a leading Russian SOE, who previously had been employed on conventional (defensive) IT work there, had been under instruction for the last year to conduct an offensive cyber operation against a foreign director of the company. Although the latter was apparently an infrequent visitor to Russia, the FSB now successfully had penetrated his personal IT and through this had managed to access various important institutions in the West through the back door.

CONFIDENTIAL/SENSITIVE SOURCE

CONFIDENTIAL/SENSITIVE SOURCE

5.   In terms of other technical IT platforms, an FSB cyber operative flagged
     up the 'Telegram' enciphered commercial system as having been of
     especial concern and therefore heavily targeted by the FSB, not least
     because it was used frequently by Russian internal political activists and
     oppositionists. His/her understanding was that the FSB now successfully
     had cracked this communications software and therefore it was no longer
     secure to use.

6.   The senior Russian government figure cited above also reported that
     non-state sponsored cyber crime was becoming an increasing problem
     inside Russia for the government and authorities there. The Central Bank
     of Russia claimed that in 2015 alone there had been more than 20
     attempts at serious cyber embezzlement of money from corresponding
     accounts held there, comprising several billions Roubles. More generally,
     s/he understood there were circa 15 major organised crime groups in the
     country involved in cyber crime, all of which continued to operate largely
     outside state and FSB control. These included the so-called 'Anunak',
     'Buktrap' and 'Metel' organisations.

**26 July 2015**

COMPANY INTELLIGENCE REPORT 2016/095

## RUSSIA/US PRESIDENTIAL ELECTION: FURTHER INDICATIONS OF EXTENSIVE CONSPIRACY BETWEEN TRUMP'S CAMPAIGN TEAM AND THE KREMLIN

### Summary

- Further evidence of extensive conspiracy between TRUMP's campaign team and Kremlin, sanctioned at highest levels and involving Russian diplomatic staff based in the US

- TRUMP associate admits Kremlin behind recent appearance of DNC e-mails on WikiLeaks, as means of maintaining plausible deniability

- Agreed exchange of information established in both directions. TRUMP's team using moles within DNC and hackers in the US as well as outside in Russia. PUTIN motivated by fear and hatred of Hillary CLINTON. Russians receiving intel from TRUMP's team on Russian oligarchs and their families in US

- Mechanism for transmitting this intelligence involves "pension" disbursements to Russian emigres living in US as cover, using consular officials in New York, DC and Miami

- Suggestion from source close to TRUMP and MANAFORT that Republican campaign team happy to have Russia as media bogeyman to mask more extensive corrupt business ties to China and other emerging countries

### Detail

1. Speaking in confidence to a compatriot in late July 2016, Source E, an ethnic Russian close associate of Republican US presidential candidate Donald TRUMP, admitted that there was a well-developed conspiracy of co-operation between them and the Russian leadership. This was managed on the TRUMP side by the Republican candidate's campaign manager, Paul MANAFORT, who was using foreign policy advisor, Carter PAGE, and others as intermediaries. The two sides had a mutual interest in defeating Democratic presidential candidate Hillary CLINTON, whom President PUTIN apparently both hated and feared.

2. Inter alia, Source E, acknowledged that the Russian regime had been behind the recent leak of embarrassing e-mail messages, emanating from the Democratic National Committee (DNC), to the WikiLeaks platform.

**CONFIDENTIAL/SENSITIVE SOURCE**

CONFIDENTIAL/SENSITIVE SOURCE

The reason for using WikiLeaks was "plausible deniability" and the operation had been conducted with the full knowledge and support of TRUMP and senior members of his campaign team. In return the TRUMP team had agreed to sideline Russian intervention in Ukraine as a campaign issue and to raise US/NATO defence commitments in the Baltics and Eastern Europe to deflect attention away from Ukraine, a priority for PUTIN who needed to cauterise the subject.

3. In the wider context of TRUMP campaign/Kremlin co-operation, Source E claimed that the intelligence network being used against CLINTON comprised three elements. Firstly there were agents/facilitators within the Democratic Party structure itself; secondly Russian émigré and associated offensive cyber operators based in the US; and thirdly, state-sponsored cyber operatives working in Russia. All three elements had played an important role to date. On the mechanism for rewarding relevant assets based in the US, and effecting a two-way flow of intelligence and other useful information, Source E claimed that Russian diplomatic staff in key cities such as New York, Washington DC and Miami were using the émigré 'pension' distribution system as cover. The operation therefore depended on key people in the US Russian émigré community for its success. Tens of thousands of dollars were involved.

4. In terms of the intelligence flow from the TRUMP team to Russia, Source E reported that much of this concerned the activities of business oligarchs and their families' activities and assets in the US, with which PUTIN and the Kremlin seemed preoccupied.

5. Commenting on the negative media publicity surrounding alleged Russian interference in the US election campaign in support of TRUMP, Source E said he understood that the Republican candidate and his team were relatively relaxed about this because it deflected media and the Democrats' attention away from TRUMP's business dealings in China and other emerging markets. Unlike in Russia, these were substantial and involved the payment of large bribes and kickbacks which, were they to become public, would be potentially very damaging to their campaign.

6. Finally, regarding TRUMP's claimed minimal investment profile in Russia, a separate source with direct knowledge said this had not been for want of trying. TRUMP's previous efforts had included exploring the real estate sector in St Petersburg as well as Moscow but in the end TRUMP had had to settle for the use of extensive sexual services there from local prostitutes rather than business success.

CONFIDENTIAL/SENSITIVE SOURCE

**COMPANY INTELLIGENCE REPORT 2016/94**

**RUSSIA: SECRET KREMLIN MEETINGS ATTENDED BY TRUMP ADVISOR, CARTER PAGE IN MOSCOW (JULY 2016)**

### Summary

- TRUMP advisor Carter PAGE holds secret meetings in Moscow with SECHIN and senior Kremlin Internal Affairs official, DIVYEKIN

- SECHIN raises issues of future bilateral US-Russia energy co-operation and associated lifting of western sanctions against Russia over Ukraine. PAGE non-committal in response

- DIVEYKIN discusses release of Russian dossier of 'kompromat' on TRUMP's opponent, Hillary CLINTON, but also hints at Kremlin possession of such material on TRUMP

### Detail

1. Speaking in July 2016, a Russian source close to Rosneft President, PUTIN close associate and US-sanctioned individual, Igor SECHIN, confided the details of a recent secret meeting between him and visiting Foreign Affairs Advisor to Republican presidential candidate Donald TRUMP, Carter PAGE.

2. According to SECHIN's associate, the Rosneft President (CEO) had raised with PAGE the issues of future bilateral energy cooperation and prospects for an associated move to lift Ukraine-related western sanctions against Russia. PAGE had reacted positively to this demarche by SECHIN but had been generally non-committal in response.

3. Speaking separately, also in July 2016, an official close to Presidential Administration Head, S. IVANOV, confided in a compatriot that a senior colleague in the Internal Political Department of the PA, DIVYEKIN (nfd) also had met secretly with PAGE on his recent visit. Their agenda had included DIVEYKIN raising a dossier of 'kompromat' the Kremlin possessed on TRUMP's Democratic presidential rival, Hillary CLINTON, and its possible release to the Republican's campaign team.

4. However, the Kremlin official close to S. IVANOV added that s/he believed DIVEYKIN also had hinted (or indicated more strongly) that the Russian leadership also had 'kompromat' on TRUMP which the latter should bear in mind in his dealings with them.

19 July 2016

COMPANY INTELLIGENCE REPORT 2016/097

**RUSSIA-US PRESIDENTIAL ELECTION: KREMLIN CONCERN THAT POLITICAL FALLOUT FROM DNC E-MAIL HACKING AFFAIR SPIRALLING OUT OF CONTROL**

**Summary**

- Kremlin concerned that political fallout from DNC e-mail hacking operation is spiralling out of control. Extreme nervousness among TRUMP's associates as result of negative media attention/accusations

- Russians meanwhile keen to cool situation and maintain 'plausible deniability' of existing /ongoing pro-TRUMP and anti-CLINTON operations. Therefore unlikely to be any ratcheting up offensive plays in immediate future

- Source close to TRUMP campaign however confirms regular exchange with Kremlin has existed for at least 8 years, including intelligence fed back to Russia on oligarchs' activities in US

- Russians apparently have promised not to use 'kompromat' they hold on TRUMP as leverage, given high levels of voluntary co-operation forthcoming from his team

**Detail**

1. Speaking in confidence to a trusted associate in late July 2016, a Russian émigré figure close to the Republican US presidential candidate Donald TRUMP's campaign team commented on the fallout from publicity surrounding the Democratic National Committee (DNC) e-mail hacking scandal. The émigré said there was a high level of anxiety within the TRUMP team as a result of various accusations levelled against them and indications from the Kremlin that President PUTIN and others in the leadership thought things had gone too far now and risked spiralling out of control.

2. Continuing on this theme, the émigré associate of TRUMP opined that the Kremlin wanted the situation to calm but for 'plausible deniability' to be maintained concerning its (extensive) pro-TRUMP and anti-CLINTON operations. S/he therefore judged that it was unlikely these would be ratcheted up, at least for the time being.

3. However, in terms of established operational liaison between the TRUMP team and the Kremlin, the émigré confirmed that an intelligence exchange had been running between them for at least 8 years. Within this context PUTIN's priority requirement had been for intelligence on the activities, business and otherwise, in the US of leading Russian oligarchs and their families. TRUMP and his associates duly had obtained and supplied the Kremlin with this information.

