**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MIKHAIL FRIDMAN, PETR AVEN, and
GERMAN KHAN,

              Plaintiffs,

      v.

BEAN LLC a/k/a FUSION GPS, and GLENN
SIMPSON,

           Defendants.

No. 1:17-cv-2041-RJL

## <u>DEFENDANTS BEAN LLC'S AND GLENN SIMPSON'S MOTION TO COMPEL PLAINTIFFS' PRODUCTION OF THEIR DOCUMENTS</u>

Pursuant to Rule 37 of the Federal Rules of Civil Procedure, Defendants Bean LLC a/k/a Fusion GPS and Glenn Simpson (collectively "Defendants") respectfully file this Motion to Compel Plaintiffs Mikhail Fridman, Petr Aven, and German Khan (collectively, "Plaintiffs"), to collect, review, and produce all documents and information relevant to either party's claims or defenses, including Plaintiffs' emails, other electronic documents, personal devices, communications sent on behalf of Plaintiffs, and hard copy documents, responsive to Defendants' Requests for Production. As stated more fully in the accompanying Memorandum of Law, Plaintiffs are inappropriately withholding documents relevant to the substantial truth or falsity of CIR 112 and the alleged defamatory statements within it and Defendants' public figure defense. Accordingly, Defendants respectfully request that the Court order Plaintiffs to collect, review and produce all responsive documents and materials forthwith.

Pursuant to Local Civil Rule 7(m), Defendants met and conferred with Plaintiffs on this issue in a good faith effort to determine whether there is any opposition to the relief sought and, if

there is, to narrow the areas of disagreement.[1] The Parties, however, were unable to resolve their disagreement. Plaintiffs oppose this motion.

Dated:    August 14, 2020                      _____/s/ Joshua A. Levy_____

Joshua A. Levy (D.C. Bar No. 475108)
Rachel M. Clattenburg (D.C. Bar No. 1018164)
Zachary Blau (D.C. Bar No. 1600714)
**LEVY FIRESTONE MUSE LLP**
1401 K St. NW, Suite 600
Washington, DC 20005
Tel: (202) 845-3215
Fax: (202) 595-8253
jal@levyfirestone.com
rmc@levyfirestone.com
zblau@levyfirestone.com

*Counsel for Defendants*

---

[1] The Parties met and conferred on August 12, 2020 about this Motion. The Parties have engaged in extensive correspondence about this issue, including Plaintiffs' letters dated: April 24, 2020; June 2, 2020; June 25, 2020; and August 4, 2020; and Defendants' letters dated May 22, 2020; June 10, 2020; and June 30, 2020.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MIKHAIL FRIDMAN, PETR AVEN, and
GERMAN KHAN,

        Plaintiffs,

    v.

BEAN LLC a/k/a FUSION GPS, and GLENN
SIMPSON,

        Defendants.

No. 1:17-cv-2041-RJL

**DEFENDANTS BEAN LLC'S AND GLENN SIMPSON'S**
**MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO COMPEL**
**PLAINTIFFS' PRODUCTION OF ALL RESPONSIVE AND RELEVANT DOCUMENTS**

<u>**TABLE OF CONTENTS**</u>

INTRODUCTION..................................................................................................1

BACKGROUND...................................................................................................4

    A.    **Plaintiffs Allege That Statements about Their and Alfa's Decades-Long Relationship with Putin and the Kremlin Are Defamatory.** ...............4

    B.    **Defendants Requested Documents Relevant to the Truth/Substantial Truth or Falsity of CIR 112 and the Alleged Defamatory Statements within It and to Plaintiffs' Public Figure Status.**...........................................................................................................5

    C.    **Plaintiffs Claim That CIR 112 and the Alleged Defamatory Statements within It Are Limited to 2016 Events, with the Exception of Statements Concerning Govorun.**...................................8

    D.    **Plaintiffs Have Shirked Their Party Discovery Obligations.**........................9

    E.    **The Instant Dispute.**...................................................................................10

LEGAL STANDARD ........................................................................................14

ARGUMENT .....................................................................................................15

    I.    **PLAINTIFFS CANNOT UNILATERALLY DICTATE DISCOVERY BASED ON *THEIR* THEORY OF RELEVANCE.**...............16

    II.    **CIR 112 AND ITS ALLEGED DEFAMATORY STATEMENTS CONCERN EVENTS THAT OCCURRED BEFORE 2016.** ......................17

    III.    **DOCUMENTS CREATED PRIOR TO 2016 ARE RELEVANT TO THE SUBSTANTIAL TRUTH OF CIR 112.**...................................21

    IV.    **DOCUMENTS GENERATED AFTER OCTOBER 3, 2017, ARE RELEVANT TO THE SUBSTANTIAL TRUTH OF CIR 112 AND DAMAGES.** ...............................................................................24

        1.    *Documents generated in the course of Spanish criminal proceedings against Mikhail Fridman that Plaintiffs have either received, produced, or have the ability to obtain* ...............24

        2.    *Documents generated in the course of Special Counsel Robert Mueller III's criminal investigation that Plaintiffs have either received, produced, or have the authority to obtain.*...............26

        3.    *Documents that Plaintiffs have either received or produced in the* Aven v. Orbis *trial* ...........................................................29

    V.    **PRE-2016 DOCUMENTS CAN ESTABLISH PLAINTIFFS AS LIMITED PUBLIC FIGURES.**...................................................32

    VI.    **PLAINTIFFS CANNOT MAKE THE REQUIRED SHOWING AS TO WHY DISCOVERY SHOULD NOT BE PERMITTED.**........................35

CONCLUSION ..................................................................................................35

# TABLE OF AUTHORITIES

*Alexander v. FBI,*
194 F.R.D. 316 (D.D.C. 2000).................................................................14–15, 16, 34

*Arpaio v. Zucker,*
414 F. Supp. 3d 84 (D.D.C. 2019)...........................................................................21

*Benic v. Reuters Am., Inc.,*
357 F. Supp. 2d 216 (D.D.C. 2004).........................................................................21

*Clyburn v. News World Commc'ns, Inc.,*
903 F.2d 29 (D.C. Cir. 1990)...................................................................................33

*Farah v. Esquire Magazine,*
736 F.3d 528 (D.C. Cir. 2013)..........................................................................17, 19

*Food Lion, Inc. v. United Food & Commercial Workers Int'l Union, AFL-CIO-CLC,*
103 F.3d 1007 (D.C. Cir. 1997).......................................................................14, 30

*Fridman v. Orbis Bus. Intelligence Ltd.,*
229 A.3d 494 (D.C. 2020).........................................................................9, 20, 33, 34

*Gertz v. Robert Welch, Inc.,*
418 U.S. 323 (1974)............................................................................................3, 32

*Hernandez v. Results Staffing, Inc.,*
907 F.3d 354 (5th Cir. 2018)...................................................................................16

*In re Comm. on the Judiciary, U.S. House of Representatives,*
951 F.3d 589 (D.C. Cir. 2020), *cert. granted sub nom. Dep't of Justice v.*
*House Comm. on Judiciary*, No. 19-1328, 2020 WL 3578680 (U.S. July 2, 2020)........29

*In re Grand Jury Subpoena,*
912 F.3d 623 (D.C. Cir. 2019)................................................................................31

*Jankovic v. Int'l Crisis Grp.,*
822 F.3d 576 (D.C. Cir. 2016)................................................................................33

*Kahl v. Bureau of Nat'l Affairs, Inc.,*
856 F.3d 106 (D.C. Cir. 2017)................................................................................33

*McKeever v. Barr,*
920 F.3d 842 (D.C. Cir. 2019)................................................................................29

*Masson v. New Yorker Magazine, Inc.,*
501 U.S. 496 (1991)................................................................................................21

*Moss v. Stockard*,
   580 A.2d 1011 (D.C. 1990) ...........................................................................21

*Olinger v. Am. Sav. & Loan Ass'n*,
   409 F.2d 142 (D.C. Cir. 1969)......................................................................21

*Oppenheimer Fund, Inc. v. Sanders*,
   437 U.S. 340 (1978)..............................................................................*passim*

*Sherrod v. Breitbart*,
   304 F.R.D. 73 (D.D.C. 2014)........................................................................14

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*,
   482 U.S. 522 (1987)......................................................................................31

*Smith v. Clinton*,
   886 F.3d 122 (D.C. Cir. 2018) .....................................................................20

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987) (en banc) .....................................................19

*United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*,
   202 F. Supp. 3d 1 (D.D.C. 2016) .................................................................15

*United States v. Kellogg Brown & Root Servs., Inc.*,
   284 F.R.D. 22 (D.D.C. 2012)..................................................................15, 35

\* Per LCvR 7(a), the asterisks denote cases on which counsel chiefly relies.

## <u>Other Authorities</u>

American Heritage Dictionary of the English Language.......................................................1, 18

Federal Rule of Civil Procedure 26 .................................................................................14, 15

Federal Rule of Civil Procedure 34 .................................................................................10

Federal Rule of Civil Procedure 37 .................................................................................4, 15

Federal Rule of Criminal Procedure 6 .............................................................................29

Restatement (Second) of Torts § 563 (1977).....................................................................19

Restatement (Second) of Torts § 620 (1977).....................................................................24

Sack on Defamation: Libel, Slander, and Related Problems § 2.4.2 ....................................19

## INTRODUCTION

Plaintiffs Mikhail Fridman, German Khan, and Petr Aven founded and are the ultimate beneficial owners of Alfa. They have sued for defamation regarding a memorandum called "CIR 112" that summarizes Plaintiffs' and Alfa's relationship with Vladimir Putin and the Kremlin, spanning more than 20 years. But Plaintiffs—well aware of their long relationship with Putin and the Kremlin—have refused to produce any documents relevant to their decades of dealings with the Russian government's leadership. In order to avoid the daunting challenge of disproving the existence of their well-established relationship with Putin and the Kremlin, Plaintiffs have implausibly tried to cabin the meaning of CIR 112 and the alleged defamatory statements within it, and thereby deny Defendants discovery that is relevant to the substantial truth or falsity of CIR 112 and the alleged defamatory statements within it.

The plain language of the memorandum at issue cannot be so misconstrued. CIR 112 reports on the findings of a top Russian government official, who "commented on ***the history*** and current state of relations between President PUTIN and the Alpha Group of businesses led by oligarchs Mikhail FRIDMAN, Petr AVEN, and German KHAN." CIR 112, ECF No. 14-2, at 1 (emphasis added). The dictionary definition of "history" is simple, short and unambiguous.[1] As such, CIR 112 covers historical events from the 1990s up through the writing of the memorandum, dated September 14, 2016, such as the "continued" exchange of "significant favours" between Alfa and Putin; Plaintiffs Fridman's and Aven's informal advice to Putin on "foreign policy" and "especially about the US;" Alfa's "'kompromat' on PUTIN and his corrupt business activities from the 1990s;" Putin's being "not personally overly bothered by [Alfa's] failure to reinvest the

---

[1] The primary elements of the American Heritage Dictionary definition are "a chronological record of events," "[t]he branch of knowledge that records and analyzes past events," and "[t]he past events relating to a particular thing." *History*, American Heritage Dictionary of the English Language, https://ahdictionary.com/word/search.html?q=history.

1

proceeds of its [2013] TNK oil company sale into the Russian economy;" and the involvement of an Alfa intermediary in the Putin-Alfa relationship during the 1990s. *Id.* at 1–2.

Instead of owning up to the history of their relationship with Putin and the Kremlin, Plaintiffs have ignored the word "history" to withhold from discovery documents relating to events that occurred before January 1, 2016, under the pretense that such events are irrelevant to CIR 112. Indeed, Plaintiffs have produced only ***three*** pre-2016 documents. Nor are Plaintiffs willing to produce documents created after October 3, 2017, the date Plaintiffs filed suit, even when those documents relate to relevant 2016 events, let alone relevant pre-2016 events, and the parties' claims and defenses. Plaintiffs have literally read "history" out of CIR 112 to preclude Defendants from documenting for this Court Plaintiffs' and Alfa's pre-2016 relationship with Putin and the two-decade kleptocracy over which he has presided.

This Motion to Compel is necessary because Plaintiffs have used their dubious, self-serving misinterpretation of relevance to justify their refusal to search for, review, or produce relevant documents.

Equally concerning, while this Court has already ruled that the question of whether Plaintiffs are limited purpose public figures must be decided on a more complete factual record, Mem. Op., ECF No. 48, at 10–11, Plaintiffs, without support, have objected to the production of *any* pre-2016 documents relevant to this affirmative defense. There is no mystery as to what a more complete factual record will show. As Plaintiffs are no doubt painfully aware, U.S. courts— including this court in 2005 and more recently the District of Columbia Superior Court and the District of Columbia Court of Appeals—have consistently found them to be limited-purpose public figures.

Plaintiffs are also, undoubtedly, keenly aware of evidence in their possession, custody, or control concerning Plaintiffs' extensive use of the American media and high powered public relations firms and professionals in the United States, both in the recent past and currently, as well as their exceptional access to high-level U.S. government officials. Evidence of Plaintiffs' access to these "channels of effective communication," *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344 (1974), directly bears on the Court's determination of whether Plaintiffs are limited purpose public figures, *see infra* at 32–34. Plaintiffs cannot be permitted to suppress these facts by simply refusing to produce documents relevant to Defendants' affirmative defense, particularly when this Court has determined that it needs a more complete factual record to adjudicate this issue.

Plaintiffs have dragged out this discovery dispute for months, coyly indicating their reluctance to produce these plainly relevant documents by declining to proffer a clear explanation as to their position on the relevance of documents outside of the January 1, 2016 – October 3, 2017, time period. During these months of delay, and through multiple letters, Defendants have made straightforward requests to Plaintiffs asking how Plaintiffs defined relevance for purposes of reviewing their documents for production. From the start, in early May 2020, Plaintiffs' answer to this basic question proved elusive. Defendants ultimately had to request Plaintiffs' position on relevance in *three* separate letters because of Plaintiffs' repeated unwillingness to give a straight answer. This process finally culminated on August 4, 2020, with a response from Plaintiffs stating—albeit still without crystal clarity—their position that "relevance" ignores both CIR 112's discussion of "history" and the Court's unambiguous order that fact development is necessary on whether Plaintiffs are public figures. This response showed that Plaintiffs are withholding responsive documents under the pretense that documents generated outside of January 1, 2016 – October 3, 2017, are not relevant to this case, and that these foreign plaintiffs seek to advance the

erroneous proposition that their use of U.S. lobbyists and U.S. public relations agents has no bearing on whether they are public figures in the United States. Plaintiffs' recalcitrance is now ripe for judicial review.

Defendants therefore respectfully move the Court to overrule Plaintiffs' objections to the production of discovery on the basis of the relevance of documents from before 2016 and after October 3, 2017, and documents relating to their involvement in U.S. public relations and lobbying activities, and to compel responsive discovery, and any other relief this Court deems appropriate under Federal Rule of Civil Procedure 37.

## BACKGROUND

### A. Plaintiffs Allege That Statements about Their and Alfa's Decades-Long Relationship with Putin and the Kremlin Are Defamatory.

Plaintiffs Mikhail Fridman, Petr Aven, and German Khan ("Plaintiffs") filed this action against Defendants Bean LLC d/b/a Fusion GPS and Glenn Simpson ("Defendants") on October 3, 2017. Plaintiffs are suing Defendants for money damages based on a report titled Company Intelligence Report 2016/112 ("CIR 112") that former British intelligence officer Christopher Steele and his London business intelligence company, Orbis, submitted to Defendant Fusion GPS. CIR 112 is one of 17 such reports Orbis sent to Defendants. The popular media has labeled the collection of these 17 reports "the Dossier."

Plaintiffs claim that various statements in CIR 112 "defamed the Plaintiffs and Alfa," Am. Compl., ECF No. 17, at ¶ 33, and allege that "Defendants are liable for the defamation of Plaintiffs and Alfa," *id.* ¶ 35. Specifically, Plaintiffs take issue with the following statements in CIR 112:

- Plaintiffs claim that the line, "RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP COOPERATION," is false and defamatory. Pls.' Suppl. Resp. to Interrog. No. 2, ECF No. 78-6.[2]

- Plaintiffs claim that this sentence in CIR 112 is false and defamatory: "Significant favours continued to be done in both directions, primarily political ones for PUTIN and business/legal ones for Alpha." *Id.*

- Plaintiffs claim that the following content of CIR 112 is false and defamatory: "during the 1990s [Oleg] GOVORUN had been Head of Government Relations at Alpha Group and in reality, the 'driver' and 'bag carrier' used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St Petersburg. Given that and the continuing sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN."[3] *Id.*

**B. Defendants Requested Documents Relevant to the Truth/Substantial Truth or Falsity of CIR 112 and the Alleged Defamatory Statements within It and to Plaintiffs' Public Figure Status.**

Defendants propounded Requests for Production (RFPs) of documents on Plaintiffs

seeking documents relevant to Defendants' defenses. Those Requests sought, for instance:

- Documents relating to the truth or falsity of the statements quoted in Plaintiffs' complaint as allegedly defamatory, *see* Defs.' Doc. Reqs. ("RFPs") Nos. 2–11, ECF No. 78-4, at 8–9;

- Documents of transactions between Plaintiffs or Alfa and Putin, members of his family, or his representatives, *see id.* Nos. 12–13; as well as relating to any business deals or

---

[2] CIR 112 spells Alfa as "Alpha" throughout.

[3] Up until May 18, 2020, Plaintiffs also alleged defamation from the paragraph of CIR 112 stating:

> Alpha held 'kompromat' on PUTIN and his corrupt business activities from the 1990s whilst although not personally overly bothered by Alpha's failure to reinvest the proceeds of its TNK oil company sales into the Russian economy since, the Russian president was able to use pressure on this count from senior Kremlin colleagues as a lever on FRIDMAN and AVEN to make them do his political bidding.

Am. Compl. ¶ 27. On May 18, 2020, however, Plaintiffs revised their Responses to Interrogatories to indicate they no longer claim this sentence is defamatory. *Compare* Pls.' Suppl. Resp. to Interrog. No. 2, at 2–3, *with* Pls.' Resp. to Interrog. No. 2, Ex. 15, at 12–13.

financial transactions between Plaintiffs or Alfa and the Russian government or anyone acting on its behalf, *id.* Nos. 28–29, all of which bear, *inter alia*, on the exchange of favors between Plaintiffs/Alfa and Putin/the Kremlin;[4]

- Documents relating to the Trump Investigations and the Mueller Investigation, *id.* Nos. 14–19, which are relevant to, *inter alia*, the exchange of favors between Plaintiffs/Alfa and Putin/the Kremlin, the Plaintiffs' provision of advice to Putin, Plaintiffs' interpretation of the top line of CIR 112, and Plaintiffs' position that CIR 112 relates only to 2016 election interference;

- Communications between Plaintiffs and their past and present public relations and government lobbyists, *see, e.g.*, *id.* Nos. 24(f), (h), (l), (nn), (ss), (ssss), the media, *see id.* Nos. 24(g), (ll), (tt), (nnn), and the organizations through which they engage in philanthropy, *see, e.g.*, *id.* Nos. 24(b), (dd), (gg), (xx), (yy), (ttttt), because these documents are relevant to, *inter alia*, showing Plaintiffs' public figure status;

- Communications between Plaintiffs and other oligarchs and those close to Putin and the Kremlin, *e.g.*, *id.* Nos. 25(a)–(f), which bear, *inter alia*, on favors exchanged between Plaintiffs/Alfa and Putin/the Kremlin, as well as the historic relationship between Plaintiffs/Alfa and Putin/the Kremlin;

- Documents relating to meetings between Plaintiffs, Alfa, and Putin or the Russian government, *id.* No. 26, or Anton Vaino, a known representative of Putin, *id.* No. 27, which bear, *inter alia*, on favors exchanged between Plaintiffs/Alfa and Putin/the Kremlin, as well as the historic relationship between Plaintiffs/Alfa and Putin/the Kremlin;

- Documents relating to Plaintiffs' children's employment, which bear, *inter alia*, on favors done by Putin and/or the Kremlin for Plaintiffs, as well as the historic relationship between Plaintiffs/Alfa and Putin/the Kremlin, *id.* No. 38;

- Documents relating to Plaintiffs' or Alfa's communications, dealings, meetings, or relationships with the Trump Campaign, Trump Transition Team, Trump Organization, Republican Party, or Trump Administration, *id.* Nos. 39–41, which bear, *inter alia*, on favors by Plaintiffs, Plaintiffs' interpretation of the top line of CIR 112, and Plaintiffs' position that CIR 112 relates only to 2016 election interference;

- Documents relating to communications between Plaintiffs and any reporter, journalist, news organization, television or radio broadcaster or producer, or podcast host or producer, *id.* No. 48, which bear, *inter alia*, on whether Plaintiffs are public figures;

---

[4] Plaintiffs have refused to produce any Alfa documents, claiming that they do not have possession, custody, or control of these documents, despite their significant ownership of Alfa and their positions as leaders of Alfa ever since they founded it. The issue of Plaintiffs' control over Alfa documents is addressed in a separate Motion to Compel. *See* Defs.' Mot. to Compel, ECF No. 78.

- Communications between Plaintiffs or Alfa and any press agent, publicist, public relations professional, government relations professional, or advertising professional, *id.* No. 53, which bear, *inter alia*, on whether Plaintiffs are public figures;

- Documents relating to lobbying performed at Plaintiffs' or Alfa's direction, *id.* No. 54, as well as communications regarding U.S. policy or U.S.-Russian relations, *id.* No. 55, which relate, *inter alia*, both to substantial truth of the "significant favours" and to the public figure analysis;

- Documents relating to or showing all statements made under oath by Plaintiffs or Alfa in any legal proceeding, *id.* No. 76, and relating to any law enforcement investigation of Plaintiffs or Alfa, *id.* No. 77, which relate, *inter alia*, to statements regarding Plaintiffs' criminal activity, their denial that they have participated in criminal activity, and may also bear on their status as public figures and the historic relationship between Plaintiffs/Alfa and Putin/the Kremlin.

Both parties worked together in good faith for months to narrow and resolve their discovery disputes. Through that considerable meet-and-confer process, the parties agreed that, for practical purposes, without waiving either party's objections and without prejudice to either party's positions on relevance, their initial production would include documents from January 1, 2016, to October 3, 2017. Plaintiffs also agreed "to produce available pre-2016 documents, if any, related to communications with the media and the truth/falsity of the defamatory statements" and "to produce available pre-2016 documents, if any, related to . . . the truth/falsity of" CIR 112. Letter from A. Lewis to J. Levy (Apr. 24, 2020) ("Apr. 24 Letter"), ECF No. 78-11, at 3. In addition, at *Plaintiffs'* request, the parties agreed that should either party seek documents beyond October 3, 2017, a request could be made after production, and the responding party would have the option of producing responsive documents or preserving objections. Letter from J. Levy to A. Lewis (Apr. 16, 2020) ("Apr. 16 Letter"), ECF No. 78-10, at 1 (stating that initial production was "without prejudice to either party's right to challenge or question what has been produced or withheld, or either party's right to seek further reasonable supplemental party discovery").

As discovery progressed, however, it became clear to Defendants that, despite Plaintiffs' agreement to produce pre-2016 documents, Plaintiffs' cramped interpretation of CIR 112 means

they consider documents relating to pre-2016 activities as not relevant to this case and refuse to produce such documents. Thus, as reflected by the three pre-2016 documents Plaintiffs produced, their agreement to produce pre-2016 documents is largely meaningless.

As for post-October 3, 2017, documents, and per the parties' agreement that either party could request such documents after the initial document production deadline, Defendants requested the following categories of post-October 3, 2017 documents: (1) Documents from *Aven v. Orbis*, Letter from J. Levy to A. Lewis (May 22, 2020) ("May 22 Letter"), ECF No. 78-15, at 4; Letter from J. Levy to A. Lewis (June 30, 2020) ("June 30 Letter"), Ex. 1, at 5; (2) the Kroll Report, *see id.* at 3–4; (3) documents from the Spanish Proceeding, *see id.* at 4; and (4) documents from the Mueller Investigation, *see id.* at 4–5. Plaintiffs stated their refusal to produce them. Letter from A. Lewis to J. Levy (Aug. 4, 2020) ("Aug. 4 Letter"), Ex. 2.

### C. Plaintiffs Claim That CIR 112 and the Alleged Defamatory Statements within It Are Limited to 2016 Events, with the Exception of Statements Concerning Govorun.

CIR 112 plainly discusses "the history and current state of relations" between Putin and Alfa, "led by oligarchs" Fridman, Aven, and Khan.[5] Nevertheless, Plaintiffs allege that CIR 112 is limited to 2016, with the exception of the statement concerning Govorun.

---

[5] CIR 112 states:

> Speaking to a trusted compatriot in mid-September 2016, a top level Russian government official commented on the *history and current state of relations* between President PUTIN and the Alpha Group of businesses led by oligarchs Mikhail FRIDMAN, Petr AVEN and German KHAN. The Russian government figure reported that although they had had their ups and downs, the leading figures in Alpha currently were on very good terms with PUTIN. Significant favours *continued to be done in both directions* . . . .

(emphasis added).

In particular, Plaintiffs have tried to circumscribe what is relevant to the truth, falsity or substantial truth of CIR 112 and the alleged defamatory statements within it by insisting that only the events of 2016 are relevant. Plaintiffs have objected to the production of documents created either before January 1, 2016, or after October 3, 2017 (when Plaintiffs filed the complaint in this case). Plaintiffs have maintained that *none* of CIR 112 relates to pre-2016 conduct, with the sole exception of the statements regarding Oleg Govorun. Plaintiffs make this clear, saying:

> CIR 112 is not explicit about when the corrupt, alleged exchange of favors began. However, by using the word "continued," it does clearly allege that a corrupt relationship and bribery were continuing in 2016, when CIR 112 was written. *Therefore, for the purposes of this lawsuit, Plaintiffs' claim treats the allegation of corruption and bribery—exchanging political favors for economic/business favors—as an allegation of conduct during 2016.*

Pls.' Suppl. Resp. to Interrog. No. 2, ECF No. 78-6, at 2–3 (emphasis added).

Plaintiffs also maintain that "pre-2016 documents are not relevant to the question of whether Plaintiffs are 'limited public figures,'" Apr. 24 Letter at 3, despite the fact that, for decades, Plaintiffs have injected themselves into the public controversies concerning how oligarchs do business in and outside of Russia, as well as the nature of their relationships to Putin, the Kremlin, and the Russian state, *see* Defs.' Ans., ECF No. 50, at 9 ¶ 13; *accord Fridman v. Orbis Bus. Intelligence Ltd.*, 229 A.3d 494, 507 (D.C. 2020) (identifying "Russian oligarchs' involvement with the Russian government and its activities and relations around the world, including the United States" as the relevant public controversy in a similar suit brought by Plaintiffs).

### D. Plaintiffs Have Shirked Their Party Discovery Obligations.

Plaintiffs' production is utterly insufficient and highly prejudicial to Defendants. Plaintiffs responded to Defendants' discovery requests by producing 240 documents. Of them, 175 were generated in previous litigation; six are printed copies of Plaintiffs' respective resumes from the

publicly accessible websites of the companies they own; and the remaining 59 documents are personal e-mails and stray documents from Plaintiffs Fridman and Aven, only *three* **(3)** of which were generated prior to 2016. Plaintiff Khan produced *no* documents.

Plaintiffs' responses to Defendants' requests for documents are replete with the objection that these requests seek documents that are "not relevant" to CIR 112. Pls.' Resps. to RFPs, ECF No. 78-5, *passim*. Because Plaintiffs claim that the exchange of favors discussed in CIR 112 concerns only favors exchanged in 2016, Plaintiffs are not reviewing or producing documents that are plainly relevant to CIR 112. *See* Apr. 24 Letter at 6. Their narrow interpretation of CIR 112 and the alleged defamatory statements also means that Plaintiffs have not complied with Federal Rule of Civil Procedure 34(b)(2)(C) because they are refusing to identify whether they are withholding documents that are relevant either to truth or falsity or substantial truth, or to public figure, based on the correct reading of CIR 112 as encompassing events outside of 2016. *See* Fed. R. Civ. P. 34(b)(2)(C) ("An objection must state whether any responsive materials are being withheld on the basis of that objection.").

Additionally, Plaintiffs objected to the production of any of their Alfa documents and continue to withhold them. On June 12, 2020, Defendants moved to compel the production of those documents, many of which would relate to Plaintiffs' and Alfa's pre-2016 relationship with the Kremlin. *See* Defs.' Mot. to Compel, ECF No. 78. That motion is fully briefed and pending before this Court.

### E.  The Instant Dispute.

The instant dispute centers on Plaintiffs' refusal to produce documents created outside of January 1, 2016–October 3, 2017, and documents that relate to events outside of that time period. It appears that Plaintiffs' refusal is based on their incorrect interpretation of CIR 112 and the

alleged defamatory statements within it as pertaining only to 2016, although Plaintiffs have done their utmost to avoid saying so directly in their responses to numerous meet and confer letters.

For several months, Defendants have tried to resolve this matter out of court, by repeatedly requesting that Plaintiffs clarify the relevance standard they used to review documents. *See* May 22 Letter at 2–4; Letter from J. Levy to A. Lewis (June 10, 2020) ("June 10 Letter"), ECF No. 78-18, at 8–9; June 30 Letter at 2. Plaintiffs have repeatedly refused to respond with any clarity on this issue, delaying discovery in this case and obligating Defendants to seek relief from the Court.

In an exchange of letters preceding the instant motion, Defendants sought clarity from Plaintiffs whether they have produced documents that are relevant to Defendants' view of the issues in this case (*i.e.*, pre-2016 events), or whether, instead, they have produced only those documents they believe are relevant to their theory of the case (*i.e.*, only 2016 events). May 22 Letter at 2–4. Plaintiffs' initial response to that question, however, did not clarify matters. To wit, Plaintiffs' counsel responded that "subject to the General Statements and Objections, Plaintiffs are not withholding documents responsive to the Requests and Interrogatories other than as indicated in the original Responses and Supplemental Responses." Letter from A. Lewis to J. Levy (June 2, 2020) ("June 2 Letter"), ECF No. 78-17, at 1. Plaintiffs' non-responsive letter therefore required Defendants to repeat their request and seek clarification from Plaintiffs on this issue. June 10 Letter at 8–9 (asking Plaintiffs to clarify whether their production was reviewed only for "*Plaintiffs' position on what is relevant* to the 'truth/falsity' of" CIR 112, or whether it "includes all responsive pre-2016 documents relevant to" truth or falsity "based on *Defendants' position that CIR 112 concerns pre-2016 events*" (emphases added)). Again, Plaintiffs refused to clarify whether they reviewed documents based on Defendants' position that CIR 112 concerns pre-2016 events, responding vaguely that: "Plaintiffs' documents were reviewed manually, and Plaintiffs did not

11

exclude from production pre-2016 documents concerning the truth or falsity of the allegations in CIR 112." Letter from A. Lewis to J. Levy (June 25, 2020) ("June 25 Letter"), Ex. 3, at 8.

For the third time, Defendants put the same question to Plaintiffs. On June 30, 2020, Defendants asked Plaintiffs to clarify whether they "have reviewed, or will review and produce, or will not review and produce Plaintiffs' pre-2016 documents for relevance, **based on Defendants' position** that CIR 112 and the allegedly defamatory statements—and not just those concerning Govorun—relate to events that transpired between the 1990s and 2016." June 30 Letter at 2.

After repeated obfuscation, Plaintiffs now appear to concede that they in fact limited their review to their own reading of CIR 112 and the alleged defamatory statements within it. Aug. 4 Letter at 1 (asserting that the allegedly defamatory statements refer only to events in 2016, and that "[i]n this regard, Plaintiffs have not withheld pre-2016 documents"). Dilatory in the extreme with this response, Plaintiffs made a last-ditch effort to play the victim, claiming they are being "strong-armed" into producing documents. *Id.* They protest too much over a simple disagreement about what is relevant in this case.

Plaintiffs thus persist in withholding documents relevant to CIR 112 and the alleged defamatory statements within it. Although Defendants cannot know the extent of relevant documents Plaintiffs have withheld under their cramped reading of CIR 112, Defendants have identified a few categories of specific relevant documents that Plaintiffs are withholding:

*First*, Plaintiffs have refused to produce the Kroll Report, an early 1990s investigation of post-Soviet corruption implicating Putin, which Plaintiff Aven has claimed is solely in his possession, which relates to favors between Plaintiffs and Putin and to possession of "kompromat" on Putin.

*Second*, Plaintiffs have refused to produce documents relevant to Spain's criminal investigation of Plaintiff Fridman, which involves accusations that Plaintiff Fridman made illicit payments to the son of the Russian Minister of the Interior, *i.e.*, a "favor" to the son of a senior Kremlin official.

*Third*, Defendants requested documents related to the Mueller and Trump Investigations. Although in their responses to Document Requests, Plaintiffs stated that they would "make a good faith effort to locate and produce any available documents, if any, relating to" the Trump-related investigations or Mueller Investigation "involving CIR 112 or the contents therein," Pls.' Resp. to RFP No. 19, ECF No. 78-5, at 13–14, Plaintiffs have since taken the position that such documents are not relevant to CIR 112 because they post-date the commencement of this action, Aug. 4 Letter at 2.

*Fourth*, Plaintiffs have failed to produce documents disclosed in their March 2020 bench trial in *Aven v. Orbis*, QB-2018-6349.[6] Although that case, a U.K. data privacy suit brought by Plaintiffs against different defendants concerning the contents of CIR 112, did not allege defamation, and certainly was not governed by the D.C. law of defamation, it presented many of the same factual issues present in the instant action. Any documents Plaintiffs produced in that proceeding presumably bear on the contents of CIR 112 and the claims and defenses at issue before this Court. They must be produced.[7]

---

[6] All subsequent citations to *Aven v. Orbis* refer to this case.

[7] Plaintiffs have also refused to produce their documents at the companies they own and control. Defendants filed a motion to compel, ECF No. 78, which is fully briefed before this Court. Should the Court grant the instant motion, that ruling would govern the case and apply to Plaintiffs' review and production of *all* documents they control.

Additionally, as noted *supra* at 9, Plaintiffs have similarly refused to clarify whether they are withholding pre-2016 documents relevant to Plaintiffs' status as public figures in the public controversy identified by Plaintiffs and the District of Columbia Court of Appeals. This inappropriately limits Defendants' ability to establish Plaintiffs' public figure status.

## LEGAL STANDARD

Federal Rule of Civil Procedure 26(b)(1) provides that a party may "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." *See Sherrod v. Breitbart*, 304 F.R.D. 73, 75 (D.D.C. 2014) (Leon, J.) (quoting Fed. R. Civ. P. 26(b)(1)). "Generally speaking, 'relevance' for discovery purposes is broadly construed," *Food Lion, Inc. v. United Food & Commercial Workers Int'l Union, AFL-CIO-CLC*, 103 F.3d 1007, 1012 (D.C. Cir. 1997), and "encompass[es] any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case," *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (citing *Hickman v. Taylor*, 329 U.S. 495, 501 (1947)); *see also id.* n.12 ("The court should and ordinarily does interpret 'relevant' very broadly to mean matter that is relevant to anything that is or may become an issue in the litigation." (alteration adopted) (quoting 4 J. Moore, Federal Practice ¶ 26.56 [1], p. 26–131 n.34 (2d ed. 1976))); *see also, e.g.*, *Alexander v. FBI*, 194 F.R.D. 316, 325 (D.D.C. 2000). Importantly, "discovery is not to be denied because it relates to a claim or defense that is being challenged as insufficient," *Alexander*, 194 F.R.D. at 326 (quoting 8 Charles Alan Wright et al., Federal Practice and Procedure § 2008 (2d ed. 1994)), and "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable," Fed. R. Civ. P. 26(b)(1).

"[O]nce a relevancy objection has been raised, the party seeking discovery must demonstrate that the information sought to be compelled is discoverable." *Alexander*, 194 F.R.D.

at 325. "If that party carries its burden, the party resisting discovery then must show 'why discovery should not be permitted,'" *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 202 F. Supp. 3d 1, 6 (D.D.C. 2016) (quoting *id.* at 326), because the "movant's request is burdensome, overly broad, vague or outside the scope of discovery," *United States v. Kellogg Brown & Root Servs., Inc.*, 284 F.R.D. 22, 33 (D.D.C. 2012). "The court must also consider the prior efforts of the parties to resolve the discovery dispute without court intervention." *Id.* at 27 (citing Fed. R. Civ. P. 37(a)(1)).

Pursuant to Federal Rule of Civil Procedure 37, "[a] party seeking discovery may move for an order compelling . . . production . . . if . . . a party fails to produce documents . . . as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(B).

## ARGUMENT

Rule 26(b)(1) does not support Plaintiffs' withholding of documents relevant to Defendants' defenses, and their review and production of documents is deficient in the following six ways. First, Plaintiffs' view of relevance may not dictate the scope of discovery. Second, the plain language of CIR 112 makes documents related to pre-2016 matters relevant to this case. Third, pre-2016 documents are manifestly relevant to Defendants' substantial truth defense, and Plaintiffs' claims of falsity. Fourth, post-October 2017 documents relating to events occurring before the alleged publication dates are also relevant to the falsity and substantial truth of CIR 112 and the alleged defamatory statements. Fifth, pre-2016 documents are relevant to Plaintiffs' public figure status. Sixth, Plaintiffs cannot meet their burden of establishing that production of relevant documents "is burdensome, overly broad, vague or outside the scope of discovery."

15

## I.   PLAINTIFFS CANNOT UNILATERALLY DICTATE DISCOVERY BASED ON *THEIR* THEORY OF RELEVANCE.

Plaintiffs' refusal to produce documents related to Defendants' position on what is relevant to CIR 112 is impermissible gamesmanship. Certainly for purposes of discovery, this Court should reject Plaintiffs' position that their view of the case controls the relevance of documents. "[D]iscovery is not to be denied because it relates to a claim or defense that is being challenged as insufficient." *Alexander*, 194 F.R.D. at 326 (citation omitted).

Plaintiffs' gambit—"agree[ing] to review and produce pre-2016 documents," but rendering their agreement meaningless by reviewing only for relevant "conduct *in 2016*," Aug. 4 Letter from A. Lewis at 1—indicates Plaintiffs are withholding responsive documents relevant to Defendants' theory of the case, while treating them as irrelevant under Plaintiffs' narrow and selective reading of CIR 112 and the alleged defamatory statements. Such tactics are disfavored. *Hernandez v. Results Staffing, Inc.*, 907 F.3d 354, 363 (5th Cir. 2018) ("Our system of discovery was designed to increase the likelihood that justice will be served in each case, not to promote principles of gamesmanship and deception in which the person who hides the ball most effectively wins the case." (quoting *Abrahamsen v. Trans-State Express, Inc.*, 92 F.3d 425, 428−29 (6th Cir. 1996))). The scope of discovery is not controlled by Plaintiffs' position alone. *See Oppenheimer Fund*, 437 U.S. at 352 (excluding from scenarios where discovery may "proper[ly]" be denied—such as "matter that is relevant only to claims or defenses that have been stricken, or to events that occurred before an applicable limitations period"—a mere disagreement between the parties over a claim); *Alexander*, 194 F.R.D. at 326 ("[D]iscovery is not to be denied because it relates to a claim or defense that is being challenged as insufficient." (citation omitted)).

