**EXHIBIT 4**



Petr Aven, Mikhail Fridman and German Khan v Orbis Business Intelligence
Limited

Day 1

March 16, 2020

Opus 2 International - Official Court Reporters

Phone: +44 (0)20 3008 5900

Email: transcripts@opus2.com

Website: https://www.opus2.com

1     range of possibilities.
2          There are no notes or records of this meeting -- of
3     these dealings and at present we know nothing more about
4     them. My Lord, that's a point I'll return to in due
5     course.
6          Mr Steele, following this interaction with his
7     source, produced Memorandum 112. As the court knows,
8     this is entitled, "Company Intelligence Report 2016/112
9     Russia/US Presidential Election Kremlin-Alpha Group
10    Co-operation".
11         The title is misleading because the memorandum says
12    nothing at all about the US presidential election and
13    the name of Alfa is spelled wrongly, which perhaps give
14    you some insight into how much care was taken with the
15    preparation of the memorandum.
16         The same day that that memorandum was given to
17    Fusion, there were two other memoranda produced, 111 and
18    113. It's interesting to note that 111, the source is
19    said to be a senior member of the Russian presidential
20    administration. One assumes that a senior member of the
21    Russian presidential administration is perhaps more
22    senior than a top level government official, but it
23    seems two different sources are being referred to.
24         My Lord, the memorandum itself, your Lordship will
25    obviously have seen it on a number of occasions, is at

                              17

1     {A/1/1}.
2     MR JUSTICE WARBY: Yes.
3     MR TOMLINSON: It's a short document. It's only two pages.
4          It has a summary and then three numbered paragraphs.
5     What it is about is clear from the title, "Co-operation
6     between the Kremlin and Alfa Group and the claimants".
7     My Lord, it is obvious, we say, from that memorandum
8     that what is being said is that the relationship is
9     a close and a corrupt one, that the claimants do
10    significant -- and President Putin do significant
11    favours for each other, that they have paid him illicit
12    cash, they give him advice and do his political bidding.
13    It's also said that Alfa holds or held kompromat on
14    President Putin, that is to say compromising material.
15         It contains nothing at all about the US presidential
16    election or anything that could possibly be related to
17    national security of either the US or the UK. It's
18    about Alfa, the claimants and President Putin.
19         Mr Fridman is mentioned by name in the two pages six
20    times, Mr Aven by name five times, and Mr Khan once.
21    My Lord, it is common ground, as your Lordship knows,
22    that the memorandum contains personal data about
23    Mr Fridman and Mr Aven in four categories, set out in
24    paragraph 6 of the particulars of claim. They all
25    concern close relationships between those individuals

                              18

1     and President Putin, but perhaps the most striking is
2     the statement that Mr Fridman and Mr Aven used
3     a Mr Oleg Govorun as a "driver" and "bag carrier" to
4     deliver large amounts of illicit cash to President Putin
5     when he was Deputy Mayor of St Petersburg.
6          There are two disputes about the personal data, as
7     your Lordship knows. The first concerns paragraph 1 and
8     paragraph 2. Going back to paragraph 1 {A/1/1},
9     my Lord, there's a dispute as to who is doing the
10    significant favours for President Putin in the first
11    paragraph. We say that clearly what that means is the
12    leading figures in Alfa, who are named in the previous
13    sentence, are the ones doing the significant favours.
14    Companies have to act through their agents or employees
15    and these are the named individuals and these are the
16    ones doing significant favours.
17         My Lord, that's, as it were, a pure matter of
18    construction.
19         The second point is the suggestion in the second
20    paragraph concerning illicit cash, is that an allegation
21    of criminal wrongdoing? Again, that's a matter for
22    construction of that paragraph. The defendants make the
23    remarkable submission that illicit means furtive or
24    secret, and so their case is what the memorandum is
25    simply saying is that in the 1990s this was just an

                              19

1     ordinary patronage transaction. They were just paying
2     cash because everybody dealt in cash in those days and
3     there was nothing wrong about it at all.
4          My Lord, we say that's an absurd construction and we
5     ask rhetorically: if this is just recording something
6     which was standard and obvious, why does it feature so
7     prominently in the memorandum? It features in the first
8     paragraph and of course it also features as the second
9     point of the summary.
10         Clearly what's being said here about the claimants
11    is that they engaged in the paying of a bribe to
12    a public official. Any reasonable person, we say, would
13    understand that.
14         My Lord, there's a bit of side issue arisen in this
15    case, as your Lordship knows, because when we made
16    this -- when we said this alleged criminal offence, the
17    defendant said, "Well, tell us what the criminal offence
18    is". Now, my Lord, we don't actually accept that we
19    have to do that because if it alleges a criminal offence
20    you don't have to know what the criminal offence is.
21    Many people in England wouldn't know -- probably most
22    people in England wouldn't know what the offence was if
23    you were accused of paying money to a public official,
24    what precise statute it was, but they would know it was
25    an offence. But in response to that request we produced

