UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
MIKHAIL FRIDMAN, PETR AVEN, and       )
GERMAN KHAN,                          )
                                      )
                    *Plaintiffs*,     )
                                      )   Case No. 1:17-cv-02041 (RJL)
            v.                        )
                                      )
BEAN LLC (a/k/a FUSION GPS) and       )
GLENN SIMPSON,                        )
_____*Defendants*.___)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS
<u>WITHHELD AS PRIVILEGED BY DEFENDANTS</u>**

CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005
(917) 533-2524

SPERDUTO THOMPSON & GASSLER PLC
1747 Pennsylvania Ave., NW, Suite 1250
Washington, DC 20006
(202) 408-8900

*Attorneys for Plaintiffs*

*Of Counsel:*

  Alan S. Lewis
  Kim Sperduto

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ........................................................**Error! Bookmark not defined.**

INTRODUCTION .................................................................................................... 1

STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY ............................... 3

    A.   This Lawsuit................................................................................................. 3

    B.   Defendants' First Privilege Log.................................................................... 5

    C.   Defendants' Second Deficient Privilege Log ................................................. 8

ARGUMENT ...................................................................................................... 11

    POINT I
    IT IS DEFENDANTS' BURDEN TO SHOW THE DOCUMENTS ARE PROTECTED...... 11

    POINT II
    DEFENDANTS' PRIVILEGE LOGS ARE DEFICIENT.................................... 12

    POINT III
    THE DEFICIENCIES IN DEFENDANTS' LOG HIGHLIGHT THEIR IMPROPER
    CLAIMS OF PRIVILEGE AND INABILITY TO ASSERT WORK-PRODUCT
    PROTECTION ...................................................................................... 15

    A.   The Attorney-Client Privilege Is Inapplicable ........................................ 15

    B.   The Work-Product Privilege Is Also Inapplicable.................................... 20

CONCLUSION.................................................................................................... 24

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. FBI,*
 186 F.R.D. 102 (D.D.C. 1998)................................................................................14

*Alexander v. FBI,*
 192 F.R.D. 42 (D.D.C. 2000)..................................................................................14

*Banneker Ventures, LLC v. Graham,*
 253 F. Supp. 3d 64 (D.D.C. 2017) .........................................................................20

*Bean LLC v. Bank,*
 291 F. Supp. 3d 34 (D.D.C. 2018) ...................................................................17, 22

*Caparrós v. Lynch,*
 2017 U.S. Dist. LEXIS 109041 (D.P.R. June 15, 2017)........................................17

*Chen-Oster v. Goldman, Sachs & Co.,*
 293 F.R.D. 547 (S.D.N.Y. 2013) ...........................................................................22

*Chevron Corp. v. Weinberg Grp.,*
 286 F.R.D. 95 (D.D.C. 2012)..................................................................................12

*Climate Investigations Center v. U.S. Dep't of Energy,*
 331 F. Supp. 3d 1 (D.D.C. 2018) ...........................................................................16

*Durling v. Papa John's Int'l, Inc.,*
 2018 U.S. Dist. LEXIS 11584 (S.D.N.Y. Jan. 24, 2018)......................................18

* *EEOC v. Lutheran Social Servs.,*
 186 F.3d 959 (D.C. Cir. 1999) ..........................................................................21, 22

*Federal Trade Comm'n v. TRW, Inc.,*
 628 F.2d 207 (D.C. Cir. 1980) ..........................................................................11, 18

*Hornbeck Offshore Transp., LLC v. United States Coast Guard,*
 2006 U.S. Dist. LEXIS 14389 (D.D.C. 2006) .......................................................12

**In re Kellogg Brown & Root, Inc.,*
 796 F.3d 137 (D.C. Cir. 2015) ..........................................................................15, 16

*In re Lindsey,*
 158 F.3d 1263 (D.C. Cir. 1998) .............................................................................11

*Loftin v. Bande,
    258 F.R.D. 31 (D.D.C. 2009)...........................................................................11, 12

In re Rail Freight Fuel Surcharge Antitrust Litig.,
    268 F.R.D. 114 (D.D.C. 2012).........................................................................20, 22

In re Sealed Case,
    676 F.2d 793 (D.C. Cir. 1982).................................................................................15

In re Sealed Case,
    737 F.2d 94 (D.D.C. 1984).......................................................................................17

SEC v. Brown,
    2010 U.S. Dist. LEXIS 162854 (D.D.C. Sept. 29, 2010).........................................20

Sinai v. State Univ. of N.Y. at Farmingdale,
    2010 U.S. Dist. LEXIS 82562 (E.D.N.Y. Aug. 10, 2010)........................................23

In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n,
    439 F.3d 740 (D.C. Cir. 2006).................................................................................11

*Tax Analysts v. IRS,
    117 F.3d 607 (D.C. Cir. 1997)...........................................................................15, 16

U.S. v. ISS Marine Servs., Inc.,
    905 F. Supp. 2d 121 (D.D.C. 2012)........................................................................11

United States v. Kovel,
    296 F.2d 918 (2d Cir. 1961).....................................................................................18

Upjohn Co. v. U.S.,
    449 U.S. 383 (1981).................................................................................................21

In re Veiga,
    746 F. Supp. 2d 27 (D.D.C. 2010)...........................................................................14

Willingham v. Ashcroft,
    228 F.R.D. 1 (D.D.C. 2005)......................................................................................21

Zelaya v. UNICCO Serv. Co.,
    682 F. Supp. 2d 28 (D.D.C. 2010)...........................................................................14

## Other Authorities

Fed. R. Civ. P. 26.....................................................................................................11, 20

iii

## <u>INTRODUCTION</u>

Plaintiffs commenced this defamation lawsuit after Defendants published statements accusing Plaintiffs of bribery and other misconduct.  The defamatory statements were in a two-page document labeled "Company Intelligence Report 2016/112" ("CIR 112"), prepared for Defendants by non-party Orbis Business Intelligence Ltd. ("Orbis"), a company formed by non-party Christopher Steele.  Defendants have produced essentially no documents relating directly to CIR 112 and appear to be withholding such documents based on unsupportable claims that production is shielded by the attorney-client privilege and work-product doctrine.

