## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MIKHAIL FRIDMAN, PETR AVEN, and GERMAN KHAN, <br><br>          Plaintiffs, <br><br>     v. <br><br> BEAN LLC (a/k/a FUSION GPS) and GLENN SIMPSON, <br><br>          Defendants, | Case No. 1:17-cv-02041-RJL |

## <u>DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL</u>

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...............................................................................................1

II.  BACKGROUND ................................................................................................3

    A.  Factual History.......................................................................................3
    B.  Procedural History .................................................................................4

III.  LEGAL STANDARD ........................................................................................7

IV.  ARGUMENT .....................................................................................................7

    A.  The Withheld Documents Are Protected by the Work-Product Doctrine. .............7
        1.  The Documents at Issue Were Prepared in Anticipation of
            Litigation.................................................................................8
        2.  Plaintiffs' Objections Misstate Both the Scope of Work-Product
            Protection and the Nature of Defendants' Work.........................11
    B.  The Withheld Documents Are Protected by the Attorney-Client Privilege. .........14
        1.  Defendants Were Engaged to Assist Perkins in Its Provision of
            Legal Advice............................................................................17
        2.  Fusion's Communications Furthered Confidential Client Requests
            for Legal Advice and Are Therefore Privileged. ........................18
        3.  Communications with Non-Lawyers Are Still Privileged. ........19
        4.  There Has Been No Waiver. .....................................................20
    C.  The Privilege Logs Are Not Deficient, and Plaintiffs' Motion Confirms
    Plaintiffs Have Enough Information to Assess Defendants' Privilege
    Claims. ..................................................................................................21
        1.  The Logs and Accompanying Declaration Are Sufficient to Enable
            Plaintiffs to Assess Defendants' Privilege Claims....................21
        2.  The Purported Technical Deficiencies Do Not Prevent Plaintiffs
            from Assessing the Claims Asserted.........................................23

V.  CONCLUSION..................................................................................................26

## I.      INTRODUCTION

Plaintiffs Mikhail Fridman, Petr Aven, and German Khan seek to compel the production of documents prepared in connection with research work conducted by Bean LLC d/b/a Fusion GPS ("Fusion") and one of its founders, Glenn Simpson (collectively, "Defendants"), on behalf of a law firm, Perkins Coie LLP ("Perkins"), in connection with Perkins's representation of the Democratic National Committee ("DNC") and the campaign of former U.S. Secretary of State Hillary Clinton ("HFACC") during the 2016 presidential election cycle.  Plaintiffs' arguments for the disclosure of information developed for and at the direction of a law firm seek to disturb the core of the attorney-client relationship.  And because Perkins retained Fusion for the *express purpose* of assisting the law firm with the provision of legal advice to its clients on how to proceed in the face of a known and well-established risk of litigation, Plaintiffs' objections implicate material squarely protected by the attorney work-product doctrine.  On both scores, Plaintiffs' position is contrary to bedrock privilege rules and must be rejected.

Plaintiffs do not contest that HFACC and the DNC retained Perkins to provide them with legal advice.  Nor do they dispute that there was a very real risk of litigation—evidenced by numerous lawsuits (including this one)—emerging from allegations that surfaced during the campaign.  Instead, Plaintiffs try to draw a false distinction between Perkins's legal representation, on the one hand, and Defendants' research, on the other—even though that research formed a necessary component of Perkins's legal advice to its clients.  Plaintiffs' remarkable position—that documents generated by a law firm's investigator to enable that firm's representation of its clients should not be entitled to *any* protection—directly contravenes the governing law.  Documents prepared in anticipation of litigation are work product, whether authored by an attorney or not. *See United States v. Nobles*, 422 U.S. 225, 238–39 (1975).  And the attorney-client privilege extends to third parties who, like Defendants, are hired by law firms to facilitate "the effective

1

consultation between the client and the lawyer." *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961).  As the Supreme Court has emphasized, "[p]roper preparation of a client's case demands that [an attorney] assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." *Hickman v. Taylor*, 329 U.S. 495, 511 (1947).  Perkins retained Defendants to precisely those ends:  to assemble information, sort relevant from irrelevant facts, and facilitate the firm's advice to its clients on how to proceed in the face of serious litigation risks.  Plaintiffs' motion is an attempted end run around this essential protection, targeting agents of a law firm to obtain information that would not be available from the attorneys themselves.  Should Plaintiffs succeed, their tortured interpretations will reverberate beyond this lawsuit and frustrate attorney-client relationships and attendant protections in this District and beyond.

But it is even worse than that.  Plaintiffs' motion also represents an obvious effort to distract from Plaintiffs' own failure to comply with even their most basic discovery obligations.  Plaintiffs are three of Russia's wealthiest and most globally prominent oligarchs, whose business and political activities have attracted substantial international press and public scrutiny for decades. Plaintiffs are suing Defendants for defamation based on an investigative report that was prepared by a Fusion subcontractor during the course of Fusion's work on behalf of Perkins and subsequently published by certain media outlets.  Despite the fact that Plaintiffs' own communications are critical to the issues that they have made relevant by filing this lawsuit, Plaintiffs have produced less than 1% of their emails and have refused to review or produce any of the documents from the companies they control, despite putting those companies at the heart of this litigation.  Plaintiffs have also refused altogether to produce documents concerning their historic, 20-plus-year relationship with the Kremlin, even as Plaintiffs claim to have been defamed

by statements about that very relationship. Plaintiffs' recalcitrance stands in stark contrast to Defendants' compliance with Rule 34. Defendants have reviewed personal and company materials and produced hundreds of responsive documents. And the only documents Defendants have excluded from production—on the basis of the attorney-client privilege and attorney work-product doctrine—are properly included in a privilege log as discussed in Section IV(C) below.

Plaintiffs have attempted to manufacture a false equivalency between Plaintiffs' own discovery failures and Defendants' legitimate withholding of privileged work product. Defendants have merely done what they are obligated to do—preserve client privileges. This Court should reject Plaintiffs' efforts to manipulate the facts and distort the law.

## II.      BACKGROUND

### A.      Factual History

Plaintiffs are the founders and beneficial owners of Alfa Group Consortium ("Alfa"), one of Russia's largest privately owned investment groups. An investigative report referred to as Company Intelligence Report 2016/112 ("CIR 112") summarized Plaintiffs' and Alfa's relationship with Vladimir Putin and the Kremlin spanning more than 20 years. After *Buzzfeed* published CIR 112, Plaintiffs filed this lawsuit, claiming that various statements in the report "defamed the Plaintiffs and Alfa." Am. Compl. ¶ 33.

