## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MIKHAIL FRIDMAN, PETR AVEN, and
GERMAN KHAN,

               *Plaintiffs,*

       v.

BEAN LLC (a/k/a FUSION GPS) and GLENN
SIMPSON,

               *Defendants*.

Case No. 1:17-cv-02041 (RJL)

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL PLAINTIFFS' PRODUCTION OF THEIR DOCUMENTS

CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005
(917) 533-2524
lewis@clm.com

SPERDUTO THOMPSON & GASSLER PLC
1747 Pennsylvania Avenue, NW, Suite 1250
Washington, D.C. 20006
(202) 408-8900
ksperduto@stglawdc.com
*Attorneys for Plaintiffs*

*Of Counsel:*
   Alan S. Lewis
   Kim Sperduto

## <u>TABLE OF CONTENTS</u>

<b>Page(s)</b>

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 1

    A.   The Lawsuit .................................................................................................. 1

    B.   The Discovery Dispute ................................................................................ 2

ARGUMENT .............................................................................................................. 4

**POINT I**
STANDARD FOR MOTION TO COMPEL .............................................................. 4

**POINT II**
PLAINTIFFS HAVE SEARCHED FOR AND PRODUCED PRE-2016
DOCUMENTS............................................................................................................ 6

**POINT III**
DEFENDANTS' REQUESTS FOR DOCUMENTS SPANNING A THIRTY-YEAR
TIME PERIOD SEEK IRRELEVANT DOCUMENTS AND ARE UNDULY
BURDENSOME .......................................................................................................... 7

**POINT IV**
PLAINTIFFS HAVE NO OBLIGATION TO PRODUCE PUBLICLY
AVAILABLE DOCUMENTS.................................................................................... 9

**POINT V**
PLAINTIFFS HAVE FULFILLED THEIR OBLIGATION TO PRODUCE
RESPONSIVE DOCUMENTS ................................................................................. 10

    A.   The So-Called "Kroll Report" Is Irrelevant ............................................. 11

    B.   The Spanish Proceeding Is Irrelevant ....................................................... 13

    C.   Documents Related to the Mueller Investigation Are Protected by the
        Grand Jury Privilege ................................................................................. 16

    D.   Defendants Can Obtain Documents from the U.K. Proceeding Themselves as
        Evidenced by Their Use of Those Documents in Motion Practice Before this
        Court ........................................................................................................... 20

CONCLUSION.......................................................................................................... 22

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bank of N.Y. v. FDIC*,
  2005 U.S. Dist. LEXIS 60540 (D.D.C. Sept. 13, 2005) .............................................................8

*Bartko v. DOJ*,
  898 F.3d 51 (D.C. Cir. 2018) .................................................................................................18

*Breiterman v. United States Capitol Police*,
  324 F.R.D. 24 (D.D.C. 2018) ...................................................................................................5

*Chatman v. Purdue*,
  2020 U.S. Dist. LEXIS 42104 (D.D.C. Mar. 11, 2020) ...........................................................5

*Compuware Corp. v. Moody's Investors Servs.*,
  222 F.R.D. 124 (E.D. Mich. 2004) ...........................................................................................8

*Cullen v. Margiotta*,
  811 F.2d 698 (2d Cir. 1987) ...................................................................................................19

*Douglas Oil Co. v. Petrol Stops Northwest*,
  441 U.S. 211 (1979) ...............................................................................................................19

* *Dushkin Pub. Group, Inc. v. Kinko's Serv. Corp.*,
  136 F.R.D. 334 (D.D.C. 1991) ..........................................................................................10, 20

*Fairholme Funds v. Fed. Hous. Fin. Agency*,
  2019 U.S. Dist. LEXIS 194892 (D.D.C. Nov. 8, 2019) ...........................................................5

*Fitts v. Unum Life Ins. Co. of Am.*,
  2007 U.S. Dist. LEXIS 33397 (D.D.C. May 7, 2007) ............................................................20

*Fund of Constitutional Gov't v. Nat'l Archives & Records Serv.*,
  656 F.2d 856 (D.C. Cir. 1981) ................................................................................................16

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) .................................................................................................................9

* *Haughton v. District of Columbia*,
  315 F.R.D. 424 (D.D.C. 2014) .................................................................................................9

*Illinois v. Sarbaugh*,
  552 F.2d 768 (7th Cir. 1977) .................................................................................................18

ii

*Jewish War Veterans of the United States of America, Inc. v. Gates*,
    506 F. Supp. 2d 30 (D.D.C. 2007) ........................................................................6

*Lopez v. Dep't of Justice*,
    393 F.3d 1345 (D.C. Cir. 2005) ...............................................................17, 18

*Martinez v. Asian 328, LLC*,
    2016 U.S. Dist. LEXIS 55889 (D.D.C. Apr. 27, 2016) ........................................6

*McKeever v. Barr*,
    920 F.3d 842 (D.C. Cir. 2019) .............................................................................16

*Meijer, Inc. v. Warner Chilcott Holdings Co., III., Ltd.*,
    245 F.R.D. 26 (D.D.C. 2007) ................................................................................5

*\*Moore v. Hartman*,
    102 F. Supp. 3d 35 (D.D.C. 2015) .................................................................17, 18

*Oppenheimer Fund v. Sanders*,
    437 U.S. 340 (1978) ..............................................................................................4

*SEC v. Oakford Corp.*,
    141 F. Supp. 2d 435 (S.D.N.Y. 2001) .................................................................16

*Senate of the Com. of Puerto Rico ex rel of Judiciary Comm. v. U.S. Dep't of
    Justice*,
    823 F.2d 574 (D.C. Cir. 1987) ............................................................................17

*Shell v. Wall*,
    760 F. Supp. 545 (W.D.N.C. 1991) .....................................................................19

*In re Grand Jury*,
    490 F.3d 978 (D.C. Cir. 2007) ............................................................................17

*\*In re Sealed Motion*,
    880 F.2d 1367 (D.C. Cir. 1989) ..........................................................................17

*In re Sulfuric Acid Antitrust Litig.*,
    2004 U.S. Dist. LEXIS 6194 (N.D. Ill. Apr. 9, 2004) .........................................18

*U.S. House of Representative v. United States DOJ (In re Comm. on the
    Judiciary)*,
    951 F.3d 589 (D.C. Cir. 2020) ......................................................................16, 19

*U.S. v. Procter & Gamble Co.*,
    356 U.S. 677 (1958) ......................................................................................18, 19

*United States v. Shamsideen*,
     2004 U.S. Dist. LEXIS 9560 (S.D.N.Y. Mar. 31, 2004) .......................................................18

**Rules**

Fed. R. Civ. P. 26 ...................................................................................................................4, 5

Fed. R. Civ. P. 34 ...................................................................................................................4, 5

Fed. R. Civ. P. 37 .......................................................................................................................5

Fed. R. Crim. P. 6 ...........................................................................................................16, 18, 19

## INTRODUCTION

Plaintiffs respectfully submit this memorandum of law in opposition to Defendants' *second* motion to compel Plaintiffs' production of documents filed Aug. 14, 2020 (Dkt. 94).  As explained below, Defendants' motion should be denied because the documents whose production Defendants seek to compel (1) have already been searched for and responsive documents produced; (2) span almost 30 years; (3) are unresponsive to Defendants' discovery requests and largely irrelevant to the lawsuit; (4) are publicly available; and/or (5) are protected from disclosure.

## STATEMENT OF FACTS

### A.    The Lawsuit

Plaintiffs commenced this defamation lawsuit on October 3, 2017 and filed the Amended Complaint on December 12, 2017. (Dkt. 17) ("Am. Compl."). The defamatory statements accuse Plaintiffs of bribery and other misconduct involving Vladimir Putin.  *See generally id.* ¶¶ 19-28. The defamatory statements are in a two-page document which bears the label "Company Intelligence Report 2016/112" ("CIR 112").  *Id.* ¶¶ 2, 19-28.  As Plaintiffs have previously articulated, there are *three* statements in CIR 112 that this lawsuit challenges as defamatory: (1) the allegation that Plaintiffs made illicit cash payments to Vladimir Putin in the 1990s when Putin was Deputy Mayor of St. Petersburg  (through Oleg Govorun as the purported "bag carrier"); (2) the allegation that at the time of the initial publication of CIR 112 in 2016 Plaintiffs were corruptly exchanging political favors for Putin in exchange for economic ones from Putin; and (3) the allegation, implied by CIR 112's headline, that Plaintiffs were involved in aiding Russian state efforts to interfere in the 2016 U.S. presidential election.  *See* Pls.' Supp. Response to Defs.' First Set of Interr. (Dkt. 78-6) at Interr. No. 2.  To be sure, other statements in CIR 112

*could* arguably be read to imply that Plaintiffs maintained a longer term corrupt relationship with Putin as President of Russia before 2016, but Plaintiffs, as the masters of their own complaint, have limited their lawsuit's allegation of defamation to the three statements of CIR 112 described above.

