### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MIKHAIL FRIDMAN, PETR AVEN, and GERMAN KHAN,<br><br>          Plaintiffs,<br><br>     v.<br><br>BEAN LLC a/k/a FUSION GPS, and GLENN SIMPSON,<br><br>          Defendants. | Civil Case No. 1:17-cv-2041-RJL |

## DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL PLAINTIFFS' PRODUCTION OF THEIR DOCUMENTS

Worth billions, the Russian oligarch Plaintiffs are free to file a defamation suit against an American business, but they are not free to ignore their obligations to comply with an American court's rules. Plaintiffs have repeatedly used the discovery process to prejudice Defendants in this litigation, and, in the instant dispute, have attempted to disguise those tactics by re-inventing the substance of the statements at the heart of this litigation and deciding for themselves what information is relevant to a public figure analysis under D.C. law.

Plaintiffs seek to evade Rule 34 in at least four distinct ways. First, Plaintiffs falsely inform the Court that they have reviewed and produced all relevant pre-2016 documents. They have not. Instead, they have only produced pre-2016 documents relevant to *their* interpretation of what the alleged defamatory statements mean and what is relevant to *their* theory of the case.

Second, Plaintiffs continue to withhold production of other relevant documents, such as those related to the Special Counsel's investigation into Alfa and Plaintiff Aven. Plaintiffs do not dispute their relevance to the case. Federal Rule of Criminal Procedure 6(e) does not apply to

Plaintiff Aven's interview and attorney proffer, and even if it did, he was a *witness* to whom grand jury secrecy does not apply. Moreover, he has consented to disclosure by filing this lawsuit.

Third, Plaintiffs continue to refuse to produce documents related to the Spanish government's investigation into Plaintiff Fridman's involvement in business corruption, which are relevant to the substantial truth of the alleged defamatory statements that he provided significant favors to government officials (*e.g.*, cash payments) and also Plaintiff Fridman's claim that such statements are defamatory and injured him.

Fourth, Plaintiffs have documents related to their UK trial, but are refusing to provide them to Defendants under the pretense that they are "publicly available," even though obtaining them would require Defendants to obtain a foreign court order.

## ARGUMENT

### I.   Plaintiffs Have Not Searched for and Reviewed Documents Pursuant to Defendants' View of Relevance.

Plaintiffs are attempting to block Defendants' ability to prove substantial truth of the statements at issue by claiming that documents relevant to that defense are not relevant simply because they do not support *Plaintiffs'* theory of the case. Indeed, the issue underlying this entire discovery dispute is that Plaintiffs have steadfastly refused to review and produce documents—regardless of time period—*pursuant to Defendants' interpretations of the meaning of the alleged defamatory statements in CIR 112*. Defendants are entitled to discovery "regarding any nonprivileged matter that is relevant to *any* party's claim or defense," Fed. R. Civ. P. 26(b)(1), but Plaintiffs have only produced documents supportive of Plaintiffs' claims and pursuant to Plaintiffs' theory of the case. The Court should not permit Plaintiffs to thwart discovery with these games. *See Tavoulareas v. Piro*, 93 F.R.D. 11, 20 (D.D.C. 1981) (in a defamation action, ordering the

plaintiffs to respond to document requests and interrogatories pursuant to *defendants' definitions* of the corporate entities involved).

In their brief, and throughout months of meet and confer correspondence, Plaintiffs have refused to represent that they reviewed and produced documents based on Defendants' view of relevance in this case. *See* Defs.' Br. at 11 & May 22 Letter at 2-4. Here, in Court, they continue to refuse to state whether they have done so, asserting only that they "produced all relevant pre-2016 documents," Pls.' Opp. at 6, while not representing that they have taken into account Defendants' view of the issues in this case when reviewing documents for relevance. The scope of discovery is not controlled by Plaintiffs' position alone. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 (1978) (holding that discovery may "proper[ly]" be denied where a matter "is relevant only to claims or defenses that have been stricken, or to events that occurred before an applicable limitations period" but not where the parties have a mere disagreement over a claim) (footnote omitted).

Plaintiffs claim that they have searched for pre-2016 documents, Pls.' Opp. at 5-6, but the issue is that Plaintiffs have reviewed and produced *only* those pre-2016 documents relevant to *their* interpretation of the alleged defamatory statements, based on *their* interpretation of relevance. *See* Defs.' Br. at 10-12 (discussing the parties' correspondence showing that Plaintiffs' agreement to produce pre-2016 documents is largely meaningless because of Plaintiffs' narrow interpretation of relevance).[1] Plaintiffs conceded this point to Defendants in a letter dated August 4, 2020. Letter from A. Lewis to J. Levy (Aug. 4, 2020), Levy Decl., Ex. 2, at 1 (asserting that "the relevance

---

[1] Furthermore, Plaintiffs are clearly continuing to limit what they produce to discovery based on their incorrect claim that relevance is limited to 2016. For example, in their recently served Responses to Requests for Admission, Plaintiffs refuse to respond to requests that inquire about events outside of January 1, 2016 – October 3, 2017. This calls into doubt their claim that they did indeed search for pre-2016 documents.

