# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MIKHAIL FRIDMAN, PETR AVEN, and
GERMAN KHAN,

       Plaintiffs,

   v.

BEAN LLC a/k/a FUSION GPS, and GLENN
SIMPSON,

       Defendants.

No. 1:17-cv-2041-RJL

### DEFENDANTS BEAN LLC'S AND GLENN SIMPSON'S
### MEMORANDUM OF LAW IN SUPPORT OF THEIR OPPOSITION TO RICHARD
### BURT'S MOTION TO MODIFY OR FOR A PROTECTIVE ORDER

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ..................................................................................................... 1

**BACKGROUND** ....................................................................................................... 3

    **A.**      **Plaintiffs Allege That Statements about Their and Alfa's Decades-Long Relationship with Putin and the Kremlin Are Defamatory.** ............... 3

    **B.**      **For Years, Richard Burt Has Been Plaintiffs' Agent in Washington, DC** ................................................................................................................. 5

         *1.*    *Richard Burt has a longstanding relationship with Plaintiffs and Alfa* .................................................................................................... 5

         *2.*    *Acting as their agent, Richard Burt's familiarity with Plaintiffs' meetings with high-level US government officials and Plaintiffs' promotional events has direct bearing on their status as public figures* ............................................................................................. 6

         *3.*    *In 2016, Richard Burt attempted to help Plaintiff Aven establish a line of communication with the Trump administration.* ................ 7

    **C.**      **Defendants Subpoenaed Richard Burt.** ........................................................ 9

    **D.**      **The Instant Dispute.** ..................................................................................... 11

         *1.*    *Amb. Burt refuses to testify concerning his personal knowledge that bears directly on Plaintiffs' status as public figures.* .............. 11

         *2.*    *Amb. Burt refuses to testify to his personal knowledge concerning activities that bear directly on Defendants' defense that the alleged defamatory statements in this lawsuit are substantially true.* .......... 12

**LEGAL STANDARDS** ............................................................................................ 13

**ARGUMENT** .......................................................................................................... 14

    **A.**      **Amb. Burt Has Not Met His Burden of Showing That His Testimony  Concerning Events outside of June 1, 2015 – October 3, 2017 Is Not Relevant** .................................................................................. 15

    **B.**      **Amb. Burt Has Not Met His Burden of Showing That His Deposition Should Otherwise Be Limited Based on Relevance** .................. 19

    **C.**      **Amb. Burt's Testimony Is Relevant and Necessary to Defendants' Defense That Plaintiffs Are Public Figures** ...................................... 23

    **D.**      **Amb. Burt's Testimony Is Relevant to Rebutting Plaintiffs' Alleged Damages** ................................................................................... 26

    **E.**      **Amb. Burt Has Not Shown That the Deposition Imposes an Undue Burden on Him** ....................................................................... 27

**CONCLUSION** ....................................................................................................... 32

## INTRODUCTION

A longtime registered lobbyist who has been advocating for three Russian oligarchs in Washington for over a decade does not want to give testimony about their participation in public life in the United States, for a libel case these three oligarch clients of his filed in the District.

This lobbyist's clients are Russian oligarch Plaintiffs Mikhail Fridman, German Khan, and Petr Aven, who founded and are the ultimate beneficial owners of Alfa Group, a conglomerate that includes Alfa Bank, the largest private commercial bank in Russia, and the LetterOne investment funds. They are claiming a memorandum that describes the history of their and Alfa's relationship with Vladimir Putin and the Kremlin – dating back to the 1990s – defamed them.

At issue in this case, *inter alia*, is whether the Plaintiffs are public figures and whether the alleged defamatory statements are substantially true. Few people in Washington, DC are more knowledgable about these issues than the Plaintiffs' agent, Richard Burt.

A former US Ambassador, he has been acting as Plaintiffs' and Alfa's agent in Washington and foreign capitals for over a decade. By his own admission, Richard Burt has a close relationship with both Plaintiffs and Alfa that spans approximately 20 years. Amb. Burt has been an advisor to or director of LetterOne since at least 2015, and he has served for an even longer period of time as advisor, lobbyist, PR representative, and spokesperson for Plaintiffs and Alfa, *in the United States*. When Plaintiffs need a meeting with senior US government officials in Washington, DC, they contact Amb. Burt. When Plaintiffs seek a dinner with other influential members of Washington, such as think-tank directors and former government officials, they ask Amb. Burt to schedule and attend the event. When Plaintiffs are promoting a book or a lecture in Washington, they involve Amb. Burt. When Plaintiffs seek strategic advice about how Washington works, they turn to Amb. Burt. When Plaintiffs need help discrediting their political and business rivals, they bring in

Richard Burt. And when Justice Department prosecutors look into the ties between the Alfa oligarchs, the Kremlin, and the President of the United States, they subpoena Richard Burt.

All of this is relevant to Plaintiffs' status as public figures and the substantial truth of the alleged defamatory statements.

This dispute comes before the Court because Amb. Burt refuses to answer any questions that might bear on Plaintiffs' status as public figures and seeks to drastically limit questioning that bears on the substantial truth of the alleged defamatory statements, arguing that his decades-worth of personal knowledge about Plaintiffs' activities is irrelevant to this litigation. Plaintiffs, Alfa and Amb. Burt continue to want to avail themselves of the benefits of the US legal system while spurning its rules. They want to harass Defendants with the expensive burden of having to defend themselves in litigation filed by some of the world's wealthiest people, who aren't even claiming financial loss, while trying to slice their legal case so thinly that Plaintiffs and their agents (*e.g.*, Burt) never have to face the music by addressing the very conduct that gave rise to the claims at the heart of this litigation.

Amb. Burt's definition of relevance tortures the English language to support magical thinking. *First,* Plaintiffs' public figure status is a key issue in this litigation, and the Court has previously ruled that the record about public figure needed to be fully developed. Mem. Op., Dkt. No. 48.

*Second*, Burt's claims that *no* activity outside of June 1, 2015 through October 3, 2017 is relevant to the substantial truth of the statements in this case fail not only because they defy the basic reading comprehension of any ordinary reader, but also because, at the discovery stage, one party's interpretation of the facts does not control questions of relevance. Amb. Burt further tries to circumscribe the deposition by limiting his 2016 testimony to his communications *explicitly*

with or concerning Plaintiffs, even though he – *as Plaintiffs' agent* – was working and communicating with the Trump campaign, its surrogates and transition team throughout the year.

Finally, Amb. Burt cannot carry his burden of establishing that his deposition imposes an undue burden by making the novel claim, without any evidentiary support, that he has *too much* relevant personal information. In addition, Defendants have already agreed to greatly reduce any burden possibly imposed on Burt by substantially limiting the scope of the document production, without waiving Defendants' right to question him on relevant matters beyond the scope of the document production. Defendants offered this accommodation to Amb. Burt to avoid burdening this Court with additional litigation and because Defendants understood they could obtain the evidence they needed for their defenses through Amb. Burt's testimony at a deposition. Nevertheless, Amb. Burt has now attempted to weaponize Defendants' accommodations, complaining that any deposition questions that exceed the scope of his extremely narrow document production would impose an undue burden.

Accordingly, Defendants respectfully request that the Court deny Amb. Burt's motion.

## BACKGROUND

### A. Plaintiffs Allege That Statements about Their and Alfa's Decades-Long Relationship with Putin and the Kremlin Are Defamatory.

Plaintiffs Mikhail Fridman, Petr Aven, and German Khan ("Plaintiffs") are suing Defendants for money damages based on a report titled Company Intelligence Report 2016/112 ("CIR 112") that former British intelligence officer Christopher Steele and his London business intelligence company, Orbis, submitted to Defendant Fusion GPS. CIR 112 is one of 17 such reports Orbis sent to Defendants. The popular media has labeled the collection of these 17 reports "the Dossier."

Plaintiffs claim that various statements in CIR 112 "defamed the Plaintiffs and Alfa," Am. Compl., Dkt. No. 17, at ¶ 33, and allege that "Defendants are liable for the defamation of Plaintiffs and Alfa," *id.* ¶ 35. Specifically, Plaintiffs take issue with the following statements in CIR 112:

- Plaintiffs claim that the line, "RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP COOPERATION," is false and defamatory. Pls.' Suppl. Resp. to Interrog. No. 2, Dkt. No. 78-6.[1]

- Plaintiffs claim that this sentence in CIR 112 is false and defamatory: "Significant favours continued to be done in both directions, primarily political ones for PUTIN and business/legal ones for Alpha." *Id.*

- Plaintiffs claim that the following content of CIR 112 is false and defamatory: "during the 1990s [Oleg] GOVORUN had been Head of Government Relations at Alpha Group and in reality, the 'driver' and 'bag carrier' used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St Petersburg. Given that and the continuing sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN." *Id.*

Defendants contend that the above statements are substantially true. Furthermore, Defendants have argued that Plaintiffs are limited-purpose public figures for the purposes of this litigation, and thus, for their defamation claims to survive, the Plaintiffs must prove by clear and convincing evidence that Defendants published the statements above with actual malice. *See Tavoulareas v. Piro*, 817 F.2d 762, 775 (D.C. Cir. 1987) (*citing Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1964)); Defs.' Mem. in Supp. Mot. to Dismiss, Dkt. No. 20-1; Defs.' Answer, Dkt. No. 50; Defs'. Mot. to Compel, Dkt. No. 94; Defs.' Reply, Dkt. No. 106. At the dismissal stage of this case, this Court noted that "Defendants have put Plaintiffs' public figure status at issue in this case," but held: "I unfortunately cannot resolve the public figure issue at this stage on the record

---

[1] CIR 112 spells Alfa as "Alpha" throughout.

before me." Mem. Op., Dkt. No. 48, at 10. Plaintiffs and their proxies have assiduously toiled to thwart the Court's order for a more developed factual record.

**B. For Years, Richard Burt Has Been Plaintiffs' Agent in Washington, DC.**

*1. Richard Burt has a longstanding relationship with Plaintiffs and Alfa.*

As demonstrated in his own briefing, Amb. Burt has worked closely with the Plaintiffs for approximately 20 years. Burt Mot. at 3 ("His relationship with Plaintiffs began in the late 1990s or early 2000s"). Likewise, Amb. Burt acknowledges several decades of experience in which he has "consulted for Alfa on Western governance and developing ties in the United States." (Burt Mot. at 3). Since 2017, Amb. Burt has served on the Board of Directors of LetterOne, an Alfa entity founded and run by Plaintiffs,[2] and before that he served as an advisor to LetterOne.[3] Additionally, in 2016, Richard Burt stated that he has "advised Russia's Alfa Bank, and he continues to work with the bank's co-founder, Mikhail Fridman."[4] Amb. Burt has also lobbied for a Kremlin-controlled  energy company, which likely factored into his admitted involvement in covert back-door diplomacy between the Kremlin and Trump.[5]

Burt has intimate knowledge of other long-time Plaintiffs' agents in the United States, who have helped Plaintiffs achieve public figure status in the United States and around the world. Alfa

[2] LetterOne, https://www.letterone.com/about-us/our-governance/board-members/richard-burt/; Realising Potential, LetterOne Annual Review (2017), https://www.letterone.com/media/1329/73529-letterone-ar_310718.pdf

[3] Richard Burt, LetterOne, https://web.archive.org/web/20151028235123/http://www.letterone.com/about-us/leadership-and-governance/board-members/richard-burt

[4] Ben Schreckinger and Julia Ioffe, *Lobbyist Advised Trump Campaign While Promoting Russian Pipeline, Politico.com*, Oct. 27, 2016, https://www.politico.com/story/2016/10/donald-trump-campaign-lobbyist-russian-pipeline-229264

[5] *Id.*

Bank is, and has been, a client of BGR Government Affairs ("BGR"),[6] one of Washington's premier lobbying and public relations firms for which Amb. Burt served as the International Director.[7] Plaintiffs say BGR represents them personally as well. Pls. Answer to Int. No. 19, Dkt. No. 111-3. Early on in BGR's work on behalf of Plaintiffs, from 2002 to 2007, Burt was the Executive Chairman of Diligence London (Diligence, Inc.), an international investigative agency and a BGR offshoot,[8] which had been accused in a 2006 D.D.C. lawsuit of committing unlawful corporate espionage on behalf of a company owned by Plaintiff Fridman. *See* Complaint ¶¶ 11-19, *IPOC International Growth Fund Limited v. Diligence et al.*, 1:06-cv-01109-PLF (D.D.C., filed Jun. 15, 2006). As those proceedings showed, the objective of that work was to use the US media and legal system to discredit a top Russian government official who was one of Fridman's primary business and political rivals.

