# Exhibit 10

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| Mikhail Fridman et al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   1:17-cv-02041-RJL |
| Bean LLC et al. | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:           Jason Felch, 1700 Connecticut Ave., Suite 400, Washington, D.C. 20009

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:
                           See Schedule A.

| Place: Sperduto Thompson & Gassler PLC<br>1747 Pennsylvania Ave., NW, Suite 1250<br>Washington, DC 20006 | Date and Time:<br>12/03/2020 10:00 am |
|---|---|
| The deposition will be recorded by this method:   video and stenographic means | |

❑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

        The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    08/11/2020

        *CLERK OF COURT*

                                                    OR

                                                          /s Alan Lewis

_____          _____
    *Signature of Clerk or Deputy Clerk*                      *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Plaintiffs
_____ , who issues or requests this subpoena, are:
Alan Lewis, Esq., Carter Ledyard & Milburn LLP, 2 Wall Street, New York, NY 10005, lewis@clm.com, (212) 732-3200

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   1:17-cv-02041-RJL

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00  .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

Jason Felch
1700 Connecticut Ave., Suite 400, Washington, D.C. 20009

## SCHEDULE A

## INSTRUCTIONS AND DEFINITIONS

1.      The provisions and definitions contained in the Federal Rules of Civil Procedure and Local Rules of the United States District Court for the District of Columbia are incorporated by reference as if fully set forth herein.

2.      In producing documents and other things, you shall furnish all responsive documents or things in your possession, custody, or control.

3.      Documents and things requested herein shall be produced as they are kept in the usual course of business, with information indicating their source (e.g., the person(s) from whom the documents were obtained).

4.      A Request calling for the production of any document shall be deemed to include, in addition to the document itself, a request for any and all exhibits or attachments to the document and any enclosures sent or kept with the document.  Documents attached to each other shall not be separated.

5.      Documents maintained or stored electronically may be produced on CD, DVD, File Transfer Protocol site, portable hard or flash drive, or other reasonably accessible media format.  All such documents shall be produced in Group IV, 300 DPI, single-page TIFF format with document-level extracted text files, and standard Concordance load files (.DAT, .OPT), and shall include all metadata (including, without limitation, document boundaries, custodian identification information, date and time, etc.).  If the text cannot be extracted, Optical Character Recognition ("OCR") text must be provided.  In addition to producing TIFF files with text, metadata, and standard load files, native files shall be produced for any PowerPoint presentations containing audio or video, any Excel documents, any Access databases, or documents created

Jason Felch
1700 Connecticut Ave., Suite 400, Washington, D.C. 20009

under equivalent software packages.  Data files shall not be zipped, encrypted, or otherwise

restricted or proprietarily protected for specific use.  If the native file format is derived from

software not accessible with Microsoft Office applications (or other common applications),

please state so in your response.

     6.     Documents maintained in hardcopy shall be produced in TIFF image format with

corresponding OCR text, associated data identifying the beginning and ending Bates numbers

and, to the extent applicable, information associating document families or attachment ranges.

     7.     The file or other container in which a document is kept is deemed to be an integral

part of the document and shall be produced with the document.  Whenever a document or group

of documents is maintained in the ordinary course of business in any file, folder, container, box

or other document storage or organization device, each Request herein shall be deemed to call

for the production of copies of, or the identification of, such file, folder, container, box or other

document storage or organization device and any labels or other form of identification set forth

thereon.

     8.     Unless otherwise indicated, the documents to be produced include all documents

prepared, sent, dated, or received, or which otherwise existed or were possessed at any time from

January 1, 2016 to the present.

     9.     Each document and thing requested herein shall be produced in its entirety and

without deletion or excisions, regardless of whether you consider the entire document to be

relevant or responsive to the Requests.  If you have redacted any portion of the document, you

shall stamp the word "redacted" on each page of the document that you have redacted.  If any

document covered by these Requests contains a redaction, you shall identify such document and

all redactions on a log prepared in accordance with Federal Rule 26(b)(5), specifically

2

Jason Felch
1700 Connecticut Ave., Suite 400, Washington, D.C. 20009

identifying the following:  (i) the type of document; (ii) any addressor and addressee; (iii) any indicated or blind copies; (iv) the document's date; (v) the general subject matter of the document, number of pages, and a description of any attachments or appendices; (vi) all persons to whom the document was distributed, shown, or explained; and (vii) the nature and basis of the privilege or grounds for redaction being asserted.

10.     If any document requested herein is withheld from production on the basis of any claim or privilege or other protection or immunity from disclosure, you shall furnish a log in accordance with Federal Rule 26(b)(5), specifically identifying the following:  (i) the type of document; (ii) any addressor and addressee; (iii) any indicated or blind copies; (iv) the document's date; (v) the general subject matter of the document, number of pages, and a description of any attachments or appendices; (vi) all persons to whom the document was distributed, shown, or explained; and (vii) the nature and basis of the privilege or grounds for withholding being asserted.

11.     Documents not otherwise responsive to the Requests shall be produced if such documents mention, discuss, refer to or explain the documents which are called for by these Requests or constitute routing slips, transmittal memoranda or letters, comments, evaluations or similar materials.

12.     If any responsive documents were, but no longer are, in your possession, custody or control, state the disposition of such documents, including, but not limited to, the identity of the person(s) to whom the documents were forwarded, the state of such disposition and the identity, if known, of the person(s) currently in possession of such documents and the current or last known address of such person(s); and if the documents have been destroyed, the date and manner of their destruction, by whom they were destroyed, who authorized such destruction, and

3

Jason Felch
1700 Connecticut Ave., Suite 400, Washington, D.C. 20009

for what purpose they were destroyed.

13.    Each Request should be interpreted broadly, so as to include all documents that could be responsive to each Request.  Plaintiffs reserve the right to supplement these Requests and seek supplementary responses to these Requests.

14.    As a non-party who has received a subpoena in this Action, you are covered by the Stipulated Confidentiality Agreement and Protective Order entered in the Action and you have the right to protect the confidentiality of documents produced in accordance with such Agreement and Order.  A copy of the Stipulated Confidentiality Agreement and Protective Order entered in the Action can be accessed on the docket at Document 67.

15.    The use of the singular form of any word includes the plural and vice versa.

16.    The masculine includes the feminine and neutral genders, and vice versa.

17.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Requests all documents that might otherwise be construed to be outside of its scope.

18.    The use of the terms "any" and "all" shall be construed to mean "any and all" as necessary to bring within the scope of these Requests all documents that might otherwise be construed outside of its scope.

19.    The term "including" shall not be construed as a limiting phrase but, rather, shall be construed to mean "including, without limitation."

20.    Each of the words "discussing," "reflecting," "concerning," "relating," "involving," "evidencing," or "referring" shall have common meanings and shall include indirect as well as direct references to the subject matter of the Request.

21.    The use of a verb in any tense shall be construed as the use of the verb in all other

Jason Felch

1700 Connecticut Ave., Suite 400, Washington, D.C. 20009

tenses as necessary to bring within the scope of these Requests all documents that might otherwise be construed to be outside of its scope.

22.     "Requests" means, collectively, each numbered request which appear below under the heading DOCUMENTS REQUESTED.

23.     The terms "you," "your," and "yourself" refer to the individual to whom these Requests are directed, and any persons or entities acting on behalf of or in concert with you.

24.     The "Action" means the above-captioned litigation *Fridman v. Bean LLC a/k/a Fusion GPS*, et al., 17-cv-2041 (D.D.C.), including all pleadings and proceedings filed or had therein.  A copy of the complaint in this Action (the "Complaint") is enclosed separately herewith.

25.      "Plaintiffs" means, collectively, Mikhail Fridman, Petr Aven, and German Khan.

26.     "Defendants" means, collectively, Fusion (as defined below) and Glenn Simpson, and any of their present or former agents, affiliates, predecessors, successors, assigns, parents, subsidiaries, officers, employees, directors, members, partners, shareholders, consultants, and representatives, or any one or more of the foregoing.

27.     The "Dossier" means the compilation of 17 separate memoranda or reports, totaling 35 pages, prepared by Christopher Steele, as described in Paragraphs 1 and 2 of the Complaint in the Action, which was published on January 10, 2017 by BuzzFeed along with, and referenced in, an article entitled "These Reports Allege Trump Has Deep Ties to Russia."   A copy of the BuzzFeed article and Dossier, including CIR 112 (as defined below), are enclosed separately herewith.

28.     "Company Intelligence Report 112" or "CIR 112" refers to any document prepared by Orbis and/or Christopher Steele during 2016 and whose content mentions Oleg

5

Jason Felch
1700 Connecticut Ave., Suite 400, Washington, D.C. 20009

Govorun and/or contains an allegation that Plaintiffs paid cash to and/or exchanged favors with Vladimir Putin, including any document identical or similar in content to the report with the header 'RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION' and/or label 'Company Intelligence Report 2016/112' which was among the reports published by BuzzFeed as an attachment to its January 10, 2017 Article titled "These Reports Allege Trump Has Deep Ties to Russia."

29.    "Alfa" means the conglomerate of entities including Alfa-Bank JSC (also known as JSC Alfa-Bank and AO Alfa-Bank), ABH Holdings S.A., Alfa Capital, AlfaStrakhovanie Group, Alfa Asset Management (Europe) S.A., A1, X5 Retail Group, Rosvodokanal Group, and IDS Borjomi International Group, or any of their subsidiaries or affiliates.

30.    "Fusion" means Bean LLC, which does business as or is also known as Fusion GPS, and its and their subsidiaries, affiliates, founders (including Glenn Simpson and Peter Fritsch), employees, or representatives.

31.    "Orbis" means Orbis Business Intelligence Ltd., the London-based firm founded by Christopher Steele, and any employees or representatives.

32.    "Steele" means Christopher Steele, the former British intelligence officer and founder of Orbis who compiled the Dossier, as referenced in Paragraph 3 of the Complaint, and any representatives.

33.    "Buzzfeed" means BuzzFeed, Inc., the American Internet media, news and entertainment company with a focus on digital media which is based in New York City.

34.    "Perkins Coie" means Perkins Coie LLP, its partners and employees, and any persons or entities acting on behalf of or in concert with it.

35.    The terms "person" or "persons" mean natural persons as well as legal entities

6

Jason Felch
1700 Connecticut Ave., Suite 400, Washington, D.C. 20009

including, without limitation, firms, companies, proprietorships, corporations, partnerships, limited liability companies, associations, unincorporated associations, and governmental bodies, agencies, and officials and every other type of organization or entity.

36.     The terms "representative" or "representatives" when used in reference to a person, mean any past or present officer, director, partner, associate, member, employee, consultant, agent, subsidiary or affiliate of such persons, and any other person acting on behalf of, or in concert with, such person.

37.     The terms "document" and "documents" have the same meaning and scope as the broadest usage given to these terms in or pursuant to the Federal Rules and applicable federal law, including (without limitation) the following: all writings and records of any kind; electronic or computerized data compilations; embedded data and metadata; originals, drafts, and all non-identical copies; written or electronic correspondence, e-mail, voice mail, instant messages, text messages, WhatsApp messages, Slack messages, Signal messages, communications, records, memoranda, notes, diaries, calendars, statistics, letters, telegrams, minutes, contracts, agreements, reports, price lists, agendas, manuals, studies, checks, statements, ledgers of account and work papers; inter-office and intra-office communications; notes and notations in any form; recordings of telephone calls or meetings; minutes of meetings or other communications; bulletins; printed matter (including newspapers, magazines and other communications and articles and clippings); press releases; printouts; teletypes and telecopies; ledgers; work sheets; graphic or oral records of representations or presentations of any kind (including without limitation photographs, charts, graphs, and PowerPoint presentations); microfiche, microfilm, and digital, video or film recordings; electronic, mechanical or electrical records; tapes, cassettes, disks, recordings or transcriptions thereof; any drafts, alterations, modifications, changes and

7

Jason Felch
1700 Connecticut Ave., Suite 400, Washington, D.C. 20009

amendments of any of the foregoing; and any other documents as defined in the Federal Rules and under applicable federal law.  The terms "document" and "documents" specifically include electronic data or information contained in or on computer networks, mainframes, computer files, pocket organizers, personal digital assistants, personal computers, LAN's local workstations, computer disks, file servers, e-mail systems, CD-ROMs, e-mails, hard drives, printer buffer or memories, fax memories, voice mail systems, or any related back-up or archived systems or tapes. The terms "document" and "documents" include documents in your possession, custody, and control, including, without limitation, your personal documents and communications and the business related documents of Fusion (to the extent not already searched by Defendant Fusion).

