# EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

| PRESENT: | HON. FRANCIS A. KAHN, III | PART | IAS MOTION 32 |
|---|---|---|---|
| | *Justice* | | |

-----------------------------------------------------------------X

MIKHAIL FRIDMAN, PETR AVEN, GERMAN KHAN,

Plaintiff,

- v -

BUZZFEED, INC., BEN SMITH, KEN BENSINGER, MIRIAM ELDER, MARK SCHOOFS,

Defendant.

-----------------------------------------------------------------X

INDEX NO.            154895/2017

MOTION DATE

MOTION SEQ. NO.       004

DECISION + ORDER ON MOTION

The following e-filed documents, listed by NYSCEF document number (Motion 004) 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192, 193, 194, 195, 196, 199, 200, 202, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 221, 222, 223, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236, 237, 241, 242, 243, 244, 245, 247, 251, 254, 257, 258, 291, 292

were read on this motion to/for                SUMMARY JUDGMENT                .

Upon the foregoing documents and oral argument taken on the record on August 12, 2020, the motion and cross motion are determined as follows:

This action involves a claim for defamation against defendant BuzzFeed, Inc. [Buzzfeed], a Delaware corporation that operates Buzzfeed News, an international digital news service, and four individual defendants. Plaintiffs Mikhail Fridman ("Fridman"), Petr Aven ("Aven"), and German Khan (Khan), are nationals of the Russian Federation ("Russia") and among the Russian "financial elite" which are sometimes referred to as "oligarchs".

The alleged defamation is in a January 10, 2017 article ("the Article") that BuzzFeed published on Buzzfeed News, with the headline, "These Reports Allege that Trump has Deep Ties to Russia" (Bolger affirmation, exhibits 34 and 35). The Article publishes verbatim all 17 reports ("the Reports") of the controversial Steele Dossier ("the Dossier"), which it made public for the first time. The Article includes an express disclaimer, stating that the allegations in the Dossier were "unverified and potentially unverifiable," and that the Reports contain errors (Bolger affirmation, exhibits 34 and 35). The Article includes hyperlinks to two additional articles, a January 10, 2017 CNN article ("the CNN Article") that is entitled "Intel Chiefs Presented Trump with Claims of Russian Efforts to Compromise Him," and an article in Mother Jones, entitled "A Veteran Spy has given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump ("Trump")."

Plaintiffs allege that they were defamed in their business reputations by statements in Report No. 112 (Report 112) of the Dossier in two respects, first that they have a corrupt relationship with President Vladimir Putin ("Putin") grounded on the delivery of large amounts

154895/2017 FRIDMAN, MIKHAIL vs. BUZZFEED, INC.
Motion No. 004

Page 1 of 11

of "illicit cash" to Putin in the 1990s, and the continuing exchange of commercial and political favors, and, second, that the clear implication of the statements in the Dossier is that plaintiffs, and nonparty Alfa Bank, were involved in the Russian interference in the 2016 United States presidential election ("the Election"). Plaintiffs do not allege that they were defamed by any statement in the Article, or in either of the hyperlinked articles. Plaintiffs do not argue that the Dossier is published other than verbatim.

## Procedural Posture

Plaintiffs commenced this action with the filing of a summons and complaint on May 26, 2017. Defendants answered and Plaintiffs subsequently moved pursuant to CPLR §3211[b] to dismiss the first through fourth affirmative defenses asserted by Defendants which were grounded in the fair report privilege under Civil Rights Law §74, a claimed neutral report privilege, a claimed privilege under the United States and New York State Constitutions and that Plaintiffs are public figures. By order dated May 4, 2018, Justice Arlene Bluth granted the motion only to the extent of dismissing the second and third affirmative defenses. Plaintiffs appealed the denial of their motion to dismiss the affirmative defense based upon Civil Rights Law §74. The Appellate Division, First Department denied the appeal (*see Fridman v BuzzFeed, Inc.*, 172 AD3d 441, 441–42 [1st Dept 2019]). Now, Defendants move for summary judgment, pursuant to CPLR §3212, dismissing the complaint. While defendants do not limit the grounds for their motion to the fair and true privilege ("the Privilege"), as codified in Civil Rights Law § 74, the parties address their arguments to the availability of the Privilege. Plaintiffs cross-move for summary judgment dismissing the first affirmative defense, which asserts the Privilege.

