# Exhibit A

**In the Matter Of:**

ALEKSEJ GUBAREV -v- BUZZFEED INC.

0 18-mc-60528-UU, 0 17-cv-60426-UU

---

**FUSION  GPS**

*August 30, 2018*

---

*30(b)(6), Attorneys Eyes Only*



*800.211.DEPO (3376)*
*EsquireSolutions.com*

1        UNITED STATES DISTRICT COURT

2        SOUTHERN DISTRICT OF FLORIDA

3              MIAMI DIVISION

4

5    _____

6    IN RE THIRD PARTY SUBPOENA TO  |   Case No.

7    FUSION GPS                      |   0 18-mc-60528-UU

8    _____|

9    ALEKSEJ GUBAREV,                |

10   XBT HOLDING S.A. and            |

11   WEBZILLA, INC.                  |   Case No.

12        Plaintiffs,                |   0 17-cv-60426-UU

13   -v-                             |

14   BUZZFEED, INC., and             |

15   BEN SMITH                       |

16        Defendants.                |

17   _____|

18

19

20

21



1                    Deposition of Peter R. Fritsch

2                         Washington, DC

3                      Thursday, August 30, 2018

4                          10:00 a.m.

5

6

7   Job No: J2625547

8   Pages:  1-271

9   Reported by:  Kenneth Norris

10

11

12

13

14

15

16

17

18

19

20

21



1       A.    The production of records primarily.

2       Q.    What subjects did you discuss with Thomas

3   Catan?

4       A.    I can't recall but likely the collection of

5   documents that could be produced.

6       Q.    And what topics did you discuss with Jason

7   Felch?

8       A.    His recollections of his contacts with Mr.

9   Bensinger of BuzzFeed.

10      Q.    Did you have any discussions with Nellie Ohr

11  concerning the matters to be discussed today?

12            MR. LEVY:  Objection, foundation.

13            MR. FRAY-WITZER:  Foundation for the

14  question?

15            MR. LEVY:  Yes.

16            MR. FRAY-WITZER:  It's been widely reported

17  that Ms. Ohr did work on collection of information for

18  the dossier.  I have no way of knowing if the

19  reporting is true.  But if it is, then that would be

20  someone that I would have expected the witness to

21  speak with.



1          We decided that that was a major area of

2    inquiry in which we could add value.

3          So Mr. Simpson and myself decided that we

4    would like to supplement our research with some more

5    human inquiries.

6          We considered a number of contractors who do

7    that kind of work and we decided after much discussion

8    that Mr. Steele was the most highly qualified and

9    reliable contractor we could hire, and so we did so.

10         You have to understand, too, that in that

11   line of work and especially when you're dealing with

12   Russia and the former Soviet Union, there's a large

13   amount of bad information and disinformation that can

14   flow through to someone like a research company like

15   ours.  We trusted Chris to identify, sort out, sift,

16   disqualify that sort of information.  That is what he

17   spent a career at MI6 learning how to do and we knew

18   him to have the most robust and experienced source

19   network in those countries.

20   Q.   When you say you knew him to have the most

21   robust source network in those countries, how did you



1          Beyond what you've already answered, you can

2     answer the question.

3          THE WITNESS:  Well, as with any contractor,

4     you discuss, you know, his availability and his firm's

5     availability to do the work, what it would cost.  And

6     can you execute the work?  Do you have the ability to

7     execute the work.

8          Our -- his response in all of those

9     instances, other than the cost one is affirmative --

10    was affirmative.  Yes, they were able to take on the

11    work.  Yes, he did have the ability to fulfill the

12    requests.  And we came to an agreement on cost.

13         Q.   What was the agreement on cost?

14         A.   I believe in the first instance, we expected

15    that this was going to be a one month, the typical

16    one month sort of engagement.  And I believe -- are

17    you asking me for the amount?

18         Q.   Yes.

19         A.   I believe it was for 20,000 probably pounds,

20    but I can't recall now.

21         Q.   In those initial conversations, what did you



1   It's just the document.

2        Q.   When Fusion first engaged Mr. Steele for

3   this assignment, did Fusion have any conversations

4   with Mr. Steele concerning the limits of human

5   intelligence?

6        A.   I don't specifically recall, but we didn't

7   have to have that conversation because we had had it

8   many times previously.  Obviously humans are human and

9   they have flawed memories.  So --

10       Q.   Did you have discussions about the risks of

11  intentional disinformation?

12            MR. LEVY:  Objection, asked and answered.

13            THE WITNESS:  Yes, we did.

14  BY MR. FRAY-WITZER:

15       Q.   What was the content of those discussions?

16            MR. LEVY:  Objection, asked and answered.

17            THE WITNESS:  We had extensive conversations

18  and had had extensive over -- conversations with Chris

19  over the years about some risks, particularly in

20  Russia and the FSU.

21            Russia as you know is run by a former KGB



1    officer.

2         Q.   The memos that were produced between May of

3    2016 and November of 2016 have sometimes been referred

4    to as the pre-election memos.

5              Are you familiar with that term?

6         A.   I don't know that I'm familiar with it but I

7    don't dispute it.

8         Q.   How many pre-election memos did Mr. Steele

9    produce?

10        A.   I'd have to -- I'd have to review them to

11   recall exactly.

12        Q.   Did you review the memos in preparation for

13   today?

14        A.   I reviewed them carefully.  I didn't count

15   them.

16             MR. LEVY:  If you want to put them in front

17   of the witness, feel free.

18             MR. FRAY-WITZER:  I will at some point.

19   BY MR. FRAY-WITZER:

20        Q.   When Mr. Steele transmitted a memo to

21   Fusion, would you typically then have a conversation



1          He did in fact meet with a senior official

2     of Rosneft, which is another -- it's also mentioned in

3     the memorandum.

