# Exhibit B

Revised First witness statement of: Christopher D
Steele Filed on behalf of: Defendant
Statement Date: 14 February 4 March 2020
Exhibit no: CDS1

**IN THE HIGH COURT OF JUSTICE**                    **Claim no. HQ18M01646**

**QUEEN'S BENCH DIVISION**

**MEDIA & COMMUNICATIONS LIST**

**BETWEEN**

**(1) PETR AVEN**

**(2) MIKHAIL FRIDMAN**

**(3) GERMAN KHAN**

**Claimants**

a n d

**ORBIS BUSINESS INTELLIGENCE LIMITED**

**Defendant**

_____

**REVISED FIRST WITNESS STATEMENT OF CHRISTOPHER STEELE**

_____

**I, Christopher David Steele**, Director of Orbis Business Intelligence Limited, 9 – 11 Grosvenor Gardens, London SW1W 0BD, **WILL SAY AS FOLLOWS**:

1. I am a Director of the Defendant, a corporate intelligence consultancy based in London, which offers strategic advice, intelligence gathering and investigation services.

2. I make this statement in support of the Defendant's defence of this data protection claim.

3. I confirm that insofar as the matters set out in this statement derive from my own knowledge they are true. Where matters are not within my personal knowledge, they are true to the best of my information and belief and derive from the sources referred to. Where facts are not within my own knowledge, I have identified the source(s) of that information or belief. Document references in this statement are to the pages of the exhibit to this witness statement marked **CDS1** or to the parties' disclosure.

4.    I was a UK Crown servant between 1987 and 2009, rising to the position of Counsellor in the Foreign and Commonwealth Office, having been posted to Moscow and Paris. In that capacity, I was considered an expert on Russia/Commonwealth of Independent States (**CIS**) affairs, based on my 22 years of experience in the field working mainly on Russian and CIS matters for the government and since then as a national security professional.

5.    I founded the Defendant ("**Orbis**") with a former FCO colleague, Christopher Burrows, in 2009 and have worked there since, as a Director responsible for, inter alia, Russia and CIS business.

**Background**

6.    This claim arises from the publication by BuzzFeed, Inc, without the Defendant's knowledge or permission, of a copy of various intelligence memoranda which it had obtained (again without the Defendant's knowledge or permission) and which had been prepared by the Defendant. One of the intelligence memoranda was headed "Company Intelligence Report 2016/112". Its substantive heading was "Russia/US Presidential Election: Kremlin-Alpha Group Co-Operation". This memo has been referred to as "CR112".

7.    The "Alpha Group" referred to in that title is in fact "Alfa Group", which is a financial investment conglomerate operating in Russia and the CIS. It owns shareholdings in a number of businesses including investment companies, banks and retail groups.

8.    The Claimants are all members of the Supervisory Board of Alfa Group. The Second and Third Claimants are founders of the company. The Second Claimant is also Chairman of Alfa Group and the First Claimant is Chairman of the Board of Directors of Alfa Bank, a subsidiary of Alfa Group.

9.    CR112 referred to the First and Second Claimants, but not the Third Claimant. In the present proceedings, the Claimants make certain complaints under the Data Protection Act 1998 (**DPA**) about aspects of CR112.

~~**Other relevant proceedings**~~

~~10.    This is one of four sets of proceedings brought by the Claimants in relation to CR112.In each of those claims, the Claimants sought damages against the relevant Defendants on the basis that they were liable for the alleged damage to the Claimants' reputations and the "resulting harm" arising from media coverage. In the claim against BuzzFeed, Inc. the Claimants sought compensatory damages in excess of $25,000 each, in addition to punitive damages and other relief. None of these claims was stated to relate to damage suffered solely in the US.~~

~~11.    The four sets of proceedings to which I refer are as follows:~~

~~11.1 In the US, the Claimants have brought defamation proceedings against the Defendant and myself. This claim was dismissed in August 2018 as a consequence of the Court having found that the Plaintiffs, who are the same as the Claimants in this claim, had not submitted evidence that the Defendant and I knew that any of the intelligence contained within the relevant memorandum was false or that the Defendant or I had acted with reckless disregard for its falsity~~

~~**[CDS1/1-24]**. The Claimants have appealed that decision, but it has not been overturned and the appeal is yet to be determined.~~

~~11.2 The Claimants have also brought separate defamation claims in the US against the third parties BuzzFeed, Inc and others **[CDS1/25-38]**. The Claimants' defamation claim in the US against BuzzFeed, Inc. and others was dismissed when the Defendants' affirmative defence of fair and true report privilege, codified in New York Civil Rights Law section 74, which shields publishers from civil liability for claims of defamation when the alleged defamatory statements are published to report accurately about official government activity, was upheld. The Claimants' appeal against that judgment was dismissed.~~

~~11.3 The Claimants have also brought defamation proceedings against Fusion GPS and Glenn Simpson **[CDS1/39-52]**. The claim remains ongoing.~~

~~12.    I think it is significant that notwithstanding the substantial publicity that arose following BuzzFeed's publication, the focus of such reporting was not on the Claimants, whether collectively or individually. To the best of my recollection, coverage focused much more substantially on the Russian state's interference with the US election, including secret meetings and the compromising material of a sexual nature about Donald Trump. The most publicity concerning the Claimants in this context in fact appears to have arisen from the Claimants' denials of the content of the relevant memorandum and the claims the Claimants have brought. By way of an indication of that point, I exhibit Google search results for "trump dossier buzzfeed" and "aven fridman khan dossier" as at 4 February 2020 **[CDS1/53-54]**.~~

**Instruction by Fusion on behalf of law firm Perkins Coie**

13.    From June 2016, Orbis was engaged by a Washington DC-based consultancy called Fusion GPS ("**Fusion**"), which describes itself as providing "research, strategic intelligence and due diligence services", to investigate the then presumptive Republican Presidential nominee, Donald Trump, and his alleged links with Russia, and specifically with President Putin and other Russian officials, whether directly or indirectly.

14.    Orbis was engaged via a telephone instruction communicated by one of Fusion's founders, Mr Glenn Simpson, to me in late May 2016. Prior to that instruction, Orbis and I had worked with Fusion and Glenn Simpson on a number of assignments since 2010. Sometimes Orbis would engage Fusion and on other occasions Fusion would engage Orbis. I think we had completed a handful of assignments together.

15.    Fusion was our client and paid our bills. Orbis was paid for the work it did up until the election on the basis of a retainer plus the payment of expenses. The sum of the retainer was £100,000 was paid in total, split over five monthly instalments, which represented just 5% of our turnover in the relevant year.

16.    Because of the sensitive nature of the assignment and the intelligence to be gathered in creating the intelligence memoranda, I had made a point at the outset of establishing that the client of Fusion, who had instructed Fusion to engage the Defendant to gather the intelligence contained in them, was trustworthy. I was told at the beginning of Orbis' engagement with Fusion that it was a respectable law firm

in Washington DC. It was not until around July that at my request, I was made aware of the identity of Fusion's immediate client. Glenn Simpson of Fusion

told me that the law firm Perkins Coie in Washington DC were his client. I ascertained that it was a well-established US law firm and I regarded them as trustworthy. I was never told the identity of the client(s) of the law firm. I did not ask to be told, and there was no need for me to know, given that I had satisfied myself as to the trustworthiness of both Fusion and Perkins Coie. I had no involvement with Perkins Coie's ultimate client. However, given the involvement of Perkins Coie, I concluded that the research I was instructed to undertake was for the purposes of a legal matter (whether a claim or advice). I expand on this conclusion below.

17.  I initially met in late-July 2016, together with Fusion's representatives, with a partner of Perkins Coie, Mark Sussman. At the time, he was identified on the firm's website as a partner in the firm's Privacy and Data Security Practice **[CDS1/55-56]**.

18.  I understood that while the research we were instructed to undertake had initially been commissioned by a Republican-leaning client, the research was by that time being funded by supporters or associates of the Democratic Party. As Fusion's client was a law firm, I understood that the purpose of this intelligence-gathering exercise was to provide Perkins Coie with information for the purposes of the provision of legal advice to its client and/or for prospective legal proceedings in the US, as further discussed below.

19.  My belief in this regard was only strengthened as the project progressed. It was on or around 11 September 2016, at the second of three meetings that I attended with Perkins Coie, that I met the partner Marc Elias, who I subsequently ascertained from the firm's website was chair of its Political Law Practice and was at that time acting as General Counsel to 'Hillary for America', the presidential campaign of Hillary Rodham Clinton for the 2016 US Presidential election. Mr Elias had also represented clients in election recount, campaign finance and ethics matters. Mr Elias did not state that the research was being sought for and/or on behalf of the Hillary Clinton campaign, and he did not inform me of the identity of his client. He merely told me that he was a partner of Perkins Coie and his business card made reference to the same. In light of the context in which Orbis was being asked to investigate and provide any relevant intelligence, the nature of the work we were being asked to do, and the entity which was asking for it, however, I formed the view that Perkins Coie's objective was to advise on legal issues arising or otherwise assist with contemplated legal proceedings to overturn an anticipated adverse Presidential election result for Mrs Clinton.

20.  I also became aware from Perkins Coie's website that Mr Elias has in fact represented a number of politicians in election challenges, both prior to and following my meeting with him, including in relation to the 2016 North Carolina post-election and recount, and for Senator Bill Nelson in the Florida Senate race in 2018. As a consequence of the fact that the client was a law firm, I had been informed that Democratic supporters were the ultimate client, and having regard to Mr Elias' area of expertise, I believed that the information contained in the work product Orbis was being asked to provide was to be provided to Perkins Coie for the purposes I have set out above.

**Preparation of the Dossier**

21.    In fulfilling the assignment, I gathered intelligence for and produced a series of intelligence reports between June 2016 and the election on 8 November 2016, by which time the assignment had concluded. Most of those reports were

provided to Fusion GPS securely by enciphered email, either via the Defendant's IT systems or using the encrypted email platform Hush, while the remainder were hand-delivered by a Fed-Ex courier.

