# Exhibit C

1                                    Wednesday, 18 March 2020
2    (10.30 am)
3            MR CHRISTOPHER STEELE (continued)
4        Cross-examination by MR TOMLINSON (continued)
5    MR TOMLINSON: Good morning, Mr Steele.
6    A.  Good morning, Mr Tomlinson.
7    Q.  I want to now ask you about the compilation of
8        Memorandum 112, the circumstances in which you were
9        instructed to provide it.
10   A.  Mm hmm.
11   Q.  In the first two versions of your witness statement,
12       signed by a statement of truth, you said that those
13       instructions were given on 11 September 2016, didn't
14       you?
15   A.  Yes.
16   Q.  And that was wrong?
17   A.  It was wrong.
18   Q.  You said -- you now say that these instructions were
19       given at the July meeting, the July meeting you had
20       previously mentioned with Mr Sussman?
21   A.  That's not the case.  I was given the instruction
22       sometime after that meeting by Mr Simpson.
23   Q.  Very well.  And so at the July -- according to you, at
24       the July meeting, Mr Sussman mentioned to you the
25       connection between the server at Alfa Group and the

                            1

1        server at Trump Tower.  Is that still your evidence,
2        Mr Steele?
3    A.  That is my recollection, yes.
4    Q.  You then say that Mr Simpson instructed you to produce
5        Memorandum 112 soon after that meeting?
6    A.  Yes.
7    Q.  But you can't remember when?
8    A.  I have no record of it.
9    Q.  You have no record of anything, have you?
10   A.  I haven't got any records relating to the creation of
11       112.
12   Q.  Or indeed any of the other memoranda?
13   A.  No, they were wiped in early January 2017.
14   Q.  Yes.  Yes.  You see, I suggest that you're wrong about
15       your recollection that the server link was mentioned to
16       you in July 2016.  Do you think that might be correct?
17   A.  I think it's possible, but I don't think it's correct.
18   Q.  You see, do you know when the -- the first time this
19       allegation was made public?
20   A.  I think it was in October.
21   Q.  On 31 October, wasn't it?
22   A.  Mm hmm.
23   Q.  Can we have a look at {D/76/1}, please.  This was the
24       first time that this was put into the public domain --
25   A.  Mm hmm.

                            2

1    Q.  -- by an article in Slate.  I'm not sure if it is
2        a magazine or a website, but whatever it is -- I think
3        it may be a magazine.
4    A.  Possibly both.
5    Q.  Possibly both.  By Mr Foer.
6    A.  Mm hmm.
7    Q.  He described it -- are you familiar with this article?
8    A.  Yes, I am.
9    Q.  He described how a computer scientist, using the
10       pseudonym Tea Leaves, had found some connections in late
11       July.
12   A.  Mm hmm.
13   Q.  Do you remember that?
14   A.  Yes, I do.
15   Q.  Look at the second page, please {D/76/2}.  The bottom
16       paragraph:
17           "In late July, one of those scientists -- who asked
18       to be referred to as Tea Leaves ... found what looked
19       like malware emanating from Russia.  The destination
20       domain had Trump in its name ..."
21           Then if you go over the page: {D/76/3}
22           "More data was needed, so he began carefully keeping
23       logs of the Trump server's DNS activity."
24           Do you see that?
25   A.  Yes.

                            3

1    Q.  So Mr Tea Leaves, who was at least one of the sources of
2        this story, didn't actually know there was a connection
3        in late July, did he?
4    A.  I think he did.
5    Q.  No, no, it says here, clearly, he first became
6        suspicious in late July, then he began carefully keeping
7        logs and so on.  It was then some research took place
8        over a period.  That's what the article outlines.
9    A.  Mm hmm.
10   Q.  But in late July all he had seen was suspicious server
11       activity.
12   A.  I believe he passed that information on to the Fusion
13       client in late July, if it was him that passed it on.
14       They were in possession of that information in
15       late July.
16   Q.  Well, that's what you say, Mr Steele, but your
17       recollection has already been proved to be wrong once
18       and I'm suggesting it is wrong again.  Do you understand
19       me?
20   A.  I do understand that, but there is a logic to this,
21       my Lord, if I may.  There are some things I'm clearer
22       about in my mind from that period than others, and what
23       I'm very clear is that the first person that ever
24       mentioned the Trump server issue, Alfa server issue, was
25       Mr Sussman.  I only ever met Mr Sussman twice, and the

                            4

1    instruction to produce 112 was absolutely definitely
2    linked to the server issue.
3          Therefore, it has to have been the case that it was
4    mentioned to me in late July.
5  Q. You see, you're also familiar with the subsequent long
6    article in the New Yorker about the history of this
7    allegation, aren't you?
8  A. Yes.
9  Q. That's at {D/121/1}. This is another computer scientist
10   with a pseudonym, this time called Max. If we look at
11   page 4 of this {D/121/4}, it is in August 2016 that Max
12   decides to reveal the data he and his colleagues had
13   assembled. Do you see, that's the penultimate
14   paragraph.
15 A. I do.
16 Q. So Max goes to the New York Times, Mr Eric Lichtblau,
17   in August 2016?
18 A. Yes.
19 Q. The New York Times then subsequently go to the FBI in
20   late September 2016. Do you remember that? If you go
21   over the page to page 5. {D/121/5}
22 A. Yeah, they went to the FBI at that time, The New York
23   Times.
24 Q. It is the middle paragraph:
25       "At the meeting, in late September, 2016,

5

1    a roomful ..."
2          And so on.
3          You see, according to your first recollection,
4    Mr Sussman told you that the FBI had been informed
5    in July.
6  A. That's right, yes.
7  Q. But there's absolutely no evidence, is there, that the
8    FBI -- anywhere else -- that the FBI were informed
9    in July, apart from your recollection?
10 A. I don't know who the source -- original source that
11   Mr Sussman had for the story. I'm not -- it seems there
12   are several sources here of this story and I'm not sure
13   where Mr Sussman's intelligence came from.
14 Q. You see, you're very familiar, I know, Mr Steele, with
15   the material -- the background to this. There's not
16   a shred of evidence anywhere that anybody was aware of
17   this supposed server connection in late July, is there?
18 A. Well, that's what I was -- my recollection is that
19   that's what I was told in late July.
20 Q. Well, all we know for certain is that you must have been
21   instructed to produce the memorandum at some date before
22   14 September 2016.
23 A. Correct.
24 Q. So what did you do then, when you got that instruction?
25   What was your next move?

6

1  A. I gave a briefing question to my source.
2  Q. Did you -- do you have a range of possible sources? Did
3    you think: is this a job for source 1, is this a job for
4    source 2, is this a job for source 3; or is there only
5    one person you go to?
6  A. No, usually several, depending on all sorts of
7    circumstances which are operational, for example, if
8    somebody is travelling, is able to meet a certain
9    sub-source and so on.
10 Q. So you chose a particular source on that occasion?
11 A. That's right, yes.
12 Q. And that source was a Russian?
13 A. Yes.
14 Q. You hesitate, but you described him in the memo as
15   a trusted compatriot of a Russian Government official?
16 A. Correct, yes.
17 Q. Where was that source living at the time?
18 A. I'd rather not answer that question, your Lordship,
19   because it is part of the issue of jigsaw
20   identification.
21 Q. Mr Steele, I know that you had a career in intelligence
22   and your instinct is to be secret, but you can't
23   possibly identify someone by saying what country they
24   are living in, can you?
25 MR JUSTICE WARBY: You didn't actually ask what country.

7

1    You said where.
2          So we have established --
3  MR TOMLINSON: I'm so sorry, your Lordship is absolutely
4    right.
5          What country were they living in, Mr Steele?
6    I wasn't asking for their address.
7  A. Your Lordship, would you care to comment on that
8    question in terms of this jigsaw --
9  MR JUSTICE WARBY: Well, it's not for me to comment. If you
10   want to say that giving the answer would risk
11   identification of the source and that you object to
12   answering the question on that basis, then that's what
13   you should say, and then we'll get another question.
14 A. Okay. Yes, I do object to that because of travel and
15   identification issues.
16 MR TOMLINSON: So the FSB has a total rundown on everybody
17   who travels around Europe and can work out from that who
18   your source might be?
19 A. From passenger manifest, yes.
20 Q. Mr Steele, that's just not realistic, is it?
21 A. It is realistic, I'm afraid.
22 MR TOMLINSON: My Lord, that's a question I would ask
23   your Lordship to direct the witness to answer.
24 MR JUSTICE WARBY: Well, shall we round them up as a list
25   and see later on?

8

1  MR TOMLINSON:  I'll ask Ms Sjøvoll to keep a list.
2  MR JUSTICE WARBY:  Yes.
3  MR TOMLINSON:  Was this person the source for any of the
4      other memoranda in the so-called dossier?
5  A.  Yes.
6  Q.  How many of them?  All of them?
7  A.  Most of them.
8  Q.  Most of them.  How long had you had them on retainer?
9  A.  On retainer or on the payroll?  It's a slightly
10     different issue.
11 Q.  Sorry, what's the distinction?  I wasn't aware there was
12     one.
13 A.  If you pay someone a retainer, you pay them a monthly
14     amount of money regardless of their work.
15 Q.  Right.
16 A.  And if you pay them according to what they produce for
17     a project or a particular report, it's a sort of
18     one-off, or series of one-off payments.
19 Q.  In your witness statement you only refer to the first as
20     people being paid a regular sum of $3,000 to $5,000.
21 A.  Yes, at that time.
22 Q.  At that time.
23 A.  We're going back in history.
24 Q.  I see.  I see.  So how long had they been either on the
25     payroll or on retainer?

9

1  A.  Yes, I would say about six years.
2  Q.  What kind of business or occupation did this source work
3      in?
4  A.  I would rather not answer that, my Lord.  If we could
5      put that on the list.
6  Q.  You see, is this -- if this is a source who moves in
7      anti-Putin émigré circles, if I can put it that way,
8      that obviously casts a substantial light on the sort of
9      information they are going to provide to you, doesn't
10     it?
11 A.  It would if they did.
12 Q.  And did they?
13 A.  But our sources are not involved in anti-Putin émigré
14     activity.
15 Q.  Well, that wasn't my description, if they moved in
16     anti-Putin émigré circles, it's a different point.
17 A.  They don't do that either.
18 Q.  You say in your third witness statement that you have
19     concerns about their safety.  Is this someone who has
20     been subject to any threats?
21 A.  That's a difficult question, my Lord, to answer.
22     I believe their family has been monitored.
23 Q.  Their family has been monitored.  This source is still
24     alive, we're talking about a living person here;
25     correct?

10

1  A.  We are.
2  Q.  Is this the source that the Inspector General's report
3      designates as Person 1?
4  A.  Person 1?
5  Q.  Person 1, your primary sub-source.  The terms are used
6      in a confusing way --
7  A.  I'm sorry, I think --
8  Q.  -- but I think by sub-source they mean source in your
9      terms?
10 A.  Yeah, I think there are two -- two separate people
11     they're referring to here, if I might say, my Lord.
12     I think there's a Person 1 and a principal sub-source.
13 Q.  There's a Person 1 and a primary sub-source?
14 A.  Yes.
15 Q.  Is this person Person 1?  Is the source you're talking
16     about here Person 1?
17 A.  No.
18 Q.  Is there -- are they the primary sub-source?
19 A.  Yes.
20 Q.  The Person 1 you described as a boaster and an egotist
21     who engaged in embellishment; correct?
22 A.  I didn't make a categorical statement of that sort.
23     I said he was somebody who possibly embellished.
24 Q.  But you said he was a boaster and an egotist?
25 A.  Yeah, that doesn't mean he's a bad source though.

11

1  Q.  Doesn't it?
2  A.  Many sources have big egos, I'm afraid.
3  Q.  Was the primary sub-source that we're referring to
4      here -- that's the source in this case --
5  A.  Yes.
6  Q.  -- was that person a boaster and an egotist as well?
7  A.  No.
8  Q.  So how did you communicate with this source, initially?
9      We're talking after Mr Simpson has called you up and
10     said, "I want you to look into the links between Alfa
11     and Putin".  How do you communicate with the source?
12 A.  Both by encrypted communications and in person.
13 Q.  So you actually have a meeting with them before they're
14     commissioned, as it were, as part of the commissioning
15     process; is that right?
16 A.  Usually, yes.
17 Q.  Not usually:  in this case?
18 A.  Yes.
19 Q.  Did you identify at that stage a suitable sub-source or
20     did you leave that to the source?
21 A.  It's a slightly more complicated situation than that
22     because obviously the source has a number of sub-sources
23     and a number of potential sub-sources to report on
24     a particular issue.  And so we obviously discuss
25     sub-sources who might be able to comment on an issue and

12

1   it's up to the source then to see who they can meet and
2   who is useful on a particular topic. To use their
3   judgment, essentially.
4   Q.   So, on this occasion, you discussed a number of
5        potential sub-sources; is that your evidence?
6   A.   Yes, there were a number of sub-sources who potentially
7        could have contributed to this, or did to the project,
8        and potentially to this specific issue.
9   Q.   But your source alighted on a sub-source who was a top
10       level Russian Government official?
11  A.   Yes.
12  Q.   Who was in the Kremlin?
13  A.   Yes. My Lord, may I make a comment about the term,
14       "the Kremlin", because for Russianists, it isn't just
15       who works physically within the walls of the Kremlin.
16       It is a reference to the leadership of the country and
17       the number of government ministries and other bodies
18       that take part in the high organs of state.
19  Q.   So this person might be the government minister in
20       Novosibirsk, you mean?
21  A.   No, that would be not the Kremlin.
22  Q.   Well, that would be a top level government official if
23       they were the --
24  A.   No, I don't think they would be.
25  Q.   Well, you said the term "the Kremlin" referred to the

13

1   top level of government?
2   A.   Yes.
3   Q.   If someone is in charge of the third city of Russia,
4        then they're obviously a top level government official,
5        aren't they?
6   A.   I don't -- I wouldn't use that term, no.
7   Q.   I see. So "in the Kremlin" -- by "in the Kremlin" you
8        don't mean that they're physically within the confines
9        of that building in Moscow?
10  A.   Indeed, because I think even the presidential
11       administration is not physically in the walls of the
12       Kremlin.
13  Q.   But you mean that they're at the centre of
14       Russian Government?
15  A.   At the peak of the vertical of power, yes.
16  Q.   Was this person the sub-source for any other of the
17       memoranda?
18  A.   Yes.
19  Q.   Which ones?
20  A.   I would say parts of them, rather than all of them --
21       all of the reports. So they contributed parts of the
22       other report.
23  Q.   Shall we go through them and identify which ones that
24       they contributed to.
25  A.   I can think of a couple but I would rather -- again,

14

1   my Lord, I have a problem with that, because I think it
2   pertains to jigsaw identification of the sub-source.
3   Q.   But it also helps us to assess whether they provided
4        accurate information, doesn't it?
5   A.   It's part of that -- could be part of that process.
6        This sub-source, of course, had worked for us for
7        several years.
8   Q.   I mean, we know that certain things in your memoranda
9        were undoubtedly inaccurate; even on your assessment,
10       they were inaccurate?
11  A.   I wouldn't admit to that.
12  Q.   The Miami consulate, for example, the non-existent Miami
13       consulate that was running cyber activities?
14  A.   There was a Miami consular general -- Miami consul
15       general, sorry, at the time, so these are minor points
16       of detail. If I might say, my Lord, no intelligence
17       report I've ever seen has been 100% correct.
18  Q.   How do you know that?
19  A.   Well, that is my assessment when we've assessed things.
20  Q.   So which bit of Memorandum 112 is not correct? You say
21       that no memorandum is ever 100% correct so -- I thought
22       you were maintaining that this one was 100% correct?
23  A.   The only thing in Memorandum 112 that appears not to be
24       100% correct is the timing of Govorun's time with Alfa
25       and the period when Vladimir Putin was Deputy Mayor of

15

1   St Petersburg.
2   Q.   Is that your evidence; that's the only thing that's
3        incorrect, Mr Steele?
4   A.   Yes.
5   Q.   Well, I'll come back to that.
6        The sub-source, is that someone you have ever met?
7   A.   Again, I'd rather not answer that, my Lord, for
8        identification reasons.
9   Q.   How long have you had dealings with them?
10  A.   Several years.
11  Q.   How many is that? Two?
12  A.   Three or four.
13  Q.   Ten?
14  A.   Well, it depends whether you are talking from 2016 or
15       from this --
16  Q.   No, of course, I'm talking about 2016.
17  A.   Okay. So I would say three years.
18  Q.   What did you know about that sub-source's connections in
19       the Russian Government?
20  A.   A lot.
21  Q.   A lot?
22  A.   Mm.
23  Q.   On what basis? Where did your information come from?
24  A.   Well, both from the source and from open source
25       information.

16

**Page 17**

1  Q. You say you're concerned about their safety?
2  A. Indeed.
3  Q. Have they been subject to threats?
4  A. I don't know.
5  Q. I now want to ask you about the specific steps you took
6     to ensure the reliability of this memorandum.
7  A. Mm hmm.
8  Q. If you look at page 31 of your first -- or your revised
9     statement {C/4/7}. It will pop up in a moment.
10 A. Which number, sorry?
11 Q. Paragraph 31.
12 A. Yeah.
13 Q. It says -- there's a little free-floating
14    subparagraph under paragraph 31.
15 A. Yes.
16 Q. It says:
17       "Instead, I took the following steps to ensure as
18    far as possible the reliability of the content of the
19    memoranda in the Dossier - including CR112."
20 A. Yeah.
21 Q. Is that your evidence?
22 A. Yes.
23 Q. I don't want to take a false point, Mr Steele. Is your
24    evidence that the steps you then outline are, unless you
25    specifically say to the contrary, steps that you took in

**Page 18**

1     relation to CR112?
2  A. Yes.
3  Q. So at paragraph 33 --
4  A. Mm hmm.
5  Q. -- you say:
6       "Normally, sources would transit through London and
7     onto other destinations out of the country. On their
8     transit out of London, I would meet with them face to
9     face to brief them on the intelligence I was seeking."
10       Did that happen in this case?
11 A. That is my evidence. So, yes --
12 Q. It did happen in this case?
13 A. Yes.
14 Q. You say at paragraph 34 --
15 A. Mm hmm.
16 Q. -- that the contact between the source and the
17    sub-source was made from a country outside -- I'm sorry.
18    Paragraph 34: the source reported back to you; you took
19    manuscript notes but did not keep them. Was that
20    correct?
21 A. I kept them for as long as it took to write the memo.
22 Q. You say, again, at paragraph 34:
23       "... the source and the sub-source had a very good
24    reporting record."
25 A. Correct.

**Page 19**

1  Q. What do you mean by that?
2  A. What I mean is that they had contributed to a number of
3     Orbis projects over the years and the things that they
4     had reported on had either been corroborated by other
5     sources or had turned out to be the case from open
6     source and events on the ground.
7  Q. Was the contact between the sub-source and the source
8     made from a country outside the UK?
9  A. Yes.
10 Q. Which country was that, in the case of Memorandum 112?
11 A. Can you elaborate on what you mean by the contact that
12    was made between them? Are you talking about them
13    meeting, or are you talking about their original --
14    initial contact, by other means?
15 Q. I'm talking about what you say at paragraph 30 of
16    your --
17 A. Direct or indirect?
18 Q. Paragraph 30 of your witness statement.
19 A. Right. I didn't see that.
20 Q. If we go back to the previous page {C/4/6}.
21 A. Yes.
22 Q. The last sentence:
23       "Contact between the sub-source and the source was
24    made from a country outside the UK."
25 A. Yeah.

**Page 20**

1  Q. Are you referring there to the initial contact, or the
2     contact for the purposes of this memorandum?
3  A. The memorandum.
4  Q. So which country was that?
5  A. Russia.
6  Q. You then have a briefing with your source when the
7     source has been in contact with the sub-source; correct?
8  A. Debriefing, I think, better term. Briefing before --
9  Q. Debriefing.
10 A. -- debriefing after.
11 Q. Let me get the terminology right. Was that in London?
12 A. Yes.
13 Q. Was that in person or by telephone?
14 A. In person.
15 Q. What did the source tell you about the meeting -- about
16    the circumstances of their meeting with the sub-source,
17    about gifts and favours?
18 A. Nothing specific about gifts and favours, other than
19    they had met directly.
20 Q. The reason I ask you is because that's what you describe
21    as happening in paragraph 29 {C/4/6}.
22 A. Yeah, I mean, gifts and favours might mean buying
23    a bottle of wine or something like that.
24 Q. It just says:
25       "During the course of my briefings with the sources

March 18, 2020          Petr Aven, Mikhail Fridman and [...] Business Intelligence Limited          Day 3

1    following their meeting with a sub-source ..."
2        I see you use the inaccurate term "briefings" as
3    well, but never mind:
4        "During the course of my briefings with the sources
5    following their meeting with a sub-source, I would ask
6    about the circumstances of the meetings ... whether any
7    modest gifts had been given ... the value of the
8    dinner ... [and whether they] had asked the source for
9    any favours in exchange for the intelligence ."
10   A.  Yes.
11   Q.  Did you ask that in this case?
12   A.  I did, yes.
13   Q.  What was the answer?
14   A.  I think they shared a bottle of wine.
15   Q.  Now, in terms of your verificatory steps, at
16       paragraph 32 {C/4/7} you say:
17       "I assessed the intelligence I received having
18   regard to what I knew of the source and sub-sources and
19   their roles ... I asked others about the individual
20   source or sub-source and their story, and
21   I cross-referenced the information ... against open
22   source data where possible ."
23       Did you do that in this case?
24   A.  I -- yes, I did.
25   Q.  You see, there's nothing about that in your witness

                            21

1    statement specifically in relation to 112, is there?
2    A.  Not everything is in the witness statement.
3    Q.  And when you were asked, when Orbis was asked to set out
4        the steps that constituted reasonable care to verify,
5        there was no mention of doing any of this, was there?
6    A.  Well, when you talk to your colleagues and people around
7        a piece of work, it doesn't usually feature in this kind
8        of contact.
9    Q.  Well, this isn't about talking to your colleagues, is
10       it? It's cross-referencing information against open
11       source data. You didn't do that in this case, did you?
12   A.  I think we did. We looked up Govorun and I think we
13       also looked up meetings that took place at the Russian
14       Union of Industrialists and Entrepreneurs --
15   Q.  Mr Steele, there's no mention of that in your witness
16       statement, is there?
17   A.  Well, there is a reference of looking at open source,
18       which is what we did.
19   Q.  But you don't say, "In this case, we did the following
20       steps ...", do you?
21   A.  No. I didn't think it was necessary.
22   Q.  When your side was asked what steps were taken to
23       constitute reasonable care, none of this was mentioned,
24       was it?
25   A.  But "open source" is mentioned, and that's what I'm

                            22

1    describing .
2    Q.  Well, let's have a look at it.
3    A.  We're getting down into the weeds here.
4    Q.  Let's have a look at the -- see what was said on behalf
5        of Orbis in the further information . I think it's
6        response 8 in {A/12/1} -- no, sorry, response 8 is
7        something different . Give me a moment. Response 15
8        {A/12/10}.
9        Sorry, it's response 21 {A/12/12}.
10   A.  Sorry, you're on 21 now?
11   Q.  It should be the bottom of A/12/12. Full details of
12       the -- this is the steps that were supposed to have been
13       taken to constitute reasonable care:
14       "... had regard to the nature of the allegations on
15   which it was instructed to report [etc] ... the roles
16   and status ... all steps reasonably required ...
17   considering public domain material (see above) and the
18   input of intelligence sources, the reliability of ...
19   the Defendant ... using its knowledge and experience."
20   A.  Sorry, where are we again?
21   Q.  Sorry, we're now going over the page to --
22   A.  We are on 21, at the top of -- before 22?
23   Q.  Yes, and we're now going over the page to {A/12/13}.
24       Sorry, forgive me.
25   A.  Yeah, so ... Yeah.

                            23

1    Q.  You see, it doesn't say there that you did any specific
2        research into Mr Govorun, for example, does it?
3    A.  But we did open source work, some open source research
4        on it, along the lines I've described.
5    Q.  I'll come to your research on Mr Govorun in a few
6        minutes, Mr Steele, but I just want to -- so your
7        evidence is this: the source comes back from Russia, he
8        says, "I have had a bottle of wine with the sub-source
9        and this is what he's told me", and you make a note?
10   A.  A detailed note, yes.
11   Q.  How long is that meeting?
12   A.  That meeting -- that meeting lasts probably a couple of
13       hours. Which -- sorry, which meeting? The meeting --
14   Q.  The meeting --
15   A.  Sorry.
16   Q.  The debriefing meeting, as you don't call it .
17   A.  The debriefing meeting with the source?
18   Q.  Yes.
19   A.  A couple of hours.
20   Q.  You make a handwritten note and then you type it up?
21   A.  Yes, probably a couple -- well, type up the note or type
22       up the report?
23   Q.  Well, type up the report .
24   A.  Yes.
25   Q.  The report -- the note becomes the report in some sense,

                            24

1  doesn't it?
2  A. It does, yes.
3  Q. And who does that?
4  A. Me.
5  Q. So you then produce -- and in between the taking of the
6     handwritten note and typing up the report, you now say
7     that you do an internet search on Mr Govorun, you look
8     at meetings of the Russian Union of Industrialists. Is
9     there anything else you do?
10 A. I think they were the only two things we looked at.
11        If I might say, it's not always me that does the
12    open source search. Sometimes one of my colleagues does
13    it, because they're far more able technologically than
14    I am. In this case -- but in this case I think I did
15    it.
16 Q. You say in paragraph 34 of your witness statement at
17    {C/4/7} --
18 A. Mm hmm.
19 Q. -- the last paragraph:
20        "The source and sub-source were established
21    connections of mine; I trusted them and knew that they
22    were in a position to report to me accurately."
23        What does that mean?
24 A. That the sub-source, by definition of their job, would
25    have known of the information --

1  Q. But that doesn't mean --
2  A. You would have expected them to have known the
3     information.
4  Q. But that doesn't mean that they're going to tell you it
5     accurately, does it?
6  A. Not by definition, no.
7  Q. I mean, they might give you an accurate account of what
8     they know or they might not?
9  A. That's absolutely true. I think that, however, when you
10    assess information, you assess whether you think that
11    the person giving it to you has access to that
12    information by definition of their job or relatives or
13    whatever.
14 Q. So --
15 A. It's one of the factors of assessment.
16 Q. -- what you mean by "in a position to report accurately"
17    is: potentially had access to the information on which
18    they were reporting. Is that the position?
19 A. More than potentially, I think; you would expect them to
20    have it.
21 Q. So did your sub-source have personal knowledge of the
22    dealings between Mr Aven, Mr Fridman and Mr Putin in the
23    1990s?
24 A. Could you define what "personal knowledge" means?
25 Q. Well, something that they didn't pick up second- or

1  third-hand; in other words, they were there. If you're
2  reporting on what happened and you have personal
3  knowledge, you must in some sense have been there, part
4  of the organisation on one side or the other?
5  A. I don't think they were there in the 1990s, but that
6     doesn't mean that they hadn't talked to people who were.
7  Q. It doesn't mean that they had either, does it?
8  A. No.
9  Q. So in relation to that allegation, that was something
10    that was second-hand, third-hand, fourth-hand; you
11    didn't know?
12 A. Not for certain, no.
13 Q. Well, you didn't know for uncertain either, did you,
14    Mr Steele?
15 A. No.
16 Q. I mean, if I tell you something that happened in British
17    politics in the 1990s, you don't know whether I was
18    there, or whether I've heard it from someone who was
19    there, or whether I have heard it from fourth-hand,
20    fifth-hand, or whether I've just read it on the
21    internet. You have no idea.
22 A. But I would ask you.
23 Q. But you couldn't ask him because you're not in touch
24    with -- him or her; you're not in touch with your
25    sub-source so you can't ask them?

1  A. No, it's the job of the source do that.
2  Q. And did the source?
3  A. On that specific point, no.
4  Q. Did the -- so far as you are aware, did the sub-source
5     know enough about Mr Putin's diary to know when he was
6     meeting Mr Fridman directly?
7  A. I would say possibly.
8  Q. But did you know one way or the other whether they
9     actually did?
10 A. I would have expected that they could have known, given
11    their position.
12 Q. Did you ask your source whether they'd asked the
13    sub-source whether they knew that directly or whether
14    they had heard that from somewhere else?
15 A. The source said that the sub-source was clear that that
16    was the case.
17 Q. Clear that Mr Fridman had recently met Mr Putin
18    directly?
19 A. Yes.
20 Q. And the source then said to the sub-source, "How do you
21    know that?", did they?
22 A. I imagine so, yes.
23 Q. Sorry, you imagine so?
24 A. Yes.
25 Q. So you don't know one way or the other?

