**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MIKHAIL FRIDMAN, PETR AVEN, and GERMAN KHAN,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>BEAN LLC (a/k/a FUSION GPS) and GLENN SIMPSON,<br><br>　　　　　　　Defendants. | Case No. 1:17-cv-02041-RJL |

**<u>DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER
JURISDICTION</u>**

Defendants Bean LLC (a/k/a Fusion GPS) and Glenn Simpson hereby respectfully move

to dismiss this case pursuant to Fed. R. Civ. P. 12(b)(1) based on lack of subject matter jurisdiction.

As set forth in the accompanying Memorandum, Declaration, and Exhibits, Russian oligarch

Plaintiffs Mikhail Fridman, Petr Aven, and German Khan cannot meet the amount in controversy

requirement of 28 U.S.C. 1332(a) and thus this case must be dismissed for lack of subject matter

jurisdiction.

Dated:  March 15, 2022　　　　　　　By:　__/s/ Joshua A. Levy__

　　　　　　　　　　　　　　　　　Joshua A. Levy (D.C. Bar No. 475108)
　　　　　　　　　　　　　　　　　Rachel M. Clattenburg (D.C. Bar No. 1018164)
　　　　　　　　　　　　　　　　　Edward A. Sharp (D.C. Bar No. 1719505)
　　　　　　　　　　　　　　　　　Kevin P. Crenny (D.C. Bar No. 1765044)
　　　　　　　　　　　　　　　　　LEVY FIRESTONE MUSE LLP
　　　　　　　　　　　　　　　　　900 17th St. NW, Suite 1200
　　　　　　　　　　　　　　　　　Washington, DC 20006
　　　　　　　　　　　　　　　　　Tel: (202) 845-3215
　　　　　　　　　　　　　　　　　Fax: (202) 595-8253
　　　　　　　　　　　　　　　　　jal@levyfirestone.com
　　　　　　　　　　　　　　　　　rmc@levyfirestone.com
　　　　　　　　　　　　　　　　　eas@levyfirestone.com

kcrenny@levyfirestone.com

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MIKHAIL FRIDMAN, PETR AVEN, and GERMAN KHAN, <br><br>          Plaintiffs, <br><br>    v. <br><br> BEAN LLC (a/k/a FUSION GPS) and GLENN SIMPSON, <br><br>          Defendants. | Case No. 1:17-cv-02041-RJL |

**<u>DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR
LACK OF SUBJECT MATTER JURISDICTION</u>**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ...........................................................................................................1

BACKGROUND ............................................................................................................4

    I.   Plaintiffs Allege That Statements about Their Notorious Decades-Long Relationship with Putin and the Kremlin Are Defamatory. However, the EU and UK Recently Sanctioned Plaintiffs Because of That Relationship..................................................................4

    II.  This Court Has Subject Matter Jurisdiction Over This Diversity Suit Only If the Amount in Controversy for Each Plaintiff Exceeds $75,000...................................................9

    III. Legal Framework ...........................................................................................10

        A. Diversity Jurisdiction ...............................................................................10

        B. Damages in Defamation Cases under D.C. Law........................................12

        C. Compensatory Damages (General, Special, and Presumed) Require Evidence of Concrete Loss.............................................................................................13

        D. Punitive Damages May Not Be Awarded without a Sufficient Showing of Special or Presumed Damages. ..........................................................................................14

LEGAL STANDARD.....................................................................................................14

ARGUMENT ..............................................................................................................15

    I.   The Substance of the Alleged Defamatory Statements Has Been Circulating in the Press and Public Sphere for Decades; Thus, the Alleged Defamatory Statements Cannot Have Harmed Plaintiffs' Reputation. ......................................................................................17

    II.  General Damages: Plaintiffs Cannot Articulate Any Concrete Loss Supporting their Claims for General Damages. ...........................................................................................20

        A. Plaintiffs' disclosures and responses to interrogatories do not explain how the allegedly defamatory statements harmed them. ..................................................................21

        B. Plaintiffs Have No Documents to Support Their Alleged Damages. .........................26

        C. At Their Depositions, Plaintiffs Aven and Fridman Were Unable to Explain How They Were Harmed. ..........................................................................................27

            1.  *Aven Identified Just One Relationship That He Says Was Harmed But the Account He Gave—For the First Time at his Deposition—Was Incoherent.* ...................28

            2.  *Fridman Identified No Relationships That Changed as a Result of CIR 112.* .....29

            3.  *In Their Deposition Testimony, Plaintiffs Fridman and Aven Do Not Claim Any Cognizable Emotional Distress Damages.* ..........................................................30

    III. General Damages: Plaintiffs Are Not Entitled to Presumed Damages...............................33

A.  Plaintiffs Are Not Entitled to Presumed Damages Because the Alleged Defamatory Statements are Not Defamatory *Per Se*. .................................................................34

B.  Plaintiffs Cannot Be Awarded Presumed Damages Because They Have Failed to Show Actual Damages. .................................................................................................36

IV. Punitive Damages: Plaintiffs Cannot Rely on Punitive Damages to Meet the Jurisdictional Threshold. ...............................................................................................................38

V.  Attorneys' Fees Do Not Count toward the Jurisdictional Amount in Controversy............40

CONCLUSION.......................................................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Al-Zahrani v. Rodriguez,*
    669 F.3d 315 (D.C. Cir. 2012) ................................................................10

*Arlie Found., Inc. v. Evening Star Newspaper Co.,*
    337 F. Supp. 421 (D.D.C. 1972) ............................................................37

*Arpaio v. Zucker,*
    414 F. Supp. 3d 84 (D.D.C. 2019) .........................................................19

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..............................................................................25

*Bell Atlantic. Corp. v. Twombly,*
    550 U.S. 554 (2007) ..............................................................................25

*BMW of N. Am., Inc. v. Gore,*
    517 U.S. 559 (1996) .........................................................................17, 40

*BYD Co. Ltd. v. All. for Am. Mfg.,*
    No. 20-cv-03458, 2021 WL 1564445 (D.D.C. Apr. 21, 2021) ...............40

*Bronner on Behalf of Am. Studies Ass'n v. Duggan,*\*
    962 F.3d 596 (D.C. Cir. 2020) ...............10, 11–12, 21–22, 25–26, 38

*Carey v. Piphus,*
    435 U.S. 247 (1978) ..............................................................................34

*Carpenter v. King,*
    792 F. Supp. 2d 29 (D.D.C. 2011) .........................................................19

*Church of Scientology Int'l v. Time Warner, Inc.,*
    932 F. Supp. 589 (S.D.N.Y. 1996) .........................................................19

*Clark v. Assoc. Retail Credit Men of Wash. D.C.,*
    105 F.2d 62 (D.C. 1939) ....................................................................31–32

*Close It! Title Servs., Inc. v. Nadel,*
    248 A.3d 132 (D.C. 2021) .....................................................................12

*Coalition for Underground Expansion v. Mineta,*
    333 F.3d 193 (D.C. Cir. 2003) ...............................................................15

*Compton v. Alpha Kappa Alpha Sorority, Inc.,*
    64 F. Supp. 3d 1 (D.D.C. 2014)
    *aff'd,* 639 F. App'x 3 (D.C. Cir. 2016). ................................................26

*Connick v. Myers,*
    461 U.S. 138 (1983) ..............................................................................36

*Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*,
  82 F. Supp. 3d 344 (D.D.C. 2015) ............................................................14, 38

*Croixland Props. L.P. v. Corcoran*,
  174 F.3d 213 (D.C. Cir. 1999) ..............................................................33–34

*Dickerson v. District of Columbia*,
  No. 09-cv-2213, 2019 WL 6910043 (D.D.C. Dec. 19, 2019) .........................................23

*Deutsch v. Hewes St. Realty Corp.*,
  359 F.2d 96 (2d Cir. 1966) ..................................................................11

*Dun & Bradstreet, Inc. v. Greenmos Builders, Inc.*,\*
  472 U.S. 749 (1985) .......................................................................17, 36

*Esquilin-Mendoza v. Don King Prods., Inc.*,
  638 F.3d 1 (1st Cir. 2011) ..................................................................11

*El-Hadad v. Embassy of United Arab Emirates*,
  No. 96-cv-1943, 2006 WL 826098 (D.DC. Mar. 29, 2006),
  *rev'd in part on other grounds sub nom. El-Hadad v. United Arab Emirates*,
  496 F.3d 658 (D.C. Cir. 2007) ..............................................................36

*Estate of Taylor v. Lilienfiled*,
  744 A.2d 1032 (D.C. 2000) ................................................................38–39

*Fridman v. Buzzfeed, Inc.*,
  Index No. 154895/2017 (N.Y. Sup. Ct., Mar. 11, 2021) .....................................4

*Franklin v. Pepco Holdings, Inc. (PHI)*,\*
  875 F. Supp. 2d 66 (D.D.C. 2012) ..........................................12, 13, 14, 34, 38

*Gertz v. Robert Welch, Inc.*,\*
  418 U.S. 323 (1974) .......................................................................13, 36

*Guccione v. Hustler Magazine, Inc.*,\*
  800 F.2d 298 (2d Cir. 1986) ...............................................................19, 20

*Gibbs v. Buck*,
  307 U.S. 66 (1939) ........................................................................15

*Hardaway v. Cross State Moving*,
  729 F. App'x 8 (D.C. Cir. 2018) ...........................................................39

*Henry v. Azar*,
  518 F. Supp. 3d 520 (D.D.C. 2021) ........................................................15

*Houlahan v. World Wide Ass'n of Specialty Programs & Schs.*,
  No. 04-cv-01161, 2006 WL 2844190 (D.D.C. Sept. 29, 2006)..................................13

*Jankovic v. Int'l Crisis Grp.*,\*
  494 F.3d 1080 (D.C. 2007) ..................................................12, 33–34, 38

*Jerome Stevens Pharm., Inc. v. Food & Drug Admin*,
   402 F.3d 1249 (D.C. Cir. 2005) ...................................................................15

*Kahal v. J.W. Wilson & Assoc., Inc.*,
   673 F.2d 547 (D.C. Cir. 1982) ....................................................................39

*Kovacs v. Chelsey*,
   406 F.3d 393 (6th Cir. 2005) ......................................................................11

*Kotsch v. District of Columbia*,
   924 A.2d 1040 (D.C. 2007) ...................................................................31–32

*Khan v. Orbis Bus. Intelligence Ltd.*,
   No. 2018 CA 002667 B, 2018 WL 11232420 (D.C. Super. Aug. 20, 2018),
   *aff'd, Fridman v. Orbis Bus. Intel. Ltd.*, 229 A.3d 494 (D.C. 2020) ..................................4

*Land v. Dollar*,
   330 U.S. 731 (1947)....................................................................................15

*LaRue v. Johnson*,
   No. 16-cv-00504, 2018 WL 1967128 (D.D.C. Feb. 22, 2018)...........................13

*Liberty Lobby, Inc. v. Anderson*,
   746 F.2d 1563 (D.C. Cir. 1984),
   *vacated*, 477 U.S. 242 (1986) .............................................................19, 20

*Logan v. District of Columbia*,
   447 F. Supp. 1328 (D.D.C. 1978) ...............................................................20

*Lopes v. JetSetDC, LLC*,
   70 F. Supp. 3d 555 (D.C. 2014).................................................................15

*Love v. Budai*,
   665 F.2d 1060 (D.C. Cir. 1980) ..................................................................26

*Lurie v. Mid.-Atl. Permanente Med. Grp., P.C.*,
   729 F. Supp. 2d 304 (D.D.C. 2010).............................................................39

*Martin v. Gibson*,
   723 F.2d 989 (D.C. 1983) ......................................................................14–15

*Maxwell v. Gallagher*,
   709 A.2d 100 (D.C. 1998) .....................................................................17, 38

*Memphis Cmty. Sch. Dist. V. Stachura*,
   477 U.S. 29 (1986)......................................................................................37

*Moss v. Stockard*,
   580 A.2d 1011 (D.C. 1990) ..................................................................13, 36

*Pearce v. E.F. Hutton Grp., Inc.*,
   664 F. Supp. 1490 (D.D.C. 1987) ...............................................................17

*Prendeville v. Singer*,
  155 F. App'x 303 (9th Cir. 2005) ..................................................................37

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
  381 F.3d 717 (7th Cir. 2004) ...................................................13–14, 36, 37

*Robertson v. McCloskey*,
  680 F. Supp. 414 (D.D.C. 1988) ..................................................................13

*Roe v. Michelin N. Am. Inc.*,
  613 F.3d 1058 (11th Cir. 2010) ....................................................................15

