# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
-----------------------------------------------------------------X
 
MIKHAIL FRIDMAN, PETR AVEN, AND
GERMAN KHAN,                                       Case 1:17-cv-02041 (RJL)
                          Plaintiffs,

            -v-

BEAN LLC (A/K/A FUSION GPS) AND
GLENN SIMPSON,

                          Defendants.
-----------------------------------------------------------------X

## AMENDED COMPLAINT
JURY TRIAL DEMANDED

Plaintiffs Mikhail Fridman, Petr Aven, and German Khan, by their attorneys Carter Ledyard & Milburn LLP, allege as follows:

## INTRODUCTION

1. This is a defamation case brought by three international businessmen who were defamed in widely disseminated political opposition research reports commissioned by political opponents of candidate Donald Trump in the 2016 presidential election cycle. The reports (which came to be known as the "Trump Dossier" and the "Dossier") were published both before and after the 2016 election by the Defendants: the Washington, D.C. based firm Fusion GPS ("Fusion") and its principal, Glenn Simpson, a former journalist specializing in political opposition research. In that role, the Defendants traffic in procuring damaging information about political candidates. The reports are gravely damaging in that, directly or by implication, they falsely accuse the Plaintiffs—and Alfa ("Alfa"), a consortium in which the Plaintiffs are investors—of criminal conduct and

alleged cooperation with the "Kremlin" to influence the 2016 presidential election. But neither the Plaintiffs nor Alfa committed any of the acts recklessly attributed to them by the Defendants. To the contrary, the Plaintiffs and Alfa are collateral damage in a U.S. political operation conducted by the Defendants, whose focus is an alleged relationship (between the Kremlin and the Trump campaign) which has nothing whatsoever to do with the Plaintiffs.

2. The specific "report" that includes facially defamatory statements about the Plaintiffs is one of seventeen written Company Intelligence Reports 2016 ("CIRs") that comprise the Trump Dossier. The Defendants included Company Intelligence Report 112 (the "Report" or "CIR 112") (which makes statements about the Plaintiffs) in the Trump Dossier, even though the Dossier's purpose and intended subject matter have nothing to do with the Plaintiffs' past, current or intended future activities. Broadly, those reports purport to describe details of an alleged scheme between the Russian government and the Trump presidential campaign to unlawfully manipulate the result of the 2016 presidential election in favor of candidate Trump. The Defendants gathered these reports as part of their engagement to conduct "opposition research" (known as "oppo research" by its practitioners and the media) against Trump. Opposition research, in essence, is the gathering of information for the purpose of eventually discrediting or otherwise harming a candidate for a public office. Opposition research is neither objective nor neutral. Instead, it is skewed from the outset in favor of appearing to find negative information about individuals—the essence of the product that political opposition research practitioners such as the Defendants are hired to produce.

3. As described below, the Defendants were initially hired to conduct this opposition research by Republican political opponents of candidate Trump during the primary phase of the 2016 election cycle. That engagement was terminated when it became clear that Mr. Trump would be the Republican nominee. At that point, Defendants solicited and obtained an engagement with the Democratic National Committee and the campaign of candidate Hillary Clinton to gather discrediting information about Mr. Trump, including any connections he might have to Russian businesses or Russia's government. To perform that research, the Defendants hired a private investigator—a former British intelligence officer named Christopher Steele, who operated through a London—based entity known as Orbis Business Intelligence Limited ("Orbis"). Steele claims to have used his own Russian sources—who were never identified—to compile the reports, which were then delivered to the Defendants over the course of several months in 2016. Eventually, the reports, including the false and defamatory Report at the heart of this case, were assembled in the document that has come to be known to the public as the Trump Dossier. Steele has acknowledged that his reports are unverified "raw intelligence" and has refused to identify his alleged "sources." Indeed, not one of the reports in the Dossier has ever been verified and none of its sources has ever been publicly identified. Defendants recklessly placed the Dossier's allegations of criminal action by Plaintiffs beyond their control which allowed those allegations to get into the hands of media devoted to breaking news on the hottest subjects of the day: the Trump candidacy and his election as President.