4. Finally, the émigré said s/he understood the Kremlin had more intelligence on CLINTON and her campaign but he did not know the details or when or if it would be released. As far as 'kompromat' (compromising information) on TRUMP were concerned, although there was plenty of this, he understood the Kremlin had given its word that it would not be deployed against the Republican presidential candidate given how helpful and co-operative his team had been over several years, and particularly of late.

**30 July 2016**

12

COMPANY INTELLIGENCE REPORT 2016/100

RUSSIA/USA: GROWING BACKLASH IN KREMLIN TO DNC HACKING AND
TRUMP SUPPORT OPERATIONS

## Summary

- Head of PA IVANOV laments Russian intervention in US presidential
  election and black PR against CLINTON and the DNC. Vows not to supply
  intelligence to Kremlin PR operatives again. Advocates now sitting tight
  and denying everything

- Presidential spokesman PESKOV the main protagonist in Kremlin
  campaign to aid TRUMP and damage CLINTON. He is now scared and
  fears being made scapegoat by leadership for backlash in US. Problem
  compounded by his botched intervention in recent Turkish crisis

- Premier MEDVEDEV's office furious over DNC hacking and associated
  anti-Russian publicity. Want good relations with US and ability to travel
  there. Refusing to support or help cover up after PESKOV

- Talk now in Kremlin of TRUMP withdrawing from presidential race
  altogether, but this still largely wishful thinking by more liberal elements
  in Moscow

## Detail

1. Speaking in early August 2016, two well-placed and established Kremlin
   sources outlined the divisions and backlash in Moscow arising from the
   leaking of Democratic National Committee (DNC) e-mails and the wider
   pro-TRUMP operation being conducted in the US. Head of Presidential
   Administration, Sergei IVANOV, was angry at the recent turn of events.
   He believed the Kremlin "team" involved, led by presidential spokesman
   Dmitriy PESKOV, had gone too far in interfering in foreign affairs with
   their "elephant in a china shop black PR". IVANOV claimed always to have
   opposed the handling and exploitation of intelligence by this PR "team".
   Following the backlash against such foreign interference in US politics,
   IVANOV was advocating that the only sensible course of action now for
   the Russian leadership was to "sit tight and deny everything".

2. Continuing on this theme the source close to IVANOV reported that
   PESKOV now was "scared shitless" that he would be scapegoated by
   PUTIN and the Kremlin and held responsible for the backlash against
   Russian political interference in the US election. IVANOV was determined

13

to stop PESKOV playing an independent role in relation to the US going forward and the source fully expected the presidential spokesman now to lay low. PESKOV's position was not helped by a botched attempt by him also to interfere in the recent failed coup in Turkey from a government relations (GR) perspective (no further details).

3. The extent of disquiet and division within Moscow caused by the backlash against Russian interference in the US election was underlined by a second source, close to premier Dmitriy MEDVEDEV (DAM). S/he said the Russian prime minister and his colleagues wanted to have good relations with the US, regardless of who was in power there, and not least so as to be able to travel there in future, either officially or privately. They were openly refusing to cover up for PESKOV and others involved in the DNC/TRUMP operations or to support his counter-attack of allegations against the USG for its alleged hacking of the Russian government and state agencies.

4. According to the first source, close to IVANOV, there had been talk in the Kremlin of TRUMP being forced to withdraw from the presidential race altogether as a result of recent events, ostensibly on grounds of his psychological state and unsuitability for high office. This might not be so bad for Russia in the circumstances but in the view of the source, it remained largely wishful thinking on the part of those in the regime opposed to PESKOV and his "botched" operations, at least for the time being.

5 August 2016

14

COMPANY INTELLIGENCE REPORT 2016/101

RUSSIA/US PRESIDENTIAL ELECTION: SENIOR KREMLIN FIGURE OUTLINES EVOLVING RUSSIAN TACTICS IN PRO-TRUMP, ANTI-CLINTON OPERATION

Summary

- Head of PA, IVANOV assesses Kremlin intervention in US presidential election and outlines leadership thinking on operational way forward

- No new leaks envisaged, as too politically risky, but rather further exploitation of (WikiLeaks) material already disseminated to exacerbate divisions

- Educated US youth to be targeted as protest (against CLINTON) and swing vote in attempt to turn them over to TRUMP

- Russian leadership, including PUTIN, celebrating perceived success to date in splitting US hawks and elite

- Kremlin engaging with several high profile US players, including STEIN, PAGE and (former DIA Director Michael Flynn), and funding their recent visits to Moscow

Details

1. Speaking in confidence to a close colleague in early August 2016, Head of the Russian Presidential Administration (PA), Sergei IVANOV, assessed the impact and results of Kremlin intervention in the US presidential election to date. Although most commentators believed that the Kremlin was behind the leaked DNC/CLINTON e-mails, this remained technically deniable. Therefore the Russians would not risk their position for the time being with new leaked material, even to a third party like WikiLeaks. Rather the tactics would be to spread rumours and misinformation about the content of what already had been leaked and make up new content.

2. Continuing on this theme, IVANOV said that the audience to be targeted by such operations was the educated youth in America as the PA assessed that there was still a chance they could be persuaded to vote for Republican candidate Donald TRUMP as a protest against the Washington establishment (in the form of Democratic candidate Hillary CLINTON). The hope was that even if she won, as a result of this CLINTON in power would be bogged down in working for internal reconciliation in the US, rather than being able to focus on foreign policy which would damage Russia's interests. This also should give President PUTIN more room for manoeuvre in the run-up to Russia's own presidential election in 2018.

3. IVANOV reported that although the Kremlin had underestimated the strength of US media and liberal reaction to the DNC hack and TRUMP's links to Russia, PUTIN was generally satisfied with the progress of the anti-CLINTON operation to date. He recently had had a drink with PUTIN to mark this. In IVANOV's view, the US had tried to divide the Russian elite with sanctions but failed, whilst they, by contrast, had succeeded in splitting the US hawks inimical to Russia and the Washington elite more generally, half of whom had refused to endorse any presidential candidate as a result of Russian intervention.

4. Speaking separately, also in early August 2016, a Kremlin official involved in US relations commented on aspects of the Russian operation to date. Its goals had been threefold- asking sympathetic US actors how Moscow could help them; gathering relevant intelligence; and creating and disseminating compromising information ('kompromat'). This had involved the Kremlin supporting various US political figures, including funding indirectly their recent visits to Moscow. S/he named a delegation from Lyndon LAROUCHE; presidential candidate Jill STEIN of the Green Party; TRUMP foreign policy adviser

15

Carter PAGE; and former DIA Director Michael Flynn, in this regard and as successful in terms of perceived outcomes.

10 August 2016

COMPANY INTELLIGENCE REPORT 2016/102

RUSSIA/US PRESIDENTIAL ELECTION: REACTION IN TRUMP CAMP TO RECENT NEGATIVE PUBLICITY ABOUT RUSSIAN INTERFERENCE AND LIKELY RESULTING TACTICS GOING FORWARD

Summary

- TRUMP campaign insider reports recent DNC e-mail leaks were aimed at switching SANDERS (protest) voters away from CLINTON and over to TRUMP

- Admits Republican campaign underestimated resulting negative reaction from US liberals, elite and media and forced to change course as result

- Need now to turn tables on CLINTON's use of PUTIN as bogeyman in election, although some resentment at Russian president's perceived attempt to undermine USG and system over and above swinging presidential election

Detail

1. Speaking in confidence on 9 August 2016, an ethnic Russian associate of Republican US presidential candidate Donald TRUMP discussed the reaction inside his camp, and revised tactics therein resulting from recent negative publicity concerning Moscow's clandestine involvement in the campaign. TRUMP's associate reported that the aim of leaking the DNC e-mails to WikiLeaks during the Democratic Convention had been to swing supporters of Bernie SANDERS away from Hillary CLINTON and across to TRUMP. These voters were perceived as activist and anti-status quo and anti-establishment and in that regard sharing many features with the TRUMP campaign, including a visceral dislike of Hillary CLINTON. This objective had been conceived and promoted, inter alia, by TRUMP's foreign policy adviser Carter PAGE who had discussed it directly with the ethnic Russian associate.

2. Continuing on this theme, the ethnic Russian associate of TRUMP assessed that the problem was that the TRUMP campaign had underestimated the strength of the negative reaction from liberals and especially the conservative elite to Russian interference. This was forcing a rethink and a likely change of tactics. The main objective in the short term was to check Democratic candidate Hillary CLINTON's successful exploitation of the PUTIN as bogeyman/Russian interference story to tarnish TRUMP and bolster her own (patriotic) credentials. The TRUMP campaign was focusing on tapping into support in the American television media to achieve this, as they reckoned this resource had been underused by them to date.

3. However, TRUMP's associate also admitted that there was a fair amount of anger and resentment within the Republican candidate's team at what was perceived by PUTIN as going beyond the objective of weakening CLINTON and bolstering TRUMP, by attempting to exploit the situation to undermine the US government and democratic system more generally. It was unclear at present how this aspect of the situation would play out in the weeks to come.