In addition to ordering production on the specific issues identified in this Motion, the Court should direct Plaintiffs to withhold documents on relevance grounds only if Plaintiffs represent that such documents are not relevant to *either* parties' claims or theories of the case.

## II.   CIR 112 AND ITS ALLEGED DEFAMATORY STATEMENTS CONCERN EVENTS THAT OCCURRED BEFORE 2016.

Plaintiffs' position that CIR 112 relates only to conduct during 2016 is unsupported by any reasonable reading of that document. Nowhere does CIR 112 say its findings are limited to 2016. Instead, CIR 112 plainly states that it comes from a source in the Russian government, who reported on the "history" and "current" relationship of Plaintiffs and Alfa with Putin and the Kremlin. CIR 112 at 1. To that end, CIR 112 illustrates this relationship through examples that occurred prior to 2016—such as Putin's time in St. Petersburg as its deputy mayor in the 1990s, Alfa's 2013 sale of its interest in TNK-BP, and Plaintiffs' possession of "kompromat" on Putin, which, by necessity, dates back years.

Plaintiffs have ignored the clear subject matter of CIR 112 and instead have latched onto a strained reading of a couple words in CIR 112 to breathe an exclusively present-tense meaning into the document where none exists. For example, they contend that the allegedly defamatory statement regarding the "continued" exchange of favors between Plaintiffs and Putin can be treated only "as an allegation of conduct during 2016," Pls.' Suppl. Resp. to Interrog. No. 2 at 3, even though CIR 112 says no such thing.

The law of defamation does not permit such cramped and tortured readings of allegedly defamatory documents. Instead, a "publication must be taken as a whole." *Farah v. Esquire Magazine*, 736 F.3d 528, 535 (D.C. Cir 2013) (quoting *Afro-American Publ'g Co. v. Jaffe*, 366 F.2d 649, 655 (D.C. Cir. 1966) (en banc)). The term "continued," especially when viewed in the context of the whole document, refers to the current and past exchange of favors. By any

reasonable construction, the assertion that something "continued" in 2016 means that it was happening prior to 2016 as well. *See, e.g.*, *Continue*, American Heritage Dictionary of the English Language, https://ahdictionary.com/word/search.html?q=continue (defining "continue" as "[t]o go on with a particular action or in a particular condition; persist").[8]

CIR 112's reference to the "history and current state of relations," as well as its historical examples of this relationship, make clear that CIR 112 refers not only to 2016 events, but also to pre-2016 events. Indeed, immediately following CIR 112's statement about the exchange of favors, the memorandum includes another statement that discusses events in the past: "Also, FRIDMAN and AVEN ***continued*** to give informal advice to PUTIN on foreign policy, and especially about the US where he ***distrusted*** advice being given to him by officials." CIR 112 at 1 (emphasis added).

The same is true of the statement regarding Govorun:

> [D]uring the 1990s GOVORUN had been Head of Government Relations at Alpha Group and in reality, the "driver" and "bag carrier" used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St Petersburg. Given that and the continuing sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN.

*Id.* at 1–2. Although Plaintiffs try to isolate and distinguish the Govorun statement as relating solely to the 1990s, *see* Apr. 24 Letter at 6 (contending that this case is about "defamatory statements regarding bribery in the 1990s, and an exchange of 'favors' in 2016"), that is not the natural reading of "[g]iven [the illicit cash paid to Putin] and the continuing sensitivity of the Putin-Alpha relationship, and need for plausible deniability, much of the contact between them was now

---

[8] The American Heritage Dictionary of the English Language is cited by Justice Scalia as one of "the most useful and authoritative for the English language generally and for law." Antonin Scalia & Bryan A. Garner, *A Note on the Use of Dictionaries*, 16 Green Bag 2D 419, 423, 428 (Summer 2013), http://www.greenbag.org/v16n4/v16n4_articles_scalia_and_garner.pdf.

indirect and entrusted to" Govorun. The statement certainly implicates actions in 2016, but also how the relationship between Plaintiffs and Putin, and the use of intermediaries, developed in the years between the 1990s and 2016. As with the "continu[ing]" favors between Alfa and the Kremlin, here, too, the verb "continuing" means that something both *was* happening and *is* happening.

In a defamation suit, the meaning and scope of an allegedly defamatory publication is determined by a "reasonabl[e]" or "normal, everyday reading." *Tavoulareas v. Piro*, 817 F.2d 762, 780 (D.C. Cir 1987) (en banc); *see also* Restatement (Second) of Torts § 563 (1977). When a court reviews a publication as a whole, the "[c]ontext is critical" for evaluating its meaning. *Farah*, 736 F.3d at 535. "Language is to be given its natural, plain, ordinary, obvious meaning and is to be construed in its popular sense." Sack on Defamation: Libel, Slander, and Related Problems § 2.4.2(A).

Applying these principles to CIR 112 supports Defendants' view of CIR 112's scope. While Plaintiffs have tried to argue here that the top line of CIR 112 (*i.e.*, "Russia/US Presidential Election Kremlin-Alpha Group Co-operation") means the entire document refers to 2016 because that is when the U.S. Presidential Election took place,[9] Plaintiffs—through their U.K. counsel— have elsewhere conceded that the first part of the "title is misleading because the memorandum says nothing at all about the US presidential election." *Aven v. Orbis* Tr. Day 1, Mar. 16, 2020, Ex. 4, at 17:11–12. Instead, "[w]hat [CIR 112] is about is clear from the [sub]title, 'Co-operation between the Kremlin and Alfa Group and the [Plaintiffs].'" *Id.* at 18:5–6. Plaintiffs' counsel went on to say that the contents of CIR 112 "ha[ve] nothing to do with the [2016] election." *Id.* at 25:19. Rather, CIR 112 "is simply about the [Plaintiffs], Alfa[,] and President Putin." *Id.* at 25:21–22.

---

[9] In any event, the presidential election cycle also encompasses 2015.

The District of Columbia Court of Appeals has also affirmed that "CIR 112 focuses on the *preexisting* controversy surrounding Russian oligarchs and their influence upon the Russian government," *Fridman*, 229 A.3d at 508 (emphasis added), rather than the 2016 election.

Likewise, in *Aven v. Orbis*, Plaintiff Aven testified to the falsity of CIR 112's statements not by denying that he and Alfa performed political favors for Putin in 2016, but by declaring, "I have *never* done favours for President Putin. President Putin *does not do and has not done* any favours for me," showing that Plaintiff Aven interprets CIR 112—and the alleged defamatory statement regarding the exchange of favors—as encompassing pre-2016 events. Witness Statement of Petr Aven, *Aven v. Orbis*, Ex. 5, at 7 ¶¶ 32–33 (emphases added).

Finally, Plaintiffs cannot claim that the CIR 112 statements defamed them because the statements were false in the year 2016, while blocking discovery as to whether the statements were true for years prior to 2016. Here, CIR 112 discusses over 20 years' worth of a relationship between Plaintiffs and Putin/Kremlin, as well as a relationship of the same duration between Alfa and the Kremlin. If that decades-long relationship included the exchange of favors, as CIR 112 states, then the alleged exchange of those favors in 2016 cannot be defamatory, even if, *arguendo*, Plaintiffs were to prove no favors were exchanged in 2016. *See Smith v. Clinton*, 886 F.3d 122, 128 (D.C. Cir. 2018) (stating that a defamation claim must allege, *inter alia*, that the statement at issue is both "false and defamatory" (quoting *Hourani v. Mirtchev*, 796 F.3d 1, 16 (D.C. Cir. 2015))). Moreover, if Plaintiffs and Alfa exchanged favors with Putin/Kremlin over the course of their decades-long relationship, then the statement in CIR 112 is substantially true, even if, *arguendo*, Plaintiffs were to prove no favors were exchanged in 2016.

### III.    DOCUMENTS CREATED PRIOR TO 2016 ARE RELEVANT TO THE SUBSTANTIAL TRUTH OF CIR 112.

All documents that reflect or refer to the exchange of favors between Plaintiffs and Alfa and the Russian Government are by definition relevant to Defendants' defense that the allegedly defamatory statements in the CIR 112 are substantially true.

Truth "is a complete defense" to defamation, *Olinger v. Am. Sav. & Loan Ass'n*, 409 F.2d 142, 144 (D.C. Cir. 1969), and the Supreme Court has explained that "[t]he common law of libel . . . overlooks minor inaccuracies and concentrates upon substantial truth," *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991). In D.C., "[t]his defense may be established by demonstrating that the statements in question are 'substantially true.'" *Benic v. Reuters Am., Inc.*, 357 F. Supp. 2d 216, 221 (D.D.C. 2004) (Leon, J.) (quoting *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 59 (D.D.C. 2002)). "Substantially true" means that a statement's "'gist' or 'sting'" is true, *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1990), "as it would be understood by its intended audience," *Benic*, 357 F. Supp. 2d at 221; *see also Arpaio v. Zucker*, 414 F. Supp. 3d 84, 90 (D.D.C. 2019) ("If the 'sting of the charge' is substantially true, the defamation suit must fail." (quoting *Parsi v. Daioleslam*, 595 F. Supp. 2d 99, 108 (D.D.C. 2009))). "Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." *Masson*, 501 U.S. at 517 (cleaned up). Substantial truth is determined by reading "the publications or statements . . . in the context of the entire communication." *Arpaio*, 414 F. Supp. 3d at 90.

As set out above, CIR 112 concerns pre-2016 activity, and so the substantial truth of CIR 112 "as it would be understood by its intended audience," *Benic*, 357 F. Supp. 2d at 221, can be proven through pre-2016 activity. Any document "that bears on, or that reasonably could lead to other matter that could bear on," *Oppenheimer Fund*, 437 U.S. at 351 (citation omitted), the

substantial truth of the ongoing relationship between the Kremlin and Alfa and Plaintiffs is clearly relevant to Defendants' defenses. Plaintiffs cannot claim to be defamed by statements concerning a history of cooperation and exchanges of favors with the Kremlin while simultaneously denying Defendants the opportunity to access and review *any* documents created outside of 2016 that may bear on the substantial truth of those same statements. *See* Apr. 24 Letter at 3 ("[P]re-2016 documents cannot, by definition, be relevant to any issues in this litigation aside from the truth or falsity of the Govorun-related defamatory statement.").

Defendants cannot know what responsive pre-2016 documents Plaintiffs are withholding or refusing to search, but Plaintiff Aven's *Aven v. Orbis* testimony offers a clue. He was asked about a report generated by a special commission tasked with investigating corruption in post-Soviet Russia. *Aven vs. Orbis* Trial Tr. Day 2, Ex. 6, at 25:7–27:8. The report "recounted widespread instances of 'bribery of officials, blackmail, and the illegal transfer of currency resources to foreign banks.'" *Id.* at 26:18–20 (quoting Karen Dawisha, *Putin's Kleptocracy: Who Owns Russia?* 19 (2014)). Plaintiff Aven denied the allegations and asserted, "I'm the only one who has in my hands Kroll report. I have it. I have Kroll report . . . . This [commission's report] was based on Kroll report. I have Kroll report." *Id* at 26:23–27:8. Yet no such report was included in Plaintiffs' production to Defendants, despite its relevance to RFPs 4 through 8, which seek documents relating to Plaintiffs' history with Putin, including their exchange of significant favors, payments to Putin, as well as any "'kompromat' on Putin and his corrupt business activities from the 1990s" held by Plaintiffs or Alfa.[10]

---

[10] If the Kroll Report referenced in Plaintiff Aven's testimony does, in fact, support his assertion that he has never done any favors for Putin or conducted business with the Russian government, it would nonetheless be responsive to RFP 10 as a document relating to the falsity of statements contained with CIR 112.

Although Plaintiffs contend that production of the report is unwarranted because "it does not relate" to the Govorun allegation, Aug. 4 Letter at 3, the Kroll Report is relevant to CIR 112's statement regarding the exchange of significant favors, which Plaintiffs claim is false and defamatory. Following the collapse of the Soviet Union, Plaintiff Aven was the Minister of Foreign Economic Relations for the Russian Federation while Putin presided over the infamous oil-for-food scandal in St. Petersburg. *See, e.g.*, Catherine Belton, *Putin's People: How the KGB Took Back Russia and Then Took On the West* 89, 189–90 (2020), Ex. 7. In his autobiography, Putin defends his role in that criminal scheme, in which energy companies received licenses in exchange for unfulfilled promises to deliver food, by denying that he and the City of St. Petersburg granted the licenses to the companies that never delivered food to the Russian people and explaining that it was the Ministry for Foreign Economic Relations that "issued the licenses"—"[t]hey were a federal structure and had nothing to do with the municipal administration." Vladimir Putin, *First Person* 98–99 (2000), Ex. 8. In other words, Plaintiff Aven (the Minister) gave Putin cover through the issuance of those licenses—a significant favor. When Yuriy Boldyrev, chief of the Main Control Directorate of the Presidential Administration, was investigating the oil-for-food scandal, he requested that Plaintiff Aven not give Putin any further authority until the case was finally settled, but Aven did nothing. *See* Dawisha, *Putin's Kleptocracy* 118 (citing Sal'ye Commission, "Letter from Yu. Boldyrev to P.O. Aven"), Ex. 9. The Kroll Report thus sheds light on CIR 112 and the alleged defamatory statements—namely, a significant favor and potential source of "kompromat," notwithstanding Plaintiffs' contention that the Kroll Report is not relevant because it does not discuss Govorun.

Like the Kroll Report, the pre-2016 documents sought by Defendants encompass subject matter that could bear on Defendants' defenses (or Plaintiffs' claims) in this case, including the

substantial truth of the alleged defamatory statements, and are therefore relevant and discoverable. *Oppenheimer Fund*, 437 U.S. at 351.

## IV.   DOCUMENTS GENERATED AFTER OCTOBER 3, 2017, ARE RELEVANT TO THE SUBSTANTIAL TRUTH OF CIR 112 AND DAMAGES.

In addition to their failure to produce documents dated or created prior to 2016, Plaintiffs continue to maintain that documents "dated or created . . . after the date of the initial Complaint, October 3, 2017," are not relevant to this case. Pls.' Suppl. Resps. to RFPs, ECF No. 78-5, at 2 ¶ C. Plaintiffs unreasonably seek to bar discovery of any *documents* generated after October 3, 2017, that nonetheless concern earlier conduct, even to include conduct that occurred in 2016, and have specifically refused to produce three categories of relevant documents.

To the extent such documents bear on Plaintiffs' conduct after the alleged publication, those documents are also relevant to the amount of damages. *See* Restatement (Second) of Torts § 620 comment a (1977) ("Nominal damages are awarded when the insignificant character of the defamatory matter, or the plaintiff's bad character, leads the jury to believe that no substantial harm has been done to his reputation, and there is no proof that serious harm has resulted from the defendant's attack upon the plaintiff's character and reputation.").

   1.   *Documents generated in the course of Spanish criminal proceedings against Mikhail Fridman that Plaintiffs have either received, produced, or have the ability to obtain*

Defendants requested all documents "received by" or "sent by" Plaintiffs, Alfa, or other affiliated entities, from, to, or on behalf of "prosecutor Jose Grinda or any other Spanish law enforcement or judicial official, or agency." RFPs Nos. 20–21. Spanish authorities have alleged that Plaintiff Fridman, *inter alia*, made payments totaling more than $20 million to the son of the Russian Minister of the Interior in exchange for services that were not worth "a tenth of that," and that such payments began in 2013. Spanish Criminal Complaint Against Vimpelcom (Aug. 19,

2016), Ex. 10, ¶ 2. Such a "favor" to the son of a senior Kremlin official, which started in early 2013 and may have continued into 2016, is consistent with the pattern of "significant favours" discussed in CIR 112, and is therefore relevant to Defendants' substantial truth defense. Accordingly, Plaintiffs should produce documents concerning these proceedings.

Plaintiffs claim that "[p]roceedings or investigations involving Spanish law enforcement or governmental entities has no relevance to the statements in CIR 112. . . . Fridman states that he intends to withhold any responsive documents on the basis of these objections." Pls.' Resps. to RFPs Nos. 20–21. Although Plaintiffs have tried to narrow the exchange of significant favors to criminal acts, *see* Pls.' Suppl. Resp. to Interrog. No. 2 (arguing that the exchange of "significant favours" refers only to "corruption and bribery"), which the Spanish government's allegations clearly cover, Plaintiffs nonetheless seek to avoid their obligation to produce documentation from the Spanish proceedings by arguing:

> [T]he 2019 Spanish proceedings are irrelevant to the defamatory statements regarding bribery in the 1990s, and an exchange of 'favors' in 2016, in CIR 112. The Spanish proceedings revolve around an investigation into the bankruptcy of a Spanish technology company and bear no connection to the defamatory statements in CIR 112.

Apr. 24 Letter at 6; *see also* Aug. 4 Letter at 3 ("[T]he Spanish proceedings have nothing to do with the defamatory allegations challenged in this lawsuit.").

But as noted in Argument § II, *supra*, Plaintiffs' position that CIR 112 addresses only favors "in 2016" is not supported by the text of CIR 112. Plaintiffs also elide a key charge against Fridman in the Spanish proceedings—that he has awarded an unreasonably favorable contract, on which payments may have been made in 2016, to a senior Kremlin official's son—which is directly relevant to the substantial truth of the allegedly defamatory phrase "Kremlin-Alpha Group Co-Operation," the alleged defamatory statement regarding Plaintiffs' exchange of favors with Putin

(who controls the Kremlin), as well as the allegation in CIR 112 that Plaintiffs paid bribes to government officials.

Defendants therefore respectfully move the Court to overrule Plaintiffs' objections to the relevance of documents generated in conjunction with the proceedings involving Spanish law enforcement that concern matters alleged to have taken place in and before 2016, and compel Plaintiffs to produce documents responsive to RFPs 20 and 21.[11]

2. *Documents generated in the course of Special Counsel Robert Mueller III's criminal investigation that Plaintiffs have either received, produced, or have the authority to obtain*

Defendants requested all documents "received by, produced by, or served upon" Plaintiffs, Alfa, or affiliated entities, "in connection with the Mueller Investigation," or "in connection with any of the Trump Investigations," as well as all documents "related to any Trump Investigation." RFPs Nos. 14–19. Additionally, Defendants requested "all transcripts of deposition or trial testimony" provided by Plaintiffs under oath in any fact-finding proceeding, investigation, or legal proceeding. RFP No. 76. In their initial Responses to RFPs, Plaintiffs stated that they would "make a good faith effort to locate and produce any available documents, if any, relating to" the Trump-related investigations or Mueller Investigation "involving CIR 112 or the contents therein." Pls.' Resp. to RFP No. 19. Plaintiffs have since taken the position that such documents are not relevant

---

[11] Seeking to avoid discovery of any documents that show the truth of the statements in CIR 112, such as the Spanish proceedings documents, Plaintiffs accuse Defendants of seeking this discovery for use in a research project rather than as part of their defense. *See* Aug. 4 Letter from A. Lewis at 3. As explained herein, the allegations in the Spanish proceedings are directly relevant to whether Plaintiff Fridman has provided favors to a Kremlin official. Plaintiffs chose to litigate the truth of the allegations that they exchange favors with Putin and the Kremlin, which Plaintiffs have construed as alleging that they engaged in criminal acts, which, in turn, only makes the Spanish Proceeding documents more relevant. They must produce the documents that bear on the substantial truth or falsity of these allegations, including the Spanish Proceeding documents.

to CIR 112 because they post-date the instant case, Aug. 4 Letter at 4, and Plaintiffs have yet to produce a single document generated in the course of the Mueller investigation.[12]

Defendants cannot know the full extent of responsive documents that are currently being withheld by Plaintiffs in response to the foregoing requests, but it is undisputed that U.S. Department of Justice officials interviewed Plaintiff Aven in connection with the Mueller investigation, and Plaintiff Aven's lawyer provided the Special Counsel with an attorney proffer. *See* 1 Special Counsel Robert S. Mueller, III, Report On The Investigation Into Russian Interference In The 2016 Presidential Election ("Mueller Report") (2019), Ex. 11, at 146 n.976 (stating that "Aven provided information to the [Special Counsel's] Office in an interview and through an attorney proffer," but redacting, per Federal Rule of Criminal Procedure 6(e), the remainder of the footnote as a matter occurring before the grand jury). Aven's interview yielded, *inter alia*, the following facts:

> Aven told the Office that he met on a quarterly basis with Putin, including in the fourth quarter (Q4) of 2016, shortly after the U.S. presidential election. Aven said that he took these meetings seriously and understood that any suggestions or critiques that Putin made during these meetings were implicit directives, and that there would be consequences for Aven if he did not follow through. As was typical, the 2016 Q4 meeting with Putin was preceded by a preparatory meeting with Putin's chief of staff, Anton Vaino.

> According to Aven, at his Q4 2016 one-on-one meeting with Putin, Putin raised the prospect that the United States would impose additional sanctions on Russian interests, including sanctions against Aven and/or Alfa-Bank. Putin suggested that

---

[12] After Plaintiffs agreed to a process *they proposed*, in which the parties would produce documents between January 1, 2016 and October 3, 2017, and then thereafter would be permitted to make separate requests for documents outside of that range, Plaintiffs now try to mischaracterize Defendants' adherence to that process as a "bullying tactic." Aug. 4 Letter at 4. The charge is absurd. Defendants repeatedly made clear that they would be seeking these documents after the May 4, 2020, party production, followed through on that request, and have explained why the documents are relevant. Defendants renewed and perfected their request through a letter after receiving Plaintiffs' May 4, 2020, production. Plaintiffs disagree that these documents are relevant and have refused to produce them. Defendants have therefore asked the Court for relief to compel production under the Federal Rules of Civil Procedure—hardly a bullying tactic.

Aven needed to take steps to protect himself and Alfa-Bank. Aven also testified that Putin spoke of the difficulty faced by the Russian government in getting in touch with the incoming Trump Administration . . . . According to Aven, although Putin did not expressly direct him to reach out to the Trump Transition Team, Aven understood that Putin expected him to try to respond to the concerns he had raised.

*Id.* at 146–47 (footnotes omitted).

The conduct described in Aven's interview, proffer, and grand jury testimony, and detailed by the Special Counsel, occurred before the filing of this case, and most of it relates to events in 2016. Such conduct is relevant to Defendants' defense that the statement "significant favours continued to be done in both directions, primarily political ones for PUTIN," *see* CIR 112 ¶ 1, is substantially true. Indeed, the record established in the Mueller Report is that Aven performed exactly the sort of favor contemplated by the memorandum when he met with Putin, internalized Putin's words as a directive to take action, and subsequently sought out the Trump Transition team to make contact on behalf of Russian interests. *See* Notes of Special Counsel's Office Interview of Richard Burt (Feb. 9, 2018), ECF No. 78-51, at 2–4 (describing Aven's efforts, through Alfa's longtime lobbyist, to "establish[] a communications channel between the Kremlin and the DONALD TRUMP transition team"). In fact, Aven evidently testified to the grand jury that Putin followed up on his directive and "asked about Aven's attempt to build relations with the Trump Administration" in early 2017 and "in several subsequent quarterly meetings." 1 Mueller Report at 165.[13]

---

[13] In their most recent letter, Plaintiffs cite to a U.K. judge's findings to dispute the Mueller investigation's record showing that Plaintiff Aven attempted to contact the Trump Transition Team on behalf of the Russian government, and they dispute that Plaintiffs did "Mr. Putin's political bidding." Aug. 4 Letter at 4. But that judicial finding—which rests on an illusory distinction between economics and politics—does not foreclose discovery in this case, and Defendants have a right to documents bearing on those factual issues that are squarely relevant to the substantial truth or falsity of the alleged defamatory statements and CIR 112.

The subject matter of the Special Counsel investigation clearly encompasses statements and activity relevant to Defendants' defenses. *See Oppenheimer Fund*, 437 U.S. at 351 (relevance "encompasses any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case" (cleaned up)). As such, Defendants respectfully move the Court to overrule Plaintiffs' objections to the relevance of the Mueller investigation documents generated after October 3, 2017, and compel, at minimum, Plaintiffs to produce Aven's proffer to the Special Counsel's Office, as well as any other documents obtained or produced in the course of the Mueller Investigation, including any transcript of Aven's grand jury testimony.[14]

3.   *Documents that Plaintiffs have either received or produced in the* Aven v. Orbis *trial*

As discovery has proceeded in the instant case, Plaintiffs have been engaged in concurrent litigation in the United Kingdom concerning CIR 112 and the truth or falsity of statements contained therein, albeit under a different legal framework. Defendants were not parties to that litigation—or even requested as third parties to participate in that case as witnesses. As described above, discovery in that case is complete and a bench trial has already been held. While the data

---

[14] Plaintiffs have separately, in their initial Responses to RFPs 14, 76, and 83, objected to producing documents or materials "presented to a grand jury." *See also* Aug. 4 Letter at 4 ("[D]ocuments related to the Mueller investigation will not be produced because they are subject to grand jury secrecy."). That objection is baseless. Even assuming *arguendo* that Plaintiff Aven's proffer to the Special Counsel, or any notes taken during the interview, constitute "a matter occurring before the grand jury," Fed. R. Crim. P. 6(e)(2)(B), "[n]o obligation of secrecy may be imposed on any person except in accordance with Rule 6(e)(2)(B)," *id.* 6(e)(2)(A). "Rule 6(e)(2)(B) provides that 'a matter occurring before the grand jury' must not be disclosed by grand jurors, interpreters, court reporters, government attorneys, or other persons specifically listed in the Rule." *In re Comm. on the Judiciary, U.S. House of Representatives*, 951 F.3d 589, 593 (D.C. Cir. 2020), *cert. granted sub nom. Dep't of Justice v. House Comm. on Judiciary*, No. 19-1328, 2020 WL 3578680 (U.S. July 2, 2020); *see also McKeever v. Barr*, 920 F.3d 842, 844–45 (D.C. Cir. 2019). Witnesses and their counsel—who are not permitted in a grand jury room—are not on that list, and Plaintiff Aven, unencumbered by Rule 6(e), is thus free to produce any responsive documents, regardless of whether it was also provided to the grand jury or recounts what he said before the grand jury.

privacy laws of the United Kingdom and the law of defamation in the District of Columbia are distinct, the subject matter at the heart of each proceeding is identical: CIR 112. Any suggestion that documents relevant to one suit regarding the veracity of CIR 112 are not relevant to a second suit on the same exact issue—particularly given that relevance at the discovery stage is "broadly construed," *Food Lion*, 103 F.3d at 1012—is risible and should be rejected. For example, one such document is an email to Plaintiff Fridman from Stuart Bruseth, LetterOne's communications director, regarding *Buzzfeed*'s "publication" of the Dossier. *See Aven v. Orbis* Tr. Day 2, at 14:5–24. The trial transcript makes clear additional disclosed documents "show that this is a familiar path for [Fridman] to tread, using communications experts, to deal with the media, to respond and rebut, if appropriate, through [his] own comments with the benefit of professional advice." *Id.* at 15:4–18.

Plaintiffs now claim that "that material is in the public domain and Plaintiffs need not produce it under the parties' agreement regarding publicly available documents." June 2 Letter at 2; Aug. 4 Letter at 4–5. That agreement, following Plaintiffs' refusal to produce documents "from the public domain to which Defendants have equal access," Pls.' Resp. to RFPs, ECF No. 78-5, at 4 ¶ L, is that the parties need not produce "publicly available" documents meaning "public domain" documents as well as those "that are freely available online or are available through a service such as Lexis or Westlaw," Apr. 16 Letter at 2–3; *see also* Apr. 24 Letter at 2 ("Your letter accurately reflects the parties' agreement with respect to publicly available documents.").

Plaintiffs represent that those documents are available "upon application to the UK High Court" or "upon an email request sent to qbenquiries@justice.gov.uk." June 2 Letter at 2. Plaintiffs' counsel, however, referred to an application form N244 which shows that those documents are not "equally available" or "freely available online" to Defendants. Unlike a

download from a docket readily available through PACER, the U.K. application makes clear—and Plaintiffs' counsel now acknowledges, June 25 Letter at 9—that Defendants can only access those documents with a court order.[15] The application asks "[w]hat order are you asking the court to make and why?," "[h]ave you attached a draft of the order you are applying for?," "[w]hat information will you be relying on, in support of your application?," as well as whether a hearing might be necessary to resolve the application—and it advises that "[m]ost applications will require a hearing and you will be expected to attend." N244 Application Notice, Ex. 12. Documents already within Plaintiffs' control are not equally or freely available to Defendants if they require Defendants to expend significant and substantial resources to seek an order from a foreign court and attend a hearing in that court in order to obtain the order.[16] In sum, neither a relevance objection

---

[15] Plaintiffs have also represented that the documents Defendants request, including "trial exhibits," "are publicly available on the English Court's electronic filing system." Aug. 4 Letter at 4–5. The *Aven v. Orbis* public docket, however, consists of thirteen documents, none of which are Plaintiffs' trial exhibits. *Aven v. Orbis* public docket, Ex. 16.

[16] In their June 25, 2020 letter, Plaintiffs contend that this application to the U.K. High Court "is a reasonable way to proceed as this avoids the need for the parties to engage in a protracted U.K. Data Protection Law analysis with respect to which documents can, and cannot, be produced by Plaintiffs to Defendants absent additional confidentiality and data processing agreements." June 25 Letter at 9. That argument is unavailing. Foreign "statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 544 n.29 (1987), and Defendants are not aware of any case law allowing a party to rely on foreign data privacy laws to avoid producing the party's own documents, much less its own documents that were previously produced in other litigation. In any event, the data protection concerns are already addressed by this Court's Protective Order § 2.C, ECF No. 67, which allows Plaintiffs to designate discovery material as "Highly Confidential – Personal Data," and allows Defendants to challenge such designations, *id.* § 4. Both case law, *see In re Grand Jury Subpoena*, 912 F.3d 623, 633 (D.C. Cir. 2019) ("[T]he party who 'relies on foreign law . . . assumes the burden of showing that such law prevents compliance with the court's order.'" (quoting *In re Sealed Case*, 825 F.2d 494, 498 (D.C. Cir. 1987) (per curiam))), and the Protective Order § 4.E require *Plaintiffs* to justify their reliance on foreign law to bar production of relevant documents. The supposed "need for . . . a protracted U.K. Data Protection Law analysis" is insufficient. Perhaps that is why Plaintiffs did not reiterate that argument in their August 4 Letter.

nor a public domain objection excuses Plaintiffs from producing *Aven v. Orbis* trial documents, and this Court should compel such production.

*     *     *

Finally, Plaintiffs' claim that post-October 2017 documents are not relevant purely because of when they were created is belied by their own third-party subpoenas, which concede the relevance of pre-2016 and post-October 2017 documents. In their third-party subpoenas to date, they instruct that "[u]nless otherwise indicated, the documents to be produced include all documents prepared, sent, dated, or received, or which otherwise existed or were possessed at any time subsequent to January 1, 2015." *See, e.g.*, Pls.' Rule 45 Subpoena to Democratic National Committee, Ex. 13, at 2 ¶ 8. In other words, the default cut-off is a full year earlier for third parties than what Plaintiffs would impose on themselves. And, because they do not include any cut-off for the relevant date range, they appear to be seeking documents from as recent as May and June 2020 when the subpoenas were issued—including documents "relating to the truth or falsity" of CIR 112 and the entire Dossier. *See, e.g.*, *id.* at 9 ¶ 7. As noted, Plaintiffs had earlier insisted that "pre-2016 documents cannot, by definition, be relevant to any issues in this litigation, aside from the truth or falsity of the Govorun-related defamatory statement." Apr. 24 Letter at 3. Their third-party subpoenas show, however, that Plaintiffs apparently do not contest that documents outside of the period from January 1, 2016, to the filing of this case are potentially relevant to the case, even under Plaintiffs' cramped interpretation of CIR 112.

## V.   PRE-2016 DOCUMENTS CAN ESTABLISH PLAINTIFFS AS LIMITED PUBLIC FIGURES.

The discovery of pre-2016 documents is also relevant to Defendants' public figure defense. Broadly, public figures are those who have "assumed roles of especial prominence in the affairs of society" that "invite attention and comment." *Gertz*, 418 U.S. at 345. The Supreme Court set

the "dividing line between public and private figures based on those who assumed the risk of publicity and had access to channels of communication to defend themselves, and those who did not." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 584–85 (D.C. Cir. 2016) (quoting *Lohrenz v. Donnelly*, 350 F.3d 1272, 1279 (D.C. Cir. 2003)). Other factors in the public figure analysis include whether Plaintiffs "'thrust themselves to the forefront' of a public controversy 'in order to influence the resolution of the issues involved,'" *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 114–15 (D.C. Cir. 2017) (Kavanaugh, J.) (quoting *Gertz*, 418 U.S. at 345), and whether their voluntary relationships with high-level officials and business associates show that they have "engaged in conduct that [they] knew markedly raised the chances that [they] would become embroiled in a public controversy," *Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 33 (D.C. Cir. 1990). In sum, Plaintiffs' access to channels of communication, their efforts to influence public perception of the relationship between Russian oligarchs, including themselves, and the Russian state, and their connections to high-level officials are key indicia of their public figure status.

Defendants' position—consistent with the recent District of Columbia Court of Appeals decision in a similar defamation suit over CIR 112 brought by Plaintiffs, *Fridman*, 229 A.3d at 508—is that Plaintiffs are public figures for purposes of the existing public controversy concerning how Russian oligarchs conduct their businesses both inside and outside of Russia, including the nature and scope of oligarchs' relationships with Putin and the Kremlin. Plaintiffs contend that the relevant controversy is "whether Russia attempted to influence the 2016 U.S. presidential election." Apr. 24 Letter at 3. But disagreement on that point does not excuse Plaintiffs from producing documents relevant to their public figure status as to the controversy identified by Defendants (and the District of Columbia Court of Appeals). Discovery on that issue "is not to be

denied because it relates to a claim or defense that is being challenged." *Alexander*, 194 F.R.D. at 326 (citation omitted).

Plaintiffs' pre-2016 documents will shed light on each of the factors identified above as bearing on their public figure status. Such documents could show Plaintiffs' contacts with government officials (relevant to their relationships with high-level officials), their communications with the press and other influential figures (relevant to their access to channels of communication), and their coordination with their many public relations assistants and lobbyists seeking to shape media coverage and their public image (relevant to showing how Plaintiffs have thrust themselves to the forefront of a public controversy). Plaintiffs note that they have produced a small number of documents "contain[ing] communications with the media," Aug. 4, Letter at 2, but that omits documents showing relationships with American "political and thought leaders" that Plaintiffs have cultivated for years, Witness Statement of Petr Aven ¶ 25. It also omits communications with their public relations assistants and lobbyists, such as when "LetterOne's Director of Communications" informed Plaintiff Fridman of the Dossier "shortly after it was published by Buzzfeed in January 2017." Witness Statement of Mikhail Fridman, *Aven v. Orbis*, Ex. 14, ¶ 19. Because the issue of oligarchs' relationship to the Russian state has long been a matter of public controversy, and "CIR 112 focuses on the preexisting controversy surrounding Russian oligarchs and their influence upon the Russian government," *Fridman*, 229 A.3d at 508 (affirming that Plaintiffs are public figures with respect to CIR 112), these documents manifestly "bear[] on" a key "issue . . . in the case," *Oppenheimer Fund*, 437 U.S. at 351—the public figure defense.

The Court should overrule Plaintiffs' objections and compel production of pre-2016 documents relevant to their public figure status.

## VI.   PLAINTIFFS CANNOT MAKE THE REQUIRED SHOWING AS TO WHY DISCOVERY SHOULD NOT BE PERMITTED.

Plaintiffs bear the burden of "show[ing] that the [Defendants'] request is burdensome, overly broad, vague or outside the scope of discovery." *Kellogg Brown & Root*, 284 F.R.D. at 27; *see also id.* at 33 ("If relevance is established and a party refuses a discovery request, the burden is on the refusing party to show that the movant's request is burdensome, overly broad, vague or outside the scope of discovery."). Plaintiffs have claimed to have had so few documents within their control that they reviewed each and every one of them rather than run search terms. June 25 Letter at 8. Plaintiffs' refusal to produce responsive documents relevant to Defendants' view of CIR 112 and Plaintiffs' status as public figures has not been due to any burden on them, but rather because of a strategic ploy to shrink their burdens in this case and stymie Defendants' ability to access party discovery in support of their defenses. Likewise, and perhaps with the same purpose in mind, Plaintiffs have feigned a lack of control over their Alfa documents. Should the Court compel Plaintiffs to produce documents relevant to Defendants' view of CIR 112 and Plaintiffs' public figure status, Plaintiffs should produce all relevant documents, including but not limited to their Alfa documents. *See* Defs.' Mot. to Compel, ECF No. 78.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their Motion in full, compelling Plaintiffs to collect, review, and produce responsive and relevant documents.

Dated:   August 14, 2020                   _____/s/ Joshua A. Levy_____

Joshua A. Levy (D.C. Bar No. 475108)
Rachel M. Clattenburg (D.C. Bar No. 1018164)
Zachary Blau (D.C. Bar No. 1600714)
**LEVY FIRESTONE MUSE LLP**
1401 K St. NW, Suite 600

Washington, DC 20005
Tel: (202) 845-3215
Fax: (202) 595-8253
jal@levyfirestone.com
rmc@levyfirestone.com
zblau@levyfirestone.com


*Counsel for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on August 14, 2020, the foregoing memorandum of law and the accompanying motion, exhibits, and proposed order, were filed using CM/ECF, which serves a copy on all counsel of record.