                              20

1    an expert report pointing out that this was an offence
2    under Article 174 of the Criminal Code of the Russian
3    Soviet Federated Socialist Republic. My Lord, if that's
4    that's relevant, that's our evidence and the defendant
5    has no expert evidence to the contrary.
6        So, my Lord --
7  MR JUSTICE WARBY: It is a bit like slander, I suppose, is
8        it? You know, that category of slander which is
9        actionable without proof of damage because it imputes
10       the commission of a criminal offence.
11 MR TOMLINSON: Yes.
12 MR JUSTICE WARBY: In that context you would have to -- you
13       might have to, depending on the precise words -- spell
14       out what the offence was, but if the words were, "He was
15       guilty of a crime", then you probably wouldn't
16       because --
17 MR TOMLINSON: My Lord, so, for example, paying money to
18       a public official is a very good example because my
19       faint recollection is that until the Bribery Act came
20       along, this used to be an offence under the Prevention
21       of Corruption Act 1911, but I suspect that 99.9% of the
22       British population have never heard of that statute, but
23       everybody would know that if you said, "He paid a bung,
24       or illicit cash to a public official", everybody would
25       know you were saying a crime had been committed, even

21

1    though they couldn't actually identify what it was.
2  MR JUSTICE WARBY: Yes, but if it wasn't a public official
3        under that Act then --
4  MR TOMLINSON: If it wasn't a public official, it wasn't
5        a crime, yes, quite.
6  MR JUSTICE WARBY: Wasn't a crime. So under the old law you
7        might have had a bit of a problem with a slander, where
8        you would have to prove that the person being bribed was
9        a public official, otherwise --
10 MR TOMLINSON: Yes, but if you say they are a public
11       official, you take the notorious case of T Dan Smith
12       that your Lordship may recollect from many years ago,
13       who was being bribed by the architect John Poulson over
14       public contracts, I mean, if someone said
15       a councillor -- I think he was the leader of Wandsworth
16       Council -- is being paid money by an architect, illicit
17       money by an architect, everybody would know that you
18       were saying he had committed a crime, even though you
19       didn't know precisely what it was called.
20       My Lord, that's the primary position.
21 MR JUSTICE WARBY: Yes.
22 MR TOMLINSON: It is interesting that the way it is put, all
23       that points in the same direction, because we have:
24       "... Govorun had been Head of Government Relations
25       at Alpha ..."

22

1    Actually that was untrue, but never mind:
2        "... in reality, the 'driver' and 'bag carrier'
3  [both in inverted commas -- sorry, over the page,
4  {A/1/2}] used by Fridman and Aven to deliver large
5  amounts of illicit cash ..."
6        So the "driver" and "bag carrier", in inverted
7  commas, is all telling us -- sending us the message that
8  this man, although his official title is head of
9  government relations, is really there to pay off public
10 officials.
11 MR JUSTICE WARBY: Yes.
12 MR TOMLINSON: My Lord, it is perhaps useful to say
13       something at this stage about processing. Of course,
14       this is a data protection claim, it relates to the
15       processing of personal data. That processing took place
16       in a number of ways: the compilation of the memorandum,
17       its disclosure to Fusion, and its disclosure to third
18       parties.
19       Obviously we are not -- we still don't know what
20       third parties it was delivered to. Mr Steele admits
21       a number of individuals. The position is somewhat
22       unclear. We accept that the defendant is not
23       responsible for the processing by other data
24       controllers. Obviously, what other data controllers do
25       with it is a matter for them and not for the defendant.

23

1    On the other hand, the defendant, we say, is
2  responsible for the damage caused by its own processing,
3  which includes the damage -- the foreseeable damage
4  caused when other people use or publish this memoranda.
5        We say, as we say in our reply, it was foreseeable
6  and likely that Memorandum 112 would be disclosed to the
7  media, given its high profile subject matter.
8        The defendant admits the disclosure to Fusion and
9  obviously, if it is disclosed to Fusion, it obviously
10 goes down the chain to the ultimate client.
11       It also admits disclosure to a number of other
12 individuals. My Lord, those are listed -- if
13 your Lordship looks at our skeleton argument at {A/2/9},
14 those are the recipients: Mr Strobe Talbott, who had
15 been a public official at one time but at that stage was
16 retired; an unidentified senior US national security
17 official; an unidentified senior UK Government national
18 security official, some former colleague; and then
19 David Kramer, who was a private individual, although was
20 provided with the memorandum for the purposes of passing
21 it on to Senator John McCain, who at that stage
22 certainly did have an official function.
23       The defendant seeks to divide the processing into
24 two categories: Fusion disclosure and what they call
25 national security disclosure.