Relying on a fundamentally flawed application of privilege law, Defendants seek to shield from production virtually every document in their possession, custody, or control that relates to the heart of the claims in this litigation.  Although the information in Defendants' privilege log is plainly inadequate, what little content is included undermines Defendants' privilege claims.  To take just a few examples, almost seventy-five percent of the documents that Defendants claim are protected by the attorney-client privilege are non-privileged on their face because they are: (1) internal communications that do not involve attorneys; (2) communications with third parties; or (3) both.  And many of the remaining documents are identified simply as "loose document" with no listed author or date, and an insufficient privilege description.  Similarly, except for two emails and their attachments, all the documents over which Defendants assert work-product protection are untethered to any actual or potential litigation.  Plaintiffs have given Defendants two opportunities to produce an adequate privilege log that satisfies their burden to establish that nearly every relevant document in their possession, custody, or control is privileged.  They have not come close to doing so.

Defendants have produced two privilege logs—initial and supplemental—the latter provided in response to questions Plaintiffs raised about the initial log.  As explained below, Defendants' initial log contained woefully insufficient detail and its assertions of privilege and work-product protection were facially dubious.  The supplemental log did not come close to curing the deficiencies of the initial log.  By way of example, the supplemental privilege log includes the following fatal deficiencies:

- more than seventy-five percent of the documents listed by Defendants as being protected by the attorney-client privilege *are not described as communications with a lawyer, and many are communications with third parties*;

- except for two emails and their attachments, none of the documents that Defendants claim are protected by the work-product privilege are tied to any actual or potential litigation—and, indeed, more than eighty percent were created prior to Defendants' retention of counsel in anticipation of this litigation;

- thirty documents include no author, no date, and an inadequate privilege description, rendering it virtually impossible for Plaintiffs to determine the basis for Defendants' assertion of privilege;

- virtually every document that carries a description includes the same generic basis for claiming privilege; and

- except for a few documents, Defendants have claimed *both* the attorney-client privilege *and* work-product protection for each withheld document.[1]

---

[1] To assist the Court with its analysis, Plaintiffs have attached an annotated copy of Defendants' second privilege log as Exhibit 14 to the Declaration of Alan S. Lewis, dated Aug. 13, 2020 ("Lewis Decl.").  In addition to indicating deficiencies on an individual document basis, the annotated copy also includes a tally on the last page showing the total number of documents within each category of deficiency.

Defendants' recent production of a handful of documents further undermines their assertions of privilege.  Those documents—which turned out to be nothing more than invoices and covering emails—were originally withheld from production and misleadingly listed on Defendants' initial privilege log as "Confidential communication regarding research prepared at the direction of" a law firm, Perkins Coie LLP ("Perkins Coie"), "and in anticipation of litigation, and for the purpose of providing legal advice."  This belated production raises larger questions about the overall adequacy of Defendants' privilege review and the accuracy of their privilege log, especially since the Defendants have offered no justification for the mislabeling and erroneous privilege assertions.

Defendants, having had several chances to demonstrate the legitimacy of their privilege and work-product claims, have failed to do so.  Respectfully, Defendants should be ordered to produce the documents listed on their log or, at minimum, to provide the documents to the Court for *in camera review*.[2]

## STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY

**A.     This Lawsuit**

Plaintiffs commenced this action on October 3, 2017 and filed an Amended Complaint on December 12, 2017.  [Dkt. 17] ("Am. Compl.").  Plaintiffs' claim arises out of defamatory

---

[2] In addition to withholding documents on the basis of improper privilege and work-product claims, Defendants, until this week, also refused to properly search for and produce a category of documents that go to the heart of this matter.  In particular, despite the fact that "Project Bangor" was Defendants' admitted code name for the project which resulted in the creation of CIR 112, Defendants refused to search for and produce responsive documents that include the term "Bangor."  During a meet-and-confer between the parties on August 13, 2020, Defendants relented and indicated that they had identified nearly 4,000 documents that include the term "Bangor."  Defendants agreed to review those documents and produce responsive documents within three weeks.  Plaintiffs hope that Defendants will apply proper privilege and work-product standards to their review and production of the "Bangor" documents, but nevertheless reserve the right to supplement this motion to seek the same relief with respect to any of the "Bangor" documents that are withheld improperly.

statements made by Defendants, which essentially falsely accuse Plaintiffs of bribery and other misconduct.  *See*, *e.g., id.* ¶¶ 19-28.  The defamatory statements were published in CIR 112, one of many individual "reports" or "memoranda" that were prepared for Defendants by Orbis and Christopher Steele and which have become commonly known as the so-called "Dossier" or the "Steele Dossier."  *Id.* ¶¶ 2, 19-28.  CIR 112 and Steele's other pre-election memoranda were produced and disseminated in connection with Defendants' engagement to conduct political opposition research for use in the 2016 presidential election.

Defendants were originally engaged by the *Washington Free Beacon* to conduct political opposition research into candidates who were then running for the Republican nomination, including now-President Donald Trump.  Am. Compl. ¶ 15.  After Donald Trump emerged as the likely Republican candidate, Defendants approached Perkins Coie, a law firm that had been working with the Democratic National Committee ("DNC") and HFACC, Inc. ("HFACC"), Hillary Rodham Clinton's presidential campaign organization.  *Id.* ¶ 15.  In April 2016, Perkins Coie contends that it engaged Defendants on behalf of the DNC and HFACC to continue with the political opposition research they already had begun.  *See* Lewis Decl. Ex. 1.  Defendants assert that they hired a former British intelligence officer, Christopher Steele, and his company, Orbis, to assist them with this project.  *See* Am. Compl. ¶ 3.