Throughout the 2016 U.S. Presidential Campaign, Perkins represented both HFACC and the DNC in connection with a broad scope of legal issues, including potential litigation risks. This included reviewing potential public statements by candidate Clinton, members of the campaign, or others, and advising them on whether those statements might create a risk of defamation litigation. In order to facilitate this work, Perkins retained numerous investigators and agencies to review and report on the factual moorings of those statements and other allegations circulating in the public sphere about which its clients might comment.

It was to facilitate this work that, in the spring of 2016, Perkins engaged Defendants to assist in its legal representation of the DNC and HFACC.  Specifically, Perkins retained Fusion to research and analyze information that, in turn, informed Perkins's advice to its clients concerning litigation risks—including exposure to potential defamation claims—stemming from statements made or to be made in connection with the 2016 election cycle.  *See* Lewis Decl. Ex. 16 ("Levy Decl."), ¶ 6.  Defendants, in turn, hired subcontractors to assist with compiling and assessing relevant public records and other information.  *Id.*

### B.  Procedural History

Since discovery opened in this case, the parties have exchanged document requests and responses, and produced documents. *See* Dkt. 95-2, Lewis Decl., Exs. 2 & 3; Dkt. 78-4, Defs.' Reqs. for Prod. of Docs.; Dkt. 78-5, Pls.' Resps. to Doc. Reqs. & Pls.' Suppl. Resps. to Doc. Reqs.

Plaintiffs' May 4, 2020 production was deficient in two key respects.  First, Plaintiffs produced virtually no personal emails and falsely claimed they lack control over documents at the companies they co-founded and own.  Plaintiff Petr Aven produced personal emails only from 2016 and 2017, and all of them appear to be Russian news blasts.  Plaintiff Mikhail Fridman produced a handful of personal of emails, and none from before March 2015.  Plaintiff German Khan apparently has *no* personal emails at all.  Dkt. 78-10, Ltr. from J. Levy to A. Lewis (Apr. 16, 2020).  Plaintiffs Fridman and Aven, for a ten-year period, have collectively reviewed fewer than 10,000 emails total.  Dkt. 78-11, Ltr. from A. Lewis to J. Levy (April 24, 2020).  Plaintiffs produced less than 1% of those emails.  And Plaintiffs' counsel represented that a significant balance of additional materials—including any and all hard-copy documents, emails sent from an Alfa or LetterOne email address, text messages or other communications on messaging apps, electronic documents, calendars, and communications written on their behalf by personal assistants—are in Alfa's exclusive possession, custody, or control, and that Plaintiffs, despite their

4

ownership roles with respect to those entities, cannot access the documents.  *See* Dkt. 78-10, Ltr. from J. Levy to A. Lewis (Apr. 16, 2020).  Defendants moved to compel Plaintiffs' production of the Alfa documents, *see* Dkt. 78, and that motion is fully briefed and pending before the Court.

Second, Plaintiffs have narrowly maintained that only documents related to a single year—2016—are relevant to this case, despite the fact that events across a broader period of time bear directly on both Plaintiffs' status as public figures and the truth of challenged statements about the "history" of Plaintiffs' long-standing relationship with Vladimir Putin and the Kremlin. Defendants therefore moved to compel production of those documents as well.  *See* Dkt. 94.

By contrast, Defendants have carefully met their Rule 34 party discovery obligations. Before the production deadline, Defendants shared with Plaintiffs the list of search terms Defendants used to review documents, which included search terms proposed by Plaintiffs.  The search terms proposed by Plaintiffs that Defendants did not incorporate were either duplicative of other search terms or overly broad.  On May 4, 2020, Defendants produced over 700 documents comprising more than 11,000 pages.  Plaintiffs, in response, asked Defendants to run additional searches for documents using various terms of Plaintiffs' own invention.  As a courtesy, Defendants complied, and promptly completed a supplemental review and production on June 11, 2020.  And on May 18, 2020, Defendants timely served a privilege log identifying responsive documents excluded from production on attorney-client privilege and attorney work-product grounds.  *See* Lewis Decl. ¶ 10 & Ex. 7.[1]

---

[1] Desperate to find fault in Defendants' production, Plaintiffs try to make a mountain out of a molehill regarding the so-called "Bangor" documents—contending that Defendants simply "refused to search for and produce responsive documents that include the term 'Bangor.'"  Pls.' Br. at 3 n.2.  Plaintiffs are flat wrong.  Well before the May 4, 2020 deadline for party discovery, Defendants ran a query for "Bangor"—as a stand-alone term—that yielded a disproportionate number of false (*i.e.*, irrelevant) documents.  Defendants therefore tailored their inquiry to search for documents containing the combination of terms "Bangor AND Russia."  Defendants

The privilege log describes each withheld document in order to facilitate Plaintiffs' assessment of the claimed privileges. As stated, the documents reflect confidential research and analysis that Defendants performed at the overall direction and on behalf of Perkins regarding potential connections between then-candidate Trump and Plaintiffs and/or Alfa, and related confidential communications. Defendants prepared those documents for the purpose and in furtherance of Perkins's advice to the DNC and HFACC concerning, among other things, defamation litigation risks facing those clients and/or other individuals and entities during the 2016 election cycle. Levy Decl., ¶¶ 5–6.

The parties worked together for months to narrow and resolve their discovery disputes.[2] Defendants explained why the document descriptions in their privilege log were legally sufficient, provided additional information regarding the anticipated litigation animating their assertion of work-product protection, and, in the spirit of cooperation, agreed to provide a revised log with further detail. *See* Lewis Decl., Ex. 9, Ltr. from J. Levy to A. Lewis (June 10, 2020), at 1–3. Throughout this process, Defendants took pains to accommodate Plaintiffs' requests while avoiding any disclosure that would itself risk a privilege waiver. Defendants subsequently produced several previously logged invoices in redacted form, *see* Lewis Decl., Exs. 12 & 15,

---

transparently explained that process to Plaintiffs on April 29, 2020, in providing a list of their search terms that included, among others, "Bangor AND Russia." On May 4 and May 18, 2020, Defendants produced documents and a privilege log containing responsive documents from the "Bangor AND Russia" search. Afterwards, Plaintiffs asked Defendants (again) to search more broadly for any and all documents mentioning "Bangor." Despite their prior efforts, Defendants agreed to comply in good faith and to avoid a needless discovery dispute. As expected, having already conducted a thorough search for responsive documents (using the "Bangor AND Russia" terms along with over two dozen other search strings catalogued in the list Defendants provided to Plaintiffs), Defendants did not locate additional responsive documents—privileged or otherwise.