After Defendants' subcontractors, Christopher Steele and Orbis Business Intelligence Ltd. ("Orbis"), prepared CIR 112 at Defendants' behest, Defendants published it, with its defamatory statements, to members of the media and others.  Am. Compl. ¶¶ 4, 16, 18.[1]

## B.    <u>The Discovery Dispute</u>

Defendants served their First Requests for Production of Documents on October 11, 2019.  *See* Defs.' First Requests for Production of Documents (Dkt. 78-4).[2]  In the general instructions, Defendants defined the relevant time period as "January 1, *1990* through the present" unless otherwise indicated.  *Id.* at Inst. ¶ 13 (emphasis added).  The only requests which contained a narrower time frame were (1) those seeking financial documents, such as tax returns and documents relating to each Plaintiffs' earned income, *see id.* at Requests 57-59; (2) a request for transcripts of any testimony given by the Plaintiffs or "Alfa" since 2000, *id.* at Request 76; and (3) requests for any "investigation of the conduct" of or criminal charges concerning Plaintiffs, "Alfa" or "Other Entities" since 2000, *see id.* at Requests 77-78.  Defendants' requests sought "any and all communications" with 145 individuals, entities, or "anyone known or

---

[1] Over a period of more than six months in 2016, Steele and Orbis prepared several other reports or memoranda for Defendants, besides CIR 112, and all of those memoranda became known in the media, singularly, as the so-called "Dossier" after they were published on the Internet by BuzzFeed, Inc. early in 2017.  Most of the reports, but not CIR 112, were about then-candidate Donald Trump and his purported ties to Russia. Am. Compl. ¶¶ 1, 15-16.

[2] Defendants did not attach copies of the requests to which they, by this motion, seek to compel compliance—although Defendants attached those requests to their previous motion to compel.

suspected of being associated" with certain entities, between January 1, 1990 to the present.  *See id.* at Request 24(a) – 24(wwwww); Request 25(a) – 25(r).

Defendants also requested documents "received by, produced by, or served upon [Plaintiffs] in connection with the Mueller Investigation" and "all documents related to any Mueller Investigation."  *See id.* at Requests 14, 19.  Additionally, Defendants requested "[a]ll documents" served "from or on behalf of prosecutor José Grinda or any other Spanish law enforcement or judicial official, or agency," and "[a]ll documents sent … to prosecutor José Grinda or anyone acting on his behalf or any other Spanish law enforcement or judicial official, or agency."  *Id.* at Requests 20-21.

Plaintiffs objected to Defendants' thirty-year time period as overly broad and burdensome.  *See* Pls.' Responses and Objections to Defs.' First Requests for Production of Documents (Dkt. 78-5) ("Doc. Responses") at General Objections and Responses (X).  Despite this, Plaintiffs agreed to search for and produce documents responsive to many of Defendants' requests, including some documents created before 2016.  *See* Lewis Apr. 24, 2020 Ltr. at 3 (Dkt. 78-11).  As to the documents related to the Mueller Investigation, Plaintiffs objected to the extent Defendants sought materials presented to a grand jury or that were irrelevant, but otherwise agreed to produce available documents.  *See* Doc. Responses at Response to Request 14.  Regarding documents related to the Spanish Proceeding, Plaintiffs objected on relevance grounds and declined to produce.  *See id.* at Responses to Requests 20-21.

During the parties' conferral process, Plaintiffs explained why the age of many of the documents sought put them beyond the scope of proper requests.  That is, Plaintiffs' claims, other than the one based on the allegation that Plaintiffs directed Oleg Govorun to deliver bribes to Putin in the 1990s, are based on statements that accuse them of misconduct in 2016.

3

Therefore, documents created before 2016 cannot be relevant to the truth or falsity of the challenged defamatory statements (unless they relate to the 1990s bribery allegation). *See* Declaration of Joshua A. Levy dated Aug. 14, 2020 (Dkt. 94-2) ("Levy Decl.") Ex. 2. Nevertheless, Plaintiffs agreed to search for and produce pre-2016 documents relating to the truth or falsity of the allegations. *See* Levy Decl. Exs. 2, 3. Plaintiffs conveyed this position to Defendants in multiple letters, including by letter dated August 4, 2020 where Plaintiffs informed Defendants that although Plaintiffs continued to assert that documents created before 2016 were irrelevant, Plaintiffs had "without conceding the relevance of the same … agreed to review and produce pre-2016 documents in their possession, custo[dy] and or control." *See* Levy Decl. Ex. 2 at 1. Plaintiffs also explained that although they had agreed to review and produce pre-2016 documents which Defendants claimed were relevant to the public figure analysis, "the only documents truly relevant to whether Plaintiffs attempted to shape the pertinent controversy (and responsive to Defendants' Document Requests 45, 46, 51, 52) are publicly available." *Id.* at 2. Nevertheless, Defendants brought this motion to seek, *inter alia*, pre-2016 and publicly available documents.

## ARGUMENT

### POINT I
### STANDARD FOR MOTION TO COMPEL

Federal Rule of Civil Procedure ("FRCP") 26(b)(1) permits "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." *See also* FRCP 34(a) ("A party may serve on any other party a request within the scope of Rule 26(b)"). Information is relevant when it "bears on, [or could reasonably] lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 351 (1978). "The Federal Rules and this Court encourage the exchange

of information through good-faith discovery and communication, but, while discovery is broadly

allowed, it is not limitless." *Chatman v. Purdue*, 2020 U.S. Dist. LEXIS 42104, at *4-5 (D.D.C.

Mar. 11, 2020).  Under FRCP 26(b)(2)(C), "the court must limit the frequency or extent of

discovery otherwise allowed … if it determines:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be
> obtained from some other source that is more convenient, less
> burdensome, or less expensive;
> (ii) the party seeking discovery has had ample opportunity to obtain the
> information by discovery in the action; or
> (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

*See also Chatman*, 2020 U.S. Dist. LEXIS 42104, at *4-5 ("the Court may limit discovery on its

own initiative, if it determines that the burden or expense of the proposed discovery outweighs

its likely benefit, when taking into account the needs of the case, the amount in controversy, the

parties' resources, the importance of the issue at stake in the litigation, and the importance of the

proposed discovery in resolving those issues") (quoting *Meijer, Inc. v. Warner Chilcott Holdings

Co., III., Ltd.*, 245 F.R.D. 26, 30 (D.D.C. 2007)) (internal quotation marks and alterations

omitted).

"Under Federal Rule of Civil Procedure 37, a party seeking discovery through … the

production of documents under Rule 34 … and who believes that the opposing party has failed to

meet its obligations under the relevant Rules, may—after conferring in good faith with the

opposing party—seek to compel a response." *Breiterman v. United States Capitol Police*, 324

F.R.D. 24, 27 (D.D.C. 2018) (citation omitted).  "When a party files a motion to compel, the first

consideration is whether the discovery sought is relevant to any party's claim or defense."

*Fairholme Funds v. Fed. Hous. Fin. Agency*, 2019 U.S. Dist. LEXIS 194892, at *5 (D.D.C. Nov.

8, 2019).  "The party that brings the motion to compel 'bears the initial burden of explaining how

the requested information is relevant.'  The burden then shifts to the non-moving party 'to

5

explain why discovery should not be permitted.'" *Martinez v. Asian 328, LLC*, 2016 U.S. Dist.

LEXIS 55889, at *6 (D.D.C. Apr. 27, 2016) (quoting *Jewish War Veterans of the United States*

*of America, Inc. v. Gates*, 506 F. Supp. 2d 30, 42 (D.D.C. 2007)).

**POINT II**
**PLAINTIFFS HAVE SEARCHED FOR AND**
**PRODUCED PRE-2016 DOCUMENTS**

Defendants' request to compel the production of pre-2016 documents must fail because

Plaintiffs have, in fact, produced all relevant pre-2016 documents.  Defendants acknowledge that

Plaintiffs *agreed* to produce pre-2016 documents related to the truth/falsity of the defamatory

statements, *see* Memorandum of Law filed Aug. 14, 2020 (Dkt. 94) ("Mem.") at 7, but

nevertheless filed the instant motion to compel production of those same documents.  In an effort

to create the appearance of a dispute, Defendants cite to Plaintiffs' interrogatory responses and a

letter in which Plaintiffs explained that their claim concerns allegations of conduct in 2016 and

therefore, that pre-2016 documents are not relevant to the truth or falsity of these allegations.