standard Plaintiffs used when producing documents" for substantial truth or falsity is that "[a]side from the Govorun-related defamatory statement, the defamatory allegations challenged by Plaintiffs in this lawsuit are about Plaintiffs' purported conduct *in 2016*") (emphasis in original). Not surprisingly, Plaintiffs do not mention this letter in their brief, instead creating a smoke screen with prior correspondence that refused to clarify the point that Plaintiffs have refused to search for all relevant documents.[2]

While Plaintiffs continue to avoid directly admitting that they have refused to search for and produce documents relevant to Defendants' defense of substantial truth, that they have not done so is also evident from Plaintiffs' brief. For instance, Plaintiffs state that "they do not have any documents evidencing any misconduct or corruption involving themselves and Putin at any time." Pls.' Opp. at 9. But the statements that Plaintiffs challenge in CIR 112 do *not* include the words "misconduct" or "corruption." *Id.* Nor do they specifically refer to "misconduct or corruption involving [Plaintiffs] and Putin." *Id.* The statements in CIR 112 that Plaintiffs allege are false and defamatory refer to "significant favours" between Putin and Alfa; "Kremlin-Alpha Group Cooperation"; and the "continuing sensitivity of the PUTIN-Alpha relationship." *See* Pls.' Suppl. Resp. to Interrog. No. 2, Dkt. No. 78-6. Thus, while evidence of "misconduct or corruption" would certainly be relevant, relevance is not limited to favors that are tantamount to misconduct or corruption.

Instead, relevance encompasses a number of matters including the relationship between Putin or Kremlin and Plaintiffs or Alfa. Relevance "is broadly construed," *Food Lion, Inc. v. United Food & Commercial Workers Int'l Union, AFL-CIO-CLC*, 103 F.3d 1007, 1012 (D.C. Cir.

---

[2] Indeed, Plaintiffs' delay in clarifying their position after multiple attempts by Defendants at a straight answer is what delayed the filing of this motion. Having received the August 4, 2020 letter, however, the issue became ripe for a motion to compel.

1997), and certainly any evidence of any favors between Alfa and/or Plaintiffs and the Kremlin and/or Putin "encompass[es] any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case," *Oppenheimer Fund, Inc.*, 437 U.S. at 351 (citing *Hickman v. Taylor*, 329 U.S. 495, 501 (1947)). For instance, any and all documents relating to any favors done by the Russian Government for Alfa or Plaintiffs, or by Alfa/Plaintiffs for the Russian Government are relevant to the substantial truth of these statements. And such evidence does not have to show a *quid pro quo* or some other form of corruption or misconduct; CIR 112 just speaks of significant favors "done in both directions" – not that they were done simultaneously or tit-for-tat.

Any evidence relating to the relationship between the Kremlin and/or Putin and Alfa and/or Plaintiffs is relevant to the substantial truth of the statements at the heart of this litigation. Plaintiffs seek to avoid producing documents by claiming that only documents "evidencing" "misconduct or corruption" by Plaintiffs and Putin are relevant, and that position should be rejected.

## II.     Plaintiffs May Not Dictate the Scope of Relevance.

Plaintiffs cannot dictate the scope of relevance in this case by trying to dictate the meaning of the statements they claim are defamatory. Plaintiffs may be "masters of their own complaint," Pls.' Opp. at 2, as they repeatedly state in their brief, and Plaintiffs can select the statements that are defamatory, but Plaintiffs are decidedly *not* masters of the meaning of the statements they allege are defamatory. In a defamation suit, the meaning and scope of an allegedly defamatory publication is determined by a "reasonabl[e]" or "normal, everyday reading," *Tavoulareas v. Piro*, 817 F.2d 762, 780 (D.C. Cir 1987) (en banc), not by what Plaintiffs desire the meaning to be. *See also* Restatement (Second) of Torts § 563 (1977). A "publication must be taken as a whole." *Farah v. Esquire Magazine*, 736 F.3d 528, 535 (D.C. Cir 2013) (quoting *Afro-American Publ'g Co. v.*

*Jaffe*, 366 F.2d 649, 655 (D.C. Cir. 1966) (en banc)). When a court reviews a publication as a whole, the "[c]ontext is critical" for evaluating its meaning. *Farah*, 736 F.3d at 535. "Language is to be given its natural, plain, ordinary, obvious meaning and is to be construed in its popular sense." Sack on Defamation: Libel, Slander, and Related Problems § 2.4.2(A).

The Court should reject Plaintiffs' narrow interpretation of the alleged defamatory statements in CIR 112. Notably, in their brief, Plaintiffs do not quote the actual sentences in CIR 112 that they claim are false and defamatory, because the actual language does not support Plaintiffs' narrow views on relevance. In fact, Plaintiffs paraphrase the alleged defamatory statements to the point of inventing what those statements say. *See* Pls.' Opp. at 1.