> 2. *As Plaintiffs' longtime agent, Richard Burt's familiarity with Plaintiffs' meetings with high-level officials and Plaintiffs' promotional events has direct bearing on their status as public figures.*

Amb. Burt has for years arranged and accompanied Plaintiffs to meetings with high-level officials throughout Washington D.C. Richard Burt accompanied Plaintiffs Aven and Fridman to three meetings at the White House, in May of 2010, 2011 and 2012. Levy Decl., Ex. 4, White House Visitor Records. According to Plaintiff Aven, Amb. Burt has "for many years" introduced Plaintiffs and Alfa to US officials. Levy Decl., Ex. 3, *Aven v. Orbis*, QB-2018-6349, Trial Tr. Day

---

[6]    BGR  Government  Affairs  Lobbying  Report,  July  20,  2020, https://soprweb.senate.gov/index.cfm?event=getFilingDetails&filingID=8F7AD9D3-E971-4A1C-9EE9-A46C98ED59A6&filingTypeID=61; BGR

[7] Ambassador Richard Burt, http://www.deltasearchlabs.com/rburt.html; *see also* Burt, Richard, opensecrets.org, https://www.opensecrets.org/revolving/rev_summary.php?id=13420

[8] https://www.bloomberg.com/news/articles/2007-02-25/spies-lies-and-kpmg?sref=VDXBDESF; Mark  Ames  and  Ari  Berman,  "McCain's  Kremlin  Ties,"  thenation.com  (Oct.  1,  2008), https://www.thenation.com/article/archive/mccains-kremlin-ties/

2, Mar. 17, 2020, at 77:10–77:11. Amb. Burt has arranged publicity events for them, overseen their meetings with influential American figures in both Washington D.C. and abroad, and acted as the intermediary between the Plaintiffs and prominent think tank institutions in Washington D.C. *See, e.g.,* Levy Decl., Ex. 1, Email from O. Dubova on behalf of P. Aven to A. Aslund, copying R. Burt (Sept. 8, 2015), at AC-054642 (asking Aslund to contact Richard Burt about scheduling, because Burt was "fully aware of [Aven's] schedule"); *id.*, Email from R. Morningstar to R. Burt (May 22, 2015), at AC-045331 (asking Burt to arrange a meeting for him with Fridman and Aven in London); *id.*, Email from F. Kempe to R. Burt (Oct. 27, 2015), at AC-045089 (asking Burt to tell Plaintiff Aven that Kempe was declining Aven's request to invite Mikhail Lesin to an event because the FBI was investigating Lesin for money laundering); *id.*, Email from A. Aslund to R. Burt (Oct. 15, 2017), at AC-43791-2 (planning the list of invitees for a private breakfast with Plaintiffs Fridman and Aven). As characterized by a longtime acquaintance of Plaintiffs' Aven and Fridman, Amb. Burt has been described as "represent[ing] both Fridman and Aven quite intensely." Levy Decl., Ex. 1, Email from A. Aslund to F. Kempe (May 20, 2016), at AC-043324.

Having managed their relationships and appearances in Washington, Amb. Burt can testify about keeping up a Russian oligarch's appearances with Western investors and government officials in Washington. Amb. Burt and Plaintiffs are desperate to avoid giving this testimony, because they are painfully aware that Amb. Burt's testimony about these efforts will show exactly how Plaintiffs have thrust themselves into a public controversy about how Russian oligarchs conduct business outside of Russia and the significance of their relationship with Putin and the Kremlin.

3. *In 2016, Burt attempted to help Plaintiff Aven establish a line of communication with the Trump administration.*

While on the board of LetterOne, *see* Mueller Report at 163-64, Dkt. No. 94-13, and continuing to act as their long-time agent in Washington, Amb. Burt was approached by Plaintiff Aven to set up a communications channel with the incoming Trump administration. This occurred in December 2016, at the request of Russian President Vladimir Putin, and Amb. Burt tried to carry out that request. The Special Counsel disclosed this sequence of events in the Mueller Report. *See* Mueller Report at 163-64, Dkt. No. 94-13 (footnotes omitted). Amb. Burt called Aven's effort to establish a communications channel between Russia and the Trump team "Project A." *Id.* at 165. According to the Mueller Report, Burt e-mailed Plaintiff Aven about the status of "Project A" on December 22, 2016, *see id.*; however, Plaintiff Aven has refused to produce that email or any other documentation related to his communications with the Special Counsel.

It is unclear from the public record why Plaintiff Aven asked Burt to follow through with that request, just as it is unclear why Putin tasked Plaintiff Aven with this directive. Burt's knowledge about both his and Putin's relationships with Plaintiff Aven (and the other Plaintiffs and Alfa) are relevant to understanding what happened and any favors done for one or the other.

In addition, Amb. Burt helped write then-candidate Donald J. Trump's first major foreign policy speech at an event which attracted Russian government representatives and was sponsored by the Center for the National Interest, on whose board Burt also sits.[9] Burt maintained contact with an early Trump booster and later the top law enforcement official in the United States

---

[9] Stephanie Kirchgaessner, "Lobbyist for Russian Interests Says He Attended Dinners Hosted by Sessions," TheGuardian.com, June 15, 2017, https://www.theguardian.com/us-news/2017/jun/15/lobbyist-russian-interests-jeff-sessions-testimony; *see also* Center for National Interest, Board of Directors, https://cftni.org/about/board-of-directors/; Center for the National Interest, Donald Trump Delivers Foreign Policy Speech, https://cftni.org/recent-events/donald-trump-delivers-foreign-policy-speech/

government, former Attorney General Jeff Sessions.[10] After the 2016 election, Amb. Burt's name was "floated frequently in various [Russian] news reports . . . as a possible U.S. ambassador to Moscow."[11]

### C.    Defendants Subpoenaed Richard Burt.

Amb. Burt does not argue that a deposition imposes an undue burden on him because he has no personal knowledge of relevant facts. Creatively, he instead contends that he is a man who knows too much. But this argument is too clever, merely proving Defendants' contention. It is precisely because of Amb. Burt's uncontested wealth of relevant personal knowledge that Defendants subpoenaed him for documents and testimony. *See* Ex. A to Burt Mot., Dkt. No. 110-2.

So as to avoid the imposition of any undue burden on Amb. Burt, Defendants waited until after Plaintiffs produced documents to re-engage with counsel for Amb. Burt. Plaintiffs, however, produced no communications with or about Amb. Burt and barely produced any documents at all, as this Court is aware through the multiple motions to compel filed by Defendants. Because Plaintiffs shirked their Rule 34 obligations, Defendants revisited their subpoena served on Plaintiffs' longtime agent, Amb. Burt.

After conferring with Amb. Burt's counsel on the scope of the document production and testimony, Defendants agreed, "for the purpose of avoiding litigation," to accept Amb. Burt's limited document production, but Defendants explicitly stated that such agreement was "without

---

[10] Stephanie Kirchgaessner, "Lobbyist for Russian Interests Says He Attended Dinners Hosted by Sessions," TheGuardian.com, June 15, 2017, https://www.theguardian.com/us-news/2017/jun/15/lobbyist-russian-interests-jeff-sessions-testimony

[11] Anna Nemtsova and Michael Weiss, "The Kremlin's Oil Company Has a Man in Trumpland," thedailybeast.com, Apr. 10, 2017, https://www.thedailybeast.com/the-kremlins-oil-company-has-a-man-in-trumpland

waiver of any of Defendants' positions, including but not limited to their position on relevance." *See* Ex. I to Burt Mot., Dkt. No. 110-10. Therefore, the document subpoena is not before this Court.[12] Moreover, in light of the fact that Defendants have already reduced the scope of production to the contours requested by Amb. Burt, his cries of "burden!" are particularly meritless.

Defendants rejected Amb. Burt's proposed scope of the deposition, which would have limited his testimony to:

- The truth or falsity of the three alleged defamatory statements in CIR 112, but *only* as they "relate[] to the time period of January 1, 2016 through October 3, 2017;"

- "Communications or attempts to establish a line of communication with the Trump Campaign or Trump Transition, as relates to Plaintiffs, AO Alfa-Bank, ABH Holdings S.A., LetterOne Investment Holdings S.A., or LetterOne Holdings S.A., and as relates to the time period of June 1, 2015 through January 20, 2017."

*See* Ex. H to Burt Mot., Dkt. No. 110-9. In so doing, Amb. Burt outright refuses to testify about any other topics or time periods, including "the public figure status of Plaintiffs." *Id.* Counsel for Amb. Burt contended that *any* questions concerning Plaintiffs' status as public figures are not relevant to this litigation. *See* Ex. H to Burt Mot. (Counsel for Burt wrote that: "Ambassador Burt will not testify about topics that are outside the scope of his document production or otherwise irrelevant, including 'the public figure status of Plaintiffs.'").

Defendants' counsel explained to Amb. Burt's counsel that his proposed limitations were unreasonable on several grounds. As Defendants' counsel explained:

---

[12] The deadline for production, however, has not yet passed, and Burt has not yet produced documents. Defendants reserve all rights to question Burt on his production and to move him to compel production of documents, should the production appear defective or insufficient.

[Amb. Burt] is a central figure in this case. We are entitled to ask Amb. Burt, a LetterOne director, questions that go to either party's claims and defenses – including the substantial truth or falsity of the three alleged defamatory statements, as interpreted by both parties (not just the Plaintiffs' interpretation). This includes, *but is not limited to* questions about Amb. Burt's relationship with Plaintiffs and Alfa; his involvement and communications with the Trump Campaign and the Trump Transition; and his knowledge about: Plaintiffs' and Alfa's relationship with the Kremlin, any favors that Plaintiffs and/or Alfa provided to Putin and/or the Kremlin, any favors that Putin and/or the Kremlin provided to Plaintiffs and/or Alfa, and any payments to government officials by Plaintiffs and/or Alfa. Because CIR 112 is not limited to a discussion of events in 2016, but rather summarizes the "history" of these relationships, the scope of these questions will include and predate 2016. Also, the public figure status of Plaintiffs is at issue. We will want to ask Amb. Burt about that status, including but not limited to the government meetings and interviews that he has arranged for Plaintiffs to invite attention and comment, and his involvement in providing them access to channels of communication. Under DC law, evidence of public figure is not limited to publicly available media, as you have previously suggested.