38.     The terms "communication" or "communications" mean the transmittal of data or information (in the form of facts, images, ideas, inquiries or otherwise) by any means or methodology, including (without limitation) any meeting, conversation, discussion, document, correspondence, message, e-mail, note, text message, WhatsApp messages, Slack messages, Signal messages, or other means of transmittal. The terms "communication" or "communications" include communications in your possession, custody, and control, including, without limitation, your personal communications and the business related communications of Fusion (to the extent not already searched by Defendant Fusion).

39.     The terms "concern" or "concerning" mean discussing, referring to, relating to, or mentioning in any way, whether explicitly or implicitly.

## DOCUMENTS REQUESTED

1.     All documents evidencing the purpose of the work that you were to perform pursuant to Fusion's retention by Perkins Coie in or about April 2016.

9701404.8

Jason Felch
1700 Connecticut Ave., Suite 400, Washington, D.C. 20009

2.      Documents—including (i) documents concerning any communications and text messages between you and any other person, (ii) calendar entries and documents reflecting meetings with Steele, the FBI, or sources of information, and (iii) notes, reports, summaries, investigative files, memos, or drafts—referencing or relating to:

        a.      Fusion;

        b.      Glenn Simpson;

        c.      Steele;

        d.      Orbis;

        e.      Plaintiffs;

        f.      Alfa;

        g.      CIR 112 or its contents;

        h.      the 2016 U.S. presidential election, including Russian interference in the 2016 U.S. presidential election;

        i.      Oleg Govorun;

        j.      Vladimir Putin;

        k.      the Dossier or its contents; or

        l.      Igor Danchenko.

3.      All documents, including text messages, concerning any communications between you and reporters or representatives of media or new organizations including, but not limited to, Ken Bensinger or any employee, agent, or representative of BuzzFeed, regarding Plaintiffs, CIR 112, the Dossier, or the contents of CIR 112 or the Dossier.

4.      All documents relating to the drafting of CIR 112, including notes, research, investigative files, and drafts or different versions of CIR 112.

9

Jason Felch
1700 Connecticut Ave., Suite 400, Washington, D.C. 20009

5.      All documents relating to the truth or falsity of the statements and allegations set forth in CIR 112 and the Dossier.

6.      All documents relating to the dissemination of CIR 112 or the Dossier.

7.      All documents and communications concerning any of the human or documentary sources of information contained in CIR 112 or the Dossier, including any documents regarding efforts by anybody to corroborate, verify, or investigate the contents of CIR 112.

8.      Documents, including text messages, concerning any communications, interviews, or testimony to or with governmental entities or representatives (including but not limited to the FBI, DOJ, State Department, or Congress) regarding Plaintiffs, Alfa, CIR 112, the Dossier, or the contents of CIR 112 or the Dossier, and documents produced or provided to any governmental entity or body.

9.      Documents and communications, including text messages, concerning Fusion's year end retreat in California that took place in or around December 2016, including communications with Glenn Simpson and Ken Bensinger.

10.      All documents, to the extent not produced in response to Requests Nos. 1-9, concerning Plaintiffs, Alfa, CIR 112, the Dossier, the contents of CIR 112 or the Dossier, or Steele or Steele's source(s) for CIR 112.

10

9701404.8

COMPLAINT

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
-----------------------------------------------------------------X
                            :

MIKHAIL FRIDMAN, PETR AVEN, AND    :
GERMAN KHAN,                          :     Case 1:17-cv-02041 (RJL)
                      Plaintiffs,     :

        -v-                         :

BEAN LLC (A/K/A FUSION GPS) AND    :
GLENN SIMPSON,                       :

                            :

                    Defendants.    :
-----------------------------------------------------------------X

## AMENDED COMPLAINT
JURY TRIAL DEMANDED

     Plaintiffs Mikhail Fridman, Petr Aven, and German Khan, by their attorneys

Carter Ledyard & Milburn LLP, allege as follows:

### INTRODUCTION

     1.     This is a defamation case brought by three international businessmen who

were defamed in widely disseminated political opposition research reports commissioned

by political opponents of candidate Donald Trump in the 2016 presidential election cycle.

The reports (which came to be known as the "Trump Dossier" and the "Dossier") were

published both before and after the 2016 election by the Defendants: the Washington,

D.C. based firm Fusion GPS ("Fusion") and its principal, Glenn Simpson, a former

journalist specializing in political opposition research.  In that role, the Defendants traffic

in procuring damaging information about political candidates.  The reports are gravely

damaging in that, directly or by implication, they falsely accuse the Plaintiffs—and Alfa

("Alfa"), a consortium in which the Plaintiffs are investors—of criminal conduct and

alleged cooperation with the "Kremlin" to influence the 2016 presidential election. But neither the Plaintiffs nor Alfa committed any of the acts recklessly attributed to them by the Defendants. To the contrary, the Plaintiffs and Alfa are collateral damage in a U.S. political operation conducted by the Defendants, whose focus is an alleged relationship (between the Kremlin and the Trump campaign) which has nothing whatsoever to do with the Plaintiffs.

       2.      The specific "report" that includes facially defamatory statements about the Plaintiffs is one of seventeen written Company Intelligence Reports 2016 ("CIRs") that comprise the Trump Dossier. The Defendants included Company Intelligence Report 112 (the "Report" or "CIR 112") (which makes statements about the Plaintiffs) in the Trump Dossier, even though the Dossier's purpose and intended subject matter have nothing to do with the Plaintiffs' past, current or intended future activities. Broadly, those reports purport to describe details of an alleged scheme between the Russian government and the Trump presidential campaign to unlawfully manipulate the result of the 2016 presidential election in favor of candidate Trump. The Defendants gathered these reports as part of their engagement to conduct "opposition research" (known as "oppo research" by its practitioners and the media) against Trump. Opposition research, in essence, is the gathering of information for the purpose of eventually discrediting or otherwise harming a candidate for a public office. Opposition research is neither objective nor neutral. Instead, it is skewed from the outset in favor of appearing to find negative information about individuals—the essence of the product that political opposition research practitioners such as the Defendants are hired to produce.

3.      As described below, the Defendants were initially hired to conduct this opposition research by Republican political opponents of candidate Trump during the primary phase of the 2016 election cycle.  That engagement was terminated when it became clear that Mr. Trump would be the Republican nominee.  At that point, Defendants solicited and obtained an engagement with the Democratic National Committee and the campaign of candidate Hillary Clinton to gather discrediting information about Mr. Trump, including any connections he might have to Russian businesses or Russia's government.  To perform that research, the Defendants hired a private investigator—a former British intelligence officer named Christopher Steele, who operated through a London—based entity known as Orbis Business Intelligence Limited ("Orbis").  Steele claims to have used his own Russian sources—who were never identified—to compile the reports, which were then delivered to the Defendants over the course of several months in 2016.  Eventually, the reports, including the false and defamatory Report at the heart of this case, were assembled in the document that has come to be known to the public as the Trump Dossier.  Steele has acknowledged that his reports are unverified "raw intelligence" and has refused to identify his alleged "sources." Indeed, not one of the reports in the Dossier has ever been verified and none of its sources has ever been publicly identified.  Defendants recklessly placed the Dossier's allegations of criminal action by Plaintiffs beyond their control which allowed those allegations to get into the hands of media devoted to breaking news on the hottest subjects of the day:  the Trump candidacy and his election as President.

4.      CIR 112, dated September 14, 2016, falsely accuses the Plaintiffs of criminal bribery in the 1990s and participation in an alleged Trump-Russia scheme to

-3-

influence the 2016 presidential election.  That alleged scheme was the overall subject matter of the Dossier.  At all relevant times Defendants were aware that CIR 112 was not verified, that its content was provided by unidentified sources whose credibility could therefore not be assessed by a reader of the Dossier, and that the accusations made in CIR 112 about Plaintiffs defamed them.  Defendants could easily have removed that Report from the Dossier before they started peddling it to media and journalists in September and October 2016.  They chose not to do so.  Nor did they attempt to determine the veracity of that Report with the Plaintiffs themselves.

5.      At all times during the Defendants' engagement of Orbis and Steele, it was either intended or clearly foreseeable that if the Dossier's contents were made available to third parties, including journalists, such provocative material would be published and republished, including to the public at large.  Indeed, that is the entire purpose of "oppo research" in American politics.  Those third parties included government officials, as well as news media and journalists who could make its content public.

6.      On information and belief, Defendants arranged for Steele to brief selected members of the print and online media about the information he was compiling on candidate Trump and his campaign.  Consistent with the intended purpose of "oppo research" to publicly discredit its target, Steele's briefings were designed to generate interest in the Dossier and secure eventual public dissemination of its content.  Briefings were held for journalists from the *New York Times*, the *Washington Post, CNN, Yahoo News,* and others in September 2016.  *The New York Times, The Washington Post* and

*Yahoo News* were given a second briefing.[1]  Shortly thereafter, Yahoo News published an article by Michael Isikoff that described some of the content of the Dossier (referred to there as "intelligence reports" and "reports"), which was still being compiled at that time.[2]  Many other media articles reported speculative accounts of the Dossier's existence and contents.  In late October 2016, Steele gave an interview to David Corn, a writer for *Mother Jones* magazine, which, on October 31, 2016, published an article by Corn headlined "A Veteran Spy Has Given The FBI Information Alleging a Russian Operation to Cultivate Donald Trump."[3]  Corn's article stated that he had "reviewed" the early reports in the Dossier, and then quoted from those reports as well as statements made by Steele in the interview.  The publication to third parties and public dissemination of the Dossier's content had begun in earnest.

       7.     In addition to cultivating media interest, the Defendants also organized or approved a meeting in Great Britain between Steele and David Kramer, who held no public office but was the director of a private foundation affiliated with U.S. Senator John McCain.  The purpose of that meeting was to show Kramer the content of the sixteen pre-election reports in the Dossier so he could brief Senator McCain, who at the time was a well-known and outspoken critic of Trump's candidacy.  Subsequently, in November

---

[1]  *Defendants' Response to Claimants Request For Information, Gubarev, et al. v. Orbis Business Intelligence Limited and Christopher Steele*, Claim No. HQ1700413, In the High Court of Justice, Queens Bench Division, May 18, 2017, p. 8 ("The Orbis/Steele Response").

[2]  Michael Isikoff, *U.S. intel officials probe ties between Trump advisor and Kremlin*, Yahoo, News, Sept. 23, 2016, https://www.yahoo.com/news/u-s-intel-officials-probe-ties-between-trump-adviser-and-kremlin-175046002.html.

[3]  David Corn, *A Verteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump*, Mother Jones, Politics, Oct. 31, 2016, https://www.motherjones.com/politics/2016/10/veteran-spy-gave-fbi-info-alleging-russian-operation-cultivate-donald-trump/

2016, Defendants provided (and thereby published) a copy of all sixteen of the Dossier's then existing reports to Kramer—for redelivery and further publication to Senator McCain—including the report (CIR 112) that falsely accused and defamed Plaintiffs.[4]

8.      As the 2016 presidential election neared, both print and online media in the United States and abroad began to expand their coverage of the Dossier and its alleged content.  That coverage only intensified after Trump won the election.  On January 10, 2017, one of those media entities, BuzzFeed, Inc., published the entire Dossier on the Internet, describing it there as "explosive."  The copy of the Dossier that BuzzFeed published included the false and defamatory allegations of CIR 112 about the Plaintiffs and Alfa, along with the article entitled "These Reports Allege Trump Has Deep Ties to Russia."[5]  The Dossier misspells Alfa's name throughout, incorrectly spelling it as "Alpha."  BuzzFeed's article did not mention CIR 112 or its allegations, but focused instead on president-elect Trump and his alleged relationships with Russia, explaining that it "was publishing the full document so that Americans can make up their minds about allegations about the president-elect that have circulated at the highest levels of the U.S. government."[6]

9.      The Defendants intended, anticipated, or foresaw a high likelihood that allowing their clients (named *infra*), third parties (like David Kramer and Senator

---

[4] The Orbis/Steele Response, pp. 5-6.

[5] Ken Bensinger, Miriam Elder, Mark Schoofs, *These Reports Allege Trump Has Deep Ties To Russia*, BuzzFeed News, Jan. 10, 2017, https://www.buzzfeed.com/kenbensinger/these-reports-allege-trump-has-deep-ties-to-russia?utm_term=.is1Q2ka2J.