## The Plaintiffs

In 1990, Fridman and Aven co-founded nonparty Alfa Bank, one of the largest private banks in Russia. Kahn joined the bank and then became president in 1994. Alfa Bank is part of the Alfa Group, a conglomerate of insurance, retail, utilities, and other businesses. Plaintiffs are beneficial owners of Alfa Group. Plaintiffs' rise to Russian economic suzerainty is chronicled in *OAO Alfa Bank v Center for Pub. Integrity* (387 F Supp2d 20, 27 [DDC 2005]; see also Browder, "Red Notice: a True Story of High Finance, Murder, and One Man's Fight for Justice, Simon & Schuster, 2015; https://www.goodreads.com/book/show/22609522-red-notice ; Belton, "Putin's People, How the KGB Took Back Russia and Then Took On the West," Farar, Strauss & Giroux, 2020; https://www.kirkusreviews.com/book-reviews/catherine-belton/putins-people/).

## Background

This action arises in the wake of the massive Russian program intended to help Trump during the Election campaign that used social media and provided purportedly damaging information on Hilary Clinton to staff members of the Trump campaign. On July 31, 2016, the Federal Bureau of Investigation ("FBI") opened a counter-intelligence investigation called Operation Crossfire, after receiving information about possible Russian efforts to recruit Carter Page ("Page"), who was listed as an energy policy advisor of the Trump Campaign. Page was never indicted, and never played a significant role in the campaign.

154895/2017 FRIDMAN, MIKHAIL vs. BUZZFEED, INC.                            Page 2 of 11
Motion No. 004

2 of 11

Operation Crossfire expanded and the FBI investigated more Trump staff members and made numerous applications for initial and renewal surveillance warrants to the Federal Intelligence Surveillance Court ("FISC"), in which the Dossier, was part of some of the applications. One such application occurred on October 21, 2016, when the Department of Justice ("DOJ") and FBI sought and received a probable cause order for electronic surveillance on Page from the FISC.

Operation Crossfire Hurricane led ultimately to the appointment on May 17, 2017, by Rod Rosenstein, the Acting Attorney General, of Robert S. Mueller III ("Mueller") as special counsel to investigate the claims involving alleged Russian collusion and interference, as well as contacts with the Trump campaign. Mueller was authorized also to investigate other matters that "may arise directly from the investigation" (*id.*, exhibit 51). The Mueller Report found that the Russian government interfered in the 2016 presidential election in sweeping and systematic fashion, but ultimately found no conclusive evidence of conspiracy or coordination between the Trump campaign and Russian operatives. The bulk of volume II of the Mueller Report discusses possible criminality by Trump and his agents for obstruction of justice.

On December 6, 2016, President Obama ordered an inter-agency assessment of Russian interference in the Election, which included the Central Intelligence Agency ("CIA"), FBI, and National Security Agency ("NSA"). As the extent of the Russian social media interference campaign became clear, President Obama issued an executive order, effective December 31, 2016, that imposed economic sanctions on Russia, expelled Russian diplomats, and closed two Russian facilities. Thereafter, the federal intelligence agencies continued to monitor the communications between Russian nationals and Trump campaign staff members, including soon-to-be, albeit briefly, National Security Advisor General Michael Flynn and former campaign manager Paul Mannafort, both of whom were convicted, although later pardoned by Trump, of lying to federal investigators about whether they had discussed lifting the sanctions with their Russian interlocuters. Also convicted and later pardoned was Khan's son-in-law, Alex van der Zwaan, then a lawyer in the London office of a large international law firm.