4          We verified that -- it's been verified now

5     that Mr. Flynn did, in fact, meet with Sergey Kislyak.

6     We now know that Mr. Page did in fact meet with Mr.

7     Kislyak during the Republican National Convention.

8          We knew a lot about Paul Manafort and I'd

9     like to back up and explain that if you'd like me to.

10    Glenn Simpson and myself were both stationed in

11    Brussels together in the -- at which time we spent a

12    lot of time -- and these are articles in the public

13    record, researching Vladimir Putin's consolidation of

14    power.

15         We spent a lot of time looking at a former

16    communications minister by the name of Leonid Reiman.

17    We spent a lot of time looking at an individual named

18    Bruce Jackson.  We spent a lot of time looking at Oleg

19    Deripaska who also was someone Mr. Manafort was

20    aligned with and had done business with.

21         We spent a particularly robust amount of



```
 1    time looking at Mr. Manafort himself.

 2              We knew him to be closely allied with Viktor

 3    and employed by Viktor Yanukovych, the head of the

 4    Party of Regions in the Ukraine and former president.

 5              We knew his consulting practice to be fairly

 6    mercenary.

 7              We knew that he had worked with an

 8    individual named Konstantin Kilimnik which was his man

 9    in Kiev who has since been identified in various

10    public reports as an asset of Russia.

11              So, those are some of the things we did to

12    verify the reports.

13         Q.   Other than Bruce Ohr, did Fusion itself --

14    separate from Mr. Steele -- did Fusion itself provide

15    the pre-election memos to anyone else in the United

16    States government?

17         A.   No, we did not.

18              MR. LEVY:  Directly?

19              MR. FRAY-WITZER:  What?

20              MR. LEVY:  Directly?

21              MR. FRAY-WITZER:  Yes.
```



1  that was understood because the expressed purpose of

2  delivering the -- making sure that James Comey had the

3  memoranda is to make sure that they would be

4  investigated by competent authorities with the

5  wherewithal to do it.

6         Earlier we talked about Exhibit 7, and our

7  feeling at that time was that the FBI is a big

8  bureaucracy and one part of the FBI might not know

9  what the other is doing.

10        So we wanted to make sure that the boss

11 understood how grave Mr. Steele thought the situation

12 was.

13    Q.   And I appreciate your saying that it was

14 understood the information contained in the memos

15 needed to be verified, but what I'd really like to

16 know is did anyone say to David Kramer the stuff in

17 here, the information in here needs to be verified?

18    A.   We don't recall those words being spoken.

19    Q.   Was he told that the information contained

20 in the memos was raw information?

21    A.   What he was told by Mr. Steele as best as we



 1  understand it is that these reports were highly

 2  credible, that they relied on reporting from the

 3  network we've been talking about.  That network was

 4  extremely well placed and had been reliable in the

 5  past.

 6       Q.   Do you know if Mr. Steele told Mr. Kramer

 7  that some of the information contained in the memos

 8  was unverified?

 9       A.   No, I don't.

10       Q.   Do you know if anyone from Fusion told Mr.

11  Kramer some of the information from the memos was

12  unverified?

13            MR. SIEGEL:  Objection.

14            THE WITNESS:  What we recall is that, once

15  again, we described the information as highly

16  credible.  There's a difference between verified by

17  and highly credible.  There was a lot of information

18  in these reports that we were able to corroborate

19  through the open source and that others since have

20  been able to corroborate from the open source.

21            And Mr. Kramer understood that.

1   described, we were going to go get it and we were

2   going to deliver it.

3        Q.   You were going to deliver it to whom?

4        A.   In this case, James Comey.

5        Q.   And how were you going to deliver this memo

6   to James Comey?

7        A.   Through Mr. Kramer.  There were

8   subsequent -- after receipt of this memo, the December

9   13th memo, we contacted or he contacted us or Mr.

10  Steele contacted Mr. Kramer.  We don't -- we're not

11  clear on what the -- or we don't recollect, I should

12  say, what the sequence was, and arranged to give him a

13  copy of this memo.  Again, for the purpose of

14  delivering it to Senator McCain so that he could

15  deliver it to James Comey.

16       Q.   I'm going to -- I'm going to back up for

17  just a moment.

18            Did Mr. Steele tell Fusion why he was giving

19  this additional information to Fusion?

20       A.   Not that we specifically recall other than

21  in his professional opinion and in his estimation,



1   this was credible reporting that was relevant to the,

2   by then, well established fact that the Russian

3   government had hacked our election.

4        Q.   And I want to get a little specific with

5   you --

6        A.   Sure.

7        Q.   -- because I believe your testimony was that

8   those things were your understanding.  And what I want

9   to know is did Christopher Steele say words to that

10  effect to you as the reason he is providing Fusion

11  with this additional memo?

12            MR. LEVY:  Objection, asked and answered.

13            THE WITNESS:  Yes.  That's my understanding.

14  That is our best recollection.

15  BY MR. FRAY-WITZER:

16       Q.   Do you recall Mr. Steele saying words to

17  that effect to you personally?

18       A.   I do.

19       Q.   So it's your recollection as you sit here

20  today that you had a conversation with Mr. Steele

21  prior to him giving Fusion the December memo in which



1    he expressed to you his belief that the information in

2    the December memo was credible and important and

3    needed to be given to the United States government?

4        A.   You said prior to the -- to delivery of the

5    December 12th memo?

6        Q.   Yes.

7        A.   And what I meant to say is no, that those

8    conversations happened after we received the memo.