22.    The first report was dated 20 June 2016 and after that 15 further reports were prepared. Collectively, these reports, together with a report prepared after the Presidential election which had not been prepared pursuant to the assignment, became known in the wider media as the "Steele Dossier" or the "Trump/Russia Dossier" (herein referred to as "the **Dossier**") **[D1/2]**. Four reports were prepared in July, four in August, three in September, including the memorandum which is the subject of these proceedings - CR112 dated 14 September 2016 **[D1/1]** and a further four in October. The last intelligence report that was prepared pursuant to the assignment from Fusion was dated 20 October 2016, and Orbis' last invoice to Fusion for the assignment was dated 31 October 2016.

23.    Initially, the nature of the instruction was broad – to investigate, through the gathering of human intelligence from reliable sources inside and outside of Russia, whether there were links between Republican Presidential candidate Donald Trump's campaign team and Russian interests.

24.    As the Court will see, CR112 is only one part of a suite of memoranda. The others addressed inter alia Russian exploitation of Donald Trump's sexual activities in Russia, extensive conspiracy between the Kremlin and the Trump Presidential Campaign, and Russian state-sponsored cybercrime in the US. None of those other memoranda made any mention of the Claimants or Alfa Group.

25.    Specifically in relation to CR112, on or around 11 September 2016, at the second meeting with Perkins Coie described at paragraph 19 above, Mark Sussman, who I had first met at the meeting with Perkins Coie in July 2016, gave me a general outline of allegations of which he was aware relating to alleged server activity linking Alfa Bank, an entity with which the Claimants are closely associated, and Trump Tower. Those allegations have subsequently been widely reported in the media **[CDS1/57]**. The gist of these allegations is that internet traffic data suggested that an Alfa Bank computer server had been interacting with a computer linked to the Trump organisation, and this was considered unusual activity which could be indicative of surreptitious communications between the organisations or individuals associated with them.

26.    I was informed by either Mr Elias or Mr Sussman at the time of the meeting on or around 11 September 2016 that the allegation of apparent communication between Alfa Bank and Trump Tower had been reported to the United States Federal Bureau of Investigation ("**FBI**"). In light of the allegations, I had been asked by Mr Simpson what intelligence Orbis could produce on Alfa Group (this is not itself a legal entity, but a consortium of companies that includes Alfa Bank), its principals and any links to President Putin. The request was made in the context of the wider tasking in relation to links between Putin and Russian officials and the Trump campaign, and potential interference. Again, as I have indicated above, I had concluded that this research was being commissioned for the purposes of a legal matter (whether a claim or advice) involving Perkins Coie's client.

27.   ~~I am aware that these allegations were taken seriously, in that Alfa Bank instructed two cybersecurity firms to investigate the allegations~~ **[CDS1/58-67]**~~. First, Mandiant was instructed to investigate allegations relating to contact in 2016; it considered the evidence to be inconclusive~~ **[CDS1/68-69]**~~. Alfa Bank~~

~~subsequently instructed a former member of Mr Trump's campaign and Presidential transition team, Mr Brian Benczkowski, to supervise an investigation by Stroz Fridberg to investigate allegations of contact in 2017~~ **[CDS1/70-75]**~~. Mr Benczkowski was subsequently appointed as Assistant Attorney General for the Criminal Division of the US Department of Justice.~~

### Compilation of CR112

28.   I personally carried out or supervised the work undertaken by Orbis for the purpose of this assignment. In order to gather the relevant intelligence, I asked trusted intermediaries, also known as sources, to de-brief trusted Russian sub-sources who would have personal knowledge of and/or direct access to the relevant information. These sources are connections that I have built during the course of my career and were tasked directly by me. I consider these intermediaries to themselves be protected confidential sources, and I believe that they would also consider themselves in the same way. I was satisfied, based on my knowledge and experience of them, that they were reliable. Indeed, I used the most reliable sources available to me. I was also satisfied that these sources would in turn draw on sub-sources who were reliable.

29.   Sources are paid a retainer which is not dependent upon productivity or results. They may also have been working on other projects at the same time as this project for Fusion. The average retainer for an intermediary is between $3,000 and $5,000 per month. The sub-sources who engaged with the intermediaries were not paid by Orbis. Each intermediary knows, because they have been informed by myself or other of the Defendant's directors or staff, that sources must not be paid and that to do so may be contrary to the Bribery Act 2010 and/or the Foreign Corrupt Practices Act 1977, depending on the identity of the source – not all would be government or corporate employees. Intermediaries would be permitted to make a small gift to a source, such as an inexpensive meal like pizza or a bottle of whisky, but otherwise the source would have no financial or other incentive to provide any intelligence, or intelligence of a certain nature. Orbis takes active steps to ensure compliance among our sources. These steps included informing the source, before he or she met with a sub-source, of the limits of gifts or favours that were allowed by to anti-corruption legislation. During the course of my briefings with the sources following their meeting with a sub-source, I would ask about the circumstances of the meetings with the sub-sources, whether any modest gifts had been given to the sub-source, the value of the dinner that had been consumed by the parties, and if the sub-source had asked the source for any favours in exchange for the intelligence.

30.   The tasking to sources was conducted as what is known as a "head agent operation", that is to say that the sources and sub-sources did not know about their respective counterparts or how the "food chain" above the source evolved. Contact between the sub-source and the source was made from a country outside the UK.

31.   I approached one main source and a couple of subsidiary sources in relation to the Dossier. The Dossier was comprised of intelligence obtained from 3 sources and

approximately 20 sub-sources. In respect of CR112 specifically, the content of the memorandum was based on the intelligence provided by a single source and a single sub-source. It would be wrong to suggest, however, that the intelligence received was merely regurgitated in CR112 and that no efforts were made to consider or assess the reliability and veracity of the intelligence received.

Instead, I took the following steps to ensure as far as possible the reliability of the content of the memoranda in the Dossier – including CR112.

32. I knew the identities of the sources and sub-sources (some of whom were public individuals). I assessed the intelligence I received having regard to what I knew of the sources and sub-sources and their roles, my knowledge of the structure of the Russian political system and its inter-connections with business, and the credibility of their story. I asked others about the individual source or sub-source and their story, and I cross-referenced the information I received against open source data where possible. I asked myself whether the appearance of the information (for example, whether it seemed sensationalist, had any discrepancies or any seemingly misleading information etc), the access of the individual, and the story itself added up and tallied with the intelligence being received from others, and was consistent with my own knowledge and experience. I did not take what was said at face value but instead looked at the open source data pertaining to the individuals involved, other reporting, including that provided by other sources, and tried to find out whether other government and intelligence institutions internationally had any relevant intelligence to corroborate or contradict the intelligence we received.

33. The source would report back to me and I would compile a memorandum based on the intelligence shared by the source. I would ask source about the circumstances of the meeting with the sub-source, what was said, what wasn't said, what if anything was handed over, and whether any favours were asked, such as for advice or assistance in arranging a meeting. Normally, sources would transit through London and onto other destinations out of the country. On their transit out of London, I would meet with them face to face to brief them on the intelligence I was seeking. Within two or three days of my briefing, they would then travel out of London and meet with their sub-source(s). Within about two or three days of their meeting with a sub-source, the intermediary would then travel back to London and I would meet with them again for a face-to-face debrief. If face-to-face briefings were not possible, I would speak with the intermediaries by phone via a secure encrypted connection.

34. I would take detailed manuscript notes during the course of debriefs and then within a day or so, would compile a summary report and destroy any manuscript notes. To my knowledge, notes would not normally be taken by sources during the course of their meetings with sub-sources. Whilst I might retain manuscript notes where the memorandum is of a complicated nature, or the intermediary is a new connection, I did not retain them with respect to CR112 specifically. I did not keep them because the memorandum and the intelligence it contained was very straightforward. The source and sub-source were established connections of mine; I trusted them and knew that they were in a position to report to me accurately. Both the source and the sub-source had a very good reporting record.

35. Where possible, I would get the source to digitally record the conversion with the sub-source so that I could listen to their exchange myself, as I speak Russian. Having listened to the relevant recording and prepared the intelligence

memorandum recording the intelligence conveyed by the sub-source to the source, the recordings were not retained and were destroyed. There were no recordings made in relation to CR112. Where no recording was made, I would make notes of the de-briefing with the sub-source as detailed above. This approach ensured that the intelligence provided by the sub-source was recorded as accurately as possible and, where recording was possible, this provided an additional measure by which to assess the intelligence.

36.    In the case of intelligence gathered on more minor subjects of reports, I would need to conduct more research, but this was not the case here. My knowledge of Alfa is very extensive. Orbis had already conducted reverse due-diligence on Alfa Group in January 2016 and the Claimants would consistently appear in unrelated intelligence reports about Russian and CIS matters during my government role and afterwards, so I was familiar with each of the Claimants' operating techniques, lobbying activities, backgrounds, histories and relationships. For example, I was aware from a now-retired senior official at the Financial Services Authority, as it then was, in the context of another enquiry, that Alfa Group had applied for a licence to operate in the financial markets and to conduct energy work in the North Sea **[CDS1/76]**. I am also aware from the same source that the Russian Ambassador to the United Kingdom, Yuri Fedotov, attended the offices of the FSA in order to attempt to incite the FSA to reverse their decision to refuse to grant Pamplona Capital Management, which was owned by Alfa Group, permission to take its stake in the insurer Chaucer above 9.9% to 29.9%, as further discussed below **[CDS1/77-80]**. I was informed that both licenses were refused as the Group and their illicit connections were considered unsuitable to operate in regulated UK markets.

37.    That extensive pre-existing knowledge of the Alfa Group and the Claimants helped me to assess the reliability and accuracy of the information I received for the purposes of this assignment, and the information I included in CR112.

38.    As I have indicated, I would usually transfer the completed intelligence report to Fusion by enciphered email (which is what I did with CR112), although the first report in the Dossier was couriered to them in person by Fed-Ex. My understanding from Glenn Simpson was that upon receipt, Fusion would print off the report and go to brief their client, Perkins Coie, and discuss the content of the report without actually disclosing a copy of it.