1   A.  I don't know one way or the other.
2   Q.  I mean, the sub-source might have said, "I met a man in
3       a bar who told me that he had a friend who knew someone
4       who said that Fridman had met Putin recently".
5   A.  Well, that wasn't the case.
6   Q.  How do you know?
7   A.  Because that's not how this sub-source and source work.
8   Q.  How do you know?  You're not there.
9   A.  That is what I'm told by the source.
10  Q.  Did you --
11  A.  Who I trust.
12  Q.  Did the sub-source have any, so far as you are aware,
13      any personal knowledge about significant favours being
14      done by President Putin for the claimants or Alfa?
15  A.  I would say yes.
16  Q.  You hesitate.
17  A.  I hesitate because I'm concerned about getting into
18      potential identification of the sub-source.
19  Q.  You see, to know about significant favours and informal
20      advice, you must have very direct knowledge.  I mean, if
21      not in the room, you must be a close friend of either --
22      of one of the two people involved, mustn't you?
23  A.  I'm not sure a friend, but certainly you would have to
24      be proximate to them.
25  Q.  So did you say to your source, "Well, that's very

                                29

1       interesting.  That's remarkable.  They know what's going
2       on in informal meetings between Putin and
3       leading Russian businessmen.  How do they know that?"
4       Did you ask the source?
5   A.  Yeah, they -- looking at the history of that source's
6       reporting track record and what they had reported on, it
7       was clear to me that they had this sort of access.
8   Q.  No, no, that wasn't the question I asked you.  The
9       question I asked you was: did you say to your source,
10      "Well, that's remarkable.  This person is telling you
11      about what happened in private, informal meetings
12      between the President of Russia and leading Russian
13      businessmen.  How do they know that?"
14  A.  Mm hmm.
15  Q.  Did you ask them that?
16  A.  I can't recall.
17  Q.  I mean, I think the position from your previous answer
18      was you thought: well, oh, they have reported accurately
19      in the past so that's fine?
20  A.  The problem here, your Lordship, is if I go into the
21      access of this sub-source, we get into potential
22      identification of the sub-source.
23  Q.  Mr Steele, I was very careful in not asking you about
24      the access of the sub-source.  If you listen again,
25      I was asking you about what you said to the source.

                                30

1   A.  Yes, I said, "Does this sub-source have direct access to
2       this information?".
3   Q.  And the source said, "Yes"?
4   A.  Yes.
5   Q.  And you then said to the source, "Well, did you quiz
6       them about that?  Did you check that actually this isn't
7       just hearsay and gossip?"
8   A.  I had -- no, because I had never seen hearsay or gossip
9       from this sub-source before.
10  Q.  Well, you wouldn't have known, would you, Mr Steele,
11      because what you're dealing with is things which are at
12      least second-hand and probably fourth- or fifth-hand,
13      done in a country which you don't have any access to.
14  A.  Not fourth- or fifth-hand.
15  Q.  You don't know whether it is fourth- or fifth-hand, do
16      you?
17  A.  Not in a particular instance, but as a matter of modus
18      operandi, it's not fourth- or fifth-hand.
19  Q.  Mr Steele, you say that, but you actually don't know one
20      way or the other, do you?
21  A.  I am making a judgment --
22  Q.  Yes.
23  A.  -- based on my knowledge of the source and the
24      sub-source.
25  Q.  Yes, yes, you make --

                                31

1   A.  And the sub-source's job.
2   Q.  Yes, you make a judgment, but you don't know whether
3       what you're being fed is hearsay, gossip and rumour, or
4       whether it is something -- you know, whether it is
5       someone who was actually in the room when Mr Putin was
6       having his meetings with Mr Aven or someone else, do
7       you?
8   A.  That's correct.
9   Q.  Your primary sub-source, which is the person I think
10      we're talking about now, as your source, told the FBI
11      you had misstated and exaggerated your statements in
12      multiple sections of your reports, didn't they?
13  A.  I'm not sure that they did say that.  Your Lordship, the
14      OIG report, which is what Mr Tomlinson is referring to,
15      has already been revised by the Department of Justice in
16      terms of its interviewing of this primary sub-source,
17      and completely changed the nature of the interview that
18      he gave to them in January 2017.
19  Q.  I mean, we have the latest version in the bundle.  Look
20      at {D/131/225}, please.
21  A.  Yes.  Is that right or ...?
22  Q.  Do you have that?
23  A.  I have page 187.
24  Q.  Yes, sorry, when I say 225, it is the electronic bundle
25      number.  Don't worry about the page numbers.  They are

                                32

1  obviously different.
2  A.  Is that the revised version?
3  Q.  It is the revised version.  It is the latest version.
4  A.  Sorry, the amended version?
5  Q.  Yes, this is the -- we have put in the latest published
6     version of this report:
7         "During the FBI's January interview, at which Case
8     Agent 1, the Supervisory Intel Analyst, and
9     representatives of NSD were present, the Primary
10    Sub-source told the FBI that he/she had not seen
11    Steele's reports until they became public that month,
12    and that he/she made statements indicating that Steele
13    misstated or exaggerated the Primary Sub-source's
14    statements in multiple sections of the reporting."
15        Do you see that?
16 A.  I see it, yes.
17 Q.  So your primary sub-source is telling -- which we're
18    talking about the individual in this case -- that you
19    have misstated or exaggerated what they told you?
20 A.  That's what's reported there.
21 Q.  Look at page --
22 A.  As I say, I have doubts about the detail of that
23    interview because it has already been amended and
24    revised once by the Department of Justice.  I think the
25    amendments are in the bundle, the trial bundle, at the

33

1  beginning of the report, and --
2  Q.  Well, let's just go back to see them.  We'll
3     go back to page -- let me get the page.  I'm not sure --
4     is it page -- it's not page 1.  {D/131/1}
5  A.  I think it's in the bundle --
6  Q.  If you go to the next page I think maybe it's there.
7     {D/131/2}
8  A.  I think it's in the bundle -- this is it, yeah, this is
9     it.  Point 3 or .3.
10 Q.  That's not about page 187, is it?
11 A.  It's about the interview with the primary sub-source
12    that took place in January 2017.
13 Q.  It's about Person 1, I think.
14 A.  No, it's not.
15 Q.  But it doesn't -- Mr Steele, it doesn't bite in any way
16    on what I'm quoting to you, which is that your source
17    from this case is telling you that -- is telling the
18    Department of Justice that you have misstated and
19    exaggerated their statements.
20 A.  With respect, I think it does purport to it because it
21    is showing that the account of that interview that was
22    put in the OIG report to begin with is actually wrong
23    and inaccurate.
24 Q.  But not in respect of this part.
25 A.  Well, certainly in respect of some very important parts,

34

1  so probably in respect of this part.
2  Q.  226, please {D/131/226}:
3         "The primary Sub-source was questioned again by the
4     FBI beginning in March 2017 ... "
5  A.  Mm hmm.
6  Q.  "The Washington Field Office agent ... who conducted
7     that interview and others after it told the OIG that the
8     Primary Sub-source felt that the tenor of Steele's
9     reports was far more 'conclusive' than was justified.
10    The Primary Sub-source also stated that he/she never
11    expected Steele to put the Primary Sub-source's
12    statements in reports or present them as facts.
13    According to WFO Agent 1, the Primary Sub-source said
14    he/she made it clear to Steele that he/she had no proof
15    to support the statements from his/her sub-sources and
16    that 'it was just talk'  ...  the Primary Sub-source
17    explained that his/her information came from 'word of
18    mouth and hearsay'; 'conversation that [he/she] had with
19    friends over beers' ..."
20        That's the kind of quality of information we're
21    dealing with, Mr Steele, isn't it?
22 A.  No, I don't accept that.
23 Q.  Well, this is what your source is telling an official
24    US Government inquiry, isn't it?
25 A.  As reported in this report.

35

1  Q.  So you think that the US Inspector General's office has
2     got it wrong and you are right; is that the position?
3  A.  Well, we know they have, Mr Tomlinson, because they have
4     already had to amend their account of that interview.
5     Significantly, I would argue.
6  Q.  Not in this respect, Mr Steele.
7  A.  Well, we'll see.
8         Can I add one other point, your Lordship, that on
9     that point, although we had engaged with the
10    Inspector General's team for six months, that was
11    unredacted from the report at the last minute and we
12    were not given the ability to answer it by the
13    Inspector General's team, which is something we
14    complained about in public afterwards.
15 Q.  If you go down to page 230, please {D/131/230}.
16 A.  Ah, yeah.  192.
17 Q.  That's 192.
18 A.  Yeah.
19 Q.  So in the penultimate paragraph, the interview with:
20        "Steele ... made statements that conflicted with
21    explanations from two of his sub-sources about their
22    access to Russian officials ... Steele explained that
23    the Primary Sub-source had direct access to a particular
24    former senior Russian government official and that they
25    had been 'speaking for a while'.  The Primary Sub-source

36

1    told the FBI, however, that he/she had never met or
2    spoken with the official ."
3        Do you see that?
4  A. Yes.
5  Q. "... the Primary Sub-source revealed that [you] did not
6    have good insight into how many degrees of separation
7    existed between the Primary Sub-source's sub-sources and
8    the persons quoted in the reporting, and that it could
9    have been multiple layers of hearsay upon hearsay."
10   {D/131/226}
11 A. I don't accept that.
12 Q. I mean, in the original version of your witness
13   statement you relied on the nice things they said about
14   you in this report to indicate what a truthful person
15   you were, didn't you?
16 A. They had obviously had significant interaction with us
17   over a period of six months, including two days of
18   voluntary interviews in London, from which they were
19   able to draw their own conclusions about me as
20   a professional; but they clearly got quite a lot wrong
21   in this report, I would argue.
22 Q. So the bits you agree with they got right, and the bits
23   you disagree with they got wrong; is that your evidence?
24 A. I don't know what else they got wrong. All I know is
25   that they got some of it wrong.

37

1  Q. Look at page 226, again, please {D/131/226}.
2  A. Mm hmm.
3  Q. "... in contrast to the impression left from [your]
4    reports, [the] sub-sources did not have direct access to
5    the persons they were reporting on."
6        That's the second paragraph.
7  A. Sorry, the sub-source -- the source? The source didn't
8    have, or the sub-source?
9  Q. That's the second paragraph:
10       "For example, the Primary Sub-source stated to
11   WFO Agent 1 that, in contrast to the impression left
12   from the election reports, his/her sub-sources [that's
13   primary sub-sources, what we're calling here the
14   sub-source] did not have direct access to the persons
15   they were reporting on."
16 A. I think it depends which ones we're talking about. It
17   relies on specifics. In the case of this particular
18   memorandum, they did.
19 Q. So you got it wrong in the other memoranda but not in
20   this one; is that your evidence?
21 A. I don't think I got it wrong. I think we described the
22   sources in different ways.
23 Q. I mean, you put out a press release criticising the
24   Attorney General and said that you --
25 A. Excuse me, not the Attorney General. The Inspector

38

1    General.
2  Q. Inspector General.
3  A. Yes, sorry.
4  Q. And saying that you didn't have the opportunity to
5    respond.
6  A. Correct.
7  Q. Let's look at that. That's at {D/133/1}. This was put
8    out on your behalf by a firm of lawyers in Washington.
9  A. Yes. Just to say, your Lordship, that Bob Weinberg from
10   that firm had been involved in the interviews we had in
11   London. He flew over. So he was present throughout the
12   interviews we had with the Inspector General's team and
13   did significant work with them back in Washington
14   thereafter.
15 Q. If we -- I think we need to go over the page to page 2
16   {D/133/2}. Yes, sorry, forgive me, we need to go back
17   to page 1 to get the complete sentence {D/133/1}:
18       "Had Orbis been given the opportunity to respond in
19   a private session, the statements by the 'Primary
20   Sub-Source' would be put in a very different light ."
21 A. Yes.
22 Q. "The 'Primary Sub-Source's' debriefings by Orbis were
23   meticulously documented and recorded."
24 A. At the time.
25 Q. But none of these documents exist, so they have all been

39

1    destroyed.
2  A. At the time, Mr Tomlinson, when we wrote the report.
3  Q. But you say it was meticulous, but nobody is in
4    a position to check that because the records don't
5    exist.
6  A. They no longer exist, but that is my assertion, indeed,
7    my assertion under oath.
8  Q. Well, you believe them to be meticulous, Mr Steele. I'm
9    sure that's right. But the person you were talking to
10   effectively says you got it all wrong.
11 A. No, they don't. I don't think that's true.
12 MR JUSTICE WARBY: Sorry, the bit that you were quoting,
13   Mr Tomlinson, where was that from?
14 MR TOMLINSON: It's the bottom of point 1 in this press
15   release and over the page; the last two sentences of
16   point 1. {D/133/1-2}
17 MR JUSTICE WARBY: Oh, I see.
18 A. Yes.
19 MR TOMLINSON: When you make statements of fact about Orbis'
20   business in a formal setting, do you always check that
21   they're correct, Mr Steele?
22 A. I'm not sure what you're asking.
23 Q. Well, in witness statements and statements to official
24   investigations and so on, do you check that, before you
25   state something as a fact, it is correct?

40

1    A.  To the best of our knowledge.

2    Q.  I just want to look at some examples, please. Look at

3        paragraph 36 of your witness statement {C/4/8}. This is

4        a point that was put in cross-examination by Mr Millar,

5        I think, yesterday, concerning a company called Pamplona

6        Capital Management and its permission to take a stake in

7        the insurer Chaucer.

8    A.  Yes.

9    Q.  Here, in paragraph 36, you say, stating apparently as

10       a fact, that:

11           "... the Russian ambassador ... attended the offices

12       of the FSA in order to attempt to incite the FSA to

13       reverse their decision to refuse to grant Pamplona

14       Capital Management, which was owned by Alfa Group..."

15           Do you see that?

16   A.  That's what I was told by the FSA official.

17   Q.  Well, you state it as a fact, Mr -- you state as a fact

18       Pamplona Investment Capital Management was owned by

19       Alfa Group, don't you?

20   A.  Yes.

21   Q.  A two-minute search on the Companies House website would

22       reveal to you that Pamplona Capital Management is in

23       fact owned by an individual called Alexander Knaster and

24       is not owned by Alfa Group at all.

25   A.  But the point that was told me by the official was that

                                41

1        it was Alfa Group that were lobbying for this takeover.

2    Q.  No, but the point I'm making to you is you state as

3        a fact:

4            "... Pamplona Capital Management, which was owned by

5        Alfa Group ..."

6            Which is wrong. It isn't a fact. It is false.

7    A.  Okay.

8    Q.  It's careless at the very least, Mr Steele, isn't it?

9    A.  It is in that instance.

10   Q.  Let's take another example. Look at paragraph 111 of

11       this statement {C/4/26}. This is a paragraph which was

12       struck out as irrelevant, legally irrelevant, but I want

13       to ask you some questions about it because this is

14       something you were prepared to put in a witness

15       statement, signed by a statement of truth:

16           "While I am aware that the Claimants have complained

17       outside of these proceedings that they had no

18       involvement in efforts to influence the 2016

19       US Presidential election, Alfa Group in fact owns

20       SCL Group, a subsidiary of which is Cambridge Analytica,

21       which was engaged on behalf of President Trump's

22       campaign and responsible for harvesting the personal

23       data of Facebook users ..."

24           Etc, etc. You then go to the trouble of exhibiting

25       the Information Commissioner's office notice finding

                                42

1        Alfa Group -- finding a breach:

2            "If the Claimants suffer from a taint of association

3        between their businesses and influence on the election

4        of President Trump, that taint seems to me to arise

5        regardless of CR112."

6            Do you see that?

7    A.  Yes.

8    Q.  This is an attempt to smear the claimants, by linking

9        them to Cambridge Analytica, isn't it, Mr Steele?

10   A.  No, it links them to -- what was it -- SL -- SL Group,

11       whatever.

12   Q.  You see, Alfa Group has nothing whatever to do with SCL.

13       That is simply an internet conspiracy theory that's been

14       put about by wild disinformation individuals. There's

15       no -- there's absolutely no truth in that whatever,

16       Mr Steele.

17   A.  That there's no link between Alfa and SCL?

18   Q.  None at all.

19   A.  If you say so.

20   Q.  Well -- but you were prepared to go into a witness

21       statement, attacking the claimants on that basis, on

22       the -- basically on the basis of a piece of false online

23       disinformation. That's not responsible conduct, is it,

24       Mr Steele?

25   A.  If it's wrong, I would apologise for it.

                                43

1    Q.  Why did you put it in your witness statement at all?

2    A.  Because I understood it to be true.

3    Q.  But you didn't say, "I understand this to be true"; you

4        state it as a fact, don't you?

5    A.  Yes.

6    MR JUSTICE WARBY:  I'm not sure how I'm supposed to

7        determine, on the basis of those questions, what to make

8        of all this.

9    MR TOMLINSON:  Well, Mr Steele has --

10   MR JUSTICE WARBY:  You have put it to him. There's no

11       evidence before me yet -- or I haven't been shown it --

12       that what's stated here is derived from a bit of

13       internet conspiracy theory.

14   MR TOMLINSON:  My Lord, there isn't, but Mr Steele has

15       accepted he has no personal knowledge of this and he's

16       accepting on the basis of the question I put to him that

17       this is -- this is -- he has no knowledge of its

18       accuracy.

19   A.  But, Mr Tomlinson, I haven't seen any evidence, as you

20       say, of that. That's your contention.

21   Q.  Well, have you seen any evidence that --

22   A.  That's your contention.

23   Q.  -- to support -- you're the one who makes the statement

24       in a witness statement with a statement of truth. Have

25       you seen any evidence to support this allegation?

                                44

1  A.  I have read about it.

2  Q.  Where?

3  A.  I can't remember.

4  Q.  Let me take another example.  Do you remember you met

5     State Department officials on 11 October 2016?

6  A.  Yes.

7  Q.  Look at {D/71/1}, please.  This is the

8     State Department's note.  This is what you told them

9     about the things that were going on, you told them about

10    your investigations.  At the bottom of the page, you're

11    reported as telling them:

12       "Peter Aven of Alfa Bank has been the conduit for

13    secret communications between the Kremlin and Manafort;

14    messages are encrypted via Tor software and run between

15    a hidden server managed by Alfa Bank (see separate paper

16    on this channel)."

17       You told the State Department as a fact that that

18    was the position; correct?

19  A.  I told them that it was the reporting that we had from,

20    I believe, Mr Simpson at the time.

21  Q.  So when they record it as a statement of fact, they have

22    got it wrong as well, have they?

23  A.  This -- again, this note by, I think, Kathleen Kavalec,

24    if I'm not mistaken --

25  Q.  Yes.

45

1  A.  -- contains some fairly odd things, like, for example,

2    implying that Vladislav Surkov is one of my sources,

3    which seems bizarre in the extreme.  So I'm not saying

4    I didn't say that.  I remember that Mr Simpson told me

5    that, but, again, there are problems with this write-up.

6  Q.  You accept that there's absolutely no truth in that

7    statement at all?

8  A.  I don't -- no, I don't accept there's no truth in it.

9    I accept it's what was reported to me in good faith by

10    Mr Simpson.

11  Q.  How do you know it was in good faith?

12  A.  I've worked with him for many years.

13  Q.  I see.

14       Let's look at another example, the

15    Inspector General's report at {D/131/155}.  This deals

16    with a meeting that you had with Bruce Ohr, who I think

17    worked for the Department of Justice?

18  A.  Still does, I think.

19  Q.  Still does, and features heavily in this report.

20       At 259 --

21  A.  Mm hmm.

22  Q.  Footnote 259:

23       "... according to an FBI FD-302 [I think that's one

24    of their, as it were, internal memoranda], that Steele

25    had told Ohr that the Alfa Bank server was a link to the

46

1    Trump campaign and that Person 1's Russia/American

2    organisation in the US had used the Alfa Bank server two

3    weeks prior."

4       Did you tell him that?

5  A.  I don't think I did.  I mean, I had two breakfast

6    meetings with Bruce Ohr.  I suspect that it was

7    Glenn Simpson that told him that, not me.

8  Q.  Well --

9  A.  I remember the two breakfast meetings quite distinctly

10    and they did not get into the details of the project at

11    all.

12  Q.  But, you see, Person 1 is your source.

13  A.  No, I don't think that's true.  I think Person 1 is

14    possibly Paul Manafort, but I'm not sure because I don't

15    believe it's my information.

16  Q.  I see.  So you think that the FBI have misrecorded that;

17    is that the position?

18  A.  I think Bruce Ohr has misreported it, which is not the

19    same thing.  Or misremembered it.

20  Q.  Yes.  Bruce -- counsel at the Department of Justice has

21    given inaccurate information to the FBI?

22  A.  Well, I don't recall -- I'm under oath here -- that

23    either that was my information or that I ever discussed

24    that issue with Bruce Ohr.

25  Q.  Very well.

47

1  A.  In fact, I'm pretty sure I didn't, because I was careful

2    not to discuss the details of memoranda with him.

3  Q.  I mean, it is an extraordinary allegation, whoever has

4    made it, whether it is you or Mr Simpson, that the

5    source's Russian-American organisation has used the

6    Alfa Bank server?

7  A.  As I have said, it's not my information.

8  Q.  You know nothing about this allegation, is that the --

9  A.  No, I believe it is Mr Simpson.  Mr Simpson had

10    a meeting with Bruce Ohr, I believe in December

11    or November 2016.  This is not emanated from us.  We

12    never produced any intelligence on the actual -- if you

13    like, the technical aspects of this issue.

14  Q.  Well, it appears that one of your sources has told

15    someone that their organisation has used the Alfa Bank

16    server?

17  A.  No, not one of my sources, Mr Tomlinson.  I think one of

18    Mr Simpson's.

19  Q.  One of Mr Simpson's sources?

20  A.  I think so.  That's my understanding of this.

21  Q.  Very well.

22       Let's now look at Memorandum 112, please {A/1/1}.

23    I suggest to you, Mr Steele, this is a hastily prepared,

24    slapdash document; that's right, isn't it?

25  A.  It's not a slapdash document; it's a fair reflection of

48

1    what my experienced source reported to me.
2    Q.  Because you can't even spell the name correctly of an
3        organisation that you claim to have extensive knowledge
4        of.  You misspell it throughout.
5    A.  That's a Russianist issue, where the letter, circle with
6        a line through it, is usually -- can be transcribed as
7        PH or as F, your Lordship, and has been, I think, in
8        many cases.
9    Q.  It's not a good start on it being a careful document, is
10       it, that you can't spell the name of the company you are
11       writing about correctly?
12   A.  It's regrettable, but, as I say, if you look at the
13       translation of the word "Alfa" from Russian into
14       English, your Lordship, many times you will find it is
15       translated as PH. The letter F in Russian is usually
16       transcribed as PH.
17   Q.  Mr Govorun is mentioned on two occasions.  He features
18       quite heavily in this memorandum, doesn't he?
19   A.  He certainly features.
20   Q.  Firstly, in the second bullet point of the summary.
21   A.  Yes.
22   Q.  Then in paragraph -- effectively the whole of
23       paragraph 2; yes?
24   A.  Yes, yes.
25   Q.  In your witness statement -- I don't want to turn it up,

49

1        unless you disagree -- you say that in relation to the
2        statements about Mr Govorun:
3            "I have seen nothing to suggest it was factually
4        incorrect."
5            Is that still your evidence?
6    A.  At that time, yes.
7    Q.  The time that you produced your witness statements, in
8        other words, two weeks ago?
9    A.  Yeah, I think that's right, yes.
10   Q.  Are you sure about that, Mr Steele?  I'm giving you the
11       opportunity for you now to correct your mistakes.
12   A.  No, I am saying what my position is, that the
13       documentation, there is -- I think there's documentation
14       in the bundle about this, so that's probably relevant,
15       but I was certainly not aware of it at the time.
16   Q.  No, no, I'm not asking you that.  In your own witness
17       statement you say:
18           "I have seen nothing to suggest that this is
19       factually incorrect."
20   A.  Yes.
21   Q.  That's not true, is it, Mr Steele?
22   A.  No, I hadn't seen, at that time.
23   Q.  No, no, no.  This is your witness statement --
24   A.  Are we talking about now or when I signed the witness
25       statement or what?

50

1    Q.  When you signed the witness statement --
2    A.  Yes.
3    Q.  -- that's what you said?
4    A.  Yes.
5    Q.  That's not true, is it?
6    A.  I hadn't read it.
7    Q.  You hadn't read what, the witness statement?
8    A.  No, I had read the witness statement.
9    Q.  You hadn't read your own memorandum?
10   A.  I had read my own memorandum.  I think there are
11       documents in the bundle that relate to Mr Govorun's
12       employment with Alfa.
13   MR JUSTICE WARBY:  I think what counsel is putting to you
14       that when you signed that statement in your witness
15       statement you had seen things that contradicted what was
16       in the memoranda.
17   MR TOMLINSON:  Yes.
18   A.  I had seen an assertion by your side that that was the
19       case.
20   MR TOMLINSON:  Had you not read the disclosure in the case?
21   A.  I'm not sure I had read everything.
22   Q.  You see, Mr Govorun's employment record was disclosed.
23   A.  Mm hmm.
24   Q.  Which showed that large parts of this are obviously
25       incorrect.

51

1    A.  I don't think it shows large parts are incorrect;
2        I think it shows there is a problem of chronology in
3        terms of Mr Govorun's employment with Alfa in the 1990s
4        and the time when President Putin was the Deputy Mayor
5        of St Petersburg.
6    Q.  Well, I'll go through it, Mr Steele, and give you the
7        opportunity.
8    A.  Mm.
9    Q.  The first -- second bullet point:
10           "Key intermediary in Putin-Alpha relationship
11       identified as Oleg Govorun, currently Head of
12       a Presidential Administration department ..."
13   A.  Yes.
14   Q.  That statement is incorrect.  He's not head of --
15       in 2016 he was not the head of a presidential
16       administration department, indeed he has never been the
17       head of a presidential administration department.
18   A.  He was responsible for relations with CIS countries,
19       which I think was a department.  I mean, again, it
20       depends how you -- which word in Russian are we talking
21       about here?
22   Q.  "... throughout the 1990s, the Alpha executive who
23       delivered illicit cash directly to Putin."
24           So that means from 1991 to 1999.  That's untrue,
25       isn't it?

52

1  A.  I'm reporting what the source said to us.
2  Q.  Mr Steele, I am not asking you about what the source
3      said to you.  I'm asking you about your assertion, in
4      evidence:
5          "I have seen nothing to suggest it was factually
6      incorrect."
7  A.  Which was factually incorrect?
8  Q.  This -- the statement about Mr Govorun.
9  A.  I have -- which statements, sorry, to be precise?
10 Q.  The statement that he was delivering illicit cash on
11     behalf of Mr Aven and Mr Fridman.
12 A.  I've not seen anything to suggest that's untrue.
13 Q.  Right.  Let's go down to paragraph 2.  The last two
14     lines of paragraph 2:
15         "... during the 1990s Govorun had been Head of
16     Government Relations at Alpha Group ..."
17 A.  Mm hmm.
18 Q.  False.
19 A.  I think he was deputy head.  So, yes, he wasn't head.
20 Q.  He wasn't head of government -- he was never head of
21     government relations at Alfa Group and during the 1990s
22     he was a manager in the government relations department.
23     He subsequently became the deputy head.
24 A.  He was deputy head in the 1990s though.
25 Q.  So you say that that's accurate, do you, Mr Steele?

53

1  A.  I say that he was deputy head, rather than head.
2  Q.  "... in reality, the 'driver' and 'bag carrier' used by
3      Fridman and Aven to deliver large amounts of illicit
4      cash to the Russian president, at that time deputy Mayor
5      of St Petersburg."
6          That's untrue, isn't it?
7  A.  It -- he wasn't working as deputy head of Alfa's
8      government relations department at the same time, it
9      seems, that Putin was Mayor of St Petersburg.
10 Q.  So it follows that he can't have been delivering illicit
11     cash on behalf of Alfa when Putin was the Deputy Mayor
12     of St Petersburg, doesn't it?
13 A.  I don't think that follows, but it may be an inference.
14 Q.  You accept that Mr Putin stopped being Deputy Mayor of
15     St Petersburg in June 1996?
16 A.  I do, yes.
17 Q.  You accept that Mr Govorun was first employed by
18     Alfa Bank as a manager in the department of
19     communications on 3 March 1997?
20 A.  Yes.
21 Q.  You told his Lordship earlier that you had done some
22     searches on the internet about Mr Govorun.
23 A.  Yes.
24 Q.  Look at {D/148/1}, please.  This Mr Govorun's biography
25     page, produced from the Kremlin --

54

1  A.  Mm hmm.
2  Q.  -- on the Kremlin website, which responds to a search on
3      his name.
4  A.  Yes.
5  Q.  We see from 1993 to 1995 he worked in various companies
6      in Moscow.  1995, he was a manager's assistant, project
7      manager, then specialist in Rosprom.  1997 to 2000,
8      deputy head -- manager, deputy head of the
9      GR department, vice-president of Alfa Bank.
10 A.  Yes.
11 Q.  Yes?
12 A.  Yes.
13 Q.  If you had done an internet search, you would have
14     immediately realised that your statement was wrong,
15     wouldn't you?
16 A.  Well, we did do an internet search.  We were looking at,
17     I remember -- I do remember specifically that he had
18     accompanied Putin to the funeral of Karimov of
19     Uzbekistan in his government capacity at that time.
20     That was the one thing that I remember checking and
21     checking our open source.
22 Q.  So you checked that he had gone to Karimov's funeral,
23     but you didn't check that he was in St Petersburg at the
24     time that he was supposed to be handing over illicit
25     cash?