*Rosenboro v. Kim*,*
  994 F.2d 13 (D.C. Cir. 1993)..........................12, 14–15, 16, 21, 25–26, 28, 32

*Ruhrgas AG v. Marathon Oil Co.*,
  526 U.S. 574 (1999)......................................................................................10

*Snyder v. Harris*,
  394 U.S. 332 (1969)................................................................................12, 16

*St. Paul Mercury Indem. Co. v. Red Cab Co.*,*
  303 U.S. 283 (1938)..........................................................................11, 23, 39

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003)..................................................................................39–40

*Street v. Hedgepath*,
  607 A.2d 1239 (D.C. 1992) ...........................................................................39

*Szymkowicz v. Frisch*,*
  No. 19-cr-3329, 2020 WL 4432240 (D.D.C. July 31, 2020)...13–14, 15, 16, 36, 37–38, 40

*Smith v. Clinton*,
  886 F.3d 122 (D.C. Cir. 2018) .......................................................................25

*Solers, Inc. v. Doe*,
  977 A.2d 941 (D.C. 2009) .............................................................................12

*Troy Bank v. G.A. Whitehead & Co.*,
  222 U.S. 39 (1911)........................................................................................12

*Vassiliades v. Garfinckel's, Brooks Brothers, Miller & Rhoades, Inc.*,
  492 A.2d 580 (D.C. 1985) .............................................................................39

*Walker v. Walker*,
  267 F. Supp. 2d 31, 33 (D.D.C. 2003) ..........................................................41

*Wexler v. United Air Lines, Inc.*,
  496 F. Supp. 2d 150 (D.D.C. 2007)...........................................................40–41

*Williams v. Baker*,
  572 A.2d 1062 (D.C. 1990) ...........................................................................32

*Wineberger v. RaceTrac Petroleum, Inc.*,
    672 F. App'x 914 (11th Cir. 2016) ...................................................................15

*Wynberg v. National Enquirer, Inc.*,
    564 F. Supp. 924 (C.D. Cal. 1982) .................................................................20

**Statutes & Other Authorities:**

28 U.S.C. § 1332(a) ...........................................................................1, 3–4, 9, 10, 11

Fed. R. Civ. P. 12 ......................................................................................10–11

Fed. R. Civ. P. 26 ...............................................................................21, 23, 30

Restatement (Second) of Torts (1977) ...........................................................34

\* Authorities principally relied upon are marked with an asterisk.

## INTRODUCTION

The need for our federal courts to police subject matter jurisdiction is well settled. After nearly five years of litigation in this case, it is now clear that Plaintiffs Mikhail Fridman, Petr Aven, and German Khan are unable to maintain this case in federal court. They cannot meet their burdens of establishing that this Court has subject matter jurisdiction under 28 U.S.C. § 1332(a).

The Russian oligarch Plaintiffs have now been sanctioned by the European Union and the United Kingdom. These sanctions are rooted in decades of widely known information about Plaintiffs' mutually beneficial relationship with Putin and the Kremlin. The Plaintiffs' company, Alfa Bank, has been sanctioned by the United States as well as by the European Union.

On February 24, 2022, Putin ordered the invasion of Ukraine, a brutal act of unprovoked war that has included unfathomable war crimes committed against innocents. More than two million Ukrainians have fled the violence in their country. No nation other than Russian vassal states have supported Putin's act of war. And so he turned to his longest serving, unquestioning supporters: the oligarchs like Aven who responded immediately to Putin's summons to the Kremlin for an emergency meeting about coming sanctions from the West prompted by the world's horror and disgust at the invasion.[1] On the same day, in response to Putin's invasion of Ukraine, the U.S. government sanctioned Alfa Bank,[2] which the three Plaintiffs control, own, and founded.[3]

---

[1] Max Seddon, *Russia's oligarchs powerless to oppose Putin over Ukraine invasion*, Fin. Times (Mar. 1, 2022), https://www.ft.com/content/5cd2c951-6b23-4e07-a72d-4731f7a71b58.

[2] Press Release, *U.S. Treasury Announces Unprecedented & Expansive Sanctions against Russia, Imposing Swift and Severe Economic Costs* (Feb. 24, 2022), https://home.treasury.gov/news/press-releases/jy0608.

[3] Minute Order (Mar. 30, 2021) (granting Defendants' Motion to Compel Plaintiffs to produce Alfa documents).

On the day Russia invaded Ukraine, Aven attended the meeting.[4] A few days later, the EU sanctioned Plaintiffs Fridman and Aven because of their long-standing relationship with Putin and the Kremlin.[5] In support of these sanctions, the EU stated that Aven, "an important shareholder of the Alfa Group," "is one of Vladimir Putin's closest oligarchs" who "benefitted from [Aven's] government connections;" that Fridman, "the founder and one of the main shareholders of the Alfa Group," "has managed to cultivate strong ties to the administration of Vladimir Putin, and has been referred to as a top Russian financier and enabler of Putin's inner circle;" and that Plaintiffs Fridman and Aven "have been engaged in the Kremlin's efforts to lift the Western sanctions issued to counter Russian aggressive policy against Ukraine."[6] On March 14, 2022, the EU announced it would also sanction Khan.[7]

On March 15, 2022, the United Kingdom sanctioned all three oligarch Plaintiffs, explaining that in doing so, the UK is "going further and faster than ever in hitting those closest to Putin . . . We are holding them to account for their complicity in Russia's crimes in Ukraine."[8] Under the

---

[4] Seddon, *supra* n. 1. This was not Aven's first meeting with Putin; he told the Office of Special Counsel in 2018 that he and other oligarchs met on a quarterly basis with Putin, that he took these meetings seriously, that he understood that any suggestions or critiques Putin made during these meetings were implicit directives, and there would be consequences for Aven if he did not follow through. Special Counsel Robert S. Mueller, III, Report On The Investigation Into Russian Interference In The 2016 Presidential Election 146–47 (2019), ECF 94-13.

[5] Ex. A, Council Implementing Regulation (EU) 2022/336 ("EU Sanctions") (Feb. 28, 2022), available at https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32022R0336.

[6] *Id.* at 6–7.

[7] Jacopo Barigazzi, *EU to sanction Chelsea FC owner Roman Abramovich in new oligarch package*, Politico (Mar. 14, 2022), https://www.politico.eu/article/eu-sanctions-chelsea-owner-roman-abramovich-oligarch-russia/ (included in Ex. A)

[8] Press Release, *Foreign Secretary Announces Historic Round of Sanctions*, Foreign, Commonwealth & Development Office (Mar. 15, 2022), https://www.gov.uk/government/news/foreign-secretary-announces-historic-round-of-sanctions-15-march-2022 ("UK Government Press Release"); *see also* Office of Fin. Sanctions Implementation HM Treasury, Consolidated List of Financial Sanctions

UK sanctions, Plaintiffs "will have their assets in the UK frozen which means no UK citizen or company can do business with them and they are also banned from travelling to or from the UK."[9]

The EU's and UK's sanctions illustrate in stark detail that the alleged defamatory statements are true, and surely must persuade any reasonable trier of fact that none of these Plaintiffs will ever succeed in meeting their burden of proving these statements false. It is now as clear as can be that Plaintiffs have been using this case to defend reputations that they do not have. They are not benevolent supporters of charities and the arts who have built substantial businesses through their acumen and skills. They are oligarchs who sold themselves to Putin and his corrupt regime and have done his bidding for decades. These Plaintiffs are not entitled to the reputations they wish they had: They are entitled only to the reputations they deserve; those actual reputations based on what they really have done have now been condemned universally be Western Democracies with the imposition of sanctions and could not possibly have been harmed by the alleged publications.[10]

Plaintiffs' efforts to launder their reputations through U.S. courts is not an appropriate use of the U.S. courts or the District's libel laws.

This Court should dismiss this improper case brought by sanctioned Russian oligarchs because Plaintiffs cannot meet their burdens of establishing that this Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) over their defamation suit: each Plaintiff has failed to

---

Targets in the UK at 55, ¶ 321 (last updated Mar. 15, 2022), https://assets.publishing. service.gov.uk/government/uploads/system/uploads/attachment_data/file/1060763/Russia.pdf ("UK Government Sanctions") (included in Ex. A).

[9] UK Government Press Release, *supra* n. 7 (Ex. A).

[10] Max Seddon and Daniel Thomas, *Russian magnate Mikhail Fridman says direct criticism of Putin risks reprisals*, Fin. Times (Mar. 1, 2022), https://www.ft.com/content/d3eda5d8-0650-4bf9-b327-1d3437851df0.

support an amount in controversy in excess of $75,000, a basic requirement in federal diversity cases like this one. After years of litigation, the Russian billionaire Plaintiffs claim no economic damages, and only make boilerplate allegations that the alleged defamatory statements affected their "personal reputations, affected Plaintiffs in their personal relationships, and caused Plaintiffs emotional stress." Their reliance on "presumed damages" does not suffice, because without any *actual* harm, they cannot—to a legal certainty—recover more than nominal damages. Likewise, punitive damages cannot make up for the lack of general damages because punitive damages must be based on actual harm to Plaintiffs. Here, Plaintiffs have failed to show actual harm. They were never entitled to each recover more than the jurisdictional amount, and this case must be dismissed for lack of subject matter jurisdiction.[11]

## BACKGROUND

**I.    Plaintiffs Allege That Statements about Their Notorious Decades-Long Relationship with Putin and the Kremlin Are Defamatory. However, the EU and UK Recently Sanctioned Plaintiffs Because of That Relationship.**

Plaintiffs Mikhail Fridman, Petr Aven, and German Khan filed this action against Defendants Bean LLC d/b/a Fusion GPS and Glenn Simpson on October 3, 2017. Plaintiffs are suing Defendants for money damages based on a report titled Company Intelligence Report 2016/112 ("CIR 112") that Orbis Business Intelligence created and submitted to Defendants. CIR 112 is one of 17 such reports Orbis sent to Defendants.

Plaintiffs claim that various statements in CIR 112 "defamed the Plaintiffs and Alfa," Ex. B, Amended Complaint ("Am. Compl.") ¶ 33, ECF No. 17, and allege that "Defendants are liable

---

[11] U.S. courts have dismissed Plaintiffs' other defamation cases regarding the alleged publication of CIR 112. *See Khan v. Orbis Bus. Intel. Ltd.*, No. 2018 CA 002667 B, 2018 WL 11232420, at *6 (D.C. Super. Aug. 20, 2018), *aff'd, Fridman v. Orbis Bus. Intel. Ltd.*, 229 A.3d 494, 509 (D.C. 2020); *see also* Order Granting Summary Judgment and Dismissing Complaint, *Fridman v. Buzzfeed*, Inc., Index No. 154895/2017 (N.Y. Sup. Ct., Mar. 11, 2021).

for the defamation of Plaintiffs and Alfa," *id.* ¶ 35. Specifically, Plaintiffs take issue with the

following statements in CIR 112:

- Plaintiffs claim that the line, "RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP COOPERATION," is false and defamatory. Pls.' Suppl. Resp. to Interrog. No. 2, ECF No. 78-6.

- Plaintiffs claim that this sentence in CIR 112 is false and defamatory: "Significant favours continued to be done in both directions, primarily political ones for PUTIN and business/legal ones for Alpha." *Id.*

- Plaintiffs claim that the following content of CIR 112 is false and defamatory: "during the 1990s [Oleg] GOVORUN had been Head of Government Relations at Alpha Group and in reality, the 'driver' and 'bag carrier' used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St Petersburg. Given that and the continuing sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN." *Id.*

On February 28, 2022, the Council of the European Union imposed economic sanctions on

Petr Aven and Mikhail Fridman because they "actively supported materially or financially and

benefited from Russian decision-makers responsible for the annexation of Crimea and the

destabilisation of Ukraine. [They] also supported actions or policies which undermine or threaten

the territorial integrity, sovereignty and independence of Ukraine."[12] On March 14, 2022, the EU

announced it would also sanction Khan.[13]

On March 15, 2022, the United Kingdom sanctioned all three Plaintiffs as "major

oligarchs" who are amongst "those closest to Putin."[14] The sanctions detail the justification for

sanctioning Plaintiffs, and expose the substantial truth of the alleged defamatory statements. For

Aven, the EU states:

---

[12] EU Sanctions at 6–7 (Ex. A).

[13] Jacopo Barigazzi, *EU to sanction Chelsea FC owner Roman Abramovich in new oligarch package*, Politico (Mar. 14, 2022), https://www.politico.eu/article/eu-sanctions-chelsea-owner-roman-abramovich-oligarch-russia/ (included in Ex. A)

[14] UK Government Sanctions, *supra* n. 7 (Ex. A).