4. CIR 112, dated September 14, 2016, falsely accuses the Plaintiffs of criminal bribery in the 1990s and participation in an alleged Trump-Russia scheme to

influence the 2016 presidential election. That alleged scheme was the overall subject matter of the Dossier. At all relevant times Defendants were aware that CIR 112 was not verified, that its content was provided by unidentified sources whose credibility could therefore not be assessed by a reader of the Dossier, and that the accusations made in CIR 112 about Plaintiffs defamed them. Defendants could easily have removed that Report from the Dossier before they started peddling it to media and journalists in September and October 2016. They chose not to do so. Nor did they attempt to determine the veracity of that Report with the Plaintiffs themselves.

5. At all times during the Defendants' engagement of Orbis and Steele, it was either intended or clearly foreseeable that if the Dossier's contents were made available to third parties, including journalists, such provocative material would be published and republished, including to the public at large. Indeed, that is the entire purpose of "oppo research" in American politics. Those third parties included government officials, as well as news media and journalists who could make its content public.

6. On information and belief, Defendants arranged for Steele to brief selected members of the print and online media about the information he was compiling on candidate Trump and his campaign. Consistent with the intended purpose of "oppo research" to publicly discredit its target, Steele's briefings were designed to generate interest in the Dossier and secure eventual public dissemination of its content. Briefings were held for journalists from the *New York Times*, the *Washington Post, CNN, Yahoo News,* and others in September 2016. *The New York Times, The Washington Post* and

-4-

*Yahoo News* were given a second briefing.[1] Shortly thereafter, Yahoo News published an article by Michael Isikoff that described some of the content of the Dossier (referred to there as "intelligence reports" and "reports"), which was still being compiled at that time.[2] Many other media articles reported speculative accounts of the Dossier's existence and contents. In late October 2016, Steele gave an interview to David Corn, a writer for *Mother Jones* magazine, which, on October 31, 2016, published an article by Corn headlined "A Veteran Spy Has Given The FBI Information Alleging a Russian Operation to Cultivate Donald Trump."[3] Corn's article stated that he had "reviewed" the early reports in the Dossier, and then quoted from those reports as well as statements made by Steele in the interview. The publication to third parties and public dissemination of the Dossier's content had begun in earnest.

7. In addition to cultivating media interest, the Defendants also organized or approved a meeting in Great Britain between Steele and David Kramer, who held no public office but was the director of a private foundation affiliated with U.S. Senator John McCain. The purpose of that meeting was to show Kramer the content of the sixteen pre-election reports in the Dossier so he could brief Senator McCain, who at the time was a well-known and outspoken critic of Trump's candidacy. Subsequently, in November

---

[1] *Defendants' Response to Claimants Request For Information, Gubarev, et al. v. Orbis Business Intelligence Limited and Christopher Steele*, Claim No. HQ1700413, In the High Court of Justice, Queens Bench Division, May 18, 2017, p. 8 ("The Orbis/Steele Response").

[2] Michael Isikoff, *U.S. intel officials probe ties between Trump advisor and Kremlin*, Yahoo, News, Sept. 23, 2016, https://www.yahoo.com/news/u-s-intel-officials-probe-ties-between-trump-adviser-and-kremlin-175046002.html.