10 August 2016

17

COMPANY INTELLIGENCE REPORT 2016/136

RUSSIA/US PRESIDENTIAL ELECTION: FURTHER DETAILS OF TRUMP LAWYER
COHEN'S SECRET LIAISON WITH THE KREMLIN

Summary

- Kremlin insider reports TRUMP lawyer COHEN's secret meeting/s with Kremlin officials in
  August 2016 was/were held in Prague

- Russian parastatal organisation Rossotrudnichestvo used as cover for this liaison and premises
  in Czech capital may have been used for the meeting/s

- Pro-PUTIN leading Duma figure, KOSACHEV, reportedly involved as "plausibly deniable"
  facilitator and may have participated in the August meeting/s with COHEN

Detail

1. Speaking to a compatriot and friend on 19 October 2016, a Kremlin insider provided further
   details of reported clandestine meeting/s between Republican presidential candidate, Donald
   TRUMP's lawyer Michael COHEN and Kremlin representatives in August 2016. Although the
   communication between them had to be cryptic for security reasons, the Kremlin insider
   clearly indicated to his/her friend that the reported contact/s took place in Prague, Czech
   Republic.

2. Continuing on this theme, the Kremlin insider highlighted the importance of the Russian
   parastatal organisation, Rossotrudnichestvo, in this contact between TRUMP campaign
   representative/s and Kremlin officials. Rossotrudnichestvo was being used as cover for this
   relationship and its office in Prague may well have been used to host the COHEN/Russian
   Presidential Administration (PA) meeting/s. It was considered a "plausibly deniable" vehicle
   for this, whilst remaining entirely under Kremlin control.

3. The Kremlin insider went on to identify leading pro-PUTIN Duma figure, Konstantin
   KOSACHEV (Head of the Foreign Relations Committee) as an important figure in the TRUMP
   campaign-Kremlin liaison operation. KOSACHEV, also "plausibly deniable" being part of the
   Russian legislature rather than executive, had facilitated the contact in Prague and by
   implication, may have attended the meeting/s with COHEN there in August.

Company Comment

We reported previously, in our Company Intelligence Report 2016/135 of 19 October 2016 from the
same source, that COHEN met officials from the PA Legal Department clandestinely in an EU
country in August 2016. This was in order to clean up the mess left behind by western media
revelations of TRUMP ex-campaign manager MANAFORT's corrupt relationship with the former
pro-Russian YANUKOVYCH regime in Ukraine and TRUMP foreign policy advisor, Carter
PAGE's secret meetings in Moscow with senior regime figures in July 2016. According to the
Kremlin advisor, these meeting/s were originally scheduled for COHEN in Moscow but shifted to

18

what was considered an operationally "soft" EU country when it was judged too compromising for him to travel to the Russian capital.

20 October 2016

19

COMPANY INTELLIGENCE REPORT 2016/105

## RUSSIA/UKRAINE: THE DEMISE OF TRUMP'S CAMPAIGN MANAGER PAUL MANAFORT

### Summary

- Ex-Ukrainian President YANUKOVYCH confides directly to PUTIN that he authorised kick-back payments to MANAFORT, as alleged in western media. Assures Russian President however there is no documentary evidence/trail

- PUTIN and Russian leadership remain worried however and sceptical that YANUKOVYCH has fully covered the traces of these payments to TRUMP's former campaign manager

- Close associate of TRUMP explains reasoning behind MANAFORT's recent resignation. Ukraine revelations played part but others wanted MANAFORT out for various reasons, especially LEWANDOWSKI who remains influential

### Detail

1.  Speaking in late August 2016, in the immediate aftermath of Paul MANAFORT's resignation as campaign manager for US Republican presidential candidate Donald TRUMP, a well-placed Russian figure reported on a recent meeting between President PUTIN and ex-President YANUKOVYCH of Ukraine. This had been held in secret on 15 August near Volgograd, Russia and the western media revelations about MANAFORT and Ukraine had featured prominently on the agenda. YANUKOVYCH had confided in PUTIN that he did authorise and order substantial kick-back payments to MANAFORT as alleged but sought to reassure him that there was no documentary trail left behind which could provide clear evidence of this.

2.  Given YANUKOVYCH's (unimpressive) record in covering up his own corrupt tracks in the past, PUTIN and others in the Russian leadership were sceptical about the ex-Ukrainian president's reassurances on this as relating to MANAFORT. They therefore still feared the scandal had legs, especially as MANAFORT had been commercially active in Ukraine right up to the time (in March 2016) when he joined TRUMP's campaign team. For them it therefore remained a point of potential political vulnerability and embarrassment.

20

3.   Speaking separately, also in late August 2016, an American political figure associated with Donald TRUMP and his campaign outlined the reasons behind MANAFORT's recent demise. S/he said it was true that the Ukraine corruption revelations had played a part in this but also, several senior players close to TRUMP had wanted MANAFORT out, primarily to loosen his control on strategy and policy formulation. Of particular importance in this regard was MANAFORT's predecessor as campaign manager, Corey LEWANDOWSKI, who hated MANAFORT personally and remained close to TRUMP with whom he discussed the presidential campaign on a regular basis.

**22 August 2016**

COMPANY INTELLIGENCE REPORT 2016/111

**RUSSIA/US: KREMLIN FALLOUT FROM MEDIA EXPOSURE OF MOSCOW'S INTERFERENCE IN THE US PRESIDENTIAL CAMPAIGN**

Summary

- Kremlin orders senior staff to remain silent in media and private on allegations of Russian interference in US presidential campaign

- Senior figure however confirms gist of allegations and reports IVANOV sacked as Head of Administration on account of giving PUTIN poor advice on issue. VAINO selected as his replacement partly because he was not involved in pro-TRUMP, anti-CLINTON operation/s

- Russians do have further 'kompromat' on CLINTON (e-mails) and considering disseminating it after Duma (legislative elections) in late September. Presidential spokesman PESKOV continues to lead on this

- However, equally important is Kremlin objective to shift policy consensus favourably to Russia in US post-OBAMA whoever wins. Both presidential candidates' opposition to TPP and TTIP viewed as a result in this respect

- Senior Russian diplomat withdrawn from Washington embassy on account of potential exposure in US presidential election operation/s

Detail

1. Speaking in confidence to a trusted compatriot in mid-September 2016, a senior member of the Russian Presidential Administration (PA) commented on the political fallout from recent western media revelations about Moscow's intervention, in favour of Donald TRUMP and against Hillary CLINTON, in the US presidential election. The PA official reported that the issue had become incredibly sensitive and that President PUTIN had issued direct orders that Kremlin and government insiders should not discuss it in public or even in private.

2. Despite this, the PA official confirmed, from direct knowledge, that the gist of the allegations was true. PUTIN had been receiving conflicting advice on interfering from three separate and expert groups. On one side had been the Russian ambassador to the US, Sergei KISLYAK, and the Ministry of Foreign Affairs, together with an independent and informal network run by presidential foreign policy advisor, Yuri USHAKOV

22

(KISLYAK's predecessor in Washington) who had urged caution and the potential negative impact on Russia from the operation/s. On the other side was former PA Head, Sergei IVANOV, backed by Russian Foreign Intelligence (SVR), who had advised PUTIN that the pro-TRUMP, anti-CLINTON operation/s would be both effective and plausibly deniable with little blowback. The first group/s had been proven right and this had been the catalyst in PUTIN's decision to sack IVANOV (unexpectedly) as PA Head in August. His successor, Anton VAINO, had been selected for the job partly because he had not been involved in the US presidential election operation/s.

3. Continuing on this theme, the senior PA official said the situation now was that the Kremlin had further 'kompromat' on candidate CLINTON and had been considering releasing this via "plausibly deniable" channels after the Duma (legislative) elections were out of the way in mid-September. There was however a growing train of thought and associated lobby, arguing that the Russians could still make candidate CLINTON look "weak and stupid" by provoking her into railing against PUTIN and Russia without the need to release more of her e-mails. Presidential Spokesman, Dmitriy PESKOV remained a key figure in the operation, although any final decision on dissemination of further material would be taken by PUTIN himself.

4. The senior PA official also reported that a growing element in Moscow's intervention in the US presidential election campaign was the objective of shifting the US political consensus in Russia's perceived interests regardless of who won. It basically comprised of pushing candidate CLINTON away from President OBAMA's policies. The best example of this was that both candidates now openly opposed the draft trade agreements, TPP and TTIP, which were assessed by Moscow as detrimental to Russian interests. Other issues where the Kremlin was looking to shift the US policy consensus were Ukraine and Syria. Overall however, the presidential election was considered still to be too close to call.

5. Finally, speaking separately to the same compatriot, a senior Russian MFA official reported that as a prophylactic measure, a leading Russian diplomat, Mikhail KULAGIN, had been withdrawn from Washington at short notice because Moscow feared his heavy involvement in the US presidential election operation, including the so-called veterans' pensions ruse (reported previously), would be exposed in the media there. His replacement, Andrei BONDAREV however was clean in this regard.

23

**Company Comment**

The substance of what was reported by the senior Russian PA official in paras 1 and 2 above, including the reasons for Sergei IVANOV's dismissal, was corroborated independently by a former top level Russian intelligence officer and Kremlin insider, also in mid-September.