*/s/* Joshua A. Levy
Joshua A. Levy

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MIKHAIL FRIDMAN, PETR AVEN, and GERMAN KHAN,<br>        Plaintiffs,<br>    v.<br>BEAN LLC a/k/a FUSION GPS, and GLENN SIMPSON,<br>        Defendants. | No. 1:17-cv-2041-RJL |

**[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO COMPEL
PLAINTIFFS' PRODUCTION OF THEIR DOCUMENTS**

Upon consideration of Defendants' Motion to Compel Plaintiffs' Production of Their Documents, the related memorandum in support thereof, the exhibits and declaration attached thereto, the opposition thereto, and the reply thereto, and good cause appearing therefor, it is hereby

**ORDERED** that Defendants' Motion is **GRANTED**; and it is further

**ORDERED** that, within 30 days, Plaintiffs shall collect, review, and produce all documents within their possession, custody, or control relevant to: (a) the substantial truth or falsity of CIR 112 and the alleged defamatory statements within it, and (b) Defendants' public figure defense; and it is further

**ORDERED** that, within 30 days, Plaintiffs shall produce to Defendants: (1) a copy of the Kroll Report, (2) documents relating to the Spanish investigation of Plaintiff Fridman, (3) documents relating to the Mueller investigation, and (4) exhibits and documents from *Aven v. Orbis*.

**SO ORDERED.**

Dated:_____                _____
                                    RICHARD J. LEON
                                    United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MIKHAIL FRIDMAN, PETR AVEN, and GERMAN KHAN,<br><br>              Plaintiffs,<br><br>     v.<br><br>BEAN LLC a/k/a FUSION GPS, and GLENN SIMPSON,<br><br>              Defendants. | No. 1:17-cv-2041-RJL |

<u>**DECLARATION OF JOSHUA A. LEVY**</u>

I, Joshua A. Levy, declare as follows:

1.        I am a member of the law firm Levy Firestone Muse LLP, counsel for Defendants Bean LLC a/k/a Fusion GPS, and Glenn Simpson. I submit this Declaration in support of Defendants' Motion to Compel Plaintiffs' Production of Documents.

2.        Attached hereto as Exhibit 1 is a true and correct copy of a Letter from Joshua Levy to Alan Lewis, dated June 30, 2020.

3.        Attached hereto as Exhibit 2 is a true and correct copy of a Letter from Alan Lewis to Joshua Levy, dated August 4, 2020.

4.        Attached hereto as Exhibit 3 is a true and correct copy of a Letter from Alan Lewis to Joshua Levy, dated June 25, 2020.

5.        Attached hereto as Exhibit 4 is a true and correct excerpt of the transcript for day 1 of the bench trial in *Aven v. Orbis*, QB-2018-6349, dated March 16, 2020.

6.        Attached hereto as Exhibit 5 is a true and correct copy of the witness statement of Plaintiff Petr Aven in *Aven v. Orbis*, QB-2018-6349, dated February 10, 2020.

7.      Attached hereto as Exhibit 6 is a true and correct excerpt of the transcript for day 2 of the bench trial in *Aven v. Orbis*, QB-2018-6349, dated March 17, 2020.

8.      Attached hereto as Exhibit 7 is a true and correct excerpt of Catherine Belton, *Putin's People: How the KGB Took Back Russia and Then Took On the West* (2020).

9.      Attached hereto as Exhibit 8 is a true and correct excerpt of Vladimir Putin, *First Person* (2000).

10.     Attached hereto as Exhibit 9 is a true and correct excerpt of Karen Dawisha, *Plutin's Kleptocracy: Who Owns Russia?* (2014).

11.     Attached hereto as Exhibit 10 is a true and correct excerpt of a translated version of the Spanish criminal complaint against Vimpelcom dated August 19, 2016, as well as a copy of the translator's certification.

12.     Attached hereto as Exhibit 11 is a true and correct excerpt of 1 Special Counsel Robert S. Mueller, III, Report On The Investigation Into Russian Interference In The 2016 Presidential Election (2019).

13.     Attached hereto as Exhibit 12 is a true and correct copy of the U.K. courts' form N244 application notice, available at https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/732360/N244_web_0818.pdf.

14.     Attached hereto as Exhibit 13 is a true and correct copy of Plaintiffs' Rule 45 Subpoena and Schedule A to the Democratic National Committee, dated May 8, 2020.

15.     Attached hereto as Exhibit 14 is a true and correct copy of the witness statement of Plaintiff Mikhail Fridman in *Aven v. Orbis*, QB-2018-6349, dated February 10, 2020.

16.     Attached hereto as Exhibit 15 is a true and correct copy of Plaintiffs' Initial Responses to Interrogatories, dated November 11, 2019.

17.     Attached hereto as Exhibit 16 is a true and correct copy of the public docket in *Aven v. Orbis*, QB-2018-6349, available at https://efile.cefile-app.com/publicsearch/case/instance/view?caseNumber=QB-2018-006349, as of August 5, 2020.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: August 14, 2020

Joshua A. Levy

**EXHIBIT 1**

# Levy | Firestone | Muse

Joshua A. Levy
Levy Firestone Muse LLP
1401 K Street, NW, Ste 600
Washington, DC  20005
T (202) 845-3215
F (202) 595-8253
levyfirestone.com

June 30, 2020

<u>via Electronic Mail</u>

Alan S. Lewis
Carter Ledyard & Milburn LLP
2 Wall Street
New York, NY 10005
lewis@clm.com

Re:     *Fridman v. Bean LLC, 17-cv-2041 (D.D.C. 2017)*

Dear Alan:

We will be responding to your June 25, 2020 letter in due course. In the interim, Defendants renew the following requests. If Plaintiffs are unwilling to comply with Defendants' below requests, then – after a Rule 7(m) conference – Defendants will file a motion to compel.

1.  <u>Relevance Standard</u>

Your letters of June 2 and June 25 do not respond to our questions regarding the relevance standard you applied in reviewing documents, leaving us unable to determine whether you are withholding responsive and relevant documents.

The parties have taken different positions on what is relevant to the statements in CIR 112. Plaintiffs' position on relevance is that "pre-2016 documents cannot, by definition, be relevant to any issues in this litigation aside from the truth or falsity of the Govorun-related defamatory statement." Letter from A. Lewis to J. Levy (Apr. 24, 2020), at 3. Defendants' position is that CIR 112 refers to events that took place not only in

Letter to Alan Lewis
June 30, 2020
Page 2 of 7

2016, but also prior to 2016, so that favors performed or exchanged prior to 2016, for example, are relevant to this case.

In our letter dated June 10, 2020, we asked whether you reviewed Plaintiffs' documents based on Defendants' position that documents and events prior to 2016 are relevant to this case or whether you reviewed them based only on Plaintiffs' position that, with exception of documents related to Govorun, pre-2016 documents are not relevant to this case. Your reply that "Plaintiffs did not identify responsive documents that may exist dated outside the initial date ranges, as set forth in the General Statements and Objections, as being withheld," Letter from A. Lewis to J. Levy (June 26, 2020), at 8, does not answer our question.

Please clarify whether you have reviewed, or will review and produce, or will not review and produce Plaintiffs' pre-2016 documents for relevance, **based on *Defendants' position*** that CIR 112 and the allegedly defamatory statements – and not just those concerning Govorun – relate to events that transpired between the 1990s and 2016.[1]

2. <u>Public Figure Relevance Standard</u>

Your letters of June 2 and June 25 likewise do not state the relevance standard you applied when reviewing documents regarding Plaintiffs' public figure status.

The parties have taken different positions on the time period that is relevant to the question of whether Plaintiffs are public figures. Plaintiffs' position is that the public controversy is "whether Russia attempted to influence the 2016 U.S. presidential election," and that "pre-2016 documents are not relevant to the question of whether Plaintiffs are 'limited public figures.'" Apr. 24 Letter at 3. Defendants' position is that Plaintiffs are public figures in the public controversy concerning how Russian oligarchs conduct their businesses both inside and outside of Russia—including the nature and scope of oligarchs' relationships with Putin and the Kremlin. *Accord Fridman v. Orbis Bus. Intelligence Ltd.*, --- A.3d ----, 2020 WL 3290907, at *9 (D.C. June 18, 2020) ("CIR 112 focuses on the preexisting controversy surrounding Russian oligarchs and their influence upon the Russian government."). As such, Defendants maintain that pre-2016 documents are relevant.

---

[1] Defendants maintain that Plaintiffs control their documents at Alfa and must review and produce those responsive documents based on Defendants' positions on what is relevant.

Letter to Alan Lewis
June 30, 2020
Page 3 of 7

Please clarify whether you have reviewed, or will review and produce, or will not review and produce Plaintiffs' pre-2016 documents for relevance **based on *Defendants' position*** regarding Plaintiffs' public figure status and the relevant public controversy.

3. Revised RFP Responses

Plaintiffs' responses to Defendants' Requests for the Production of Documents (RFPs) remain insufficient. Plaintiffs' initial responses to requests 2–11, 14, 16, 18, 19, 22, 23, 26, 27, 30, 31, 32, 33, 37, 48, 53, 55, 80, 81, 83, and 84 stated that you would "make a good faith effort to locate and produce" responsive documents. The supplemental responses state that for other RFPs, *e.g.*, 63–66, Plaintiffs "are not aware of having any responsive documents," but do not update the initial responses for 68 of the 85 RFPs. Again, failure to supplement those responses means that Defendants cannot know whether you have produced responsive documents for any of these requests, whether you have no responsive documents for any or all of these requests, or whether you are withholding responsive documents based on Plaintiffs' view of what is relevant to the case (or based on some other objection). Rule 34 requires a specific response to each RFP, and Plaintiffs' initial responses, *e.g.*, that Plaintiffs would make a "good faith effort to locate and produce" responsive documents, are, at this date, insufficient.

Please advise whether you will revise your responses to document requests to identify whether you have produced responsive documents, whether you have no responsive documents, or whether you are withholding responsive documents, and if so, the basis for each withholding.

4. Kroll Report

As described in the U.K. proceedings, the Kroll Report "recounted widespread instances of 'bribery of officials, blackmail, and the illegal transfer of currency resources to foreign banks.'" *Aven vs. Orbis* Trial Tr. Day 2, at 26:18–20 (quoting Karen Dawisha, *Plutin's Kleptocracy: Who Owns Russia?* 19 (2014)). Plaintiff Aven then asserted, "I'm the only one who has in my hands Kroll report. I have it. I have Kroll report . . . . This [commission's report] was based on Kroll report. I have Kroll report." *Id.* at 27. That report was not included in Plaintiffs' production to Defendants, even though the document is relevant and responsive to RFPs 4 through 8, which seek documents relating to Plaintiffs' history with Putin, including their exchange of significant favors, payments to Putin, as well as any "'kompromat' on Putin and his corrupt business activities from

Letter to Alan Lewis
June 30, 2020
Page 4 of 7

the 1990s" held by Plaintiffs or Alfa. Conversely, if the Report supports Plaintiffs' assertion that they have not exchanged favors with Putin, and do not possess "kompromat" on him, the Report is responsive to RFP 10. Either way, it is a responsive and relevant document within Plaintiff Aven's possession, custody, or control, and must be produced.

        Please promptly produce the Kroll Report.

   5. Spanish Proceeding

        In the initial response to RFPs 20 and 21 Plaintiffs asserted that Plaintiff Fridman "intends to withhold any responsive documents" on the grounds that the Spanish proceeding is not relevant to CIR 112, and that such documents are not in his possession, custody, or control. Defendants disagree. The allegations against Plaintiff Fridman in the Spanish proceeding—*i.e.*, that he has been making payments to the son of the Russian Minister of the Interior, starting in 2013, with more than $20 million paid since then—are directly relevant to the substantial truth of CIR 112, specifically "co-operation" between Alfa and the Kremlin, the exchange of favors between them, and Plaintiffs' involvement in bribery. Accordingly, the documents requested in RFPs 20 and 21 are relevant to Defendants' defense and must be produced.

        Please promptly produce responsive documents from the Spanish proceeding.

   6. Mueller Investigation

        In the initial responses to RFPs 14 through 19, Plaintiffs stated that they would "make a good faith effort to locate and produce any available documents, if any, relating to" the Trump-related investigations or Mueller Investigation "involving CIR 112 or the contents therein," yet no such documents have been produced. Plaintiff Aven was interviewed in connection with the Mueller investigation and, through counsel, provided the Special Counsel with an attorney proffer. Based on the publicly available, redacted version of Plaintiff Aven's 302 and the publicly available, redacted version of the Mueller Report, the actions that are the subject of Plaintiff Aven's interview, proffer, and grand jury testimony are relevant to the substantial truth of CIR 112, namely that Plaintiffs perform favors for Putin and provide him with advice on foreign policy matters. Accordingly, any documents relating to Plaintiff Aven's proffer, interview, and testimony are relevant and must be produced.

Letter to Alan Lewis
June 30, 2020
Page 5 of 7

Please promptly produce documents relating to the Mueller and Trump Investigations.

7. U.K. Proceeding

Your June 25 letter makes several new arguments justifying Plaintiffs' failure to produce documents from *Aven v. Orbis*. None are persuasive.

First, you try to back away from the parties' agreed understanding of "publicly available." Letter from A. Lewis to J. Levy (June 25, 2020) at 9. My letter of April 16 sets forth the parties' understanding:

> The parties agreed that neither party is required to produce responsive documents that are publicly available. As clarified by Plaintiffs' counsel in their letter of March 12, 2020, the term "publicly available" has the same meaning as "public domain" and includes "documents that are freely available online or are available through a service such as Lexis or Westlaw."

Letter from J. Levy to A. Lewis (Apr. 16, 2020), at 2–3. Your response, dated April 24, 2020, states: "Your letter accurately reflects the parties' agreement with respect to publicly available documents." Letter from A. Lewis to J. Levy (Apr. 24, 2020), at 2. Therefore, your position expressed in your June 25, 2020 letter that the agreed-upon definition of "publicly available" "applied specifically to the limited public figure status of Plaintiffs and was referring to newspaper articles that are widely available to both parties" misstates the parties' agreement.

Second, your assertion that "transcripts . . . and statements of the case are available by simple request" does not excuse the failure to produce discovery disclosures, which are not available by request, and are not available on any public docket. Moreover, the request is not "simple." It requires the expenditure of resources and time for US-based defendants to engage UK counsel for the purpose of obtaining permission of UK courts to access UK court documents.

Letter to Alan Lewis
June 30, 2020
Page 6 of 7

Third, you claim that Plaintiffs' production of their own, previously-disclosed, documents requires "a protracted U.K. Data Protection Law analysis with respect to which documents can, and cannot, be produced . . . absent additional confidentiality and data processing agreements." Plaintiffs bear the burden of explaining precisely how U.K. law limits their ability to produce their own documents, *see United States v. Vetco Inc.*, 691 F.2d 1281, 1289 (9th Cir. 1981) ("The party relying on foreign law has the burden of showing that such law bars production"), and in any event the protective order entered in this case, ECF No. 67, anticipates such concerns and permits a "Highly Confidential – Personal Data" designation. Plaintiffs' documents from *Aven v. Orbis* must be produced.

Please promptly produce relevant disclosures from *Aven v. Orbis.*

* * *

Please advise whether you are willing to (1) review Plaintiffs' documents for relevance based on Defendants' view that pre-2016 events and documents are relevant to CIR 112 and the question of whether Plaintiffs are public figures; (2) revise Plaintiffs' RFP responses to specifically identify whether you have produced responsive documents, have no responsive documents, or whether you are withholding responsive documents and the grounds for each withholding; and (3) produce documents for items 4 through 7 above.

If you decline any of these reasonable requests, we intend to file a motion to compel. In advance of doing so, we will schedule a Rule 7(m) conference to discuss the anticipated motion with you in a good faith effort to determine whether there is any opposition to the relief sought and, if there is, to narrow the areas of disagreement.

* * *

Letter to Alan Lewis
June 30, 2020
Page 7 of 7

     Defendants expressly reserve all of their rights and remedies. This letter is without waiver of, or prejudice to, Defendants' rights, remedies, or objections to discovery requests.


     Sincerely,


     Joshua A. Levy

**EXHIBIT 2**

# CARTER LEDYARD & MILBURN LLP

*Counselors at Law*

**Alan S. Lewis**
**Partner**
•
*Direct Dial: 212-238-8647*
*Email: lewis@clm.com*

*2 Wall Street*
*New York, NY 10005-2072*
•
*Tel (212) 732-3200*
*Fax (212) 732-3232*

*570 Lexington Avenue*
*New York, NY 10022-6856*
*(212) 371-2720*

August 4, 2020

**<u>VIA EMAIL</u>**

Joshua A. Levy, Esq.
Levy Firestone Muse LLP
1401 K St. NW, Suite 600
Washington, DC 20005

   Re: <u>*Fridman v. Bean LLC a/k/a Fusion GPS, et al.*, 17-cv-2041 (D.D.C. 2017)</u>

Dear Josh:

  This letter responds to yours dated June 30, and uses the same topic headers.

  Your letter threatens to move to compel if Plaintiffs are "unwilling to comply" with Defendants' requests. Plaintiffs have been transparent and will not be strong-armed into producing information that has nothing to do with the elements of or defenses to their defamation claims in this case. Should Defendants make such a motion, Plaintiffs will likely seek costs. Indeed, in various ways, Defendants' threat ignores the framework that the parties agreed upon after extensive meet and confer negotiations.

 **1. Truth and Falsity Relevance Standard**

  You again ask what relevance standard Plaintiffs used when producing documents. As previously indicated, documents are relevant to truth or falsity insofar as they are relevant to the truth or falsity of the specific defamatory statements challenged by Plaintiffs in this lawsuit. Aside from the Govorun-related defamatory statement, the defamatory allegations challenged by Plaintiffs in this lawsuit are about Plaintiffs' purported conduct *in 2016*. *See* Plaintiffs' Supplemental Response to Interrogatory No. 2.

  Nevertheless, at your request, without conceding the relevance of the same, Plaintiffs agreed to review and produce pre-2016 documents in their possession, custoand or control. In this regard, Plaintiffs have not withheld pre-2016 documents. Accordingly, moving to compel on this issue is unwarranted.

Joshua A. Levy, Esq.
August 4, 2020
Page 2

## 2. Public Figure Relevance Standard

Similarly, as previously conveyed (including in our April 24 letter), Plaintiffs' position is that, for purposes of determining whether Plaintiffs are limited purpose public figures for the purposes of this litigation, the controversy that gave rise to the dissemination of the defamatory statements is the alleged collusion between the Trump campaign and the Russian government to influence the outcome of the 2016 U.S. presidential election.

Nevertheless, without conceding that such documents are relevant, Plaintiffs agreed to review and produce pre-2016 documents in their possession, custody, or control if they contain communications with the media—and did so.

As discussed during the meet-and-confer process, the only documents truly relevant to whether Plaintiffs attempted to shape the pertinent controversy (and responsive to Defendants' Document Requests 45, 46, 51, 52) are publicly available. The parties have agreed that neither is required to produce publicly available documents.  Accordingly, moving to compel on this issue is unwarranted.

## 3. Revised RFP Responses

Plaintiffs have supplemented their responses to Defendants' Document Requests to indicate whether documents within the agreed upon date range were withheld.  While Plaintiffs do not agree that they must specifically indicate whether documents were produced in response to requests, as a further effort to avoid wasting the Court's time on such a frivolous dispute, Plaintiffs indicate they have produced available documents responsive to Requests 2-11,[1] 22-23,[2] 48,[3] 53,[4] 55,[5] 80-81,[6] 83,[7] and 84.[8]

For Requests 14, 16, 18, 19 (relating to the Mueller investigation or Trump-related investigations), the only responsive documents would relate to Mr. Aven, as described in Response to Interrogatory No. 10, but, reserving all rights as to any and all applicable privileges, any such documents are from after October 3, 2017 (outside the agreed upon date range). Accordingly, consistent with Defendants' approach (in their Revised Responses to Plaintiffs' Document Requests), Plaintiffs did not identify responsive documents that may exist dated outside the date ranges, as set forth in the General Statements and Objections, as being withheld.

---

[1] *See, e.g.,* PDDC00000077-112, 152-60, 1037-48, 997-1031, 1057-75, 1224-44,
2347-64, 4770-4816, 4830-59, 5753-70, 5932-53, 6593, 6595-96, 6597-98, 6672-6741, 6805-29,
6871-6928, 7606-38, 7640-71 (various documents, including motion papers and briefs filed by Plaintiffs in other cases).
[2] *See, e.g.,* PDDC00008305-15.
[3] *See, e.g.,* PDDC00008305-15, 8317-22, 8324-31, 8323.
[4] *See, e.g.,* PDDC00008307-12, 8320-22, 8327-30.
[5] *See, e.g.,* PDDC00008303-04, 8316.
[6] *See, e.g.,* PDDC00000001-8229.
[7] *See, e.g.,* PDDC00008332-8794, 6593-98.
[8] Documents received by Plaintiffs in response to subpoenas in this action have been provided to Defendants.

Joshua A. Levy, Esq.
August 4, 2020
Page 3

Indeed, as per our extensive meet-and-confer negotiations, you agreed that documents that post-date October 3, 2017 need not be produced as part of the parties' initial production.

For Requests 26, 27, 30, Plaintiffs supplement their responses to indicate that they are not aware of having any responsive documents in their possession, custody, or control. However, Plaintiffs provided information relating to meetings or communications with Vladimir Putin in their Response to Interrogatory No. 6. Similarly, for Requests 31, 32, 33, 37, Plaintiffs supplement their responses to indicate that they are not aware of any responsive documents in their possession, custody, or control. Accordingly, there is no basis to move to compel.

**4. Kroll Report**

The so-called Kroll Report referenced in the book that Mr. Aven was asked about during the U.K. proceeding does not relate to the truth or falsity of the defamatory statements at issue in this case or to any other fact relevant to this lawsuit. Indeed, this issue relates to activities that occurred decades before the publication of CIR 112. The report was drafted almost thirty years ago and does not relate in any way to Vladimir Putin, to the Plaintiffs, or to any of the matters that are the subject of CIR 112. Specifically, it does not relate to the allegation that Govorun acted as a "bag carrier" for Plaintiffs' purported payments of illicit cash to Mr. Putin in the 1990s. Accordingly, to seek to compel such information would be to engage in a meritless fishing expedition, a clear example of a situation where seeking costs associated with any such motion to compel would be warranted.

**5. Spanish Proceeding**

As we have already represented, the Spanish proceedings have nothing to do with the defamatory allegations challenged in this lawsuit, including that Plaintiffs purportedly have a relationship with Putin involving corruption and bribery. Plaintiffs stand on their objections to Requests Nos. 20 and 21. Further, we note that Defendants appear to have an interest in the Spanish proceedings, independent of this litigation. As evidenced by DEFS0011790-92, documents produced by Defendants in this litigation, the Spanish proceeding appears to be listed as a current Fusion "project" of interest, with a potential budget assigned to the same. It would be highly improper for the Defendants to use this litigation to attempt to get information entirely divorced and irrelevant to the defamation action at hand.[9] We are hopeful that this is not the case and that the parties can amicably agree that such proceedings have nothing to do with the merits of this litigation. Accordingly, to seek to compel such information would also be abusive and without merit—another clear example of a situation where seeking costs associated with any such motion to compel would be warranted.

---

[9] We note that Defendants have previously stated that they view litigation discovery as a means to obtain information that furthers their business interests. Indeed, in the book *Crime in Progress*, Defendants expressed excitement about being sued by Michael Cohen because it would allow them to get information they had been after for years in discovery. We are hopeful that Defendants' repeated attempts to seek information that pertain to non-relevant matters is not such an attempt.

Joshua A. Levy, Esq.
August 4, 2020
Page 4

### 6.  Mueller Investigation

Your contentions about production of Mueller Investigation documents once again ignore the fact that any such documents are outside the date range agreed to by the parties for the May 4 production.  Moreover, reserving all rights, privileged information that is subject to, among other things, grand jury secrecy, is immune from production.[10]  Defendants' attempt to retread agreements reached in good faith are simply disruptive to the litigation and serves as one of many examples of the Defendants attempting to punish Plaintiffs for pursuing this narrowly focused defamation action by seeking potentially sensitive information that has no relevance to the case.  Again, Plaintiffs will not submit to such bullying tactics.

Moreover, we disagree with your characterization of the Mueller Report.  Indeed, a U.K. High Court Judge recently awarded Judgment to Plaintiffs against Christopher Steele's company, Orbis Business Intelligence Limited, expressly finding that the allegations of CIR 112 about Plaintiffs are inaccurate or misleading as a matter of fact, and that "the idea of [the Plaintiffs] doing Mr. Putin's political bidding makes no sense." Moreover, the U.K. Court found that Mr. Aven did not attempt to contact the Trump Transition Team on behalf of the Russian government.[11]

Further, your inquiry as to a 2019 investigation by the United States Select Committee on Intelligence is irrelevant and outside the agreed upon date range.  None of the Plaintiffs was required to produce any documents in regard to the same.  Again, there is simply nothing for Defendants to compel.

### 7.  U.K. Proceeding

The parties agreed that publicly available information need not be produced in this litigation.  Plaintiffs have not changed or limited the meaning of "publicly" available, as you suggest.  If U.K. court filings are obtainable by the general public, they are publicly available.[12]  The documents you request (Plaintiffs' witness statements, the trial transcript, and trial exhibits)

---

[10] As we have indicated previously, documents related to the Mueller investigation will not be produced because they are subject to grand jury secrecy.  *In re Grand Jury*, 490 F.3d 978, 988 (D.C. Cir. 2007) ("Preventing a *third party* from reviewing a witness's grand jury testimony is essential to guarantee secrecy to witnesses[.]"); *SEC v. Oakford Corp.*, 141 F. Supp. 2d 435, 437 (S.D.N.Y. 2001) (grand jury secrecy prevents a civil litigant from compelling a grand jury witness from testifying as to what occurred before the grand jury absent a strong showing of necessity).  Grand jury secrecy covers the grand jury subpoena, documents produced in response, and other related communications and documents inasmuch as they may reveal statements made to the grand jury or the focus of the grand jury attention.  *See In re Sealed Case*, 801 F.2d 1379, 1381 (D.C. Cir. 1986).

[11] *See* Judgment at 169-74, available at https://www.bailii.org/ew/cases/EWHC/QB/2020/1812.html#para123.

[12] It is well established that discovery need not be required of publicly available documents and records which are accessible to all parties."  *Fitts v. Unum Life Ins. Co. of Am.*, 2007 U.S. Dist. LEXIS 33397, *54 (D.D.C. May 7, 2007) (medical records of party were available via an authorization); *Dushkin Pub. Grp., Inc. v. Kinko's Serv. Corp.*, 136 F.R.D. 334, 335 (D.D.C. 1991) (documents were available from court clerk).  Again, the parties reached agreement that publicly available documents need not be produced.

Joshua A. Levy, Esq.
August 4, 2020
Page 5

are publicly available on the English Court's electronic filing system.  We understand that all transcripts, orders, judgments, and statements of the case, are available by request using form EX107, and other documents (such as witness statements and exhibits) can be obtained by using form N244, which entails an application to the High Court.

The dispute you have raised about this subject is particularly perplexing in view of the fact that you already have many of the documents you are now asking Plaintiffs to produce. Defendants clearly have the trial transcript and witness statements—such documents were included in Defendants' recently filed Motion to Compel.  We can only assume that Defendants have already employed the U.K. court application process to obtain the documents included within the Motion to Compel, the same process that Defendants now apparently refuse to employ to obtain other documents.  Respectfully, there is no reason why Defendants cannot also utilize the U.K. court document application process to obtain the other U.K. documents Defendants seek.  Indeed, potentially filing a motion to compel over this issue puts into question Defendants' motive for threatening the same.  In any event, the recent judgment in favor of Plaintiffs in that proceeding is available at https://www.bailii.org/ew/cases/EWHC/QB/2020/1812.html.

*        *        *        *        *

This letter is without waiver of or prejudice to Plaintiffs' rights or remedies, all of which are expressly reserved.

Sincerely,

*Alan Lewis*

Alan S. Lewis

ASL:bp

**EXHIBIT 3**

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

# CARTER LEDYARD & MILBURN LLP

*Counselors at Law*

**Alan S. Lewis**
**Partner**
•
*Direct Dial: 212-238-8647*
*Email: lewis@clm.com*

*2 Wall Street*
*New York, NY 10005-2072*
•
*Tel (212) 732-3200*
*Fax (212) 732-3232*

*570 Lexington Avenue*
*New York, NY 10022-6856*
*(212) 371-2720*

June 25, 2020

**VIA EMAIL**

Joshua A. Levy, Esq.
Levy Firestone Muse LLP
1401 K St. NW, Suite 600
Washington, DC 20005

     Re:     *Fridman v. Bean LLC a/k/a Fusion GPS, et al.*, 17-cv-2041 (D.D.C. 2017)

Dear Josh:

We respond to your June 10 letter (defending the adequacy of Defendants' responses to Plaintiffs' discovery requests) and to your June 2 letter (challenging Plaintiffs' responses to Defendants' discovery requests).

**A.**     **Defendants' Responses and Production (A Subject Raised Initially in our May 28 Letter)**

     **I.**     **Privilege Log Deficiencies**

       *a.*  *The Privilege Log Does Not Contain Sufficient Detail*

We acknowledge your commitment to provide a supplemental privilege log containing "additional non-privileged information regarding the documents listed therein." While we await that supplemental log, we continue to maintain that Defendants' existing log is inadequate. In defense of your log, you cite *Feld v. Fireman's Fund Ins*. Co, but the information missing from your log contrasts it with the much more fulsome log provided in *Feld* - as that court's description of the log makes clear:

    The log includes the following information about each document: date, **title (typically, the subject line of an email)**, type of document (that is, email, attachment, or standalone computer file), document identification number, from, to, and carbon copy recipients, the privilege type (that is, attorney-client privilege,

9686476.1

Joshua A. Levy, Esq.
June 25, 2020
Page 2

> attorney work product, or both), **any additional notes, and the "privilege basis."**

*Feld v. Fireman's Fund Ins*. Co., 991 F. Supp. 2d 242, 248 (D.D.C. 2013) (emphasis added).

Moreover, no case cited in your June 10 letter stands for the proposition that "D.C. courts do not require the type of information [Plaintiffs] seek." To the contrary, the cases you cite hold that where, as here, the "subject" line of an e-mail does not contain information sufficient to evaluate the claim of privilege being asserted, additional information must be provided. *See Hornbeck Offshore Transp., LLC v. United States Coast Guard*, 2006 U.S. Dist. LEXIS 14389, *47 (D.D.C. 2006) ("Here, the description of Documents # 26 and # 15 provided by the Agency… 'gives no indication as to the confidentiality of the information on which they are based. It simply states the subject, source, and recipient of the legal opinion rendered.' On its face, with no further detail provided by the Agency regarding the communications between Eareckson and Vachon, it is impossible to determine if confidential information was supplied with the expectation of secrecy that was not known or disclosed to any third party.") (Internal citation omitted). *See also Loftin v. Bande*, 258 F.R.D. 31, 33 (D.D.C. 2009) ("The descriptions for Document Nos. 403 and 490 are insufficient because they do not specify the subject matter of the teleconferences…. Finally, the description for Document No. 762 is insufficient because it simply refers to 'revised redlines' or 'draft agreements.' This sparse description does not adequately describe the subject matter of those drafts.").

Nor does *Apollo*, another case that you cite, endorse the blanket proposition that the mere provision of an e-mail's subject line in a privilege log satisfies the obligation of the party asserting the privilege to produce an adequate privilege log. In that case, the court "agree[d] …that the generic titles in the subject line of an email *often do not* convey information concerning the specific matter being discussed" but found that (in that specific instance) the additional information provided by agency affiants in declarations regarding the specific subject of the communications ("DOE's decisions as to how to conduct the Program Review") provided sufficient detail. *In re Apollo Group, Inc. Sec. Litig*., 251 F.R.D. 12, 31 (D.D.C. 2008). Indeed, the court recognized that the description was deficient, but accepted the DOE's representation that the subject line would not inform the relevant analysis with respect to deliberative privilege (for the purposes of which internal decision-making process communications are privileged).[1]

In the aggregate, the teaching of the cases you cite is that where it is not clear from the "subject" line whether the e-mail is privileged (*i.e.*, a generic title), Defendants have an *additional* obligation to explain the basis for the assertion of privilege. *See, e.g., Feld*, 991 F. Supp. 2d at 248. That is particularly so where the e-mail does not involve an attorney in the to, from, or cc lines. If you contend that providing the title of a specific e-mail would disclose legal advice, as you appear to suggest, you should indicate so in the entry for that specific document while also providing a description of the e-mail sufficient to enable the assertion of privilege to

---

[1] *Elliott v Fed. Bur. of Prisons*, 521 F Supp 2d 41, 57 (D.D.C. 2007), another case you cite, merely recognizes the unremarkable rule that "an e-mail sent by an attorney to his or her client for the purposes of providing legal advice might well fall within the scope of the attorney-client privilege." The issue in the case was inadvertent waiver, not the appropriateness of excluding the subject line of the e-mail from a privilege log.

Joshua A. Levy, Esq.
June 25, 2020
Page 3

be assessed. [2]  Withholding the subject line for all communications and documents on that basis is indefensible.

The information supplied by Defendants in support of the assertion of work-product privilege is similarly inadequate (a subject addressed under the sub-heading "Identification of litigation" in your June 10 Letter).  Defendants' privilege log includes the same generic description—"Confidential communication regarding research prepared at the direction of Perkins Coie and in anticipation of litigation, and for the purpose of providing legal advice"—for nearly all entries.  This is unreasonable, as it provides no information about the specific subject of the individual documents that would allow us to assess the claim of privilege.  A log needs to provide such information in sufficient detail to permit assessment of the assertions of attorney-client and work-product privilege.  One of the cases that you cited, *Jud. Watch, Inc. v United States HUD*, 20 F. Supp. 3d 247, 256-258 (D.D.C. 2014), underscores the point.  There, for each entry, the index provided "(1) a document number; (2) a brief description of the document including the author, any recipients of the document, and the date and time the document was sent (if applicable); (3) the exemption relied upon for withholding or redacting the document; and (4) a narrative "justification" for withholding or redacting the document."  The narrative justification used descriptive terms that "help[ed] convey the relevant content of documents without divulging the privileged information."  The court held that a sufficient narrative "provides a sufficient basis for plaintiff and the Court to assess whether an attorney-client relationship existed and whether the content of the communications was confidential."  *Id.* at 259.  That is the level of detail required, but which is missing here.

We appreciate your willingness to provide further detail about your engagement with Perkins Coie and to confirm that the engagement letter was logged at PRIV0000497.[3]  But that further detail should be provided on a *document by document* basis, because the purpose of a privilege log is to permit assessment of the asserted privilege, *in each instance* in which it is asserted.

In sum, we expect Defendants to provide the "subject" information and an adequate explanation for the basis of the privilege assertion in their supplemental privilege log.  For the

---

[2] *See generally Jones v. Carson*, 2018 U.S. Dist. LEXIS 67400, *13-14 (D.D.C. March 30, 2018) ("measured by these standards, the government's original privilege log … was insufficient. … [It] identified only the author and recipients of the document in question, and provided only very general descriptions of the basis for the privilege asserted … [that] are too brief to adequately inform the requestor of the character of the information being withheld from him or her.") (internal citations and quotation marks omitted).

[3] Please explain the basis for withholding your engagement letter with Perkins Coie from production, as such final engagement letters are not generally considered to be confidential.  *See, e.g.*, *United States ex rel. Rubar v. Hayner Hoyt Corp.*, No. 5:14-CV-830 (GLS/CFH) 2018 US Dist. LEXIS 189274, at *27-28 (N.D.N.Y. Nov. 5, 2018) ("The final engagement letter sets forth Dannible's fees, payment structure, the general extent of the services Dannible was to perform, and boilerplate language about how Dannible and Lynn Law Firm would address disputes regarding payment. The final engagement letter is not privileged.").  *See also United States v. Pape*, 144 F2d 778, 782 (2d Cir 1944) ("The authorities are substantially uniform against any privilege as applied to the fact of retainer or identity of the client. The privilege is limited to confidential communications, and a retainer is not a confidential communication, although it cannot come into existence without some communication between the attorney and the - at that stage prospective - client.").

Joshua A. Levy, Esq.
June 25, 2020
Page 4

avoidance of doubt, Plaintiffs are asking for precisely the type of log that the court in *Feld* found to be sufficient.

### b. *Dates*

There indeed appears to be some misunderstanding with respect to the assertion of privilege over specific documents that pre-date Fusion's engagement by Perkins Coie. Specifically, we were referring to documents on the log during the period of January 2016 (the earliest dates on the log) to April 2016 (when Fusion was engaged).

Defendants' log starts with documents with dates of 1/13/16 and 4/14/2016, thus we logically concluded that the dates are in month/date/year format, as you confirm.   For the documents that we provided as examples in our May 28 letter, the dates reflected are 1/6/2016, 1/9/2016, 1/11/2016, 1/12/2016, and 1/4/2016.  We assumed that the same dating convention was used throughout, and those documents are from January of 2016.  If that is not the case, please let us know.

If Defendants are withholding e-mails from January of 2016 (months before Fusion was engaged by Perkins Coie), please explain how these e-mails could possibly relate to research prepared at the "direction of counsel."

We expect that you will address this in your supplemental privilege log.

### c. *Orbis and Steele*

Your production did not contain any communications with Orbis and Steele and, according to your privilege log, only 13 such responsive e-mails are in Defendants' possession. This apparently includes *all* e-mails with Orbis and Steele regarding CIR 112 and "generally relating to the 'Dossier,' or generally relating to Steele's reports or investigations" (but not including e-mails relating *solely* to other CIRs).  *See* Levy June 10 Ltr. at 2-3.

We are profoundly skeptical of the notion that only 13 communications ever existed between Defendants, on the one hand, and Orbis and/or Steele, on the other, regarding the preparation and publication of CIR 112.  That is why we requested, among other things, that you explain "whether other communications with Orbis or Steele once existed but were destroyed or returned, and the date and details of such destruction or return."  *See* Lewis May 28 Ltr. at 2-3. Your letter fails to address this (other than a vague statement that other communications with Orbis and Steele might exist, but which you deemed non-responsive).  We therefore request, once again, that you apprise us whether or not any responsive documents or communications ever existed and were since destroyed or returned to Orbis and Steele (or to some other third-party).