24

1          My Lord, we don't accept that there are national
2     security disclosures in this case.  Your Lordship will
3     know that there's an exemption from certain principles
4     in the Data Protection Act under section 28 of the Data
5     Protection Act.  We deal with that at paragraphs 80 to
6     82 of our skeleton, and the defendant at paragraphs 41
7     to 46.
8          My Lord, our short answer to that is whatever the
9     position in relation to the Trump -- the whole Trump
10    dossier, as it has been called, we can see something of
11    an argument which says: well, look, this is about the
12    potential US President being subject to blackmail by the
13    Kremlin or having improper connections with the Kremlin
14    and so on.  One can see that in those circumstances it
15    might well be arguable that there were national security
16    reasons for disclosure, but Memorandum 112 has nothing
17    to do with any of that.  It has nothing to do with --
18    the only mention of candidate Trump is in the title.  It
19    has nothing to do with the election.  It is about -- and
20    it doesn't have anything to do with links between
21    servers.  It is simply about the claimants, Alfa and
22    President Putin.  We say that that has no national
23    security implications at all.  It's certainly not -- its
24    disclosure is certainly not required for the purposes --
25    for national security purposes.

25

1          My Lord, we say, and there's a dispute of fact about
2     this, that the memorandum was never actually provided to
3     the FBI.  Mr Steele decided, because he thought that the
4     results of his investigations were explosive, or what
5     his sources had told him, he decided to tell the FBI
6     about it.  I showed your Lordship a note of a meeting
7     from July.  He provided -- there's no doubt he provided
8     certain memoranda to the FBI.  But the FBI say that, "He
9     didn't provide this memorandum to us".  Mr Steele says
10    he did.  Well, my Lord, with respect to Mr Steele, the
11    FBI's evidence in relation to this is to be preferred,
12    particularly as Mr Steele, as your Lordship will have
13    seen from the supplemental statement that he served,
14    can't even recollect when he was instructed to produce
15    the memorandum.  So the idea that he can accurately
16    recollect when he handed it to some third party is --
17 MR JUSTICE WARBY: Where do I get what the FBI say about
18    this?
19 MR TOMLINSON: My Lord, it's in our skeleton.  My Lord, if
20    I can just -- if your Lordship will give me a moment.
21    This in the report of the inspector general.
22 MR JUSTICE WARBY: Yes.
23 MR TOMLINSON: And the report of the inspector general,
24    which is -- I don't know if your Lordship -- it is a
25    very long document and your Lordship may --

26

1 MR JUSTICE WARBY: No, I have just read -- so far I have
2    just read what you asked me to read.
3 MR TOMLINSON: Yes.
4 MR JUSTICE WARBY: Because I thought I could get directed to
5    the bits that matter.
6 MR TOMLINSON: Well, yes. The report of the Inspector
7    General is an extremely interesting document about the
8    background to this.  It is all about the warrants that
9    were obtained.  At paragraph 24 of our skeleton we deal
10   with this {A/2/9}. The reference is to {D/131/155}.
11   D/131 is the Horowitz report and your Lordship will see
12   the footnote is about Report 112:
13        "The Crossfire Hurricane team [which is the FBI
14   investigators who are looking into the links between the
15   Trump team and Russia] received Report 112 on or about
16   November 6, 2016, from a Mother Jones journalist through
17   then FBI General Counsel James Baker."
18        In other parts of the report it makes clear that
19   they didn't receive this from Mr Steele.
20        It is entirely unclear how the Mother Jones
21   journalist got it.
22 MR JUSTICE WARBY: Yes.
23 MR TOMLINSON: Although we do know that Mr Steele admits to
24   having spoken to the Mother Jones journalist --
25 MR JUSTICE WARBY: Is there any controversy about the status

27

1    of this report evidentially?
2 MR TOMLINSON: I don't think so.  Not that I'm aware of.
3    It's.
4 MR JUSTICE WARBY: I mean, it's a source of multiple hearsay
5    evidence of some kind.
6 MR TOMLINSON: It certainly is hearsay evidence, my Lord, of
7    course it is, but on the other hand the FBI interviewed
8    something like 100 witnesses, including Mr Steele, and
9    of course crucially what they had access to was their
10   documentary records.
11 MR JUSTICE WARBY: Yes, I only ask because sometimes, as you
12   know, there can be some debate about the status of
13   findings in reports of this kind.
14 MR TOMLINSON: Yes, my Lord.
15 MR JUSTICE WARBY: What you're showing me is a statement of
16   fact.
17 MR TOMLINSON: Yes. I'm not saying it's -- their assessment
18   of the witnesses and so on obviously has a very
19   different status, but this is a matter of fact.
20        Of course it is possible it is wrong and
21   your Lordship could of course believe Mr Steele, rather
22   than the FBI, but we say that really the position is
23   clear that Mr Steele didn't -- he obviously doesn't
24   actually remember when he gave this memorandum and who
25   he gave it to, if one looks at his witness statement

28