The reports that Steele and Orbis ultimately produced for Defendants over the course of several months during 2016 did not identify sources.  *See* Am. Compl. ¶ 3.  During 2016, Defendants arranged for Steele to brief members of the media about the content of the reports.  *Id.*  ¶ 6.  Yahoo News published an article describing some of what it had learned from such briefing(s), and in late October 2016, Steele gave an interview to David Corn, a writer for *Mother Jones* magazine, which later published an article reporting what Corn had been told

about the contents of Steele's reports.  *Id.*  Defendants also arranged for Steele to meet with David Kramer, the director of a private foundation affiliated with Senator John McCain, who was a known critic of then-candidate Trump.  *Id.* ¶ 7.

Defendants contend that their engagement with Perkins Coie "concluded prior to the November 2016 Presidential election" (*i.e.*, November 8, 2016).  *See* Lewis Decl. Ex. 1 at 2.

## B.     Defendants' First Privilege Log

Plaintiffs served document requests on Defendants on October 11, 2019, and Defendants responded on November 11, 2019.  *See* Lewis Decl. Exs. 2, 3.  Defendants objected to several requests on privilege grounds and claimed that their "work was performed at the direction of Perkins Coie LLP in anticipation of litigation and for the purpose of providing Perkins Coie with information that was integral to Perkins Coie LLP providing legal advice to its clients."  Lewis Decl. Ex. 4 at 2.  Defendants sweepingly asserted that "[s]uch work and communications related thereto were protected by the attorney work product doctrine and the attorney-client privilege" and that "Perkins Coie has not waived those privileges."  *Id.* at 2-3.  Essentially, Defendants took the view that any communications they had with Perkins Coie were privileged under both the attorney-client privilege and the work-product doctrine.  *See, e.g.*, Lewis Decl. Ex. 5 at 25, Ans. Interr. No. 8 ("Inasmuch as Defendants communicated with anyone at Perkins Coie LLP, those communications are protected by the attorney-client privilege and the attorney work product doctrine, and Defendants are not authorized to waive those privileges.").  However, as revealed by their privilege log, Defendants' claims of privilege are actually much broader.  Not only are Defendants claiming that their communications with Perkins Coie are privileged, but they are also claiming their internal communications and communications with third-parties are also protected by the attorney-client privilege and the work-product doctrine.  *See, e.g.*, Lewis Decl.

Exs. 7, 13 at PRIV0000058, PRIV0000063, PRIV0000122, PRIV0000207, PRIV0000363, PRIV0000381.

Defendants withheld nearly 500 documents while producing approximately 730 documents to Plaintiffs, none of which referenced CIR 112 or its contents.  *See* Lewis Decl. ¶ 9, Exs. 7, 13.  The documents that Defendants withheld were listed on an initial privilege log provided to Plaintiffs on May 18, 2020.  *See* Lewis Decl. ¶ 10.  That log generically claimed that every single listed document was subject to work-product protection and, for all but five entries, was also subject to the attorney-client privilege.  Lewis Decl. Ex. 7.  Defendants repeatedly used the same generic and conclusory descriptions of the documents being withheld and failed to include information that would allow Plaintiffs to properly assess their privilege claims, such as document titles or individualized descriptions of the subject matter of the withheld documents. Indeed, more than 300 documents listed as either "email," "attachment," or "loose document" were identically described as "Confidential communication regarding research prepared at the direction of Perkins Coie and in anticipation of litigation, and for the purpose of providing legal advice."  Moreover, for thirty entries identified simply as "loose document," Defendants' log contained no additional information—such as the author, recipient, date, or subject matter.  *See*, *e.g.*, Lewis Decl. Exs. 7, 13 at PRIV0000030, PRIV0000031, PRIV0000044, PRIV0000045.[3] And the overwhelming majority (426) of the entries identified on the log as being supposedly protected by the attorney-client privilege had no attorney present on the communication.  *See,* *e.g.*, Lewis Decl. Exs. 7, 13 at PRIV0000010, PRIV0000014, PRIV0000156, PRIV0000159, PRIV0000203, PRIV0000206, PRIV0000207, PRIV0000208, PRIV0000209, PRIV0000295,

---

[3] Interestingly, some of the entries listed as "loose document" had dates in the initial log but Defendants removed this information when they produced their supplemental log.  *Compare* Lewis Decl. Ex. 7 at PRIV0000030 and PRIV0000045 *with* Lewis Decl. Ex. 13 at PRIV0000030 and PRIV0000045.

PRIV0000298, PRIV0000300.[4]  Several documents identified on the privilege log as protected

by the attorney-client privilege were shared with third parties, and no attorneys.  *See*, *e.g.*, Lewis

Decl. Exs. 7, 13 at PRIV0000110-11.

Plaintiffs pointed out the numerous issues with Defendants' initial log by letter dated

May 28, 2020, and, with respect to Defendants' work-product assertions in particular, asked

Defendants what litigation was anticipated at the time the documents listed on the log were

prepared.  *See* Lewis Decl. Ex. 8.  Defendants eventually agreed to provide a "supplementary

privilege log containing additional non-privileged information regarding the documents listed

therein."  *See* Lewis Decl. Ex. 9 at 2.  And with respect to Plaintiffs' work-product inquiry,

Defendants claimed that they had been hired to assist Perkins Coie "in assessing [Perkins Coie's]

own political clients' vulnerabilities or those of [Perkins Coie's clients'] political opponents."[5]

Lewis Decl. Ex. 9 at 3.  Defendants further claimed that they were hired to assist in "performing

legal review of public communications to confirm that there is an adequate factual basis for any

claims or allegations, so the client does not run the risk of civil litigation —including, for

example, libel, defamation, or other claims implicating the accuracy of information."  Lewis

Decl. Ex. 9 at 3.

Importantly, however, Defendants' explanations failed to justify their assertions of

privilege and work-product protection with respect to certain documents prepared after their

---

[4] Notably, Defendants' have not produced any communications between Fusion and Steele while
withholding 24 such communications, including two which appear to predate Steele's engagement—
meaning that they have apparently either destroyed or withheld all such communications from production
on the basis of privilege. Lewis Decl. ¶ 9; Lewis Decl. Ex. 14; Lewis Decl. Exs. 7 and 13 at
PRIV0000010, PRIV0000014.