[2] *See* Dkts. 78-7–78-18, Meet and Confer Correspondence; *see also* Lewis Decl., Ex. 10, Ltr. from A. Lewis to J. Levy (June 25, 2020) ("June 25 Letter"); *id.*, Ex. 11, Ltr. from A. Lewis to J. Levy (July 22, 2020); *id.* Ex. 12, Ltr. from J. Levy to A. Lewis (July 28, 2020).

along with a revised log and a declaration from Defendants' counsel further explaining the grounds for the privileges invoked, Lewis Decl., Exs. 13 & 16.

Despite Defendants' extensive efforts to substantiate their well-founded privilege claims, Plaintiffs continue to accuse Defendants of improperly refusing to produce documents without justification. Those accusations are baseless. Defendants have appropriately withheld privileged documents in accordance with their obligations under the engagement. And—as Plaintiffs' motion to compel itself confirms—Defendants have supplied the information necessary for Plaintiffs (and the Court) to assess the bases for Defendants' privilege invocations, without risking waiver.

## III.   LEGAL STANDARD

A party seeking to compel production under Federal Rule of Civil Procedure 37 "has the burden of proving that the opposing party's answers were incomplete." *Equal Rights Ctr. v. Post Props., Inc.*, 246 F.R.D. 29, 32 (D.D.C. 2007). Where a party withholds documents on privilege grounds, that party bears the burden of establishing that the relevant protection applies. *See Elkins v. Dist. of Columbia*, 250 F.R.D. 20, 24, 26 (D.D.C. 2008). In carrying its burden, the asserting party can rely on "declarations or other competent evidence addressing or relating to specific documents which, together with the content of the documents and the other information supplied, [are] sufficient to demonstrate that the privilege or protection is applicable." *In re Domestic Airline Travel Antitrust Litig.*, No. 15-MC-1404, 2020 WL 3496748, at *4 (D.D.C. Feb. 25, 2020).

## IV.   ARGUMENT

### A.   The Withheld Documents Are Protected by the Work-Product Doctrine.

Plaintiffs' entire motion proceeds from a fundamental misrepresentation of Defendants' role as Perkins's agent. Perkins expressly retained Defendants in furtherance of its undisputed legal representation of HFACC and the DNC—relying on Defendants' investigative expertise to ensure that its clients had an "adequate factual basis for any claims or allegations" made during

the campaign.  Levy Decl., ¶ 6.  Such expertise was critical for Perkins to address the anticipated "risk of civil litigation—including, for example, libel, defamation, or other claims implicating the accuracy of public information."  *Id.*  Stated simply, Perkins and its clients foresaw the risk that public allegations raised during the intensely contested presidential campaign could—and ultimately did—lead to litigation.  *See infra* at 10.  To advise its clients appropriately, Perkins needed to understand the import of those allegations and so retained Defendants to conduct targeted research and analysis.  Documents generated in furtherance of that engagement fall within the heart of the work-product doctrine, and Plaintiffs' effort to undermine that protection is unfounded.[3]

## 1.    The Documents at Issue Were Prepared in Anticipation of Litigation

The work-product doctrine shields from discovery "documents and tangible things that are prepared in anticipation of litigation or for trial by or for [a] party or its representative."  Fed. R. Civ. P. 26(b)(3)(A).  The doctrine is an "intensely practical one," *Nobles*, 422 U.S. at 238, which the D.C. Circuit has cautioned must be "interpreted broadly and held largely inviolate," *Jud. Watch, Inc. v. Dep't of Justice*, 432 F.3d 366, 369 (D.C. Cir. 2005).  Consistent with that broad scope, the Supreme Court has long held that work-product protection extends beyond lawyers to "material prepared by agents for the attorney"—such as Defendants—as "attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial."  *Nobles*, 422 U.S. at 238–39; *see also FTC v. Boehringer Ingelheim Pharm., Inc.*, 778 F.3d 142, 155 n.3 (D.C. Cir. 2015) (noting that amendments to the Federal Rules "abolished the distinction between factual materials prepared by counsel and those prepared by non-attorneys").

---

[3] Plaintiffs expressly decline to press their claim that they have a "substantial need" for the documents at issue, Pls.' Br. at 21, and so Defendants do not address that point here.

Whether a document constitutes work product turns on "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010) (internal quotation marks and citation omitted).  Under that standard, the party that "prepared the document must have possessed 'a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable.'" *Campbell v. U.S. Dep't of Justice*, 133 F. Supp. 3d 58, 67 (D.D.C. 2015) (Leon, J.) (quoting *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998)); *see also Nat'l Ass'n of Crim. Def. Lawyers v. Exec. Office for U.S. Attorneys*, 844 F.3d 246, 251 (D.C. Cir. 2016) (same).  "[L]itigation need not be imminent or certain" in order to be anticipated; instead, it must only be "fairly foreseeable at the time the materials were prepared," and documents designed to "discern the likelihood and magnitude of [] future [] liability" are work product, irrespective of whether the contemplated claim is then pending.  *United States v. All Assets Held at Bank Julius Baer & Co.*, 315 F.R.D. 103, 109, 111 (D.D.C. 2016) (internal quotation marks and citation omitted).

The work-product doctrine clearly protects the documents at issue here.  Defendants were retained in direct response to Perkins's subjectively held and objectively reasonable concern that statements made during the 2016 election campaign might result in defamation litigation.  As Defendants explained in a sworn declaration substantiating their privilege invocations, at the time Perkins secured Defendants' services, Perkins "anticipated the potential for [libel, defamation, or other claims implicating the accuracy of public information] in connection with its representation of the DNC and HFACC" and retained Defendants "to facilitate and provide information

necessary" to inform Perkins's "legal advice . . . concerning [those] potential litigation risks."[4] Levy Decl., ¶¶ 5–6.

Perkins's concerns were well founded.  Recent years have seen numerous high-profile defamation suits and similar litigation stemming from allegations made during political campaigns at all levels.[5]  *See, e.g.*, Kate Irby, *Can Devin Nunes Sue California Publisher in Virginia? Judge Wants to Know More from McClatchy*, THE FRESNO BEE (Feb. 12, 2020), https://tinyurl.com/y6kzv4q7; Kim Chandler, *Roy Moore Defamation Lawsuit against Accusers Is Paused*, ABC NEWS (Aug. 16, 2019), https://tinyurl.com/y628e39f; John Nickerson, *Stamford Judge to Decide Norwalk Free Speech Suit*, ASSOC. PRESS (Feb. 16, 2019), https://tinyurl.com/yxnc52y5.  And, as Perkins anticipated, that litigation risk was particularly sharp during the 2016 presidential campaign, in which then-candidate Trump's reputation for litigiousness was both well-known and on display to his opponents.  *See, e.g.*, Nick Penzenstadler & Susan Page, *Exclusive: Trump's 3,500 Lawsuits Unprecedented for a Presidential Nominee*, USA TODAY (June 1, 2016), https://tinyurl.com/y46evk32 (describing volume of lawsuits filed by Mr. Trump for, *inter alia*, personal defamation, including "at least 70 cases" filed since campaign launch); *see also*, Katie Reilly, *Donald Trump Says He Will Sue Sexual Misconduct Accusers.  Law Experts Have Doubts.*, TIME MAGAZINE (Oct. 22, 2016), https://tinyurl.com/y2laeco2; Jeremy Diamond, *Trump Threatens to Sue over Attack Ad*, CNN (Oct. 5, 2016), https://tinyurl.com/y6ptz6k8.  Facing this clear and present threat of litigation targeting campaign

---

[4] Defendants' April 1, 2016 engagement letter with Perkins is included in the Privilege Log.