*See* Mem. at 9.  Defendants distort this correspondence to imply that Plaintiffs have only

produced documents created in or after 2016.  *See* Mem. at 16.  But while Plaintiffs have largely

limited this lawsuit to allegations of their purported misconduct in 2016, Plaintiffs, as

communicated to Defendants, have "[n]evertheless, at [Defendants'] request, *without conceding*

*the relevance of the same*, agreed to review and produce pre-2016 documents in their possession,

custo[dy] and or control.  . . .   Plaintiffs have not withheld pre-2016 documents."  *See* Levy

Decl. Ex. 2 at 1.  Thus, without standing on an objection to the irrelevance of documents created

before 2016, Plaintiffs searched for and produced such documents.[3]

---

[3] In April 2020, Plaintiffs told Defendants that although pre-2016 documents could not be relevant, they would "produce available pre-2016 documents, if any, related to communications with the media and the truth/falsity of the defamatory statements [as] an accommodation, made

6

For some reason, Defendants do not accept this, apparently continuing to accuse Plaintiffs of not searching for pre-2016 documents, even though Plaintiffs have done so and made that clear to Defendants.  Defendants' misperception appears to have developed after they received Plaintiffs' production and realized it included relatively few documents created before 2016.[4]

In sum, as Plaintiffs have informed Defendants multiple times, they searched for and produced pre-2016 documents within their custody and control, without waiving Plaintiffs' objections to the requests on other grounds.  Plaintiffs cannot produce what they do not have. Accordingly, this portion of Defendants' motion to compel should be denied.

## POINT III
## DEFENDANTS' REQUESTS FOR DOCUMENTS SPANNING A THIRTY-YEAR TIME PERIOD SEEK IRRELEVANT DOCUMENTS

Defendants' motion should also be denied because, as explained below, the imposition of a requirement to produce documents created over a thirty-year time frame would, in light of the nature of Plaintiffs' claims, require the production of irrelevant documents.

Plaintiffs, as masters of their complaint, have primarily sued Defendants for publishing statements that allege Plaintiffs' purported misconduct in 2016.   Accordingly, documents

---

in a good-faith effort to resolve issues outside of court.  It is not a concession that such documents are in any way relevant (or exist)."  *See* Lewis Apr. 24, 2020 Ltr. at 3 (Dkt. 78-11). In June, Plaintiffs represented that their May 4 production included "pre-2016 communications with the media and the truth/falsity of the defamatory statements," and their "production and Supplemental Responses included such pre-2016 documents—to the extent available and within their possession, custody, and control."  Furthermore, Plaintiffs reiterated that "[n]o such documents were withheld."  *See* Lewis June 2, 2020 Ltr. at 2 (Dkt. 78-17).

[4] The pre-2016 documents Plaintiffs produced consist primarily of correspondence with a U.S. State Department employee.  Declaration of Alan S. Lewis dated Sept. 11, 2020 ("Lewis Decl.") Ex. 1.  Plaintiffs produced these documents even though they are from 2015 and therefore are irrelevant to allegations of misconduct by the Plaintiffs in 2016.  Although Defendants might complain about the *number* of documents Plaintiffs produced, these documents illustrate that Plaintiffs did in fact produce pre-2016 documents.

7

created before 2016 would not supply evidence of the truth or the falsity of those allegations.
*See Compuware Corp. v. Moody's Investors Servs.*, 222 F.R.D. 124, 136 (E.D. Mich. 2004)
(defamation claim rested entirely on allegation regarding unfunded debt, therefore only
documents that offer information about unfunded debt and cash to pay credit facility were
relevant, documents addressing "financial dealings that do not deal with either of these two
issues are not relevant and therefore are not discoverable"); *accord Bank of N.Y. v. FDIC*, 2005
U.S. Dist. LEXIS 60540, at *5 (D.D.C. Sept. 13, 2005) ("the scope of BNY's claim determines
the relevance of the discovery it seeks").

Defendants, seeking to expand the scope of discovery beyond Plaintiffs' claims, would
interpret CIR 112 as also alleging a corrupt relationship between Plaintiffs and Putin (as the
President of Russia) in the years *before* 2016. *See*, *e.g.*, Mem. at 19. But the baseline for
relevance is the statement or statements that *Plaintiffs* allege to be defamatory, not other
arguably false statements about Plaintiffs which their lawsuit does *not* target. Defendants,
unable to challenge this essential point, argue that "[i]f [Plaintiffs'] decades-long relationship
[with the Kremlin/Putin] included the exchange of favors, as CIR 112 states, then the alleged
exchange of those favors in 2016 cannot be defamatory." *See* Mem. at 20. That is mistaken.
Even if Defendants could show, which they cannot, something untoward about Plaintiffs'
conduct involving Putin in 2005 or 2010, for example, that would not render non-defamatory the
publication of a false claim of misconduct by Plaintiffs, also involving Putin, in 2016. The truth
or falsity of the allegations of 2016 misconduct cannot be established with documents created
before the occurrence of the alleged misconduct and Plaintiffs should therefore not be required to
search for and produce such documents. *See Haughton v. District of Columbia*, 315 F.R.D. 424,

428 (D.D.C. 2014) (limiting discovery requests where Plaintiff failed to limit time period and thus sought documents from "well before" termination at issue).

But in any event, as Plaintiffs have represented to Defendants, they do not have any documents evidencing any misconduct or corruption involving themselves and Putin at any time, including years prior to 2016, and thus, the documents whose production Defendants are seeking to compel do not exist.

### POINT IV
### PLAINTIFFS HAVE NO OBLIGATION TO PRODUCE
### PUBLICLY AVAILABLE DOCUMENTS

Defendants also complain that Plaintiffs have failed to produce documents relevant to the issue of whether or not Plaintiffs are limited purpose public figures in this case.  *See* Mem. at 32-34.  Specifically, Defendants seek documents showing "Plaintiffs' contacts with government officials …, communications with the press and other influential figures …, and their coordination with their many public relations assistants and lobbyists." *See* Mem. at 34.  Thus, the evidence Defendants are seeking to compel, under the guise of its relevance to the limited purpose public figure issue, relates to Plaintiffs' non-public communications.  But as Defendants acknowledge, *see* Mem. at 32-33, individuals become limited purpose public figures by "thrust[ing] themselves to the forefront" of a public debate and "invit[ing] attention and comment."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974).  Defendants make no argument as to how *private* communications available only to Plaintiffs could inform the question of whether Plaintiffs are limited purpose public figures in this case.  Indeed, thrusting

9

oneself into the forefront of a public debate is by definition a public act, the evidence of which would necessarily be public.[5]

Although Defendants might prefer that Plaintiffs comb through the public record and find news articles, press releases, and other online publications that they claim are relevant to the public figure issue, Plaintiffs have no such obligation to do so, given that those documents are equally accessible to Defendants.  Indeed, "[i]t is well established that discovery need not be required of documents of public record which are equally accessible to all parties." *Dushkin Pub. Group, Inc. v. Kinko's Serv. Corp.*, 136 F.R.D. 334, 335 (D.D.C. 1991) (quotation and citation omitted).  It is Defendants, not Plaintiffs, who would like to use these publicly available documents to support a public figure defense.  Accordingly, it is Defendants, not Plaintiffs, who must comb through the public record and find news articles or other documents they believe are relevant.[6]

Accordingly, Defendants' motion to compel documents related to their public figure defense should be denied as Defendants seek either irrelevant private communications, or public documents which they have the burden of locating.

### POINT V
### PLAINTIFFS HAVE FULFILLED THEIR OBLIGATION
### TO PRODUCE RESPONSIVE DOCUMENTS

In an effort to make it appear as if Plaintiffs are withholding documents, Defendants cite what they claim are four examples of documents which should have been produced: (1) the so-

---

[5] Notwithstanding this, Plaintiffs told Defendants that they "agreed to review and produce pre-2016 documents in their possession, custody, or control if they contain communications with the media—and did so."  Levy Decl. Ex. 2 at 2.

[6] Moreover, the parties specifically agreed that neither side was obligated to produce publicly available documents.  *See* Levy Apr. 16, 2020 Ltr. at 2-3 (Dkt. 78-10); *see also* Lewis Apr. 24, 2020 Ltr. at 2 (Dkt. 78-11).

called "Kroll Report" which relates to events in the early 1990s; (2) documents related to a

Spanish legal proceeding; (3) documents created or produced in 2017 in connection with the

Mueller Investigation; and (4) documents related to a British court proceeding.  None of these

examples support Defendants' claim that Plaintiffs are withholding documents as Defendants

seek evidence that is irrelevant, protected from disclosure, and/or publicly available.[7]

A.       **The So-Called "Kroll Report" Is Irrelevant**

Defendants point to the so-called Kroll Report as proof that Plaintiffs are refusing to

produce relevant documents.  *See* Mem. at 12.  But given the nature of the claims and defenses in

this action, the Kroll Report is not even arguably relevant.  Indeed, Defendants misapprehend the

nature of the Kroll Report and ignore both Mr. Aven's sworn testimony and representations from

Plaintiffs' counsel that the Kroll Report is not relevant to this matter.