First, Plaintiffs challenge this sentence in CIR 112 as false and defamatory: "Significant favours continued to be done in both directions, primarily political ones for PUTIN and business/legal ones for Alpha." Pls.' Suppl. Resp. to Interrog. No. 2, Dkt. No. 78-6. Rather than quote the statement in their brief, Plaintiffs contend this statement regarding the "continued" exchange of favors between Alfa and Putin is only an "allegation that at the time of the initial publication of CIR 112 in 2016 Plaintiffs were corruptly exchanging political favors for Putin in exchange for economic ones from Putin," Pls.' Opp. at 1. To be clear, CIR 112 says no such thing, and Plaintiffs' paraphrase of the language has invented a completely different statement. Under any reasonable construction of the sentence that actually appears in CIR 112, an allegation that "significant favours *continued*" in 2016 means that they were also occurring prior to 2016. *See* Defs.' Br. at 17-18. Moreover, viewed in the context of the whole document, which refers to the 'history and current state of relations" and provides historical examples of this relationship, it is clear that this sentence refers to pre-2016 events. CIR 112, Dkt. No. 20-2; *see also Klayman v. Segal*, 783 A.2d 607, 614 (D.C. 2001) (holding that "context" "serves as a constant reminder that

a statement in an article may not be isolated and then pronounced defamatory, or deemed capable of a defamatory meaning. Rather, any single statement or statements must be examined within the context of the entire article.").

The statement is also not limited to "corruptly exchanging" favors, Pls.' Opp. at 1; in fact, the sentence does not include the word "corruption" in any form. Nor is the sentence limited to "political favors for Putin" or "economic ones from Putin." Pls.' Opp. at 1. CIR 112 says that the favors were "*primarily* political ones" for Putin and "business/legal ones for Alfa" – but the text does not limit favors to such categories.

All documents that reflect or refer to any favors between Plaintiffs or Alfa, on the one hand, and the Russian Government or Putin, on the other, are relevant to Defendants' defense that this allegedly defamatory statement in the CIR 112 is substantially true.

Nor can Plaintiffs limit what the defamatory statements mean by not challenging the falsity of the statements as they relate to pre-2016 conduct; that merely goes to show that these alleged defamatory statements are substantially true as to conduct that pre-dates 2016. Plaintiffs state:

> CIR 112 is not explicit about when the corrupt, alleged exchange of favors began. However, by using the word "continued," it does clearly allege that a corrupt relationship and bribery were continuing in 2016, when CIR 112 was written. *Therefore, for the purposes of this lawsuit, Plaintiffs' claim treats the allegation of corruption and bribery—exchanging political favors for economic/business favors—as an allegation of conduct during 2016.*

Pls.' Suppl. Resp. to Interrog. No. 2, Dkt. No. 78-6, at 2–3 (emphasis added). Plaintiffs therefore effectively admit that the statements are not false and are substantially true for years prior to 2016. That admission does not limit the scope of relevance in any way; Defendants are still entitled to obtain discovery in furtherance of their defense that the statement is substantially true.

Second, Plaintiffs allege that the line, "RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP COOPERATION," is false and defamatory. Pls.' Suppl. Resp. to

Interrog. No. 2, Dkt. No. 78-6. In their brief, they say this implies "that Plaintiffs were involved in aiding Russian state efforts to interfere in the 2016 U.S. presidential election." Pls.' Opp. at 1. It does not. Plaintiffs read "Plaintiffs" into this line where their names do not appear. The line only mentions Alfa. Therefore, the Court should reject Plaintiffs' interpretation that only documents pertaining to Plaintiffs—as opposed to any Alfa entity—are relevant. *Id.* Furthermore, Plaintiffs want to have it both ways when it comes to Alfa, identifying themselves as one and the same as Alfa when it comes to the statements they claim as defamatory, but refusing to produce Alfa documents by claiming they have no control over Alfa documents. *See* Dkt. No. 78**.**

Finally, as Plaintiffs conceded in their UK trial, through their U.K. counsel, the first part of the "title is misleading because the memorandum says nothing at all about the US presidential election." *Aven v. Orbis* Tr. Day 1, Mar. 16, 2020, Levy Decl., Ex. 4, at 17:11–12. Therefore, CIR 112 is not limited to 2016 or the election, *see* Defs.' Br. at 19-20, and is not limited to Plaintiffs' conduct but also includes Alfa's, and Plaintiffs should be required to produce documents relevant to Alfa's cooperation with the Kremlin both in and before 2016.

Third, Plaintiffs allege that the following statement in CIR 112 is false and defamatory:

> during the 1990s [Oleg] GOVORUN had been Head of Government Relations at Alpha Group and in reality, the "driver" and "bag carrier" used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St Petersburg. Given that and the ***continuing*** sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN.

Pls.' Suppl. Resp. to Interrog. No. 2, Dkt. No. 78-6 (emphasis added). This statement concerns the relationship between Plaintiffs, Alfa, and Putin, and the use of intermediaries, that developed in the years between the 1990s and 2016. As with the "continu[ing]" favors between Alfa and the

Kremlin, here, too, the verb "continuing" means that something both *was* happening and *is* happening. Therefore, it is incorrect to limit relevance to events in the 1990s.