*See* Ex. H to Burt Mot., Email from J. Levy to M. Krawiec (Sept. 18, 2020), Dkt. No. 110-9, at 4

(emphasis added).[13]

### D.  The Instant Dispute

1. *Ambassador Burt refuses to testify concerning personal knowledge that bears directly on Plaintiffs' status as public figures.*

Amb. Burt has refused to answer any questions bearing on Plaintiffs' public figure status,

absurdly claiming the issue is "irrelevant" to a defamation case. Defendants are entitled to seek

---

[13] Throughout his brief, Amb. Burt misleadingly refers to the topics listed in this email as the proposed scope of the deposition. He states in his brief that Defendants have "eight proposed deposition topics," Burt Mot. at 14, quoting the September 18, 2020, email. Defendants provided that non-exclusive list of the types of topics Defendants will cover in Amb. Burt's deposition to explain why Defendants are unwilling to limit Amb. Burt's deposition to the narrow time period he proposes. Amb. Burt's treatment of this e-mail as an exclusive list of topics is false and misleading. The email states that Defendants will ask Amb. Burt questions "that go to either party's claims and defenses ... This includes, *but is not limited to* questions…" Ex. H to Burt Mot., Email from J. Levy to M. Krawiec (Sept. 18, 2020), Dkt. No. 110-9, at 4. Furthermore, Amb. Burt never asked Defendants to list proposed topics for his deposition. Defendants offered a partial list in an effort to accommodate Amb. Burt and elicit a more constructive dialogue on these issues.

evidence for their affirmative defenses, including Plaintiffs' status as public figures, and the Court

has acknowledged that Plaintiffs' status as public figures is an issue that is relevant to this case.

Mem. Op., Dkt. No. 48.

2. *Ambassador Burt refuses to testify to his personal knowledge concerning Plaintiffs'*
   *and Alfa's activities that bear directly on Defendants' defense that the alleged*
   *defamatory statements in this lawsuit are substantially true.*

Likewise, Burt impermissibly seeks to avoid testifying about any matters bearing on the

truth or falsity of Plaintiffs' and Alfa's relationship with Putin and the Kremlin – the facts that lie

at the center of this case – if they touch on matters before January 1, 2016 or after October 3, 2017.

Amb. Burt asks the Court to limit the scope of his deposition to January 1, 2016 to October 3,

2017, for most topics, and for June 1, 2015 through January 20, 2017 for communications with the

Trump Campaign or Trump Transition. *See* Burt Mot. at 12-13; Ex. H. He asks for these time

limitations even though CIR 112 plainly discusses "the history and current state of relations"

between Putin and Alfa, "led by oligarchs" Fridman, Aven, and Khan. *See* CIR 112, Dkt. No. 14-

2.[14] The decades-long relationship between Plaintiffs and the Russian government is the topic of

CIR 112, yet Amb. Burt piggybacks on Plaintiffs' meritless claim that the substance of CIR 112

is limited to 2016, with the exception of the statement concerning Govorun. Defendants have

already filed a motion to compel challenging Plaintiffs' reading of CIR 112 and incorporate in this

brief their arguments in that Motion, Dkt. No. 94-1, and Reply Brief, Dkt. No. 106.

It is telling that Amb. Burt's Motion ignores the text of the alleged defamatory statements

and instead relies on Plaintiffs' own misinterpretation of those statements, a set of unoriginal

observations that have been made by many Russia experts and news correspondents for decades.

*See* Burt Mot. at 12. Specifically, Amb. Burt quotes from Plaintiffs' answer to an interrogatory

asking *Plaintiffs* to explain what the alleged defamatory statements *mean to Plaintiffs*. *Id.* Counsel for Amb. Burt does this in a misleading manner, failing to identify that the text being cited is from Plaintiffs' answers to interrogatories, and instead listing only the docket number. *Id*.

## LEGAL STANDARDS

"Generally speaking, '[a] party is entitled to depose a witness on all relevant issues to which the witness has knowledge.'" *Alexander v. F.B.I.*, 186 F.R.D. 1, 3 (D.D.C. 1998) (quoting *CBS, Inc. v. Ahern,* 102 F.R.D. 820, 822 (S.D.N.Y. 1984)). Relevance "is broadly construed," *Food Lion, Inc. v. United Food & Commercial Workers Int'l Union, AFL-CIO-CLC*, 103 F.3d 1007, 1012 (D.C. Cir. 1997). Defendants are entitled to discovery "regarding any nonprivileged matter that is relevant to *any* party's claim or defense," Fed. R. Civ. P. 26(b)(1). The same broad scope of relevance set forth in Rule 26 applies to Rule 45. *Coleman v. D.C.*, 275 F.R.D. 33, 36 (D.D.C. 2011).

Amb. Burt requests that the Court grant a protective order under Rule 26(c) or modify the subpoena under Rule 45(d). "Limiting discovery and quashing subpoenas pursuant to Rule 26 and/or Rule 45 'goes against courts' general preference for a broad scope of discovery.'" *U.S. Dep't of the Treasury v. Pension Benefit Guar. Corp.*, 301 F.R.D. 20, 25 (D.D.C. 2014) (quoting *North Carolina Right to Life, Inc. v. Leake,* 231 F.R.D. 49, 51 (D.D.C. 2005)). Federal Rule of Civil Procedure 26(c) permits a person to move for a protective order "for good cause shown." Amb. Burt, as the person seeking the protective order, "bears the burden of making the showing of good cause contemplated by the rule." *Alexander v. F.B.I.*, 186 F.R.D. 71, 75 (D.D.C. 1998) (denying motion for a protective order and rejecting argument that the testimony sought was not relevant to the case); *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 249 F. Supp. 3d 516, 520 (D.D.C. 2017) (same). To meet his burden of showing good cause, Amb. Burt must

"make *a specific demonstration of facts* in support of the request as opposed to conclusory or speculative statements about the need for a protective order and the harm which will be suffered without one." *Alexander v. F.B.I.*, 186 F.R.D. at 75 (emphasis added). "Moreover, the showing required under Rule 26(c) must be sufficient to overcome [Defendants'] legitimate and important interests in trial preparation." *Id.*

"Rule 45 provides that a subpoena for relevant information may be quashed or modified if it 'subjects a person to undue burden.'" *Flanagan v. Wyndham Int'l Inc.*, 231 F.R.D. 98, 102–03 (D.D.C. 2005) (quoting Fed. R. Civ. P. 45(c)(3)(A)(iv)). As the party seeking to modify the subpoena, Amb. Burt "bears the burden of showing that it subjects [him] to undue burden." *Id.* To determine whether a non-party's claim of burden is grounds for modifying or a quashing a subpoena, courts "generally employ a balancing test, weighing the burdensomeness to the moving party against the deponent's need for, and the relevance of, the information being sought." *Id.*

## ARGUMENT

Amb. Burt's brief relies on conclusory claims and lacks any specific factual support for his arguments. He provides no declaration or other evidence of specific facts supporting his motion and thus fails to satisfy his burden. Moreover, his arguments apply the wrong standard for relevance.

First, the alleged defamatory statements at the heart of this litigation largely relate to pre-2016 matters, so there are no grounds for limiting the vast majority of Burt's testimony to January 1, 2016 – October 3, 2017 (or June 1, 2015 – January 20, 2017). Second, Amb. Burt's vague assertions of burden and requests for judicial intervention to order the Defendants not to ask about other topics are meritless; Amb. Burt has failed to demonstrate that any of Defendants' proposed deposition topics are not relevant, and Amb. Burt is free to raise relevance as an objection to

specific questions during his deposition. Third, Amb. Burt's testimony is necessary to Defendants' case: he has unique knowledge relevant to Plaintiffs' status as public figures, and, according to Plaintiffs' discovery responses, has knowledge of any alleged harm to Plaintiffs. The testimony of Amb. Burt is manifestly relevant to the claims or defenses of the parties in this case and he must testify without any court-ordered limitation on time period or topics. The information sought is relevant and necessary for Defendants' defenses in this case and does not unduly burden Amb. Burt.

To be clear, Amb. Burt's testimony is relevant, *inter alia*, to the substantial truth or falsity of the alleged defamatory statements, the public figure status of Plaintiffs, and Plaintiffs' allegations of damages. Truth "is a complete defense" to defamation, *Olinger v. Am. Sav. & Loan Ass'n*, 409 F.2d 142, 144 (D.C. Cir. 1969). "This defense may be established by demonstrating that the statements in question are 'substantially true.'" *Benic v. Reuters Am., Inc.*, 357 F. Supp. 2d 216, 221 (D.D.C. 2004) (Leon, J.) (quoting *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 59 (D.D.C. 2002)). "Substantially true" means that a statement's "'gist' or 'sting'" is true, *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1990), "as it would be understood by its intended audience," *Benic*, 357 F. Supp. 2d at 221. Therefore, Defendants should be entitled to probe facts that might establish whether the "gist" or "sting" of the alleged defamatory statements are true, in addition to those that bear on the public figure status of Plaintiffs and their alleged damages.

### A. Amb. Burt Has Not Met His Burden of Showing That His Testimony Concerning Events Outside of June 1, 2015 – October 3, 2017 Is Not Relevant.

The Court should reject Amb. Burt's effort to limit his deposition to the time periods of January 1, 2016 – October 3, 2017 and June 1, 2015 – January 20, 2017, because his argument relies on Plaintiffs' incorrect interpretation that the alleged defamatory statements in CIR 112 concern only 2016. Defendants have already explained in depth why this interpretation of the

alleged defamatory statements is incoherent and incorrect. *See* Defs.' Mot. to Compel, Dkt. No. 94-1, and Defs.' Reply Br., Dkt. No. 106. For the same reasons Defendants advance in those briefs, Amb. Burt's arguments about relevance should be rejected.

Amb. Burt reaches the conclusion that the alleged defamatory statements pertain only to 2016 by relying on *Plaintiffs'* interpretation of the statements, not the statements themselves. *See* Burt Mot. at 12.[15] Yet Plaintiffs' position that CIR 112 relates only to conduct during 2016 is unsupported by any reasonable reading of that document. For example, Plaintiffs contend that the allegedly defamatory statement regarding the "continued" exchange of favors between Plaintiffs and Putin can be treated only "as an allegation of conduct during 2016," Pls.' Suppl. Resp. to Interrog. No. 2, Dkt. No. 78-6, at 3. CIR 112 says no such thing. More importantly, Plaintiffs' arguments about what the alleged defamatory statements mean *to them* do not dictate the scope of discovery in this case.

CIR 112 plainly states that it reports on the "history" and "current" relationship of Plaintiffs and Alfa with Putin and the Kremlin. CIR 112, Dkt. No. 14-2, at 1. To that end, CIR 112 illustrates this relationship through examples that occurred prior to 2016—such as Putin's time in St. Petersburg as its deputy mayor in the 1990s, Alfa's 2013 sale of its interest in TNK-BP, and Plaintiffs' possession of "kompromat" on Putin, which, by necessity, dates back years.

---

[15] Amb. Burt misleadingly writes that:

> Plaintiffs' defamation claims are limited to three statements in CIR 112: (i) that Plaintiffs and Alfa "cooperated with a Kremlin-orchestrated illegal campaign to interfere with the 2016 U.S. presidential election"; (ii) that Plaintiffs and Russian President Vladimir Putin exchanged "[s]ignificant favours" during 2016; and (iii) that Plaintiffs used an intermediary to "deliver large amounts of illicit cash" to Putin "during the 1990s." Dkt. 78-6, at 3–4.

As already explained, *supra* at 12-13, those are quotations from Plaintiffs' answers to interrogatories, rather than the text of CIR 112.

The law of defamation does not permit the interpretations advanced by Amb. Burt and Plaintiffs. Instead, a "publication must be taken as a whole." *Farah v. Esquire Magazine*, 736 F.3d 528, 535 (D.C. Cir 2013) (quoting *Afro-American Publ'g Co. v. Jaffe*, 366 F.2d 649, 655 (D.C. Cir. 1966) (en banc)). In a defamation suit, the meaning and scope of an allegedly defamatory publication is determined by a "reasonabl[e]" or "normal, everyday reading." *Tavoulareas v. Piro*, 817 F.2d 762, 780 (D.C. Cir 1987) (en banc); *see also* Restatement (Second) of Torts § 563 (1977). When a court reviews a publication as a whole, the "[c]ontext is critical" for evaluating its meaning. *Farah*, 736 F.3d at 535. "Language is to be given its natural, plain, ordinary, obvious meaning and is to be construed in its popular sense." Sack on Defamation: Libel, Slander, and Related Problems § 2.4.2(A).