[6] *Id.*

McCain) and the media access to the Dossier's defamatory content would result in its republication by news media outlets, including online news media such as BuzzFeed.

10.     Plaintiffs seek an award of compensatory and punitive damages for the harm to their personal and professional reputations, current business interests, and the impairment of business opportunities that resulted from the blatantly false and defamatory statements and implications about them published recklessly to third parties by the Defendants and republished by BuzzFeed and countless other media around the world.

## THE PARTIES

11.     Plaintiffs Fridman, Aven, and Khan are ultimate beneficial owners of Alfa.  Fridman and Khan are each citizens of both Russia and Israel, and Aven is a citizen of Russia.  Plaintiffs are not widely known in the United States, had no role or involvement in any aspect of the 2016 U.S. presidential election, and made no public comments about it.

12.     On information and belief, defendant Bean LLC is a Delaware corporation that conducts business under the name Fusion GPS.  Fusion is registered to transact business in Washington, D.C., where it is headquartered and conducts its operations.

13.     Defendant Glenn Simpson, on information and belief, is a principal of Fusion.  He was the primary actor involved in securing the Dossier from Orbis and Steele, arranging for press briefings about it in the late summer and early fall of 2016, and publishing the Dossier to various recipients including Fusion's clients, third parties like David Kramer and Senator McCain, other government officials and the news

media.  Simpson conducts his business for Fusion from an office in Washington, D.C., where his business included his activities with respect to the Dossier.  Both Simpson and his subcontractor Steele used their prior experience as, respectively, an investigative journalist for the Wall Street Journal and an operative in British intelligence who had covered Russian matters, to give their "oppo research" output a gloss of credibility and reliability which, in this case, was unwarranted.  Simpson has described Fusion's work as "journalism for rent" and claimed publicly that he and Fusion uphold strict standards that Simpson developed in his years as a journalist:  "You can't just say what you know.  You have to say how you know it.  And you have to be able to prove it."[7]  And yet, Simpson and Fusion did not live up to their own professed standards when they published the Dossier.  As Steele (Defendants' supplier of the Dossier's unverified, anonymous "raw intelligence" content)  recently told a journalist, he did not interview his sources himself, but gathered his information through "intermediaries" and "subsources."  And as Steele further acknowledged, as much as 30% of the Dossier's content may not be "accurate."[8]  Those are the "standards" by which Defendants operated when they published  CIR 112.

---

[7] Jack Gillum, Shawn Boburg, *'Journalism for rent': Inside the secretive firm behind the Trump dossier*, The Washington Post, Investigations, Dec. 11, 2017 (*available at* https://www.washingtonpost.com/investigations/journalism-for-rent-inside-the-secretive-firm-behind-the-trump-dossier/2017/12/11/8d5428d4-bd89-11e7-af84-d3e2ee4b2af1_story.html? utm_term=.51524l4bbcce).

[8] Luke Harding, *How Trump walked into Putin's web*, The Guardian, News, Nov. 15, 2017, *https*://www.theguardian.com/news/2017/nov15/how-trump-walked-into-putins-web-luke; https://theguardian.com/us-new/2017/nov15/christopher-steele-trump-russia-dossier-accurate.

-8-

## JURISDICTION AND VENUE

14.     This case is within this Court's jurisdiction pursuant to 28 U.S.C.

§ 1332(a)(2). Venue is proper in this District pursuant to 28 U.S.C. § 1391. The matter

in controversy in the cause of action asserted herein exceeds $75,000.

## FACTUAL ALLEGATIONS

15.     On information and belief, the Defendants were engaged in 2015 by the

Washington Free Beacon to conduct research from public sources about several

Republican candidates for President, an engagement which ended in May 2016 when

Donald J. Trump was emerging as the likely winner of the nomination.[9]  Even prior to

that termination, Defendants approached Perkins Coie, a law firm representing the

Democratic National Committee (DNC) and HFACC, Inc., the campaign organization

supporting Hillary Rodham Clinton's candidacy for President, to solicit an engagement

that would continue the research regarding Donald Trump which it had been pursuing on

behalf of its previous client.  Perkins Coie retained Defendants to provide such research

services in April 2016, an engagement which continued until October 2016.[10]  The

Defendants were tasked with conducting "oppo research" against Trump, including the

gathering of compromising and salacious information about Trump's personal behavior

---

[9]  Alicia Cohn, *Conservative site funded project that led to Trump dossier*, The Hill, Home News,
Oct. 27, 2017, http://thehill.com/homenews/news/357599-conservative-publication-originally-
funded-trump-dossier-report.

[10]  Adam Entous, Devlin Barrett, Rosalind S. Helderman, *Clinton campaign, DNC paid for
research that led to Russia dossier*, The Washington Post, National Security, Oct. 24, 2017
(available at https://www.washingtonpost.com/world/national-security/clinton-campaign-dnc-
paid-for-research-that-led-to-russia-dossier/2017/10/24/22).

and business dealings in Russia. The Defendants in turn engaged Orbis and Steele for

assistance in fulfilling this task.

16.     Orbis proceeded to research Trump's personal behavior in Russia and

business dealings with Russian government officials, business leaders, and business

entities. Steele compiled the "investigative" results into at least seventeen written CIRs

for delivery to the Defendants in Washington, D.C. By Steele's own description, the

CIRs were "raw intelligence" containing unverified information from sources he did not

personally interview.[11]  The CIRs produced between June 2016 and the end of October

2016 (including CIR 112) were provided and thus published to lawyers at Perkins Coie

and by them to their clients at the DNC and the HFACC.

17.     After Trump received the Republican nomination for President in July

2016, many media reports subsequently surfaced asserting, correctly, that Fusion had

entered into a new engagement with Democratic Party operatives interested in using the

oppo research to support Hillary Clinton's candidacy. These media reports vastly

increased other media's and the public's interest in the content of the Dossier.

18.     As they continued their work for their new clients, the Defendants knew,

anticipated or reasonably should have foreseen that, once in the hands of third parties

such as David Kramer, Senator McCain, journalists like Michael Isikoff and David Corn,

Perkins Coie, the political operatives at the DNC and HFACC, and their media contacts,

the CIRs would be further disseminated publicly, thereby fostering widespread discussion

about them in the United States when, in fact, Plaintiffs had no role whatsoever in any

actions the Russian government or other Russian actors may have taken with regard to

---

[11] The Orbis/Steele Response, p.7, #17.

the 2016 election in the United States. That is exactly what happened. Much of the ensuing media attention and public discussion focused on Defendants' and Steele's roles in the creation and dissemination of the Dossier, and the interviews solicited by them. During this campaign to promote the public dissemination of their "oppo research," which, upon information and belief, included the provision of background briefing to the media by Defendants without attribution, Defendants never vouched for the credibility of their sources or the accuracy and reliability of the content of the Dossier and CIR 112. Despite the fact that they did not know whether the unverified, anonymous, inherently harmful accusations in CIR 112 about Plaintiffs were true or false, Defendants intentionally published the Dossier, including CIR 112, to Perkins Coie, David Kramer and John McCain, and foresaw (or reasonably should have foreseen) that it would then be republished to (1) Perkins Coie's clients (the DNC and the HFACC); (2) employees of the DNC and the HFACC; and (3) journalists and media. Elements of the Dossier, possibly including CIR112, may have been published even more extensively by being made available for viewing during arranged briefings of certain journalists. Worldwide publication of the entire Dossier, whether by BuzzFeed or anyone else, was inevitable after these reckless actions by Defendants.

19.     CIR 112 specifically discusses the Plaintiffs. Its heading, "RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION," is defamatory in the Trump/Russia context of the entire Dossier, as this heading suggests that Alfa and its executives, including the Plaintiffs, cooperated in the alleged Kremlin-orchestrated campaign to interfere in the 2016 U.S. presidential election—the overriding focus of Steele's reports. This is a plausible and, indeed, inescapable inference of fact

based on the headings of fifteen of the sixteen CIR's that Defendants dated and/or

published before the end of October, 2016:

US PRESIDENTIAL ELECTION: REPUBLICAN CANDIDATE DONALD
TRUMP'S ACTIVITIES IN RUSSIA AND COMPROMISING RELATIONSHIP
WITH THE KREMLIN (CIR 80 – JUNE 20, 2016)

RUSSIA/US PRESIDENTIAL ELECTION:  FURTHER INDICATIONS OF
EXTENSIVE CONSPIRACY BETWEEN TRUMP'S CAMPAIGN TEAM AND
THE KREMLIN ( CIR 95 – UNDATED)

RUSSIA:  SECRET KREMLIN MEETINGS ATTENDED BY TRUMP ADVISOR,
CARTER PAGE IN MOSCOW (JULY 2016)  (CIR 94 – JULY 19, 2016)

RUSSIA-US PRESIDENTIAL ELECTION:  KREMLIN CONCERN THAT
POLITICAL FALLOUT FROM DNC E-MAIL HACKING AFFAIR SPIRALING
OUT OF CONTROL (CIR 97 – JULY 30, 2016)

RUSSIA/USA:  GROWING BACKLASH IN KREMLIN TO DNC HACKING AND
TRUMP SUPPORT OPERATIONS (CIR 100 - AUGUST 5, 2016)

RUSSIA/US PRESIDENTIAL ELECTION:  SENIOR KREMLIN FIGURE
OUTLINES EVOLVING RUSSIAN TACTICS IN PRO-TRUMP, ANTI-CLINTON
OPERATION (CIR 101 – AUGUST 10, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: REACTION IN TRUMP CAMP TO
RECENT NEGATIVE PUBLICITY ABOUT RUSSIAN INTERFERENCE AND
LIKELY RESULTING TACTICS GOING FORWARD (CIR 102 – AUGUST 10,
2016)

RUSSIA/US PRESIDENTIAL ELECTION:  FURTHER DETAILS OF TRUMP
LAWYER COHEN'S SECRET LIAISON WITH THE KREMLIN (CIR 136 –
OCTOBER 20, 2016)

RUSSIA/UKRAINE:  THE DEMISE OF TRUMP'S CAMPAIGN MANAGER
PAUL MANAFORT (CIR 105 – AUGUST 22, 2016)

RUSSIA/US:  KREMLIN FALLOUT FROM MEDIA EXPOSURE OF
MOSCOW'S INTERFERENCE IN THE US PRESIDENTIAL CAMPAIGN (CIR
111 – SEPTEMBER 14, 2016)

RUSSIA/US PRESIDENTIAL ELECTION:  KREMLIN-ALPHA GROUP CO-
OPERATION (CIR 112 – SEPTEMBER 14, 2016)

RUSSIA/US PRESIDENTIAL ELECTION:  REPUBLICAN CANDIDATE
TRUMP'S PRIOR ACTIVITIES IN ST. PETERSBURG (CIR 113 – SEPTEMBER
14, 2016)

RUSSIA:  KREMLIN ASSESSMENT OF TRUMP AND RUSSIA INTERFER-
ENCE IN US PRESIDENTIAL ELECTION (CIR 130 – OCTOBER 12, 2016)

RUSSIA/US PRESIDENTIAL ELECTION:  FURTHER DETAILS OF KREMLIN
LIAISON WITH TRUMP CAMPAIGN  (CIR 134 – OCTOBER 18, 2016)

20.      CIR 112 , in sections labeled "Summary" and "Detail," makes a series of

factual allegations about the "current closeness" of an "Alpha Group/PUTIN

relationship," including that "[s]ignificant favors continue to be done in both directions"

and that "FRIDMAN and AVEN [are] still giving informal advice to PUTIN, especially

on the US."

21.      The Summary section of CIR 112 identifies a former employee of Alfa,

Oleg Govorun, who is now the head of a government department in Putin's

administration, as a "key intermediary" in the "PUTIN-Alfa relationship."  CIR 112

alleges that Govorun "delivered illicit cash directly to PUTIN" "throughout the 1990s,"

when Govorun was an "Alpha executive" and Putin was the Deputy Mayor of St.

Petersburg.

22.      The first paragraph of the Detail section of CIR 112 states the full names

of Plaintiffs Fridman, Aven, and Khan.  It then includes a report from an unnamed

"Russian government official:"

> although they have had their ups and downs, the leading
> figures in Alpha currently are on very good terms with
> PUTIN.  Significant favors continued to be done in both
> directions, primarily political ones for PUTIN and
> business/legal ones for Alpha. Also, FRIDMAN and
> AVEN continued to give informal advice to PUTIN on

-13-

foreign policy, and especially about the US where he distrusted advice being given him by officials.