As the Mueller Report found:

"Incoming National Security Advisor Michael Flynn called Russia Ambassador Sergey Kislyak and asked Russia not to escalate the situation in response to the sanctions. The following day, Putin announced that Russia would not take retaliatory measures in response to the sanctions at that time. Hours later, President-Elect Trump tweeted, "Great move on delay (by V. Putin)." The next day, on December 31, 2016, Kislyak called Flynn and told him the request had been received at the highest levels and Russia had chosen not to retaliate as a result of Flynn's request"

(Mueller Report, p. 7).

Aven, in response to a subpoena, spoke with Mueller's investigators, stating that:

154895/2017 FRIDMAN, MIKHAIL vs. BUZZFEED, INC.
Motion No. 004
Page 3 of 11

3 of 11

> "he met on a quarterly basis with Putin, including in the fourth quarter (Q4) of 2016, shortly after the U.S. presidential election. Aven said that he took these meetings seriously and understood that any suggestions or critiques that Putin made during these meetings were implicit directives, and that there would be consequences for Aven if he did not follow through"

(Mueller Report, 978-979; *see* Blake, Heidi, "From Russia with Blood," Little, Brown and Company, 2020; https://apnews.com/article/d8a624fce76f865d6abd1b319ef69b46).

    At that December 2016 meeting with Putin, according to Aven's statements to the Mueller investigators, the main topic of the meeting was the same as in Aven's previous meeting alone with Putin, the prospect of upcoming sanctions.  Shortly after the meeting with Putin, Aven contacted an associate, Richard Burt ("Burt") who had been an ambassador, and asked him to set up a communications channel to the Trump transition team.  Burt contacted Dmitri Simes (Simes), president of the think tank the Center for the National Interest ("CNI"), who knew Jared Kushner.  Simes stated to investigators:

> "that he declined and stated to Burt that setting up such a channel was not a good idea in light of the media attention surrounding Russian influence in the U.S. presidential election.  According to Simes, he understood that Burt was seeking a secret channel, and Simes did not want CNI to be seen as an intermediary between the Russian government and the incoming Administration.  Based on what Simes had read in the media, he stated that he already had concerns that Trump's business connections could be exploited by Russia, and Simes said that he did not want CNI to have any involvement or apparent involvement"

(Mueller Report, pp 78-79).

    Simes wrote further:

> "Through a trusted third party, I have reached out to the very influential person I mentioned in Luxembourg concerning [the channel]. There is an interest and an understanding for the need to establish such a channel. But the individual emphasized that at this moment, with so much intense interest in the Congress and the media over the question of cyber-hacking (and who ordered what), [the channel] was too explosive to discuss. The individual agreed to discuss it after the new year. I trust the individual's instincts on this"

(*id.*, at 163).

    The allegations in Report 112 concerning plaintiffs' relationship, past and present, with Putin provide background and context to the central thrust of the Dossier involving Russian interference in the Election, thus connecting the allegedly defamatory statements in Report 112 to the official proceedings on which the Article reports.

154895/2017 FRIDMAN, MIKHAIL vs. BUZZFEED, INC.
Motion No. 004

Page 4 of 11

4 of 11

In sum, the Mueller investigation established that Russian operatives had developed multiple links between Trump Campaign officials and Russian nationals with governmental ties who offered assistance to the Trump campaign. Ultimately, the Mueller Report did not establish that the Campaign coordinated or conspired with Russian operatives, but the Report did find massive interference in the Election through social media, and furnishing hacked information relating to Hilary Clinton.

While the Mueller Report, and the closed door Congressional hearings occurred after the publication of the Article, and thus cannot qualify as proceedings reported on by the Article, they provide a strong evidentiary foundation for assessing whether the requirements for invoking the Privilege have been met.

## The Dossier

The Dossier is a loose compilation of reports of raw intelligence, written at different times over a six-month period, in 2016, as opposition research for political campaigns, that was initially focused on Trump's business dealings in Russia before he became the Republican nominee, but expanded to include Russian efforts to cultivate Trump over the years, and then Russian interference in the Election.