9             Our best recollection is that we did not

10   know this memorandum was coming.

11            Let me see if I can explain that a little

12   bit to help you understand it better.

13            And the best metaphor I can use if you'll

14   allow me a metaphor is -- are my former journalism

15   life.  Often in the course of collecting information

16   for a story when you're reporting a story, there are

17   sources who get back to you after your story has been

18   printed or it's run.  And in this particular case, I

19   think this information came in after our story had

20   run, the story in this metaphor being the election.

21        Q.   In what form did Fusion receive the December



1        A.    No, he didn't.

2        Q.    Just so that I understand, prior to the Wall

3   Street Journal publishing that information, Fusion was

4   unaware that the Wall Street Journal intended to

5   publish that information.  Is that correct?

6        A.    That is correct.

7        Q.    Prior to the publication of the memos, did

8   Fusion undertake any efforts to verify the allegations

9   in the December memo concerning Alex Gubarev?

10             MR. LEVY:  Take your time to read through

11  it.

12             THE WITNESS:  Yes, we did.  We took

13  extensive steps to verify the information.

14  BY MR. FRAY-WITZER:

15       Q.    And specifically the information concerning

16  Alex Gubarev?

17       A.    Yes, that's right, we did.

18       Q.    What steps did Fusion take to verify the

19  allegations concerning Alex Gubarev?

20       A.    We took extensive steps to, as I believe I

21  testified, XBT, Webzilla and Mr. Gubarev were all new



1    names to us.  So we went to the public record to

2    determine who these people are and to determine

3    whether the information in Paragraph 3 of this memo

4    was credible.

5             What we found was an extensive record of a

6    company based in Luxemburg with no fewer than 51

7    subsidiary companies or shell companies, located in

8    places like the British Virgin Islands, Cypress,

9    Panama, India and Russia and the United States that

10   was constructed in such a way to obscure the

11   beneficial ownership of the company.

12            That's an important detail in our mind.

13            We undertook a litigation search of XBT and

14   Webzilla and a public record search with the internet.

15   We found extensive allegations, credible allegations.

16   Paragraph 3 talks about porn traffic.  We found a

17   number of websites hosted by Webzilla;

18   asianpissinggirls.com, japanesetoiler.com.  In Fort

19   Lauderdale, osuck.com.  They were hosted by Webzilla.

20            We found extensive allegations in the public

21   record from credible people like motion picture



1   associations in filings to the U.S. and comments to

2   the U.S. Copyright Office that Webzilla had ignored

3   repeated entreaties to take down pirated traffic

4   particularly in pornography.

5            We found that -- and this is a very telling

6   fact for us -- we found Mr. Gurvits's name on

7   extensive litigation in defense of alleged criminal

8   hackers and networks in the Ukraine and Russia.

9            And that -- we found that FireEye had

10  determined that --

11           (The reporter requested clarification.)

12           THE WITNESS:  FireEye, which is an internet

13  security firm had determined that Webzilla was hosting

14  a Propeller Ads -- a company called Propeller Ads

15  which involved various individuals, also tied to Mr.

16  Gubarev.

17           We understood there was a couple companies.

18  One was called Co-locate USA, which is a known

19  spamming network which is actually owned by Webzilla

20  is what we understand.

21           There was another company called Digital --



```
 1    I can't remember it right now.  It was involved

 2    allegedly in the Methbot attack which was --

 3              (The reporter requested clarification.)

 4              THE WITNESS:  Methbot, M-E-T-H-B-O-T, that

 5    at its height was stealing somewhere between three and

 6    $5 million a day from unsuspecting internet users.

 7              So what we found was a pattern and a fact

 8    set that corroborated and substantially raised the

 9    credibility of the underlying reporting in this

10    memorandum.

11    BY MR. FRAY-WITZER:

12       Q.   I asked you what steps you took prior to the

13    publication.  Is it your testimony that you undertook

14    those steps prior to BuzzFeed's publication of the

15    dossier?

16              MR. LEVY:  Objection, asked and answered.

17              MR. FRAY-WITZER:  Except he's answering a

18    totally different question.

19              MR. LEVY:  No, he's not.

20              MR. FRAY-WITZER:  Okay.  Well, then let him

21    answer it.
```



```
 1                MR. SIEGEL:  That's testimony, Evan.

 2     BY MR. FRAY-WITZER:

 3          Q.   Did you --

 4                MR. SIEGEL:  Ask your question.

 5     BY MR. FRAY-WITZER:

 6          Q.   Did you -- did Fusion undertake those

 7     research efforts before BuzzFeed published the

 8     dossier?

 9          A.   Yes, we did.

10          Q.   Then let me ask you this.  You said it was

11     very relevant to you that Val Gurvits's name was on

12     the pleading.  Why was that relevant prior to the

13     publication of the dossier?

14                MR. LEVY:  Objection, lacks foundation.

15                THE WITNESS:  May I answer?

16     BY MR. FRAY-WITZER:

17          Q.   Please.

18          A.   Well, as an investigative matter, as a

19     research matter, who someone's lawyer is, whether it's

20     for the formation of a company or the defense of

21     allegations against them is entirely relevant in our
```



 1   mind.

 2        Q.   And what relevance did that have prior to

 3   the publication of the dossier?

 4             MR. LEVY:  Objection, lack of foundation.

 5             THE WITNESS:  Again --

 6             MR. FRAY-WITZER:  He testified that it was

 7   relevant to him.  That's the foundation.  What's the

 8   relevance?