**Disclosures of the Dossier, including CR112**

39.    I wish to emphasise that I considered the memoranda to be extremely sensitive, by reference to the interests of sources, sub-sources and my clients in particular. I did not and would not have authorised the content of the Dossier being disclosed to the media or put into the public domain. In the previous ten years, to my knowledge no report ever compiled by Orbis has ever been reported in the media, despite many of them pertaining to high-profile matters. This is a testament to how carefully intelligence is handled by Orbis.

40.    I prepared CR112 and delivered it to Fusion on or around 14 September 2016. Fusion understood that they were not permitted to give copies of the pre-election reports (i.e. the memoranda, including CR112) that they received from us, whether hard or digital copies, to anyone else without our consent. This included to the client on whose instructions Fusion had engaged the Defendant to gather the intelligence, and I had no reason to believe that Fusion, whom I trusted, would not respect this

important restriction. Fusion was, of course, free to brief their client/s as to the content of the pre-election reports and to discuss the same with the client/s. Fusion did not ask us for permission to give copies of the pre-election reports to their client or any other third party. This understanding with Fusion was based on a standing direction in respect of this instruction specifically and the general practices between Orbis and Fusion.

41.    Aside from the disclosure CR112 to Fusion, I made certain other disclosures, as set out in the Defendant's Defence in these proceedings. I explain those other disclosures as follows.

42.    In early July 2016, in light of the emerging intelligence picture regarding Russian interference in the US presidential election, I felt duty bound to report the information to the FBI, which has as part of its mission "to protect and defend the United States against terrorist and foreign intelligence threats" **[D1/12]**. I provided the intelligence reports prepared to date to them. I initially did this at a meeting with the FBI which took place at the Defendant's office and was attended by myself and my co-director of the Defendant, Mr Burrows. I did not receive payment from the FBI for doing this.

43.    In August 2016, I was requested by the FBI to provide them with all the intelligence we had gathered in the course of our engagement by Fusion, on national security grounds. I was informed by the agent I met with at the meeting in July that the FBI was already investigating similar allegations in relation to connections between the Trump campaign and Russian officials, and that it was in possession of intelligence which was consistent with and would corroborate some of our own reporting. I agreed to do so and provided all the information gathered to that date and continued to pass on these reports to the FBI through to October 2016. This included CR112, which was likely disclosed to the FBI within a few days of it being shared with Fusion on or around 14 September 2016. The content of CR112 was subsequently discussed with the FBI, and they considered it relevant to their investigatory work **[CLAELE00000137]**. I do not know whether this report and others were passed on to the relevant agent's superiors at the FBI, but I am not aware of any reason as to why they would not be. Following the July meeting, subsequent reports were provided to the FBI by way of secure email. The email itself would have been encrypted and any attachment, password protected. I considered the intelligence worthy of further investigation by the FBI, i.e. I made these disclosures for the purposes of assisting the FBI in its functions of safeguarding the national security of the US, which is of course an exceptionally close and important ally of the UK, including in security terms.

44.    I did not seek permission from Fusion or Perkins Coie at this time, although I did inform Glenn Simpson of Orbis' cooperation with the FBI. My recollection is that he did not express any particular view on the matter. I considered the intelligence of such importance, having regard to its potential implications for the national security of the US and UK and their allies, in particular that a political nominee and/or his representatives were potentially colluding with and may ultimately be beholden to foreign powers whose interests would not be in alignment with the national interests of the US or the UK. Therefore, regardless of the consent (or lack of consent) of my client and its client, it was my duty to the Crown to seek to ensure that it was brought to the attention of the appropriate authorities and thoroughly investigated.

45.   In light of the intelligence I was receiving I became concerned about the potential national security implications not only for the US, but also for the UK, both as a consequence of its position as an ally of the US, but also in its own right, as it could be exposed to similar risks as those apparently arising in the US. As a former Crown servant, upon my retirement I was informed that I was under a continuing obligation to report any matter pertinent to UK national security to my former employer. I had done so on at least one previous occasion. My judgment was that I needed to do so again on this occasion, as regards the information I

was gathering and compiling pursuant to the Defendant's assignment from Fusion.

46.   On or around 15 November 2016, I conferred with a former colleague about the situation I found myself in. I didn't provide copies of the intelligence memoranda or inform them of their specific content, but I discussed the general issue of principle. They agreed with my instinct that I should report the intelligence I had received to the national security apparatus of the UK government, for the purposes of helping safeguard the national security of the UK. I therefore contacted a senior UK government national security official, whose responsibilities included monitoring and giving early warning of the development of direct and indirect threats and opportunities to British interests or policies and to the international community as a whole in the fields of external affairs, defence, terrorism, major international criminal activity, scientific, technical and international economic matters and other transnational issues, and to keep under review threats to security at home and overseas and to deal with such security problems as may be referred to them. I arranged to meet with them to brief them on the memoranda. That official indicated that they agreed with my assessment that I should report the relevant intelligence and requested a copy of the memoranda (including CR112), which I provided to them.

47.   On 28 November 2016, I met with Mr David Kramer, former US Assistant Secretary of State for Democracy, Human Rights and Labor of the Bush Administration, in the UK. I had been introduced to Mr Kramer by Sir Andrew Wood, a former British Ambassador to Russia, who is an associate of Orbis and mine. Sir Andrew was aware of the work I had been conducting relating to Russia and the US presidential election. Sir Andrew is a Russianist expert and a trusted friend. I confided in him about the substance of the reports in early November 2016 when I considered that, following the cessation of my contact with the FBI, it nevertheless remained my duty to ensure the intelligence was brought to the attention of appropriate authorities, as discussed at paragraph 42 above. Sir Andrew then attended an international security conference in Nova Scotia and met Mr Kramer, who Andrew knew to be an aide to the then Republican Senator John McCain. Senator McCain was Chair of the Senate Armed Services Committee, whose jurisdiction includes common defence and strategic and critical materials necessary for it, as well as the comprehensive review of matters relating to common defence policy **[CDS1/81-82]**. He was also an ex-officio member of the Senate Committee on Intelligence, whose mission is to "oversee and make continuing studies of the intelligence activities and programs of the United States Government" and to "provide vigilant legislative oversight over the intelligence activities of the United States to assure that such activities are in conformity with the Constitution and laws of the United States" **[D1/15]**. I considered Senator McCain to be a widely respected Senator who took his responsibilities extremely seriously. I did not have any sense that he spoke to the press off the record nor that he leaked confidential information during the course

of his work. He, in particular was approached because I considered him to be an expert and leading senator on Russia national security issues.

48.   Sir Andrew told me that he and Mr Kramer had discussed their concerns over Donald Trump's links to Russia, which were circulating in the public domain by that time in the wider context of the criminal hacking of the Democratic National Committee. Mr Kramer arranged for Sir Andrew to speak to Senator McCain, who asked Sir Andrew if I would be willing to meet with Mr Kramer to share the concerns about Russian interference in the US presidential election arising from the intelligence we had gathered and to give him sight of this intelligence on a

confidential basis. I did not know Mr Kramer, whether personally, professionally or by reputation prior to this, but agreed to meet with him and relied on Sir Andrew's recommendation and Senator McCain's appointment of Mr Kramer as his designated personal representative.

49.   Mr Kramer informed me at the meeting that, from his conversations with Sir Andrew, he considered that my investigations and the resulting intelligence raised issues of potential national security importance to the US and that was why he, as a representative of Senator McCain, was requesting sight of the reports on a confidential basis and a discussion regarding their contents. From what I knew of Sir Andrew's discussion with Senator McCain and Mr Kramer's explanation, I accepted this assessment and I showed Mr Kramer a copy of the intelligence reports prepared as at that time, those being all the reports in the Dossier, including CR112, with the exception of the December memorandum which had not yet been prepared, and we discussed their content. I did not provide Mr Kramer with a copy of the reports at this time because I did not want him carrying hard copy confidential documents across borders where they were susceptible to being reviewed by customs officials.

50.   Upon Mr Kramer's return to the United States, however, Mr Kramer requested a copy of the reports with a view to providing them to Senator McCain. I understood that Mr Kramer had discussed the intelligence I had shared with him at our meeting with Senator McCain and that Senator McCain had tasked Mr Kramer with obtaining copies for him to review and take appropriate action, which I anticipated could include Senator McCain discussing the memoranda with senior Congressional colleagues on oversight committees and/or the FBI.

51.   Although some of the intelligence reports had been provided to the FBI by this time, which Mr Kramer was aware of (as I had told him), my understanding is that the FBI would have been under no obligation to share such material with a member of Congress and therefore Senator McCain would need to obtain it from us. I was satisfied that the intelligence we were continuing to receive was of considerable national security value and ought to be brought to the attention of appropriate entities and further investigated. I therefore considered it appropriate to provide it to Mr Kramer on Senator McCain's behalf.

52.   I agreed to do so in late November 2016 via Fusion, on the understanding that Mr Kramer would provide them only to Senator McCain. I considered it important that Senator McCain, having regard to his roles as described above, was able to have access to this material himself and to take whatever action he considered necessary. Mr Simpson of Fusion was to print a copy of the memoranda and provide a hard copy to Mr Kramer to take to Senator McCain in person. I told both Mr Simpson and Mr Kramer that this was the basis on which the reports were being

disclosed and was satisfied that they both understood this and would comply with the stipulation. They accepted that Orbis would need to be consulted about and to approve any wider dissemination of the reports or the information contained within them. I was not asked by Mr Kramer for, and did not provide, permission for the reports or their content to be shared more widely at that time, and certainly not to the media. As I have said, I did not consent and would not have consented to their publication to the world at large. I believed that Mr Kramer and Senator McCain's interest in the intelligence was genuine and for legitimate national security purposes. I had no reason to think that the purpose for which the material was requested was anything other than this.

53.    I also provided a copy of CR112 to Strobe Talbott in early November 2016. Mr Talbott is a former US Deputy Secretary of State, who at the time was the President of the Brookings Institution and a member of the Council on Foreign Relations. Mr Talbott approached me and I understood that he had been speaking with John Kerry, the then US Secretary of State, and Victoria Nuland, the then Assistant Secretary of State for European and Eurasian Affairs. Mr Kerry had been informed by Ms Nuland of the existence and broad content of the Dossier and its relevance to the Presidential election. He told me that he was due to meet with a group of individuals at the State Department, including Tony Blinken, the then US Deputy Secretary of State, and asked whether I could share a copy of the Dossier with him, with a view to him being able to discuss the national security issues raised with these individuals. I agreed to provide him with a copy, because I considered that this was reasonably necessary for national security purposes.