55

1  A.  All I remember is what came up in the open source check
2      that we did.
3  Q.  You see, going back to {A/1/1} --
4  A.  I was looking at his current job, his current role.
5  Q.  The state -- if -- assuming in your favour, Mr Steele,
6      that you have faithfully transcribed what your source
7      has told you --
8  A.  Yes.
9  Q.  And the source has said, "Christopher, I have
10     discovered --" or Mr Steele, Sir, however he addresses
11     you, "I have discovered that in the -- my sub-source
12     tells me that in the 1990s Oleg Govorun used to hand
13     over illicit cash on behalf of Aven and Fridman to
14     Vladimir Putin when he was Deputy Mayor of
15     St Petersburg".
16         Is that -- he said to you something like that?
17 A.  Not just when he was Deputy Mayor of St Petersburg.
18     I think it's during the 1990s.
19 Q.  Oh, I see.  So go to the second page of this memorandum
20     {A/1/2}.  So you have inaccurately recorded what your
21     source has told you, have you?
22 A.  No, I --
23 Q.  You're now saying it was during the 1990s, not just when
24     he was Deputy Mayor of St Petersburg --
25 A.  I think it --

56

1   Q.  -- so afterwards?
2   A.  I think it says, if you go back to the summary {A/1/1},
3       I think it refers to the 1990s, doesn't it?
4   Q.  I think, Mr Steele, the summary is supposed to be
5       summarising what it says in the memorandum, not
6       introducing new facts.
7   A.  It is what I was told by the source.
8   Q.  So your source says this to you, "Mr Steele, Mr Putin
9       was getting illicit cash from Aven and Fridman in the
10      1990s when he was Deputy Mayor of St Petersburg"; and
11      you say to him, "Well, what does your source know
12      about -- what does your own sub-source know about
13      this?", and he says, "Trust me, he is a high-ranking
14      official, he knows all these things".
15          A conversation something like that took place?
16  A.  Sure, but that doesn't rule out that people occasionally
17      get things wrong.
18  Q.  And then --
19  A.  Sources get things wrong.
20  Q.  Yes, indeed.  Then you do a check and you discover that
21      Mr Govorun, actually, there is no cross-over in time.
22      So a rational person, Mr Steele, then thinks, "Perhaps
23      my source has got it wrong"?
24  A.  I never saw the cross-over problem at the time.  At
25      the --

                                57

1   Q.  Because you didn't do the searches you claim to have
2       done.
3   A.  No, I did certain searches and I said what we had
4       searched on.  We had searched on his current role and
5       the fact that he had gone with Putin to Karimov's
6       funeral in Uzbekistan.
7   Q.  Isn't it an absolutely elementary thing to do,
8       Mr Steele: someone tells you something which includes
9       checkable historical facts.  You can check those
10      historical facts to see whether the other things they
11      are telling you might be true or not?
12  A.  It's a reasonable assertion, yes.
13  Q.  And you didn't do it?
14  A.  No, we did an open source search.  We just didn't come
15      across the document that you referred --
16  Q.  What I don't understand, Mr Steele, is how in this court
17      you can assert, "I have seen nothing to suggest that
18      this was factually inaccurate", when the actual facts
19      that are given to you by your source are obviously
20      false?
21  A.  I don't agree that the facts given to me by the source
22      are false.  I agree that one of the points made is
23      false.
24  Q.  No, the point you have recorded, assuming you were
25      accurately recording it, is that your source told you

                                58

1       this happened when Putin was Deputy Mayor of
2       St Petersburg; correct?
3   A.  Well, it says throughout the 1990s so it would include
4       the time when he was Deputy Mayor of St Petersburg.
5   MR JUSTICE WARBY:  Is that a convenient moment?
6   MR TOMLINSON:  I was -- my Lord, I had my eye on the time
7       and I'll stop.
8   MR JUSTICE WARBY:  Good.  Right.  We'll take a ten-minute
9       break.
10          As I said before, don't talk to anyone about the
11      case, even if you were tempted.
12  A.  Yes.
13  (11.46 am)
14                  (Short Break)
15  (11.57 am)
16  MR JUSTICE WARBY:  Before you continue, Mr Tomlinson, can
17      I just mention something which I think you're both aware
18      of, that there's been a request by a journalist for
19      access to Mr Steele's witness statement.  It may be
20      a convenient moment just to deal with that.
21          The rule is that, unless the court otherwise
22      directs, a witness statement is available for inspection
23      during the course of the trial, unless -- is open to
24      inspection during the course of the trial, unless the
25      court otherwise directs.  So unless anyone asks for

                                59

1       a direction that the witness statement is not to be open
2       to inspection, then it is.  The mechanism for that is
3       another matter.  I think this case is on the CE-File
4       system, is it not?  It would be before all cases
5       automatically went on, but I think they have all been
6       migrated to the CE-File.
7           Perhaps I can just say that my understanding is that
8       under the Civil Procedure Rules, anyone who wishes has
9       a right of inspection of that witness statement and
10      should apply to Queen's Bench listing or go on CE-File
11      in the usual way to obtain a copy.
12  MR TOMLINSON:  My Lord, I am sure that that's entirely
13      right.  I have to say that I have always taken the
14      view -- two things: first of all, a witness statement
15      stands as the witness's evidence in-chief, so it is --
16      in the old days you would hear -- someone in court would
17      hear it all, and so having a witness statement is just
18      a short way of dealing with it.
19          Secondly, although perhaps it deprives Her Majesty's
20      Court Service of a small fee, in general it is probably
21      more convenient for a journalist just to be given
22      a paper copy in court if one is available.
23  MR JUSTICE WARBY:  Yes.  I am not concerned with being the
24      overseer of collection of fees if a party is willing to
25      disclose it, but I don't think the rule requires a party

                                60

1    to provide a copy if they don't wish to. The right is
2    to obtain inspection I think from the court records, so
3    that's the point that I was seeking to make. Sometimes
4    parties prefer not to volunteer documents, even if they
5    are available for inspection, but that's a matter for
6    Mr Steele and Orbis.
7    MR MILLAR: All of the above I think is correct.
8    MR JUSTICE WARBY: Good. Right.
9    MR TOMLINSON: Mr Steele, I now want to ask you just very
10       briefly about the use of the word "illicit" in
11       paragraph 2 of the memorandum {A/1/1}. Is that a word
12       that was used -- is that your word or is that the word
13       of your source?
14   A. I imagine it's the word of the source, to the best of my
15       recollection.
16   Q. And is it your evidence that, really, by "illicit" in
17       this context, you simply mean patronage payments of an
18       informal nature as opposed to anything illegal?
19   A. Yes -- well, it's not clear. It's the word illicit. It
20       means it's not money, I think, your Lordship, which has
21       passed through formal accounting procedure.
22   Q. I think it is suggested on behalf -- it has been
23       suggested on behalf of Orbis that really -- I put it in
24       summary, but in St Petersburg in the 1990s things were
25       very different and it was quite common for money to

61

1    be -- cash/money to be passed around informally in a way
2    that wasn't -- didn't constitute any kind of illegal
3    conduct. Is that your --
4    A. That's my view, yes.
5    Q. And is it -- are you -- is it your evidence in this
6       court that that's what was meant by the use -- what
7       you -- whether this is legally relevant is a matter for
8       his Lordship in due course, but that you're suggesting
9       that that's what you meant by using the word "illicit"
10       in the memorandum?
11   A. I was quoting what -- directly what the source had told
12       me and I had written down from the source.
13   Q. Well, a moment ago you were imagining that that was the
14       position. Are you now saying that that was the
15       position?
16   A. Sorry, what --
17   Q. Your evidence was, "I imagine that that's what
18       happened"?
19   A. Sorry. It was what happened.
20   MR JUSTICE WARBY: Yes, I think he said both, really, that
21       it was his recollection and that he imagined it.
22           Were these conversations in English or Russian?
23   A. The conversation between me --
24   MR JUSTICE WARBY: With your source?
25   A. Between me and the source --

62

1    MR JUSTICE WARBY: Yes.
2    A. -- were in English.
3    MR TOMLINSON: You see, Mr Steele, the position is, if this
4       is really fairly run-of-the-mill and standard behaviour
5       for Russia in 1990, why does it feature so heavily in
6       your memorandum? Why is it of any significance at all?
7    A. Because it establishes a -- perhaps reportedly
8       establishes a link between Mr Putin and the plaintiffs.
9    Q. But there was -- everybody knew that there was a link
10       between Mr Aven and President Putin. Had you done a few
11       more internet searches, you would have found that out.
12   A. But not involving Mr Govorun, I think.
13   Q. Well, there's no link involving Mr Govorun whatever.
14       That's purely made up, Mr Steele, as you know.
15   A. No, I don't know that.
16   Q. Well, the only evidence you have to the contrary is what
17       the -- is the incorrect statements made to you by your
18       source.
19   A. No, Mr Govorun was working for Alfa in the late 1990s
20       and went on to work for Mr Putin.
21   Q. Correct. Probably along with many tens or hundreds of
22       other people.
23   A. Not --
24   Q. But that's nothing to do with illicit cash.
25   A. Not at that level.

63

1    Q. But do you see the point I'm making, that what I'm
2       suggesting to you is the prominence you give to this
3       allegation shows you regard it as a serious one?
4    A. It's providing background to a relationship between
5       Mr Putin and the plaintiffs.
6    Q. Is that your evidence, it is simply a matter of
7       background showing the relationship? Is that your
8       evidence to his Lordship?
9    A. The question we were asked by Mr Simpson and his client
10       was: what links were there between the Alfa Group and
11       Mr Putin.
12   Q. So do you still abide by your evidence -- this is at
13       paragraph 96, I think it is, of your statement {C/4/24}:
14           "I therefore considered (and consider) ..."
15           So that's the present tense when the statement was
16       signed:
17           "... sentence 4 ..."
18           Which is the sentence to do with using Mr Govorun as
19       a "driver" and "bag carrier" to deliver large amounts of
20       illicit cash to President Putin when he was Deputy Mayor
21       of St Petersburg:
22           "... to be a fair, accurate and well-founded
23       assessment ..."
24           Is that still your evidence, Mr Steele? I'll give
25       you the final opportunity to admit that you got it

64

1    wrong.
2    A.  I got one aspect of it -- we got -- well, not I got it
3        wrong.  It is the source and the sub-source who were
4        reporting this to me, and obviously how it was
5        reflected, but I concede that one aspect of this is
6        wrong, which is that Mr Putin's tenure in St Petersburg
7        did not overlap with Mr Govorun's formal tenure within
8        Alfa.
9    Q.  And that's as far as you're prepared to go in support
10       of -- in withdrawing this allegation, is it, Mr Steele?
11   A.  Yes.
12   Q.  You say that the intended audience -- paragraph 89, so
13       the previous page {C/4/23}.  The intended audience for
14       CR112 would interpret the -- you don't believe the
15       intended audience would interpret the sentence as an
16       allegation of criminality?
17   A.  Yes.
18   Q.  Who do you mean by the intended audience?
19   A.  The people I disclosed it to.
20   Q.  No, no.  You didn't intend -- when you produced it, you
21       didn't intend to disclose it to Mr Strobe Talbott and
22       all those other people later on?
23   A.  No, to the FBI and to the client of Fusion.
24   Q.  So the intended audience was -- you didn't write it for
25       the FBI; you wrote it for your client.

1    A.  No, but we had had an instruction in August,
2        late August 2016, your Lordship, to provide all our
3        reporting to the FBI.
4    Q.  Well, I'll come on to that, Mr Steele.
5    A.  Yeah.
6    Q.  You know what I'll say about that in due course.
7    A.  Yes, sure.  But that was the instruction.
8    Q.  Well, I'll come on to that, but the intended audience
9        was Fusion and Fusion's ultimate client, wasn't it?
10   A.  No, and the FBI.
11   Q.  Well, put the FBI to one side.  Let's agree to differ
12       about the FBI for the moment.
13   A.  Okay.
14   Q.  But the intended -- you were being paid to produce this
15       document by the ultimate client of --
16   A.  Perkins Coie.
17   Q.  No.  No, no.  You were being paid by the Hillary for
18       America campaign, as you knew.  The money was coming
19       from them; they were the ultimate client.
20   A.  I -- I'm not sure that that's true.
21   Q.  Well, it wasn't coming out of Perkins Coie's own pocket,
22       was it?
23   A.  I believe we now know that in fact the DNC was the
24       ultimate client for this, not Hillary Clinton.  I think
25       there's a difference, I think.

1    Q.  Let's not argue about which particular Democratic Party
2        institution it was.  You knew it was some Democratic
3        Party institution; correct?
4    A.  I knew -- yes.
5    Q.  So are you saying -- is it your evidence that
6        a Democratic Party institution, whoever it was, would
7        understand the nuances of patronage payments in
8        St Petersburg in the 1990s?  Is that your evidence?
9    A.  I believe that the Perkins Coie lawyers would have known
10       that, the clients would have known that.  I have no
11       evidence that they passed this on to anyone beyond that.
12   Q.  That wasn't my question, Mr Steele.
13   A.  What was your question?
14   Q.  You say that the intended audience would interpret --
15       would not -- you're talking about how the intended
16       audience would interpret this memorandum.
17   A.  Yes.
18   Q.  And I'm saying to you that the intended audience was the
19       person who was paying your bills, namely the ultimate
20       client?
21   A.  I disagree with that.  The intended audience was the
22       Perkins Coie client and the FBI.
23   Q.  So when you produced the memoranda, your client, who is
24       paying your bills, is not your intended audience; is
25       that the position?

1    A.  No, the client is -- the client actually was Fusion but
2        their client was Perkins Coie, not the DNC or Hillary
3        for America.
4    Q.  Can we go back to the memorandum at {A/1/1} --
5    A.  Sorry, just to put on that point, if I may,
6        your Lordship, Fusion would have had very much the
7        sophisticated understanding of this issue in Russia in
8        the 1990s.  So they're one of the filters that this
9        stuff went back to the Perkins Coie ultimate client.
10   Q.  But they could and indeed did hand this out to all kinds
11       of people, as we know?
12   A.  Not -- not to my understanding at the time, no.
13   Q.  We'll come back to that.
14       You also say that Mr Fridman had recently met
15       directly with Putin in Russia.
16   A.  Mm hmm.
17   Q.  Is your evidence -- and you said -- I think you said
18       earlier to his Lordship that you did a Google search and
19       discovered that he had been at a meeting of the Congress
20       of Russian Union Industrialists.  Is it your evidence
21       that you meant by saying he had recently met Putin
22       directly in Russia, that six months earlier he had been
23       to a meeting of the Congress of Russian -- the Russian
24       Union of Industrialists and Entrepreneurs?
25   A.  No, that's not my evidence.  My evidence is that what

1    was reported to me by the source appeared to be
2    credible, given that open source record.
3  Q. So, the fact he had been to a plenary session of the
4    Russian equivalent of the CBI was evidence that he had
5    met Putin directly; is that what you're saying?
6  A. No, it meant that he was at meetings which were
7    involving Mr Putin.
8      And you used the word "recent"?
9  Q. "Recently" and "directly" were the words you used,
10    Mr Steele.  Not me.  You used them.
11  A. Yes, I believe that to be true.
12  Q. And --
13  A. Certainly what was reported to us by the source and
14    sub-source.
15  Q. The truth is that, like all -- I think you have now
16    accepted all your reports, this memorandum contains
17    a number of serious inaccuracies, doesn't it, Mr Steele?
18  A. I think it contains one inaccuracy.
19  Q. So, despite the evidence of the claimants in this court,
20    you prefer the multiple hearsay evidence from your
21    sub-source to what they say; is that what you're saying?
22  A. I had faith, your Lordship, in my source and sub-source
23    to report the situation as they understood it to me,
24    faithfully and truthfully.
25  Q. I want to now ask you about some of the -- your claim

69

1    that the disclosure of this memorandum was required for
2    national security purposes.
3  A. Mm hmm.
4  Q. I have already referred you to your company's formal
5    legal further information of 1 August 2018.  That's
6    {A/12/3}.  Sorry, that's the bit I want to look at, but
7    it begins at {A/12/1}.  That's signed as true on your
8    behalf -- on behalf of Orbis by your solicitor.
9  A. Right.
10  Q. You have seen this document before?
11  A. I have, yes.
12  Q. And do you say that it's true?
13  A. Yes.
14  Q. So if we look at the bottom, "Under paragraph 2":
15      "The disclosures referred to ... were required for
16    the purpose of safeguarding the national security ..."
17      That's the statement that Orbis makes.
18  A. Yes.
19  Q. And the request is, at 8:
20      "State, so that the Claimants may understand the
21    nature of the Defendant's case, the factual basis on
22    which it is alleged that the [memorandum disclosures
23    are] required for the purposes of safeguarding the
24    national security ..."
25      Turn over the page.  And so on.

70

1      Then your response is that there were allegations of
2    Russian interference, including links between
3    individuals associated with the Trump campaign, Russian
4    operatives with links to the Kremlin.
5  A. Mm hmm.
6  Q. Any such interference would be likely to constitute
7    a serious threat to democracy and national security in
8    the US, and so on?
9  A. Yes.
10  Q. Yes?
11  A. Yes.
12  Q. You then say -- your company says:
13      "Memorandum 112 was concerned with such links."
14      That is to say links between individuals associated
15    with the Trump campaign and Russian operatives?
16  A. Yes.
17  Q. That's not true, is it?
18  A. It is, because it arose out of the tasking that came
19    from the Trump Tower-Alfa server issue.
20  Q. Mr Steele, let me just ask you the question again.  It
21    is a matter of ordinary English:
22      "Memorandum 112 was concerned with such links."
23      It was not, was it?
24  A. It was a background context to such links.  I don't know
25    how you would describe "concerned", your Lordship, but

71

1    to me, that is "link".
2  Q. Then you -- the next answer -- unfortunately the
3    subparagraphs aren't numbered, but the next answer seeks
4    to explain why links between the claimants and the
5    Russian President were material to the allegations
6    outlined above; yes?
7  A. Yes.
8  Q. And then it suggests -- it says that:
9      "Internet traffic data suggested that a computer
10    server of an entity in which the Claimants have an
11    interest, Alfa Bank, had been communicating with
12    a computer server linked to the Trump Organisation."
13  A. Yes.
14  Q. So far, so good.  Do you still maintain that the next
15    three -- four sentences have any relevance to this case?
16    I'll give you the opportunity to -- just read them.
17  A. Which ones, sir?
18  Q. The next ones:
19      "Alfa Bank instructed an individual,
20    Mr Brian Benczkowski, to investigate the allegations ..."
21      And if we go over the page {A/12/5}.  Do you accept
22    that all this material about Mr Benczkowski has nothing
23    whatever to do with the case?   If you do, then we can
24    move on.
25  A. It was just pointing out that Mr Benczkowski had

72

1    investigated this at the same time that he was involved
2    in the Trump transition. That's all.
3  Q. Yes, but this was six months later.
4  A. Sure.
5  Q. Mr Benczkowski was a partner in Kirkland & Ellis, which
6    was a firm of lawyers which had been instructed to look
7    at this. It has nothing whatever to do with your
8    preparation of the memorandum, has it?
9  A. No, it hasn't, no.
10 Q. No. Thank you.
11    Then it says:
12    "Memoranda including Memorandum 112 were requested
13    from the Defendant by individuals with official
14    responsibilities ..."
15    Etc, for the safeguarding.
16 A. Yes.
17 Q. Is that true, Mr Steele?
18 A. Yes.
19 Q. Just tell me, who are the individuals who requested it
20    from you? Requested this memorandum from you?
21 A. The FBI, who requested all our memorandum -- or
22    memoranda --
23 Q. Yes, well, I'll come on to the FBI.
24 A. Sure, yeah.
25 Q. Just put them to one side.

73

1  A. And the senior British national security official who we
2    dealt with.
3  Q. You approached him?
4  A. Yes, but he -- I approached him. We had a conversation
5    and he then requested that I provided him with all our
6    memoranda.
7  Q. So you tout your memoranda to one of your former
8    colleagues. That's not him requesting the memoranda
9    from you.
10 A. No. He specifically requested all our memoranda in hard
11    copy.
12 Q. After you had gone to him and said --
13 A. Sure.
14 Q. -- excuse me --
15 A. There's an issue -- I'd like to --
16 Q. -- whoever it is, Sir Humphrey: "Excuse me,
17    Sir Humphrey, I have these memoranda which show
18    extraordinary things about President Trump and Russia",
19    and he says, "Give me a copy"?
20 A. Yes. He says, "Can you --"
21 Q. So that's at your instigation, not his?
22 A. No, it's at his request.
23 Q. You sought a meeting with the State Department as part
24    of a wider effort to disseminate these memoranda to
25    people in Washington, didn't you?

74

1  A. No, I didn't. They sought a meeting with me.
2  Q. Can you look at {D/131/154}, please. Look at the second
3    paragraph.
4  A. Mm hmm.
5  Q. "We asked Kavalec [that's the person who produced the
6    note] about the meeting with Steele. She stated that
7    Nuland did not ask to meet Steele and that Nuland
8    requested she attend the meeting because Nuland did not
9    want to devote time to it. It was Kavalec's
10    understanding that Steele sought the meeting with Nuland
11    as part of a wider effort to disseminate his election
12    report findings to persons in Washington, DC. She
13    stated that during the meeting Steele expressed
14    frustration that the FBI had not acted on his reporting
15    and explained that when he first offered information to
16    the FBI he found a lack of interest."
17 A. The meeting was set up by a State Department official
18    called John Winer.
19 Q. At your request?
20 A. No, at his request -- his suggestion. He invited us in
21    to meet, as I understood it, at her request, Assistant
22    Secretary of State Nuland.
23 Q. As a result of your contact with the State Department,
24    then Strobe Talbott got in touch with you and said he
25    had heard about your memoranda and he wanted to show it

75

1    to other people?
2  A. I think Strobe Talbott had got in touch with us much
3    earlier than that. I remember taking a phone call from
4    him, your Lordship, earlier in the summer, in which he
5    said that he was aware that I had -- he spoke in fairly
6    cryptic terms, but he was aware that we had material of
7    relevance to the US election.
8    A little bit of background if I may, your Lordship
9    on that.
10    Both National Security Advisor at the time,
11    Susan Rice, and Assistant Secretary of State,
12    Victoria Nuland, who were the key policymakers on
13    Russia, had been colleagues of Mr Talbott, and I had --
14    although he didn't state it explicitly, one or either or
15    both of them had briefed him on the work we had been
16    doing.
17 Q. He had been out of government for 15 years. Mr Talbott
18    had been the Deputy Secretary of State in 2001.
19 A. He was a Russian expert. He was consulted, I believe,
20    by both National Security Advisor Rice and Assistant
21    Secretary Nuland, both of whom had worked with him in
22    the Brookings Institution, your Lordship, before they
23    entered government under President Obama.
24 Q. Look at paragraph 53 of your witness statement at
25    {C/4/12}, please. I mean, what you say there is:

76

1          "I ... provided a copy ... to Strobe Talbott in
2     early November 2016."
3   A.  Yes.
4   Q.  You then talk about his history and so on.
5   A.  Mm hmm.
6   Q.  "Mr Talbott approached me and I understood that he had
7     been speaking with John Kerry ... and
8     Victoria Nuland ..."
9   A.  Yeah.
10  Q.  So, on the face of it, it looks like you are saying he
11    approached you in November?
12  A.  No, he -- well, he -- no, he approached me originally in
13    I think it was August and then I contacted him in
14    early November, after I had spoken to Sir Andrew Wood --
15    in fact, with Sir Andrew Wood.
16  Q.  Where does that appear in your witness statement?
17  A.  So, what we're saying is that he contacted me originally
18    earlier in the summer. I contacted him. He then --
19  Q.  Sorry, where does it say that? Sorry, show me that
20    paragraph, Mr Steele.
21  A.  What do we say here ... Yes. He approached me. So
22    that's absolutely right. So he called me in my office
23    in, I think, August, saying that he was aware, he had
24    heard from colleagues, that we had been working on the
25    election and we had interesting information on it and

                                77

1     that we should stay in touch.
2   Q.  And in November 2016 you discussed this with your friend
3     Sir Andrew Wood; is that correct?
4   A.  Yes.
5   Q.  And Andrew Wood then spoke to Mr David Kramer at
6     a conference in Nova Scotia?
7   A.  That was sometime afterwards actually, yes. But "yes"
8     is the answer. Sir Andrew came back to me about three
9     weeks later and he said that he was going to this
10    conference and he felt it important that he spoke to
11    Mr Kramer about this issue, because Mr Kramer was an
12    advisor and would have been at the conference with
13    Senator John McCain.
14  Q.  Mr Kramer actually was a private citizen who worked for
15    a think tank.
16  A.  He was a former Assistant Secretary of State. He was an
17    expert on Russia. He was somebody who Sir Andrew had
18    dealt with for many years, and he was effectively
19    Senator McCain's advisor on Russia.
20  Q.  You see, all these -- all these disclosures for the
21    purposes of national security were, in effect,
22    instigated by you, weren't they? It wasn't the position
23    that the national security officials were saying, "This
24    is a huge national security issue"; it was you saying,
25    "Look, this is very interesting", and them saying,

                                78

1     "Well, okay, give me a copy"?
2   A.  No, I disagree with that. I think they were all
3     requested by these people. In fact, it was Sir Andrew's
4     idea to approach Mr Kramer.
5   Q.  You having approached Sir Andrew?
6   A.  Well, I had confided in Sir Andrew earlier in the
7     summer. But it was his proposal. He brought to me the
8     fact that he was going to this conference in
9     Nova Scotia. Senator McCain he knew was going to be
10    there, along with Mr Kramer, your Lordship, and his
11    proposal was that he would speak to Mr Kramer at the
12    conference and, hopefully, Senator McCain.
13  Q.  I mean, the position, Mr Steele, you had absolutely no
14    idea how widely these memoranda were going to be
15    circulated, did you?
16  A.  My understanding was that the memoranda were not
17    circulating at all amongst -- outside of government, if
18    you like.
19  Q.  I mean, Fusion could disclose, or Fusion's client,
20    ultimate client, could disclose the memoranda to whoever
21    they wanted, couldn't they?
22  A.  I don't know what the terms of their confidentiality and
23    privilege agreement was with Fusion, but I would doubt
24    that's the case, not least because, in my understanding,
25    what I was told by Fusion, your Lordship, was that they

                                79

1     didn't actually give the memoranda to Perkins Coie.
2     They just briefed them on them orally. And in fact
3     I was at one of the briefings where that happened.
4   Q.  I mean, look at {C/4/8}, please. You say, in
5     paragraph 40 at the bottom:
6          "Fusion understood that they were not permitted to
7     give copies of the pre-election reports ... that they
8     received from us, whether hard or digital copies, to
9     anyone else without our consent."
10  A.  Yes.
11  Q.  That wasn't a term of your contract with them, was it?
12  A.  It was a term of my -- our confidentiality agreement
13    with Mr Simpson that was signed in 2010 and was still
14    extant at -- still is extant.
15  Q.  That was a personal agreement between Orbis and
16    Mr Simpson. Nothing to do with Fusion.
17  A.  Mr Simpson is the majority owner and the director of
18    Fusion and therefore it would apply to -- in this case.
19  Q.  You understood that Fusion could disclose the memoranda
20    to its client if appropriate; correct?
21  A.  I think if appropriate and if they asked us permission.
22  Q.  Well, look at paragraph 57, please {C/4/13}.
23          "... intended for a very limited audience, namely
24    Fusion (and its client, if appropriate) ..."
25  A.  Yes.

                                80

1   Q.  So they could disclose it to their client?
2   A.  No, only if they consulted us beforehand.
3   Q.  I mean, the fact that --
4   A.  That's taken -- sorry, Mr Tomlinson. That's taken as
5       read under the terms of engagement and the
6       confidentiality agreement we had signed with Mr Simpson.
7   Q.  The fact is that Fusion controlled what was done with
8       the information in these reports; isn't that right?
9   A.  I'm not sure what the legal status of that is, but the
10      understanding was that they had to consult with us on
11      every time that they deployed these things.
12  Q.  You see, Mr Steele --
13  A.  How they deployed them.
14  Q.  -- I say that because that's your own statement to the
15      public in your press release. If you look at {D/133/1}.
16  A.  Yeah.
17  Q.  I think it's over the page {D/133/2}. Point 2:
18      "Fusion paid for the work, owned the intellectual
19      property, and controlled what was done with the
20      information in the reports."
21  A.  Mm hmm.
22  Q.  They didn't require your consent. On your own public
23      statements they controlled the intellectual property and
24      what was done with the information.
25  A.  They owned the intellectual property, they were able to

81

1       brief from it to their client, but they were still
2       covered by the -- this confidentiality agreement that we
3       had signed with them in 2010.
4   Q.  Well, let's just look at that, please. It's at
5       {D/32/1}.
6   A.  Mm hmm.
7   Q.  It's a formal undertaking from Glenn Simpson personally
8       relating to the termination of his work with Orbis
9       Business Intelligence and associated companies, and it
10      is about disclosing trade secrets.
11  A.  And an obligation of confidence to any third party
12      during or after my engagement.
13  Q.  And it refers to confidential reports and research taken
14      by or on behalf of either.
15  A.  Mm hmm.
16  Q.  It has no -- on the face of it, no bearing at all on
17      research taken by or on behalf of Perkins Coie or the
18      Democratic National Committee.
19  A.  Our client was Fusion.
20  Q.  Oh, you're a subcontractor?
21  A.  No, our client was Fusion.
22  Q.  You have said repeatedly that this memorandum was
23      disclosed to the FBI.
24  A.  Mm hmm.
25  Q.  Can you look at {C/4/9}, please. Paragraph 43, about

82

1       halfway down that paragraph, you say you met with the
2       FBI in July.
3   A.  Yeah.
4   Q.  And you agreed to provide:
5       "... all the information gathered to that date and
6       continued to pass on these reports to the FBI through to
7       October 2016. This included CR112, which was likely
8       disclosed to the FBI within a few days of it being
9       shared with Fusion ..."
10  A.  Mm hmm.
11  Q.  So when you say "likely", that means you don't remember?
12  A.  No, likely within a few days. We don't have, because
13      our records were wiped, conclusive proof that that
14      memorandum was sent to our contact. It's a mystery to
15      me, because it's not just this report, but three others,
16      my Lord, all of which are important to the
17      investigation -- it's not as if they're marginal
18      reports: one of them concerns meeting between
19      President Putin and ex-president Yanukovych of Ukraine
20      about Mr Manafort -- do not seem to have arrived at FBI
21      headquarters.
22      In fact, as background to this, your Lordship, also,
23      even the report that I gave to my FBI contact in early
24      July 2016 does not seem to have reached the headquarters
25      investigation team until at least 19 September.