Petr Aven is one of Vladimir Putin's closest oligarchs. He is an important shareholder of the Alfa Group, which includes one of major Russian banks, Alfa Bank. He is one of approximately 50 wealthy Russian businessmen who regularly meet with Vladimir Putin in the Kremlin. He does not operate independently of the President's demands. His friendship with Vladimir Putin goes back to the early 1990s. When he was the Minister of Foreign Economic Relations, he helped Vladimir Putin, then deputy mayor of St. Petersburg, with regard to the Sal'ye Commission investigation. He is also known to be an especially close personal friend of the Rosneft chief Igor Sechin, a key Putin ally. Vladimir Putin's eldest daughter Maria ran a charity project, Alfa-Endo, which was funded by Alfa Bank.

Mr[.] Aven benefitted from his government connections. He wrote a letter to Vladimir Putin complaining about the Moscow Arbitration Court's decision in the legal case concerning interests of one of Mr[.] Aven's businesses. Vladimir Putin instructed the Prosecutor General of Russia to investigate the case. Vladimir Putin rewarded Alfa Group's loyalty to the Russian authorities by providing political help to Alfa Group foreign investment plans.

Mr[.] Aven and his business partner Mikhail Fridman have been engaged in the Kremlin's efforts to lift the Western sanctions issued to counter Russian aggressive policy against Ukraine. In 2016 Vladimir Putin warned Mr[.] Aven about the prospect that the United States would impose additional sanctions against Aven and/or Alfa-Bank and suggested that he needed to take steps to protect himself and Alfa Bank, to which Mr[.] Aven complied. In 2018 Mr[.] Aven along with Mr[.] Fridman visited Washington DC on an unofficial mission to convey the Russian government's message on US sanctions and on counter-sanctions by the Russian Federation.

Therefore he actively supported materially or financially and benefited from Russian decision-makers responsible for the annexation of Crimea and the destabilisation of Ukraine. He also supported actions or policies which undermine or threaten the territorial integrity, sovereignty and independence of Ukraine.[15]

For Fridman, the EU states:

Mikhail Fridman is the founder and one of the main shareholders of the Alfa Group, which includes the major Russian bank Alfa Bank. He has managed to cultivate strong ties to the administration of Vladimir Putin, and has been referred to as a top Russian financier and enabler of Putin's inner circle. He managed to acquire state assets through government connections. Vladimir Putin's eldest daughter Maria ran a charity project, Alfa-Endo, which was funded by Alfa Bank. Vladimir Putin rewarded Alfa Group's loyalty to the Russian authorities by providing political help to Alfa Group foreign investment plans.

---

[15] *Id.* at 6.

Mr[.] Fridman and his business partner Petr Aven have been engaged in the Kremlin's efforts to lift the Western sanctions issued to counter Russian aggressive policy against Ukraine. In 2018 Mr[.] Fridman along with Mr[.] Aven visited Washington DC on an unofficial mission to convey the Russian government's message on US sanctions and on counter-sanctions by the Russian Federation.

Therefore he actively supported materially or financially and benefited from Russian decision-makers responsible for the annexation of Crimea and the destabilisation of Ukraine. He also supported actions or policies which undermine or threaten the territorial integrity, sovereignty and independence of Ukraine.[16]

For Khan, the UK sanctions state:

German Borisovich KHAN, hereafter KHAN, is a prominent Russian businessman. KHAN is obtaining a benefit from and/or supporting the Government of Russia through his positions on the Supervisory Board of the Alfa Group Consortium and the Board of Directors of ABH Holdings S.A., owner of Russia's largest privately owned bank 'Alfa-Bank (Russia)', and Chairman of the Supervisory Board of A1 Investment Holding S. A., entities which are carrying on business in sectors of strategic significance to the Government of Russia, KHAN is also a close associate of Vladimir Putin who has been involved in destabilising Ukraine or undermining or threatening the territorial integrity, sovereignty or independence of Ukraine.[17]

For Fridman, the UK sanctions state:

MIKHAIL MARATOVICH FRIDMAN is a prominent Russian businessman and pro-Kremlin oligarch. FRIDMAN is involved in obtaining a benefit from or supporting the Government of Russia through his positions on the Supervisory Board of the Alfa Group and the Board of Directors of ABH Holdings S.A., owner of Russia's largest privately owned bank 'Alfa-Bank (Russia)', which are carrying on business in a sector or sectors of strategic significance to the Government of Russia. FRIDMAN is closely associated with President Vladimir Putin and is therefore associated with an individual who is involved in destabilising and threatening the territorial integrity, sovereignty and independence of Ukraine.[18]

For Aven, the UK sanctions state:

PETR OLEGOVICH AVEN is a prominent Russian businessman and pro-Kremlin oligarch. AVEN is or has been involved in supporting the Government of Russia as a Director of Alfa-Bank (Russia), the fourth largest bank in Russia, and its holding company ABH Holding, which are entities carrying on business in the

---

[16] *Id.* at 7.

[17] UK Government Sanctions, *supra* n. 7.

[18] *Id.*

financial sector, which is a sector of strategic significance to the Government of Russia. AVEN is also associated with the Putin who is or has been involved in destabilising or undermining or threatening the territorial integrity, sovereignty or independence of Ukraine, by engaging in, providing support for, or promotes any policy or action which destabilises Ukraine or undermines or threatens the territorial integrity, sovereignty or independence of Ukraine.[19]

In the wake of the sanctions, Plaintiffs took quick action to distance themselves from long-held corporate positions—tacitly recognizing the toxicity of their names in the public square. They resigned from the boards of multiple institutions,[20] including their own companies Alfa Bank and LetterOne Holdings S.A.[21] So leery was LetterOne of its founders that it went so far as to order staff to have no contact with them.[22] Khan, along with two other long-standing Alfa Group partners, resigned from LetterOne Holdings the following week.[23] Notably, Plaintiffs did not take

---

[19] *Id.*

[20] Aven, who has used his riches to amass a large art collection, has resigned from The Royal Academy in London, which returned his donation to its current exhibition, Francis Bacon: Man and Beast. Vivienne Chow, *Russian Billionaire Petr Aven Resigns as Royal Academy Trustee as Arts Institutions Face Mounting Pressure to Cut Ties with Russia*, Artnet News (Mar. 2, 2022), https://news.artnet.com/art-world/russia-cultural-institutions-war-ukraine-2079992. The Tate museum also cut ties with him. James Pickford & Arash Massoudi, *Tate Cuts Links with Two Billionaires Hit with Sanctions over Ukraine Invasion*, Fin. Times (Mar. 14, 2022), https://www.ft.com/content/4b36fda5-e5b8-49c6-89b1-d93ac8f130d2. Fridman also stepped down the board of Alfa's Amsterdam-based telecommunications company, VEON. Press Release, *Mikhail Fridman steps down from VEON Board*, Veon (Mar. 1, 2022). https://www.veon.com/media/media-releases/2022/mikhail-fridman-steps-down-from-veon-board/.

[21] Daniel Thomas and Max Seddon, *Mikhail Fridman Loses Control of LetterOne After Sanctions*, Fin. Times (Mar. 2, 2022), https://www.ft.com/content/c1837a20-6147-45c5-876c-add96ee8432c; Benjamin Stupples, *Sanctioned Russian Billionaires Resign From Alfa-Bank Owner*, Bloomberg.com (Mar. 9, 2022), https://www.bloomberg.com/news/articles/2022-03-09/sanctioned-russian-billionaires-resign-from-alfa-bank-owner; Grace Dean, *2 Russian Billionaires Resigned from the Board of One of the Country's Biggest Banking Companies a Day after the EU Sanctioned Them*, Bus. Insider (Mar. 10, 2022), https://www.businessinsider.com/russia-resign-alfa-bank-abh-eu-sanctions-ukraine-fridman-aven-2022-3.

[22] Thomas and Seddon, *supra* n.13.

[23] Rupert Neate, *Three More Russian Billionaires Resign from LetterOne Board*, The Guardian, (Mar. 7, 2022) https://www.theguardian.com/business/2022/mar/07/three-more-russian-billionaires-resign-from-letterone-board.

similar actions to distance themselves from their corporate positions after the alleged publication of CIR 112, an indication of the lack of any meaningful reputational harm caused by that report.

To be clear, while the sanctions have been imposed directly on these men because of Russia's invasion of Ukraine, the basis of these sanctions is their years of corrupt toadying up to perhaps the most destabilizing dictator of the 21st century to date. They have enabled Putin for years, and so it is for years of enabling the man who initiated the largest invasion in Europe since the end of World War II that they are being scorned by government, finance, corporations, and charities who are recoiling in horror at the prospect of being associated with them.

## II. This Court Has Subject Matter Jurisdiction Over This Diversity Suit Only If the Amount in Controversy for Each Plaintiff Exceeds $75,000.

Plaintiffs filed this defamation case in federal court in 2017 pursuant to this Court's diversity jurisdiction under 28 U.S.C. § 1332(a) and claimed in their Amended Complaint that "[t]he matter in controversy in the cause of action asserted herein exceeds $75,000." Am. Compl. ¶ 14. This Court only has jurisdiction over this case if each of the Plaintiffs sufficiently alleges that his damages exceed the amount in controversy. They have had nearly five years to supply such information and have declined many requests to do so.

In terms of alleged damages, Plaintiffs have merely said the alleged defamation caused "harm to their personal and professional reputations." Am. Compl. ¶ 10. They have asked the Court to award "compensatory damages . . . based on reputational harm, humiliation, embarrassment, mental anguish, and emotional distress." Ex. C, Pls.' 4th Supp. Resps. and Objs. to Defs.' First Set of Interrogatories ("Pls.' 4th Supp. Resps."), at 4; Ex. D, Pls.' Third Revised Initial Disclosures ("Pls.' 3d Rev. Discls."), at 14. Plaintiffs have dropped their claims for economic damages. *See* Pls.' 4th Supp. Resps. at 3 (Plaintiffs no longer seek "damages for lost profits or loss of business

opportunities."); Pls.' 3d Rev. Discls. at 13 (same). Plaintiffs have no documentary support for their reputational and emotional damages.

The sum total of information produced by Plaintiffs concerning the harm they allegedly suffered can be found in only five places: (1) Plaintiffs' Amended Complaint; (2) Plaintiffs' Third Revised Initial Disclosures (identical for each Plaintiff); (3) Plaintiffs' Fourth Supplemental Responses and Objections to Defendants' Interrogatories (identical for each Plaintiff); (4) Aven's deposition, Ex. E, Aven Depo. Tr. ("Aven Tr.") (Dec. 9, 2020); and (5) Fridman's deposition, Ex. F, Fridman Depo. Tr. ("Fridman Tr.") (Nov. 17, 2020). The attached Demonstrative Exhibit 1 is a summary document collecting the entirety of the claims and testimony provided by each plaintiff concerning the nature and extent of the injuries for which he seeks to recover. None has laid out sufficient evidence of harm to give this Court subject matter jurisdiction over Plaintiffs' claims under § 1332(a).

## III. Legal Framework

### A. Diversity Jurisdiction

"Federal courts are courts of limited subject-matter jurisdiction" with "the power to decide only those cases over which Congress grants jurisdiction." *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012). Limitations on the court's subject matter jurisdiction, such as the amount in controversy for diversity jurisdiction, "'must be policed by the courts on their own initiative,'" *Bronner on Behalf of Am. Studies Ass'n v. Duggan*, 962 F.3d 596, 602 (D.C. Cir. 2020) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *see also* 28 U.S.C. § 1332(a) (providing jurisdiction in diversity case "where the matter in controversy exceeds the sum or value of $75,000").

When it appears "to a legal certainty that the claim is really for less than the jurisdictional amount," a plaintiff's case must be dismissed for lack of subject-matter jurisdiction. *Bronner*, 962 F.3d at 602 (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 280 (1938)). Although ordinarily, "'the sum claimed by the plaintiff controls if the claim is apparently made in good faith' . . . 'legal certainty . . . trumps the plaintiff's good faith.'" *Bronner*, 962 F.3d at 602, 605 (quoting *St. Paul Mercury Indem. Co.*, 303 U.S. at 288, and then quoting *Esquilin-Mendoza v. Don King Prods., Inc.*, 638 F.3d 1, 4 (1st Cir. 2011)); *see also Deutsch v. Hewes St. Realty Corp.*, 359 F.2d 96, 99 (2d Cir. 1966) (describing "the first test," focusing on the plaintiff's good faith as "but a linguistic variant of the second," focusing on "legal certainty"). The case may be dismissed at the outset when "from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed," or later along if, "from the proofs"—the evidence brought forward during litigation—"the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount." *St. Paul Mercury Indem. Co.*, 303 U.S. at 289; *see also Kovacs v. Chelsey*, 406 F.3d 393, 395 (6th Cir. 2005) (describing the *St. Paul Mercury* test as asking first whether "there is a legal basis for [the plaintiff's] claim" and second whether "there is some chance that she could recover the amount claimed").