[3] David Corn, *A Verteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump*, Mother Jones, Politics, Oct. 31, 2016, https://www.motherjones.com/politics/2016/10/veteran-spy-gave-fbi-info-alleging-russian-operation-cultivate-donald-trump/

-5-

2016, Defendants provided (and thereby published) a copy of all sixteen of the Dossier's then existing reports to Kramer—for redelivery and further publication to Senator McCain—including the report (CIR 112) that falsely accused and defamed Plaintiffs.[4]

8. As the 2016 presidential election neared, both print and online media in the United States and abroad began to expand their coverage of the Dossier and its alleged content. That coverage only intensified after Trump won the election. On January 10, 2017, one of those media entities, BuzzFeed, Inc., published the entire Dossier on the Internet, describing it there as "explosive." The copy of the Dossier that BuzzFeed published included the false and defamatory allegations of CIR 112 about the Plaintiffs and Alfa, along with the article entitled "These Reports Allege Trump Has Deep Ties to Russia."[5] The Dossier misspells Alfa's name throughout, incorrectly spelling it as "Alpha." BuzzFeed's article did not mention CIR 112 or its allegations, but focused instead on president-elect Trump and his alleged relationships with Russia, explaining that it "was publishing the full document so that Americans can make up their minds about allegations about the president-elect that have circulated at the highest levels of the U.S. government."[6]

9. The Defendants intended, anticipated, or foresaw a high likelihood that allowing their clients (named *infra*), third parties (like David Kramer and Senator

---

[4] The Orbis/Steele Response, pp. 5-6.

[5] Ken Bensinger, Miriam Elder, Mark Schoofs, *These Reports Allege Trump Has Deep Ties To Russia*, BuzzFeed News, Jan. 10, 2017, https://www.buzzfeed.com/kenbensinger/these-reports-allege-trump-has-deep-ties-to-russia?utm_term=.is1Q2ka2J.

[6] *Id.*

-6-

McCain) and the media access to the Dossier's defamatory content would result in its republication by news media outlets, including online news media such as BuzzFeed.

10. Plaintiffs seek an award of compensatory and punitive damages for the harm to their personal and professional reputations, current business interests, and the impairment of business opportunities that resulted from the blatantly false and defamatory statements and implications about them published recklessly to third parties by the Defendants and republished by BuzzFeed and countless other media around the world.

## THE PARTIES

11. Plaintiffs Fridman, Aven, and Khan are ultimate beneficial owners of Alfa. Fridman and Khan are each citizens of both Russia and Israel, and Aven is a citizen of Russia. Plaintiffs are not widely known in the United States, had no role or involvement in any aspect of the 2016 U.S. presidential election, and made no public comments about it.

12. On information and belief, defendant Bean LLC is a Delaware corporation that conducts business under the name Fusion GPS. Fusion is registered to transact business in Washington, D.C., where it is headquartered and conducts its operations.

13. Defendant Glenn Simpson, on information and belief, is a principal of Fusion. He was the primary actor involved in securing the Dossier from Orbis and Steele, arranging for press briefings about it in the late summer and early fall of 2016, and publishing the Dossier to various recipients including Fusion's clients, third parties like David Kramer and Senator McCain, other government officials and the news

media. Simpson conducts his business for Fusion from an office in Washington, D.C., where his business included his activities with respect to the Dossier. Both Simpson and his subcontractor Steele used their prior experience as, respectively, an investigative journalist for the Wall Street Journal and an operative in British intelligence who had covered Russian matters, to give their "oppo research" output a gloss of credibility and reliability which, in this case, was unwarranted. Simpson has described Fusion's work as "journalism for rent" and claimed publicly that he and Fusion uphold strict standards that Simpson developed in his years as a journalist: "You can't just say what you know. You have to say how you know it. And you have to be able to prove it."[7] And yet, Simpson and Fusion did not live up to their own professed standards when they published the Dossier. As Steele (Defendants' supplier of the Dossier's unverified, anonymous "raw intelligence" content) recently told a journalist, he did not interview his sources himself, but gathered his information through "intermediaries" and "subsources." And as Steele further acknowledged, as much as 30% of the Dossier's content may not be "accurate."[8] Those are the "standards" by which Defendants operated when they published CIR 112.

---

[7] Jack Gillum, Shawn Boburg, '*Journalism for rent*': *Inside the secretive firm behind the Trump dossier*, The Washington Post, Investigations, Dec. 11, 2017 (*available at* https://www.washingtonpost.com/investigations/journalism-for-rent-inside-the-secretive-firm-behind-the-trump-dossier/2017/12/11/8d5428d4-bd89-11e7-af84-d3e2ee4b2af1_story.html?utm_term=.5152414bbcce).