**14 September 2016**

24

COMPANY INTELLIGENCE REPORT 2016/112

## RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION

### Summary

- Top level Russian official confirms current closeness of Alpha Group-PUTIN relationship. Significant favours continue to be done in both directions and FRIDMAN and AVEN still giving informal advice to PUTIN, especially on the US

- Key intermediary in PUTIN-Alpha relationship identified as Oleg GOVORUN, currently Head of a Presidential Administration department but throughout the 1990s, the Alpha executive who delivered illicit cash directly to PUTIN

- PUTIN personally unbothered about Alpha's current lack of investment in Russia but under pressure from colleagues over this and able to exploit it as lever over Alpha interlocutors

### Detail

1. Speaking to a trusted compatriot in mid-September 2016, a top level Russian government official commented on the history and current state of relations between President PUTIN and the Alpha Group of businesses led by oligarchs Mikhail FRIDMAN, Petr AVEN and German KHAN. The Russian government figure reported that although they had had their ups and downs, the leading figures in Alpha currently were on very good terms with PUTIN. Significant favours continued to be done in both directions, primarily political ones for PUTIN and business/legal ones for Alpha. Also, FRIDMAN and AVEN continued to give informal advice to PUTIN on foreign policy, and especially about the US where he distrusted advice being given to him by officials.

2. Although FRIDMAN recently had met directly with PUTIN in Russia, much of the dialogue and business between them was mediated through a senior Presidential Administration official, Oleg GOVORUN, who currently headed the department therein responsible for Social Co-operation With the CIS. GOVORUN was trusted by PUTIN and recently had accompanied him to Uzbekistan to pay respects at the tomb of former president KARIMOV. However according to the top level Russian government official, during the 1990s GOVORUN had been Head of Government Relations at Alpha Group and in reality, the "driver" and "bag carrier"

25

used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St Petersburg. Given that and the continuing sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN.

3.  The top level Russian government official described the PUTIN-Alpha relationship as both carrot and stick. Alpha held 'kompromat' on PUTIN and his corrupt business activities from the 1990s whilst although not personally overly bothered by Alpha's failure to reinvest the proceeds of its TNK oil company sale into the Russian economy since, the Russian president was able to use pressure on this count from senior Kremlin colleagues as a lever on FRIDMAN and AVEN to make them do his political bidding.

**14 September 2016**

COMPANY INTELLIGENCE REPORT 2016/113

## RUSSIA/US PRESIDENTIAL ELECTION- REPUBLICAN CANDIDATE TRUMP'S PRIOR ACTIVITIES IN ST PETERSBURG

### Summary

- Two knowledgeable St Petersburg sources claim Republican candidate TRUMP has paid bribes and engaged in sexual activities there but key witnesses silenced and evidence hard to obtain

- Both believe Azeri business associate of TRUMP, Araz AGALAROV will know the details

### Detail

1. Speaking to a trusted compatriot in September 2016, two well-placed sources based in St Petersburg, one in the political/business elite and the other involved in the local services and tourist industry, commented on Republican US presidential candidate Donald TRUMP's prior activities in the city.

2. Both knew TRUMP had visited St Petersburg on several occasions in the past and had been interested in doing business deals there involving real estate. The local business/political elite figure reported that TRUMP had paid bribes there to further his interests but very discreetly and only through affiliated companies, making it very hard to prove. The local services industry source reported that TRUMP had participated in sex parties in the city too, but that all direct witnesses to this recently had been "silenced" i.e. bribed or coerced to disappear.

3. The two St Petersburg figures cited believed an Azeri business figure, Araz AGALAROV (with offices in Baku and London) had been closely involved with TRUMP in Russia and would know most of the details of what the Republican presidential candidate had got up to there.

14 September 2016

27

COMPANY INTELLIGENCE REPORT 2016/130

RUSSIA: KREMLIN ASSESSMENT OF TRUMP AND RUSSIAN INTERFERENCE IN US PRESIDENTIAL ELECTION

Summary

- Buyer's remorse sets in with Kremlin over TRUMP support operation in US presidential election. Russian leadership disappointed that leaked e-mails on CLINTON have not had greater impact in campaign

- Russians have injected further anti-CLINTON material into the 'plausibly deniable' leaks pipeline which will continue to surface, but best material already in public domain

- PUTIN angry with senior officials who "overpromised" on TRUMP and further heads likely to roll as result. Foreign Minister LAVROV may be next

- TRUMP supported by Kremlin because seen as divisive, anti-establishment candidate who would shake up current international status quo in Russia's favor. Lead on TRUMP operation moved from Foreign Ministry to FSB and then to presidential administration where it now sits

Detail

1. Speaking separately in confidence to a trusted compatriot in early October 2016, a senior Russian leadership figure and a Foreign Ministry official reported on recent developments concerning the Kremlin's operation to support Republican candidate Donald TRUMP in the US presidential election. The senior leadership figure said that a degree of buyer's remorse was setting in among Russian leaders concerning TRUMP. PUTIN and his colleagues were surprised and disappointed that leaks of Democratic candidate, Hillary CLINTON's hacked e-mails had not had greater impact on the campaign.

2. Continuing on this theme, the senior leadership figure commented that a stream of further hacked CLINTON material already had been injected by the Kremlin into compliant western media outlets like Wikileaks, which remained at least "plausibly deniable", so the stream of these would continue through October and up to the election. However s/he understood that the best material the Russians had already was out and there were no real game-changers to come.

3. The Russian Foreign Ministry official, who had direct access to the TRUMP support operation, reported that PUTIN was angry at his subordinate's "over-promising" on the Republican presidential candidate, both in terms of his chances and reliability and being able to cover and/or contain the US backlash over Kremlin interference. More heads therefore were likely to roll, with the MFA the easiest target. Ironically, despite his consistent urging of caution on the issue, Foreign Minister LAVROV could be the next one to go.

4. Asked to explain why PUTIN and the Kremlin had launched such an aggressive TRUMP support operation in the first place, the MFA official said that Russia needed to upset the liberal international status quo, including on Ukraine-related sanctions, which was seriously

disadvantaging the country. TRUMP was viewed as divisive in disrupting the whole US political system; anti-Establishment; and a pragmatist with whom they could do business. As the TRUMP support operation had gained momentum, control of it had passed from the MFA to the FSB and then into the presidential administration where it remained, a reflection of its growing significance over time. There was still a view in the Kremlin that TRUMP would continue as a (divisive) political force even if he lost the presidency and may run for and be elected to another public office.

12 October 2016

COMPANY INTELLIGENCE REPORT 2016/134

RUSSIA/US PRESIDENTIAL ELECTION: FURTHER DETAILS OF KREMLIN LIAISON WITH TRUMP CAMPAIGN

### Summary

- Close associate of SECHIN confirms his secret meeting in Moscow with Carter PAGE in July

- Substance included offer of large stake in Rosneft in return for lifting sanctions on Russia. PAGE confirms this is TRUMP's intention

- SECHIN continued to think TRUMP could win presidency up to 17 October. Now looking to reorientate his engagement with the US

- Kremlin insider highlights importance of TRUMP's lawyer, Michael COHEN in covert relationship with Russia. COHEN's wife is of Russian descent and her father a leading property developer in Moscow

### Detail

1. Speaking to a trusted compatriot in mid October 2016, a close associate of Rosneft President and PUTIN ally Igor' SECHIN elaborated on the reported secret meeting between the latter and Carter PAGE, of US Republican presidential candidate's foreign policy team, in Moscow in July 2016. The secret meeting had been confirmed to him/her by a senior member of SECHIN's staff, in addition to by the Rosneft President himself. It took place on either 7 or 8 July, the same day or the one after Carter PAGE made a public speech to the Higher Economic School in Moscow.

2. In terms of the substance of their discussion, SECHIN's associate said that the Rosneft President was so keen to lift personal and corporate western sanctions imposed on the company, that he offered PAGE/TRUMP's associates the brokerage of up to a 19 per cent (privatised) stake in Rosneft in return. PAGE had expressed interest and confirmed that were TRUMP elected US president, then sanctions on Russia would be lifted.

3. According to SECHIN's close associate, the Rosneft President had continued to believe that TRUMP could win the US presidency right up to 17 October, when he assessed this was no longer possible. SECHIN was keen to re-adapt accordingly and put feelers out to other business and political contacts in the US instead.

4. Speaking separately to the same compatriot in mid-October 2016, a Kremlin insider with direct access to the leadership confirmed that a key role in the secret TRUMP campaign/Kremlin relationship was being played by the Republican candidate's personal lawyer Michael COHEN. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

30

**Source Comment**

5.  SECHIN's associate opined that although PAGE had not stated it explicitly to SECHIN, he had clearly implied that in terms of his comment on TRUMP's intention to lift Russian sanctions if elected president, he was speaking with the Republican candidate's authority.

**Company Comment**

6. ███████████████████████████████████████████████████████

18 October 2016

31

COMPANY INTELLIGENCE REPORT 2016/135

**RUSSIA/US PRESIDENTIAL ELECTION: THE IMPORTANT ROLE OF TRUMP LAWYER, COHEN IN CAMPAIGN'S SECRET LIAISON WITH THE KREMLIN**

**Summary**

- Kremlin insider outlines important role played by TRUMP's lawyer COHEN in secret liaison with Russian leadership

- COHEN engaged with Russians in trying to cover up scandal of MANAFORT and exposure of PAGE and meets Kremlin officials secretly in the EU in August in pursuit of this goal

- These secret contacts continue but are now farmed out to trusted agents in Kremlin-linked institutes so as to remain "plausibly deniable" for Russian regime

- Further confirmation that sacking of IVANOV and appointments of VAINO and KIRIYENKO linked to need to cover up Kremlin's TRUMP support operation

**Detail**

1. Speaking in confidence to a longstanding compatriot friend in mid-October 2016, a Kremlin insider highlighted the importance of Republican presidential candidate Donald TRUMP's lawyer, Michael COHEN, in the ongoing secret liaison relationship between the New York tycoon's campaign and the Russian leadership. COHEN's role had grown following the departure of Paul MANNAFORT as TRUMP's campaign manager in August 2016. Prior to that MANNAFORT had led for the TRUMP side.