### d. *Attorney Client Privilege and the Work of Third Parties*

Joshua A. Levy, Esq.
June 25, 2020
Page 5

You continue to assert attorney client privilege for communications and records that you describe as having been made "for the purpose of assisting Perkins Coie in providing legal advice to its clients." June 10 Ltr. At 4. While we cannot fully vet your claim of privilege given the extremely limited amount of information you have provided, your statement of assistance to Perkins Coie and purpose for rendering that assistance does not establish that all of the subject communications are privileged. While you rely on *Kovel* and its progeny for your contention, you have exaggerated *Kovel's* protection for the work product of third parties and ignored its limitations. When analyzing whether communications with those who are neither attorney nor client are privileged "[w]hat is vital . . . is that the communication be made in confidence *for the purpose of obtaining legal advice from the lawyer*" and if no legal advice is sought "no privilege exists." *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961). Thus, there are "limitations on the protection accorded the work of third persons" because, without such limitations, "the attorney-client privilege would engulf all manner of services performed for the lawyer that are not now, and should not be, summarily excluded from the adversary process." *FTC v. TRW, Inc.*, 628 F.2d 207, 212 (D.C. Cir. 1980). A limitation of the privilege is that the reports of third parties "put in usable form information obtained *from the client*." *Id.*

Your assertion of *Kovel* protection goes well beyond this limitation, by evidently seeking the protection of privilege for communications which do not express information obtained from Perkins Coie's client(s). *See ECDC Envtl., L.C. v. New York Marine & Gen. Ins. Co.,* 1998 U.S. Dist. LEXIS 8808, *23-24 (S.D.N.Y. 1998) (analyzing *Kovel* and finding that privilege does not apply to analysis performed by a consultant because the "test data was either not confidential or did not originate with [the client]."); *United States ex rel. Barko v. Halliburton Co.*, 75 F. Supp. 3d 532, 541 (D.D.C. 2014) (because "the privilege protects communications between a client and his attorney, but does not protect an agent's work product that does more than record such confidential communications," no privilege lied where in-house counsel "used the investigators in part to gather bid information and contract completion information," and not "because only the investigators could decipher or interpret technical material."); *Durling v. Papa John's Int'l, Inc.*, 2018 U.S. Dist. LEXIS 11584, *10 (S.D.N.Y. Jan. 24, 2018) ("On the other hand, where an attorney seeks out a third party in order to obtain information that his client does not have, the third party's role is 'not as a translator or interpreter of client communications, and the principle of *Kovel* does not shield his discussions with the attorney.") (internal quotations marks, citations and alterations omitted).

Applying these principles, it is apparent that many of the communications for which you are asserting privilege are not privileged. For example, communications about or based on allegations reported by Fusion or Orbis (neither of whom was a client of Perkins Coie), such as CIR 112, cannot be privileged.

Indeed, it is well established that political opposition research of the kind Fusion and Orbis conducted falls outside any sort of attorney-client privilege (even *if* an attorney is present in the conversation). *See, e.g., Caparrós v. Lynch*, No. 3:15-cv-2229-JL, 2017 U.S. Dist. LEXIS 109041, at *23 (D.P.R. June 15, 2017) (citing *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998)) ("advice on political, strategic, or policy issues . . . would not be shielded from disclosure by the attorney-client privilege").

Joshua A. Levy, Esq.
June 25, 2020
Page 6

In this case Defendants' invocation of privilege is even weaker given that no attorney was included in the majority of the communications claimed to be privileged, rendering untenable any claim that Fusion was "translating" client data for the purpose of legal advice by Perkins Coie (*e.g.* the *Kovel* test). *See Caparrós*, 2017 U.S. Dist. LEXIS 109041, at *17 ("The document described at log no. 114 reflects communications among only USAO employees regarding whether to seek advice from the GCO -- not discussing advice from GCO. Insofar as no GCO attorney participated in that communication, it is not protected by the attorney-client privilege."). At the very least, sufficient information must be disclosed in the privilege log to allow Plaintiffs to assess whether legal advice was being discussed in those communications. *FTC v. Boehringer Ingelheim Pharms., Inc*., 892 F.3d 1264, 1269 (D.C. Cir 2018) ("Where a privilege claimant has closely intertwined purposes—a legal purpose as well as a business purpose—it must still establish to a 'reasonable certainty,' that 'obtaining or providing legal advice was one of the significant purposes' animating each communication withheld[.]") (internal citations omitted).

Particularly under the circumstances, it is not "sufficient to offer as support privilege logs with bare, conclusory assertions that the listed communications were made for the purpose of securing legal advice." *Id*.[4]

If Defendants do not provide a supplemental privilege log that corrects the above-described defects, Plaintiffs will move to compel the same.  Please advise whether you will provide a supplemental log.

## II.    Defendants' Production

We take your response to mean that, other than documents (1) produced by Defendants,[5] (2) withheld by Defendants on the basis of privilege (the appropriateness of which is addressed above), and (3) document specifically identified as being in the public domain, there are no additional responsive documents in Defendants' possession, custody, or control.  This includes specifically any pre-publication documents relating to the defamatory statements in CIR 112, or to the "Dossier" generally.  *See Lewis 5/28 Ltr at 3.*  If that is not the case please advise us specifically with respect to what documents exist but were not produced, or logged on the privilege log, for the agreed upon period.

With respect to Document Request No. 45 (relating to Govorun) and specific documents identified in response to Interrogatory No. 18 (Edward Baumgartner, Report re: ALFA Dossier Open Source" and "Fusion GPS, Conflict With IPOC, date unknown"), we requested that you identify the entry numbers on the privilege log.  *See Lewis 5/28 Ltr. at 4.*  Please do so, as it is not apparent to us from the descriptions provided.

## III.    Defendants' Search Terms

---

[4] In fact, in *TRW* (on which Defendants rely), the Court denied privilege protection due to the proponent's failure to provide sufficient information to assess the applicability of the claimed privilege. *TRW*, 628 F.2d at 213.
[5] This includes the four "Kompromat" documents recently produced.

Joshua A. Levy, Esq.
June 25, 2020
Page 7

       Thank you for providing additional detail about the additional searches you preformed. Without any waiver of Defendants' rights, we have the following follow up questions:

      a.  **<u>Bangor</u>**:  This is an internal codename your client chose for the relevant project in this case and is therefore an important term.  You state that limiters were appropriate because the term, standing alone, produced "many" false hits for the city "Bangor, ME."  Please advise what constitutes "many,"[6] and whether you considered complex searches that include ("Bangor") BUT NOT ("Bangor, ME")?  If not, please advise why, so that we can evaluate the suggested burden.

      b.  **<u>Kompromat / Alfa / LetterOne / Ohr</u>**:  Thank you for agreeing to run the searches, and for producing the additional four documents the use of "Kompromat" returned.  Please confirm whether the searches resulted in any additional documents being added to the privilege log, in addition to the four additional documents produced.

      c.  **<u>Alpha</u>**:  Please advise whether Defendants' vendor applied limiting terms (*e.g.* (Alpha) BUT NOT ("SeekingAlpha" OR "Alpha Travel" OR "Alphanex" OR "Alpha and Omega")) to cull these documents.  If not, please advise why, so that we can evaluate your contention of burden.

      d.  **<u>L1</u>:** We understand that Defendants do not wish to review 6,500 documents consisting of HTML code.  We ask that you run a report on L1 in conjunction with other search terms—Kremlin, Putin, Alpha, Kramer, Steele, and Ohr—to check if any documents were inadvertently overlooked. We also would like you to search "L1" which should identify the term as used in the body of an email or document and eliminate false hits where "L1" appears in an HTML code string.  If "L1" still returns a large number of false hits that is not feasible to search, please inform us of the total hit count.

      e.  **<u>Kramer and ("Dossier" or "CIR" or "intelligence report!")</u>**:  Thank you for confirming this was searched.

      f.  **<u>Putin / Kremlin and ("Alfa" or "Alpha" or "cash" or "bag carrier" or "driver" or "TNK" or "bid!" or "corrupt!" or "Petersburg!" or "Leningrad!" or "lever!" or "favor!" or "favour!" or "advi!" or "pressure" or "bribe!")</u>**:  We agree that the connector Alfa is not necessary if all documents were reviewed.  Our understanding is that you initially objected to "Alpha" as a standalone search term, and therefore believe that (at minimum) "Putin and Alpha" together should be searched.  We request that

---

[6] Your use of that vague description, rather than providing the actual hit counts as you did with the other test searches, makes the statement hard to evaluate.

Joshua A. Levy, Esq.
June 25, 2020
Page 8

    you (or your discovery vendor) compare the unique hits between the Putin and Kremlin searches to identify how many documents (total) would be returned by the additional search so that we can assess the suggested burden in reviewing these additional documents.

    g. **(Steele or Chris!) and ("Dossier" or "CIR" or "intelligence report!" or "memo!" or "source!"):** This search was narrowly tailored to capture communications with or about Christopher Steele's "Dossier" and CIR 112. Considering that there are only 13 e-mails on your privilege log, and none in your production, with Orbis and Steele, we question the thoroughness of your review if there are almost 12,000 e-mails about that subject which you have *not* reviewed. We will need additional information about what these documents are (and whether they can be further culled by applying excluding terms) before we can agree that your search was adequate.

Finally, with respect to the other searches you identified (Nos. 10, 11 and 14), please have your discovery vendor identify which terms in those search bullions are pulling in potentially non-responsive documents, so that we can confer on how to narrow those searches. For instance, if it is the term "memo!" as opposed to "CIR" or "intelligence report!" we can have an informed discussion about the topic.

## B.   Plaintiffs' Responses and Production (June 2 Letter)

### I.   Plaintiffs' Production

#### a. *Document Objections*

Plaintiffs confirm that they have produced responsive documents and, except as specifically indicated in their initial and supplemental responses, did not withhold documents on the basis of Plaintiffs' General Objections. Consistent with Defendants' approach (in their Revised Responses to Plaintiffs' Document Requests), Plaintiffs did not identify responsive documents that may exist dated outside the initial date ranges, as set forth in the General Statements and Objections, as being withheld.

#### b. *Interrogatory Objections*

Plaintiffs refer Defendants to the response immediately above.

#### c. *Searches of Pre-2016 Documents*

Plaintiffs' documents were reviewed manually, and Plaintiffs did not exclude from production pre-2016 documents concerning the truth or falsity of the allegations in CIR 112.

#### d. *Documents Designated Highly Confidential*

Joshua A. Levy, Esq.
June 25, 2020
Page 9

It is well settled that email addresses are considered personal data entitled to protection under the GDPR and Russian Personal Data law.  We understand that we disagree as to the appropriateness of the Highly Confidential designation but appreciate your desire to compromise.  Plaintiffs will agree to consider the redaction of specific documents (that are easily redacted) which Defendants deem necessary in connection with any court filing but believe this is premature at this juncture.

### e.   UK Proceeding Documents

The parties agreed that they were not required to produce documents that are in the public domain.  This was reflected in your Revised Responses, as memorializing the parties' agreement: "Lastly, the parties agreed that responsive documents shall not include publicly available responsive documents; thus, any statement herein indicating the absence of responsive documents does not include publicly available responsive documents."  *See* Defendants' May 18, 2020 Revised Responses to Plaintiffs' First Set of Document Requests at 2.  The language you quote applied specifically to the limited public figure status of Plaintiffs and was referring to newspaper articles that are widely available to both parties.  *See* Lewis 3/12 Ltr at 8.  It was not intended to limit the meaning of "publicly available"—as you suggest.  It also cannot be fairly read as limiting a later agreement memorialized in Defendants' own Responses.   To be clear, if court filings are obtainable by the general public, we deem them publicly available.

It is our understanding that the documents you request are, in fact, publicly available.  Some are available on the English Court's electronic filing system.  We further understand that all transcripts, orders, judgments, and statements of the case, are available by simple request using form EX107.  Other documents can be obtained by using from N244, which entails a simple application to the High Court.  This procedure is no more burdensome than what you have required us to undertake in obtaining Mr. Fritsch's prior testimony.

In any event, it appears that you have been able to obtain documents from that U.K. proceeding, including witness statements and transcripts, as they are attached to and cited in your recently filed Motion to Compel.  *See, e.g.*, Levy Aff., Exhs. 42, 66 – 67.

We additionally think this is a reasonable way to proceed as this avoids the need for the parties to engage in a protracted U.K. Data Protection Law analysis with respect to which documents can, and cannot, be produced by Plaintiffs to Defendants absent additional confidentiality and data processing agreements.  As a result, Plaintiffs believe they have complied with both the spirit and the letter of the parties' agreement with respect to these documents.

### II.       The Alfa Documents

Given your recently filed motion to compel, we will refrain from further addressing this issue here.

Joshua A. Levy, Esq.
June 25, 2020
Page 10

&ast;  &ast;  &ast;  &ast;  &ast;

  This letter is without waiver of or prejudice to Plaintiffs' rights or remedies, all of which are expressly reserved.

        Sincerely,

        *Alan Lewis*

        Alan S. Lewis

ASL:bp

**EXHIBIT 4**



Petr Aven, Mikhail Fridman and German Khan v Orbis Business Intelligence Limited

Day 1

March 16, 2020

Opus 2 International - Official Court Reporters

Phone: +44 (0)20 3008 5900

Email: transcripts@opus2.com

Website: https://www.opus2.com

1  range of possibilities.

2      There are no notes or records of this meeting -- of
3  these dealings and at present we know nothing more about
4  them. My Lord, that's a point I'll return to in due
5  course.

6      Mr Steele, following this interaction with his
7  source, produced Memorandum 112. As the court knows,
8  this is entitled, "Company Intelligence Report 2016/112
9  Russia/US Presidential Election Kremlin-Alpha Group
10  Co-operation".

11      The title is misleading because the memorandum says
12  nothing at all about the US presidential election and
13  the name of Alfa is spelled wrongly, which perhaps give
14  you some insight into how much care was taken with the
15  preparation of the memorandum.

16      The same day that that memorandum was given to
17  Fusion, there were two other memoranda produced, 111 and
18  113. It's interesting to note that 111, the source is
19  said to be a senior member of the Russian presidential
20  administration.  One assumes that a senior member of the
21  Russian presidential administration is perhaps more
22  senior than a top level government official, but it
23  seems two different sources are being referred to.

24      My Lord, the memorandum itself, your Lordship will
25  obviously have seen it on a number of occasions, is at

                              17

1      {A/1/1}.

2  MR JUSTICE WARBY: Yes.

3  MR TOMLINSON: It's a short document. It's only two pages.
4  It has a summary and then three numbered paragraphs.
5  What it is about is clear from the title, "Co-operation
6  between the Kremlin and Alfa Group and the claimants".
7  My Lord, it is obvious, we say, from that memorandum
8  that what is being said is that the relationship is
9  a close and corrupt one, that the claimants do
10  significant -- and President Putin do significant
11  favours for each other, that they have paid him illicit
12  cash, they give him advice and do his political bidding.
13  It's also said that Alfa holds or held kompromat on
14  President Putin, that is to say compromising material.

15      It contains nothing at all about the US presidential
16  election or anything that could possibly be related to
17  national security of either the US or the UK. It's
18  about Alfa, the claimants and President Putin.

19      Mr Fridman is mentioned by name in the two pages six
20  times, Mr Aven by name five times, and Mr Khan once.
21  My Lord, it is common ground, as your Lordship knows,
22  that the memorandum contains personal data about
23  Mr Fridman and Mr Aven in four categories, set out in
24  paragraph 6 of the particulars of claim.  They all
25  concern close relationships between those individuals

                              18

1  and President Putin, but perhaps the most striking is
2  the statement that Mr Fridman and Mr Aven used
3  a Mr Oleg Govorun as a "driver" and "bag carrier" to
4  deliver large amounts of illicit cash to President Putin
5  when he was Deputy Mayor of St Petersburg.

6      There are two disputes about the personal data, as
7  your Lordship knows. The first concerns paragraph 1 and
8  paragraph 2.  Going back to paragraph 1 {A/1/1},
9  my Lord, there's a dispute as to who is doing the
10  significant favours for President Putin in the first
11  paragraph. We say that clearly what that means is the
12  leading figures in Alfa, who are named in the previous
13  sentence, are the ones doing the significant favours.
14  Companies have to act through their agents or employees
15  and these are the named individuals and these are the
16  ones doing significant favours.

17      My Lord, that's, as it were, a pure matter of
18  construction.

19      The second point is the suggestion in the second
20  paragraph concerning illicit cash, is that an allegation
21  of criminal wrongdoing? Again, that's a matter for
22  construction of that paragraph. The defendants make the
23  remarkable submission that illicit means furtive or
24  secret, and so their case is what the memorandum is
25  simply saying is that in the 1990s this was just an

                              19

1  ordinary patronage transaction.  They were just paying
2  cash because everybody dealt in cash in those days and
3  there was nothing wrong about it at all.

4      My Lord, we say that's an absurd construction and we
5  ask rhetorically: if this is just recording something
6  which was standard and obvious, why does it feature so
7  prominently in the memorandum? It features in the first
8  paragraph and of course it also features as the second
9  point of the summary.

10      Clearly what's being said here about the claimants
11  is that they engaged in the paying of a bribe to
12  a public official.  Any reasonable person, we say, would
13  understand that.

14      My Lord, there's a bit of side issue arisen in this
15  case, as your Lordship knows, because when we made
16  this -- when we said this alleged criminal offence, the
17  defendant said, "Well, tell us what the criminal offence
18  is".  Now, my Lord, we don't actually accept that we
19  have to do that because if it alleges a criminal offence
20  you don't have to know what the criminal offence is.
21  Many people in England wouldn't know -- probably most
22  people in England wouldn't know what the offence was if
23  you were accused of paying money to a public official,
24  what precise statute it was, but they would know it was
25  an offence.  But in response to that request we produced

                              20

1    an expert report pointing out that this was an offence
2    under Article 174 of the Criminal Code of the Russian
3    Soviet Federated Socialist Republic. My Lord, if that's
4    that's relevant, that's our evidence and the defendant
5    has no expert evidence to the contrary.
6        So, my Lord --
7  MR JUSTICE WARBY: It is a bit like slander, I suppose, is
8        it? You know, that category of slander which is
9        actionable without proof of damage because it imputes
10       the commission of a criminal offence.
11 MR TOMLINSON: Yes.
12 MR JUSTICE WARBY: In that context you would have to -- you
13       might have to, depending on the precise words -- spell
14       out what the offence was, but if the words were, "He was
15       guilty of a crime", then you probably wouldn't
16       because --
17 MR TOMLINSON: My Lord, so, for example, paying money to
18       a public official is a very good example because my
19       faint recollection is that until the Bribery Act came
20       along, this used to be an offence under the Prevention
21       of Corruption Act 1911, but I suspect that 99.9% of the
22       British population have never heard of that statute, but
23       everybody would know that if you said, "He paid a bung,
24       or illicit cash to a public official", everybody would
25       know you were saying a crime had been committed, even

21

1        though they couldn't actually identify what it was.
2  MR JUSTICE WARBY: Yes, but if it wasn't a public official
3        under that Act then --
4  MR TOMLINSON: If it wasn't a public official, it wasn't
5        a crime, yes, quite.
6  MR JUSTICE WARBY: Wasn't a crime. So under the old law you
7        might have had a bit of a problem with a slander, where
8        you would have to prove that the person being bribed was
9        a public official, otherwise --
10 MR TOMLINSON: Yes, but if you say they are a public
11       official, you take the notorious case of T Dan Smith
12       that your Lordship may recollect from many years ago,
13       who was being bribed by the architect John Poulson over
14       public contracts, I mean, if someone said
15       a councillor -- I think he was the leader of Wandsworth
16       Council -- is being paid money by an architect, illicit
17       money by an architect, everybody would know that you
18       were saying he had committed a crime, even though you
19       didn't know precisely what it was called.
20           My Lord, that's the primary position.
21 MR JUSTICE WARBY: Yes.
22 MR TOMLINSON: It is interesting that the way it is put, all
23       that points in the same direction, because we have:
24           "... Govorun had been Head of Government Relations
25       at Alpha ..."

22

1        Actually that was untrue, but never mind:
2            "... in reality, the 'driver' and 'bag carrier'
3        [both in inverted commas -- sorry, over the page,
4        {A/1/2}] used by Fridman and Aven to deliver large
5        amounts of illicit cash ..."
6        So the "driver" and "bag carrier", in inverted
7        commas, is all telling us -- sending us the message that
8        this man, although his official title is head of
9        government relations, is really there to pay off public
10       officials.
11 MR JUSTICE WARBY: Yes.
12 MR TOMLINSON: My Lord, it is perhaps useful to say
13       something at this stage about processing. Of course,
14       this is a data protection claim, it relates to the
15       processing of personal data. That processing took place
16       in a number of ways: the compilation of the memorandum,
17       its disclosure to Fusion, and its disclosure to third
18       parties.
19           Obviously we are not -- we still don't know what
20       third parties it was delivered to. Mr Steele admits
21       a number of individuals. The position is somewhat
22       unclear. We accept that the defendant is not
23       responsible for the processing by other data
24       controllers. Obviously, what other data controllers do
25       with it is a matter for them and not for the defendant.

23

1        On the other hand, the defendant, we say, is
2        responsible for the damage caused by its own processing,
3        which includes the damage -- the foreseeable damage
4        caused when other people use or publish this memoranda.
5        We say, as we say in our reply, it was foreseeable
6        and likely that Memorandum 112 would be disclosed to the
7        media, given its high profile subject matter.
8        The defendant admits the disclosure to Fusion and
9        obviously, if it is disclosed to Fusion, it obviously
10       goes down the chain to the ultimate client.
11       It also admits disclosure to a number of other
12       individuals. My Lord, those are listed -- if
13       your Lordship looks at our skeleton argument at {A/2/9},
14       those are the recipients: Mr Strobe Talbott, who had
15       been a public official at one time but at that stage was
16       retired; an unidentified senior US national security
17       official; an unidentified senior UK Government national
18       security official, some former colleague; and then
19       David Kramer, who was a private individual, although was
20       provided with the memorandum for the purposes of passing
21       it on to Senator John McCain, who at that stage
22       certainly did have an official function.
23       The defendant seeks to divide the processing into
24       two categories: Fusion disclosure and what they call
25       national security disclosure.

24

1    My Lord, we don't accept that there are national
2  security disclosures in this case.  Your Lordship will
3  know that there's an exemption from certain principles
4  in the Data Protection Act under section 28 of the Data
5  Protection Act.  We deal with that at paragraphs 80 to
6  82 of our skeleton, and the defendant at paragraphs 41
7  to 46.
8    My Lord, our short answer to that is whatever the
9  position in relation to the Trump -- the whole Trump
10  dossier, as it has been called, we can see something of
11  an argument which says: well, look, this is about the
12  potential US President being subject to blackmail by the
13  Kremlin or having improper connections with the Kremlin
14  and so on.  One can see that in those circumstances it
15  might well be arguable that there were national security
16  reasons for disclosure, but Memorandum 112 has nothing
17  to do with any of that.  It has nothing to do with --
18  the only mention of candidate Trump is in the title.  It
19  has nothing to do with the election.  It is about -- and
20  it doesn't have anything to do with links between
21  servers.  It is simply about the claimants, Alfa and
22  President Putin.  We say that that has no national
23  security implications at all.  It's certainly not -- its
24  disclosure is certainly not required for the purposes --
25  for national security purposes.

25

1    My Lord, we say, and there's a dispute of fact about
2  this, that the memorandum was never actually provided to
3  the FBI.  Mr Steele decided, because he thought that the
4  results of his investigations were explosive, or what
5  his sources had told him, he decided to tell the FBI
6  about it.  I showed your Lordship a note of a meeting
7  from July.  He provided -- there's no doubt he provided
8  certain memoranda to the FBI.  But the FBI say that, "He
9  didn't provide this memorandum to us".  Mr Steele says
10  he did.  Well, my Lord, with respect to Mr Steele, the
11  FBI's evidence in relation to this is to be preferred,
12  particularly as Mr Steele, as your Lordship will have
13  seen from the supplemental statement that he served,
14  can't even recollect when he was instructed to produce
15  the memorandum. So the idea that he can accurately
16  recollect when he handed it to some third party is --
17  MR JUSTICE WARBY: Where do I get what the FBI say about
18    this?
19  MR TOMLINSON: My Lord, it's in our skeleton.  My Lord, if
20    I can just -- if your Lordship will give me a moment.
21    This in the report of the inspector general.
22  MR JUSTICE WARBY: Yes.
23  MR TOMLINSON: And the report of the inspector general,
24    which is -- I don't know if your Lordship -- it is a
25    very long document and your Lordship may --

26

1  MR JUSTICE WARBY: No, I have just read -- so far I have
2    just read what you asked me to read.
3  MR TOMLINSON: Yes.
4  MR JUSTICE WARBY: Because I thought I could get directed to
5    the bits that matter.
6  MR TOMLINSON: Well, yes. The report of the Inspector
7    General is an extremely interesting document about the
8    background to this.  It is all about the warrants that
9    were obtained.  At paragraph 24 of our skeleton we deal
10    with this {A/2/9}.  The reference is to {D/131/155}.
11    D/131 is the Horowitz report and your Lordship will see
12    the footnote is about Report 112:
13      "The Crossfire Hurricane team [which is the FBI
14    investigators who are looking into the links between the
15    Trump team and Russia] received Report 112 on or about
16    November 6, 2016, from a Mother Jones journalist through
17    then FBI General Counsel James Baker."
18      In other parts of the report it makes clear that
19    they didn't receive this from Mr Steele.
20      It is entirely unclear how the Mother Jones
21    journalist got it.
22  MR JUSTICE WARBY: Yes.
23  MR TOMLINSON: Although we do know that Mr Steele admits to
24    having spoken to the Mother Jones journalist --
25  MR JUSTICE WARBY: Is there any controversy about the status

27

1    of this report evidentially?
2  MR TOMLINSON: I don't think so.  Not that I'm aware of.
3    It's.
4  MR JUSTICE WARBY: I mean, it's a source of multiple hearsay
5    evidence of some kind.
6  MR TOMLINSON: It certainly is hearsay evidence, my Lord, of
7    course it is, but on the other hand the FBI interviewed
8    something like 100 witnesses, including Mr Steele, and
9    of course crucially what they had access to was their
10    documentary records.
11  MR JUSTICE WARBY: Yes, I only ask because sometimes, as you
12    know, there can be some debate about the status of
13    findings in reports of this kind.
14  MR TOMLINSON: Yes, my Lord.
15  MR JUSTICE WARBY: What you're showing me is a statement of
16    fact.
17  MR TOMLINSON: Yes. I'm not saying it's -- their assessment
18    of the witnesses and so on obviously has a very
19    different status, but this is a matter of fact.
20      Of course it is possible it is wrong and
21    your Lordship could of course believe Mr Steele, rather
22    than the FBI, but we say that really the position is
23    clear that Mr Steele didn't -- he obviously doesn't
24    actually remember when he gave this memorandum and who
25    he gave it to, if one looks at his witness statement

28

**EXHIBIT 5**

**Claimants**
**P Aven**
**First**
**No Exhibits**

**Dated:**      **02.2020**

**Claim No: QB-2018-006349**

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**MEDIA AND COMMUNICATIONS LIST**

**B E T W E E N**

**(1) PETR AVEN**
**(2) MIKHAIL FRIDMAN**
**(3) GERMAN KHAN**

**Claimants**

**-and-**

**ORBIS INTELLIGENCE LIMITED**

**Defendant**

---

**WITNESS STATEMENT OF PETR AVEN**

---

I, **PETR OLEGOVICH AVEN** of 2nd floor, Devonshire House, One Mayfair Place, London, W1J 8AJ, **WILL SAY** as follows: -

1.      I am the First Claimant in these proceedings and I make this statement in support of my claim for breaches of the Data Protection Act 1998.

2.      My native language is Russian. I speak English relatively well and I have given this statement in English.  However, I intend to have an interpreter available at the trial in case I need to request that a question is translated or if I need to give my answer in Russian, so I can explain myself better to the Judge.

3.      Unless otherwise stated, the facts and matters set out below are within my own knowledge or are derived from other sources or documents that I have seen and which in all cases I believe to be true.

**PERSONAL AND PROFESSIONAL BACKGROUND**

4.     I was born in Moscow. I hold Russian and Latvian citizenship. I have a young child at school in the UK and I now split my time between London and Moscow.

5.     I studied at Moscow State University and graduated in 1977 with a degree in economics. I obtained a Ph.D. in Econometrics three years later, also at Moscow State University. In 1980 I started work as a research scholar in the Russian Academy of Sciences, where I stayed for eight years. In 1989 I joined the International Institute of Applied Systems Analysis in Laxenberg, Austria. My role was in research on the mathematical economy and economic reforms in Eastern Europe. I became a very well-known and much quoted economist. I worked in Austria until 1991, when I returned to Moscow.

6.     From 1981 to 1991, I was part of a group of young economists, informally led by Yegor Gaidar. We were dedicated to promoting economic reform in Russia and we would organise seminars, publish books and make presentations on this topic. As far as I'm aware, we were the only economic group of this kind to be invited to lecture outside Russia, for example at Harvard and Yale universities in the United States.

7.     Boris Yeltsin was elected President in 1991. He was committed to a programme of radical economic reform and he approached me, Mr Gaidar and the other economists in our group to come up with a plan to completely change the old Soviet-style economy. Mr Gaidar told me a few days in advance that I would be appointed Minister for Foreign Economic Relations in November 1991 and I remember him saying to "*come prepared*". During those few days I wrote all the decrees in my area for President Yeltsin to pass as part of the new foreign trade regime making immediate and crucial changes, the biggest of which were the liberalisation of foreign trade and making the ruble convertible.

8.     My main responsibilities were setting export and import tariffs, dealing with the World Trade Organisation and negotiating bilateral tariff agreements with Russia's foreign partners. I also served as Russia's representative to the Group of Seven (G7) and represented President Yeltsin at the G7 summit in 1992. After fourteen months, I resigned as the Minister for Foreign Economic

Relations in December 1992, after Mr Gaidar, who was Prime Minister at the time, was fired.

9.    I joined Alfa Bank ("**Alfa**"), part of the wider Alfa Group, in 1994 as President. I remained in this role until 2011. Since then I have held the position of Chairman of the Board of Directors.  I am also a member of the Board of Directors of LetterOne Holdings SA and LetterOne Investment Holdings SA, which together comprise the international investment business known as LetterOne, which was founded in 2013 by myself, Mikhail Fridman, German Khan, Alexey Kuzmichev and Andrei Kosogov.

10.   Alfa now offers a wide range of products and operates in all sectors of the financial market, including corporate and retail lending, deposits, payment and account services, foreign exchange operations, cash handling services, custody services, investment banking and other ancillary services to corporate and retail customers.

11.   Because of Alfa's size and its importance to the Russian economy, it naturally comes into contact with Russian government ministries and officials. A key part of my role as Chairman of one of the largest private businesses in Russia is to meet with relevant authorities, including on occasion heads of the government's financial departments, the Central Bank Chairman, the Prime Minister and the President.

12.   Although I previously held a ministerial role in the Russian government, I know that because of my Latvian and Jewish heritage and my role as a businessman, I am still considered an "outsider" to the political elite. In Russia, the state is pre-eminent and business is secondary. In other words, private business is expected to stay out of politics.

## RELATIONSHIP WITH PRESIDENT PUTIN

13.   I have known President Putin in a professional context for many years.  I first met him in 1991 while I was a government Minister and Mr Putin worked at the St Petersburg Mayor's Office as head of the Committee for External Relations of the Mayor's Office. During this time, we had a reasonably good relationship. However, this relationship has of course changed over the years, and especially since he became President, following which the distance between us

grew dramatically. I do not consider myself to be close to President Putin or to be a personal friend.

14.   I have one-on-one meetings with President Putin three or four times a year. During 2016 I met with President Putin three times, as is usual.  My meetings with President Putin are always formal and we discuss only the issues relating to my professional expertise: economics, banking and Alfa. I believe President Putin values my expertise as an economist, which is why he is interested in my views on the Russian economy and banking industry generally. He also asks about Alfa, given its importance to the economy as the largest private group in Russia.

15.   The fact that my meetings with President Putin take place is not a secret and from time to time Alfa and the Russian government have publicly confirmed the occurrence of such meetings.

16.   As well as these one-on-one meetings with President Putin, I also attend regular business meetings which are hosted by President Putin for Russia's most prominent businessmen (which I understand are referred to in the press as the "oligarch" meetings). These are usually attended by around 50 people.

17.   President Putin has never asked me for "assistance" in relation to politics or foreign relations. He has never asked me to represent either himself or the government. He has not asked me to do and I have not done any favours for him.   I have never asked President Putin to do any favours for me (or for Alfa), nor has he ever performed any such favours.

**MUELLER REPORT**

18.   In 2018 I provided information to the Special Counsel's Office of the U.S. Department of Justice as part of the investigation by Special Counsel Robert Mueller (the "**Special Counsel's Investigation**").

19.   The Special Counsel's Investigation was examining, amongst other matters, alleged Russian interference in the 2016 U.S. presidential election.

20.   The Special Counsel's Office asked me about a particular meeting with President Putin and my subsequent actions involving Richard Burt.  Mr Burt is

a former Assistant Secretary of State for European and Canadian Affairs and U.S. Ambassador to Germany, who now sits on both Boards of LetterOne and has helped advise us in relation to U.S. matters.

21.   During a meeting with President Putin in December 2016, he told me, as I understand he told many Russian business leaders, that he expected the U.S. government to impose additional sanctions on Russian businessmen.

22.   I was well aware of this risk, and informed President Putin that my businesses were taking steps to protect themselves, including by strengthening compliance and trying to establish contact with the new administration of the United States.

23.   President Putin's concerns coincided with those I already had in respect of the potential for Alfa (or one or more of my business partners) to fall victim to U.S. sanctions. These concerns were exacerbated by the publication in October 2016 by Slate of a report alleging the exchange of data between an Alfa server and the servers of one of the companies associated with the then-President elect Donald Trump. The report raised questions about a possible link between Alfa and the Donald Trump election campaign.

24.   These allegations are totally false and I find it frustrating that they continue to be repeated by others. During Robert Mueller's testimony following the publication of the Mueller Report, the former Special Counsel said that he did not believe these allegations were true. The report by the Office of the Inspector General of the U.S. Department of Justice (on certain aspects of the FBI's investigation into alleged Russian interference in the U.S. Presidential election), published in December 2019, further confirmed that "*the FBI investigated whether there were cyber links between the Trump Organization and Alfa Bank, but had concluded by early February 2017 that there were no such links.*"

25.   For many years, Mr Fridman and I worked on behalf of our businesses to build relationships with U.S. business, political and thought leaders.  This was to help establish ourselves as credible and trustworthy businessmen in the U.S. with the long-term intention of investing in the U.S. economy.

26.   President Trump's election in November 2016 came as a surprise to us and we recognised that we had no contacts with the incoming administration.  I spoke

to Mr Burt to seek an introduction to the incoming administration, much as I had sought to establish relationships with prior U.S. administrations.   He understood the importance of building such relationships given the risk of the imposition of sanctions on Russian businessmen such as myself.  The purpose of seeking this introduction was solely to further and protect our business interests and to establish contacts in the U.S. Administration, as we had previously done.

27.     Mr Burt subsequently advised me that given the political environment between the U.S. and Russia, the time was not right for him to approach the President-Elect's team. No approach or contact was made at this time or subsequently.

28.     I have since learned that Mr Burt misunderstood our conversation and believed that I was asking him about an approach on behalf of the Russian government. This is not correct.  As I have said, the request for an introduction was solely on behalf of me, my partners and our respective business interests, and for no one else.  It is inconceivable that President Putin would entrust a businessman like me with any communications or approaches on behalf of the Russian government.

### MEMORANDUM CR112 ("MEMORANDUM")

29.     Shortly after its publication in January 2017, I heard about the Memorandum and Mr Steele's wider series of so-called intelligence memoranda from LetterOne's Director of Communications.

30.     My reaction on reading the Memorandum was that it was rubbish. The Memorandum does not relate to Russian interference in the U.S. Presidential election (as much of the wider series of Mr Steele's memoranda does) but its heading suggests that it does, and I knew these allegations about Russian interference were going to be a very big and important news story. I was extremely concerned that by being named in the Memorandum I was being wrongly linked to this story. I was worried that it would be very damaging to my interests in the U.S. and elsewhere. Although I knew the contents of the Memorandum were completely false, it concerned me that it was being taken seriously by the Western media.

31.   The Memorandum makes a number of false statements about me personally.

32.   First, it is said that significant favours are done by President Putin for Alfa and for President Putin by Alfa. I understand this to be, amongst other things, a suggestion that President Putin and I do "significant favours" for each other. This is completely untrue.

33.   I have never done favours for President Putin. President Putin does not do and has not done any favours for me. As I have already explained, while it is important that Alfa maintains good working relations with the Russian state, this does not involve the carrying out of favours on my behalf by President Putin or vice versa.

34.   Second, it is said that Mr Fridman and I give informal advice to President Putin on foreign policy. This is not true. I do not give any foreign policy advice to President Putin and I have never been asked to provide such advice. As I have said, this is not the way things work in Russia. My status as a businessman does not put me in a position where I could offer such advice, even if I wanted to. President Putin has never sought my views on anything other than economic and business matters that fall within my professional expertise.

35.   Third, it is said that Oleg Govorun was used by me and Mr Fridman as a "driver" and "bag carrier" to deliver large amounts of illicit cash to President Putin when he was Deputy Mayor of St Petersburg. This is a serious and false allegation of criminal misconduct. I certainly did not make any arrangements with Mr Govorun to deliver "illicit cash" to President Putin (or anyone else). I have never paid or been involved in paying bribes to President Putin or any other government official. This allegation is particularly damaging as it reinforces the Western stereotype that all Russian businessmen are corrupt. Although I knew it was completely false, it made me concerned because I knew there would be many people who would find it easy to believe that a Russian businessman was corrupt.

36.   After the publication of the Memorandum, I inquired about Mr Govorun's employment at Alfa as I did not recall ever having had any dealings with him or speaking to him at all. It appears that he worked at Alfa for only 3 years in the late 1990s, a few years after he left university, and that he was not in a senior position. The Memorandum wrongly suggests that Mr Govorun was Head of Government Relations at Alfa Group during the 1990s. I understand that he

was one of the Deputy Heads of the Department for Communications with State Authorities at Alfa Bank in the late 1990s, and that he did not work at Alfa Bank when Mr. Putin was Deputy Mayor of St. Petersburg.

37.   Fourth, it is said that the President, through senior Kremlin colleagues, pressured Alfa over its failure to reinvest the proceeds of the TNK oil company sale into the Russian economy, using this as a lever on Mr Fridman and I to make us do his political bidding. This is not true. I do not do President Putin's "political bidding". We do not discuss "political" matters.  As I have mentioned, our conversations are limited to my professional expertise: business and economics.

**IMPACT**

38.   The publication of my personal data in the Memorandum has had a significant impact on me personally. I received a lot of calls during the period after it was published. Some of my personal and business acquaintances (particularly those from the U.S.) have not spoken or met with me since the publication of the Memorandum. A close friend told me that he could not see or speak to me publicly because it could potentially be damaging for him reputationally to be linked to me and the allegations in the Memorandum. I found this very distressing, particularly as some of these acquaintances were trusted contacts I had built relationships with over twenty or thirty years.

39.   LetterOne's ability to do business in the U.S. has also been negatively affected by the Memorandum. In 2016, Mr Khan was working on a large acquisition of Texan-based oil assets which was to be our first significant investment in this area in the U.S. However, we had to abandon the acquisition in early 2017 because of concerns raised by the Committee on Foreign Investment in the United States.  As a shareholder in LetterOne, the loss of $45 million in deposit money, the costs involved in negotiating this deal and the loss of a major revenue opportunity was frustrating and is not insignificant.