[5] Defendants have never claimed that *they* anticipated being sued as a result of their engagement by
Perkins Coie.  Rather, the anticipated litigation was against Perkins Coie's clients.  Lewis Decl. Ex. 16
(Decl. of Joshua A. Levy) ¶¶ 5, 6.  In any event, the vast majority (over eighty percent), of the documents
pre-date Defendants' retention of counsel in anticipation of this litigation.  *See* Lewis Decl. Exs. 7, 13 at
PRIV0000001-431, PRIV0000495-97.

engagement with Perkins Coie had concluded, their internal communications or their communications with third parties throughout the engagement.  *See, e.g.*, Lewis Decl. Exs. 7, 13 at PRIV0000098, PRIV0000109, PRIV0000110, PRIV00000112, PRIV0000119, PRIV0000130, PRIV0000422-27.[6]  And Defendants' work-product claims, which necessarily require there to be actual or anticipated litigation, were plainly at odds with their previous assertions that documents were immediately returned or destroyed once that engagement concluded—because, if indeed there were anticipated litigation, Defendants would have been under an obligation to preserve those documents.[7]  In any event, Defendants never provided any explanation as to what specific litigation they anticipated.

**C.**     **Defendants' Second Deficient Privilege Log**

On July 28, 2020, Defendants produced their supplemental privilege log.  *See* Lewis Decl. Exs. 12, 13.  However, the supplemental log suffers from the same deficiencies as the initial log, including: the use of identical, generic descriptions; the repeated, blanket assertions of both the attorney-client privilege and work-product doctrine (for all but five documents); the failure to include additional relevant material that would allow for proper assessment of privilege claims, such as email subject headings or document titles; and the listing of documents that do not include any attorney and, in some cases, appear to be communications with third parties. *Compare* Lewis Decl. Ex. 7 *with* Lewis Decl. Ex. 13.  More specifically:

---

[6] Defendants also included communications from 2017 with counsel in this action.  However, Plaintiffs explicitly informed Defendants that they were not seeking such communications.  *See* Lewis Decl. Ex. 17 at 2.

[7] Defendants explicitly stated in response to Plaintiffs' interrogatories that "[a]t the end of each engagement, Defendants return or destroy the work product as directed by the client."  Lewis Decl. Ex. 5 at 40 (Ans. Interr. No. 21).

- Defendants' supplemental log continues to describe 327 documents simply as "Confidential communication regarding research prepared at the direction of Perkins Coie and in anticipation of litigation, and for the purpose of providing legal advice";

- eighty documents are described only as "Confidential research prepared at the direction of Perkins Coie and in anticipation of litigation, and for the purpose of providing legal advice";

- fifteen documents are described only as "Confidential research prepared at the direction of counsel and in anticipation of litigation, and for the purpose of obtaining legal advice";

- forty-three documents are described only as "Confidential communication in anticipation of litigation and for the purpose of providing legal advice"; and

- nine documents are described only as "Confidential communication with counsel in anticipation of litigation and for the purpose of obtaining legal advice."[8]

*See* Lewis Decl. Ex. 14.

It appears that the only changes Defendants made to their initial log were a minor formatting change, the removal of some dates as mentioned previously, and a decision to remove and produce to Plaintiffs a handful of documents that were listed on the initial privilege log as being among the numerous documents described as a "Confidential communication regarding research prepared at the direction of Perkins Coie and in anticipation of litigation, and for the purpose of providing legal advice." These documents, however, turned out to be nothing of the

---

[8] Remarkably, for two of the nine emails described as "Confidential communication with counsel in anticipation of litigation, and for the purpose of obtaining legal advice," no attorney is even listed as being included on the communication. *See* Lewis Decl. Ex. 13 at PRIV0000480, PRIV0000483.

9

sort.  They are simply invoices from Fusion to Perkins Coie and the covering emails enclosing them.  *Compare* Lewis Decl. Ex. 7 at PRIV0000024-27, PRIV0000050-53, PRIV0000428-29 *with* Lewis Decl. Ex. 15.  Defendants offered no explanation for why these documents were initially marked privileged nor any explanation for why they were identified simply as an "email" and "attachment" and mislabeled as "confidential communication regarding research." Defendants also again suggested that they "returned or destroyed" communications with Orbis "as would have been standard practice" during the period in which they are claiming work product.  *See* Lewis Decl. Ex. 12 at 2.

Finally, in addition to the supplemental log itself, Defendants also provided a declaration from counsel in an apparent effort to justify Defendants' position.  *See* Lewis Decl. Ex. 16. Counsel essentially recycled Defendants' prior argument, claiming that Perkins Coie was advising its clients "concerning potential litigation risks relating to information distributed in connection with the 2016 election cycle" and that Defendants assisted Perkins Coie through "review and analysis of publicly available records and compiling and assessing information gathered by its subcontractors."  *Id.* ¶ 6.  Defendants asserted that their "knowledge and expertise with respect to both Russia and then-candidate Trump [was] critical in interpreting the results of portions of Defendants' research and thereby assisting Perkins in advising" its clients.  *Id.* ¶ 8. According to counsel, Defendants' rote, generic description of nearly all the documents withheld in the exact same way was sufficient to "facilitate Plaintiffs' assessment of the privileges claimed."  *Id.* ¶ 10.

## ARGUMENT

### POINT I

### IT IS DEFENDANTS' BURDEN TO SHOW THE
### DOCUMENTS ARE PROTECTED

Defendants, of course, bear the burden of establishing that a privilege relieves them of the

obligation to produce relevant documents.  *See, e.g., In re Subpoena Duces Tecum Issued to*

*Commodity Futures Trading Comm'n,* 439 F.3d 740, 750 (D.C. Cir. 2006).  To meet that burden,

Defendants "must offer more than just conclusory statements, generalized assertions, and

unsworn averments of its counsel."  *U.S. v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 127

(D.D.C. 2012) (internal quotation marks and citation omitted).  Defendants must "present the

underlying facts demonstrating the existence of the privilege," and "conclusively prove each

element of the privilege."  *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) (internal

quotation marks and citation omitted).  If Defendants fail to present sufficient facts to allow the

Court to "state with *reasonable certainty* that the privilege applies, this burden is not met."