[5] The allegations at issue in this case have also been the subject of other (now-dismissed) lawsuits. *See* Josh Gerstein, *Judge Tosses Another Carter Page Suit against DNC over Dossier*, POLITICO (Aug. 17, 2020), https://tinyurl.com/y68rkflf.  The D.C. Circuit has considered that a party's "fear of litigation was eventually confirmed" by later litigation in assessing objective reasonableness. *EEOC v. Lutheran Soc. Servs.*, 186 F.3d 959, 969 (D.C. Cir. 1999).

speech, Perkins's concern over the prospect of defamation litigation—in which truth and the absence of actual malice would be central issues[6]—was more than reasonable.  And the documents Defendants generated in anticipation of those potential claims are protected work product.

### 2.   Plaintiffs' Objections Misstate Both the Scope of Work-Product Protection and the Nature of Defendants' Work.

Plaintiffs do not actually contest the risk of litigation foreseen by Perkins.  Nor could they, given their own decision to bring a suit of precisely the type Perkins anticipated.[7]  Instead, Plaintiffs argue that because the DNC and HFACC had not already been sued at the time Fusion was hired, and because Defendants' work purportedly *also* served the political objectives of Perkins's clients and was therefore not prepared *solely* in anticipation of litigation, the work product Fusion generated is somehow stripped of protection.  Plaintiffs are wrong on both the facts and the law.

First, the D.C. Circuit has explicitly rejected Plaintiffs' contention that Defendants must establish a particular "date on which Perkins Coie's clients received a demand or warning that a claim was in prospect" in order for work-product protection to apply.  Pls.' Br. at 22.  Contrary to Plaintiffs' position, the D.C. Circuit has "long held that there is no general, overarching requirement that a [] document can fall within the work-product privilege only if prepared in

---

[6] "[S]ubstantial truth is a defense to defamation."  *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 318 (D.C. Cir. 1994).

[7] The fact that the litigation which eventually emerged targeted other defendants and other actors, and not only the DNC or HFACC, is irrelevant for purposes of assessing whether work-product protection applies.  *See Bank Julius Baer*, 315 F.R.D. at 111 n.3 ("[T]he question has never been whether the document was prepared in anticipation of the *instant* litigation, only whether it was prepared in anticipation of *any* litigation." (emphasis in original)).

anticipation of litigating a specific claim."[8]  *Nat'l Ass'n of Crim. Def. Lawyers*, 844 F.3d at 253. Indeed, "[i]t is often prior to the emergence of specific claims that lawyers are best equipped either to help clients avoid litigation or to strengthen available defenses should litigation occur"—and imposing the "specific claim" requirement Plaintiffs advocate would therefore "severely limit[] [attorneys'] ability to advise clients effectively."  *In re Sealed Case*, 146 F.3d at 886.  That reasoning applies with particular force here: In responding to a perceived risk of defamation litigation, it is vital that work product concerning the accuracy of allegations present a candid picture.  Plaintiffs' effort to probe that work product would discourage candor and undermine the protections at the privilege's core.  *See id.* at 886–87 ("Discouraging lawyers from engaging in the writing, note-taking, and communications so critical to effective legal thinking would, in *Hickman*'s words . . . [,] 'demoralize' the legal profession, [and] 'the interests of the clients and the cause of justice would be poorly served.'" (citation omitted)).[9]

Against that well-defined backdrop, Plaintiffs' brief cites extensively to *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 268 F.R.D. 114 (D.D.C. 2010), for the proposition that a work product claimant must establish the date of the claim, demand, or charge against them.  *See* Pls.'

---

[8] The "specific claim" standard is employed only in cases of "active investigations of potential wrongdoing" by government investigators.  *See Shapiro v. U.S. Dep't of Justice*, 969 F. Supp. 2d 18, 30 (D.D.C. 2013) (citing *In re Sealed Case*, 146 F.3d at 885).

[9] In a last-ditch effort to salvage their argument, Plaintiffs contend that Defendants' routine practice of destroying documents following an engagement—here, after the conclusion of the 2016 election—demonstrates that no litigation was *ever* contemplated.  Pls.' Br. at 23.  In support, they cite an unpublished, out-of-district decision evaluating a spoliation motion in light of properly invoked work-product protection.  *See Sinai v. State Univ. of N.Y. at Farmingdale*, 2010 WL 3170664, at *5 (E.D.N.Y. Aug. 10, 2010).  Even if Plaintiffs had proven spoliation—and they have not, *see, e.g.*, *Mannina v. Dist. of Columbia*, 437 F. Supp. 3d 1, 6 (D.D.C. 2020) (noting that spoliation requires a showing of a "culpable state of mind")—that fact would be irrelevant. Defendants are not aware of a single case in this District or elsewhere treating a party's preservation of documents as a factor, let alone a dispositive factor, in evaluating whether those same documents were susceptible to work-product protection.

Br. at 20, 22.  Plaintiffs conspicuously neglect to mention that the language they rely on comes from a 1979 special masters' privilege guideline that the *Rail Freight* decision examined for an entirely different issue and then *declined to follow as non-precedential*.  *Rail Freight Fuel Surcharge*, 268 F.R.D. at 118 ("More to the point, guidelines by Special Masters . . . are not controlling precedent.").