Defendants describe the Kroll Report as "an early 1990s investigation of post-Soviet

corruption implicating Putin, which Plaintiff Aven has claimed is solely in his possession, which

relates to favors between Plaintiffs and Putin and to possession of 'kompromat' on Putin."  *See*

Mem. at 12.  That description of the content of the Kroll Report, made up in an effort to portray

it as relevant, is pure speculation and, not only unsupported, but contradicted, by the evidence

Defendants cite.  First, Defendants offer *no* support that the Kroll Report "implicat[es]", or even

*mentions*, Putin.  Plaintiffs' counsel has represented that the Kroll Report "does not relate in any

way to Vladimir Putin, to the Plaintiffs, or to any of the matters that are the subject of CIR 112."

Levy Decl., Ex. 2 at 3.[8]  The sources Defendants rely on in arguing that Plaintiffs should be

---

[7] To be clear, Plaintiffs object to the production of any documents post-dating the filing of the
Complaint, not just those that fit within categories highlighted by Defendants.

[8] Defendants omit this sentence, which clearly refutes the relevance of the Kroll Report, from
their motion and instead suggest that Plaintiffs only objected to the relevance of the Kroll Report
on the grounds that it did not relate to the Govorun-related allegation.

compelled to produce the Kroll Report also fail to suggest that the Kroll Report contains any

allegations concerning Putin.[9]  Instead of acknowledging counsel's statement, or their own

sources, Defendants make a tangential argument concerning the alleged "oil-for-food" scandal.

However, Defendants offer no connection between the oil-for-food scandal and the Kroll

Report.[10]  Other than once again making gratuitous accusations about Mr. Aven's alleged role in

the oil-for-food scandal, it is not clear why Defendants intermingle their references to that

scandal with their claims about the content of the Kroll Report.  In any event, Defendants'

inability to offer any evidence that the Kroll Report even mentions Putin defeats their claims of

relevance.

Second, in addition to failing to show that the Kroll Report discusses corruption by Putin,

Defendants also fail to offer any evidence that the Kroll Report discusses Plaintiffs.  None of the

sources cited by Defendants suggest that Plaintiffs are mentioned in the Kroll Report.[11]

Moreover, Defendants have misleadingly edited Mr. Aven's prior testimony to make it appear

that he suggested the special commission report was based on the Kroll Report—when he in fact

testified to the opposite.  *See* Mem. at 22.

---

[9] Defendants appear to rely solely on Karen Dawisha's book, *Putin's Kleptocracy: Who Owns Russia* for their characterization of the Kroll Report.  However, Dawisha's book never suggests that Putin, or any of the Plaintiffs, is mentioned in the Kroll Report, but instead simply states that Mr. Aven is mentioned in a *different* report.  *See* Levy Decl., Ex. 9 at 6-7.  Dawisha's book was also discussed, and where relevant to this dispute, refuted, in the portion of Mr. Aven's trial testimony that Defendants cite.  *See* Levy Decl. Ex. 6 at 26:22 – 27:8.

[10] Even the excerpts from Dawisha's book cited by Defendants make clear that the subject of the oil-for-food scandal was separate from the subject of the Kroll Report.  Dawisha discussed those two things in completely different sections of her book.  *See* Levy Decl. Ex. 9.

[11] The closest Defendants come is a passage in Dawisha's book that states that Mr. Aven was mentioned in a special commission report that also happened to mention "Kroll's efforts."  But Dawisha never states that this mention of Mr. Aven was based on Kroll's investigation.  *See* Levy Decl., Ex. 9 at 6-7.

In their memorandum, Defendants omit the portion of Mr. Aven's testimony where he stated clearly that the Kroll Report "has nothing to do with me," and then misleadingly edit his testimony where he disputed that the special commission report Defendants cite to in their memorandum was based on the Kroll Report. *See* Levy Decl., Ex. 6 at 27:1; 27:6-8 ("*But you say* this [commision's report] is based on Kroll Report.  I have Kroll Report in my hands.  *The commission didn't see the report*.") (emphasis added).  Because Defendants cannot point to any evidence that the Kroll Report discusses any of the Plaintiffs, they have again failed to prove its relevance.

Finally, the simple fact that Mr. Aven came to possess a copy of the Kroll Report more than twenty-five years ago when he was a government official does not transform it into a document that is somehow relevant to this lawsuit or even imply that it has anything to do with him.  Since the Kroll Report does not relate to the Plaintiffs or even to Putin, much less to anything in CIR 112, it is irrelevant and not properly the subject of a valid motion to compel.[12]

**B.**     **The Spanish Proceeding Is Irrelevant**

Defendants also seek to compel the disclosure of *all* documents received or sent by Plaintiffs in connection with a Spanish legal proceeding.  *See* Mem. at 24.  However, Defendants' explanation regarding the alleged relevance of these documents betrays their fundamental misunderstanding of the proceedings, which relate to the actions underlying the bankruptcy of a Spanish company, Zed Worldwide.  Defendants claim that the "Spanish authorities allege" that Mr. Fridman engaged in certain improper activities, citing what they term the "Spanish Criminal Complaint Against Vimpelcom."  Mem. at 24.  The document Defendants cite, however, is an

---

[12] Defendants' suggestion that Plaintiffs should have to produce the Kroll Report even if it is not relevant so that Plaintiffs can disprove the allegations in CIR 112 is absurd and would open the door for limitless discovery.

unverified report of allegations recited to Spanish authorities by the former CEO of Zed Group and the primary investigated party in the action, Javier Perez Dolset. Levy Decl. Ex. 10 at 1. Notably, Vimpelcom is not a party and has not been charged with any wrongdoing related to this matter.

Under Spanish law, anyone can make an allegation of criminal conduct to the authorities; the statements made in such a report do not need to be verified or supported by any evidence. Mr. Perez Dolset has an obvious incentive to point the finger at someone other than himself, as he has been accused, together with several family members, of misappropriating funds from Zed, engaging in accounting fraud to falsify assets, and improperly using subsidies given to Zed by the Spanish government for his own gain.[13]

Further, beyond misattributing Mr. Perez Dolset's allegations to the "Spanish authorities," the Defendants misconstrue what Mr. Perez Dolset's claim states on its face. The Defendants claim that the complaint they cite alleges that Mr. Fridman purportedly made payments to a company owned by the son of a Russian minister for services that were overvalued. Mem. at 24. However, the language Defendants point to alleges that any such payments were made by *Vimpelcom*, a publicly traded company in which Mr. Fridman has no involvement in operational management and instead as to which he merely sits on a Supervisory Board. Levy Decl. Ex. 10 at 2.

Aside from the factual inaccuracies regarding the party that provided the alleged overpayment, Defendants claim, without further explanation, that an overpayment constitutes a "favor" that is "consistent with the pattern of 'significant favors'" alleged in CIR 112. Mem. at

---

[13] Angela Martialay, *La UDEF lanza una operación contra fraude de subvenciones y detiene a Pérez Dolset (Spanish police investigators launch an operation against subsidy fraud and detain Pérez Dolset)*, VOZPOPULI (November 22, 2017), *available at* https://www.vozpopuli.com/espana/operacion-fraude-subvenciones-detenido-javier-perez-dolset_0_1039697171.html.

25.  However, Defendants fail to—and would be unable to—show how an overvalued Spanish contract supplies evidence of the Plaintiffs' purported exchange of *political* and *economic* favors with *Putin*—the defamatory allegation made in CIR 112.

Thus, Defendants fail to carry their burden to prove that the Spanish proceeding documents are relevant to the truth or falsity of the defamatory statements in CIR 112.  Plaintiffs have previously explained, as Defendants noted in their motion, that the ongoing Spanish proceeding has *nothing to do* with the defamatory statements challenged in this lawsuit, or even the so-called "Dossier" more generally.  Mem. at 25.  Instead, the Spanish proceeding concerns the insolvency of a Spanish company, not any of the topics of CIR 112.[14]

Defendants may be seeking documents related to the Spanish proceeding for some purpose other than this lawsuit.  As revealed by documents produced by Defendants, *see* Lewis Decl. at Ex. 2, the Spanish proceeding is a Fusion "project" of interest.  Defendants should not be permitted to use this litigation to attempt to get information irrelevant to this lawsuit, for Defendants' use in some other context.[15]

---

[14] If the Plaintiffs did have documents in their possession, custody, or control relating to the Spanish Proceeding that were also relevant to the truth/falsity of the defamatory statements at issue here, these documents would have been produced in response to Defendants' other document requests.  Accordingly, to the extent that no such documents were produced, it is because Plaintiffs do not have any.