To recap: evidence related to *any* favors between Alfa and Plaintiffs, on the one hand, and Putin and the Kremlin, on the other, is relevant to Defendants' defense of substantial truth and must be produced, regardless of the date, and regardless of whether it shows "corruption" or "misconduct." Evidence relating to the relationship among Plaintiffs, Alfa, Putin, and/or the Kremlin is relevant to the substantial truth of the statements Plaintiffs challenge in CIR 112 and must be produced. Evidence related to any "cooperation" between the Kremlin and Alfa and/or the Plaintiffs is relevant to substantial truth and must be produced. Relevance encompasses information that "will have some probable effect on the organization and presentation of the moving party's case," *Cartagena v. Centerpoint Nine, Inc.*, 303 F.R.D. 109, 112 (D.D.C. 2014) (quoting *Smith v. Schlesinger,* 513 F.2d 462, 473 (D.C. Cir. 1975)), and all of this evidence falls within that scope.

### III.     Plaintiffs Must Produce Their Documents Related to the Mueller Investigation.

Plaintiffs do not contest the relevance of documents related to the Mueller investigation, in which Plaintiff Aven participated. The only issue is whether Plaintiffs may continue to withhold these documents under meritless claims of grand jury secrecy.

Federal Rule of Criminal Procedure 6(e), pursuant to which Plaintiff Aven withholds documents, does not apply here. It is undisputed that Plaintiff Aven "provided information to the Office in an interview and through an attorney proffer," Mueller Report (2019), Levy Decl., Ex. 11, at 146 n.976; Defs.' Br. at 27. Rule 6(e) does not apply to Plaintiff Aven's documents that

relate to the interview and attorney proffer, which are not "matter[s] occurring before the grand jury." Fed. R. Crim. P. 6(e)(2).[3] In determining whether a matter occurred before the grand jury,

> [t]he relevant inquiry for this Court is whether disclosure of the information requested would "tend to reveal some secret aspect of the grand jury's investigation, such matters as the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like."

*Lopez v. Dep't of Justice*, 393 F.3d 1345, 1349 (D.C. Cir. 2005) (quoting *Senate of the Commonwealth of Puerto Rico v. DOJ,* 823 F.2d 574, 582 (D.C. Cir. 1987)). Furthermore, information produced through a parallel criminal investigation is not a matter occurring before the grand jury. *In re Grand Jury Subpoena,* 920 F.2d 235, 242 (4th Cir. 1990) ("[I]nformation produced by criminal investigations paralleling grand jury investigations does not constitute matters 'occurring before the grand jury' if the parallel investigation was truly independent of the grand jury proceedings.") (as quoted in *In re Sealed Case No. 99-3091*, 192 F.3d 995, 1002 (D.C. Cir. 1999)); *In re Grand Jury Investigation*, 610 F.2d 202, 217 (5th Cir. 1980) ("[T]he disclosure of information obtained from a source independent of the grand jury proceedings, such as a prior government investigation, does not violate Rule 6(e).") (quoted in *In re Sealed Case No. 99-3091*, 192 F.3d at 1002).

The government itself has disclosed that Plaintiff Aven was interviewed, provided an attorney proffer, and disclosed some of what he said or proffered. *See* Levy Decl., Ex. 11. This shows that documents related to this interview and attorney proffer are not protected by Rule 6(e), nor is withholding them furthering any need for continued grand jury secrecy. *See In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994) (releasing Independent Counsel's report over Rule 6(e)

---

[3] Plaintiff Aven has stated that he is not withholding any documents under attorney-client privilege or as attorney work product. Accordingly, these documents must be produced.

objections, because information in the report had been widely publicized, and explaining that "[t]here must come a time . .  when information is sufficiently widely known that it has lost its character as Rule 6(e) material.").

Plaintiffs concede that at least some of the documents related to the Mueller Investigation do not amount to a matter occurring before the grand jury and thus cannot be withheld on claims of grand jury secrecy, because in their responses to document requests they commit to making "a good faith effort to locate and produce any documents relating to any Mueller investigation involving CIR 112 or the contents therein," and "a good faith effort to locate and produce any available documents received by, produced by, or served upon him in connection with the Mueller Investigation." *See* Dkt. No. 78-5, at Request Nos. 14 & 19. Accordingly, Plaintiffs pledged to produce some portion of these documents, and it is not clear why they have refused to do so.

Even if, *arguendo*, some of the responsive documents pertain to "a matter occurring before the grand jury," Rule 6(e) specifically exempts witnesses from the secrecy obligations, and thus Plaintiff Aven may produce his documents. "A grand jury witness is legally free to tell, for example, his or her attorney, family, friends, associates, reporters, or bloggers what happened in the grand jury. For that matter, the witness can stand on the courthouse steps and tell the public everything the witness was asked and answered." *In re Grand Jury*, 490 F.3d 978, 989 (D.C. Cir. 2007) (holding that a grand jury witness may review the transcript of his own testimony).