To recap, the alleged defamatory statements cannot be limited to 2016, because they clearly refer to historical events:

- The line "RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP COOPERATION," refers to long-term cooperation between the Kremlin and Alfa Group, which Plaintiffs have admitted in other contexts. Plaintiffs—through their U.K. counsel—have elsewhere conceded that the first part of the "title is misleading because the memorandum says nothing at all about the US presidential election." *Aven v. Orbis* Tr. Day 1, Mar. 16, 2020, Dkt. No. 94-6, at 17:11–12. Instead, "[w]hat [CIR 112] is about is clear from the [sub]title, 'Co-operation between the Kremlin and Alfa Group and the [Plaintiffs].'" *Id.* at 18:5–6. Plaintiffs' counsel went on to say that the contents of CIR 112 "ha[ve] nothing to do with the [2016] election." *Id.* at 25:19. Rather, CIR 112 "is simply about the [Plaintiffs], Alfa[,] and President Putin." *Id.* at 25:21–22. The District of Columbia Court of Appeals has also affirmed that "CIR 112 focuses on the *preexisting* controversy surrounding Russian oligarchs and their influence upon the Russian

government," *Fridman v. Orbis Bus. Intelligence Ltd.*, 229 A.3d 494, 508 (D.C. 2020) (emphasis

added), rather than the 2016 election. Furthermore, in Plaintiffs' appellate brief in their ongoing

lawsuit against *Buzzfeed*, Plaintiffs state that although this top-line:

> references "cooperation" involving the Kremlin and "Alpha Group," a misspelling of Alfa Group, a company in which Plaintiffs have invested, following a colon preceded by the words "Russia/US Presidential Election," the text of CIR 112 includes *no* allegations about the election.
>
> Instead, in sections labelled "Summary" and "Detail," CIR 112 accuses Plaintiffs of having a financially corrupt relationship with Russian President Vladimir Putin [going back to when Putin was the Deputy Mayor of St. Petersburg], without relating that contention to the U.S. presidential election or Trump.

Brief for Plaintiffs-Appellants, at 4-5, *Fridman v. Buzzfeed*, Index No. 154895/17 (N.Y. Sup. Ct.,

App. Div., 1st Dep't, dated Nov. 5, 2018) (emphasis in original).

- The line: "Significant favours continued to be done in both directions, primarily

political ones for PUTIN and business/legal ones for Alpha," refers to the current and past favors.

By any reasonable construction, the assertion that something "continued" in 2016 means that it

was happening prior to 2016 as well. *See, e.g.*, *Continue*, American Heritage Dictionary of the

English Language, https://ahdictionary.com/word/search.html?q=continue (defining "continue" as

"[t]o go on with a particular action or in a particular condition; persist"). CIR 112's reference to

the "history and current state of relations," as well as its historical examples of this relationship,

make clear that CIR 112 refers not only to 2016 events, but also to pre-2016 events. Indeed,

immediately following CIR 112's statement about "favours," the memorandum includes yet

another statement that discusses past events: "Also, FRIDMAN and AVEN **continued** to give

informal advice to PUTIN on foreign policy, and especially about the US where he **distrusted**

advice being given to him by officials." CIR 112, Dkt. No. 14-2, at 1 (emphasis added).

- Plaintiffs claim that the following content of CIR 112 is false and defamatory: "during the 1990s [Oleg] GOVORUN had been Head of Government Relations at Alpha Group and in reality, the 'driver' and 'bag carrier' used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St Petersburg. Given that and the continuing sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN." The statement implicates how the relationship between Plaintiffs and Putin, and the use of intermediaries, developed in the years between the 1990s and 2016. As with the "continu[ing]" favors between Alfa and the Kremlin, here, too, the adjective "continuing" can only be accurate, if something that *occurred in the past* remains. Thus, evidence relevant to what *occurred in the past* is critical to establishing the substantial truth or falsity of the statement.

Additionally, Amb. Burt's knowledge of events that occurred after October 3, 2017 is relevant to: the substantial truth of the alleged defamatory statements; whether the statements defamed and harmed Plaintiffs; and whether Plaintiffs have mitigated damages. For instance, Amb. Burt's interview with the Special Counsel's Office—clearly relevant to the substantial truth of the statements—occurred in 2018. Mueller Report at 163, Dkt. No. 94-13.

Accordingly, limiting Amb. Burt's testimony to 2016 is unwarranted and would severely prejudice Defendants' well-founded argument that the statements at issue in this litigation are substantially true. Amb. Burt's Motion fails to acknowledge that relevance encompasses *any* party's claims or defenses.

### B. Ambassador Burt Has Not Met His Burden of Showing That His Deposition Should Otherwise Be Limited Based on Relevance.

Amb. Burt takes pains to object to the relevance of topics Defendants offered as examples of what they may cover at a deposition. Burt Mot. at 14. In support, Amb. Burt's Motion cites an

email in which Defendants provide examples of likely topics that will be included in a Rule 45 deposition, all of which are topics that Amb. Burt can speak to with ease and go to the heart of the claims and defenses in this case, and all of which Defendants offered in hopes of furthering dialogue and potentially resolving this dispute outside of this Court. These topics include: "Plaintiffs' and Alfa's relationship with the Kremlin, any favors that Plaintiffs and/or Alfa provided to Putin and/or the Kremlin, any favors that Putin and/or the Kremlin provided to Plaintiffs and/or Alfa, and any payments to government officials by Plaintiffs and/or Alfa. Also … We will want to ask Amb. Burt about … government meetings and interviews that he has arranged for Plaintiffs … and his involvement in providing them access to channels of communication." *See* Ex. H to Burt Mot.

Counsel for Amb. Burt has labeled Defendants request to depose Amb. Burt about these relevant issues a "campaign of intimidation and retaliation."[16] Burt Mot. at 14. That barb is not only unfounded, but rich with irony, as it comes from Amb. Burt's counsel, who also represents Alfa Bank, Russia's largest commercial bank, and a party that has intervened in this litigation to aid Plaintiffs' legal strategy.[17] Here, again, Amb. Burt has weaponized Defendants' attempts at good faith. Moreover, the frenzy of obfuscation is all done in service of an objection that is unsupported by the law.

---

[16] Amb. Burt's Motion falsely accuses Defendants of improper motives in seeking his deposition. *See* Burt Mot. at 13. Defendants are merely trying to defend themselves against a lawsuit that Plaintiffs are using as a tool to harass Defendants. Amb. Burt has necessary and relevant information, and Defendants are seeking that information. Amb. Burt's accusations that Defendants would use the deposition for purposes other than defending themselves, *id.*, are also unfounded because, as Amb. Burt acknowledges, *id.* at 6, Defendants agreed to a confidentiality protocol for pages of Amb. Burt's transcript that he designates as confidential. *See* Ex. J. to Burt Mot.

[17] Indeed, one of Amb. Burt's lawyers, Ryan Junck, not only represents Alfa in this matter, but also represented Plaintiff Aven before the Special Counsel.

Because Amb. Burt "possesses some unique knowledge that [ ] warrant[s] his deposition," the Court should not "rule in advance about the questions that [Defendants] may ask." *Zimmerman v. Al Jazeera Am., LLC*, 329 F.R.D. 1, 7 (D.D.C. 2018). Indeed, as with any deponent, Amb. Burt can answer questions at his deposition subject to an objection based on relevance. Fed. R. Civ. P. 30(c)(2). And, as noted by the court in *Zimmerman*, Defendants' "counsel's interest in maximizing the use of the limited time available for the deposition will provide an adequate incentive not to waste time exploring irrelevant topics." *Zimmerman*, 329 F.R.D. at 7 (holding that even though the party requesting the deposition had not demonstrated the relevance of a particular topic, the court would not preclude exploring that topic at the deposition, because the party had demonstrated that the deposition was warranted and that alone was sufficient).

Amb. Burt does not – and cannot – show that any of the possible topics are irrelevant to the parties' claims or defenses. Instead, he fills the brief with empty statements. *First*, he states that the Court "should not permit a free-flowing inquiry" into his relationship with Plaintiffs and Alfa "unmoored from the truth or falsity of the allegedly defamatory statements at issue in this case." Burt. Mot. at 14. It is not clear what Amb. Burt is requesting here; Amb. Burt's counsel may object in a deposition to statements that do not relate to either party's claim or defense, but Defendants are entitled to ask about the relationship between Amb. Burt and Plaintiffs/Alfa, his knowledge of facts from this relationship that bear on the substantial truth or falsity of the alleged defamatory statements, and, *inter alia*, facts that relate to Plaintiffs' public figure status, such as the meetings between Plaintiffs and US government officials that Amb. Burt has arranged or attended. All of these issues bear directly on Defendants' defenses in this case and are subject to discovery.

*Second*, in arguing that the "Court should preclude questioning regarding Ambassador Burt's interactions with the Trump Campaign and Trump Transition *unrelated* to Plaintiffs or [AO Alfa-Bank, ABH Holdings S.A., LetterOne Investment Holdings S.A., or LetterOne Holdings S.A.], which have nothing to do with the truth or falsity of the allegedly defamatory statements at issue in this case," Burt. Mot. at 15 (emphasis in original), Amb. Burt appears to forget who he is. Whenever Amb. Burt was working or communicating with the Trump Campaign or the Trump Transition in 2016, he was simultaneously serving on the board of LetterOne, a company that Plaintiffs own and created, and as Plaintiffs' man in Washington, DC, and as a lobbyist for a pipeline company directly controlled by the Kremlin.[18] Defendants should be able to use the deposition to ask about the extent of Amb. Burt's agency on behalf of Plaintiffs while he worked and communicated with the Trump Campaign, its surrogates and the Transition Team.

In addition, his testimony also cannot be limited to the four Alfa entities suggested by him: AO Alfa-Bank, ABH Holdings S.A., LetterOne Investment Holdings S.A., or LetterOne Holdings S.A. He provides no facts supporting the limitation to these four entities, which are hand-picked by Alfa's counsel. As defined by Plaintiffs, Alfa is "the conglomerate of entities including Alfa-Bank JSC (also known as JSC Alfa-Bank and Alfa-Bank AO), ABH Holdings S.A., Alfa Capital, AlfaStrakhovanie Group, Alfa Asset Management (Europe) S.A., A1, X5 Retail Group, Rosvodokanal Group, and IDS Borjomi International Group, or any of their subsidiaries or affiliates." *See* Pls.' Rule 45 Subpoena to Dem, Nat'l Comm., Dkt. No. 94-15, ¶ 29. CIR 112 refers broadly to Alfa, and thus Defendants are entitled to ask questions regarding *any* Alfa entity.