23.     Under any reasonable reading of CIR 112, alone, and in the context of the full Dossier and the headings of sixteen of its seventeen CIR's ("the Trump/Russia context"), Plaintiffs Fridman, Aven, and Khan, along with Alfa, are alleged to maintain a highly inappropriate, and even criminal, relationship with Putin, based on criminal interaction dating back to the 1990s. By clear and defamatory implication, CIR 112 purports to tie the Plaintiffs to a Kremlin-orchestrated campaign to interfere in the 2016 U.S. election.

24.     The second paragraph of the Detail section alleges that Mr. Fridman "recently met directly with PUTIN" and that "much of the dialogue and business between them was mediated" by Govorun, the former Alfa employee. The paragraph describes Govorun as a "senior Presidential Administration official" who is "trusted by PUTIN:"

> during the 1990s GOVORUN had been Head of Government Relations at Alpha Group and in reality the 'driver' and 'bag carrier' used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St. Petersburg. Given that and the continuing sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN.

25.     These allegations are false. Oleg Govorun was not employed by Alfa Bank until after Mr. Putin left St. Petersburg to join the Yeltsin administration in Moscow. The defamatory nature of these allegations, even when read alone, is clear: CIR 112 alleges that, in the 1990s, Alfa (a member of "Alpha Group") and two of its

-14-

largest beneficial owners purportedly engaged in acts of criminal bribery of Vladimir

Putin, a public official, to secure favorable business treatment.

     26.     Those statements, considered in the Trump/Russia context of the Dossier

as a whole, imply that the alleged improper relationship between Alfa, the Plaintiffs, and

Putin, which purportedly started in the 1990s, is currently ongoing, and that Govorun, the

alleged "bag carrier" of the 1990s, who is now a senior official in Putin's administration,

serves as the trusted intermediary between the Plaintiffs and Putin in the alleged

cooperation of Plaintiffs in the Trump/Russia conspiracy.

     27.     The third paragraph of the Detail section characterizes the "PUTIN-Alpha

relationship as both a carrot and stick:"

> Alpha held 'kompromat' on PUTIN and his corrupt
> business activities from the 1990s whilst although not
> personally overly bothered by Alpha's failure to reinvest
> the proceeds of its TNK oil company sales into the Russian
> economy since, the Russian president was able to use
> pressure on this count from senior Kremlin colleagues as a
> lever on FRIDMAN and AVEN to make them do his
> political bidding.

     28.     This passage is defamatory in several ways:  read in the context of the

Dossiser's Trump/Russia theme, it suggests that Plaintiffs Fridman and Aven use their

knowledge of past bribery of Putin—"kompromat"—as a means of criminally extorting

continuing favorable treatment for their business interests from his government.  It also

implies that Alfa and two of its largest beneficial owners, Plaintiffs Fridman and Aven,

willingly maintain a close relationship with Putin and cooperated in some unspecified

way in the Kremlin's alleged campaign to interfere in the U.S. election in an effort to

avoid retribution from Putin for not reinvesting business proceeds in Russia.

29.     The statements about the Plaintiffs in the context of the Dossier as a whole are false, defamatory, and gravely damaging.  The statements in the Detail section of CIR 112 about Plaintiffs allege a criminal relationship with Mr. Putin in the 1990s, in addition to and apart from the defamatory implications described above, even if considered independently, raising substantial questions about why these almost twenty-year-old allegations were included by Defendants in a Dossier of "oppo research" about Donald Trump.  The statements of CIR 112, published in an unverified report attributed to an anonymous "top level Russian official" of unknown credibility or existence, raise a clear and plausible inference of reckless disregard of truth or falsity by Defendants.

## CAUSE OF ACTION

30.     Plaintiffs repeat and reallege paragraphs 1-29 above.

31.     By their direct and intentional publication to third parties such as clients, news media, journalists, and others, and by the foreseeable republication of the Dossier and CIR 112 by someone in that group, the Defendants published to a worldwide public false and defamatory statements concerning Plaintiffs and Alfa, including that:

      (a)     they are implicated in the scandalous allegations involving Russia and President Trump referred to in CIR 112 and the other CIRs in the Dossier;

      (b)     they and other officials and employees of Alfa "cooperated" with an alleged Kremlin campaign to interfere in the U.S. presidential election;

      (c)     they are parties to a highly inappropriate, and even criminal, relationship with Vladimir Putin;

-16-

(d)     they engaged in acts of criminal bribery of Vladimir Putin, then the

Deputy Mayor of St. Petersburg, in the 1990s to secure favorable business

treatment; and

(e)     they continue to use their knowledge of past bribery of Putin as a

means of criminally extorting continuing favorable treatment for their business

interests from the Putin government.

32.     Readers of the CIRs and Dossier were also led to understand, incorrectly,

that as a result of their alleged past—and current—close relationships and corrupt

dealings with Mr. Putin, the Plaintiffs and Alfa were and are required to do Putin's

bidding, including by cooperating in the Kremlin's alleged efforts to influence the

outcome of the recent U.S. presidential election.

33.     The false statements by the Defendants referred to above defamed the

Plaintiffs and Alfa, and have caused and will continue to cause serious injury to their

personal, professional, and institutional reputations.

34.     The false and defamatory statements published and republished by the

Defendants concerning the Plaintiffs and Alfa, as well as the obvious implications of

those statements, were made negligently or with reckless disregard of whether they were

true or false.

35.     Defendants are liable for the defamation of Plaintiffs and Alfa, and the

resulting harm caused by the news media coverage of the Dossier, including the

republication by BuzzFeed and countless other media.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

-17-

WHEREFORE, Plaintiffs Mikhail Fridman, Petr Aven, and German Khan demand judgment against Defendants Bean LLC, Fusion GPS, and Glenn Simpson for:

a.    compensatory damages in an amount to be proved at trial, together with interest and the costs and disbursements of this action, plus reasonable attorneys' fees;

b.    punitive damages in an amount to be determined at trial; and

c.    such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       December 12, 2017

By:     _/s/ Alan S. Lewis_
        Alan S. Lewis, Esq. (#NY0252)
        John J. Walsh, Esq.
        CARTER LEDYARD & MILBURN LLP
        2 Wall Street
        New York, N.Y. 10005
        Telephone:  212-238-8647
        *Counsel for Plaintiffs*
        *Mikhail Fridman, et al.*

        *Of Counsel:*

        Kim H. Sperduto, Esq. (# 416127)
        SPERDUTO THOMPSON PLC
        1133 Twentieth Street, NW Second Floor
        Washington, D.C. 20036
        Telephone:    202-408-8900

BuzzFeed Article and Dossier

**BuzzFeed News**

REPORTING TO YOU

# These Reports Allege Trump Has Deep Ties To Russia

A dossier, compiled by a person who has claimed to be a former British intelligence official, alleges Russia has compromising information on Trump. The allegations are unverified, and the report contains errors.


**Ken Bensinger**
BuzzFeed News Reporter


**Miriam Elder**
BuzzFeed News Reporter


**Mark Schoofs**
BuzzFeed News contributor

Last updated on January 10, 2017, at 9:09 p.m. ET
Posted on January 10, 2017, at 6:20 p.m. ET




These Reports Allege Trump Has Deep Ties To Russia



*Drew Angerer | Getty Images*

A dossier making explosive — but unverified — allegations that the Russian government has been "cultivating, supporting and assisting" President-elect Donald Trump for years and gained compromising information about him has been circulating among elected officials, intelligence agents, and journalists for weeks.

The dossier, which is a collection of memos written over a period of months, includes specific, unverified, and potentially unverifiable allegations of contact between Trump aides and Russian operatives, and graphic claims of sexual acts documented by the Russians. BuzzFeed News reporters in the US and Europe have been investigating various alleged facts in the dossier but have not verified or falsified them. CNN reported Tuesday that a two-page synopsis of the report was given to President Obama and Trump.

Now BuzzFeed News is publishing the full document so that Americans can make up their own minds about allegations about the president-elect that have circulated at the highest levels of the US government.

The document was prepared for political opponents of Trump by a person who is understood to be a former British intelligence agent. It is not just unconfirmed: It includes some clear errors. The report misspells the

name of one company, "Alpha Group," throughout. It is Alfa Group. The report says the settlement of Barvikha, outside Moscow, is "reserved for the residences of the top leadership and their close associates." It is not reserved for anyone, and it is also populated by the very wealthy.

The Trump administration's transition team did not immediately respond to BuzzFeed News' request for comment. However, the president-elect's attorney, Michael Cohen, told *Mic* that the allegations were absolutely false.

"It's so ridiculous on so many levels," he said. "Clearly, the person who created this did so from their imagination or did so hoping that the liberal media would run with this fake story for whatever rationale they might have."

And Trump shot back against the reports a short time later on Twitter.

 FAKE NEWS - A TOTAL POLITICAL WITCH HUNT!          **Donald J. Trump**
                                                                    @realDonaldTrump

FAKE NEWS - A TOTAL POLITICAL WITCH HUNT!

01:19 AM - 11 Jan 2017

Reply      Retweet      Favorite

His former campaign manager and current senior White House adviser, Kellyanne Conway, also denied the claims

during an appearance on *Late Night With Seth Meyers,* adding that "nothing has been confirmed." She also said Trump was "not aware" of any briefing on the matter.

The documents have circulated for months and acquired a kind of legendary status among journalists, lawmakers, and intelligence officials who have seen them. *Mother Jones* writer David Corn referred to the documents in a late October column.

Harry Reid spokesman Adam Jentleson tweeted Tuesday that the former Senate Democratic leader had seen the documents before writing a public letter to FBI Director James Comey about Trump's ties to Russia. And CNN reported Tuesday that Arizona Republican John McCain gave a "full copy" of the memos to Comey on Dec. 9, but that the FBI already had copies of many of the memos.

## If you have tips related to this story, write us at trumpstories@buzzfeed.com. To send us information confidentially, go here.

## Read the report here:

To print the document, click the "Original Document" link to open the original PDF. At this time it is not possible to print the document with annotations.

These Reports Allege Trump Has Deep Ties To Russia                                      Page 5 of 6

**TOPICS IN THIS ARTICLE**

( Russia )

 Ken Bensinger is an
investigative reporter
for BuzzFeed News and
is based in Los Angeles.
He is the author of "Red
Card," on the FIFA

 Miriam Elder is a
political reporter for
BuzzFeed News and is
based in New York. Her
secure PGP fingerprint
is 5B5F EC17 C20B

scandal. His DMs are                    C11F 226D 3EBE 6205

The Village Voice, he
won the 2000 Pulitzer

CONFIDENTIAL/SENSITIVE SOURCE

COMPANY INTELLIGENCE REPORT 2016/080

## US PRESIDENTIAL ELECTION: REPUBLICAN CANDIDATE DONALD TRUMP'S ACTIVITIES IN RUSSIA AND COMPROMISING RELATIONSHIP WITH THE KREMLIN

### Summary

- Russian regime has been cultivating, supporting and assisting TRUMP for at least 5 years. Aim, endorsed by PUTIN, has been to encourage splits and divisions in western alliance

- So far TRUMP has declined various sweetener real estate business deals offered him in Russia in order to further the Kremlin's cultivation of him. However he and his inner circle have accepted a regular flow of intelligence from the Kremlin, including on his Democratic and other political rivals

- Former top Russian intelligence officer claims FSB has compromised TRUMP through his activities in Moscow sufficiently to be able to blackmail him. According to several knowledgeable sources, his conduct in Moscow has included perverted sexual acts which have been arranged/monitored by the FSB

- A dossier of compromising material on Hillary CLINTON has been collated by the Russian Intelligence Services over many years and mainly comprises bugged conversations she had on various visits to Russia and intercepted phone calls rather than any embarrassing conduct. The dossier is controlled by Kremlin spokesman, PESKOV, directly on PUTIN's orders. However it has not as yet been distributed abroad, including to TRUMP. Russian intentions for its deployment still unclear

### Detail

1. Speaking to a trusted compatriot in June 2016 sources A and B, a senior Russian Foreign Ministry figure and a former top level Russian intelligence officer still active inside the Kremlin respectively, the Russian authorities had been cultivating and supporting US Republican presidential candidate, Donald TRUMP for at least 5 years. Source B asserted that the TRUMP operation was both supported and directed by Russian President Vladimir PUTIN. Its aim was to sow discord and

CONFIDENTIAL/SENSITIVE SOURCE

disunity both within the US itself, but more especially within the Transatlantic alliance which was viewed as inimical to Russia's interests. Source C, a senior Russian financial official said the TRUMP operation should be seen in terms of PUTIN's desire to return to Nineteenth Century 'Great Power' politics anchored upon countries' interests rather than the ideals-based international order established after World War Two. S/he had overheard PUTIN talking in this way to close associates on several occasions.