Report No. 80, dated June 20, 2016, captioned, "US Presidential Election: Republican Candidate Donald Trump's Activities in Russia," (Bolger affirmation, exhibit 1) describes an initiative that Russian President Vladimir Putin ("Putin") allegedly began five years earlier, that he personally "both supported and directed" to cultivate, support and assist Trump by offering him lucrative real estate deals and feeding him information on Hilary Clinton during the presidential Election campaign. The Report states that the Russian authorities had "obtained enough embarrassing material on [Trump] to be able to blackmail him if they so wished." The alleged embarrassing material involves an alleged incident in a hotel in St. Petersburg in 2013, that Trump denies.

The Dossier has spawned litigation in several other forums. In Florida, in an action alleging defamation by a different Russian plaintiff over Report No. 166, the federal court succinctly stated the genesis of the Dossier:

> "In the fall of 2015, Fusion GPS ("Fusion"), a private research firm headed by Glenn Simpson, was retained—first by a Republican and later by a law firm working for the Democratic National Committee—to conduct research on Donald Trump [Trump]. Fusion retained Orbis Business Intelligence Limited ("Orbis") to investigate business ties between Trump and Russian interests. Orbis was founded by Christopher Steele [Steele], who worked for the [British] Foreign and Commonwealth Office from 1987 until 2009"

(*Gubarev v BuzzFeed, Inc.*, 340 F Supp3d 1304, 1308–1309 [SD Fla 2018][citations to record omitted]).

154895/2017 FRIDMAN, MIKHAIL vs. BUZZFEED, INC.                              Page 5 of 11
Motion No. 004

5 of 11

## The Alleged Defamation

The essence of the alleged defamation is that plaintiffs are engaged in an improper relationship with Putin, grounded on payments of large amounts of illicit cash to Putin from Alfa Bank and plaintiffs Fridman and Aven in the 1990s, and Putin's alleged leverage over plaintiffs based on his ability to compel plaintiffs to repatriate the multi-billion dollars in profits that plaintiffs and Alfa Bank realized on the sale of their interest in TNK Oil Co., a formerly state-owned petroleum business in which plaintiffs and Alfa Bank purchased substantial interests in the 1990s at a large discount to market value, and later increased their holdings in similar fashion.

The only allegedly defamatory statements cited by plaintiffs are in Report No. 112 (Report 112), dated September 10, 2016, and captioned "Russia/US Presidential Election: Kremlin-Alpha [sic] Group Co-operation." Plaintiffs do not allege that they were defamed by any statements in the Article or the two articles that are hyperlinked to the Article, other than the headline of Report 112, there is no other specific mention of involvement by either Alfa Bank or plaintiffs in connection with the Election in any of the Reports or in the text of Report 112.

Report 112 states that, in the 1990s, Alfa Bank, Fridman and Aven delivered large amounts of "illicit cash," through a middleman, to Putin, when he was Deputy Mayor of St. Petersburg and a senior Russian intelligence officer. It states further:

> "although they have had their ups and downs, the leading figures in Alpha [sic] currently are on very good terms with PUTIN. Significant favors continued to be done in both directions, primarily political ones for PUTIN and business/legal ones for Alpha [sic]. Also, FRIDMAN and AVEN continued to give informal advice to PUTIN on foreign policy, and especially about the US where he distrusted advice being given him by officials"

(*id.*).

The third paragraph of the Detail section characterizes "the PUTIN-Alpha relationship as both a carrot and stick," asserting that:

> "Alpha [sic] held 'kompromat' on PUTIN and his corrupt business activities from the 1990s whilst although not personally overly bothered by Alpha's failure to reinvest the proceeds of its TNK oil company sale into the Russian economy since, the Russian president was able to use pressure on this count from senior Kremlin colleagues as a lever on FRIDMAN and AVEN to make them do his political bidding"

(*id.*).