 9             MR. LEVY:  Preserving the objection.

10             MR. FRAY-WITZER:  Fine.

11             THE WITNESS:  The relevance -- I mean, we

12   were trying to understand, as I testified to you -- we

13   were trying to understand who XBT, Webzilla and Mr.

14   Gubarev are.  We had no idea.

15             So we employed our methodology, which as I

16   said is an extensive collection effort, and a

17   litigation review found those commonalities.

18   BY MR. FRAY-WITZER:

19        Q.   On what date did Fusion start that review?

20        A.   Almost immediately.

21        Q.   Almost immediately upon what?



1        A.    Sorry, upon receipt of the December 13th

2    memo.

3        Q.    You -- and by you I mean Fusion was asked

4    and ordered by the Court in this case to produce to us

5    all documents that demonstrated investigation or

6    information that you had concerning Webzilla, XBT or

7    Mr. Gubarev that you had prior to the publication of

8    the dossier.  There's not a single document that

9    reflects anything that you're talking about.  Why is

10   that?

11            MR. SIEGEL:  Objection.

12            MR. LEVY:  Objection, that's incorrect.  And

13   if you'd let the witness testify as opposed to

14   characterizing documents in his own testimony as

15   you've done for the last six hours, we'd greatly

16   appreciate it.

17   BY MR. FRAY-WITZER:

18       Q.    Why aren't there any documents that

19   demonstrate such an investigation prior to the

20   publication?

21            MR. LEVY:  Objection, lack of foundation.



1   BY MR. FRAY-WITZER:

2       Q.   Tell me what documents you produced that

3   demonstrate any kind of investigation that Fusion

4   undertook prior to the publication of the dossier?

5       A.   I think our document production speaks for

6   itself.

7       Q.   Tell me a single document that indicates

8   that Fusion undertook an investigation of XBT,

9   Webzilla or Mr. Gubarev prior to the publication of

10  the dossier?

11          MR. LEVY:  Objection, asked and answered.

12          MR. SIEGEL:  Objection.

13          THE WITNESS:  I'm sorry.  I'm not sure how I

14  can answer that.

15  BY MR. FRAY-WITZER:

16      Q.   You said you reviewed the documents that you

17  produced before today's deposition?

18      A.   Yes.

19      Q.   Correct?

20      A.   Correct.

21      Q.   So identify for me, tell me any document



1   that demonstrates an investigation prior to the

2   publication --

3        A.   The entire.  I apologize for not letting you

4   finish.

5            The entire Dr. Tubrook case, dot com case,

6   the entire WebArt case were all things that we found

7   in the public record prior to publication.  Not

8   difficult to find.

9            MR. LEVY:  We can bring out the document

10  production for Mr. Fritsch to look through if it's

11  helpful for you.  He's given you some examples, he can

12  give you others.  You have the production.

13  BY MR. FRAY-WITZER:

14       Q.   Is there a document that you believe you

15  produced that demonstrates -- that has a date on it

16  prior to the publication of the dossier, that

17  demonstrates that Fusion was engaged in an

18  investigation of the sort you're talking about?

19       A.   I'm sorry.  As I sit here today I'd have to

20  sit down with the documents and go -- and review them.

21  Which I'm happy to do.



1          Q.    I believe you testified that you did go

2     through them and review them prior to this deposition?

3               MR. LEVY:   Objection, asked and answered.

4     BY MR. FRAY-WITZER:

5          Q.    Did you go through them and review them

6     prior to the deposition?

7          A.    I did.

8          Q.    So, why can't you tell us today as you sit

9     here what document has any date that predates the

10    publication of the dossier that you believe supports

11    your assertion that there was such an investigation

12    before the publication of the dossier?

13         A.    I'm sorry.   I'm not trying to be difficult.

14    I just can't recall.   The document production that I

15    reviewed with Mr. Levy was probably four or five

16    inches thick, if not larger.

17         Q.    What evidence did Fusion find that Alex

18    Gubarev had been recruited under duress by the FSB?

19         A.    I don't believe we found any such evidence.

20    Again, as I believe I've testified and as Mr. Steele

21    evidently testified, the purpose or the goal was to



1   share this information in urgent fashion with

2   competent authorities in law enforcement and

3   government who could pursue them.

4       Q.   Well --

5       A.   This is not the kind of information that is

6   easily confirmed in the open source.

7       Q.   What evidence did Fusion find that XBT,

8   Webzilla was conducting altering operations against

9   the democratic party leadership?

10      A.   Again, by altering operations by the way, I

11  believe we're talking about hacking.

12           We found no specific allegations about XBT,

13  Webzilla in the open source.  However, at this time it

14  was an extensive matter of public record that the

15  democratic party leadership had been hacked.  And,

16  again, as I believe I testified, we determined that

17  XBT, Webzilla operates the kind of network with the

18  capability to carry out those kinds of acts.

19           We also understood XBT, by the way, since

20  2015 to be working in Russia through its acquisition

21  of Edinaya Set, E-D-I-N-A-Y-A, separate word, S-E-T.



1    Our understanding is we need to be in close

2    cooperation with the State to offer internet services

3    for hosting in Russian.

4              Prime Minister Medvedev just a couple of

5    months ago signed a new law requiring companies to

6    cooperate with the State under the guise of its

7    National Security and Counter Terrorist Act.

8              So to us, again, the credibility's

9    reinforced by the profile of the company.

10       Q.   Did Fusion have any actual evidence of

11   cooperation between XBT, Webzilla and the Russian

12   government?

13             MR. LEVY:  Objection, asked and answered.

14             He just answered the question.

15             MR. FRAY-WITZER:  No.  He just testified

16   that there are requirements that he believes are in

17   place and I want to know if he has any actual evidence

18   that this company is cooperating with the Russian

19   government.