54.    I have subsequently revisited the circumstances in which I provided the Dossier to Strobe Talbott with him and he has explicitly stated that he considered that his request for the provision of the Dossier, including CR112, was in connection with the national security issues presented by potential interference in the Presidential election by a foreign power. We had this discussion in November 2016.

55.    I have explained above all disclosures of the Dossier, including CR112, which I made or authorised. Though it does not entail the disclosure or authorisation of the disclosure of the Dossier, there is one further point I should draw to the Court's attention. This point is as follows.

56.    In early December 2016, Mr Kramer asked me if he could discuss the Dossier with a senior US national security official, Celeste Wallander, the Special Assistant to the President and Senior Director for Russia and Eurasia on the National Security Council, and also mentioned that he had spoken about it to the chief of staff of a senior member of Congress, Paul Ryan, who was the speaker of the US House of Representatives. The role of the National Security Council is to advise and assist the US President, who Chairs the Council, on national security and foreign policies and was established by the National Security Act of 1947 (PL 235 – 61 Stat. 496; U.S.C. 402), amended by the National Security Act Amendments of 1949 (63 Stat. 579; 50 U.S.C. 401 et seq. **[CDS1/83-92]**. As Speaker of the US House of Representatives, Mr Ryan was second in the presidential line of succession under the Presidential Succession Act of 1947 and would remain in post following the Presidential election. I considered that these further disclosures were consistent with the original purpose for which the information was disclosed though I do not recall whether I positively agreed or simply did not object but I assumed that Senator McCain was aware of Mr Kramer's discussions with other US national security officials. I do not know whether the content of CR112 was specifically discussed. However, Mr Kramer did not ask my permission to disclose

a copy of the Dossier to these individuals, and I had no indication that he intended to do so.

57.   I was involved, on Fusion's instruction, in giving certain briefings to media organisations in the US, highlighting the wholescale Russian US election interference project and antecedents of it in Europe, Kremlin liaison with Wikileaks and relationships with Trump and leading figures in his campaign, and the Russian objective of helping to get Trump elected as well as sowing divisions and undermining faith in the elections. However, I reiterate that I did not disclose or discuss the content of the Dossier, including CR112, with the media, nor do I recall discussing the Claimants with the media. To the best of my knowledge, the

same is true of Fusion. Thus, my preparation and disclosures of CR112, as described above, were intended for a very limited audience, namely Fusion (and its client, if appropriate) and the persons and entities to whom disclosure was made or authorised for national security purposes. I did not intend, authorise, or envisage that CR112 and the information it contains about the First and Second Claimants would become more widely disseminated.

58.   In particular, I was not aware of and did not authorise any discussion of the content of the Dossier, or grant permission to provide a copy of the Dossier, to BuzzFeed or to its journalist, Mr Ken Bensinger, prior to its publication by BuzzFeed, Inc. on 10 January 2017.

**Accuracy**

59.   The Claimants complain that CR112 included certain statements about them that they say were inaccurate and had not previously been published in the public domain. The Claimants complain of the following sentences (quoted directly from CR112):

(i)   "significant favours continue to be done in both directions [by the Claimants for President Putin and by President Putin for the Claimants], primarily political ones for Putin and business/legal ones for Alpha [sic]";

(ii)  that "[Mikhail] Fridman and [Petr] Aven continued to give informal advice to [President] Putin on foreign policy";

(iii) shortly before 14 September 2016, Mikhail "Fridman recently had met directly with [President] Putin in Russia";

(iv)  that "during the 1990s [Oleg] Govorun had been Head of Government Relations at Alpha Group and in reality, the "driver" and "bag carrier" used by [Mikhail] Fridman and [Petr] Aven to deliver large amounts of illicit cash to the Russian President, at that time deputy Mayor of St Petersburg"; and,

(v)   that Petr Aven and Mikhail Fridman do President Putin's "political bidding".

60.   None of the above sentences refers to the Third Claimant, whether directly or indirectly. I did not intend to make any direct or indirect reference to him personally in those sentences – indeed, if I had wanted to say something about him, I would have done so, as I did with the First and Second Claimants. I do not believe that

the intended audiences for CR112 would read those sentences as containing any reference to the Third Claimant.

61. The Claimants have alleged that all the personal data contained within CR112, to the extent that it relates to each of the Claimants, was based on a single unverified and unsubstantiated source. As set out above, that is incorrect. The intelligence was gleaned from one sub-source and then relayed via a single source to me, whereupon I took steps to evaluate the credibility and correctness of the sources and the intelligence they had provided. In order to do so, I took the steps set out at paragraphs 28-38 above. Based on my knowledge and experience, I consider those steps to have been reasonable and sufficient.

62. The Claimants have persistently declined to explain precisely which factual points within the above sentences they say are inaccurate. For example: in relation to sentence one, I do not know whether the Claimants say that favours have only been done in one direction; in relation to statement two, I do not know whether the Claimants take issue with the word "advice"; in relation to statement three, I do not know whether the Second Claimant takes issue with the approximate date, and so on for the other sentences. As I explain further below, given the factual context here – including the First and Second Claimants' involvements with President Putin – wholescale denial of the above sentences would strike me as very surprising indeed. The Defendant has therefore asked the Claimants to explain their case on accuracy **[CDS1/93-94]**, but the Claimants have not done so. They have maintained their position that the sentences are inaccurate. This point above which party needs to specify their case on accuracy first appears to have reached an impasse. I have therefore proceeded in this statement to explain as much as I can about the accuracy of the five sentences about which the Claimants complain. I do so on a sentence-by-sentence basis. First, however, I make a few contextual points.

63. Information about which the Claimants complain has been the subject of widespread publication, including in court decisions, and such information remains readily available online. This suggests to me that the Claimants do not in fact consider that such information has caused them damage or distress. Aside from the litigation referred to earlier in my statement, I am not aware that the Claimants have made any effort to have such personal data removed or corrected, for example by making take-down requests to websites or delinking requests to search engines.

64. The Second Claimant has himself given an interview to the *New York Times* in which he acknowledged that statements regarding alleged criminality and corruption on the part of the Claimants were *"always around"* **[D2/3]**. This was acknowledged by the court in the US, which dismissed a defamation claim by the First and Second Claimants and found that *"Aven and Fridman have been dogged by allegations of corruption and illegal conduct. Russian newspapers have published repeated claims that Aven and Fridman have rigged the auction of state assets through government connections, threatened the lives of government officials, ordered the assassination of a mobster and engaged in narcotics trafficking and money laundering"* **[D2/8]**. In these circumstances, I simply do not understand why the Claimants say that the five sentences they criticise within CR112 have caused them damage or distress.

65. Regardless, I will now turn to addressing the accuracy of those five sentences. It is important to emphasise the context of these sentences. As I have explained, they

are intelligence material: they are in effect a record of my source and sub-source's understanding, the reliability of which was assessed by me. They are evaluations, rather than what I might think of as objective facts, such as a date of birth or a record of a conviction. The authorised recipients of the memoranda would clearly have understood the information in that way. In addition, some of the sentences are in the nature of opinions - including terms such as "significant favours" and "political bidding".

66. ~~I also note from the outset that, given the significance of the Dossier and the intelligence it disclosed, I have given evidence to US officials on the matter many times. One important example gave rise to the *Report on the Investigation into Russian Interference in the 2016 Presidential Election* by Special Counsel Robert S. Mueller, III published in March 2019 ("**the Mueller Investigation**" or "**the Mueller Report**"). Another important example is my evidence to the Department of Justice and the Office of the Inspector General for the purposes of its review, published in December 2019. Both reports make repeated reference to my credibility and reputation of providing truthful and accurate information. The OIG Report specifically states, in reference to me, that "his former colleagues considered him to be a Russia expert and very competent in [my] work...many of them, almost without exception said, look, he is truthful. He has never been accused of, nor did anybody think he is an embellisher, let alone a fabricator".~~

### Sentence 1: "significant favours"

67. ~~I note that this sentence is about Alfa Group, and does not refer to any specific individual. I also note that no issue is taken with the assertion in CR112 that "the leading figures within Alpha [sic] currently were on very good terms with Putin".~~

68. ~~The Claimants have not stated whether it is their position that: (i) they and President Putin have never done significant favours for each other; (ii) they and President Putin have only done one favour for each other; (iii) that they and President Putin have done favours for each other but they do not consider these to have been significant, (iv) either they have done favours for President Putin or vice-versa but these have not been mutual, or (v) either they have done favours for President Putin or vice-versa but these have not been mutual and were not significant.~~

69. ~~The suggestion that the Claimants and President Putin have not done favours for each other is surprising to me. It is also surprising that such a suggestion would cause any of the Claimants damage or distress, not least because the Claimants have themselves publicly stated the importance of having close connections with the government in order to succeed in their business endeavours.~~

70. I am aware of a number of examples of favours being carried out between the Claimants and President Putin historically, and of the Claimants admitting that this was the case and that they had received preferential treatment:

70.1 The relationship between the First Claimant and Putin dates back a number of years, to when Putin was Deputy Mayor of St Petersburg and head of the Committee for External Relations of the City Hall. In 1992, Putin was the subject of an investigation by the St Petersburg City Council of People's Deputies, which was conducted by Marina Saliye, in relation to the grant of export licences which should have been (but apparently was not) carried out by another official and exchanged

for food **[CDS1/95-99]**. The investigation resulted in a recommendation that he be removed from his post. Instead, the First Claimant subsequently granted Putin's request to be given the right to dispose of quotas and issue export licenses, and Putin received a promotion. I was aware of these facts at the time of compiling CR112.