83

1   Q.  That's because he had doubts about your credibility,
2       Mr Steele?
3   A.  No, I don't believe that's true. I mean --
4   Q.  It's clear from the Horowitz report --
5   A.  No --
6   Q.  -- that the reason he was taking, as we lawyers say,
7       instructions to find out what to do with this material?
8   A.  That doesn't imply that he had doubts about my
9       reliability. I would argue the opposite, given that we
10      had been working with him for three years.
11  Q.  Look at {D/131/139}, please. So I'm sure you're
12      familiar with this. Footnote 231:
13      "The following are reports with select highlights
14      that Steele did not furnish to the FBI ..."
15  A.  Yeah.
16  Q.  Then if we go over the page to {D/131/140}, in that
17      footnote one of them is Report 112?
18  A.  Yes.
19  Q.  Then if we look at 155 {D/131/155}. Footnote 259 deals
20      with Report 112, and it says:
21      "The Crossfire Hurricane team received Report 112 on
22      or about November 6, 2016, from a Mother Jones
23      journalist through then FBI General Counsel
24      James Baker."
25      Do you see that?

84

1  A.  I see it, yes.
2  Q.  Did you give that memorandum to Mother Jones?
3  A.  No, I didn't.
4  Q.  Someone must have done, mustn't they?
5  A.  According to this, yes, but not us, and I had no
6      knowledge of that at the time.
7  Q.  You spoke to Mother Jones?
8  A.  I did.
9  Q.  You read to them from your reports?
10 A.  No, I didn't read to them from my reports.
11 Q.  They appear to quote your reports?
12 A.  They appear to, yes.
13 Q.  But that's --
14 A.  And I never read my report to them and I certainly
15     didn't give my reports, your Lordship, to Mother Jones.
16     The only contact I had was one Skype call on, I think,
17     31 October.
18 Q.  Look at page 213, please {D/131/213}. Footnote 319:
19         "These were the Steele Reports ..."
20         And then it lists the report -- the numbers of your
21     reports.
22 A.  Mm hmm.
23 Q.  "FBI records show that the FBI had not previously
24     received [and it lists various reports, including 112]
25     from Steele."

85

1  A.  It's like a mystery to me because that's more reports
2      than were in the dossier. I think there's 20 reports
3      referred to there.
4  Q.  Well --
5  A.  So it's slightly confusing.
6  Q.  Well, if you remember, the meeting you had with the FBI
7      in Rome --
8  A.  Sure.
9  Q.  -- records you as giving them a report which doesn't
10     form part of the dossier?
11 A.  Several, but, I mean, that was constant traffic so over
12     the previous three years we had supplied dozens of
13     reports to the FBI, with company numbers on like this,
14     on different issues, your Lordship.
15 Q.  Well, doubtless these were the ones they got within the
16     material, period. But the point I'm making to you is
17     this, Mr Steele: FBI records show that they hadn't
18     received 112 from you?
19 A.  That is true, yes.
20 Q.  They have records. You don't.
21 A.  Yes, correct, but I still find it mysterious because
22     I do not see, your Lordship, why I would not have
23     supplied, after I had agreed to do so, four reports,
24     which were pretty seriously at the heart of this
25     investigation.

86

1  Q.  Yes. But not this one?
2  A.  Yeah, I would agree -- I would argue it was.
3  Q.  You say that this was at the heart of the investigation?
4  A.  Well, the Alfa -- Trump Tower-Alfa Bank server story,
5      they were investigating.
6  Q.  Which isn't mentioned in the report?
7  A.  No, but it's relevant -- this is relevant to that.
8  Q.  In your witness statement you say -- look at {C/4/9},
9      please, paragraph 43. You're talking about the FBI
10     requesting them to provide the reports.
11 A.  Yes.
12 Q.  And we have looked at this paragraph before.
13 A.  Mm hmm.
14 Q.  The content included likely -- I took you to the words
15     "likely disclosed":
16         "The content of CR112 was subsequently discussed
17     with the FBI, and they considered it relevant to their
18     investigatory work."
19         The reference there is to {D/71/7}, if we can turn
20     that up. That's not a meeting with the FBI at all.
21 A.  No, but my understanding is that the FBI and the
22     State Department were discussing this information, this
23     dossier from the get-go and that my understanding was
24     that even for the July meeting, your Lordship, when the
25     FBI officer came to London to meet me, he had cleared

87

1      his lines with Victoria Nuland, the Assistant Secretary
2      of State, before he did that.
3  Q.  Well, one thing we can agree on, Mr Steele, I think, is
4      that this note provides no support whatever for the
5      statement in your witness statement that the FBI
6      considered CR112 relevant to their work; correct?
7  A.  I don't accept that, as I have said, your Lordship.
8  Q.  Which part of this note supports that statement,
9      Mr Steele?
10 A.  I don't know whether the note does, but what I'm saying
11     is it was clear to me at the time that the
12     State Department and FBI were co-ordinating and
13     discussing the dossier and its implications.
14 Q.  Well, you, in your witness statement, refer to this
15     document as evidence that the FBI considered this
16     Memorandum 112 relevant to their investigatory work.
17     That's false?
18 A.  I don't think it is false.
19 Q.  It's false. This document does not evidence it, does
20     it?
21 A.  That document doesn't provide evidence, but at the
22     meeting I had with Kathy Kavalec, your Lordship, it was
23     very clear that FBI and State Department were both
24     consulting each other and discussing the whole issue of
25     engagement with us and our investigation.

88

1  MR JUSTICE WARBY: So your evidence is that you accept that
2     this document doesn't support this view, but you
3     maintain that, as a result of a meeting you had with
4     Kathy Kavalec --
5  A. Yes.
6  MR JUSTICE WARBY: -- it was clear to you that the FBI and
7     State Department had been discussing Memorandum 112 and
8     its implications?
9  A. And before actually. As I said, your Lordship, even the
10    first meeting I had with my contact -- our contact that
11    came into London on July 5, I think it was, had had to
12    seek permission from Victoria Nuland at the
13    State Department to come to London and engage.
14  MR TOMLINSON: Mr Steele, you're confusing two entirely
15    distinct things.
16       First of all, there's the question of whether the
17    State Department and the FBI were interested in your
18    supposed revelations about the connections between
19    candidate Trump and Russia.
20  A. Mm hmm.
21  Q. I am not disputing that they were so interested. Do you
22    understand?
23  A. Sure.
24  Q. The second thing is: were they interested in
25    memorandum -- which is a completely different thing, did

89

1     they consider Memorandum 112 relevant to their
2     investigatory work? Do you understand me?
3  A. My understanding was that Kathy Kavalec, who raised
4     I think the Alfa issue with us in this meeting
5     in October, had been closely co-ordinating with the FBI
6     and the FBI knew that we were having the meeting and so
7     on and so forth and that they were jointly working on
8     this material.
9  Q. So is the answer to my question that the FBI did not
10    consider 112 relevant to their investigatory work?
11  A. I don't agree with that.
12  Q. Because we know that the FBI, putting it neutrally, had
13    no record whatever of having received this memorandum
14    from you; correct?
15  A. Yes.
16  Q. There's no mention of the memorandum in this note with
17    the State Department; correct?
18  A. Well, there's no reference to the memorandum, but the
19    issue was discussed with them.
20  Q. No, no. The issue in the memorandum is the issue of the
21    supposed close connections between the claimants --
22  A. Yes.
23  Q. -- and President Putin.
24  A. Yes.
25  Q. There's no evidence that that issue was discussed with

90

1     either the FBI or Kathy Kavalec, is there?
2  A. Not from the writer, but there was also the discussions
3     I had with John Winer, who was involved in this meeting,
4     in which these things were definitely discussed.
5  Q. That's something else that doesn't appear in your
6     witness statement?
7  A. John Winer was at the meeting with Kathy Kavalec.
8  Q. Something else that does not appear in your witness
9     statement; correct, Mr Steele?
10  A. And nor does the meeting with Kathy Kavalec, I don't
11    think.
12  Q. Well, it does, but misidentified as a meeting with the
13    FBI.
14  A. It was Kathy Kavalec, acting on FBI instructions.
15  Q. You understand that that's not what is said in the
16    Inspector General's report about it?
17  A. It may not be, but that was my understanding at the
18    time, that there was close co-ordination between
19    Victoria Nuland and Kathy Kavalec and the FBI on these
20    issues.
21  Q. You appear to have misled the State Department about the
22    nature of your instruction. If you look at the first
23    paragraph {D/71/1}. (Pause)
24  A. In what regard?
25  Q. Well, that's not accurate, is it?

91

1  A. What isn't accurate?
2  Q. "... undertook the investigation ... at the behest of an
3     institution he declined to identify that had been
4     hacked."
5        That's not true?
6  A. Well, Perkins Coie's client was the DNC.
7  Q. You didn't know that?
8  A. I had assumed it was the Democratic Party and the
9     campaign. In fact, John Podesta's emails had been
10    hacked as well.
11  Q. "The Institution approached them based on the
12    recommendation of Glenn Simpson and Peter Fritsch ..."
13       That's not true?
14  A. That seems very muddled to me.
15  Q. And then there's this, you see. Mr Steele, this really
16    gives the game away as to the purpose of all this:
17       "... is keen to see this information come to light
18    prior to November 8."
19       What was happening on 8 November?
20  A. There's the US election.
21  Q. Precisely. You told the State Department that your
22    client was keen to see this information come to light
23    before the election; correct?
24  A. I'm not sure.
25  Q. Do you think the State Department has made it up?

92

1  A.  I think there are errors in this account, as I have said
2      before, from Kathy Kavalec and I don't have a lot of
3      confidence in some of the detail in her account.
4  Q.  You see, that's the truth, isn't it? Your client --
5      your ultimate client -- as you have said, it's the
6      Democratic Party institution and you assumed it might be
7      the Democratic National Committee -- was keen to have
8      this information come to light prior to the date of the
9      US presidential election, but perfectly understandably?
10 A.  But why would I be taking it to the State Department
11     then, if that were the case?
12 Q.  Because you were hoping that the State Department --
13     nobody was listening to you, Mr Steele, so you were
14     hoping that the State Department might take some public
15     action which would bring this information into the
16     public domain.
17 A.  I don't agree. You say no one was listening to me. The
18     FBI had sent four agents to a European capital to meet
19     me in October and to fully debrief me on things that we
20     had been --
21 Q.  Yes, to ask you whether you could actually provide some
22     proper evidence, which you were unable to do?
23 A.  No, it was far more than that, involving things like
24     offering to pay for the resettlement of our sub-sources
25     from Russia, which is a very serious undertaking.

93

1  Q.  Yes. The FBI were asking -- at one point I think you
2      sarcastically said to them, "Oh, well, perhaps you'd
3      like me to arrange for you to meet with the hotel
4      manager so he can tell you about the prostitutes"?
5  A.  That wasn't frivolous. The hotel manager was outside of
6      Russia by that time and that was a serious proposal.
7  Q.  The FBI were asking you to provide some evidence to back
8      up what you were saying, weren't they?
9  A.  No, the FBI were actually trying to get us to pump and
10     pressure our network of sources to produce more
11     information and even to go as far as offering to
12     resettle, which is a large undertaking, our sub-sources,
13     your Lordship, from Russia.
14 Q.  When you met the FBI in October, you told them that the
15     ultimate clients were people seeking to prevent
16     Donald Trump from becoming president?
17 A.  Yes. Well, obviously if you're an election opponent,
18     that is what you are trying to do.
19 Q.  So, in other words, to use the information for
20     a political purpose?
21 A.  No, I don't agree with that.
22 Q.  I see. Preventing Donald Trump becoming president is
23     not a political purpose, is that your evidence?
24 A.  There is no evidence that the client ever used any of
25     the memoranda and the information, your Lordship, into

94

1      the public domain.
2  Q.  Well, Mr Steele -- I'm sorry, Mr Steele, the position is
3      that you and Mr Simpson, on the instructions of the
4      client, conducted a number of media briefings, trying to
5      get this material into the public domain?
6  A.  No, we were briefing them on the general outlines of the
7      material for further investigation. We were not saying,
8      "Here's a memo. Can you please put it in the public
9      domain".
10 Q.  That wasn't my question.
11 A.  We were giving them background briefings off the record.
12 Q.  Well, you knew they were going to be published because
13     they were published in Yahoo News and Mother Jones?
14 A.  I didn't know it was going to be published.
15 Q.  Once it had been in Yahoo News, you must have realised
16     the next time you gave a briefing it was likely to come
17     out?
18 A.  It was certainly -- well, it was possible, but it was
19     supposed to be off the record.
20 Q.  Just look at 70.1, please --
21 A.  If I can come back to that, your Lordship. My
22     understanding of the Yahoo News article relied upon
23     a source within the Department of Justice.
24 MR JUSTICE WARBY: I am just trying to understand what
25     you're doing talking to journalists when you don't

95

1      intend publication. That's what they do.
2  A.  Yes. I would differentiate, your Lordship, between
3      publication of the memos and raising issues that came
4      from the memos with journalists off the record. There
5      was never any intention for any of the memos to be
6      either handed to a journalist, shown to a journalist or
7      published by a journalist.
8  MR TOMLINSON: I'll come on to that question in a moment,
9      Mr Steele, but I just want to establish what the purpose
10     of all this was.
11         If you look at {D/70.1/1}, please. This is your
12     note of your meeting with the FBI in Rome that we were
13     talking about a little earlier.
14 A.  Yeah.
15 Q.  Although you said that the FBI were very interested, as
16     of October they are saying that they're late into the
17     case, but at 2(ii), so about halfway down:
18         "FBI accepted they were late into the case and that
19     we had other commitments and confidences with our
20     original US client which they could not ask us to modify
21     or suspend. Also, although I identified Glenn Simpson
22     of GPS Fusion as the intermediary, they did not press me
23     to identify our ultimate client/s. The form of words GS
24     uses with contacts ('people seeking to prevent
25     Donald Trump becoming president') sufficed."

96

1   A.   Mm hmm.
2   Q.   Yes?
3   A.   Yeah.
4   Q.   That was the purpose of your work, to prevent
5        Donald Trump from becoming president?
6   A.   By definition, an opposing candidate in their campaign
7        was seeking to win an election.
8   Q.   Yes, thank you.
9            You attended -- I think we have already discussed
10       that you attended meetings with journalists and then
11       with -- we discussed it yesterday. Also I think you
12       attended meetings with news networks as well.
13  A.   Sorry, can you specify?
14  Q.   I think NBC, CNN?
15  A.   NBC, no, not NBC and not --
16  Q.   Well, Mr Simpson gave evidence about all this to the
17       Senate Judiciary Committee. It's probably not necessary
18       to go through it, but Mr Simpson, himself, accepted that
19       one of the purposes of the gathering of the information
20       was that it might be useful to the press. Do you agree
21       with that?
22  A.   I think the general outlines and the lead information,
23       possibly, yes. One of the purposes, not the only
24       purpose.
25  Q.   You ensured -- I don't think you actually gave the

97

1        memoranda to Mr Kramer, but you arranged for Fusion to
2        give copies to him?
3   A.   That's right. At his request, and at Senator McCain's
4        request.
5   Q.   But he was a private individual. He had the memoranda
6        and you didn't place him under any constraint as to the
7        uses he could put them to, did you?
8   A.   We possibly should have done, but he was coming,
9        your Lordship, as the emissary of Senator McCain, as
10       explicitly said to Sir Andrew Wood in Halifax,
11       Nova Scotia.
12  Q.   He provided a copy to the Washington Post, didn't he?
13  A.   So it would appear from his witness statement in the
14       Florida BuzzFeed case, yes.
15  Q.   And he told you he had done it?
16  A.   No, he didn't.
17  Q.   Look at {D/110/15}, please. This is what you're
18       referring to. It's his deposition in a case I can now
19       use the name correctly, Mr Gubarev v BuzzFeed.
20  A.   Yes, in Florida.
21  Q.   He's given evidence there under oath. If you look at
22       page 55, line 20:
23           "And did Mr Steele know that you were going to be
24       providing a [copy] of the Memo to The Washington Post?
25           "Answer: Yes."

98

1            Do you see that?
2   A.   Yes. I disagree with that. I knew he was talking to
3        the Washington Post. I did not know he was going to
4        provide copies of the memos to the Washington Post and,
5        your Lordship, would not have agreed to that.
6   Q.   Then you telephoned him around Christmas, on
7        Christmas Day --
8   A.   Christmas Eve, I think.
9   Q.   I think he thinks it's Christmas Day, but I'm sure it
10       doesn't matter.
11  A.   I think, again, another mistake in his deposition, I'm
12       afraid.
13  Q.   I think he says around Christmas. You specifically
14       asked him to meet with Mr Ken Bensinger, if that's how
15       you pronounce his name, at BuzzFeed, didn't you?
16  A.   Yeah. He had told me that Mr Bensinger was pestering
17       him and was demanding to see him and meet him. And
18       I simply suggested that he should meet Mr Bensinger,
19       find out what he was -- where he was coming from, what
20       he might know and report back to me.
21  Q.   If you look just at the next page, page {D/110/16}.
22       Page 58 of the transcript, line 8 onwards.
23  A.   Right.
24  Q.   "You said that Mr Steele asked that you meet with
25       someone at BuzzFeed; is that correct?

99

1            "Answer: That is correct.
2            "Question: Did he specify an individual at BuzzFeed?
3            "Answer: He did.
4            "Question: And who was that individual?
5            "Answer: Ken Bensinger.
6            "Question: And did you meet with Mr Bensinger?
7            "Answer: I did."
8   A.   Yeah.
9   Q.   If you look on the next page, page 60 -- sorry, page 59,
10       line 10:
11           "When did Mr Steele make this suggestion to you?
12           "Answer: It was either Christmas Day -- excuse me,
13       Christmas Day or right around there, right around that
14       holiday.
15           "Question: Was this in a telephone conversation?"
16       Then if you look at line 18 onwards:
17           "He indicated ... Mr Bensinger had been in touch
18       with him ... he vouched for Mr Bensinger saying that he
19       had worked with him and BuzzFeed in the FIFA
20       investigation ... was very trustworthy and
21       professional ..."
22           And he couldn't talk to him in London.
23  A.   Mm hmm.
24  Q.   Had you worked with Mr Bensinger on the FIFA
25       investigation?

100

1  A.  He was writing a book, your Lordship, on FIFA and had
2      approached me the previous summer, 2016, and then had
3      travelled through London, I think, the previous summer,
4      as part of his research and I had agreed to help him
5      with his research on FIFA.
6  Q.  So Mr Kramer has that right?
7  A.  Well, what right, sorry?
8  Q.  That you told him that Mr Bensinger had -- you had
9      worked with Mr Bensinger in relation to FIFA?
10 A.  Yes.
11 Q.  So you were -- is it your evidence that Mr Kramer asked
12     you to meet Mr Bensinger, rather than the other way
13     around?
14 A.  He brought it to my attention that Mr Bensinger was
15     pestering him and demanding a meeting.
16 Q.  And you told him it was a good idea?
17 A.  I said, "I think you need to see what he's -- where he's
18     coming from, what he knows, what he's doing".
19 Q.  And it's obvious, Mr Steele, isn't it, that if you are
20     meeting with a serious journalist and you are telling
21     them very serious allegations, they are going to say to
22     you, "Do you have any documents to back this up"?
23 A.  I wasn't expecting him to be discussing the
24     investigation or the memos with Mr Bensinger.
25 Q.  Why not?

101

1  A.  I simply expected him to find out what Mr Bensinger,
2      where he was coming from, what he was doing, what he
3      knew, what he wanted to know and to report back,
4      your Lordship, afterwards, because I was worried that he
5      might know something about the investigation.
6  Q.  Why were you suddenly so coy about it? You had been
7      briefing journalists for months. Why are you suddenly
8      coy about Mr Bensinger briefing Mr Kramer?
9  A.  Because I suspect -- I feared that Mr Bensinger knew
10     about the memoranda and the dossier and so on and was
11     trying to find out more about them.
12 Q.  Well, as a proper journalist that is exactly what you
13     would expect him to do, isn't it?
14 A.  I don't know how he knew about it though in the first
15     place.
16 Q.  But everybody knew about them because you had been
17     briefing about -- you and Mr Simpson had been briefing
18     any journalist who would listen to you for months on
19     end, hadn't you, Mr Steele?
20 A.  We had briefed a small number of journalists off the
21     record about the general themes, your Lordship, in the
22     memoranda.
23 Q.  You didn't say to Mr Kramer, "Well, don't show him the
24     memoranda. Don't give him copies", did you?
25 A.  It was a clear understanding, when Mr Kramer took the

102

1      memoranda off Mr Simpson, that he was not to divulge the
2      memoranda to anybody, other than Senator McCain and his
3      aid, and then other people if Senator McCain requested
4      it.
5  Q.  What do you mean by "clear understanding"?
6  A.  I had told him that he would need to seek permission to
7      discuss it with other people and he did that. He came
8      to me, your Lordship, when he was proposing --
9      Senator McCain apparently asked him to go and see
10     Celeste Wallander in the White House and
11     Victoria Nuland, I believe, in the State Department, and
12     he -- Mr Kramer contacted me before doing so to ask my
13     permission as to whether he could do that.
14 Q.  You see, the true position is this, Mr Steele, isn't it,
15     that you were very keen for this information to come out
16     because you thought that this was a serious threat to
17     the US because of the influence of Russia over
18     president -- by this time President Trump, didn't you?
19 A.  I wanted the US Government to investigate it properly
20     and thoroughly and I wanted the US media to investigate
21     the main leads that came out of the investigation --
22 Q.  Well --
23 A.  -- such as the hacking, such as the contacts between
24     members of the campaign and Russian officials and so on.
25 Q.  You were keen for all this to come out and the way for

103

1      it to come out is for these memoranda to be shown to
2      journalists, isn't it? It's obvious, Mr Steele.
3  A.  That's not true. That was never the case and we never
4      did it.
5  Q.  You never -- you knew full well that when Mr Kramer was
6      meeting with BuzzFeed that he was going to -- he was
7      likely to be showing them the memoranda with the
8      consequent risk that they were going to publish
9      something -- either the memoranda or something based on
10     them?
11 A.  Absolutely not. In fact, when I asked Mr Bensinger,
12     after the leak, your Lordship, to BuzzFeed, whether he
13     had shown Mr Bensinger any of the memoranda or given
14     them the memoranda, he lied to me and he admits that in
15     his witness statement here. He said he hadn't
16     basically, even though he had.
17 MR TOMLINSON: My Lord, I have no further questions.
18     I would say this is superbly timed but -- ah ... (Pause)
19 MR JUSTICE WARBY: We have possibly two outstanding
20     questions that you wanted.
21 MR TOMLINSON: I think there are four, I'm told.
22 MR JUSTICE WARBY: The list has grown. We had probably
23     better deal with that at 2 o'clock.
24     Is there going to be any re-examination, subject to
25     the next phase?

104

1    MR MILLAR:  Five questions.

2    MR JUSTICE WARBY:  We'll deal with that at 2 o'clock.

3    (1.00 pm)

4                  (The luncheon adjournment)

5    (2.00 pm)

6                  Procedural  discussion

7    MR JUSTICE WARBY:  Yes, well, for the record, I think there

8        are things that we all know that probably should be said

9        now.

10          Since we parted, I learn, Mr Steele has been told

11       that his wife is unwell with Covid-19.

12   MR MILLAR:  It's not that clear-cut.  She was taken to

13       hospital after he left her this morning.  She was taken

14       in an ambulance to Frimley Park Hospital.

15   MR CHRISTOPHER STEELE (via phone):  I can't hear this.

16   MR MILLAR:  She was taken in an ambulance to Frimley Park

17       Hospital with breathing  difficulties .  She is, as

18       I understand it from my client, in  isolation , has been

19       tested for Covid-19.  There is no test result yet, but

20       she remains in  isolation .

21   MR JUSTICE WARBY:  Right.  And Mr Steele himself has been

22       advised about this?  Not legally  advised but medically

23       advised ; is that  right ?

24   MR MILLAR:  No.  He's been advised by the court that the

25       appropriate  procedure  -- the RCJ procedure --

105

1    MR JUSTICE WARBY:  Ah.

2    MR MILLAR:  He was initially advised -- we were advised, my

3        junior was advised -- that he was supposed to leave the

4        court .

5    MR JUSTICE WARBY:  Right.

6    MR MILLAR:  Step 1 in the protocol.  I don't know on what

7        basis that is  said , so we said --

8    MR CHRISTOPHER STEELE (via phone):  I can't hear this feed,

9        I'm afraid.

10   MR MILLAR:  So we said that Mr Steele is in the middle of

11       giving evidence,  technically  he has to be discharged by

12       the judge if he is going to leave the building , and

13       there was then supposed to be an arrangement which would

14       have a conference room or something that he could sit

15       in, but that never  materialised , so your Lordship kindly

16       offered  --

17   MR JUSTICE WARBY:  At the moment he is in court 75, which is

18       right next door.  Can you hear me now, Mr Steele?

19   MR CHRISTOPHER STEELE (via phone):  I can't hear you, I'm

20       sorry .

21   MR JUSTICE WARBY:  Right.

22   MR TOMLINSON:  My Lord, there seems to be some confusion

23       because your Lordship will remember on the first day

24       Mr Steele had had some close exposure, namely to his

25       business  partner , who had shown symptoms and was

106

1        self - isolating .  I think both sides looked into the

2        guidance and the guidance said that if  you're exposed to

3        someone but you're showing no symptoms, you don't have

4        to  self - isolate .

5           Now, my Lord, as far as I understand it, the

6        guidance hasn't changed.  So although Mr -- poor

7        Mr Steele has had the unfortunate  experience of (a)

8        being exposed to his  business  partner , who is showing

9        symptoms, and then (b) his  wife  showing symptoms, at the

10       moment, as he has no symptoms, there's no need for  any

11        isolation  steps to be taken.

12   MR JUSTICE WARBY:  Well, that wasn't my understanding.

13       I thought that the point was about the time at which you

14       had exposure, in other words whether the person to whom

15       you were exposed themselves had symptoms at the time you

16       were in their company.

17   MR TOMLINSON:  When I -- I don't have it here, but we --

18       because of this  issue arising  -- I may have it here --

19       on Monday, we actually -- I think I do have it here, the

20       guidance produced by the government.  The

21       government's -- I think Mr Millar made the point to

22       your Lordship on Monday morning that the guidance says

23       that if you ...

24          Ah, well,  it may have -- we're just checking now

25       whether it has changed, but  certainly  as of Monday the

107

1        guidance was you only had to  self - isolate  if  you were

2        showing symptoms.

3    MR CHRISTOPHER STEELE (via phone):  I'm still having

4        difficulty  hearing this .

5    MR TOMLINSON:  Ah, there's new guidance.  (Pause)

6           Yes, my Lord.  So the new guidance says that you

7        should stay at home for 14 days if someone in your

8        household has symptoms.

9    MR JUSTICE WARBY:  Yes.  That's what I thought.  So, on the

10       basis of that guidance, then whatever label one calls

11       it,  self - isolation  or whatever, Mr Steele should be

12       separating  himself from the general  public and staying

13       at home, on the grounds that at the moment it seems that

14       his  wife may have symptoms of Covid-19.  We don't have

15       the diagnosis .

16   MR TOMLINSON:  Yes.

17   MR JUSTICE WARBY:  Now, you have four questions that you

18        provisionally   wanted answered that hadn't been answered

19       yet .

20   MR TOMLINSON:  Yes.

21   MR JUSTICE WARBY:  And Mr Millar said he had five questions

22       in  re-examination.

23   MR TOMLINSON:  Yes.

24   MR JUSTICE WARBY:  What, Mr Tomlinson, do you want to do in

25       the light of the current  situation ?  Press on?