"Put differently, 'jurisdiction is defeated notwithstanding the plaintiff's good faith . . . if one familiar with the applicable law could not reasonably have concluded that the claim was worth the jurisdictional amount." *Bronner*, 962 F.3d at 605 (quoting *Esquilin-Mendoza*, 638 F.3d at 4). It does not matter "whether the plaintiff is [or might be] victorious once the dust settles" because "[s]uccess (or lack thereof) on the merits is not the linchpin of federal diversity jurisdiction." *Id.* at 606. Even when the parties are far along in their litigation, if it turns out that "the plaintiff *never* was entitled to recover" the claimed and jurisdictionally required amount, the case must be

11

dismissed because "the exercise of jurisdiction was erroneous in the first instance." *Id.* (emphasis in original) (quoting *St. Paul Mercury*, 303 U.S. at 289).

Finally, and significantly for this case, the "separate and distinct claims of two or more plaintiffs cannot be aggregated in order to satisfy the jurisdictional amount requirement." *Snyder v. Harris,* 394 U.S. 332, 335 (1969); *see also Rosenboro v. Kim*, 994 F.2d 13, 17 (D.C. Cir. 1993), ("The claims of multiple plaintiffs may not be aggregated for the purpose of meeting the . . . threshold for diversity jurisdiction." (citing *Troy Bank v. G.A. Whitehead & Co.,* 222 U.S. 39, 40– 41 (1911))).

### B.  Damages in Defamation Cases under D.C. Law

There are four elements to defamation under District of Columbia law—a defamation plaintiff must prove:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) **either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm**.

*Close It! Title Servs., Inc. v. Nadel*, 248 A.3d 132, 139 (D.C. 2021) (emphasis added) (quoting *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009)). In other words, a defamation Plaintiff must prove special harm (economic damages) or presumed damages. *Franklin v. Pepco Holdings, Inc. (PHI)*, 875 F. Supp. 2d 66, 74 (D.D.C. 2012) ("[A] plaintiff must allege . . . either that the statement was actionable as a matter of law irrespective of special harm [*i.e.* defamation *per se*] or that its publication caused the plaintiff special harm." (quoting *Jankovic v. Int'l Crisis Group*, 494 F.3d 1080, 1088 (D.C. Cir. 2007))). Here, because Plaintiffs have stated they have no economic damages, *see* Ex. Pls.' 4th Supp. Resps. at 3; Pls.' 3d Rev. Discls. at 13 (same). Plaintiffs must prove they are entitled to presumed damages, including showing actual injury, *see Gertz v. Robert*

*Welch, Inc.*, 418 U.S. 323, 349 (1974). None of the Plaintiffs can make a showing of actual injury that renders his total damages in excess of the jurisdictional threshold.

### C. Compensatory Damages (General, Special, and Presumed) Require Evidence of Concrete Loss.

*Special harm (or economic damages)*. "Special damages cover economic and pecuniary loss." *LaRue v. Johnson*, No. 16-cv-00504, 2018 WL 1967128, at *9 (D.D.C. Feb. 22, 2018); *see also Houlahan v. World Wide Ass'n of Specialty Programs & Schs.*, No. 04-cv-01161, 2006 WL 2844190, at *8 (D.D.C. Sept. 29, 2006). Plaintiffs claim no economic damages.

*General damages*. General damages "compensate a plaintiff for harm to . . . reputation or emotional well-being." *Houlahan*, 2006 WL 2844190, at *8 (D.D.C. Sept. 29, 2006) (quoting *Robertson v. McCloskey*, 680 F. Supp. 414, 415 (D.D.C. 1988)). They include compensation for *"*impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Gertz*, 418 U.S. at 350.

*Presumed damages*. General damages can be further broken down into actual and presumed damages. If defamation plaintiffs do not claim special harm (as Plaintiffs do not so claim here), they must prove presumed damages, which requires (1) that the statements are "defamatory *per se*," *i.e* "so likely to cause degrading injury to the subject's reputation that proof of that harm is not required to recover compensation." *Franklin*, 875 F. Supp. 2d at 75, and (2) also requires proof of actual malice when, as here, a private plaintiff is suing over an alleged defamatory statement relating to a matter of public concern. *Moss v. Stockard*, 580 A.2d 1011, 1033 n.40 (D.C. 1990). Presumed damages "still 'serve a compensatory function'" and "**may not be awarded** 'in a substantial amount to a party who has not demonstrated evidence of concrete loss.'" *Szymkowicz v. Frisch*, No. 19-cr-3329, 2020 WL 4432240, at *7 (D.D.C. July 31, 2020) (quoting *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 734 (7th Cir. 2004) (emphasis added)).

13

### D. Punitive Damages May Not Be Awarded without a Sufficient Showing of Special or Presumed Damages.

Punitive damages are not compensatory and may not be awarded on their own in a defamation case under D.C. law because the elements of a defamation claim are not present in the absence of a sufficient showing of either special or presumed damages. *Franklin*, 875 F. Supp. 2d at 74 (D.D.C. 2012). Punitive damages also may not be awarded without a basis in the record for *actual* loss. *Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*, 82 F. Supp. 3d 344, 353 (D.D.C. 2015).

In other words, the amount of recoverable damages in a defamation case—whether presumed, economic, general, or punitive—comes down to showing actual, concrete loss. Here, Plaintiffs have disclaimed any special (economic) damages and thus must prove they are entitled to presumed damages in order to recover for defamation. First, they cannot recover presumed damages because the statements are not *per se* defamatory. Second, presumed damages, as stated, may not be awarded in any substantial amount without proof of concrete loss. *Szymkowicz*, 2020 WL 4432240, at *7. Punitive damages also may not be awarded without a sufficient basis in the record for concrete loss. Because Plaintiffs cannot show any appreciable concrete loss from the alleged publication of the three allegedly defamatory statements, they cannot—to a legal certainty—show that their claimed damages (presumed, general, punitive) exceed $75,000 for each Plaintiff.

### LEGAL STANDARD

"[T]he party asserting jurisdiction"—here, Plaintiffs—"always bears the burden of establishing the amount in controversy." *Rosenboro*, 994 F.2d at 17; *see also Martin v. Gibson*, 723 F.2d 989, 991 (D.C. Cir. 1983) ("[T]he burden of establishing the amount in controversy, to be sure, rests squarely with the litigant asserting jurisdiction."). When a defendant challenges the

plaintiff's "allegations of jurisdictional facts" like the amount in controversy, the plaintiff (as the party claiming jurisdiction) "must produce evidence supporting a legal uncertainty about whether she could prove" the amount asserted. *Szymkowicz*, 2020 WL 4432240, at *4 (quoting *Rosenboro*, 994 F.2d at 18); *see also Lopes v. JetSetDC, LLC*, 70 F. Supp. 3d 555, 558 (D.D.C. 2014).

The Court is not constrained in what it may consider when deciding a motion to dismiss under Rule 12(b)(1). "[W]hen a question of the District Court's jurisdiction is raised . . . the court may inquire by affidavits or otherwise, into the facts as they exist." *Land v. Dollar*, 330 U.S. 731, 735 (1947); *see also Gibbs v. Buck*, 307 U.S. 66, 71–72 (1939) ("As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court."). A court assessing its subject matter jurisdiction may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Henry v. Azar*, 518 F. Supp. 3d 520, 525 (D.D.C. 2021) (quoting *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003)); *see also Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) ("[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."). The inquiry is a flexible one and courts "may use their judicial experience and common sense." *Wineberger v. RaceTrac Petroleum, Inc.*, 672 F. App'x 914, 917 (11th Cir. 2016) (per curiam) (quoting *Roe v. Michelin N. Am., Inc.*, 613 F.3d 1058, 1061–62 (11th Cir. 2010)).

## ARGUMENT

Plaintiffs cannot establish the amount in controversy is sufficient because they have provided nothing more than vague and boilerplate descriptions of their alleged harm. In their Amended Complaint, their required disclosures, their interrogatory responses, and their

depositions, Plaintiffs have done little more than list *types* of harm that victims of defamation *might* suffer. Nowhere have they explained the ways in which they themselves have been injured. Nor have they said anything that suggests they will be able to produce evidence supporting the notion that each of them could recover in excess of $75,000 in this action. *See Rosenboro*, 994 F.2d at 18 (explaining that a plaintiff "must produce evidence" when its jurisdictional facts are challenged); *Snyder,* 394 U.S. at 335 (establishing that plaintiffs may not aggregate damages to meet the amount in controversy).

Plaintiffs are seeking general damages, including presumed damages, and punitive damages, based on emotional distress and reputational harms. General damages in excess of $75,000 for each Plaintiff will not be available here because Plaintiffs have yet to identify the personal, reputational, and emotional injuries they suffered with the requisite level of detail, and there is no reason to think they ever can. *See Szymkowicz*, 2020 WL 4432240 at *6 ("[T]his is not a situation where discovery would enable plaintiff to present a stronger case at trial than he can now; the facts related to his potential damages . . . are particularly within his control."). Indeed, the EU's and UK's recent sanctions of Plaintiffs, based on the long-known facts underlying the alleged defamatory statements in this case, make manifest that the Russian oligarch Plaintiffs had no reputation to harm. None of Plaintiffs' allegations or disclosures in this case explains why they possible could have suffered any reputational or emotional injury from the publications at issue in this case in light of these devastating facts known to regulators and governments the world over.

Plaintiffs cannot meet the jurisdictional threshold with an award of punitive damages because punitive damages cannot be awarded without "a basis in the record for an award of actual damages." *Maxwell v. Gallagher*, 709 A.2d 100, 103 (D.C. 1998). Even if the Court were to find that one of the Plaintiffs has sufficiently alleged he could win a nominal or otherwise *de minimis*

amount of damages, that dollar amount will fall far below the required amount in controversy, and punitive damages will not be able to bridge the gap without becoming unacceptably disproportionate to the small compensatory damages. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 580 (1996) (requiring a "reasonable relationship" between compensatory and punitive damages).[24] It is apparent, then, to a legal certainty, that none of the Plaintiffs can recover more than $75,000 and that jurisdiction is accordingly improper.

I. **The Substance of the Alleged Defamatory Statements Has Been Circulating in the Press and Public Sphere for Decades; Thus, the Alleged Defamatory Statements Cannot Have Harmed Plaintiffs' Reputation.**

First, the notion that Plaintiffs are entitled to damages for harm to their reputations is refuted by the fact that the gist of the alleged defamatory statements was and is not new. Plaintiffs' reputations are unaffected by statements describing their already long-publicized, symbiotic relationship with the Kremlin and Putin. The EU and UK sanctions, quoted above, cite activity beginning as early as the 1990s to describe a mutually beneficial relationship between Plaintiffs and Putin that has been characterized by reciprocal business and political favors that have continued for decades. For example, Aven himself proclaimed at his deposition: "I have never publicly opposed Mr. Putin, and never criticized him publicly," Aven Tr. at 251:16–17, and testified about hosting Putin at his *dacha*. *Id.* at 271:20–272:10. Fridman also testified that he has

---

[24] Plaintiffs' claims for presumed and punitive damages also fail because Plaintiffs cannot prove actual malice, which is a requirement for recovering either type of damages when the alleged defamation involves matters of public concern. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985) (permitting presumed and punitive damages without a showing of actual malice only when alleged defamatory speech "involv[es] no matters of public concern"); *Pearce v. E.F. Hutton Grp., Inc.*, 664 F. Supp. 1490, 1510 (D.D.C. 1987) (noting that, when alleged defamation "involve[s] matters of public concern . . . . [t]o recover punitive damages, plaintiff must prove actual malice by clear and convincing evidence."). Nevertheless, the Court need not reach the question of actual malice to decide this motion because Plaintiffs' presumed damages and punitive damages are not sufficient to meet the amount in controversy.

never criticized Putin publicly, Fridman Tr. At 178:3–179:11, and that he has met with Putin an average of twice a year for the past two decades, *id.* at 350:11–15.[25] Much of Plaintiffs' mutually beneficial relationship with Putin and the Kremlin was widely chronicled by the international media as it happened, and well before the alleged publication of the allegedly defamatory statements.[26] Plaintiffs cannot, therefore, show that any publication of the allegedly defamatory

---

[25] *See also* Aven, Fridman, and Khan testimony in *Aven v. Orbis Bus. Intelligence*, QB-2018-6349, March 16-17, 2020, attached as Exhibit L (describing their relationships with Putin).