[8] Luke Harding, *How Trump walked into Putin's web*, The Guardian, News, Nov. 15, 2017, *https*://www.theguardian.com/news/2017/nov15/how-trump-walked-into-putins-web-luke; https://theguardian.com/us-new/2017/nov15/christopher-steele-trump-russia-dossier-accurate.

## JURISDICTION AND VENUE

14. This case is within this Court's jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). Venue is proper in this District pursuant to 28 U.S.C. § 1391. The matter in controversy in the cause of action asserted herein exceeds $75,000.

## FACTUAL ALLEGATIONS

15. On information and belief, the Defendants were engaged in 2015 by the Washington Free Beacon to conduct research from public sources about several Republican candidates for President, an engagement which ended in May 2016 when Donald J. Trump was emerging as the likely winner of the nomination.[9] Even prior to that termination, Defendants approached Perkins Coie, a law firm representing the Democratic National Committee (DNC) and HFACC, Inc., the campaign organization supporting Hillary Rodham Clinton's candidacy for President, to solicit an engagement that would continue the research regarding Donald Trump which it had been pursuing on behalf of its previous client. Perkins Coie retained Defendants to provide such research services in April 2016, an engagement which continued until October 2016.[10] The Defendants were tasked with conducting "oppo research" against Trump, including the gathering of compromising and salacious information about Trump's personal behavior

---

[9] Alicia Cohn, *Conservative site funded project that led to Trump dossier*, The Hill, Home News, Oct. 27, 2017, http://thehill.com/homenews/news/357599-conservative-publication-originally-funded-trump-dossier-report.

[10] Adam Entous, Devlin Barrett, Rosalind S. Helderman, *Clinton campaign, DNC paid for research that led to Russia dossier*, The Washington Post, National Security, Oct. 24, 2017 (available at https://www.washingtonpost.com/world/national-security/clinton-campaign-dnc-paid-for-research-that-led-to-russia-dossier/2017/10/24/22).

-9-

and business dealings in Russia. The Defendants in turn engaged Orbis and Steele for assistance in fulfilling this task.

16. Orbis proceeded to research Trump's personal behavior in Russia and business dealings with Russian government officials, business leaders, and business entities. Steele compiled the "investigative" results into at least seventeen written CIRs for delivery to the Defendants in Washington, D.C. By Steele's own description, the CIRs were "raw intelligence" containing unverified information from sources he did not personally interview.[11] The CIRs produced between June 2016 and the end of October 2016 (including CIR 112) were provided and thus published to lawyers at Perkins Coie and by them to their clients at the DNC and the HFACC.

17. After Trump received the Republican nomination for President in July 2016, many media reports subsequently surfaced asserting, correctly, that Fusion had entered into a new engagement with Democratic Party operatives interested in using the oppo research to support Hillary Clinton's candidacy. These media reports vastly increased other media's and the public's interest in the content of the Dossier.

18. As they continued their work for their new clients, the Defendants knew, anticipated or reasonably should have foreseen that, once in the hands of third parties such as David Kramer, Senator McCain, journalists like Michael Isikoff and David Corn, Perkins Coie, the political operatives at the DNC and HFACC, and their media contacts, the CIRs would be further disseminated publicly, thereby fostering widespread discussion about them in the United States when, in fact, Plaintiffs had no role whatsoever in any actions the Russian government or other Russian actors may have taken with regard to

---

[11] The Orbis/Steele Response, p.7, #17.