2. According to the Kremlin insider, COHEN now was heavily engaged in a cover up and damage limitation operation in the attempt to prevent the full details of TRUMP's relationship with Russia being exposed. In pursuit of this aim, COHEN had met secretly with several Russian Presidential Administration (PA) Legal Department officials in an EU country in August 2016. The immediate issues had been to contain further scandals involving MANNAFORT's commercial and political role in Russia/Ukraine and to limit the damage arising from exposure of former TRUMP foreign policy advisor, Carter PAGE's secret meetings with Russian leadership figures in Moscow the previous month. The

32

overall objective had been to "to sweep it all under the carpet and make sure no connections could be fully established or proven"

3. Things had become even "hotter" since August on the TRUMP-Russia track. According to the Kremlin insider, this had meant that direct contact between the TRUMP team and Russia had been farmed out by the Kremlin to trusted agents of influence working in pro-government policy institutes like that of Law and Comparative Jurisprudence. COHEN however continued to lead for the TRUMP team.

4. Referring back to the (surprise) sacking of Sergei IVANOV as Head of PA in August 2016, his replacement by Anton VAINO and the appointment of former Russian premier Sergei KIRIYENKO to another senior position in the PA, the Kremlin insider repeated that this had been directly connected to the TRUMP support operation and the need to cover up now that it was being exposed by the USG and in the western media.

**Company Comment**

The Kremlin insider was unsure of the identities of the PA officials with whom COHEN met secretly in August, or the exact date/s and locations of the meeting/s. There were significant internal security barriers being erected in the PA as the TRUMP issue became more controversial and damaging. However s/he continued to try to obtain these.

**19 October 2016**

33

COMPANY INTELLIGENCE REPORT 2016/166

**US/RUSSIA: FURTHER DETAILS OF SECRET DIALOGUE BETWEEN TRUMP CAMPAIGN TEAM, KREMLIN AND ASSOCIATED HACKERS IN PRAGUE**

### Summary

- TRUMP's representative COHEN accompanied to Prague in August/September 2016 by 3 colleagues for secret discussions with Kremlin representatives and associated operators/hackers

- Agenda included how to process deniable cash payments to operatives; contingency plans for covering up operations; and action in event of a CLINTON election victory

- Some further details of Russian representatives/operatives involved; Romanian hackers employed; and use of Bulgaria as bolt hole to "lie low"

- Anti-CLINTON hackers and other operatives paid by both TRUMP team and Kremlin, but with ultimate loyalty to Head of PA, IVANOV and his successor/s

### Detail

1. We reported previously (2016/135 and /136) on secret meeting/s held in Prague, Czech Republic in August 2016 between then Republican presidential candidate Donald TRUMP's representative, Michael COHEN and his interlocutors from the Kremlin working under cover of Russian 'NGO' Rossotrudnichestvo.

2. ███████████████████████████████████████ provided further details of these meeting/s and associated anti-CLINTON/Democratic Party operations. COHEN had been accompanied to Prague by 3 colleagues and the timing of the visit was either in the last week of August or the first week of September. One of their main Russian interlocutors was Oleg SOLODUKHIN operating under Rossotrudnichestvo cover. According to ██████████████, the agenda comprised questions on how deniable cash payments were to be made to hackers who had worked in Europe under Kremlin direction against the CLINTON campaign and various contingencies for covering up these operations and Moscow's secret liaison with the TRUMP team more generally.

34

3.    � ▇▇▇▇▇▇▇▇▇▇ reported that over the period March-September 2016 a company called ▇▇▇▇▇▇▇ and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership. Entities linked to one ▇▇▇▇▇▇▇▇ were involved and he and another hacking expert, both recruited under duress by the FSB, ▇▇▇▇ ▇▇▇▇▇ were significant players in this operation. In Prague, COHEN agreed contingency plans for various scenarios to protect the operation, but in particular what was to be done in the event that Hillary CLINTON won the presidency. It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and other operators were stood down/able to go effectively to ground to cover their traces. (We reported earlier that the involvement of political operatives Paul MANAFORT and Carter PAGE in the secret TRUMP-Kremlin liaison had been exposed in the media in the run-up to Prague and that damage limitation of these also was discussed by COHEN with the Kremlin representatives).

4.    In terms of practical measures to be taken, it was agreed by the two sides in Prague to stand down various "Romanian hackers" (presumably based in their homeland or neighbouring eastern Europe) and that other operatives should head for a bolt-hole in Plovdiv, Bulgaria where they should "lay low". On payments, IVANOV's associate said that the operatives involved had been paid by both TRUMP's team and the Kremlin, though their orders and ultimate loyalty lay with IVANOV, as Head of the PA and thus ultimately responsible for the operation, and his designated successor/s after he was dismissed by president PUTIN in connection with the anti-CLINTON operation in mid August.

**13 December 2016**

35

# EXHIBIT 3

Case 1:17-cv-02041-RJL   Document 93-2   Filed 08/05/20   Page 162 of 187

#WeAreDoneDying                                        NAACP                                        TAKE ACTION

☰  *Esquire*                                                                    SUBSCRIBE | SIGN IN

# The U.S. Has Never Held Anyone Accountable for Torture. Daniel J. Jones Is Still Pissed Off About That.

**The Senate's lead investigator, Daniel J. Jones, is played by Adam Driver in *The Report*.**

BY **JACK HOLMES**    NOV 15, 2019



SHUTTERSTOCK, AMAZON STUDIOS

"We tortured some folks," said the President of the United States in August of 2014, in what was meant to be the kind of Frank Admission a politician will sometimes offer on the weighty issues of the day. Instead, it's become kind of a meme. Barack Obama's cocktail of bizarro earnestitude and relentless folksiness was too much for our irony-soaked Internet culture. But the more you learn about the subject at hand—the CIA's torture program, the Senate's report on that program, and whether it was ever going to see the light of day—the less funny it all it is. If you ask the lead investigator on that report, Daniel J. Jones, it really isn't funny at all.

"People remember that, and rightfully they should, because that's a ridiculous line," Jones says. "But what they don't remember is what comes next, and it pisses me off to this day. He says something to the effect of, 'It's important we don't get too sanctimonious about what these people did. These people are real patriots.' None of them are patriots. Not the people that came back from torturing and lied about it."

Jones spent seven years in the basement of CIA headquarters at Langley with a continually shrinking staff of Senate aides, reviewing 6.3 million documents—emails and cables between agents and decision-makers, descriptions of the torture procedures and what they did to detainees, admissions in real time that the program didn't work and the CIA was lying about it to the Bush administration and the Department of Justice. He sat in that basement and looked at the CIA's own paperwork—when they weren't disappearing documents off the Senate server—until he built the story of what happened.

THE REPORT Official Trailer (2019) Adam Driver, Jon Hamm Movie HD

His story is the subject of a new film out Friday, *The Report*, in which it's Adam Driver doing the basement reading and, in the end, the politicking. One thing this story will prove to you is that, in the end, every single thing in the Washington, D.C. metro area comes down to politics. The CIA might be a clandestine operation, but they know the power of public relations. Almost as soon as President Obama announced Osama bin Laden had been killed in a Navy SEAL raid in Abbotobad, Pakistan, in 2011, "the Agency's PR people," as the film refers to them, were on television linking the nation's greatest counterterrorism victory of the decade to intelligence supposedly gathered via Enhanced Interrogation Techniques—one of many sickeningly anaesthetic terms swirling around the torture program.

"That was a massively compartmented operation," Jones tells me of the bin Laden raid. Scarcely anyone, even inside the agency, was abreast of it during the planning phase. Yet a month before the raid was a go, Jones says the CIA looped in their PR team to help craft the narrative linking it to the EITs. As soon as it went public, former Director Michael Hayden and a cast of Agency allies were out in public pushing the line in an attempt to retroactively justify the program. In the film, when Jones told his boss, Senate Intelligence Committee Chair Dianne Feinstein (played by Annette Bening), that the narrative was bunk, she called the Obama White House to clarify the bin Laden intelligence was separate from the program. They brushed her off.

"What just happened?" Driver, as Jones, asks Feinstein's chief of staff when the senator leaves the room.

"The CIA just got the president reelected," she responds.



**Daniel J. Jones was the lead investigator for the Senate torture report.**
Arturo Holmes / Getty Images

Jones says this is a bit of creative license, but the core issue is the same. "They could not have cared less," he says of the White House. "That is a massive lack of leadership." Obama was headed into a knock-down drag-out reelection fight, and he'd just landed a giant right hook. He wasn't going to confuse the public about what had happened.

It's one of many moments where the Obama administration does not cover itself in glory. White House chief of staff, Denis McDonough (Jon Hamm), features heavily, and you can almost see the political calculations running behind his eyes while he discusses...anything. McDonough knew Jones for years before the report was set to be released. He knew Jones was no assassin looking to destroy the Agency's credibility for no reason. And yet, at pretty much every point, the White House sides with or defers to the CIA.