40.   It was particularly distressing to me that, despite the reputation we had built up as an internationally-focused businessmen, we were essentially being prevented from making a significant investment in the U.S. because of the controversies surrounding the Memorandum. We had not experienced this particular issue with CFIUS before and indeed a previous transaction, prior to

the publication of the Memorandum, was approved by them. Since that first refusal in 2017, the attitude of CFIUS towards foreign investors, and Russian investors in particular, has hardened, meaning that for most of our business units within LetterOne, the U.S. is a no-go area. I have no doubt that the false allegations contained in the Memorandum have been a significant contributory factor in this hardening of attitude and approach.

41.     In addition, the inaccurate allegations have had an adverse effect on my reputation. I am involved in international and UK-based charitable organisations, particularly those relating to art, for example the Tate, the Royal Academy of Arts and the Serpentine Galleries. I make significant personal donations to these organisations and I am on the board of the Royal Academy of Arts.  I have an extensive art collection, with a particular focus on Russian art, and I have previously loaned pieces from my art collection for exhibitions. While negotiations are currently ongoing (and are therefore confidential), it is my current intention to donate my collection (and a significant amount of money) to a British museum. While the museum in question is eager to accept my donation, it is currently carrying out extensive due diligence on me to establish whether it can accept my donation because of the allegations in the Memorandum. It has said that it is likely I will need to at least delay the donation by a few years.  I did not face problems such as these before the Memorandum was published.

42.     Because the contents of the Memorandum have been so widely published, many people know what it says about me. This has been very frustrating. The fact that the allegations remain available to the world at large and are uncorrected further exacerbates my distress. There has been no apology or admission that the very serious allegations made are inaccurate.

43.     Through this litigation, I hope to obtain a ruling by the Court that my personal data in the Memorandum is inaccurate and an order that it is corrected by the Defendant and that third parties are made aware of this.

44.     These objectives are important to me because I want to be able to demonstrate to my business and personal contacts that the allegations in the Memorandum are false and to stop this from impacting on my charitable interests and reputation.

I believe that the facts stated in this witness statement are true.

Signed:................................................        Dated:  10.02.2020

10

**EXHIBIT 6**



Petr Aven, Mikhail Fridman and German Khan v Orbis Business Intelligence
Limited

Day 2

March 17, 2020

Opus 2 International - Official Court Reporters

Phone: +44 (0)20 3008 5900

Email: transcripts@opus2.com

Website: https://www.opus2.com

1    whether Mr Steele was responsible for the document
2    entering the public domain. That's not something you
3    can give direct evidence on.
4        But at 37 in your witness statement {C/1/9}, you
5    suggest that the problem with the memorandum is that it
6    got the attention of the media in the West; yes?
7  A. Yeah.
8  Q. Where you're trying to carry on business more now than
9    you were ten years ago?
10 A. Probably, yes.
11 Q. And it contains, you say, specific allegations about you
12   specifically?
13 A. That's correct.
14 Q. But now, at the conclusion of this cross-examination,
15   you would agree with me, would you not, that there has
16   been, and had been before this memorandum was released
17   by BuzzFeed, a very large amount of publicity about you
18   in the mainstream media in the West over the years; yes?
19 A. True.
20 Q. And some of that contains very serious allegations
21   against you and Alfa and about how you made your money,
22   doesn't it?
23 A. Unfortunately, you're right.
24 Q. And some of it accuses you of making large amounts of
25   money, huge amounts of money improperly, with the

13

1    knowing assistance of successive Russian governments.
2    That's one of the charges that has been levelled against
3    you.
4  A. Probably, yes.
5  Q. {D/85/1}, please.  This is one of your documents that
6    you have disclosed in this case.  It's an email just
7    after the -- at the time of the BuzzFeed publication
8    from somebody called Stuart Bruseth, who is director of
9    communications at LetterOne; yes?
10 A. Yeah.
11 Q. No reason why you should remember the document. You
12   remember the period after the BuzzFeed publication?
13 A. Yeah.
14 Q. So just have a look at the email he's sending you.
15 A. Yeah.
16 Q. It is right, isn't it, that he was able to advise you
17   and assist you to respond to the BuzzFeed publication in
18   the media and to rebut the suggestions in the
19   memorandum? Yes?
20 A. Correct.
21 Q. And you had considerable resources to enable you to do
22   that, including professional expertise of the sort
23   that's being offered here; yes?
24 A. Yeah.
25 Q. And he's telling you in this email what the line is to

14

1    be in response and rebuttal in the media if you're asked
2    about this; yes?
3  A. Yeah.
4  Q. And there are other documents in your disclosure, both
5    before and after the BuzzFeed publication.
6  A. Correct.
7  Q. In the three claimants' disclosure.
8  A. Correct.
9  Q. I don't want to go through it all, which show that this
10   is a familiar path for you to tread, using
11   communications experts, to deal with the media, to
12   respond and rebut, if appropriate, through your own
13   comments with the benefit of professional advice?
14 A. Right.
15 Q. Yes?
16 A. Correct.
17 Q. Something you take a lot of care about?
18 A. Yeah.
19 Q. In your witness statement at paragraph 40 {C/1/9} you
20   say -- I don't question the underlying facts -- that
21   in March 2017, the US Committee on Foreign Investment
22   became concerned about an oil and gas investment in
23   Texas, about your involvement in that, and you're trying
24   to suggest that the reason for that was BuzzFeed's
25   publication of the memorandum. Is that right?

15

1  A. Yeah, I think the circumstances -- I don't know exactly,
2    but it seems to me the circumstances, that's the fact.
3  Q. Rather than any other material the Committee on Foreign
4    Investment had about you --
5  A. Yeah.
6  Q. -- that they might have thought was relevant to their
7    decision-making?
8  A. I suggest, yes.
9  Q. Do you have any evidence of that, that that was what
10   determined that decision, rather than other
11   considerations?
12 A. Yeah, I have certain set of facts which actually I made
13   the suggestion very kind of realistic, because we got
14   permission from American authority to invest in the US,
15   literally couple of months before, for our other
16   investment, and after this publication, we been rejected
17   in investment in Texas. So it was in a few months from
18   the same agency they have got different answer.
19 Q. In different cases?
20 A. Different cases, but -- it's different businesses, but
21   it was the same owner, the same investor. So we didn't
22   care about us as investor, didn't worry about us few
23   months ago, and suddenly we started to be quite cautious
24   regarding us as investor.
25 Q. But do you know what else they looked at --

16

1    (Pause)
2  A.  Yeah.
3  Q.  Just finish it, over the page, next page, top of the
4      next page {D/40/31}. Go back to the previous page
5      {D/40/30}.
6  A.  Uh-huh.
7  Q.  This discusses a report of a special commission set up
8      by the Gaidar-Yeltsin government to investigate
9      corruption and abuse of power, doesn't it?
10 A.  No. It was specifically -- report, it was done
11     specifically search for Communist Party money abroad.
12     Kroll was hired -- (inaudible) contact was Kroll, it was
13     hired specifically in search for Communist Party money
14     abroad.
15 Q.  I am putting to you what is reported in the book; do you
16     understand?
17 A.  It's completely untrue.
18 Q.  We'll come to that in a moment. Take it stage-by-stage.
19     What is reported in the book:
20         "... that a special commission be established by the
21     procurator general to investigate corruption, abuse of
22     power, and economic offences."
23         And that there was a report presented to the Supreme
24     Soviet in September 1993. That is what is being
25     reported here. Do you accept that there was

25

1      a commission set up that reported --
2  A.  This be -- this were Kroll or some commission by
3      Supreme, maybe there was a commission, maybe.
4  Q.  Yes.
5  A.  Yes.
6  Q.  And the background was investigation by Kroll, wasn't
7      it?
8  A.  I don't know.
9  Q.  It says Mr Yeltsin was receiving monthly updates from
10     Kroll.
11 A.  He did not.
12 Q.  At the bottom of page 19, in the last five lines, you're
13     criticised, aren't you? {D/40/30}
14 A.  I am. I see it.
15 Q.  By implication; by Dawisha referring to you being
16     criticised by the commission in its report?
17 A.  Uh-huh. Yes, I see it.
18 Q.  "... the document recounted widespread instances of
19     'bribery of officials, blackmail, and the illegal
20     transfer of currency resources to foreign banks '..."
21 A.  It's said in the book.
22 Q.  But you don't agree with any of that?
23 A.  I'm the only one who has in my hands Kroll report.
24     I have it. I have Kroll report. I have Kroll report.
25     I have Kroll report. It gets nothing to do with what's

26

1      said in this book. It has nothing to do with me. It
2      was completely false. Here it's completely untrue.
3      I have it in English and in Russian.
4  Q.  I think what this is referring to is the special
5      commission's report?
6  A.  But you say this is based on Kroll report. I have Kroll
7      report in my hands. The commission didn't see the
8      report.
9  Q.  I want to ask you about Mr Putin's time in
10     St Petersburg. The public or general understanding is
11     that Mr Putin had retired from the KGB in around 1990
12     and through acquaintanceship with Mr Sobchak, then the
13     Mayor of St Petersburg, went to work in his
14     administration. Is that correct?
15 A.  I know this only from newspapers. I don't know how they
16     met and when they met. That, I don't know this story.
17 Q.  You never discussed that with Mr Putin?
18 A.  Never. Never.
19 Q.  At your paragraph 13 you say you first met him {C/2/3},
20     subject to the clarification that you have just given
21     us, in 1991 when he was head of the committee for
22     external relations in Mr Sobchak's office?
23 A.  Yes.
24 Q.  But you have recalled now that you met him shortly
25     before that?

27

1  A.  Yes. Yes, I met him two weeks before I was appointed.
2  Q.  One of the other problems at that time is identified in
3      the Dawisha book at {D/40/2}. Could we get that up,
4      please. Can you read -- we need to expand it. It's the
5      bottom of the left-hand page, 106. Can you read that?
6  A.  106?
7  Q.  The left-hand page.
8  A.  Mm hmm.
9  Q.  About 13 lines up from the bottom.
10 A.  Mm hmm.
11 Q.  Read down to the bottom. It describes food shortages,
12     but also shortages of cash used to pay for food imports,
13     so that barter arrangements were used. Do you agree?
14 A.  It was some sort of barter agree -- yeah, that was -- at
15     that time barter was common in Russia. That was
16     a barter arrangement, that's right.
17 Q.  And then if we go to the next page {D/40/3}. On the
18     left-hand side, about six lines down, after the
19     description of the Salye commission --
20 A.  Mm hmm.
21 Q.  -- beginning:
22         "Before that, the legal authority ..."
23 A.  Mm hmm.
24 Q.  Just read down to the middle of the page.
25 A.  Yeah, I read it.

28

**EXHIBIT 7**

# PUTIN'S PEOPLE

### HOW THE KGB

### TOOK BACK RUSSIA

### AND THEN TOOK ON

### THE WEST

## CATHERINE BELTON

FARRAR, STRAUS AND GIROUX

*New York*

Farrar, Straus and Giroux
120 Broadway, New York 10271

Copyright © 2020 by Catherine Belton
All rights reserved
Printed in the United States of America
Originally published in 2020 by William Collins, Great Britain
Published in the United States by Farrar, Straus and Giroux
First American edition, 2020

Library of Congress Control Number: 2020933664
ISBN: 978-0-374-23871-1

Our books may be purchased in bulk for promotional, educational, or business use. Please contact your local bookseller or the Macmillan Corporate and Premium Sales Department at 1-800-221-7945, extension 5442, or by e-mail at MacmillanSpecialMarkets@macmillan.com.

www.fsgbooks.com
www.twitter.com/fsgbooks • www.facebook.com/fsgbooks

1   3   5   7   9   10   8   6   4   2

# *Contents*

| | | |
|---|---|---|
| List of Illustrations | | xi |
| Dramatis Personae | | xiii |
| Prologue | | 1 |

## PART ONE

| 1 | 'Operation Luch' | 19 |
|---|---|---|
| 2 | Inside Job | 50 |
| 3 | 'The Tip of an Iceberg' | 84 |
| 4 | Operation Successor: 'It Was Already After Midnight' | 115 |
| 5 | 'Children's Toys in Pools of Mud' | 152 |

## PART TWO

| 6 | 'The Inner Circle Made Him' | 179 |
|---|---|---|
| 7 | 'Operation Energy' | 211 |
| 8 | Out of Terror, an Imperial Awakening | 241 |
| 9 | 'Appetite Comes During Eating' | 274 |




x   Contents

## PART THREE

10   *Obschak*                                                    309

11   Londongrad                                                   344

12   The Battle Begins                                            366

13   Black Cash                                                   396

14   Soft Power in an Iron Fist: 'I Call Them the
     Orthodox Taliban'                                            419

15   The Network and Donald Trump                                 448

     Epilogue                                                     489

     Acknowledgements                                             501

     Notes                                                        505

     Index                                                        597




out the additional $900 million in quotas to other firms which also disappeared with the proceeds, as Salye had been unable to access any further documentation. But she suspected that he had.[14]

As Salye and her deputies dug through the paperwork, the scandal seemed to grow. State customs officials and St Petersburg's representative from the foreign trade ministry had written to Putin complaining that he'd issued the export licences in violation of laws governing such barter deals.[15] An expert opinion commissioned by Salye's committee warned that the companies involved were so obscure they could disappear with the proceeds from the sales overnight.[16] Most of them were to receive mind-blowing commissions for their services: 25 to 50 per cent of the value of the deals, instead of the usual 3 or 4 per cent.[17] A handful of the contracts appeared to allow the companies to purchase raw materials for far less than the market price. One quota awarded by Putin allowed for an outfit created just two months before the scheme took off to acquire 13,997 kilograms of rare-earth metals for two thousand times less than the global market price, enabling it to reap vast profits when it sold it all on world markets.[18]

The scheme Salye had uncovered was almost identical to the practices deployed by KGB joint ventures in the dying days of the Soviet Union, which had led to a flood of raw materials being siphoned out of the country from state-owned enterprises at the low internal Soviet price, while the profits from the subsequent sales at much higher world prices remained in bank accounts abroad. In those days, any outfit that wanted to export raw materials had to receive a special licence to do so from the ministry of foreign trade, whose ranks were mostly manned by associates of the KGB. When the Russian government launched a series of barter schemes intended to staunch the looming humanitarian crisis following the Soviet collapse, the deals followed a similar route. But Putin had special permission to award his own quotas, licences and contracts for the city's so-called oil-for-food deals, bypassing the need to agree each one with the ministry.[19] He'd been granted this by the minister for foreign trade himself, Pyotr Aven, the same bespectacled economist who'd worked closely on reforms with Gaidar in the early eighties, and who then protected Putin when the oil-for-food deals came under scrutiny.

bases in Central Asia from which it could launch attacks in neighbouring Afghanistan. Putin's KGB past was pushed into the background, as George W. Bush said that when he looked deep into his eyes he got a 'sense of his soul'.

But all of this was short-lived. The early days of Putin's presidency now seem an era of wishful thinking and great naïvety. According to Pugachev, the attempts at rapprochement with the West were made not out of any sense of generosity, but because Putin expected something in return.[23] So when in June 2002 George W. Bush, after months of being courted by Putin, announced that the United States was unilaterally withdrawing from the Anti-Ballistic Missile Treaty, a key arms agreement dating from the Cold War, Putin and his advisers felt betrayed. The withdrawal from the treaty would allow the US to begin testing a missile-defence system that it proposed to install in former Warsaw Pact states. The US claimed that it was intended as a defence against Iranian missiles, but Putin's administration saw it as directly aimed at Russia. 'It's clear the missile-defence shield can't be against any other country apart from Russia,' Voloshin told reporters. American officials, he said, had 'Cold War cockroaches in their head'.[24] At the same time, NATO was continuing a relentless march east. Assurances given by a string of Western leaders to Gorbachev that there would be no eastern expansion were being ridden over roughshod. The final year of Yeltsin's rule had seen NATO swallow Poland, Hungary and the Czech Republic. In November 2000, NATO invited seven more Central and East European countries to join.[25] It seemed to the Kremlin that the US was rubbing the West's dominance in their faces.

From the beginning, behind the appearance of liberal economics there was a strong undertow aimed at strengthening the control of the state. Putin's early reforms were in fact intended to establish an Augusto Pinochet-type rule, whereby economic reform would be pushed through with the 'totalitarian force' of a strong state. Almost as soon as he was elected, Pyotr Aven, the bespectacled economist who'd trained first with Gaidar and then at a KGB-linked institute of economics in Austria, had called on Putin to rule the country as Pinochet had ruled Chile.[26] Aven was the former minister for foreign

economic trade who'd protected Putin and signed off on the St
Petersburg oil-for-food schemes, and who'd hired the international
investigations firm Kroll to track down the missing Party gold,
without giving it access to the information Russian prosecutors had.
By this time, he had joined forces with Mikhail Fridman, one of the
young Komsomol cultivated by the KGB to become the country's
first entrepreneurs. Aven was president of Fridman's Alfa Bank,
which formed the core of one of Russia's biggest financial industrial
conglomerates, with holdings in oil and telecoms. At the centre of
the Alfa Group's financial network sat the director of one of its main
holding companies in Gibraltar, Franz Wolf, the son of Markus Wolf,
the Stasi's ruthless former intelligence chief.[27] To all appearances,
Fridman and Aven were honouring and preserving KGB connec-
tions. Putin, Aven was clearly hinting, was now in a position to
complete Russia's market transition in the way Andropov had
intended, before the process spiralled out of control.



The signs that Putin was seeking to carve out a different type of
power were there from the start. Optimists hoped at first that he
was carrying out a tightrope act, seeking to balance the relatively
liberal, relatively pro-Western Yeltsin Family flank of his regime with
the St Petersburg security men. But the influence of the KGB men
began to far outweigh all else. Their world view was steeped in the
logic of the Cold War, and gradually that came to define and mould
Putin too. Seeking to restore Russia's might, they viewed the US as
eternally seeking the break-up of their country and the weakening
of its power. For them, the economy was to be harnessed as a weapon
first to restore the power of the Russian state – and themselves as
leaders of the KGB – and then against the West. Putin had, to some
degree, retained some of the influence of the liberal Sobchak. But
eventually, said Pugachev, 'the inner circle made him. They changed
him into someone else. He got disappointed in the US and then he
just wanted to get rich. It was the inner circle who pushed him to
restore the state.'[28]

The FSB chief Patrushev, in particular, had sought to tie Putin to
the KGB security clan and its Cold War views. He had been more
senior than Putin within the FSB, holding top posts in the Moscow



**EXHIBIT 8**

# FIRST PERSON

An Astonishingly Frank

Self-Portrait by

## RUSSIA'S PRESIDENT

# VLADIMIR PUTIN

FIRST PERSON

PUBLICAFFAIRS Reports

Case 1:17-cv-02041-RJL   Document 94-10   Filed 08/14/20   Page 3 of 4

Finally, there was the problem of personnel. There were few specialists who spoke foreign languages. With Sobchak's support, Putin created a faculty of international relations at LGU. The first class was announced in 1994. Graduates of the program are now working in our Committee and in other organizations.

**Much has been written in the St. Petersburg press about the food delivery scandal. What was that?**

In 1992, there was a food crisis in the country, and Leningrad experienced big problems. Our businessmen presented us with a scheme: If they were allowed to sell goods—mainly raw materials—abroad, they would deliver food to Russia. We had no other options. So the Committee for Foreign Liaison, which I headed, agreed to their offer.

We obtained permission from the head of the government and signed the relevant contracts. The firms filled out all the necessary paperwork, obtained export licenses, and began exporting raw materials. The customs agency would not have let anything out of the country without the correct paperwork and accompanying documents. At the time, a lot of people were saying that they were exporting certain rare earth metals. Not a single gram of any metal was exported. Anything that needed special permission was not passed through customs.

The scheme began to work. However, some of the firms did not uphold the main condition of the contract—they didn't deliver food from abroad, or at least they didn't import full loads. They reneged on their commitments to the city.

**A deputies' commission was created, headed by Marina Salye, who conducted a special investigation.**

No, there wasn't any real investigation. How could there be? There was no criminal offense.

Case 1:17-cv-02041-RJL   Document 94-10   Filed 08/14/20   Page 4 of 4

Then where does this whole corruption story come from?

I think that some of the deputies exploited this story in order to pressure Sobchak into firing me.

**Why?**

For being a former KGB agent. Although they probably had other motives too. Some of the deputies wanted to make money off those deals, and they wound up with nothing but a meddlesome KGB agent. They wanted to put their own man in the job.

I think the city didn't do everything it could have done. They should have worked more closely with law enforcement agencies. But it would have been pointless to take the exploiters to court—they would have dissolved immediately and stopped exporting goods. There was essentially nothing to charge them with. Do you remember those days? Front offices appeared all over the place. There were pyramid schemes. Remember the MMM company? We just hadn't expected things to get so far out of hand.

You have to understand: We weren't involved in trade. The Committee for Foreign Liaison did not trade in anything itself. It did not make purchases or sales. It was not a foreign trade organization.

**But the granting of licenses?**

We did not have the right to grant licenses. That's just it: A division of the Ministry for Foreign Economic Relations issued the licenses. They were a federal structure and had nothing to do with the municipal administration.



**EXHIBIT 9**

# PUTIN'S KLEPTOCRACY

# Who Owns Russia?

## KAREN DAWISHA

**Simon & Schuster Paperbacks**

*New York   London   Toronto   Sydney   New Delhi*



Simon & Schuster Paperbacks
An Imprint of Simon & Schuster, Inc.
1230 Avenue of the Americas
New York, NY 10020

Copyright ©2014 by Karen Dawisha

All rights reserved, including the right to reproduce this book or portions thereof
in any form whatsoever. For information address Simon & Schuster Paperbacks
Subsidiary Rights Department, 1230 Avenue of the Americas, New York, NY 10020

First Simon & Schuster paperback edition September 2015

SIMON & SCHUSTER PAPERBACKS and colophon are
registered trademarks of Simon & Schuster, Inc.

For information about special discounts for bulk purchases,
please contact Simon & Schuster Special Sales at
1-866-506-1949 or business@simonandschuster com

The Simon & Schuster Speakers Bureau can bring authors to your live event.
For more information or to book an event contact the Simon & Schuster Speakers
Bureau at 1-866-248-3049 or visit our website at www.simonspeakers.com.

Cover design by Flag Tonuzi

Manufactured in the United States of America

1  3  5  7  9  10  8  6  4  2

Library of Congress Control Number: 2014948969

ISBN 978-1-4767-9519-5
ISBN 978-1-4767-9520-1 (pbk)
ISBN 978-1-4767-9521-8 (ebook)

# CONTENTS

*Glossary of Acronyms and Key Political Leaders*      *xi*

*Introduction*      *1*

1. The USSR at the Moment of Collapse      *13*

2. The Making of Money and Power:
   The Establishment of Putin's Circle, from the KGB
   to St. Petersburg, 1985–1996      *36*

3. Putin in St. Petersburg, 1990–1996:
   Accusations of Illicit Activities      *104*

4. Putin in Moscow, 1996–1999      *163*

5. Putin Prepares to Take Over:
   From Prime Minister to Acting President,
   December 1999–May 2000      *224*

6. The Founding of the Putin System:
   His First Hundred Days and Their Consequences,
   May–August 2000      *266*

7. Russia, Putin, and the Future of Kleptocratic
   Authoritarianism      *313*

*Acknowledgments*      *351*

*Selected Bibliography*      *355*

*Notes*      *361*

*Index*      *423*

chief of base and chief of station in countries of the former Soviet Union. When Palmer gave his testimony in September 1999, Putin was not yet president, but he was prime minister, he had been head of the successor organization to the KGB, the Federal Security Service, and he had been investigated on a number of occasions for high-level corruption and criminal activity.

Of course, there were those in the Russian government who were aware of the problem and had tried to correct it. On February 18, 1992, for example, the Yel'tsin-Gaidar government signed an agreement with an American corporate private investigation firm, Kroll Associates, to track down and help repatriate money illegally held or taken abroad by former Communist Party and Soviet government agencies, including the KGB. The money had allegedly left the country prior to the August 1991 attempted coup against the reformist-oriented Gorbachev by conservatives in the highest echelons of the ruling Communist Party and the KGB.[13] A group of Central Committee officials, including the head of the Party department dealing with the defense industry, the head of state television and radio, and the deputy head of the committee in charge of privatizing state property, were all dismissed after revelations about their involvement in embezzlement and capital flight. Several of them had also been involved in efforts during the Gorbachev period by a so-called patriotic wing of the special services to organize various provocations to undermine Gorbachev and prove that his reforms needed to be halted. Yegor Gaidar, who at that time was the minister of finance, stated that this kind of activity was not only illegal but constituted continued political resistance to the government's economic reform efforts: "Last year saw large-scale privatization by the nomenklatura [the high-ranking elite], privatization by officials for their own personal benefit."[14] The *New York Times* reported that the office of the Russian procurator general had been "unable to penetrate the maze of hidden bank accounts and secret investments, left behind by party officials acting in some cases . . . with the cooperation of the K.G.B. . . . One estimate for the party's hidden assets is $50 billion."[15] Kroll, which had also led the hunt for stolen funds from the Marcos regime in the Philippines and Saddam Hussein's invasion of Kuwait, was reported to have "found that thousands of mostly offshore bank accounts, real estate holdings and offshore compa-

nies had been set up to launder and shelter these funds and what had been the Soviet Union's gold reserves."[16]*

In response to this report and their own investigations, the Yel'tsin government passed a law giving it the right to confiscate funds taken abroad illegally. Yel'tsin was receiving monthly updates from Kroll; the lower house of the Russian Supreme Soviet, the Council of Nationalities (as it was called until December 1993), demanded that the Foreign Intelligence Service† provide a report on Kroll's progress, which *Izvestiya* reported was provided in a closed session by First Deputy Director Vyacheslav Trubnikov.[18] The Supreme Soviet Presidium had decreed that a special commission be established by the procurator general to investigate corruption, abuse of power, and economic offenses. Its report was presented to the Supreme Soviet in September 1993. In it Kroll's efforts were noted; the document recounted widespread instances of "bribery of officials, blackmail, and the illegal transfer of currency resources to foreign banks," with specific ministers sanctioned by name, including Minister of Foreign Economic Relations Pyotr Aven (whose activities in approving Putin's early contracts as

---

*Joseph Serio, an American seconded to the Organized Crime Control Department of the Soviet Interior Ministry in 1990–91 who went on to head Kroll's operations in Moscow, reached similar conclusions. On this subject and the global spread of Russian organized crime that occurred in parallel at this time, see Handelman (1995), Klebnikov (2000), Friedman (2002), Varese (2001), Gerber (2000), Williams (1997), and Shelly (2004).[17]

†When the KGB was broken up after its involvement in the 1991 coup attempt against Gorbachev, several separate security institutions emerged with different functions. The Foreign Intelligence Service (Sluzhba Vneshney Razvedki, SVR) was formed out of the First Directorate of the KGB and was responsible for external intelligence. The Federal Agency of Government Communications and Information (Federal'noye Agentstvo Pravitel'stvennoy Svyazi i Informatsii, FAPSI) was made responsible for electronic surveillance. FAPSI was the rough equivalent to the National Security Agency in the United States. It existed until 2003, when Putin reunited it with the FSB. The Main Administration for the Protection of the Russian Federation (Glavnoye Upravleniye Okhrany, GUO) came out of the Ninth Directorate of the KGB. It was renamed the Federal Protective Service (Federal'naya Sluzhba Okhrany, FSO) in 1996. It is roughly equivalent to the U.S. Secret Service and is responsible for the protection of high-ranking officials, including the president. The Ministry of Security was formed out of the internal security functions of the KGB and was responsible for domestic and border security. It was reorganized in December 1993 into the Federal Counter-Intelligence Service (Federal'naya Sluzhba Kontrrazvedki, FSK). The FSK was then reorganized into the current-day Federal Security Service (FSB) in April 1995, and it was the FSB that Putin took over as director in 1998.

head of the St. Petersburg Committee for Foreign Liaison* are dealt with below). The report also criticized the Ministry of Security (the precursor of the FSB) for the fact that while it had opened three hundred investigations in the first six months of 1993 alone, only "two criminal cases had been instituted in practice." [19] In theory, in both Yel'tsin's camp and in the Communist-dominated legislature, everyone was seeking to stanch the flow. But nothing happened in practice. As one of Kroll's investigators stated, the report raised "suspicions about certain players and institutions [in the former Soviet Union]. Our problem is that when we sent it to Moscow, it was never followed up." [20]

This image of high-level culpability was reinforced when U.S. law enforcement intercepted telephone calls in the United States from the highest officials in President Yel'tsin's office, Prime Minister Viktor Chernomyrdin's staff, and other ministers to and from the head of the Russian firm Golden ADA, established in San Francisco, linking the firm to various scams that collectively added up to almost $1 billion. [21] The size of the scams is suggested by the fact that in 1994 Golden ADA had a *declared* taxable income in the United States of $111,485,984, according to U.S. court documents. [22] FBI records show that the FBI turned over to Russia information linking Golden ADA with Yevgeniy Bychkov, the chairman of the Russian Committee for Precious Gems and Metals, and Igor Moskovskiy, a deputy minister of finance. Eventually, in 2001, with documents provided by FBI wiretaps, as the FBI website wryly states, both "were convicted of abusing their state positions and immediately granted State Duma amnesties." [23] At an Aspen Conference in St. Petersburg in the early 1990s, I asked a high-ranking U.S. government official, "How many Russian government ministers have bank accounts abroad in excess of $1 million?" The reply came back immediately and without hesitation: "All of them. Every last one." This was the general view of what was going on throughout the entire country at the time, a view reaffirmed by subsequent Russian journalistic investigations. [24]

---

*Komitet vneshnikh svyazey—KVS, also sometimes referred to as the Committee on Foreign Economic Relations, or External Relations.

sequently identified as Peter Bachmann.[70] Dzhikop received a tender for rare earth metals in which the sale price was up to two thousand times lower than world market prices, leading to condemnation by the St. Petersburg City Council of the "criminal nature of the terms and conditions of the agreement" and to the conclusion that it was not surprising that the company "self-dissolved" and put the "total revenue in accounts of foreign banks."[71]

Vladimir Pribylovskiy subsequently stated that Dzhangir Rahimov was behind the company and he was the brother of one of Putin's classmates from Azerbaijan and closest friends, Ilham Rahimov.[72] Putin's coworker in Dresden and biographer claimed that while in Dresden Putin had found a way to visit "his lawyer friend (and possible classmate)" in Azerbaijan and had come back horrified at the complete failure of Soviet policy there—instead, Putin reported, "nepotism among clans was just like the nepotism in the Party's higher ranks, so evident within the 'civilized' part of the USSR—in Russia."[73] A 2012 *Forbes* Russia investigation into the relationship between Putin and Ilham Rahimov confirmed that they had been classmates and friends in the Law Faculty at Leningrad State University; Putin often stayed in Rahimov's dorm room and they shared a love of judo. Presidential spokesman Dmitriy Peskov confirmed to *Forbes* Russia that the two had indeed been friends at university. *Forbes* Russia listed Rahimov's net worth in 2012 at $2.5 billion.[74]

The documents used by the Sal'ye Commission show Putin's guiding hand in these activities. He signed contracts at below-market rates; he intervened with Moscow to gain the authority to sign export licenses; he intervened to override the objections of the head of customs, who had refused to open the border because the paperwork was not in order.[75] His signature is on all of these documents.

After all of this feverish activity, according to the Sal'ye Commission report, the $122 million of quotas that Gaidar had granted Putin's KVS translated into two tankers of cooking oil delivered by a company called Tamigo, registered in Germany, with a Petersburg-domiciled general director, G. N. Misikov.[76] As the press subsequently reported, the tanker "trun-

dled into St. Petersburg on February 3, 1992. The arrival of this cooking oil was a sufficient triumph for Putin to write Gaidar on February 6 to inform him of it."[77]

In acting on the results of the investigative report by the Sal'ye Commission, the St. Petersburg City Council could not have been clearer in assigning blame and suggesting remediation. In a paragraph that Investigator Andrey Zykov was subsequently to call "the control shot to the head,"[78] the Council recommended that the documents be turned over to the Procurator General's Office for prosecution: Putin was accused of "showing complete incompetence, bordering on bad faith in drafting contracts . . . and an unprecedented negligence and irresponsibility in the submission of documents to the parliamentary group."[79] The Council recommended that Putin and his deputy be "removed from their posts"[80] and that the "right of the Committee for Foreign Liaison to conduct business be withdrawn."[81] Procurator Vladimir Yeremenko sent a representation to the mayor proposing that he start an investigation of "the Committee for Foreign Liaison's improperly drawn-up contracts and false registration of some licenses."[82]

The report was passed on to Moscow, to fellow Petersburger and corruption crusader Yuriy Boldyrev, chief of the Main Control Directorate of the Presidential Administration, who investigated the matter. He issued a statement on March 31, 1992: "The Main Control Directorate has received documents from St. Petersburg city council representatives attesting to the necessity of removing the head of the city's Committee for Foreign Liaison Vladimir Vladimirovich Putin from his post. I request that the question of appointing him to any other post not be raised before the Main Control Directorate reaches its final decision regarding this issue."[83] He called to Moscow Sobchak and all his deputies, including Putin, and they wrote down their version of events. Boldyrev recalled, "There were enough material facts that checked out."[84] He requested of Minister of Foreign Economic Relations Pyotr Aven, who had already reinstated Putin's right to issue licenses, that Putin not be given any further authority until the case was finally settled.[85] As part of the investigation, Yel'tsin's federal representative to the St. Petersburg and Leningrad *oblast'* was asked to assist. Bold-

yrev also requested documents from Putin and his KVS and found the level of cooperation so lacking that he wrote Putin on February 12, 1992, "I have been sent documents that are incomplete, and are not relevant to my request to the point that it is not possible to draw any conclusions. I was not even sent a copy of the licenses or copies of the contracts, which should be at least thirteen. I have been delivered only two documents, one of which is in Finnish, which at the very least is unjust on your part. I demand the presentation of a full set of documents by February 17." [86] Boldyrev also reported the entire case to Yel'tsin, who, like Minister of Foreign Economic Relations Pyotr Aven, ultimately did nothing.*

No one was able to unseat Putin or oblige Mayor Sobchak to discipline his own deputy. The local procurator general also declined to take up the case. The KVS continued to function as before, and even after Putin was promoted to first deputy mayor in March 1994, he held on to his function as chairman of this committee. The Council's report asked Sobchak to consider the position of both Putin and Putin's deputy, Aleksandr Anikin. In response Sobchak didn't fire Putin, but Anikin did lose his job. Anikin's own deputy, Aleksey Miller, was promoted to take his place. [89] In 2000 Putin would appoint Miller as deputy minister of energy, and then in 2001 as head of Gazprom, a position in which he was widely reported to have acquired vast wealth. [90]

While Putin temporarily lost the right to grant contracts, this authority was once again reinstated by Minister Aven later in 1992. [91] Once he regained his authority, he granted licenses to those, like Vladimir Yakunin and Andrey Fursenko, with whom he would ultimately be associated as co-owners of the Ozero Cooperative. [92] Yel'tsin disbanded the national leg-

---

*Aven left the government in 1994 and has risen to be first president and then chairman of the board of Russia's largest private bank, Alfa-Bank. In 2014 *Forbes* estimated his net worth as $6.2 billion. [87] As for Boldyrev, who had been a key democrat in the early 1990s and an initial ally of Sobchak, he lost his position in the Main Control Directorate of the Presidential Administration and went on to fight against corruption as a member of the Federation Council and a member of the Federal Audit Chamber. He became a founding member of the liberal Yabloko Party and fell out with Sobchak after 1993. Despite the fact that he represented St. Petersburg, by his own testimony Sobchak and Putin worked against him: "In 1994–5 when I was one of two representatives of St. Petersburg in the Federation Council, I never got the chance to speak live on St. Petersburg television." [88]

**EXHIBIT 10**

[emblem]

SPECIAL PROSECUTOR FOR
CORRUPTION AND ORGANIZED
CRIME

Before the undersigned Prosecutors appears Mr. Javier Pérez Dolset, with D.N.I. (*Documento Nacional de Identidad* [National Identity Document]) No. 5275105-D. He states his desire to report the facts described below, also delivering the documentation he references in his report.

He also points out that some of the facts set out below were brought to the attention of the Madrid Prosecutor's Office in Majadahonda. He is aware that proceedings have been opened and filed.

"ZED" is a Spanish company, born in 1998, with subsidiaries in 80 countries. It is the world's number one company in the value-added services sector for mobile operators.

We arrived in Russia in 2006 after acquiring a competitor listed on the London Stock Exchange that had a subsidiary in St. Petersburg.

1. After two years of good performance by the company in Russia, in 2008 we were approached by "Vimpelcom" and Mikhail Fridman's best friend, named Vage Engibaryan, who explained that they had a problem with "Vimpelcom" because they were not able to build the value-added business within the operator, and that despite their efforts, they had always failed. They offered, as we were the number one company in the world, to create a joint company, but controlled by "ZED," to build that business within "Vimpelcom."

On June 30, 2009, we began operating with them under this formula via a subsidiary called "Temafon," which was 51% owned by "ZED," 20% owned by "Vimpelcom" and 29% owned by Fridman's friend.

Between 2009 and 2013, the business grew extraordinarily, going from zero to generating more than 500 million dollars in profit for Vimpelcom. In 2013, "Temafon" earned more than 60 million dollars. In 2016, "Temafon" will barely earn $1 million after being emptied and looted by local executives.

2. In February 2013, the son of the Russian Interior Minister, Alexander Kolokoltsev, met with Fridman to tell him that he considered himself underpaid and mistreated within "Temafon" by his friend Engibaryan.

Kolokoltsev had a small supplier that invoiced around $700,000 a year. As a result of that meeting, Fridman instructed the CEO of "Vimpelcom Russia" (Anton Kudryashov) to change these contracts, which rose from the previous figure to more than $8 million per year (at the exchange rate at that time) in exchange for services not worth a tenth of that. Simultaneously, Mr. Kudryashov wrote a memorandum to the auditor "PWC" relating the instructions received and the reasons for it, giving concrete instructions that this information should not be shared with "ZED" under any circumstances. The contracts were signed, paid and continue to be paid via "Temafon," without the necessary authorization from the board and against the existing internal regulations, statutes and agreements. Validating these operations required, among other things, my signature, which was not even requested. To date, over $20 million has been paid to Mr. Kolokoltsev through this procedure.