*Federal Trade Comm'n v. TRW, Inc.*, 628 F.2d 207, 213 (D.C. Cir. 1980) (emphasis added).

Consistent with this obligation, pursuant to Federal Rule of Civil Procedure

26(b)(5)(A)(ii), a party withholding documents on the basis of a claim of attorney-client

privilege or work-product protection must "describe the nature of the documents,

communications, or tangible things not produced or disclosed—and do so in a manner that,

without revealing information itself privileged or protected, will enable other parties to assess the

claim."  Fed. R. Civ. P. 26(b)(5)(A)(ii).  Thus, a privilege log "must state the basis upon which

the privilege is claimed, state the subject matter, number of pages, author, date created, and the

identity of all persons to whom the original or any copies of the document were shown or

provided."  *Loftin v. Bande*, 258 F.R.D. 31, 33 (D.D.C. 2009) (internal quotations and citation

omitted).  "[T]he intendment to the Rule is clear: the opposing party should be able, from the entry in the log itself, to assess whether the claim of privilege is valid."  *Chevron Corp. v. Weinberg Grp.*, 286 F.R.D. 95, 98 (D.D.C. 2012).

As detailed further below, Defendants' privilege log is plainly defective, and they have failed to sustain their burden because the documents they have withheld are neither privileged nor work product.

## POINT II

## <u>DEFENDANTS' PRIVILEGE LOGS ARE DEFICIENT</u>

Defendants' initial and supplemental privilege logs are deficient to meet either their obligations under Federal Rule of Civil Procedure 26 or, more importantly, their larger burden to show that the documents are protected by either the attorney-client privilege or the work-product doctrine.  To begin with, each lists nearly 500 documents identified variously as "email," "attachment," or "loose document," many of which include no date, recipients, or author.  *See* Lewis Decl. Exs. 7, 13, 14.  Nor do Defendants provide the subject lines for emails, much less additional information regarding the subject matter of the documents in cases where the subject line provides insufficient information as is required.  *See Hornbeck Offshore Transp., LLC v. United States Coast Guard*, 2006 U.S. Dist. LEXIS 14389, at *47 (D.D.C. 2006) (descriptions inadequate where party provided "no further detail" to allow determination "if confidential information was supplied with the expectation of secrecy that was not known or disclosed to any third party"); *Loftin*, 258 F.R.D. at 33 (descriptions "insufficient because they do not specify the subject matter of the teleconferences").

In fact, for approximately thirty documents identified simply as a "loose document," *see, e.g.*, Lewis Decl. Ex. 13 at PRIV0000430-41; Lewis Decl. Ex. 14, Defendants provide *no*

*information* other than the type of privilege claimed.  Those documents utilize the same, repeated and generic description appearing on the overwhelming majority of Defendants' entries (335 on the initial log and 327 on the supplemental log), the problem with which is perhaps best highlighted by the handful of cover emails and invoices Defendants produced with their supplemental privilege log.  *See* Lewis Decl. Ex. 15.  Incredibly, those cover emails and invoices, identified on the initial log as "email" and "attachment," had been described in the same misleading and inaccurate way, as "Confidential communication regarding research prepared at the direction of Perkins Coie and in anticipation of litigation, and for the purpose of providing legal advice."  *See*, *e.g.*, Lewis Decl. Ex. 7 at PRIV0000024-27, PRIV0000050-53, PRIV0000428-29.  This alone calls into serious question what other documents appearing on Defendants' logs have been described inaccurately, especially considering Defendants' failure to explain the initial misattribution.

The validity of Defendants' privilege log becomes even more dubious by virtue of its repeated reliance on both the attorney-client privilege and the work-product doctrine for *492 out of 486* (or 497 for the initial log) documents.  *See* Lewis Decl. Ex. 7 at PRIV0000006-PRIV0000497; Ex. 13 at PRIV0000006-PRIV0000497.  It seems altogether unlikely, particularly when considered in the context of the other questions surrounding Defendants' logs, that both the attorney-client privilege and work-product protection apply to all but five documents— particularly where, as explained above and in Point III *infra*, the vast majority of the documents

logged by Defendants do not identify either (i) an attorney as a participant in the communication,[9] or (ii) the litigation allegedly anticipated.[10]

Having now failed twice to provide a sufficient or credible privilege log, and having further produced documents (the cover emails and invoices) that never should have been withheld in the first place (and which were clearly described in a misleading way on the initial privilege log), there is at this point no reason to conclude that Defendants would satisfy their obligations, if asked to produce a third version of their log. Accordingly, Defendants should, respectfully, be ordered either to (a) immediately produce to Plaintiffs all of the documents appearing on their log,[11] or (b) alternatively, provide all of the documents on their log to the Court for *in camera* review.[12] Indeed, as explained further below, it appears that there is no basis for any claim of privilege or work-product protection.

---

[9] Excluding communications with Defendants' counsel in this action, which Plaintiffs explicitly did not request, only seven emails on Defendants' supplemental privilege log actually include attorneys with whom Fusion alleges to have had a confidential relationship. *See* Lewis Decl. Ex. 13 at PRIV0000012, PRIV0000072, PRIV0000137, PRIV0000402, PRIV0000404, PRIV0000405, PRIV0000426. Furthermore, Defendants list 130 emails and attachments that not only do not include any attorneys but were shared with third parties. *See, e.g.*, Lewis Decl. Ex. 13 at PRIV0000098-99, PRIV0000110-11, PRIV0000274-82; Lewis Decl. Ex. 14.