Second, the assertion that Defendants' research advanced purported non-litigation interests, even if taken as true, in no way forecloses application of the work-product doctrine. According to Plaintiffs, Defendants' analysis generated "opposition research" to be used against the DNC's and HFACC's political opponents.  That assertion rests primarily on Plaintiffs' own unadorned say-so.  *See* Pls.' Br. at 4.  Plaintiffs do not, and cannot, cite to any examples of the DNC or HFACC distributing or referencing Fusion materials in their own public communications, demonstrating that the primary use of their work was *not* as traditional opposition research. Regardless, it is a settled principle that "material generated in anticipation of litigation may also be used for ordinary business purposes without losing its protected status."  *Deloitte*, 610 F.3d at 138.  Defendants have offered ample evidence that Perkins and its clients were genuinely and reasonably concerned about potential litigation arising from public statements and therefore relied on Defendants to assess the factual basis for any such statements.  Thus, "[e]ven if accurate," Plaintiffs' speculative "recharacterization of [Perkins's] motivation" for retaining Defendants misses the point, as it "does nothing to undermine [Defendants'] contention that [they] genuinely feared litigation."  *Lutheran Soc. Servs.*, 186 F.3d at 968–69.  In any event, Plaintiffs' conjecture that Defendants' work was created *solely* as political opposition research is not only unsupported but—in light of the fact that the DNC and HFACC are not alleged to have disclosed its contents—

illogical.  *See* Am. Compl. ¶ 5 (asserting that the "entire purpose of 'oppo research'" is for it to be "published and republished").

By the same token, Plaintiffs contend that Defendants' position would render all opposition research "privileged because errors in the research expose[] the political candidate to libel or defamation claims."  Pls.' Br. at 21.  That assertion turns the correct analysis on its head.  The materials at issue here are protected not because they *created* a risk of litigation, but rather because they *responded* to the very real likelihood of litigation.[10]  Plaintiffs have not alleged that either HFACC or the DNC publicly disclosed Defendants' research.  And that confidential treatment, nowhere addressed in Plaintiffs' brief, is both entirely consistent with the reason Perkins retained Defendants—to collect information informing the firm's judgments and legal advice to its clients—and entirely inconsistent with Plaintiffs' assertion that Fusion's reports were intended for public dissemination to political ends.

Because the work product identified on Defendants' privilege logs was prepared in light of a genuinely held and objectively reasonable expectation of potential litigation, it is protected from disclosure.  Plaintiffs' motion to compel production of those materials should therefore be denied.

**B.      The Withheld Documents Are Protected by the Attorney-Client Privilege.**

The majority of Defendants' communications are likewise covered by the attorney-client

---

[10] Plaintiffs' contention betrays a second misconception—that allegations concerning Russian efforts to interfere in the U.S. election were "created by Defendants." Pls.' Br. at 21.  In truth, the FBI had been investigating allegations of Russian interference since at least 2015, *see* Matthew Nussbaum, *The Definitive Trump-Russia Timeline of Events*, POLITICO (Mar. 3, 2017), https://tinyurl.com/yyqu4jpw; S. Select Comm. On Intelligence, *Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Vol 5:  Counterintelligence Threats and Vulnerabilities*,  S. Rep. No. 116-XX, at 821 (2020).  ("From August 2015 until early May 2016, the FBI attempted to assist the DNC in recognizing and responding to Russian intrusions into the DNC network."), and that topic was the subject of intense interest months before Plaintiffs allege Defendants' research was released, *see, e.g.*, Eric Lichtblau et al., *Russian Spies Said to Hack Clinton's Bid*, N.Y. TIMES, at A1 (July 30, 2016).

privilege, given their central import to Perkins's provision of legal advice to its clients, and were properly withheld on that independent basis. Plaintiffs' narrow construction—requiring direct attorney involvement and a strict recitation of client confidences in each individual document—is contrary to well-settled law and would eviscerate the privilege for most legal communications.

The attorney-client privilege exists to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). To further that purpose, the D.C. Circuit has established a "liberal standard," *FTC v. Boehringer Ingelheim Pharm., Inc.*, 180 F. Supp. 3d 1, 30 (D.D.C. 2016), under which a confidential communication is insulated from disclosure if "obtaining or providing legal advice was *one of* the significant purposes of the . . . communication," *In re Kellogg Brown & Root, Inc.* ("*KBR*"), 756 F.3d 754, 760 (D.C. Cir. 2014) (Kavanaugh, J.) (emphasis added).

Federal courts applying the privilege have "consistently included communications of the attorney to the client as well as vice versa." *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 254 n.25 (D.C. Cir. 1977). And the same protection extends to communications by third parties that counsel hires to facilitate "effective consultation between the client and the lawyer[.]" *Kovel*, 296 F.2d at 922. Thus, "communications made by and to non-attorneys serving as agents of attorneys . . . are routinely protected by the attorney-client privilege." *KBR*, 756 F.3d at 758. And while the privilege generally covers "reports of third parties made at the request of the attorney or the client where the purpose of the report was to put in usable form information obtained from the client," *FTC v. TRW, Inc.*, 628 F.2d 207, 212 (D.C. Cir. 1980), the D.C. Circuit has stressed that "the critical factor for purposes of the attorney-client privilege [is] that the communication be made 'in confidence for the purpose of obtaining legal advice from the

lawyer,'" *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Tr. Corp.*, 5 F.3d 1508, 1514 (D.C. Cir. 1993) (quoting *Kovel*, 296 F.2d at 922).

*Kovel* thus "has been construed broadly to include individuals who assist attorneys in providing legal services, such as . . . investigators, interviewers, technical experts, accountants, physicians, patent agents, and other specialists in a variety of social and physical sciences." *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 71 (S.D.N.Y. 2010) (internal citations and quotations omitted). Specifically, communications of third-party fact investigators retained by lawyers qualify for the attorney-client privilege because they "giv[e] . . . information to . . . lawyer[s] to enable [them] to give sound and informed advice." *Upjohn*, 449 U.S. at 390. Recognizing that there are many "problem[s] with which [attorneys] need[] outside help related to their provision of . . . legal advice," courts have also extended the privilege to communications by, for example, public relations consultants because "the ability of lawyers to perform some of their most fundamental client functions . . . such as . . . *advising the client of the legal risks of speaking publicly* . . . would be undermined seriously if lawyers were not able to engage in frank discussions of facts and strategies with the lawyers' public relations consultants." *In re Grand Jury Subpoenas Dated Mar. 24, 2003*, 265 F. Supp. 2d 321, 326, 330 (S.D.N.Y. 2003) (emphasis added).

These principles are dispositive here. Defendants' non-attorney employees (and subcontractors) served an essential role in promoting "effective consultation between" Perkins and its clients, and their communications in furtherance of that representation are therefore privileged. *Kovel*, 296 F.2d at 922. As established above, HFACC and the DNC retained Perkins to provide legal advice related to, *inter alia*, potential exposure to defamation-based claims, Levy Decl., ¶¶ 7–8, 12, requiring Perkins to determine whether allegations in the public sphere on which its clients might comment were true. Its investigative expertise rendered Fusion "*necessary* for Perkins's

provision of *legal advice*" in this regard, *id.* ¶¶ 5–6 (emphasis added), because without the information Defendants provided, Perkins could not have advised HFACC and the DNC regarding whether making certain statements would expose them to potential defamation-based claims.  *See Gucci*, 271 F.R.D. at 71 ("[W]ere an attorney required to exclude investigators from the circle of confidentiality in order to maintain the privilege, providing legal advice to clients would be difficult, if not in some cases impossible."); *In re Grand Jury Subpoenas*, 265 F. Supp. 2d at 330 (holding communications by third-party public relations firm were protected by attorney-client privilege because its services were necessary for the lawyer to "advis[e] the client of the legal risks of speaking publicly").  Accordingly, the attorney-client privilege covers Defendants' confidential communications.