[15] Defendants have previously revealed that they view litigation discovery as a means to obtain information that furthers their business interests.  For example, in the book Crime in Progress, Defendants expressed excitement about being sued by Michael Cohen because it would allow them to get information they had been after for years in discovery.  *See* Crime in Progress at 233 (Lewis Decl. Ex. 3).

15

In sum, Defendants' motion to compel production of the Spanish proceeding documents appears to be an improper "fishing expedition" for documents wholly unrelated to the issues in the matter and therefore should be denied.

**C.**     **Documents Related to the Mueller Investigation Are Protected by the Grand Jury Privilege**

Defendants also seek to compel the production of "all documents received by, produced by, or served upon Plaintiffs" in connection with the Mueller Investigation or any other Trump Investigation, including "all transcripts of deposition or trial testimony provided by Plaintiffs under oath in any fact-finding proceeding, investigation, or legal proceeding."  Mem. at 26.   But grand jury proceedings are generally secret and those involved in them prohibited from disclosing any matter related to the proceedings.  *See* Fed. R. Crim. P. 6(e).  Thus, the record of the Mueller investigation is subject to grand jury secrecy unless a court determines otherwise. *See U.S. House of Representative v. United States DOJ (In re Comm. on the Judiciary)*, 951 F.3d 589, 595 (D.C. Cir. 2020).  And, as the D.C. Circuit has held, "disclosure of matters occurring before the grand jury is the exception and not the rule."  *McKeever v. Barr*, 920 F.3d 842, 844 (D.C. Cir. 2019) (quoting *Fund of Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 868 (D.C. Cir. 1981)).   The documents sought by Defendants consisting of attorney proffers, pre-testimony witness interviews and grand jury testimony are protected by grand jury secrecy.

Courts have also held that grand jury secrecy rights encompass the right of a witness not to produce grand jury materials in discovery in a civil action.  *See*, *e.g. SEC v. Oakford Corp.*, 141 F. Supp. 2d 435, 437 (S.D.N.Y. 2001) ("[A] witness may not be compelled to testify whether or not he has appeared and testified before a grand jury as to a particular matter, absent a court order to do so … [and] absent a strong showing of necessity[.]").  Indeed, "the right to the

16

secrecy of the testimony of a grand jury witness belongs to the witness and thus the privilege is his to waive." *In re Sealed Motion*, 880 F.2d 1367, 1372 (D.C. Cir. 1989) (summarizing Professor Wigmore's explanation).  This is because "[t]he theory of the privilege is that the witness is guaranteed against compulsory disclosure." *Id.* (quoting VIII J. Wigmore, Evidence § 2362 (McNaughton Rev.1961)); *accord*, *e.g. In re Grand Jury*, 490 F.3d 978, 985 (D.C. Cir. 2007) ("[T]he theory of grand jury secrecy is that 'the witness is guaranteed against compulsory disclosure; the *privilege* must therefore be *that of the witness*, and rests upon his consent.'") (quoting 8 J. Wigmore, Evidence In Trials At Common Law § 2362 (McNaughton rev. 1961))

In determining whether requested materials are covered by the grand jury secrecy rules, the "key test" is whether "disclosure of documents … 'would tend to reveal some secret aspect of the grand jury's investigation.'"  *Moore v. Hartman*, 102 F. Supp. 3d 35, 108 (D.D.C. 2015) (quoting *Senate of the Com. of Puerto Rico ex rel of Judiciary Comm. v. U.S. Dep't of Justice*, 823 F.2d 574, 582 (D.C. Cir. 1987)).  The test is met when "the documents themselves or the context in which they are described, relayed or communicated indicates that they were a focus of grand jury attention and, thereby, 'reveal some secret aspect of the grand jury's investigation.'" *Moore*, 102 F. Supp. 3d at 109 (quoting *Lopez v. Dep't of Justice*, 393 F.3d 1345, 1349 (D.C. Cir. 2005)).

Defendants' broad request would necessarily reveal the grand jury's inner process, including what documents it sought and what information was the focus of its investigation. Indeed, Defendants do not fault Plaintiffs for failing to produce pre-existing documents that were provided to investigators, but rather fault Plaintiffs for not producing "document[s] *generated* in the course of the Mueller investigation." Mem. at 27 (emphasis added).  That is, Defendants seek Mr. Aven's "interview, [attorney] proffer, and grand jury testimony."  Mem. at 28.  But as

documents that were generated during the course of the grand jury investigation which would reveal its content, these documents are protected from disclosure by the grand jury secrecy rules. *See*, *e.g. Bartko v. DOJ*, 898 F.3d 51, 73 (D.C. Cir. 2018) (explaining that Rule 6(e) protects, among other things, "the substance of testimony, the strategy or direction of the investigation, [and] the deliberations or questions of jurors"); *Lopez*, 393 F.3d at 1350 (noting that, "[i]n many cases," information related to preliminary witness interviews is covered under Rule 6(e) when it was compiled in the process of "screening" a potential witness); *Moore*, 102 F. Supp. 3d at 109 ("[A] grand jury transcript or a grand jury subpoena would fall squarely within the protection of Rule 6(e), since such records demonstrably reveal the inner workings of the grand jury."); *In re Sulfuric Acid Antitrust Litig.*, 2004 U.S. Dist. LEXIS 6194, at *9 (N.D. Ill. Apr. 9, 2004) ("case law recognizes that the identification and production of materials supplied to the grand jury may permit discerning attorneys to learn not only the information contained in specific documents, but the pattern of the grand jury's entire investigation") (quotation and citation omitted).

The application of these principles to the Mueller Investigation documents did not evaporate with the conclusion of that investigation. Instead, the secrecy of a grand jury proceeding continues even after its conclusion. *See Illinois v. Sarbaugh*, 552 F.2d 768, 774-75 (7th Cir. 1977) ("The reason [for secrecy] that survives the grand jury's term and the criminal proceeding is the need to protect the grand jury witnesses from retaliation, lest witnesses before future grand juries be inhibited by the knowledge 'that the secrecy of their testimony [may] be lifted tomorrow.'") (quoting *U.S. v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958)); *United States v. Shamsideen*, 2004 U.S. Dist. LEXIS 9560, at *27-28 (S.D.N.Y. Mar. 31, 2004) ("[T]he grand jury has concluded, but the witnesses who testified have an interest in the secrecy of the proceedings with respect to their identities and their testimony. The fact that the names of the

18

two witnesses at issue have been disclosed to the Defendants reduces this interest, but does not eliminate it. More particularly, a witness's right to secrecy does not end with the disclosure of his or her name. A witness has an on-going interest in the secrecy of the substance of his or her testimony to the grand jury.").

Thus, the Supreme Court has held that a motion to compel production of grand jury materials (such as a transcript of a witness's testimony) should be denied, despite the apparent relevance and usefulness of the materials in civil case, unless the requesting party shows that "without the transcript a defense would be greatly prejudiced or that without reference to it an injustice would be done." *Procter & Gamble*, 356 U.S. at 682; *compare In re Comm. on the Judiciary*, 951 F.3d at 600-01 (although the need for secrecy of Mueller grand jury materials remains, members of Congress had a compelling need for disclosure in support of presidential impeachment investigation). "A private party requesting disclosure of grand jury material pursuant to Rule 6(e)(3)(C)(i) has the burden of demonstrating particularized need, *i.e.*, that (a) the material sought is needed to avoid a possible injustice, (b) the need for disclosure is greater than the need for secrecy, and (c) the request is structured to cover only material so needed." *Cullen v. Margiotta*, 811 F.2d 698, 715 (2d Cir. 1987) (citing *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222-23 (1979). The need for grand jury transcripts must "be made with particularity." *Douglas Oil*, 441 U.S. at 221 (quotation omitted).