Plaintiff Aven's claims of "privilege" and that he is protected from "compulsory disclosure," Pls.' Opp. at 17, also fail because he has consented to disclosing his Mueller Investigation documents by bringing a suit that puts at issue the statements and documents related to his involvement in the Mueller Investigation. Plaintiffs have failed to cite to any case where the party who chose to put at issue the substantial truth of certain facts revealed to the government can

withhold evidence as to those same statements by claiming the evidence is "privileged" under protections for grand jury secrecy. *See* Pls.' Opp. at 16-17 (citing *SEC v. Oakford Corp.*, 141 F. Supp. 2d 435, 437 (S.D.N.Y. 2001), which involved *not* the plaintiff in a lawsuit, but a third-party deponent, and whether that deponent could be compelled to answer questions relating to whether he had appeared before a grand jury). The "privilege" is "that of the witness, and rests upon *his consent*," *In re Grand Jury*, 490 F.3d at 985–86 (internal citations and quotation marks omitted) (emphasis added), and by bringing a suit to challenge the truth of the information he provided to the Special Counsel's Office, Plaintiff Aven consented to the disclosure of that information, if indeed the information even falls within the protection for grand jury secrecy. *See In re Grand Jury Subpoena, Judith Miller*, 493 F.3d 152, 154 (D.C. Cir. 2007) (holding that Rule 6(e) protections were waived when a grand jury witness discussed his role on the CBS Evening News).

According to the Mueller Report, Plaintiff Aven revealed, among other relevant facts, that "he met on a quarterly basis with Putin," including "shortly after the U.S. presidential election," and that "he took these meetings seriously and *understood that any suggestions or critiques that Putin made during these meetings were implicit directives, and that there would be consequences for Aven if he did not follow through.*" Mueller Report at 146-47 (footnotes omitted) (emphasis added); *see also* Defs.' Br. at 27-28. Even under Plaintiffs' restrictive view of relevance in this case, these facts and the other information Plaintiff Aven gave the Special Counsel's Office are directly relevant to the substantial truth of the statements in CIR 112 that Plaintiffs challenge as defamatory. In fact, these statements go to the heart of the truth of the alleged defamatory statements – *i.e.*, the relationship between Plaintiffs and Putin.

Plaintiffs should not be permitted to bury the documents related to the Mueller Investigation in claims of unwarranted "grand jury secrecy" when the documents do not pertain to

a grand jury matter; when Plaintiff Aven was a witness and not bound by secrecy obligations; and when it was Plaintiffs who brought this suit and challenged the truth of the statements in CIR 112, thereby consenting to disclosure of these documents.

## IV.   Documents Relevant to Plaintiffs' Public Figure Status Are Not Limited to Publicly Available Documents.

Plaintiffs have not searched for documents relevant to the issue of whether they are public figures. Instead, they have tried to shirk this obligation by promoting an unsupported claim that only publicly available documents are relevant to Defendants' defense that Plaintiffs are limited purpose public figures. *See* Pls.' Opp. at 9-10. That argument ignores significant elements of the test for public figure, which requires Plaintiffs to review and produce documents that are *not* publicly available.

As Defendants set out in their opening brief, Defs.' Br. at 32-33, when determining whether Plaintiffs are public figures, the court looks to factors that include whether Plaintiffs "assumed the risk of publicity and had access to channels of communication to defend themselves," *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 584–85 (D.C. Cir. 2016) (quoting *Lohrenz v. Donnelly*, 350 F.3d 1272, 1279 (D.C. Cir. 2003); whether Plaintiffs "'thrust themselves to the forefront' of a public controversy 'in order to influence the resolution of the issues involved,'" *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 114–15 (D.C. Cir. 2017) (Kavanaugh, J.) (quoting *Gertz*, 418 U.S. at 345), and whether their voluntary relationships with high-level officials and business associates show that they have "engaged in conduct that [they] knew markedly raised the chances that [they] would become embroiled in a public controversy," *Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 33 (D.C. Cir. 1990).

Consequently, documents not in the public domain are relevant to the public figure test. Included among them are any documents tending to show that Plaintiffs use public relations

professionals; are able to arrange interviews with the media when they so desire; have voluntary relationships with high-level officials and business associates; and are otherwise seeking to influence the views on how oligarchs do business and the significance of their relationship with the Kremlin to their business. For instance, in affirming that the plaintiff in *Tavoulareas v. Piro*— the president of Mobil Corporation—was a public figure, the D.C. Circuit looked to evidence of his "continuing access to the media" "through Mobil's publicity apparatus." 817 F.2d at 774. Evidence of Plaintiffs' use of Alfa's publicity apparatus to enjoy access to the media is likewise relevant to their public figure status. This would include communications between Plaintiffs and Alfa publicity or communications professionals. In *Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29 (D.C. Cir. 1990), the Court held that evidence that the plaintiff's consulting firm had contracts with the District government, and that he had "many social contacts with administration officials" showed that he took the risk of placing himself at the "heart of a public controversy." *Id.* at 33. Likewise here, Plaintiffs' private communications showing their contacts with high level officials and business persons will shed light on how they have "engaged in conduct that . . . markedly raised the chances that [they] would become embroiled in a public controversy." *Id.*

Defendants are not asking Plaintiffs to produce publicly available documents, as Plaintiffs claim. Pls.' Opp. at 10. Indeed, Defendants have already submitted to the Court over 60 news articles in their Motion to Dismiss. Dkt. No. 20-1. Instead, Defendants seek evidence tending to show Plaintiffs' access to channels of communication, their meetings with business elite and government officials, and their involvement in the public controversy, all of which are relevant to the Court's determination of whether Plaintiffs are public figures.