---

[18] Stephanie Kirchgaessner, "Lobbyist for Russian Interests Says He Attended Dinners Hosted by Sessions," TheGuardian.com, June 15, 2017, https://www.theguardian.com/us-news/2017/jun/15/lobbyist-russian-interests-jeff-sessions-testimony

*Third*, he argues that the "Court should not permit an open-ended inquiry into Ambassador Burt's knowledge of Plaintiffs' and Alfa's relationship with the Kremlin, which would encompass matters bearing no relation to the truth or falsity of the allegedly defamatory statements at issue in this case." Burt Mot. at 15. Amb. Burt does not – and cannot – provide any specifics on how this obviously-relevant topic should be limited, but rather repeats, without support, that the "Court should not permit examination … regarding events outside the time period of January 1, 2016 through October 3, 2017." Burt Mot. at 15. As Defendants have previously explained, that argument has no merit. *See supra*, Argument § A, at 15-19 [19]

### C. Ambassador Burt's Testimony Is Relevant and Necessary to Defendants' Defense That Plaintiffs Are Public Figures.

Plaintiffs' status as limited purpose public figures, and their corresponding burden to prove actual malice, is a key component of Defendants' defense. Amb. Burt claims that any testimony he can offer regarding Plaintiffs status as public figures would, on the one hand, have "miniscule" probative value, Burt Mot. at 3, and, on the other hand, is "irrelevant to the issues in this case." Ex. H. Again parroting Plaintiffs' arguments, Amb. Burt states that only publicly available evidence should be permitted to prove that Plaintiffs are public figures. *See* Burt Mot. at 16. But

---

[19] Amb. Burt further argues that the "Court should not permit a fishing expedition into any 'payments' over the last thirty years that have nothing to do with the allegedly defamatory statements." Burt Mot. at 16. Here, again, the objections are purely speculative. Amb. Burt's deposition is, like all depositions, time-limited. It would be odd for Defendants to waste their time asking questions "that have nothing to do with the allegedly defamatory statements." Additionally, among other things, payments that show cooperation or favors between Alfa and/or the Plaintiffs, on the one hand, and any Russian government officials, on the other, are relevant to substantial truth. Payments by Plaintiffs to Amb. Burt for his services in helping shape the perception of Plaintiffs and Alfa in the West are relevant to Plaintiffs' status as public figures, inasmuch as they show Plaintiffs trying to influence the controversy about the relationship between Russian oligarchs and the Kremlin/Putin.

he cites to no case that says this because, to undersigned counsel's knowledge, none exists. His arguments have no merit.

Public figure is a "viable defense" for Defendants, and "to prevail, [Defendants] must support the defense with evidence." *BuzzFeed, Inc. v. U.S. Dep't of Justice*, 318 F. Supp. 3d 347, 357 (D.D.C. 2018) (in defamation case, granting motion to compel testimony from government officials because it was directly relevant to defendant's affirmative defense of fair report privilege). Public figures are those who have "assumed roles of especial prominence in the affairs of society" that "invite attention and comment." *Gertz v. Robert Welch, Inc.,* 418 U.S. at 345. When determining whether Plaintiffs are public figures, the court looks to factors that include whether Plaintiffs "assumed the risk of publicity and had access to channels of communication to defend themselves," *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 584–85 (D.C. Cir. 2016) (quoting *Lohrenz v. Donnelly*, 350 F.3d 1272, 1279 (D.C. Cir. 2003); whether Plaintiffs "'thrust themselves to the forefront' of a public controversy 'in order to influence the resolution of the issues involved,'" *Kahl v. Bureau of Nat'l Affairs, Inc*., 856 F.3d 106, 114–15 (D.C. Cir. 2017) (Kavanaugh, J.) (quoting *Gertz*, 418 U.S. at 345), and whether their voluntary relationships with high-level officials and business associates show that they have "engaged in conduct that [they] knew markedly raised the chances that [they] would become embroiled in a public controversy," *Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 33 (D.C. Cir. 1990).

Amb. Burt clearly has relevant information to Plaintiffs' public figure status. According to Plaintiffs Fridman and Aven, they "have been assisted in connection with government and public relations matters by BGR Group and by Richard Burt, a non-executive director of LetterOne, working as a sub-contractor to BGR Group." Pls. Answer to Int. No. 19, Dkt. No. 111-3. Ambassador Burt has personally accompanied Plaintiffs on at least three separate visits to the

White House, Levy Decl., Ex. 4, and he was involved in planning publicity events for them, such as an off-the-record breakfast featuring Mikhail Fridman, Petr Aven, and several prominent public policy experts in 2017. Levy Decl., Ex. 1, at AC-043791-2; Levy Decl. Ex. 2, Invitation to Private Roundtable (AC-000029).

Nevertheless, in the instant dispute, Burt argues that "information related to alleged efforts in the shadows has no bearing on the question whether Plaintiffs are *public* figures," Burt Mot. at 16 (emphasis in orginal), and contends that only publicly available information is relevant to the public figure test. Not so. Information not in the public domain is relevant to the public figure test. For example, information tending to show that Plaintiffs retain and use public relations professionals; are able to arrange interviews with the media when they so desire; have voluntary relationships with high-level officials and business associates; and are otherwise seeking to influence views on how they and other oligarchs do business and the significance of their relationship with the Kremlin to their business is all relevant to the public figure test. In affirming that the plaintiff in *Tavoularas v. Piro*—the president of Mobil Corporation—was a public figure, the D.C. Circuit looked to evidence of his "continuing access to the media" "through Mobil's publicity apparatus." 817 F.2d 762, 774 (D.C. Cir. 1987). Amb. Burt is part of Plaintiffs' "publicity apparatus," *id.*, among other things. Testimony concerning Plaintiffs' engagement of Amb. Burt – to arrange interviews with the media, plan publicity events, or arrange meetings with government officials – would all be relevant evidence indicating that Plaintiffs have ample resources to tell their side of the story and have used those resources to influence their perception in the West, and thus are limited purpose public figures. *See also Clyburn v. News World Commc'ns, Inc.*, 903 F.2d at 33 (holding that evidence that the plaintiff's consulting firm had contracts with the District

government, and that he had "many social contacts with administration officials" showed that he took the risk of placing himself at the "heart of a public controversy.")

Finally, the Court in this case has found that the record must be more fully developed on the issue of public figure and declined to take judicial notice of publicly available documents at the motion to dismiss stage. *See* Mem. Op., Dkt. No. 48, at 10-11 & n.1 (stating that the Court "cannot resolve the public figure issue at this stage on the limited record," and that the Court saw no reason to take judicial notice of the news articles "before the parties have had a chance to develop a record.") Therefore, Defendants must take discovery on the issue and are entitled to develop a record of Plaintiffs' public figure status, including through deposition testimony.

### D.  Amb. Burt's Testimony Is Relevant to Rebutting Plaintiffs' Alleged Damages.

In their discovery responses, Plaintiffs disclosed Amb. Burt as an individual with knowledge "concerning the falsity of the defamatory allegations contained in CIR 112 and the damages caused by Defendants' publication of the defamatory statements at issue." Pls.' Sec. Supp. Resps. & Objs. to Ints., Dkt. No. 111-4, at 11; *see also id.*, at 11-12 & n.1 (To show damages, "Plaintiffs will rely on testimony from themselves and/or third parties," including Richard Burt "to show the wide dissemination of the defamatory statements, and how the defamatory statements damaged Plaintiffs' reputations, affected Plaintiffs in their personal relationships, and caused Plaintiffs emotional stress.") At present, however, Amb. Burt seeks relief from this Court to preclude *any* questions not related to the truth or falsity of the statements in CIR 112 (as Plaintiffs interpret them) or his contacts with the Trump administration, which would necessarily preclude any questions concerning Plaintiffs' claim of damages. Indeed, the scope of testimony Amb. Burt has proposed is so narrow that it would prevent him from providing the very testimony with which his longtime clients plan to prosecute this lawsuit.

### E.  Amb. Burt Has Not Shown That the Deposition Imposes an Undue Burden.

Amb. Burt makes no factual showing whatsoever, let alone a "specific demonstration of facts in support of the request," *Alexander v. F.B.I.*, 186 F.R.D. at 75, that his deposition poses an undue burden, nor can he. Amb. Burt "may not … simply allege a broad need for a protective order so as to avoid general harm;" he "must demonstrate specific facts which would justify such an order." *Flanagan v. Wyndham Int'l Inc.*, 231 F.R.D. at 102–03 (denying a motion to quash a Rule 45 subpoena for deposition after the non-party failed to show that the deposition would cause irreparable harm or be unreasonably duplicative).

*First*, Amb. Burt has not met his burden of showing good cause for a protective order under Rule 26(c), because he has provided no specific facts "about the need for a protective order and the harm which will be suffered without one." *Alexander v. F.B.I.*, 186 F.R.D. at 75. Amb. Burt's only allegation of harm is that requiring him "to prepare for and answer questions at a deposition covering virtually the entirety of his history with and knowledge of Plaintiffs would be highly burdensome." Burt Mot. at 18. This is mere speculation and a conclusory statement. *See Flanagan v. Wyndham Int'l Inc.*, 231 F.R.D. at 105 (explaining that "a party's showing of 'good cause' required to limit discovery must describe with specificity the potential harm the party is trying to avoid."). Requiring a witness to answer questions based on his personal knowledge is not unduly burdensome. If it were, third party subpoenas for testimony would be off limits.

*Second*, Amb. Burt's conclusory allegations that the burden of testifying outweighs the Defendants' need for, and the relevance of, Amb. Burt's testimony do not come close to meeting his burden of showing that the subpoena should be modified under Rule 45(c)(3)(A)(iv). *See* Burt Mot. at 19-20. As the party seeking to modify the subpoena, Amb. Burt "bears the burden of showing that it subjects [him] to undue burden." *Id.* Courts "generally employ a balancing test,

weighing the burdensomeness to the moving party against the deponent's need for, and the relevance of, the information being sought." *Flanagan v. Wyndham Int'l Inc.*, 231 F.R.D. at 102–03. When applying a balancing test and evaluating the reasonableness of a Rule 45 discovery test, "'what constitutes unreasonableness or oppression is, of course, a matter to be decided in the light of all the circumstances of the case.'" *U.S. Dep't of the Treasury v. Pension Benefit Guaranty Corp.*, 301 F.R.D. at 28 (citing *Northrop Corp. v. McDonnell Douglas Corp.,* 751 F.2d 395, 403 (D.C. Cir. 1984)).

He cannot satisfy his burden of showing that the deposition subjects him to an undue burden.

Amb. Burt is a key fact witness with a wealth of relevant information that is necessary to Defendants' case. *See supra*, Background § B, at 5-9**.** He professes an in-depth knowledge of Plaintiffs and Alfa, and their actions over the same time period discussed in CIR 112. Amb. Burt can speak to the longstanding relationship and "cooperation," between Plaintiffs, Alfa, and Putin/the Kremlin; transactions and interactions between Plaintiffs/Alfa and Putin/the Kremlin that amount to "significant favors,"; Plaintiffs' meetings with government officials and other high level officials, which goes directly to proof of public figure status, *Clyburn v. News World Commc'ns, Inc.*, 903 F.2d at 33 (voluntary relationships with high-level officials and business associates show that Plaintiffs have "engaged in conduct that [they] knew markedly raised the chances that [they] would become embroiled in a public controversy,"); Plaintiffs' access to the channels of communication, *see Jankovic v. Int'l Crisis Grp.*, 822 F.3d at 584–85; and Plaintiffs' efforts to thrust themselves to the forefront of the public controversies concerning how oligarchs do business in and outside of Russia, as well as the nature of their relationships to Putin, the Kremlin, and the Russian state, *see* Defs.' Answer, Dkt. No. 50, at 9 ¶ 13; *accord Fridman v. Orbis Bus. Intelligence*

*Ltd.*, 229 A.3d at 507 (identifying "Russian oligarchs' involvement with the Russian government and its activities and relations around the world, including the United States" as the relevant public controversy in a similar suit brought by Plaintiffs). Moreover, as this Circuit has noted, depositions "rank high in the hierarchy of pre-trial, truth-finding mechanisms." *U.S. Dep't of the Treasury v. Pension Benefit Guaranty Corp.,* 301 F.R.D. at 30 (citing *Founding Church of Scientology v. Webster*, 802 F.2d 1448, 1451 (D.C. Cir. 1986)).