2. In terms of specifics, Source A confided that the Kremlin had been feeding TRUMP and his team valuable intelligence on his opponents, including Democratic presidential candidate Hillary CLINTON, for several years (see more below). This was confirmed by Source D, a close associate of TRUMP who had organized and managed his recent trips to Moscow, and who reported, also in June 2016, that this Russian intelligence had been "very helpful". The Kremlin's cultivation operation on TRUMP also had comprised offering him various lucrative real estate development business deals in Russia, especially in relation to the ongoing 2018 World Cup soccer tournament. However, so far, for reasons unknown, TRUMP had not taken up any of these.

3. However, there were other aspects to TRUMP's engagement with the Russian authorities. One which had borne fruit for them was to exploit TRUMP's personal obsessions and sexual perversion in order to obtain suitable 'kompromat' (compromising material) on him. According to Source D, where s/he had been present, TRUMP's (perverted) conduct in Moscow included hiring the presidential suite of the Ritz Carlton Hotel, where he knew President and Mrs OBAMA (whom he hated) had stayed on one of their official trips to Russia, and defiling the bed where they had slept by employing a number of prostitutes to perform a 'golden showers' (urination) show in front of him. The hotel was known to be under FSB control with microphones and concealed cameras in all the main rooms to record anything they wanted to.

4. The Moscow Ritz Carlton episode involving TRUMP reported above was confirmed by Source E, ██████████████████████████, who said that s/he and several of the staff were aware of it at the time and subsequently. S/he believed it had happened in 2013. Source E provided an introduction for a company ethnic Russian operative to Source F, a female staffer at the hotel when TRUMP had stayed there, who also confirmed the story. Speaking separately in June 2016, Source B (the former top level Russian intelligence officer) asserted that TRUMP's unorthodox behavior in Russia over the years had provided the authorities there with enough embarrassing material on the now Republican presidential candidate to be able to blackmail him if they so wished.

5. Asked about the Kremlin's reported intelligence feed to TRUMP over recent years and rumours about a Russian dossier of 'kompromat' on

CONFIDENTIAL/SENSITIVE SOURCE

Hillary CLINTON (being circulated), Source B confirmed the file's existence. S/he confided in a trusted compatriot that it had been collated by Department K of the FSB for many years, dating back to her husband Bill's presidency, and comprised mainly eavesdropped conversations of various sorts rather than details/evidence of unorthodox or embarrassing behavior. Some of the conversations were from bugged comments CLINTON had made on her various trips to Russia and focused on things she had said which contradicted her current position on various issues. Others were most probably from phone intercepts.

6. Continuing on this theme, Source G, a senior Kremlin official, confided that the CLINTON dossier was controlled exclusively by chief Kremlin spokesman, Dmitriy PESKOV, who was responsible for compiling/handling it on the explicit instructions of PUTIN himself. The dossier however had not as yet been made available abroad, including to TRUMP or his campaign team. At present it was unclear what PUTIN's intentions were in this regard.

20 June 2016

CONFIDENTIAL/SENSITIVE SOURCE

CONFIDENTIAL/SENSITIVE SOURCE

COMPANY INTELLIGENCE REPORT 2016/086

## RUSSIA/CYBER CRIME: A SYNOPSIS OF RUSSIAN STATE SPONSORED AND OTHER CYBER OFFENSIVE (CRIMINAL) OPERATIONS

### Summary

- Russia has extensive programme of state-sponsored offensive cyber operations. External targets include foreign governments and big corporations, especially banks. FSB leads on cyber within Russian apparatus. Limited success in attacking top foreign targets like G7 governments, security services and IFIs but much more on second tier ones through IT back doors, using corporate and other visitors to Russia

- FSB often uses coercion and blackmail to recruit most capable cyber operatives in Russia into its state-sponsored programmes. Heavy use also, both wittingly and unwittingly, of CIS emigres working in western corporations and ethnic Russians employed by neighbouring governments e.g. Latvia

- Example cited of successful Russian cyber operation targeting senior Western business visitor. Provided back door into important Western institutions.

- Example given of US citizen of Russian origin approached by FSB and offered incentive of "investment" in his business when visiting Moscow.

- Problems however for Russian authorities themselves in countering local hackers and cyber criminals, operating outside state control. Central Bank claims there were over 20 serious attacks on correspondent accounts held by CBR in 2015, comprising Roubles several billion in fraud

- Some details given of leading non-state Russian cyber criminal groups

### Details

1. Speaking in June 2016, a number of Russian figures with a detailed knowledge of national cyber crime, both state-sponsored and otherwise, outlined the current situation in this area. A former senior intelligence officer divided Russian state-sponsored offensive cyber operations into four categories (in order of priority):- targeting foreign, especially

CONFIDENTIAL/SENSITIVE SOURCE

CONFIDENTIAL/SENSITIVE SOURCE

western governments; penetrating leading foreign business corporations, especially banks; domestic monitoring of the elite; and attacking political opponents both at home and abroad. The former intelligence officer reported that the Federal Security Service (FSB) was the lead organization within the Russian state apparatus for cyber operations.

2.  In terms of the success of Russian offensive cyber operations to date, a senior government figure reported that there had been only limited success in penetrating the "first tier" foreign targets. These comprised western (especially G7 and NATO) governments, security and intelligence services and central banks, and the IFIs. To compensate for this shortfall, massive effort had been invested, with much greater success, in attacking the "secondary targets", particularly western private banks and the governments of smaller states allied to the West. S/he mentioned Latvia in this regard. Hundreds of agents, either consciously cooperating with the FSB or whose personal and professional IT systems had been unwittingly compromised, were recruited. Many were people who had ethnic and family ties to Russia and/or had been incentivized financially to cooperate. Such people often would receive monetary inducements or contractual favours from the Russian state or its agents in return. This had created difficulties for parts of the Russian state apparatus in obliging/indulging them e.g. the Central Bank of Russia knowingly having to cover up for such agents' money laundering operations through the Russian financial system.

3.  In terms of the FSB's recruitment of capable cyber operatives to carry out its, ideally deniable, offensive cyber operations, a Russian IT specialist with direct knowledge reported in June 2016 that this was often done using coercion and blackmail. In terms of 'foreign' agents, the FSB was approaching US citizens of Russian (Jewish) origin on business trips to Russia. In one case a US citizen of Russian ethnicity had been visiting Moscow to attract investors in his new information technology program. The FSB clearly knew this and had offered to provide seed capital to this person in return for them being able to access and modify his IP, with a view to targeting priority foreign targets by planting a Trojan virus in the software. The US visitor was told this was common practice. The FSB also had implied significant operational success as a result of installing cheap Russian IT games containing their own malware unwittingly by targets on their PCs and other platforms.

4.  In a more advanced and successful FSB operation, an IT operator inside a leading Russian SOE, who previously had been employed on conventional (defensive) IT work there, had been under instruction for the last year to conduct an offensive cyber operation against a foreign director of the company. Although the latter was apparently an infrequent visitor to Russia, the FSB now successfully had penetrated his personal IT and through this had managed to access various important institutions in the West through the back door.

CONFIDENTIAL/SENSITIVE SOURCE

5

CONFIDENTIAL/SENSITIVE SOURCE

5.  In terms of other technical IT platforms, an FSB cyber operative flagged up the 'Telegram' enciphered commercial system as having been of especial concern and therefore heavily targeted by the FSB, not least because it was used frequently by Russian internal political activists and oppositionists. His/her understanding was that the FSB now successfully had cracked this communications software and therefore it was no longer secure to use.

6.  The senior Russian government figure cited above also reported that non-state sponsored cyber crime was becoming an increasing problem inside Russia for the government and authorities there. The Central Bank of Russia claimed that in 2015 alone there had been more than 20 attempts at serious cyber embezzlement of money from corresponding accounts held there, comprising several billions Roubles. More generally, s/he understood there were circa 15 major organised crime groups in the country involved in cyber crime, all of which continued to operate largely outside state and FSB control. These included the so-called 'Anunak', 'Buktrap' and 'Metel' organisations.

26 July 2015

COMPANY INTELLIGENCE REPORT 2016/095

## RUSSIA/US PRESIDENTIAL ELECTION: FURTHER INDICATIONS OF EXTENSIVE CONSPIRACY BETWEEN TRUMP'S CAMPAIGN TEAM AND THE KREMLIN

### Summary

- Further evidence of extensive conspiracy between TRUMP's campaign team and Kremlin, sanctioned at highest levels and involving Russian diplomatic staff based in the US

- TRUMP associate admits Kremlin behind recent appearance of DNC e-mails on WikiLeaks, as means of maintaining plausible deniability

- Agreed exchange of information established in both directions. TRUMP's team using moles within DNC and hackers in the US as well as outside in Russia. PUTIN motivated by fear and hatred of Hillary CLINTON. Russians receiving intel from TRUMP's team on Russian oligarchs and their families in US

- Mechanism for transmitting this intelligence involves "pension" disbursements to Russian emigres living in US as cover, using consular officials in New York, DC and Miami

- Suggestion from source close to TRUMP and MANAFORT that Republican campaign team happy to have Russia as media bogeyman to mask more extensive corrupt business ties to China and other emerging countries

### Detail

1. Speaking in confidence to a compatriot in late July 2016, Source E, an ethnic Russian close associate of Republican US presidential candidate Donald TRUMP, admitted that there was a well-developed conspiracy of co-operation between them and the Russian leadership. This was managed on the TRUMP side by the Republican candidate's campaign manager, Paul MANAFORT, who was using foreign policy advisor, Carter PAGE, and others as intermediaries. The two sides had a mutual interest in defeating Democratic presidential candidate Hillary CLINTON, whom President PUTIN apparently both hated and feared.

2. Inter alia, Source E, acknowledged that the Russian regime had been behind the recent leak of embarrassing e-mail messages, emanating from the Democratic National Committee (DNC), to the WikiLeaks platform.

**CONFIDENTIAL/SENSITIVE SOURCE**

CONFIDENTIAL/SENSITIVE SOURCE

The reason for using WikiLeaks was "plausible deniability" and the operation had been conducted with the full knowledge and support of TRUMP and senior members of his campaign team. In return the TRUMP team had agreed to sideline Russian intervention in Ukraine as a campaign issue and to raise US/NATO defence commitments in the Baltics and Eastern Europe to deflect attention away from Ukraine, a priority for PUTIN who needed to cauterise the subject.

3. In the wider context of TRUMP campaign/Kremlin co-operation, Source E claimed that the intelligence network being used against CLINTON comprised three elements. Firstly there were agents/facilitators within the Democratic Party structure itself; secondly Russian émigré and associated offensive cyber operators based in the US; and thirdly, state-sponsored cyber operatives working in Russia. All three elements had played an important role to date. On the mechanism for rewarding relevant assets based in the US, and effecting a two-way flow of intelligence and other useful information, Source E claimed that Russian diplomatic staff in key cities such as New York, Washington DC and Miami were using the émigré 'pension' distribution system as cover. The operation therefore depended on key people in the US Russian émigré community for its success. Tens of thousands of dollars were involved.

4. In terms of the intelligence flow from the TRUMP team to Russia, Source E reported that much of this concerned the activities of business oligarchs and their families' activities and assets in the US, with which PUTIN and the Kremlin seemed preoccupied.

5. Commenting on the negative media publicity surrounding alleged Russian interference in the US election campaign in support of TRUMP, Source E said he understood that the Republican candidate and his team were relatively relaxed about this because it deflected media and the Democrats' attention away from TRUMP's business dealings in China and other emerging markets. Unlike in Russia, these were substantial and involved the payment of large bribes and kickbacks which, were they to become public, would be potentially very damaging to their campaign.

6. Finally, regarding TRUMP's claimed minimal investment profile in Russia, a separate source with direct knowledge said this had not been for want of trying. TRUMP's previous efforts had included exploring the real estate sector in St Petersburg as well as Moscow but in the end TRUMP had had to settle for the use of extensive sexual services there from local prostitutes rather than business success.