In Russian intelligence parlance, kompromat means information that can be used to compromise or blackmail politicians or prominent figures and is a modus operandi of Russian intelligence work. "Fridman has acknowledged . . . that the 'rules of business' in Russia 'are

154895/2017 FRIDMAN, MIKHAIL vs. BUZZFEED, INC.
Motion No. 004

Page 6 of 11

6 of 11

quite different to western standards . . . To say one can be completely clean and transparent is not realistic.'" (*OAO Alfa Bank*, 387 F Supp2d at 29).

Plaintiffs also allege that, although there is no specific allegation in the Dossier as to "cooperation" between "the Kremlin" and defendants or Alfa Group relating to the Election, they contend that they

> "are drawn, under any reasonable reader's understanding ... by clear and defamatory implication, [into] the purported Kremlin campaign to interfere in the recent U.S. election"

(Complaint, ¶ 18).

## The Summary Judgment Standard

"[T]he proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact" (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986][internal citations omitted]). "Once this showing has been made, however, the burden shifts to the party opposing the motion for summary judgment to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial of the action" (*id.*). "'[M]ere conclusions, expressions of hope or unsubstantiated allegations or assertions are insufficient' for this purpose" (*Gilbert Frank Corp. v Federal Ins. Co.*, 70 NY2d 966, 967 [1988][citation omitted]). "'[A]verments merely stating conclusions, of fact or of law, are insufficient' to 'defeat summary judgment'" (*Banco Popular N. Am. v Victory Taxi Mgt.*, 1 NY3d 381, 383 [2004][citations omitted]).

## Applicable Law of Defamation

Defamation is an injury to reputation. The elements of a cause of action for defamation are the publishing of a false statement to a third party; without authorization or privilege; and special harm or defamation per se (*see Dillon v City of New York*, 261 AD2d 34 [1st Dept. 1999]). The false statement must expose the plaintiff to "public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society" (*Stepanov v Dow Jones & Co., Inc.*, 120 AD3d 28, 34 [1st Dept 2014] [internal quotation marks and citation omitted]). Where the defamation is in the plaintiff's trade or business reputation, no showing of special damages is required (*see Herlihy v Metropolitan Museum of Art*, 214 AD2d 250, 261 [1st Dept 1995]).

Defamation by implication requires "an especially rigorous showing," as the publication "must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference" (*Rappaport v VV Publ. Corp.*, 163 Misc 2d 1, 5 [Sup Ct NY County 1994], *affd* 223 AD2d 515 [1st Dept 1996][internal quotation marks and citation omitted]).

154895/2017 FRIDMAN, MIKHAIL vs. BUZZFEED, INC.
Motion No. 004
Page 7 of 11

7 of 11

### The Privilege

Civil Rights Law §74 provides, as pertinent:

"A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published"

(id.).

The Privilege is liberally construed to promote the public interest by encouraging the dissemination of information. It provides "broad protection to news accounts" of official proceedings, including not only judicial and legislative proceedings, but also protects classified proceedings and publications of fair and true reports of "any action taken by any officers or agency of the government of the United States, or of any State or of any of its subdivisions" officially empowered to do so [citation omitted]" (*Freeze Right Refrigeration & AC Servs. v City of New York*, 101 AD2d 175, 182 [1st Dept 1984]; *see also Holy Spirit Assn. for Unification of World Christianity v New York Times Co.*, 49 NY2d 63, 67 [1979]).

To be protected under the Privilege, the report must meet three conditions. First, the published report must be of an "official proceeding," as defined above, and second, the article must be fair and true, meaning that it is "substantially accurate" (*see Holy Spirit Assn.*, 49 NY2d at 67). Finally, it must be clear to an average reader that the Article is reporting on a proceeding, as that term is defined. "If the context in which the statements are made make it impossible for the ordinary viewer [listener or reader] to determine whether defendant was reporting on a proceeding, the absolute privilege does not apply" (*see Cholowsky v Civiletti*, 69 AD3d 110, 114-15 [2d Dept 2009] [internal quotation marks and citations omitted]).