20             MR. LEVY:  Objection.  Same objection as in

21   that was part of his testimony, it wasn't all of his



```
 1   testimony.

 2             THE WITNESS:  One thing we found in the open

 3   source, just to help you understand that, is that --

 4   and I'm going to mangle the name -- but XBT after the

 5   Russian government shut down the messaging app

 6   telegram, it did talk about the contract, it's

 7   Roskomnadzor.  I can't remember the name.

 8             (The reporter requested clarification.)

 9             THE WITNESS:  I'm sorry.  I don't know how

10   to spell it.

11             There's a report in the open source that

12   talks about a contract with Edinaya Set, the company I

13   referenced earlier that belongs to XBT Holdings to

14   work with the Russian government.

15             So, again, from a researcher standpoint, a

16   lot of those facts are important.

17             When you're trying to assess the credibility

18   of a report like this, not the truth, the credibility

19   of it.

20   BY MR. FRAY-WITZER:

21        Q.   Have you produced this alleged contract
```



1    between Edinaya Set and the Russian government?

2         A.   No, we did not.  We're not privy to private

3    company contracts with the Russian government.

4         Q.   Have you produced the open source

5    information that you say supports the existence of

6    such a contract?

7         A.   I can't recall.

8         Q.   Did you find this supposed open source

9    information prior to BuzzFeed publishing the dossier?

10        A.   No.

11        Q.   After BuzzFeed published the dossier, Fusion

12   undertook great efforts to investigate Gubarev,

13   Webzilla and XBT.  Isn't that true?

14        A.   I'm not sure what you characterize as great

15   efforts.  But we did take -- undertake an effort to

16   investigate, and I'll tell you why.

17             Again, we, like Mr. Steele, shared a concern

18   that now the president, incoming president of the

19   United States or about to be inaugurated president of

20   the United States was an asset of some -- some caliber

21   of the Russian government.  So we did undertake that



 1   as part of our -- we're exercising our rights as

 2   citizens and also our responsibility as citizens to do

 3   that.

 4          We Felch like we had a certain amount of

 5   knowledge and understanding of these networks and the

 6   fact set, and so we decided that we needed to keep

 7   doing that.

 8       Q.   Did Mr. Steele ask you to try and verify the

 9   information after the dossier had been published?

10       A.   No, and he didn't have to.

11       Q.   Did BuzzFeed ask you to verify information

12   concerning Webzilla, XBT or Mr. Gubarev?

13       A.   Absolutely not.  It's fair to say our

14   communications with BuzzFeed were not robust after

15   publication of the dossier.

16       Q.   What communications did Fusion have with

17   BuzzFeed after the publication of the dossier?

18          MR. LEVY:  Asked and answered.

19          THE WITNESS:  About what?

20   BY MR. FRAY-WITZER:

21       Q.   About Webzilla, XBT or Mr. Gubarev.



1        A.    None that we can recall.

2              (Fritsch Exhibit No. 13 was marked for

3    identification.)

4    BY MR. FRAY-WITZER:

5        Q.    You've been shown what's been marked as

6    Exhibit Number 13.  Can you tell me what this document

7    is?

8        A.    Sure.

9              This is an e-mail from Ed Baumgartner who

10   works for a company called Edward Austin.

11             Ed is a contractor of ours who has

12   advanced -- I think he has an advanced degree in

13   Russian Language and History and maybe Literature from

14   Harvard University.  And is someone who we rely on to

15   conduct research.

16       Q.    When did Fusion engage Mr. Baumgartner to

17   conduct the research that resulted in these memos?

18       A.    I'm afraid I don't recall.  We don't recall.

19       Q.    Why did Fusion engage Mr. Baumgartner to

20   conduct the research that resulted in these memos?

21       A.    We wanted to learn more about several



1    matters.  One of which involved Mr. Gubarev.

2         Q.   Why at this point in time did Fusion want to

3    learn more information about Mr. Gubarev?

4         A.   Because we received a memo on December 13th

5    from Christopher Steele and Orbis.  Again, one of the

6    most knowledgeable Western Russianists in the world

7    who represented to us that he had credible information

8    that XBT Holdings and Webzilla was involved in the

9    hacking of the democratic party leadership.

10        Q.   You're saying that Mr. Steele specifically

11   represented to you that he had credible information

12   about those things, not that he considered them to be

13   raw intelligence that needed to be verified and

14   confirmed?

15             MR. LEVY:  Objection.

16             MR. SIEGEL:  Objection.

17             MR. LEVY:  Please just ask him questions.

18   Rephrase the question, Evan.

19   BY MR. FRAY-WITZER:

20        Q.   Is it your testimony -- and I think you just

21   said this, that Mr. Steele specifically told you that



1  he had credible information of the allegations

2  concerning XBT, Webzilla that are contained in the

3  December memo.  Is that your testimony?

4          MR. LEVY:  Want to read back the testimony?

5          MR. FRAY-WITZER:  No.  I'd like the witness

6  to answer the question.

7          MR. LEVY:  We have a problem because you ask

8  him a question, he answers it.  And then you try to

9  recapitulate his answer and ask him if you got it

10  right.  This happened, I can't -- I've lost track of

11  how many times this has happened during the course of

12  this deposition.

13  BY MR. FRAY-WITZER:

14      Q.  Is that your testimony?

15      A.  I'm sorry.  The back and forth really

16  confuses me, and I apologize for that.

17      Q.  Is it your testimony that Mr. Steele

18  explicitly told you that he had credible evidence that

19  XBT, Webzilla were involved in the allegations that he

20  makes in the December memo?