70.2 ~~Each of the Claimants was identified in the US Treasury Department's 'Report to Congress pursuant to section 241 of the Countering America's Adversaries through Sanctions Act of 2017 regarding Senior Foreign Political Figures and Oligarchs in the Russian Federation and Russian Parastatal Entities' as *"determined by their closeness to the Russian regime and their net worth"* [D2/9]~~.

70.3 ~~President Putin has taken steps to support the Claimants' ventures, participating in a television broadcast to agree with the First Claimant that reports of Alfa~~

~~Bank's liquidity problems in 2004, which threatened a run on the bank, were artificial after it was reported that $100m (£54m) had been withdrawn in the first week of July [CDS1/100-101]~~.

70.4 In 2003, Putin blessed BP's joint venture with the First and Second Claimants in favour of a deal with Gazprom or Rosneft (known as TNK-BP) **[D2/30]**. Subsequently, it has been alleged that the Russian FSB (the Russian Federal Security Service), whose head reports directly to the President, supported the First and Second Claimants to gain the advantage against BP in their joint venture in which the parties each had a 50% interest and therefore had been unable to gain control or force their agenda. That support allegedly included harassing staff by opening unfounded investigations and bringing prosecutions against them **[CDS1/102-107]**. One example of this is Ilya Zaslavskiy, who claims to have been the victim of one such investigation, the purpose of which he said he believes was to provide cover for a search of TNK-BP's offices. He has said that despite compromising material having been found relating to the conduct of one of the Russian directors, this was never pursued, while allegations against him were **[CDS1/108-112]**. I was aware of these facts at the time of compiling CR112 and they have since been reported in the press **[CDS/102-107]**.

70.5 The First Claimant has previously given evidence to the US Court for the District of Columbia admitting that Alfa Bank was one of a handful of private financial companies who had a special, direct line to the Kremlin **[D2/8]**. I was aware of these facts at the time of compiling CR112 and have subsequently learnt that the Second Claimant's deposition in US proceedings against the Center for Public Integrity dated 5 February 2002 quotes him as saying "it is impossible to do business if you cannot call to the government" **[CLAELE00000005]**. He is described as being "well connected to the Kremlin and is likely to be one of the main fundraisers for the Russian President". Whilst Mr Fridman accepted that he was well connected to Mr Putin, he did not accept that he was a fundraiser. The Second Claimant has repeated this sentiment publicly, reflecting that "You can't do big business unless you have a good dialogue with those in power" **[CLAELE00000005]**. I was aware of these proceedings at the time of compiling CR112 though had not reviewed the Second Claimant's deposition.

70.6 In 2010, Alfa Bank, one of the entities in the loose consortium of companies comprising the Alfa Group in which the Claimants have an ownership interest, was refused a licence in the context of its efforts though Pamplona Capital Management to take over Chaucer Holdings, the Lloyd's of London insurer, by the

Financial Services Authority ("**FSA**"), as it then was. Subsequent to this refusal, I have been informed by Sir Andrew Wood and a senior official at the FSA that, in what they considered to be a highly unusual if not unprecedented step, the then Russian Ambassador to the UK, Yuri Fedotov, demanded a meeting and met with officials to intervene on Alfa Bank's behalf. I consider it inconceivable that such a high-ranking diplomat would have taken such a step to further Alfa's interests without this having been instigated and/or sanctioned at the highest level of the Kremlin. My experience is that ambassadors would take instructions from senior officials before taking such a step, and it is inconceivable that Mr Fedotov would make such a demand without having prior instruction, particularly as it is my understanding that he had not undertaken something like this before. I was aware of these facts at the time of compiling CR112.

70.7 Following his earlier involvement in the deal that brought the companies together, President Putin was again personally involved in the sale of TNK-BP, in which the First and Second Claimants had an interest, to the majority Russian state-owned energy company Rosneft. That took place in 2013. The First and Second Claimants profited hugely and apparently received a sum in excess of the company's then market value **[CDS1/113-116]**. I was aware of these facts at the time of compiling CR112 which have since been reported in the press, see for example **[CDS/113-116]**. The Claimants and their advisers have since acknowledged that the photograph of them with President Putin at this signing represented for "Many in the USA" that the Claimants "are close to Putin" **[CLAELE00000111]**.

70.8 The First Claimant has publicly stated that "I make no secret of the fact that the authorities helped us in a major Russian investment abroad made by Alfa, when we put USD 3.2 billion into Turkcell. It would have been absolutely impossible for us to have done it without political support" **[CLAELE00000013]**.

70.9 In 2015, the First Claimant was personally honoured with an award, the Order of Friendship, by President Putin **[CDS1/117-118]**. I was aware of these facts at the time of compiling CR112.

70.10 The Claimants have assisted the Russian Ministry of the Interior by granting positions to former officers of the Russian FSB or Federal Security Service of the Russian Federation. I was aware of these facts at the time of compiling CR112 which have since been reported in the press, see for example **[CDS1/119-130]**.

70.11 The Claimants, through Alfa Group, support the Alfa-Endo Charitable Programme, which is run by the Endocrinology Research Centre in Moscow and was established to help children in remote areas who are living with type-one diabetes. President Putin's daughter, Maria Faassen, was reported to be a PhD candidate at that Centre in 2015 **[CDS1/131-132]**.

70.12 In an article considered by the Director of Communications at Letter One (one of the constituent entities of Alfa Group) to represent "good" coverage, Alfa Group was described as having been "close enough to the Russian state to manipulate it on many occasions" **[CLAELE00000050]**.

70.13 In approving the proposed response to queries posed by Private Eye concerning the content of CR112, the Second Claimant indicted that "Everything, from my point of view, is exactly right". That response included the statement that "We

always followed this philosophy – always to be loyal and friendly [to the government]..." **[CLAELE00000062]**.

70.14 Between 2004 and 2014, the Claimants through Alfa Bank conducted spent almost $6 million on lobbying efforts related to "Bilateral US-Russian Relations" **[CDS1/133-145]**. I was aware of these facts at the time of compiling CR112.

70.15 The Second Claimant visited the White House in May 2010 and again in May 2011, accompanied by the former US diplomat Richard Burt (now a member of the senior advisory board at Alfa Bank) with the stated aim of strengthening *"ties between the United States and Russia and to discuss Russian ascension to the World Trade organisation"* **[CDS1/140]**. I was aware of these facts at the time of compiling CR112.

70.16 In addition, in the context of the very issues on which the Dossier was focused, the First Claimant gave evidence to the Mueller Investigation **[D1/6]** that in 2016 President Putin had discussed the difficulty in the Russian government in engaging with the incoming Trump administration. The First Claimant made clear that he understood the discussion, and others like it, to represent "implicit directives" on the part of President Putin, and as a consequence he made efforts to reach out to the Trump transition team via Richard Burt **[CDS1/146]**.

70.17 The First Claimant achieved this by instructing Mr Burt in the margins of a Board meeting of Letter One to assist in establishing a "communications channel between the Kremlin and the Trump transition team" and informed Mr Burt that this was on behalf of "someone high in the Russian government". This was referred to as "Project A". Richard Burt subsequently emailed the First Claimant stating that he "had reached out to a very influential person [he] mentioned in Luxembourg concerning Project A... With so much intense interest in the Congress and the media over the question of cyber-hacking, project A was too explosive to discuss". Having had this initial discussion with President Putin, the President subsequently enquired as to the progress of the First Claimant's efforts in securing such a communications channel on the occasions when he met with the First Claimant. In these circumstances, I would expect that the Second Claimant was also aware and approved of the tasking on behalf of President Putin. Indeed, I consider it would be highly unlikely if each of the Claimants was not fully aware of the overtures by President Putin and the First Claimant's use of Alfa Group's resources in an effort to satisfy them.

71. I note that despite these efforts to connect with President Trump, in a March 2017 briefing note for an interview with Reuters concerning the apparent server links between Alfa Bank and the Trump Organization, it was proposed that the Claimants would state that "these malicious attacks are designed to create the false impression that Alfa Bank has a secretive relationship with the Trump Organization. In fact, there is not and never has been such a relationship" **[CLAELE00000067]**. I was aware of these facts at the time of compiling CR112.

72. As such, I believe it to be evident that President Putin and the Claimants – whether individually or through Alfa – have done numerous and significant favours for each other over a number of years. Furthermore, in light of these matters and the fact that they were and continue to be widely reported in the public domain, it does not appear to me that any of the Claimants would have suffered damage or distress as a consequence of such a suggestion appearing in CR112.

**Sentence 2: giving "informal advice" to President Putin**

73.   ~~The First and Second Claimants have not made clear whether their position is, for example, that they have (i) never given any policy advice to President Putin or (ii) whether they accept that they have given policy advice to President Putin but have only done so in a formal and not an informal capacity (although if the latter is the case it is difficult to envisage why that would cause them damage or distress).~~

74.   The involvement of the First and Second in a number of policy-forming initiatives, both directly with President Putin/his staff and in wider society, has been well-publicised and is not something that they have shied away from:

74.1   The First Claimant has admitted that Mr Putin reported directly to him when they were employed at the ministry in the St Petersburg region. He has admitted that he was close to Mr Putin before he became President and that he has met President Putin on multiple occasions since he became President. He has admitted that the topics of discussion included "Economic issues of the day", "Liberalization of the currency regime", "banking reform -- bank supervision", "private pension funds" and the "World Trade Organization", and that he had previously discussed "free press" when Mr Putin was Prime Minister **[CLAELE00000008].** I was aware of these facts at the time of compiling CR112.

74.2   The First and Second Claimants were Board members of the Russian Union of Industrialists and Entrepreneurs, the meetings of which have regularly been attended by President Putin, who has admitted that many government decisions are only taken after consulting with the group, and attended numerous meetings at which he was also in attendance. I was aware of these facts at the time of compiling CR112 which have since been reported in the press, see for example **[CDS1/147-150].** The Union states that it has "the advantage of formalized mechanisms of cooperation with governmental authorities through Russian Trilateral Commission on the Regulation of Social and Labour Relations, regional and territorial trilateral commissions" **[CDS1/151-152].**

74.3   The First Claimant, who is also the former Minister of Foreign Economic Relations, is a member of the Presidium of the Russian International Affairs Council, established in 2010 pursuant to a Russian Presidential decree, and cofounded by the Foreign Ministry and the Education and Science Ministry of the Russian Federation **[CDS1/153].** Its mission is to "facilitate Russia's peaceful integration into the global community". Other members of the Presidium are the former Russian Foreign Minister Igor Ivanov, President Putin's Press Secretary Dmitriy Peskov, Deputy Foreign Minister Dmitriy Morgulov and Fedor Lukyanov, the Editor-in-Chief for Russia in Global Affairs journal and Chairman of the Presidium of the Council for Foreign and Defense Policy. I was aware of these facts at the time of compiling CR112.