108

1    MR TOMLINSON:  My Lord, I think in the light of the current
2        situation, it is probably sensible for me to not take up
3        any more time in relation to that.
4    MR JUSTICE WARBY:  Mr Millar?
5    MR MILLAR:  I wouldn't say any of the questions I was going
6        to ask in re-examination are central to the case.  So
7        I'm happy to adopt that position.
8    MR JUSTICE WARBY:  Yes.  Well, what I think I'll do is
9        I will release Mr Steele, unless there's an
10       application -- I am seeing a shaking head from behind
11       you, Mr Tomlinson.
12   MS SJØVOLL:  Oh, sorry, I was saying --
13   MR JUSTICE WARBY:  It wasn't out of disagreement with what
14       I was saying.  That's reassuring.
15   MR TOMLINSON:  No, the point was that Ms Sjøvoll was simply
16       concerned that Mr Steele couldn't hear what
17       your Lordship was saying.
18   MR CHRISTOPHER STEELE (via phone):  Yes, I can't.
19   MR JUSTICE WARBY:  Well, I'll get the court clerk to tell
20       you in a moment.
21           He won't have long to wait.  I will release him and
22       I will give a short ruling on what I would have said,
23       what I provisionally would have said on the four
24       questions, but I think we can deal with that separately
25       because he can go.

                                109

1    MR TOMLINSON:  Yes.
2           So, Mr Steele, the court clerk will -- you are going
3        to be released and the court clerk will come and let you
4        go formally in one minute's time.
5    MR CHRISTOPHER STEELE:  Okay.  Thank you.
6           Thank you, your Lordship.
7    MR MILLAR:  He obviously is very concerned.
8    MR TOMLINSON:  Yes, we all are.
9    MR JUSTICE WARBY:  Yes.  One of the factors that has led me
10       to slightly prompt you to not press on further is the
11       obvious and natural distress that Mr Steele must be
12       feeling --
13   MR TOMLINSON:  My Lord, absolutely so.
14   MR JUSTICE WARBY:  -- at learning this somewhat incomplete
15       version of what his wife's current position is.
16   MR TOMLINSON:  No, it is obviously something that he will
17       want to go and deal with as soon as he possibly can.
18   MR JUSTICE WARBY:  Let's just wait until the clerk returns,
19       having made sure that that's happened.
20           (Pause)
21           Now, Mr Tomlinson, I know the clerk is not back,
22       what I'd like to hear from you are what the four
23       questions are that you would have asked and, in relation
24       to what I think is the first one, which is details of
25       that part of Mr Steele's career which you suggested was

                                110

1        spent training, how you say it should be approached,
2        because you made the point to him that there was no
3        lawful basis on which he could withhold that
4        information.  If there are any other questions?
5    MR TOMLINSON:  My Lord, subject to your Lordship's views,
6        I'm not sure that it is necessary to pursue any of this
7        now because, as Mr Millar said in relation to his
8        re-examination, I don't think any of it is
9        case-changing.
10          The position, as I understand it, under the Official
11       Secrets Act, is that it covers only the disclosure of
12       information about national security matters, not
13       information about Civil Service careers in whatever
14       department.  And there were some questions about his
15       sources.  But, my Lord, as I'm not going to put the
16       questions to the witness now, I am not asking
17       your Lordship to make any ruling about any of them.
18   MR JUSTICE WARBY:  Well, the only reason I was -- well, two
19       reasons really why I had it in mind to rule on it now.
20       One is it is fresh in my mind and it gets part of the
21       reasoning process out of the way; and the other is in
22       case it was going to be suggested later on that the
23       refusal to answer the question had some implications for
24       the way in which I should approach the evidence.
25          If I rule now, or having heard any further argument,

                                111

1        or determined later, that the question was not
2        sufficiently important to the pursuit of justice in the
3        case to justify the intrusion into confidentiality that
4        it would involve, then you couldn't invite me to draw
5        any adverse inferences from his refusal to answer it,
6        but if I took another view, you might.
7    MR TOMLINSON:  My Lord, in relation to that, his -- I am not
8        going to ask you to draw any adverse inferences from
9        his, I would say, unjustified refusal to give a proper
10       explanation as to his Civil Service career.  In relation
11       to his sources, I will say, generally, not in respect of
12       those four questions that he refused to answer, but
13       I will say generally that bearing in mind -- and this is
14       a point your Lordship made yesterday, and I apologise
15       for misrepresenting the way that Mr Millar put it in
16       submissions yesterday.  Your Lordship said in the
17       absence of an established privilege, the position is
18       somewhat different from the position that we find in --
19       the familiar position in relation to journalists.  I am
20       entitled to say if someone is trying to show that they
21       have taken reasonable care, the fact that they don't
22       give details that would back that up about the nature of
23       their sources is a factor the court can take into
24       account, but that's as far as I'm going to go.  I'm not
25       going to say: and, in particular, the fact he refused to

                                112

1  say -- as he did -- what country his source was located
2  in is an additional factor that the court should take
3  into account.
4      So, my Lord, in relation to those, I'm not proposing
5  to put any forensic weight on the failure to answer any
6  of those specific questions. Subject to anything
7  your Lordship says, I don't think it would be, certainly
8  from my point of view, necessary for your Lordship to
9  rule on any of those issues.
10 MR JUSTICE WARBY: Mr Millar, do you disagree with that,
11     given what has been said?
12 MR MILLAR: No, I think my learned friend is entitled to
13     say, by way of comment, whatever he wants to say about
14     the question -- each question and answer. We have them
15     on the record. He can comment on that. The judicial
16     role then will be, as it always is, to decide what value
17     that argument and that comment has in the greater scheme
18     of things.
19 MR JUSTICE WARBY: Right. Well, then, I don't need to say
20     anything about it now.
21                  Housekeeping
22      What remains is just to agree the case management
23  for the next stage, which at the moment is we start at
24  10 o'clock tomorrow. Is that agreed?
25 MR TOMLINSON: My Lord, I'm not sure it was agreed.

113

1  MR MILLAR: I think it was an indication from the court last
2      week.
3  MR JUSTICE WARBY: Yes. My clerk indicated that I need to
4      be away by 4.00.
5  MR TOMLINSON: Ah.
6  MR JUSTICE WARBY: Therefore --
7  MR TOMLINSON: I had -- that had passed me by or popped out
8      of my mind.
9      My Lord, obviously there are two questions. The
10     first is when written closing submissions should be
11     lodged and then the second is when we commence oral
12     argument about those written closing submissions.
13 MR JUSTICE WARBY: Right. So what --
14 MR MILLAR: And the third question is whether we cap the
15     time for those oral submissions.
16 MR JUSTICE WARBY: Yes. We have a four-day time estimate.
17     I don't see any reason not to stick to that.
18 MR TOMLINSON: No.
19 MR JUSTICE WARBY: In fact, there's every reason to stick to
20     it in the usual way.
21     So what's your proposal?
22 MR TOMLINSON: Sorry, there's another question that arises
23     as to -- in terms of order of closing, whether we stick
24     to the old version, if I can put it that way, claimant
25     goes last, or whether we stick to the modern version,

114

1  which is claimant goes first and has a right of reply?
2      I am --
3  MR JUSTICE WARBY: I am accustomed to the old version.
4  MR MILLAR: You are accustomed to the old version?
5  MR JUSTICE WARBY: Yes, but I don't really mind.
6  MR MILLAR: I have had both.
7  MR TOMLINSON: Exactly, so have I.
8  MR JUSTICE WARBY: Usually, I mean, the old version is if
9      the defendant calls evidence, the claimant gets the last
10     word. That's the --
11 MR TOMLINSON: Yes, that's the rule from jury trials going
12     back to --
13 MR MILLAR: I am happy to go first, if we are knocking the
14     issue around and asking what people's positions are.
15     I'm happy to go first.
16 MR TOMLINSON: I'm happy to do it either way, but whatever
17     your Lordship would find most helpful.
18 MR MILLAR: Yes.
19 MR JUSTICE WARBY: I think I would like Mr Tomlinson to go
20     first, please, and then you have a right of reply.
21 MR TOMLINSON: Yes.
22 MR MILLAR: Yes.
23 MR TOMLINSON: Then we need a timetable for that.
24 MR JUSTICE WARBY: Yes. Well, that gives us five hours in
25     the usual way, doesn't it, with some breaks to take out

115

1  of that? Let's say that gives us four and a half hours
2  in total.
3  MR TOMLINSON: Two hours each and half an hour reply.
4  MR JUSTICE WARBY: Two hours each and half an hour for
5      reply.
6  MR MILLAR: Yes, that's fine.
7  MR JUSTICE WARBY: So we'll start at 10.00. The guillotine
8      will come down at midday and Mr Millar will have an hour
9      before and an hour after lunch or -- then we'll have to
10     make an allowance for the ten or 15 minutes of break in
11     the morning, or thereabouts, and we'll finish with half
12     an hour, starting at 3.30 for you, Mr Tomlinson.
13 MR TOMLINSON: I was going to say, yes, if we -- if we --
14 MR JUSTICE WARBY: I was not allowing for the breaks.
15 MR TOMLINSON: Yes. So, in other words, finish at 12.30, if
16     the breaks are 15 minutes each or ten.
17 MR JUSTICE WARBY: Yes, we'll look for a convenient moment
18     to ensure that the shorthand writers don't get
19     exhausted.
20 MR MILLAR: I can work within a little less than two hours,
21     I'm sure.
22 MR JUSTICE WARBY: Yes.
23     As far as written closings are concerned, I'm not
24     going to impose a timetable. The sooner you get them to
25     me the sooner I'll read them, but there's always

116

119

1      a balance to be struck between speed and quality,
2      although I expect the quality to be excellent on both
3      sides, and I will leave it to you, unless you want me to
4      impose a timetable for exchange.
5  MR TOMLINSON:  Not necessarily impose a timetable, but, in
6      an ideal world, when would your Lordship like to start
7      reading them tomorrow morning?
8  MR JUSTICE WARBY:  Well, we're not in an ideal world so
9      I won't answer that question.  I can start reading at
10     8 o'clock in the morning, if you really want to get them
11     to me then, or tonight.
12 MR TOMLINSON:  I think tonight is probably --
13 MR JUSTICE WARBY:  I thought it might be.
14 MR TOMLINSON:  I did say the ideal world tomorrow morning.
15 MR JUSTICE WARBY:  I know.
16 MR MILLAR:  We can exchange between 8.00 and 9.00 and get
17     them to you as soon as possible.
18 MR TOMLINSON:  Yes, before 9.00 is what we'll aim for.
19 MR JUSTICE WARBY:  Before 9.00, yes.
20 MR TOMLINSON:  Thank you.
21 MR JUSTICE WARBY:  Thank you very much.  Right.  10 o'clock.
22 (2.20 pm)
23                 (The court adjourned until 10.00 am
24                    on Thursday, 19 March 2020)
25

117

1                    INDEX
2  MR CHRISTOPHER STEELE (continued)  ...................1
3      Cross-examination by MR TOMLINSON (continued) ....1
4  Procedural discussion          ...........................105
5  Housekeeping              .......................................113
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

118

**A**

a11 (5) 48:22 56:3 57:2
   61:11 68:4
a12 (1) 56:20
a121 (2) 23:6 70:7
a1210 (1) 23:8
a1212 (2) 23:9,11
a1213 (1) 23:23
a123 (1) 70:6
a125 (1) 72:21
abide (1) 64:12
ability (1) 36:12
able (5) 7:8 12:25 25:13
   37:19 81:25
above (3) 23:17 61:7
   72:6
absence (1) 112:17
absolutely (11) 5:1 6:7
   8:3 26:9 43:15 46:6
   58:7 77:22 79:13
   104:11 110:13
accept (10) 35:22 37:11
   46:6,8,9 54:14,17
   72:21 88:7 89:1
accepted (4) 44:15
   69:16 96:18 97:18
accepting (1) 44:16
access (12) 26:11,17
   30:7,21,24 31:1,13
   36:22,23 38:4,14
   59:19
accompanied (1) 55:18
according (6) 1:23 6:3
   9:16 35:13 46:23 85:5
account (7) 26:7 34:21
   36:4 93:1,3 112:24
   113:3
accounting (1) 61:21
accuracy (1) 44:18
accurate (6) 15:4 26:7
   53:25 64:22 91:25
   92:1
accurately (5) 25:22
   26:5,16 30:18 58:25
accustomed (2) 115:3,4
across (1) 58:15
acted (1) 75:14
acting (1) 91:14
action (1) 93:15
activities (1) 15:13
activity (3) 3:23 4:11
   10:14
actual (2) 48:12 58:18
actually (8) 4:2 7:25
   12:13 28:9 31:6,19
   32:5 34:22 57:21 68:1
   78:7,14 80:1 89:9
   93:21 94:9 97:25
   107:19
add (1) 36:8
additional (1) 113:2
address (1) 8:6
addresses (1) 56:10
adjourned (1) 117:23
adjournment (1) 105:4
administration (4)
   14:11 52:12,16,17
admit (2) 15:11 64:25
admits (1) 104:14
adopt (1) 109:7
adverse (2) 112:5,8
advice (1) 29:20

advised (7)
   105:22,22,23,24
   106:2,2,3
advisor (4) 76:10,20
   78:12,19
afraid (4) 8:21 12:2
   99:12 106:9
after (12) 1:22 2:5 12:9
   20:10 35:7 74:12
   77:14 82:12 86:23
   104:12 105:13 116:9
afterwards (4) 36:14
   57:1 78:7 102:4
again (13) 4:18 14:25
   16:7 18:22 23:20
   30:24 35:3 38:1 45:23
   46:5 52:19 71:20
   99:11
against (1) 21:21 22:10
agent (4) 33:8 35:6,13
   38:11
agents (1) 93:18
ago (2) 50:8 62:13
agree (11) 37:22
   58:21,22 66:11 87:2
   88:3 90:11 93:17
   94:21 97:20 113:22
agreed (6) 83:4 86:23
   99:5 101:4 113:24,25
agreement (5) 79:23
   80:12,15 81:6 82:2
ah (6) 36:16 104:18
   106:1 107:24 108:5
   114:5
aid (1) 103:3
aim (1) 117:18
alexander (1) 41:23
alfa (34) 1:25 4:24
   12:10 15:24 29:14
   41:14,19,24 42:1,5,19
   43:1,12,17 45:12,15
   46:25 47:2 48:6,15
   49:13 51:12 52:3
   53:21 54:11,18 55:9
   63:19 64:10 65:8
   72:11,19 87:4 90:4
alfas (1) 54:7
alighted (1) 13:9
alive (1) 10:24
allegation (9) 2:19 5:7
   27:9 44:25 48:3,8 64:3
   65:10,16
allegations (5) 23:14
   71:1 72:5,20 101:21
alleged (1) 70:22
allowance (1) 116:10
allowing (1) 116:14
along (3) 24:4 63:21
   79:10
alpha (2) 52:22 53:16
already (6) 4:17 32:15
   33:23 36:4 70:4 97:9
also (9) 5:5 15:3 22:13
   35:10 68:14 83:22
   91:2 96:21 97:11
although (7) 36:9 60:19
   76:14 96:15,21 107:6
   117:2
always (5) 25:11 40:20
   60:13 113:16 114:25
ambassador (1) 41:11
ambulance (2)
   105:14,16

amend (1) 36:4
amended (2) 33:4,23
amendments (1) 33:25
america (2) 66:18 68:3
amongst (1) 79:17
amount (1) 9:14
amounts (2) 54:3 64:19
analyst (1) 33:8
analytica (2) 42:20 43:9
andrew (9) 77:14,15
   78:3,5,8,17 79:5,6
   98:10
andrews (1) 79:3
another (5) 5:9 8:13
   42:10 45:4 46:14 60:3
   99:11 112:6 114:22
answer (25) 7:18
   8:10,23 10:4,21 16:7
   21:13 30:17 36:12
   72:2,3 78:8 90:9 98:25
   100:1,3,5,7,12 111:23
   112:5,12 113:5,14
   117:9
answered (2) 108:18,18
answering (1) 8:12
antiputin (3) 10:7,13,16
anybody (2) 6:16 103:2
anyone (5) 59:10,25
   60:8 67:11 80:9
anything (6) 2:9 25:9
   53:12 61:18 113:6,20
anywhere (2) 6:8,16
apart (1) 6:9
apologise (2) 43:25
   112:14
apparently (1) 41:9
   103:9
appear (7) 77:16
   85:11,12 91:5,8,21
   98:13
appeared (1) 69:1
appears (2) 15:23 48:14
application (1) 109:10
apply (2) 60:10 80:18
approach (2) 79:4
   111:24
approached (10) 74:3,4
   77:6,11,12,21 79:5
   92:11 101:2 111:1
appropriate (4)
   80:20,21,24 105:25
arent (3) 5:7 14:5 72:3
argue (5) 36:5 37:21
   67:1 84:9 87:2
argument (1) 111:25
   113:17 114:12
arise (1) 43:4
arises (1) 114:22
arising (1) 107:18
arose (1) 71:18
around (9) 8:17 22:6
   62:1 99:6,13
   100:13,13 101:13
   115:14
arrange (1) 94:3
arranged (1) 98:1
arrangement (1) 106:13
arrived (1) 83:20
article (5) 3:1,7 4:8 5:6
   95:22
ask (24) 1:7 7:25 8:22
   9:1 17:5 20:20 21:5,11
   27:22,23,25 28:12

30:4,15 42:13 61:9
   69:25 71:20 75:7
   93:21 96:20 103:12
   109:6 112:8
asked (18) 3:17 21:8,19
   22:3,3,22 28:12 30:8,9
   64:9 75:5 80:21
   99:14,24 101:11 103:9
   104:11 110:23
asking (1) 8:6
   30:23,25 40:22 50:16
   53:2,3 94:1,7 111:16
   115:14
asks (1) 59:25
aspect (2) 65:2,5
aspects (1) 48:13
assembled (1) 5:13
assert (1) 58:17
assertion (5) 40:6,7
   51:18 53:3 58:12
assess (3) 15:3 26:10,10
assessed (2) 15:19
   21:17
assessment (4) 15:9,19
   26:15 64:23
assistant (6) 55:6 75:21
   76:11,20 78:16 88:1
associated (3) 71:3,14
   82:9
association (1) 43:2
assumed (2) 92:8 93:6
assuming (2) 56:5 58:24
attacking (1) 43:21
attempt (2) 41:12 43:8
attend (1) 75:8
attended (4) 41:11
   97:9,10,12
attention (1) 101:14
attorney (2) 38:24,25
audience (12)
   65:12,13,15,18,24
   66:8
   67:14,16,18,21,24
   80:23
august (7) 5:11,17
   66:1,2 70:5 77:13,23
automatically (1) 60:5
available (3) 59:22
   62:2 61:5
bench (1) 60:10
benczkowski (4)
   72:20,22,25 73:5
bensinger (18)
   99:14,16,18
   100:5,6,17,18,24
   66:8 107:8
   67:14,16,18,21,24
   80:23
believe (14) 4:12 10:22
   40:8 45:20 47:15
   48:9,10 65:14 66:23
   67:9 69:11 76:19 84:3
   103:11
big (1) 12:2
bills (2) 67:19,24
biography (1) 54:24

bank (11) 45:12,15
   46:25 47:2 48:6,15
   54:18 55:9 72:11,19
   87:4
bar (1) 29:3
based (3) 31:23 92:11
   104:9
basically (2) 43:22
   104:16
basis (10) 8:12 16:23
   43:21,22 44:7,16
   70:21 106:7 108:10
   111:3
bearing (2) 82:16
   112:13
became (3) 4:5 33:11
   53:23
becomes (1) 24:25
becoming (4) 94:16,22
   96:25 97:5
beers (1) 35:19
before (21) 6:21 12:13
   20:8 23:22 31:9 40:24
   44:11 59:10,16 60:4
   70:10 76:22 87:12
   88:2 89:9 92:23 93:2
   103:12 116:9
   117:18,19
beforehand (1) 81:2
began (2) 3:22 4:6
begin (1) 34:22
beginning (3) 34:1 35:4
begins (1) 70:7
behalf (32) 23:4 39:8
   42:21 53:11 54:11
   56:13 61:22,23 70:8,8
   82:14,17
behaviour (1) 63:4
behest (1) 92:2
behind (1) 109:10
being (10) 9:20 29:13
   32:3 49:9 54:14 60:23
   66:14,17 83:8 107:8
bundle (8) 32:19,24
   33:25,25 34:5,8 50:14
   51:11
business (5) 10:2 40:20
   82:9 106:25 107:8
businesses (1) 43:3
businessmen (2)
   30:3,13
buying (1) 20:22
buzzfeed (8) 18:9,14,19
   99:15,25 100:2,19
   104:6,12

**B**

b (1) 107:9
back (23) 9:23 16:5
   18:18 19:20 24:7
   34:2,3 39:13,16 56:3
   57:2 68:4,9,13 78:8
   94:7 95:21 99:20
   101:22 102:3 110:21
   112:22 115:12
background (7) 6:15
   64:4,7 71:24 76:8
   83:22 95:11
bad (1) 11:25
bag (1) 54:2 64:19
baker (1) 84:24

balance (1) 117:1
   62:1
categorical (1) 11:22
cbi (1) 69:4
cefile (3) 60:3,6,10
celeste (1) 103:10
central (1) 109:6
centre (1) 14:13
certain (5) 6:20 7:8
   15:8 27:12 58:3
changed (3) 32:17
   107:6,25
channel (1) 45:16
charge (1) 14:3
chaucer (1) 41:7
check (8) 31:6
   40:4,20,24 55:23 56:1
   57:20 58:9
checkable (1) 58:9
checked (1) 55:22
checking (3) 55:20,21
   107:24
chose (1) 7:10
christmas (7)
   99:6,7,8,9,13
   100:12,13
christopher (9) 1:3 56:9
   105:15 106:8,19 108:3
   109:18 110:5 118:2
chronology (1) 52:2
circle (1) 49:5
circles (2) 10:7,16
circulated (1) 79:15
circulating (1) 79:17
circumstances (4) 1:8
   7:7 20:16 21:6
cis (1) 52:18
citizen (1) 78:14
city (1) 14:3

**C**

c412 (1) 76:25
c413 (1) 80:22
c423 (1) 65:13
c424 (1) 64:13
c426 (1) 42:11
c46 (2) 19:20 20:21
c47 (3) 17:9 21:16
   25:17
c48 (2) 41:3 80:4
c49 (2) 82:25 87:8
call (3) 24:16 76:3
   85:16
called (6) 5:10 12:9
   41:5,23 75:18 77:22
calling (1) 38:13
calls (2) 108:10 115:9

cambridge (2) 42:20
   43:9
came (10) 6:13 35:17
   56:1 71:18 78:8 87:25
   89:11 96:3 103:7,21
campaign (8) 42:22
   47:1 66:18 71:3,15
   92:9 97:6 103:24
candidate (2) 89:19
   97:6
cant (12) 2:7 7:22
   27:25 30:16 45:3
   49:2,10 54:10 105:15
   106:18,19 109:18
cap (1) 114:14
capacity (1) 55:19
capital (6)
   41:6,14,18,22 42:4
   93:18
care (5) 8:7 22:4,23
   23:13 112:21
career (3) 7:21 110:25
   112:10
careers (1) 111:13
careful (3) 30:23 48:1
   49:9
carefully (3) 3:22 4:6
careless (1) 42:8
carrier (2) 54:2 64:19
casechanging (1) 111:9
cases (2) 49:8 60:4
cash (9) 52:23 53:10
   54:4,11 55:25 56:13
   57:9 63:24 64:20
cashmoney (1) 62:1
casts (1) 10:8

civil (1) 60:8 111:13
112:10
claimant (1) 114:24
115:1,9
claimants (10) 29:14
42:16 43:2,8,21 69:19
70:20 72:4,10 90:21
clear (12) 4:23 28:15,17
30:7 35:14 61:19 84:4
88:11,23 89:6 102:25
103:5
clearcut (1) 105:12
cleared (1) 87:25
clearer (1) 4:21
clearly (2) 4:5 37:20
clerk (6) 109:19
110:2,3,18,21 114:3
client (31) 4:13 64:9
65:23,25
66:9,15,19,24
67:20,22,23 68:1,1,2,9
79:19,20 80:20,24
81:1 82:1,19,21
92:6,22 93:4,5 94:24
95:4 96:20 105:18
clients (3) 67:10 94:15
96:23
clinton (1) 66:24
close (4) 29:21 90:21
91:18 106:24
closely (1) 90:5
closing (3) 114:10,12,23
closings (1) 116:23
cnn (1) 97:14
coie (7) 66:16 67:9,22
68:2,9 80:1 82:17
coies (2) 66:21 92:6
colleagues (7) 5:12
22:6,9 25:12 74:8
76:13 77:24
collection (1) 60:24
come (20) 16:5,23 24:5
58:14 66:4,8 68:13
73:23 89:13 92:17,22
93:8 95:16,21 96:8
103:15,25 104:1 110:3
116:8
comes (1) 24:7
coming (6) 66:18,21
98:8 99:19 101:18
102:2
commence (1) 114:11
comment (7) 8:7,9
12:25 13:13
113:13,15,17
commissioned (1) 12:14
commissioners (1)
42:25
commissioning (1)
12:14
commitments (1) 96:19
committee (3) 82:18
93:7 97:17
common (1) 61:25
communicate (2)
12:8,11
communicating (1)
72:11
communications (3)
12:12 45:13 54:19
companies (3) 41:21
55:5 82:9
company (5) 41:5 49:10

71:12 86:13 107:16
companys (1) 70:4
compatriot (1) 7:15
compilation (1) 1:7
complained (2) 36:14
42:16
complete (1) 39:17
completely (2) 12:17
89:25
complicated (1) 12:21
computer (4) 3:9 5:9
72:9,12
concede (1) 65:5
concerned (9) 17:1
29:17 60:23
71:13,22,25 109:16
110:7 116:23
concerning (1) 41:5
concerns (2) 10:19
83:18
conclusions (1) 37:19
conclusive (2) 35:9
83:13
conduct (2) 43:23 62:3
conducted (2) 35:6 95:4
conduit (1) 45:12
conference (6)
78:6,10,12 79:8,12
106:14
confided (1) 79:6
confidence (2) 82:11
93:3
confidences (1) 96:19
confidential (1) 82:13
confidentiality (5) 79:22
80:12 81:6 82:2 112:3
confines (1) 14:8
conflicted (1) 36:20
confusing (3) 11:6 86:5
89:14
confusion (1) 106:22
congress (3) 68:19,23
connection (3) 1:25 4:2
6:17
consent (2) 80:9 81:22
consequent (1) 104:8
consider (3) 64:14
90:1,10
considered (4) 64:14
87:17 88:6,15
considering (1) 23:17
conspiracy (2) 43:13
44:13
constant (1) 86:11
constitute (4) 22:23
23:13 62:2 71:6
constituted (1) 22:4
constraint (1) 98:6
consul (1) 15:14
consular (1) 15:14
consulate (2) 15:12,13
consult (1) 81:10
consulted (2) 76:19
81:2
consulting (1) 88:24
contact (15) 18:16
19:7,11,14,23 20:1,2,7
22:8 75:23 83:14,23
85:16 89:10,10
contacted (4)

77:13,17,18 103:12
contacts (2) 96:24
103:23
contains (3) 46:1
69:16,18
content (3) 17:18
87:14,16
contention (2) 44:20,22
context (2) 61:17 71:24
continue (1) 59:16
continued (5) 1:3,4
83:6 118:2,3
contract (1) 80:11
contradicted (1) 51:15
contrary (2) 17:25
63:16
contrast (2) 38:3,11
contributed (4) 13:17
14:21,24 19:2
controlled (3)
81:7,19,23
convenient (4) 59:5,20
60:21 116:17
conversation (5) 35:18
57:15 62:23 74:4
100:15
conversations (1) 62:22
coordinating (2) 88:12
90:5
coordination (1) 91:18
copies (5) 80:7,8 98:2
99:4 102:24
copy (9) 60:11,22 61:1
74:11,19 77:1 79:1
98:12,24
correct (34) 2:16,17
6:23 7:16 10:25 11:21
15:17,20,21,22,24
18:20,25 20:7 32:8
39:6 40:21,25 45:18
50:11 59:2 61:7 63:21
67:3 78:3 80:20 86:21
88:6 90:14,17 91:9
92:23 99:25 100:1
correctly (3) 49:2,11
98:19
corroborated (1) 19:4
couldnt (5) 27:23 79:21
100:22 109:16 112:4
counsel (3) 47:20 51:13
84:23
countries (1) 52:18
country (12) 7:23,25
8:5 13:16 18:7,17
19:8,10,24 20:4 31:13
113:1
couple (4) 14:25
24:12,19,21
course (8) 15:6 16:16
20:25 21:4 59:23,24
62:8 66:6
covered (1) 82:2
covers (1) 111:11
covid19 (3) 105:11,19
108:14
coy (2) 102:6,8
cr112 (7) 17:19 18:1
43:5 65:14 83:7 87:16
88:6
creation (1) 2:10
credibility (1) 84:1
credible (1) 69:2
criminality (1) 65:16

criticising (1) 38:23
crossexamination (3)
1:4 41:4 118:3
crossfire (1) 84:21
crossover (2) 57:21,24
crossreferenced (1)
21:21
crossreferencing (1)
22:10
cryptic (1) 76:6
current (6) 56:4,4 58:4
108:25 109:1 110:15
currently (1) 52:11
cyber (1) 15:13