[26] *See generally* Ex. G, Composite Exhibit of International Media Concerning Alfa and Plaintiffs, 1994-2020 ("Composite Media Exhibit"), numbered G001–G184. Prior to the publication of CIR 112, Plaintiffs and Alfa had been accused of assisting Putin in his "corruption schemes" in the early 1990s, *id.* at G132, "organizing drug shipments from Central Asia to Europe", *id.* at G014, "funneling hundreds of millions of dollars in bribes to Russian officials," *id.* at G117, covertly providing funding to Iran's nuclear weapons program, *id.* at G095, colluding with Russian immigration authorities to deport ex-pat British Petroleum employees from Russia, *id.* at G152, and funding a charity that employs Putin's eldest daughter, *id.* at G130. Throughout Putin's reign, Alfa and its principals have been closely linked to the Kremlin and the mutual benefits to both sides of the relationship have been obvious. *See, e.g.*, Ian Traynor, *Putin urged to apply the Pinochet stick*, The Guardian (Mar. 30, 2000) ("Petr Aven, president of Alfa, Russia's biggest and most successful private bank, and a key business supporter of the newly elected president, said that Mr Putin should model his regime on that of Augusto Pinochet of Chile, combining Reaganomics with dictatorial controls."), G009; Jeanne Whalen, *Brains, Bare Knuckles Are Keys To Success of Firm in Rich Deal*, Wall St. J. (Feb. 22, 2001) ("Alfa Group remains among the most influential in the Kremlin. President Vladimir Putin . . . asked them to contribute millions to a fund to help veterans of Russia's war in Chechnya."), G023; *The New Face of Russia's Oligopoly*, The Moscow Times (Nov. 1, 2001) ("Alfa has managed to build one of the most powerful and effective political lobbies in the country. The appointment last year of Vladislav Surkov, an active Alfa lobbyist, as the deputy head of the presidential administration paved the way for other Alfa agents to follow in different branches of power[.]"), G026; *The 'Evolving Oligarch,'* Institutional Investor (Aug. 31, 2003) ("Fridman is a heavy contributor to the United Russia Party, the political entity most closely linked to Putin."), G036; Gregory L. White, *As Russia Squeezes Big Business, A Tycoon Decides to Pick a Fight*, Wall St. J. (Oct. 6, 2005) ("So far, Alfa has managed to avoid trouble with the Kremlin itself. Mr. Fridman has tried to insulate himself by hiring . . . Pyotr Aven, a former trade minister and an old friend of Mr. Putin who meets the president regularly."), G048; Andrew E. Kramer, *A $50 Billion Bailout in Russia Favors the Rich and Connected*, N.Y. Times (Oct. 30, 2008) ("By Thursday, [state-owned] VEB had awarded about $10 billion . . . The Alfa Group, led by men on Russia's Forbes magazine list of the country's wealthiest individuals, may be among the larger recipients[.]"), G096; Howard Amos, *Russian Tycoon Fridman Should Make U.K. Feel Nervous*, Moscow Times (Mar. 10, 2015) ("Fridman's access to top Russian officials is undisputed . . . Fridman's ties extend to the heart of the Kremlin."), G126; *Whitewashing Putin's*

statements in CIR 112 had any appreciable effect on their reputations. The statements at issue are consistent with public discussion of Plaintiffs that has been circulated by the international media for nearly twenty-five years, and well before the publication of CIR 112.

A plaintiff is said to be "libel-proof" when his "reputation for a particular trait is sufficiently bad, [that] further statements regarding that trait, even if false and made with malice, are not actionable because, as a matter of law, the plaintiff cannot be damaged in his reputation as to that trait." *Church of Scientology Int'l v. Time Warner, Inc.*, 932 F. Supp. 589, 593 (S.D.N.Y. 1996).[27] This rule "is not limited to plaintiffs with criminal records," *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 303 (2d Cir. 1986). In the present case, the doctrine has teeth, as this Court cannot retain jurisdiction over Plaintiffs' case when their long track record of association with Putin and the Kremlin limits their recovery to only unquantifiable nominal damages.

The libel-proof plaintiff doctrine has been applied against plaintiffs, like Fridman, Aven, and Khan, who bring lawsuits challenging the mere reiteration of established and notorious reputational facts—true or false—that are already circulating in the public consciousness. For instance, in *Guccione v. Hustler Magazine, Inc.*, the Second Circuit ruled that the plaintiff, a well-known pornographer, could not sue over accusations of adultery, in light of "magazine and

---

*Kleptocracy*, Hudson Institute (Nov. 9, 2015) ("Mr. Aven's long-standing business relations to Putin personally are no big secret in Russia."), G130; Jason Corcoran, *Mikhail Fridman – the Teflon oligarch new to Londongrad*, BNE Intellinews (Apr. 11, 2016) ("A former Alfa executive tells bne IntelliNews that Fridman and his partners were allowed to keep the $14bn proceeds of their sale of TNK-BP offshore. 'Abramovich was allowed to keep his proceeds . . . and Fridman/Alfa were allowed to too,' said the former Alfa executive. 'This is probably driven by their personal relations with Putin.'"), G151.

[27] Recent cases brought in this District under D.C. law have treated this doctrine as applicable, *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 91 (D.D.C. 2019); *Carpenter v. King*, 792 F. Supp. 2d 29, 34 n.2 (D.D.C. 2011), notwithstanding an earlier and later-vacated D.C. Circuit case to the contrary, *Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1568–69 (D.C. Cir. 1984), *vacated on other grounds*, 477 U.S. 242 (1986).

newspaper articles" establishing his "notoriety for adultery." 800 F.2d at 303–04. Likewise, in *Wynberg v. National Enquirer, Inc.*, 564 F. Supp. 924 (C.D. Cal. 1982), the plaintiff could not sue for defamation over an article claiming he had married his wife for money, when "numerous articles" published up to three years prior, had ascribed the same motivations, *id.* at 928–29, and in *Logan v. District of Columbia*, 447 F. Supp. 1328 (D.D.C. 1978), a plaintiff could not sue for libel based on an article saying he had used illegal drugs because he was "an admitted drug user and his use of drugs was publicized in a book," *id.* at 1332. The oligarch Plaintiffs here have brought an equally preposterous case, as demonstrated by the decades-long record of prior articles reflecting that they and their businesses have long been seen as very close with Putin and the Kremlin.[28]

## II.   General Damages: Plaintiffs Cannot Articulate Any Concrete Loss Supporting their Claims for General Damages.

Plaintiffs cannot meet the amount-in-controversy requirement because it is legally certain that they have not alleged and cannot prove any facts supporting the claim that any single plaintiff (let alone all three) can each recover over $75,000 in general damages. Plaintiffs' legal papers have failed to explain how they were injured, they have produced **no** supporting documents, and neither Aven nor Fridman was able, at his deposition, to describe harm to his relationships or reputation or emotional distress that could conceivably lead to more than a $75,000 recovery. Because

---

[28] The third alleged defamatory statement in CIR 112—concerning Plaintiffs' use of a man named Oleg Govorun to deliver "large amounts of illicit cash" in the 1990s, Pls.' Suppl. Resp. to Interrog. No. 2, ECF No. 78-6—is not actionable for the related reason that it is merely "incremental evidence of" the same kind of corrupt conduct "which is in any event amply established" already through decades' of publicized statements about Plaintiffs' conduct. *Liberty Lobby, Inc.*, 746 F.2d at 1568 n.6; *id.* ("If, for example, an individual is said to have been convicted of 35 burglaries, when the correct number is 34, it is not likely that the statement is actionable . . . because, since the essentially derogatory implication of the statement ('he is an habitual burglar') is correct, he has not been libeled.") (Scalia, J.).

Plaintiffs cannot articulate how they were injured and will not be able to produce evidence to prove their injuries, they will not be able to recover general damages in an amount sufficient to make this a federal case, and this case should be dismissed.

### A. Plaintiffs' disclosures and responses to interrogatories do not explain how the allegedly defamatory statements harmed them.

"[D]iversity suits backed only by purely speculative or unsupported allegations of injury" do not belong in federal court. *Rosenboro*, 994 F.2d at 19. Plaintiffs claim that as a result of the alleged defamatory statements, they "(a) suffered harm to their personal reputations; (b) experienced significant humiliation, embarrassment, and emotional distress; and (c) experienced the loss of or negative impact on relationships with people." Pls.' 4th Supp. Resps. at 3; Pls.' 3d Rev. Discls. at 13.[29] Naming these categories is not enough to invoke this court's jurisdiction, and that is effectively all Plaintiffs have done. *See Bronner*, 962 F.3d at 609 (rejecting similarly "vaguely assert[ed] . . . personalized injuries" including "economic and reputational damage" as not sufficiently descriptive to support damages). Plaintiffs have all submitted *identical* vague descriptions of their supposed damages, which further shows the lack of any factual basis for their damages claims. Presumably, if any of them had actually suffered any harm, he would have specific facts that differed from the alleged harm to the other Plaintiffs.

---

[29] Based on Plaintiffs' inadequate responses to discovery about their claimed damages, Defendants moved to compel revised responses to discovery and to compel documents related to their claimed damages. Defs. Mot. to Compel (Oct. 27, 2020), ECF No. 111. The Court granted in part that motion, and ordered Plaintiffs to revise their Answer to Interrogatory No. 20 (asking for specificity as to their damages) and to revise their Rule 26(a)(1)(A)(iii) disclosure, which requires "[a] computation of each category of damages claimed" along with "the documents or other evidentiary material . . . on which each computation is based, including materials bearing on the nature and extent of injuries suffered." Fed. R. Civ. P. 26(a)(1)(A)(iii). *See* Minute Order (Sept. 30, 2021). In response to the Court's Order, on October 14, 2021, Plaintiffs served their Third Revised Initial Disclosures and Fourth Supplemental Responses to Defendants' Interrogatories, which continue to fail to allege specifics or any factual basis for their alleged damages. *See* Pls.' 4th Supp. Resps. at 2–4; Pls.' 3d Rev. Discls. at 12–14.

***Answer to Interrogatory No. 20:*** In response to an interrogatory asking for "the complete nature of [Plaintiffs'] injury" and "all facts relating to or supporting the allegation of injury," Plaintiffs again merely identified the *types* of injuries they suffered. Pls.' 4th Supp. Resps. at 3. Plaintiffs all supplied the identical boilerplate language, did not provide a single concrete fact supporting the allegations, and instead simply repeated the types of harm that a victim of defamation might suffer. After identifying harm to reputations and relationships and emotional distress as the injuries they suffered, Plaintiffs assert that unnamed "friends and acquaintances . . . questioned Plaintiffs' integrity and reputations, and/or expressed concern about how their own reputations would suffer based on their association with Plaintiffs." *Id.* This nebulosity says nothing about how these Plaintiffs were harmed, or which of their relationships suffered. It is simply a description of what it would mean to suffer harm to one's reputation. *Id.* ("Plaintiffs have experienced damage and harm to their relationships with people, which has caused them to experience emotional distress.") As for alleged harm to relationships, Plaintiffs only state that unspecified individuals "no longer communicated or met with Plaintiffs after seeing or hearing about the defamatory statements." *Id.* Plaintiffs do not say who these people are, how they met them, how or when they cut off ties, or even whether these are "personal friends, contacts, or acquaintances" that they are describing. *Id.* A "complete" description of "all facts relating to" the injuries would include some degree of precision, and certainly some differentiation among the Plaintiffs. Aven testified that Plaintiffs are "not seeking any recovery apart from what is set out in the document [Answer to Interrogatory No. 20 in Plaintiffs' Second Supplemental Responses & Objections to Interrogatories, ECF No. 78-6]." Aven Tr. at 42:11–12

***Rule 26 Initial Disclosures:*** Plaintiffs' Rule 26 disclosures are similarly devoid of facts supporting their damage claims or suggestions of what evidence they might use to establish them.