the 2016 election in the United States. That is exactly what happened. Much of the ensuing media attention and public discussion focused on Defendants' and Steele's roles in the creation and dissemination of the Dossier, and the interviews solicited by them. During this campaign to promote the public dissemination of their "oppo research," which, upon information and belief, included the provision of background briefing to the media by Defendants without attribution, Defendants never vouched for the credibility of their sources or the accuracy and reliability of the content of the Dossier and CIR 112. Despite the fact that they did not know whether the unverified, anonymous, inherently harmful accusations in CIR 112 about Plaintiffs were true or false, Defendants intentionally published the Dossier, including CIR 112, to Perkins Coie, David Kramer and John McCain, and foresaw (or reasonably should have foreseen) that it would then be republished to (1) Perkins Coie's clients (the DNC and the HFACC); (2) employees of the DNC and the HFACC; and (3) journalists and media. Elements of the Dossier, possibly including CIR112, may have been published even more extensively by being made available for viewing during arranged briefings of certain journalists. Worldwide publication of the entire Dossier, whether by BuzzFeed or anyone else, was inevitable after these reckless actions by Defendants.

19. CIR 112 specifically discusses the Plaintiffs. Its heading, "RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION," is defamatory in the Trump/Russia context of the entire Dossier, as this heading suggests that Alfa and its executives, including the Plaintiffs, cooperated in the alleged Kremlin-orchestrated campaign to interfere in the 2016 U.S. presidential election—the overriding focus of Steele's reports. This is a plausible and, indeed, inescapable inference of fact

based on the headings of fifteen of the sixteen CIR's that Defendants dated and/or published before the end of October, 2016:

US PRESIDENTIAL ELECTION: REPUBLICAN CANDIDATE DONALD TRUMP'S ACTIVITIES IN RUSSIA AND COMPROMISING RELATIONSHIP WITH THE KREMLIN (CIR 80 – JUNE 20, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: FURTHER INDICATIONS OF EXTENSIVE CONSPIRACY BETWEEN TRUMP'S CAMPAIGN TEAM AND THE KREMLIN ( CIR 95 – UNDATED)

RUSSIA: SECRET KREMLIN MEETINGS ATTENDED BY TRUMP ADVISOR, CARTER PAGE IN MOSCOW (JULY 2016) (CIR 94 – JULY 19, 2016)

RUSSIA-US PRESIDENTIAL ELECTION: KREMLIN CONCERN THAT POLITICAL FALLOUT FROM DNC E-MAIL HACKING AFFAIR SPIRALING OUT OF CONTROL (CIR 97 – JULY 30, 2016)

RUSSIA/USA: GROWING BACKLASH IN KREMLIN TO DNC HACKING AND TRUMP SUPPORT OPERATIONS (CIR 100 - AUGUST 5, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: SENIOR KREMLIN FIGURE OUTLINES EVOLVING RUSSIAN TACTICS IN PRO-TRUMP, ANTI-CLINTON OPERATION (CIR 101 – AUGUST 10, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: REACTION IN TRUMP CAMP TO RECENT NEGATIVE PUBLICITY ABOUT RUSSIAN INTERFERENCE AND LIKELY RESULTING TACTICS GOING FORWARD (CIR 102 – AUGUST 10, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: FURTHER DETAILS OF TRUMP LAWYER COHEN'S SECRET LIAISON WITH THE KREMLIN (CIR 136 – OCTOBER 20, 2016)

RUSSIA/UKRAINE: THE DEMISE OF TRUMP'S CAMPAIGN MANAGER PAUL MANAFORT (CIR 105 – AUGUST 22, 2016)

RUSSIA/US: KREMLIN FALLOUT FROM MEDIA EXPOSURE OF MOSCOW'S INTERFERENCE IN THE US PRESIDENTIAL CAMPAIGN (CIR 111 – SEPTEMBER 14, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION (CIR 112 – SEPTEMBER 14, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: REPUBLICAN CANDIDATE TRUMP'S PRIOR ACTIVITIES IN ST. PETERSBURG (CIR 113 – SEPTEMBER 14, 2016)

RUSSIA: KREMLIN ASSESSMENT OF TRUMP AND RUSSIA INTERFERENCE IN US PRESIDENTIAL ELECTION (CIR 130 – OCTOBER 12, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: FURTHER DETAILS OF KREMLIN LIAISON WITH TRUMP CAMPAIGN (CIR 134 – OCTOBER 18, 2016)

20.     CIR 112, in sections labeled "Summary" and "Detail," makes a series of factual allegations about the "current closeness" of an "Alpha Group/PUTIN relationship," including that "[s]ignificant favors continue to be done in both directions" and that "FRIDMAN and AVEN [are] still giving informal advice to PUTIN, especially on the US."