The "we tortured some folks" moment came at a time when the administration was attempting to release a heavily redacted version of the report in August 2014, when DC basically shuts down and people try to bury things in the abandoned swamp. The redactions were so heavy because Feinstein handed the report over to the White House and the White House handed it over to the Agency, which blacked out as much as humanly possible. In the course of events, there are continual crises around the separation of powers, as the Senate's oversight function falls prey to Executive Branch prerogatives. After all, the same CIA director trying to quash the report—at the time, John Brennan—is giving the presidential briefings and circling up with Obama to plan drone strikes.

●●

## "None of them are patriots. Not the people that came back from torturing and lied about it."

In the end, though, this is the story of how the country lost its mind after the 9/11 attacks. The torture program was the triumph of unreason, the perilous result when you reach a conclusion—we must employ the harshest measures to get information from terrorist suspects in order to prevent the next attack—and then go looking for evidence to support it.

The two "doctors" who developed the program, James Mitchell and Bruce Jessen, had zero relevant expertise, and in the film, they get the gig with a Powerpoint presentation. "They were really introduced to the counter-terrorism program through a CIA lawyer whose wife happened to work in the area where they housed psychologists at the CIA," Jones tells me, "and she just happened to say to him, 'Hey, I know these two guys, they wrote a paper.' And within 48 hours they're basically giving the instructions on how to interrogate Zubaydah. I mean, no other vetting. And these guys were considered jokes in their own community." Their firm was given complete immunity from prosecution and, by the end of it, a total of $80 million.

"Zubaydah" is Abu Zubaydah, the first detainee subjected to the program whose story kind of sums up the whole deal. He was first captured by the FBI, and in their custody he gave up some useful information. Law enforcement officers used proven techniques —specifically, rapport-building—and knowledge of Arabic to gain his trust and get the information. But as soon as he was transferred to the CIA, it went from law enforcement to lawlessness. The Agency almost immediately lied to the Justice Department about his level of seniority in al Qaeda to get approval to try out the EITs. And by subjecting suspects to these "techniques," the CIA destroyed any chance they could be tried in a court of law. Early on in the film, an FBI agent asks how they're going to build a case against a detainee if they torture him. The evidence would be inadmissible. "Who says he's getting a trial?" the Jessen character responds. Of course, the film notes that the CIA admitted in the end that one quarter of the 119 people we tortured should never have been detained at all.



There's a cruel logic to it all, as the Justice Department's grotesque legal justifications—headlined by John Yoo's assertion that they could "crush the resticles of the person's child"—are built on the insane premise that the torture is legal as long as it helps obtain intelligence that will stop terror attacks. "You have to make this work," Gina Haspel (played by Maura Tierney) tells one of the interrogators in the dank and cavernous corridor of a black site. "It's only legal if it works."

Yoo and Haspel are among the many, many people directly involved in the program whose careers have only blossomed afterwards. In fact, no one was held accountable. But Yoo is currently the Emanuel S. Heller Professor of Law at Berkeley and a frequent cable-news guest. Hayden and Brennan are also cable-news mainstays and, in the age of Trump, have garnered Resistance Hero status for pushing back against the president's assaults on the intelligence community.

# "It's only legal if it works."

"It's appalling," says Jones, who currently leads an investigative consultancy called the Penn Quarter Group and the nonprofit Advance Democracy. "They're writing books where they're getting million dollar paychecks, they're on television as commentators, you've got Phil Mudd on CNN all the time, you know, Mike Morell, John McLaughlin, Michael Hayden, John McGoff, all of these people are viewed with some reverence, and some esteem, and brought on TV." He adds that many are involved with firms that profit from contracts and other ties to the intelligence community. Gina Haspel, of course, is now the CIA director. "The legislative branch bears some responsibility for this, too," Jones says, pointing out that the same Senate committee that produced the report also confirmed Haspel. Everyone seems to have adopted the Obama administration line, articulated by Hamm's McDonough: *Are we going to save the world, or are we going to look for people to blame?* That was also, of course, the attitude towards Wall Street after the economy nearly collapsed.

**: Related Stories**



**This Is a Country That Tortures People**



**Force-Feeding Is Torture, and the U.S. Is Doing It**

Those are the kind of American political calculations that prove inevitable, and inevitably destructive. At one point, the film—which was shot beautifully, with relentless pacing, in just 26 days—documents the extended torture of Khalid Sheikh Mohammed, the mastermind of the 9/11 attacks who will never be tried for his crimes against humanity because we waterboarded him 183 times and, as the movie shows, administered unnecessary "rectal rehydration." It is almost debilitatingly gruesome, but the music in the background is not the usual death metal that greets other torture scenes. *"Put a feather in his cap and called it macaroni,"* a choir of kids sings as interrogators waterboard him yet again. It's an incredible showcase of the great dichotomy of America: the sunny, patriotic optimism, and the dark and disgusting cruelties we are capable of when we're governed by fear.

**JACK HOLMES**  Politics Editor

Jack Holmes is the Politics Editor at Esquire, where he writes daily and edits the Politics Blog with Charles P Pierce.

# EXHIBIT 4

## INVESTIGATIVE DUE DILIGENCE AFFIDAVIT

### United States District Court for the District of Columbia

**Mikhail Fridman, et al**

        Plaintiff(s),

VS.

**Bean LLC, et al**

        Defendant(s).

**Case Number: 1:17-cv-02041-RJL**

Attorney: Alan Lewis, Esq.

Sperduto Thompson & Gassler PLC
1747 Pennsylvania Ave., NW, #1250
Washington DC 20006



**\*255389\***

Legal documents received by Same Day Process Service, Inc. was requested to provide an affidavit of due diligence for subject(s), **Daniel Jones on 06/16/2020 at 9:35 AM at 801 Pennsylvania Ave., NW, #1208, Washington, DC 20004**

The undersigned, swear and affirm that on **July 12, 2020** at **9:15 PM**, I did the following:

**NON-SERVED:** After careful inquiry and diligent attempts, I was unable to serve **Daniel Jones** the **Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action; Subpoena to Testify at a Deposition in a Civil Action; Witness Check for $51.50; Schedule A; Attachment (RE: Enclosures for Rule 45 Subpoenas)** for the reason(s) indicated in the comments below:

| Date/Time | Address | Remarks |
|---|---|---|
| 06/16/2020-5:23 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I arrived at the address and found the address to be a secured complex. I was informed by the front desk concierge that no one was authorized to go upstairs and that the subject would have to either escort me upstairs or grant my permission to go upstairs. The front desk concierge confirmed the subject resided at the address and attempted to reach the subject, via telephone, but was unable to reach the subject. I waited at the address for fifteen minutes but after not being able to gain access and the concierge no being able to reach the subject on the telephone I left the address. Prior to leaving I did leave my phone number with the concierge to pass along to the subject. - Attempted by Kion Lathan |
| 06/24/2020-6:30 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I arrived at the address and began the stakeout. I staked out the main entrance at the corner of 8th St., NW & D St., NW. - Attempted by Rene Rivas |
| 06/24/2020-11:19 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I ended the stakeout at 10:45 pm. During the stakeout at around 8:30 pm an individual came out the main door to walk a dog. That individual turned his face too fast for me to get a great look at him. He was a Caucasian male with black and gray hair and a full beard which was also black and gray. I never observed that individual return to verify if it was indeed the subject or not. Approximately five minutes after observing that individual a security guard from 701 Pennsylvania Ave., NW came out and walked around my vehicle and went into the address of 801 Pennsylvania Ave., NW. As the security guard went inside 801 Pennsylvania Ave., NW I observed a Caucasian female exit from 801 Pennsylvania Ave., NW |

| | | |
|---|---|---|
| | | and observed her stand behind my vehicle and observed her take pictures of the street. - Attempted by Rene Rivas |
| 06/27/2020-8:08 AM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I arrived at the address and began the stakeout at the property. - Attempted by Kion Lathan |
| 06/27/2020-12:12 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I ended the stakeout at the property address after not observing the subject enter or exit the complex. I had mulitple photos of the subject and did not observe anyone matching those photos. - Attempted by Kion Lathan |
| 06/28/2020-3:58 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I arrived at the address and began the stakeout at the property address. - Attempted by Kion Lathan |
| 06/28/2020-8:04 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I ended the stakeout after not observing the subject enter or exit the complex while conducting the stakeout. - Attempted by Kion Lathan |
| 07/01/2020-1:34 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I began my stakeout, positioning myself with a clear view of the entrance of "The Residences at Market Square." - Attempted by Harvey Jessup |
| 07/01/2020-5:34 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I ended my stakeout. I did not observe the subject enter or leave the building. For the duration of my stakeout only twelve different people entered or left the building in total with ten being female and two were male. The two males were under the age of 30 and both African-American. - Attempted by Harvey Jessup |
| 07/10/2020-6:55 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I arrived to the main entrance of the apartment building of the subject's known address and began a 3 hour stake out upon the subject from 7pm to 10pm. - Attempted by Rene Rivas |
| 07/10/2020-10:20 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | During the 3 hours, I observed some tenants come in and out of the building but no one matched the description of the subject nor did anyone look like the person in the picture. - Attempted by Rene Rivas |
| 07/12/2020-2:45 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I arrived to the main entrance of the apartment building of the subject's known address and began a 6 hour stake out upon the subject from 3pm to 9pm. - Attempted by Rene Rivas |
| 07/12/2020-9:15 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | During the 6 hours, I observed some tenants come in and out of the building but no one matched the description of the subject nor did anyone look like the person in the picture. - Attempted by Rene Rivas |