[emblem]
SPECIAL PROSECUTOR FOR
CORRUPTION AND ORGANIZED
CRIME

3. In parallel, Vimpelcom executives, the aforementioned Kudryashov and his Business Development Director, Phillip Yalovega, negotiated with us the creation of a new parent company in the Netherlands as a result of merging ZED and the joint Russian subsidiary Temafon. Its name would be Zed+ and it would be controlled 30% by the Russians (between the 2 groups) and 70% by ZED shareholders. During this whole process all information concerning Kolokoltsev was hidden by direct order of Kudryashov.

This operation to create ZED+ was completed in December 2013.

4. After a few months, internal problems began to appear because the cash flow from Russia did not balance with the accounts.

Coincidentally, in April 2014, we had a Zed+ board meeting planned in Amsterdam, which had to be suspended because the day before the American, Dutch, Swiss and Norwegian governments opened a criminal investigation into Vimpelcom for bribery in Uzbekistan. And with Vimpelcom's former CEO and CFO on our board, they risked being arrested when they landed in the Netherlands.

5. I had a heated discussion with former Vimpelcom CEO Alexander Isozimov about the need for them to leave the board because the bribes in Uzbekistan had indeed occurred. For ZED it was important, because we had just appointed investment banks and intended to go public in the US before the end of 2014. This operation would be impossible if the ex-CEO of Vimpelcom as the CFO (Helena Shmatova) was still on the Board according to SEC regulations.

[emblem]
SPECIAL PROSECUTOR FOR
CORRUPTION AND ORGANIZED
CRIME

local company in Uzbekistan. During the "due diligence" process, the need to pay the president's daughter, as all the telecommunication operators already did, became apparent. In view of this condition, ZED rejected the agreement three times. All this information was discussed internally by the Temafon Board with Vimpelcom's senior representatives who are even quoted in certain documents, so it is completely impossible for anyone to claim that they did not know the structure of the market's operation in Uzbekistan.

Madrid, August 19, 2016.

Javier Pérez Dolset          Carlos Iáñez Martínez          José Grinda González



TRANSPERFECT

### AFFIDAVIT OF ACCURACY

I, Clayton Crooks, hereby certify that the document "Spain Complaint Against Mikhail Fridman" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Clayton Crooks

Sworn to before me this
7th day of August, 2020

Signature, Notary Public

Lisa Chan
Notary Public, District of Columbia
My Commission Expires 3/14/2023

Stamp, Notary Public

Washington, DC



**EXHIBIT 11**

U.S. Department of Justice

Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

# Report On The Investigation Into Russian Interference In The 2016 Presidential Election

## Volume I of II

### Special Counsel Robert S. Mueller, III

*Submitted Pursuant to 28 C.F.R. § 600.8(c)*

Washington, D.C.

March 2019

U.S. Department of Justice

Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

# TABLE OF CONTENTS – VOLUME I

INTRODUCTION TO VOLUME I ............................................................................................. 1

EXECUTIVE SUMMARY TO VOLUME I .................................................................................. 4

I. THE SPECIAL COUNSEL'S INVESTIGATION ...................................................................... 11

II. RUSSIAN "ACTIVE MEASURES" SOCIAL MEDIA CAMPAIGN ....................................... 14

    A. Structure of the Internet Research Agency .................................................. 15

    B. Funding and Oversight from Concord and Prigozhin ................................. 16

    C. The IRA Targets U.S. Elections ................................................................. 19

        1. The IRA Ramps Up U.S. Operations As Early As 2014 ...................... 19

        2. U.S. Operations Through IRA-Controlled Social Media Accounts .................... 22

        3. U.S. Operations Through Facebook ..................................................... 24

        4. U.S. Operations Through Twitter ........................................................ 26

            a. Individualized Accounts ............................................................. 26

            b. IRA Botnet Activities ................................................................. 28

        5. U.S. Operations Involving Political Rallies ......................................... 29

        6. Targeting and Recruitment of U.S. Persons ......................................... 31

        7. Interactions and Contacts with the Trump Campaign ........................... 33

            a. Trump Campaign Promotion of IRA Political Materials ................ 33

            b. Contact with Trump Campaign Officials in Connection to Rallies ............... 35

III. RUSSIAN HACKING AND DUMPING OPERATIONS ......................................................... 36

    A. GRU Hacking Directed at the Clinton Campaign ....................................... 36

        1. GRU Units Target the Clinton Campaign ............................................ 36

        2. Intrusions into the DCCC and DNC Networks ..................................... 38

            a. Initial Access ............................................................................. 38

            b. Implantation of Malware on DCCC and DNC Networks ................ 38

            c. Theft of Documents from DNC and DCCC Networks ................... 40

    B. Dissemination of the Hacked Materials ...................................................... 41

        1. DCLeaks ............................................................................................. 41

        2. Guccifer 2.0 ........................................................................................ 42

        3. Use of WikiLeaks ............................................................................... 44

            a. WikiLeaks's Expressed Opposition Toward the Clinton Campaign .............. 44

            b. WikiLeaks's First Contact with Guccifer 2.0 and DCLeaks ......................... 45

i

c. The GRU's Transfer of Stolen Materials to WikiLeaks ................................... 45

d. WikiLeaks Statements Dissembling About the Source of Stolen Materials .......................................................................................................... 48

C. Additional GRU Cyber Operations ................................................................ 49

1. Summer and Fall 2016 Operations Targeting Democrat-Linked Victims ........... 49

2. Intrusions Targeting the Administration of U.S. Elections .................................. 50

D. Trump Campaign and the Dissemination of Hacked Materials ................................ 51

1. **HOM** ............................................................................................ 51

a. Background .............................................................................................. 51

b. Contacts with the Campaign about WikiLeaks ........................................... 52

c. **Harm to Ongoing Matter** ................................ 54

d. WikiLeaks's October 7, 2016 Release of Stolen Podesta Emails ................... 58

e. Donald Trump Jr. Interaction with WikiLeaks .......................................... 59

2. Other Potential Campaign Interest in Russian Hacked Materials ........................ 61

a. Henry Oknyansky (a/k/a Henry Greenberg) ............................................. 61

b. Campaign Efforts to Obtain Deleted Clinton Emails ................................... 62

IV. RUSSIAN GOVERNMENT LINKS TO AND CONTACTS WITH THE TRUMP CAMPAIGN ............... 66

A. Campaign Period (September 2015 – November 8, 2016) .......................................... 66

1. Trump Tower Moscow Project .............................................................................. 67

a. Trump Tower Moscow Venture with the Crocus Group (2013-2014) ............ 67

b. Communications with I.C. Expert Investment Company and Giorgi Rtskhiladze (Summer and Fall 2015) ......................................................... 69

c. Letter of Intent and Contacts to Russian Government (October 2015-January 2016) .......................................................................................... 70

i. Trump Signs the Letter of Intent on behalf of the Trump Organization .... 70

ii. Post-LOI Contacts with Individuals in Russia ......................................... 72

d. Discussions about Russia Travel by Michael Cohen or Candidate Trump (December 2015-June 2016) .................................................................... 76

i. Sater's Overtures to Cohen to Travel to Russia ....................................... 76

ii. Candidate Trump's Opportunities to Travel to Russia ............................. 78

2. George Papadopoulos .......................................................................................... 80

a. Origins of Campaign Work ....................................................................... 81

b. Initial Russia-Related Contacts ................................................................. 82

c. March 31 Foreign Policy Team Meeting .................................................... 85

d.  George Papadopoulos Learns That Russia Has "Dirt" in the Form of
    Clinton Emails ....................................................................................... 86

e.  Russia-Related Communications With The Campaign.................................... 89

f.  Trump Campaign Knowledge of "Dirt" ........................................................ 93

g.  Additional George Papadopoulos Contact..................................................... 94

3.  Carter Page ............................................................................................................ 95

a.  Background ....................................................................................................... 96

b.  Origins of and Early Campaign Work ........................................................... 97

c. Carter Page's July 2016 Trip To Moscow ....................................................... 98

d.  Later Campaign Work and Removal from the Campaign ............................ 102

4.  Dimitri Simes and the Center for the National Interest ................................... 103

a.  CNI and Dimitri Simes Connect with the Trump Campaign........................ 103

b.  National Interest Hosts a Foreign Policy Speech at the Mayflower Hotel
    ............................................................................................................................ 105

c.  Jeff Sessions's Post-Speech Interactions with CNI ...................................... 107

d.  Jared Kushner's Continuing Contacts with Simes......................................... 108

5.  June 9, 2016 Meeting at Trump Tower................................................................ 110

a.  Setting Up the June 9 Meeting ....................................................................... 110

    i.  Outreach to Donald Trump Jr.................................................................. 110

    ii. Awareness of the Meeting Within the Campaign ................................... 114

b.  The Events of June 9, 2016............................................................................. 116

    i.  Arrangements for the Meeting ................................................................. 116

    ii.  Conduct of the Meeting.......................................................................... 117

c.  Post-June 9 Events .......................................................................................... 120

6.  Events at the Republican National Convention .................................................. 123

a.  Ambassador Kislyak's Encounters with Senator Sessions and J.D.
    Gordon the Week of the RNC ......................................................................... 123

b.  Change to Republican Party Platform............................................................ 124

7.  Post-Convention Contacts with Kislyak ............................................................. 127

a.  Ambassador Kislyak Invites J.D. Gordon to Breakfast at the
    Ambassador's Residence.................................................................................. 127

b.  Senator Sessions's September 2016 Meeting with Ambassador Kislyak...... 127

8.  Paul Manafort........................................................................................................ 129

a.  Paul Manafort's Ties to Russia and Ukraine................................................. 131

Case 1:17-cv-02041-RJL  Document 94-13  Filed 08/14/20  Page 6 of 13
U.S. Department of Justice

Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

i.   Oleg Deripaska Consulting Work ......................................................... 131

ii.  Political Consulting Work ................................................................. 132

iii. Konstantin Kilimnik ....................................................................... 132

b.  Contacts during Paul Manafort's Time with the Trump Campaign ............. 134

i.   Paul Manafort Joins the Campaign ...................................................... 134

ii.  Paul Manafort's Campaign-Period Contacts........................................... 135

iii. Paul Manafort's Two Campaign-Period Meetings with Konstantin Kilimnik in the United States ................................................. 138

c.  Post-Resignation Activities ................................................................. 141

B.  Post-Election and Transition-Period Contacts ....................................................... 144

1.  Immediate Post-Election Activity....................................................................... 144

a.  Outreach from the Russian Government ...................................................... 145

b.  High-Level Encouragement of Contacts through Alternative Channels ....... 146

2.  Kirill Dmitriev's Transition-Era Outreach to the Incoming Administration ...... 147

a.  Background .............................................................................................. 147

b.  Kirill Dmitriev's Post-Election Contacts With the Incoming Administration........................................................................................ 149

c.  Erik Prince and Kirill Dmitriev Meet in the Seychelles ................................ 151

i.   George Nader and Erik Prince Arrange Seychelles Meeting with Dmitriev........................................................................................ 151

ii.  The Seychelles Meetings.................................................................. 153

iii. Erik Prince's Meeting with Steve Bannon after the Seychelles Trip.... 155

d.  Kirill Dmitriev's Post-Election Contact with Rick Gerson Regarding U.S.-Russia Relations ............................................................... 156

3.  Ambassador Kislyak's Meeting with Jared Kushner and Michael Flynn in Trump Tower Following the Election............................................................ 159

4.  Jared Kushner's Meeting with Sergey Gorkov .................................................... 161

5.  Petr Aven's Outreach Efforts to the Transition Team ........................................ 163

6.  Carter Page Contact with Deputy Prime Minister Arkady Dvorkovich ............. 166

7.  Contacts With and Through Michael T. Flynn .................................................... 167

a.  United Nations Vote on Israeli Settlements................................................. 167

b.  U.S. Sanctions Against Russia................................................................... 168

V.  PROSECUTION AND DECLINATION DECISIONS ............................................................... 174

A.  Russian "Active Measures" Social Media Campaign................................................. 174

B. Russian Hacking and Dumping Operations ............................................................ 175

   1. Section 1030 Computer-Intrusion Conspiracy.................................................... 175

      a. Background ....................................................................................................... 175

      b. Charging Decision As to **Harm to Ongoing Matter** ....... 176

   2. Potential Section 1030 Violation By **Personal Privacy** .............................. 179

C. Russian Government Outreach and Contacts........................................................... 180

   1. Potential Coordination: Conspiracy and Collusion........................................... 180

   2. Potential Coordination: Foreign Agent Statutes (FARA and 18 U.S.C. § 951) . 181

      a. Governing Law................................................................................................. 181

      b. Application ....................................................................................................... 182

   3. Campaign Finance ............................................................................................. 183

      a. Overview Of Governing Law........................................................................... 184

      b. Application to June 9 Trump Tower Meeting.................................................. 185

         i. Thing-of-Value Element ............................................................................ 186

         ii. Willfulness ................................................................................................. 187

         iii. Difficulties in Valuing Promised Information ......................................... 188

      c. Application to WikiLeaks **HOM** ................................................ 188

         i. Questions Over **Harm to Ongoing Matter**

          .................................. 189

         ii. Willfulness ................................................................................................ 190

         iii. Constitutional Considerations ................................................................. 190

         iv. Analysis **HOM** ..................................................................... 190

   4. False Statements and Obstruction of the Investigation...................................... 191

      a. Overview Of Governing Law........................................................................... 191

      b. Application to Certain Individuals.................................................................. 192

         i. George Papadopoulos................................................................................ 192

         ii. **Personal Privacy** ............................................................... 194

         iii. Michael Flynn .......................................................................................... 194

         iv. Michael Cohen ......................................................................................... 195

         v. **HOM** .................................................................................. 196

         vi. Jeff Sessions ............................................................................................. 197

         vii. Others Interviewed During the Investigation ......................................... 198

U.S. Department of Justice

Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

### b. High-Level Encouragement of Contacts through Alternative Channels

As Russian officials in the United States reached out to the President-Elect and his team, a number of Russian individuals working in the private sector began their own efforts to make contact. Petr Aven, a Russian national who heads Alfa-Bank, Russia's largest commercial bank, described to the Office interactions with Putin during this time period that might account for the flurry of Russian activity.[976]

Aven told the Office that he is one of approximately 50 wealthy Russian businessmen who regularly meet with Putin in the Kremlin; these 50 men are often referred to as "oligarchs."[977] Aven told the Office that he met on a quarterly basis with Putin, including in the fourth quarter (Q4) of 2016, shortly after the U.S. presidential election.[978] Aven said that he took these meetings seriously and understood that any suggestions or critiques that Putin made during these meetings were implicit directives, and that there would be consequences for Aven if he did not follow through.[979] As was typical, the 2016 Q4 meeting with Putin was preceded by a preparatory meeting with Putin's chief of staff, Anton Vaino.[980]

According to Aven, at his Q4 2016 one-on-one meeting with Putin,[981] Putin raised the prospect that the United States would impose additional sanctions on Russian interests, including sanctions against Aven and/or Alfa-Bank.[982] Putin suggested that Aven needed to take steps to protect himself and Alfa-Bank.[983] Aven also testified that Putin spoke of the difficulty faced by the Russian government in getting in touch with the incoming Trump Administration.[984] According to Aven, Putin indicated that he did not know with whom formally to speak and generally did not know the people around the President-Elect.[985]

---

[976] Aven provided information to the Office in an interview and through an attorney proffer, ███ **Grand Jury**

[977] Aven 8/2/18 302, at 7.

[978] **Grand Jury** ███

[979] Aven 8/2/18 302, at 2-3.

[980] **Grand Jury** ███ and interview with the Office, Aven referred to the high-ranking Russian government officials using numbers (*e.g.*, Official 1, Official 2). Aven separately confirmed through an attorney proffer that Official 1 was Putin and Official 2 was Putin's chief of staff, Vaino. *See* Affidavit of Ryan Junck (Aug. 2, 2018) (hard copy on file).

[981] At the time of his Q4 2016 meeting with Putin, Aven was generally aware of the press coverage about Russian interference in the U.S. election. According to Aven, he did not discuss that topic with Putin at any point, and Putin did not mention the rationale behind the threat of new sanctions. Aven 8/2/18 302, at 5-7.

[982] **Grand Jury** ███

[983] **Grand Jury** ███

[984] **Grand Jury** ███

[985] **Grand Jury** ███

146

Aven **Grand Jury** told Putin he would take steps to protect himself and the Alfa-Bank shareholders from potential sanctions, and one of those steps would be to try to reach out to the incoming Administration to establish a line of communication.[986]  Aven described Putin responding with skepticism about Aven's prospect for success.[987]  According to Aven, although Putin did not expressly direct him to reach out to the Trump Transition Team, Aven understood that Putin expected him to try to respond to the concerns he had raised.[988]  Aven's efforts are described in Volume I, Section IV.B.5, *infra*.

### 2.  Kirill Dmitriev's Transition-Era Outreach to the Incoming Administration

Aven's description of his interactions with Putin is consistent with the behavior of Kirill Dmitriev, a Russian national who heads Russia's sovereign wealth fund and is closely connected to Putin.  Dmitriev undertook efforts to meet members of the incoming Trump Administration in the months after the election.  Dmitriev asked a close business associate who worked for the United Arab Emirates (UAE) royal court, George Nader, to introduce him to Trump transition officials, and Nader eventually arranged a meeting in the Seychelles between Dmitriev and Erik Prince, a Trump Campaign supporter and an associate of Steve Bannon.[989]  In addition, the UAE national security advisor introduced Dmitriev to a hedge fund manager and friend of Jared Kushner, Rick Gerson, in late November 2016.  In December 2016 and January 2017, Dmitriev and Gerson worked on a proposal for reconciliation between the United States and Russia, which Dmitriev implied he cleared through Putin.  Gerson provided that proposal to Kushner before the inauguration, and Kushner later gave copies to Bannon and Secretary of State Rex Tillerson.

### a.  Background

Dmitriev is a Russian national who was appointed CEO of Russia's sovereign wealth fund, the Russian Direct Investment Fund (RDIF), when it was founded in 2011.[990]  Dmitriev reported directly to Putin and frequently referred to Putin as his "boss."[991]

RDIF has co-invested in various projects with UAE sovereign wealth funds.[992]  Dmitriev regularly interacted with Nader, a senior advisor to UAE Crown Prince Mohammed bin Zayed

---

[986] **Grand Jury**

[987] **Grand Jury** Aven 8/2/18 302, at 6.

[988] Aven 8/2/18 302, at 4-8; **Grand Jury**

[989] Nader provided information to the Office in multiple interviews, all but one of which were conducted under a proffer agreement. **Grand Jury** .  The investigators also interviewed Prince under a proffer agreement.  Bannon was interviewed by the Office, **Grand Jury** under a proffer agreement.

[990] Kirill Dmitriev Biography, Russian Direct Investment Fund, *available at* https://rdif.ru/Eng_person_dmitriev_kirill/.  *See also* Overview, Russian Direct Investment Fund, *available at* https://rdif.ru/Eng_About/.

[991] Gerson 6/15/18 302, at 1.  *See also, e.g.*, 12/14/16 Text Message, Dmitriev to Gerson; 1/9/17 Text Message, Dmitriev to Gerson.

[992] **Grand Jury**

The investigation did not resolve the apparent conflict in the accounts of Kushner and Gorkov or determine whether the meeting was diplomatic in nature (as Kushner stated), focused on business (as VEB's public statement indicated), or whether it involved some combination of those matters or other matters. Regardless, the investigation did not identify evidence that Kushner and Gorkov engaged in any substantive follow-up after the meeting.

Rather, a few days after the meeting, Gorkov's assistant texted Kushner's assistant, "Hi, please inform your side that the information about the meeting had a very positive response!"[1163] Over the following weeks, the two assistants exchanged a handful of additional cordial texts.[1164] On February 8, 2017, Gorkov's assistant texted Kushner's assistant (Berkowitz) to try to set up another meeting, and followed up by text at least twice in the days that followed.[1165] According to Berkowitz, he did not respond to the meeting request in light of the press coverage regarding the Russia investigation, and did not tell Kushner about the meeting request.[1166]

### 5. Petr Aven's Outreach Efforts to the Transition Team

In December 2016, weeks after the one-on-one meeting with Putin described in Volume I, Section IV.B.1.b, *supra*, Petr Aven attended what he described as a separate "all-hands" oligarch meeting between Putin and Russia's most prominent businessmen.[1167] As in Aven's one-on-one meeting, a main topic of discussion at the oligarch meeting in December 2016 was the prospect of forthcoming U.S. economic sanctions.[1168]

After the December 2016 all-hands meeting, Aven tried to establish a connection to the Trump team. Aven instructed Richard Burt to make contact with the incoming Trump Administration. Burt was on the board of directors for LetterOne (L1), another company headed by Aven, and had done work for Alfa-Bank.[1169] Burt had previously served as U.S. ambassador to Germany and Assistant Secretary of State for European and Canadian Affairs, and one of his primary roles with Alfa-Bank and L1 was to facilitate introductions to business contacts in the United States and other Western countries.[1170]

While at a L1 board meeting held in Luxembourg in late December 2016, Aven pulled Burt aside and told him that he had spoken to someone high in the Russian government who expressed

---

[1163] AKIN_GUMP_BERKOWITZ_0000011 (12/19/16 Text Message, Ivanchenko to Berkowitz (9:56 a.m.)).

[1164] AKIN_GUMP_BERKOWITZ_0000011-15 (12/19/16 – 2/16/17 Text Messages, Ivanchenko & Berkowitz).

[1165] AKIN_GUMP_BERKOWITZ_0000015 (2/8/17 Text Message, Ivanchenko to Berkowitz (10:41 a.m.)).

[1166] Berkowitz 3/22/18 302, at 4-5.

[1167] Aven 8/2/18 302, at 7; **Grand Jury** ▮▮▮▮▮▮▮▮

[1168] **Grand Jury** ▮▮▮▮▮▮▮▮

[1169] **Grand Jury** ▮▮▮▮▮▮▮ Aven 8/2/18 302, at 6.

[1170] **Grand Jury** ▮▮▮▮▮▮▮ Aven 8/2/18 302, at 6; Burt 2/9/18 302, at 2.

interest in establishing a communications channel between the Kremlin and the Trump Transition Team.[1171]  Aven asked for Burt's help in contacting members of the Transition Team.[1172]  Although Burt had been responsible for helping Aven build connections in the past, Burt viewed Aven's request as unusual and outside the normal realm of his dealings with Aven.[1173]

Burt, who is a member of the board of CNI (discussed at Volume I, Section IV.A.4, *supra*),[1174] decided to approach CNI president Dimitri Simes for help facilitating Aven's request, recalling that Simes had some relationship with Kushner.[1175]  At the time, Simes was lobbying the Trump Transition Team, on Burt's behalf, to appoint Burt U.S. ambassador to Russia.[1176]

Burt contacted Simes by telephone and asked if he could arrange a meeting with Kushner to discuss setting up a high-level communications channel between Putin and the incoming Administration.[1177]  Simes told the Office that he declined and stated to Burt that setting up such a channel was not a good idea in light of the media attention surrounding Russian influence in the U.S. presidential election.[1178]  According to Simes, he understood that Burt was seeking a secret channel, and Simes did not want CNI to be seen as an intermediary between the Russian government and the incoming Administration.[1179]  Based on what Simes had read in the media, he stated that he already had concerns that Trump's business connections could be exploited by Russia, and Simes said that he did not want CNI to have any involvement or apparent involvement in facilitating any connection.[1180]

In an email dated December 22, 2016, Burt recounted for Aven his conversation with Simes:

> Through a trusted third party, I have reached out to the very influential person I mentioned in Luxembourg concerning Project A.  There is an interest and an understanding for the need to establish such a channel.  But the individual emphasized that at this moment, with so much intense interest in the Congress and the media over the question of cyber-hacking (and who ordered what), Project A was too explosive to discuss.  The individual agreed to discuss it again after the New Year.  I trust the individual's instincts on this.

---

[1171] Burt 2/9/18 302, at 2; **Grand Jury**

[1172] **Grand Jury**

[1173] Burt 2/9/18 302, at 4.

[1174] Burt 2/9/18 302, at 5.

[1175] Burt 2/9/18 302, at 3.

[1176] Burt 2/9/18 302, at 3.

[1177] Burt 2/9/18 302, at 3; Simes 3/27/18 302, at 4.

[1178] Burt 2/9/18 302, at 3; Simes 3/27/18 302, at 4.

[1179] Simes 3/27/18 302, at 5.

[1180] Simes 3/27/18 302, at 5.

U.S. Department of Justice

Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

If this is unclear or you would like to discuss, don't hesitate to call.[1181]

According to Burt, the "very influential person" referenced in his email was Simes, and the reference to a "trusted third party" was a fabrication, as no such third party existed. "Project A" was a term that Burt created for Aven's effort to help establish a communications channel between Russia and the Trump team, which he used in light of the sensitivities surrounding what Aven was requesting, especially in light of the recent attention to Russia's influence in the U.S. presidential election.[1182] According to Burt, his report that there was "interest" in a communications channel reflected Simes's views, not necessarily those of the Transition Team, and in any event, Burt acknowledged that he added some "hype" to that sentence to make it sound like there was more interest from the Transition Team than may have actually existed.[1183]

Aven replied to Burt's email on the same day, saying "Thank you. All clear."[1184] According to Aven, this statement indicated that he did not want the outreach to continue.[1185] Burt spoke to Aven some time thereafter about his attempt to make contact with the Trump team, explaining to Aven that the current environment made it impossible, ▓Grand Jury▓ ▓▓▓▓▓▓▓▓▓▓.[1186] Burt did not recall discussing Aven's request with Simes again, nor did he recall speaking to anyone else about the request.[1187]

In the first quarter of 2017, Aven met again with Putin and other Russian officials.[1188] At that meeting, Putin asked about Aven's attempt to build relations with the Trump Administration, and Aven recounted his lack of success.[1189] ▓Grand Jury▓ ▓▓▓▓[1190] Putin continued to inquire about Aven's efforts to connect to the Trump Administration in several subsequent quarterly meetings.[1191]

Aven also told Putin's chief of staff that he had been subpoenaed by the FBI.[1192] As part of that conversation, he reported that he had been asked by the FBI about whether he had worked to create a back channel between the Russian government and the Trump Administration.[1193]

---

[1181] 12/22/16 Email, Burt to Aven (7:23 p.m.).

[1182] Burt 2/9/18 302, at 3.

[1183] Burt 2/9/18 302, at 3-4.

[1184] 12/22/16 Email, Aven to Burt (4:58:22 p.m.).

[1185] Aven 8/2/18 302, at 7.

[1186] ▓Grand Jury▓▓▓▓▓▓▓

[1187] Burt 2/9/18 302, at 3-4.

[1188] ▓Grand Jury▓▓▓▓

[1189] ▓Grand Jury▓▓▓  Aven 8/2/18 302, at 7.

[1190] ▓Grand Jury▓▓▓

[1191] ▓Grand Jury▓▓▓

[1192] Aven 8/2/18 302, at 8.

[1193] Aven 8/2/18 302, at 8; ▓Grand Jury▓▓▓

According to Aven, the official showed no emotion in response to this report and did not appear to care.[1194]

### 6.   Carter Page Contact with Deputy Prime Minister Arkady Dvorkovich

In December 2016, more than two months after he was removed from the Trump Campaign, former Campaign foreign policy advisor Carter Page again visited Moscow in an attempt to pursue business opportunities.[1195] **Grand Jury**

**Grand Jury** [1196]   According to Konstantin Kilimnik, Paul Manafort's associate, Page also gave some individuals in Russia the impression that he had maintained his connections to President-Elect Trump.  In a December 8, 2016 email intended for Manafort, Kilimnik wrote, "Carter Page is in Moscow today, sending messages he is authorized to talk to Russia on behalf of DT on a range of issues of mutual interest, including Ukraine."[1197]

On December 9, 2016, Page went to dinner with NES employees Shlomo Weber and Andrej Krickovic.[1198]  Weber had contacted Dvorkovich to let him know that Page was in town and to invite him to stop by the dinner if he wished to do so, and Dvorkovich came to the restaurant for a few minutes to meet with Page.[1199]  Dvorkovich congratulated Page on Trump's election and expressed interest in starting a dialogue between the United States and Russia.[1200]  Dvorkovich asked Page if he could facilitate connecting Dvorkovich with individuals involved in the transition to begin a discussion of future cooperation.[1201] **Grand Jury**

[202] **Grand Jury**

[1203]

---

[1194] Aven 8/2/18 302, at 8; **Grand Jury**

[1195] Page 3/10/17 302, at 4; Page 3/16/17 302, at 3; **Grand Jury**   Among other meetings, Page contacted Andrey Baranov, head of investor relations at Rosneft, and they discussed the sale of Rosneft and meetings Baranov had attended with Rosneft CEO Igor Sechin. **Grand Jury**

[1196] **Grand Jury**

[1197] **Investigative Technique**

[1198] Page 3/16/17 302, at 3; Page 3/30/17 302, at 8.

[1199] Weber 7/28/17 302, at 4; Page 3/16/17 302, at 3; **Grand Jury**

[1200] Page 3/16/17 302, at 3; **Grand Jury**

[1201] Page 3/16/17 302, at 3; **Grand Jury**

[1202] **Grand Jury**

[1203] **Grand Jury**

**EXHIBIT 12**

N244

# Application notice

For help in completing this form please read the notes for guidance form N244Notes.

Find out how HM Courts and Tribunals Service uses personal information you give them when you fill in a form: https://www.gov.uk/government/organisations/hm-courts-and-tribunals-service/about/personal-information-charter

| Name of court | | Claim no. | |
|---|---|---|---|
| **Fee account no.** (if applicable) | | **Help with Fees – Ref. no.** (if applicable) | |
| | | **H W F** – ☐☐☐ – ☐☐☐ | |
| **Warrant no.** (if applicable) | | | |
| **Claimant's name** (including ref.) | | | |
| **Defendant's name** (including ref.) | | | |
| **Date** | | | |

1. What is your name or, if you are a legal representative, the name of your firm?

2. Are you a   ☐ Claimant   ☐ Defendant   ☐ Legal Representative

   ☐ Other (please specify)

   If you are a legal representative whom do you represent?

3. What order are you asking the court to make and why?

4. Have you attached a draft of the order you are applying for?   ☐ Yes   ☐ No

5. How do you want to have this application dealt with?   ☐ at a hearing   ☐ without a hearing

   ☐ at a telephone hearing

6. How long do you think the hearing will last?   ☐ Hours   ☐ Minutes

   Is this time estimate agreed by all parties?   ☐ Yes   ☐ No

7. Give details of any fixed trial date or period

8. What level of Judge does your hearing need?

9. Who should be served with this application?

9a. Please give the service address, (other than details of the claimant or defendant) of any party named in question 9.

10. What information will you be relying on, in support of your application?

☐ the attached witness statement

☐ the statement of case

☐ the evidence set out in the box below

If necessary, please continue on a separate sheet.

**Statement of Truth**

(I believe) (The applicant believes) that the facts stated in this section (and any continuation sheets) are true.

Signed _____   Dated _____

Applicant('s legal representative)('s litigation friend)

Full name _____

Name of applicant's legal representative's firm _____

Position or office held _____
(if signing on behalf of firm or company)

11. Signature and address details

Signed _____   Dated _____

Applicant('s legal representative's)('s litigation friend)

Position or office held _____
(if signing on behalf of firm or company)

Applicant's address to which documents about this application should be sent

| | If applicable | |
|---|---|---|
| | Phone no. | |
| | Fax no. | |
| | DX no. | |
| Postcode ☐☐☐☐ ☐☐☐☐ | Ref no. | |

| E-mail address | |
|---|---|

# Application Notice (Form N244) – Notes for Guidance

Court Staff cannot give legal advice. You may qualify for legal aid. Visit www.gov.uk/legal-aid. Alternately you can contact your local Citizens Advice Bureau. Details of your local offices and contact numbers are available via their website www.citizensadvice.org.uk

**Paying the court fee**
A court fee is payable depending on the type of application you are making. For example:

- To apply for judgment to be set aside
- To apply to vary a judgment or suspend enforcement
- To apply for a summons or order for a witness to attend
- To apply by consent, or without service of the application notice, for a judgment or order.

No fee is payable for an application by consent for an adjournment of a hearing if it is received by the court at least 14 days before the date of the hearing.

**What if I cannot afford the fee?**
If you show that a payment of a court fee would involve undue hardship to you, you may be eligible for a fee remission.

For further information, or to apply for a fee remission, ask court staff for a copy of the combined booklet and form EX160A - Court and Tribunal fees - Do I have to pay them? This is also available from any county court office, or a copy of the leaflet can be downloaded from our website http://hmctsformfinder.justice.gov.uk

## Completing the form

**Question 3**
Set out what order you are applying for and why; e.g. to adjourn the hearing because..., to set aside a judgment against me because... etc.

**Question 5**
Most applications will require a hearing and you will be expected to attend. The court will allocate a hearing date and time for the application. Please indicate in a covering letter any dates that you are unavailable within the next six weeks.

The court will only deal with the application 'without a hearing' in the following circumstances.

- Where all the parties agree to the terms of the order being asked for;
- Where all the parties agree that the court should deal with the application without a hearing, or
- Where the court does not consider that a hearing would be appropriate.

Telephone hearings are only available in applications where at least one of the parties involved in the case is legally represented. Not all applications will be suitable for a telephone hearing and the court may refuse your request.

**Question 6**
If you do not know how long the hearing will take do not guess but leave these boxes blank.

**Question 7**
If your case has already been allocated a hearing date or trial period please insert details of those dates in the box.

**Question 8**
If your case is being heard in the High Court or a District Registry please indicate whether it is to be dealt with by a Master, District Judge or Judge.

**Question 9**
Please indicate in the box provided who you want the court to send a copy of the application to, and their address for service.

**Question 10**
In this section please set out the information you want the court to take account of in support of the application you are making.
If you wish to rely on:

- **a witness statement,** tick the first box and attach the statement to the application notice.
- **a statement of case,** tick the second box if you intend to rely on your particulars of claim or defence in support of your application.
- **written evidence** on this form, tick the third box and enter details in the space provided. You must also complete the statement of truth. Proceedings for contempt of court may be brought against a person who signs a statement of truth without an honest belief in its truth.

**Question 11**
The application must be signed and include your current address and contact details. If you agree that the court and the other parties may communicate with you by Document Exchange, telephone, facsimile or email, complete the details

## Before returning your form to the court

Have you:
- signed the form on page 2,
- enclosed the correct fee or an application for fee remission,
- made sufficient copies of your application and supporting documentation. You will need to submit one copy for each party to be served and one copy for the court.

**EXHIBIT 13**

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### District of Columbia

| | |
|---|---|
| Mikhail Fridman et al. | ) |
| *Plaintiff* | ) |
| v. | )   Civil Action No.   1:17-CV-02041-RJL |
| Bean LLC et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:         Democratic National Comittee, 430 South Capitol Street SE, Washington, DC 20003

---
*(Name of person to whom this subpoena is directed)*

✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: see Schedule A.

| Place: SPERDUTO THOMPSON & GASSLER PLC<br>1747 Pennsylvania Ave., NW, Suite 1250<br>Washington, DC 20006 | Date and Time:<br><br>06/16/2020 5:00 pm |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:         05/08/2020

|                        CLERK OF COURT | |
|---|---|
| | OR |
| | /s/ Alan Lewis |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*         Plaintiffs
, who issues or requests this subpoena, are:

Alan Lewis, Esq., Carter Ledyard & Milburn LLP, 2 Wall Street, New York, NY 10005, lewis@clm.com, (212) 732-3200

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 1:17-CV-02041-RJL

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❒  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____             _____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| Mikhail Fridman et al. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  1:17-CV-02041-RJL |
| Bean LLC et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:         Democratic National Comittee, 430 South Capitol Street SE, Washington, DC 20003

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:
Subject matter of the requests in Schedule A.

| Place:  SPERDUTO THOMPSON & GASSLER PLC<br>1747 Pennsylvania Ave., NW, Suite 1250<br>Washington, DC 20006 | Date and Time:<br><br>08/13/2020 10:00 am |
|---|---|

The deposition will be recorded by this method:         video and stenographic means

❑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:         05/08/2020

                    *CLERK OF COURT*

                                                    OR

|                                        |                                        |
|---|---|
|                                        | /s/ Alan Lewis |
| *Signature of Clerk or Deputy Clerk*   | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*         Plaintiffs
, who issues or requests this subpoena, are:

Alan Lewis, Esq., Carter Ledyard & Milburn LLP, 2 Wall Street, New York, NY 10005, lewis@clm.com, (212) 732-3200

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   1:17-CV-02041-RJL

### PROOF OF SERVICE
#### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____  on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) *Claiming Privilege or Protection.***
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**SCHEDULE A**

**INSTRUCTIONS AND DEFINITIONS**

1.      The provisions and definitions contained in the Federal Rules of Civil Procedure

and Local Rules of the United States District Court for the District of Columbia are incorporated

by reference as if fully set forth herein.

2.      In producing documents and other things, you shall furnish all responsive

documents or things in your possession, custody, or control.

3.      Documents and things requested herein shall be produced as they are kept in the

usual course of business, with information indicating their source (e.g., the person(s) from whom

the documents were obtained).

4.      A Request calling for the production of any document shall be deemed to include,

in addition to the document itself, a request for any and all exhibits or attachments to the

document and any enclosures sent or kept with the document.  Documents attached to each other

shall not be separated.

5.      Documents maintained or stored electronically may be produced on CD, DVD,

File Transfer Protocol site, portable hard or flash drive, or other reasonably accessible media

format.  All such documents shall be produced in Group IV, 300 DPI, single-page TIFF format

with document-level extracted text files, and standard Concordance load files (.DAT, .OPT), and

shall include all metadata (including, without limitation, document boundaries, custodian

identification information, date and time, etc.).  If the text cannot be extracted, Optical Character

Recognition ("OCR") text must be provided.  In addition to producing TIFF files with text,

metadata, and standard load files, native files shall be produced for any PowerPoint presentations

containing audio or video, any Excel documents, any Access databases, or documents created

under equivalent software packages.  Data files shall not be zipped, encrypted, or otherwise

restricted or proprietarily protected for specific use.  If the native file format is derived from

software not accessible with Microsoft Office applications (or other common applications),

please state so in your response.

6.     Documents maintained in hardcopy shall be produced in TIFF image format with

corresponding OCR text, associated data identifying the beginning and ending Bates numbers

and, to the extent applicable, information associating document families or attachment ranges.

7.     The file or other container in which a document is kept is deemed to be an integral

part of the document and shall be produced with the document.  Whenever a document or group

of documents is maintained in the ordinary course of business in any file, folder, container, box

or other document storage or organization device, each Request herein shall be deemed to call for

the production of copies of, or the identification of, such file, folder, container, box or other

document storage or organization device and any labels or other form of identification set forth

thereon.