[10] Of the nearly 500 emails and attachments that Defendants claim are protected from disclosure by the work-product doctrine, Defendants only identify the litigation to which the document relates for five items. *See* Lewis Decl. Ex. 13 at PRIV0000001, PRIV0000002, PRIV0000004, PRIV0000012, PRIV0000013.

[11] *See In re Veiga*, 746 F. Supp. 2d 27, 40-42 (D.D.C. 2010) (motion to compel granted and respondent ordered to produce all 447 documents on third iteration of privilege log where privilege log and declaration failed to "establish any facts necessary to find the attorney-client privilege or work-product doctrine protect the sought-after documents." (citation omitted)); *Zelaya v. UNICCO Serv. Co.*, 682 F. Supp. 2d 28, 38 (D.D.C. 2010) (compelling production of documents where defendants failed to meet burden of proof "that the attorney-client privilege properly attaches").

[12] *Alexander v. FBI*, 192 F.R.D. 42, 46 (D.D.C. 2000) (where party "failed to sustain his burden with his privilege log and declarations, the court reviewed the documents *in camera* in order to determine whether the privilege was properly invoked"); *Alexander v. FBI*, 186 F.R.D. 102, 107 (D.D.C. 1998) (court ordered *in camera* inspection of documents for which privilege log descriptions fell "woefully short of what is required" to determine whether documents were properly withheld).

## POINT III

### THE DEFICIENCIES IN DEFENDANTS' LOG HIGHLIGHT THEIR IMPROPER CLAIMS OF PRIVILEGE AND INABILITY TO ASSERT WORK-PRODUCT PROTECTION

It is clear that Defendants are simply attempting to shield key documents from Plaintiffs. Save for PRIV00001-5, Defendants have sweepingly asserted that all of the documents appearing on the privilege log are both attorney-client privileged and work-product protected. *See* Lewis Decl., Ex. 13.  In other words, rather than carefully analyzing the documents to determine which of the two privileges may apply, Defendants "sloppily insist[ ] on both [and] fail[ ] to distinguish between them."  *See In re Kellogg Brown & Root, Inc.*, 796 F.3d 137, 149 (D.C. Cir. 2015).[13]  And in furtherance of this artifice, Defendants are utilizing identical, generic descriptions for their documents, claiming attorney-client privilege over documents that do not include lawyers (including several documents on which third parties are present), failing to include dates, authors, or recipients, and refusing to identify any actual or anticipated litigation that would justify their work-product claims.  The reason for these tactics is clear: Defendants cannot meet their burden.

### A.     The Attorney-Client Privilege Is Inapplicable

The attorney-client privilege "protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services."  *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997); *In re Sealed Case*, 676 F.2d 793, 809 (D.C. Cir. 1982) (the attorney-client privilege "covers only confidential communications between attorney and client, … communications that do not involve both attorney and client, are unprotected").  Here,

---

[13] At least one commentator has noted that haphazardly labeling documents protected by both the attorney-client and work-product privilege only serves to "annoy the judge and demonstrate that one has not thought with any care about what each covers."  1 EDNA SELAN EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE, 132 (5th ed. 2007).

Perkins Coie's clients were the DNC and HFACC.  There is no indication that Perkins Coie gave

any confidential information it learned from its clients to Defendants.  Accordingly, the attorney-

client privilege would not apply.  *See Tax Analysts*, 117 F.3d at 618 (attorney-client privilege

"protects confidential communications from clients to their attorneys" and "communications

from attorneys to their clients *if* the communications *rest on information obtained from the*

*client*") (emphasis added) (quotation omitted).

As shown in Exhibit 14, moreover, Defendants have marked as privileged 240 emails and

attachments that are internal Fusion communications and which include no attorneys.  None of

these documents are privileged as there is no claim that Defendants were helping Perkins Coie

understand information obtained from Perkins Coie's client, or even that Perkins Coie ever

conveyed confidential client communications to Defendants.  *See*, *e.g.*, *In re Kellogg Brown &*

*Root, Inc.*, 796 F.3d at 149 ("[M]aterials produced by an attorney's agent are attorney-client

privileged only to the extent they contain information obtained from the client including 'where

the purpose of the report was to put in usable form the information obtained from the client.'").

This is, of course, even more obvious with respect to the 132 documents on the privilege log on

which no attorneys appear and which were shared with third parties.  *See Tax Analysts*, 117 F.3d

at 618; *accord Climate Investigations Center v. U.S. Dep't of Energy*, 331 F. Supp. 3d 1, 19

(D.D.C. 2018) (attorney-client privilege protects only communications between attorney and

client, privilege does not apply to communications between client, attorney, and third party, even

if communications were intended to be kept confidential).

In any event, although Defendants may now claim that they were engaged to assist

Perkins Coie in providing "legal advice," in truth the work they were doing was plainly

opposition research for the 2016 election, something which is quintessentially "political" and not

"legal," and thus not privileged even *if* an attorney is included on the communication.  *See, e.g.,*
*Bean LLC v. Bank*, 291 F. Supp. 3d 34, 46 (D.D.C. 2018) (describing Fusion's work in 2016 as
"political in nature"); *Caparrós v. Lynch*, 2017 U.S. Dist. LEXIS 109041, at *23 (D.P.R. June
15, 2017) ("advice on political, strategic, or policy issues … would not be shielded from
disclosure by the attorney-client privilege") (citing *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir.
1998)).  Indeed, Defendant Simpson himself wrote that Defendants were retained for the purpose
of finding out "how Trump had managed to recover from a string of bankruptcies that should
have ruined him. Where did his money come from, how much did he really have, and who
helped him?"  GLENN SIMPSON AND PETER FRITSCH, CRIME IN PROGRESS, 57 (2019) (Lewis Decl.
Ex. 18) ("*Crime in Progress*"). [14]

In his declaration, counsel for Defendants unconvincingly attempts to spin Fusion's work
as providing support for Perkins Coie's legal services, but the nature of Fusion's work does not
support this argument.[15]  Defendants' counsel suggests only one concrete legal service that
Perkins Coie engaged Fusion to assist with, "confirm[ing] that there is an adequate factual basis

---

[14] In the same passage Defendants describe their work as "[p]olitical" and suggest that Perkins Coie
wanted Fusion to funnel all communications to Marc Elias, a partner at Perkins Coie, so that they could
claim privilege over all communications down the road.  *See id.*  However, it is axiomatic that not all
communications are privileged merely because an attorney was present.  *See, e.g., In re Sealed Case*, 737
F.2d 94, 98-99 (D.D.C. 1984) (laying out test for when communications between attorney and client are
privileged).