### 1.   Defendants Were Engaged to Assist Perkins in Its Provision of Legal Advice.

Echoing their objection to work-product protection, Plaintiffs first claim that the communications at issue are not subject to the attorney-client privilege because Defendants performed non-legal political opposition research for the 2016 election.  Pls.' Br. at 16–18.  As discussed *supra*, however, there is no support in the record for Plaintiffs' position that Defendants' only (or even primary) function was political.  For privilege to attach, it is not necessary that the provision of legal advice be the *exclusive* purpose of covered communications; instead, the relevant consideration is whether "obtaining or providing legal advice [was] . . . *one* of the significant purposes of the communication."  *KBR*, 756 F.3d at 760 (emphasis added).  That prerequisite is satisfied here—Perkins hired Defendants "to . . . provide information *necessary* for Perkins's provision of *legal advice* to the DNC and Hillary for America concerning potential litigation risks relating to information distributed in connection with the 2016 election cycle," including "libel, defamation, or other claims implicating the accuracy of public information."

Levy Decl., ¶¶ 5–6 (emphasis added).  Because "one of the significant purposes of [Fusion's engagement] was to . . . provide legal advice, the privilege . . .appl[ies]."  *KBR*, 756 F.3d at 760.

### 2.     Fusion's Communications Furthered Confidential Client Requests for Legal Advice and Are Therefore Privileged.

Plaintiffs claim that the attorney-client privilege should narrowly cover only communications expressly reciting "confidential information [Perkins] learned from its clients." Pls.' Br. at 16, 18–19.  According to Plaintiffs, Defendants' communications are not privileged because Fusion gathered information from sources other than Perkins's clients—including publicly available records and information gathered by its subcontractors.  *Id.* at 16.  Plaintiffs' restrictive formulation drastically overstates the privilege's limitations.

In the D.C. Circuit, the attorney-client privilege extends not only to attorney communications that convey client confidences, but also those which are "based, in part at least, upon a confidential communication to the lawyer from the client."  *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984) (internal alterations and citation omitted).  Consistent with that principle, courts have "taken an expansive view of protected communications between independent contractors and counsel."  *In re CV Therapeutics, Inc. Sec. Litig.*, 2006 WL 1699536, at *7 (N.D. Cal. June 16, 2006).  And "[f]actual investigations conducted by an [attorney's] agent clearly fall within the attorney-client rubric."  *Gucci*, 271 F.R.D. at 71 (internal quotations and citation omitted); *see also McCaugherty v. Siffermann*, 132 F.R.D. 234, 239 (N.D. Cal. 1990) (finding the privilege could apply to consultants that "provide[d] information . . . in order [for the] law firm . . . to provide its clients . . . with fully informed legal advice.").

Contrary to Plaintiffs' unduly narrow view, communications need not be based on a client's confidential *information*, but only on the client's confidential *communication* for the purpose of obtaining legal advice.  Under the correct formulation, attorney communications reflecting a

client's request for legal advice, even if unaccompanied by "confidential information," thus merit protection.  *See, e.g.*, *United States v. Singhal*, 800 F. Supp. 2d 1, 8–9 (D.D.C. 2011) (an attorney's email stating "as requested" could be privileged to the extent it implicitly reflected a request for legal advice).  That principle applies here: Communications among Fusion employees and with Perkins were based, in part at least, upon the DNC's and HFACC's requests for legal advice regarding subjects on which they might wish to comment publicly.  For privilege purposes, it is irrelevant whether Perkins's advice in response to that request included information gathered from HFACC and the DNC or elsewhere.

### 3. Communications with Non-Lawyers Are Still Privileged.

Plaintiffs also make the categorical argument that communications not including attorney senders or recipients necessarily cannot qualify as privileged.  Pls.' Br. at 16.  Specifically, Plaintiffs argue that internal Fusion correspondence or communications with Defendants' subcontractors are inherently exempt from protection.  Not so.

In this Circuit, the attorney-client privilege applies not only to communications between counsel and "agents of the attorney," *TRW*, 628 F.2d at 212, but also to communications *among* the attorney's agents in furtherance of rendering legal advice, *see Boehringer*, 180 F. Supp. 3d at 34.  As explained in *Boehringer*: "The same protections afforded to communications between counsel and client extend to communications between corporate employees who are working together to compile facts for . . . counsel to use in rendering legal advice."  *Id.*; *see also AT&T Corp. v. Microsoft Corp.*, No. 02-0164, 2003 WL 21212614, at *3 (N.D. Cal. Apr. 18, 2003) ("Communications between non-lawyer employees about matters [on] which the parties intend to seek legal advice are likewise cloaked by attorney-client privilege").[11]  To accept Plaintiffs'

---

[11] None of the emails on the privilege log were with parties outside of the privileged relationship. For example, Nellie Ohr (PRIV0000058 & PRIV0000063), Edward Baumgartner (PRIV0000122),

premise would drastically inhibit the ability of attorneys to engage and rely on subject-matter experts in developing and providing legal advice to their clients.[12]

### 4.     There Has Been No Waiver.

In a desperate finale, Plaintiffs argue that Defendants waived the attorney-client privilege by disclosing certain related information to third-party media outlets and in Mr. Simpson's book, *Crime in Progress*. Pls.' Br. at 19. Plaintiffs describe these purported disclosures in broad-brushed terms—suggesting, for example, that Mr. Simpson "briefed journalists" regarding "the contents" of the so-called Dossier. *Id.* But even if Plaintiffs could establish specific third-party disclosures of the particular communications at issue here (and they have not done so), Defendants could not have waived privileges that they themselves did not own. "[I]t is axiomatic that the attorney-client privilege is held by the client[s]"—here, HFACC and the DNC. *Nat'l Sec. Counselors v. Central Intelligence Agency*, 2020 WL 4590548, at *4 (D.C. Cir. Aug. 11, 2020). And the privilege can be waived only where there has been a "voluntary disclosure by the holder of [the] privilege." *In re Subpoena Duces Tecum*, 738 F.2d 1367, 1369 (D.C. Cir. 1984). Plaintiffs allege disclosures

---

Christopher Steele (PRIV0000207), and Lloyd Greene (PRIV0000363) were Defendants' subcontractors subject to the engagement of Fusion by Perkins, and their communications therefore are protected. *See Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 2002 WL 31556383, at *2 (S.D.N.Y. Nov. 15, 2002) ("The fact that the nature of the industry dictates the use of independent contractors over employees should not . . . create greater limitations on the scope of the attorney-client privilege."); *see also* Levy Decl., ¶ 6 (noting Defendants "review[ed] and analy[zed] . . . publicly available records and compil[ed] and assess[ed] information gathered by its subcontractors"). Plaintiffs themselves have identified one of the recipients, Christopher Steele, as one of Defendants' subcontractors, *see* Am. Compl. ¶ 3, and Plaintiffs' argument now should be rejected as nothing more than a manipulative litigation effort.