The burden is not easily met. "Requests for wholesale disclosures should generally be denied, especially in a civil case." *Cullen*, 811 F.2d at 715; *accord Shell v. Wall*, 760 F. Supp. 545, 547 (W.D.N.C. 1991). "The fact that access to the grand jury testimony would have saved plaintiffs a good deal of time and expense is not a sufficient reason to breach grand jury secrecy." *Cullen*, 811 F.2d at 715. Defendants have not even attempted to meet this exacting

19

burden to show why they need documents *generated* during the course of the Mueller

Investigation.  Accordingly, this request should be denied.[16]

## D.   Defendants Can Obtain Documents from the U.K. Proceeding Themselves as Evidenced by Their Use of Those Documents in Motion Practice Before this Court

Finally, Defendants seek to compel the production of documents produced in a recent

British court proceeding, *Aven v. Orbis*, to support their defense.  It is well established that

discovery need not be required of publicly available documents and records which are accessible

to all parties.  *See Fitts v. Unum Life Ins. Co. of Am.*, 2007 U.S. Dist. LEXIS 33397, at *54

(D.D.C. May 7, 2007) (medical records of party were available via an authorization); *Dushkin*

*Pub. Group, Inc.*, 136 F.R.D. at 335 (documents available from court clerk).  Here, given

Defendants' repeated reference to and reliance on documents from the British court proceeding

throughout their motion papers, it is clear that Defendants have ready access to those documents.

Moreover, the parties have an agreement under which neither side need produce publicly

available information to the other.  In this light, Plaintiffs have no obligation to produce these

documents.

The British proceeding documents whose disclosure Defendants seek to compel consist

of Plaintiffs' witness statements, a trial transcript, and trial exhibits.  These documents are

publicly available on the English Court's electronic filing system.  Furthermore, all transcripts,

orders, judgments, and statements of the case, are available by request.[17]

---

[16] Defendants incorrectly suggest that the Mueller Report demonstrates that Mr. Aven sought to contact the Trump Transition team on behalf of the Russian government.  In fact, the U.K. High Court recently held that Mr. Aven did not seek to contact the Trump Transition team on behalf of the Russian government.  *See* July 8, 2020 Approved Judgment (Case No: QB-2018-006349) at ¶ 171 (https://www.bailii.org/ew/cases/EWHC/QB/2020/1812.html).

[17] As Plaintiffs have previously notified Defendants, the procedure to obtain these documents is to fill out specific forms—EX107 and N244—the latter of which entails a *pro forma* application to the English High Court.  *See* Levy Decl. Ex. 3 at 9.

Defendants argue that it would be burdensome for them to obtain the English proceeding documents because the form to request them mentions the possibility of a public hearing. *See* Mem. at 31.  However, Defendants are relying on speculation, as they fail to represent that they have made any effort to obtain the documents directly from the U.K. Court.  Evidently, Defendants merely looked at the form, *assumed* that they would be required to appear for a hearing, and then filed the instant motion to compel.[18]

Defendants do not offer any reason to believe that the British court would make them appear for a hearing on a simple request to obtain court documents.  The referenced form is used for a wide variety of requests, applications or motions.  For example, the notes for guidance appended to the form reference applications to set aside, vary, or suspend judgments. *See* Levy Decl. Ex. 12 at 3.  It is not surprising therefore, that it references a hearing as many of the types of requests covered by the form would necessitate a hearing.  There is no indication on the form or other support provided by Defendants for the notion that a simple request to obtain court documents like witness statements or exhibits would require a court hearing.

Indeed, Defendants appear to have obtained many documents from the U.K. proceeding without significant trouble.  Defendants clearly have the trial transcript and witness statements—such documents were cited in Defendants' first motion to compel as well as the present motion. Notably, these documents are not listed in the docket sheet Defendants attached to their motion to compel.  *See* Levy Decl. Ex. 16.  Therefore, they appear to be able to access documents other than the ones listed in the docket sheet they included.  Respectfully, there is no reason why Defendants cannot also utilize the U.K. court document application process to obtain the other

---

[18] Defendants' position is inconsistent with their insistence that Plaintiffs seek court intervention to obtain a deposition transcript from the related *Gubarev* litigation in the Southern District of Florida.  *See* Levy Apr. 16, 2020 Ltr. at 6 (Dkt. 78-10).

U.K. documents they seek.  In any event, the recent judgment in favor of Plaintiffs in that

proceeding is available at https://www.bailii.org/ew/cases/EWHC/QB/2020/1812.html.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

Motion.


Dated: September 11, 2020
        New York, New York

CARTER LEDYARD & MILBURN LLP


By:        */s/ Alan S. Lewis*

Alan S. Lewis
2 Wall Street
New York, NY 10005
(917) 533-2524
lewis@clm.com

Kim Sperduto
SPERDUTO THOMPSON & GASSLER PLC
1747 Pennsylvania Avenue, NW, Suite 1250
Washington, D.C. 20006
(202) 408-8900
ksperduto@stglawdc.com

*Attorneys for Plaintiffs*

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of September 2020, I electronically filed and served the foregoing using the CM/ECF system.

_____*/s/ Alan S. Lewis*_____
Alan S. Lewis

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

-------------------------------------------------------------------
)
MIKHAIL FRIDMAN, PETR AVEN, and )
GERMAN KHAN, )
)
)
*Plaintiffs,* )
) Case No. 1:17-cv-02041 (RJL)
)
v. )
)
)
BEAN LLC (a/k/a FUSION GPS) and GLENN )
SIMPSON, )
*Defendants*. )
-------------------------------------------------------------------)

**DECLARATION OF ALAN S. LEWIS**
**IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL PLAINTIFFS'**
**PRODUCTION OF DOCUMENTS**

I, Alan S. Lewis, declare under penalty of perjury as follows:

1.      I am an attorney duly licensed to practice law in this Court.  I am a partner at the

law firm of Carter Ledyard & Milburn LLP, and represent Plaintiffs Mikhail Fridman, Petr

Aven, and German Kahn, in the above-captioned case.

2.      This Declaration is submitted in support of Plaintiffs' opposition to Defendants'

motion to compel production of documents filed August 14, 2020 (Dkt. 94).  I am fully familiar

with the facts and circumstances of this case.

3.      Annexed hereto as **Exhibit 1** is a true and correct copy of the pre-2016 documents

Plaintiffs produced as PDDC00008302, PDDC00008304, and PDDC00008316.

4.      Annexed hereto as **Exhibit 2** is a true and correct copy of documents produced

and bates stamped DEFS0011790-92 by Defendants, except that they have been converted from

Excel to PDF format for the purposes of filing.

5.      Annexed hereto as **Exhibit 3** is a true and correct excerpt of Crime in Progress:

The Secret History of the Trump-Russia Investigation, written by Glenn R. Simpson and Peter

Fritsch.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on September 11, 2020                            _____/s/ Alan S. Lewis_____

                                                                                  Alan S. Lewis

# EXHIBIT 1

**From:** Nuland, Victoria J
**Sent:** Thursday, 05 March 2015 13:47
**To:** Михаил Фридман
**Subject:** Re:

Thanks, M. I was frankly surprised the question came up. Best, t

From: Михаил Фридман
Sent: Thursday, March 5, 2015 8:15 AM
To: Nuland, Victoria J
Subject:

Dear Mrs. Nuland,

I would like to express our sincere gratitude for your support to our company and to me personally which you have demonstrated during your recent speech in Congress. This support is extremely important for us right now especially in the conditions of conflicts escalation between Russia and the West which caused the growing challenges of development of our business in the European Union.

I firmly believe that the problems in political relations between the two countries should not interfere the cooperation in the humanitarian sphere, in the sphere of science, should not be an obstacle to investment of independent private Russian business into Western economy, and Western – to Russia.

I am pleased to have the opportunity to discuss these issues with you and I am glad that you share my persuasions that consolidation of cooperation between private companies of Russia and the West, the mutual renunciation of discrimination of such companies will serve to normalization in the political relations in the future as well.

Thank you once again for your support.

Sincerely yours,

Mikhail Fridman

Highly Confidential - Personal Data Material

**From:** Михаил Фридман
**Sent:** Thursday, 05 March 2015 13:16
**To:** nulandvj@state.gov
**Subject:**

Dear Mrs. Nuland,


I would like to express our sincere gratitude for your support to our company and to me personally which you have demonstrated during your recent speech in Congress. This support is extremely important for us right now especially in the conditions of conflicts escalation between Russia and the West which caused the growing challenges of development of our business in the European Union.


I firmly believe that the problems in political relations between the two countries should not interfere the cooperation in the humanitarian sphere, in the sphere of science, should not be an obstacle to investment of independent private Russian business into Western economy, and Western – to Russia.


I am pleased to have the opportunity to discuss these issues with you and I am glad that you share my persuasions that consolidation of cooperation between private companies of Russia and the West, the mutual renunciation of discrimination of such companies will serve to normalization in the political relations in the future as well.


Thank you once again for your support.