14

Plaintiffs should be ordered to produce all documents related to the factors that the Court relies on for determining the public figure status of Plaintiffs, including their communications with public relations professionals, Alfa publicity staff, media, government officials, and business elite.

**V.    Plaintiffs Are Wrongfully Withholding Documents Related to the Spanish Investigations.**

Plaintiffs are withholding all documents related to Spanish government proceedings, investigations in which Plaintiff Fridman is accused of engaging in the very conduct described in the statements in CIR 112 that Plaintiffs allege are false and defamatory. Plaintiffs allege that the statements in CIR 112 regarding "significant favors" between the Plaintiffs/Alfa and the Kremlin/Putin and payments to government officials are defamatory. In the Spanish proceedings, Plaintiff Fridman is accused of bribing the son of a senior Kremlin official, as well as business corruption. Thus, documents related to these proceedings go directly to the substantial truth or falsity of the allegedly defamatory statements in CIR 112.

Plaintiff Mikhail Fridman is currently "under official investigation for corruption, accus[ed] [ ] of having helped orchestrate the bankruptcy of Spanish technology company Zed." *Spain Probes Russian Billionaire Fridman for Corruption*, France24.com (Aug. 7, 2019), http://f24.my/5KWe. "Spain's anti-corruption prosecutors say mobile phone operator Vimpelcom, which has since been re-named as VEON, controlled by Fridman, suddenly terminated or modified contracts with a Russian subsidiary of the Spanish group from 2014, depriving it of significant revenue." *Id.* Fridman is also personally under investigation for his role in "business corruption." *Russia Oligarch Questioned by Spanish Criminal Court*, Agence France-Presse, Oct. 21, 2019, https://www.courthousenews.com/russia-oligarch-questioned-by-spanish-criminal-court/. "Spanish prosecutors accuse [Fridman] of market manipulation, fraudulent insolvency, business corruption and misuse of company assets." *Id.*

Both U.S. and Spanish authorities have been investigating Plaintiff Fridman for the payment of "bribes to relatives of one of the most relevant ministers of the Kremlin" by a company controlled by Fridman. Agustin Marco, *The FBI and the SEC Investigate a Spanish Company for Bribes to Russian Politicians*, El Confidencial, Dec. 30, 2016, https://www.elconfidencial.com/empresas/2016-12-30/fbi-sec-investigan-grupo-zed-sobornos-politicos-rusos_1308929/. Plaintiff Fridman is accused of arranging these bribes:

> In February 2013, the son of the Russian Interior Minister, Alexander Kolokoltsev, met with Fridman to tell him that he considered himself underpaid and mistreated within "Temafon" by his friend Engibaryan.
>
> Kolokoltsev had a small supplier that invoiced around $700,000 a year. As a result of that meeting, Fridman instructed the CEO of "Vimpelcom Russia" (Anton Kudryashov) to change these contracts, which rose from the previous figure to more than $8 million per year (at the exchange rate at that time) in exchange for services not worth a tenth of that. Simultaneously, Mr. Kudryashov wrote a memorandum to the auditor "PWC" relating the instructions received and the reasons for it, giving concrete instructions that this information should not be shared with "ZED" under any circumstances. The contracts were signed, paid and continue to be paid via "Temafon," without the necessary authorization from the board and against the existing internal regulations, statutes and agreements. Validating these operations required, among other things, my signature, which was not even requested. To date, over $20 million has been paid to Mr. Kolokoltsev through this procedure.

Levy Decl., Ex. 10. Defendants are entitled to documents regarding these proceedings. Clearly, evidence tending to show that Alfa and/or Fridman provided favors to a senior Kremlin official, or was involved in business corruption, goes to the substantial truth of the following statements in CIR 112 that Plaintiffs claim are false and defamatory: "significant favours continued to be done in both directions, primarily political ones for PUTIN and business/legal ones for Alpha"; "KREMLIN-ALPHA GROUP COOPERATION"; "the PUTIN-Alpha relationship"; and the statements that Fridman and Aven used an intermediary to make payments to government officials. *See* Dkt. No. 78-6.

Plaintiffs' arguments to the contrary largely side-step the actual issue here of relevance. Pls.' Opp. at 13-15. First, Plaintiffs argue that the person who provided information to the Spanish authorities "has an obvious incentive to point the finger at someone other than himself." Pls.' Opp. at 14. But the issue of relevance at the discovery stage is *not* a question of the weight to be given evidence or its admissibility. Rule 26 clearly states: "Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1); *see also English v. Washington Metro. Area Transit Auth.*, 323 F.R.D. 1, 17 (D.D.C. 2017) (same); *Tavoulareas v. Piro*, 93 F.R.D. at 21 (explaining that "the standard of relevance as a limitation on discoverability is distinct from the standard of relevance which governs the admissibility of evidence at trial."). Plaintiffs' arguments about Mr. Dolset are therefore meritless.

Plaintiffs next argue that because the payments were made by Vimpelcom, not Fridman personally, they are not relevant. Pls.' Opp. at 14. But Fridman is named *personally* as arranging the payment in the Spanish proceeding document. *See* Levy Decl., Ex. 10. And Vimpelcom is yet another Alfa entity in which Fridman sits on the Supervisory Board. Pls.' Opp. at 14. Evidence of Plaintiff Fridman's involvement in providing favors to government officials or other corrupt business activity helps Defendants show that the alleged defamatory statements about significant favors and payments to government officials are substantially true and not defamatory.