Amb. Burt's conclusory allegation that it "would be highly burdensome" to sit for a deposition because he has so much personal knowledge of Plaintiffs and Alfa does not tip the balance to any extent. Burt Mot. at 18. His wealth of personal knowledge is precisely *why* his testimony is so important. While Burt's counsel suggests that preparing for additional testimony constitutes an undue burden that requires relief from this court, the deponent is a non-party who Plaintiffs have employed to broker introductions, advocate on their behalf, and help tell their story to influential US officials for over 20 years. Speaking on behalf of the Plaintiffs is quite literally Amb. Burt's stock and trade.

Amb. Burt cannot avoid testifying because he knows too much. Protective orders are granted where the subpoenaed deponent *lacks* personal knowledge, but not where the deponent has a wealth of first-hand knowledge. Indeed, Amb. Burt repeatedly relies on *Breiterman v. United States Capitol Police*, 323 F.R.D. 36 (D.D.C. 2017). *See* Burt Mot. at 9, 10, 11, 16, 17, 19. But in that case, the Court quashed the subpoena for a deposition because the witness was a high-ranking government official who *lacked* "personal knowledge of the relevant topics." *Breiterman*, 323 F.R.D. at 54. That is the opposite of the situation here, where Amb. Burt has a vast amount of personal knowledge about both Plaintiffs and Alfa, any alleged damages, their connection and cooperation with Putin and the Kremlin, and their ties to the Trump Campaign and Trump

Transition. *See Zimmerman*, 329 F.R.D. at 7 ("When a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition.") (internal quotation marks and citation omitted). Amb. Burt's reliance on *Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, 300 F.R.D. 406, 411 (C.D. Cal. 2014), *see* Burt Mot. at 18 & 20, is also misplaced because there it was unknown whether the witness had relevant information and thus "whether [the deponent] can actually provide relevant testimony [was] speculative." *Amini Innovation Corp.*, 300 F.R.D. at 411. Amb. Burt does not contest his relevant knowledge; he merely claims to know so much that it is burdensome for him to prepare for a deposition.

Moreover, Amb. Burt offers no evidence of any burden imposed on him by sitting for a deposition. He attaches no affidavit or other proof of burden. He relies solely on the fact of having to sit for a deposition. *C.f. Phillips & Cohen, LLP v. Thorpe*, 300 F.R.D. 16, 18 (D.D.C. 2013) (party seeking to quash the subpoena demonstrated undue burden through an unrebutted declaration).[20] In an inference that pervades his motion, Burt has attempted to characterize Defendants as unreasonable for seeking to expand the scope of his deposition after previously agreeing to a narrowed scope of document production. In fact, Defendants' previous accommodations weigh against a finding of unreasonableness here; unreasonableness or oppression is "a matter to be decided in the light of all the circumstances of the case." *U.S. Dep't of the Treasury v. Pension Benefit Guaranty Corp.*, 301 F.R.D. at 28 (citation omitted). Defendants greatly reduced the scope of the subpoena for documents, lessening any burden on Amb. Burt to a

---

[20] Likewise, *Phillips & Cohen, LLP & Thorpe*, relied on by Amb. Burt, *see* Burt Mot. at 10, 12, 17, 19, is inapposite, because the subpoena in that case sought documents "of no conceivable relevance" to the action; instead the requests appeared to be a "naked attempt to gather information" to evaluate other possible litigation. *Phillips*, 300 F.R.D. at 18. Here, in contrast, Amb. Burt's information is directly relevant to the claims or defenses of Defendants and Plaintiffs.

point where he is left to complain merely that he has to prepare for a deposition – not an undue burden.

While their agent, Amb. Burt occupies a position unique from Plaintiffs, and his testimony will not be cumulative or duplicative of Plaintiffs' testimony. In this litigation, Plaintiffs have sought to distance themselves from their Alfa entities, including LetterOne, in an effort to avoid having to produce discovery, despite the fact that they claim statements about Alfa in CIR 112 have defamed them personally. *See* Pls.' Opp. to Defs.' Mot. to Compel Production of Pls' Alfa Docs., Dkt. No. 84 (arguing that Plaintiffs cannot produce their own emails and documents because they are controlled by Alfa).[21] Plaintiffs seek damages for "reputational harm" that "is professional—as well as personal," Dkt. No. 84, and thus seek damages *personally* based on harm to *Alfa. See also* Pls.' Supp. Resp. Int. No. 2, Dkt. No. 78-6. Despite the obvious centrality of Alfa to Plaintiffs' claims, Plaintiffs have professed themselves as not knowledgeable about Alfa (their own company), unwilling to access their own emails at Alfa, and unwilling to answer discovery requests concerning Alfa.[22]

Plaintiffs' consistent refusal to provide information about Alfa—information that is central to the substantial truth or falsity of the alleged defamation—gives Defendants no reason to believe that Plaintiffs will be more forthcoming in their own depositions. Therefore, Amb. Burt's claims that Defendants can obtain the information necessary for their defense from "Plaintiffs themselves" is meritless. Burt Mot. at 19. This argument rings hollow especially considering it is

---

[21] Plaintiffs have also refused to produce their documents at the Alfa and LetterOne companies they own and control. Defendants filed a motion to compel, Dkt. No. 78, which is fully briefed before this Court. Amb. Burt's counsel represents Intervenor AO Alfa-Bank in that dispute, in which Alfa argues that Plaintiffs should not be compelled to produce their own emails and documents. *See* Intervenor AO Alfa-Bank's Opposition, Dkt. No. 100.

[22] In their discovery responses, Plaintiffs state that "Plaintiffs are not responding on behalf of the Alfa conglomerate of entities." Pls.' Resps. To Ints., Dkt. No. 111-3, at 4 ¶ M.

made by the same counsel who represents Alfa in this lawsuit and who has asked the Court to allow Plaintiffs to withhold their information about Alfa. *See* Interv. AO Alfa-Bank Mem. in Opp. to Defs.' Mot. to Compel, Dkt. No. 100. Thus, Defendants are also seeking information about Alfa from third parties, including Amb. Burt, who has worked for many years as an advisor to Alfa and sits on the board of LetterOne. His personal knowledge of Alfa's relationship with the Kremlin is relevant to the substantial truth, falsity, alleged defamatory nature of the statements, and damages, and Defendants have been unable to get this information from Plaintiffs. In addition, "some overlap" of relevant material "does not justify foreclosing discovery" of the party to be deposed. *U.S. Dep't of the Treasury v. Pension Benefit Guaranty Corp.,* 301 F.R.D. at 30 (denying motion to quash deposition subpoena on grounds of undue burden and duplicative/cumulative information).

Accordingly, the balance weighs heavily in favor of permitting Defendants to depose Ambassador Richard Burt, without any time or topic limitations on the scope of his deposition.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Amb. Burt's Motion in full.

Dated:   November 6, 2020          _/s/ Joshua A. Levy_

Joshua A. Levy (D.C. Bar No. 475108)
Rachel M. Clattenburg (D.C. Bar No. 1018164)
**LEVY FIRESTONE MUSE LLP**
1401 K St. NW, Suite 600
Washington, DC 20005
Tel: (202) 845-3215
Fax: (202) 595-8253
jal@levyfirestone.com
rmc@levyfirestone.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 6, 2020, the foregoing memorandum of law and the accompanying exhibits were filed using CM/ECF, which serves a copy on all counsel of record.

_/s/_ Joshua A. Levy
Joshua A. Levy

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MIKHAIL FRIDMAN, PETR AVEN, and GERMAN KHAN,<br><br>        Plaintiffs,<br><br>  v.<br><br>BEAN LLC a/k/a FUSION GPS, and GLENN SIMPSON,<br><br>        Defendants. | No. 1:17-cv-2041-RJL |

## <u>DECLARATION OF JOSHUA A. LEVY</u>

I, Joshua A. Levy, declare as follows:

1.      I am a member of the law firm Levy Firestone Muse LLP, counsel for Defendants Bean LLC a/k/a Fusion GPS, and Glenn Simpson. I submit this Declaration in support of Defendants' Memorandum of Law in Support of Their Opposition to Richard Burt's Motion for a Protective Order.

2.      Attached hereto as Exhibit 1 is a true and correct copy the following emails as produced by the Atlantic Council:

- Email from A. Aslund to F. Kempe (May 20, 2016) (Bates AC-043324)

- Email from A. Aslund to R. Burt (Oct. 15, 2017) (Bates AC-43791-2)

- Email from F. Kempe to R. Burt (Oct. 27, 2015) (Bates AC-045089)

- Email from R. Morningstar to R. Burt (May 22, 2015) (Bates AC-045331)

- Email from O. Dubova on behalf of P. Aven to A. Aslund, copying R. Burt (Sept. 8, 2015) (Bates AC-054642).

3.      Attached hereto as Exhibit 2 is a true and correct copy of "Invitation to Private Roundtable: A Discussion with Dr. Petr Aven and Mr. Mikhail Fridman on Russia's Current Economic and Political Situation" (Bates AC-000029), as produced by the Atlantic Council.

4.      Attached hereto as Exhibit 3 is a true and correct excerpt of the transcript for day 2 of the bench trial in *Aven v. Orbis*, QB-2018-6349, dated March 17, 2020.

5.      Attached hereto as Exhibit 4 is a true and correct copy of White House visitor records downloaded from https://obamawhitehouse.archives.gov/goodgovernment/tools/visitor-records.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: November 6, 2020

Joshua A. Levy

**EXHIBIT 1**

Message

| | |
|---|---|
| **From**: | Anders Aslund [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=47795046D77547DBBC869F5746927F72-AASLUND] |
| **Sent**: | 5/20/2016 1:33:48 PM |
| **To**: | Fred Kempe [fkempe@acus.org]; Damon Wilson [dwilson@atlanticcouncil.org]; John Herbst [jherbst@atlanticcouncil.org]; Randy Bell [rbell@atlanticcouncil.org] |
| **Subject**: | Fridman promises to give away his fortune |

Fred, Damon, John and Randy,

Mikhail Fridman, net worth $15 bn, has announced that he will give away his whole fortune to charitable purposes while alive, and so will his three partners, including Petr Aven, $5bn. This could open an opportunity. To date Fridman has been extremely stingy. Rich Burt represents both Fridman and Aven quite intensely. I shall tentatively have dinner with Aven in Moscow Sunday night so I might be able to ask him what he wants. Ass you remember, we hosted him here in November and got nothing.

Only in Russian: http://www.rbc.ru/business/20/05/2016/573ec55f9a79472c983009ab?from=main

Anders

 **Atlantic Council**

Anders Åslund| Senior Fellow
1030 15th Street, NW, 12th Floor | Washington, DC 20005
E: AAslund@AtlanticCouncil.org |Phone: (202) 864-2848
Follow me on twitter: @anders_aslund
www.facebook.com/AtlanticCouncil | @AtlanticCouncil | www.atlanticcouncil.org
Read my new book: "Ukraine: What Went Wrong and How to Fix It"

AC-043324

Message

| | |
|---|---|
| **From:** | Anders Aslund [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=47795046D77547DBBC869F5746927F72-AASLUND] |
| **Sent:** | 10/15/2017 8:21:46 PM |
| **To:** | Richard Burt [rburt@maglobal.com]; Jemile Safaraliyeva [jsafaraliyeva@atlanticcouncil.org]; Geysha Gonzalez [ggonzalez@atlanticcouncil.org] |
| **CC:** | John Herbst [jherbst@atlanticcouncil.org]; Daniel Fried [dfried@atlanticcouncil.org] |
| **Subject:** | Aven Fridman breakfast on October 26 |

Geysha and Jemile,

We need to go out soon with invitations for a small, private, off-the-record breakfast 8.00-9.30 am on Thursday October 26 with Mikhail Fridman, Chairman and CEO of the Alfa Group, and Petr Aven, President of Alfa Bank. Let us choose a broad title: "Russia's current economic and political situation." Both speak. I moderate.