CONFIDENTIAL/SENSITIVE SOURCE

COMPANY INTELLIGENCE REPORT 2016/94

### RUSSIA: SECRET KREMLIN MEETINGS ATTENDED BY TRUMP ADVISOR, CARTER PAGE IN MOSCOW (JULY 2016)

#### Summary

- TRUMP advisor Carter PAGE holds secret meetings in Moscow with SECHIN and senior Kremlin Internal Affairs official, DIVYEKIN

- SECHIN raises issues of future bilateral US-Russia energy co-operation and associated lifting of western sanctions against Russia over Ukraine. PAGE non-committal in response

- DIVEYKIN discusses release of Russian dossier of 'kompromat' on TRUMP's opponent, Hillary CLINTON, but also hints at Kremlin possession of such material on TRUMP

#### Detail

1. Speaking in July 2016, a Russian source close to Rosneft President, PUTIN close associate and US-sanctioned individual, Igor SECHIN, confided the details of a recent secret meeting between him and visiting Foreign Affairs Advisor to Republican presidential candidate Donald TRUMP, Carter PAGE.

2. According to SECHIN's associate, the Rosneft President (CEO) had raised with PAGE the issues of future bilateral energy cooperation and prospects for an associated move to lift Ukraine-related western sanctions against Russia. PAGE had reacted positively to this demarche by SECHIN but had been generally non-committal in response.

3. Speaking separately, also in July 2016, an official close to Presidential Administration Head, S. IVANOV, confided in a compatriot that a senior colleague in the Internal Political Department of the PA, DIVYEKIN (nfd) also had met secretly with PAGE on his recent visit. Their agenda had included DIVEYKIN raising a dossier of 'kompromat' the Kremlin possessed on TRUMP's Democratic presidential rival, Hillary CLINTON, and its possible release to the Republican's campaign team.

4. However, the Kremlin official close to S. IVANOV added that s/he believed DIVEYKIN also had hinted (or indicated more strongly) that the Russian leadership also had 'kompromat' on TRUMP which the latter should bear in mind in his dealings with them.

19 July 2016

COMPANY INTELLIGENCE REPORT 2016/097

**RUSSIA-US PRESIDENTIAL ELECTION: KREMLIN CONCERN THAT POLITICAL FALLOUT FROM DNC E-MAIL HACKING AFFAIR SPIRALLING OUT OF CONTROL**

**Summary**

- Kremlin concerned that political fallout from DNC e-mail hacking operation is spiralling out of control. Extreme nervousness among TRUMP's associates as result of negative media attention/accusations

- Russians meanwhile keen to cool situation and maintain 'plausible deniability' of existing /ongoing pro-TRUMP and anti-CLINTON operations. Therefore unlikely to be any ratcheting up offensive plays in immediate future

- Source close to TRUMP campaign however confirms regular exchange with Kremlin has existed for at least 8 years, including intelligence fed back to Russia on oligarchs' activities in US

- Russians apparently have promised not to use 'kompromat' they hold on TRUMP as leverage, given high levels of voluntary co-operation forthcoming from his team

**Detail**

1. Speaking in confidence to a trusted associate in late July 2016, a Russian émigré figure close to the Republican US presidential candidate Donald TRUMP's campaign team commented on the fallout from publicity surrounding the Democratic National Committee (DNC) e-mail hacking scandal. The émigré said there was a high level of anxiety within the TRUMP team as a result of various accusations levelled against them and indications from the Kremlin that President PUTIN and others in the leadership thought things had gone too far now and risked spiralling out of control.

2. Continuing on this theme, the émigré associate of TRUMP opined that the Kremlin wanted the situation to calm but for 'plausible deniability' to be maintained concerning its (extensive) pro-TRUMP and anti-CLINTON operations. S/he therefore judged that it was unlikely these would be ratcheted up, at least for the time being.

3. However, in terms of established operational liaison between the TRUMP team and the Kremlin, the émigré confirmed that an intelligence exchange had been running between them for at least 8 years. Within this context PUTIN's priority requirement had been for intelligence on the activities, business and otherwise, in the US of leading Russian oligarchs and their families. TRUMP and his associates duly had obtained and supplied the Kremlin with this information.

4.  Finally, the émigré said s/he understood the Kremlin had more intelligence on
    CLINTON and her campaign but he did not know the details or when or if it would be
    released. As far as 'kompromat' (compromising information) on TRUMP were
    concerned, although there was plenty of this, he understood the Kremlin had given its
    word that it would not be deployed against the Republican presidential candidate
    given how helpful and co-operative his team had been over several years, and
    particularly of late.

**30 July 2016**

12

COMPANY INTELLIGENCE REPORT 2016/100

RUSSIA/USA: GROWING BACKLASH IN KREMLIN TO DNC HACKING AND
TRUMP SUPPORT OPERATIONS

Summary

- Head of PA IVANOV laments Russian intervention in US presidential
  election and black PR against CLINTON and the DNC. Vows not to supply
  intelligence to Kremlin PR operatives again. Advocates now sitting tight
  and denying everything

- Presidential spokesman PESKOV the main protagonist in Kremlin
  campaign to aid TRUMP and damage CLINTON. He is now scared and
  fears being made scapegoat by leadership for backlash in US. Problem
  compounded by his botched intervention in recent Turkish crisis

- Premier MEDVEDEV's office furious over DNC hacking and associated
  anti-Russian publicity. Want good relations with US and ability to travel
  there. Refusing to support or help cover up after PESKOV

- Talk now in Kremlin of TRUMP withdrawing from presidential race
  altogether, but this still largely wishful thinking by more liberal elements
  in Moscow

Detail

1. Speaking in early August 2016, two well-placed and established Kremlin
   sources outlined the divisions and backlash in Moscow arising from the
   leaking of Democratic National Committee (DNC) e-mails and the wider
   pro-TRUMP operation being conducted in the US. Head of Presidential
   Administration, Sergei IVANOV, was angry at the recent turn of events.
   He believed the Kremlin "team" involved, led by presidential spokesman
   Dmitriy PESKOV, had gone too far in interfering in foreign affairs with
   their "elephant in a china shop black PR". IVANOV claimed always to have
   opposed the handling and exploitation of intelligence by this PR "team".
   Following the backlash against such foreign interference in US politics,
   IVANOV was advocating that the only sensible course of action now for
   the Russian leadership was to "sit tight and deny everything".

2. Continuing on this theme the source close to IVANOV reported that
   PESKOV now was "scared shitless" that he would be scapegoated by
   PUTIN and the Kremlin and held responsible for the backlash against
   Russian political interference in the US election. IVANOV was determined

13

to stop PESKOV playing an independent role in relation to the US going forward and the source fully expected the presidential spokesman now to lay low. PESKOV's position was not helped by a botched attempt by him also to interfere in the recent failed coup in Turkey from a government relations (GR) perspective (no further details).

3. The extent of disquiet and division within Moscow caused by the backlash against Russian interference in the US election was underlined by a second source, close to premier Dmitriy MEDVEDEV (DAM). S/he said the Russian prime minister and his colleagues wanted to have good relations with the US, regardless of who was in power there, and not least so as to be able to travel there in future, either officially or privately. They were openly refusing to cover up for PESKOV and others involved in the DNC/TRUMP operations or to support his counter-attack of allegations against the USG for its alleged hacking of the Russian government and state agencies.

4. According to the first source, close to IVANOV, there had been talk in the Kremlin of TRUMP being forced to withdraw from the presidential race altogether as a result of recent events, ostensibly on grounds of his psychological state and unsuitability for high office. This might not be so bad for Russia in the circumstances but in the view of the source, it remained largely wishful thinking on the part of those in the regime opposed to PESKOV and his "botched" operations, at least for the time being.

5 August 2016

COMPANY INTELLIGENCE REPORT 2016/101

RUSSIA/US PRESIDENTIAL ELECTION: SENIOR KREMLIN FIGURE OUTLINES EVOLVING RUSSIAN TACTICS IN PRO-TRUMP, ANTI-CLINTON OPERATION

Summary

- Head of PA, IVANOV assesses Kremlin intervention in US presidential election and outlines leadership thinking on operational way forward

- No new leaks envisaged, as too politically risky, but rather further exploitation of (WikiLeaks) material already disseminated to exacerbate divisions

- Educated US youth to be targeted as protest (against CLINTON) and swing vote in attempt to turn them over to TRUMP

- Russian leadership, including PUTIN, celebrating perceived success to date in splitting US hawks and elite

- Kremlin engaging with several high profile US players, including STEIN, PAGE and (former DIA Director Michael Flynn), and funding their recent visits to Moscow

Details

1. Speaking in confidence to a close colleague in early August 2016, Head of the Russian Presidential Administration (PA), Sergei IVANOV, assessed the impact and results of Kremlin intervention in the US presidential election to date. Although most commentators believed that the Kremlin was behind the leaked DNC/CLINTON e-mails, this remained technically deniable. Therefore the Russians would not risk their position for the time being with new leaked material, even to a third party like WikiLeaks. Rather the tactics would be to spread rumours and misinformation about the content of what already had been leaked and make up new content.

2. Continuing on this theme, IVANOV said that the audience to be targeted by such operations was the educated youth in America as the PA assessed that there was still a chance they could be persuaded to vote for Republican candidate Donald TRUMP as a protest against the Washington establishment (in the form of Democratic candidate Hillary CLINTON). The hope was that even if she won, as a result of this CLINTON in power would be bogged down in working for internal reconciliation in the US, rather than being able to focus on foreign policy which would damage Russia's interests. This also should give President PUTIN more room for manoeuvre in the run-up to Russia's own presidential election in 2018.

3. IVANOV reported that although the Kremlin had underestimated the strength of US media and liberal reaction to the DNC hack and TRUMP's links to Russia, PUTIN was generally satisfied with the progress of the anti-CLINTON operation to date. He recently had had a drink with PUTIN to mark this. In IVANOV's view, the US had tried to divide the Russian elite with sanctions but failed, whilst they, by contrast, had succeeded in splitting the US hawks inimical to Russia and the Washington elite more generally, half of whom had refused to endorse any presidential candidate as a result of Russian intervention.

4. Speaking separately, also in early August 2016, a Kremlin official involved in US relations commented on aspects of the Russian operation to date. Its goals had been threefold- asking sympathetic US actors how Moscow could help them; gathering relevant intelligence; and creating and disseminating compromising information ('kompromat'). This had involved the Kremlin supporting various US political figures, including funding indirectly their recent visits to Moscow. S/he named a delegation from Lyndon LAROUCHE; presidential candidate Jill STEIN of the Green Party; TRUMP foreign policy adviser

Carter PAGE; and former DIA Director Michael Flynn, in this regard and as successful in terms of perceived outcomes.

**10 August 2016**

COMPANY INTELLIGENCE REPORT 2016/102

RUSSIA/US PRESIDENTIAL ELECTION: REACTION IN TRUMP CAMP TO RECENT NEGATIVE PUBLICITY ABOUT
RUSSIAN INTERFERENCE AND LIKELY RESULTING TACTICS GOING FORWARD

Summary

- TRUMP campaign insider reports recent DNC e-mail leaks were aimed at switching SANDERS (protest)
  voters away from CLINTON and over to TRUMP

- Admits Republican campaign underestimated resulting negative reaction from US liberals, elite and
  media and forced to change course as result

- Need now to turn tables on CLINTON's use of PUTIN as bogeyman in election, although some
  resentment at Russian president's perceived attempt to undermine USG and system over and above
  swinging presidential election

Detail

1. Speaking in confidence on 9 August 2016, an ethnic Russian associate of Republican US presidential
   candidate Donald TRUMP discussed the reaction inside his camp, and revised tactics therein resulting
   from recent negative publicity concerning Moscow's clandestine involvement in the campaign.
   TRUMP's associate reported that the aim of leaking the DNC e-mails to WikiLeaks during the Democratic
   Convention had been to swing supporters of Bernie SANDERS away from Hillary CLINTON and across to
   TRUMP. These voters were perceived as activist and anti-status quo and anti-establishment and in that
   regard sharing many features with the TRUMP campaign, including a visceral dislike of Hillary CLINTON.
   This objective had been conceived and promoted, inter alia, by TRUMP's foreign policy adviser Carter
   PAGE who had discussed it directly with the ethnic Russian associate.