### The Publication of the Article is Privileged

Defendants have met their burden of presenting sufficient evidence in admissible form to establish their prima facie entitlement to judgment as a matter of law, and plaintiffs have failed to demonstrate the existence of a factual question.

Plaintiffs' contentions that the allegedly defamatory statements in Report 112 are extraneous, and that Report 112 was not in the possession of the security agencies or considered for any official action are insufficient to raise a factual issue on any of the requirements for invoking the Privilege.

It would undermine the Privilege if a news organization were required to

"tie every specific allegation in the report to a specific instance of official action. In return for frequent and timely reports on governmental activity, defamation law has traditionally stopped short of imposing extensive investigatory requirements on a news organization reporting on a governmental activity or document"

154895/2017 FRIDMAN, MIKHAIL vs. BUZZFEED, INC.
Motion No. 004
Page 8 of 11

8 of 11

(*Gubarev v BuzzFeed, Inc.*, 340 F Supp 3d 1304, 1314 [SD Fla 2018 [internal quotation marks, citations, and parentheses omitted]).

The Florida federal court in Gubarev, stated its reasoning:

"BuzzFeed did not editorialize or restate the Dossier; it simply published it. To go line-by-line to determine if official action existed with respect to each statement in Report 166 would not impose on BuzzFeed a duty to faithfully recount official proceedings, but instead, would impose on BuzzFeed a duty to investigate extensively the allegations of the Dossier and to determine whether the government was investigating each separate allegation. Defamation law does not impose that requirement on the press"

(*id.* at 1317 [citation omitted]).

"In early January, at some point prior to BuzzFeed's publication of the Dossier, Brennan, Rogers, and former Director of National Intelligence, James Clapper, briefed President Obama about allegations in the Dossier"

(*id.*, at 1311).

There can be no genuine dispute that the three intelligence chiefs were empowered not only to report to President Obama on their findings, but also to analyze the Dossier in order to be able to do so, and that their actions constituted a "proceeding" (*Freeze Right*, 101 AD2d at 182 ). Plaintiffs' argument that Report 112 was not included in the subject matter of that briefing is unavailing. Even if plaintiffs are correct that Report 112 was never subject to any proceeding prior to publication of the Article, defendants were within their rights to publish the Dossier without being first required to investigate the internal operations of classified proceedings.

The Appellate Division, First Department, in affirming this court's denial of plaintiffs' motion to dismiss the Civil Rights Law § 74 defense, stated that

"an ordinary reader of [the Article] which hyperlinked a CNN article and the embedded dossier . . which included [Report No. 112] . . . containing the alleged defamatory statements about plaintiffs, would have concluded that there were official proceedings, such as classified briefings and/or an FBI investigation concerning the dossier as a whole, including [Report No. 122]"

(*Fridman v BuzzFeed, Inc.*, 172 AD3d at 441–42).

Defendants argue that the Appellate Division holding above is preclusive on the issue of whether the Article reported on an official proceeding. Plaintiffs dispute that argument on the ground that the Appellate Division was only ruling on a CPLR §3211 motion testing the sufficiency of the affirmative defense as a matter of pleading. The court agrees that the issue of whether the Article was reporting on an official proceeding is not precluded, but, nonetheless,

154895/2017 FRIDMAN, MIKHAIL vs. BUZZFEED, INC.                    Page 9 of 11
Motion No. 004

9 of 11

plaintiffs have failed to present sufficient evidence to demonstrate the existence of any factual issue.

The Article itself, even without the hyperlinks, provides sufficient information for an ordinary reader to determine that Buzzfeed was reporting on a proceeding. The Article states that "Arizona Republican [Senator] John McCain gave a 'full copy' of the memos to [FBI Director] Comey on Dec. 9, but that the FBI already had copies of many of the memos" [Bolger affirmation, exhibit 35). It is inconceivable that, given the enormous significance of allegations that a rival superpower was interfering in our democratic process to help elect a candidate who had allegedly been cultivated to be a Russian asset would not be investigated thoroughly by the FBI, or that the average reader would so think.