21      A.  It's my testimony that Mr. Steele provided



1  us the memorandum marked Exhibit 11 on December 13th,

2  2016.  And, therefore, they are credible because Mr.

3  Steele sent them to us.  And Mr. Steele, once again is

4  a highly trained professional who is trained in

5  sorting out good intelligence from disinformation and

6  not credible intelligence.

7       Q.   Is it your belief that 100 percent of

8  everything in the dossier is credible?

9       A.   You're asking me for my personal belief, or

10 our personal belief?

11      Q.   Fusion's belief.

12      A.   I'm sorry.  I think that's a tough question

13 to answer, what an entire company believes.

14           However I'll tell you that I think that we

15 believe that the information is highly credible.  I

16 also think we believe extensive parts of the memoranda

17 that we're calling the dossier have been corroborated.

18      Q.   And I think I'm asking a different question.

19           Is it your belief that 100 percent of all

20 the information contained in the dossier is credible?

21           MR. LEVY:  Objection, asked and answered.



```
 1              THE WITNESS:  Yes, I do.

 2   BY MR. FRAY-WITZER:

 3        Q.   And only because you've made this

 4   distinction before, do you believe that 100 percent of

 5   the information contained in the dossier is true?

 6        A.   I don't know.

 7        Q.   In Exhibit 13 would you turn, please, to --

 8   it has the number one at the bottom -- actually let me

 9   give you the Bates number at the very bottom --

10        A.   Sure.

11        Q.   -- which ends in 14.

12        A.   Sure.

13        Q.   That is the beginning of the memo concerning

14   Aleksei Gubarev from Mr. Baumgartner.  Is that

15   correct?

16        A.   That's correct.

17        Q.   If you would turn to Page 4 of that and that

18   has a Bates number that ends in 17, and there's a

19   heading at the top of the page:  Interviews.

20              Were you aware that Mr. Baumgartner had

21   conducted interviews as part of his work being
```



FUSION  GPS  30(b)(6), Attorneys Eyes Only        August 30, 2018
ALEKSEJ GUBAREV -v- BUZZFEED INC.                   208

1  performed for you?

2       A.  In advance of receipt of this memorandum?

3       Q.  Yes, did you know he was going to conduct

4  interviews?

5       A.  We reviewed this and don't specifically

6  recall that.

7          However, we understand that part of what

8  Edward does is conduct interviews or his network

9  conducts interviews, I should say.

10       Q.  The section on interviews begins, "Our

11  interviews of people familiar with Gubarev paint a

12  picture of a relatively well known person in the IT

13  sector with an entirely positive reputation as a

14  successful self made entrepreneur."

15          Did I read that correctly?

16       A.  You did.

17       Q.  In the next paragraph Mr. Baumgartner

18  writes, "Source from Mail.Ru Group describes Gubarev

19  as follows:  'He created from scratch a successful

20  business that continues to grow.  I have never heard

21  anyone say anything negative about him.'"



1           Did I read that portion correctly?

2      A.    You did.

3      Q.    "I have a very ambiguous feeling about all

4  these allegations against him from the U.S. press.

5  Yes, nobody has ever heard him talking about hacking

6  or having any ties to intelligence agencies."

7           Did I read that correctly?

8      A.    You did.  I would only note that you don't

9  hear a lot of talk about ties to the intelligence

10  agencies.

11           I don't know if you got that.  But I also

12  forgot what I said.

13      Q.    Without --

14           MR. LEVY:  You want to finish your answer?

15           THE WITNESS:  I'm okay.

16  BY MR. FRAY-WITZER:

17      Q.    The remainder of the interviews that Mr.

18  Baumgartner conducted are consistent with his

19  conclusion that everyone he had spoke with had an

20  entirely positive reputation attributed to Mr.

21  Gubarev.  Is that correct?



```
 1        A.   I don't know.  I'd have to read it again.

 2             MR. LEVY:  Is there a conclusion you want to

 3   point him to in the language?

 4             MR. FRAY-WITZER:  Well, in the first

 5   paragraph, yes.

 6   BY MR. FRAY-WITZER:

 7        Q.   "They paint a picture of a relatively well

 8   known person in the IT sector with an entirely

 9   positive reputation as a successful self made

10   entrepreneur."

11             The interviews he conducted are consistent

12   with that conclusion that he makes.  Is that correct?

13        A.   I agree that the first sentence says that.

14        Q.   Did Mr. Baumgartner provide Fusion with any

15   negative information about Mr. Gubarev that it

16   obtained from its interviews with people?

17        A.   What do you mean by negative information?

18        Q.   Did Mr. Baumgartner report to Fusion that

19   people he interviewed said that Alex Gubarev was a

20   hacker?

21        A.   First of all, I don't know that I said that
```



1  Mr. Baumgartner interviewed anybody.

2          Second of all, that characterization that

3  you just made is not reflected in this memorandum.  I

4  agree.

5          I'd also say that Mr. Baumgartner is not a

6  highly trained or decorated intelligence official from

7  a major government.

8      Q.   And yet, you did decide to hire him for some

9  reason.  Is that not correct?

10     A.   We did hire Mr. Baumgartner.

11     Q.   Did you pay Mr. Baumgartner?

12     A.   Yes.

13     Q.   How much did you pay Mr. Baumgartner for

14  performing this work?

15     A.   I can't recall.  But it was not an extensive

16  engagement.  I think he conducted a couple interviews

17  or his network conducted a couple of interviews.

18          I'd also add that I think what this memo

19  reflects is an honest methodology that seeks to

20  collect and capture all views and opinions on all

21  sides of the matter.