74.4   Alfa Group is also a Partner of the Valdai Discussion Club, co-founded by the Russian International Affairs Council, the Council on Foreign and Defense Policy, and two Russian Universities, the Moscow State Institute of International Relations and the Higher School of Economics. The Club's focus is on "practical work aimed at forming the global agenda and delivering a qualified and objective assessment of global political and economic issues". President Putin attends and meets with the participants of the Club's annual meeting and has done so every

year since it was founded in 2004 **[CDS1/154-155]**. I was aware of these facts at the time of compiling CR112.

74.5    The Second Claimant has been a member of the US-headquartered International Advisory Board of the Council on Foreign Relations, a think-tank which invites its members to comment on practical opportunities for collaboration between the Council and institutions abroad, and provides international insights into US foreign policy **[CDS1/156]**. I was aware of these facts at the time of compiling CR112.

74.6    Again, the First Claimant has admitted that he attended, I believe with the Second Claimant, the quarterly oligarch meetings attended by President Putin at which matters of foreign policy were discussed, on issues including the prospect of forthcoming US sanctions **[CDS1/157-160]**.

75.     I therefore remain of the view that I was entitled ~~and indeed correct~~ to assess the First and Second Claimants as giving "informal advice" to President Putin. The same is true of my assessment of such advice extending to or including "foreign policy" and in particular the US. In this regard, I add that, in the context in which the Claimants were operating, it would artificial to seek to distinguish economic advice from foreign policy advice.

**Sentence 3: Second Claimant's having "recently met" with President Putin**

76.     The Second Claimant complains that it is inaccurate to suggest that he met with President Putin shortly before 14 September 2016. I point out that CR112 actually stated that "FRIDMAN recently had met directly with PUTIN in Russia". I did not provide a specific date. In my view, what constitutes a recent meeting in relation to the Russian President is different to, say, referring to a recent meeting with one's neighbour. I highlight also that – as my discussion of sentences 1 and 2 makes clear – CR112 was concerned with a long-term picture of interactions. Indeed, sentence 4 concerns the 1990s.

77.     ~~I do not understand precisely what information the Second Claimant alleges is inaccurate in his personal data in this sentence. I do not know whether, for example, it is his position that (i) he has not met President Putin, or (ii) that he has met President Putin but that he does not consider that he had done so "recently" as at 14 September 2016. If the latter, the Second Claimant has not explained what he thinks counts as "recently", and in any event it is difficult to understand what damage or distress could legitimately have been caused to him on this specific point.~~

78.     ~~The Claimants' internal briefing documents preparing them to dispute this allegation publicly appear to focus on the Second Claimant's position that he had "never met Mr Putin privately... never met him one-to-one" **[CLAELE00000069]**. Again, that is not was CR112 stated. I referred to the Second Claimant as having met "directly" with President Putin, i.e. rather than with President Putin's representatives. I did not refer to private or one-to-one meetings, and do not believe that the intended audience for CR112 – or anyone else for that matter – would have read in any reference to private or one-to-one meetings. If I had intended to convey that a recent meeting of that nature had occurred, I would have said so.~~

79.     ~~Those same briefing documents suggested that the Second Claimant accepts that he had "routine contact" with regulators and ministries and had "met~~

President Putin". This was repeated in a letter from the Second Claimant to the President of CNN, which stated that "I have met President Putin..." **[CLAELE00000078]**.

80.     In any event, the Second Claimant has in fact met publicly with President Putin on several occasions, including in 2016:

80.1 The Second Claimant and President Putin were pictured together on 31 May 2001 **[CDS1/161-163]** and shaking hands a meeting about TNK-BP on 22 April 2005 **[CDS1/164]**. I was aware of these facts at the time of compiling CR112.

80.2 The Second Claimant has given evidence in a deposition that he met with President Putin on more than one occasion **[CLAELE000005]**.

80.3 The Second Claimant has met President Putin both prior to and since September 2016, including on 22 October 2008 **[CDS1/165-166]**, in March 2016 **[D2/14]**, on 19 December 2016, 16 March 2017, in April 2017 (shortly before issuing these proceedings) and 21 September 2017 in his role as member of the Russian Union of Industrialists and Entrepreneurs **[D2/14]**. It is my understanding from a recent conversation with a confidential source that he has had separate meetings with President Putin in the margins of such meetings. I was aware of these facts at the time of compiling CR112.

80.4 I believe that there was also a meeting between the Second Claimant and President Putin in Sochi in or around July 2016.

80.5 Following the meeting of the Russian Union of Industrialists and Entrepreneurs which took place at the Ritz-Carlton, Moscow on 24 March 2016, which was attended by the First and Second Claimants, I understand that they subsequently spoke directly with President Putin **[CDS1/165-170]**. I understand that they sought the President's support for their business ventures in the event of a further deterioration in the economic and political situation in the Ukraine, and approval for further Western investments, which Putin provided, and indicated he would

discuss the US investment plans with the then US Secretary of State John Kerry **[CDS1/171]**.

80.6 Similarly, following the meeting of the Russian Union of Industrialists and Entrepreneurs which took place at the Ritz-Carlton, Moscow on 16 March 2017, which was attended by the First and Second Claimants, they subsequently spoke directly with President Putin **[CDS1/172-176]**. I understand that he thanked them for their contribution to US and Ukrainian foreign policy in relation to Russia and to Russian security and intelligence efforts around the world and said he would mention them to intelligence chiefs. This of course post-dates CR112, but it reinforces the picture of a consistency of engagement.

80.7 Likewise, on 21 September 2017, the First and Second Claimants attended a closed meeting of oligarchs with President Putin at the Kremlin, during which event they engaged in a direct conversation with President Putin concerning difficulties they were experiencing with Letter One's holdings in the UK and US and requesting his assistance **[CDS1/177-178]**.

81.     I therefore maintain that the third sentence complained of was accurate. I am fortified in that assessment by the meetings well before 2016 to which I have

referred above, as well as those after CR112 was compiled. Furthermore, I do not believe that the Second Claimant, or any of the Claimants, would be embarrassed, upset or ashamed of engaging or meeting with President Putin:

81.1 The Second Claimant has admitted that he has spoken regularly to President Putin and that Alfa Bank had a direct line to the Kremlin **[D2/8]**.

81.2 The Second Claimant has recently publicly acknowledged that having access to the Kremlin is *"crucially important"* **[CDS1/179-181 at 180]**.

81.3 I also note that the First Claimant has acknowledged that he "quite regularly meet with the Prime Minister of RF, Minister of Finance of RF, Chairman of the Central Bank, as well as with the President of RF. Usually, I meet with the President 3-4 times a year". The First Claimant also sits on the Board of Trustees of the Russian Geographical Society with President Putin **[CLAELE00000135]**.

### Sentence 4: Oleg Govorun

82.     Again, the First and Second Claimants have not made clear whether it is their position that (i) neither was involved in the delivery of illicit cash to President Putin when he was Deputy Mayor of St Petersburg, (ii) that they were involved in the delivery of illicit cash to President Putin, but not while he was Deputy Mayor, (iii) that they were involved in the delivery of illicit cash to President Putin while he was Deputy Mayor but not via Mr Govorun, or (iv) that they were involved in the delivery of cash to President Putin while he was Deputy Mayor but that they dispute that the cash was illicit. President Putin held the role of Deputy Mayor of St Petersburg between 1994 and 1996, but had previously held other roles in the local government administration.

83.     CR112 stated that Oleg Govorun had been engaged in the role of Head of Government Relations at Alfa Group during the 1990s and acted on behalf of the First and Second Claimants as *"driver"* and *"bag carrier"* to *"deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St Petersburg"*.

84.     I do not believe that it is disputed that Mr Govorun until recently worked as Deputy Head of the Department for Relations with Public Authorities at Alfa Bank prior to becoming Deputy Chief of Territorial Administration of the President of the Russian Federation in 2000. Mr Govorun currently holds the position of Head of the Presidential Directorate for Social and Economic Cooperation with the Commonwealth of Independent States Member Countries. Mr Govorun was included in the US Treasury Department's Office of Foreign Assets Control list of individuals and entities made pursuant to Executive Order (E.O.) 13661 and E.O. 13662, authorities codified by the Countering America's Adversaries Through Sanctions Act (CAATSA), as well as E.O. 13582 **[CDS1/182-187]**.

85.     The fourth sentence refers to Mr Govorun acting as an intermediary between the First and Second Claimants and Mr Putin in the 1990s, delivering substantial cash sums to the latter. The intelligence I received and evaluated in accordance with the methods I have described in my statement led me to believe that this was factually correct. I seen nothing to suggest that it was factually incorrect.

86.     The First and Second Claimants have suggested that this sentence alleged that they committed criminal offences. They have ultimately explained that they read

sentence 4 as an allegation that they had paid a criminal bribe contrary to Article 173 of the old Criminal Code of the Russian Soviet Federative Socialist Republic. CR112 does not state, nor was it intended to state, what purpose(s) the illicit cash was reported to me to have been paid to President Putin for, nor what (if any) benefit the First and Second Claimants may have derived as a consequence. I did not receive any intelligence as to the purpose(s) (if any) for which sums were alleged to have been paid, or any benefit to the First and Second Claimants, and no such purpose or benefit was recorded in CR112, and I did not express any opinion as to why that may have been the case.