────────────
D
────────────

d11015 (1) 98:17
d11016 (1) 99:21
d1211 (1) 5:9
d1214 (1) 5:11
d1215 (1) 5:21
d1311 (1) 34:4
d131139 (1) 84:11
d131140 (1) 84:16
d131154 (1) 75:2
d131155 (2) 46:15
84:19
d1312 (1) 34:7
d131213 (1) 85:18
d131225 (1) 32:20
d131226 (3) 35:2 37:10
38:1
d131230 (1) 36:15
d1331 (3) 39:7,17 81:15
d13312 (1) 40:16
d1332 (2) 39:16 81:17
d1481 (1) 54:24
d321 (1) 82:5
d7011 (1) 96:11
d711 (2) 45:7 91:23
d717 (1) 87:19
d761 (1) 2:23
d762 (1) 3:15
d763 (1) 3:21
data (6) 3:22 5:12 21:22
22:11 42:23 72:9
date (3) 6:21 83:5 93:8
david (1) 78:5
day (5) 99:7,9
100:12,13 106:23
days (5) 37:17 60:16
83:8,12 108:7
dc (1) 75:12
deal (5) 59:20 104:23
105:2 109:24 110:17
dealing (3) 31:11 35:21
60:18
dealings (2) 16:9 26:22
deals (2) 46:15 84:19
dealt (2) 74:2 78:18
debrief (1) 93:19
debriefing (5) 20:8,9,10
24:16,17
debriefings (1) 39:22
december (1) 48:10
decide (1) 113:16
decides (1) 5:12
decision (1) 41:13
declined (1) 92:3
defendant (3) 23:19
73:13 115:9
defendants (1) 70:21
define (1) 26:24

definitely (2) 5:1 91:4
definition (4) 25:24
26:6,12 97:6
degrees (1) 37:6
deliver (2) 54:3 64:19
delivered (1) 52:23
delivering (2) 53:10
54:10
demanding (2) 99:17
101:15
democracy (1) 71:7
democratic (7) 67:1,2,6
82:18 92:8 93:6,7
department (34) 32:15
33:24 34:18 45:5,17
46:17 47:20
52:12,16,17,19 53:22
54:8,18 55:9 74:23
75:17,23 87:22
88:12,23 89:7,13,17
90:17 91:21 92:21,25
93:10,12,14 95:23
103:11 111:14
departments (1) 45:8
depending (1) 7:6
depends (3) 16:14
38:16 52:20
deployed (2) 81:11,13
deposition (2) 98:18
99:11
deprives (1) 60:19
deputy (20) 15:25 52:4
53:19,23,24
54:1,4,7,11,14 55:8,8
56:14,17,24 57:10
59:1,4 64:20 76:18
derived (1) 44:12
describe (2) 20:20
71:25
described (6) 3:7,9 7:14
11:20 24:4 38:21
describing (1) 23:1
description (1) 10:15
designates (1) 11:3
despite (1) 69:19
destination (1) 3:19
destinations (1) 18:7
destroyed (1) 40:1
detail (3) 15:16 33:22
93:3
detailed (1) 24:10
details (5) 23:11 47:10
48:2 110:24 112:22
determine (1) 44:7
determined (1) 112:1
devote (1) 75:9
diagnosis (1) 108:15
diary (1) 28:5
didnt (41) 1:13 4:2 7:25
11:22 19:19 22:11,21
26:25 27:11,13 32:12
37:15 38:7 39:4 44:3
46:4 48:1 55:23
58:1,13,14 62:2
65:20,21,24 74:25
75:1 76:14 80:1 81:22
85:3,10,15 92:7 95:14
98:6,12,16 99:15
102:23 103:18
differ (1) 66:11
difference (1) 66:25
different (10) 9:10
10:16 23:17 33:1 38:22
88:10,19,19

39:20 61:25 86:14
89:25 112:18
differentiate (1) 96:2
difficult (1) 10:21
difficulties (1) 105:17
difficulty (1) 108:4
digital (1) 80:8
dinner (1) 21:8
direct (7) 8:23 19:17
29:20 31:1 36:23
38:4,14
direction (1) 60:1
directly (10) 20:19
28:6,13,18 52:23
62:11 68:15,22 69:5,9
director (1) 80:17
directs (2) 59:22,25
disagree (6) 37:23 50:1
67:21 79:2 99:2
113:10
disagreement (1)
109:13
discharged (1) 106:11
disclose (6) 60:25 65:21
79:19,20 80:19 81:1
disclosed (5) 51:22
65:19 82:23 83:8
87:15
disclosing (1) 82:10
disclosure (5) 51:20
70:1 111:11
disclosures (3) 70:15,22
78:20
discover (1) 57:20
discovered (3) 56:10,11
68:19
discuss (3) 12:24 48:2
103:7
discussed (9) 13:4
47:23 78:2 87:16
90:19,25 91:4 97:9,11
discussing (5) 87:22
88:13,24 89:7 101:23
discussion (2) 105:6
118:4
discussions (1) 91:2
disinformation (2)
43:14,23
disputing (1) 89:21
disseminate (2) 74:24
75:11
distinct (1) 89:15
distinction (1) 9:11
distinctly (1) 47:9
distress (1) 110:11
divulge (1) 103:1
dnc (3) 66:23 68:2 92:6
dns (1) 3:23
document (10)
48:24,25 49:9 58:15
66:15 70:10
88:15,19,21 89:2
documentation (2)
53:13,13
documented (1) 39:23
documents (4) 39:25
51:11 61:4 101:22
does (24) 24:2
25:2,3,11,12,23 26:5
27:7 31:1 34:20
46:18,19 57:11,12
63:5 77:16,19 83:24
88:10,19,19

91:8,10,12
doesnt (25) 10:9 11:25
12:1 15:4 22:7 24:1
25:1 26:1,4 27:6,7
34:15,15 49:18 54:12
57:3,16 69:17 84:8
86:9 88:21 89:2 91:5
99:10 115:25
doing (6) 22:5 76:16
95:25 101:18 102:2
103:12
domain (7) 2:24 3:20
23:17 93:16 95:1,5,9
donald (4) 94:16,22
96:25 97:5
done (12) 29:14 31:13
54:21 55:13 58:2
63:10 81:7,19,24 85:4
98:8,15
dont (74) 2:17 6:10
10:17 13:24 14:6,8
17:4,23 22:19 24:16
27:5,17 28:25 29:1
31:13,15,19 32:2,25
35:22 37:11,24 38:21
40:4,11,11 41:19 44:4
46:8,8 47:5,13,14,22
49:25 52:1 54:13
58:16,21 59:10 60:25
61:1 63:15 65:14
71:24 79:22 83:11,12
84:3 86:20 88:7,10,18
90:11 91:10 93:2,17
94:21 95:25 97:25
102:14,23,24 106:6
107:3,17 108:14 111:8
112:21 113:7,19
114:17 115:5 116:18
door (1) 106:18
dossier (7) 9:4 17:19
86:2,10 87:23 88:13
102:10
doubt (1) 79:23
doubtless (1) 86:15
doubts (3) 33:22 84:1,8
down (7) 23:3 36:15
53:13 62:12 83:1
96:17 116:8
dozens (1) 86:12
draw (3) 37:19 112:4,8
driver (2) 54:2 64:19
due (2) 62:8 66:6
during (11) 20:25 21:4
33:7 53:15,21
56:18,23 59:23,24
75:13 82:12

────────────
E
────────────

earlier (8) 54:21
68:18,22 76:3,4 77:18
79:6 96:13
early (4) 2:13 77:2,14
83:23
effect (1) 78:21
effectively (4) 40:10
49:22 78:18
effort (2) 74:24 75:11
efforts (1) 42:18
egos (1) 12:2
egotist (3) 11:20,24
12:6
either (14) 9:24 10:17
19:4 27:7,13 29:21

91:8,10,12

transcripts@opus2.com
+44 (0)20 3008 5900

47:23 76:14 82:14
91:1 96:6 100:12
104:9 115:16
**elaborate (1)** 19:11
**election (11)** 38:12
42:19 43:3 75:11 76:7
77:25 92:20,23 93:9
94:17 97:7
**electronic (1)** 32:24
**elementary (1)** 58:7
**ellis (1)** 73:5
**else (8)** 6:8 25:9 28:14
32:6 37:24 80:9 91:5,8
**emails (1)** 92:9
**emanated (1)** 48:11
**emanating (1)** 3:19
**embellished (1)** 11:23
**embellishment (1)**
11:21
**emissary (1)** 98:9
**employed (1)** 54:17
**employment (3)**
51:12,22 52:3
**encrypted (2)** 12:12
45:14
**end (1)** 102:19
**engage (1)** 89:13
**engaged (3)** 11:21 36:9
42:21
**engagement (3)** 81:5
82:12 88:25
**english (4)** 49:14 62:22
63:2 71:21
**enough (1)** 28:5
**ensure (3)** 17:6,17
116:18
**ensured (1)** 97:25
**entered (1)** 76:23
**entirely (2)** 60:12 89:14
**entitled (2)** 112:20
113:12
**entity (1)** 72:10
**entrepreneurs (2)** 22:14
68:24
**equivalent (1)** 69:4
**eric (1)** 5:16
**errors (1)** 93:1
**essentially (1)** 13:3
**establish (1)** 96:9
**established (3)** 8:2
25:20 112:17
**establishes (2)** 63:7,8
**estimate (1)** 114:16
**etc (4)** 23:15 42:24,24
73:15
**europe (1)** 8:17
**european (1)** 93:18
**eve (1)** 99:8
**even (10)** 14:11 15:19
49:2 59:11 61:4 83:23
87:24 89:9 94:11
104:16
**events (1)** 19:6
**ever (7)** 4:23,25
15:17,21 16:6 47:23
94:24
**every (2)** 81:11 114:19
**everybody (3)** 8:16 63:9
102:16
**everything (2)** 22:2
51:21
**evidence (51)** 2:1 6:7,16
13:5 16:2 17:21,24

---

**F**

**f (2)** 49:7,15
**face (4)** 18:8,9 77:10
82:16
**facebook (1)** 42:23
**factor (2)** 112:23 113:2
**factors (2)** 26:15 110:9
**factual (1)** 70:21
**factually (5)** 50:3,19
53:5,7 58:18
**failure (1)** 113:5
**fair (2)** 48:25 64:22
**fairly (3)** 46:1 63:4 76:5
**faith (3)** 46:9,11 69:22
**faithfully (2)** 56:6 69:24

---

**false (10)** 17:23 42:6
43:22 53:18
58:20,22,23
88:17,18,19
**familiar (5)** 3:7 5:5 6:14
84:12 112:19
**family (2)** 10:22,23
**far (12)** 17:18 25:13
28:4 29:12 35:9 65:9
72:14 93:23 94:11
107:5 112:24 116:23
**favour (1)** 56:5
**favours (6)** 20:17,18,22
21:9 29:13,19
**fbi (63)** 5:19,22 6:4,8,8
32:10 33:10 35:4 37:1
46:23 47:16,21
65:23,25
66:3,10,11,12 67:22
73:21,23 75:14,16
82:23 83:2,6,8,20,23
84:14,23 85:23,23
86:6,13,17
87:9,17,20,21,25
88:5,12,15,23 89:6,17
90:5,6,9,12
91:1,13,14,19 93:18
94:1,7,9,14
96:12,15,18
**fbis (1)** 33:7
**fd302 (1)** 46:23
**feared (1)** 102:9
**feature (2)** 22:7 63:5
**features (3)** 46:19
49:17,19
**fed (1)** 32:3
**fee (1)** 60:20
**feed (1)** 106:8
**feeling (1)** 110:12
**fees (1)** 60:24
**felt (2)** 35:8 78:10
**few (4)** 24:5 63:10
83:8,12
**field (1)** 35:6
**fifa (5)** 100:19,24
101:1,5,9
**fifthhand (5)** 27:20
31:12,14,15,18
**filters (1)** 68:8
**final (1)** 64:25
**find (8)** 49:14 84:7
86:21 99:19 102:1,11
112:18 115:17
**finding (2)** 42:25 43:1
**findings (1)** 75:12
**fine (2)** 30:19 116:6
**finish (2)** 116:11,15
**firm (3)** 39:8,10 73:6
**first (23)** 1:11 2:18,24
4:5,23 6:3 9:19 17:8
52:9 54:17 60:14
75:15 89:10,16 91:22
102:14 106:23 110:24
114:10 115:1,13,15,20
**firstly (1)** 49:20
**five (3)** 105:1 108:21
115:24
**flew (1)** 39:11
**florida (2)** 98:14,20
**foer (1)** 3:5
**following (5)** 17:17
21:1,5 22:19 84:13
**follows (2)** 54:10,13

---

**footnote (5)** 46:22
84:12,17,19 85:18
**forensic (1)** 113:5
**forgive (2)** 23:24 39:16
**form (2)** 86:10 96:23
**formal (5)** 40:20 61:21
65:7 70:4 82:7
**formally (1)** 110:4
**former (3)** 36:24 74:7
78:16
**forth (1)** 90:7
**found (3)** 3:10,18 63:11
75:16
**four (10)** 16:12 72:15
86:23 93:18 104:21
108:17 109:23 110:22
112:12 116:1
**fourday (1)** 114:16
**fourth (4)**
31:12,14,15,18
**fourthhand (2)** 27:10,19
**freefloating (1)** 17:13
**fresh (1)** 111:20
**fridman (9)** 26:22
28:6,17 29:4 53:11
34:5 36:13 57:9 68:14
**friends (1)** 35:19
**frimley (2)** 105:14,16
**fritsch (1)** 92:12
**frivolous (1)** 94:5
**frustration (1)** 75:14
**fsa (3)** 41:12,12,16
**fsb (1)** 8:16
**full (2)** 23:11 104:5
**fully (1)** 93:19
**funeral (2)** 55:18,22
58:6
**furnish (1)** 84:14
**further (6)** 23:5 70:5
95:7 104:17 110:10
111:25
**fusion (20)** 4:12 65:23
66:9 68:1,6
79:19,23,25
80:6,16,18,19,24
81:7,18 82:19,21 83:9
96:22 98:1
**fusions (2)** 66:9 79:19

---

**G**

**game (1)** 92:16
**gathered (1)** 83:5
**gathering (1)** 97:19
**gave (6)** 7:1 32:18
83:23 95:16 97:16,25
**general (12)** 15:14,15
38:24,25 39:1,2 60:20
84:23 95:6 97:22
102:21 108:12
**generally (2)** 112:11,13
**generals (7)** 11:2
36:1,10,13 39:12
46:15 91:16
**get (15)** 8:13 20:11
30:21 34:3 39:17
50:7 57:17,19 94:9
95:5 109:19 116:18,24
117:10,16
**getgo (1)** 87:23
**gets (2)** 111:20 115:9
**getting (3)** 23:3 29:17
57:9

---

**gifts (2)** 20:17,18,22
21:7
**give (17)** 23:7 26:7 52:6
64:2,24 72:16 74:19
79:1 80:1,7 85:2,15
98:2 102:24 109:22
112:9,22
**given (16)** 1:13,19,21
21:7 28:10 36:12
39:18 47:21 58:19,21
60:21 69:2 84:9 98:21
104:13 113:11
**gives (3)** 92:16 115:24
116:1
**giving (6)** 8:10 26:11
50:10 86:9 95:11
106:11
**glenn (4)** 47:7 82:7
92:12 96:21
**goes (3)** 5:16 114:25
115:1
**going (31)** 9:23 10:9
23:21,23 26:4 30:1
45:9 56:3 78:9
79:8,9,14 95:12,14
98:23 99:3 101:21
104:6,8,24 106:12
109:5 110:2 111:15,22
112:8,24,25 115:11
116:13,24
**gone (3)** 55:22 58:5
74:12
**good (11)** 1:5,6 18:23
37:6 46:9,11 49:9 59:8
61:8 72:14 101:16
**google (1)** 68:18
**gossip (3)** 31:7,8 32:3
**government (22)** 7:15
13:10,17,19,22
14:1,4,14 16:19 35:24
36:24 53:16,20,21,22
54:8 55:19 76:17,23
79:17 103:19 107:20
**governments (1)** 107:21
**govorun (17)** 22:12
24:2,5 25:7 49:17 50:2
52:11 53:8,15
54:17,22 56:12 57:21
63:12,13,19 64:18
**govoruns (6)** 15:24
51:11,22 52:3 54:24
65:7
**gps (1)** 96:22
**gr (1)** 55:9
**grant (1)** 41:13
**greater (1)** 113:17
**ground (1)** 19:6
**grounds (1)** 108:13
**group (14)** 1:25
41:14,19,24
42:1,5,19,20
43:1,10,12 53:16,21
64:10
**grown (1)** 104:22
**gs (1)** 96:23
**gubarev (1)** 98:19
**guidance (9)**
107:2,2,6,20,22
108:1,5,6,10
**guillotine (1)** 116:7

---

**H**

**hacked (2)** 92:4,10

---

**hacking (1)** 103:23
**hadnt (9)** 27:6 50:22
51:6,7,9 86:17 102:19
104:15 108:18
**half (4)** 116:1,3,4,11
**halfway (2)** 83:1 96:17
**halifax (1)** 98:10
**hand (2)** 56:12 68:10
**handed (1)** 96:6
**handing (1)** 55:24
**handwritten (2)** 24:20
25:6
**happen (2)** 18:10,12
**happened (8)** 27:2,16
30:11 59:1 62:18,19
80:3 110:19
**happening (2)** 20:21
92:19
**happy (4)** 109:7
115:13,15,16
**hard (2)** 74:10 80:8
**harvesting (1)** 42:22
**hasnt (2)** 73:9 107:6
**hastily (1)** 48:23
**havent (2)** 2:10
44:11,19
**having (9)** 21:17 32:6
60:17 79:5 90:6,13
108:3 110:19 111:25
**head (17)**
52:11,14,15,17
53:15,19,19,20,20,23,24
54:1,1,7 55:8,8 109:10
**headquarters (2)**
83:21,24
**hear (8)** 60:16,17
105:15 106:8,18,19
109:16 110:22
**heard (6)** 27:18,19
28:14 75:25 77:24
111:25
**hearing (1)** 108:4
**hearsay (7)** 31:7,8 32:3
35:18 37:9,9 69:20
**heart (2)** 86:24 87:3
**heavily (3)** 46:19 49:18
63:5
**help (1)** 101:4
**helpful (1)** 115:17
**helps (1)** 15:3
**here (18)** 4:1,6 10:2
10:24 11:11,16 12:4
23:3 30:20 38:13 41:9
44:12 47:22 52:21
77:21 104:15
107:17,18,19
**heres (1)** 95:8
**hes (9)** 11:25 24:9
44:15 52:14 98:21
101:17,17,18 105:24
**heshe (7)** 33:10,12
35:10,14,14,18 37:1
**hesitate (3)** 7:14
29:16,17
**hidden (1)** 45:15
**high (1)** 13:18
**highlights (1)** 84:13
**highranking (1)** 57:13
**hillary (3)** 66:17,24 68:2
**himself (3)** 97:18
105:21 108:12
**hisher (3)** 35:15,17
38:12

---

**historical (2)** 58:9,10
**history (4)** 5:6 9:23
30:5 77:4
**hmm (32)** 1:10 2:22,25
3:6,12,4:9 17:7
18:4,15 25:18 30:14
35:5 38:2 46:21 51:23
53:17 55:1 68:16 70:3
71:5 75:4 77:5 81:21
82:6,15,24 83:10
85:22 87:13 89:20
97:1 100:23
**holiday (1)** 100:14
**home (2)** 108:7,13
**hopefully (1)** 79:12
**hoping (2)** 93:12,14
**horowitz (1)** 84:4
**hospital (3)**
105:13,14,17
**hotel (2)** 94:3,5
**hour (5)** 116:3,4,8,9,12
**hours (7)** 24:13,19
115:24 116:1,3,4,20
**house (2)** 41:21 103:10
**household (1)** 108:8
**housekeeping (2)**
113:21 118:5
**however (2)** 26:9 37:1
56:10
**huge (1)** 78:24
**humphrey (2)** 74:16,17
**hundreds (1)** 63:21
**hurricane (1)** 84:21

---

**I**

**id (4)** 7:18 16:7 74:15
110:22
**idea (4)** 27:21 79:4,14
101:16
**ideal (3)** 117:6,8,14
**identification (7)** 7:20
8:11,15 15:2 16:8
29:18 30:22
**identified (2)** 52:11
96:21
**identify (5)** 7:23 12:19
14:23 92:3 96:23
**ill (15)** 9:1 16:5 24:5
52:6 59:7 64:24
66:4,6,8 72:16 73:23
96:8 109:8,19 116:25
**illegal (2)** 61:18 62:2
**illicit (13)** 52:23 53:10
54:3,10 55:24 56:13
57:9 61:10,16,19 62:9
63:24 64:20
**im (62)** 3:1 4:18,21,23
6:11,12 8:3,21 11:7
12:2 16:16 18:17
19:15 22:25
29:9,17,23 32:13
34:3,16 40:8,22 42:2
44:6,6 45:24 46:3
47:14,22 48:1
50:10,16 51:21 53:1,3
64:1,1 66:20 67:18
81:9 84:11 86:16
88:10 92:24 95:2
99:9,11 104:21
106:9,19 108:3 109:7
111:6,15 112:24,24
113:4,25 115:15,16
116:21,23

imagine (4) 28:22,23
61:14 62:17
imagined (1) 62:21
imagining (1) 62:13
immediately (1) 54:13
implications (3) 88:13
89:8 111:23
imply (1) 84:8
implying (1) 46:2
important (4) 34:25
78:10 83:16 112:2
impose (3) 116:24
117:4,5
impression (2) 38:3,11
inaccuracies (1) 69:17
inaccuracy (1) 69:18
inaccurate (6) 15:9,10
21:2 34:23 47:21
58:18
inaccurately (1) 56:20
inchief (1) 60:15
incite (1) 41:12
include (1) 59:3
included (2) 83:7 87:14
includes (1) 58:8
including (5) 17:19
37:17 71:2 73:12
85:24
incomplete (1) 110:14
incorrect (9) 16:3
50:4,19 51:25 52:1,14
53:6,7 63:17
index (1) 118:1
indicate (1) 37:14
indicated (2) 100:17
114:3
indicating (1) 33:12
indication (1) 114:1
indirect (1) 19:17
individual (7) 21:19
33:18 41:23 72:19
98:5 100:2,4
individuals (5) 43:14
71:3,14 73:13,19
industrialists (4) 22:14
25:8 68:20,24
inference (1) 54:13
inferences (1) 112:5,8
influence (3) 42:18 43:3
103:17
informal (4) 29:19
30:2,11 61:18
informally (1) 62:1
information (43)
4:12,14 10:9 15:4
16:23,25 21:21 22:10
23:5 25:25
26:3,10,12,17 31:2
35:17,20 42:25
47:15,21,23 48:7 70:5
75:15 77:25
81:8,20,24 83:5 87:22
92:17,22 93:8,15
94:11,19,25 97:19,22
103:15 111:4,12,13
informed (2) 6:4,8
initial (2) 19:14 20:11
initially (2) 12:8 106:2
input (1) 23:18
inquiry (1) 35:24
insight (1) 37:6
inspection (6) 59:22,24
60:2,9 61:2,5

inspector (9) 11:2
36:1,10,13 38:25
39:2,12 46:15 91:16
instance (2) 31:17 42:9
instead (1) 17:17
instigated (1) 78:22
instigation (1) 74:21
instinct (1) 7:22
institution (1) 67:2,3,6
76:22 92:3,11 93:6
instructed (1) 1:9 2:4
6:21 23:15 72:19 73:6
instruction (6) 1:21 5:1
6:24 66:1,7 91:22
instructions (5) 1:13,18
84:7 91:14 95:3
insurer (1) 41:7
intel (1) 33:8
intellectual (3)
81:18,23,25
intelligence (9) 6:13
7:21 15:16 18:9
21:9,17 23:18 48:12
82:9
intend (3) 65:20,21 96:1
intended (3)
65:12,13,15,18,24
66:8,14
67:14,15,18,21,24
80:23
intention (1) 96:5
interaction (1) 37:16
interest (2) 72:11 75:16
interested (4)
89:17,21,24 96:15
interesting (3) 30:1
77:25 78:25
interference (2) 71:2,6
intermediary (2) 52:10
96:22
internal (1) 46:24
internet (9) 25:7 27:21
43:13 44:13 54:22
55:13,16 63:11 72:9
interpret (4) 65:14,15
67:14,16
interview (8) 32:17
33:7,23 34:11,21 35:7
36:4,19
interviewing (1) 32:16
interviews (3) 37:18
39:10,12
into (21) 2:24 12:10
23:3 24:2 29:17
30:20,21 37:6 43:20
47:10 49:13 89:11
93:15 94:25 95:5
96:16,18 107:1
112:3,23 113:3
introducing (1) 57:6
intrusion (1) 112:3
investigate (3) 72:20
103:19,20
investigated (1) 73:1
investigating (1) 87:5
investigation (12)
83:17,25 86:25 87:3
88:25 92:2 95:7
100:20,25 101:24
102:5 103:21
investigations (2) 40:24
45:10
investigatory (4) 87:18

88:16 90:2,10
investment (1) 41:18
invite (1) 112:4
invited (1) 75:20
involve (1) 112:4
involved (5) 10:13
29:22 39:10 73:1 91:3
involvement (1) 42:18
involving (4) 63:12,13
69:7 93:23
irrelevant (2) 42:12,12
isnt (21) 13:14 22:9
31:6 35:21,24 42:6,8
43:9 44:14 48:24
52:25 54:6 58:7 81:8
87:6 92:1 93:4 101:19
102:13 103:14 104:2
isolation (3) 105:18,20
107:11
issues (5) 8:15 86:14
91:20 96:3 113:9
its (69) 2:17,17 3:20 8:9
9:9,17 10:16 12:21
13:1 15:5 22:10
23:5,9,19 25:11 26:15
28:1 31:18 32:16
34:4,5,6,8,11,13,14
40:14 41:6 42:8 43:25
44:17 46:9 47:15
48:7,25,25 49:9,12
56:18 58:12
61:14,19,19,20 64:4
70:12 74:22 80:20,24
81:17 82:4,7
83:14,15,17 84:4
86:1,5 87:7 88:13,19
89:8 93:5 97:17 98:18
99:9 101:19 104:22
105:12

J

james (1) 84:24
january (4) 2:13 32:18
33:7 34:12
jigsaw (3) 7:19 8:8 15:2
job (8) 7:3,3,4 25:24
26:12 28:1 32:1 56:4
john (6) 75:18 77:7
78:13 91:3,7 92:9
jointly (1) 90:7
jones (5) 84:22
85:2,7,15 95:13
journalist (9) 59:18
60:21 84:23 96:6,6,7
101:20 102:12,18
journalists (7) 95:25
96:4 97:10 102:7,20
104:2 112:19
judge (1) 106:12
judgment (3) 13:3
31:21 32:2
judicial (1) 113:15
judiciary (1) 97:17
july (21) 1:19,19,23,24
2:16 3:11,17
4:3,6,10,13,15 5:4
6:5,9,17,19 83:2,2
87:24 89:11
june (1) 54:15
junior (1) 106:3
jury (1) 115:11

justified (1) 35:9
justify (1) 112:3

K

karimov (1) 55:18
karimovs (2) 55:22 58:5
kathleen (1) 45:23
kathy (8) 88:22 89:4
90:3 91:1,7,10,14,19
93:2
kavalec (11) 45:23 75:5
88:22 89:4 90:3
91:1,7,10,14,19 93:2
kavalecs (1) 75:9
keen (5) 92:17,22 93:7
103:15,25
keep (2) 9:1 18:19
keeping (2) 3:22 4:6
ken (2) 99:14 100:5
kept (1) 18:21
kerry (1) 77:7
key (2) 52:10 76:12
kind (4) 10:2 22:7 35:20
62:2
kindly (1) 106:15
kinds (1) 68:10
kirkland (1) 73:5
knaster (1) 41:23
knew (17) 21:18 25:21
28:13 29:3 63:9 66:18
67:2,4 79:9 90:6 95:12
99:2 102:3,9,14,16
104:5
knocking (1) 115:13
know (58) 2:18 4:2
6:10,14,20 7:21
15:8,18 16:18 17:4
26:8 27:11,13,17
28:5,5,8,21,25
29:1,6,8,19 30:1,3,13
31:15,19 32:2,4 36:3
37:24,24 46:11 48:8
57:11,12 63:14,15
66:6,23 68:11 71:24
79:22 88:10 90:12
92:7 95:14 98:23
99:3,20 102:3,5,14
105:8 106:6 110:21
117:15
knowledge (12) 23:19
26:21,24 27:3
29:13,20 31:23 41:1
44:15 47 49:3 85:6
known (6) 25:25 26:2
28:10 31:10 67:9,10
knows (2) 57:14 101:18
kramer (15)
78:5,11,11,14
79:4,10,11 98:1
101:6,11 102:8,23,25
103:12 104:5
kremlin (12)
13:12,14,15,21,25
14:7,7,12 45:13 54:25
55:2 71:4