Rule 26 requires Plaintiffs to provide "computation[s] of each category of damages claimed" along with "documents or other evidentiary material . . . including materials bearing on the nature and extent of the injuries suffered." Fed R. Civ. P. 26(a)(1)(A)(iii). Plaintiffs have said that this computation requirement does not apply to their intangible damages, Ex. Pls.' 3d Rev. Discls. at 13–14,[30] and, instead, Plaintiffs' required disclosures regurgitate the above-quoted ambiguous account of their injuries using the same language found in their interrogatory responses. *Compare id.* at 12–14, *with* Pls.' 4th Supp. Resps. at 2–4. Rule 26 also requires that a plaintiff provide "the name and, if known the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the [plaintiff] may use to support its claims." Fed. R. Civ. P. 26(a)(1)(A)(i). Plaintiffs have explained in their disclosures that in order to show how "how the defamatory statements damaged Plaintiffs' personal reputations, affected Plaintiffs in their personal relationships, and caused Plaintiffs emotional stress" they "will rely on testimony from themselves and/or third parties and publicly available media reports." Pls.' 3d Rev. Discls. at 13. Thus far, they have identified two such third parties—and no others—in their filings. These are Ed Rogers and Richard Burt, Washington D.C. lobbyists who have been working on Plaintiffs' behalf for nearly 20 years and whose companies have been paid millions of dollars by Alfa entities. *Id.* at 13 n.1; *see also* Pls.' 3d Rev. Discls. at 2–12 (identifying Plaintiffs themselves, Ed Rogers, Richard Burt, and no others as individuals likely to have knowledge or discoverable information concerning damages). Richard Burt is also

---

[30] Whether this is correct may be an open question in this district. *See Dickerson v. District of Columbia*, No. 09-cv-2213, 2019 WL 6910043, at *4 (D.D.C. Dec. 19, 2019) ("No exceptions are listed in the Rule . . . . [T]he Court ha[s] found some cases that discuss an exception for intangible damages, but these are few and far between.").

a non-executive Director of LetterOne, an investment company founded and largely owned by Plaintiffs. *See* Aven Tr. at 72:15–17.

At his deposition, however, Aven revealed that he did not know what information these two individuals had about harm to him or his colleagues. Aven Tr. at 40:7–16 ("I don't know [what Richard Burt would testify]. He definitely knows about the publication. He knows about us. Now what he knows about our internal sufferings, I'm not in a position to tell you."); *id.* at 40:19–20 ("The same that I've just said about Rick Burt goes for Ed Rogers."). During their depositions, neither Aven nor Fridman offered Richard Burt or Ed Rogers as individuals who have evidence about Plaintiffs' emotional distress or reputational harm. At their depositions, Fridman and Aven each referenced one or more additional individuals who might have information concerning damages they are claiming. *See* Aven Tr. at 30–34 (Anders Aslund); Fridman Tr. at 89–92 (certain family members, Quincy Jones, Borus Kiperman, Dimitri Azara, and Dimitri Fridman). However, Plaintiffs did not identify these individuals in their revised disclosures as possessing discoverable information,[31] did not provide any documents referencing these individuals, nor have they provided Defendants with contact information for these individuals.

*       *       *

These vague descriptions of the types or categories of injuries Plaintiffs have suffered were drafted well into this litigation, and after numerous revisions by Plaintiffs.[32] *Compare* Pls.' 4th

---

[31] Plaintiffs filed their Third Revised Disclosures on October 14, 2021, well after Aven and Fridman had been deposed and had referenced these additional individuals. Aven was deposed on December 9, 2020; Fridman was deposed on November 17, 2020.

[32] Defendants served Interrogatory No. 20, asking Plaintiffs to specify their damages, in November 2019 – over two years ago. Since that time, Plaintiffs have revised their Answer to Interrogatory No. 20 *four times*. *See* Pls.' 1st Resps. & Objs. to Interrogs. (Nov. 11, 2019), ECF 111-3; Pls.' 2d Supp. Resps. & Objs. to Interrogs. (Oct. 14, 2020), ECF 111-4; Ex. H, Pls.' 3d Supp. Resps. & Objs. to Interrogs.  (June 21, 2021); Pls.' 4th Supp. Resps. & Objs. to Interrogs. (Oct. 14, 2021).

Supp. Resps. at 3 (dated Oct. 14, 2021 and containing this description), *with* Pls.' 3d Supp. Resps. and Objs. to Defs.' First Set of Interrogatories at 12–13 (dated June 21, 2021 and saying even less in response to the same interrogatory). They are comparable to the kinds of "boilerplate recitation, unaccompanied by any factual detail" that courts have rejected as insufficiently detailed to state a claim at the pleading stage. *Smith v. Clinton*, 886 F.3d 122, 128 (D.C. Cir. 2018) (per curiam) (rejecting as insufficient an assertion by defamation plaintiffs' that they suffered "injury to reputation, impairment to standing in their community, personal humiliation, pain and suffering, and emotional distress" in a complaint and in affidavits); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (describing the pleading standard as "demand[ing] more than an unadorned, the-defendant-unlawfully-harmed-me accusation" and more than "'naked assertion[s]' devoid of 'further factual enhancement'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 557 (2007)). At any stage of litigation it remains unacceptable for Plaintiffs to provide only "speculative [and] unsupported allegations of injury," *Rosenboro*, 994 F.2d at 19, and to "'submit[] *no* . . . evidence' supporting their alleged injury." *Bronner*, 962 F.3d at 610 (quoting *Rosenboro*, 994 F.2d at 17). When a Plaintiff can do no better than this, it is legally certain that he cannot recover over $75,000 and "dismissal is warranted." *Id.*

More specificity is needed to meet the "legal certainty" test. In *Bronner*, for example, four university professors "vaguely assert[ed] several personalized injuries" including "economic and reputational damage," but never "explain[ed] *how* they ha[d] suffered" these injuries. *Bronner*,

---

None of these responses, including the last one that was revised at the Court's order, sufficiently alleges damages that exceed the amount in controversy. Likewise, Plaintiffs have revised their initial disclosures (which are supposed to include a computation of damages) *three* times, the last time at the Court's order, and none of these disclosures adequately supports Plaintiffs' damages claims. *See* Pls.' Initial Discls. (Sept. 25, 2019), ECF 111-5; Pls.' Rev. Initial Discls. (Oct. 14, 2020), ECF 111-6; Ex. I, Pls.' 2d Revised Initial Discls. (June 21, 2021); Pls.' 3d Rev. Discls. (Oct. 14, 2021).

962 F.3d at 609–10. Ruling that the professors had not adequately pleaded the amount in controversy for diversity jurisdiction, the *Bronner* court noted they had "assert[ed] no loss of standing within their universities," did not "purport to have been denied tenure, promotions or other prestigious honors" and did not "claim to have had their writings rejected by academic journals." *Id.* at 610. Like those professors, Plaintiffs here have "provided nothing beyond a bare-bones assertion of jurisdictional sufficiency to suggest that the monetary damages arising from their direct claims even remotely approach $75,000." *Id.* Plaintiffs who survive challenges to their jurisdictional facts on the amount in controversy have been able to articulate these kinds of specifics. *E.g. Love v. Budai*, 665 F.2d 1060, 1063 (D.C. Cir. 1980) (per curiam) ("[Plaintiff] assert[ed] emotional distress continuing long after [a] traumatic incident, and physical discomfort in the form of recurrent headaches that she had not experienced prior to the episode in suit."); *Compton v. Alpha Kappa Alpha Sorority, Inc.*, 64 F. Supp. 3d 1, 14 (D.D.C. 2014) (mothers suing over their daughters' non-admissions to a sorority had alleged "emotional harms" caused, in one case, by "never hav[ing] the opportunity to share the bond of sorority with [her] daughter," and in another by the sorority's "broken promise" and the university's "interference"), *aff'd,* 639 F. App'x 3 (D.C. Cir. 2016).

### B.  Plaintiffs Have No Documents to Support Their Alleged Damages.

Plaintiffs have no documentary support for their damages. Plaintiffs agreed to produce documents supporting their claims for damages prior to the first deposition of a Plaintiff. *See, e.g.*, Pls.' 1st Supp. Resps. Doc. Requests No. 58–60, ECF No. 111-3 ("Plaintiffs have already represented to Defendants that any documents used for the purpose of supporting Plaintiffs' damages claims will be produced prior to the deposition of any of the Plaintiffs.") Prior to the deposition of Fridman, the first deposition of the Plaintiffs, when all of Plaintiffs' documents in support of damages were due (by agreement of counsel), Plaintiffs' counsel represented that "other

than documents that have been or may be produced by third parties in this case, Plaintiffs have no documents to produce supporting their damages, including general damages." Email from M. White (Oct. 14, 2020), ECF 111-15.

### C.  At Their Depositions, Plaintiffs Aven and Fridman Were Unable to Explain How They Were Harmed.[33]

It is not only Plaintiffs' legal documents that fail to explain how they were harmed. Fridman and Aven themselves, at their depositions, provided little more explanation. Fridman and Aven each agreed that he was only seeking recovery for emotional harm and harm to his personal relationships and reputations, not any economic damages. Aven Tr. at 28:11–30:14, 41:21–42:12; Fridman Tr. at 61:3–62:10, 137:12–15. But neither was able to explain specific facts showing how these harms occurred to them, how they were exhibited, or what exactly these alleged harms are; both Plaintiffs relied heavily on the barebones legal terms put forth by their attorneys in discovery responses. These two Plaintiffs offered wildly inconsistent accounts of how they were injured and how they can prove it. Plaintiffs were unable to articulate anywhere near $75,000 worth of injury, or to suggest where evidence supporting their damage claims could be found.

The Court can take deposition testimony into account when considering whether a plaintiff has any chance of recovering the claimed amount in controversy. *See Rosenboro*, 994 F.2d at 17 (referencing deposition testimony). When it does, "inconsistencies in [a plaintiff's] own accounts" of injury can contribute to the conclusion that the plaintiff did not adequately plead his damages.

---

[33] Plaintiffs' very limited testimony about supposed harm was all based on the publication by *BuzzFeed. See* Fridman Tr. 40:12–42:19; 84:8–85:4. As Defendants played no part in that publication, Ex. J, David Kramer Depo. Tr. at 157:6–157:20 (Sept. 24, 2020). Plaintiffs will also not be able to show that Defendants caused even the *de minimis* harm that Plaintiffs claim to have suffered from the *BuzzFeed* publication.

*Id.* When a medically diagnosable injury has been alleged, a "total lack of medical findings showing . . . a continuing or permanent injury" can also count against the Plaintiff. Id.

1. *Aven Identified Just One Relationship That He Says Was Harmed But the Account He Gave—For the First Time at his Deposition—Was Incoherent.*

Aven said his reputation was damaged because he received "like a million telephone calls," and that "many" of the people he spoke with understood his explanation that the claims about him and Alfa were false, but that "others did not realize that." Aven Tr. at 34:22–35:12. Yet he named only a single individual—Anders Aslund—who fell in the latter category. Id. at 30:15–31:3. This was a "friend for 30 years" who Aven said "stopped any dealings with [him]," id. at 31:1–3, but Aslund has not been named in Plaintiffs' disclosures as a person who would have knowledge about damages caused by Defendants' publication, id. at 33:21–34:6; Ex. Pls.' 3d Rev. Discls. at 2–12. Further, Aven conceded that he had not "realize[d] as clearly" that Aslund had changed his opinion of him until late in 2020, just before his deposition, and three years after he filed this lawsuit. Aven Tr. at 34:14–16. And even before the alleged change in relationship with Aslund, Aven only spoke to Aslund "sometimes two or three times per year." Id. at 52:16–18. Aven's testimony is also contradicted by emails produced by Aslund, which show cordial correspondence between Aven and Aslund in 2018, long after publication of CIR 112. Ex. K (emails dated May 2018). [34]

---

[34] Aven testified that he learned of his changed relationship from articles published about two weeks before his December 9, 2020 deposition. Aven Tr. at 34:11–19. Aven may have been recalling a November 2020 article containing quotes from a 2016 email Aslund wrote concerning his difficulties securing donations from Aven and Fridman. Chuck Ross, *Atlantic Council, A Prominent DC-Based Think Tank, Wooed Russian Bankers, Emails Show*, DailyCaller.com, (Nov. 15, 2020), https://dailycaller.com/2020/11/15/atlantic-council-alfa-bank-anders-aslund/ (quoting an email from Aslund stating "I shall tentatively have dinner with Aven in Moscow Sunday night so I might be able to ask him what he wants" and "To date Fridman has been extremely stingy."). The email predates CIR 112 and the article long postdates it, so there is little reason to think that CIR 112 had anything to do with any alleged change in the Aven-Aslund relationship caused by this article.