21.     The Summary section of CIR 112 identifies a former employee of Alfa, Oleg Govorun, who is now the head of a government department in Putin's administration, as a "key intermediary" in the "PUTIN-Alfa relationship." CIR 112 alleges that Govorun "delivered illicit cash directly to PUTIN" "throughout the 1990s," when Govorun was an "Alpha executive" and Putin was the Deputy Mayor of St. Petersburg.

22.     The first paragraph of the Detail section of CIR 112 states the full names of Plaintiffs Fridman, Aven, and Khan. It then includes a report from an unnamed "Russian government official:"

> although they have had their ups and downs, the leading figures in Alpha currently are on very good terms with PUTIN. Significant favors continued to be done in both directions, primarily political ones for PUTIN and business/legal ones for Alpha. Also, FRIDMAN and AVEN continued to give informal advice to PUTIN on

-13-

foreign policy, and especially about the US where he distrusted advice being given him by officials.

23. Under any reasonable reading of CIR 112, alone, and in the context of the full Dossier and the headings of sixteen of its seventeen CIR's ("the Trump/Russia context"), Plaintiffs Fridman, Aven, and Khan, along with Alfa, are alleged to maintain a highly inappropriate, and even criminal, relationship with Putin, based on criminal interaction dating back to the 1990s. By clear and defamatory implication, CIR 112 purports to tie the Plaintiffs to a Kremlin-orchestrated campaign to interfere in the 2016 U.S. election.

24. The second paragraph of the Detail section alleges that Mr. Fridman "recently met directly with PUTIN" and that "much of the dialogue and business between them was mediated" by Govorun, the former Alfa employee. The paragraph describes Govorun as a "senior Presidential Administration official" who is "trusted by PUTIN:"

> during the 1990s GOVORUN had been Head of Government Relations at Alpha Group and in reality the 'driver' and 'bag carrier' used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St. Petersburg. Given that and the continuing sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN.

25. These allegations are false. Oleg Govorun was not employed by Alfa Bank until after Mr. Putin left St. Petersburg to join the Yeltsin administration in Moscow. The defamatory nature of these allegations, even when read alone, is clear: CIR 112 alleges that, in the 1990s, Alfa (a member of "Alpha Group") and two of its

-14-

largest beneficial owners purportedly engaged in acts of criminal bribery of Vladimir Putin, a public official, to secure favorable business treatment.

26.     Those statements, considered in the Trump/Russia context of the Dossier as a whole, imply that the alleged improper relationship between Alfa, the Plaintiffs, and Putin, which purportedly started in the 1990s, is currently ongoing, and that Govorun, the alleged "bag carrier" of the 1990s, who is now a senior official in Putin's administration, serves as the trusted intermediary between the Plaintiffs and Putin in the alleged cooperation of Plaintiffs in the Trump/Russia conspiracy.

27.     The third paragraph of the Detail section characterizes the "PUTIN-Alpha relationship as both a carrot and stick:"

> Alpha held 'kompromat' on PUTIN and his corrupt business activities from the 1990s whilst although not personally overly bothered by Alpha's failure to reinvest the proceeds of its TNK oil company sales into the Russian economy since, the Russian president was able to use pressure on this count from senior Kremlin colleagues as a lever on FRIDMAN and AVEN to make them do his political bidding.