**Kion Lathan**
Process Server

**Rene Rivas**
Process Server

**Harvey Jessup**
Process Server

District of Columbia: SS
Subscribed and Sworn to before me
this ____ day of ____ 2020

_____
K. Mack, Notary Public, D.C.
My commission expires February 29, 2024

**Same Day Process Service, Inc.**
**1413 K St., NW, 7th Floor**
**Washington DC 20005**
**(202)-398-4200**
**info@samedayprocess.com**

Internal Job ID:255389



Requests for Investigative Due Diligence on a subject can always be expanded upon. There are occasions during which a subject's current whereabouts can be found in the data compiled. The subject's true location, however, can be obfuscated by the sheer amount of information (both accurate and inaccurate) provided by proprietary databases and/or interviews conducted during neighborhood investigations via word of mouth. Online searches alone may not be met with success. In such cases, canvassing communities and conducting field investigations to uncover new leads and verification may be required. There is one nationwide criminal database known as the National Crime Information Center (NCIC). NCIC is not a public record and cannot be legally accessed by anyone other than criminal justice agencies. Not all courts offer records online. For these reasons, Same Day Process Service strongly advocates physically hand-searching documents in the city or county courts in question. Our affidavits are NOT CONSUMER REPORTS and do not constitute a "consumer report" under the Fair Credit Reporting Act ("FCRA"). This affidavit may not be used to determine eligibility for credit, insurance, employment or any other purpose regulated under the FCRA.

# EXHIBIT 5

# INVESTIGATIVE DUE DILIGENCE AFFIDAVIT

### United States District Court for the District of Columbia

**Mikhail Fridman, et al**

        Plaintiff(s),

VS.

**Bean LLC, et al**

        Defendant(s).

**Case Number: 1:17-cv-02041-RJL**

Attorney: Alan Lewis, Esq.

Sperduto Thompson & Gassler PLC
1747 Pennsylvania Ave., NW, #1250
Washington DC 20006

*255390*

Legal documents received by Same Day Process Service, Inc. was requested to provide an affidavit of due diligence for subject(s), **The Democracy Integrity Project on 06/16/2020 at 9:36 AM at 801 Pennsylvania Ave., NW, #1208, Washington, DC 20004**

The undersigned, swear and affirm that on **July 12, 2020** at **9:15 PM**, I did the following:

**NON-SERVED:** After careful inquiry and diligent attempts, I was unable to serve **The Democracy Integrity Project** the **Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action; Attachment (RE: Enclosures for Rule 45 Subpoenas)** for the reason(s) indicated in the comments below:

| Date/Time | Address | Remarks |
|---|---|---|
| 06/16/2020-5:23 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I arrived at the address and found the address to be a secured complex. I was informed by the front desk concierge that no one was authorized to go upstairs and that the subject would have to either escort me upstairs or grant my permission to go upstairs. The front desk concierge confirmed the subject resided at the address and attempted to reach the subject, via telephone, but was unable to reach the subject. I waited at the address for fifteen minutes but after not being able to gain access and the concierge no being able to reach the subject on the telephone I left the address. Prior to leaving I did leave my phone number with the concierge to pass along to the subject. - Attempted by Kion Lathan |
| 06/24/2020-6:30 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I arrived at the address and began the stakeout. I staked out the main entrance at the corner of 8th St., NW & D St., NW. - Attempted by Rene Rivas |
| 06/24/2020-11:19 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I ended the stakeout at 10:45 pm. During the stakeout at around 8:30 pm an individual came out the main door to walk a dog. That individual turned his face too fast for me to get a great look at him. He was a Caucasian male with black and gray hair and a full beard which was also black and gray. I never observed that individual return to verify if it was indeed the subject or not. Approximately five minutes after observing that individual a security guard from 701 Pennsylvania Ave., NW came out and walked around my vehicle and went into the address of 801 Pennsylvania Ave., NW. As the security guard went inside 801 Pennsylvania Ave., NW I observed a Caucasian female exit from 801 Pennsylvania Ave., NW |

| | | and observed her stand behind my vehicle and observed her take pictures of the street. - Attempted by Rene Rivas |
|---|---|---|
| 06/27/2020-8:08 AM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I arrived at the address and began the stakeout at the property. - Attempted by Kion Lathan |
| 06/27/2020-12:12 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I ended the stakeout at the property address after not observing the subject enter or exit the complex. I had mulitple photos of the subject and did not observe anyone matching those photos. - Attempted by Kion Lathan |
| 06/28/2020-3:58 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I arrived at the address and began the stakeout at the property address. - Attempted by Kion Lathan |
| 06/28/2020-8:04 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I ended the stakeout after not observing the subject enter or exit the complex while conducting the stakeout. - Attempted by Kion Lathan |
| 07/01/2020-1:34 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I began my stakeout, positioning myself with a clear view of the entrance of "The Residences at Market Square." - Attempted by Harvey Jessup |
| 07/01/2020-5:34 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I ended my stakeout. I did not observe the subject enter or leave the building. For the duration of my stakeout only twelve different people entered or left the building in total with ten being female and two were male. The two males were under the age of 30 and both African-American. - Attempted by Harvey Jessup |
| 07/10/2020-6:55 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I arrived to the main entrance of the apartment building of the subject's known address and began a 3 hour stake out upon the subject from 7pm to 10pm. - Attempted by Rene Rivas |
| 07/10/2020-10:20 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | During the 3 hours, I observed some tenants come in and out of the building but no one matched the description of the subject nor did anyone look like the person in the picture. - Attempted by Rene Rivas |
| 07/12/2020-2:45 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | I arrived to the main entrance of the apartment building of the subject's known address and began a 6 hour stake out upon the subject from 3pm to 9pm. - Attempted by Rene Rivas |
| 07/12/2020-9:15 PM | 801 Pennsylvania Ave., NW, #1208 Washington, DC 20004 | During the 6 hours, I observed some tenants come in and out of the building but no one matched the description of the subject nor did anyone look like the person in the picture - Attempted by Rene Rivas |

**Kion Lathan**
Process Server

**Harvey Jessup**
Process Server

**Rene Rivas**
Process Server

District of Columbia: Ss
Subscribed and Sworn before me
this ____ day of _____,

_____
K. Mack, Notary Public, D.C.
My commission expires February 29, 2024

DISTRICT OF COLUMBIA
2.25.2024
EXPIRES
COMMISSION
MY
NOTARY PUBLIC
K MACK

**Same Day Process Service, Inc.**
**1413 K St., NW, 7th Floor**
**Washington DC 20005**
**(202)-398-4200**
**info@samedayprocess.com**

Internal Job ID:255390



Requests for Investigative Due Diligence on a subject can always be expanded upon. There are occasions during which a subject's current whereabouts can be found in the data compiled. The subject's true location, however, can be obfuscated by the sheer amount of information (both accurate and inaccurate) provided by proprietary databases and/or interviews conducted during neighborhood investigations via word of mouth. Online searches alone may not be met with success. In such cases, canvassing communities and conducting field investigations to uncover new leads and verification may be required. There is one nationwide criminal database known as the National Crime Information Center (NCIC). NCIC is not a public record and cannot be legally accessed by anyone other than criminal justice agencies. Not all courts offer records online. For these reasons, Same Day Process Service strongly advocates physically hand-searching documents in the city or county courts in question. Our affidavits are NOT CONSUMER REPORTS and do not constitute a "consumer report" under the Fair Credit Reporting Act ("FCRA"). This affidavit may not be used to determine eligibility for credit, insurance, employment or any other purpose regulated under the FCRA.

# EXHIBIT 6



**(~/)**

Mayor Muriel Bowser

---

**311 Online (https://311.dc.gov/)**   **Agency Directory (https://dc.gov/directory)**   **Online Services (http://dc.gov /online-services)**   **Accessibility (http://dc.gov/page/dcgov-accessibility-policy)**

Home (/Home.aspx)

Edit Account (/Account.aspx/AccountManagement) Log Out (/Account.aspx/LogOff)

# Penn Quarter Group (The) LLC - Initial File Number: L00005440135

| Main | Reports | Trade Names | Beneficial Owners |

## Entity Info

**Business Name**
Penn Quarter Group (The)

**Suffix**
LLC

**Registration / Effective Date**
4/26/2016

**Commencement Date**
4/26/2016

**Entity Status**
Active

**Foreign Name**

**Date of Organization**

**State**

**Country**
USA

## Business Address

**Line1**
801 Pennsylvania Ave, NW

**Line2**
c/o Daniel J. Jones

| **City** | **State** | **Zip** |
| --- | --- | --- |
| Washington | District of Columbia | 20004 |

## Agent

**Is non-commercial Registered Agent?**
Yes

**Name**
Daniel J. Jones

## Address

**Line1**
801 Pennsylvania Ave, NW

**Line2**
c/o Daniel J. Jones

| **City** | **State** | **Zip** |
| --- | --- | --- |
| Washington | District of Columbia | 20004 |

**Email**
daniel@thepqg.com

**Return to Home**

---

**District News**

- Mayor's Public Schedule (https://mayor.dc.gov/newsroom)
- Citywide News (https://newsroom.dc.gov)
- Citywide Calendar (https://calendar.dc.gov)
- Subscribe to Receive Emails (https://service.govdelivery.com/service/user.html?code=DCWASH)
- Subscribe to Text Alerts (https://textalert.ema.dc.gov/index.php?CCheck=1)
- Subscribe to Newsletters (https://public.govdelivery.com/accounts/DCWASH/subscriber/new?)