8.     Unless otherwise indicated, the documents to be produced include all documents

prepared, sent, dated, or received, or which otherwise existed or were possessed at any time

subsequent to January 1, 2015.

9.     Each document and thing requested herein shall be produced in its entirety and

without deletion or excisions, regardless of whether you consider the entire document to be

relevant or responsive to the Requests.  If you have redacted any portion of the document, you

shall stamp the word "redacted" on each page of the document that you have redacted.  If any

document covered by these Requests contains a redaction, you shall identify such document and

all redactions on a log prepared in accordance with Federal Rule 26(b)(5), specifically identifying

2

the following:  (i) the type of document; (ii) any addressor and addressee; (iii) any indicated or

blind copies; (iv) the document's date; (v) the general subject matter of the document, number of

pages, and a description of any attachments or appendices; (vi) all persons to whom the

document was distributed, shown, or explained; and (vii) the nature and basis of the privilege or

grounds for redaction being asserted.

10.    If any document requested herein is withheld from production on the basis of any

claim or privilege or other protection or immunity from disclosure, you shall furnish a log in

accordance with Federal Rule 26(b)(5), specifically identifying the following:  (i) the type of

document; (ii) any addressor and addressee; (iii) any indicated or blind copies; (iv) the

document's date; (v) the general subject matter of the document, number of pages, and a

description of any attachments or appendices; (vi) all persons to whom the document was

distributed, shown, or explained; and (vii) the nature and basis of the privilege or grounds for

withholding being asserted.

11.    Documents not otherwise responsive to the Requests shall be produced if such

documents mention, discuss, refer to or explain the documents which are called for by these

Requests or constitute routing slips, transmittal memoranda or letters, comments, evaluations or

similar materials.

12.    If any responsive documents were, but no longer are, in your possession, custody

or control, state the disposition of such documents, including, but not limited to, the identity of

the person(s) to whom the documents were forwarded, the state of such disposition and the

identity, if known, of the person(s) currently in possession of such documents and the current or

last known address of such person(s); and if the documents have been destroyed, the date and

manner of their destruction, by whom they were destroyed, who authorized such destruction, and

for what purpose they were destroyed.

13.     Each Request should be interpreted broadly, so as to include all documents that could be responsive to each Request.  Plaintiffs reserve the right to supplement these Requests and seek supplementary responses to these Requests.

14.     As a non-party who has received a subpoena in this Action, you are covered by the Stipulated Confidentiality Agreement and Protective Order entered in the Action and you have the right to protect the confidentiality of documents produced in accordance with such Agreement and Order.  A copy of the Stipulated Confidentiality Agreement and Protective Order entered in the Action can be accessed on the docket at Document 67.

15.     The use of the singular form of any word includes the plural and vice versa.

16.     The masculine includes the feminine and neutral genders, and vice versa.

17.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Requests all documents that might otherwise be construed to be outside of its scope.

18.     The use of the terms "any" and "all" shall be construed to mean "any and all" as necessary to bring within the scope of these Requests all documents that might otherwise be construed outside of its scope.

19.     The term "including" shall not be construed as a limiting phrase but, rather, shall be construed to mean "including, without limitation."

20.     Each of the words "discussing," "reflecting," "concerning," "relating," "involving," "evidencing," or "referring" shall have common meanings and shall include indirect as well as direct references to the subject matter of the Request.

21.     The use of a verb in any tense shall be construed as the use of the verb in all other

4

tenses as necessary to bring within the scope of these Requests all documents that might otherwise be construed to be outside of its scope.

22.     "Requests" means, collectively, each numbered request which appear below under the heading DOCUMENTS REQUESTED.

23.     The terms "DNC," "you," "your," and "yourself" refer to the Democratic National Committee and the DNC Services Corporation, their employees, and any persons or entities acting on behalf of or in concert with the DNC, including but not limited to Debbie Wasserman Schultz, Donna Brazile, and Thomas Perez.

24.     The "Action" means the above-captioned litigation, including all pleadings and proceedings filed or had therein.  A copy of the complaint in this Action (the "Complaint") is enclosed herewith as **ATTACHMENT A**.

25.     "Plaintiffs" means, collectively, Mikhail Fridman, Petr Aven, and German Khan.

26.     "Defendants" means, collectively, Fusion (as defined below) and Glenn Simpson, and any of their present or former agents, affiliates, predecessors, successors, assigns, parents, subsidiaries, officers, employees, directors, members, partners, shareholders, consultants, and representatives, or any one or more of the foregoing.

27.     The "Dossier" means the compilation of 17 separate memoranda or reports, totaling 35 pages, prepared by Christopher Steele, as described in Paragraphs 1 and 2 of the Complaint in the Action, which was published on January 10, 2007 by BuzzFeed along with, and referenced in, an article entitled "These Reports Allege Trump Has Deep Ties to Russia."   A copy of the BuzzFeed article and Dossier, including CIR 112 (as defined below), are enclosed herewith as **ATTACHMENT B**.

28.     "CIR 112" means Company Intelligence Report ("CIR") 112 entitled

5

"RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION," which was prepared by Christopher Steele and was included among the reports published by BuzzFeed that were referred to as the Dossier, and the contents therein.

29.     "Alfa" means the conglomerate of entities including Alfa-Bank JSC (also known as JSC Alfa-Bank and Alfa-Bank AO), ABH Holdings S.A., Alfa Capital, AlfaStrakhovanie Group, Alfa Asset Management (Europe) S.A., A1, X5 Retail Group, Rosvodokanal Group, and IDS Borjomi International Group, or any of their subsidiaries or affiliates.

30.     "Fusion" means Bean LLC, which does business as or is also known as Fusion GPS, and its and their subsidiaries, affiliates, founders (including Glenn Simpson and Peter Fritsch), employees, or representatives.

31.     "Orbis" means Orbis Business Intelligence Ltd., the London-based firm founded by Christopher Steele, and any employees or representatives.

32.     "Steele" means Christopher Steele, the former British intelligence officer and founder of Orbis who compiled the Dossier, as referenced in Paragraph 3 of the Complaint, and any representatives.

33.     "Perkins Coie" means Perkins Coie LLP, its partners and employees, and any persons or entities acting on behalf of or in concert with it.

34.     The terms "person" or "persons" mean natural persons as well as legal entities including, without limitation, firms, companies, proprietorships, corporations, partnerships, limited liability companies, associations, unincorporated associations, and governmental bodies, agencies, and officials and every other type of organization or entity.

35.     The terms "representative" or "representatives" when used in reference to a person, mean any past or present officer, director, partner, associate, member, employee,

6

consultant, agent, subsidiary or affiliate of such persons, and any other person acting on behalf of, or in concert with, such person.

36.     The terms "document" and "documents" have the same meaning and scope as the broadest usage given to these terms in or pursuant to the Federal Rules and applicable federal law, including (without limitation) the following: all writings and records of any kind; electronic or computerized data compilations; embedded data and metadata; originals, drafts, and all non-identical copies; written or electronic correspondence, e-mail, voice mail, instant messages, text messages, WhatsApp messages, Slack messages, Signal messages, communications, records, memoranda, notes, diaries, calendars, statistics, letters, telegrams, minutes, contracts, agreements, reports, price lists, agendas, manuals, studies, checks, statements, ledgers of account and work papers; inter-office and intra-office communications; notes and notations in any form; recordings of telephone calls or meetings; minutes of meetings or other communications; bulletins; printed matter (including newspapers, magazines and other communications and articles and clippings); press releases; printouts; teletypes and telecopies; ledgers; work sheets; graphic or oral records of representations or presentations of any kind (including without limitation photographs, charts, graphs, and PowerPoint presentations); microfiche, microfilm, and digital, video or film recordings; electronic, mechanical or electrical records; tapes, cassettes, disks, recordings or transcriptions thereof; any drafts, alterations, modifications, changes and amendments of any of the foregoing; and any other documents as defined in the Federal Rules and under applicable federal law.  The terms "document" and "documents" specifically include electronic data or information contained in or on computer networks, mainframes, computer files, pocket organizers, personal digital assistants, personal computers, LAN's local workstations, computer disks, file servers, e-mail systems, CD-ROMs, e-mails, hard drives,

7

printer buffer or memories, fax memories, voice mail systems, or any related back-up or archived systems or tapes.

37.     The terms "communication" or "communications" mean the transmittal of data or information (in the form of facts, images, ideas, inquiries or otherwise) by any means or methodology, including (without limitation) any meeting, conversation, discussion, document, correspondence, message, e-mail, note, text message, WhatsApp messages, Slack messages, Signal messages, or other means of transmittal.

38.     The terms "concern" or "concerning" mean discussing, referring to, relating to, or mentioning in any way, whether explicitly or implicitly.

## DOCUMENTS REQUESTED

1.     Documents evidencing the terms of the engagement of Perkins Coie by the Democratic National Committee or the DNC Services Corporation, the Hillary Clinton campaign, or some other person or entity which led to the compilation or preparation of the Dossier, including documents evidencing the purpose of the work that Perkins Coie and Fusion were to perform in connection with this engagement.

2.     Documents evidencing the terms of Perkins Coie's engagement with or retention of Fusion in connection with the compilation or preparation of the Dossier, including documents evidencing the purpose of the work that Fusion was to perform.

3.     All documents concerning any communications between you and Defendants relating to Plaintiffs, Alfa, CIR 112, the Dossier, or the contents of CIR 112 or the Dossier.

4.     All documents concerning any communications between you or Perkins Coie, on the one hand, and Orbis or Steele, on the other, relating to Plaintiffs, Alfa, CIR 112, the Dossier, or the contents of CIR 112 or the Dossier, including communications relating to meetings between Steele

8

and Perkins Coie partners Michael Sussmann and Marc Elias in 2016.

5.     All documents concerning any communications, interviews, or testimony to or with governmental entities or representatives (including the FBI, DOJ, State Department, or Congress) regarding Plaintiffs, Alfa, CIR 112, the Dossier, or the contents of CIR 112 or the Dossier, communications with members of Congress or Congressional committees, testimony before any governmental entity or body, and documents produced or provided to any governmental entity or body.

6.     All documents you have filed, served, or received (as a party or non-party), or testimony given, in any litigation involving CIR 112, the Dossier, or the contents of CIR 112 or the Dossier, including in *Carter Page v. Democratic National Committee, et al.*, CIV-18-1019 (W.D. Oklahoma), *Carter Page v. Democratic National Committee, et al.*, 20-cv-667 (N.D. Illinois), and *Gubarev v. BuzzFeed*, No. 17-cv-60426 (S.D. Florida).

7.     All documents relating to the truth or falsity of the statements and allegations set forth in CIR 112 and the Dossier.

8.     All documents, to the extent not produced in response to Requests Nos. 1-7, concerning Plaintiffs, Alfa, CIR 112, the Dossier, the contents of CIR 112 or the Dossier, or Steele or Steele's source(s) for CIR 112.

**EXHIBIT 14**

**Claimants**
**M Fridman**
**First**
**No Exhibits**

**Dated:** _10_.02.2020

**Claim No: QB-2018-006349**

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**MEDIA AND COMMUNICATIONS LIST**


**B E T W E E N**

**(1) PETR AVEN**
**(2) MIKHAIL FRIDMAN**
**(3) GERMAN KHAN**

**Claimants**

**-and-**

**ORBIS INTELLIGENCE LIMITED**

**Defendant**

---

**WITNESS STATEMENT OF MIKHAIL FRIDMAN**

---

I, **MIKHAIL FRIDMAN** of 2nd floor, Devonshire House, One Mayfair Place, London, W1J 8AJ, **WILL SAY** as follows: -


1.      I am the Second Claimant in this matter and I make this statement in support of my claim for breaches of the Data Protection Act 1998.


2.      My native language is Russian although I speak English quite well.  I am comfortable giving this statement in English and plan to give my evidence in English at trial.  However, I would not say that my English is perfect and I anticipate that having an interpreter available at trial would be helpful, in case I do not understand a question or wish to express myself better for the benefit of the Judge.

1

3.      Unless I have stated otherwise, the facts and matters set out below are within my own knowledge or are derived from other sources or documents that I have seen and which in all cases I believe to be true.

**PERSONAL BACKGROUND**

4.      I am Jewish and was born in Lviv, Ukraine, in 1964.  As a Ukrainian Jew, I have always been considered an outsider by the Russian establishment.  I was entrepreneurial from a young age and I started in business when I was a student in the 1980s.  I established Alfa Bank in December 1990.  Until 1995, I was the Chairman of the Advisory Board of Alfa Bank, and I became Chairman of the Board of Directors in 1998 and am currently a member of the Board of Directors. Alfa Bank is now Russia's largest private bank by total assets, total equity, customer accounts and loan portfolio.

5.      I am also Chairman of the Supervisory Board of the Alfa Group Consortium (the "**Alfa Group**"), and have been since its foundation in 1989.  Alfa Group is not a legal entity itself, but a combination of independent businesses (including Alfa Bank) that has become one of the largest privately owned financial-investment conglomerates in Russia.   The companies currently in the Alfa Group include commercial and investment banking, asset management, insurance, retail trade, water utilities, and mineral water production companies, as well as special-situation investments businesses.

6.      I co-founded LetterOne in 2013 with Petr Aven, German Khan, Alexey Kuzmichev, and Andrei Kosogov. LetterOne is an international investment business with over $22bn of net assets.  We invest in a variety of sectors including energy, technology, health and retail, with a focus on long-term growth.

7.      Although Alfa Group aims to maintain positive government and regulatory relations (like any international business), I have never sought political favours or developed close ties with the Russian government or sought to involve myself in political decision-making – I am politically neutral.  In my view, it is better not to get closely involved in politics as I think that being too close to power is a risky long term strategy.

8.      Alfa Group sometimes makes donations to state projects, for example towards a school in Sochi. It is always done properly, through a registered fund into which all of the donors, including Alfa Group (there are usually 20-25 organisations donating in total), can pay their donation. Given the scale of Alfa Group's business, the donations we give are relatively modest. Such donations are not specific to Alfa, and generally relate to philanthropic issues that are publicly known, certainly within Russia.

## RELATIONSHIP WITH PRESIDENT PUTIN

9.      I did not know Mr Putin when he was Deputy Mayor of St Petersburg.  It is difficult for me to remember exactly when I first met him, but I believe that it was in Moscow in the late 1990s, when he was a Deputy Chief of Presidential Staff.

10.     Since his election as President in May 2000, I have on a few dozen occasions attended various events and meetings that were also attended by President Putin.  I have never met President Putin on a one-to-one basis.  The events were either occasions involving many other people, such as the congress of the Jewish foundation Keren Hayesod, or formal meetings involving groups of prominent businessmen and other government officials. These formal meetings are highly choreographed and conducted according to a very strict protocol. There is a photo opportunity at the start, when the media is permitted to take photographs, followed by a discussion between the businessmen, on the one hand, and the government officials attending, on the other.   Government officials usually attend, for example the head of the Russian Central Bank, the Prime Minister, and one or more of his deputies.

11.     An agenda is prepared for these meetings and agreed in advance, although the general topics of such meetings are always the same – the business climate, economic problems, taxation, legislation, what the government and the President could do to improve investment.  The discussions are usually very high level.  Often those attending from the government side will agree to consider comments made, or to set up a working group to look into a particular matter. No decisions are made at the meetings, it is just an opportunity for businessmen to voice their opinions on the kinds of topics I have mentioned, and for President Putin and the government to show their interest in business.

3

It is regarded as an honour to attend such meetings, the same as it would be to go to Downing Street. I attend given my position as a leading businessman, although I rarely say anything.

12.   I attend similar meetings in my capacity as a member of the Russian Union of Industrialists and Entrepreneurs ("the **RSPP**"). The RSPP was established in 1990 as a public non-political organisation to protect the interests of industry. It involves nearly all the major entrepreneurs in Russia. I am a member of the RSPP's Bureau of Management, which is elected by the business community to address certain public issues that are of interest to them.

13.   President Boris Yeltsin had regular meetings with representatives of the RSPP bureau, and these meetings continued after President Putin was elected. Two or three times a year, around 24 of the members of the RSPP's Bureau of Management are invited to meet President Putin and other members of the Russian government, including his Chief of Staff and the Prime Minister. They discuss issues relevant to Russian business. The RSPP is liberal in both its spirit and its views. It advocates the priority of private property over state property and supports the liberalization of business in Russia.

14.   In 1997, Alfa was one of three entities that came together to tender for Tyumen Oil Company ("**TNK**"), which at that time was a struggling Siberian oil producer which had been hit by the fall in oil prices. We restructured TNK's debt and began to grow the company as the price in crude oil started to rise again. TNK subsequently entered into a joint venture with UK oil company British Petroleum PLC ("**BP**") in 2003 to form TNK-BP.

15.   Following this and in addition to the meetings I have already described, I was involved in meetings with President Putin on a few occasions, during the period of my involvement with the TNK-BP venture, to discuss specific issues to do with the joint venture. In June 2003 I attended the signing of the deal in London, which took place during President Putin's state visit to the UK. He also attended, along with various others, including Prime Minister Blair. This was again a highly choreographed affair, which I understood was significant for both Russia and the UK. Given the size of the transaction, it assumed high international significance. That is not to say that either President Putin or Prime Minister Blair were actually involved in negotiating the deal, but it was seen as

4

important by both governments to demonstrate that there was political approval on both sides, so we had a signing ceremony for show, once the transaction had been completed.

16.    I subsequently attended a couple of meetings with President Putin, BP's CEO Bob Dudley and Lord Browne.   For example, I was present at a meeting between Lord Browne and President Putin on 22 April 2005 at which President Putin reiterated his support for the TNK-BP venture to Lord Browne.   The purpose of the meetings was generally to show how important the joint venture was, as an example of direct foreign investment in Russia. I think it remains the largest example of major foreign investment in Russia.   These were polite, official meetings that lasted around 40 minutes. I did not say very much and most of the talking was done by Lord Browne.

17.    I am aware that it has been suggested in the press that I was involved in subsequently pressuring BP into reducing its involvement and influence in the TNK-BP venture. This is completely untrue. In fact, it was BP's decision to sell its shareholding.   The aim of the Russian shareholders was to improve operating performance at TNK-BP and to remove a parallel management structure (in which TNK-BP reported to BP and furthered BP's interests at the expense of others).  BP ultimately sold its stake in TNK and Rosneft purchased the company in 2013, with $14bn going to the Alfa Group.

18.    My meetings with President Putin have always been on formal business occasions. I do not have private meetings with President Putin.  I have never met President Putin in a one-on-one situation.  Our relationship is not a close or personal one.

## MEMORANDUM CR112 ("MEMORANDUM")

19.    I heard about the Memorandum from LetterOne's Director of Communications shortly after it was published by Buzzfeed in January 2017.

20.    I remember my immediate reaction when I read it for the first time.  It accused me of corruption and bribery and was and is absolute nonsense, but it concerned me a lot that it was on the internet and therefore going to have a

very harmful, undeserved and unfair impact on my reputation.   It contains sensational information that simply is not true.

21.   The title of the Memorandum "*Russia/US Presidential Election: Kremlin-Alpha* [sic] *Group Co-operation*" suggested to me that the author was claiming that Alfa Group was cooperating with the Russian government to interfere with the U.S. Presidential election.   This claim is untrue and ridiculous, but it was obviously of great concern to me.

22.   The Memorandum makes a number of false statements about me. I deal with them in the order they appear.

23.   First, it is said that "*Top level Russian official confirms current closeness of Alpha Group – PUTIN relationship. Significant favours continue to be done in both directions and FRIDMAN and AVEN still give informal advice to PUTIN especially on the US.*" This suggests that "significant favours" are done by President Putin for the Alfa Group, and by Alfa Group for President Putin.   It also suggests that President Putin and I do "significant favours" for each other. This is all completely untrue.

24.   I have never done, and indeed am not in a position to do, favours for President Putin.   Nor has he any reason to do me favours and has never done such favours for me. I find such an allegation extraordinary and completely wrong.

25.   It is also alleged that Mr Aven and I give informal advice to President Putin on foreign policy.   This is untrue and ridiculous.   The distance between businessmen like me and politicians like President Putin is, in reality, huge. The Russian political system is a highly formalised oriental-style culture in which this sort of thing just could not happen.   Businessmen like me are expected to focus on business, not politics.   In any case, I am not sure what kind of foreign policy advice I am supposed to be able to give.   I have no expertise in foreign policy.

26.   The Memorandum says that "*recently*" (that is, "*shortly before*" the date of the Memorandum, 14 September 2016), I "*met directly*" with President Putin. There was no such meeting.   I did travel to Russia in early September, but this was for normal business meetings with my usual business contacts. I travel back to

Russia roughly every second week throughout the year for business.  I have no idea what this allegation is based on and it is entirely inaccurate.

27.   I did meet President Putin in 2016 as part of the regular larger meetings I have mentioned.  The only one I attended that year was on 19 December 2016 at 15.30 local time.

28.   Of particular concern to me is the allegation that I used Oleg Govorun as a driver and "bag carrier" to deliver illicit amounts of cash to President Putin when he was Deputy Mayor of St Petersburg.  This is also entirely false.  As I have said, I did not know President Putin at the time. The suggestion that I was arranging for "*illicit cash*" to be delivered to him is complete nonsense and accuses me of being engaged in bribery of some kind. This is an allegation that I have been involved in criminal activity, which I take very seriously. Allegations of corruption are particularly damaging to my and Alfa Group's reputation in the West, where there is already a common misconception that someone cannot be a successful businessman in Russia without engaging in underhand and corrupt tactics. I have never engaged in such behaviour and it is not how I conduct business. This allegation is totally unfounded.

29.   I am aware that other businessmen in Russia turn to unorthodox channels, obtaining so-called "krysha" ("protection") from criminals, or paying bribes. I am also aware that it is commonly perceived that it was not possible to become a successful businessman in post-communist Russia without resorting to such channels. This is wrong and a false cliché. I have always avoided such channels. This is why I was so angry to see my name in connection with allegations of criminal activity. It is extremely upsetting to read such things when I have spent my whole life keeping clear of such activity.

30.   My efforts through the Alfa Group and LetterOne have been focused in large part on developing our international business alongside Mr Aven and other key stakeholders. Both Mr Aven and I are interested in Westernising the Alfa Group and in understanding US/Western business practices (for example, the application of good corporate governance), and we seek to explore potential investment opportunities there. I fully appreciate the scepticism that is attached to Russian businessmen in Western markets. Mr Aven and I have worked over the years to educate potential partners and dispel some of the stereotyping.

31.   At the time President Putin was Deputy Mayor of St Petersburg, I did not know Oleg Govorun and had never heard of him.  He certainly never acted as a "bag carrier" or intermediary for me.  Mr Govorun was a relatively junior employee of Alfa Bank, for three years between 1997 and 2000.  As far as I am aware, President Putin was no longer working for the mayor's office in St Petersburg during that period.

32.   Finally, it is said that Mr Aven and I "*do President Putin's political bidding*". This is also false.  President Putin has never asked me to do his "*political bidding*".  In the context of my position as a businessman, the idea of me doing the President's political bidding makes no sense. My focus has always been on business, not politics.

### IMPACT OF PUBLICATION OF MY PERSONAL DATA

33.   To understand the impact of the publication of my personal data in the Memorandum, I need to give some context about the kind of allegations that have been made against me in the past and how such allegations have been made.

34.   I am aware that there are various allegations out there, recycled in the press every now and again, suggesting that I used criminals to further my business activities, that I have engaged in corruption (for example bribing local officials), and that I have been involved in drug running or had contact with criminal gangs.  These kinds of allegations have been made in Russia's gutter press on and off since around the mid-1990's. By "gutter press", I mean highly unreliable publications which people can pay to print anything they like.  These types of allegations are malicious inventions and none of them have ever been raised with me by the authorities.

35.   I pay less attention to the gutter press because even in Russia it is not regarded as respectable media – they will publish anything if they think it will bring them a source of income, and no one familiar with the Russian media seriously cares about this kind of material. It would bring more attention to such articles if I were to sue. I have got used to ignoring this type of press.

36.   I am more worried about false information circulating outside Russia, particularly in the Western or international press, because non-Russian business people may not know precisely who I am, what I do, my background and so on.   That is why I (and my business colleagues) are particularly concerned about allegations of this kind being made in the foreign media. It is already difficult for Russian businessmen operating in the West to avoid false and malicious allegations of corruption and other wrongdoing and it is important to me to ensure that they are corrected.

37.   The Memorandum forms part of a series of so-called intelligence memoranda. Unlike other memoranda in this series and despite its title, the Memorandum has nothing to do with the U.S. presidential election.  However, the problem with the Memorandum was that it was not a gutter press article, but something written by an ex-Western intelligence officer that got the attention of the media in the West and that contained serious allegations about me specifically.  This caused me great distress.

38.   Beginning in late October 2016, allegations were made in the press that Alfa Bank servers were sending and receiving communications from Trump Organisation servers. The so-called "server allegations" were investigated by the FBI and determined to be false.

39.   Following publication of the Memorandum, whenever anyone was conducting 'Know Your Client' checks on me, LetterOne or the Alfa Group, the first thing they read about me is that I was mentioned in a memorandum that is part of a series of memoranda written by Mr Steele and which accuses me of corruption and bribery.  At the time we started these proceedings in May 2018, it was seen as more reliable than all of the other previous press articles.

40.   I have felt the effects of the publication of the Memorandum much more strongly than previous public articles about me.  Various people called me after publication, asking me what the Memorandum was all about – business people, family members and personal friends, both at home and abroad. I find it upsetting to have my credibility and reputation called into question, having spent many years building my reputation as a businessman and philanthropist. The Memorandum has undone much of that hard work, in particular in the U.S. For example, despite having previously approved a LetterOne transaction, in

9

March 2017, not long after publication of the Memorandum, the Committee on Foreign Investment in the United States informed LetterOne that it had significant concerns with our planned oil and gas investment in Texas.  Since then, I have effectively been blocked from carrying out any significant business activity in the U.S. and I am generally regarded with a higher level of suspicion than I was prior to the Memorandum's publication.

41.   I found the accusations of criminal activity in the Memorandum particularly upsetting.  It was highly embarrassing and humiliating to be called by people and asked whether any of the allegations were true.  Even my daughter asked me about it.

42.   It is not just my business reputation that has suffered.  My charity work is very important to me and I am personally involved in and give donations to various charities, including Jewish organisations. It was therefore very upsetting for me to have my reputation called into question by the reporting of the Memorandum in relevant reputable publications such as the Israeli news publication, Haaretz.

43.   Jazz music is also a long-standing personal passion of mine and I devote much of my spare time to charitable support for jazz musicians.  I am one of the founders and supporters of a jazz festival in my birth town of Lviv, the Leopolis Jazz Festival, which is now one of Europe's top jazz festivals.  I also take a close personal interest in the "Rising Stars" jazz competition for the benefit of young musicians which is sponsored by LetterOne.  This is a charitable enterprise I helped to launch in 2017 that is aimed at giving young musicians access to relevant expertise and support and the opportunity to raise their profile internationally. I had invited a famous American jazz artist and record producer to be one of the judges for the Rising Star Award.  They were initially really enthusiastic and agreed to get involved.  I was very pleased to secure their involvement, as it would have given this initiative global coverage. Following the Memorandum and the Special Counsel's investigation (run by Robert Mueller), however they withdrew and revoked our agreement.  It seems they decided that it would be better not to be associated with me, just to be on the safe side.  Of course, I don't blame them personally.  I was however extremely disappointed and frustrated after all the effort that had been put in by me and my colleagues.

**MY OBJECTIVES IN THE PRESENT PROCEEDINGS**

44.     The reason I have brought these proceedings is to seek to correct the inaccurate statements that have been made so that I can prove to my friends, family and business colleagues that the allegations made against me are untrue.   When banks, business partners and charitable organisations with which I wish to be personally involved raise questions during their KYC checks, for example, I would be able to provide them with an English Court judgment that they will understand and respect.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true.

Signed: …………………………………….…..          Date:   *10. 02. 2020*

**EXHIBIT 15**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

————————————————————————X
                                          :
MIKHAIL FRIDMAN, PETR AVEN, AND           :
GERMAN KHAN,                              :
                                          :
                    Plaintiffs,           :        Case 1:17-CV-02041 (RJL)
                                          :
            -v-                           :
                                          :
BEAN LLC (A/K/A FUSION GPS) AND GLENN     :
SIMPSON,                                  :
                                          :
                    Defendants.           :
                                          :
————————————————————————X

## PLAINTIFFS' RESPONSES AND OBJECTIONS TO
## DEFENDANTS' FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (the "Federal Rules") and the Local Rules of the District Court for the District of Columbia (the "Local Rules"), Plaintiffs Mikhail Fridman, Petr Aven, and German Khan ("Plaintiffs"), by and through their undersigned counsel, hereby respond and object to Defendants' First Set of Interrogatories of Defendants Bean LLC (a/k/a Fusion GPS) ("Fusion") and Glenn Simpson ("Simpson") (together, "Defendants"), dated October 11, 2019 (each an "Interrogatory," and together, the "Interrogatories"), as follows:

### GENERAL OBJECTIONS AND RESPONSES

A.    These responses and objections (each a "Response," and together, the "Responses") are being provided based upon documents and information presently available and known to Plaintiffs.  Plaintiffs reserve, and do not waive, (i) the right to rely on any information, facts, documents, or other materials that may subsequently come to Plaintiffs' attention through

disclosure or otherwise; (ii) the right to assert additional objections should Plaintiffs determine a basis for doing so; (iii) any and all objections as to the relevance, authenticity, or admissibility of any general or specific information, facts, documents, or other materials provided pursuant to these Responses and/or in response to the Interrogatories; (iv) the right to object, on any appropriate ground, to any demands or requests for additional discovery by any method, device, medium or format; and (v) the right to supplement, amend, modify, or clarify these Responses.

B.      Plaintiffs object to the Interrogatories, including to each of the definitions and instructions set forth therein, to the extent that they seek or are intended to impose obligations that exceed those under the Federal Rules of Civil Procedure, the Local Rules of the District Court for the District of Columbia, and applicable law. Plaintiffs' Responses are limited to their obligations under the Federal Rules of Civil Procedure, the Local Rules of the District Court for the District of Columbia, and applicable law.

C.      Plaintiffs object to the Interrogatories, including each of the definitions and instructions set forth therein, to the extent that any Interrogatory seeks expert disclosure prematurely and/or is a premature contention interrogatory that should not have to be answered until discovery is complete. Fact discovery is not scheduled to conclude until November 13, 2020, and expert discovery is not scheduled to conclude until February 5, 2021. Plaintiffs reserve the right to amend their Response to any Interrogatory at the conclusion of expert discovery.

D.      Plaintiffs object to the Interrogatories, including each of the definitions and instructions set forth therein, to the extent that they exceed the twenty-five-interrogatory limit, inclusive of all discrete subparts, set forth in Rule 33(a)(1) of the Federal Rules of Civil

Procedure. By way of example, several Interrogatories could be interpreted as having multiple subparts, in contravention of Rule 33(a)(1).

E.     Plaintiffs object to the Interrogatories, including each of the definitions and instructions set forth therein, to the extent that they are vague, ambiguous, overly broad (whether in terms of time, scope and/or subject matter), unduly burdensome, or are formulated so as to seek information that is not relevant, material, or necessary to the issues in the above-captioned action (the "Action"), or not proportional to the needs of the case.

F.     Plaintiffs object to the Interrogatories to the extent that they create unreasonable annoyance, expense, embarrassment, disadvantage or other prejudice to Plaintiffs.

G.     Plaintiffs object to the Interrogatories to the extent that they do not specify the information sought with reasonable particularity.

H.     Plaintiffs object to the Interrogatories, including each of the definitions and instructions set forth therein, to the extent they request information more appropriately supplied in response to a pretrial order.

I.     Plaintiffs object to Defendants' Interrogatories to the extent that they require Plaintiffs to make legal conclusions and/or presuppose legal conclusions that are disputed, concern matters of law, and/or call for opinions and interpretations.

J.     Plaintiffs object to the Interrogatories, including to each of the definitions and instructions set forth therein, to the extent that any specific Interrogatory is duplicative, repetitive, or cumulative, in whole or in part, of any other specific Interrogatory. Any objections set forth in a Response to any Interrogatory shall be deemed to be part of any Response to any other Interrogatory that is duplicative, repetitive, or cumulative of it, whether or not such objections are specifically set forth in the latter Response.

K.     Plaintiffs object to the Interrogatories, including to each of the definitions and instructions set forth therein, to the extent that they seek or are intended to seek information protected by the attorney-client privilege, the work-product doctrine, or any other privilege and/or protection or immunity from disclosure under applicable law.  Plaintiffs' Responses to these Interrogatories do not include information which is privileged, work-product, or otherwise protected or immune from disclosure.  The inadvertent disclosure of any such information shall not constitute a general or specific waiver of any such privilege, protection, or immunity.

L.     Plaintiffs object to the Interrogatories, including to each of the definitions and instructions set forth therein, to the extent that they seek information that may be obtained from other sources or by other means that are more convenient, less burdensome, and/or less expensive, or that is already in the possession of the Defendants.

M.     Plaintiffs object to the Interrogatories, including to each of the definitions and instructions set forth therein, to the extent that they seek or are intended to seek information not within Plaintiffs' possession, custody or control, and/or information within the possession, custody, or control of non-parties over whom Plaintiffs have no authority and/or control.  In responding to the Interrogatories, Plaintiffs are responding on their behalf only and providing information only within Plaintiffs' possession, custody, or control.  For the avoidance of doubt, Plaintiffs are not responding on behalf of the Alfa conglomerate of entities, including Alfa-Bank JSC (also known as JSC Alfa-Bank and Alfa-Bank AO), ABH Holdings S.A., Alfa Capital, AlfaStrakhovanie, Alfa Asset Management (Europe) S.A., A1, X5 Retail Group, Rosvodokanal Group, and IDS Borjomi International Group or any of their subsidiaries or affiliates ("Alfa"), Letterone Holdings S.A. and Letterone Investment Holdings S.A., or any of their subsidiaries or

4

affiliates ("LetterOne"), or any other person or entity whose information and documents are not within Plaintiffs' possession, custody, or control.

N.      Plaintiffs object to the Interrogatories, including to each of the definitions and instructions set forth therein, to the extent they assume or characterize, or are intended to assume or characterize, facts or law. These Responses shall not constitute an endorsement, admission, concession, agreement with, or acceptance of any such assumptions or characterizations. Plaintiffs expressly reserve, and do not waive, any objections to any characterizations of fact or law set forth in the Interrogatories.

O.      Plaintiffs reserve all objections to the use or admissibility of any documents or information identified, made available, or produced. The disclosure of any documents or information does not constitute an admission by Plaintiffs that such documents are relevant to the Action or admissible in evidence.

P.      Plaintiffs object to the Interrogatories to the extent they seek confidential and non-public information or information that is subject to data protection, privacy, secrecy or blocking laws, statutes or regulations (including the European Union General Data Protection Regulation), trade secrets, proprietary business information, competitively sensitive information, or other information the disclosure of which would be contrary to law or detrimental to the conduct of Plaintiffs' business interests or otherwise substantially likely to cause injury to Plaintiffs, and otherwise not protected under the limited Stipulated Confidentiality Agreement and Protective Order (Docket Doc. No. 67), and object to the production of such information unless and until appropriate protections are put into place.

Q.     Plaintiffs object to Defendants' Interrogatories to the extent that they may be read to call for the production of information generated in furtherance of or otherwise relating to attempts to compromise or settle any claim or dispute.

R.     Any reference herein to any allegation or definition from Defendants' Interrogatories, or any other document filed or served by Defendants, shall not constitute Plaintiffs' agreement with or acquiescence in any such allegation, description, or definition.

S.     Plaintiffs object to the relevant time period as overly broad and burdensome.

T.     Plaintiffs object to the definitions of "You" and "Your" as vague, ambiguous, and overly broad.  For purposes of these Responses, Plaintiffs construe all references to "You" and "Your" to mean Plaintiffs Mikhail Fridman, Petr Aven, and German Khan.  Where appropriate, for certain Interrogatories, each of the Plaintiffs have provided separate answers.

U.     Plaintiffs object to the definition of "Alfa" as overly broad, vague, and including entities that have no relevance to the issues in this Action.

V.     Plaintiffs object to the definition of "Other Entities" as overly broad, vague, and including entities that have no relevance to the issues in this Action.

W.     The "Dossier" means the compilation of 17 separate memoranda, totaling 35 pages, prepared by Christopher Steele and/or Orbis Business Intelligence Ltd., as described in Paragraphs 1 and 2 of the Complaint., and "CIR 112" means Company Intelligence Report ("CIR") 112 entitled "RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION," which was part of the Dossier, and the contents therein.

X.     The foregoing general objections and responses are hereby incorporated by reference in each of the specific Responses appearing below.

**RESPONSES AND OBJECTIONS**

Subject to and without waiver of the foregoing General Objections, Plaintiffs specifically object and respond to Defendants' Interrogatories as follows:

<u>INTERROGATORY NO. 1</u>

Identify all persons who are believed or known by you to have information concerning any of the allegations in the Complaint, and for each state the subject matter of their knowledge.

<u>RESPONSE TO INTERROGATORY NO. 1</u>

The persons likely to have information concerning the allegations in the Complaint are as follows:

- Mikhail Fridman
  c/o Alan S. Lewis
  Carter Ledyard & Milburn LLP
  2 Wall Street
  New York, NY 10005

Mr. Fridman has knowledge concerning the falsity of the defamatory allegations contained in CIR 112 and the damages caused by Defendants' publication of the defamatory statements at issue.

- Petr Aven
  c/o Alan S. Lewis
  Carter Ledyard & Milburn LLP
  2 Wall Street
  New York, NY 10005

Mr. Aven has knowledge concerning the falsity of the defamatory allegations contained in CIR 112 and the damages caused by Defendants' publication of the defamatory statements at issue.

- German Khan
  c/o Alan S. Lewis
  Carter Ledyard & Milburn LLP
  2 Wall Street
  New York, NY 10005

7

Mr. Khan has knowledge concerning the falsity of the defamatory allegations contained in CIR 112 and the damages caused by Defendants' publication of the defamatory statements at issue.

- Glenn Simpson
  Fusion GPS
  1700 Connecticut Avenue, NW, Suite 400
  Washington, DC 20006

  c/o Joshua A. Levy
  Cunningham Levy Muse LLP
  1401 K Street, NW, Suite 600
  Washington, DC 20005

Upon information and belief, Mr. Simpson has knowledge concerning the publication of the defamatory allegations contained in CIR 112 and the Defendants' fault in publishing those defamatory allegations.