[15] An October 2017 letter from Perkins Coie's general counsel to then-counsel for Fusion, makes it further
clear that Defendants' purpose in engaging with Perkins Coie was to continue conducting the same
political opposition research on President Trump that Fusion had been performing for other non-attorney
clients for at least a year before.  The letter identified Perkins Coie as a "client" of Fusion and authorized
Fusion's counsel to disclose that in March 2016, Fusion approached Perkins Coie and "expressed interest
in an engagement with [Perkins Coie] in connection with the 2016 presidential election to continue
research regarding then-Presidential candidate Donald Trump, research that Fusion GPS had conducted
for one or more other clients during the Republican primary contest."  Lewis Decl., Ex. 1 at 1.  Both
Simpson's and Perkins Coie's description of Defendants' work are consistent with this Court's prior
statement that Fusion's work was "political in nature" and unrelated to the provision of legal services.

for any claims or allegations, so that their client does not run the risk of civil litigation," for example in a defamation case.  Lewis Decl. Ex. 16 ¶ 5.  However, Defendants were not helping Perkins Coie analyze the legal risk of independent claims being made by the Clinton campaign. Rather, Defendants were assisting in confirming there was an adequate factual basis *for their own research*—from the beginning, Fusion was providing political opposition research and suggesting *new* angles with which to attack candidate Trump.[16]  *See* Lewis Decl. Ex. 16 ¶¶ 6, 8. As such, Defendants' attempts to claim attorney-client privilege over all communications with Perkins Coie as well as internal Fusion communications and communications between Fusion and third parties that may relate[17] to Fusion's work for Perkins Coie cannot stand.

In letters to Plaintiffs' counsel, Defendants have attempted to rely on *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961) to suggest their documents are privileged.  However, *Kovel* re-iterates that in determining whether a communication is privileged "[w]hat is vital … is that the communication be made in confidence *for the purpose of obtaining legal advice from the lawyer*," and if no legal advice is sought "no privilege exists."  *Id.* at 922 (emphasis added). Thus, although courts have protected communications with third parties where the third party has "put in usable form information obtained *from the client*," *see Federal Trade Comm'n*, 628 F.2d at 207, 212, such communications are not privileged where the third party is obtained to gather facts from other third parties, *see Durling v. Papa John's Int'l, Inc.*, 2018 U.S. Dist. LEXIS

---

[16] *See Crime in Progress* at 59.  At the initial meeting with Elias, Defendant Simpson and Peter Fritsch summarized their research on Donald Trump's ties to Russia and "[t]his angle was all new to Elias, and he loved it.  The research book the DNC had put together on Trump, [Elias] said, contained none of this stuff.  Fusion's research team would soon be hired *and given wide latitude to go where the story led it.*" *Id.* (emphasis added).

[17] In the absence of a proper privilege log, it is difficult to make a determination as to why Defendants are claiming attorney-client privilege over internal communications at Fusion and communications with third parties.

18

11584, at *10 (S.D.N.Y. Jan. 24, 2018) ("[W]here an attorney seeks out a third party in order to obtain information that his client does not have, the third party's role is not as a translator or interpreter of client communications, and the principle of *Kovel* does not shield his discussions with the attorney.") (internal quotation marks, citations, and alterations omitted).

Here, Defendants were engaged by Perkins Coie to conduct political opposition research. There is no claim that Perkins Coie ever communicated any confidential information it had obtained from its clients to Defendants. Instead, Defendants were tasked with independently gathering facts from third parties and conveying those facts to Perkins Coie. Accordingly, Defendants' documents and communications with Perkins Coie are not protected by the attorney-client privilege.

Even assuming that Defendants credibly could claim the attorney-client privilege over some of the documents—which they cannot—the privilege has been waived through Defendants' repeated disclosures of the contents of those documents to third parties. Defendant Simpson briefed journalists, including from *The New York Times*, *ABC*, and *The Washington Post*, on the contents of the Dossier in September 2016; and he provided copies of the Dossier to *Mother Jones* journalist David Corn on October 30, 2016, to researcher David Kramer a few days later, and to journalists at *The New York Times* on December 15, 2016. *See Crime in Progress* at 109–10, 113, 118, 127–31, 139–41. Simpson, moreover, published information on these disclosures and Fusion's investigatory process in a bestselling tell-all, *Crime in Progress*, which appears to reveal the contents of Fusion's work for Perkins Coie. Defendants cannot now self-servingly assert that these same documents are privileged after they themselves have put them into the public sphere for the purpose of turning profit.

19

Defendants' waiver of any protections afforded by the attorney-client privilege extends beyond the materials that they previously have disclosed and encompasses "all other communications relating to the same subject matter." *SEC v. Brown*, 2010 U.S. Dist. LEXIS 162854, at *6 (D.D.C. Sept. 29, 2010); *accord, e.g.*, *Banneker Ventures, LLC v. Graham*, 253 F. Supp. 3d 64, 74 (D.D.C. 2017) ("[W]aiver of the attorney-client privilege for a document is not confined to that document alone, but extends to all other documents involving the same subject matter as well.") (internal quotations and citation omitted).  Under this standard, Defendants have waived the attorney-client privilege as to all documents included in their privilege log.  For this reason, too, the Court should order Defendants to produce documents withheld on the basis of the attorney-client privilege.