[12] Plaintiffs argue that two emails (PRIV0000480 and PRIV0000483) were mistakenly described as "Confidential communication with counsel in anticipation of litigation, and for the purpose of obtaining legal advice," because "no attorney is even listed as being included on the communication." Pls.' Br. at 9 n.8. Not so. In those two emails, a Fusion employee forwarded to another Fusion employee a Word document from counsel containing privileged communications with the client.

only by Fusion employees—not by Perkins, and not by HFACC and the DNC as the privilege holders.  Accordingly, Plaintiffs' vague allegations of Defendants' purported disclosure to third parties, even if taken as true, fail to support a finding of waiver in this case.[13]

### C. The Privilege Logs Are Not Deficient, and Plaintiffs' Motion Confirms Plaintiffs Have Enough Information to Assess Defendants' Privilege Claims.

Plaintiffs' arguments regarding Defendants' original and supplemental privilege logs amount to immaterial quibbling.  Several of the purported "deficiencies" Plaintiffs identify are simply byproducts of their distortions of the law.  For instance, Plaintiffs assert without any legal basis that entries are insufficient because they do not identify specific litigation or because entries include communications between non-attorneys and with "third-parties" (who were in fact agents in the privileged relationship).  *See* Pls.' Br. at 13–14; *supra* at 12–13, 19–20.

More fundamentally, Plaintiffs talk out of both sides of their mouths. They at once assert that the privilege logs (and accompanying declaration) lack sufficient detail for them to assess Defendants' privilege and work-product assertions while, in the same breath, proceed to challenge those very assertions.  Defendants have provided the information Plaintiffs need to assess the privilege claims, and Plaintiffs' technical objections should be rejected.

### 1. The Logs and Accompanying Declaration Are Sufficient to Enable Plaintiffs to Assess Defendants' Privilege Claims.

The Federal Rules of Civil Procedure require a party claiming privilege over withheld documents to "expressly make the claim" and "describe the nature of the documents . . . in a manner that, without revealing information itself privileged or protected, will enable other parties

---

[13] Plaintiffs do not claim that Defendants waived work-product protection, nor can their arguments regarding attorney-client privilege be carried over to the work product context.  "It is hornbook law that waiver of the attorney-client privilege should always be analyzed distinctly from waiver of work product."  *In re Kellogg Brown & Root, Inc.*, 796 F.3d 137, 145 (D.C. Cir. 2015) (internal quotation marks, alterations, and citation omitted).

to assess the claim." Fed. R. Civ. P. 26(b)(5)(A).  That description "need not always include all specifics that might ultimately be necessary to resolve" a privilege dispute.  8 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2016.1 (3d ed. 2008).  Rather, the asserting party bears a "threshold burden to show [their] entitlement to a ruling on the existence of a privilege." *In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n*, 439 F.3d 740, 750 (D.C. Cir. 2006).  And while that burden is "frequently" satisfied through the use of a privilege log, *Feld v. Fireman's Fund Ins. Co.*, 991 F. Supp. 2d 242, 248 (D.D.C. 2013), the proponent can bolster its claim through declarations or affidavits elaborating on the basis for seeking protection, *cf. NLRB v. Jackson Hosp. Corp.*, 257 F.R.D. 302, 309 (D.D.C. 2009) ("Agencies seeking to invoke the deliberative process privilege commonly do so through a combination of privilege logs that identify specific documents, and declarations from agency officials explaining what the documents are and how they relate to the decisions."); *In re Apollo Grp., Inc. Sec. Litig.*, 251 F.R.D. 12, 31, *vacated on other grounds* (D.D.C. 2008) (sustaining privilege claims based on information provided in a log and accompanying declarations regarding the specific subject of the communications at issue).

Defendants have provided sufficient information for Plaintiff to assess the claims of protection or privilege as to each document.  Defendants' sworn declaration details the basis for work-product protection, including: (1) Defendants' retention by Perkins to assist in the firm's ongoing representation of HFACC and the DNC, Levy Decl., ¶ 6; (2) the potential litigation concerns that served as the impetus for that relationship, *id.* ¶ 5; and (3) the causal nexus between Defendants' retention and research and Perkins's legal advice, *id.* ¶ 6-8.  *Compare* Levy Decl., ¶¶ 3–8, 12 (describing the timing of the engagement, subject matter of Defendants' research, and the import of that research to Perkins's legal representation), *with In re Veiga*, 746 F. Supp. 2d 27,

39 (D.D.C. 2010) (deeming insufficient a declaration that "consist[ed] almost exclusively of conclusory and empty invocations of privilege").  The declaration likewise substantiates the attorney-client relationship and describes—without disclosing privileged information—the nature of the confidential facts communicated and the subject matter of the legal advice sought and provided.  Levy Decl., ¶¶ 4–6, 8, 12.

Coupled with the declaration, the supplemental log adds the information necessary to understand how each withheld document fits into the claimed protections—identifying the nature of each withheld document, the fact that the documents were kept confidential and, where applicable, sender and recipient information that elucidates the documents' origins.  Taken together, those facts allow Plaintiffs to understand Defendants' basis for withholding, both categorically and as to the individual documents listed in the log.  *See, e.g.*, *Campbell*, 133 F. Supp. 3d at 67 (stating that a party withholding claimed work product must "(1) provide a description of the nature of and contents of the withheld document, (2) identify the document's author or origin, (3) note the circumstances that surround the document's creation, and (4) provide some indication of the type of litigation for which the document's use is at least foreseeable"); *Mannina v. Dist. of Columbia*, No. 15-cv-931, 2019 WL 1993780, at *6 (D.D.C. May 6, 2019) ("The log clearly identifies the documents, the senders and recipients where applicable, and includes a descriptive narrative describing the reasons for redacting or withholding each document.").