Sincerely yours,


Mikhail Fridman

**From:** Михаил Фридман
**Sent:** Thursday, 05 March 2015 13:16
**To:** nulandvj@state.gov
**Subject:**

Dear Mrs. Nuland,


I would like to express our sincere gratitude for your support to our company and to me personally which you have demonstrated during your recent speech in Congress. This support is extremely important for us right now especially in the conditions of conflicts escalation between Russia and the West which caused the growing challenges of development of our business in the European Union.


I firmly believe that the problems in political relations between the two countries should not interfere the cooperation in the humanitarian sphere, in the sphere of science, should not be an obstacle to investment of independent private Russian business into Western economy, and Western – to Russia.


I am pleased to have the opportunity to discuss these issues with you and I am glad that you share my persuasions that consolidation of cooperation between private companies of Russia and the West, the mutual renunciation of discrimination of such companies will serve to normalization in the political relations in the future as well.


Thank you once again for your support.


Sincerely yours,


Mikhail Fridman

Highly Confidential - Personal Data Material

# EXHIBIT 2

| Project | Description | Manager | Staff | Contractor1 | Contractor2 | Contractor3 | Contractor4 | 60-day Budget |
|---|---|---|---|---|---|---|---|---|
| Canvas of Rim States | Estonia, Sweden, Latvia, Lithuania, Finland, Poland | Fritsch/King | | Veracity | Orbis | | | 200 |
| Canvas of  Nato Majors | UK, Germany, France, ex-diplos, ex-NSC | Fritsch/King | Bagwell | Veracity | Orbis | | | 150 |
| Cyber Propaganda | Webzilla, Soldukin, et al , Breitbart, Gorka | King/Simpson | Seago | Mikey D? | Sub in NL | Crowdstrike? D Berlin? | Sayari/C4 | 200 |
| Info Intake Portal | Solicit tips, Crowsourcing, Digital library site | King/Catan | Seago | Mikey D? | | | | 25 |
| Front Groups & Lobbying | Center for National Interest | Simpson | Berkowitz Bagwell Michaels | Leach | | | | 0 |
| Alfa | Secret Server & Ties to Putin | Fritsch/Simpson | | | | | | 0 |
| Carter Page | Business dealings in 2016 | Simpson | Berkowitz | Edward B. | C4 | | | 35 |
| Bayrock | Identify sources of funds | Corcoran | Berkowitz | Sayari | C4 | | | 35 |
| Manafort | | Corcoran | Berkowitz | Edward B. | Sayari | C4 | | 35 |
| NRA | | Corcoran | Bagwell | Edward B. | Leach | Mintz | | 150 |
| Italy & Eastern Europe ties to DT | Romania, Czech, Italy/Zampolli | King | Berkowitz | Ricketts | | | | 100 |
| Campaign funding | Russians w/green cards, C4s | Simpson | Seago, Michaels | Chapman | | | | 35 |
| Agalarov Family deals with DT | | Corcoran | Sears, Berkowitz | Alaco? | | | | 70 |
| Deutsche Bank & other Loans to DT | | Simpson | Berkowitz | Indian guy | Crawford? | | | 50 |
| DT Condo Sales | | Corcoran | Berkowitz | Leach | Anson | | | 50 |
| Michael Cohen & Family | Jason Greenblatt | Simpson | Berkowitz/Sears | Ed B., Dizenko | | | | 35 |
| Republican Primaries | | King/Simpson | Michaels | Lloyd G | | | | 25 |
| Euro Elections | France, Germany, NL | King | | Orbis | | | | 100 |
| Foreign Hotels | Panama, Dubai, Toronto, Istanbul | Simpson | Berkowitz | Anson | | | | 120 |
| Tech Transfer | | Simpson | Bagwell | | | | | 0 |
| Timelines | DT,PM,CP,IT,JK,MF,RS,MC | Jones | TDIP | | | | | 0 |
| History of DT-Russia | Early trips & genesis of ties. Lorber, Geovanis. | Jones | TDIP/Berkowitz | Alaco? | Orbis | | | 0 |
| Papadopoulos/Wikileaks | Life in London & Poss. Ties to Assange | Simpson | | Orbis | Alaco? | | | 50 |
| Trump Kids/Kushner | | Simpson | Berkowitz, Sears | | | | | 0 |
| Spain | Firtash, Torshin, Fridman, Vlad | Fritsch/Corcoran/Catan | | Anson | K2 | | | 0 |
| Russian Intell in Latin America | | Corcoran | Farah | | | | | 20 |

## LAUNCH OF INITIAL DATA ANALYSIS AND INVESTIGATIONS FOR PROJECT PARTNERS

| # | Investigations and Projects | Description | 60-day Budget | Lead | Staff | Sub Con 1 | Sub Con 2 | Sub Con 3 | Sub Con 4 | | Sub Con 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Information Canvas of Rim States | Estonia, Sweden, Latvia, Lithuania, Finland, Poland | $ 200,000.00 | Fritsch/King | | Veracity | Orbis | | | | |
| 2 | Information Canvas of NATO Major Players | UK, Germany, France, ex-diplos, ex-NSC | $ 150,000.00 | Fritsch/King | Bagwell | Veracity | Orbis | | | | |
| 3 | Cyber Propaganda Investigation | Webzilla, Soldukin, et al , Breitbart, Gorka | $ 200,000.00 | King/Simpson | Seago | Mikey D? | Sub in NL | Crowdstrike? | D Berlin? | cameron | Sayari/C4 |
| 4 | Creation Intake Portal for Information | Solicit tips, Crowsourcing, Digital library site | $ 25,000.00 | King/Catan | Seago | Mikey D? | | | | | |
| 5 | Ident of Front Groups & Lobbying Efforts | Center for National Interest | $ - | Simpson | Berkowitz Bagwell Michaels | Leach | | | | | |
| 6 | Alfa Bank- Detailed Backgrounder and Links | Secret Server & Ties to Putin | $ - | Fritsch/Simpson | | | | | | | |
| 7 | Carter Page Investigation | Full Profile:  Business dealings in 2016 | $ - | Simpson | Berkowitz | Edward B. | C4 | | | | |
| 8 | Boris Epshteyn | | | | | | | | | | |
| 9 | Bayrock Investigation | Identify sources of funds esp FL Group | $ 35,000.00 | Corcoran | Berkowitz | Sayari | C4 | | | | |
| 10 | Paul Manafort Investigation | Full Profile:  Business Dealings and Entrance to CM, Cyprus | $ 35,000.00 | Corcoran | Berkowitz | Edward B. | Sayari | C4 | | | |
| 11 | NRA Election and Russian Intel Ties | | $ 150,000.00 | Corcoran | Bagwell | Edward B. | Leach | Mintz | | | |
| 12 | Italy & Eastern Europe ties to DT | Romania, Czech, Italy/Zampolli | $ 100,000.00 | King | Berkowitz | Ricketts | | | | | |
| 13 | Campaign Funding Analysis | Russians w/green cards, C4s | $ 35,000.00 | Simpson | Seago, Michaels | Chapman | | | | | |
| 14 | Agalarov Family Financial Dealings w/Subject 1 | | $ 70,000.00 | Corcoran | Sears, Berkowitz | Alaco? | | | | | |
| 15 | Deutsche Bank & Other Lending to Subject 1 | | $ 50,000.00 | Simpson | Berkowitz | Indian guy | Crawford? | | | | |
| 16 | Subject 1 Condo Sales | | $ 50,000.00 | Corcoran | Berkowitz | Leach | Anson | | | | |
| 17 | Michael Cohen & Family Analysis and Investigation | Jason Greenblatt | $ 35,000.00 | Simpson | Berkowitz/Sears | Ed B., Dizenko | | | | | |
| 18 | Republican Primaries & Russian Intel Subversion | | $ 25,000.00 | King/Simpson | Michaels | Lloyd G | | | | | |
| 19 | Euro Elections and Russian Intel | France, Germany, NL | $ 100,000.00 | King | | Orbis | | | | | |
| 20 | Analysis of Foreign Hotels Related to Subject 1 | Panama, Dubai, Toronto, Istanbul | $ 120,000.00 | Simpson | Berkowitz | Anson | | | | | |
| 21 | Russian Intel Tech Theft from US/West | | $ - | Simpson/Felch | Bagwell | | | | | | |
| 22 | Timelines- All Events & Individuals-Citations | DT,PM,CP,IT,JK,MF,RS,MC | $ - | Jones | TDIP | | | | | | |
| 23 | History of Subject 1 in Russia | Early trips & genesis of ties. Lorber, Geovanis. | $ - | Jones | TDIP/Berkowitz | Alaco? | Orbis | | | | |
| 24 | Papadopoulos/Wikileaks Investigation | Life in London & Poss. Ties to Assange | $ 50,000.00 | Simpson | | Orbis | Alaco? | | | | |
| 25 | Subject 1 Relatives/Chidren/Kushner | | $ - | Simpson | Berkowitz, Sears | | | | | | |
| 26 | Spain Sensitive | Firtash, Torshin, Fridman, Vlad | $ - | Fritsch/Corcoran/Catan | | Anson | K2 | | | | |
| 27 | Russian Intel Influence Presence in Latin America | | $ 20,000.00 | Corcoran | | Farah | | | | | |
| 28 | Weiner Case/Pharma | - | $ - | | | | | | | | |
| 29 | Sensitive Pending | - | $ - | | | | | | | | |
| 30 | Sensitive Pending | - | $ - | | | | | | | | |
| | | - | $ - | | | | | | | | |
| | | | TOTAL $ 1,450,000.00 | | | | | | | | |