Finally, Plaintiffs argue that documents related to the Spanish proceeding are not relevant because overpayment to a senior Kremlin official's son is not an "exchange of political and economic favors with Putin," Pls.' Opp. at 15, but Plaintiffs are again misconstruing the plain language of the statements they claim are defamatory. Those statements are *not* limited to "exchanges" – in fact, they do not use the word "exchange"; they are also not limited to "political" or "economic" favors, although it is unclear why Plaintiffs consider a financial payment as

anything other than an economic favor. Furthermore, the alleged defamatory statements speak of *Alfa*, a consortium of entities including Vimpelcom, not just Plaintiffs (and some of the statements do not mention Plaintiffs at all) and also refer to the "Kremlin," not only Putin. Therefore, evidence tending to show that Plaintiffs and/or Alfa received or provided favors to Putin or other government officials is relevant to the substantial truth of the alleged defamatory statements.[4]

Plaintiffs have failed to show that the Spanish proceedings documents are outside the scope of discovery. Accordingly, Plaintiffs should be ordered to produce all documents related to that investigation that are currently within their possession, custody, or control.

## VI. Plaintiffs Are Wrongfully Withholding the Kroll Report.

Plaintiffs are withholding the Kroll Report under their incorrect view of relevance in this case. Plaintiffs interpret "relevance" as matters supporting their claims, while ignoring that relevance encompasses any matter related to either party's claims or defenses.

As stated in *Putin's Kleptocracy*: "The Supreme Soviet Presidium had decreed that a special commission be established by the procurator general to investigate corruption, abuse of power, and economic offenses. Its report was presented to the Supreme Soviet in September 1993. In it Kroll's efforts were noted; the document recounted widespread instances of 'bribery of officials, blackmail, and the illegal transfer of currency resources to foreign banks,' with specific ministers sanctioned by name, including Minister of Foreign Economic Relations Pyotr Aven." Levy Decl., Ex. 9, at 18.

---

[4] Plaintiffs, unable to attack the relevance of the Spanish proceeding documents, instead make baseless attacks on Defendants' motives in seeking these documents. Pls.' Opp. at 15. Defendants are simply defending themselves in litigation that Plaintiffs brought. If Plaintiffs want to shield Spanish proceeding documents from the Spanish investigations, they should not have brought a lawsuit that challenges descriptions of the same conduct for which Plaintiff Fridman is being investigated in Spain, documents that are plainly relevant to substantial truth.

First, stunningly, Plaintiffs argue that the Kroll Report is not relevant because *their lawyers* informed Defendants' lawyers that the report is not relevant. A self-serving attorney proffer from Plaintiffs' lawyers, *in a letter* – not even in a declaration – has no evidentiary value and should have no bearing on the Court's determination of the Kroll Report's relevance. Defendants showed why the Kroll Report is relevant, *see* Defs.' Br. at 22-23, and Plaintiffs have not met their burden of explaining why they should not be compelled to produce the Kroll Report.

The Kroll Report describes "bribery of officials" in Russia and identifies Plaintiff Aven as the official who commissioned the report and as one of the officials whose actions were under scrutiny. Plaintiffs' efforts to parse the text of Ms. Dawisha's book to invent a new meaning of what she wrote in an attempt to make the Kroll Report not relevant fail. Her account is supported by the recent reporting by Catherine Belton, *see* Levy Decl., Ex. 7, with which Plaintiffs do not take issue. Ms. Belton writes that it was Plaintiff Aven who hired Kroll for the report: "Aven was the former minister for foreign economic trade who'd protected Putin and signed off on the St Petersburg oil-for-food schemes, and who'd hired the international investigations firm Kroll to track down the missing Party gold, without giving it access to the information Russian prosecutors had." Catherine Belton, *Putin's People: How the KGB Took Back Russia and Then Took On the West* 189-90 (2020), Levy Decl., Ex. 7. In other words, Plaintiff Aven commissioned the investigation, but then blocked access to relevant information. That Plaintiff Aven hired Kroll refutes his self-serving statement that the report has "nothing to do" with him. *See* Pls.' Opp. at 13.

Second, Plaintiffs' view that the only relevant documents are those that "discuss corruption by Putin" or that "discuss[ ] Plaintiffs" is plainly wrong. *See* Pls.' Opp. at 12. The alleged defamatory statements discuss, among other things, the "cooperation" between the Kremlin and

Alfa; the relationship between Putin/the Kremlin and Alfa; and that favors have been done between Alfa and Putin/the Kremlin. Nowhere do Plaintiffs contend that the Kroll Report does not relate to the relationship between Alfa and the Kremlin, or Plaintiffs and the Kremlin, or the cooperation between Alfa/Plaintiffs and Putin/Kremlin. Nor do Plaintiffs provide any evidence that the Kroll Report does not refer to Plaintiff Aven by some designation other than his name, such as the office he worked for at the time, the Ministry for Foreign Economic Relations. Under Plaintiffs' incredibly narrow reading, the fact that the Report allegedly does not name Plaintiff Aven is enough to render the report not relevant.[5]

## VII.   Defendants Should Not Be Required to Expend Unnecessary Resources to Obtain UK Court Records in Plaintiffs' Possession.