Invitees:

State:
Wess Mitchell
Kathy Kavalec, plus Russia desk chief
Policy Planning?

NSC: Fiona Hill,
Joe Wang

Treasury: DSA Clay Berry, Clay.Berry@treasury.gov
OFAC?

Congress - key aides from foreign relations committees:

Senate: Damien Murphy & Jim Green, Jessica Elledge
Who is the chief Republican aide?

House: Kyle Parker
Doug Sieay

Atlantic Council:
John Herbst,
Dan Fried,
Sandy Vershbow
Bob Nurick
Agnia Grigas
Ariel Cohen
Brian O'Toole
Daleep Singh
Me

Brookings: Toria Nuland

AC-043791

Toby Gati, Akin Gump

Georgetown:
Angela Stent
Thane Gustafson
Andrew Kuchins

CFR: Steven Sestanovich

Carnegie: Andrew Weiss

Rand: Ambassador Bill Courtney
Kathrine Dale

Dan Yergin, IHS

AEI: Leon Aron

Rick Burt, who will also accompany them

Ambassador John Tefft (I have his private email).

We should not invite journalists.

Rick will add & Dan can hopefully also add.

Best,


Anders

AC-043792

Message

| | |
|---|---|
| **From:** | Fred Kempe [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6E7FF92474CB4EFBAB8C17995086130F-FKEMPE] |
| **Sent:** | 10/27/2015 6:40:45 AM |
| **To:** | Richard Burt [rburt@maglobal.com] |
| **Subject:** | FW: Mikhail Lesin at Aven dinner |

Rick,

Can you manage this more informally?

Fred

 **Atlantic Council**

**Frederick Kempe** | President and CEO
1030 15th Street, NW, 12th Floor | Washington, DC 20005
T: 202-778-4959 | E: fkempe@AtlanticCouncil.org
www.facebook.com/AtlanticCouncil | @AtlanticCouncil | www.AtlanticCouncil.org

---

**From:** Alison Perry
**Sent:** Monday, October 26, 2015 6:14 PM
**To:** Fred Kempe
**Cc:** Drew Dickson
**Subject:** Mikhail Lesin at Aven dinner

Fred, although you and Anders previously agreed we had to say yes to Aven's request to invite Mikhail Lesin on November 4, we've now learned Lesin is being investigated by the FBI for money laundering. Anders advises we find a polite way to let Aven know we cannot host Lesin at the November 4 dinner, emphasizing that it would reflect poorly on Aven (not to mention the AC). If you agree with this decision we would send a note from either Anders or you directly to Aven, regretting we cannot invite him.

http://www.rferl.org/content/us-fbi-russia-lesin-money-laundering/26736027.html

http://www.worldaffairsjournal.org/blog/vladimir-kara-murza/us-investigation-topples-kremlin-propaganda-chief

-------- Original message --------
From: Olga A Dubova <ODubova@alfabank.ru>
Date: 10/20/2015 15:23 (GMT+02:00)
To: Richard Burt <rburt@maglobal.com>, Liebeth Turbati <lturbati@maglobal.com>
Cc: Fred Kempe <fkempe@atlanticcouncil.org>, Anders Aslund <AAslund@ATLANTICCOUNCIL.ORG>
Subject: Re. Dinner on November 4th at Atlantic Council

Dear Mr. Burt,

Following Mr. P. Aven's request I would like to let you know that he wants to invite Mr. Mikhail Lesin (former Russian propaganda minister) to the dinner discussion at Atlantic Council on November 4th.

Awaiting your confirmation, is it Ok?

Best regards,

AC-045089

Olga Dubova
EA to Mr. P. Aven

AC-045090

Message

| | |
|---|---|
| **From**: | Richard Morningstar [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=9D73AF8624014E64AD79BAE770117920-RMORNINGSTA] |
| **Sent**: | 5/22/2015 6:57:50 PM |
| **To**: | Richard Burt [rburt@maglobal.com] |
| **CC**: | Fred Kempe [fkempe@atlanticcouncil.org]; Alison Perry [aperry@atlanticcouncil.org]; David Koranyi [dkoranyi@atlanticcouncil.org]; Randy Bell [rbell@atlanticcouncil.org] |
| **Subject**: | Meeting with L1 |

Rick- Fred will be in London on June 9 and could meet with Lord Browne, Fridman and/or Aven. I might be there as well. Could you let us know whether they would be available. Thanks ...Dick

Sent from my iPhone

AC-045331

# Redacted

**From:** Anders Aslund <AAslund@atlanticcouncil.org>
**Sent:** Friday, December 20, 2019 2:43 PM
**To:** Julie Varghese <JVarghese@atlanticcouncil.org>
**Subject:** FW: Your talk on Gaidar's Revolution here on November 4
**Importance:** High

**From:** Olga A Dubova <ODubova@alfabank.ru> **On Behalf Of** Petr O Aven
**Sent:** Tuesday, September 08, 2015 12:13 PM
**To:** Anders Aslund <AAslund@ATLANTICCOUNCIL.ORG>
**Cc:** Richard Burt <rburt@maglobal.com>
**Subject:** Ha: Your talk on Gaidar's Revolution here on November 4
**Importance:** High

Dear Anders,

Thank you for your e-mail.

The lunch talk at a private off-the-record meeting with 20-24 people completely suits me.

I'll have some other meetings in DC, so please coordinate the time of the lunch on November 4th with Rick Burt who is fully aware of my schedule.

Best regards,

Petr Aven

От:       Anders Aslund <AAslund@ATLANTICCOUNCIL.ORG>
Кому:      "Petr O. Aven" <Paven@alfabank.ru>,
Копия:     Olga Dubova <odubova@alfabank.ru>, Richard Burt <rburt@maglobal.com>, "John Herbst" <JHerbst@ATLANTICCOUNCIL.ORG>
Дата:      01.09.2015 21:31
Тема:      Your talk on Gaidar's Revolution here on November 4

Dear Petr,

I am following up on Fred Kempe's email of August 1. We would love to have you speaking here at the Atlantic Council on November 4 as you indicated. I would of course very much like to hear you speaking about Gaidar's Revolution, but in order to attract a broader interest I think it would be preferable if you apply the lessons

AC-054642

from the early 1990s to the present Russian economy. Fred will chair and I would be happy to comment on your presentation.

Our preference would be a lunch talk, but please indicate what time that suits you. Do you want a private off-the-record meeting with 20-24 people or a bigger public meeting? The choice is yours.

Whenever you have time here in Washington, Anna and I are always happy to see you.

All the best,


Anders


Anders Åslund| Senior Fellow
1030 15th Street, NW, 12th Floor | Washington, DC 20005
E: AAslund@AtlanticCouncil.org |Phone: (202) 864-2848
Follow me on twitter: @anders_aslund
www.facebook.com/AtlanticCouncil | @AtlanticCouncil | www.atlanticcouncil.org
Read my new book: "Ukraine: What Went Wrong and How to Fix It"

**EXHIBIT 2**



## Private Roundtable: A Discussion with Dr. Petr Aven and Mr. Mikhail Fridman on Russia's Current Economic and Political Situation

Thursday, October 26, 2017

8:00 a.m. – 9:30 a.m.

Atlantic Council Headquarters

**Dr. Anders Åslund**
*Senior Fellow, Dinu Patriciu Eurasia Center*
Atlantic Council

**Ambassador Richard Burt**
*Managing Director, Europe and Eurasia Practice*
McLarty Associates

**Ms. Glyn Cozart**
*Program Manager*
US-Kazakhstan Business Association

**Ambassador Daniel Fried**
*Distinguished Fellow, Future Europe Initiative and Dinu Patriciu Eurasia Center*
Atlantic Council

**Dr. Thane Gustafson**
*Professor of Government*
Georgetown University

**Dr. Claire Kaiser**
*Director for Strategic Initiatives*
McLarty Associates

**Mr. Rory MacFarquhar**
*Director*, Google; *Former Senior Director for Global Economics and Finance*
National Security Council

**Mr. Robert Nurick**
*Senior Fellow, Transatlantic Security Initiative, Brent Scowcroft Center on International Security*
Atlantic Council

**EXHIBIT 3**



Petr Aven, Mikhail Fridman and German Khan v Orbis Business Intelligence Limited

Day 2

March 17, 2020

Opus 2 International - Official Court Reporters

Phone: +44 (0)20 3008 5900

Email: transcripts@opus2.com

Website: https://www.opus2.com

1  A.  No, never.  Never.  And when I saw A, I was not sure
2      what's all about, whether it's Alfa or what.  Basically
3      unclear.  Never.
4  Q.  Do you know why he called it Project A?
5  A.  No, I do not.  I do not.
6  Q.  Might it have been because it was a secretive project
7      and couldn't be given its true description?
8  A.  Well, I had another idea because we had some rival --
9      I had some idea, but nothing to do with this story, but
10     basically not clear at least up 'til now, but it was
11     definitely not about secrets.
12 Q.  Anyway, if you look at the bottom of the page, in the
13     email, what he's telling you in the email is that Simes
14     thought Project A was too explosive to discuss at that
15     time.  Do you remember him saying that to you?
16 A.  No, he never said anything.  That was the only
17     communication we receive.  That's only one thing and
18     I thought it was about different topic and also.
19 Q.  You thought this email was about something else?
20 A.  We discussed two topics.  I approached to Trump
21     administration and some other project where I had
22     nothing to do with that at all and I thought this A is
23     about different thing.  That's all.
24 Q.  Right.  So there's another project in which he's reached
25     out to a very influential person --

73

1  A.  Not at all, no.
2  Q.  -- who has got back to him and said, "There's so much
3      interest in Congress and the media over the question of
4      cyber-hacking and who ordered what, the project is too
5      explosive to discuss".  On the face of it, that has all
6      the characteristics, when you are reading that email, of
7      the project put to you by President Putin, doesn't it?
8  A.  Absolutely not.
9  Q.  So it was just a coincidence there was another project
10     which also had all those characteristics?
11 A.  We discussed some investigation, some set person in
12     Russia.  This is nothing to do with politics, with
13     economics.  There's some people who didn't pay back our
14     money to the bank so that was, I think, what he was
15     mentioning.  It was nothing to do with it at all --
16     nothing to do with Putin at all.  In my sense there was
17     nothing secretive, nothing special.
18 Q.  Why would the level of interest in the Congress and the
19     media about the question of Russian cyber-hacking and
20     who ordered what, why would that have anything to do
21     with the other project?
22 A.  Well, cyber attack and this was a big -- a lot of
23     publicity.  So basically it's all about Russian events
24     and elections, about secret communication with Trump.
25     I guess it was very special they pay so much attention.