2. Continuing on this theme, the ethnic Russian associate of TRUMP assessed that the problem was that
   the TRUMP campaign had underestimated the strength of the negative reaction from liberals and
   especially the conservative elite to Russian interference. This was forcing a rethink and a likely change
   of tactics. The main objective in the short term was to check Democratic candidate Hillary CLINTON's
   successful exploitation of the PUTIN as bogeyman/Russian interference story to tarnish TRUMP and
   bolster her own (patriotic) credentials. The TRUMP campaign was focusing on tapping into support in
   the American television media to achieve this, as they reckoned this resource had been underused by
   them to date.

3. However, TRUMP's associate also admitted that there was a fair amount of anger and resentment
   within the Republican candidate's team at what was perceived by PUTIN as going beyond the objective
   of weakening CLINTON and bolstering TRUMP, by attempting to exploit the situation to undermine the
   US government and democratic system more generally. It was unclear at present how this aspect of
   the situation would play out in the weeks to come.

10 August 2016

17

COMPANY INTELLIGENCE REPORT 2016/136

RUSSIA/US PRESIDENTIAL ELECTION: FURTHER DETAILS OF TRUMP LAWYER
COHEN'S SECRET LIAISON WITH THE KREMLIN

Summary

- Kremlin insider reports TRUMP lawyer COHEN's secret meeting/s with Kremlin officials in
  August 2016 was/were held in Prague

- Russian parastatal organisation Rossotrudnichestvo used as cover for this liaison and premises
  in Czech capital may have been used for the meeting/s

- Pro-PUTIN leading Duma figure, KOSACHEV, reportedly involved as "plausibly deniable"
  facilitator and may have participated in the August meeting/s with COHEN

Detail

1. Speaking to a compatriot and friend on 19 October 2016, a Kremlin insider provided further
   details of reported clandestine meeting/s between Republican presidential candidate, Donald
   TRUMP's lawyer Michael COHEN and Kremlin representatives in August 2016. Although the
   communication between them had to be cryptic for security reasons, the Kremlin insider
   clearly indicated to his/her friend that the reported contact/s took place in Prague, Czech
   Republic.

2. Continuing on this theme, the Kremlin insider highlighted the importance of the Russian
   parastatal organisation, Rossotrudnichestvo, in this contact between TRUMP campaign
   representative/s and Kremlin officials. Rossotrudnichestvo was being used as cover for this
   relationship and its office in Prague may well have been used to host the COHEN/Russian
   Presidential Administration (PA) meeting/s. It was considered a "plausibly deniable" vehicle
   for this, whilst remaining entirely under Kremlin control.

3. The Kremlin insider went on to identify leading pro-PUTIN Duma figure, Konstantin
   KOSACHEV (Head of the Foreign Relations Committee) as an important figure in the TRUMP
   campaign-Kremlin liaison operation. KOSACHEV, also "plausibly deniable" being part of the
   Russian legislature rather than executive, had facilitated the contact in Prague and by
   implication, may have attended the meeting/s with COHEN there in August.

Company Comment

We reported previously, in our Company Intelligence Report 2016/135 of 19 October 2016 from the
same source, that COHEN met officials from the PA Legal Department clandestinely in an EU
country in August 2016. This was in order to clean up the mess left behind by western media
revelations of TRUMP ex-campaign manager MANAFORT's corrupt relationship with the former
pro-Russian YANUKOVYCH regime in Ukraine and TRUMP foreign policy advisor Carter
PAGE's secret meetings in Moscow with senior regime figures in July 2016. According to the
Kremlin advisor, these meeting/s were originally scheduled for COHEN in Moscow but shifted to

what was considered an operationally "soft" EU country when it was judged too compromising for him to travel to the Russian capital.

20 October 2016

COMPANY INTELLIGENCE REPORT 2016/105

## RUSSIA/UKRAINE: THE DEMISE OF TRUMP'S CAMPAIGN MANAGER PAUL MANAFORT

### Summary

- Ex-Ukrainian President YANUKOVYCH confides directly to PUTIN that he authorised kick-back payments to MANAFORT, as alleged in western media. Assures Russian President however there is no documentary evidence/trail

- PUTIN and Russian leadership remain worried however and sceptical that YANUKOVYCH has fully covered the traces of these payments to TRUMP's former campaign manager

- Close associate of TRUMP explains reasoning behind MANAFORT's recent resignation. Ukraine revelations played part but others wanted MANAFORT out for various reasons, especially LEWANDOWSKI who remains influential

### Detail

1. Speaking in late August 2016, in the immediate aftermath of Paul MANAFORT's resignation as campaign manager for US Republican presidential candidate Donald TRUMP, a well-placed Russian figure reported on a recent meeting between President PUTIN and ex-President YANUKOVYCH of Ukraine. This had been held in secret on 15 August near Volgograd, Russia and the western media revelations about MANAFORT and Ukraine had featured prominently on the agenda. YANUKOVYCH had confided in PUTIN that he did authorise and order substantial kick-back payments to MANAFORT as alleged but sought to reassure him that there was no documentary trail left behind which could provide clear evidence of this.

2. Given YANUKOVYCH's (unimpressive) record in covering up his own corrupt tracks in the past, PUTIN and others in the Russian leadership were sceptical about the ex-Ukrainian president's reassurances on this as relating to MANAFORT. They therefore still feared the scandal had legs, especially as MANAFORT had been commercially active in Ukraine right up to the time (in March 2016) when he joined TRUMP's campaign team. For them it therefore remained a point of potential political vulnerability and embarrassment.

20

3. Speaking separately, also in late August 2016, an American political figure associated with Donald TRUMP and his campaign outlined the reasons behind MANAFORT's recent demise. S/he said it was true that the Ukraine corruption revelations had played a part in this but also, several senior players close to TRUMP had wanted MANAFORT out, primarily to loosen his control on strategy and policy formulation. Of particular importance in this regard was MANAFORT's predecessor as campaign manager, Corey LEWANDOWSKI, who hated MANAFORT personally and remained close to TRUMP with whom he discussed the presidential campaign on a regular basis.

**22 August 2016**

21

COMPANY INTELLIGENCE REPORT 2016/111

## RUSSIA/US: KREMLIN FALLOUT FROM MEDIA EXPOSURE OF MOSCOW'S INTERFERENCE IN THE US PRESIDENTIAL CAMPAIGN

### Summary

- Kremlin orders senior staff to remain silent in media and private on allegations of Russian interference in US presidential campaign

- Senior figure however confirms gist of allegations and reports IVANOV sacked as Head of Administration on account of giving PUTIN poor advice on issue. VAINO selected as his replacement partly because he was not involved in pro-TRUMP, anti-CLINTON operation/s

- Russians do have further 'kompromat' on CLINTON (e-mails) and considering disseminating it after Duma (legislative elections) in late September. Presidential spokesman PESKOV continues to lead on this

- However, equally important is Kremlin objective to shift policy consensus favourably to Russia in US post-OBAMA whoever wins. Both presidential candidates' opposition to TPP and TTIP viewed as a result in this respect

- Senior Russian diplomat withdrawn from Washington embassy on account of potential exposure in US presidential election operation/s

### Detail

1. Speaking in confidence to a trusted compatriot in mid-September 2016, a senior member of the Russian Presidential Administration (PA) commented on the political fallout from recent western media revelations about Moscow's intervention, in favour of Donald TRUMP and against Hillary CLINTON, in the US presidential election. The PA official reported that the issue had become incredibly sensitive and that President PUTIN had issued direct orders that Kremlin and government insiders should not discuss it in public or even in private.

2. Despite this, the PA official confirmed, from direct knowledge, that the gist of the allegations was true. PUTIN had been receiving conflicting advice on interfering from three separate and expert groups. On one side had been the Russian ambassador to the US, Sergei KISLYAK, and the Ministry of Foreign Affairs, together with an independent and informal network run by presidential foreign policy advisor, Yuri USHAKOV

22

(KISLYAK's predecessor in Washington) who had urged caution and the potential negative impact on Russia from the operation/s. On the other side was former PA Head, Sergei IVANOV, backed by Russian Foreign Intelligence (SVR), who had advised PUTIN that the pro-TRUMP, anti-CLINTON operation/s would be both effective and plausibly deniable with little blowback. The first group/s had been proven right and this had been the catalyst in PUTIN's decision to sack IVANOV (unexpectedly) as PA Head in August. His successor, Anton VAINO, had been selected for the job partly because he had not been involved in the US presidential election operation/s.

3. Continuing on this theme, the senior PA official said the situation now was that the Kremlin had further 'kompromat' on candidate CLINTON and had been considering releasing this via "plausibly deniable" channels after the Duma (legislative) elections were out of the way in mid-September. There was however a growing train of thought and associated lobby, arguing that the Russians could still make candidate CLINTON look "weak and stupid" by provoking her into railing against PUTIN and Russia without the need to release more of her e-mails. Presidential Spokesman, Dmitriy PESKOV remained a key figure in the operation, although any final decision on dissemination of further material would be taken by PUTIN himself.

4. The senior PA official also reported that a growing element in Moscow's intervention in the US presidential election campaign was the objective of shifting the US political consensus in Russia's perceived interests regardless of who won. It basically comprised of pushing candidate CLINTON away from President OBAMA's policies. The best example of this was that both candidates now openly opposed the draft trade agreements, TPP and TTIP, which were assessed by Moscow as detrimental to Russian interests. Other issues where the Kremlin was looking to shift the US policy consensus were Ukraine and Syria. Overall however, the presidential election was considered still to be too close to call.

5. Finally, speaking separately to the same compatriot, a senior Russian MFA official reported that as a prophylactic measure, a leading Russian diplomat, Mikhail KULAGIN, had been withdrawn from Washington at short notice because Moscow feared his heavy involvement in the US presidential election operation, including the so-called veterans' pensions ruse (reported previously), would be exposed in the media there. His replacement, Andrei BONDAREV however was clean in this regard.

23

**Company Comment**

The substance of what was reported by the senior Russian PA official in paras 1 and 2 above, including the reasons for Sergei IVANOV's dismissal, was corroborated independently by a former top level Russian intelligence officer and Kremlin insider, also in mid-September.

**14 September 2016**

24

COMPANY INTELLIGENCE REPORT 2016/112

RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION

Summary

- Top level Russian official confirms current closeness of Alpha Group-PUTIN relationship. Significant favours continue to be done in both directions and FRIDMAN and AVEN still giving informal advice to PUTIN, especially on the US

- Key intermediary in PUTIN-Alpha relationship identified as Oleg GOVORUN, currently Head of a Presidential Administration department but throughout the 1990s, the Alpha executive who delivered illicit cash directly to PUTIN

- PUTIN personally unbothered about Alpha's current lack of investment in Russia but under pressure from colleagues over this and able to exploit it as lever over Alpha interlocutors

Detail

1. Speaking to a trusted compatriot in mid-September 2016, a top level Russian government official commented on the history and current state of relations between President PUTIN and the Alpha Group of businesses led by oligarchs Mikhail FRIDMAN, Petr AVEN and German KHAN. The Russian government figure reported that although they had had their ups and downs, the leading figures in Alpha currently were on very good terms with PUTIN. Significant favours continued to be done in both directions, primarily political ones for PUTIN and business/legal ones for Alpha. Also, FRIDMAN and AVEN continued to give informal advice to PUTIN on foreign policy, and especially about the US where he distrusted advice being given to him by officials.

2. Although FRIDMAN recently had met directly with PUTIN in Russia, much of the dialogue and business between them was mediated through a senior Presidential Administration official, Oleg GOVORUN, who currently headed the department therein responsible for Social Co-operation With the CIS. GOVORUN was trusted by PUTIN and recently had accompanied him to Uzbekistan to pay respects at the tomb of former president KARIMOV. However according to the top level Russian government official, during the 1990s GOVORUN had been Head of Government Relations at Alpha Group and in reality, the "driver" and "bag carrier"

25

used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St Petersburg. Given that and the continuing sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN.

3.  The top level Russian government official described the PUTIN-Alpha relationship as both carrot and stick. Alpha held 'kompromat' on PUTIN and his corrupt business activities from the 1990s whilst although not personally overly bothered by Alpha's failure to reinvest the proceeds of its TNK oil company sale into the Russian economy since, the Russian president was able to use pressure on this count from senior Kremlin colleagues as a lever on FRIDMAN and AVEN to make them do his political bidding.