And if that were not enough, an average citizen would certainly understand the importance of the hyperlink to provide further information about those proceedings. The hyperlinked articles were more explicit about investigations of the Dossier.

> "The hyperlink here is the same size as the text around it, it appears in the body of the text rather than hidden somewhere at the bottom or side, and it is the only blue text in the paragraph in which it appears. Additionally, it is apparent from the face of Article that BuzzFeed used blue text to link to sources. The words that BuzzFeed chose to print in blue naturally suggest an outside link"

(*Gubarev v BuzzFeed, Inc.*, 340 F Supp 3d at 1319 [citation omitted]).

If the hyperlinked articles had become material, the court would hold that the hyperlinks were sufficiently conspicuous, and the court would place no weight on plaintiffs submission of data from Turner Broadcasting Corp. (Lewis Affirmation, exhibit A) as to the percentage of readers in a given time period who clicked through on either hyperlink. An internet publication is not so finite. A screen shot can be taken and shared, and could reach unlimited numbers of people. Also the Article could be searched and recirculated as the Mueller investigation unfolded and drew public attention to the massive, hostile action of the Russians.

There is a sufficient connection between the allegedly defamatory statements and the subject of the Article. The Mueller Report determined that the massive Russian Election interference campaign was financed by Yevgeny Prigozhin, a Russian oligarch with close ties to Putin. Whether true or not, the possibility of cooperation with Putin by plaintiffs in his election interference program is background information that is sufficiently related to the Article to give it context.

Even if Civil Rights Law §74 did not afford immunity to defendants for the publication of the Article, plaintiffs would still have to satisfy a high burden of proof applicable to suits against the news media. A newspaper that defames a person who is not a public figure can only be held liable if the reporting was "grossly irresponsible" (*Chapadeau v Utica Observer-Dispatch*, 38 NY2d 196, 199 [1975]; *see also New York Times Co. v Sullivan*, 376 US 254 [1964]), but the "grossly irresponsible" standard applies if it defames even a limited-purpose public figure, who had attained that status by thrusting his or herself into the forefront of a public

154895/2017 FRIDMAN, MIKHAIL vs. BUZZFEED, INC.
Motion No. 004
Page 10 of 11

10 of 11

controversy by engaging in business activities which were a matter of public concern (*Huggins v Moore*, 94 NY2d 296, 302 [1999]; *Gertz v Robert Welch, Inc.*, 418 US 323, 345 [1974]). In the absence of the immunity conferred by the Privilege, plaintiffs would be required to demonstrate that defendants knew that the allegedly defamatory statements were false, or they acted with reckless disregard of the truth. On this record, that standard cannot be met.

Accordingly, it is

ORDERED that the motion of defendants Buzzfeed, Inc., Ben Smith, Ken Bessinger, Miriam Elder, and Mark Schoofs, for summary judgment, pursuant to CPLR 3212, dismissing the complaint, is granted, with costs and disbursements, as taxed by the Clerk upon presentment of an appropriate bill of costs; and it is further

ORDERED, that the cross motion of plaintiffs Mikhail Fridman, Petr Aven, and German Khan, is denied, as moot; and it is further

ORDERED that the complaint is dismissed.

___3/11/2021___  ___[signature]___
DATE  FRANCIS A. KAHN, III, A.J.S.C.

CHECK ONE:  [X] CASE DISPOSED  [ ] NON-FINAL DISPOSITION
            [X] GRANTED  [ ] DENIED  [ ] GRANTED IN PART  [ ] OTHER
APPLICATION:  [ ] SETTLE ORDER  [ ] SUBMIT ORDER
CHECK IF APPROPRIATE:  [ ] INCLUDES TRANSFER/REASSIGN  [ ] FIDUCIARY APPOINTMENT  [ ] REFERENCE

HON. FRANCIS A. KAHN III
J.S.C.

154895/2017 FRIDMAN, MIKHAIL vs. BUZZFEED, INC.
Motion No. 004

Page 11 of 11

11 of 11