1        Q.   I just don't want to interrupt you.

2        A.   I'm done.

3             (Fritsch Exhibit No. 14 was marked for

4    identification.)

5             THE WITNESS:  I'm sorry.  Evan, do you mind

6    if we take a quick break?

7             MR. FRAY-WITZER:  No.

8             THE VIDEOGRAPHER:  Going off the record at

9    1614.

10            (Whereupon, a recess ensued.)

11            THE VIDEOGRAPHER:  Back on the record at

12   1626.

13   BY MR. FRAY-WITZER:

14       Q.   Just before we went off the record, you

15   testified about efforts that you say Fusion undertook

16   after receiving the December memo but before

17   BuzzFeed's publication of the dossier to verify

18   allegations against Gubarev, Webzilla and XBT.

19            Specifically which Fusion employees worked

20   on verifying those allegations?

21       A.   I can't recall that, sorry.  I know that



1    Glenn did so. I know that Mr. Berkowitz did so. I know

2    that Laura Seago did so.  I know that I myself did so.

3         Q.   Before the publication of the --

4              MR. LEVY:  I don't know if he finished his

5    answer.

6              MR. FRAY-WITZER:  Oh, I'm sorry.

7              THE WITNESS:  That's what I recall.

8    BY MR. FRAY-WITZER:

9         Q.   Before the publication of the dossier what

10   specific steps did you take to verify the allegations?

11        A.   I did some internet searches about XBT,

12   Webzilla.  We looked in PayServ for various court

13   documents.

14             We looked in --

15        Q.   I'm sorry.  I don't want to stop you other

16   than to say I should clarify the question.

17             In this instance I mean you personally.

18   What steps did you personally take prior to the

19   publication of the dossier?

20        A.   I did some web searching.  We looked in

21   PayServ, we -- and I shared some of what we saw with



 1    colleagues such as Glenn, such as Laura.  Not a lot

 2    frankly.

 3        Q.   What web searching did you personally

 4    undertake?

 5        A.   I'm sorry.  I can't recall that.

 6        Q.   What PayServ searching did you personally

 7    undertake?

 8        A.   Sorry, I can't recall that either.

 9        Q.   When you say --

10        A.   You're asking about a very specific period

11    of time that's less than a month.

12        Q.   Yes.

13        A.   Including holidays?

14        Q.   Correct.

15        A.   Right.  And, so, what I'm telling you is not

16    a lot.  But enough to find a lot of the documents that

17    I've referenced today.

18        Q.   But you can't tell me any specific web

19    searching that you personally undertook during that

20    period of time?

21             MR. LEVY:  Objection, asked and answered.



1           MR. FRAY-WITZER:  Objection.

2           THE WITNESS:  That's correct.

3   BY MR. SIEGEL:

4       Q.   You testified that as you received the

5   memoranda from Mr. Steele, that Fusion undertook its

6   own efforts to try to independently assess the

7   credibility of the information.  And I believe you

8   testified about Carter Page, you testified about Paul

9   Manafort, you testified about Alexsei Gubarev and XBT.

10          Are there any other examples that you can

11  recall of people or topics within the dossier that

12  Fusion undertook to look at the credibility of those

13  -- of those allegations on its own?

14      A.   Sure.

15          I would say that the most prominent example

16  I probably overlooked is Michael Cohen who is Donald

17  Trump's -- or was Donald Trump's attorney, personal

18  attorney, and I believe worked with the Trump

19  Organization for many years.

20          Mr. Cohen who I believe has now pled guilty

21  to eight felonies is accused or it is written in --



1    the dossier represents that he has made deniable cash

2    payments to individuals.  I believe that's

3    substantially what Mr. Cohen has pled guilty to.

4         Q.   And did you -- at the time these memos came

5    -- were coming in, did you make any efforts to look at

6    Michael Cohen?

7         A.   We made substantial efforts to look at

8    Michael Cohen.

9         Q.   And can you describe those?

10        A.   Sure.

11             We looked as his history, we looked at his

12   taxi business, we looked at his family background.

13   His taxi business it would appear was financed and

14   supported in part by Russians, Russian-Americans.

15             He himself is married to someone who is

16   Russian.

17             We looked at his background and his

18   relationships to people like Felix Sater with whom --

19   they were connected on social media.  And those were

20   just a few examples of many things we looked at

21   regarding Mr. Cohen.



1     Q.    Did those enhance your confidence in the

2    credibility of the statements in the dossier about Mr.

3    Cohen?

4     A.    Substantially so.

5     Q.    Do you know who Mr. Agalarov is?

6     A.    I do.

7     Q.    Did you undertake any efforts to investigate

8    the statements related to Mr. Agalarov?

9     A.    Yes, we did.

10     Q.    What did you do?

11     A.    We researched his history with Mr. Trump and

12    his support for the Miss Universe pageant.  We also

13    looked at -- just to be clear you're talking about

14    pre-publication?

15     Q.    Pre-publication, yes, as the memos are

16    coming in?

17     A.    We looked at his background.  We found

18    evidence of a substantial relationship between the

19    Agalarov family and Mr. Trump including a music video

20    cut by Aras Agalarov's son Emin in which Mr. Trump

21    appears.



1         Q.    And did the research you conducted about Mr.

2    Agalarov enhance your confidence level about the

3    credibility of the statements made to him -- or

4    connected, related to him?

5         A.    Yes, it did.

6         Q.    Do you know who Sergei Ivanov is?

7         A.    I do.

8         Q.    Did you undertake any efforts to assess

9    statements related to Sergei Ivanov in the dossier?

10        A.    Yes, we did.

11        Q.    What did you do?

12        A.    We read substantially about Mr. Ivanov who's

13   known to us.  He is the head of the presidential

14   administration or was.