87. In fact, whether on its face or as a consequence of my own personal knowledge of Russian society at the relevant time, I did not understand the intelligence as alleging that the First and Second Claimants had been involved in a criminal offence. Societal norms in force today would not necessarily apply to conduct during the 1990s, and it is in my view fair to say that Russia was a rather more lawless place in the 1990s than more recently. The concept of patronage was common, and the business and political elites more intertwined, not least demonstrated by the First Claimant's own career progression. Much business was conducted in cash transactions during the crisis economy of that time, and money changed hands frequently without the checks and balances in place today and without any implication of criminality as alleged by the Claimants. I believe that the Claimants would accept this to be the case, as detailed below.

88. ~~In this regard, I have read the expert report of Ms Eleonora Sergeeva dated 26 July 2019 and note that she accepts at paragraph 23 of her report that "Accepting money for general patronage or connivance at work was not indicated as an element of a bribe in the Old Criminal Code", i..e. under Article 173 of the old Criminal Code of the Russian Soviet Federative Socialist Republic on which the First and Second Claimants rely. In the circumstances, and if and in so far as it is appropriate for her to draw the conclusion that she does in her report, I do not accept that this part of CR112 of which the First and Second Claimants complain "constitutes a criminal offence".~~

89. When I used the word "illicit", I intended to refer to patronage payments of this kind – payments not governed by formal legal arrangements or commercial transactions of the kinds that would be expected by a "Western" audience in particular (bearing in mind the intended audience for CR112). "Illicit" is of course a characterisation or opinion rather than a fact, but – based on the intelligence source(s) I drew on for CR112 and on my knowledge – I believe it to be an apt one in this context. If I had wished to convey something about actual or suspected criminality, I would have made that clear in CR112. I do not believe that the intended audience for CR112 would interpret this sentence as an allegation of criminality.

90. ~~Furthermore, it is important to note that the Claimants and companies with which they are associated have been the subject of allegations of bribery and criminality in the past, and even around the time that CR112 was prepared. I note that the judgment dismissing the Claimants' US defamation claim against me and the Defendant states that "*the information in the Steele Dossier about corrupt payments to Russian public officials was consistent with other information in the public domain*". It goes on to say that "*Mr Fridman himself acknowledged that the "rules of business" in Russian "are quite different to western standards" and "to be completely clean and transparent is not realistic"* **[D2/8]**.~~

91.    In February 2016, it was reported that VimpelCom, a telecoms company in which Letter One (as indicated above, a company owned and managed by the Claimants) owns the biggest shareholding of 47.9%, agreed to settle ~~pay $835m in settlement of~~ US and Dutch charges that it paid massive bribes to enter the Uzbekistan telecommunications market **[CDS1/188-190]**. I was aware of these facts at the time of compiling CR112.

~~92.    I am aware that the Second Claimant is currently under investigation in Spain for allegedly engineering the collapse of Zed World Wide, a technology company in which he was a shareholder to enable him to take over the company at a share price significantly lower than its previous value. Spanish prosecutors alleged that by forcing Zed World Wide to default on loans (issued by VimpelCom), the Second Claimant sought to undertake a hostile takeover of Zed World Wide. Manuel Garcia Castellon, the judge in that case, ruled in September 2019 that there were indications that the Second Claimant exercised control over people and entities that damaged Zed World Wide~~ **[CDS1/191-193]**.

~~93.    Allegations of bribery and corruption have also been made against the Second Claimant and associates connected to him in the Spanish Courts. In 2017, Dutch lawyer Peter Wakkie, described in the media as the Second Claimant's "right hand" was arrested on suspicion of authorising on behalf of Zed World Wide, $30 million in bribes to FunBox, a company owned by the family of then-Russian Minister of Internal Affairs, Vladimir Alexandrovich Kolokoltsev~~ **[CDS1/194-203]**.

94.    ~~I also note that in a 2001~~ *Kommersant Daily* ~~article titled "~~*Economic growth and moral values",* ~~the First Claimant is quoted as explaining that "~~*receiving money from mafia groups or builders of financial pyramids is acceptable"* **[CLAELE00000003]**. ~~In a previous article, the First Claimant stated that "... Russian society has stayed quite attached to bribery. The bribe, in Berdyaev's phrase, is the pillar of Russian life, its fundamental essence... our society looks with a certain admiration at the big-time grafter. In any event people do not shut their doors to him and they shake his hand"~~ **[CLAELE00001123]**. ~~These suggest that he, and those individuals with whom he is in business, would not consider being associated with or accused of involvement in corruption, bribery or other forms of "patronage" as being damaging or distressing.~~

~~95.    Lastly in this regard, I note that no complaint is made of the reference in CR112 to Alfa holding "kompromat" on President Putin "and his corrupt business activities from the 1990s".~~

96.    I therefore considered (and consider) sentence 4 to be a fair, accurate and well-founded assessment that was unlikely to cause the First or Second Claimants damage or distress, given the other public-domain material I have cited above.

**Sentence 5: "political bidding"**

97.    The First and Second Claimants also complain that it was inaccurate to suggest that they do President Putin's political bidding. CR112 in fact recorded that I had been informed that while President Putin was not himself overly concerned by Alfa's failure to reinvest in Russia, he had been able to use pressure from his colleagues at the Kremlin on this count as a lever on the First and Second Claimants to make them do his political bidding. This sentence is an assessment or opinion, which I believe to be apt.

98.     I refer the Court again to the recent example of the First Claimant doing President Putin's political bidding, details of which are set out at paragraph 70.6 above. It seems very likely to me that the other Claimants were aware of that. I also rely on the steps taken by Alfa and/or the Claimants to further President Putin's interests, as detailed in respect of sentence 1 above. Those matters are in my view relevant to my assessment that the First and Second Claimants could aptly be characterised as doing President Putin's "political bidding" on occasion.

99.     This can be linked at least in part to the sale of TNK-BP. By way of example, following the Claimants' sale of shares in TNK-BP to Rosneft, President Putin publicly stated *"If the money was earned legally they can do what they like with it, but I recommend they reinvest it into Russia"* **[CDS1/204-209 at 208]** *OR "I would very much like them to invest this money, or a significant portion of it, in the Russian economy"*. The Claimants responded by indicating that this was indeed their intention. **[CDS1/210-211].** I was aware of these facts at the time of compiling CR112.

100.    I therefore remain of the view that my assessment in sentence 5 was apt and well-founded, and I do not see how it could realistically be said to cause any damage or distress to any of the Claimants, given what I have set out above concerning public-domain material relevant to the sentences complained of.

**Processing of personal data**

101.    Over the period in which CR112 was compiled and disclosed, the Defendant was registered with the Information Commissioner's Office as a data controller under registration ZA065779. Its registration identified the purposes for which personal data was processed as being to "provide investigatory services" amongst other things and that the data being processed would include personal and sensitive personal data in relation to the subjects of investigations., which would be shared with other organisations including the government, business associates, police forces, and examining bodies.

102.    In early 2016, the Claimants had given the Defendant their consent to the processing of their personal data, via the Director of Communications at Letter One. The Defendant duly conducted a reverse due-diligence exercise in relation to the Claimants. While the Claimants were not specifically informed of the circumstances in which their personal data was being processed on a confidential basis in the context of provision of legal advice and/or the conduct of potential legal proceeding and/or for the purpose of national security, it would have been entirely inappropriate to do so and the Defendant did not consider that in these circumstances it was under any obligation to inform the Claimants of the processing of their personal data. While sources were not fully informed as to how the intelligence they provided would be shared, in the manner and for the reasons set out above, they were in no way deceived or misled as to the basis on which it was being provided.

103.    The Claimants' personal data as set out in CR112 accurately records information I was provided with from third parties, i.e. my source and sub-source, and I took reasonable steps to ensure the accuracy of that personal data. Those steps are set out at paragraphs 28 to 38 above. I believe that the steps I took were in line with the approach taken within the industry.

104.    Moreover, I confirm that the Defendant only holds copies of CR112 for the purposes of legal proceedings arising from that memorandum. The Defendant's records indicate that the Claimants contest the accuracy of some of their personal data as contained in CR112. This has been the case since their letter of claim dated 8 February 2018 **[CDS1/212-214]**.

105.    My colleagues and I took great care in relation to ensuring the security of the personal data that we processed. This involved providing verbal briefings and sharing recorded data in person so as to minimise the risks associated with recorded information. We also used encrypted communications platforms.

106.    As to the disclosures made of the personal data contained in CR112, these have been detailed above. I reiterate that the Defendant gathered, recorded and disclosed that personal data for the furtherance of its own business interests and those of Fusion and its client (Perkins Coie and that firm's client). These interests were legitimate, and included the provision of legal advice and/or potential legal claims. The other disclosures made, as detailed above, were for the purposes of safeguarding the national security of the US and/or the UK. I also reiterate that neither I nor the Defendant disclosed CR112 or its contents to the media, nor did we authorise or have any advance knowledge of such disclosure.

107.    The Defendant's position is therefore that these claims under the DPA should be dismissed. However, if the claims are to any extent upheld, I give the following evidence as to the alleged "anxiety and distress" the Claimants say they have suffered.

**The Claimants' alleged distress**

108.    The Claimants have each alleged that they have suffered "anxiety and distress" as a result of Defendant's allegedly unlawful processing of their personal data. In this regard, it is important to distinguish the Defendant's actions, as explained in this statement, from the publication of CR112, which had nothing to do with the Defendant.

109.    Moreover, the Claimants are renowned as hard-nosed businessmen, about whom multiple allegations of criminality have been and continue to be published over the years. I simply do not believe that the five sentences from CR112 on which these proceedings are based have caused the Claimants to suffer anxiety or distress.