L

label (1) 108:10
lack (1) 75:16
large (5) 51:24 52:1
54:3 64:19 94:12

last (8) 19:22 25:19
36:11 40:15 53:13
114:1,25 115:9
lasts (1) 24:12
late (16) 3:10,17
4:3,6,10,13,15
5:4,20,25 6:17,19
63:19 66:2 96:16,18
later (8) 8:25 65:22
73:3 78:9 111:22
112:1
latest (3) 32:19 33:3,5
lawful (1) 111:3
lawyers (4) 39:8 67:9
73:6 84:6
layers (1) 37:9
lead (1) 97:22
leadership (1) 13:16
leading (2) 30:3,12
leads (1) 103:21
leak (1) 104:12
learn (1) 105:10
learned (1) 113:12
learning (1) 110:14
least (5) 4:1 31:12 42:8
79:24 83:25
leave (4) 12:20
106:3,12 117:3
leaves (3) 3:10,18 4:1
led (1) 110:9
left (3) 38:3,11 105:13
legal (2) 70:5 81:9
legally (3) 42:12 62:7
105:22
less (1) 116:20
let (5) 20:11 34:3 45:4
71:20 110:3
lets (13) 23:2,4 34:2
39:7 42:10 46:14
48:22 53:13 66:11
67:1 82:4 110:18
116:1
letter (2) 49:5,15
level (5) 13:10,22
14:1,4 63:25
lichtblau (1) 5:16
lied (1) 104:14
light (7) 10:8 39:20
92:17,22 93:8 108:25
109:1
like (17) 3:19 20:23
46:1 48:13 56:16
57:15 69:15 74:15
77:10 79:18 86:1,13
93:23 94:3 110:22
115:19 117:6
likely (8) 71:6
83:7,11,12 87:14,15
95:16 104:7
limited (1) 80:23
line (5) 49:6 98:22
99:22 100:10,16
lines (3) 24:4 53:14 88:1
link (7) 45:18 47:17
46:25 63:8,9,13 72:1
linked (2) 5:2 72:12
linking (1) 43:8
links (10) 12:10 43:10
64:10
71:2,4,13,14,22,24
72:4
list (8) 8:24 9:1 10:5
104:22

listen (2) 30:24 102:18
listening (2) 93:13,17
listing (1) 60:10
lists (2) 85:20,24
little (4) 17:13 76:8
96:13 116:20
living (4) 7:17,24 8:5
10:24
lobbying (1) 42:1
located (1) 113:1
lodged (1) 114:11
logic (1) 4:20
logs (2) 3:23 4:7
london (10) 18:6,8
20:11 37:18 39:1
87:25 89:11,13 100:22
101:3
long (7) 5:5 9:8,24 16:9
18:21 24:11 109:21
longer (1) 40:6
look (45) 2:23 3:15
5:10 12:10 17:8 23:2,4
25:7 32:19 33:21 38:1
39:7 41:2,2 42:10 45:7
46:14 48:22 49:12
54:24 70:6,14 73:6
75:2,2 76:24 78:25
80:4,22 81:15 82:4,25
84:11,19 85:18 87:8
91:22 95:20 96:11
100:9,16 116:17
looked (6) 3:18
22:12,13 25:10 87:12
107:1
looking (2) 22:17 30:5
55:16 56:4
looks (1) 77:10
lordship (55) 7:18
8:3,7,23 30:20 32:13
36:8 39:9 49:7,14
54:21 61:20 62:8 64:8
66:2 68:6,18 69:22
71:25 76:4,8,22
79:10,25 83:22 85:15
86:14,22 87:24
88:7,22 89:9 94:9,13,25
95:21 96:2 98:9 99:5
101:1 102:4,21 103:8
104:12 106:15,23
111:17 112:14,16
113:7,8 115:17 116:7
115:8
means (5) 19:14 26:24
52:24 61:20 83:11
meant (4) 62:6,9 68:21
69:6
mechanism (1) 60:2
media (2) 95:4 103:20
medically (1) 105:22
meet (14) 7:8 13:1 18:8
75:7,21 87:25 93:18
94:3 99:14,17,18,24
100:6 101:12
meeting (49)
1:19,19,22,24 2:5 5:25
12:13 19:13 20:15,16
21:1,5
24:11,12,12,13,13,14,16,17
28:6 46:16 48:10
68:19,23 74:23
75:1,6,8,10,13,17
83:18 86:6 87:20,24
88:22 89:3,10 90:4,6
91:3,7,10,12 96:12
101:15,20 104:6
members (1) 103:24
memo (4) 7:14 18:21
95:8 98:24

managed (1) 45:15
management (6)
41:6,14,18,22 42:4
113:22
manager (6) 53:22
54:18 55:7,8 94:4,5
managers (1) 55:6
manifest (1) 8:19
manuscript (1) 18:19
many (9) 6:12,2 16:11
37:6 46:12 49:8,14
63:21 78:18
march (4) 1:1 35:4
54:19 117:24
marginal (1) 83:17
material (10) 6:15
23:17 72:5,22 76:6
84:7 86:16 90:8 95:5,7
materialised (2) 106:15
matter (7) 31:17 60:3
61:5 62:7 64:6 71:21
110:2
matters (1) 111:12
maybe (3) 5:10,11,16
maybe (1) 34:6
mayor (13) 15:25 52:4
54:4,9,11,14
56:14,17,24 57:10
59:1,4 64:20
mccain (7) 78:13
79:9,12 98:9 103:2,3,9
mccains (2) 78:19 98:3
mean (39) 11:8,25
13:20 14:8,13 15:8
19:1,2,11 20:22,22
25:23 26:1,4,7,16
27:6,7,16 29:2,20
30:17 32:19 37:12
38:23 47:5 48:3 52:19
61:17 65:18 76:25
79:13,19 80:4 81:3
84:3 86:11 103:5
115:8

memoranda (37) 2:12
  9:4 14:17 15:8 17:19
  38:19 46:24 48:2
  51:16 67:23 73:12,22
  74:6,7,8,10,17,24
  75:25 79:14,16,20
  80:1,19 94:25 98:1,5
  102:10,22,24 103:1,2
  104:1,7,9,13,14
memorandum (42) 1:18
  2:5 6:21 15:20,21,23
  17:6 19:10 20:2,3
  38:18 48:22 49:18
  51:9,10 56:19 57:5
  61:11 62:10 63:6
  67:16 68:4 69:16
  70:1,22 71:13,22
  73:8,12,20,21 82:22
  83:14 85:2 88:16
  89:7,25
  90:1,13,16,18,20
memos (5) 96:3,4,5
  99:4 101:24
mention (4) 22:5,15
  59:17 90:16
mentioned (9) 1:20,24
  2:15 4:24 5:4 22:23,25
  49:17 87:6
messages (1) 45:14
met (13) 4:25 16:6
  20:19 28:17 29:2,4
  37:1 45:4 68:14,21
  69:5 83:1 94:14
meticulous (2) 40:3,8
meticulously (1) 39:23
miami (4)
  15:12,12,14,14
midday (1) 116:8
middle (2) 5:24 106:10
might (19) 2:16 8:18
  11:11 12:25 13:19
  15:16 20:22 25:11
  26:7,8 29:2 58:11
  93:6,14 97:20 99:20
  102:5 112:6 117:13
migr (3) 10:7,13,16
migrated (1) 60:6
millar (29) 41:4 61:7
  105:1,12,16,24
  106:2,6,10 107:21
  108:21 109:4,5 110:7
  111:7 112:15
  113:10,12 114:1,14
  115:4,6,13,18,22
  116:6,8,20 117:16
mind (7) 4:22 21:3
  111:19,20 112:13
  114:8 115:5
mine (1) 25:21
minister (1) 13:19
ministries (1) 13:17
minor (1) 15:15
minute (1) 36:11
minutes (4) 24:6 110:4
  116:10,16
misidentified (1) 91:12
misled (1) 91:21
misrecorded (1) 47:16
misremembered (1)
  47:19
misreported (1) 47:18
misrepresenting (1)
  112:15

misspell (1) 49:4
misstated (4) 32:11
  33:13,19 34:18
mistake (1) 99:11
mistaken (1) 45:24
mistakes (1) 50:11
mm (34) 1:10 2:22,25
  3:6,12 4:9 16:22 17:7
  18:4,15 25:18 30:14
  35:5 38:2 46:21 51:23
  52:8 53:17 55:1 68:16
  70:3 71:5 75:4 77:5
  81:21 82:6,15,24
  83:10 85:22 87:13
  89:20 97:1 100:23
modern (1) 114:25
modest (1) 21:7
modify (1) 96:20
modus (1) 31:17
moment (13) 17:9 23:7
  59:5,20 62:13 66:12
  96:8 106:17 107:10
  108:13 109:20 113:23
  116:17
monday (3)
  107:19,22,25
money (4) 9:14
  61:20,25 66:18
monitored (2) 10:22,23
month (1) 33:11
monthly (1) 9:13
months (6) 36:10 37:17
  68:22 73:3 102:7,18
moore (2) 3:22 12:21
  25:13 26:19 35:9
  60:21 63:11 86:1
  93:23 94:10 102:11
  109:3
morning (8) 1:5,6
  105:13 107:22 116:11
  117:7,10,14
moscow (2) 14:9 55:6
most (3) 9:7,8 115:17
mother (5) 84:22
  85:2,7,15 95:13
mouth (1) 35:18
move (2) 6:25 72:24
moved (1) 10:15
moves (1) 10:6
ms (3) 9:1 109:12,15
much (3) 68:6 76:2
  117:21
muddled (1) 92:14
multiple (4) 32:12
  33:14 37:9 69:20
must (5) 6:20 27:3
  29:20,21 85:4 95:15
  110:11
mustnt (2) 29:22 85:4
mysterious (1) 86:21
mystery (2) 83:14 86:1

N
name (6) 3:20 49:2,10
  55:3 98:19 99:15
namely (3) 67:19 80:23
  106:24
national (13) 70:2,16,24
  71:7 74:1 76:10,20
  78:21,23,24 82:18
  93:7 111:12
natural (1) 110:11

nature (6) 23:14 32:17
  61:18 70:21 91:22
  112:22
nbc (3) 97:14,15,15
necessarily (1) 117:5
necessary (4) 22:21
  97:17 111:6 113:8
need (8) 39:15,16
  101:17 103:6 107:10
  113:19 114:3 115:23
needed (1) 3:22
network (1) 94:10
networks (1) 97:12
neutrally (1) 90:12
never (14) 21:3 31:8
  35:10 37:1 48:12
  52:16 53:20 57:24
  85:14 96:5 104:3,3,5
  106:15
news (4) 95:13,15,22
  97:12
next (12) 6:25 34:6
  72:2,3,14,18 95:16
  99:21 100:9 104:25
  106:18 113:23
nice (1) 37:13
nobody (2) 40:3 93:13
none (3) 22:23 39:25
  43:18
nonexistent (1) 15:12
nor (1) 91:10
normally (1) 18:6
note (14)
  24:9,10,20,21,25 25:6
  45:8,23 75:6 88:4,8,10
  90:16 96:12
notes (1) 18:19
nothing (12) 20:18
  21:25 43:12 48:8
  50:3,18 53:5 58:17
  63:24 72:22 73:7
  80:16
notice (1) 42:25
nova (3) 78:6 79:9
  98:11
november (8) 48:11
  77:2,11,14 78:2 84:22
  92:18,19
novosibirsk (1) 13:20
nsd (1) 33:9
nuances (1) 67:7
nuland (12)
  75:7,7,8,10,22
  76:12,21 77:8 88:1
  89:12 91:19 103:11
number (11) 12:22,23
  13:4,6,17 17:10 19:2
  32:25 69:17 95:4
  102:20
numbered (1) 72:3
numbers (3) 32:25
  85:20 86:13

O
oath (3) 40:7 47:22
  98:21
obama (1) 76:23
obligation (1) 82:11
obtain (2) 60:11 61:2
obvious (3) 101:19
  104:2 110:11
obviously (13) 10:8
  12:22,24 14:4 33:1

37:16 51:24 58:19
  65:4 94:17 110:7,16
  114:9
occasion (2) 7:10 13:4
occasionally (1) 57:16
occasions (1) 49:17
occupation (1) 10:2
oclock (5) 104:23 105:2
  113:24 117:10,21
october (9) 2:20,21
  45:5 83:7 85:17 90:5
  93:19 94:14 96:16
odd (1) 46:1
offered (2) 75:15 106:16
offering (2) 93:24 94:11
office (4) 35:6 36:1
  42:25 77:22
officer (1) 87:25
offices (1) 41:11
official (15) 7:15
  13:10,22 14:4 35:23
  36:24 37:2 40:23
  41:16,25 57:14 73:13
  74:1 75:17 111:10
officials (4) 36:22 45:5
  78:23 103:24
oh (6) 30:18 40:17
  56:19 82:20 94:2
  109:12
ohr (6) 46:16,25
  47:6,18,24 48:10
oig (3) 32:14 34:22 35:7
okay (6) 8:14 16:17
  42:7 66:13 79:1 110:5
old (5) 60:16 114:24
  115:3,4,8
oleg (2) 52:11 56:12
once (3) 4:17 33:24
  95:15
oneoff (2) 9:18,18
ones (6) 14:19,23 38:16
  72:17,18 86:15
online (1) 43:22
onto (1) 18:7
onwards (2) 99:22
  100:16
open (15) 16:24 19:5
  21:21 22:10,17,25
  24:3,3 25:12 55:21
  56:1 58:14 59:23 60:1
  69:2
operandi (1) 31:18
operational (1) 7:7
operatives (2) 71:4,15
opponent (1) 94:17
opportunity (6) 39:4,18
  50:11 52:7 64:25
  72:16
opposed (1) 61:18
opposing (1) 97:6
opposite (1) 84:9
oral (2) 114:11,15
orally (1) 80:2
orbis (12) 19:3 22:3
  23:5 39:18,22 40:19
  61:6,23 70:8,17 80:15
  82:8
order (2) 41:12 114:23
ordinary (1) 71:21
organisation (6) 27:4
  47:8,15 49:5 49:3
  72:12
organs (1) 13:18

original (4) 6:10 19:13
  37:12 96:20
originally (2) 77:12,17
others (4) 4:22 21:19
  35:7 83:15
otherwise (3) 59:21,25
outline (1) 17:24
outlined (1) 72:6
outlines (3) 4:8 95:6
  97:22
outside (6) 18:17
  19:8,24 42:17 79:17
  94:5
outstanding (1) 104:19
over (19) 3:21 4:8 5:21
  19:3 23:21,23 35:19
  37:17 39:11,15 40:15
  55:24 56:13 70:25
  72:21 81:17 84:16
  86:11 103:17
overlap (1) 65:7
overseer (1) 60:24
own (8) 37:19 50:16
  51:9,10 57:12 66:21
  81:14,22
owned (7)
  41:14,18,23,24 42:4
  81:18,25
owner (1) 80:17
owns (1) 42:19

P
paid (4) 9:20 66:14,17
  81:18
pamplona (5)
  41:5,13,18,22 42:4
paper (2) 45:15 60:22
paragraph (40) 3:16
  5:14,24 17:11,14
  18:3,14,18,22
  19:15,18 20:21 21:16
  25:16,19 36:19 38:6,9
  41:3,9 42:10,11
  49:22,23 53:13,14
  61:11 64:13 65:12
  70:14 75:3 76:24
  77:20 80:5,22 82:25
  83:1 87:9,12 91:23
park (2) 105:14,16
part (15) 7:19 12:14
  13:18 15:5,5 27:3
  34:24 35:1 74:23
  75:11 86:10 88:8
  101:4 110:25 111:20
parted (1) 105:10
particular (9) 7:10 9:17
  12:24 13:2 31:17
  36:23 38:17 67:1
  112:25
parties (1) 61:4
partner (3) 73:5 106:25
  107:8
parts (5) 14:20,21 34:25
  51:24 52:1
party (8) 60:24,25
  67:1,3,6 82:11 92:8
  93:6
pass (1) 83:6
passed (6) 4:12,13
  61:21 62:1 67:11
  114:7
passenger (1) 8:19
past (1) 30:19

patronage (2) 61:17
  67:7
paul (1) 47:14
pause (4) 91:23 104:18
  108:5 110:20
pay (4) 9:13,13,16
  93:24
paying (2) 67:19,24
payments (3) 9:18
  61:17 67:7
payroll (2) 9:9,25
peak (1) 14:15
penultimate (2) 5:13
  36:19
people (17) 9:20 11:10
  22:6 27:6 29:22 57:16
  63:22 65:19,22 68:11
  74:25 76:1 79:3 94:15
  96:24 103:3,7
peoples (1) 115:14
perfectly (1) 93:9
perhaps (5) 57:22
  60:7,19 63:7 94:2
period (5) 4:8,22 15:25
  37:17 86:16
perkins (6) 66:16,21
  67:9,22 68:2,9 80:1
  82:17 92:6
permission (5) 41:6
  80:21 89:12 103:6,13
permitted (1) 80:6
person (32) 4:23 7:5
  9:3 10:24
  11:3,4,5,12,13,15,15,16,20
  12:6,12 13:19 14:16
  20:13,14 26:11 30:10
  32:9 34:13 37:14 40:9
  47:1,12,13 57:22
  67:19 75:5 107:14
personal (7) 26:21,24
  27:2 29:13 42:22
  44:15 80:15
personally (1) 82:7
persons (4) 37:8
  38:5,14 75:12
pertains (1) 15:2
pestering (2) 99:16
  101:15
peter (2) 45:12 92:12
petersburg (17) 16:1
  52:5 54:5,9,12,15
  55:23 56:15,17,24
  57:10 59:2,4 61:24
  64:21 65:6 67:8
ph (3) 49:7,15,16
phase (1) 104:25
phone (6) 76:3 105:15
  106:8,19 108:3 109:18
physically (3) 13:15
  14:8,11
pick (1) 26:25
piece (2) 22:7 43:22
place (6) 4:7 22:13
  34:12 57:15 98:6
  102:15
plaintiffs (2) 63:8 64:5
please (24) 2:23 3:15
  32:20 35:2 36:18 38:1
  41:2 45:7 48:22 54:24
  75:2 76:25 80:4,22
  82:4,25 84:11 85:18
  87:9 95:8,20 96:11
  98:17 115:20

plenary (1) 69:3
pm (3) 105:3,5 117:22
pocket (1) 66:21
podestas (2) 92:9
pointing (1) 72:25
points (2) 15:15 58:22
policymakers (1) 76:12
political (2) 94:20,23
politics (1) 27:17
poor (1) 107:6
pop (1) 17:9
popped (1) 114:7
position (24) 25:22
  26:16,18 28:11 30:17
  36:2 40:4 45:18 47:17
  50:12 62:14,15 63:3
  67:25 78:22 79:13
  95:2 103:14 109:7
  110:15 111:10
  112:17,18,19
positions (1) 115:14
possession (1) 4:14
possible (6) 2:17 7:2
  17:18 21:22 95:18
  117:17
possibly (10) 3:4,5 7:23
  11:23 28:7 47:14
  97:23 98:8 104:19
  110:17
post (4) 98:12,24 99:3,4
potential (4) 12:23 13:5
  29:18 30:21
potentially (4) 13:6,8
  26:17,19
power (1) 14:15
precise (1) 53:9
precisely (1) 92:21
preelection (1) 80:7
prefer (2) 61:4 69:20
preparation (1) 73:8
prepared (4) 42:14
  43:20 48:23 65:9
present (4) 33:9 35:12
  39:11 64:15
president (20) 29:14
  30:2,12 42:21 43:4
  52:4 54:4 63:10 64:20
  72:5 74:18 76:23
  95:2 103:14 109:14
  96:25 97:5 103:18,18
presidential (6) 14:10
  42:19 52:12,15,17
  93:9
press (7) 38:23 40:14
  81:15 96:22 97:20
  108:25 110:10
pressure (1) 94:10
pretty (2) 48:1 86:24
prevent (3) 94:15 96:24
  97:4
preventing (1) 94:22
previous (6) 19:20
  30:17 65:13 86:12
  101:2,3
previously (2) 1:20
  85:23
primary (24) 11:5,13,18
  12:3 32:9,16
  33:9,13,17 34:11
  35:3,8,10,11,13,16
  36:23,25 37:5,7
  38:10,13 39:19,22
principal (1) 11:12

prior (3) 47:3 92:18
93:8
private (4) 30:11 39:19
78:14 98:5
privilege (2) 79:23
112:17
probably (12) 24:12,21
31:12 35:1 50:14
60:20 63:21 97:17
104:22 105:8 109:2
117:12
problem (4) 15:1 30:20
52:2 57:24
problems (1) 46:5
procedural (2) 105:6
118:4
procedure (4) 60:8
61:21 105:25,25
proceedings (1) 42:17
process (3) 12:15 15:5
111:21
produce (7) 2:4 5:1 6:21
9:16 25:5 66:14 94:10
produced (7) 48:12
50:7 54:25 65:20
67:23 75:5 107:20
professional (2) 37:20
100:21
project (4) 9:17 13:7
47:10 55:6
projects (1) 19:3
prominence (1) 64:2
prompt (1) 110:10
pronounce (1) 99:15
proof (2) 35:14 83:13
proper (3) 93:22 102:12
112:9
properly (1) 103:19
property (3)
81:19,23,25
proposal (4) 79:7,11
94:6 114:21
proposing (2) 103:8
113:4
prostitutes (1) 94:4
protocol (1) 106:6
proved (1) 4:17
provide (1) 9:10 9:9
61:1 66:2 83:4 87:10
88:21 93:21 94:7 99:4
provided (4) 15:3 74:5
77:1 98:12
provides (1) 88:4
providing (2) 64:4 98:24
provisionally (2) 108:18
109:23
proximate (1) 29:24
pseudonym (2) 3:10
5:10
public (13) 2:19,24
23:17 33:11 36:14
81:15,22 93:14,16
95:1,5,8 108:12
publication (2) 96:1,3
publish (1) 104:8
published (5) 33:5
95:12,13,14 96:7
pump (1) 94:9
purely (1) 63:14
purport (1) 34:20
purpose (7) 70:16 92:16
94:20,23 96:9 97:4,24
purposes (1) 20:2

70:2,23 78:21
97:19,23
pursue (1) 111:6
pursuit (1) 112:2
putin (30) 12:11 15:25
26:22 28:17 29:4,14
30:2 32:5 52:4,23
54:9,11,14 55:18
56:14 57:8 58:5 59:1
63:8,10,20 64:5,11,20
68:15,21 69:5,7 83:19
90:23
putinalpha (1) 52:10
putins (2) 28:5 65:6
putting (2) 51:13 90:12

――――――― Q ―――――――

q (524) 1:7,11,16,18,23
3:1,5,7,9,13,15
4:1,5,10,16
5:5,9,16,19,24
6:7,14,20,24
7:2,10,12,14,17,21
8:20
9:6,8,11,15,19,22,24
10:2,6,12,15,18,23
11:2,5,8,13,15,18,20,24
12:1,3,6,8,13,17,19
13:4,9,12,19,22,25
14:3,7,13,16,19,23
15:3,8,12,18,20
16:2,5,9,11,13,16,18,21,23
17:1,3,5,8,11,13,16,21,23
18:3,5,12,14,16,22
19:1,7,10,15,18,20,22
20:1,4,6,9,11,13,15,20,24
21:11,13,15,25
22:3,9,15,19,22
23:2,4,11,21,23
24:1,5,11,14,16,18,20,23,23
25:3,5,16,19
26:1,4,7,14,16,21,25
27:7,9,13,16,23
28:2,4,8,12,17,20,23,25
29:2,6,8,10,12,16,19,25
30:8,15,17,23
31:3,10,15,19,22,25
32:2,9,19,22,24
33:3,5,17,21
34:2,6,10,13,15,24
35:2,6,23
36:1,6,15,17,19
37:5,12,22
38:1,3,9,19,23
39:2,4,7,15,22,25
40:3,8,23 41:2,9,17,21
42:2,8,10
43:8,12,18,20
44:1,3,21,23
45:2,4,7,21,25
46:6,11,13,19,22
47:8,12,16,20,25
48:3,8,14,19,21
49:2,9,17,20,22,25
50:7,10,16,21,23
51:1,3,5,7,9,22,24
52:6,9,14,22
52:8,10,13,18,20,25
54:2,10,14,17,21,24
55:2,5,11,13,22
56:3,5,9,19,23
57:1,4,8,18,20

58:1,7,13,16,24
61:16,22 62:5,13,17
63:9,13,16,21,24
64:1,6,12
65:9,12,18,20,24
66:4,6,8,11,14,17,21
67:1,5,12,14,18,23
68:4,10,13,17
69:3,9,12,15,19,25
70:4,10,12,14,19
71:6,10,12,17,20
72:2,8,14,18
73:3,5,10,17,19,23,25
74:3,7,12,14,16,21,23
75:2,5,19,23 76:17,24
77:4,6,10,16,19
78:2,5,14,20
79:5,13,19
80:4,11,15,19,22
81:1,3,7,12,14,17,22
82:4,7,13,16,20,22,25
83:4,11
84:1,4,6,11,16,19
85:2,4,7,9,11,13,18,23
86:4,6,9,15,20
87:1,3,6,8,12,14
88:3,8,14,19 89:21,24
90:9,12,16,20,23,25
91:5,8,12,15,21,25
92:2,7,11,15,21,25
93:4,12,21
94:1,7,14,19,22
95:2,10,12,15,20
96:15
97:2,4,8,14,16,25
98:5,12,15,17,21
99:6,9,13,21,24
100:9,24
101:6,8,11,16,19,25
102:6,12,16,23
103:5,14,22,25 104:5
106:1,8,11,16,19,25
107:12,13 71:10 89:16
90:9 95:10 96:8
100:2,4,6,15 111:23
112:1 113:14,14
114:14,22 117:9
questioned (1) 35:3
questions (16) 42:13
44:7 104:17,20 105:1
108:17,21 109:5,24
110:23 111:4,14,16
112:12 113:6 114:9
quite (4) 37:20 47:9
49:18 61:25
quiz (1) 31:5
quote (1) 85:11
quoted (1) 37:8
quoting (3) 34:16 40:12
62:11

――――――― R ―――――――

raised (1) 90:3
raising (1) 96:3
range (1) 7:2
rather (7) 7:18 10:4
14:20,25 16:7 54:1
101:12

rational (1) 57:22
rcj (1) 105:25
reached (1) 83:24
read (15) 27:20 45:1
51:6,7,8,9,10,20,21
72:16 81:5 85:9,10,14
81:15 109:9,21
released (1) 110:3
relevance (2) 72:15
76:7
relevant (9) 50:14 62:7
87:7,7,17 88:6,16
90:1,10
reliability (4) 17:6,18
23:18 84:9
relied (2) 37:13 95:22
relies (1) 38:17
remains (2) 105:20
113:22
remarkable (2) 30:1,10
remember (15) 2:7 3:13
5:20 45:3,4 46:4 47:9
55:17,17,20 56:1 76:3
83:11 86:6 106:23
repeatedly (1) 82:22
reply (4) 115:1,20
116:3,5
report (39) 9:17 11:2
12:23 14:22 15:17
23:15 24:22,23,25,25
25:6,22 26:16 32:4
33:6 34:1,22 35:25
36:11 37:14,21 40:2
46:15,19 69:23 75:12
83:15,23
84:4,17,20,21
85:14,20 86:9 87:6
91:16 99:20 102:3
reported (11) 18:18
19:4 30:6,18 33:20
35:25 45:11 46:9 49:1
69:1,13
reportedly (1) 63:7
reporting (13) 18:24
26:18 27:2 30:6 33:14
37:8 38:5,15 49:19
53:1 65:4 66:3 75:14
reports (27) 14:21
32:12 33:11 35:9,12
38:4,12 69:16 80:7
81:8,20 82:13 83:6,18
84:13
85:9,10,11,15,19,21,24
86:1,2,13,23 87:10
representatives (1) 33:9
request (8) 59:18 70:19
74:22 75:19,20,21
98:3,4
requested (9)
73:12,19,20,21
74:5,10 75:8 79:3
103:3
requesting (2) 74:8
87:10
require (1) 81:22
required (4) 23:16
70:1,15,23
requires (1) 60:25
research (8) 4:7
24:2,3,5 82:13,17
101:4,5
resettle (1) 94:12
resettlement (1) 93:24
respect (6) 34:20,24,25

35:1 36:6 112:11
respond (2) 39:5,18
responds (1) 55:2
response (5) 23:6,6,7,9
71:1
responsibilities (1)
73:14
responsible (3) 42:22
43:23 52:18
result (3) 75:23 89:3
105:19
retainer (4) 9:8,9,13,25
returns (1) 110:18
reveal (5) 5:12 41:22
revealed (1) 37:5
revelations (1) 89:18
reverse (1) 41:13
revised (5) 17:8 32:15
33:2,3,24
rice (2) 76:11,20
risk (2) 8:10 104:8
role (3) 56:4 58:4
113:16
roles (2) 21:19 23:15
rome (2) 86:7 96:12
room (3) 29:21 32:5
106:14
roomful (1) 6:1
rosprom (1) 55:7
round (1) 8:24
rules (1) 60:8
ruling (2) 109:22 111:17
rumour (1) 32:3
run (1) 45:14
rundown (1) 8:16
running (1) 15:13
runofthemill (1) 63:4
russia (18) 3:19 14:3
20:5 24:7 30:12 63:5
68:7,15,22 74:18
76:13 78:17,19 89:19
93:25 94:6,13 103:17
russiaamerican (1) 47:1
russian (27) 7:12,15
13:10 14:14 16:19
22:13 25:8 30:3,12
36:22,24 41:11
49:13,15 52:20 54:4
62:22 68:20,23,23
69:4 71:2,3,15 72:5
76:19 103:24
russianamerican (1)
45:8
russianist (1) 49:5
russianists (1) 13:14

――――――― S ―――――――

safeguarding (3)
70:16,23 73:15
safety (2) 10:19 17:1
same (3) 47:19 54:8
73:1
sarcastically (1) 94:2
saw (1) 57:24
saying (25) 7:23 39:4
46:3 50:12 56:23
62:14 67:5,18 68:21
69:5,21 77:10,17,23
78:23,24,25 88:10
94:8 95:7 96:16
100:18 109:12,14,17
scheme (1) 113:17
scientist (2) 3:9 5:9