Aven refused to name anyone other than Aslund who did not believe his assertions that Defendants' publications were false, explaining at one point that there were "quite a few" such people, but later referred to "a personal relationship and one that I would not like to talk about," suggesting that he had only one other person in mind. *Id.* at 35:13–19. He refused to give specifics:

> Q: Is there any other relationship for which you're seeking recovery in this lawsuit?
> **A: My relations with a large number of people, including in particular in the United States, have suffered.**
> Q: Can you name any of those relationships?
> **A: No. These are personal relationships. Therefore, I will not be listing the names.**

Aven Tr. at 31:4–11. It will be impossible for Aven to prove that his "personal relationships" were injured, as he claims, Ex. Pls.' 3d Rev. Discls. at 13, while he refuses to talk about these relationships and will not disclose the names of anyone else who can.

### 2. *Fridman Identified No Relationships That Changed as a Result of CIR 112.*

Fridman's testimony was similarly scant on details. He also testified that many friends called him but would not provide the name of a single one, and he could not say whether the alleged publications changed anyone's relationship with him. Fridman Tr. at 62:20–64:22, 76. Much of his testimony related to alleged harm to LetterOne, a company founded by Fridman, but LetterOne is not a plaintiff and is obviously not entitled to emotional distress damages. Fridman vaguely described how Quincy Jones backed out of an agreement with LetterOne to participate in a jazz competition sponsored by LetterOne, but Fridman went on to explain that he never had personal contact with Quincy Jones. Fridman Tr. at 65:12–14; 70:9–12; 70:15–72:7. Fridman also claimed that the Kennedy Center in Washington D.C. had dropped out of a sponsorship by LetterOne, but again, LetterOne is not a plaintiff in this action, Plaintiffs do not seek damages for any financial loss, and Fridman has not had any personal contact with the Kennedy Center. *Id.* at

66:1–6, 74:14–75:16. Plaintiffs have never produced the supposed agreements at issue or identified Quincy Jones or the Kennedy Center in their disclosures or Answers to Interrogatories.

Fridman testified that his relationship with his daughters was "affected strongly," but did not change, and is good today. *Id.* at 77:2–4; 79:1–2. He claimed his mother called him at the time and was "worried," *id.* 63:12, but then clarified that he is not seeking damages for the alleged defamatory statements affecting his relationship with his parents. *Id.* at 68:9–19. He said that "millions of people" including "dozens and hundreds of people who [he] know[s] personally" would have knowledge of damages caused to him. *Id.* at 90:2–19. But repeatedly asked to identify anyone falling into this category, he named only three such people, each of whom he said asked about Defendants' publications, each of whom he told that the publications were false, and each of whom he "hope[s]" he is still friends with today. *Id.* at 91:15–94:20. As discussed above, only the three Plaintiffs, Richard Burt, and Ed Rogers were listed on Plaintiffs' revised disclosures— which Defendants received months after they deposed Fridman and Aven. Ex. Pls.' 3d Rev. Discls. at 2–12. Plaintiffs' counsel did not list either Anders Aslund or Fridman's three friends as having any discoverable information that Plaintiffs would use to support their claims. *See* Fed. R. Civ. P. 26(a)(1)(A)(i).

> 3. *In Their Deposition Testimony, Plaintiffs Fridman and Aven Do Not Claim Any Cognizable Emotional Distress Damages.*

Plaintiffs do not claim cognizable emotional damages. Aven described worsening hypertension, but clarified that it was a pre-existing condition, and then provided conflicting testimony on whether he was claiming compensatory damages connected with it (he was clear that he was not seeking any damages for medical expenses). Aven Tr. at 36:3–37:20, 41:7–10, 284:20– 285:8. He testified that his hypertension may have indicated depression and said he had not slept well, but he had not seen a psychologist. Id. at 37:21–38:5, 38:10–39:1. He had suffered no loss

of confidence, had no trouble working, and had not stopped attending social events. *Id.* at 39:10–40:3.

Fridman said that when people reached out to him about *BuzzFeed*'s publication of CIR 112, it "of course" caused him "emotional stress," Fridman Tr. at 79:3–10, but he was not depressed, it was just "very unpleasant." Fridman Tr. at 79:16–18, 80:1–2. He did not cry; he did not lose sleep; rather, "most of [Fridman's] concern was the kind of health of [his] parents." *Id.* at 79:19-80:6. In other words, Fridman is claiming that he can recover large amounts of damages not because the alleged defamation caused *him* harm, but because the alleged defamatory statements allegedly caused *his parents* distress, and the fact that his parents were "worried" allegedly caused Fridman "concern." Fridman claimed it was "not a pleasant feeling" to go out in public "immediately after publication," *id.* at 81:22–82:10, but he continued to work, did not lack confidence, and did not stop going out in public. *Id.* at 82:14–19, 81:8–82:10. Fridman did not see a therapist or seek medical treatment. *Id.* 80:7–13; 81:15–16. Fridman said he had had trouble sleeping on just four occasions since the 2017 publication. *Id.* 82:20–83:22. He claimed his vague, unspecific "emotional stress" was ongoing because the *BuzzFeed* publication was still available online. *Id.* 85:20–86:5; *see also* 84:8–85:4 (stating that the *BuzzFeed* publication is the cause of emotional distress). Fridman also noted that when he told his family that the allegations were not true, they believed him. *Id.* at 78:13–78:16. Such an attenuated basis for emotional distress damages is clearly insufficient for claiming in excess of $75,000 in damages. *Kotsch v. District of Columbia*, 924 A.2d 1040, 1045 (D.C. 2007) ("[To permit an award of emotional distress damages] the defendant's actions must proximately cause the plaintiff emotional distress 'of so acute a nature

that harmful physical consequences might not be unlikely to result.'") (quoting *Clark v. Associated Retail Credit Men of Wash. D.C.*, 105 F.2d 62, 65 (D.C. 1939)).[35]

This testimony adds little to the Plaintiffs' case for the amount in controversy—an amount they must each meet individually. As in *Rosenboro*, there are "inconsistencies" within each Plaintiff's account of how he was harmed, and even if the injuries had been described in a coherent manner, Plaintiffs identified no evidence and no witnesses that would be able to help establish them. *Rosenboro*, 994 F.2d at 17 (concluding "to a legal certainty that [the plaintiff's] claim [did] not satisfy the amount in controversy" because despite "refer[ences] to intermittent back problems in her deposition and in her responses to interrogatories," the plaintiff later "*denied* having any permanent injury" and "total[ly] lack[ed] medical findings" establishing the injury).

Plaintiffs do not appear to disagree that their depositions added nothing to their case on damages, as they themselves identified no new witnesses or evidence, and added no specifics to their descriptions of their injuries when they supplemented their disclosures and interrogatory responses **_after_** Aven and Fridman were deposed. Even speaking freely and putting their case in their own words, these Plaintiffs were not able to explain how they could each meet the amount in controversy requirement.

\*     \*     \*

To summarize what these three Plaintiffs have shown for damages, through their Rule 26(a) initial disclosures, their Answer to Interrogatory No. 20, and testimony:

---

[35] As a general matter of D.C. tort law, a parent may not "recover for emotional distress[] caused by witnessing injury to an immediate family member [unless] the [parent] . . . feared for his or her own safety." *Williams v. Baker*, 572 A.2d 1062, 1064 (D.C. 1990). It would be surprising, then, if D.C. defamation law permitted an adult child who himself did not suffer emotional harm to recover over $75,000 based on his concern that his parents were worried.

**Mikhail Fridman:** Fridman has claimed in total for his damages that the *Buzzfeed* publication (**not** any publication by Defendants) was "unpleasant," that it was "damaging emotionally to him" to have the alleged defamatory statements on the Internet, that he was concerned about his parents' concern about the statements, but that he had no physical manifestations of distress other than a few nights of lost sleep, and that he continued to work, did not lose confidence or consortium, never sought medical treatment or therapy, and the three people he identified in his deposition as having knowledge about his damages he is not using to support his claims in this case.

**Petr Aven:** Aven, in turn, claims he had one friendship that fell apart, but he did not even realize that until three years after this lawsuit was filed, and otherwise claims his pre-existing hypertension has worsened, but he consulted no physician other than his wife, and he is not seeking any medical damages.

**German Khan:** Khan's name appears nowhere in the alleged defamatory statements (and only once elsewhere in CIR 112, identifying him as one of the oligarchs leading the "Alpha Group of businesses"), so his claim for damages in excess of $75,000 is impossible. Although he has not yet been deposed, he has not presented any specific facts supporting his claim for damages in either documents or discovery responses, and he has had over four years to do so since filing this case. The only damages he claims are the vague categories of damages set forth in the initial disclosures and Answers to Interrogatory.

**III. General Damages: Plaintiffs Are Not Entitled to Presumed Damages.**

As noted, because Plaintiffs do not claim the alleged publication caused them "special harm," they must prove that "the statement was actionable as a matter of law irrespective of special harm" and thus that they are entitled to presumed damages. *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1088 (D.C. Cir. 2007) (quoting *Croixland Props. L.P. v. Corcoran*, 174 F.3d 213, 215 (D.C.

Cir. 1999)). Here, the statements are not defamatory *per se*, and even if they were, the Plaintiffs'

lack of any concrete loss or articulable injury means that they could only recover nominal damages,

which are not sufficient to meet the amount in controversy requirement.

### A.   Plaintiffs Are Not Entitled to Presumed Damages Because the Alleged Defamatory Statements are Not Defamatory *Per Se*.

Because the alleged defamatory statements say nothing new and merely point out that

Plaintiffs have a close relationship with the Kremlin, they are not defamatory *per se* and Plaintiffs

cannot claim presumed damages. In many cases, "[d]efamation as a matter of law . . . consists of

false statements that impute to the subject a crime, a repugnant disease, a matter adversely affecting

the person's ability to work in a profession, or gross sexual misconduct." *Franklin*, 875 F. Supp.

2d at 75 (D.D.C. 2012) (citing *Carey v. Piphus,* 435 U.S. 247, 262 n. 18 (1978) (citing Restatement

(Second) of Torts §§ 558–59, 569–74 (1977)). Statements that are defamatory *per se* must be

"virtually certain to cause serious injury to reputation" of a kind that "is extremely difficult to

prove." *Carey*, 435 U.S. at 262.

The alleged defamation in this case does not qualify. CIR 112 says nothing about disease

or sexual misconduct. Rather than "adversely affecting [plaintiffs'] ability to work in [their]

profession," *Franklin*, 875 F. Supp. 2d at 75, the statements in question establish, and the general

thrust of CIR 112 also suggests, that Plaintiffs have been wildly successful by virtue of their close

relationships with the Russian government. Their apparent conduct establishes their bona fides as

powerful and influential oligarchs. They have said as much: Plaintiffs have discussed the same

dynamics openly in the international media, admitting that many Russians believe they acquired

state property at a discount during the 1990s,[36] that it is "not realistic" to say that "one can be

---

[36] Ex. G at G035, Andrew Jack and Arkady Ostrovsky, *Power Broker in Russia's Shifting Scene*, Fin. Times (Aug. 29, 2003) ("Mr. Fridman makes no bones about the way he and his counterparts

completely clean and transparent" when doing business in Russia,[37] that they never want to challenge Putin's authority,[38] and that connections to the government are essential to success in Russia.[39] According to Aven: "To become a millionaire in our country, it is not necessary to have a good head and specialized knowledge . . . It is enough to have active support in government, the parliament, local power structures and law enforcement agencies . . . . In other words, you are appointed a millionaire . . . ." Ex. G at G003 (Igor Baranovsky, *Terror is a Fact of Russian Competition*, Moscow News (July 22, 1994)). At his deposition, Aven confirmed the accuracy of this quote. *See* Aven Tr. at 84:8–85:2.

If the Plaintiffs' reputations had in fact suffered as a result of CIR 112, it would not be difficult to establish at this stage and state that harm with reasonable specificity. Plaintiffs have not done so.

---

made their money. 'Of course we benefited from events in the country over the past 10 years. Of course we understand that the distribution of state property was not very objective. But we used our chance, and people are angry about it,' he says.")

[37] *Id.* ("'The rules of business are quite different to western standards,' [Fridman] says. 'I don't want to lie and play this game. To say one can be completely clean and transparent is not realistic.'").

[38] Ex. G at G143, Guy Chazan, *Lunch with the FT: Mikhail Fridman*, Fin. Times (Apr. 1, 2016) ("'We never wanted to challenge authority,' [Fridman] says. 'We always followed this philosophy—always to be loyal and friendly, but never to be too close.'").