28.     This passage is defamatory in several ways: read in the context of the Dossiser's Trump/Russia theme, it suggests that Plaintiffs Fridman and Aven use their knowledge of past bribery of Putin—"kompromat"—as a means of criminally extorting continuing favorable treatment for their business interests from his government. It also implies that Alfa and two of its largest beneficial owners, Plaintiffs Fridman and Aven, willingly maintain a close relationship with Putin and cooperated in some unspecified way in the Kremlin's alleged campaign to interfere in the U.S. election in an effort to avoid retribution from Putin for not reinvesting business proceeds in Russia.

29. The statements about the Plaintiffs in the context of the Dossier as a whole are false, defamatory, and gravely damaging. The statements in the Detail section of CIR 112 about Plaintiffs allege a criminal relationship with Mr. Putin in the 1990s, in addition to and apart from the defamatory implications described above, even if considered independently, raising substantial questions about why these almost twenty-year-old allegations were included by Defendants in a Dossier of "oppo research" about Donald Trump. The statements of CIR 112, published in an unverified report attributed to an anonymous "top level Russian official" of unknown credibility or existence, raise a clear and plausible inference of reckless disregard of truth or falsity by Defendants.

## CAUSE OF ACTION

30. Plaintiffs repeat and reallege paragraphs 1-29 above.

31. By their direct and intentional publication to third parties such as clients, news media, journalists, and others, and by the foreseeable republication of the Dossier and CIR 112 by someone in that group, the Defendants published to a worldwide public false and defamatory statements concerning Plaintiffs and Alfa, including that:

  (a) they are implicated in the scandalous allegations involving Russia and President Trump referred to in CIR 112 and the other CIRs in the Dossier;

  (b) they and other officials and employees of Alfa "cooperated" with an alleged Kremlin campaign to interfere in the U.S. presidential election;

  (c) they are parties to a highly inappropriate, and even criminal, relationship with Vladimir Putin;

-16-

Case 1:17-cv-02041-RJL Document 15 Filed 12/12/17 Page 17 of 18

(d) they engaged in acts of criminal bribery of Vladimir Putin, then the Deputy Mayor of St. Petersburg, in the 1990s to secure favorable business treatment; and

(e) they continue to use their knowledge of past bribery of Putin as a means of criminally extorting continuing favorable treatment for their business interests from the Putin government.

32. Readers of the CIRs and Dossier were also led to understand, incorrectly, that as a result of their alleged past—and current—close relationships and corrupt dealings with Mr. Putin, the Plaintiffs and Alfa were and are required to do Putin's bidding, including by cooperating in the Kremlin's alleged efforts to influence the outcome of the recent U.S. presidential election.

33. The false statements by the Defendants referred to above defamed the Plaintiffs and Alfa, and have caused and will continue to cause serious injury to their personal, professional, and institutional reputations.

34. The false and defamatory statements published and republished by the Defendants concerning the Plaintiffs and Alfa, as well as the obvious implications of those statements, were made negligently or with reckless disregard of whether they were true or false.

35. Defendants are liable for the defamation of Plaintiffs and Alfa, and the resulting harm caused by the news media coverage of the Dossier, including the republication by BuzzFeed and countless other media.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiffs Mikhail Fridman, Petr Aven, and German Khan demand judgment against Defendants Bean LLC, Fusion GPS, and Glenn Simpson for:

a. compensatory damages in an amount to be proved at trial, together with interest and the costs and disbursements of this action, plus reasonable attorneys' fees;

b. punitive damages in an amount to be determined at trial; and

c. such other and further relief as this Court may deem just and proper.

Dated: New York, New York
December 12, 2017

By:     /s/ Alan S. Lewis
Alan S. Lewis, Esq. (#NY0252)
John J. Walsh, Esq.
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, N.Y. 10005
Telephone: 212-238-8647
*Counsel for Plaintiffs*
 *Mikhail Fridman, et al.*

*Of Counsel:*

Kim H. Sperduto, Esq. (# 416127)
SPERDUTO THOMPSON PLC
1133 Twentieth Street, NW Second Floor
Washington, D.C. 20036
Telephone: 202-408-8900

-18-