**District Initiatives**

- Green DC (http://green.dc.gov/)

- Grade DC (http://grade.dc.gov/)
- Age-Friendly DC (http://agefriendly.dc.gov/)
- Sustainable DC (http://sustainable.dc.gov/)
- Connect DC (http://connect.dc.gov/)
- Great Streets (http://greatstreets.dc.gov/)
- Ready DC (http://ready.dc.gov/)

**About DC**

- Open DC (http://open.dc.gov/)
- Budget (http://cfo.dc.gov/budget)
- Emancipation (http://emancipation.dc.gov/)
- Consumer Protection (http://consumer.dc.gov/)
- Contracts (http://dc.gov/contracts)
- Property Quest (http://propertyquest.dc.gov/)
- Track DC (http://track.dc.gov/)

**Contact Us**

- Agency Director (http://directory.dc.gov/)
- Call 311 (http://311.dc.gov/)
- Contact the Mayor (http://app.dc.gov/apps/about.asp?page=atd&type=dsf&referrer= [$DSF_SERVER_NAME$]&agency_id=1075)
- Contact Agency Directors (https://dcra.dc.gov/page/contact-agency-directors)
- FOIA Requests (http://foia.dc.gov/)
- Report Website Problems (http://dcforms.dc.gov/webform/problems-dc-government-website)
- Send Feedback (http://feedback.dc.gov/)
- Service Request Center (http://311.dc.gov/)

# EXHIBIT 7



# Department of Consumer and Regulatory Affairs

Home                                                                                                    Edit Account

## DEMOCRACY INTEGRITY PROJECT (THE) - Initial File Number: N00005576321

**Main**      Reports      Trade Names      Beneficial Owners

### Entity Info

| | |
|---|---|
| **Business Name** | DEMOCRACY INTEGRITY PROJECT (THE) |
| **Suffix** | |
| **Registration / Effective Date** | 1/31/2017 |
| **Commencement Date** | 1/31/2017 |
| **Entity Status** | Revoked |
| **Foreign Name** | |
| **Date of Organization** | |
| **State** | |
| **Country** | |

### Business Address

| | |
|---|---|
| **Line1** | 1015 15th ST. NW |
| **Line2** | STE# 1000 |

| **City** | WASHINGTON | **State** | District of Columbia | **Zip** | 20005 |

### Agent

| | |
|---|---|
| **Is non-commercial Registered Agent?** | No |
| **Name** | C T CORPORATION SYSTEM |
| **Address** | |
| **Line1** | 1015 15th St NW |
| **Line2** | Suite 1000 |

| **City** | Washington | **State** | District of Columbia | **Zip** | 20005 |

| **Email** | CT-StateCommunications@wolterskluwer.com |

Return to Home

| District News | Information Centers | Community | DC Government | Contact Us |
|---|---|---|---|---|
| Press Briefings & Schedules | 72hours Emergency Planning | Citywide Calendar | Mayor's Office | Call 311 |
| Statements & Releases | Business | Census | DC Agencies | Contact the Mayor |
| Subscribe to Emails | Consumer Protection | DC Jobs | DC Council | Contact Agency Directors |
| Subscribe to Text Alerts | Education | DC Procurement | Elected Officials | Send Feedback |
| Online Chats | Health | Green DC | District Appointees | Search Telephone Directory |
| DC.Gov Social Networks | Social Services | DC One Card | CapStat | Submit Service Requests |
| DC Webcasts | Residents | Interagency on Homelessness | Courts | Make FOIA Requests |
| Government Closures | Visitors | Recovery.dc.gov | DC Laws | |
| | | | DC Statehood | |

Accessibility   |   About DC.Gov   |   DC Guide   |   Wi-Fi Hotspots   |   Feedback   |   Privacy & Security   |   Terms & Conditions

# EXHIBIT 8

# AFFIDAVIT OF PROCESS SERVER

### United States District Court for the District of Columbia

**Mikhail Fridman, et al**

         Plaintiff(s),

VS.

**Bean LLC, et al**

         Defendant(s).

Attorney: Alan Lewis, Esq.

Sperduto Thompson & Gassler PLC
1747 Pennsylvania Ave., NW, #1250
Washington DC 20006

*255465*

**Case Number: 1:17-cv-02041-RJL**

Legal documents received by Same Day Process Service, Inc. on **06/18/2020** at **12:55 PM** to be served upon **The Democracy Integrity Project, by serving Superintendent of Corporations at Department of Consumer and Regulatory Affairs Business and Professional Licensing Administration - Corporations Division - 1100 4th Street, SW, 4th Floor, Washington, DC 20024**

I, **Michael Molash**, swear and affirm that on **June 19, 2020** at **9:49 AM**, I did the following:

Served **The Democracy Integrity Project, by serving Superintendent of Corporations** by delivering a conformed copy of the **Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action; Attachment (RE: Enclosures for Rule 45 Subpoenas)** by Certified Mailing to f **The Democracy Integrity Project, by serving Superintendent of Corporations** at **Department of Consumer and Regulatory Affairs Business and Professional Licensing Administration - Corporations Division - 1100 4th Street, SW, 4th Floor , Washington, DC 20024**.

**Supplemental Data Appropriate to this Service:** On 06-19-2020, a copy of the legal documents was certified mailed to the subject with receipt number: 70200640000071200366 to the address of: 1100 4th Street, SW, 4th Floor, Washington, DC 20024. On 06-25-2020, the domestic return receipt was returned indicating delivery on 06-22-2020.

I declare under penalty of perjury that the foregoing information contained in this affidavit is true and correct and that I am a professional process server over the age of 18 and have no interest in the above legal matter.

_____
**Michael Molash**
Process Server

**Same Day Process Service, Inc.**
**1413 K St., NW, 7th Floor**
**Washington DC 20005**
(202)-398-4200
info@samedayprocess.com

Internal Job ID: **255465**

District of Columbia: SS
Subscribed and Sworn to before me
this ____ day of _____, 2020

_____
K. Mack, Notary Public, D.C.
My commission expires February 29, 2024

# EXHIBIT 9

U.S. Postal Service™
CERTIFIED MAIL RECEIPT
Domestic Mail Only

For delivery information, visit our website at *www.usps.com®*.

WASHINGTON, DC 20024

OFFICIAL USE

| Certified Mail Fee | $3.55 | 0238 |
| | $2.85 | 33 |
| Extra Services & Fees *(check box, add fee as appropriate)* | | |
| ☐ Return Receipt (hardcopy) | $ $0.00 | |
| ☐ Return Receipt (electronic) | $ $0.00 | Postmark |
| ☐ Certified Mail Restricted Delivery | $ $0.00 | Here |
| ☐ Adult Signature Required | $ $0.00 | |
| ☐ Adult Signature Restricted Delivery | $ | |
| Postage | $7.50 | |
| $ | | 06/19/2020 |
| Total Pos | $13.90 | |

JUN 19 2020

Sent To

The Demography Integrity Project, by serving
Superintendent of Corporations
Department of Consumer and Regulatory Affairs
Business and Professional Licensing Administration -
Corporations Division
1100 4th Street, SW, 4th Floor
Washington, DC 20024

7020 0490 0000 0712 3996

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____ ☑ Agent
                ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

Haskell

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

JUN 2 2 2020

USPS

1. Article Addressed to:

The Democracy Integrity Project, by serving
Superintendent of Corporations
Department of Consumer and Regulatory Affairs
Business and Professional Licensing Administration -
Corporations Division
1100 4th Street, SW, 4th Floor
Washington. DC 20024

9590 9402 3953 8060 8455 40

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ____ Mail
☐ ____ Mail Restricted Delivery
(over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

2. Article Number (Transfer from service label)

7020 0640 0000 7120 0366

PS Form 3811, July 2015 PSN 7530-02-000-9053     Domestic Return Receipt

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **MIKHAIL FRIDMAN, *et al.*,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | Civil Case No. 1:17-cv-2041-RJL |
| | ) | |
| **ORBIS BUSINESS INTELLIGENCE** | ) | |
| **LIMITED, *et al.*** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**<u>PROPOSED ORDER</u>**

Upon consideration of Plaintiffs' Unopposed Motion For Leave To Serve Subpoenas On

Daniel Jones And The Democracy Integrity Project Via Alternative Service (the "Motion"), the

Court ORDERS that:

The Motion is GRANTED; and

Service of Plaintiffs' Rule 45 subpoenas on Daniel J. Jones and The Democracy Integrity

Project by (1) posting copies of the subpoenas outside the lobby of 801 Pennsylvania Ave., NW,

Washington, D.C. 20004 and leaving copies with the concierge; (2) delivering copies to Mr.

Jones by certified mail to 801 Pennsylvania Ave., N.W., Washington, D.C. 20004; 3) by email to

the address info@advdem.org; 4) by email to daniel@thepqg.com; and 5) by certified mail to the

"Penn Quarter Group, 801 Pennsylvania Ave, NW, c/o Daniel Jones, Washington, D.C. 20004"

shall be deemed good and sufficient service under Rule 45.

_____
Richard J. Leon
Senior United States District Judge