- Peter Fritsch
  Fusion GPS
  1700 Connecticut Avenue, NW, Suite 400
  Washington, DC 20006

  c/o Joshua A. Levy
  Cunningham Levy Muse LLP
  1401 K Street, NW, Suite 600
  Washington, DC 20005

Upon information and belief, Mr. Fritsch has knowledge concerning the publication of the defamatory allegations contained in CIR 112 and the Defendants' fault in publishing those defamatory allegations.

- Nellie Ohr
  Accenture iDefense
  201 Wilson Boulevard
  Arlington, VA 22209

Upon information and belief, Ms. Ohr has knowledge concerning the publication of the defamatory allegations contained in CIR 112 and the Defendants' fault in publishing those defamatory allegations.

- Christopher Steele
  Orbis Business Intelligence Ltd.
  9-11 Grosvenor Gardens
  London SW1W 0BD
  United Kingdom

Upon information and belief, Mr. Steele has knowledge concerning the publication of the defamatory allegations contained in CIR 112 and the Defendants' fault in publishing those defamatory allegations.

- Christopher Burrows
  Orbis Business Intelligence Ltd.
  9-11 Grosvenor Gardens
  London SW1W 0BD
  United Kingdom

Upon information and belief, Mr. Burrows has knowledge concerning the publication of the defamatory allegations contained in CIR 112 and the Defendants' fault in publishing those defamatory allegations.

- David Kramer
  The McCain Institute for International Leadership
  at Arizona State University
  1800 I Street, NW, Sixth Floor
  Washington, DC 20006

Upon information and belief, Mr. Kramer has knowledge concerning the publication of the defamatory allegations contained in CIR 112.

- Jonathan Winer
  Middle East Institute
  1763 N Street, NW
  Washington, DC 20036

Upon information and belief, Mr. Winer has knowledge concerning the publication of the defamatory allegations contained in CIR 112.

9

- Bruce Ohr
  U.S. Department of Justice
  950 Pennsylvania Avenue, NW
  Washington, DC 20530

Upon information and belief, Mr. Ohr has knowledge concerning publication of the defamatory allegations contained in CIR 112 and the Defendants' fault in publishing those defamatory allegations.

- Ben Smith, Ken Bensinger, Miriam Elder, Mark Schoofs
  BuzzFeed, Inc.
  111 E. 18th Street, 13th Floor
  New York, N.Y. 10003 701 First Avenue

Upon information and belief, these BuzzFeed employee have knowledge concerning publication of the defamatory allegations contained in CIR 112 and the Defendants' fault in publishing those defamatory allegations.

- Michael Isikoff
  Yahoo! News
  701 First Avenue
  Sunnyvale, CA 94089

Upon information and belief, Mr. Isikoff has knowledge concerning publication of the defamatory allegations contained in CIR 112 and the Defendants' fault in publishing those defamatory allegations.

- David Corn
  Mother Jones
  P.O. Box 584
  San Francisco, CA 94104

Upon information and belief, Mr. Corn has knowledge concerning publication of the defamatory allegations contained in CIR 112 and the Defendants' fault in publishing those defamatory allegations.

- Evan Perez, Jim Sciutto, Jake Tapper, Carl Bernstein
  CNN
  820 First Street, NE
  Washington, DC 20001

Upon information and belief, Messrs. Perez, Sciutto, Tapper, and Bernstein have knowledge concerning publication of the defamatory allegations contained in CIR 112 and the Defendants' fault in publishing those defamatory allegations.

- Jane Mayer
  New Yorker
  1 World Trade Center
  New York, NY 10006

Upon information and belief, Ms. Mayer has knowledge concerning publication of the defamatory allegations contained in CIR 112 and the Defendants' fault in publishing those defamatory allegations.

- The Washington Post
  1301 K Street, NW
  Washington, DC 20071

Upon information and belief, a representative of The Washington Post has knowledge concerning publication of the defamatory allegations contained in CIR 112 and the Defendants' fault in publishing those defamatory allegations.

- The New York Times Company
  620 Eighth Avenue
  New York, NY 10018

Upon information and belief, a representative of The New York Times has knowledge concerning publication of the defamatory allegations contained in CIR 112 and the Defendants' fault in publishing those defamatory allegations.

- Oleg Govorun
  Address Not Known

Upon information and belief, Mr. Govorun has knowledge concerning the falsity of the defamatory allegations contained in CIR 112.

INTERROGATORY NO. 2

Identify all of the specific statements of and concerning you that you allege in this action amount to defamation by the Defendants and for each of those statements, explain the alleged defamatory meaning of the statement as it applies to you.

The heading of CIR 112, "RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP COOPERATION," coupled with Plaintiffs and Alfa being the subject of CIR 112, falsely suggests that Plaintiffs and Alfa cooperated with a Kremlin-orchestrated illegal campaign to interfere with the 2016 U.S. presidential election.

CIR 112 falsely states that "significant favours continue to be done in both directions" between Vladimir Putin and Alfa and Plaintiffs, that Putin received "primarily political" favors while Alfa received business/legal favors, which included Fridman and Aven giving "informal advice to Putin on foreign policy" and "about the U.S." This falsely suggests that, as part of this relationship, Plaintiffs, as Alfa executives and among its largest beneficial owners, have a corrupt, bribery-based relationship with Putin and the Kremlin.

CIR 112 falsely states that during the 1990s Oleg Govorun, Head of Government Relations at Alfa, was the "key intermediary" between Putin and Alfa and the "'driver' and 'bag carrier' used by Fridman and Aven to deliver large amounts of illicit cash to the Russian president [Putin], at that time deputy Mayor of St. Petersburg." This falsely conveys that Plaintiffs had an inappropriate and criminal relationship with Putin, or otherwise were bribing Putin or participating in illegal or fraudulent activities with, or on behalf of, Putin.

CIR 112 falsely states that Plaintiffs and Alfa "held 'kompromat' on Putin and his corrupt business activities from the 1990s," which suggests that Plaintiffs used their knowledge of past bribery or illegal business activities by Putin in order to obtain favorable business opportunities or interests from Putin or his government. CIR 112 also falsely states that Putin and senior Kremlin colleagues used Plaintiffs' or Alfa's "lack of investment in Russia" and "failure to

reinvest the proceeds of the TNK oil company sale into the Russian economy" as pressure to make them do Putin's political bidding (and were "able to exploit as lever over Alfa[sic] interlocutors"). This suggests that Plaintiffs engaged in criminal extortion by using their knowledge of illegal activities by Putin to obtain favorable business opportunities, and that Plaintiffs were extorted by Putin because of their lack of investment in Russia and, to avoid retribution from Putin, were pressured to assist Putin in illegal or corrupt acts.

INTERROGATORY NO. 3

For each of the statements identified by you in your Answer to Interrogatory No. 2, identify each and every publication of the statement that you allege caused you harm, specifying the date of the alleged publication, manner of the alleged publication, who made the publication, and the person or persons to whom the publication was made.

RESPONSE TO INTERROGATORY NO. 3

In September and October 2016, Defendants published, and arranged for Christopher Steele ("Steele") to publish, the contents of CIR 112 to members of the print and online media, including the New York Times, the Washington Post, CNN, and Yahoo News.

In October 2016, Steele gave an interview (as arranged by or at the direction of Defendants) to David Corn, a writer for Mother Jones magazine, in which Steele published to Corn the contents of CIR 112.

In November 2016, Defendants organized a meeting in Great Britain between Steele and David Kramer, in which Steele published the contents of CIR 112 to Kramer, and Defendants subsequently published the contents of CIR 112 to Kramer for redelivery and further publication to John McCain.

13

In 2016, upon information and belief, Defendants published the contents of CIR 112 to their clients, including Perkins Coie LLP, the Democratic National Committee, the campaign of Hillary Clinton, and/or HFACC, Inc.

In publishing the contents of CIR 112, Defendants knew or reasonably should have known that the above-referenced individuals and entities (or others to whom they published CIR 112) would further disseminate and publish the contents of CIR 112 to others.

On January 10, 2017, BuzzFeed, Inc., which had received a copy of CIR 112, published the contents of CIR 112 on the internet, along with an article entitled "These Reports Allege Trump Has Deep Ties to Russia." Upon information and belief, BuzzFeed received the Dossier from Defendants or somebody who obtained it from Defendants.

Discovery will be needed from Defendants and third parties to identify the precise dates and manners of publication, as well as the precise persons who made the publications and the precise persons to whom they were made.

INTERROGATORY NO. 4

For each of the statements identified by you in your Answer to Interrogatory No. 2, identify all facts supporting your allegation that the statement, as it applies to you, is false and defamatory, and identify all persons who have knowledge or information of such facts.

RESPONSE TO INTERROGATORY NO. 4

Plaintiffs object to this Interrogatory on the basis that this Interrogatory requests facts supporting the absence of a fact or proof of a negative premise, and is unsusceptible to response. Plaintiffs further object as this Interrogatory is duplicative of Interrogatory No. 1. Subject to the foregoing objections, Plaintiffs respond as follows:

The statements identified in the Answer to Interrogatory No. 2 are false. To the extent that the headline of CIR 112 suggests that Plaintiffs and Alfa cooperated with a Kremlin-orchestrated campaign to interfere with the 2016 U.S. presidential election, the headline is false. Putin, on the one hand, and the Plaintiffs and Alfa, on the other, did not have a relationship in which favors were performed for each other, or which included bribes paid to Putin and/or included Plaintiffs assisting Putin with any other corrupt or illegal act. Govorun was not "a key intermediary" and "driver and bag carrier" for the delivery of bribes from Alfa or the Plaintiffs to Putin in the 1990s when Putin was Deputy Mayor of St. Petersburg (or otherwise worked in the St. Petersburg government) and no such bribes occurred. In fact, Govorun was not an employee of Alfa when Putin worked for the St. Petersburg government (approximately 1990-1996), as Govorun did not begin employment with Alfa until 1997. Putin resigned as deputy mayor of St. Petersburg in August 1996 and began working for the President of Russia in Moscow, thus Putin's time in St. Petersburg does not overlap with the time that Govorun worked for Alfa in St. Petersburg. In addition, Govorun was not "Head of Government Relations" at Alfa, but was instead a mid-level employee and one of three Deputy Heads of Government Relations.

Plaintiffs did not have an inappropriate or criminal relationship with Putin, or otherwise participate in bribes to Putin or other illegal or fraudulent activities with, or on behalf of, Putin. Plaintiffs were not involved in holding "kompromat" on Putin based on his alleged corrupt business activities from the 1990s, and did not use any alleged knowledge of past bribery or illegal business activities by Putin in order to obtain favorable business opportunities or interests from Putin or his government.

Each of the Plaintiffs, as well as Govorun, would have knowledge or information of the falsity of the defamatory statements in CIR 112.

INTERROGATORY NO. 5

With respect to the facts identified in your Answer to Interrogatory No. 4, identify all documents that refer or relate to or contain information concerning those facts, or upon which you rely to show those facts.

RESPONSE TO INTERROGATORY NO. 5.

Plaintiffs object to this Interrogatory on the basis that this Interrogatory requests identification of documents relating to the absence of facts or proof of a negative premise. Subject to the foregoing objections, Plaintiffs respond as follows:

Employment records of Alfa reflect that Govorun did not begin employment for Alfa in St. Petersburg until 1997. This is also reflected in Govorun's biography located on the official website for the President of Russia. Putin worked in the St. Petersburg government from 1990 until 1996, and in August 1996 resigned as deputy mayor of St. Petersburg and began working for the President of Russia in Moscow, which is reflected in Putin's biography located on the official website for the President of Russia.

INTERROGATORY NO. 6

Identify all communications between you and Vladimir Putin. For each such communication, identify the date, topic(s), duration, method of communication (*e.g.*, in-person meeting, phone, e-mail, text message, social media, encrypted messaging, letter, memorandum, telegram), participants in the communication, and physical address (if an in-person meeting).

RESPONSE TO INTERROGATORY NO. 6.

Plaintiffs object to this Interrogatory as overly broad, unduly burdensome, and seeking information that is not relevant to the issues in the Action. Subject to the foregoing objections, Plaintiffs respond as follows:

Aven: Aven communicated on multiple occasions with Putin in 1991 to 1992 when Aven served as Minister of Foreign Economic Relations for the Russian Federation and Putin

16

represented the Ministry in the St. Petersburg government. During this time, Putin and Aven communicated with each other, and met in person. Since 2000, when Putin became President, Aven has attended in-person meetings with Putin at the presidential building in Moscow along with numerous prominent Russian business persons. Putin has hosted (and continues to host) such meetings with prominent members of the business community on at least an annual basis to discuss general business and economic issues, the state of the Russian economy, and economic legislation and policies. In addition, Aven has attended one-on-one meetings with Putin on a periodic basis from the mid-2000s onwards. The topics covered during such meetings are macro-economic issues, the Russian banking sector, and Alfa. In the fourth quarter of 2016, Aven met one-on-one with Putin at the presidential building, in which they discussed, amongst other things, U.S. sanctions as they affected the Russian banking sector and other business issues.

Fridman: Since 2000, when Putin became President, Fridman has attended in-person meetings with Putin at the presidential building in Moscow along with numerous prominent Russian business persons. Putin has hosted (and continues to host) such meetings with prominent members of the business community on at least an annual basis to discuss general business and economic issues, the state of the Russian economy, and economic legislation and policies. Fridman has never met with Putin one-on-one or as part of any smaller group, or otherwise communicated with Putin.

Khan: Since 2000, when Putin became President, Khan has attended in-person meetings with Putin at the presidential building in Moscow along with numerous prominent Russian business persons. Putin has hosted (and continues to host) such meetings with prominent members of the business community on at least an annual basis to discuss general business and

economic issues, the state of the Russian economy, and economic legislation and policies. Khan has never met with Putin one-on-one or as part of any smaller group, or otherwise communicated with Putin.

## INTERROGATORY NO. 7

Identify any tangible or intangible thing of value that Vladimir Putin or his representatives provided directly or indirectly to any of you. Identify for each item the name of the thing of value, its present value in US dollars, and the date of the transaction.

## RESPONSE TO INTERROGATORY NO. 7

Plaintiffs are not aware of (or do not recall) having received anything of value from Putin or his representatives.

## INTERROGATORY NO. 8

Identify any tangible or intangible thing of value that any of you provided directly or indirectly to Vladimir Putin, his family members, or his representatives. Identify for each item the name of the thing of value, its present value in US dollars, and the date of the transaction.

## RESPONSE TO INTERROGATORY NO. 8

Plaintiffs are not aware of (or do not recall) having provided anything of value to Putin, persons known or believed by them to be his family members, or his representatives.

## INTERROGATORY NO. 9

Identify all consideration or things of value that any of you or a business entity in which you were holding an interest have offered or provided to a government official in any country. Identify for each item the name of the thing of value, its present value in US dollars, the date of the transaction, and all benefits you or the business entity received in exchange.

## RESPONSE TO INTERROGATORY NO. 9

Plaintiffs object to this Interrogatory as overly broad, vague, unduly burdensome, and seeking information that is not relevant to the issues in the Action. Subject to the foregoing objections, Plaintiffs respond as follows:

Plaintiffs are not aware of (or do not recall) any consideration or things of value having been offered or provided to a government official in any country by Plaintiffs.

INTERROGATORY NO. 10

Identify all communications, including but not limited to in-person meetings, phone conversations, and video teleconferences, between any of you and any of the following: any US government official; any representative of the Republican Party; any representative of the Trump Campaign; any representative of the Trump Transition Team; or any representative of the government of Ukraine. For each such communication, identify the date, topic(s), duration, physical address if an in-person communication, method of communication (e.g., phone, e-mail, text message, social media, encrypted messaging, letter, memorandum, telegram), and the participants in the communication.

RESPONSE TO INTERROGATORY NO. 10

Plaintiffs object to this Interrogatory as overly broad, vague, unduly burdensome, and seeking information that is not relevant to the issues in the Action. Subject to the foregoing objections, Plaintiffs respond as follows:

Plaintiffs are not aware of (or do not recall) any of them communicating with U.S. government officials, any representative of the Republican Party, any representative of the Trump Campaign, any representative of the Trump Transition Team, or any representative of the government of Ukraine, relating to CIR 112 or the contents therein, except as follows:

Aven: In May 2018, Aven received a grand jury subpoena from the U.S. Department of Justice – Special Counsel's Office about matters relating to its investigation into Russian interference in the 2016 presidential election. Aven subsequently met with representatives of the Special Counsel's Office and Aven testified before the grand jury in 2018. In addition, in May 2019, Aven received (via legal counsel) a letter from the United States Senate Select Committee on Intelligence, requesting information from, and a meeting with, Mr. Aven in relation to that committee's investigation into alleged Russian interference in the 2016 U.S. presidential

19

election.  However, no such meeting took place and there were no substantive communications with or production of documentation to the committee or its representatives.

Fridman:  None

Khan:  None

## INTERROGATORY NO. 11

Provide your estimated net worth and the estimated net worth of Vladimir Putin and explain, with particularity, how you and Putin accrued those fortunes, identifying the source, location, and value of each of your and Putin's significant assets and holdings.

## RESPONSE TO INTERROGATORY NO. 11

Plaintiffs object to this Interrogatory as overly broad, vague, unduly burdensome, and seeking information that is not relevant to the issues in the Action.  Plaintiffs object to the Interrogatory as designed to create unreasonable annoyance, embarrassment, and prejudice to the Plaintiffs.  Plaintiffs' net worth, the specific sources of Plaintiffs' income, the precise location and value of their assets and holdings, and other details regarding their net worth are not relevant to the issues in the Action and constitute non-public and confidential information, and any inquiry into such matters is an unreasonable invasion of privacy.   Plaintiffs object to the portion of the Interrogatory seeking the estimated net worth of Putin as such information is not within the possession, custody, or control of Plaintiffs, and Plaintiffs have no knowledge as to the net worth of Putin.

## INTERROGATORY NO. 12

Identify every company in which any of you own a financial stake of at least 5 percent, and/or for which you have performed professional services and have been compensated between January 1, 2010 and the present (whether as an officer, director, employee, consultant, independent contractor or otherwise). For each company, identify the value of your ownership interest, and/or the dates during which you were so compensated, and provide a specific description of your duties and responsibilities in each instance.

## RESPONSE TO INTERROGATORY NO. 12

Plaintiffs object to this Interrogatory as overly broad, vague, unduly burdensome, and seeking information that is not relevant to the issues in the Action. Plaintiffs object to the Interrogatory as designed to create unreasonable annoyance, embarrassment, and prejudice to the Plaintiffs. The specific sources of Plaintiffs' income, the precise dates of compensation, and details regarding their financial interests in companies are not relevant to the issues in the Action and constitute non-public and confidential information, and any inquiry into such matters is an unreasonable invasion of privacy.

## INTERROGATORY NO. 13

Identify every bank or financial institution (and its location) where any of you has an account, or from which you have sought a loan or other financing, whether such financing was granted, and the dates of such application and decision.

## RESPONSE TO INTERROGATORY NO. 13

Plaintiffs object to this Interrogatory as overly broad, vague, unduly burdensome, and seeking information that is not relevant to the issues in the Action. Plaintiffs object to the Interrogatory as designed to create unreasonable annoyance, embarrassment, and prejudice to the Plaintiffs. Details regarding Plaintiffs' bank accounts, loans or financings are not relevant to the issues in the Action and constitute non-public and confidential information, and any inquiry into such matters is an unreasonable invasion of privacy.

## INTERROGATORY NO. 14

Identify each and every instance in which you have been mentioned, identified, interviewed, referred to, or quoted in, or credited as the author of, any book, magazine, newspaper, press conference, speech, public statement, podcast, blog, television or radio program, or on the Internet.

## RESPONSE TO INTERROGATORY NO. 14

Plaintiffs object to this Interrogatory as overly broad, vague, unduly burdensome, and seeking information that is not relevant to the issues in the Action. Plaintiffs object to the Interrogatory to the extent it is not limited to relevant subject matter and seeks information that Defendants can obtain from the public domain. As to the undue burden and overbreadth of this Interrogatory, Defendants, in their 2018 motion to dismiss papers, indicate that over 10,000 articles mention Fridman, over 1,700 articles mention Aven, and over 5,000 articles mention Khan. Assuming these figures are generally correct, it would be entirely unreasonable and burdensome for all such articles to be identified and listed in response to this Interrogatory. In addition, as reflected in Defendants' 2018 motion to dismiss papers, in which they cite over sixty such articles, this information has already been compiled by Defendants and/or Defendants can obtain such information from the public domain.

## INTERROGATORY NO. 15

Identify all press conferences, speeches, public statements, or interviews you have given or held, and each and every instance in which you have communicated with a reporter, journalist, news organization, television or radio broadcaster or producer, or podcast host or producer.

## RESPONSE TO INTERROGATORY NO. 15

Plaintiffs object to this Interrogatory as overly broad, duplicative of Interrogatory No. 14, unduly burdensome, and seeking information that is not relevant to the issues in the Action. Plaintiffs object to the Interrogatory as it is not limited to relevant subject matter, unduly burdensome, and seeks information that Defendants can obtain from the public domain.

## INTERROGATORY NO. 16

Identify all individuals subject to sanctions by the United States under the Global Magnitsky Human Rights Accountability Act or the Sergei Magnitsky Rule of Law Accountability Act of 2012 with whom you have communicated and/or engaged in business dealings. The list of individuals subject to these sanctions is available at

https://sanctionssearch.ofac.treas.gov/ (select program as "MAGNIT" and "GLOMAG").

RESPONSE TO INTERROGATORY NO. 16

Plaintiffs object to this Interrogatory as vague, overly broad, unduly burdensome, and seeking information that is not relevant to the issues in the Action. Plaintiffs' communications or dealings, if any, with persons or entities listed on the above-referenced sanctions lists are not relevant to the content of CIR 112, its publication, its defamatory character, Defendants' fault in publishing the Defamatory Statements in contains, or the harm Plaintiffs suffered as a result of the publication of those statements.

INTERROGATORY NO. 17

Identify all awards, accolades, or other recognitions you have received from any civic, political, charitable, religious, business, cultural, military, police, social, educational, governmental, non-profit, or professional organization.

RESPONSE TO INTERROGATORY NO. 17.

Plaintiffs object to this Interrogatory as overly broad, vague, seeking information that is not relevant to the issues in the Action. Subject to the foregoing objections, Plaintiffs respond as follows:

Plaintiffs have received the following awards, accolades, and recognitions:

Fridman:

- 2003 -- Golden Plate Award from the Academy of Achievement in Washington.

- 2003 -- Named one of "The Stars of Europe: 25 Leaders at the forefront of change" by BusinessWeek.

- 2004 -- Included in the Financial Times list of 25 business executives named "Leaders of the New Europe."

- 2012 -- Russian Businessman of the Year by Forbes Russia.

- 2017 -- Russian Businessman of the Year by Forbes Russia.

23

Aven:

- 2004 -- Best Manager in the Financial Services Sector in Russia in 2004 by Institutional Investor.

- 2015 -- Woodrow Wilson Award for Corporate Citizenship by the Wilson Center's Kennan Institute.

- 2015 – Russian Federation Order of Friendship.

- 2013 – Honorary Doctorate (Dr.h.c.) from the University of Latvia.

- 2012 – Latvian Order of the Three Stars.

- 2005 – Russian Federation Order of Honor.

Khan:

- None.

INTERROGATORY NO. 18

Identify all public events, including sporting events, and charitable donations that Alfa, any Other Entities, or any of you have made, sponsored or otherwise financed, in whole or in part. For each event or organization, identify the date and amount of the contribution.

RESPONSE TO INTERROGATORY NO. 18

Plaintiffs object to this Interrogatory as overly broad, unduly burdensome, and seeking information that is not relevant to the issues in the Action. Plaintiffs object to the Interrogatory as creating unreasonable annoyance, embarrassment, and prejudice to the Plaintiffs. Details regarding Plaintiffs' charitable contributions are not relevant to the issues in the Action and constitute non-public and confidential information, and any inquiry into such matters is an unreasonable invasion of privacy. Subject to the foregoing objections, Plaintiffs respond as follows:

Fridman: In 1996, Fridman co-founded the Russian Jewish Congress, and he is an active member. He regularly contributes to the European Jewish Fund, which promotes inter-religious

24

dialogue. In 2007, Fridman co-founded the Genesis Philanthropy Group, which supports the development and enhancement of Jewish identity among Russian-speaking Jews worldwide and which awards the $1 million Genesis Prize annually to Jewish individuals for their contributions to humanity. Fridman was one of the funders of, and is a member of the Initiative Group for, the creation of the Babi Yar Holocaust Memorial Center in Ukraine. In 2011 he founded the annual Alfa Jazz Fest, which is funded by Alfa, in his hometown of Lviv, Ukraine, and in 2014 launched the Alfa Future People Festival, an annual electronic-music festival held in the Nizhny Novgorod area of Russia.

Aven: In 2007, Aven co-founded the Genesis Philanthropy Group, which supports the development and enhancement of Jewish identity among Russian-speaking Jews worldwide and which awards the $1 million Genesis Prize annually to Jewish individuals for their contributions to humanity. Aven regularly contributes to programs that support the arts and theatre in Russia. Aven has lent works of art from his personal collection to museums, including the Jewish Museum in Moscow, the Tate in London, the Museum of Modern Art in New York, and the Royal Academy.

Khan: Khan is an active supporter of the Life Line charitable program, which provides medicine and surgery for seriously ill children in Russia. Khan is a supporter of Jewish initiatives in Russia and elsewhere in Europe. He is a co-founder and active member of the Russian Jewish Congress, and regularly contributes to the European Jewish Fund, which promotes inter-religious dialogue. In 2007, Khan co-founded the Genesis Philanthropy Group, which supports the development and enhancement of Jewish identity among Russian-speaking Jews worldwide and which awards the $1 million Genesis Prize annually to Jewish individuals for their contributions

to humanity. Khan was one of the funders of, and is a member of the Initiative Group for, the creation of the Babi Yar Holocaust Memorial Center in Ukraine.

## INTERROGATORY NO. 19

Identify all individuals and/or entities whom you, Alfa or the Other Entities have contracted or otherwise tasked to conduct government or public relations in any country and/or to respond on your behalf to press inquiries, public appearance requests, requests for your attendance at meetings, or other public relations matters, and state whether it was you, Alfa or one of the Other Entities that tasked or contracted the identified individual or entity.

## RESPONSE TO INTERROGATORY NO. 19

Plaintiffs object to this Interrogatory as overly broad, unduly burdensome, and seeking information that is not relevant to the issues in the Action. Subject to the foregoing objections, Plaintiffs respond as follows:

Plaintiffs have been assisted in connection with government public relations matters by Stuart Bruseth, Director of Communications at LetterOne, as tasked by LetterOne. In addition, Plaintiffs Fridman and Aven have been assisted in connection with government and public relations matters by BGR Group and by Richard Burt, a non-executive director of LetterOne, working as a sub-contractor to BGR Group, and by Teneo, in each case as tasked by LetterOne.

## INTERROGATORY NO. 20

For each element of damage that you claim in this action, including, but not limited to, the injuries claimed at Paragraphs 10 and 33 of the Complaint, identify separately and with specificity the complete nature of your injury, the amount of damage and how you calculate it, all facts relating to or supporting the allegation of injury, and all documents that refer or relate to, contain information concerning, or upon which you rely to show the damages you claim in this action.

## RESPONSE TO INTERROGATORY NO. 20

Plaintiffs object to this Interrogatory as overly broad, unduly burdensome, and premature. Subject to the foregoing objections, Plaintiffs respond as follows:

Plaintiffs' damages have not been computed at this time. As indicated in the Amended Complaint, Plaintiffs seek compensatory damages and punitive damages in amounts to be proven at trial, together with interest and the costs and disbursements of this action, plus reasonable attorneys' fees. Plaintiffs have suffered damage to their personal, professional, and institutional reputations, in that persons who read or saw the contents of CIR 112 were led to understand, incorrectly, that Plaintiffs had an inappropriate relationship with Putin, engaged in inappropriate and criminal activities such as bribery and extortion, and, based on the headline of CIR 112, were involved in some unspecified way in a Kremlin-orchestrated campaign to interfere in the 2016 U.S. presidential election. This information affected how people viewed, regarded, and treated Plaintiffs, and has affected Plaintiffs in their personal and business relationships.

INTERROGATORY NO. 21

Identify all legal actions, lawsuits, or arbitrations to which you are or have been a party, whether civil or criminal, and/or in which you have testified. For each action, suit, or arbitration, provide the caption, the court or forum in which it was brought, the nature of the allegations at issue, and the outcome.

RESPONSE TO INTERROGATORY NO. 21

Plaintiffs object to this Interrogatory as overly broad, unduly burdensome, and seeking information that is not relevant to the issues in the Action. Subject to the foregoing objections, Plaintiffs respond as follows:

The following are legal actions or proceedings relating to the defamatory statements in CIR 112, which involve(d) Plaintiffs as parties or in which Plaintiffs testified:

In 2017, Aven, Fridman, and Khan filed a civil lawsuit for defamation in the New York Supreme Court, New York County, against BuzzFeed Inc. and certain individuals, for publishing

the statements in CIR 112 that defame Plaintiffs and which are likewise the subject of this Action. The lawsuit is ongoing. *Fridman v. BuzzFeed, Inc.*, No. 154895/2017.

In 2017, Aven, Fridman, and Khan filed a civil lawsuit for defamation in the Superior Court of the District of Columbia against Orbis Business Intelligence Limited and Christopher Steele for publishing the statements in CIR 112 that defame Plaintiffs and which are likewise the subject of this Action. In 2018, the lawsuit was dismissed, but that decision has been appealed to the District of Columbia Court of Appeals. *Khan v. Orbis Business Intelligence Limited*, No. 2018 CA 002667 B, Appeal No. CAB2667-18.

In 2017, Aven, Fridman, and Khan filed a civil lawsuit for violation of a UK data protection law against Orbis Business Intelligence Limited in the High Court of Justice, Queens Bench Division, for processing inaccurate personal data comprising the contents of CIR 112 which included the defamatory suggestions and statements that are the subject of this Action as well as other personal data of the plaintiffs. The lawsuit is ongoing. *Aven v. Orbis Business Intelligence Limited*, No. HQ18M01646.

<u>INTERROGATORY NO. 22</u>

Identify (a) all instances in which criminal charges were made or brought against you and/or any entity you own in whole or in part, in any jurisdiction, and (b) identify each and every investigation by law enforcement authorities or other governmental entities regardless of whether or not charges were filed against any of you or the disposition of any such charges or investigation, in which you have been involved either as a defendant, subject or target of investigation.

<u>RESPONSE TO INTERROGATORY NO. 22</u>

Plaintiffs object to this Interrogatory as overly broad, unduly burdensome, vague, and seeking information that is not relevant to the issues in the Action. Subject to the foregoing objections, Plaintiffs respond as follows:

Fridman: Criminal charges have never been brought against Fridman, nor, as far as he is aware, has he ever been the target of investigation by law enforcement authorities or other governmental entities relating to anything said about him in CIR 112.

Aven: Criminal charges have never been brought against Aven, nor, as far as he is aware, has he ever been the target of investigation by law enforcement authorities or other governmental entities relating to anything said about him in CIR 112.

Khan: Criminal charges have never been brought against Khan, nor, as far as he is aware, has he ever been the target of investigation by law enforcement authorities or other governmental entities relating to anything said about him in CIR 112.

INTERROGATORY NO. 23

Identify all public controversies for which you have engaged Kroll Associates or any other investigations firm, including but not limited to the Vimpelcom bribery investigations, the IPOC case, the Telenor disputes, and the dispute with Vladimir Yakunin.

RESPONSE TO INTERROGATORY NO. 23

Plaintiffs object to this Interrogatory as overly broad, unduly burdensome, vague, and seeking information that is not relevant to the issues in the Action. The Interrogatory's use of the term "public controversies" is vague, subject to varying interpretations, and unintelligible. Plaintiffs' engagement of the services of investigation firms is not relevant to issues in this Action and involves non-public and confidential information. Plaintiffs further object to the Interrogatory as creating unreasonable annoyance, embarrassment, and prejudice to the Plaintiffs.

INTERROGATORY NO. 24

Identify all instances in which you have attempted to obtain government banking licenses worldwide, including but not limited to Ukraine, the United Kingdom, and the United States.

## RESPONSE TO INTERROGATORY NO. 24

Plaintiffs object to this Interrogatory as overly broad, unduly burdensome, and seeking information that is not relevant to the issues in the Action. Attempts to obtain banking licenses are not relevant to the issues in this Action.

## INTERROGATORY NO. 25

Identify each person—other than counsel of record in this action—who answered these Interrogatories or contributed information used to answer these Interrogatories and identify specifically what information each person contributed to each answer.

## RESPONSE TO INTERROGATORY NO. 25

Plaintiffs object to this Interrogatory as overly broad and seeking information that is protected by the attorney-client privilege and work product doctrine. Subject to the foregoing objections, Plaintiffs respond as follows: Answers to these Interrogatories, and information used to answer these Interrogatories, was primarily provided by Plaintiffs and counsel of record. Additional input and information was provided by A. Stephen Gillespie, who also serves as an attorney to the individual Plaintiffs.

Dated:   New York, New York
          November 11, 2019

CARTER LEDYARD & MILBURN LLP

By:   _Alan S. Lewis_

Alan S. Lewis
John J. Walsh
2 Wall Street
New York, NY 10005
(212) 732-3200

Kim H. Sperduto
Sperduto Thompson & Gassler PLC
1747 Pennsylvania Ave., NW, Suite 1250
Washington, DC 20006
Phone: (202) 408-8900

*Attorneys for Plaintiffs*

# VERIFICATION

I, **MIKHAIL FRIDMAN**, am a plaintiff in the above-captioned action. I have read the foregoing Responses and Objections to Defendants' First Set of Interrogatories and know the contents thereof and, as the responses pertain to me individually, they are true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true as they pertain to me individually.

Mikhail Fridman

## VERIFICATION

I, **PETR AVEN**, am a plaintiff in the above-captioned action. I have read the foregoing Responses and Objections to Defendants' First Set of Interrogatories and know the contents thereof and, as the responses pertain to me individually, they are true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true as they pertain to me individually.

_____
Petr Aven

## <u>VERIFICATION</u>

I, **GERMAN KHAN**, am a plaintiff in the above-captioned action. I have read the foregoing Responses and Objections to Defendants' First Set of Interrogatories and know the contents thereof and, as the responses pertain to me individually, they are true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true as they pertain to me individually.

German Khan

**EXHIBIT 16**

HM Courts & Tribunals Service · C-Track                                   Spiegel Blau ▾

**Case View - QB-2018-006349**

### Case Information ▾

| | | | |
|---|---|---|---|
| **Case Title** | Mr Petr Aven and other v Orbis Business Intelligence Limited | **Case Status** | Open |
| **Case Type** | HQ Migrated Case - HQ Migrated Case - HQ Migrated Case | **Filed Date** | 04-05-2018 12:00 AM |
| **Alt Case Number** | HCF - HQ18M01646<br>OTH - TLQ19/0920 | **Last Updated Date** | 27-07-2020 03:28 PM |

### Parties / Participants

| # | Role | Name | Legal Representative |
|---|---|---|---|
| 1 | Claimant | Mr Petr Aven | CMS Cameron McKenna Nabarro Olswang LLP |
| 2 | Claimant | Mr Mikhail Fridman | CMS Cameron McKenna Nabarro Olswang LLP |
| 3 | Claimant | Mr German Khan | CMS Cameron McKenna Nabarro Olswang LLP |
| 1 | Defendant | Orbis Business Intelligence Limited | Rpc |

1 to 4 of 4 records

### Case Event Log

| Event Id | Submitted Date | Filed Date ▾ | Type | Description | Fee | |
|---|---|---|---|---|---|---|
| 13 | 22-07-2020 | 22-07-2020 | Order by Judge - Order | Order by Warby J dated 21 July 2020.<br>The Applicant be given permission to obtain from the records of the court a copy of the following documents full details in the body of the order. | £10.00 | ☐ |
| 12 | 15-07-2020 | 15-07-2020 | Order by Judge - Order | Order dated 15 July 2020 before Warby J, sealed and distributed to parties on 15 July 2020<br><br>RE: IT IS ORDERED THAT:<br>1. Time is extended for the Applicant to file and serve its written submissions in response to 4pm on Monday 20 July 2020.<br><br>Re... | £10.00 | ☐ |
| 11 | 08-07-2020 | 08-07-2020 | Order by Judge - Order | Order Upon Judgement by Warby J dated 08 July 2020.<br>The Defendant shall by 4pm on 29 July 2020 pay to the First Claimant the sum of £18,000.<br>The Defendant shall by 4pm on 29 July 2020 pay to the Second Claimant the sum of £18,000. | £10.00 | ☐ |
| 10 | 06-07-2020 | 06-07-2020 | Order by Judge - Order | Order - Warby J dd 6/7 -- (without notice) | £10.00 | ☐ |
| 9 | 23-03-2020 | 23-03-2020 | Order by Judge - Order | Order amending the Defence and striking out parts of the Defendant's witness statements and refusing permission to rely on a particular Expert's report | £10.00 | ☐ |
| 8 | 13-03-2020 | 13-03-2020 | Order by Judge - Order | Order by Warby J dated 13th March 2020. Sealed and sent to parties solicitors in DX on 13th March 2020. | £10.00 | ☐ |
| 7 | 03-03-2020 | 12-03-2020 | Filing - Amended Defence | Amended Defence | £10.00 | ☐ |
| 6 | 10-03-2020 | 11-03-2020 | Filing - Response to Request for Further Information | Def's Response to claimant's 2nd Part 18 Request for Further Information | £10.00 | ☐ |
| 5 | 10-03-2020 | 10-03-2020 | Order by Judge - Order | Order - allowing Defendant to rely on additional witness statement and giving additional directions | £10.00 | ☐ |
| 4 | 28-02-2020 | 28-02-2020 | Order by Master - Order | Order by master Davison dtd 26/02/20 and sealed on 28/02/20. Copies sent to Claimant's sols to serve. AE 28/02/20 | £10.00 | ☐ |
| 3 | 20-02-2020 | 20-02-2020 | Order by Master - Order | Order of Master Davison dated 18/02/2020 and sealed on 20/02/2020 | £10.00 | ☐ |
| 2 | 07-02-2020 | 07-02-2020 | Order by Master - Order | Order before MAster Davison dtd 30.01.20 sld 07.02.20<br>Sent to clmnts sols to serve. SK 07.02.20 | £10.00 | ☐ |
| 1 | 12-12-2019 | 12-12-2019 | Order by Master - Order | Order by7 Deputy Master Bard dated 11/12/19 and sealed on 12/12/19<br>copies sent to claimants sols to arrange service. Jiromu | £10.00 | ☐ |

1 to 13 of 13 records

[Back to Search Results]                                    [Add To Basket]