**B.**  **The Work-Product Privilege Is Also Inapplicable**

Federal Rule 26(b)(3) protects from disclosure "documents and tangible things that are prepared in anticipation of litigation or for trial."  In this context, "in anticipation" means "after initiation of the proceeding or such earlier time as the party who normally would initiate the proceeding had tentatively formulated a claim, demand or charge." *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 268 F.R.D. 114, 117-18 (D.D.C. 2012) (citing guidelines by Special Masters).  The proponent of the privilege must establish the "date when the claim, demand or charge was tentatively formulated." *Id.*  When the material was prepared by a potential defendant, that person must establish "the date when he received a demand or warning of charges or information from an outside source that a claim, demand or charge was in prospect." *Id.*

To determine whether a particular document was actually prepared in anticipation of litigation, this Circuit applies the "because of" test, asking "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to

have been prepared or obtained because of the prospect of litigation." *EEOC v. Lutheran Social Servs.*, 186 F.3d 959, 968 (D.C. Cir. 1999) (internal quotation marks and citation omitted).  If the same or essentially similar documents would have been created whether or not litigation was foreseen, "'it [cannot] fairly be said that they were created 'because of' actual or impending litigation.'"  *Willingham v. Ashcroft*, 228 F.R.D. 1, 4 (D.D.C. 2005).

Here, Defendants have not identified any specific litigation that was then-ongoing or purportedly "anticipated."  Rather Defendants' (most recent) justification for their work-product claims is that they were assisting Perkins Coie in "performing legal review of public communications to confirm that there is an adequate factual basis for any claims or allegations, so their client does not run the risk of civil litigation—including, for example, libel, defamation, or other claims implicating the accuracy of public information," and that the "potential" for such litigation was anticipated.  Lewis Decl. Ex. 16 ¶ 5.  This is plainly insufficient to sustain Defendants' burden.[18]

First, Defendants were not assisting Perkins Coie in conducting a legal review of public communications for their client that were compiled by a third party; rather, the legal review Defendants reference was of public communications *created by Defendants*.[19]   *See* Lewis Decl. Ex. 16 ¶ 8.  Effectively, Defendants are taking the position that whenever a political candidate engages a consultant to conduct opposition research, that research is privileged because any errors in the research exposes the political candidate to libel or defamation claims.  This is not

---

[18] In the event that the Court provides Defendants another opportunity to meet their burden, and Defendants are somehow able to do so, Plaintiffs reserve the right to demonstrate that Plaintiffs' substantial need for these documents merits their disclosure.  *See Upjohn Co. v. U.S.*, 449 U.S. 383, 400 (1981) (work product may be disclosed "upon a showing of substantial need and inability to obtain the equivalent without undue hardship").

[19] As mentioned above, Defendant Simpson explained that Fusion was not hired to research and support claims that the Clinton Campaign was making, it was hired to conduct research on new claims that could be made about Donald Trump.  *See supra* ns. 15, 16.

the standard.  It is not enough that if Defendants were incorrect in *their* research litigation *might* occur, but rather the research must have been conducted *because of* the prospect of imminent litigation independent of a hypothetical error on Defendants' part.  *See EEOC*, 186 F.3d at 968.

Second, Defendants' own shifting theories confirm that they cannot even articulate a cogent and viable theory of work-product protection.  Previously, Defendants characterized their engagement by Perkins Coie as having been "to provide consulting services in support of Perkins Coie's rendering of legal advice to its clients, including with respect to actual and potential litigation."  Lewis Decl. Ex. 5 at 28 (Ans. Interr. No. 11).  If litigation were truly anticipated at the time the documents were created, then Defendants would not have struggled so mightily (as they have) to identify that anticipated litigation.  And, tellingly, they have now shifted to their new theory of litigation-risk-avoidance only after having been pressed on that point by Plaintiffs. Nevertheless, an amorphous need for consulting services related to a potential litigation "down the road" (*see Crime in Progress* at 57) is insufficient to sustain a claim of work-product privilege.  *See, e.g., Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 547, 553 (S.D.N.Y. 2013) ("While legal risks may ripen into litigation, not all risk management qualifies as anticipation of litigation. Generalized steps to avoid non-specific litigation are not accorded work product protection.").  Defendants simply cannot establish—as they must—the date on which Perkins Coie's clients received a demand or warning that a claim was in prospect—because no such demand was ever received.[20]  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 268 F.R.D. at 117-118.  In truth, Fusion's work was simply not created "because of" impending litigation; Fusion was retained to provide political research services in aid of a political campaign.  *Bean*,

---

[20] Defendants cannot point to the instant litigation as the anticipated litigation since more than eighty percent of the documents on their privilege log pre-date their retention of litigation counsel and thus could not have been prepared in anticipation of this litigation against them.

291 F. Supp. 3d at 34, 46 (Fusion was retained to "conduct political opposition research" and describing their work as "political in nature".).

Finally, Defendants' work-product theory is ultimately belied by their previous admission in response to Plaintiffs' interrogatories that they returned or destroyed documents at the conclusion of their engagement with Perkins Coie.  Either that or their destruction of documents is potentially sanctionable.  In other words, if work-product protection applies, it is because litigation was anticipated.  But if litigation was anticipated, Defendants had a duty to preserve, not destroy, their documents.  *See Sinai v. State Univ. of N.Y. at Farmingdale*, 2010 U.S. Dist. LEXIS 82562, at *16-17 (E.D.N.Y. Aug. 10, 2010) (agreeing that if litigation "was reasonably foreseeable for work product purposes, … it was reasonably foreseeable for duty to preserve purposes").  Defendants cannot have it both ways.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court order Defendants to produce the withheld documents or, in the alternative, conduct an *in camera* review of the documents to assess Defendants' privilege claims.

Dated: August 14, 2020
New York, New York

CARTER LEDYARD & MILBURN LLP

By: _____*/s/ Alan S. Lewis*_____
Alan S. Lewis
2 Wall Street
New York, NY 10005
(917) 533-2524

Kim Sperduto
SPERDUTO THOMPSON & GASSLER PLC
1747 Pennsylvania Ave., NW, Suite 1250
Washington, DC 20006
(202) 408-8900

*Attorneys for Plaintiffs*