### 2. The Purported Technical Deficiencies Do Not Prevent Plaintiffs from Assessing the Claims Asserted.

Plaintiffs' motion confirms that Plaintiffs have enough information to ascertain—and contest—the basis for Defendants' assertions of privilege and work-product protection.  Plaintiffs nonetheless highlight a mishmash of purported technical deficiencies in hopes of piercing the privilege barrier and obtaining discovery.  Plaintiffs' potpourri of objections includes complaints

that multiple entries share a common narrative, are listed by type (*e.g.*, "email," "attachment"), or lack subject lines, dates, or author information.  Pls.' Br. at 12–14.[14]  Those objections ignore cases from this District rejecting substantially similar challenges where, as here, the information furnished by the proponent was sufficient to enable the opponent to "assess the claim."  *See, e.g.*, *Texas v. Holder*, No. 12-128, 2012 WL 13070060, at *5 (D.D.C. June 5, 2012) (approving of duplicative descriptions of "[c]onfidential communication[s] . . . made for the purpose of giving or seeking legal advice" as "sufficiently described to enable [the opponent] 'to assess the claim [of privilege]'"); *Feld*, 991 F. Supp. 2d at 247 (approving document types listed as "email, attachment, or standalone computer file"); *Apollo Grp.*, 251 F.R.D. at 31 (concluding that email subject lines need not be provided because they "often do not convey information concerning the specific matter being discussed"); *Jud. Watch, Inc. v. Comm'n  on U.S.-Pac. Trade and Inv. Pol.*, No. 97-0099, 1999 WL 33944413, at *8 (D.D.C. Sept. 30, 1999) ("The fact that the legal basis for the assertion of privilege is repeated throughout the index is not dispositive[.]").[15]

At base, Plaintiffs' objections are nothing more than an attempt to skirt the fact the information already furnished is sufficient to "assess the basis" for Defendants' claims.  Fed. R. Civ. P. 26(b)(5)(A).  For example, while various "loose documents" were not identified by title,

---

[14] Plaintiffs' brief notes that two of the entries which had dates in the original log were not dated in the supplemental log.  Pls.' Br. at 6 n.3.  That change resulted from a scrivener's error in the computer program used to generate the supplemental log, and Defendants provided the correct dates to Plaintiffs after reviewing the present motion.

[15] In the same vein, Plaintiffs repeatedly suggest that Defendants' recent production of previously withheld invoices and cover emails "calls into serious question" the accuracy of other privilege log entries.  In fact, those disclosures prove the opposite:  Though Plaintiffs fail to mention it, Defendants produced those documents in redacted form, omitting the portions identifying confidential information about "research prepared at the direction of Perkins Coie and in anticipation of litigation."  Ex. 15.  Combined with the description of the subject matter of that research and its relation to the legal representation provided by the declaration, *see* Levy Decl. ¶¶ 6–8, 12, those narratives were both accurate and sufficient to discharge Defendants' disclosure obligations.

date, or authorship (none of which could be identified on the face of the documents with reasonable certainty), neither was that information necessary for Plaintiffs to understand why Defendants withheld those documents. As detailed in the logs, all of those documents consist of "[c]onfidential research prepared at the direction of Perkins [] in anticipation of litigation, and for the purpose of providing legal advice," *see, e.g.*, Lewis Decl., Ex. 13, at PRIV0000030, and the accompanying declaration spells out the scope and subject matter of the research conducted at Perkins's direction and its relationship to Perkins's representation of its clients. Neither the particular authorship of the document nor the specific date on which it was prepared is necessary for Plaintiffs to understand and contest Defendants' basis for claiming privilege over those documents, as Plaintiffs themselves prove *by contesting Defendants' basis for claiming privilege over those documents.*

Plaintiffs' final (and entirely rhetorical) objection is that entries on the log asserting both attorney-client privilege and work-product protection are of "dubious" validity. That complaint is emblematic of Plaintiffs' objections to the log as a whole. At root, their argument has nothing to do with the content of the log and simply boils down to general skepticism about the foundation of Defendants' claims. As detailed above, however, Defendants have made clear their entitlement to withhold documents on both privilege and work-product grounds.[16] Plaintiffs' objection reflects nothing more than discontent with Defendants' assertions dressed up as a claim of procedural deficiency.

In the end, Plaintiffs' insistence on further detail is nothing more than an attempt to elevate form over function. This Court should reject it.[17]

---

[16] There is no authority for the proposition that a party must choose between different meritorious claims; quite the opposite, as *failure* to timely assert a privilege or protection may waive it. *See Banks v. Office of Senate Sergeant-At-Arms*, 233 F.R.D. 1, 9 (D.D.C. 2005).

[17] Even if the Court were to conclude that any part of Defendants' logs is deficient, Defendants respectfully submit that they should be permitted to remedy those issues. Absent a finding of

## V.       CONCLUSION

The documents Defendants withheld from production are properly subject to the attorney-client privilege and/or work-product protection, and Defendants adequately discharged their obligation to give Plaintiffs sufficient information to evaluate the bases for those privilege claims. Plaintiffs' motion to compel [Dkt. 95] should therefore be denied in its entirety.

Respectfully submitted,

Dated: September 11, 2020

By:____/s/ Joshua A. Levy_____

Joshua A. Levy (D.C. Bar No. 475108)
Rachel M. Clattenburg (D.C. Bar No. 1018164)
LEVY FIRESTONE MUSE LLP
1401 K St. NW, Suite 600
Washington, DC 20005
Tel: (202) 845-3215
Fax: (202) 595-8253
jal@levyfirestone.com

*Counsel for Defendants*

---

"unjustified delay, inexcusable conduct, and bad faith," the general recourse for privilege logs deemed inadequate is ordering a revised privilege log. *United States v. British Am. Tobacco (Invs.) Ltd.*, 387 F.3d 884, 885 (D.C. Cir. 2004) ("'[W]aiver of a privilege is a serious sanction' that a court should impose only if a party behaves unreasonably or worse." (quoting *United States v. Phillip Morris Inc.*, 347 F.3d 951, 954 (D.C. Cir. 2003)); *TIG Ins. Co. v. Fireman's Ins. Co. of Wash., D.C.*, 718 F. Supp. 2d 90, 97 (D.D.C. 2010) ("[T]he court generally does not deem a party to have waived a privilege because it did not provide an adequate privilege log."); *Jackson Hosp. Corp.*, 257 F.R.D. at 307 (review of documents *in camera* risks prejudice and so should "never be any greater than absolutely necessary").

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 11, 2020, the foregoing Memorandum in Opposition was filed using CM/ECF, which serves a copy on all counsel of record.

<u>*/s/* Joshua A. Levy</u>

Joshua A. Levy

27