## LAUNCH OF INITIAL DATA ANALYSIS AND INVESTIGATIONS FOR PROJECT PARTNERS

| # | Investigations and Projects | Description | 60-day Budget | Lead | Staff | Sub Con 1 | Sub Con 2 | Sub Con 3 | Sub Con 4 | | Sub Con 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Information Canvas of Rim States | Estonia, Sweden, Latvia, Lithuania, Finland, Poland | $ 200,000.00 | Fritsch/King | | Veracity | Orbis | McKew | | | |
| 2 | Information Canvas of NATO Major Players | UK, Germany, France, ex-diplos, ex-NSC | $ 150,000.00 | Fritsch/King | | Veracity | Orbis | | | | |
| 3 | Cyber Propaganda Investigation | Webzilla, Soldukin, et al , Breitbart, Gorka | $ 200,000.00 | King/Simpson | Seago | Mikey D? | Sub in NL | Crowdstrike? | D Berlin? | cameron | Sayari/C4 |
| 4 | Creation Intake Portal for Information | Solicit tips, Crowsourcing, Digital library site | $ 25,000.00 | King/Catan | Seago | Mikey D? | | | | | |
| 5 | Front Groups & Lobbying Efforts | Center for National Interest | $ - | Simpson | Berkowitz Bagwell Michaels | Leach | | | | | |
| 6 | Alfa Bank- Detailed Backgrounder and Links | Secret Server & Ties to Putin | $ - | Fritsch/Simpson | | | | | | | |
| 7 | Carter Page Investigation | Full Profile:  Business dealings in 2016 | $ - | Simpson | Berkowitz | Edward B./Diz | C4 | | | | |
| 8 | Boris Epshteyn | | | | | | | | | | |
| 9 | Bayrock Investigation | Identify sources of funds esp FL Group | $ 35,000.00 | Corcoran | Berkowitz | Sayari | C4 | | | | |
| 10 | Paul Manafort Investigation | Full Profile:  Business Dealings and Entrance to CM, Cypru | $ 35,000.00 | Corcoran | Berkowitz | Edward B. | Sayari | C4 | | | |
| 11 | NRA Election and Russian Intel Ties | | $ 150,000.00 | Corcoran | Bagwell | Edward B. | Leach | Mintz | | | |
| 12 | Italy & Eastern Europe ties to DT | Romania, Czech, Italy/Zampolli | $ 100,000.00 | King | Berkowitz | Ricketts | | | | | |
| 13 | Campaign Funding Analysis | Russians w/green cards, C4s | $ 35,000.00 | Simpson | Seago, Michaels/Bagwell | Chapman | | | | | |
| 14 | Agalarov Family Financial Dealings w/Subject 1 | | $ 70,000.00 | Corcoran | Sears, Berkowitz | Alaco? | | | | | |
| 15 | Deutsche Bank & Other Lending to Subject 1 | | $ 50,000.00 | Simpson | Berkowitz | Indian guy | Crawford? | | | | |
| 16 | Subject 1 Condo Sales | | $ 50,000.00 | Corcoran | Berkowitz | Gormley | Anson | | | | |
| 17 | Michael Cohen & Family Analysis and Investigation | Jason Greenblatt | $ 35,000.00 | Simpson | Berkowitz/Sears | Ed B., Dizenko | | | | | |
| 18 | Republican Primaries & Russian Intel Subversion | | $ 25,000.00 | King/Simpson | Michaels/Seago | | | | | | |
| 19 | Euro Elections and Russian Intel | France, Germany, NL | $ 100,000.00 | King | | Orbis | | | | | |
| 20 | Analysis of Foreign Hotels Related to Subject 1 | Panama, Dubai, Toronto, Istanbul | $ 120,000.00 | Simpson | Berkowitz | Anson | | | | | |
| 21 | Russian Intel Tech Theft from US/West | | $ - | Simpson/Felch | Bagwell | | | | | | |
| 22 | Timelines- All Events & Individuals-Citations | DT,PM,CP,IT,JK,MF,RS,MC | $ - | Jones | TDIP | | | | | | |
| 23 | History of Subject 1 in Russia | Early trips & genesis of ties. Lorber, Geovanis. | $ - | Jones | TDIP/Berkowitz | Alaco? | Orbis | | | | |
| 24 | Papadopoulos/Wikileaks Investigation | Life in London & Poss. Ties to Assange | $ 50,000.00 | Simpson | | Orbis | Alaco? | | | | |
| 25 | Subject 1 Relatives/Chldren/Kushner | | $ - | Simpson | Berkowitz, Sears | | | | | | |
| 26 | Spain Sensitive | Firtash, Torshin, Fridman, Vlad | $ - | Fritsch/Corcoran/Catan | | Anson | K2 | | | | |
| 27 | Russian Intel Influence Presence in Latin America | | $ 20,000.00 | Corcoran | | Farah | | | | | |
| 28 | Weiner Case/Pharma | - | $ - | | | | | | | | |
| 29 | Jared/Beny | - | $ - | | | | | | | | |
| 30 | Sensitive Pending | - | $ - | | Veracity | | | | | | |
| | | - | $ - | | | | | | | | |
| | | | **TOTAL** $ 1,450,000.00 | | | | | | | | |

# EXHIBIT 3



In the middle of that exercise, a ripple of gasps and chuckles coursed through the office when up popped a news alert: Michael Cohen, the president's pit bull personal lawyer, had filed a defamation lawsuit in U.S. federal court accusing Fusion and Simpson of spreading false allegations, via the dossier, about Cohen's alleged interactions with various Russians. These reports had done "harm to his personal and professional reputation," the suit claimed. Cohen wanted to defend his honor in a trial by jury. His complaint, along with another against *BuzzFeed,* was filed one day shy of a year after the website had published the dossier, barely beating the buzzer on the statute of limitations for defamation.

No one at Fusion relished another depleting wave of legal fees and the distraction of another court battle—the fourth in a year. But there was the potential for getting court-ordered access to Cohen, his records, his friends and associates—even potentially the president himself. "He's going to lose this suit," Fritsch said. "Yeah," Catan replied, "but hopefully not before we get discovery."

Fusion could easily draw up a long list of things they would like to extract from Cohen—his whereabouts during the summer of 2016, when Steele's reporting placed him at a meeting with Russians in Prague; his passport and travel records; his emails; any recordings or notes of conversations with Trump or his campaign team. And that was even before delving into the reputational issues around Cohen's colorful history as a mob lawyer and would-be casino operator.

Fusion, it turned out, knew a lot about Michael Cohen—more by then, probably, than any news or law enforcement organization. It was information they'd accumulated and dug up over many months, ever since Steele spotlighted Cohen as a central player in the Trump-Russia relationship in 2016. All that work established that no incoming president in recent U.S. history had worked so closely with a person of such obvious ill repute. Cohen had been a bright-red warning signal flashing in plain sight. And yet no one paid him much mind until well after Election Day.


Cohen had surfaced early in the Bangor assignment, but only peripherally. At first, he seemed to be merely another brash New Yorker and loyalist working for Trump. He was the guy who would call gossip columnists to slip them some scoop favorable to Trump, or political reporters to scream about a story the boss didn't like. Oddly, he was also the

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MIKHAIL FRIDMAN, PETR AVEN, and GERMAN KHAN,<br><br>*Plaintiffs,*<br><br>v.<br><br>BEAN LLC (a/k/a FUSION GPS) and GLENN SIMPSON,<br>*Defendants.* | )<br>)<br>)<br>)<br>)  Case No. 1:17-cv-02041 (RJL)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>PROPOSED ORDER</u>

Upon consideration of Defendants Bean LLC's and Glenn Simpson's Motion to Compel Plaintiffs' Production of their Documents, filed Aug. 14, 2020 (Dkt. 94) (the "Motion"), the Court ORDERS that:

The Motion is DENIED.

.

_____
Richard J. Leon
Senior United States District Judge