The Court should not condone the discovery games Plaintiffs are playing in hiding documents from Plaintiffs' U.K. proceeding. *See* Pls.' Opp. at 20-22.; Defs.' Br. at 29-31. Plaintiffs do not contest the relevance and responsiveness of the UK trial documents that Defendants have requested. Instead, they refuse to produce their copies of these documents by falsely stating that the UK trial documents "are publicly available on the English Court's electronic filing system." Pls.' Opp. at 20. Plaintiffs do not provide a citation for this statement because none exists; the documents cannot be pulled from an electronic cite akin to PACER in US federal courts. Moreover,

---

[5] In a failed effort to distinguish the "bribery of officials" discussed in the report from the oil-for-food scandal in which Plaintiff Aven played a role, *see* Defs.' Br. at 23, Plaintiffs claim that Ms. Dawisha's book discusses the Kroll Report and the oil-for-food scandal "in completely different sections of her book." Pls.' Opp. at 12 n.10. It is ridiculous to claim that two pieces of information are not related because they are discussed on different pages of a book. At any rate, that claim is false. Ms. Dawisha writes: "In it Kroll's efforts were noted; the document recounted widespread instances of 'bribery of officials, blackmail, and the illegal transfer of currency resources to foreign banks,' with specific ministers sanctioned by name, including Minister of Foreign Economic Relations Pyotr Aven (whose activities in approving Putin's early contracts as head of the St. Petersburg Committee for Foreign Liaison* are dealt with below)," thus acknowledging their connection. *See* Levy Decl., Ex. 9.

obviously Defendants would not be pursuing these documents if they already had them, an absurd suggestion by Plaintiffs. *See* Pls.' Opp. at 20. Instead of just producing the documents that Plaintiffs have in their possession, they ask Defendants to go through a foreign court process, including a hearing, to obtain these documents. *Id.*

The "Federal Rules do not shield publicly available documents from discovery merely because of their accessibility. A limitation of this nature would lead to patently absurd consequences." *Shatsky v. Syrian Arab Republic*, 312 F.R.D. 219, 223 (D.D.C. 2015) (Leon, J.) (sanctioning the party who failed to timely produce publicly available documents). Plaintiffs provide no substantial justification for not producing the relevant and responsive documents. During the meet and confer process, Plaintiffs and Defendants agreed that the parties need not produce documents "that are freely available online or are available through a service such as Lexis or Westlaw." *See* Defs.' Br. at 30; Apr. 16 Letter (Dkt. No. 78-10) at 2-3 & Apr. 24 Letter (Dkt. No. 78-11) at 2. But these documents are not freely available online or through such a service. Plaintiffs have directed Defendants to apply to the UK High Court for a *court order* to obtain the documents, likely necessitating a hearing in the UK, *see* Levy Decl., Ex. 12. Plaintiffs unconvincingly argue that the form does not specifically state that the request "would require a court hearing," Pls. Opp. at 21, but the U.K. Court application makes clear that "[m]ost applications will require a hearing and you will be expected to attend." N244 Application Notice, Levy Decl., Ex. 12. As soon as Defendants informed Plaintiffs that Defendants could not obtain these documents through the public domain, Plaintiffs were under an obligation to produce them to Defendants.

Even if a hearing is not held, requiring Defendants to take on the burdensome process of applying to a foreign court for an order granting access to documents that Plaintiffs have readily

available defeats the purposes of discovery. The "federal discovery rules are designed to make litigation a 'fair contest with the basic issues and facts disclosed to the fullest practicable extent.'" *Shatsky*, 312 F.R.D. at 224 (quoting *United States v. Procter & Gamble Co.*, 356 U.S. at 682 (1958)). Instead of following these rules, Plaintiffs are deliberately seeking to delay or prevent Defendants' access to these documents, and seeking to require Defendants to unnecessarily expend resources to obtain documents that Plaintiffs have in their possession. Not only should the Court order Plaintiffs to produce such documents, but they should be sanctioned for withholding these documents with no substantial justification. "[F]rivolous resistance to legitimate discovery requests must be curtailed if justice is to be done on bases other than the willingness to spend money and to waste time." *United States v. Am. Tel. & Tel. Co.*, 86 F.R.D. 603, 656 (D.D.C. 1979).

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court grant Defendants' Motion to Compel and that the Court provide any other relief that it finds to be just, proper, and equitable.

Dated:  September 25, 2020                    By:___*/s/* Joshua A. Levy_____

Joshua A. Levy (D.C. Bar No. 475108)
Rachel M. Clattenburg (D.C. Bar No. 1018164)
LEVY FIRESTONE MUSE LLP
1401 K St. NW, Suite 600
Washington, DC 20005
Tel: (202) 845-3215
Fax: (202) 595-8253
jal@levyfirestone.com

*Counsel for Defendants*

22

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 25, 2020, the foregoing Reply Memorandum was filed using CM/ECF, which serves a copy on all counsel of record.


*/s/* Joshua A. Levy_____
Joshua A. Levy

23