74

1      Fortunately it was completely rubbish.
2  Q.  Right.  So coming back to your statement at 23 {C/2/5},
3      paragraph 23 -- sorry, I've lost the reference, but you
4      deal with this in your statement, that you thought he
5      was asking him about an approach -- that Mr Burt
6      believed you were asking him about an approach on behalf
7      of the Russian Government. I think it may be 26
8      {C/2/5}.
9  MR TOMLINSON: 28.
10 MR MILLAR: 28, the first sentence of 28 {C/2/6}:
11     "I have since learned that Mr Burt misunderstood our
12     conversation and believed that I was asking him about an
13     approach on behalf of the Russian government. That is
14     not correct."
15     Is that your evidence to this court?
16 A.  Yes.
17 Q.  172, please, in the bundle {D/124/172}. If you look in
18     the middle of that page, footnoted as 1177, by reference
19     to evidence that both Burt and Simes gave to Mueller, is
20     this sentence:
21     "Burt contacted Simes by telephone and asked if he
22     could arrange a meeting with Kushner to discuss setting
23     up a high-level communications channel between Putin and
24     the incoming Administration."
25     So is that what you're referring to at paragraph 28

75

1      in your statement:
2      "I have since learned that Mr Burt misunderstood our
3      conversation ..."
4  A.  I'm not sure.  Maybe, yes, but I don't know with whom
5      else Mr Burt spoke in Russia.  I have no idea.
6  Q.  No, but is it what you read in Mueller because Simes and
7      Burt told Mueller that's what they thought Project A was
8      about, setting up a high level communications channel
9      between Putin and the incoming administration?  That's
10     what they told Mueller they thought was going on here.
11 A.  Well, that was what Burt said.  As I said, it's
12     completely incorrect.
13 Q.  I mean, it's an odd mistake to make, isn't it, Mr Aven?
14 A.  No, it was 30 seconds discussion and it's difficult and
15     you see that I'm very slow -- very fast here that the
16     interpreters cannot understand.  I have the same problem
17     maybe with Mr Burt here.  Maybe there was just
18     misunderstanding; that's all.
19 Q.  Well, you say --
20 A.  And we never continued.  It was -- if there was anything
21     serious, he would definitely continue it.  There was
22     never a continuation of any discussions at all.
23 Q.  Let's just go back to what you said to him.  You said to
24     Burt, in this 30 second conversation, "We, Alfa, want to
25     set up -- make contact with the incoming

76

1    administration", is that right?
2  A.  Yes.
3  Q.  "To discuss the risk that Alfa gets sanctions imposed on
4    it"?
5  A.  Yes.
6  Q.  Or, "We, as leaders of Alfa, get sanctions imposed"?
7  A.  Yes.
8  Q.  Yes?
9  A.  Yes.
10  Q.  And, "We want you to do that".   You asked him to do it?
11  A.  Yes, because he did it for many years for us.
12  Q.  Right.   So he was being told he would speak to the Trump
13    team on behalf of Alfa to lobby against Alfa getting
14    sanctions imposed on them?
15  A.  Not to lobby against but to introduce us and to give us
16    a chance to express our -- who we are and our own views
17    on that.   Basically that's not lobbying.   We wanted
18    introduction.   That was a very clear request from my
19    side.
20  Q.  This man, who is a former US diplomat and Washington
21    lobbyist, leaves have conversation with the
22    understanding that what he has been asked to do is set
23    up a high level communications channel between Putin and
24    the incoming administration.   They are completely
25    different things, aren't they?

77

1  A.  Well, maybe he had his own agenda. I don't know. That
2    you have to ask Mr Burt.
3  Q.  Well, have you asked Mr Burt?
4  A.  No, we never discussed it with Mr Burt.   Never.
5  Q.  Even since was this written in the Mueller report, you
6    haven't discussed it --
7  A.  We never discussed that.   I didn't want to discuss that
8    because it was definitely mistake from my side.   I don't
9    think he would feel comfortable because it was
10    a mistake, definitely, so I didn't want him to feel
11    unpleasant.   I never discuss it with him.
12  Q.  But he didn't think it was a mistake when he was giving
13    that evidence to Mueller.
14  A.  I guess he does think it -- I hope he does understand it
15    now.
16  Q.  Well, how, if you haven't spoken to him, would he now
17    think it was a mistake?
18  A.  I guess he saw my evidence as well.
19  Q.  If we look at {D/124/173}, where there's that email at
20    the bottom of 172, over on to 173, is this your
21    evidence -- look at the middle of 173.   Mueller says:
22       "Aven replied to Burt's email on the same day,
23    saying, 'Thank you. All clear'.   According to Aven,
24    this statement indicated that he did not want the
25    outreach to continue."

78

1    So are you telling Mueller at that point, when you
2    say, "Thank you. All clear" to Burt in response to his
3    email, you're referring to this other channel of
4    communication that you haven't described to us but you
5    had in mind?
6  A.  No, I understood that basically I approached him and he
7    cannot build any communication with us with Trump. It
8    seems that's clear so what to continue?  If you cannot,
9    you cannot.   That's all what I say.
10  Q.  But you thought he was referring to the other matter?
11  A.  No, I think that he was -- in his mind I don't know what
12    he was referring to, but we discussed two topics and he
13    didn't want to do it.   So basically I don't know
14    exactly, but for this specific case definitely we
15    understood that there were no communication.
16  Q.  But I thought you said that when he said in his email to
17    you "can't establish such a channel", you were thinking
18    about a channel of communication about something
19    completely different?
20  A.  No, no, channel of communication was only one thing.
21    That's only one story.
22  Q.  Something completely different?
23  A.  But --
24  Q.  Nothing to do with sanctions or Putin?
25  A.  Communication or sanctions, nothing to do, but we have

79

1    some -- we have many things discuss with Mr Burt.   That
2    I understood, but channel of communication is all over.
3    That's period.   That I took as referring to channel of
4    communication that he cannot do it.
5  Q.  All right.   So you give some evidence -- I'm going to
6    move on from the Mueller report now -- in your witness
7    statement at paragraph 36 about Mr Govorun. How do you
8    pronounce that in Russian?
9  A.  Govorun.
10  Q.  Govorun?
11  A.  Mm.
12  Q.  Mr Govorun {C/2/7}. In your second sentence, you say:
13       "It appears that he worked at Alfa for only 3 years
14    in the late 1990s ..."
15       So you're speaking then of when Govorun was an Alfa
16    employee in the 1990s?
17  A.  Yeah.
18  Q.  At the end of that paragraph -- I'm sorry, is that the
19    extent of your knowledge of Govorun's career in Russia?
20    Do you know Govorun since then?
21  A.  I don't know Govorun even now. I wouldn't recognise him
22    if I meet him.  I don't know how he looks like.   If
23    I meet Govorun on the street, I wouldn't know that he's
24    Govorun.  I never met him.  I never spoke with him.
25    I don't know him.

80

**EXHIBIT 4**

| NAMELAST | NAMEFIRST | NAMEMID | UIN | BDGNBR | ACCESS_TYP | TOA | POA | TOD | POD | APPT_MADE_DATE | APPT_START_DATE | APPT_END_DATE | APPT_CANCE | Total_People | LAST_UPDAT | POST | LastEntryDate | TERMINAL_S | visitee_name | visitee_name | MEETING_LC | MEETING_RI | CALLER_NA | CALLER_NA | CALLER_ROO | Description | Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aven | Petr | O | U05460 | 92651 | VA | 5/17/12 14:51 | D1501 | | | 5/8/12 0:00 | 5/17/12 15:00 | 5/17/12 23:59 | | 4 | MR | WIN | 5/8/12 15:27 | MR | Wells | Alice | OEOB | 382 | REDDRICK | MYRTLE | | | 8/31/12 |
| Burt | Richard | R | U05460 | 80670 | VA | 5/17/12 14:43 | D1501 | 5/17/12 15:58 | D1S | 5/8/12 0:00 | 5/17/12 15:00 | 5/17/12 23:59 | | 4 | MR | WIN | 5/8/12 15:15 | MR | Wells | Alice | OEOB | 382 | REDDRICK | MYRTLE | | | 8/31/12 |
| Fridman | Mikhail | M | U05460 | 85074 | VA | 5/17/12 14:51 | D1501 | 5/17/12 15:59 | D1S | 5/8/12 0:00 | 5/17/12 15:00 | 5/17/12 23:59 | | 4 | MR | WIN | 5/8/12 15:27 | MR | Wells | Alice | OEOB | 382 | REDDRICK | MYRTLE | | | 8/31/12 |
| Roberts | John | W | U05460 | 92670 | VA | 5/17/12 14:44 | D1501 | 5/17/12 15:59 | D1S | 5/15/12 0:00 | 5/17/12 15:00 | 5/17/12 23:59 | | 4 | MR | WIN | 5/15/12 9:51 | MR | Wells | Alice | OEOB | 382 | REDDRICK | MYRTLE | | | 8/31/12 |

| NAMELAST | NAMEFIRST | NAMEMID | UIN | BDGNBR | ACCESS_TYP | TOA | POA | TOD | POD | APPT_MADE_DATE | APPT_START_DATE | APPT_END_DATE | APPT_CANCE | Total_People | LAST_UPDAT | POST | LastEntryDat | TERMINAL_S | visitee_nam | visitee_nam | MEETING_LC | MEETING_RI | CALLER_NAM | CALLER_NAM | ROC | description | release_date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Burt | Richard | r | U0815B | 75675 | VA | 5/12/11 15:44 | D0101 | 5/12/11 16:55 | D1S | | 5/11/11 0:00 | 5/12/11 16:00 | 5/12/11 23:59 | | 3 | GB | WIN | ######## | GB | Burton | Groslyn | OEOB | | 223 | BURTON | GROSLYN | 8/26/11 |
| Fridman | Mikhail | m | U0815B | 80263 | VA | 5/12/11 15:45 | D0101 | 5/12/11 16:55 | D1S | | 5/12/11 0:00 | 5/12/11 16:00 | 5/12/11 23:59 | | 3 | GB | WIN | ######## | GB | Burton | Groslyn | OEOB | | 223 | BURTON | GROSLYN | 8/26/11 |
| Olegovich | Peter | A | U0815B | 71847 | VA | 5/12/11 15:47 | D0101 | 5/12/11 16:55 | D1S | | 5/12/11 0:00 | 5/12/11 16:00 | 5/12/11 23:59 | | 3 | GB | WIN | ######## | GB | Burton | Groslyn | OEOB | | 223 | BURTON | GROSLYN | 8/26/11 |

| NAMELAST | NAMEFIRST | NAMEMID | UIN | BDGNBR | ACCESS_TYP | POA | POA | TOD | POD | APPT_MADE_DATE | APPT_START_DATE | APPT_END_I | APPT_CANCE | Total_People | LAST_UPDAT | POST | LastEntryDat | TERMINAL_S | visitee_nam | visitee_nam | MEETING_LC | MEETING_R | CALLER_NA | CALLER_NA | CALLER_ROC | Description | RELEASE_DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AVEN | PETR | | U06252 | 76535 | VA | | 5/13/10 17:32 | 01501 | 5/13/10 18:11 | D1S | 5/13/10 10:54 | 5/13/10 17:30 | ######### | | 4 | LC | WIN | ######### | LC | LIPTON | DAVID | OEOB | 223 | BURTON | GROSLYN | 8/27/10 |
| BURT | RICHARD | | U06252 | 77502 | VA | | 5/13/10 17:27 | 00101 | 5/13/10 18:11 | D1S | 5/13/10 9:50 | 5/13/10 17:30 | ######### | | 4 | LC | WIN | ######### | LC | LIPTON | DAVID | OEOB | 223 | BURTON | GROSLYN | 8/27/10 |
| FRIDMAN | MIKHAIL | | U06252 | 72819 | VA | | 5/13/10 17:31 | 01501 | 5/13/10 18:11 | D1S | 5/13/10 10:54 | 5/13/10 17:30 | ######### | | 4 | LC | WIN | ######### | LC | LIPTON | DAVID | OEOB | 223 | BURTON | GROSLYN | 8/27/10 |
| RADEMAKER | STEPHEN | | U06252 | 75279 | VA | | 5/13/10 17:33 | 01501 | 5/13/10 18:11 | D1S | 5/13/10 9:50 | 5/13/10 17:30 | ######### | | 4 | LC | WIN | ######### | LC | LIPTON | DAVID | OEOB | 223 | BURTON | GROSLYN | 8/27/10 |