**14 September 2016**

26

COMPANY INTELLIGENCE REPORT 2016/113

**RUSSIA/US PRESIDENTIAL ELECTION- REPUBLICAN CANDIDATE TRUMP'S PRIOR ACTIVITIES IN ST PETERSBURG**

**Summary**

- Two knowledgeable St Petersburg sources claim Republican candidate TRUMP has paid bribes and engaged in sexual activities there but key witnesses silenced and evidence hard to obtain

- Both believe Azeri business associate of TRUMP, Araz AGALAROV will know the details

**Detail**

1. Speaking to a trusted compatriot in September 2016, two well-placed sources based in St Petersburg, one in the political/business elite and the other involved in the local services and tourist industry, commented on Republican US presidential candidate Donald TRUMP's prior activities in the city.

2. Both knew TRUMP had visited St Petersburg on several occasions in the past and had been interested in doing business deals there involving real estate. The local business/political elite figure reported that TRUMP had paid bribes there to further his interests but very discreetly and only through affiliated companies, making it very hard to prove. The local services industry source reported that TRUMP had participated in sex parties in the city too, but that all direct witnesses to this recently had been "silenced" i.e. bribed or coerced to disappear.

3. The two St Petersburg figures cited believed an Azeri business figure, Araz AGALAROV (with offices in Baku and London) had been closely involved with TRUMP in Russia and would know most of the details of what the Republican presidential candidate had got up to there.

14 September 2016

27

COMPANY INTELLIGENCE REPORT 2016/130

RUSSIA: KREMLIN ASSESSMENT OF TRUMP AND RUSSIAN INTERFERENCE IN US PRESIDENTIAL ELECTION

Summary

- Buyer's remorse sets in with Kremlin over TRUMP support operation in US presidential election. Russian leadership disappointed that leaked e-mails on CLINTON have not had greater impact in campaign

- Russians have injected further anti-CLINTON material into the 'plausibly deniable' leaks pipeline which will continue to surface, but best material already in public domain

- PUTIN angry with senior officials who "overpromised" on TRUMP and further heads likely to roll as result. Foreign Minister LAVROV may be next

- TRUMP supported by Kremlin because seen as divisive, anti-establishment candidate who would shake up current international status quo in Russia's favor. Lead on TRUMP operation moved from Foreign Ministry to FSB and then to presidential administration where it now sits

Detail

1. Speaking separately in confidence to a trusted compatriot in early October 2016, a senior Russian leadership figure and a Foreign Ministry official reported on recent developments concerning the Kremlin's operation to support Republican candidate Donald TRUMP in the US presidential election. The senior leadership figure said that a degree of buyer's remorse was setting in among Russian leaders concerning TRUMP. PUTIN and his colleagues were surprised and disappointed that leaks of Democratic candidate, Hillary CLINTON's hacked e-mails had not had greater impact on the campaign.

2. Continuing on this theme, the senior leadership figure commented that a stream of further hacked CLINTON material already had been injected by the Kremlin into compliant western media outlets like Wikileaks, which remained at least "plausibly deniable", so the stream of these would continue through October and up to the election. However s/he understood that the best material the Russians had already was out and there were no real game-changers to come.

3. The Russian Foreign Ministry official, who had direct access to the TRUMP support operation, reported that PUTIN was angry at his subordinate's "over-promising" on the Republican presidential candidate, both in terms of his chances and reliability and being able to cover and/or contain the US backlash over Kremlin interference. More heads therefore were likely to roll, with the MFA the easiest target. Ironically, despite his consistent urging of caution on the issue, Foreign Minister LAVROV could be the next one to go.

4. Asked to explain why PUTIN and the Kremlin had launched such an aggressive TRUMP support operation in the first place, the MFA official said that Russia needed to upset the liberal international status quo, including on Ukraine-related sanctions, which was seriously

disadvantaging the country. TRUMP was viewed as divisive in disrupting the whole US political system; anti-Establishment; and a pragmatist with whom they could do business. As the TRUMP support operation had gained momentum, control of it had passed from the MFA to the FSB and then into the presidential administration where it remained, a reflection of its growing significance over time. There was still a view in the Kremlin that TRUMP would continue as a (divisive) political force even if he lost the presidency and may run for and be elected to another public office.

12 October 2016

29

COMPANY INTELLIGENCE REPORT 2016/134

RUSSIA/US PRESIDENTIAL ELECTION: FURTHER DETAILS OF KREMLIN LIAISON WITH
TRUMP CAMPAIGN

### Summary

- Close associate of SECHIN confirms his secret meeting in Moscow with Carter PAGE in July

- Substance included offer of large stake in Rosneft in return for lifting sanctions on Russia. PAGE
  confirms this is TRUMP's intention

- SECHIN continued to think TRUMP could win presidency up to 17 October. Now looking to
  reorientate his engagement with the US

- Kremlin insider highlights importance of TRUMP's lawyer, Michael COHEN in covert
  relationship with Russia. COHEN's wife is of Russian descent and her father a leading property
  developer in Moscow

### Detail

1.  Speaking to a trusted compatriot in mid October 2016, a close associate of Rosneft President
    and PUTIN ally Igor' SECHIN elaborated on the reported secret meeting between the latter
    and Carter PAGE, of US Republican presidential candidate's foreign policy team, in Moscow in
    July 2016. The secret meeting had been confirmed to him/her by a senior member of SECHIN's
    staff, in addition to by the Rosneft President himself. It took place on either 7 or 8 July, the same
    day or the one after Carter PAGE made a public speech to the Higher Economic School in
    Moscow.

2.  In terms of the substance of their discussion, SECHIN's associate said that the Rosneft
    President was so keen to lift personal and corporate western sanctions imposed on the
    company, that he offered PAGE/TRUMP's associates the brokerage of up to a 19 per cent
    (privatised) stake in Rosneft in return. PAGE had expressed interest and confirmed that were
    TRUMP elected US president, then sanctions on Russia would be lifted.

3.  According to SECHIN's close associate, the Rosneft President had continued to believe that
    TRUMP could win the US presidency right up to 17 October, when he assessed this was no
    longer possible. SECHIN was keen to re-adapt accordingly and put feelers out to other
    business and political contacts in the US instead.

4.  Speaking separately to the same compatriot in mid-October 2016, a Kremlin insider with direct
    access to the leadership confirmed that a key role in the secret TRUMP campaign/Kremlin
    relationship was being played by the Republican candidate's personal lawyer Michael
    COHEN. █████████████████

30

**Source Comment**

5.  SECHIN's associate opined that although PAGE had not stated it explicitly to SECHIN, he had clearly implied that in terms of his comment on TRUMP's intention to lift Russian sanctions if elected president, he was speaking with the Republican candidate's authority.

**Company Comment**

6.

18 October 2016

31

COMPANY INTELLIGENCE REPORT 2016/135

RUSSIA/US PRESIDENTIAL ELECTION: THE IMPORTANT ROLE OF TRUMP
LAWYER, COHEN IN CAMPAIGN'S SECRET LIAISON WITH THE KREMLIN

## Summary

- Kremlin insider outlines important role played by TRUMP's lawyer
  COHEN in secret liaison with Russian leadership

- COHEN engaged with Russians in trying to cover up scandal of
  MANAFORT and exposure of PAGE and meets Kremlin officials secretly in
  the EU in August in pursuit of this goal

- These secret contacts continue but are now farmed out to trusted agents
  in Kremlin-linked institutes so as to remain "plausibly deniable" for
  Russian regime

- Further confirmation that sacking of IVANOV and appointments of VAINO
  and KIRIYENKO linked to need to cover up Kremlin's TRUMP support
  operation

## Detail

1. Speaking in confidence to a longstanding compatriot friend in mid-
   October 2016, a Kremlin insider highlighted the importance of
   Republican presidential candidate Donald TRUMP's lawyer, Michael
   COHEN, in the ongoing secret liaison relationship between the New York
   tycoon's campaign and the Russian leadership. COHEN's role had grown
   following the departure of Paul MANNAFORT as TRUMP's campaign
   manager in August 2016. Prior to that MANNAFORT had led for the
   TRUMP side.

2. According to the Kremlin insider, COHEN now was heavily engaged in a
   cover up and damage limitation operation in the attempt to prevent the
   full details of TRUMP's relationship with Russia being exposed. In
   pursuit of this aim, COHEN had met secretly with several Russian
   Presidential Administration (PA) Legal Department officials in an EU
   country in August 2016. The immediate issues had been to contain
   further scandals involving MANNAFORT's commercial and political role
   in Russia/Ukraine and to limit the damage arising from exposure of
   former TRUMP foreign policy advisor, Carter PAGE's secret meetings
   with Russian leadership figures in Moscow the previous month. The

overall objective had been to "to sweep it all under the carpet and make
sure no connections could be fully established or proven"

3.  Things had become even "hotter" since August on the TRUMP-Russia
    track. According to the Kremlin insider, this had meant that direct contact
    between the TRUMP team and Russia had been farmed out by the
    Kremlin to trusted agents of influence working in pro-government policy
    institutes like that of Law and Comparative Jurisprudence. COHEN
    however continued to lead for the TRUMP team.

4.  Referring back to the (surprise) sacking of Sergei IVANOV as Head of PA
    in August 2016, his replacement by Anton VAINO and the appointment of
    former Russian premier Sergei KIRIYENKO to another senior position in
    the PA, the Kremlin insider repeated that this had been directly
    connected to the TRUMP support operation and the need to cover up now
    that it was being exposed by the USG and in the western media.

**Company Comment**

The Kremlin insider was unsure of the identities of the PA officials with whom
COHEN met secretly in August, or the exact date/s and locations of the
meeting/s. There were significant internal security barriers being erected in the
PA as the TRUMP issue became more controversial and damaging. However s/he
continued to try to obtain these.

**19 October 2016**

33

COMPANY INTELLIGENCE REPORT 2016/166

**US/RUSSIA: FURTHER DETAILS OF SECRET DIALOGUE BETWEEN TRUMP CAMPAIGN TEAM, KREMLIN AND ASSOCIATED HACKERS IN PRAGUE**

**Summary**

- TRUMP's representative COHEN accompanied to Prague in August/September 2016 by 3 colleagues for secret discussions with Kremlin representatives and associated operators/hackers

- Agenda included how to process deniable cash payments to operatives; contingency plans for covering up operations; and action in event of a CLINTON election victory

- Some further details of Russian representatives/operatives involved; Romanian hackers employed; and use of Bulgaria as bolt hole to "lie low"

- Anti-CLINTON hackers and other operatives paid by both TRUMP team and Kremlin, but with ultimate loyalty to Head of PA, IVANOV and his successor/s

**Detail**

1. We reported previously (2016/135 and /136) on secret meeting/s held in Prague, Czech Republic in August 2016 between then Republican presidential candidate Donald TRUMP's representative, Michael COHEN and his interlocutors from the Kremlin working under cover of Russian 'NGO' Rossotrudnichestvo.

2. ███████████████████████████████████ provided further details of these meeting/s and associated anti-CLINTON/Democratic Party operations. COHEN had been accompanied to Prague by 3 colleagues and the timing of the visit was either in the last week of August or the first week of September. One of their main Russian interlocutors was Oleg SOLODUKHIN operating under Rossotrudnichestvo cover. According to ███████████████, the agenda comprised questions on how deniable cash payments were to be made to hackers who had worked in Europe under Kremlin direction against the CLINTON campaign and various contingencies for covering up these operations and Moscow's secret liaison with the TRUMP team more generally.

34

3.  ████████ reported that over the period March-September 2016 a company called ████████ and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership. Entities linked to one ████████ were involved and he and another hacking expert, both recruited under duress by the FSB, ████ ████████ were significant players in this operation. In Prague, COHEN agreed contingency plans for various scenarios to protect the operation, but in particular what was to be done in the event that Hillary CLINTON won the presidency. It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and other operators were stood down/able to go effectively to ground to cover their traces. (We reported earlier that the involvement of political operatives Paul MANAFORT and Carter PAGE in the secret TRUMP-Kremlin liaison had been exposed in the media in the run-up to Prague and that damage limitation of these also was discussed by COHEN with the Kremlin representatives).

4.  In terms of practical measures to be taken, it was agreed by the two sides in Prague to stand down various "Romanian hackers" (presumably based in their homeland or neighbouring eastern Europe) and that other operatives should head for a bolt-hole in Plovdiv, Bulgaria where they should "lay low". On payments, IVANOV's associate said that the operatives involved had been paid by both TRUMP's team and the Kremlin, though their orders and ultimate loyalty lay with IVANOV, as Head of the PA and thus ultimately responsible for the operation, and his designated successor/s after he was dismissed by president PUTIN in connection with the anti-CLINTON operation in mid August.

**13 December 2016**