15             The dossier recounts in large, in many

16   instances, a story of tension between various

17   individuals in the Kremlin, inside the Kremlin,

18   specifically between a camp related to Mr. Peskov, who

19   is the spokesman for the Kremlin and Mr. Ivanov.  It

20   talks about how those tensions are coming to a head.

21   Subsequently we learned that Mr. Ivanov did in fact --



1    was in fact let go by Mr. Putin, which was a

2    surprising development to us because of their long

3    history together going back to Saint Petersburg.

4         Q.    And did you look at all into whether there

5    was a pension payment system that involved Russian --

6         A.    We did.

7         Q.    What did you find?

8         A.    And there is such a system and we -- in fact

9    as recently as the other day, it was reported that

10   Sergey Kislyak the former ambassador to the United

11   States undertook such cash payments to people.  Mr.

12   Kislyak obviously is someone who had met with Michael

13   Flynn who is awaiting a plea agreement under -- with

14   Mr. Mueller and with -- Mr. Kislyak also met with

15   various other people in the Trump orbit including

16   Carter Page, including Jeff Sessions.

17        Q.    You testified that one of the things that

18   you discussed with Mr. Steele was generally whether

19   there was a risk of disinformation when you undertake

20   intelligence in Russia.  What was the nature of what

21   Mr. Steele told you about that in relation to the



```
 1   dossier?

 2        A.   Mr. Steele -- and this is an ongoing

 3   conversation that would happen with the delivery of

 4   each memorandum -- and frankly, it goes back to our

 5   sort of first meeting Mr. Steele in that 2009, '10,

 6   '11 period.  He told us that Orbis has made its best

 7   efforts to ensure that the memorandum -- memoranda

 8   collected as the dossier is free of that sort of

 9   disinformation.

10        It's -- he represented that he -- that is

11   one of the primary things that an MI6 officer working

12   in the FSB does.

13        Q.   Mr. Fray-Witzer showed you today a number of

14   statements from other people that in one way or the

15   other used the word "verified", "further verified",

16   "unverified."  I'm not going to ask you what that

17   means to other people.

18        What did you understand the reference to

19   verification meant in connection with the statements

20   in the dossier?

21             MR. FRAY-WITZER:  Objection.  What context?
```



 1 │ BY MR. SIEGEL:

 2 │     Q.   Well, for example, Mr. Fray-Witzer showed

 3 │ you a statement in one of Mr. Steele's pleadings that

 4 │ information of the dossier was to be further verified,

 5 │ further investigated.

 6 │         What did you understand that to mean?

 7 │     A.   We understood that to mean precisely that,

 8 │ you know, there are a number of things that can be

 9 │ further developed or corroborated.

10 │         Michael Cohen's -- at one point we talk

11 │ about a trip to Prague.  That has -- requires

12 │ additional verification.

13 │         At the same time, is has not been denied in

14 │ any satisfactory way.

15 │         We live in the internet age under

16 │ substantial and repeated pressure, right?  Michael

17 │ Cohen after all this time has refused to provide a

18 │ public accounting of his whereabouts in the time

19 │ period in question.  He can do that with credit card

20 │ records, he can do it with -- via speed records, he

21 │ can do it any number of ways.  And so far he's refused



1   to do that.

2          Q.   All right.

3          A.   At the same time I would just add that, you

4   know, a substantial amount of information has been

5   verified.

6          Q.   Mr. Fray-Witzer asked you about --

7          A.   Just to finish my answer.  I'm sorry.

8               I would just point out that James Clapper

9   has publicly stated that information in the dossier

10  has been verified.

11              Dianne Feinstein, that's the former chairman

12  of the Senate Intelligence Committee has claimed --

13  has said that to her knowledge, nothing in the dossier

14  has been dis-proven.

15              The Senate Judiciary Committee -- excuse me,

16  the Senate Intelligence Committee has issued a

17  bipartisan report that agrees that the foundational

18  precept of this entire set of documents which is that

19  the Russians interfered to benefit Donald Trump

20  specifically.

21              The House Intelligence Committee minority



1  has issued a similar report that goes further and says

2  that specific elements of the dossier have been

3  corroborated and verified.  To me verified means

4  proven.

5         Q.   Mr. Fray-Witzer showed you also, I think a

6  statement in one of Mr. Steele's pleadings saying that

7  the information -- that information in the December

8  memo was not actively sought, it was unsolicited.  And

9  you testified about your understanding of what that

10 means.

11        Does that -- does the fact that information

12 is unsolicited mean that it is less accurate?

13        A.   Not at all.  In this instance, Mr. Steele,

14 just to reiterate, is a professional.  With a

15 reputation and a track record of faithful service to

16 his country and its allies.  He would not have

17 forwarded to us for the purposes of putting

18 information before James Comey, the director of the

19 Federal Bureau of Investigation unless he thought that

20 information was reliable, credible and important.

21        Q.   In connection with the way the reports on



1               REPORTER'S CERTIFICATE

2               District of Columbia

3               County of Washington, to wit:

4                    I, KENNETH NORRIS, a Notary Public of

5       the District of Columbia, County of Washington, do

6       hereby certify that the within named witness

7       personally appeared before me at the time and place

8       herein set out, and after having been duly sworn by

9       me, according to law, was examined.

10                   I further certify that the examination

11      was recorded stenographically by me and this

12      transcript is a true record of the proceedings.

13                   I further certify that I am not of

14      counsel to any of the parties, nor in any way

15      interested in the outcome of this action.

16                   As witness my hand and notarial seal

17      this 30th day of August 2018.

18

19

20

21