110.    ~~The First Claimant has acknowledged that *"All this kompromat (compromising material) is published about everybody, including ourselves"* **[CDS1/215-217 at 216]**. Mr Fridman has even accepted that in the West he and his colleagues will be assumed to be *"agents of influence"* **[CDS1/180]**.~~

111.    ~~While I am aware that the Claimants have complained outside of these proceedings that they had no involvement in efforts to influence the 2016 US Presidential election, Alfa Group in fact owns SCL Group, a subsidiary of which is Cambridge Analytica, which was engaged on behalf of President Trump's campaign and responsible for harvesting the personal data of Facebook users to micro-target voters with tailored political messaging. That company was found guilty by the Information Commissioner's Office of serious breaches of the data protection principles **[CDS1/218-219]**. If the Claimants suffer from a taint of association between their businesses and influence on the election of President Trump, that taint seems to me to arise regardless of CR112.~~

RPC

112. The Claimants have previously been the subject of numerous allegations of criminal or improper conduct over many years, which have been widely published in the media and referenced in published judgments, and these have continued up until the present day. In the vast majority of these cases, which involve personal and sensitive personal data concerning the Claimants and allegations far more serious than those now being complained of, which the Claimants appear not to have made efforts to have removed, either from the search results of search engine providers such as Google or from the original publishers. In light of these I am highly sceptical as to the suggestion that the specific content of memorandum CR112 which is complained of caused them anxiety and distress.

113. For example, in an article first published in August 2000 by the Center for Public Integrity which remains freely available online **[D2/28]** 'Cheney led Halliburton to feast at Federal trough', the First and Second Claimants were accused of being involved in trafficking heroin from Burma to East Germany, and Alfa Bank was accused of involvement in money laundering. The article referred to an FSB report and a report prepared by a former US intelligence officer based on information provided by a KGB officer, which was claimed to state that *"Alfa Bank, one of Russia's largest and most profitable, as well as Alfa Eko, a trading company, had been deeply involved in the early 1990s in laundering of Russian and Colombian drug money and in trafficking drugs from the Far East to Europe"*. It was further stated that under the operation which was controlled by a Chechen mob family a *"large channel of heroin transit was established from Burma through Laos, Vietnam, to the Far East [Siberia]"*, and that from there the drugs were camouflaged as flour and sugar shipments and forwarded on to Germany. Although the article recorded that the Claimants had denied these allegations, the First and Second Claimants brought proceedings for defamation against the Center for Public Integrity and the allegations were recorded in the court's public judgment dismissing their claim **[D2/8].**

114. In 2001, Alfa Bank was reported on its own website to have been blacklisted by the European Bank for Reconstruction and Development which the First Claimant considered *"appeared to be basing its decision on unsubstantiated claims of wrongdoing published in the Russian "yellow", or gossip, press"* **[CDS1/220-221]**.

115. A report concerning the Second Claimant, prepared by Stratfor in 2007 and published by Wikileaks records that the Second Claimant *"is closely tied into the Muscovite Solntsevo (Solsnetskaya) Organization, one of Russia's largest and most powerful organized crime associations, via funding from Alfa. Solsnetskaya is a confederation of a half-dozen criminal groups often accused of drugrunning, racketeering, money laundering and bribery. The organization is led by Sergei Mikhailov, widely considered to be one of the most dangerous and notorious gangsters in Russia".* The report also states that both the First and Second Claimants had had ties to the organisation since the 1990s. The First Claimant's alleged direct involvement in the drug trade has also been documented in filings made in US federal courts. Specifically, it was asserted in the report that *"Alfa Group is now involved in transporting drugs from Southeast Asia through Russia into Europe, laundering money of Colombian drug cartels, and bribing organs of justice in Russia in order to keep the entire operation below law enforcement's radar"* **[D2/13]**.

116. In the same report, the Second Claimant was suggested to be *"at least partially responsible. For many of the assassination that plague Russian society... Two cases in point include the assassination of Ukrainian journalist Georgi Gongadze*

~~*in Ukraine in 2000 and the 2004 murder of U.S. journalist Paul Klebnikov in Moscow. Fridman's involvement in the two murders has been alluded to by several media publications, including Radio Free Europe and Johnson's List, while also partially corroborated by journalists and Ukrainian politicians Stratfor spoke with while preparing this report"* **[D2/13]**. In relation to Gongadze, the report cites witness testimony in the case, which claimed that *"Alfa hired the local Izmailovskaya organized crime gang to murder and decapitate Gongadze in order to silence his investigations"* **[D2/13]**.~~

117. ~~An unsigned affidavit by Robert Levinson, a retired FBI agent who went missing in Iran whilst on an assignment for the CIA in 2007, details intelligence Mr Levinson had gathered on the assassination of Gongadze. It states that the Second Claimant on behalf of Alfa Group had entered into an agreement with Ukrainian public figure Oleksandr Moroz in 2000 to provide financial assistance to Moroz's political cause to push President Leonid Kuchma out of Ukraine. In return for Alfa Group's assistance to Moroz, Alfa Group would receive the benefits of lucrative privatisation projects in the energy sphere when Moroz entered office. The affidavit goes on to say that Moroz was aware of Kuchma's desire to "get rid of an Internet journalist, Heorihiy Gongadze". According to the affidavit, Moroz formed an agreement with an associate of the Second Claimant to assassinate Gongadze and effectively frame Kuchma so that he would be impeached. The affidavit then goes on to detail various potential sources to verify the connections between the Second Claimant and Oleksandr Moroz~~ **[CDS1/222-233]**.

118. ~~The Claimants have also been the subject of anonymous allegations, purportedly written by certain officers of the Federal Security Service of the Russian Federation, the FSB, which were sent to Victor Ilyukhin, Chairman of the Security Committee of the Russian Duma in 1999, which he is said to have passed to the Ministry of the Interior to investigate~~ **[D2/8]**. ~~These allegations, including of connections to organised crime groups, were published in Versia (6-12 July 1999) and subsequently by the Center for Public Integrity in~~ *The Public I*, ~~on 2 August 2000. This letter, and the allegations contained therein, have been published, and following the First and Second Claimants' unsuccessful defamation claim against the Center for Public Integrity, are referenced in that judgment~~ **[D/28]**.

119. ~~Fridman was accused in the US courts in 2006 of conspiring with Leonid Rozhetskin to steal IPOC's interest in Telecominvest via money laundering, bribery, wire fraud and other criminal wrongdoing under the Racketeer Influenced and Corrupt Organizations (RICO) Act~~ **[D2/13]**. ~~The other defendants were Alfa Capital Markets, a US corporation; Alfa Telecom (now known as Altimo); and Swiss lawyer Hans Bodmer. Alfa Group Consortium is an association of various companies controlled by the Second Claimant.~~

120. ~~The UN sponsored Report of the Independent Inquiry Committee into the United Nations Oil for Food Programme~~ **[CDS1/234-279]**, ~~led by former U.S. Federal Reserve Board Chairman Paul Volcker, accused one Alfa Group entity, Alfa Eco, co-founded by the Second Claimant, which was the fourth largest purchaser of oil under the programme, with the payment of illegal surcharges to Iraq for oil, alleging that it paid $2.3 million in illegal kickbacks and bribes largely via the Iraqi embassy in Moscow. The report recorded that despite declining to co-operate with the Inquiry, Alfa Eco denied involvement in violating any~~ *"regimes and norms established by the international community and national legislation"* **[CDS/278]**.

121. ~~Allegations in respect of the First and Second Claimants that they have connections to organised crime and have engaged in narcotics trafficking have been recorded in a publicly available judgment of the US courts **[D2/8]**. This judgment stated that Fridman and Aven had been *"dogged by allegations of corruption and illegal conduct"* and recorded that *"Russian newspapers have published repeated claims that Aven and Fridman have rigged the auction of state assets through government connections, threatened the lives of government officials, ordered the assassination of a mobster, and engaged in narcotics trafficking and money laundering"*. While the judgment recorded that these allegations were denied, it also noted that the Second Claimant had himself acknowledged that the *"rules of business"* in Russia *"are quite different to western standards.... To say one can be completely clean and transparent is not realistic"*.~~

122. ~~I am also aware of filings in the US courts, including an intelligence memorandum regarding Alfa Group and the Claimants which was prepared in 2001, and which referenced various criminal investigations launched against Alfa Group, including in relation to possession of arms and ammunition, as well as alleged financial crimes. This dossier also stated that, in relation to the Second Claimant, *"some reports suggest that in 1985, prior to beginning his professional career, Fridman had ties with what was known to be the "Bauman Brigade," the only serious organized crime group in Moscow at the time. Interior Ministry reports claim that the group dealt in illegal drugs"*.~~

123. ~~Igor Lazurenko, the former Director of Logistics of TNK-BP, accused the Third Claimant of *"bribery and corruption of senior public officials"* in documents filed in court proceedings in London and the court refused to impose a reporting restriction preventing the reporting of such allegations **[CDS1/280-281]**.~~

124. Not only do I therefore consider that the sentences from CR112 of which the Claimants complain are accurate, but believed and continue to believe that the allegations contained therein were true and consistent with other intelligence and open source material concerning the Claimants' conduct. In light of the public-domain material I have cited in this statement, I do not consider that the Claimants would have suffered any incremental distress as a consequence of the Defendant's processing of their personal data within and for the purposes of CR112.

RPC

125.   The Defendant therefore respectfully invites the Court to dismiss these claims and/or to refuse to grant the declarations the Claimants seek and/or to award no compensation. As regards the claims for relief under section 14 of the DPA, I have explained above that the Defendant only holds copies of CR112 for the purposes of legal proceedings, and its records already indicate that the Claimants dispute the accuracy of certain passages in CR112.

Claimants dispute the accuracy of certain passages in CR112.

**Statement of truth**

I believe that the facts stated in this Witness Statement are true

Signature .................................................................................................

Name      Christopher David Steele

Date      4 March 2020

**Revised First witness statement of:**
**Cristopher D Steele Served on behalf of:**
**Defendant Statement date: 4 March ~~14~~**
**~~February~~ 2020**
**Exhibit no: CDS1**

**Claim No. HQ18M01646**

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**MEDIA & COMMUNICATIONS LIST**

**BETWEEN**

**(1) PETR AVEN**

**(2) MIKHAIL FRIDMAN**

**(3) GERMAN KHAN**

**Claimants**

and

**ORBIS BUSINESS INTELLIGENCE LIMITED**

**Defendant**

_____

**REVISED FIRST WITNESS STATEMENT OF**

**CHRISTOPHER STEELE**

_____

RPC
Tower Bridge House
St Katharine's Way
London
E1W 1AA
T: 020 3060 6000

Reference: NC03/ORB4.2

Solicitors for the Defendant