35:16 36:6 112:11
scientists (1) 3:17
scl (3) 42:20 43:12,17
scotia (3) 78:6 79:9
98:11
search (8) 25:7,12
41:21 55:21,16
58:14 68:18
searched (2) 58:4,4
searches (4) 54:22
58:1,3 63:11
second (10) 3:15 26:25
38:6,9 49:20 52:9
56:19 75:2 89:24
114:11
secondhand (2) 27:10
31:13
secondly (1) 60:19
secret (2) 7:22 45:13
secretary (6) 75:22
76:11,18,21 78:16
88:1
secrets (2) 82:10 111:11
sections (2) 32:12 33:14
security (11) 70:2,16,24
71:7 74:1 76:10,20
78:21,23,24 111:12
see (56) 2:14,18 3:24
5:5,13 6:3,14 8:25
9:24,24 10:6 13:1 14:7
19:19 21:2,25 23:4,17
24:1 29:19 33:15,16
34:2 36:7 37:3 40:17
41:15 43:6,12 45:15
46:13 47:12,16 51:22
55:5 56:3,19 58:10
63:3 64:1 78:20 81:12
84:25 85:1 86:22
92:15,17,22 93:4
94:22 99:1,17 101:17
103:9,14 114:17
seeing (1) 109:10
seek (2) 89:12 103:6
seeking (5) 18:9 61:3
94:15 96:24 97:7
seeks (1) 72:3
seem (2) 83:20,24
seems (7) 6:11 43:4
46:3 54:9 92:14
106:22 108:13
seen (16) 4:10 15:17
31:8 33:10
44:19,21,25
50:3,18,22 51:15,18
53:5,12 58:17 70:10
select (1) 84:13
selfisolate (2) 107:4
108:1
selfisolating (1) 107:1
selfisolation (1) 108:11
senate (1) 97:17
senator (9) 78:13,19
79:9,12 98:3,9
103:2,3,9
senior (2) 36:24 74:1
sense (2) 24:25 27:3
sensible (1) 109:2
sent (2) 83:14 93:18
sentence (5) 19:22
39:17 64:17,18 65:15
sentences (2) 40:15
72:15
separate (2) 11:10
45:15

separately (1) 109:24
separating (1) 108:12
separation (1) 37:6
september (5) 1:13
    5:20,25 6:22 83:25
series (1) 9:18
serious (8) 64:3 69:17
    71:7 93:25 94:6
    101:20,21 103:16
seriously (1) 86:24
server (17) 1:25 2:1,15
    4:10,24,24 5:2 6:17
    45:15 46:25 47:2
    48:6,16 71:19
    72:10,12 87:4
servers (1) 3:23
service (3) 60:20 111:13
    112:10
session (2) 39:19 69:3
set (2) 22:3 75:17
setting (1) 40:20
several (5) 6:12 7:6
    15:7 16:10 86:11
shaking (1) 109:10
shall (1) 8:24 14:23
shared (2) 21:14 83:9
short (3) 59:14 60:18
    109:22
shorthand (1) 116:18
should (13) 8:13 23:11
    60:10 78:1 98:8 99:18
    105:8 108:7,11
    111:1,24 113:2 114:10
show (7) 74:17 75:25
    77:19 85:23 86:17
    102:23 112:20
showed (1) 51:24
showing (7) 34:21 64:7
    104:7 107:3,8,9 108:2
shown (5) 44:11 96:6
    104:1,13 106:25
shows (3) 52:1,2 64:3
shred (1) 6:16
side (5) 22:22 27:4
    51:18 66:11 73:25
sides (2) 107:1 117:3
signed (10) 1:12 42:15
    50:24 51:1,14 64:16
    70:7 80:13 81:6 82:3
significance (1) 63:6
significant (4) 29:13,19
    37:16 39:13
significantly (1) 36:5
simpson (23) 1:22 2:4
    12:9 45:20 46:4,10
    47:7 48:4,9,9 64:9
    80:13,16,17 81:6 82:7
    92:12 95:3 96:21
    97:16,18 102:17 103:1
simpsons (2) 48:18,19
since (1) 105:10
sir (13) 56:10 72:17
    74:16,17 77:14,15
    78:3,8,17 79:3,5,6
    98:10
sit (1) 106:14
situation (4) 12:21
    69:23 108:25 109:2
six (5) 10:1 36:10 37:17
    68:22 73:3
sjvoll (3) 9:1 109:12,15
skype (1) 85:16
sl (2) 43:10,10

slapdash (2) 48:24,25
slate (1) 3:1
slightly (4) 9:9 12:21
    86:5 110:10
small (2) 60:20 102:20
smear (1) 43:8
socalled (1) 9:4
software (1) 45:14
solicitor (1) 70:8
somebody (3) 7:8 11:23
    78:17
someone (17) 7:23 9:13
    10:19 14:3 16:6 27:18
    29:3 32:5,6 48:15 58:8
    60:16 85:4 99:25
    107:3 108:7 112:20
something (20) 20:23
    23:7 26:25 27:9,16
    32:4 36:13 40:25
    42:14 56:16 57:15
    58:8 59:17 91:5,8
    102:5 104:9,9 106:14
    110:16
sometime (2) 1:22 78:7
sometimes (2) 25:12
    61:3
somewhat (2) 110:14
    112:18
somewhere (1) 28:14
soon (3) 2:5 110:17
    117:17
sooner (2) 116:24,25
sophisticated (1) 68:7
sort (4) 9:17 10:8 11:22
    30:7
sorts (1) 7:6
sought (3) 74:23
    75:1,10
source (100) 6:10,10
    7:1,3,4,4,10,12,17
    8:11,18 9:3 10:2,6,23
    11:2,8,15,25
    12:4,8,11,20,22 13:1,9
    16:24,24 18:16,18,23
    19:6,7,23 20:6,7,15
    21:8,18,20,22
    22:11,17,25
    24:3,3,7,17 25:12,20
    28:1,2,12,15,20
    29:7,9,25 30:4,9,25
    31:3,5,23 32:10 34:16
    35:23 38:7,7 47:12
    49:1 53:1,2 55:21
    56:1,6,9,21
    57:7,8,11,23
    58:14,19,21,25
    61:13,14
    62:11,12,24,25 63:18
    65:3 69:1,2,13,22
    95:23 113:1
sources (22) 4:1 6:12
    7:2 10:13 12:2 18:6
    19:5 20:25 21:4 23:18
    30:5 38:22 46:2
    48:5,14,17,19 57:19
    94:10 111:15
    112:11,23
speak (1) 79:11
speaking (2) 36:25 77:7
specialist (1) 55:7
specific (6) 13:8 17:5
    20:18 24:1 28:3 113:6
specifically (5) 17:25

22:1 55:17 74:10
    99:13
specifics (1) 38:17
specify (2) 97:13 100:2
speed (1) 117:1
spell (1) 49:2,10
spent (1) 111:1
spoke (4) 76:5 78:5,10
    85:7
spoken (2) 37:2 77:14
st (17) 16:1 52:5
    54:5,9,12,15 55:23
    56:15,17,24 57:10
    59:2,4 61:24 64:21
    65:6 67:8
stage (2) 12:19 113:23
stake (1) 41:6
standard (1) 63:4
stands (1) 60:15
start (5) 49:9 113:23
    116:7 117:6,9
starting (1) 116:12
stated (5) 35:10 38:10
    44:12 75:6,11
statement (57) 1:11,12
    9:19 10:18 11:22 17:9
    19:18 22:1,2,16 25:16
    37:13 41:3
    42:11,15,15 43:21
    44:1,23,24,24 45:21
    46:7 49:25
    50:17,23,25
    51:1,7,8,14,15 52:14
    53:8,10 55:14
    59:19,22 60:1,9,14,17
    64:13,15 70:17 76:24
    77:16 81:14 87:8
    88:5,5,8,14 91:6,9
    98:13 104:15
statements (16) 32:11
    33:12,14 34:19
    35:12,15 36:20 39:19
    40:19,23,23 50:2,7
    53:9 63:17 81:23
stating (1) 41:9
status (2) 23:16 81:9
stay (2) 78:1 108:7
staying (1) 108:12
steele (104) 1:3,5 2:2
    4:16 6:14 7:21 8:5,20
    16:3 17:23 22:15 24:6
    27:14 30:23 31:10,19
    33:12 34:15
    35:11,14,21
    36:6,20,22 40:8,21
    42:8 43:9,16,24
    44:9,14 46:24 48:23
    50:10,21 52:6 53:2,25
    56:5,10 57:4,8,22
    58:8,16 61:6,9 63:3,14
    64:24 65:10 66:4
    67:12 69:10,17 71:20
    73:17 75:6,7,10,13
    77:20 79:13 81:12
    84:2,14 85:19,25
    86:17 88:3,9 89:14
    91:9 92:15 93:13
    95:2,2 96:9 98:23
    99:24 100:11 101:19
    102:19 103:14 104:2
    105:10,15,21
    106:8,10,18,19,24
    107:7 108:3,11

109:9,16,18
    110:2,5,11 118:2
steeles (4) 33:11 35:8
    59:19 110:25
step (1) 106:16
steps (11) 17:5,17,24,25
    21:15 22:4,20,22
    23:12,16 107:11
stick (4)
    114:17,19,23,25
still (13) 2:1 10:23
    46:18,19 50:5
    64:12,24 72:14
    80:13,14 82:1 86:21
    108:3
stop (1) 59:7
stopped (1) 54:14
story (5) 4:2 6:11,12
    21:20 87:4
strobe (4) 65:21 75:24
    76:2 77:1
struck (2) 42:12 117:1
stuff (1) 68:9
subcontractor (1) 82:20
subject (5) 10:20 17:3
    104:24 111:5 113:6
subparagraph (1) 17:14
subparagraphs (1) 72:3
subsequent (1) 5:5
subsequently (3) 5:19
    53:23 87:16
subsidiary (1) 42:20
subsource (65) 7:9
    11:5,8,12,13,18
    12:3,19 13:9 14:16
    15:2,6 16:6 18:17,23
    19:7,23 20:7,16
    21:1,5,20 24:8
    25:20,24 26:21 27:25
    28:4,13,15,20
    29:2,7,12,18
    30:21,22,24 31:1,9,24
    32:9,16 33:10,17
    34:11 35:3,8,10,13,16
    36:23,25 37:5
    38:7,8,10,14 39:20
    56:11 57:12 65:3
    69:14,21,22
subsources (20)
    12:22,23,25 13:5,6
    16:18 21:18 32:1
    33:13 35:11,15 36:21
    37:7,7 38:4,12,13
    39:22 93:24 94:12
substantial (1) 10:8
suddenly (2) 102:6,7
suffer (1) 43:2
sufficed (1) 96:25
sufficiently (1) 112:2
suggest (7) 2:14 48:23
    50:3,18 53:5,12 58:17
suggested (6) 61:22,23
    72:9 99:18 110:25
    111:22
suggesting (3) 4:18
    62:8 64:2
suggestion (2) 75:20
    100:11
suggests (1) 72:8
suitable (1) 12:19
sum (1) 9:20
summarising (1) 57:5
summary (4) 49:20

57:2,4 61:24
summer (5) 76:4 77:18
    79:7 101:2,3
superbly (1) 104:18
supervisory (1) 33:8
supplied (2) 86:12,23
support (6) 35:15
    44:23,25 65:9 88:4
    89:2
supports (1) 88:8
supposed (10) 6:17
    23:12 44:6 55:24 57:4
    89:18 90:21 95:19
    106:3,13
sure (29) 3:1 6:12 29:23
    32:13 34:3 40:9,22
    44:6 47:14 48:1 50:10
    51:21 57:16 60:12
    66:7,20 73:4,24 74:13
    81:9 84:11 86:8 89:23
    92:24 99:9 110:19
    111:6 113:25 116:21
surkov (1) 46:2
susan (1) 76:11
suspect (2) 47:6 102:9
suspend (1) 96:21
suspicious (2) 4:6,10
sussman (6) 1:20,24
    4:25,25 6:4,11
sussmans (1) 6:13
symptoms (9) 106:25
    107:3,9,9,10,15
    108:2,8,14
system (1) 60:4

         T

taint (2) 43:2,4
taken (12) 22:22 23:13
    60:13 81:4,4 82:13,17
    105:12,13,16 107:11
    112:21
takeover (1) 42:1
taking (4) 25:5 76:3
    84:6 93:10
talbott (7) 65:21 75:24
    76:2,13,17 77:1,6
talk (5) 22:6 35:16
    59:10 77:4 100:22
talked (1) 27:6
talking (20) 10:24
    11:15 12:9 16:14,16
    19:12,13,15 22:9
    32:10 33:18 38:16
    40:9 50:24 52:20
    67:15 87:9 95:25
    96:13 99:2
tank (1) 78:15
tasking (1) 71:18
tea (3) 3:10,18 4:1
team (5) 36:10,13
    39:12 83:25 84:21
technical (1) 48:13
technically (1) 106:11
technologically (1)
    25:13
telephone (2) 20:13
    100:15
telephoned (1) 99:6
telling (8) 30:10 33:17
    34:17,17 35:23 45:11
    58:11 101:20
tells (2) 56:12 58:8
tempted (1) 59:11

ten (5) 16:13 116:10,16
    118:11
tenminute (1) 59:8
tenor (1) 35:8
tens (1) 63:21
tense (1) 64:15
tenure (2) 65:6,7
term (7) 13:13,25 14:6
    20:8 21:2 80:11,12
termination (1) 82:8
terminology (1) 20:11
terms (10) 8:8 11:5,9
    21:15 32:16 52:3 76:6
    79:22 81:5 114:23
test (1) 105:19
tested (1) 105:19
thank (6) 73:10 97:8
    110:5,6 117:20,21
thats (104) 1:21 4:8,16
    5:9,13 6:6,18,19 7:11
    8:12,20,22 10:21 12:4
    16:2,2 20:20 22:25
    26:9 29:7,25
    30:1,10,19 32:8 33:20
    34:10 35:20 36:17
    38:6,9,12 39:7 40:9,11
    41:16 43:13,23
    44:20,22 46:23 47:13
    48:20,24 49:5
    50:9,14,21 51:3,5
    52:24 53:12,25 54:6
    60:12 61:3,5
    62:4,6,9,17 63:14,24
    64:15 65:9 66:20
    68:25 70:5,6,7,17
    71:17 73:2 74:8,21
    75:5 77:22 79:24
    81:4,4,14 84:1,3 85:13
    86:1 87:20 88:17
    91:5,15,25 92:5,13
    93:4 96:1 98:3 99:14
    104:3 108:9 109:14
    110:19 112:24
    115:10,11 116:6
themes (1) 102:21
themselves (1) 107:15
theory (2) 43:13 44:13
thereabouts (1) 116:11
thereafter (1) 39:14
therefore (4) 5:3 64:14
    80:18 114:6
theres (31) 6:7,15
    11:12,13 17:13 21:25
    22:15 43:14,15,17
    44:10 46:6,8 50:13
    59:18 63:13 66:25
    74:15 86:2 89:16
    90:16,18,25 92:15,20
    107:10 108:5 109:9
    114:19,22 116:25
theyd (1) 28:12
theyre (11) 11:11 12:13
    14:4,8,13 25:13 26:4
    40:21 68:8 83:17
    96:16
thing (8) 15:23 16:2
    47:19 55:20 58:7 88:3
    89:24,25
thinks (2) 57:22 99:9
third (4) 10:18 14:3
    82:11 114:14
thirdhand (2) 27:1,10
thoroughly (1) 103:20
though (4) 11:25 53:24

102:14 104:16
thought (6) 15:21 30:18
    103:16 107:13 108:9
    117:13
threat (2) 71:7 103:16
threats (2) 10:20 17:3
three (7) 16:12,17
    72:15 78:8 83:15
    84:10 86:12
through (9) 14:23 18:6
    49:6 52:6 61:21 83:6
    84:23 97:18 101:3
throughout (2) 39:11
    49:4 52:22 59:3
thursday (1) 117:24
time (42) 2:18,24
    5:10,22 7:17 9:21,22
    15:15,24 39:24 40:2
    45:20 50:6,7,15,22
    52:4 54:4,8 55:19,24
    57:21,24 59:4,6 68:12
    73:1 75:9 76:10 81:11
    85:6 88:11 91:18 94:6
    95:16 103:18
    107:13,15 109:3 110:4
    114:15,16
timed (1) 104:18
times (4) 5:16,19,23
    49:14
timetable (4) 115:23
    116:24 117:4,5
timing (1) 15:24
told (36) 6:4,19 24:9
    29:3,9 32:10 33:10,19
    35:7 37:1 41:16,25
    45:8,9,17,19 46:4,25
    47:7 48:14 54:21
    56:7,21 57:7 58:25
    62:11 79:25 92:21
    94:14 98:15 99:16
    101:8,16 103:6 104:21
    105:10
tomlinson (68) 1:4,5,6
    8:3,16,22 9:1,3 32:14
    36:3 40:2,13,14,19
    44:9,14,19 48:17
    51:17,20 59:6,16
    60:12 61:9 63:3 81:4
    89:14 96:8 104:17,21
    106:22 107:17
    112:16,20,20,23,24
    109:1,11,15
    110:1,8,13,16,21
    111:5 112:7 113:25
    114:5,7,18,22
    115:7,11,16,19,21,23
    116:3,12,13,15
    117:5,12,14,18,20
    118:3
tomorrow (3) 113:24
    117:7,14
tonight (2) 117:11,12
took (12) 4:7
    17:5,17,25 18:18,21
    22:13 34:12 57:15
    87:14 102:25 112:6
topic (1) 13:2
tor (1) 45:14
total (2) 8:16 116:2
touch (6) 27:23,24
    75:24 76:2 78:1
    100:17
tout (1) 74:7

tower (1) 2:1
toweralfa (2) 71:19 87:4
track (1) 30:6
trade (1) 82:10
traffic (2) 72:9 86:11
training (1) 111:1
transcribed (3) 49:6,16 56:6
transcript (1) 99:22
transit (2) 18:6,8
transition (1) 73:2
translated (1) 49:15
translation (1) 49:13
travel (1) 8:14
travelled (1) 101:3
travelling (1) 7:8
travels (1) 8:17
trial (3) 33:25 59:23,24
trials (1) 115:11
trouble (1) 42:24
true (20) 26:9 40:11 44:2,3 47:13 50:21 51:5 58:11 66:20 69:11 70:7,12 71:17 73:17 84:3 86:19 92:5,13 103:14 104:3
trump (19) 2:1 3:20,23 4:24 43:4 47:1 71:3,15,19 72:12 73:2 74:18 87:4 89:19 94:16,22 96:25 97:5 103:18
trumps (1) 42:21
trust (2) 29:11 57:13
trusted (7) 7:15 25:21
trustworthy (1) 100:20
truth (8) 1:12 42:15 43:15 44:24 46:6,8 69:15 93:4
truthful (1) 37:14
truthfully (1) 69:24
trying (6) 94:9,18 95:4,24 102:11 112:20
turn (3) 49:25 70:25 87:19
turned (1) 19:5
twice (1) 4:25
twominute (1) 41:21
type (4) 24:20,21,21,23
typing (1) 25:6

—————  U  —————

uk (2) 19:8,24
ukraine (1) 83:19
ultimate (10) 66:9,15,19,24 67:19 68:9 79:20 93:5 94:15 96:23
unable (1) 93:22
uncertain (1) 27:13
understand (13) 4:18,20 44:3 58:16 67:7 70:20 89:22 90:2 91:15 95:24 105:18 107:5 111:10
understandably (1) 93:9
understanding (16) 48:20 60:7 68:7,12 75:10 79:16,24 81:10 87:21,23 90:3 91:17 95:22 102:25 103:5 107:12

understood (6) 44:2 69:23 75:21 77:6 80:6,19
undertaking (3) 82:7 93:25 94:12
undertook (1) 92:2
undoubtedly (1) 15:9
unfortunate (1) 107:7
unfortunately (1) 72:2
union (4) 22:14 25:8 68:20,24
unjustified (1) 112:9
unless (8) 17:24 50:1 59:21,23,24,25 109:9 117:3
unredacted (1) 36:11
until (4) 33:11 83:25 110:18 117:23
untrue (3) 52:24 53:12 54:6
unwell (1) 105:11
upon (2) 37:9 95:22
used (11) 11:5 47:2 48:5,15 54:2 56:12 61:12 69:8,9,10 94:24
useful (2) 13:2 97:20
users (1) 42:23
uses (2) 96:24 98:7
using (4) 3:9 23:19 62:9 64:18
usual (3) 60:11 114:20 115:25
usually (7) 7:6 12:16,17 22:7 49:6,15 115:8
uzbekistan (2) 55:19 58:6

—————  V  —————

v (1) 98:19
value (2) 21:7 113:16
various (2) 55:5 85:24
verificatory (1) 21:15
verify (1) 22:4
version (13) 32:19 33:2,3,3,4,6 37:12 110:15 114:24,25 115:3,4,8
versions (1) 1:11
vertical (1) 14:15
via (6) 45:14 105:15 106:8,19 108:3 109:18
vicepresident (1) 55:9
victoria (6) 76:12 77:8 88:1 89:12 91:19 103:11
views (1) 111:5
vladimir (3) 15:25 56:14
vladislav (1) 46:2
voluntary (1) 37:18
volunteer (1) 61:4
vouched (1) 100:18

—————  W  —————

wait (2) 109:21 110:18
wallander (1) 103:10
walls (2) 13:15 14:11
wants (1) 113:13
warby (64) 7:25 8:9,24 9:2 40:12,17 44:6,10 51:13 59:5,8,16 60:23 61:8 62:20,24 63:11 89:1,6 95:24

104:19,22 105:2,7,21 106:1,5,17,21 107:12 108:9,17,21,24 109:4,8,13,19 110:9,14,18 111:18 113:10,19 114:3,6,13,16 115:3,5,8,19,24 115:15,8,9,24 116:4,7,14,17,22 117:8,13,15,19,21
washington (9) 35:6 39:8,13 74:25 75:12 98:12,24 99:3,4
wasnt (20) 2:21 8:6 10:9 10:15 29:5 30:8 53:19,20 54:7 62:2 66:9,21 67:12 78:22 80:11 94:5 95:10 101:23 107:12 109:13
way (20) 10:7 11:6 28:8,25 29:1 31:20 34:15 60:11,18 62:1 101:12 103:25 111:21,24 112:15 113:13 114:20,24 115:16,25
ways (1) 38:22
website (3) 3:2 41:21 55:2
wednesday (1) 1:1
weeds (1) 23:3
week (1) 114:2
weeks (3) 47:3 50:8 78:9
weight (1) 113:5
weinberg (1) 39:9
wellfounded (1) 64:22
went (4) 5:22 60:5 63:20 68:9
werent (2) 78:22 94:8
weve (1) 15:19
wfo (2) 35:13 38:11
whatever (15) 3:2 26:13 43:11,12,15 63:13 72:23 73:7 88:4 90:13 108:10,11 111:13 113:13 115:16
whats (5) 9:11 30:1 33:20 44:12 114:21
white (1) 103:10
whoever (4) 48:3 67:6 74:16 79:20
whole (2) 49:22 88:24
whom (2) 76:21 107:14
widely (1) 79:14
wider (2) 74:24 75:11
wife (3) 105:11 107:9 108:14
wifes (1) 110:15
wild (1) 43:14
willing (1) 60:24
win (1) 97:7
wine (3) 20:23 21:14 24:8
winer (3) 75:18 91:3,7
wiped (2) 2:13 83:13
wish (1) 61:1
wishes (1) 60:8
withdrawing (1) 65:10
withhold (1) 111:3
witness (41) 1:11 8:23 9:19 10:18 19:18 21:25 22:2,15 25:16

37:12 40:23 41:3 42:14 43:20 44:1,24 49:25 50:7,16,23,24 51:1,7,8,14 59:19,22 60:1,9,14,17 76:24 77:16 87:8 88:5,14 91:6,8 98:13 104:15 111:16
witness (1) 60:15
wont (2) 109:21 117:9
wood (5) 77:14,15 78:3,5 98:10
work (18) 8:17 9:14 10:2 22:7 24:3 29:7 39:13 63:20 76:15 81:18 82:8 87:18 88:6,16 90:2,10 97:4 111:16
worked (9) 15:6 46:12,17 55:5 76:21 78:14 100:19,24 101:9
working (5) 54:7 63:19 77:24 84:10 90:7
works (1) 13:15
world (3) 117:6,8,14
worried (1) 102:4
worry (1) 32:25
wouldnt (5) 14:6 15:11 31:10 55:15 109:5
write (2) 18:21 65:24
writer (1) 91:2
writers (1) 116:18
writeup (1) 46:5
writing (2) 49:11 101:1
written (4) 62:12 114:10,12 116:23
wrong (24) 1:16,17 2:14 4:17,18 34:22 36:2 37:20,23,24,25 38:19,21 40:10 42:6 43:25 45:22 55:14 57:17,19,23 65:1,3,6
wrote (2) 40:2 65:25

—————  Y  —————

yahoo (3) 95:13,15,22
yanukovych (1) 83:19
yeah (25) 5:22 11:10,25 17:12,20 19:25 20:22 23:25,25 30:5 34:8 36:16,18 50:9 96:5 73:24 77:9 81:16 83:3 84:15 87:2 96:14 97:3 99:16 100:8
years (10) 10:1 15:7 16:10,17 19:3 46:12 76:17 78:18 84:10 86:12
yesterday (4) 41:5 97:11 112:14,16
yet (3) 44:11 105:19 108:19
york (3) 5:16,19,22
yorker (1) 5:6
youd (1) 94:2
youre (31) 2:14 5:5 6:14 11:15 17:1 23:10 27:1,23,24 29:8 31:11 32:3 40:22 44:23 45:10 56:23 59:17 62:8 65:9 67:15 69:5,21 82:20 84:11 87:9 89:14 94:17 95:25 98:17 107:2,3

—————  1  —————

1 (23) 7:3 11:3,4,5,12,13,15,16,20 33:8 34:4,13 35:13 38:11 39:17 40:14,16 47:12,13 70:5 106:6 118:2,3
10 (3) 100:10 113:24 117:21
100 (5) 15:17,21,22,24 105:3
1000 (2) 116:7 117:23
1030 (1) 1:2
105 (1) 118:4
11 (2) 1:13 45:5
111 (1) 42:10
112 (21) 1:8 2:5,11 5:1 15:20,23 19:10 22:1 48:22 71:13,22 73:2 84:17,20,21 85:24 86:18 88:16 89:7 90:1,10
113 (1) 118:5
1146 (1) 59:13
1157 (1) 59:15
1230 (1) 116:15
14 (2) 6:22 108:7
15 (4) 23:7 76:17 116:10,16
155 (1) 84:19
18 (2) 1:1 100:16
187 (2) 32:23 34:10
19 (2) 83:25 117:24
192 (2) 36:16,17
1990 (1) 63:5
1990s (18) 26:23 27:5,17 52:3,22 53:15,21,24 56:12,18,23 57:3,10 59:3 61:24 63:19 67:8 68:8
1991 (1) 52:24
1993 (1) 55:5
1995 (2) 55:5,6
1996 (1) 54:15
1997 (2) 54:19 55:7
1999 (1) 52:24
1s (1) 47:1

—————  2  —————

2 (10) 7:4 39:15 49:23 53:13,14 61:11 70:14 81:17 104:23 105:2
20 (2) 86:2 98:22
200 (1) 105:5
2000 (1) 55:7
2001 (1) 76:18
2010 (2) 80:13 82:3
2016 (20) 1:13 2:16 5:11,17,20,25 6:22 16:14,16 42:18 45:5 48:11 52:15 66:2 77:2 78:2 83:7,24 84:22 101:2
2017 (4) 2:13 32:18 34:12 35:4
2018 (1) 70:5
2020 (2) 1:1 117:24
21 (3) 23:9,10,22
213 (1) 85:18
22 (1) 23:22

220 (1) 117:22
225 (1) 32:24
226 (2) 35:2 38:1
230 (1) 36:15
231 (1) 84:12
259 (3) 46:20,22 84:19
29 (1) 20:21
2ii (1) 96:17

—————  3  —————

3 (4) 7:4 34:9,9 54:19
30 (2) 19:15,18
3000 (1) 9:20
31 (5) 2:21 17:8,11,14 85:17
319 (1) 85:18
32 (1) 21:16
33 (1) 18:3
330 (1) 116:12
34 (4) 18:14,18,22 25:16
36 (2) 41:3,9

—————  4  —————

4 (2) 5:11 64:17
40 (1) 80:5
400 (1) 114:4
43 (2) 82:25 87:9

—————  5  —————

5 (2) 5:21 89:11
5000 (1) 9:20
53 (1) 76:24
55 (1) 98:22
57 (1) 80:22
58 (1) 99:22
59 (1) 100:9

—————  6  —————

6 (1) 84:22
60 (1) 100:9

—————  7  —————

701 (1) 95:20
75 (1) 106:17

—————  8  —————

8 (7) 23:6,6 70:19 92:18,19 99:22 117:10
800 (1) 117:16
89 (1) 65:12

—————  9  —————

900 (3) 117:16,18,19
96 (1) 64:13