[39] Ex. G at G151, Jason Corcoran, *PROFILE: Mikhail Fridman – the teflon oligarch new to Londongrad*, Bne Intellinews (Apr. 11, 2016) ("Asked about the difference between life in Moscow and London . . . , Fridman made a tacit admission that he owes his success in Russia to connections to power, which doesn't apply in the UK. 'They are different worlds,' Fridman told *Snob* magazine. 'Here [Moscow], the most important factor of your success is the ability to build relationships with the government.'"); *see also id.* at G135, Kristina Subbotina, *Exclusive "No Tie" Interview with head of the Alfa Banking Holding, Petr Aven on business, childhood and friends*, Jewish Business News (Nov. 19, 2015) (Aven: "I met with Mikhail Fridman in May 1993. . . . I needed the money, and he needed the ideas and useful contacts at the government.").

### B. Plaintiffs Cannot Be Awarded Presumed Damages Because They Have Failed to Show Actual Damages.

Plaintiffs are unable to point to any evidence supporting injuries that could form the basis for an award of presumed damages sufficient to invoke diversity jurisdiction. Today, for a defamation case based on statements relating to matters of public concern, *Moss*, 580 A.2d at 1033 n.40,[40] like this one, every award including "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering" needs to have evidence supporting it. *Gertz*, 418 U.S. at 350.[41] Far from "amounting to a blank check," presumed damages "'serve a compensatory function' . . . . [and] may not be awarded 'in a substantial amount to a party who has not demonstrated evidence of concrete loss.'" *Szymkowicz*, 2020 WL 4432240 at *7 (quoting *Republic Tobacco Co.*, 381 F.3d at 734).[42] Therefore, Plaintiffs here must prove an actual

---

[40] *Dun & Bradstreet, Inc*., later narrowed *Gertz*, but did so on other grounds and only with respect to alleged defamatory statements that related only to "matter[s] of purely private concern." 472 U.S. at 759 (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)); *see Moss*, 580 A.2d at 1033 n.40 (summarizing the doctrine's development). Because the alleged publications here relate to matters of obvious public concern (corruption at high levels of the Russian government), the narrowing of *Gertz* by *Dun & Bradstreet* has no bearing on the case.

[41] Traditionally the doctrine of presumed damages "allow[ed] recovery of purportedly compensatory damages without evidence of actual loss." *Gertz*, 418 U.S. at 349. In *Gertz*, the Court constrained this doctrine by holding that "all awards"—including presumed damage awards—"must be supported by competent evidence concerning the injury," even if there is "no evidence which assigns an actual dollar value to the injury." 418 U.S. at 350; *see also Dun & Bradstreet, Inc.*, 472 U.S. at 766 (describing *Gertz* as holding that "even with [proof of actual malice], damages were not presumed but had to be proved") (White, J., concurring in the judgment); *Moss*, 580 A.2d at 1033 n.40 (describing *Gertz* as "abrogat[ing] this 'oddity of tort law'" with respect to matters of public concern).

[42] "Factors considered in determining the amount of presumed damages include the reputation of the defamed party prior to the defamation, the probable as well as proved effect of the defamation on his profession, how widely the defamation was disseminated, the duration of the effect of the defamation, and whether there has been a timely and effective retraction and apology, but the motive and purpose of the publisher is not to be considered in presumed damages." *El-Hadad v. Embassy of United Arab Emirates*, No. 96-cv-1943, 2006 WL 826098, at *15 (D.D.C. Mar. 29, 2006), *rev'd in part on other grounds sub nom. El-Hadad v. United Arab Emirates*, 496 F.3d 658 (D.C. Cir. 2007).

injury, even though they have asked the Court for a presumed damages award based on a meritless theory of defamation *per se*. The pleadings and record of this case do not support a presumed damages award, and certainly not one that would permit Plaintiffs to invoke the jurisdiction of this Court.

Plaintiffs cannot rely on pleading "presumed damages" to hide their lack of evidence of actual loss and improperly pursue this case in federal court. *See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 310 (1986) ("[D]amages [that] are wholly divorced from any compensatory purpose . . . cannot be justified as presumed damages."). When jurors award presumed damages in an improper amount, courts may reject their verdicts. *Republic Tobacco Co.*, 381 F.3d at 734 (reducing presumed damages awarded to "to a party who ha[d] not demonstrated evidence of concrete loss" by seventy percent and noting that "there must be some meaningful limit on the magnitude of a jury award when it is arrived at by pure speculation"); *Prendeville v. Singer*, 155 F. App'x 303, 305 (9th Cir. 2005) ("A court . . . retains discretion to grant a new trial for excessive damages where the amount of presumed damages is wholly unsupported by the evidence presented."); *see also Airlie Found., Inc. v. Evening Star Newspaper Co.*, 337 F. Supp. 421, 431 (D.D.C. 1972) (rejecting a jury verdict as "excessive" in part because "a nominal recovery" might suffice to vindicate reputational injuries that were "extremely difficult to quantify").

In *Szymkowicz*, this Court held that a defamation plaintiff who "failed to explain in any concrete terms how [the] defendant's statements harmed him," as Plaintiffs here have failed to do, had accordingly "failed to support his purported presumed damages . . . given that his presumed damages must at least roughly approximate his actual harms." 2020 WL 4432240, at *8. As in *Szymkowicz*, Plaintiffs here have "submitted no . . . evidence" and have come forward with no

"facts related to [their] potential damages" even though those facts were "particularly within [their] control." *Id.* at *6 (contrasting "a situation where discovery would enable plaintiff to present a stronger case at trial than he can now"). The plaintiff in *Szymkowicz* "failed to establish that this Court ha[d] jurisdiction to consider his claims further," which meant that he could not recover general compensatory damages and that pleading presumed damages could not save him, *id.* at *6, *8. Likewise, nothing has prevented Plaintiffs here from identifying witnesses or producing evidence showing that their personal relationships and reputations suffered, or that they suffered emotional distress. Instead, Plaintiffs have come forward with only "bare-bones assertion[s] of jurisdictional sufficiency," *id.* at *7 (quoting *Bronner*, 962 F.3d at 610). This weak showing is not enough to invoke this Court's jurisdiction.

## IV. Punitive Damages: Plaintiffs Cannot Rely on Punitive Damages to Meet the Jurisdictional Threshold.

With no claim for special damages and no concrete loss, Plaintiffs cannot rely on their prayer for punitive damages to get them across the jurisdictional threshold, because punitive damages may not be awarded if there is no basis to award any other damages. "Although a court need not *award* actual damages in order to award punitive damages, there must be a *basis in the record* for actual damages" before punitive damages can be awarded.[43] *Council on Am.-Islamic Rels. Action Network, Inc.*, 82 F. Supp. 3d at 353 (emphasis added); *Maxwell v. Gallagher*, 709 A.2d 100, 103 (D.C. 1998) ("[B]efore punitive damages may be awarded, there must be a basis in the record for an award of actual damages . . . ."); *Estate of Taylor v. Lilienfield*, 744 A.2d 1032,

---

[43] As discussed, *supra* p. 10, in a defamation case under D.C. law, punitive damages may not stand alone for reasons separate from the amount in controversy. In this jurisdiction, a sufficient allegation of special or presumed damages is an element of a defamation claim. *See Franklin*, 875 F. Supp. 2d at 74 (citing *Jankovic*, 494 F.3d at 1088. As a result, in a defamation case under D.C. law, punitive damages will not be available on their own because if a plaintiff has no chance of recovering anything else, he has failed to state a claim.

1036 (D.C. 2000) ("It is now established in the District of Columbia that when there is no basis for compensatory or 'actual' damages, there can be no consideration of punitive damages.").

Here, Plaintiffs' inability to identify sufficient specific facts supporting a claim for compensatory damages puts punitive damages out of reach as well because they cannot show any "basis for compensatory damages." *Street v. Hedgepath*, 607 A.2d 1238, 1248 n.9 (D.C. 1992) (citing *Vassiliades v. Garfinckel's, Brooks Brothers, Miller & Rhoades, Inc.*, 492 A.2d 580, 593 (D.C. 1985)). "[W]here the availability of punitive damages is the sine qua non of federal jurisdiction," a court applying the *St. Paul Mercury* legal certainty test must "scrutinize the punitive damage claim to ensure that it has at least a colorable basis in law and fact" rather than allowing "plaintiffs to shoehorn [an] essentially local action[] into federal court through extravagant or invalid punitive damage claims." *Kahal v. J.W. Wilson & Assoc., Inc.*, 673 F.2d 547, 549 (D.C. Cir. 1982); *Hardaway v. Cross State Moving*, 729 F. App'x 8, 8–9 (D.C. Cir. 2018) (mem.) (same, citing *Kahal*, 673 F.2d at 549); *see also Lurie v. Mid-Atl. Permanente Med. Grp., P.C.*, 729 F. Supp. 2d 304, 332 (D.D.C. 2010) ("When appraising the amount in controversy . . . . [r]equests for punitive damages should . . . be considered, albeit with a sceptical eye." (citation omitted)). Because these Plaintiffs have identified no facts supporting their recovery, there is no "colorable basis" for any of them to win punitive damages. Plaintiffs therefore cannot remedy their jurisdictional shortcomings by invoking punitive damages.

Even if Plaintiffs somehow prove that they are entitled to nominal damages or an otherwise limited amount of compensatory damages, they will not be able to tack on an award of punitive damages sizeable enough to bring any Plaintiff's claims up to the jurisdictional threshold. The Supreme Court has held that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," and that "an award of

more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 425 (2003); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 580 (1996) ("The principle that exemplary [*i.e.* punitive] damages must bear a 'reasonable relationship' to compensatory damages has a long pedigree.").

Punitive damages, therefore, cannot be determined by some kind of freestanding evaluation of a defendant's conduct. They are tied to the injuries established, and the availability of punitive damages therefore depends on whether a plaintiff has established such injuries. Because Plaintiffs cannot prove that they were actually harmed, any amount of punitive damages is improper. *See BYD Co. Ltd. v. All. for Am. Mfg.*, No. 20-cv-03458, 2021 WL 1564445, at \*4 (D.D.C. Apr. 21, 2021) (holding that when a plaintiff "offers no facts to support a claim for compensatory damages[,] . . . 'even adding potential punitive damages to the calculus'" leaves the plaintiff "short of satisfying the amount-in-controversy requirement" (quoting *Szymkowicz*, 2020 WL 4432240, at \*9). In *Szymkowicz*, this meant that when the plaintiff showed "only a *de minimis* amount of compensatory and presumed damages potentially at issue," he could not win a punitive damage award large enough for him to reach the amount in controversy while remaining constitutionally proper. *Szymkowicz*, 2020 WL 4432240, at \*9. Even if the Court were to find that some of these Russian oligarch Plaintiffs might recover nominal or *de minimis* damages, they would still be tens of thousands of dollars short of the jurisdictional threshold.

## V.  Attorneys' Fees Do Not Count toward the Jurisdictional Amount in Controversy.

Plaintiffs also intend to ask the Court to award them attorneys' fees, Am. Compl. at 18; Pls.' 4th Supp. Resps. at 3; Pls.' 3d Rev. Discls. at 13, but any such award would not count toward the amount in controversy and cannot help them establish jurisdiction. "Attorney's fees are generally not included in the amount in controversy, unless provided for by statute or contract."

*Wexler v. United Air Lines, Inc.*, 496 F. Supp. 2d 150, 154 (D.D.C. 2007); *Walker v. Walker*, 267 F. Supp. 2d 31, 33 (D.D.C. 2003) ("[T]he undersigned finds no authority for including speculative attorneys fees in the amount in controversy."). Plaintiffs here have identified no statute or contract that would allow them to collect fees.

## CONCLUSION

For all of these reasons, Defendants respectfully request the Court to dismiss this case based on lack of subject matter jurisdiction.

Dated:  March 15, 2022                    By:____*/s/* Joshua A. Levy_____

Joshua A. Levy (D.C. Bar No. 475108)
Rachel M. Clattenburg (D.C. Bar No. 1018164)
Edward A. Sharp (D.C. Bar No. 1719505)
Kevin P. Crenny (D.C. Bar No. 1765044)
LEVY FIRESTONE MUSE LLP
900 17th St. NW, Suite 1200
Washington, DC 20006
Tel: (202) 845-3215
Fax: (202) 595-8253
jal@levyfirestone.com
rmc@levyfirestone.com
eas@levyfirestone.com
kcrenny@levyfirestone.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 15, 2022, the foregoing Motion, Memorandum in Support and accompanying exhibits were filed via CM/ECF, which served copies on counsel of record.

By:    */s/* Joshua A. Levy

Joshua A. Levy